# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| QUIET COMMUNITIES, INC.<br>60 Thoreau St.<br>Suite 261<br>Concord, MA 01742; *and*<br><br>JEANNE M. KEMPTHORNE,<br>            *Plaintiffs.*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY; *and*<br><br>MICHAEL S. REGAN, in his official capacity as<br>Administrator,<br><br>United States Environmental Protection Agency<br>Mail Code 1101A<br>1200 Pennsylvania Ave., N.W.<br>Washington, DC 20460,<br>            *Defendants.* | Case No. 1:23-cv-01649-JMC |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

i

# TABLE OF CONTENTS

I.     INTRODUCTION.................................................................................................. 1

II.    BACKGROUND .................................................................................................. 3

       A.    Factual Background ................................................................................. 3

       B.    Statutory and Regulatory History: 1970–1982 ....................................... 4

       C.    Legal Background .................................................................................... 6

III.   STANDARD OF REVIEW ................................................................................ 10

IV.    JURISDICTION, VENUE, AND NOTICE ...................................................... 11

V.     STANDING ....................................................................................................... 12

VI.    ARGUMENT ...................................................................................................... 19

       A.    EPA's Failure to Propose Regulations for Identified Major Sources of Noise
             Constitutes a Failure to Perform Nondiscretionary Duties Under the Noise
             Control Act............................................................................................ 21

       B.    EPA's Failure to Carry Out All Other NCA Duties for Forty Years
             Constitutes Unreasonable Delay Under the APA .................................. 25

             1.    Sections 4, 5, 8, 14, and 15 of the Noise Control Act Contain
                   Nondiscretionary Duties that Support Relief Under the APA ...................... 26

             2.    EPA's Forty-Year Delay in Carrying Out Nondiscretionary Duties Under
                   the Noise Control Act Is Unreasonable ........................................... 33

VII.   CONCLUSION .................................................................................................. 36

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*,
365 F. Supp. 3d 118 (D.D.C. 2019) ....................................................... 12, 15, 27, 34

*Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*,
334 F.3d 93 (D.C. Cir. 2003) ................................................................ 23, 26

*Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*,
946 F.3d 615 (D.C. Cir. 2020) .............................................................. 13

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
389 F.3d 536 (6th Cir. 2004)................................................................ 18

*Am. Legal Found v. Fed. Commc'ns Comm'n*,
808 F.2d 84 (D.C. Cir. 1987) ............................................................... 13

*Anderson v. Yungkau*,
329 U.S. 482 (1947) ........................................................................... 23

*Association of American Railroads v. Costle*,
562 F.2d 1310 (D.C. Cir. 1977) ........................................................... 23

*Bennett v. Spear*,
520 U.S. 154 (1997) ....................................................................... 19, 23, 26

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ........................................................................... 10

*City of Dover v. U.S. Env't Prot. Agency*,
956 F. Supp. 2d 272 (D.D.C. 2013) ...................................................... 27, 32

*Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*,
794 F. Supp. 2d 151 (D.D.C. 2011) ...................................................... 20, 25, 26

*Equal Rts. Ctr. v. Post Props., Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) ........................................................... 12

*Fed. Election Comm'n v. Akins*,
524 U.S. 11 (1998) ............................................................................. 17

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
528 U.S. 167 (2000) ........................................................................... 15

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) ........................................................................... 14

*In re A Community Voice*,
    878 F.3d 779 (9th Cir. 2017) ............................................................................. 35

*In re Am. Rivers & Idaho Rivers United*,
    372 F.3d 413 (D.C. Cir. 2004) ........................................................................... 34

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ......................................................................... 34

*In re Core Commc'ns, Inc.*,
    531 F.3d 849 (D.C. Cir. 2008) ........................................................................... 34

*In re Int'l Chem. Workers Union*,
    958 F.2d 1144 (D.C. Cir. 1992) ......................................................................... 33

*In re. Ctr. for Auto Safety*,
    793 F.2d 1346 (D.C. Cir. 1986) ............................................................. 20, 25, 35

*Inland Empire Waterkeeper v. Corona Clay Co.*,
    17 F.4th 825 (9th Cir. 2021) .............................................................................. 17

*Kingman Park Civic Ass'n v. U.S. Env't Prot. Agency*,
    84 F. Supp. 2d 1 (D.D.C. 1999) ........................................................................ 22

*L. Singer & Sons v. Union Pac. R.R. Co.*,
    311 U.S. 295 (1940) .......................................................................................... 18

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 12

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ................................................................... 33, 35

*MCI Telecomms. Corp. v. Fed. Commc'ns Comm'n*,
    627 F.2d 322 (D.C. Cir. 1980) ........................................................................... 34

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ......................................................................... 25, 26, 27, 32

*Outdoor Power Equip. Inst., Inc. v. Env't Prot. Agency*,
    438 F. Supp. 1092 (D.D.C. 1977) ................................................................ 26, 28

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015) ................................................................... 12, 15

*Pesticide Action Network N. Am. v. Nat. Res. Def. Council, Inc.*,
    798 F.3d 809 (9th Cir. 2015) ............................................................................. 35

*Pub. Citizen Health Rsch. Grp. v. Auchter*,
  702 F.2d 1150 (D.C. Cir. 1983) ........................................................ 35

*Sierra Club v. Leavitt*,
  355 F. Supp. 2d 544 (D.D.C. 2005) ................................................... 26

*Sierra Club v. Thomas*,
  828 F.2d 783 (D.C. Cir. 1987) ..................................... 20, 22, 24, 35

*Telecomms. Rsch. & Action Ctr. v. Fed. Commc'ns Comm'n*,
  750 F.2d 70 (D.C. Cir. 1984) ........................................ 25, 33, 34

*WildEarth Guardians v. U.S. Env't Prot. Agency*,
  751 F.3d 649 (D.C. Cir. 2014) ........................................................ 26

*Zook v. McCarthy*,
  52 F. Supp. 3d 69 (D.D.C. 2014) .................................................... 20

## OTHER AUTHORITIES

*Clean Air Act Title IV—Noise Pollution*, U.S. Env't Prot. Agency, https://www.epa.gov/clean-air-act-overview/clean-air-act-title-iv-noise-pollution (last updated Aug. 8, 2023) .................. 4

*EPA History: Noise and the Noise Control Act*, U.S. Env't Prot. Agency, https://www.epa.gov/history/epa-history-noise-and-noise-control-act (last updated June 5, 2023) .......................................................................................... 6

U.S. Env't Prot. Agency, *Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development* ........................................................ 4

## REGULATIONS

40 C.F.R. § 210.2(b) ........................................................................ 11

## FEDERAL STATUTES

5 U.S.C. § 702 ................................................................................. 11

5 U.S.C. § 706(1) ........................................................ 10, 11, 20, 25

28 U.S.C. § 1391(e)(1) .................................................................... 11

33 U.S.C. § 1365(a)(2) .................................................................... 22

42 U.S.C. § 4901 ............................................................................... 3

42 U.S.C. § 4901(a)(1) .................................................................... 13

42 U.S.C. § 4901(b) ....................................................................... 4, 5

42 U.S.C. § 4903 ............................................................................................ 2, 10, 21

42 U.S.C. § 4903(c)(3) ...................................................................................... passim

42 U.S.C. § 4904(a)(1), (c) ........................................................................................ 1

42 U.S.C. § 4904(a)(2) ........................................................................................ 7, 28

42 U.S.C. § 4904(a)(2), (c) ........................................................................................ 1

42 U.S.C. § 4904(a)–(c) ...................................................................................... 20, 32

42 U.S.C. § 4904(b) ........................................................................................ 7, 22, 29

42 U.S.C. § 4904(b)–(c) .............................................................................................. 2

42 U.S.C. § 4904(c) ........................................................................................ 7, 28, 29

42 U.S.C. § 4905 ............................................................................................ 2, 20, 22

42 U.S.C. § 4905(a)(2)(B) ........................................................................................ 23

42 U.S.C. § 4905(a)(3) ............................................................................................ 23

42 U.S.C. § 4905(a), (c) ........................................................................................ 2, 8

42 U.S.C. § 4905(c)(1) ............................................................................................ 22

42 U.S.C. § 4907 ............................................................................................ 2, 21

42 U.S.C. § 4907(a) ............................................................................................ 8, 29

42 U.S.C. § 4907(b) ............................................................................................ 9, 29

42 U.S.C. § 4911(a)(2)(A) ...................................................................... 10, 11, 20, 21

42 U.S.C. § 4911(b)(2) ............................................................................................ 11

42 U.S.C. § 4913 ...................................................................................... passim

42 U.S.C. § 4914 ............................................................................................ 2, 8, 21

42 U.S.C. § 4914(b)(1) ............................................................................................ 32

42 U.S.C. § 4914(b)(2) ............................................................................................ 32

42 U.S.C. § 4916(a)–(b) ............................................................................................ 23

42 U.S.C. § 7604(a)(2) ............................................................................................ 22

42 U.S.C. §§ 4901 to 4918 ....................................................................................................... 1, 5

Noise Control Act of 1972, Pub. L. No. 92-574, 86 Stat. 1234 ...................................................... 4

**RULES OF PROCEDURE**

Fed. R. Civ. P. 26(f) ................................................................................................................. 1

Fed. R. Civ. P. 56(a), (c) ......................................................................................................... 10

**FEDERAL REGISTER NOTICES**

40 Fed. Reg. 23,105 (May 28, 1975) ..................................................................................... 8, 24

