**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| QUIET COMMUNITIES, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> U.S ENVIRONMENTAL PROTECTION AGENCY, et al., <br><br> Defendants. | Case No. 1:23-cv-01649-JMC |

**DEFENDANTS' CROSS- MOTION FOR SUMMARY JUDGMENT AND RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Dated: February 16, 2024

TODD KIM
Assistant Attorney General

ANDREW D. KNUDSEN
DC Bar No. 1019697
U.S. Department of Justice
Environment & Natural Resources Division
Environmental Defense Section
P.O. Box 7611
Washington, D.C. 20044
(202) 353-7466
Andrew.Knudsen@usdoj.gov

*Counsel for Defendants*

*Of Counsel*:
Matthew Schwarz
U.S. Environmental Protection Agency
Office of General Counsel
Washington, D.C.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iv

GLOSSARY .......................................................................................................... x

INTRODUCTION ................................................................................................. 1

STATEMENT OF JURISDICTION..................................................................... 2

BACKGROUND .................................................................................................. 2

   I.  The Noise Control Act ............................................................................. 2

   II. EPA's Implementation of the NCA ...................................................... 4

   III.Congress's Withdrawal of Funding for the NCA ................................... 6

STANDARD OF REVIEW .................................................................................. 8

ARGUMENT ....................................................................................................... 9

   I.  Plaintiffs Are Not Entitled to Relief Under the NCA's Citizen-Suit Provision. ................. 9

      A.  Plaintiffs Concede that Claims 1-3 and 5-8 Must Be Denied Because They Do Not Allege Violation of a Date-Certain Deadline.................................. 10

      B.  Plaintiffs Are Not Entitled to Relief on Claim 4........................................ 11

         1.  Plaintiffs Lack Standing to Assert Claim 4........................................ 11

         2.  NCA Section 6 Does Not Establish a Nondiscretionary Duty to Propose Noise Emission Standards.................................. 14

         3.  EPA Has Withdrawn Its Identification of Truck Transport Refrigeration Units, Pavement Breakers, Rock Drills, and Power Lawn Mowers as Major Sources of Noise.................................. 17

   II. Plaintiffs' Claims of Unreasonable Delay under the APA Should Be Denied. ................. 20

      A.  This Court Lacks Jurisdiction to Review Claims 5, 6, and 8 (as to NCA Section 4(c)(1)). ................................. 21

         1.  Plaintiffs Lack Standing to Assert Claims 5 and 8 (as to NCA Section 4(c)(1)). ................................. 21

         2.  This Court Lacks Subject Matter Jurisdiction over Claim 6................................. 23

      B.  Claims 5 and 6 Should Be Denied Because Plaintiffs Fail to Identify Any Mandatory Duty EPA Has Not Performed. ................................. 24

      C.  Claims 7 and 8 Should Be Denied Because They Seek to Compel Implementation of Broad Statutory Programs, Not Discrete Actions................................. 29

      D.  All of Plaintiffs' APA Claims Should Be Denied Because EPA's Inaction Is Consistent with Congressional Intent and Is Not "Unreasonable Delay.".................. 34

CONCLUSION...................................................................................................... 39

APPENDIX A ........................................................................................................ 40

# LIST OF EXHIBITS

**Exhibit 1:**    Excerpts from "Noise Control Program: Progress to Date – 1980," Report No. ANR-471 (Apr. 1980)

**Exhibit 2:**    S. Rep. No. 97-110 (May 15, 1981)

**Exhibit 3:**    H.R. Rep. No. 97-85 (May 19, 1981)

**Exhibit 4:**    Excerpts from "Reauthorization of the Noise Control Act of 1972: Hearing Before the Subcomm. on Commerce, Transp., and Tourism of the Comm. on Energy and Commerce," 97th Cong. 48 (Feb. 24, 1981)

**Exhibit 5:**    Excerpts from "Reauthorizations: Hearing before the Subcomm. on Toxic Substances and Env't Oversight of the Comm. on Env't and Pub. Works," 97th Cong. H10 (May 5, 1981).

**Exhibit 6:**    Excerpts from "Transportation Noise: Federal Control and Abatement Responsibilities May Need to Be Revised," Report No. GAO/RCED-90-11 (Oct. 1989)

## TABLE OF AUTHORITIES

**Cases**

*Am. Road & Transp. Builders Ass'n v. EPA*,
    865 F. Supp. 2d 72 (D.D.C. 2012) ................................................................. 11, 12

*Arpaio v. Obama*,
    797 F.3d 11 (D.C. Cir. 2015) ...................................................................... 13

*Ashtari v. Pompeo*,
    496 F. Supp. 3d 462 (D.D.C. 2020) ................................................................ 8

*Ass'n of Am. R.R.s v. Costle*,
    562 F.2d 1310 (D.C. Cir. 1977) .................................................................... 17

*Babamuradova v. Blinken*,
    633 F. Supp. 3d 1 (D.D.C. 2022) .................................................................. 28

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................ 8

*Biodiversity Legal Found. v. Norton*,
    285 F. Supp. 2d 1 (D.D.C. 2003) .................................................................. 35

*Century Telesis Joint Venture v. FCC*,
    318 F.3d 192 (D.C. Cir. 2003) ..................................................................... 8

*Chamber of Com. of U.S. v. EPA*,
    642 F.3d 192 (D.C. Cir. 2011) .................................................................... 12

*Clapper v. Amnesty Int'l, USA*,
    133 S. Ct. 1138 (2013) ............................................................................ 13

*Ctr. for Biological Diversity v. Zinke*,
    260 F. Supp. 3d 11 (D.D.C. 2017) ................................................................ 26

*Dallas Safari Club v. Bernhardt*,
    518 F. Supp. 3d 535 (D.D.C. 2021) ................................................................ 9

*Davis v. FEC*,
    554 U.S. 724 (2008) ........................................................................... 11, 21

*Env't Def. Fund v. Thomas*,
    870 F.2d 892 (2d Cir. 1989) ...................................................................... 15

*Env't Integrity Project v. EPA*,
    160 F. Supp. 3d 50 (D.D.C. 2015) ........................................................................ 10

*Finnibin, LLC v. Consumer Prod. Safety Comm'n*,
    45 F.4th 127 (D.C. Cir. 2022) ............................................................................. 12

*Friends of the Earth v. EPA*,
    934 F. Supp. 2d 40 (D.D.C. 2013) ....................................................................... 16

*Fryshman v. U.S. Comm'n for Pres. of Am.'s Heritage Abroad*,
    422 F. Supp. 3d 1 (D.D.C. 2019) ................................................................... 30, 31

*In re Bluewater Network*,
    234 F.3d 1305 (D.C. Cir. 2000) ........................................................................... 29

*Kennecott Copper Corp. v. Costle*,
    572 F.2d 1349 (9th Cir. 1978) ....................................................................... 17, 27

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .............................................................................................. 8

*Mashpee Wampanoag Tribal Council v. Norton*,
    336 F.3d 1094 (D.C. Cir. 2003) ...................................................................... 34, 35

*Monongahela Power Co. v. Reilly*,
    980 F.2d 272 (4th Cir. 1992) ............................................................................... 11

*Norton v. S. Utah Wilderness All.*,
    542 U.S. 55 (2004) ............................................................... 24, 29, 30, 32, 33, 34

*Oryszak v. Sullivan*,
    576 F.3d 522 (D.C. Cir. 2009) ............................................................................. 23

*Outdoor Power Equip. Inst. v. EPA*,
    438 F. Supp. 1092 (D.D.C. 1997) ............................................................. 17, 18, 19

*Public Citizen v. Nuclear Regul. Comm'n*,
    845 F.2d 1105 (D.C. Cir. 1988) ........................................................................... 25

*Sierra Club v. Jackson*,
    648 F.3d 848 (D.C. Cir. 2011) ....................................................................... 15, 27

*Sierra Club v. Thomas*,
    828 F.2d 783 (D.C. Cir. 1987) ............................................................................. 10

*Telecomms. Rsch. & Action Ctr. v. FCC*,
   750 F.2d 70 (D.C. Cir. 1984) ........................................................ 23, 24, 35, 38

*Washington v. U.S. Dep't of Homeland Sec.*,
   387 F. Supp. 3d 33 (D.D.C. 2019) ............................................ 29, 30, 31

*Zook v. McCarthy*,
   52 F. Supp. 3d 69 (D.D.C. 2014) ................................................ 15, 16, 24

**Statutes**

5 U.S.C. § 706 ........................................................................................ 8

5 U.S.C. § 706(1) .................................................................... 20, 23, 27

28 U.S.C. § 1331 .................................................................................. 24

33 U.S.C. 1365(a)(2) ............................................................................ 10

42 U.S.C. § 4901(a)(3) .......................................................................... 38

42 U.S.C. § 4901(b) ................................................................................ 2

42 U.S.C. § 4903(c)(1) .......................................................... 2, 10, 22, 33

42 U.S.C. § 4903(c)(3) .......................................................... 2, 10, 22, 33

42 U.S.C. § 4904(a)(1) ............................................................................ 3

42 U.S.C. § 4904(a)(2) ............................................................................ 3

42 U.S.C. § 4904(b) ................................................................................ 3

42 U.S.C. § 4904(c) .................................................................... 3, 10, 18

42 U.S.C. § 4904(d) .............................................................................. 18

42 U.S.C. § 4905(a) .................................................................... 3, 11

42 U.S.C. § 4905(a)(1) .......................................................................... 15

42 U.S.C. § 4905(a)(2) ............................................................................ 3

42 U.S.C. § 4905(a)(3) ............................................................................ 3

42 U.S.C. § 4905(a)(1)(B) ................................................................ 14, 15

42 U.S.C. § 4905(a)(2)(B) ............................................................................... 15

42 U.S.C. § 4907 .............................................................................................. 10

42 U.S.C. § 4907(a) ........................................................................................... 3

42 U.S.C. § 4907(a)(1) ............................................................................ 5, 25, 26

42 U.S.C. § 4907(b) ..................................................................................... 3, 25

42 U.S.C. § 4911(a) .......................................................................................... 14

42 U.S.C. § 4911(a)(2)(A) ............................................................................. 4, 8

42 U.S.C. § 4913 ...................................................................... 3, 4, 10, 32, 38

42 U.S.C. § 4913(b) .......................................................................................... 33

42 U.S.C. § 4913(c) .................................................................................... 32, 33

42 U.S.C. § 4913(e) .......................................................................................... 33

42 U.S.C. § 4913(f) ........................................................................................... 33

42 U.S.C. § 4913(g) .......................................................................................... 32

42 U.S.C. § 4914 .......................................................................................... 3, 10

42 U.S.C. § 4914(a)(3) ...................................................................................... 21

42 U.S.C. § 4914(b) ........................................................................................... 3

42 U.S.C. § 4914(b)(1) ...................................................................................... 25

42 U.S.C. § 4914(b)(2) ...................................................................................... 21

42 U.S.C. § 4914(b)(2)(A) ................................................................................ 25

42 U.S.C. § 4914(b)(5) ...................................................................................... 25

42 U.S.C. § 4914(h) ........................................................................................... 25

42 U.S.C. § 4915(a) ...................................................................................... 4, 24

42 U.S.C. § 4916(a)(1) ...................................................................................... 17

42 U.S.C. § 6972(a)(2) ............................................................................................ 10

42 U.S.C. § 7408(a)(1)(A) ....................................................................................... 16

42 U.S.C. § 7571(a)(1)(A) ....................................................................................... 16

42 U.S.C. § 7604(a)(2) ............................................................................................ 10

43 U.S.C. § 1782(c) ................................................................................................. 30

**Rules**

Fed. R. Civ. P. 56 ...................................................................................................... 8