42 Fed. Reg. 2525 (Jan. 12, 1977) ......................................................................................... 8, 24

42 Fed. Reg. 27,442 (May 21, 1977) ........................................................................................ 8

42 Fed. Reg. 6722 (Feb. 3, 1977) ........................................................................................... 8, 24

74 Fed. Reg. 39,150 (Aug. 5, 2009) ........................................................................................ 9, 34

## EXHIBITS FILED WITH MOTION

**Exhibit 1:** Plaintiffs' Complaint for Declaratory and Injunctive Relief, ECF No. 1

**Exhibit 2:** Defendants' Answer, ECF No. 15

**Exhibit 3:** Parties' Joint Rule 26(f), Local Rule 16.3 Report, ECF No. 16

**Exhibit 4:** Plaintiffs' Statement of Material Facts as to Which There Is No Genuine Dispute

**Exhibit 5:** Affidavit of Richard Neitzel in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 6:** Affidavit of Chuck Elkins in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 7:** Affidavit of Jamie Banks, President, on Behalf of Quiet Communities, Inc., in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 8:** Declaration of Jeanne M. Kempthorne in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 9:** Affidavit of Elizabeth Ross Williams in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 10:** Affidavit of John Rowe Herron in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 11:** Affidavit of Jeremiah Leonard in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 12:** Affidavit of Stephen Jones in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 13:** Affidavit of Eve Herron in Support of Plaintiffs' Motion for Summary Judgment

**Exhibit 14:** U.S. Env't Prot. Agency, *Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development* (2022)

**Exhibit 15:** *Clean Air Act Title IV—Noise Pollution*, U.S. Env't Prot. Agency, https://www.epa.gov/clean-air-act-overview/clean-air-act-title-iv-noise-pollution (last updated Aug. 8, 2023)

**Exhibit 16:** *EPA History: Noise and the Noise Control Act*, U.S. Env't Prot. Agency, https://www.epa.gov/history/epa-history-noise-and-the-noise-control-act (last updated June 5, 2023)

## I.  INTRODUCTION

At the root of this case lies a Congressional statute—the Noise Control Act, 42 U.S.C. §§ 4901 to 4918. It was enacted in 1972. It both empowered and commanded the United States Environmental Protection Agency ("EPA" or "the Agency") to protect the American public from noise pollution. For ten years, EPA carried out Congress's commands. Then, in 1982, EPA stopped carrying out all of its mandatory duties under the Act.

There are no genuine issues of material fact. The "Parties do not disagree as to whether EPA took action under" the statutory provisions relevant to Plaintiffs' claims. Joint Fed. R. Civ. P. 26(f), LCvR 16.3(d) Report ¶ 8 (ECF No. 16; Pls.' Ex. 3) (hereinafter "Joint Report"); Plaintiffs' Statement of Material Facts ¶ 11 (Pls.' Ex. 4) (hereinafter "Pls.' SMF").

Both the Noise Control Act ("NCA" or "the Act") and the Administrative Procedure Act ("APA") afford relief when an agency has failed to perform nondiscretionary duties. Here, that failure extends four decades, far beyond any time frame that courts have deemed decisive in these kinds of failure-to-act cases. Accordingly, Plaintiffs Quiet Communities, Inc. ("Quiet Communities" or "QCi"), and Jeanne M. Kempthorne (collectively "Plaintiffs") are entitled to summary judgment. This Court should declare that EPA is in violation of its legal duties under the Noise Control Act and order EPA and its Administrator to:

(i)     publish an updated Criteria Document as required by Sections 5(a)(1) and 5(c) of the Act, 42 U.S.C. § 4904(a)(1), (c) (first claim for relief);

(ii)    publish an updated Levels Document as required by Sections 5(a)(2) and 5(c) of the Act, 42 U.S.C. § 4904(a)(2), (c) (second claim for relief);

(iii)   identify current major sources of noise and set emission standards for those sources, and review and revise or supplement identification reports and

1

regulations for sources identified in the 1970s as required by Sections 5(b), 5(c), and 6 of the Act, 42 U.S.C. §§ 4904(b)–(c), 4905 (third claim for relief);

(iv) propose regulations for truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills, products identified as major sources of noise in 1975 and 1977, as required by Sections 6(a) and 6(c) of the Act, 42 U.S.C. § 4905(a), (c) (fourth claim for relief);

(v) comply with its statutory obligations to administer the low-noise-emission product certification process under Section 15 of the Act, 42 U.S.C. § 4914 (fifth claim for relief);

(vi) designate products that are capable of mitigating exposure to noise or of emitting excessive noise, regulate labeling for such products, and update outdated regulations for such products as required by Section 8 of the Act, 42 U.S.C. § 4907 (sixth claim for relief);

(vii) comply with its statutory obligations and carry out all duties to support State and local governments in their noise abatement efforts as required by Section 14 of the Act, 42 U.S.C. § 4913 (seventh claim for relief); and

(viii) comply with its statutory obligations to coordinate, consult on, and report on the status and progress of all Federal activities relating to noise research and noise control, as required by Section 4 of the Act, 42 U.S.C. § 4903, including publishing an updated report as required by Section 4(c)(3), 42 U.S.C. § 4903(c)(3) (eighth claim for relief).

Pls.' Compl. ¶¶ 124–92 (ECF No. 1; Pls.' Ex. 1).

2

Plaintiffs respectfully request that this Court enter judgment for Plaintiffs as to liability on each of Plaintiffs' claims, declare that EPA has failed to perform nondiscretionary duties in violation of the Noise Control Act (claims one through eight) and the Administrative Procedure Act (ninth claim for relief), and direct the Parties to confer within 14 days of the Court's ruling on this Motion and submit a joint scheduling proposal for addressing remedies. Judicial relief is warranted and needed to end EPA's ongoing violations and afford Plaintiffs the protections Congress enacted when it passed the Noise Control Act fifty years ago.

## II.  BACKGROUND

### A.  FACTUAL BACKGROUND

In 1972, Congress concluded that "inadequately controlled noise presents a growing danger to the health and welfare of the Nation's population" and that "Federal action is essential" to dealing with the problems of noise pollution. 42 U.S.C. § 4901. Today, scientists and public health experts continue to recognize noise as a public health hazard along with an urgent need for the United States to take seriously, study, and address this harmful pollutant. Neitzel Aff. ¶¶ 5–69 (Pls.' Ex. 5); Quiet Communities, Inc., Aff. Exs. A, L, M (Pls.' Ex. 7) (hereinafter "QCi Aff.").

Noise pollution is not simply a nuisance issue, and exposure to harmful noise contributes to serious health problems well beyond hearing loss. QCi Aff. ¶¶ 13–14, 21–22, 26, 30–33, 37, 53, 91–94; Neitzel Aff. ¶¶ 20–21, 31, 40, 45–48, 65–66. In addition to hearing damage, noise pollution causes or contributes to sleep disruption, cardiovascular disease, cerebrovascular disease, metabolic disturbances, exacerbation of psychological disorders, premature mortality, and more. Neitzel Aff. ¶¶ 45–48, 66; QCi Aff. ¶¶ 53, 91–92; *see also* QCi Aff. Exs. A, L–S.

EPA itself acknowledges that noise pollution is directly linked to these and other major health harms. Pls.' SMF ¶¶ 4–6; *Clean Air Act Title IV—Noise Pollution*, U.S. Env't Prot. Agency, https://www.epa.gov/clean-air-act-overview/clean-air-act-title-iv-noise-pollution (last updated Aug. 8, 2023) (Pls.' Ex. 15). EPA also acknowledges that the lives of millions of Americans are adversely impacted by noise pollution. Pls.' SMF ¶ 3; *Clean Air Act Title IV—Noise Pollution*, *supra*. Further, EPA recognizes that noise is a relevant non-chemical stressor contributing to cumulative impacts that disproportionately affect low-income, marginalized, and environmental justice communities. Pls.' SMF ¶ 7; U.S. Env't Prot. Agency, *Cumulative Impacts Research: Recommendations for EPA's Office of Research and Development* 1 n.2 (2022) (Pls.' Ex. 14); *see also* QCi Aff. Exs. T, U.

## B.  STATUTORY AND REGULATORY HISTORY: 1970–1982

EPA has had both the authority and the duty to protect the American public from noise pollution for more than fifty years. In 1970, EPA's noise program was established under Title IV of the Clean Air Act. *See* U.S. Env't Prot. Agency, *Noise Control Program: Progress to Date—1980* v (1980) (QCi Aff. Ex. I) (hereinafter "1980 Progress to Date Report"). "Title IV directed the Agency to conduct a full and complete investigation and study of noise and its effect on public health and welfare and to report the findings to Congress within one year." *Id.* EPA filed that report, providing the necessary information to support national noise control legislation.

Two years later, in 1972, Congress enacted the Noise Control Act "to promote an environment for all Americans free from noise that jeopardizes their health or welfare." Noise Control Act of 1972, Pub. L. No. 92-574, 86 Stat. 1234; 42 U.S.C. § 4901(b). The Act is meant "to establish a means for effective coordination of Federal research and activities in noise control, to authorize the establishment of Federal noise emission standards for products

distributed in commerce, and to provide information to the public respecting the noise emission and noise reduction characteristics of such products." 42 U.S.C. § 4901(b).

In 1978, Congress strengthened its noise control efforts when it passed the Quiet Communities Act, 42 U.S.C. § 4913, as an amendment to the Noise Control Act. That amendment, which was incorporated into the NCA as Section 14, directs EPA to provide extensive informational, technical, and financial assistance to State and local governments to facilitate their noise control efforts. The Noise Control Act and its amendments impose nondiscretionary duties on EPA. 42 U.S.C. §§ 4901 to 4918.