**Code of Federal Regulations**

40 C.F.R. pt. 201 ....................................................................................................... 4

40 C.F.R. pt. 202 ....................................................................................................... 4

40 C.F.R. pt. 203 ....................................................................................................... 5

40 C.F.R. § 203.4 ..................................................................................................... 25

40 C.F.R. pt. 204 ....................................................................................................... 4

40 C.F.R. pt. 205 ....................................................................................................... 4

40 C.F.R. pt. 211 ................................................................................................. 5, 25

**Federal Registers**

39 Fed. Reg. 6670 (Feb. 21, 1974) ........................................................................ 25

40 Fed. Reg. 23105 (May 28, 1975) ........................................................................ 4

42 Fed. Reg. 2525 (Jan. 12, 1977) ........................................................................... 5

42 Fed. Reg. 6722 (Feb. 3, 1977) ............................................................................. 5

44 Fed. Reg. 56120 (Sept. 28, 1979) ................................................................ 26, 27

46 Fed. Reg. 4078 (Jan. 16, 1981) .......................................................................... 22

47 Fed. Reg. 54108 (Dec. 1, 1982) ........................................................... 8, 17, 18, 19

**Legislative History**

127 Cong. Rec. 15584 (July 14, 1981) ........................................................................ 7

127 Cong. Rec. 31756 (Dec. 16, 1981) ....................................................................... 7

House Bill 3071, 97th Congress (1981) ....................................................................... 7

Senate Bill 1204, 97th Congress (1981) ...................................................................... 7

H.R. Rep. No. 92-842 (1972), *reprinted in* A Legislative History of the Noise Control Act of 1972 (1974) ............................................................................................................. 27

S. Rep. No. 92-1160 (1972), *reprinted in* A Legislative History of the Noise Control Act of 1972, (1974) ........................................................................................................... 28

**GLOSSARY**

APA                                    Administrative Procedure Act

EPA                                    U.S. Environmental Protection Agency

NCA                                    Noise Control Act

OSHA                                   Occupational Safety and Health Administration

## INTRODUCTION

In 1972, Congress enacted the Noise Control Act ("NCA"), assigning the U.S. Environmental Protection Agency ("EPA") several responsibilities to control and abate noise pollution and to help foster development of state and local noise control programs. Ten years later, in 1982, Congress eliminated all funding for EPA's implementation of the NCA, approving EPA's plan to phase out all of its activities addressing noise pollution and defer future regulation to state and local governments. Now, more than 40 years later with no resumption of appropriations, Plaintiffs ask this Court to order EPA to carry out various purportedly mandatory duties under the NCA.

For numerous reasons, Plaintiffs' claims under the NCA's citizen-suit provision and the Administrative Procedure Act's ("APA") "unreasonable delay" provision should be dismissed or denied. This Court lacks subject matter jurisdiction over several of Plaintiffs' claims, whether for lack of standing (Claims 4, 5, and 8) or because exclusive jurisdiction lies in the D.C. Circuit (Claim 6). For all but Claim 4, Plaintiffs themselves concede their claims are not viable under the NCA's citizen-suit provision. And the majority of Plaintiffs' unreasonable delay claims fail because they either do not identify any mandatory duty that EPA has not performed (Claims 5-6) or simply allege general noncompliance with broad statutory mandates that are not actionable under the APA (Claims 7-8).

As for the merits, EPA has not "unreasonably delayed" action under any provision of the NCA. Under the D.C. Circuit's "rule of reason," this Court must consider the particular circumstances of each case in assessing what is reasonable. Here, where Congress debated, held hearings on, and ultimately endorsed EPA's 1981 plan to stand down from further federal activities under the NCA in favor of state and local responsibility, EPA's inaction is reasonable. If Plaintiffs believe that a revival of federal noise control activities would be necessary or

beneficial, they are free to pursue that goal through other means, such as advocacy to Congress or in an administrative petition for rulemaking.  Accordingly, the Court should enter summary judgment for the United States on all claims.[1]

## STATEMENT OF JURISDICTION

For the reasons discussed below, the Court lacks jurisdiction over Claims 4, 5, and 8 (with respect to NCA Section 4(c)(1)) because Plaintiffs have not established standing, *infra* pp. 11-14, 21-23, and lacks jurisdiction over Claim 6 because it concerns action exclusively reviewable in the D.C. Circuit, *infra* pp. 23-24.

## BACKGROUND

### I.   The Noise Control Act

Congress enacted the NCA in 1972 to "promote an environment for all Americans free from noise that jeopardizes their health or welfare."  42 U.S.C. § 4901(b).  The NCA contains numerous provisions directing EPA to develop information about noise, to promulgate noise emission standards and labeling requirements for various products in commerce, to establish a program for certifying low-noise-emission products, and to coordinate federal agencies' programs involving noise research and control.

Section 4 directs EPA to "coordinate the programs of all Federal agencies relating to noise research and noise control."  *Id.* § 4903(c)(1).  "[F]rom time to time," EPA must also publish a report on "the status and progress of Federal activities relating to noise research and noise control."  *Id.* § 4903(c)(3).

Section 5(a) of the NCA requires EPA to publish two reports: one addressing criteria for indicating the kind and extent of effects which may be expected from noise; and one addressing

---

[1] A brief summary of the bases for dismissing or denying each of Plaintiffs' claims is provided in Appendix A to this filing.

the levels of environmental noise that are requisite to protect the public health and welfare with an adequate margin of safety.  42 U.S.C. § 4904(a)(1), (a)(2).  Section 5(b) requires EPA to publish a "report or series of reports" identifying products "which in [the Administrator's] judgment are major sources of noise."  *Id.* § 4904(b).  EPA is required to "review and, as appropriate, revise or supplement" its criteria or reports "from time to time."  *Id.* § 4904(c).

Section 6 directs EPA to propose and then finalize noise emission standards for each product: (1) which is identified as a major source of noise in a report under Section 5(b); (2) "for which, in [the Administrator's] judgment, noise emission standards are feasible"; and (3) which falls into one of four product categories.  *Id.* § 4905(a).  The statute includes deadlines by which EPA must propose and finalize regulations under this section.  *Id.* § 4905(a)(2), (a)(3).

Section 8 establishes a noise labeling program for products in commerce.  It directs EPA to designate products that "emit[] noise capable of adversely affecting the public health or welfare," or are "sold wholly or in part on the basis of [their] effectiveness in reducing noise." *Id.* § 4907(a).  Once EPA designates a product, it must promulgate labeling requirements for the product that notify users of, *inter alia*, the level of noise the product emits or its effectiveness in reducing noise.  *Id.* § 4907(b).

Finally, Section 15 establishes a program for federal procurement of low-noise-emission products.  *Id.* § 4914.  As part of that program, EPA must determine whether particular products qualify as such in response to certification applications.  *Id.* § 4914(b).

In 1978, Congress passed the Quiet Communities Act, which is codified as Section 14 of the NCA.  *Id.* § 4913.  The Quiet Communities Act was enacted to "promote the development of effective State and local noise control programs, to provide an adequate Federal noise control research program designed to meet the objectives of" the NCA, and to otherwise carry out NCA

policy.  *Id.*  This provision authorizes EPA to engage in a broad array of research and technical support activities to promote state and local noise control programs, including: developing information and educational materials; supporting research on particular topics; providing grants, equipment, and technical assistance to state and local programs; and establishing regional technical assistance centers.  *Id.*

The NCA provides for judicial review of specific agency actions in the D.C. Circuit, including noise emission standards under Section 6 and labeling regulations under Section 8.  *Id.* § 4915(a).  It also includes a citizen-suit provision allowing any person to "commence a civil action on his own behalf … against the Administrator of the [EPA] where there is alleged a failure of such Administrator to perform any act or duty under this chapter which is not discretionary."  *Id.* § 4911(a)(2)(A).

## II.    EPA's Implementation of the NCA

Between 1972 and 1982, EPA took numerous actions to carry out its authorities and duties under the NCA.  EPA published reports under Sections 5(a)(1) and 5(a)(2) in 1973 and 1974, respectively.  U.S. Environmental Protection Agency, "Public Health and Welfare Criteria for Noise" (July 27, 1973); U.S. Environmental Protection Agency, "Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety," Report No. 550/9-74-004 (Mar. 1974); Answer ¶¶ 28, 31.  EPA has not reviewed those reports for potential revision.  Answer ¶¶ 30, 33.

EPA also published several reports identifying products as major sources of noise under Section 5(b) and proceeded to propose and/or finalize noise emission standards for many of those products under Section 6.  *See* 40 C.F.R. pts. 201, 202, 204, 205.  As relevant here, EPA identified truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills as major sources of noise.  40 Fed. Reg. 23105 (May 28, 1975) (truck transport

refrigeration units); 42 Fed. Reg. 2525 (Jan. 12, 1977) (power lawn mowers); 42 Fed. Reg. 6722 (Feb. 3, 1977) (pavement breakers and rock drills).  EPA has not proposed noise emission standards for these products or made a finding that such standards are "feasible" under Section 6(a)(1)(B).

EPA promulgated noise labeling requirements for hearing protective devices under Section 8 in 1979.  *See* 40 C.F.R. pt. 211 subpt. B.  EPA has not designated any products for potential labeling requirements on the basis that they emit noise "capable of adversely affecting the public health or welfare."  42 U.S.C. § 4907(a)(1).

In 1974, EPA promulgated procedural regulations to implement Section 15's program for certification of low-noise-emission products.  *See* 40 C.F.R. pt. 203.  There are no applications for certification currently pending before EPA.

EPA took several steps to coordinate federal agencies' noise control and research programs under Section 4.  As of 1980, EPA had organized a four-part program to integrate federal agency noise abatement policies and programs into a national noise strategy, which included a communication and information exchange program, a joint special studies and demonstration program, research coordination efforts, and an interagency committee on urban noise.  U.S. Environmental Protection Agency, "Noise Control Program: Progress to Date – 1980," Report No. ANR-471, at 27-28 (Apr. 1980) ("1980 Progress Report") (attached as Ex. 1). EPA also published a report on the status and progress of federal noise control activities in 1975. *Id.* at 28.