To carry out its duties under the Act, EPA established the Office of Noise Abatement and Control ("ONAC"), at one time housed in the Office of Air, Noise, and Radiation ("OANR"), as well as a Noise Enforcement Division of the Office of Mobile Source and Noise Enforcement. Defs.' Answer ¶ 24 (ECF No. 15; Pls.' Ex. 2); Elkins Aff. ¶¶ 6, 13 (Pls.' Ex. 6). From 1972 to 1980, EPA actively carried out the mandates of the Act, as Congress directed. For example, EPA:

- Researched the effects of noise and how to control it;

- Published information on the effects of noise exposure, safe levels of noise, major sources of noise, and the status and progress of Federal activities relating to noise research and noise control;

- Drafted, proposed, and finalized regulations;

- Integrated Federal agency noise abatement policies and programs and commented on the policies and regulations of Federal agencies regarding noise; and

- Supported State and local noise control programs in a variety of ways, including by awarding grants and contracts, coordinating and attending regional noise

abatement workshops, establishing regional technical assistance centers, and

launching Quiet Communities Program research and demonstration projects.

Defs.' Answer ¶¶ 28, 31, 38, 51–52, 58–59, 62, 79–81, 86–89 (admitting to work performed

pursuant to the NCA from 1972 to 1982 as alleged in Plaintiffs' Complaint); Elkins Aff. ¶¶ 7–10;

*see also* 1980 Progress to Date Report (QCi Aff. Ex. I).

EPA's efforts came to a halt in 1982: ONAC, the Noise Enforcement Division, and all

ten regional technical assistance centers shut down. Defs.' Answer ¶ 2; Elkins Aff. ¶ 18. When

EPA ceased complying with the Act, it had not completed its mandatory duties. Elkins Aff.

¶¶ 22–23; *see also* 1980 Progress to Date Report at 1–32 (QCi Aff. Ex. I) (describing EPA's

open action items and planned next steps for carrying out its duties under each section of the

NCA). Congress had not repealed or otherwise amended the Noise Control Act at that time. *EPA

History: Noise and the Noise Control Act*, U.S. Env't Prot. Agency,

https://www.epa.gov/history/epa-history-noise-and-noise-control-act (last updated June 5, 2023)

(Pls.' Ex. 16); Elkins Aff. ¶¶ 19–21. Nor has Congress repealed or otherwise amended the Noise

Control Act at any time since. Rather, in 1982, the Director of ONAC simply was informed that

ONAC was being shut down. Elkins Aff. ¶¶ 6, 15–18.

## C. LEGAL BACKGROUND

The Noise Control Act does not just give EPA permission to regulate noise pollution; it

requires it. As is relevant to Plaintiffs' claims for relief in this action, the Noise Control Act

imposes the following nondiscretionary duties on EPA, each for which EPA has not taken any

final action since at least 1982. Joint Report ¶ 8; Pls.' SMF ¶ 11.

Section 5(a)(1) of the Act requires EPA to publish "criteria with respect to noise" that

"shall reflect the scientific knowledge most useful in indicating the kind and extent of all

6

identifiable effects on the public health or welfare which may be expected from differing

quantities and qualities of noise" ("Criteria Document"). 42 U.S.C. § 4904(a)(1). Section 5(c) of

the Act requires EPA to "from time to time review and, as appropriate, revise or supplement"

Section 5(a)(1)'s report. 42 U.S.C. § 4904(c). EPA has not revised or supplemented the Criteria

Document since 1973. Defs.' Answer ¶¶ 30, 127.

Section 5(a)(2) of the Act requires EPA to "publish information on the levels of

environmental noise the attainment and maintenance of which in defined areas under various

conditions are requisite to protect the public health and welfare with an adequate margin of

safety" ("Levels Document"). 42 U.S.C. § 4904(a)(2). Section 5(c) of the Act requires EPA to

"from time to time review and, as appropriate, revise or supplement" Section 5(a)(2)'s report. 42

U.S.C. § 4904(c). EPA has not revised or supplemented the Levels Document since 1974. Defs.'

Answer ¶¶ 33, 134.

Section 5(b) of the Act requires EPA to publish reports "(1) identifying products (or

classes of products) which in [EPA's] judgment are major sources of noise, and (2) giving

information on techniques for control of noise from such products, including available data on

the technology, costs, and alternative methods of noise control." 42 U.S.C. § 4904(b).

Section 5(c) requires EPA to "from time to time review and, as appropriate, revise or

supplement" Section 5(b)'s reports. 42 U.S.C. § 4904(c). EPA has not revised or supplemented

Section 5(b) reports since 1977. Defs.' Answer ¶¶ 40, 141. EPA has not identified any major

sources of noise under Section 5(b) of the Act since 1977. *Id.*

Section 6 of the Act requires EPA to publish proposed regulations that include noise

emission standards and limits on noise emissions "requisite to protect the public health and

welfare" for products identified as major sources of noise under Section 5(b) of the Act within

eighteen months of identification. 42 U.S.C. § 4905(a), (c). In 1975, EPA identified truck

transport refrigeration units as a major source of noise. Identification of Products as Major

Sources of Noise, 40 Fed. Reg. 23,105 (May 28, 1975). In 1977, EPA identified power lawn

mowers, pavement breakers, and rock drills as major sources of noise. Identification of Products

as Major Sources of Noise, 42 Fed. Reg. 2525 (Jan. 12, 1977); Identification of Products as

Major Sources of Noise: Pavement Breakers and Rock Drills, 42 Fed. Reg. 6722 (Feb. 3, 1977).

Forty-six years have passed since EPA identified these four products as major sources of noise.

Defs.' Answer ¶¶ 45, 150–51. EPA never published proposed regulations for these four major

sources of noise as required by Section 6 of the Act. *Id.*

Section 15 of the Act assigns EPA responsibility for developing low-noise-emission

products ("LNEPs"), products that "emit[] noise in amounts significantly below the levels

specified in noise emission standards" promulgated pursuant to Section 6 of the Act. 42 U.S.C.

§ 4914. Under Section 15, EPA "shall determine which products qualify as [LNEPs]," and the

Federal Government "shall" acquire certified LNEPs for "use by the Federal Government in lieu

of other products." 42 U.S.C. § 4914(b)(1), (c)(1). In 1977, EPA issued but never finalized a

Notice for Proposed Rulemaking for criteria and procedures for EPA to use in certifying

products as LNEPs suitable for purchase by the Federal Government. Low Noise Emission

Products: Proposed Criteria and Data Requirements, 42 Fed. Reg. 27,442 (May 21, 1977); Defs.'

Answer ¶¶ 52–53.

Under Section 8 of the Act, EPA "shall by regulation designate any product (or class

thereof)—(1) which emits noise capable of adversely affecting the public health or welfare; or

(2) which is sold wholly or in part on the basis of its effectiveness in reducing noise." 42 U.S.C.

§ 4907(a).

8

> For each product (or class thereof) designated under subsection (a) [EPA] shall by regulation require that notice be given to the prospective user of the level of the noise the product emits, or of its effectiveness in reducing noise, as the case may be. Such regulations shall specify (1) whether such notice shall be affixed to the product or to the outside of its container, or to both, at the time of its sale to the ultimate purchaser or whether such notice shall be given to the prospective user in some other manner, (2) the form of the notice, and (3) the methods and units of measurement to be used.

42 U.S.C. § 4907(b). EPA has not finalized any rulemaking for product labeling under Section 8 in more than forty years. Defs.' Answer ¶¶ 60, 167.

EPA's most recent attempt at fulfilling some of its duties under the Act was in 2009 when the Agency proposed a rule to update the 1979 regulations for hearing protection devices under Section 8 of the Act. Product Noise Labeling Hearing Protection Devices, 74 Fed. Reg. 39,150 (Aug. 5, 2009). The revisions were proposed because the labeling standards for hearing protection devices had

> not been amended since 1979 and technologies have evolved and improved in the interim. The proposed revisions provide manufacturers with newly developed testing methodologies that are the most appropriate to assess and label hearing protection devices, and to allow legitimate hearing protection products to be sold as such in U.S. markets. In particular, this action [would have resulted] in the availability of a new generation of significantly improved devices that are precluded from entering the marketplace as "hearing protectors" by the 1979 regulation.

*Id.* EPA received input from trade organizations, manufacturers, researchers, and other Federal agencies, recognized that "[a]ll interested parties generally agree that the existing regulation needs to be revised," and held a public hearing. *Id.* at 39,151; Defs.' Answer ¶¶ 68–72. However, the Agency never published a final rule and the antiquated 1979 regulations remain in place. Defs.' Answer ¶ 72.

Under Section 14 of the Act, EPA "shall," among other duties, (a) "develop and disseminate information and educational materials to all segments of the public on the public

health and other effects of noise and the most effective means for noise control"; (b) "conduct or finance research . . . on the effects, measurement, and control of noise"; (c) "administer a nationwide Quiet Communities Program" that supports State and local noise control programs in a variety of ways, including through grants, purchases of equipment, development and implementation of equipment monitoring procedures, studies and demonstrations to determine State and local needs, and development of education and training materials; (d) "develop and implement a national noise environmental assessment program"; (e) "establish regional technical assistance centers"; and (f) "provide technical assistance to State and local governments to facilitate their development and enforcement of noise control." 42 U.S.C. § 4913.