Finally, EPA implemented several financial and technical assistance programs to promote state and local noise control programs under Section 14.  *Id.* at 1.  In addition to providing support services such as conducting or financing research, training personnel, and loaning

equipment, EPA established ten regional technical assistance centers, launched Quiet Communities research and demonstration projects in three cities, and coordinated 100 regional noise abatement workshops.  *Id.* at 1-13.

## III.   Congress's Withdrawal of Funding for the NCA

In March 1981, the President submitted a proposed budget to Congress that would significantly reduce and then eliminate funding for EPA's implementation of the NCA.  S. Rep. No. 97-110, at 2 (May 15, 1981) (attached as Ex. 2); H.R. Rep. No. 97-85, at 3-4 (May 19, 1981) (attached as Ex. 3).  The budget included a small amount of funding for fiscal year 1982 to conduct an orderly winddown of operations, and no funding for fiscal year 1983 and onward.  S. Rep. No. 97-110, at 2.  The budget proposal made clear that the administration's intent was not a temporary pause in federal activities, but rather a complete "phase out [of] the EPA noise control program by the end of 1982."  *Id.*  The basis for this plan was the administration's "determination that the benefits of noise control are highly localized and that the function of noise control can be adequately carried out at the State and local level without the presence of a Federal program."  *Id.*  In furtherance of this goal, the administration planned to spend the phase-out period "transfer[ring] the knowledge and experience EPA has gained to the State and local programs" in order to "facilitate an effective assumption of noise control responsibilities."  *Id.*

During 1981, Congress deliberated on the administration's proposed budget, including the plan to phase out EPA's noise control program.  The House and Senate held subcommittee hearings specifically addressing the administration's plan for EPA and the appropriate role of the federal government in noise control.  *Reauthorization of the Noise Control Act of 1972: Hearing Before the Subcomm. On Commerce, Transp., and Tourism of the Comm. On Energy and Commerce*, 97th Cong. 48 (Feb. 24, 1981) ("House Hearing") (attached as Ex. 4); *Reauthorizations: Hearing before the Subcomm. On Toxic Substances and Env't Oversight of the*

*Comm. On Env't and Pub. Works*, 97th Cong. H10 (May 5, 1981) ("Senate Hearing") (attached as Ex. 5).

The House and Senate Committees with jurisdiction expressed support for halting further regulation of noise by EPA.  S. Rep. No. 97-110, at 2; H. Rep. No. 97-85, at 3-4.  Each chamber also considered bills that would have amended the NCA to reflect this shift in responsibility to state and local noise programs. The Senate passed a bill under which "the Federal regulatory program for noise [would] be eliminated entirely except for two areas—railroads and interstate motor carriers—and … the regulation of even these two [would] be made discretionary."  S. Rep. No. 97-110, at 2 (describing Senate Bill 1204); 127 Cong. Record 15584 (July 14, 1981) (documenting passage of Senate Bill 1204).  Separately, the House passed a bill that would preserve some funding for assistance to state and local noise programs and significantly narrow EPA's regulatory authority, while retaining any already-promulgated noise emission standards in order to preserve federal preemption of state and local law for those products.  H. Rep. No. 97-85, at 3-6 (describing House Bill 3071); 127 Cong. Record 31756 (Dec. 16, 1981) (documenting passage of House Bill 3071).  The House and Senate did not reach agreement on legislation to substantively amend the NCA.  But ultimately, Congress approved the administration's proposed budget insofar as it did not appropriate any funding for EPA's noise control program for fiscal year 1983 and beyond.

As part of its phaseout activities, EPA withdrew several proposed regulations, proposed amendments to regulations, and other pending proceedings.  On December 1, 1982, consistent with the process set forth in NCA Section 5(d), EPA published a Federal Register notice withdrawing its identification of several products as major sources of noise, including truck

transport refrigeration units, pavement breakers, rock drills, and power lawn mowers as major sources of noise.  47 Fed. Reg. 54108 (Dec. 1, 1982).

Since approximately 1982, EPA has not taken any final regulatory action under the NCA. Congress has never resumed funding for implementation of the statute.

## STANDARD OF REVIEW

Plaintiffs bear the burden of establishing the Court's subject matter jurisdiction over their case.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  To establish Article III standing at the summary judgment stage, a plaintiff must "set forth by affidavit or other evidence specific facts" showing that each element of standing is met.  *Bennett v. Spear*, 520 U.S. 154, 167-68 (1997) (cleaned up).  "The irreducible constitutional minimum for Article III standing is that the [plaintiff] was injured in fact, that its injury was caused by the challenged conduct, and that the injury would likely be redressed by a favorable decision of the court."  *21st Century Telesis Joint Venture v. FCC*, 318 F.3d 192, 197-98 (D.C. Cir. 2003) (cleaned up).

As a general matter, Federal Rule of Civil Procedure 56 requires a court to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In matters involving the APA standard of review, "the summary judgment standard functions slightly differently, because the reviewing court generally reviews the agency's decision as an appellate court addressing issues of law."  *Ashtari v. Pompeo*, 496 F. Supp. 3d 462, 467 (D.D.C. 2020) (cleaned up).  In cases under the APA—including suits to compel agency action unreasonably delayed—the Court's review is limited to the administrative record.[2]  5 U.S.C. § 706; *Dallas*

---

[2] Several of Plaintiffs' factual assertions rely on extra-record material contained in affidavits submitted with Plaintiffs' Motion for Summary Judgment.  *See* Mot. 3-6 (citing Affidavit of Chuck Elkins (Mot. Ex. 6) and exhibits to Affidavit of Jamie Banks on Behalf of Quiet

*Safari Club v. Bernhardt*, 518 F. Supp. 3d 535, 539-40 (D.D.C. 2021) ("The better reading of the APA is that its record review requirement applies regardless of whether a court is reviewing agency action or inaction.") (cleaned up).

## ARGUMENT

**I.     Plaintiffs Are Not Entitled to Relief Under the NCA's Citizen-Suit Provision.**

Claims 1-8 of Plaintiffs' Complaint seek to compel various agency actions pursuant to the NCA's citizen-suit provision, which authorizes civil actions against the Administrator of EPA "where there is alleged a failure of such Administrator to perform any act or duty under [the NCA] which is not discretionary with such Administrator."  42 U.S.C. § 4911(a)(2)(A).  But Plaintiffs concede that for all but one of these claims, the relevant NCA provisions do not contain any clear-cut deadline for agency action, which is an essential element of any enforceable nondiscretionary duty.  And as to the sole claim for which the NCA arguably provides a clear-cut deadline—Claim 4, asserting failure to propose noise emission standards for major sources of noise under NCA Section 6—Plaintiffs have failed to establish standing.  Moreover, even if Plaintiffs had standing, this claim would fail because NCA Section 6 does not impose a nondiscretionary duty and because EPA has withdrawn its major source designation for the products at issue.  Accordingly, the Court should enter summary judgment for the United States on Claims 1-8.

---

Communities, Inc. (Mot. Ex. 7) ("Quiet Cmtys. Aff.").  Plaintiffs' affidavits are not part of the record and are not otherwise documents suitable for judicial notice.  Accordingly, the Court may not consider the extra-record assertions contained in Plaintiffs' affidavits for purposes of determining liability.

**A. Plaintiffs Concede that Claims 1-3 and 5-8 Must Be Denied Because They Do Not Allege Violation of a Date-Certain Deadline.**

In Claims 1-3 and 5-8, Plaintiffs seek to compel EPA to take a variety of actions for which the NCA either provides no deadline or only requires action at irregular intervals within EPA's discretion. It is black-letter law that in order to establish an enforceable "nondiscretionary duty," a statute must "categorically mandate that all specified action be taken by a date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987) (cleaned up) (abrogated on other grounds). Although no court has specifically addressed the relevant language of the NCA's citizen-suit provision at Section 11(a), 42 U.S.C. § 4911(a), the text of that statute is materially identical to the citizen-suit provisions of other environmental statutes that courts have held require a date-certain deadline. *See* 33 U.S.C. § 1365(a)(2) (Clean Water Act); 42 U.S.C. § 6972(a)(2) (Resource Conservation and Recovery Act); 42 U.S.C. § 7604(a)(2) (Clean Air Act). The NCA's nondiscretionary duty clause should be read *in pari materia* with the parallel clauses of those statutes.

By Plaintiffs' own admission, none of the statutory provisions at issue in Claims 1-3 and 5-8 establish a "clear-cut" or "date-certain" deadline for agency action that is enforceable under the NCA's citizen-suit provision. Mot. 20-21, 24. Claims 1, 2, 3, and 8 (with respect to NCA Section 4(c)(3)) involve actions to be taken "from time to time." Mot. 20; 42 U.S.C. §§ 4903(c)(3), 4904(c). Statutory language directing an agency to act at undefined, irregular intervals "does not impose a date-certain deadline" enforceable through a citizen suit. *See Env't Integrity Project v. EPA*, 160 F. Supp. 3d 50, 60 (D.D.C. 2015) (interpreting requirement for action "from time to time" under Clean Air Act). And Claims 5, 6, 7, and 8 (with respect to NCA Section 4(c)(1)) involve statutory provisions with no deadline at all. Mot. 20-21; 42 U.S.C. §§ 4903(c)(1), 4907, 4913, 4914.

Plaintiffs assert in passing that the Court could grant relief on Claims 1-3 and 5-8 "*if the Court chooses not to interpret the NCA's citizen suit as limited to duties with date-certain deadlines.*" Mot. 24 (emphasis added). But Plaintiffs do not offer any reason why the Court should interpret the NCA in that way. And because this citizen-suit provision is a limited waiver of the United States' sovereign immunity that must be construed narrowly, such a broad reading would be inappropriate. *See Am. Road & Transp. Builders Ass'n v. EPA*, 865 F. Supp. 2d 72, 81 (D.D.C. 2012) (citing *Monongahela Power Co. v. Reilly*, 980 F.2d 272, 276 n.3 (4th Cir. 1992)), *aff'd*, 2013 WL 599474 (D.C. Cir. 2013). Accordingly, Claims 1-3 and 5-8 must be denied. To the extent Plaintiffs may challenge EPA inaction under the cited statutory provisions at all, they must do so under the APA's "unreasonable delay" provision.

**B. Plaintiffs Are Not Entitled to Relief on Claim 4.**

The only one of Plaintiffs' claims that is even arguably "actionable under the citizen suit provision of the NCA" is Claim 4, alleging that EPA violated a nondiscretionary duty to propose noise emission standards for certain sources under Section 6 of the NCA, 42 U.S.C. § 4905(a). Mot. 22. But this claim should be denied for at least three reasons. First, Plaintiffs lack standing to assert Claim 4 because they are not harmed by the lack of noise emission standards for these sources. Second, they lack a cause of action under the NCA's citizen-suit provision because EPA's publication of proposed regulations under NCA Section 6 is discretionary. And third, EPA has no duty to propose standards for the products at issue here because EPA withdrew its identification of them as major sources of noise, consistent with the process set forth in NCA Section 5(d).