Section 4 of the Act requires EPA to coordinate and consult with Federal agencies regarding noise research and control. 42 U.S.C. § 4903.

> On the basis of regular consultation with appropriate Federal agencies, [EPA] shall compile and publish, from time to time, a report on the status and progress of Federal activities relating to noise research and noise control. This report shall describe the noise-control programs of each Federal agency and assess the contributions of those programs to the Federal Government's overall efforts to control noise.

42 U.S.C. § 4903(c)(3). EPA has not published a report under Section 4(c) since at least 1982. Defs.' Answer ¶ 91.

The NCA allows citizen suits against EPA for its failure to perform these nondiscretionary duties. 42 U.S.C. § 4911(a)(2)(A). And the APA empowers the Court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

### III.  STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c); LCvR 7(h); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). In this case, Plaintiffs allege that EPA has

failed to perform nondiscretionary duties under the Noise Control Act, 42 U.S.C.

§ 4911(a)(2)(A), or otherwise unlawfully withheld and unreasonably delayed in carrying out the

Act's Congressional commands, 5 U.S.C. § 706(1). This case does not require the Court to

resolve any factual disputes because the "Parties do not disagree as to whether EPA took action

under the relevant statutory provisions here." Joint Report ¶ 8; Pls.' SMF ¶ 11. The only issues in

this case are legal issues that can be appropriately resolved on summary judgment. Joint Report

¶¶ 1, 6, 8, 13–15.

## IV.   JURISDICTION, VENUE, AND NOTICE

This Court has jurisdiction to order EPA to carry out its duties under the Noise Control

Act. The Act's citizen suit provision authorizes district courts to hear actions brought by "any

person" to compel EPA's performance of "any act or duty" under the Act "which is not

discretionary with [EPA]." 42 U.S.C. § 4911(a)(2)(A). In addition, the APA authorizes district

courts to hear actions to "compel agency action unlawfully withheld or unreasonably delayed." 5

U.S.C. §§ 702, 706(1).

Venue is properly vested in this Court because the United States District Court for the

District of Columbia is a judicial district in which a substantial part of the events or omissions

giving rise to the claims took place and because Defendants reside in this district. 28 U.S.C.

§ 1391(e)(1).

Plaintiffs satisfied the Noise Control Act's notice requirements for bringing this action.

42 U.S.C. § 4911(b)(2); 40 C.F.R. § 210.2(b); Pls.' SMF ¶¶ 27–28. More than sixty days elapsed

between the time that Plaintiffs provided their notice of intent to sue on March 17, 2023, and the

time that Plaintiffs filed their complaint on June 7, 2023. Pls.' SMF ¶¶ 27–28. Defendants have

not acted to remedy the violations set forth in the notice. Joint Report ¶ 8.

## V.  STANDING

Quiet Communities and Kempthorne have standing to bring this litigation because they have injuries in fact that are concrete, particularized, and actual or imminent; fairly traceable to Defendants' inaction; and likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiff Quiet Communities has standing on its own behalf (organizational standing) and through its members (associational standing). *See, e.g.*, *Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd*., 365 F. Supp. 3d 118, 127–29 (D.D.C. 2019) (analyzing organizational and associational standing as two distinct theories of standing). Plaintiff Kempthorne has standing as an affected individual.

Quiet Communities has standing on its own behalf because Defendants' inaction has injured the organization's interests and the organization has used its resources to counteract that harm. *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (quoting *Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)); QCi Aff. ¶¶ 19–23, 33–48, 56–64, 67–85, 93–99. Quiet Communities is a nonprofit organization dedicated to helping communities reduce health and environmental harm from noise pollution. QCi Aff. ¶¶ 3–4. It furthers its mission through research; education and outreach; community assistance; consulting; programmatic solutions; expert testimony; peer-reviewed articles; conferences; involvement in relevant organizations; and educating journalists and other media professionals. *Id.* at ¶¶ 17, 56. The organization was founded by President Jamie L. Banks in 2013 following her personal experience with harmful noise pollution and the scarcity of evidence-based resources she encountered in trying to address the issue. *Id.* at ¶¶ 7, 10–15, 19–47, 85–98. QCi works with hundreds of individuals and communities nationwide, from California to Massachusetts, to address noise concerns from a variety of sources. *Id.* at ¶¶ 6, 14–

16, 27–31, 79–84. The organization also supports a wide variety of governmental and nongovernmental entities on noise control efforts, including municipalities, counties, school districts, universities, libraries, retirement communities, homeowner associations, commercial campuses, and parks. *Id.* at ¶¶ 6, 64. QCi has over 200 members and 25 professional advisors. *Id.* at ¶ 5. Its ability to perform discrete programmatic functions and member services that are particular to its mission is hampered by EPA's inaction. *Id.* at ¶¶ 13–15, 19–23, 33–48, 56–63, 67–85, 94–99; *see also Am. Legal Found v. Fed. Commc'ns Comm'n*, 808 F.2d 84, 92 (D.C. Cir. 1987).

Often the same sources of noise are adversely impacting individuals who seek assistance from Quiet Communities across multiple communities. QCi Aff. ¶¶ 14, 18, 62–80. If EPA did its job, there would be centralized regulation of major sources of noise. Quiet Communities could therefore spend fewer resources doing duplicative work on the same products that could more efficiently be regulated by EPA. *Id.* at ¶¶ 18, 62–80.

Relatedly, without EPA's leadership, Quiet Communities battles to convince local officials and stakeholders of a fact Congress found fifty years ago to be true: Noise is a serious public health issue. *Id.* at ¶¶ 18–23, 29–38, 67, 83, 94, 98–99; *see also* 42 U.S.C. § 4901(a)(1). If EPA complied with the Act, Quiet Communities could devote its resources working toward reasonable solutions rather than educating people of the basic premise that noise is not just a nuisance. QCi Aff. ¶¶ 18–23, 29–38, 67, 83, 94, 98–99; *Am. Anti-Vivisection Soc'y v. U.S. Dep't of Agric.*, 946 F.3d 615, 619 (D.C. Cir. 2020) (finding organizational standing where agency's failure to promulgate standards deprived the organization of key information on which its public educational activities depended and compelled the organization to develop guidance for the public that otherwise would have been provided by the agency's standards). Similarly, Quiet

Communities could spend resources advancing programs beyond providing the information and support to local and State governments that, by law, EPA is responsible for providing. QCi Aff. ¶¶ 19–28, 33–48, 56–64, 67–85, 93–99. In short, Quiet Communities could dedicate its efforts to performing its job, not EPA's.

Not only does Quiet Communities have organizational standing to bring this suit, but it also has associational standing. That is, Quiet Communities can establish standing through its members because at least one member would otherwise have individual standing, the interests Quiet Communities seeks to protect are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The regulation of noise by EPA is directly germane to Quiet Communities' mission. QCi Aff. ¶ 4. In addition, as detailed below, Quiet Communities' members have suffered cognizable harms and those harms have been caused by EPA and can be redressed through this litigation. Finally, because the relief sought here is injunctive, not monetary, this litigation does not require the participation of individual members in the lawsuit. *Hunt*, 432 U.S. at 343–44.

Because of EPA's failure to:

- produce and publish information about public health consequences of noise pollution and safe levels of noise (as required by Section 5 of the NCA; Plaintiffs' first and second claims for relief);

- identify major sources of noise (as required by Section 5 of the NCA; Plaintiffs' third claim for relief);

- set emission standards for those major sources of noise (as required by Section 6 of the NCA; Plaintiffs' fourth and fifth claims for relief);

14

- regulate product labeling so consumers can identify products that either mitigate or cause exposure to excessive noise (as required by Section 8 of the NCA; Plaintiffs' sixth claim for relief);

- establish regional technical assistance centers, disseminate information, or provide funding and other Federal support to local and State governments for noise control (as required by Section 14 of the NCA; Plaintiffs' seventh claim for relief); and

- coordinate, consult, and report on Federal agency noise control efforts (as required by Section 4 of the NCA; Plaintiffs' eighth claim for relief)

there is a gaping hole in knowledge and regulation of noise pollution in the United States.

As a result of the sizeable informational and regulatory gap caused by EPA's forty years of inaction, Quiet Communities—both on its own right and through its members—and Kempthorne have suffered cognizable harms in the form of physical, economic, aesthetic, recreational, informational, and other injuries. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181–84 (2000) (in addition to injurious physical impacts, damage to aesthetic and recreational interests and concerns about health risks from pollution may qualify as injury in fact); *Air All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd*., 365 F. Supp. 3d 118, 121 (D.D.C. 2019) (finding informational, organizational, and associational standing where agency's failure to promulgate regulations increased risk of pollutant exposure and diminished Plaintiffs' and members' ability to collect or provide information about emissions); *People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015) (finding standing where agency's inaction caused organizational injury).

In particular, Kempthorne and members of QCi live, work, attend school or educational programs, and engage in activities impeded by noise pollution. Kempthorne Decl. ¶¶ 4–8, 12–20; Williams Aff. ¶¶ 4–19, 23–26, 29–32; John Herron Aff. ¶¶ 4–16; Leonard Aff. ¶¶ 4–23, 69; Jones Aff. ¶¶ 5–23, 44; Eve Herron Aff. ¶¶ 5, 9–43 (Pls.' Exs. 8, 9, 10, 11, 12, and 13, respectively).