**1. Plaintiffs Lack Standing to Assert Claim 4.**

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (cleaned up); *Finnbin,*

11

*LLC v. Consumer Prod. Safety Comm'n*, 45 F.4th 127, 136 (D.C. Cir. 2022).  Here, Plaintiffs have failed to meet their burden to demonstrate that they are suffering any harm caused by the lack of proposed (or even final) noise emission standards for truck transport refrigeration units, pavement breakers, rock drills, or power lawn mowers that is likely to be redressed by a favorable ruling.

Plaintiffs submitted numerous affidavits in support of their standing arguments.  *See* Aff. of Jeanne M. Kempthorne, Mot. Ex. 8 ("Kempthorne Aff."); Quiet Cmtys. Aff.; Mot. Exs. 5, 6, 9-13 (affidavits of Quiet Communities members).  However, none of Plaintiffs' affidavits claims that Plaintiffs or their members are even *exposed* to—let alone harmed by—noise from truck transport refrigeration units, pavement breakers, or rock drills.  Nor do they claim that any such harm would be redressed by requiring EPA to propose and ultimately finalize noise emission standards for these sources.  Thus, Plaintiffs have not established the "irreducible constitutional minimum" of standing for their claims with respect to these sources.  *Chamber of Com. of U.S. v. EPA*, 642 F.3d 192, 200 (D.C. Cir. 2011) (holding petitioner lacked standing because it "has not identified a single member who was or would be injured by" challenged action).

Likewise, Plaintiffs fail to carry their standing burden with respect to standards for noise from power lawn mowers.  No affiant claims actual or imminent harm from noise from these sources that likely would be redressed by EPA's proposal and finalization of standards under NCA Section 6.  Four affiants refer to noise from "landscapers" or "landscaping equipment" generally.[3]  But only one of these affiants makes even a passing reference to "mowing." Kempthorne Aff. ¶ 6.

---

[3] *See* Kempthorne Aff. ¶ 6; Aff. of John Rowe Herron, Mot. Ex. 10 ("J. Herron Aff."); Aff. of Stephen Jones, Mot. Ex. 12 ("Jones Aff."); Aff. of Eve Herron, Mot. Ex. 13 ("E. Herron Aff.").

In fact, a review of their testimony makes clear that the affiants' concern is noise from *other* landscaping equipment—namely, leaf blowers—not from power lawn mowers. Plaintiffs' affidavits focus almost exclusively on those individuals' alleged injuries from exposure to noise from gas-powered leaf blowers.[4] Notably, these individuals' advocacy efforts have all focused specifically on reducing noise from leaf blowers, further supporting the conclusion that the affiants' alleged harms are related to those products and not power lawn mowers.[5]

Moreover, Plaintiffs have failed to establish any certain *future* harm from power lawn mower noise to support their claims for prospective declaratory and injunctive relief. Where a plaintiff seeks forward-looking relief, they "may not rest on past injury" and must "establish an ongoing or future injury that is 'certainly impending.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (quoting *Clapper v. Amnesty Int'l, USA*, 133 S. Ct. 1138, 1147 (2013)). But all four of Plaintiffs' affiants have either left or are imminently leaving the communities that were the source of their earlier concerns about landscaping noise.[6] Further, it appears at least some of Plaintiffs' affiants have successfully advocated for local noise control measures that have

---

[4] Kempthorne Aff. ¶ 7 (alleging harm from "gas-powered equipment, most obnoxiously leaf blowers"); *id.* ¶ 14 (alleging exposure to leaf blower noise); J. Herron Aff. ¶¶ 9-31 (describing impact of noise from leaf blowers); *id.* Exs. C & D (documenting noise complaints regarding leaf blowers and hedge trimmers); Jones Aff. ¶ 15 (stating harmful noise "came from two-stroke, gas-powered leaf blowers" and hedge trimmers); E. Herron Aff. ¶¶ 9-27, 32, 36, 37 (describing impact of noise from leaf blowers).

[5] *See* Kempthorne Aff. ¶ 9; J. Herron Aff. ¶¶ 32-34, 37, 41-50, 57-59, Ex. E (describing outreach to neighbors, neighborhood associations, landscapers, and local authorities to reduce leaf blower noise); Jones Aff. ¶¶ 26, 36-45, 48 (describing advocacy for local regulation of leaf blower noise); E. Herron Aff. ¶¶ 31, 42 (same).

[6] Jones Aff. ¶¶ 30, 32 (stating affiant sold home in 2015 and moved to new community with "a homeowner's association which can control the time and frequency of landscaping"); J. Herron Aff. ¶¶ 62-63 (stating affiant bought new home "to escape harmful levels of noise pollution" and is renovating with intent to move there as primary residence in January 2024); E. Herron Aff. ¶ 4 (reiterating same); Kempthorne Aff. ¶¶ 12-13 (stating affiant relocated twice).

reduced their exposure to landscaping noise.[7]  Thus, to the extent their testimony establishes any *past* harm from power lawn mower noise, it cannot support standing to seek *prospective* relief, which is the only form of relief authorized by the NCA's citizen-suit provision.  42 U.S.C. § 4911(a).

Finally, to the extent Plaintiffs may rely on a generalized harm from "landscaping equipment" noise collectively to establish injury, an order from this Court directing EPA to propose noise emission standards for power lawn mowers would not likely redress that injury. Even if EPA were to ultimately finalize such standards, the affiants' testimony makes clear that noise from leaf blowers is the overwhelming driver of their alleged harm from landscaping noise, with power lawn mowers barely warranting a mention.  *See supra* pp. 12-13.  Thus, Plaintiffs have not shown that federal standards limiting noise emissions from power lawn mowers would be likely to significantly alter Plaintiffs' exposure to landscaping noise.

Accordingly, Plaintiffs have failed to establish standing with respect to any of the sources of noise for which they seek proposed standards, and Claim 4 must be dismissed.

### 2. NCA Section 6 Does Not Establish a Nondiscretionary Duty to Propose Noise Emission Standards.

Even if Plaintiffs have standing to advance Claim 4, that claim fails on the merits because Section 6 of the NCA does not impose an enforceable nondiscretionary duty to propose noise emission standards.  Instead, the proposal of such standards is expressly conditioned on the Administrator's *discretionary* finding that, "in his judgment, noise emission standards are feasible."  42 U.S.C. § 4905(a)(1)(B).

Plaintiffs assert a right to bring this action under the NCA's citizen-suit provision at 42 U.S.C. § 4911(a).  Compl. ¶¶ 6-8, 152, 156, and Prayer for Relief.  Citizen-suit provisions like

---

[7] Jones Aff. ¶ 43.

the NCA's only provide a cause of action where the statute "impose[s] on the EPA a nondiscretionary requirement to act." *Zook v. McCarthy*, 52 F. Supp. 3d 69, 73 (D.D.C. 2014). This cause of action is a limited waiver of the United States' sovereign immunity and, accordingly, must be construed narrowly. *See Am. Road & Transp. Builders Ass'n*, 865 F. Supp. 2d at 81. Courts may "compel the Administrator to perform purely ministerial acts," but are not authorized to require EPA to "make particular judgmental decisions." *Zook*, 52 F. Supp. 3d at 73 (quoting *Env't Def. Fund v. Thomas*, 870 F.2d 892, 899 (2d Cir. 1989)).

Plaintiffs argue that because Section 6 of the NCA uses the term "shall," it necessarily imposes an "actionable nondiscretionary dut[y]" to propose noise emission standards for products identified as major sources of noise. Mot. 23. But while the use of "shall" is often associated with a nondiscretionary duty, the Court cannot simply read that term "in isolation." *Sierra Club v. Jackson*, 648 F.3d 848, 856 (D.C. Cir. 2011). Instead, the Court must "consider the language and structure of the statute to determine whether the Administrator retained discretion in the statutory duty." *Id.*

Here, the language and structure of the NCA demonstrate that no duty to propose noise emission standards attaches until the Administrator first makes a discretionary finding that such standards are feasible. Section 6(a)(1) provides that the Administrator "shall publish proposed regulations … for each product" that satisfies three statutory criteria. 42 U.S.C. § 4905(a)(1). And one of those criteria is that the product is one "for which, *in his judgment*, noise emission standards are *feasible*." *Id.* § 4905(a)(1)(B) (emphases added). Further, the 18-month deadline that Plaintiffs cite from Section 6(a)(2)(B) applies only to EPA's proposal of standards for "any product described in paragraph (1)"—*i.e.*, a product for which the Administrator has made the required feasibility finding. *Id.* § 4905(a)(2)(B).

Thus, identification of a product as a major source of noise under Section 5(b) is not enough by itself to trigger a nondiscretionary duty for EPA to propose noise emission standards by a date-certain deadline.  Where a statute conditions a duty to act on a related finding that Congress left to the agency's discretion, a court cannot compel the agency to act where the agency has not made that predicate finding.  *See Zook*, 52 F. Supp. 3d at 74-75; *Friends of the Earth v. EPA*, 934 F. Supp. 2d 40 (D.D.C. 2013).  In *Zook*, plaintiffs sought an order directing EPA to take action under a Clean Air Act provision that requires EPA to list a pollutant for regulation if it meets certain criteria, including that its emissions "in [the Administrator's] judgment, cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare."  52 F. Supp. 3d at 71 (quoting 42 U.S.C. § 7408(a)(1)(A)) (alteration in original).  This Court found that "[i]n the absence of an affirmative determination made by EPA that" the endangerment criterion was met, "there is no mandatory duty" enforceable through a citizen suit, and ordering EPA to act would "improperly usurp EPA's exclusive authority to make the substantive judgment" entrusted to it by Congress.  *Id.* at 74-75.  Similarly, in *Friends of the Earth*, plaintiffs sought to compel action under a Clean Air Act provision requiring EPA to propose aircraft engine emission standards for any pollutant for which EPA makes an endangerment finding.  934 F. Supp. 2d at 48 (quoting 42 U.S.C. § 7571(a)(2)(A)).  This Court found that, despite the statute's use of "shall," plaintiffs could not compel EPA to propose regulations for a particular pollutant because EPA had not made the predicate endangerment finding, and Congress did not create a mandatory duty for EPA to do so.  *Id.* at 48, 51.

Here, because NCA Section 6 does not require EPA to propose noise emission standards unless the Administrator finds regulation is feasible, there is no nondiscretionary duty for

Plaintiffs to enforce.[8]  Plaintiffs' reliance on *Association of American Railroads v. Costle*, 562 F.2d 1310 (D.C. Cir. 1977), is misplaced.  Mot. 23.  First, that case did not involve a citizen suit, but a substantive challenge under the NCA's judicial review provision to regulations EPA had already promulgated.  *Ass'n of Am. R.R.s*, 562 F.2d at 1310 n.1.  Thus, the Court did not address whether the relevant statutory language created a nondiscretionary duty that plaintiffs could compel through a citizen suit.  Second, unlike NCA Section 6, the statute at issue there did not condition EPA's duties on a discretionary finding by the Administrator.  *See id.* at 1311; 42 U.S.C. § 4916(a)(1) (stating simply that EPA "shall publish proposed noise emission regulations for surface carriers engaged in interstate commerce by railroad").