They suffer from medical harms associated with exposure to excessive noise. Kempthorne Decl. ¶¶ 16–17; Williams Aff. ¶¶ 19–22; John Herron Aff. ¶¶ 17, 38–39, 61; Leonard Aff. ¶¶ 13–16, 66, 68, 70; Jones Aff. ¶ 23; Eve Herron Aff. ¶¶ 22, 41.

Their ability to enjoy their property has been and continues to be diminished because of noise pollution. Kempthorne Decl. ¶¶ 7–8, 12–14, 16; Williams Aff. ¶¶ 23–26, 30–32; John Herron Aff. ¶¶ 5–7, 17, 25–29, 35–36, 38–39, 62–63; Leonard Aff. ¶¶ 17–19; Jones Aff. ¶¶ 5–23, 30–31; Eve Herron Aff. ¶¶ 9–11, 18–22, 24, 27, 32, 37–39.

They have expended and continue to expend resources attempting to mitigate harm from noise exposure in their homes. Kempthorne Decl. ¶¶ 9–12, 14–16, 18; Williams Aff. ¶¶ 14, 29, 32–59; John Herron Aff. ¶¶ 41–59, 63–66, 79; Leonard Aff. ¶¶ 24–65, 71–74; Jones Aff. ¶¶ 20–21, 24–32, 34–49; Eve Herron Aff. ¶¶ 31, 41, 43.

They are concerned that excessive exposure to noise in their communities increases their risk of physical and mental harms associated with noise pollution. Kempthorne Decl. ¶¶ 16–17, 19–20; Williams Aff. ¶¶ 22, 28–31; John Herron Aff. ¶¶ 30–31; Leonard Aff. ¶¶ 21–22, 66, 69–70; Eve Herron Aff. ¶¶ 15, 22, 29, 34, 41.

Some members have experienced and continue to experience adverse impacts to their professional lives or economic harm from lost productivity due to excessive exposure to noise.

Neitzel Aff. ¶¶ 13–69; John Herron Aff. ¶¶ 23–24; Kempthorne Decl. ¶¶ 5, 7–8, 16; Eve Herron
Aff. ¶¶ 22.

And the children of some Quiet Communities' members experience sleep and learning
disruption due to noise exposure at home. John Herron Aff. ¶¶ 30–31; Leonard Aff. ¶ 19; Eve
Herron Aff. ¶¶ 18, 20, 24–29, 31.

Moreover, Plaintiffs and Quiet Communities' members spend their own time and money
documenting noise exposures, educating their communities on the harms of noise, and
advocating for noise control. Williams Aff. ¶¶ 32–64; John Herron Aff. ¶¶ 32–79; Leonard Aff.
¶¶ 24–74; Jones Aff. ¶¶ 24–29, 33–49; Kempthorne Decl. ¶¶ 2–3, 9–12, 14–16, 18, 20; Eve
Herron Aff. ¶¶ 31, 40, 43.

Additionally, through EPA's decades-long inaction, Plaintiffs and Quiet Communities'
members are harmed by the lack of information about the levels at which noise can cause health
harms, the kinds of health harms associated with exposure to excessive noise, the kinds of
products that can cause harmful exposure, the kinds of products that can mitigate harmful
exposure, and the status and progress of all Federal activities relating to noise research and noise
control. *See Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21–24 (1998) (citations omitted)
(holding that, where an informational harm "is concrete, though widely shared," injury in fact is
satisfied, and finding informational injury where "plaintiff fails to obtain information which must
be publicly disclosed pursuant to a statute"); *Inland Empire Waterkeeper v. Corona Clay Co.*, 17
F.4th 825, 833 (9th Cir. 2021), *cert. denied*, 212 L. Ed. 2d 538, 142 S. Ct. 1444 (2022) (holding
increased risk of harm from information required but not provided constitutes more than an
informational injury where possession of information would reduce the risk of injury to a
plaintiff who wishes to be informed of pollution before use); *Am. Canoe Ass'n, Inc. v. City of*

*Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004) (citing *L. Singer & Sons v. Union Pac. R.R. Co.*, 311 U.S. 295, 303 (1940)) (finding standing to sue for members' informational injuries where a lack of information caused an injury, including an inability to make choices regarding personal safety from pollution).

This lack of information impairs Quiet Communities' ability to provide information and services to its members and to assist them in protecting their interests; hampers the ability of Plaintiffs and Quiet Communities' members to take actions to protect their health and communities; diminishes their enjoyment of activities in their daily lives; and leaves them without the expert voice of a well-known Federal agency to aid their ability to advocate for themselves. Williams Aff. ¶¶ 32–64; John Herron Aff. ¶¶ 32–79; Leonard Aff. ¶¶ 24–63; Jones Aff. ¶¶ 24–29, 33–49; Kempthorne Decl. ¶¶ 3, 9–11, 14–16, 18–20; Eve Herron Aff. ¶¶ 16, 18–19, 24, 28, 30–31, 36–38, 42–43; Neitzel Aff. ¶¶ 13–69; QCi Aff. ¶¶ 13–99.

Their concerns about noise impacts on their health are repeatedly ignored by public officials who do not acknowledge noise as a harmful pollutant. Kempthorne Decl. ¶¶ 9–12, 14–15, 18–20; QCi Aff. ¶¶ 18–23, 29–38, 67, 83, 94, 98–99; Eve Herron Aff. ¶¶ 18, 30–31, 36, 42–43; Williams Aff. ¶¶ 32–64; John Herron Aff. ¶¶ 32–79; Leonard Aff. ¶¶ 24–74; Jones Aff. ¶¶ 24–29, 33–49.

They experience ongoing harm because product information (including identification, labeling, and the need for emission standards) is absent or inadequate due to EPA's outdated publications and regulations or failure to regulate. QCi Aff. ¶¶ 13–99; Kempthorne Decl. ¶¶ 6–7, 13–14, 16–20; John Herron Aff. ¶¶ 8–74; Jones Aff. ¶¶ 15–29, 36–49; Eve Herron Aff. ¶¶ 9–15, 18, 20–22, 29, 34, 36, 38, 41–43.

In short, EPA's inaction prolongs and increases Plaintiffs' and Quiet Communities'
members' exposure to higher levels of noise pollution that harms Plaintiffs' and Quiet
Communities' members' health, recreational, informational, and other interests. The relief that
Plaintiffs seek—compelling EPA to carry out the duties required by Sections 5(a)(1), 5(a)(2),
5(b), 5(c), 6(a), 6(c), 15, 8, 14, and 4 of the Noise Control Act—would redress these injuries
because EPA would be made to study, inform of, regulate, and reduce harmful noise pollution.
To that end, if EPA were to carry out its duties to redress the claims alleged in this litigation,
Quiet Communities, its members, and Kempthorne would likely experience a diminished risk of
exposure to harmful noise and would certainly be better able to protect themselves against
harmful noise.

The kinds of harms suffered by Plaintiffs satisfy not just the Article III standing
requirements but also prudential standing requirements. *Bennett v. Spear*, 520 U.S. 154, 162
(1997). Congress included a citizen suit provision in the Noise Control Act to provide aggrieved
parties the opportunity to vindicate certain harms from noise pollution, including harms arising
from EPA's failure to act. It is hard to imagine a more appropriate plaintiff than Quiet
Communities, whose sole mission is to mitigate the very source of harm the Act addresses, and
whose members have suffered those harms. Quiet Communities is precisely the kind of focused
organization doing precisely the kind of work that Congress directed EPA to provide when it
enacted the Noise Control Act fifty years ago.

## VI.   ARGUMENT

For more than forty years, EPA has ignored an entire public health statute. After initially
working to implement the Noise Control Act upon its enactment in 1972, EPA shuttered ONAC
in 1982. Since then, EPA has completely failed to carry out all duties mandated by the NCA,

including those set out in Sections 4, 5(a)(1), 5(a)(2), 5(b), 5(c), 6(a), 6(c), 8, 14, and 15 of the Act. These decades-long failures are actionable both under either the NCA's citizen suit provision, 42 U.S.C. § 4911(a)(2)(A), and the APA's unreasonable delay provision, 5 U.S.C. § 706(1).

The distinction between claims of unreasonable delay under the APA or failure to perform nondiscretionary duties under citizen suit provisions like that in the NCA turns on whether the agency is required to act by a date-certain deadline. *Sierra Club v. Thomas*, 828 F.2d 783, 794–95 (D.C. Cir. 1987); *Zook v. McCarthy*, 52 F. Supp. 3d 69, 73 (D.D.C. 2014); *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 794 F. Supp. 2d 151, 159–62 (D.D.C. 2011). Where there is no date-certain deadline, courts have found claims for an agency's failure to carry out nondiscretionary duties actionable under the APA's unreasonable delay provision, 5 U.S.C. § 706(1). *Sierra Club v. Thomas*, 828 F.2d at 790–95; *In re. Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986); *Zook*, 52 F. Supp. 3d at 73; *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 794 F. Supp. 2d at 159–62.

Of the statutory duties raised in this case, some are accompanied by date-certain deadlines, like EPA's obligation to set noise emission standards within eighteen months of identifying a major source of noise under Section 6. 42 U.S.C. § 4905. Others are required "from time to time" or "as appropriate," like EPA's obligation to publish reports on the health harms caused by noise, safe levels of noise, major sources of noise, and the status and progress of Federal activities relating to noise research and noise control. *See* 42 U.S.C. §§ 4903(c)(3), 4904(a)–(c). And others contain no deadline, like the duties to designate and label products capable of causing harmful noise or of mitigating harmful noise, to establish a low-noise-emission products program, to coordinate and regularly consult with Federal agencies regarding

noise abatement, and to facilitate State and local noise abatement programs in a number of specific ways. *See* 42 U.S.C. §§ 4903, 4907, 4913, 4914.