By contrast, Section 6 does not require any action unless the Administrator has determined "in his judgment" that noise emission standards are "feasible"—a finding that "is obviously a matter requiring an exercise of the Administrator's discretion."  *Kennecott Copper Corp. v. Costle*, 572 F.2d 1349, 1354 (9th Cir. 1978).  Accordingly, Claim 4 must be denied.

### 3.   EPA Has Withdrawn Its Identification of Truck Transport Refrigeration Units, Pavement Breakers, Rock Drills, and Power Lawn Mowers as Major Sources of Noise.

Even if NCA Section 6 creates an enforceable nondiscretionary duty to propose standards for products identified as major sources of noise under Section 5(b), there is no such duty to enforce here.  EPA withdrew its identification of the four products at issue in this case over 40 years ago.  47 Fed. Reg. 54108 (Dec. 1, 1982) ("1982 Notice").

As this Court has recognized, the NCA grants EPA broad discretion to "halt the regulatory process [under Section 6] whenever it finds, on the basis of the developing administrative record, that control measures are not needed."  *Outdoor Power Equip. Inst., Inc. v.*

---

[8] Plaintiffs do not assert that EPA has made a finding of feasibility under Section 6(a)(1)(B) for truck transport refrigeration units, pavement breakers, rock drills, or power lawn mowers.

*EPA*, 438 F. Supp. 1092, 1095 (D.D.C. 1977).  Section 5(c) authorizes EPA to "review and, as appropriate, revise or supplement any criteria or reports published under" Section 5, including any report identifying products as major sources of noise.  42 U.S.C. § 4904(c).  Indeed, this provision "*obligates* the agency to make continuous reassessments of its [major noise source identifications] and, once the results are in, to adjust the administrative process as appropriate." *Outdoor Power Equip.*, 438 F. Supp. at 1095 (emphasis added).

Here, EPA announced that it was withdrawing its identification of truck transport refrigeration units, pavement breakers, rock drills, and power lawn mowers as major sources of noise in the 1982 Notice.  47 Fed. Reg. at 54108.  The 1982 Notice announced EPA's rationale for withdrawing these identifications, including the cost of regulating noise from these sources and the "significant strides in noise control program development and capabilities … at the State and local levels."[9]  *Id.* at 54109.

Plaintiffs argue that the 1982 Notice was merely a "proposed withdrawal" that "was never finalized," such that EPA's identification of these products as major sources of noise is still in effect.  Mot. 24 n.3.  But this argument misreads the statute's procedural requirements and the 1982 Notice itself.  The NCA does not require EPA to proceed through the notice-and-comment rulemaking process in order to revise a Section 5(b) report identifying major sources of noise.  Instead, it simply states that "[a]ny report (*or revision thereof*) under subsection (b)(1) identifying major noise sources shall be published in the Federal Register."  42 U.S.C. § 4904(d) (emphasis added).  Notably, this is less than the NCA requires for revision of reports on "criteria or information on control techniques," where EPA must both provide Federal Register notice *and*

---

[9] The 1982 Notice also withdrew EPA's proposed noise emission standards and Section 5(b) identifications for two other product categories (buses and wheel and crawler tractors).  *Id.* at 54108.  Plaintiffs have not included those product categories in their claim.

make copies of the revised criteria or information "available to the general public." *Id.*
Accordingly, all that is required to withdraw EPA's identification of a major source of noise is a
Federal Register notice announcing EPA's intent to do so.

EPA satisfied that requirement with publication of the 1982 Notice.  That document
announced the action EPA was taking and explained EPA's rationale for finding it "appropriate"
to revise its identifications for these products.[10]  Commentators have recognized that the 1982
Notice had the legal effect of withdrawing EPA's identification of the listed products as major
sources of noise.  *See* Sidney Shapiro, "Lessons from a Public Policy Failure: EPA and Noise
Abatement," 19 *Ecology Law Quarterly* 1, 22 (1992) (explaining that in 1982 Notice, "EPA
withdrew its outstanding product identifications").  The 1982 Notice itself demonstrates that it
was an announcement of EPA's present action, not a tentative step that would not become
effective until followed by some subsequent notice of final rulemaking.  For example, the
document is styled as a "notice of intent" and not as a "notice of proposed rulemaking," which
would be the usual designation given by EPA with respect to an action it planned to complete
later in a separate notice of final action.  47 Fed. Reg. at 54108; *compare id.* at 54250 (publishing
"notice of proposed rulemaking" by EPA in same issue of Federal Register).

Accordingly, Plaintiffs cannot show that EPA failed to perform any nondiscretionary
duty under Section 6 to propose standards for truck transport refrigeration units, pavement
breakers, rock drills, or power lawn mowers.  The Court should dismiss Claim 4 for lack of
standing or, in the alternative, should deny Claim 4 on the merits.

---

[10] To the extent Plaintiffs disagree with EPA's rationale for withdrawing its identification of
these products as major sources of noise, they may not challenge the merits of EPA's withdrawal
in the 1982 Notice.  The NCA provides the D.C. Circuit "exclusive jurisdiction" to review EPA's
Section 5(b) determinations, *Outdoor Power Equipment Inst.*, 438 F. Supp. at 1096, and any such
petition would have been due within 90 days after EPA's action, 42 U.S.C. § 4915(a).

II.     **Plaintiffs' Claims of Unreasonable Delay under the APA Should Be Denied.**

Recognizing that the NCA's citizen-suit provision cannot provide relief for alleged statutory duties that lack a clear-cut deadline, Plaintiffs instead advance those claims under Section 706(1) of the APA, which authorizes courts to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Specifically, Plaintiffs argue that EPA has "unreasonably delayed" action on the alleged mandatory duties described in Claims 1-3 and 5-8.[11]

Plaintiffs are not entitled to relief under the APA on any of these claims. First, this Court lacks jurisdiction to review Claims 5 and 8 (as to NCA Section 4(c)(1)) because Plaintiffs have not established standing, and lacks jurisdiction to review Claim 6 because the D.C. Circuit has exclusive jurisdiction over suits to compel action under NCA Section 8. Second, Claims 5 and 6 should be denied because EPA has not failed to perform any mandatory duty under the relevant statutory provisions. Third, Claims 7 and 8 should be denied because those statutory provisions only describe general programmatic duties, not discrete actions. Fourth, all of Plaintiffs' APA claims should be denied because EPA's inaction does not constitute "unreasonable delay" in light of Congress's considered decision more than 40 years ago to completely defund EPA's implementation of the NCA.

---

[11] Plaintiffs plead all of their NCA citizen-suit claims (Claims 1-8) together in the alternative under one blanket APA "unreasonable delay" claim (Claim 9). Compl. ¶¶ 186-92. For clarity, this brief will refer to Plaintiffs' individual APA "unreasonable delay" sub-claims by the claim number in which they first appear in the Complaint.

A.  **This Court Lacks Jurisdiction to Review Claims 5, 6, and 8 (as to NCA Section 4(c)(1)).**

1.  **Plaintiffs Lack Standing to Assert Claims 5 and 8 (as to NCA Section 4(c)(1)).**

As discussed above, Plaintiffs must establish standing for each claim they seek to advance.  *Davis*, 554 U.S. at 734.  Here, Plaintiffs have failed to carry their burden on the essential elements of standing—an injury in fact, caused by the challenged action, that is likely to be redressed by a favorable decision—for Claim 5 and, in part, Claim 8.

Claim 5:  Plaintiffs assert that EPA has unreasonably delayed various actions under NCA Section 15, which sets forth a program for federal certification and procurement of "low-noise-emission products."  Compl. ¶¶ 157-63; 42 U.S.C. § 4914.  None of the affidavits submitted with Plaintiffs' Motion establishes that Plaintiffs or their members have suffered any harm from EPA's purported delay that would likely be redressed by a decision of this Court.  The affidavit submitted on behalf of Plaintiff Quiet Communities suggests the organization is harmed because EPA has not certified any products in the lawn and garden industry as "low-noise-emission products."  Quiet Cmtys. Aff. ¶¶ 59, 70-74.  But even assuming Plaintiffs have identified any cognizable injury, a favorable decision on this claim is unlikely to redress that injury, because the Court cannot order any relief that would lead to EPA making such a certification.

First, by definition, a "low-noise-emission product" is one that "emits noise in amounts significantly below the levels specified in noise emission standards under regulations applicable under" NCA Section 6.  42 U.S.C. § 4914(a)(3).  Because there are no Section 6 regulations for leaf blowers, lawn mowers, or any other product in the "lawn and garden industry," Quiet Cmtys. Aff. ¶ 70, no product in these categories could qualify as a "low-noise-emission product" under Section 15.

Second, the relief Plaintiffs seek depends on the action of independent third parties not before the Court—namely, the manufacturers who may submit applications for certification of their products.  *See Clapper v. Amnesty Int'l, USA*, 568 U.S. 398, 414 (2013) (discussing Supreme Court's "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors").  Section 15 does not direct EPA to certify "low-noise-emission products" on its own initiative, but rather, provides that EPA will certify products *in response to applications* it receives.  42 U.S.C. § 4914(b)(2).  Thus, a favorable decision in this case would not redress Plaintiffs' alleged injury because the Court cannot direct EPA to make "low-noise-emission product" determinations for products in the categories Plaintiffs describe.

Claim 8:  The Complaint also asserts that EPA has unreasonably delayed action to "coordinate the programs of all Federal agencies relating to noise research and noise control" under NCA Section 4(c)(1) and to "compile and publish, from time to time, a report on the status and progress of Federal activities relating to noise research and noise control" under NCA Section 4(c)(3).  Compl. ¶¶ 179-85, 42 U.S.C. § 4903(c)(1), (c)(3).  Plaintiffs have not established standing to pursue the first part of this claim addressing coordination of federal activities under Section 4(c)(1).

It is unclear how Plaintiffs could be harmed by a lack of interagency coordination, or how an order directing EPA to coordinate with other agencies would be likely to redress any of the injuries Plaintiffs assert.  The only evidence that Plaintiffs offer on this point relates to an Occupational Safety and Health Administration ("OSHA") standard for occupational noise exposure.  Quiet Cmtys. Aff. ¶¶ 85-93; *see* 29 C.F.R. § 1910.95; 46 Fed. Reg. 4078, 4161 (Jan. 16, 1981) (promulgating OSHA standard discussed in affidavit).  But while Plaintiffs may believe the OSHA standard is inadequate, they have not established that any other federal agency

is using or relying on it in a way that harms Plaintiffs and that would be altered by coordination with EPA. Quiet Cmtys. Aff. ¶ 86 (asserting that "various organizations and industries," but not federal agencies, look to OSHA standard in purportedly inappropriate settings). And to the extent Plaintiffs claim any harm from the OSHA standard itself, that harm cannot possibly be traced to a lack of coordination under the NCA, given that EPA *in fact did consult* with OSHA about this standard under NCA Section 4 before it was promulgated in 1981. 1980 Progress Report at 28 (noting "EPA has strongly stated its case for a more stringent occupational noise standard than that propose by" OSHA).