Regardless of whether these failures are viewed as actionable under the NCA or the APA, all are nondiscretionary duties of the type that compel declaratory and injunctive relief. All are preceded by the well-established mandatory command of "shall." All are commands for discrete, identifiable actions. None of these commands requires the Court to tell EPA how to do its job with any semblance of nuance. Through the text of the Noise Control Act, Congress set out clear-cut commands requiring that EPA take a series of discrete actions to disseminate certain kinds of information and take certain kinds of regulatory steps to abate noise pollution in the United States.

This is not a case where EPA is doing some work under a statute and Plaintiffs complain that EPA is not doing the right kind of work or is not doing it well enough. Rather, here, Plaintiffs are asking the Court to provide relief where EPA has chosen—in the face of clear Congressional mandates—to do no work at all under the Noise Control Act for forty years. If ever there was an instance of failure to perform, if ever there was an instance of unreasonable delay, this is it. And if not, one is left to wonder what redress is available when Federal agencies thumb their noses at clear and unambiguous Congressional commands.

### A. EPA'S FAILURE TO PROPOSE REGULATIONS FOR IDENTIFIED MAJOR SOURCES OF NOISE CONSTITUTES A FAILURE TO PERFORM NONDISCRETIONARY DUTIES UNDER THE NOISE CONTROL ACT

The Noise Control Act allows "any person" to "commence a civil action" against EPA "where there is alleged a failure of such [Agency] to perform any act or duty under [the Act] which is not discretionary." 42 U.S.C. § 4911(a)(2)(A). While there are no relevant cases interpreting the NCA's citizen suit provision for EPA's failure to perform nondiscretionary

21

duties, several Federal environmental statutes enacted in the same era as the NCA include citizen

suit provisions with similar or near-identical language. *See, e.g.*, 42 U.S.C. § 7604(a)(2) (similar

provision under Clean Air Act); 33 U.S.C. § 1365(a)(2) (similar provision under Clean Water

Act). The D.C. Circuit interpreted similar language in the Clean Air Act's citizen suit provision

to provide a cause of action when the alleged nondiscretionary duty is "clear-cut" and requires

the agency to act by a "date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 791–92

(D.C. Cir. 1987) (construing the Clean Air Act's "failure to perform" citizen suit provision); *see

also Kingman Park Civic Ass'n v. U.S. Env't Prot. Agency*, 84 F. Supp. 2d 1, 4–7 (D.D.C. 1999)

(applying *Sierra Club v. Thomas* to the Clean Water Act's "failure to perform" citizen suit

provision, though taking a more lenient approach in allowing for an inferred deadline).

      Under the standard that courts have applied to "failure to perform" citizen suit provisions

in similar statutes enacted in a similar era as the Noise Control Act, Plaintiffs' fourth claim for

relief—alleging violations of Section 6—is actionable under the citizen suit provision of the

NCA.

      The NCA requires EPA to identify products that are major sources of noise. 42 U.S.C.

§ 4904(b). Once EPA has identified a product as a "major source of noise," Section 6 requires

EPA to publish proposed regulations setting noise emission standards for those identified

products. 42 U.S.C. § 4905. Those regulations "shall include a noise emission standard which

shall set limits on noise emissions from such product and shall be a standard which in [EPA's]

judgment, based on criteria published under section 4904 of this title, is requisite to protect the

public health and welfare." 42 U.S.C. § 4905(c)(1).

      These proposed regulations must be published, and then finalized, by a date-certain

deadline. Regulations "shall be proposed and published by the [Agency] not later than eighteen

months" after identification. 42 U.S.C. § 4905(a)(2)(B). After proposed regulations are published, EPA "shall" finalize regulations between six months of publication of the proposed regulations and twenty-four months of the product's identification as a major source of noise. 42 U.S.C. § 4905(a)(3).

The duties arising under Section 6 are actionable nondiscretionary duties within the meaning of the NCA's citizen suit. These cited sub-sections of Sections 5 and 6 of the Act use the word "shall" ten times to prescribe mandatory duties. *Bennett v. Spear*, 520 U.S. 154, 172, 175 (1997) ("any contention that the relevant provision . . . is discretionary would fly in the face of its text, which uses the imperative 'shall.'"); *see also Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003) ("the word 'shall' is ordinarily the language of command" (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)). This "well-recognized principle," *Allied Pilots*, 334 F.3d at 98, was applied to the NCA in *Association of American Railroads v. Costle*, 562 F.2d 1310 (D.C. Cir. 1977), to find EPA's duty to establish noise emission standards for interstate rail carriers under Section 17 of the NCA mandatory due to the use of the word "shall." *Ass'n of Am. R.Rs.*, 562 F.2d at 1312; 42 U.S.C. § 4916(a)–(b).[1]

Not only is Section 6 framed with the word "shall" and otherwise is unambiguous, but Section 6 of the Act also provides two specific dates (eighteen months from identification to proposed regulations, and between six months following publication of proposed regulations and twenty-four months of identification to prescribed regulations) by which EPA is required to perform specific actions (propose and prescribe regulations for identified major sources of noise

---

[1] Relief was granted in *American Railroads* via Section 706(1) of the APA, not the NCA's citizen suit provision, though the Court provided no analysis as to why one avenue of relief was chosen over the other. The Court focused its discussion on the mandatory nature of the commands at issue, and, in so doing, took particular note of the Noise Control Act's use of the word "shall" with respect to Section 17, the section at issue in that case.

meeting the requirements of Section 6(c)). These Section 6 duties are therefore nondiscretionary duties of the type that are actionable under the NCA's "failure to perform" citizen suit provision. *Cf. Sierra Club v. Thomas*, 828 F.2d at 791 (concluding that duties are nondiscretionary within the meaning of the Clean Air Act's citizen suit provision if they are "clear-cut" and require the agency to act by a "date-certain deadline").

In the late 1970s, EPA identified four types of products—truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills—as major sources of noise.[2] Once EPA identified these products as major sources of noise, the Section 6 deadline for setting emission standards for these products was triggered. That explicit statutory deadline required that EPA publish proposed regulations for these major sources of noise by November 28, 1976; July 12, 1978; and August 3, 1978, respectively. EPA admits it has never published proposed regulations for any of these four products. Defs.' Answer ¶¶ 45, 150–51.[3] EPA has therefore missed the statute's mandated, date-certain deadline by over forty-five years and has thus failed to perform clear-cut, nondiscretionary duties in violation of Section 6 of the Noise Control Act.

If the Court does not apply the standard from other citizen suits—that is, if the Court chooses not to interpret the NCA's citizen suit as limited to duties with date-certain deadlines— Plaintiffs' other claims for relief (those related to inaction under Sections 4, 5(a), 5(b), 5(c), 8, 14, and 15) are also mandatory and clear-cut in nature such that they would warrant relief under

---

[2] In 1975, EPA identified truck transport refrigeration units as a major source of noise under Section 5(b) of the Noise Control Act. 40 Fed. Reg. 23,105 (May 28, 1975). In 1977, EPA identified power lawn mowers, pavement breakers, and rock drills as major sources of noise under Section 5(b) of the Noise Control Act. 42 Fed. Reg. 2525 (Jan. 12, 1977); 42 Fed. Reg. 6722 (Feb. 3, 1977).
[3] While EPA proposed to withdraw identification of these major sources of noise, Proposed Withdrawal of Products from the Agency's Reports Identifying Major Noise Sources and Withdrawal of Proposed Rules, 47 Fed. Reg. 54,108 (Dec. 1, 1982), that proposed withdrawal was never finalized.

24

the NCA citizen suit provision. In the alternative, such relief is appropriate for the remaining claims under the APA's unreasonable delay provision.

### B.  EPA'S FAILURE TO CARRY OUT ALL OTHER NCA DUTIES FOR FORTY YEARS CONSTITUTES UNREASONABLE DELAY UNDER THE APA

Under Section 706(1) of the APA, courts must "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). In particular, Section 706(1) of the APA provides relief for an agency's unreasonable delay in carrying out nondiscretionary duties. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62–67 (2004) (hereinafter "*SUWA*").

Even if a statutory provision lacks a date-certain deadline, the agency nonetheless has a duty of reasonable timeliness under the APA. *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1353 (D.C. Cir. 1986); *Telecomms. Rsch. & Action Ctr. v. Fed. Commc'ns Comm'n*, 750 F.2d 70, 76–77 (D.C. Cir. 1984) (hereinafter "*TRAC*"); *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 794 F. Supp. 2d 151, 161–62 (D.D.C. 2011). In other words, an agency cannot avoid a nondiscretionary duty just because there is no date-certain deadline. At some point, the delay in carrying out that duty is unreasonable and becomes actionable under Section 706(1) of the APA.

EPA's failure to perform all other nondiscretionary duties prescribed by the Noise Control Act and alleged in Plaintiffs' Complaint—namely violations of Sections 4, 5, 8, 14, and 15 of the Act—constitutes agency action unreasonably delayed under the APA. 5 U.S.C. § 706(1). To state their claims, Plaintiffs need to show the duties set forth in those sections of the Act are nondiscretionary and that EPA's delay in carrying out those duties is unreasonable. There is no factual dispute as to whether EPA failed to take action under these sections. Pls.' SMF ¶ 11; Defs.' Answer ¶¶ 2, 30, 33, 40, 45, 52–53, 60, 72, 91, 127, 134, 141, 150–51, 167 (admitting allegations of failure to act in Plaintiffs' Complaint); Joint Report ¶ 8.