Because Plaintiffs have failed to establish standing on these claims, the Court should dismiss Claim 5 and Claim 8 (as to NCA Section 4(c)(1)).

### 2.  This Court Lacks Subject Matter Jurisdiction over Claim 6

Claim 6, which asserts that EPA has unreasonably delayed action under NCA Section 8 to designate and adopt or revise labeling regulations for certain products, must be dismissed. Although the APA provides a cause of action for courts of competent jurisdiction to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), the APA itself is "not a jurisdiction-conferring statute," *Oryszak v. Sullivan*, 576 F.3d 522, 524 (D.C. Cir. 2009) (internal citation omitted). Instead, the Court must look elsewhere to determine whether it has authority to hear an APA claim. And under longstanding precedent, the D.C. Circuit—not this Court—has exclusive jurisdiction over suits to compel agency action under Section 8 of the NCA.

The D.C. Circuit has long held that where a statute assigns appellate courts exclusive jurisdiction to review an agency's action, the appellate courts also have exclusive jurisdiction over claims seeking to *compel* that action. *See Telecomms. Rsch. & Action Ctr. v. FCC*, 750 F.2d 70, 77-79 (D.C. Cir. 1984) ("*TRAC*"). In *TRAC*, the court held that under the All Writs Act,

an appellate court has jurisdiction to "resolve claims of unreasonable delay in order to protect its future jurisdiction" over challenges to the agency's eventual action on the merits.  *Id.* at 76. Moreover, this jurisdiction is necessarily exclusive because "[b]y lodging review of agency action in the Court of Appeals, Congress manifested an intent that the appellate court exercise sole jurisdiction over the class of claims covered by the statutory grant of review power."  *Id.* at 77.  The specific grant of power to the appellate court strips the district court of any general federal question jurisdiction it would otherwise have under 28 U.S.C. § 1331.  *Id.*

The NCA grants the D.C. Circuit exclusive jurisdiction to review EPA's actions under Section 8.  42 U.S.C. § 4915(a) (limiting challenges to "any labeling regulation under section 4907" to D.C. Circuit).  Plaintiffs' claim that EPA has unreasonably delayed in acting under Section 8 seeks "relief that might affect the Circuit Court's future jurisdiction" to review any such action, *TRAC*, 750 F.2d at 75, and thus it can only be brought in the D.C. Circuit under the All Writs Act.  The Court should therefore dismiss Claim 6.

### B.  Claims 5 and 6 Should Be Denied Because Plaintiffs Fail to Identify Any Mandatory Duty EPA Has Not Performed.

On the merits, if the Court concludes it has jurisdiction, it should deny Claims 5 and 6. To succeed on an unreasonable delay claim, as with a citizen-suit claim, Plaintiffs must demonstrate that the relevant statute "impose[s] on the EPA a nondiscretionary requirement to act," albeit without a date-certain deadline.  *Zook*, 52 F. Supp. 3d at 73; *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 n.1 (2004) (stating "delay cannot be unreasonable with respect to action that is not required").  Here, Plaintiffs have not identified any mandatory duty under either of the relevant statutory provisions that EPA has not already carried out.

Claim 5:  As discussed above, this claim asserts that EPA has unreasonably delayed various actions under NCA Section 15, which sets forth a program for federal certification and

procurement of "low-noise-emission products."  Compl. ¶¶ 157-63; 42 U.S.C. § 4914.  But

Plaintiffs do not cite any statutory language assigning EPA several of the purported "duties"

identified in their Complaint, which appear nowhere in the text of NCA Section 15.  *See* Compl.

¶¶ 158 (alleging "responsibility for developing low-noise-emission products"), 160 (alleging

duty to "administer[] LNEP purchases by the government"), 161 (alleging duty to "define LNEP

levels for major sources of noise").  Thus, Plaintiffs have no avenue to compel EPA to take these

actions under the APA.

Section 15 does require EPA to "determine which products qualify as low-noise-emission

products in accordance with the provisions of this section."  42 U.S.C. § 4914(b)(1).  But the

statute goes on to specify that EPA is to make these determinations *in response to applications* it

receives for certification of specific products.  *Id.* § 4914(b)(2)(A), (b)(5); *see also* 40 C.F.R.

§ 203.4.  The NCA does not establish a freestanding obligation for EPA to identify and certify

low-noise-emission products on its own initiative absent an application.  And Plaintiffs have not

identified any application for certification that EPA has failed to respond to, or that this Court

could compel EPA to act on.

The NCA also requires EPA to "promulgate the procedures required to implement"

Section 15.  42 U.S.C. § 4914(h).  But EPA fulfilled that requirement 50 years ago when it

promulgated regulations for certifying low-noise-emission products, codified at 40 C.F.R. part

203.  *See* 39 Fed. Reg. 6670 (Feb. 21, 1974).  Although Plaintiffs may believe those regulations

are inadequate, they cannot use an APA unreasonable delay suit as a vehicle to challenge the

merits of action that EPA has already taken.  *See Public Citizen v. Nuclear Regul. Comm'n*, 845

F.2d 1105, 1108 (D.C. Cir. 1988) (rejecting unreasonable delay claim where "[t]he agency has

acted" and petitioners "just do not like what the Commission did").

Claim 6:  Plaintiffs assert that EPA has unreasonably delayed action under Section 8 of the NCA concerning labeling requirements for certain products.  Compl. ¶¶ 164-71.  But again, Plaintiffs have not identified any mandatory duty that EPA failed to fulfill.  Section 8 requires EPA to promulgate labeling requirements for any product (or class of products) that the Administrator designates as one that "emits noise capable of adversely affecting the public health or welfare" or "is sold wholly or in part on the basis of its effectiveness in reducing noise."  42 U.S.C. § 4907(a), (b).  EPA fulfilled this obligation in 1979 when it promulgated labeling regulations for hearing protectors, the only class of products for which EPA has made a designation under Section 8(a).  *See* 44 Fed. Reg. 56120 (Sept. 28, 1979); 40 C.F.R. pt. 211 subpt. B.  EPA has not designated any products under Section 8(a) for which labeling regulations are still outstanding.

Moreover, nothing in the NCA requires EPA to "amend" or "revise" those labeling regulations.  *Contra* Compl. ¶¶ 168, 171.  Section 8 describes what EPA must include in such regulations but does not command EPA to review or amend them at any time after promulgation. *See* 42 U.S.C. § 4907(b).

To the extent Plaintiffs claim EPA has a mandatory duty to identify and designate additional products for labeling requirements, Plaintiffs misread the statute.  Compl. ¶¶ 168, 170. Section 8 provides that EPA "shall by regulation designate any product (or class thereof) which emits noise capable of adversely affecting the public health or welfare."  42 U.S.C. § 4907(a)(1). Contrary to Plaintiffs' reading, this provision grants EPA *discretionary* authority to identify products for designation as targets of labeling requirements.  Although the statute uses the term "shall," that term alone is not dispositive as to whether there is an enforceable mandatory duty. *See Ctr. for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11, 27 (D.D.C. 2017) (holding

language that agencies "shall take action as necessary" "confers upon agencies so much discretion regarding whether and how to act that it lacks the mandatoriness that is required to support a cause of action under § 706(1)") (cleaned up).

A closer reading of the "language and structure of the statute," *Sierra Club*, 648 F.3d at 855, demonstrates that EPA retains discretion over whether, when, and how to identify products for designation.  The determination whether a particular product is "capable of adversely affecting the public health or welfare," 42 U.S.C. § 4907(a)(1), inherently "requires the fusion of technical knowledge and skills with judgment which is the hallmark of duties which are discretionary." *Kennecott Copper*, 572 F.2d at 1354.  Likewise, at the initial step of identifying products to examine for potential designation, EPA "must consider many different products for possible regulatory action, and have a means of selecting products for initial study."  44 Fed. Reg. at 56121 (announcing EPA's process for selecting products as candidates for labeling regulations).  At this stage, the Administrator must exercise judgment in order to determine which products warrant scrutiny as potential candidates for labeling based on factors like the intensity of noise produced, the manner and duration of the product's use, the number of people potentially exposed, and the possible usefulness of labeling.  *Id.* at 56122.  Indeed, EPA has published a list of *20 different factors* it considers in identifying products for possible noise labeling regulatory action.  *Id.*  The degree of discretionary judgment involved in identifying products for potential regulation under Section 8 demonstrates that EPA does not have a mandatory duty enforceable under the APA.[12]

---

[12] The discretionary nature of Section 8 is also reinforced by the NCA's legislative history, which shows that Congress intended the statutory language to merely "authorize" EPA to designate sources for labeling regulations and "afford[] the Administrator wide latitude" in doing so.  *See* H.R. Rep. No. 92-842, at 16, *reprinted in* A Legislative History of the Noise Control Act

The statute is best read as setting out what EPA must do—*i.e.*, undertake rulemaking to designate a product for development of noise labeling requirements—conditional on the Administrator finding, in his judgment, that the product meets the criteria of Section 8(a). Plaintiffs appear to read Section 8's reference to "any product" as creating a mandatory duty for EPA to survey the entire universe of products to identify and designate *every* product that emits noise capable of adversely affecting public health or welfare.  Compl. ¶¶ 168, 170.  This broad reading is implausible.  This Court has rejected similar attempts to interpret statutory language as creating "extreme" and "untenable" mandatory duties.  *Babamuradova v. Blinken*, 633 F. Supp. 3d 1, 14-15 (D.D.C. 2022).  In *Babamuradova*, the Court considered whether a statute providing that "[a]ll immigrant visa applications shall be reviewed and adjudicated by a consular officer" imposed an enforceable mandatory duty for the State Department to adjudicate literally *all* visa applications.  *Id.* at 14.  The Court rejected that reading and held that the statute simply specified *who* must adjudicate applications, noting the "far-reaching" consequences that would result from the plaintiffs' broader reading.  *Id.*  Here, the consequences of Plaintiffs' argument—which would require EPA to evaluate the effects of noise from every product distributed in commerce—would be similarly far-reaching.