1.  **Sections 4, 5, 8, 14, and 15 of the Noise Control Act Contain Nondiscretionary Duties that Support Relief Under the APA**

Nondiscretionary duties are discrete actions that an agency is required to perform. *SUWA*, 542 U.S. at 62–67. As with the analysis of nondiscretionary duties under the NCA's citizen suit provision, a mandatory duty is signified by the word "shall." *Bennett v. Spear*, 520 U.S. 154, 172, 175 (1997); *Allied Pilots Ass'n v. Pension Benefit Guar. Corp.*, 334 F.3d 93, 98 (D.C. Cir. 2003); *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 549–50 (D.D.C. 2005). Additionally, when a statute requires an agency to act at indefinite intervals, such as "from time to time" or "as appropriate," that language is another indicator that Congress intended the agency to take affirmative action on an ongoing basis. *WildEarth Guardians v. U.S. Env't Prot. Agency*, 751 F.3d 649, 655–57 (D.C. Cir. 2014) ("This language—'from time to time' and 'in his judgment'—implies that the Administrator may exercise reasonable discretion in determining *when*" not *whether* to act (emphasis in original)); *Ctr. for Biological Diversity v. U.S. Env't Prot. Agency*, 794 F. Supp. 2d 151, 161 (D.D.C. 2011) (finding that the statutory provision at issue did not "lack any indication of when EPA's obligation . . . is triggered. It requires EPA to act 'from time to time,' a [phrase] that, while vague, allows for judicial review of an agency's allegedly unreasonable delay." (internal citations omitted)); *Outdoor Power Equip. Inst., Inc. v. Env't Prot. Agency*, 438 F. Supp. 1092, 1095–96 (D.D.C. 1977) (finding that the "time to time" language in Section 5(c) of the NCA "obligates the agency to make continuous reassessments" and that "[a]dditional reports [under Section 5] are to follow at intervals chosen by the agency").

A discrete action is characterized as one where the court can readily ascertain what action Congress intended the agency to take. For example, "a specific statutory command requiring an agency to promulgate regulations," even in the absence of a date-certain deadline, is the kind of action that would support a judicial decree to take action under Section 706(1). *Air All. Hous. v.*

*U.S. Chem. & Safety Hazard Investigation Bd*., 365 F. Supp. 3d 118, 131–32 (D.D.C. 2019) (quoting *SUWA*, 542 U.S. at 65).

By contrast, agency duties are discretionary where the statute provides a broad or general mandate such that the agency has a range of choices on how to go about fulfilling that mandate. *SUWA*, 542 U.S. at 63–67 (concluding that FLPMA's non-impairment mandate, which required the Bureau of Land Management to manage wilderness study areas "in a manner so as not to impair the suitability of such areas for preservation as wilderness" leaves the agency with a "great deal of discretion" as to how to achieve the mandate and is therefore not actionable under Section 706(1) of the APA). *Cf. City of Dover v. U.S. Env't Prot. Agency*, 956 F. Supp. 2d 272, 282–83 (D.D.C. 2013) (finding that, though EPA "must act to promote public participation, [its] vast discretion as to the *methods*" created a non-readily ascertainable, general duty "not actionable under the Clean Air Act's citizen suit provision" (emphasis in original) (citations omitted)). Discretionary duties are those for which the statute provides no guidance as to how the agency is supposed to carry out their action apart from a broad or general standard. *SUWA*, 542 U.S. at 63–67; *City of Dover*, 956 F. Supp. 2d at 282. In other words, discretionary duties read like broad visions without discernible work product or end points.

In this case, as is relevant to the APA unreasonable delay claims, EPA has failed to take required final action under Sections 4, 5, 8, 14, and 15 of the NCA since at least 1982. The statutory commands provided in each of these sections are nondiscretionary duties of the type that are actionable under Section 706(1) of the APA.

First, there is no doubt that these duties are mandatory. As set out below, the text of each of these statutory provisions uses the word "shall" to signify mandatory obligations. Some of the provisions further signify Congress's intent to obligate EPA to perform its duties on an ongoing

basis by requiring EPA to act "from time to time," "on the basis of regular consultation," or "as appropriate." *See Outdoor Power Equip. Inst.*, 438 F. Supp. at 1095–96 (finding that Section 5(c) of the NCA "obligates the agency to make continuous reassessments").

- Section 4(c)(3) provides that "on the basis of regular consultation," EPA "shall" publish "from time to time" "a report on the status and progress of Federal activities relating to noise research and noise control." 42 U.S.C. § 4903(c)(3).

- Section 5(a)(1) provides that EPA "shall" develop and publish criteria based on science indicating "all identifiable effects on the public health or welfare which may be expected from differing quantities and qualities of noise." 42 U.S.C. § 4904(a)(1). Section 5(c) further provides that EPA "shall from time to time review and, as appropriate, revise or supplement any criteria or reports published under this section." 42 U.S.C. § 4904(c).

- Section 5(a)(2) provides that EPA "shall . . . publish information on the levels of environmental noise the attainment and maintenance of which in defined areas under various conditions are requisite to protect the public health and welfare with an adequate margin of safety." 42 U.S.C. § 4904(a)(2). Section 5(c) further provides that EPA "shall from time to time review and, as appropriate, revise or supplement any criteria or reports published under this section." 42 U.S.C. § 4904(c).

- Section 5(b) requires that EPA publish reports that identify "major sources of noise" and provide information on abatement. It states that EPA "shall . . . compile and publish a report or series of reports (1) identifying products (or classes of products) which in [its] judgment are major sources of noise, and (2) giving information on techniques for control of noise from such products, including available data on the

28

technology, costs, and alternative methods of noise control." 42 U.S.C. § 4904(b).

EPA "shall from time to time review and, as appropriate, revise or supplement any

criteria or reports published under this section." 42 U.S.C. § 4904(c).

- Section 8 requires that EPA designate and enact labeling regulations to give notice to

consumers about products that are either capable of mitigating harmful effects from

noise or of emitting noise capable of causing harm. It states that EPA "shall by

regulation designate any product (or class thereof)—(1) which emits noise capable of

adversely affecting the public health or welfare; or (2) which is sold wholly or in part

on the basis of its effectiveness in reducing noise." 42 U.S.C. § 4907(a). "For each

product (or class thereof) designated under subsection (a) [EPA] shall by regulation

require that notice be given to the prospective user of the level of the noise the

product emits, or of its effectiveness in reducing noise, as the case may be. Such

regulations shall specify (1) whether such notice shall be affixed to the product or to

the outside of its container, or to both, at the time of its sale to the ultimate purchaser

or whether such notice shall be given to the prospective user in some other manner,

(2) the form of the notice, and (3) the methods and units of measurement to be used."

42 U.S.C. § 4907(b).

- Section 14 (also known as the Quiet Communities Act Amendments of 1978)

contains an enumerated list of mandatory tasks that Congress expected EPA to

perform in order to support communities and local and State governments in their

efforts to control noise pollution. 1980 Progress to Date Report at v–vi (QCi Aff. Ex.

I) ("During Congressional oversight hearings in Spring of 1978, much of the

testimony highlighted the need for developing more effective local noise control

29

programs, expanding the public education/information program, and providing

increased funding for technical assistance at the State and local levels. . . . [T]he

Quiet Communities Act amended Section 14 to significantly increase the EPA role in

aiding States and localities in establishing noise control programs and in providing

the public with information on the harmful effects of noise on their health and

welfare."). To that end, Section 14 provides that EPA "*shall*, in cooperation with

other Federal agencies and through the use of grants, contracts, and direct Federal

actions—"

> (a) develop and disseminate information and educational materials to all segments of the public on the public health and other effects of noise and the most effective means for noise control, through the use of materials for school curricula, volunteer organizations, radio and television programs, publication, and other means;

> (b) conduct or finance research directly or with any public or private organization or any person on the effects, measurement, and control of noise, including but not limited to—

>> (1) investigation of the psychological and physiological effects of noise on humans and the effects of noise on domestic animals, wildlife, and property, and the determination of dose/response relationships suitable for use in decisionmaking, with special emphasis on the nonauditory effects of noise;

>> (2) investigation, development, and demonstration of noise control technology for products subject to possible regulation under sections 4905 and 4907 of this title and section 44715 of Title 49;

>> (3) investigation, development, and demonstration of monitoring equipment and other technology especially suited for use by State and local noise control programs;

>> (4) investigation of the economic impact of noise on property and human activities; and

>> (5) investigation and demonstration of the use of economic incentives (including emission charges) in the control of noise;

(c) administer a nationwide Quiet Communities Program which *shall include*, but not be limited to—

(1) grants to States, local governments, and authorized regional planning agencies for the purpose of—

(A) identifying and determining the nature and extent of the noise problem within the subject jurisdiction;

(B) planning, developing, and establishing a noise control capacity in such jurisdiction, including purchasing initial equipment;

(C) developing abatement plans for areas around major transportation facilities (including airports, highways, and rail yards) and other major stationary sources of noise, and, where appropriate for the facility or source itself; and,

(D) evaluating techniques for controlling noise (including institutional arrangements) and demonstrating the best available techniques in such jurisdiction;

(2) purchase of monitoring and other equipment for loan to State and local noise control programs to meet special needs or assist in the beginning implementation of a noise control program or project;

(3) development and implementation of a quality assurance program for equipment monitoring procedures of State and local noise control programs to help communities assure that their data collection activities are accurate;

(4) conduct of studies and demonstrations to determine the resource and personnel needs of States and local governments required for the establishment and implementation of effective noise abatement and control programs; and

(5) development of education and training materials and programs, including national and regional workshops, to support State and local noise abatement and control programs; . . .