Moreover, it is unclear how this Court could fashion relief to compel the action Plaintiffs seek.  Plaintiffs have requested issuance of an order requiring EPA to "designate and adopt labeling regulations for any product that 'emits noise capable of adversely affecting the public health or welfare.'"  Compl. ¶ 170.  But because that kind of broad remedial order has no endpoint, this Court would necessarily be required to continually supervise EPA's compliance

---

of 1972, at 481 (1974); S. Rep. No. 92-1160 at 13, *reprinted in* A Legislative History of the Noise Control Act of 1972, at 233 (1974).

with the order and determine when the agency had done enough to satisfy the statute.  *See Norton*, 542 U.S. at 66-67 (finding no enforceable duty where granting relief would require "the supervising court, rather than the agency, to work out compliance with the broad statutory mandate").  Plaintiffs "do not provide any parameters or criteria" for how the Court could determine whether EPA has met its purported obligations under Section 8, and this "inability to give a coherent account of what a mandamus order might look like belies their assertion that the provision in fact contains a clear, non-discretionary duty to act."  *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000).

Accordingly, Claims 5 and 6 of Plaintiffs' Complaint fail to identify any mandatory duty that EPA has failed to carry out, and they should be denied.

## C.  Claims 7 and 8 Should Be Denied Because They Seek to Compel Implementation of Broad Statutory Programs, Not Discrete Actions.

Claims 7 and 8 of Plaintiffs' Complaint also lack merit.  To establish an APA claim for unreasonable delay, a plaintiff must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*."  *Norton*, 542 U.S. at 64 (emphases in original).  Even if the statutory provisions at issue in Claims 7 and 8 speak in mandatory terms (which EPA does not concede), they do not require EPA to take discrete actions that the Court may compel under the APA.  As discussed in further detail below, these claims merely allege "general deficiencies in compliance" with "broad statutory mandates," for which the APA provides no remedy.  *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 387 F. Supp. 3d 33, 51 (D.D.C. 2019) ("*CREW*") (quoting *Norton*, 542 U.S. at 66).

*Norton* involved a suit under Section 706(1) of the APA by plaintiffs seeking to compel the Bureau of Land Management to prohibit off-road vehicles in wilderness study areas.  542 U.S. at 59.  The plaintiffs argued that the agency had failed to take action under a statute

providing that the Secretary of the Interior "shall continue to manage such lands … in a manner so as not to impair the suitability of such areas for preservation as wilderness." *Id.* (citing 43 U.S.C. § 1782(c)).  The Supreme Court held that while this provision was "mandatory as to the object to be achieved," that broad mandate did not set forth any "*discrete* agency action" that a federal court could compel the agency to take.  *Id.* at 66 (emphasis in original).  The APA does not provide an avenue for such "broad programmatic attack[s]" based on "[g]eneral deficiencies in compliance" with statutory mandates.  *Id.* at 64, 66.

The Court noted that this limitation serves an important purpose: to prevent "undue judicial interference with [agencies'] lawful discretion" and "avoid judicial entanglement in abstract policy disagreements."  *Id.* at 66.  Where a statute specifies a discrete action that an agency must take, a court may order the agency to act "without directing how the agency shall act."  *Id.* (cleaned up).  But if Section 706(1) authorized courts to "enter general orders compelling compliance with broad statutory mandates,"

> they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Id.* at 66-67.  Thus, the APA does not permit a court to "simply enter a general order compelling compliance with" a general duty.  *Id.* at 66.

Following the Supreme Court's direction in *Norton*, this Court has routinely rejected attempts to enforce agencies' compliance with broad statutory mandates through APA unreasonable delay claims.  *See, e.g.*, *Fryshman v. U.S. Comm'n for Pres. of Am.'s Heritage Abroad*, 422 F. Supp. 3d 1 (D.D.C. 2019); *CREW*, 387 F. Supp. 3d at 51.  In *Fryshman*, the plaintiffs argued that an agency had failed to carry out a mandatory duty to identify sites associated with the foreign heritage of U.S. citizens and seek assurances from foreign

governments that they will be protected.  422 F. Supp. 3d at 10.  This Court found that the relevant statute imposed only a "*general* duty," not a requirement to take specific discrete action, and held that it lacked authority under the APA to issue a broad remedial order requiring the agency to "take reasonable steps to obtain the assurances that the law requires" or to "comply with its mandate."  *Id.* (emphasis in original).  Likewise, in *CREW*, the plaintiffs argued that by failing to create sufficient records to link migrant children to the adults with whom they were apprehended, the Department of Homeland Security had failed to fulfill various mandatory duties to make and preserve records under the Federal Records Act and implementing regulations.  387 F. Supp. 3d at 50.  The Court held that these authorities provided only "general commands to agencies" regarding the types of records they must create, and that an order directing the agency to comply with these broad mandates would improperly require the Court to "decide just how much detail is necessary for every form prepared by" the Department.  *Id.* at 51.

As discussed further below, Claims 7 and 8 merely allege general deficiencies in compliance with the NCA.  Because they fail to identify any discrete agency action that EPA is required to take, they should be denied under *Norton*.

Claim 7:  Plaintiffs allege that EPA has failed to fulfill a host of purported mandatory duties under NCA Section 14.  Compl. ¶¶ 172-78.  That provision establishes a "program of resea[r]ch, technical assistance, and discretionary grants to support State and local efforts" to address noise pollution.  S. Rep. No. 97-110, at 1.  Plaintiffs' lengthy recitation of Section 14's contents demonstrates the breadth of federal activities contemplated by that provision.  Mot. 30-32.  At its heart, Section 14 instructs EPA to "administer a nationwide Quiet Communities Program" offering numerous forms of assistance to state and local noise control programs, including awarding grants for various projects, loaning equipment, developing a quality

assurance program for monitoring data, determining resource and personnel needs, and developing education and training materials.  42 U.S.C. § 4913(c).  In addition, Section 14 directs EPA to engage in other research and technical support activities, including: disseminating educational materials to the public; conducting or financing research on numerous topics; developing a "national noise environmental assessment program"; establishing regional technical assistance centers; and providing technical assistance directly to state and local governments.  *Id.* § 4913.  Finally, Section 14 requires EPA to ensure that the state and local programs it assists "provide for the maximum use" by senior citizens.  *Id.* § 4913(g).

Claim 7 alleges precisely the kind of "[g]eneral deficiencies in compliance" with broad statutory mandates that the Supreme Court held were not actionable in *Norton*.  542 U.S. at 66.  None of the various statutory requirements in Section 14 identifies any discrete action that EPA must take with the specificity requisite to support a claim under APA Section 706(1).  Instead, the statute simply provides general, high-level commands and leaves EPA with substantial discretion in deciding how to carry them out.

Claim 7's incompatibility with *Norton* is evident in the relief that Plaintiffs are seeking.  Plaintiffs claim that ordering EPA to carry out its duties under Section 14 would "not require the Court to tell EPA *how* to do its job," only "that it *must* do its job."  Mot. 33 (emphases in original).  This is simply incorrect.  Indeed, the relief Plaintiffs request in their Complaint—an order "requiring EPA to comply with its statutory obligations and carry out the duties mandated by" Section 14, Compl. ¶ 178—is no different from the "general order compelling compliance" that the Supreme Court held was "not contemplated by the APA" in *Norton*.  542 U.S. at 66, 67.

Moreover, because Section 14 reserves significant discretion for EPA in determining how to achieve its general commands, *any* relief ordering EPA to comply with Section 14 would

necessarily entangle this Court in "abstract policy disagreements" that would need to be resolved

in order to determine "whether compliance was achieved" with Section 14's broad programmatic

requirements.  *Id.* at 66.  To take just a few examples: How is the Court to determine whether

EPA has complied with an order to "administer a nationwide Quiet Communities Program"?  42

U.S.C. § 4913(c).  What grants (and in what amounts, to what entities), training materials, or

equipment purchases would be sufficient to meet that requirement?  How many research studies

would be necessary to comply with an order to "conduct or finance research" on the non-

exhaustive list of topics provided in Section 14?  *Id.* § 4913(b).  How would the Court determine

whether EPA has adequately "provide[d] technical assistance to State and local governments to

facilitate their development and enforcement of noise control"?  *Id.* § 4913(f).  And how many

regional technical assistance centers must EPA establish?  *Id.* § 4913(e).  Answering these

questions would require "pervasive oversight by [this Court] over the manner and pace of agency

compliance" with Section 14, in excess of this Court's authority under APA Section 706(1).

    Claim 8:  Plaintiffs also allege that EPA has failed to carry out a mandatory duty to

"coordinate the programs of all Federal agencies relating to noise research and noise control"

under NCA Section 4(c)(1).  42 U.S.C. § 4903(c)(1).  Again, because this provision does not

require any discrete agency action, it is not actionable under the APA.[13]

    Section 4(c)(1) is silent as to how and in what form or frequency EPA must "coordinate"

other federal agencies' noise programs.  In the absence of a specific mandate, EPA retains

---

[13] Claim 8 also alleges that EPA failed to carry out a mandatory duty under Section 4(c)(3) to
"compile and publish, from time to time, a report on the status and progress of Federal activities
relating to noise research and noise control."  Compl. ¶ 181; 42 U.S.C. § 4903(c)(3).  This
provision arguably does mandate a discrete agency action.  However, for the reasons described in
Section II.D below, this portion of Claim 8 should be denied because EPA has not unreasonably
delayed action.

significant discretion as to how to achieve that command.  Thus, Claim 8 merely alleges a

"[g]eneral deficienc[y] in compliance" with Section 4(c)(1)'s broad mandate.  *Norton*, 542 U.S.

at 66.

Likewise, as with Claim 7, it would be impossible to craft relief on this claim that avoids

the need for "pervasive oversight" by this Court over EPA's discretionary decisions on how to

comply with Section 4(c)(1).  *Id.* at 67.  Indeed, because "coordinat[ion]" of federal agency noise

programs may involve an ongoing exchange of communications between agency personnel

(including internal deliberations that typically may not be available to the public), monitoring

EPA's compliance with an order to carry out Section 4(c)(3) would likely require a particularly

high degree of judicial involvement in "day-to-day agency management."  *Id.*

Accordingly, Claims 7 and 8 should be denied because they impermissibly seek to

compel compliance with broad statutory mandates rather than discrete agency actions.

**D.  All of Plaintiffs' APA Claims Should Be Denied Because EPA's Inaction Is Consistent with Congressional Intent and Is Not "Unreasonable Delay."**

Even if the Court disagrees with EPA's arguments above, *all* of Plaintiffs' claims under

APA Section 706(1) should be denied because EPA has not "unreasonably delayed" action under

the NCA.[14]  To the contrary, Congress—the ultimate source of any mandatory duties contained

in the NCA—determined over 40 years ago that it was *reasonable* for EPA to cease new

activities under this statute and defer further noise control efforts to state and local programs.

The D.C. Circuit in *TRAC* outlined six factors that are "usually relevant" to determining

whether an agency has unreasonably delayed action.  *Mashpee Wampanoag Tribal Council, Inc.*

*v. Norton*, 336 F.3d 1094, 1100 (D.C. Cir. 2003).  Those factors are:

---

[14] This argument applies to Claims 1, 2, 3, 8 (as to EPA's obligations under Section 4(c)(3), *see supra* p. 33 n.12), and any other remaining claims that the Court does not see fit to deny on other grounds.