(d) develop and implement a national noise environmental assessment program to identify trends in noise exposure and response, ambient levels, and compliance data and to determine otherwise the effectiveness of noise abatement actions through the collection of physical, social, and human response data;

31

(e) establish regional technical assistance centers which use the capabilities of university and private organizations to assist State and local noise control programs;

(f) provide technical assistance to State and local governments to facilitate their development and enforcement of noise control, including direct onsite assistance of agency or other personnel with technical expertise, and preparation of model State or local legislation for noise control; and

(g) provide for the maximum use in programs assisted under this section of senior citizens and persons eligible for participation in programs under the Older Americans Act.

42 U.S.C. § 4913 (emphasis added).

- Section 15 directs EPA to establish a certification program identifying low-noise-emission products. It states that EPA "shall determine which products qualify as low-noise-emission products." 42 U.S.C. § 4914(b)(1). EPA "shall certify" low-noise-emission products. 42 U.S.C. § 4914(b)(2).

There is specificity in each of these statutory provisions. Congress has not simply handed EPA a "general" duty as to noise pollution with a "a great deal of discretion" as to the methods for carrying it out. *SUWA*, 542 U.S. at 63–67; *City of Dover*, 956 F. Supp. 2d at 282. Many of the tasks are information-gathering, culminating in a distinct work product: a published report or enacted regulations. *See* 42 U.S.C. §§ 4903(c)(3), 4904(a)–(c). Section 8 is information-forcing and requires an identifiable work product: regulations that give notice to consumers through labeling and other means about the capacity of products to mitigate or produce harmful noise. Section 14 is more involved but no less specific. It sets out an enumerated list of specific "shall" commands—a punch list—of what tasks Congress expected EPA to perform: establish and maintain technical assistance centers; develop and disseminate informational, training, and educational materials; conduct or finance research; award grants and contracts; purchase and

provide equipment; collect data; and more. Section 15 requires EPA to establish a Federal program for certifying and purchasing low-noise-emission products.

These are all commands that this Court can order EPA to carry out. The statutory language at issue is not broad, general, or vague. It actually is an impressive compilation of discrete and clearly stated tasks that together create a logical, methodical approach to the role that Congress expected the Federal government to play in protecting the American people from harmful noise. Because Congress was detailed in its commands under the NCA, ordering EPA to carry out these duties does not require the Court to tell EPA *how* to do its job. Rather, Plaintiffs are asking the Court to tell EPA that it *must* do its job. That is something Congress has already made painstakingly clear in enacting the mandatory obligations and detailed individual commands of the Act.

## 2. EPA's Forty-Year Delay in Carrying Out Nondiscretionary Duties Under the Noise Control Act Is Unreasonable

EPA's forty-year delay is unreasonable. Whether agency delay is unreasonable so as to warrant court-ordered relief requires consideration of several factors and depends on the facts and circumstances of each case. *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003); *In re Int'l Chem. Workers Union*, 958 F.2d 1144, 1149–50 (D.C. Cir. 1992); *TRAC*, 750 F.2d 70, 79–80 (D.C. Cir. 1984). The factors to be considered are:

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

33

*TRAC*, 750 F.2d at 79–80 (citations and quotation marks omitted).

Regarding factor one, length of delay, the D.C. Circuit has consistently held that a delay of four or more years is unreasonable. *See, e.g.*, *In re Core Commc'ns, Inc.*, 531 F.3d 849, 850, 857 (D.C. Cir. 2008) (finding failure to act within six years following remand "egregious," and finding this factor "decisive"); *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 419 (D.C. Cir. 2004) (finding a six-year delay following court order to respond to petition "egregious"); *In re Bluewater Network*, 234 F.3d 1305, 1316 (D.C. Cir. 2000) (finding nine-year delay unreasonable); *MCI Telecomms. Corp. v. Fed. Commc'ns Comm'n*, 627 F.2d 322, 341–42 (D.C. Cir. 1980) (finding four-year delay unreasonable). Length of delay has been held to be "decisive" in the D.C. Circuit where the agency has failed to act for more than six years. *In re Core Commc'ns, Inc.*, 531 F.3d at 857; *Air. All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 131 (D.D.C. 2019) ("But in this case the court need not dwell on [*TRAC*'s multiple] factors, because the D.C. Circuit has *never* held that a delay of the magnitude present here—more than 20 years—can be reasonable." (emphasis in original)).

Here, EPA admits it has failed to carry out any final action pursuant to its duties under the Noise Control Act in over forty years. Pls.' SMF ¶ 11; Defs.' Answer ¶¶ 2, 30, 33, 40, 45, 52–53, 60, 72, 91, 127, 134, 141, 150–51, 167 (admitting allegations of failure to act in Plaintiffs' Complaint); Joint Report ¶ 8. This length of delay should be decisive in this case. It is decades beyond the length of time this Court has previously found unreasonable and it is not governed by a rule of reason. Even in the case of EPA's most recent incomplete attempt at rulemaking under the Noise Control Act to update regulations for hearing protection devices (Product Noise Labeling Hearing Protection Devices, 74 Fed. Reg. 39,150 (Aug. 5, 2009)),

34

fourteen years have lapsed, a period well-within the D.C. Circuit's findings of "egregious" agency delay.

If length of delay is not decisive, *TRAC*'s other factors also point toward relief. *In re Ctr. for Auto Safety*, 793 F.2d 1346, 1347–49, 1353–54 (D.C. Cir. 1986); *Pub. Citizen Health Rsch. Grp. v. Auchter*, 702 F.2d 1150, 1158 (D.C. Cir. 1983). For example, where human health and welfare are impacted by agency delay, *TRAC*'s factor three weighs in favor of relief. *Mashpee Wampanoag Tribal Council, Inc.*, 336 F.3d at 1100–01; *Sierra Club v. Thomas*, 828 F.2d 783, 798 (D.C. Cir. 1987); *In re A Community Voice*, 878 F.3d 779, 786–87 (9th Cir. 2017); *Pesticide Action Network N. Am. v. Nat. Res. Def. Council, Inc.*, 798 F.3d 809, 814–15 (9th Cir. 2015).

Additionally, compelling agency action is appropriate where unreasonable delay frustrates statutory purpose. *In re Ctr. for Auto Safety*, 793 F.2d at 1347–49 (finding absence of *TRAC*'s "rule of reason" and unreasonable delay in agency's pattern of inaction, noting that the "agency itself impedes progress toward the statutorily mandated goals of fuel conservation and national energy sufficiency. These persistent delays and the obvious adverse consequences that they produce do not bode well for the regulatory scheme under [the Energy Policy and Conservation Act]"); *Pub. Citizen Health Rsch. Grp.*, 702 F.2d at 1154, 1158 (holding that, when Congress creates an initial standard but grants an agency regulatory authority to amend that standard, the agency is under a duty to act where there is an "obvious need, apparent to" the agency to alter the initial standard in light of new information); *In re A Community Voice*, 878 F.3d at 784 (finding that the Toxic Substances Control Act's statutory framework "indicates that Congress did not want EPA to set initial standards and then walk away, but to engage in an ongoing process, accounting for new information, and to modify initial standards when necessary to further Congress's intent").

When one combines EPA's four-decade delay, the serious impacts to human health and welfare, the Agency's total abandonment of the NCA, and complete frustration of the statute's purpose, the *TRAC* factors undoubtedly warrant a finding of unreasonable delay on Plaintiffs' first, second, third, fifth, sixth, seventh, and eighth claims for relief.

## VII.  CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully ask this Court to grant its Motion for Summary Judgment and find that (i) EPA's failure to propose regulations under Section 6 of the Noise Control Act for four identified major sources of noise constitutes failure to perform nondiscretionary duties in violation of the Noise Control Act and redressable through the Act's citizen suit provision; and (ii) EPA's failure to perform all other duties required by the Noise Control Act, and specifically those required by Sections 4, 5(a)(1), 5(a)(2), 5(b), 5(c), 6(a), 6(c), 8, 14, and 15 of the Act, constitutes unreasonable delay in violation of the Administrative Procedure Act. Plaintiffs request that the Court enter judgment for Plaintiffs as to liability on each of Plaintiffs' claims, and direct Parties to confer within 14 days of the Court's ruling on this Motion to submit a joint scheduling proposal for addressing remedies.

Dated: December 15, 2023.

Respectfully submitted,

/s/ Jeffrey M. Feldman
Jeffrey M. Feldman (D.C. Bar No. WA0032)
Summit Law Group
315 Fifth Avenue S, Suite 1000
Seattle, WA 98104-2682
Tel: (206) 676-7000
jefff@summitlaw.com

/s/ Sanne Knudsen
Sanne Knudsen (*Admitted Pro Hac Vice*)

WSBA Bar No. 52654
Regulatory Environmental Law & Policy
Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 221-7443
sknudsen@uw.edu

/s/ Erica Proulx
Erica Proulx (*Admitted Pro Hac Vice*)
WSBA Bar No. 60155
Regulatory Environmental Law & Policy
Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 616-7329
uwdiehlfellow@uw.edu

*Attorneys for Plaintiffs Quiet Communities,*
*Inc., and Jeanne M. Kempthorne*

37