> (1) the time agencies take to make decisions must be governed by a rule of reason; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is unreasonably delayed.

*TRAC*, 750 F.2d at 80 (cleaned up).  In most cases, the "ultimate issue" is whether the elapsed time satisfies the rule of reason.  *Mashpee Wampanoag*, 336 F.3d at 1102.

Here, the "rule of reason" weighs in favor of EPA.  Plaintiffs are correct that this Court has found shorter periods of inactivity to be "unreasonable" in other cases.  *See* Mot. 34.  But under *TRAC*, the "rule of reason" "cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful." *Mashpee Wampanoag*, 336 F.3d at 1102.  Instead, it turns on the specific circumstances of each case.  EPA's lack of activity under the NCA passes *TRAC*'s "rule of reason" under the highly unusual circumstances presented here.

This is not a case in which competing demands on its staff or resources have prevented EPA from acting expeditiously.  *See Biodiversity Legal Found. v. Norton*, 285 F. Supp. 2d 1 (D.D.C. 2003).  Nor is this a case in which EPA simply neglected its duties or otherwise failed to act due to "impropriety."  *See TRAC*, 750 F.2d at 80.  Rather, EPA's lack of action follows and reflects Congress's considered judgment and agreement that EPA should indefinitely pause further activities under the NCA.  Plaintiffs suggest that in 1982, EPA simply "ceased complying with the Act" with no explanation or justification.  Mot. 6.  To the contrary, EPA presented its proposal to phase out its federal noise control activities to Congress a year earlier in 1981, and *Congress* then publicly deliberated on—and ultimately endorsed—EPA's approach by

35

eliminating, and never restoring, appropriations for NCA implementation.  *See supra* pp. 6-8.

Congress's informed and deliberate approval of the plan to phase out federal noise control

activities shows that EPA's inactivity under the NCA since that time is reasonable.

Specifically, in March 1981, the President submitted a proposed federal budget to

Congress that would phase out and then eliminate funding for all EPA activities under the NCA.

U.S. General Accounting Office, "Transportation Noise: Federal Control and Abatement

Responsibilities May Need to Be Revised," Report No. GAO/RCED-90-11, at 15 (Oct. 1989)

("GAO Report") (attached as Ex. 6).  In addition to reducing the federal budget, the President's

rationale for eliminating these activities was that, consistent with the goals of the 1978 Quiet

Communities Act, noise control benefits are highly localized and the function could be

adequately carried out at the state and local level without a federal program.  *Id.*  The proposed

budget recommended $2.2 million for fiscal year 1982 to be used for an orderly phaseout of the

federal NCA program (including closure of EPA's Office of Noise Abatement and Control), and

no funding for fiscal year 1983 and beyond.  *Id.*  Congress considered alternative approaches—

including bills that would have provided even less funding during the phaseout period—before

approving the President's budget request.  *Id.* at 16.

Moreover, the legislative history makes clear that Congress did not simply adopt the

President's proposed budget (including the plan to phase out NCA implementation) without

consideration.  Rather, the future of EPA's noise control program was the subject of significant

debate, and Congress was well aware that the funding levels it ultimately approved would have

the effect of phasing out all federal activities to implement the NCA.  *See* S. Rep. No. 97-110, at

2; H. Rep. No. 97-85, at 3.

During the appropriations process, both the House of Representatives and the Senate held subcommittee hearings at which members discussed the proper role of the federal government in noise control efforts and endorsed the views reflected in the President's proposed budget prior to approving the phaseout of EPA's noise control program. At a hearing of the House Subcommittee on Commerce, Transportation, and Tourism, lawmakers acknowledged EPA's intent to phase out the federal noise program under the NCA and heard testimony from the Acting Administrator of EPA, who stated that "the emphasis of noise control should be at the State and local levels." House Hearing at 1, 33. Members also expressed support for shifting noise control to state and local authorities and noted their past criticisms of federal regulatory actions under the NCA. *Id.* at 1, 2, 31.

Likewise, at a hearing of the Senate Subcommittee on Toxic Substances and Environmental Oversight, lawmakers discussed the President's proposed budget and demonstrated their understanding that approving that budget would effectively end federal implementation of the NCA. Senate Hearing at 1, 9, 24.

Indeed, at the same time that Congress approved the phaseout of EPA's noise control activities under the NCA, it was considering bills to repeal some or all of the NCA. *See* S. Rep. No. 97-110 (May 15, 1981) (recommending adoption of S.1204, a bill to eliminate federal noise control program except for two areas that would be made discretionary). Although Congress ultimately did not formally repeal the NCA, it did not reach that decision out of a desire for EPA to continue taking new regulatory actions, as demonstrated by the fact that Congress has never restored funding to implement the NCA. Instead, it appears that Congress left the NCA in place primarily out of a desire to keep in effect any regulations that EPA had already promulgated to

preserve their preemptive effect over any conflicting state or local regulations.  GAO Report at 16; *see* Senate Hearing at 2, 4.

Thus, at the time Congress phased out and eliminated funding for EPA's federal noise control activities, it clearly understood that the effect would be to freeze all federal work to implement the NCA.  The resulting period of EPA inaction in carrying out any mandatory duties is therefore "reasonable."  Although this Congressional acquiescence is reflected in an appropriations act and not in the NCA itself, it nonetheless represents an "indication of the speed with which [Congress] expects the agency to proceed" that should inform the Court's evaluation of the "rule of reason" for unreasonable delay.  *TRAC*, 750 F.2d at 80.

Contrary to Plaintiffs' arguments, EPA's inactivity under the NCA does not "frustrate[] statutory purpose."  Mot. 35.  The NCA itself declares that "primary responsibility for control of noise rests with State and local governments."  42 U.S.C. § 4901(a)(3).  And the 1978 Quiet Communities Act, codified as Section 14 of the NCA, states that its goal is to "promote the development of effective State and local noise control programs."  *Id.* § 4913.  Through its 1981 appropriations act and related hearings, Congress reiterated the importance of state and local primacy while laying bare its desire to minimize (or even eliminate) the federal government's role in noise control.  Thus, EPA's current inactivity under the NCA and its deferral to state and local noise control efforts are entirely consistent with statutory purpose.

Accordingly, under the "rule of reason" provided by *TRAC*, EPA has not unreasonably delayed any mandatory duty under the NCA.  Under the unique circumstances presented in this case, where Congress deliberately eliminated funding for the NCA's implementation with the knowledge that it would effectively end EPA's federal noise control program, this Court should

find that EPA's lack of activity under the NCA does not violate the APA. Thus, all of Plaintiffs'

unreasonable delay claims should be denied.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for the United

States on all of Plaintiffs' claims.


Respectfully submitted,


Dated: February 16, 2024                        TODD KIM
                                                Assistant Attorney General


                                                 /s/  Andrew D. Knudsen
                                                ANDREW D. KNUDSEN
                                                DC Bar No. 1019697
*Of Counsel*:                                   U.S. Department of Justice
Matthew Schwarz                                 Environment & Natural Resources Division
U.S. Environmental Protection Agency            Environmental Defense Section
Office of General Counsel                       P.O. Box 7611
Washington, D.C.                                Washington, DC 20044
                                                (202) 353-7466
                                                Andrew.Knudsen@usdoj.gov

                                                *Counsel for Defendants*

# APPENDIX A

**Summary of Bases for Dismissal or Denial of Plaintiffs' Claims**

| Claim | Relevant Statutory Provision | Basis for Dismissal or Denial |
|-------|------------------------------|-------------------------------|
| 1 | NCA Section 5(a)(1), 42 U.S.C. § 4904(a)(1)<br><br>Publication of noise criteria | *Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 2 | NCA Section 5(a)(2), 42 U.S.C. § 4904(a)(2)<br><br>Publication of information on levels of environmental noise | *Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 3 | NCA Section 5(b), 42 U.S.C. § 4904(b)<br><br>Publication of reports identifying products as major sources of noise and giving information on control techniques | *Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 4 | NCA Section 6, 42 U.S.C. § 4905<br><br>Proposal of noise emission standards | *Basis for dismissal:*<br>• Plaintiffs lack standing, pp. 11-14<br><br>*Basis for denial of NCA citizen-suit claim:*<br>• Statute does not establish nondiscretionary duty to propose noise emission standards, pp. 14-17<br>• EPA has withdrawn identification of relevant products as major sources of noise, pp. 17-19<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Plaintiffs did not advance alternative claim in Motion |

| Claim | Relevant Statutory Provision | Basis for Dismissal or Denial |
|---|---|---|
| 5 | NCA Section 15, 42 U.S.C. § 4914<br><br>Certification of low-noise-emission products | *Basis for dismissal:*<br>• Plaintiffs lack standing, pp. 21-22<br><br>*Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Statute does not impose mandatory duty that EPA has not already carried out, pp. 24-25<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 6 | NCA Section 8, 42 U.S.C. § 4907<br><br>Promulgation of labeling regulations | *Basis for dismissal:*<br>• Court lacks jurisdiction because D.C. Circuit has exclusive jurisdiction over claims to compel action under NCA Section 8, pp. 23-24<br><br>*Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Statute does not impose mandatory duty that EPA has not already carried out, pp. 26-29<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 7 | NCA Section 14, 42 U.S.C. § 4913<br><br>Administration of nationwide Quiet Communities Program and related research, grants, and technical assistance | *Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Statute does not mandate discrete action, pp. 31-33<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |

| Claim | Relevant Statutory Provision | Basis for Dismissal or Denial |
|---|---|---|
| 8 | NCA Section 4(c)(1), 42 U.S.C. § 4903(c)(1)<br><br>Coordination of federal agency programs relating to noise research and control<br><br>NCA Section 4(c)(3), 42 U.S.C. § 4903(c)(3)<br><br>Publication of report on status and progress of federal activities relating to noise research and control | *Basis for dismissal:*<br>• Plaintiffs lack standing as to NCA Section 4(c)(1), pp. 22-23<br><br>*Basis for denial of NCA citizen-suit claim:*<br>• Statute lacks a clear-cut deadline for action, pp. 10-11<br><br>*Basis for denial of APA unreasonable delay claim:*<br>• Statute does not mandate discrete action as to NCA Section 4(c)(1), pp. 33-34<br>• Agency has not unreasonably delayed action under *TRAC*, pp. 34-39 |
| 9 | Administrative Procedure Act, 5 U.S.C. § 706(1) | Claim 9 pleads each of the foregoing NCA citizen-suit claims in the alternative as APA unreasonable delay claims.  The basis for denying each of these alternative APA claims is addressed above. |

## CERTIFICATE OF SERVICE

I certify that on February 16, 2024, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.

*/s/ Andrew D. Knudsen*
Andrew D. Knudsen
