# Exhibit 4

Excerpts from: Reauthorization of the Noise Control Act of 1972: Hearing Before the Subcomm. On Commerce, Transp., and Tourism of the Comm. on Energy and Commerce, 97th Cong. 48 (Feb. 24, 1981)

*Quiet Communities, Inc. v. EPA*, No. 1:23-cv-01649-JMC

# REAUTHORIZATION OF THE NOISE CONTROL ACT OF 1972

# HEARING

**BEFORE THE**

## SUBCOMMITTEE ON
## COMMERCE, TRANSPORTATION, AND TOURISM

**OF THE**

## COMMITTEE ON
## ENERGY AND COMMERCE
## HOUSE OF REPRESENTATIVES

### NINETY-SEVENTH CONGRESS

**FIRST SESSION**

**FEBRUARY 24, 1981**

## Serial No. 97–48



Printed for the use of the
Committee on Energy and Commerce

U.S. GOVERNMENT PRINTING OFFICE

86-791 O              WASHINGTON : 1981

H361-14

## COMMITTEE ON ENERGY AND COMMERCE

JOHN D. DINGELL, Michigan, *Chairman*

JAMES H. SCHEUER, New York
RICHARD L. OTTINGER, New York
HENRY A. WAXMAN, California
TIMOTHY E. WIRTH, Colorado
PHILIP R. SHARP, Indiana
JAMES J. FLORIO, New Jersey
ANTHONY TOBY MOFFETT, Connecticut
JIM SANTINI, Nevada
EDWARD J. MARKEY, Massachusetts
THOMAS A. LUKEN, Ohio
DOUG WALGREN, Pennsylvania
ALBERT GORE, JR., Tennessee
BARBARA A. MIKULSKI, Maryland
RONALD M. MOTTL, Ohio
PHIL GRAMM, Texas
AL SWIFT, Washington
MICKEY LELAND, Texas
RICHARD C. SHELBY, Alabama
CARDISS COLLINS, Illinois
MIKE SYNAR, Oklahoma
W. J. "BILLY" TAUZIN, Louisiana
RON WYDEN, Oregon
RALPH M. HALL, Texas

JAMES T. BROYHILL, North Carolina
CLARENCE J. BROWN, Ohio
JAMES M. COLLINS, Texas
NORMAN F. LENT, New York
EDWARD R. MADIGAN, Illinois
CARLOS J. MOORHEAD, California
MATTHEW J. RINALDO, New Jersey
MARC L. MARKS, Pennsylvania
TOM CORCORAN, Illinois
GARY A. LEE, New York
WILLIAM E. DANNEMEYER, California
BOB WHITTAKER, Kansas
THOMAS J. TAUKE, Iowa
DON RITTER, Pennsylvania
HAROLD ROGERS, Kentucky
CLEVE BENEDICT, West Virginia
DAN COATS, Indiana
THOMAS J. BLILEY, JR., Virginia

FRANK M. POTTER, Jr., *Chief Counsel and Staff Director*
SHARON E. DAVIS, *Chief Clerk/Administrative Assistant*
DONALD A. WATT, *Printing Editor*
RANDALL E. DAVIS, *Minority Counsel*

---

## SUBCOMMITTEE ON COMMERCE, TRANSPORTATION, AND TOURISM

JAMES J. FLORIO, New Jersey, *Chairman*

JIM SANTINI, Nevada
BARBARA A. MIKULSKI, Maryland
JAMES H. SCHEUER, New York
ANTHONY TOBY MOFFETT, Connecticut
JOHN D. DINGELL, Michigan
  (Ex Officio)

NORMAN F. LENT, New York
EDWARD R. MADIGAN, Illinois
GARY A. LEE, New York
JAMES T. BROYHILL, North Carolina
  (Ex Officio)

GREGORY E. LAWLER, *Staff Director*
GEORGETTE E. WALSH, *Staff Assistant*
SHEILA E. BROWN, *Counsel*
CLAIRE WHITNEY, *Associate Minority Counsel*

(II)

# CONTENTS

Statement of:                                                                    Page
  Barber, Walter C., Jr., Acting Administrator, Environmental Protection
    Agency ...................................................................................................... 32
  Borthwick, Jesse O., executive director, National Association of Noise
    Control Officials .......................................................................................... 15, 23
  Fellendorf, George, Ed. D., executive director, national information center
    for quiet hearing, Educational Aid and Research Foundation, Inc ............ 3
  Heather, Jacqueline E., on behalf of National League of Cities ..................... 15, 21
  Lipoti, Jill, on behalf of Noise Technical Assistance Center, Region II,
    Environmental Protection Agency ............................................................. 15
  Martin, John, on behalf of the American Association of Retired Persons
    and National Retired Teachers Association ................................................ 3, 10
  Pulaski, Joseph B., director, noise control unit, Connecticut Department
    of Environmental Protection ...................................................................... 15,18
  Shafroth, Frank, legislative counsel, National League of Cities .................... 15
  Tuerk, Edward F., Acting Assistant Administrator for Air Noise and
    Radiation, Environmental Protection Agency ............................................ 32
Additional material submitted for the record by:
  National Retired Teachers Association and American Association of Re-
    tired Persons, program summary ............................................................... 13
  Subcommittee on Commerce, Transportation, and Tourism, Committee on
    Energy and Commerce, letter dated February 18, 1981, from Edward
    Tuerk to Walt Barber and others are placement of employees of the
    Office of Noise Abatement .......................................................................... 40
Statements and correspondence submitted for the record by:
  American Public Health Association ................................................................. 70
  Association of American Railroads .................................................................... 95
  Association of New Jersey Environmental Commissions ................................. 68
  Bergen County Department of Health Services ............................................... 100
  Boulder, city of .................................................................................................. 81
  Cedar Grove Township ...................................................................................... 73
  Hearing, Educational Aid and Research Foundation, Inc ............................... 66
  Illinois Environmental Protection Agency ....................................................... 76
  Metro Clean Air Committee .............................................................................. 74
  National Association of Neighborhoods ............................................................ 84
  National Environmental Health Association .................................................... 83
  National Institute of Governmental Purchasing, Inc ...................................... 56
  National Urban League, Inc .............................................................................. 52
  New Jersey Department of Environmental Protection ..................................... 46
  New Jersey State ECHO program ..................................................................... 101
  New Orleans, city of .......................................................................................... 103
  San Diego, city of .............................................................................................. 80
  University of California, Los Angeles ............................................................... 94
  University of Miami School of Medicine ........................................................... 69
  University of Tennessee .................................................................................... 75
  University of Virginia Health Medical Department of Otolaryngolgy ........... 102

# REAUTHORIZATION OF THE NOISE CONTROL ACT OF 1972

## TUESDAY, FEBRUARY 24, 1981

HOUSE OF REPRESENTATIVES,
SUBCOMMITTEE ON COMMERCE,
TRANSPORTATION, AND TOURISM,
COMMITTEE ON ENERGY AND COMMERCE,
*Washington, D.C.*

The subcommittee met, pursuant to notice, at 9:30 a.m., in room 2322, Rayburn House Office Building, Hon. James J. Florio (chairman) presiding.

Mr. FLORIO. The subcommittee will come to order.

This is a very important, and one of our first authorization hearings dealing with matters concerning the environment. I feel very strongly about the value of the noise control program, particularly if directed in the way which the Congress has clearly sent signals over the last number of years, that is, with local emphasis as opposed to a national regulatory system. Information has been provided to the committee that the funding level for the noise control program for fiscal 1982 will be lean to the point of nonexistence. We are hopeful that it is not the case that there will be little or no money for the noise control program for fiscal year 1982. We also understand that the long-term policy objectives of this administration include a rescission of most if not all of the existing noise control regulations. We would hope that that review would be done in a very selective way. This committee has publicly been critical in the past of some of the regulatory activities of this particular program, with the major exception of the airport noise regulations. Many of the other noise regulatory activities of EPA have left something to be desired in the minds of this committee, and that is a matter of record.

I am troubled by, and I would like to read into the record, a memo that has been provided to me that is directed to certain EPA personnel from other personnel. The body of the message is:

As you are well aware, the revised EPA budget submission to the Congress assumes there will be no EPA noise program after fiscal 1982. This decision creates a situation in which it would be advantageous for current employees of the Office of Noise Abatement and Control to be placed in other assignments as available on an expedited basis, in order to minimize uncertainties. To facilitate this transition, effective immediately I am instituting a requirement that no position in your organization be filled without considering all qualified personnel currently employed in the noise program. All completed personnel actions in which selection was not made of an employee of the noise program must be accompanied by a statement as to who was considered and the reasons for their nonselection for my review prior to being acted upon by Personnel.

(1)

2

I am very sympathetic to the idea that seems to be embodied in this memo, that EPA should be concerned about the well-being of noise program personnel. They should be given first opportunity to transfer to other positions, if those positions are available. I think, however, inherent in this message there is a certain amount of arrogance that presupposes that those personnel should start to be primed for transfer because the assumption is that there will be no noise program after fiscal 1982. This is somewhat presumptuous, because it is the Congress that makes those decisions, and over and above that, it presupposes that the law which is currently in existence, that is the fiscal 1981 programs, are somehow not going to be pursued as diligently as they could be, because the personnel now are either being moved out, or at least they are being put on notice that their job positions are not as secure as they could be. One cannot expect maximum performance out of someone that is being told that they had better start looking around for other positions. So I just think that though this is not quite something that can be categorized as impoundment, one is coming very close to the proposition that though funds and programs are currently on line, someone is saying that the prospect is they will not be on line, and therefore we have to start the movement. I think that is an inappropriate approach, if I am reading this memo correctly, and I suspect that that is the clear intent of what the memo is.

EPA's program funding to this point has been virtually evenly divided between two principal activities: promulgating standards for noise source products and activities, and providing local communities with technical and financial assistance to develop appropriate programs, and to enforce noise control measures.

As I said earlier, this committee is on record as wanting to tilt toward the latter, rather than toward the former, with the major exception of airport noise control. This suggestion that there will be no noise program either after fiscal 1982 or perhaps implying during fiscal 1982 means, of course, that EPA would play no role as a consulting body to FAA in the development of regulations as required under the law for airport noise control, a major problem in the Nation. I would hope that that is not the intent of this administration.

Let me just conclude by saying that, in the past, this committee has, in a bipartisan way, approached all environmental subjects, and particularly this one, with cost effectiveness in mind. As many of you recall, last year we required a study assessing the regulatory system dealing with railroad noise because we thought it was not cost-effective, and that the cost it would have imposed upon the railroad industry far exceeded the benefits that would have been obtained from those regulations. So, this committee has no one to apologize to in its sensitivity for the balancing of costs and benefits. And I would hope that this administration would respect the sensitivity that we have, and not go forward in a less thoughtful way that would represent a meat ax rather than a scalpel approach to this program budget.

I am pleased that we are having these important hearings. I am troubled by the fact that the representatives from the administration have apparently been given directions that they are not in a position to talk about the administration requests for this year

3

until after March 10. The difficulty with that timetable is that we in the Congress are charged under the Budget Act with reporting out of the subcommittee, and then reporting out of the full committee to the House of Representatives by May 15 all of our new authorizations. Therefore, we have some difficulties that could have been addressed a little earlier if we would have had the opportunity to hear from administration spokesmen on their budgetary needs or requests, but be that as it may, we are going forward today with the authorization hearing. On March 10, I assume we will hear what the administration is suggesting for this program and for the other programs that are within this committee's jurisdiction. We will go forward as the committee sees fit.

Mr. FLORIO. I am pleased to have as our first two witnesses—we have a panel—Dr. George Fellendorf, the director of the National Information Center for Quiet, and Mr. John Martin, legislative consultant and formerly U.S. Commissioner of Aging, on behalf of the American Association of Retired Persons. I would ask both gentlemen to come forward.

Gentlemen, as with all of our witnesses, your statements will be made a part of the record in their entirety, and you may feel free to go forward as you see fit.

### STATEMENTS OF GEORGE FELLENDORF, ED. D., EXECUTIVE DIRECTOR, NATIONAL INFORMATION CENTER FOR QUIET, HEARING EDUCATIONAL AID AND RESEARCH FOUNDATION, INC.; AND JOHN MARTIN, ON BEHALF OF THE AMERICAN ASSOCIATION OF RETIRED PERSONS AND NATIONAL RETIRED TEACHERS ASSOCIATION

Dr. FELLENDORF. Mr. Chairman, I am pleased to be here today. I have had the privilege of testifying before this committee before and it is a pleasure to be back again as executive director of the Hearing Educational Aid and Research Foundation, which is a nonprofit organization that has as its concern protection from hearing loss and the various programs and activities to preserve the health, and the hearing health in particular, of our citizens. I am going to limit my remarks to the health aspects of noise.

In connection with this hearing, I reviewed with Dr. Luther Terry, the vice chairman of the board of the HEAR Foundation, some of the current research. I believe he has a short note coming to you, if you have not received it already. Dr. Terry unfortunately could not be with us today, but as you know, he was the Surgeon General during the sixties, and is probably known perhaps best for his emphasis upon calling attention of the public to the hazards of smoking. Dr. Terry, in our conversation, mentioned that he felt that perhaps there was as good or better evidence today for the potential damage of noise on hearing and other aspects of health as there was when he was among the leaders to start this antismoking campaign in the sixties.

In the area of hearing damage, there is little doubt that there is strong evidence that prolonged exposure to moderate levels of noise and to impact noise for shorter periods of time can really be damaging to the hearing of our individuals in the country. It is estimated that some 25 million Americans are exposed to noise

4

levels that can be potentially damaging to their ears and to their health. Actually it is estimated in recent reports out of the National Center for Health Statistics there are some 15 million Americans that have some degree of hearing loss, so it is probably the largest single disability in the country.

We are aware that children and youth are growing up in an environment which is noisy. Dr. David Lipscomb, in a study of college freshmen a few years ago, demonstrated that the hearing levels of these college freshmen, young people in their late teens and early twenties, were at roughly the same level as individuals in their fifties and sixties. Dr. Lipscomb feels this is evidence of the impact of a noisy environment both in rural as well as urban areas, and what the impact may be to the hearing health of our citizens.

I recently spoke to some colleagues at the National Institutes of Health and learned of recent research, which has really not been reported publicly yet outside of the research reports, on the relationship of certain ototoxic drugs and noise. It appears those who are being given certain types of medication are actually extremely susceptible to permanent noise damage and this is something that only recently has come out of the reports of the University of Michigan. Also they are discovering that the impact noise, the noise that comes from loud sounds in short periods of time, is apparently considerably more devastating than was earlier thought. This is other information that is coming to light now.

In Washington, there was a recent study by the D.C. Environmental Health Administration of discotheques, the kinds of things we often think about in terms of young people. There was evidence there that young people going into these discotheques, sometimes for periods as long as 5 hours, are exposing themselves to noise levels that are clearly hazardous to their hearing health.

Mr. FLORIO. Doctor, if I can just express to you I am totally convinced that my three children who are 19, 18, and 17 will be stone deaf by the time they are 21 years old as a result of going to the basement to hear their stereos.

Dr. FELLENDORF. Most of us are aware of that experience which you are talking about. There are other areas of health which correlate with noise. Dr. Peterson, at the University of Miami, has been working with primates for a number of years, exposing rhesus monkeys to the same cycles of noise levels that are experienced by an ordinary industrial worker in this country in his office, in his factory, and also in his home, and on the streets. He reported in 1979 to our model symposium on community noise that a 30-percent increase in blood pressure resulted from this exposure. Also that the blood pressure did not return to the normal level after these animals were exposed to this experience. In post mortems on these animals it was determined that while there appeared to be no structural changes to their ears, there was clear evidence of changes in things like the adrenal glands, which influences aspects of human behavior and health other than hearing.

It may well be that out of this research of Peterson and research that is now being done at Johns Hopkins on the same topic, we may determine a profile of individuals who are at risk for damage to excessive noise. Such individuals may then be advised in connec-

5

tion with job placement and even in living conditions, to avoid excessive noise levels, knowing that they are extremely susceptible to damage from those noise levels.

Welch, in a study of research in foreign countries, reported on the other health aspects of noise. I would like to quote his report:

Cardiovascular morbidity of one kind or another has been found to be greater among people who work for prolonged periods under high-intensity sound than among people who work under low intensities of sound in 40 different studies.

No studies involving appropriate measures and statistical analyses have been identified which failed to suggest an adverse cardiovascular effect of long-term employment under high-intensity industrial noise.

Ising was studying workers in a brewery in the northern part of Germany and showed significant differences in blood pressure and noradrenaline among workers in noisy environments when they were wearing ear protectors as compared to when their ears were unprotected. This is significant because the researchers studied the same individuals under ear protection and non-ear protection, which is a valid method of research in an area like this. Such research is felt to be much more conclusive than some of the group work that has been done in other studies.

Similar results were reported by researchers in the Netherlands, which is referred to in my paper.

In conclusion, Mr. Chairman, while it is clear that there is a need for continuing research into the effects of noise exposure on the ear, the heart, blood pressure, and the nervous system, there is ample evidence today which justifies alerting the public to the potential hazards of noise.

[Dr. Fellendorf's prepared statement follows:]

6

TESTIMONY OF GEORGE W. FELLENDORF, ED. D., NATIONAL INFORMATION CENTER FOR QUIET, HEARING EDUCATIONAL AID AND RESEARCH FOUNDATION, INC., WASHINGTON, D.C.

Mr. Chairman and Members of the Subcommittee, I am testifying today as Executive Director of the Hearing, Educational Aid and Research Foundation, Inc. (H.E.A.R.) and in my capacity as Director of the National Information Center for Quiet which is one of my responsibilities. My purpose is to share with you some of the more recent developments on the health aspects of noise.

In preparing these remarks, I reviewed with Dr. Luther L. Terry, Vice Chairman of the Board of the H.E.A.R. Foundation, some of the current research reports on the health effects of noise. Dr. Terry, as you know, was the Surgeon General of the United States in the early 60's when the national focus in public health turned to the potential hazards of smoking. In many respects, Dr. Terry feels that the case for environmental noise abatement today is based upon as good or better evidence than existed for the anti-smoking program when it began.

In the area of hearing damage, there is ample evidence of the detrimental effects of prolonged exposure to moderate levels of noise and to impact noise for shorter periods of time. It has been estimated that more than 25 million Americans are exposed daily to potentially damaging levels of noise in their homes, work-places or on their streets. Recent health statistics indicate that hearing impairment is the most common disorder in the country today with more than 15 million men, women and children exhibiting some degree of hearing loss.

Children and youth are among those who are susceptible to hearing loss and the resulting interference with their education

**7**

and communication.  Studies of college freshmen by Dr. David Lipscomb, University of Tennessee, have shown that the levels of hearing loss in these youths approximate those found in adult populations in the 50-60 year old range.  Dr. Lipscomb attributes a substantial portion of these observations to the pervasive noise environment in which youngsters are growing up in both rural as well as urban areas.

Among the most recent research results which have come to our attention from the National Institutes of Health in personal communications are reports from the University of Michigan on the relationship between certain drugs and noise. It has been found that users of many types of ototoxic drugs are highly susceptible to permanent damage to their auditory mechanism in the presence of noise.  Also impact and impulse noise have been found to be considerably more destructive to the hearing system than was previously thought to be the case.

Here in Washington, a study reported by the D. C. Environmental Health Administration revealed that the noise levels in a group of 19 discotheques frequented by young adults ranged from 85 to 115 dB.  Patrons in the sample study spent an average of five hours in such environments thereby exposing themselves to levels of noise in excess of acceptable levels. (Walker, B. <u>Perceived Effects of Levels in Discotheques of the District of Columbia</u>, 1979).

There are health areas other than hearing loss, however, which have been shown to correlate with exposure to excessive

8

noise.  Dr. Ernest A. Peterson, University of Miami, has been experimenting with primates for years to demonstrate the impact of typical community-workplace noise on blood pressure.  He reported to the Model Sympsium on Community Noise in 1979 that a 30% increase in blood pressure resulted from several months of exposure to the types and levels of noise experienced by an industrial worker on a daily basis.  In a recent communication, I asked him about the post mortem studies of these animals and he responded that while there was no evidence of structural changes, there was evidence of changes in the adrenal glands which he considered to be significant.  Among the practical goals of this research may well be the determination of a profile of individuals who are at risk for health damage as a result of noise exposure.  Such individuals can then be advised to seek job placement and living situations where they are not exposed to excessive noise levels.

Some internationally recognized authorities, who in the past have questioned the non-auditory effects of noise, have more recently come to acknowlege that such effects may well exist. Among the evidence that has influenced this recognition has been that reported by such researchers as Welch, who in 1979 critically reviewed a number of research studies on non-auditory health effects as found in foreign literature (Welch, B. L. Extra Auditory Health Effects of Industrial Noise: Survey of Foreign Literature).  Welch states, "Cardiovascular morbidity of one kind or another has been found to be greater among people who work for prolonged periods under high intensity sound than among people who work under low intensities of sound in 40 different studies".

9

He goes on to say, "No study involving appropriate measures and statistical analyses has been identified which failed to suggest an adverse cardiovascular effect of long-term employment under high intensity industrial noise".

Among the other studies of risk of heart and circulatory diseases as a result of noise exposure is one conducted in factories in West Germany by Ising and colleagues in 1977-78. (Ising, H. et al, Study of the Quantification of Risk for the Heart and Circulatory System Associated with Noise Workers, 1979). The results indicated significantly observable differences in the systolic blood pressure and noradrenaline among workers in noisy environments when they were wearing ear protectors as compared to when their ears were unprotected. These data are particularly informative because of the great care which the German investigators took to consider various medical parameters which were factored out in order to isolate the noise-related effects. Mosskov and Ettema in the Netherlands also report research data which strongly suggest that long-term exposure to noise is a risk factor for cardiovascular disease in daily living and working conditions. (Mosskov, J. J. and Ettema, J. H., Extra Auditory Effects in Long-term Exposure to Aircraft and Traffic Noise, 1977). They found that exposure to traffic noise caused decrease of systolic blood pressure, increase in diastolic blood pressure, changes in pulse pressure, heart rate and quotient of heart rate and respiratory rate and increase of respiratory rate.

In conclusion, while it is clear that there is need for continuing research into the effects of noise exposure on the ear, the heart, blood pressure and the nervous system, there is evidence today which justifies alerting the public to the potential hazards of noise.

BEST COPY AVAILABLE

10

Mr. FLORIO. Thank you very much, sir.

### STATEMENT OF JOHN MARTIN

Mr. MARTIN. The National Retired Teachers Association and the American Association of Retired Persons represent approximately 12 million dues-paying members who are over the age of 55. At a time when the average age in the United States is creeping steadily upward, older Americans, as a group, are becoming an ever-more significant portion of our population. In this area, we are vitally concerned with the health, well-being, and living conditions of our constituents and their families. We are particularly concerned with the problem of noise in our cities, communities, and neighborhoods.

Our immediate concern is the reauthorization of the Quiet Communities Act which will enable the Federal Government to continue to help older Americans escape the very real and present health hazards attendant to continuous exposure to unreasonably high levels of noise.

Mr. Chairman, NRTA–AARP is concerned about noise for a variety of reasons which lead to a cumulative and serious health threat to older Americans who should be enjoying their lives in peace, and quiet, and with a degree of safety from unwanted intrusions. We represent a group of citizens, many of whom for economic reasons are unable to maintain their quality of life and who are constantly subjected to exposure to excessive noise levels. For example, many older Americans live on fixed incomes in communities which are decaying and victims of urban blight—the symptoms of which include excessive noise. They are unable to flee those areas of urban blight due to low income levels and the skyrocketing costs of housing in unblighted communities and neighborhoods.

For the most part, a great number of older Americans have already experienced a sizable percentage hearing loss due to the aging process and due to the cumulative effects of lifelong exposure to excessive levels of noise in the workplace as well as in our day-to-day environment. For those who have to live in noisy communities, high-noise levels present health and safety concerns with respect to being able to hear fire alarms, warning signals, police and ambulance sirens, and other sounds which allow for safety and safe passage on our streets.

Older Americans, as a group, also suffer from a much higher incidence of hypertension and cardiovascular disorders which are caused in some instances, and aggravated in others, by excessive noise. While I am not qualified to discuss the medical and/or physiological causes of hypertension and/or cardiovascular problems, clearly high noise levels induce sleeplessness, insomnia, and disorientation, which exacerbate already existing disorders.

Mr. Chairman, the conditions I have just described exist in our Nation's cities today. They exist and when taken as a whole create a set of conditions which most older people are simply unable to endure. In most instances, older people are unable to do anything about this set of conditions due to lack of information and assistance from States and units of local government. We need the protection from noise which can be provided by States and local governments but they, too, have a limited ability to help at this

11

time. Assistance and leadership are needed from the Federal level as well in order to bring about effective change.

Since the enactment of the Quiet Communities Act of 1978, the Environmental Protection Agency's Office of Noise Abatement and Control has been active in assisting States and local governments to develop their own noise programs. We agree that this is the most effective use of the taxpayer's dollar. And I think the committee is of the same opinion. We urge the committee to capitalize on the EPA State and local assistance portion of the noise-abatement-and-control program until such time that the States and local governments can efficiently assume their proper role in noise control. Further, we need to continue the public education and information aspects of the program as well. Many older Americans can and, indeed, will do something about their own noise problems within the context of their living conditions. But as of yet, they have been uninformed about those many things they can do to protect themselves from excessive noise. I am convinced that if they are provided with State and local program protection coupled with a viable public education and information program which originates in the continuation of the Quite Communities Act, our people will act to protect themselves.

Mr. Chairman, I urge this committee to reauthorize the Quiet Communities Act and focus it entirely on those programs that will strengthen the abilities and capacities of State and local governments to control and abate noise and to further inform the American public as to the harmful effects of excessive noise as well as the remedies they may take to protect themselves.

Mr. FLORIO. Mr. Martin, I want to thank you very much, and thank both of you gentlemen for your testimony.

Mr. Martin, it almost sounds like you and I rehearsed our testimony or our statements before we got here, and of course we did not, but I think it does represent the obvious benefits that are able to flow from the focus of this program, what the focus should be, that is, the EPA's role in providing startup funds or minimal amounts of funds for State and local programs designed to address State and local noise problems with some degree of particularity. There is one of the programs, the ECHO program, each community helps others, which is a program that is extremely modestly funded, $100,000. It depends principally on volunteers, and I know the RSVP seniors have been one of the groups of volunteers that have become involved in this within the community for staff purposes, to develop programs at the local level to account for whatever the local noise generators are, and also has a very heavy educational component, that is to be educating people as to what they can be doing and what they should be doing.

This committee is far beyond the point of needing to be persuaded about the health ramifications of overexposure to noise. I would just like to ask you, Doctor, one point with regard to the research funding that has been provided in previous years. It is only one-half of a million dollars earmarked for research into noise impact with regard to health. Most of the research is conducted through grants to universities and institutes such as the National Institutes of Health and the National Academy of Sciences. Is there any legitimate criticism that can be made that that type of research

12

would be going on anyway by those agencies, and therefore EPA should not be involved in the exploration of health consequences of overexposure to noise? Rather those agencies and those institutes, such as National Institutes of Health, would be doing it anyway?

Dr. FELLENDORF. I wish I could answer your question conclusively, Congressman. I think that there is no question the research must continue. I think there has been some need for better coordination between the various agencies, and I am not sure there is any, to assure there is no overlap or duplication. I think that EPA has the advantage of more or less being closer to the firing line, if you will, and while basic research must always continue to go on, I think EPA represents the agency that is closest to the consumer and the impacted person. NIH, as we both know, tends to step back, if you will, into the more systematic and basic research component, and things like I reported a few minutes ago, in terms of the impact of certain ototoxic drugs and noise, are matters that should be brought out to the public, and they should be brought out in a fashion that they will hold together in terms of their presentation to the public. That is not just a public awareness, that is part of interpretation of the research results from NIH. So I really do not feel qualified to comment on the broad context of your question, but I do feel that there has been some limitations in the liaison between the research establishments, which would be very easy, I would think, to clear in terms of the future of these various programs. We must make the most of whatever dollars we have in research.

Mr. MARTIN. May I also say that AARP-NRTA has an activities program which deals with the use of volunteers for helping to carry out this exact kind of program, and I would like to furnish to you for the record a short statement on that.

Mr. FLORIO. I would be happy to see that.

This year we are also going to be reviewing the Older Americans Act.

Mr. MARTIN. Yes.

Mr. FLORIO. Assuming that there is any budgetary authority left for that, too, but we think that is something that can be utilized to a much greater effect in some directions, this being one of them.

Mr. MARTIN. There is no question but what ordinary citizens, if they are given a little training and a little background, can do a great deal to make these programs effective without costing a great deal, and that is an important question of cost-effectiveness.

Mr. FLORIO. Gentlemen, thank you very much. We appreciate your testimony.

Dr. FELLENDORF. Thank you.

[The following statement was received for the record:]

13

### NRTA/AARP COMMUNITY NOISE COUNSELING PROGRAM
#### Program Summary

The Community Noise Counseling Program concept developed as
a response to the growing irritation and frustration of local
communiites and individuals with increasing noise in their
environment and the knowledge that such pollution is detrimen-
tal to the quality of community life.

The goal of this community service program is to stimulate public
awareness of the hazardous effects of noise on health and hearing
through a variety of educational and public information activities
in schools, civic organizations and communities.  In addition,
noise counselors have become a vehicle for assisting individuals
or communities in resolving their specific noise problems or for
guiding them through the appropriate complaint and enforcement
process.

The Community Noise Counseling program is now being piloted under
a contract with the Environmental Protection Agency.   The man-
power for the pilot has come from the Senior Community Service
Employment Program, a grant project of the NRTA/AARP Associations funded
by the Department of Labor.  The purpose of the Associations' involve-
ment is to organize a pool of trained NRTA/AARP volunteers at
the local level to participate as noise counselors to enhance
their community environment.

In joint session, the NRTA Community Participation Advisory Com-
mittee and AARP Community Services Advisory Committee, September
27, 1979, recommended that the Associations explore the feasibi-
lity of transferring the Community Noise Counseling Program now
being operated under contract with EPA to the status of Associa-
tion volunteer program, observing that excessive noise in the
environment can have a deleterious effect on the well-being of
older persons.

The Community Noise Counseling Program is a community service
program which would provide opportunities for both NRTA unit
and AARP chapter members and NRTA/AARP national members to
participate in activities to educate the public about the health
effects of noise, to serve as a focal point in the community for
issues that concern noise and to counsel communities and indivi-
duals in how to reduce their exposure to noise in their environ-
ment.  It is suggested that the best way to ensure availability
of trained volunteers and equitable distribution of activities
is the formation of unit/chapter Noise Counseling Committees as
a focal point for program activities.  National members could
work with these committees or independent volunteer committees.

National and unit/chapter members would be trained in the basic,
semi-technical aspects of sound, sound measurement and methods
to reduce or eliminate noise.  Training materials and a training
package are being developed.  The training and on-going assistance
to the unit/chapter Noise Counseling Committees in planning and
organizing activities would be provided by trained volunteers

14

and Noise Counselors who are currently participating in the demonstration program.

Additional funds are now being made available to demonstrate the implementation of the program by the NRTA/AARP membership as volunteers.

The variety of opportunities for involvement in Noise Counseling activities is limited only by the imagination of the Noise Counseling group. The program opportunities are flexible and would, to a large extent, depend on local needs and interests. Short-term opportunities exist for those with limited time commitments and long-range activities can be used to promote sustained chapter interest and activity.

Individuals and chapter members involved in noise counseling activities would be trained in the basic, semi-technical aspects of sound, sound measurement and methods to reduce or eliminate noise and would be provided on-going assistance by trained volunteers in planning and organizing their chosen activities.

The need exists for a whole array of activities to stimulate awareness of noise as an environmental problem, and to educate the public concerning the health effects of noise and the importance of preserving and protecting hearing. This may be done by talking to civic groups or introducing noise in the health curriculum of elementary and high schools. The Noise Counseling Committee might sponsor a noise booth at fairs or hearing testing in conjunction with the public health department. Community attitudinal surveys regarding noise can not only document community noise problems, but also serve as a vehicle for disseminating information to the public along with distributing pamphlets to doctor and veterinarians' offices, etc.

Creating public awareness of noise and its harmful effects, knowing where to go about a noise problem and getting people to change their habits are challenging goals for a NRTA/AARP Noise Counseling Committee. But the rewards in assisting individuals and creating a healthier environment for the community are great as well.

Currently, thirty Community Noise Counselors including four full-time volunteers, have received training and are working with local NRTA/AARP units/chapters in community projects.

Seven locations have enlisted the help of AARP chapter volunteers in support of their activities.

Six AARP chapters have initiated noise counselor projects as a chapter activity. Meetings have been scheduled through April and May to initiate other chapter projects.

The Association's support has included the publication of an activities brochure for the use of the membership, and the creation of a Noise Counselor's Handbook for chapter/unit projects. An article, written in the AARP Chapter News, has prompted responses from several state directors and chapter presidents indicating an interest in starting a "Noise Volunteer Program in their areas.

The volunteer concept of Community Noise Counselors has been eagerly endorsed by noise control and abatement officials at national and regional offices of the EPA, and state and local officials responsible for health and noise enforcement, as an effective community awareness and education program for quiet communities.

15

Mr. FLORIO. Our next witnesses are a panel. Dr. Jill Lipoti, Director of the New York-New Jersey Region II, Noise Technical Assistance Center of Rutgers University, and Mr. Joseph Pulaski, Director of the Noise Control Unit of the State of Connecticut.

I think what we will do, if no one minds, is to take our next two witnesses, and since there is a good cross-section, have our four witnesses as a panel. Ms. Jacqueline Heather, mayor, Newport Beach, Calif., on behalf of the National League of Cities, and Mr. Jesse Borthwick, executive director, National Association of Noise Control Officials.

We are pleased to have with us the ranking minority member, Congressman Lent from New York.

**STATEMENTS OF JILL LIPOTI, ON BEHALF OF NOISE TECHNI-CAL ASSISTANCE CENTER, REGION II, ENVIRONMENTAL PRO-TECTION AGENCY; JOSEPH B. PULASKI, DIRECTOR, NOISE CONTROL UNIT, CONNECTICUT DEPARTMENT OF ENVIRON-MENTAL PROTECTION; JACQUELINE E. HEATHER, ON BEHALF OF NATIONAL LEAGUE OF CITIES, ACCOMPANIED BY FRANK SHAFROTH, LEGISLATIVE COUNSEL; AND JESSE O. BORTHWICK, EXECUTIVE DIRECTOR, NATIONAL ASSOCI-ATION OF NOISE CONTROL OFFICIALS**

Ms. LIPOTI. Thank you. Mr. Chairman and members of the sub-committee.

I am Jill Lipoti, a member of the faculty of Rutgers University in New Brunswick, N.J.

I am here today representing the Noise Technical Assistance Center of Region II which was established 2 years ago through a grant from the U.S. Environmental Protection Agency, Office of Noise Abatement and Control.

As originally conceived, the Region II Noise Technical Assistance Center was responsible for providing training and consultation to communities within New York, New Jersey, Puerto Rico and the Virgin Islands. It is 1 of 10 centers established at major universi-ties in each of 10 regions of the Nation.

This regional emphasis permits the communities within the region to benefit from a highly responsive and geographically ac-cessible advisory service. At absolutely no expense to the local or county government, the specialized capability of a university is available for assisting the community in:

One, developing and writing an effective ordinance for local noise control; two, providing training of local officials in noise enforce-ment; and three, technical consultations in local noise abatement techniques.

In addition, the Technical Assistance Center has been of great value to the noise programs of the States of New Jersey and New York by performing research in noise topics that the small State program budgets could not allow.

The question I am here to address is: "What is the practical effect of the discontinuation of the Technical Assistance Center Program?"

The Federal Government must show its commitment to the all pervading problem of noise by funding technical assistance pro-grams. Congress had the foresight and concern in 1972 to pass the

16

Noise Control Act and amended it in 1978 by the Quiet Communities Act.

Now, unless you show a firm commitment to noise, the State and local programs will die. Already the New Jersey State noise budget was cut in half and the New York budget by one-third.

While Federal money is not directly allocated to local programs, support is provided in areas that no State or local program could possibly afford on its own.

Noise is a local problem and should be controlled at the local level. This fact was recognized by the Congress in the mandate for the Noise Control Act, section 2, paragraph 5.

Through EPA, Office of Noise Abatement and Control funding of regional noise technical assistance centers, training in noise abatement is provided to local officials at no cost to the community.

In the past year in New York and New Jersey, Rutgers University, in its capacity as Region II Noise Technical Assistance Center trained 282 local officials. The training courses were conducted in 12 locations convenient to local officials.

For example, in New York, noise training programs were presented in Rochester, Binghamton, Babylon, Mount Vernon, and Poughkeepsie, preparing 89 community officials for local ordinance enforcement.

In addition, in New Jersey, training was provided at Plainsboro, Paramus, Cherry Hill, Convent Station, New Brunswick, Pomona, and Hillside.

These locations were chosen so that all towns surrounding these communities could take advantage of the course without much travel time. Forty-eight percent of the officials trained were from health departments, 20 percent from police departments and other representatives included building inspectors, planners, environmental commissioners, citizens groups, attorneys, media and others.

From 1975-77 an additional 169 people from New Jersey were trained. A newsletter, Soundings, has been started for these officials to continue their association with Rutgers and to provide a network of peer support in solving local noise problems.

Even this total of 450 trained people in region II is just a start. With 567 communities in New Jersey and 1,709 cities, towns, and villages in New York, much more training is needed to cover every location.

Not only are trained people necessary for ordinance enforcement, but every citizen should know the physiologic effects of noise so that they will limit the amount of noise to which they voluntarily subject themselves.

Noise assaults every individual, every day and every night, in his own home, his car, and his job.

Recent estimates claim that about 10 percent of the country's population is exposed to noise of duration and intensity such that permanent hearing losses would occur.

Noise is considered to be one of many causes of stress and as such is linked to hypertension and possible heart problems.

Noise-related stress can also effect behavior patterns, learning patterns, and daily activities. The learning patterns of children can be permanently affected by a noisy environment.

17

We all know we have to tighten our belts and spend less Federal money, but this is no time to retrogress and ignore the foresight of the Congress that established the national concern for noise.

Doesn't every citizen deserve relief from excessive noise in his surroundings? From my experience with citizens, they feel they have a right to quiet.

I should like to make you aware that each regional technical assistance center receives no more than $60,000 per year of Office of Noise Abatement and Control support. For this modest sum, you are providing hundreds of communities in each region and thousands of communities in the Nation with the opportunity to receive on-site, personal assistance free of charge.

In our opinion, no individual State could afford to financially support their own technical assistance program and one of the best Federal expenditures is in providing a network of Technical Assistance Centers that locals can call upon for free advice.

This is the most cost-effective method to provide personalized noise assistance. The entire wealth and capability of a university can be drawn upon to implement and support this technical assistance program.

The Regional Noise Technical Assistance Centers were selected for their unique capability to provide training and consultation. But this, along with research performance, insures further specialization within the university in addressing community noise problems. This is seed money; the fruits of which go far into the future.

We, at the university, are learning from the local officials. For every problem they bring to us to solve, in posing a solution, we are adding to our body of knowledge. We develop our technical expertise and become more and more responsive to local needs as the program goes on.

As a specific example, the technical assistance center is involved in a study of noise from Newark Airport. In response to concerned citizens in communities surrounding the airport, the center is assisting in a monitoring program designed to measure and assess noise exposure in the communities resulting from aircraft. The implication of even this one study are far reaching.

Studies have been provided to the State office of Noise Control in New Jersey on fire siren, construction, and stock car auto racing noise as well as procedures for noise measurement.

The Technical Assistance Center is presently compiling a computer inventory of all local noise ordinances within New York and New Jersey for the purpose of ordinance development.

Presently, 453 towns, villages, and cities in New York have ordinances but less than one-quarter of these contain specific decibel limits. Similar data for New Jersey shows that 87 percent of the local ordinances do not contain decibel levels and only about 50 percent of the communities have local codes.

When questioned on why towns had not adopted an ordinance, the difficulty of the technical aspects of decibel levels was often cited. These data were derived from a survey done by the center last May.

It is clear from this study and our extensive involvement with community officials that without assistance in addressing these

18

technical concerns, the development of effective local noise control, which Congress deemed so important, will not be achieved.

Some of you may think that universities are ivory towers where people ponder great questions of the universe. Here is one situation where the university is listening to local problems and helping the locals themselves solve them.

Consequently, a large base of noise facts and abatement techniques is being built. The university is finding practical solutions to real life problems. By funding a program which works on this grass-roots level, you are helping citizens now and in the future.

If you have ever met a person with a noise problem and caused a cessation of that noise, you will know how grateful they are for relief. Remember that every citizen is bothered by noise in some form, every day and every night, particularly in the urban centers.

If you make a commitment to abating noise in this country, every person will be grateful. Because noise is highly correlated with population density, urban areas are severely impacted.

Somewhat surprising to urban experts has been the significance of noise to the urban dweller.

The Department of Housing and Urban Development has conducted an annual housing survey in selected central cities since 1973. HUD has found that noise is ranked as the most frequently mentioned undesirable neighborhood condition each year.

Noise consistently ranked higher than crime, heavy traffic, litter, street repair, street lighting, deteriorated housing, and abandoned buildings.

In closing, we urge this committee to endorse the reauthorization of the Noise Control Act of 1972. The U.S. EPA, ONAC support of the regional noise technical assistance program has provided an essential service to communities seeking to establish a self-sufficient and effective local noise control program.

We are certain that the experiences of the Region II Noise Technical Assistance Center are identical to the technical centers in each of the other nine regions of the Nation.

With modest funding, the Congress can assure the policy of the Noise Control Act, "* * * to promote an environment for all Americans free from noise that jeopardizes their health or welfare."

Mr. FLORIO. Thank you very much.

Mr. Pulaski.

### STATEMENT OF JOSEPH B. PULASKI

Mr. PULASKI. Good morning, Mr. Chairman and members of the committee.

My name is Joseph Pulaski and I am the director of the Connecticut Department of Environmental Protection's Noise Control Unit.

I am here today to urge you to reauthorize the Quiet Communities Act of 1978 and to support ongoing Federal efforts in noise control. These efforts, particularly in the areas of financial and technical assistance, are extremely important to the success of noise control programs at the State and local level.

Connecticut has statewide noise regulations and standards which are effective in dealing with major noise problems having statewide

19

significance (for example, the noise from a major industrial facility) but do not adequately address many problems unique to individual communities (for example, noise from local construction activity, residential air-conditioners, late night entertainment facilities, et cetera).

We are, therefore, encouraging and assisting Connecticut communities in developing local noise control ordinances through a Federal ECHO (Each Community Helps Others) grant.

As you are probably aware, the ECHO program matches up local noise "experts" called Community Noise Advisors (CNA's) with officials in towns wishing to develop local noise ordinances (called Recipient Communities or RC's).

There are currently 11 Connecticut communities with a total population of over 500,000 people involved in this program. The communities are Hartford, East Windsor, West Hartford, Danbury, Norwalk, Windsor, Shelton, Brookfield, Westbrook, Greenwich, and Bloomfield. Several more have expressed interest in becoming part of this program.

The ECHO program, as you have heard over and over again, and I reinforce that, is extremely cost effective in that it provides a relatively small amount of funding to the State and relies on volunteers from the towns to donate their time and effort to developing and enforcing local noise control ordinances.

In Connecticut we receive approximately $35,000 a year to fund a State ECHO Project Director, a typist, to purchase noise monitoring equipment and supplies, as well as provide mileage reimbursement to CNA's and RC's.

The ECHO Project Director coordinates the activities of the CNA's and RC's, arranges for noise equipment loans, assists and advises in the drafting and reviewing of local ordinances and most importantly, acts as a catalyst in moving the ordinance development process along.

In my judgment, a critical element in the success of this program in Connecticut has been the active role played by the ECHO Project Director. Without continued Federal support his presence will cease to exist and local noise control efforts will suffer severely.

Another extremely important noise control activity, that of the Regional Noise Techical Assistance Center (RNTAC) located at the University of Hartford, is funded through the Quiet Communities Act.

This Center provides valuable technical assistance to State and local governments throughout the U.S. Environmental Protection Agencies (EPA) region I. This includes all of the New England States. Similar Centers are funded in the other EPA regions.

The assistance provided includes the following:

Conducting workshops to train local officials in noise control techniques and the proper use of noise measuring equipment.

Conducting seminars for the general public on noise and the need for, as well as the benefits of, noise control.

Serving as a calibration laboratory for State and local agencies, enabling them to have sound measuring equipment checked for calibration at no cost.

Providing instructional programs to local school systems in order to educate students on noise control matters.

20

The Hartford RNTAC has held over 15 workshops and seminars throughout New England in the past year and a half. Of that number, 7 have been held in Connecticut in cooperation with our State Noise Office.

At these jointly sponsored 1-day seminars over 100 officials from 60 Connecticut towns received instruction in noise control, the health effects of noise, noise regulations, as well as "hands on" experience in the use of sound level meters.

These trained individuals are of great value to our noise control efforts. Besides generating local interest in noise control ordinance development they are frequently called upon by our office to assist us in the preliminary investigation of noise complaints originating in their respective towns.

Often, using the skills obtained at the RNTAC noise seminars and their knowledge of the local situation, these officials are able to resolve noise problems with no further assistance from our office. This greatly increases our noise control effectiveness and permits many more noise problems to be expeditiously resolved than would otherwise be possible.

The continuation of these seminars to provide refresher courses and to instruct new personnel will be a major factor in the continued success of the "outreach" effort.

Funding for the Centers is contingent upon reauthorization of the Quiet Communities Act. Without Federal funding the Regional Noise Technical Assistance Center at the University of Hartford would not be able to continue in operation.

Besides these critically important areas of assistance to the State and local governments, I believe the Federal Government has a very important role to play in continuing to identify and control products which are major sources of noise.

Much progress has been made in this area, especially with respect to reducing aircraft noise, heavy truck noise, and construction equipment noise.

Control of products which are major noise sources, particularly those involved in interstate commerce requiring uniformity of treatment throughout the country, is out of the jurisdiction of the State and local governments. This responsibility most appropriately lies with the Federal Government. Failure to continue Federal activity in this area will undermine and weaken all local noise control efforts.

In summary, I think there is clearly a need to scrutinize government spending at all levels. We must not, however, lose sight of the overriding need to protect our environment and the health and welfare of the American people in the process.

The Federal Noise Control program, particularly in the area of State and local assistance, is an extremely cost-effective program. It addresses a very serious environmental problem of excessiveness with a minimum of funding.

I strongly urge you to support reauthorization of the Quiet Communities Act and continue the Federal commitment in this important area of environmental control.

Mr. FLORIO. Thank you very much.

Ms. Heather.

21

## STATEMENT OF JACQUELINE E. HEATHER

Ms. HEATHER. Thank you. Good morning, Mr. Chairman and members of the subcommittee.

My name is Jacqueline Heather and I am the mayor of Newport Beach, Calif. My city lies under the flight path of John Wayne International Airport, the third busiest airport in the United States, so I am here representing the National League of Cities but I am also representing a noise impacted city.

With me is Mr. Frank Shafroth, the legislative counsel for the National League of Cities.

The National League of Cities (NLC) is a national organization for cities and for the people who live in them. NLC consists of, and is the principal representative for approximately 15,000 cities, large and small, throughout the United States.

The League is an advocate for the 70 percent of the Nation's population that lives in metroplitan areas.

NLC is committed to a policy of enhancing the urban environment. A key step in improving that environment is the reduction of noise.

Mr. Chairman, the EPA noise program is in trouble. Indeed, its continued existence is in doubt. The Office of Management and Budget has recommended to the President elimination of EPA's role in noise control for fiscal year 1982.

This decision apparently came without consideration given to preserving the good elements of EPA's program, the elements that legitimately reflect what the agency should be doing, even under the most conservative interpretation of the proper Federal role in noise control.

To emphasize this point, I have in my hand and will submit for the record, a column by the noted conservative columnist James J. Kilpatrick. In it he praises the "Buy Quiet" program, which has been referenced before, which seeks to utilize marketplace economics to procure quieter goods and services.

This program is financed in part by funds appropriated under the Noise Control Act.

In my experience with Federal regulatory programs this is one of the few I know of which seeks to find a better, more economical, and certainly less burdensome way to achieve an important social goal without regulation. It seems to be the type of alternative program which would be favored by the new administration.

There are other good and useful noise programs at EPA, many of which I can quite honestly say represent the best use of taxpayers' dollars for a legitimate function of government. Most meet an important demand either for soundproofing and weatherization, equipment loans, limited financial assistance, and, of course, technical assistance and information exchange through the Each Community Helps Others (ECHO) program, which was mentioned before and which I find very dynamic.

Furthermore, these programs are all voluntary and generate a voluntary match by cities unequalled by most other Federal programs. All work toward the goal of a quieter environment—a goal advocated by cities and mandated by Congress.

Mr. Chairman, the Nation's cities are well aware of the nature and extent of the fiscal and economic crisis we face. We are pre-

22

pared to take our fair share of reductions and program cuts. But totally eliminating the noise program will exacerbate the noise problem in our communities. It would be a counterproductive way to approach the issue of spending reductions.

As an alternative, I want to suggest a three-step program which will both reduce Federal spending, end unnecessary regulation, and make the best elements of EPA's existing noise program even more cost effective.

What I am proposing today is that the Nation's cities join ranks with you and the other members of this committee to hammer out a reasonable compromise measure to present to the Senate and the new administration.

We all share noise problems and need Federal coordination to help us solve them and avoid unnecessary and costly duplication of effort.

Even President Reagan recognized the need for a coordinated attack on noise by signing into law some of the noise programs still underway in California today, many of which have served as models for our Federal programs.

And as an aside, I just testified yesterday at the hearing in our area for John Wayne Airport, so I can attest to the State of California's interests in the Noise Act and President Reagan's participation in it.

My three-step program is this:

First, eliminate all current or proposed regulatory initiatives called for in sections 5 and 6 of the Noise Control Act.

Shut down in total EPA's noise regulatory effort. Over $50 million has been spent on these initiatives since 1972 and much legitimate criticism has been fired at these regulations over the past several months.

For the most part cities receive only very limited noise reduction from these preemptive regulations and the benefits do not outweigh the costs in taxpayers' dollars or added consumer costs. Cities are willing to work with others to promote voluntary standards through programs such as "Buy Quiet."

Second, reduce the Agency's budget from its current $13 million to $6 million with all appropriated moneys used exclusively in support of State and local programs. This is a difficult choice because it means an end to research, international cooperation, and no state-of-the-art studies, but it will return the focus of the Agency to practical, nuts and bolts activities for the prevention and control of noise at the local level.

I underscore the word practical because in the past NLC has witnessed some very well-intentioned projects designed to help cities, particularly in the area of construction noise, which did not have any utility for the vast majority of local governments.

Cities need real world programs based on utility and ease of application, not costly, state-of-the-art techniques that simply do not sell at city hall.

Third, a continuation and examination of aircraft noise abatement assistance is desperately needed. Why EPA has not supported aircraft noise abatement assistance to a greater extent I cannot say, but a conscious decision now by EPA to help cities with airport noise planning would be tremendously helpful.

23

We don't need any further study of the problem. Cities know it is a problem already. We need good, practical techniques that can be applied locally to solve this growing problem.

I know you, Congressman Florio, share similar concerns. Your own district, and my city, are severely impacted by airport noise. However, if EPA's noise program is scrapped, you will have no advocate in Washington, nor will any city in the country.

Eliminating EPA's role in aircraft noise would be a major hardship for many communities which would be more efficiently served by coordinated technical assistance to assist them in implementing effective aircraft noise control measures, in making the Federal Aviation Administration aware of the impact of airport noise on our Nation's communities.

This three-point strategy for EPA's noise program will mean a better Federal noise program for everyone. An appropriation of $6 million, although significantly less than prior years, could bring increased benefits for cities.

In the past, despite the explicit directives of the Quiet Communities Act, most appropriated moneys have been consumed by EPA's regulatory efforts. Unfortunately, this strategy has contributed to the dilemma we face today. This singular regulatory obsession has led to highly critical articles and editorials, and countless lawsuits which waste taxpayer and consumer dollars.

Mr. Chairman, I don't know of any support for EPA regulations that preempt local government, set permissive standards, mandate recordkeeping, require Federal forms to be filled out, and contribute to inflated consumer costs.

It is our hope that your committee will make the Quiet Communities Act amendments the focus of this reauthorization bill together with section 7 of the parent legislation which spells out a program for airport noise control. We need this EPA program.

Allow me to clearly demonstrate this need by concluding my testimony with some very disturbing statistics gathered by the staff at NLC through a survey of the Nation's cities.

Seventy-seven percent of all large cities cite aircraft noise as a serious problem;

Fifty-three percent of city officials view noise as a serious problem, more so than air pollution, water pollution, or solid waste pollution;

Fifty-four percent believe not enough is being done to control noise;

Forty-six percent of city officials believe noise is a more serious problem than 5 years ago;

And, a full 37 percent believe noise represents a threat to the health of citizens in their community.

The National League of Cities thanks you for this opportunity to testify on this very important piece of urban legislation.

I welcome any questions that you or other members of this subcommittee wish to ask.

Mr. FLORIO. Thank you very much, sir.

## STATEMENT OF JESSE O. BORTHWICK

Mr. BORTHWICK. Mr. Chairman, members of the subcommittee, I appreciate the opportunity to appear before you today to present

24

the views of NANCO on the Noise Control Act of 1972, as amended by the Quiet Communities Act of 1978.

Our association is extremely concerned about the direction of the national noise control effort, especially in light of the recent OMB recommendation to abolish the noise control programs at EPA. We would like to echo—and no pun intended—what has been said earlier. Through the establishment of a national program of technical and financial assistance under the auspices of the Quiet Communities Act, over the last 2 years State and local programs have flourished. State and local cooperative agreements, while limited in numbers and levels, have sparked programs to life. In addition, EPA has established several exemplary programs including regional technical assistance centers, the volunteer echo program, the noise counselors program, the quiet schools program, and buy quiet. If you want to find waste, you needn't look at these programs. They should serve as models for other Federal programs to emulate, and yet OMB suggests they should be abolished. NANCO strongly opposes such a recommendation.

Our written testimony focuses on reducing environmental noise and on the tremendous success of the national technical and financial assistance programs established by the Quiet Communities Act amendments. However, due to the short time available, I will limit my oral testimony to the critical issue of Federal preemption.

There is a great deal of talk these days about the proliferation of Federal regulations and their impact on industry and, in turn, our economy. We tend to forget that some regulations are designed to protect industry. This is the case with those regulations promulgated to date under the Noise Control Act.

The Federal Government's inability to regulate at a reasonable level has been clearly demonstrated by those standards promulgated to date. For example, in 1975, as a result of new products standards, in effect in several States and cities, the industry standard for newly manufactured trucks was 83 decibels. In 1976, EPA issued standards for newly manufactured trucks with an initial status quo standard of 83 decibels effective in 1978, with further standards dropping to 80 decibels effective in 1982 and a reserve standard for 1985.

While studies conducted by the U.S. Department of Transportation in the early 1970's and more recently by EPA have clearly demonstrated the feasibility of a 75-decibel truck, under heavy pressure from industry EPA has postponed its 1982 standard for 1 year and is currently considering freezing the standard at 83 decibels, the level at which State and locals were regulating in 1975. This regulation, like so many others, has done nothing more than preempt States and cities from taking action.

With regard to enforcement, the U.S. Department of Transportation's Bureau of Motor Carrier Safety and the Federal Railroad Administration have both failed to provide adequate enforcement mechanisms to guarantee compliance with the interstate motor carrier regulation and the railroad noise regulations.

While their disinterest is partially justified based on an inadequate appropriation, the hands of State and local officials interested in taking enforcement actions are tied. Before a State or a

community can take enforcement actions against a federally regulated noise source, they must first adopt identical legislation.

Even if a State or municipality goes to the trouble of adopting complementary legislation, they usually back off when they realize that complicated Federal enforcement procedures must be adhered to.

So what do we have? We have weak standards that do little more than legalize noise, an almost total lack of enforcement, and several industries protected against State and local action.

I can assure you that unless these standards are made more stringent and adequate provision is made for their enforcement, States and communities will be the first to support and those affected industries the last to support abolishment of these regulations. Of course, our greatest concern is possibility that the EPA noise regulatory program will be crippled while these regulations are maintained only to preempt State and local action.

If the Federal program is severely curtailed, these regulations must be stricken.

In conclusion, NANCO recognizes the need for national uniformity of new product regulations. However, those regulations which have been promulgated to date have done little more than shield the industry from State and local control. In light of President Reagan's program of deregulation, and the Federal Government's inability to regulate at a reasonable level, NANCO strongly encourages Congress to consider abolishing those regulations which have been promulgated under the Noise Control Act, with the important exception of the Federal standards and control programs regarding aircraft noise.

Furthermore, NANCO recognizes that the future of noise control in the United States at the State and local levels depends heavily on a national presence and on those programs which have evolved within the last 2 years. There appears to be a new spirit of working together for a quiet environment in this country. Federal, State, and local officials along with senior citizens, university professors, elected officials, noise control professionals, neighborhood associations, and teachers are all cooperating, communicating, and supporting one another.

We therefore strongly encourage Congress to reauthorize, at a minimum, those provisions of the act established through the Quiet Communities Act. Mr. Chairman, members of the committee, thank you again for the opportunity to testify. I will be glad to answer any questions.

[Mr. Borthwick's prepared statement follows:]

26

STATEMENT OF JESSE O. BORTHWICK, EXECUTIVE DIRECTOR, NATIONAL ASSOCIATION
OF NOISE CONTROL OFFICIALS

## INTRODUCTION

Mr. Chairman and Members of the Subcommittee. I appreciate the
opportunity to appear before you to present the views of the
National Association of Noise Control Officials, NANCO, on the
Noise Control Act of 1972 as amended by the Quiet Communities Act
of 1978.

There are two major points we would like to make today. First,
the Noise Control Act of 1972, which focused heavily on federal
regulation of major noise sources, has for the most part failed to
reduce environmental noise in the United States. Second,
Congress, recognizing, this failure enacted the Quiet Communities
Act of 1978, which focused on helping States and cities solve
their own problems. This more recent legislation has been highly
successful and is vital to the continuation of State and local
noise control activities.

## NOISE CONTROL THROUGH FEDERAL REGULATION

Long before the Noise Control Act of 1972 States and cities were
dealing with the problem of noise and its control. At first the
regulations were qualitative in nature, dealing with the problem
from a nuisance standpoint. Then, in the 1950's, States and
cities began establishing quantitative or numerically based
standards. Noise control was evolving from an art into a science.
By the mid 1960's California and a handful of other States and
cities began adopting standards for newly manufactured motor
vehicles, construction equipment, snowmobiles, and other products.
Airports were beginning to be regulated along with trucks and rail
carriers. Industry, concerned over having to comply with a
multiplicity of State and local regulations sought and received
relief from Congress in the form of the Noise Control Act of 1972.

The Act called for the identification and regulation of major
noise sources distributed in commerce and for the establishment of
noise standards for aircraft, rail carriers, and motor carriers.
But most importantly it effectively preempted States and cities
from regulating (except through identical standards) those sources
regulated at the Federal level. Our views of regulations issued
to date follow:

    MOTOR CARRIER NOISE EMISSION STANDARD (1974)
    While the initial in-use standards for interstate motor
    carriers were reasonable, the average truck noise emission
    levels have dropped over the last six years as a result of
    State and local new truck noise standards in effect in the
    late 1960's and early 1970's. Standards are no longer
    appropriate especially in light of the federal standards for

newly manufactured medium and heavy duty trucks. In any case
federal enforcement of this regulation by the Bureau of Motor
Carrier Safety is severely lacking if not totally absent.

RAILROAD NOISE EMISSION STANDARDS (1975/1980)
The in use noise standards established in 1975 for trains
operated by interstate rail carriers are considered
reasonable. However, enforcement through the Federal
Railroad Administration is to the best of our knowledge
totally absent. In 1977 as a result of a petition filed by
the American Association of Railroads, EPA was directed by
court order to broaden the scope of its railroad noise
emission standards. This only points out the intent of the
Act to usurp the powers of State and local government to deal
with the problem of railroad noise. While source specific
standards set to date are considered reasonable, the
requirements to adopt identical standards and follow complex
enforcement methodologies have severely limited State and
local enforcement.

PORTABLE AIR COMPRESSORS (1976)
Standards adopted by EPA are weaker than State and local
regulations on the books at the time of adoption. Most
significant impacts can be best controlled through in-use
noise standards and administrative controls.

MEDIUM AND HEAVY DUTY TRUCKS (1976)
In 1975 as a result of new product standards in effect in
several States and cities, the industry standard for newly
manufactured trucks was 83 dB. In 1976 EPA issued standards
for newly manufactured trucks with an inital "status quo"
standard of 83 dB effective 1978, 80 dB effective 1982, and a
reserve standard for 1985. While studies conducted by the
USDOT and EPA have clearly demonstrated the feasibility of a
75 dB truck, under heavy industry pressure EPA has postponed
its 1982 standard for one year and is currently considering
freezing the standard at 83 dB. Again this regulation has
done nothing more than preempt States and cities from taking
action.

TRUCK MOUNTED SOLID WASTE COMPACTORS (1979)
While the standard established by EPA calls for a reduction
in compactor noise emissions, the regulation fails to address
the critical issue. The problem with refuse collection noise
can best be dealt with through local in-use and
administrative controls. Reducing compactor noise emission
levels 5 or 6 dB will virtually have no effect on reducing
the impact of refuse collection in a noise sensitive area
during early morning hours when background noise levels are
low.

MOTORCYCLES AND MOTORCYCLE REPLACEMENT EXHAUST SYSTEMS (1980)
While the exhaust system portion of this rule is worthy of
praise, the 83 dB standard for motorcycles in 1983 does

28

nothing more than accept "status quo" and again provide industry with protection. States and cities were regulating effectively at 83 dB in 1975 with scheduled reductions to 75 dB planned by 1985. The real problem with unnecessary motorcycle noise centers around the owner/operator's failure to maintain the exhaust system and improper operation. In-use enforcement by State and local authorities should prove to be the most effective control. Labeling of aftermarket exhaust systems as required by the regulation could greatly assist enforcement efforts.

In our opinion these regulations have if anything had a negative effect on the quality of our Nation's acoustic environment. They do nothing more than legalize noise. Either they should be strengthened and adequate provisions made for their enforcement or they should be abolished, allowing States and cities to regulate as they see fit.

There is one important exception. We do strongly feel that it is extremely important that the Federal regulations and control programs regarding aircraft noise be maintained and strengthened. Even if aircraft noise emission levels on average should continue to drop as a result of these standards, airport noise levels will more than likely remain high as the number of commercial operations increase. Decentralizing the already taxed hub airports will also result in significant increases in noise impacts at smaller reliever airports. Only through the maintenance of strong Federal source regulation, combined with specific State and local actions, will a meaningful reduction in airport noise be realized.


### HELPING STATES AND CITIES HELP THEMSELVES


The Quiet Communities Act of 1978 has had a completely different impact on noise control in the United States. Through the establishment of a nationwide program of technical and financial assistance State and local programs have flourished. Some examples of programs established under the Act include:

STATE AND LOCAL COOPERATIVE AGREEMENTS
Over the last two years approximately 23 communities have received grants averaging $10,000 to help launch noise control programs. More important are the 22 State grants. Averaging only $34,000, the majority of these State grant programs have been designed to support the development of local programs through various technical assistance programs. During the first year these States sponsored over 30 training courses and assisted over 130 communities. It is expected that the number of communities receiving assistance will double during FY 82. We feel that EPA has done an excellent job of developing and implementing the grant programs

established by Congress.

## TECHNICAL ASSISTANCE CENTERS

EPA has established regional technical assistance centers at 10 universities across the country. These technical assistance centers worked with over 100 communities last year and conducted 66 training programs. We believe this concept to be highly effective, taking advantage of the expertise and facilities of our academic community.

## EACH COMMUNITY HELPS OTHERS

The ECHO program was launched by EPA early in 1978 prior to the passage of the Quiet Communities Act. Under the national ECHO program 38 local noise control officials volunteer their time one or two days a month to work with communities interested in developing or improving noise control programs. Program emphasis is on the transferability of local noise control skills and expertise. To date over 165 communities have received technical assistance under this volunteer program. In addition there are some 10 State ECHO programs that are promoting the concept of peer support. While this program taxes those experts who volunteer their time, the benefits to communities are tremendous.

## NOISE COUNSELORS PROGRAM

Working together with the National Retired Teachers Association/American Association of Retired Persons and the Urban League under the auspices of the Older Americans Act, EPA has created a network of "Noise Counselors". Senior citizens receive formal training in health effects of noise, basic acoustics, and noise program development as well as on-the-job training. They are placed as volunteer resource persons in interested communities. Last year the programs 40 counselors made over 900 presentations, handled over 1100 noise complaints, responded to 9000 requests for noise control information, generated close to 1000 media items, and exhibited at 90 Fairs. In addition a substantial number of senior citizens from local chapters are working with these counselors on a volunteer basis.

## QUIET SCHOOLS PROGRAM

EPA has developed a program designed to assist teachers and school officials across the country to teach the importance of noise control in their schools and to make their schools a quieter place in which to work and study. School systems in nine cities across the country are currently participating in pilot projects. Many State and local programs are anxiously awaiting the results of the pilot projects.

## BUY QUIET

In concert, the National Institute of Governmental Purchasing and EPA have developed a new concept in noise control, Buy Quiet. The program provides States and cities with the information necessary to purchase quiet products. The

30

program indirectly encourages industry, on a volunteer basis,
to develop and market quieter products. This program appears
to be a viable alternative to new product regulation.

With the support of these and other Quiet Communities Act programs
we have made more progress in the last two years than in the last
twenty. There appears to be a new spirit of "working together for
a quiet environment." Federal, State, and local officials along
with senior citizens, university professors, noise control
professionals, and teachers are all cooperating, communicating and
supporting one another.

This legislation and the programs which have evolved in the short
time since its enactment should serve as models for other federal
programs to emulate, and yet we recently learned that OMB has
recommended that these programs be totally abolished. NANCO
strongly opposes such a drastic recommendation.


### CONCLUSIONS


In conclusion, NANCO recognizes the·need for national uniformity
of new product regulations. However, those regulations which have
been promulgated to date have done little more than shield the
industry from State and local control. In light of President
Reagan's program of deregulation, the Nation's economic posture,
and the federal government's inability to regulate at a reasonable
level, NANCO strongly encourages Congress to consider abolishing
those regulations which have been promulgated by EPA under the
Noise Control Act, with the important exception of those federal
standards and control programs regarding aircraft noise.

Times are hard and we wholeheartedly support the President in his
efforts to bring federal spending under control. However, there
should be equality in application of fiscal reductions. Perhaps
the Noise Control Program at EPA should be cut 20 to 30 percent.
But, to completely abolish a program which is designed to support
not burden State and local government would be a major mistake.
The future of noise control in the United States at the State and
local level depends heavily on a national presence and on those
programs which have evolved within the last two years. NANCO
therefore, strongly encourages Congress to reauthorize, at a
minimum, those provisions of. the Act established through the Quiet
Communities Act of 1978.


This completes our comments. Again, I thank you for the
invitation and opportunity to testify on this most critical
legislation. I would be more than happy to attempt to answer any
questions you might have. Thank you.

31

Mr. FLORIO. Thank you very much. It was a very good presentation by all of the witnesses. Mr. Lent.

Mr. LENT. Thank you, Mr. Chairman.

I don't have any specific questions other than to just comment on the fact that I appreciate the testimony of these people. This is an area that we are going to have to be looking into very closely, and we will be waiting with interest for March 10 when I understand that the administration will be coming down with more specific recommendations, and we will have to see at that time whether the authorization will be continued for this program. We appreciate your testimony. It will help us in evaluating those recommendations of the administration.

Mr. FLORIO. I would like to identify with the major thrust of all of the points that were raised, particularly your point, the last point with regard to the regulatory scheme. If things are going the way that I perceive that they are going, this is not just as a result of this administration but it is a result of this committee's directions to EPA over the last 2 years.

We are going to focus on these local programs and we are going to provide, hopefully, adequate funds for these very cost-effective local programs to provide for local participation, local volunteer efforts, and local educational programs to address the problems associated with the local generators of noise. We will be fighting as hard as we can to provide adequate funding.

My impression is, and perhaps with some legitimacy, that the regulatory requirements for lawn mowers, compactors and other things have not been as cost-effective as they could be. We have tried to steer EPA with some degree of success away from that program activity.

But your point is very, very important. To the degree that we are going to make that philosophic commitment, we have got to make that philosophic commitment with a clean sweep. We should not leave in place a haphazard regulatory system that can be used to justify nothing happening at the local level to address those problems.

I make reference specifically to the railroad problems that this committee has jurisdiction over; that as of now, my understanding of the legal situation is that there is really no real regulatory system in operation. There are studies that this committee has called for. There has been a court decision that says the very fact of the study going forward, the fact of the regulatory process being considered and revised effectively preempts the field.

I am not sure I agree with those decisions, but I think that is the law. The existence of Federal requirements that preclude local response in terms of rail yards, is unsatisfactory; that if we are going to make the decision that we are going to emphasize local participation and steer away from national regulatory systems, we should clean the slate and therefore allow the localities to address the problems as they see fit to do so.

The other points that have been raised I think are very valuable in terms of the local orientation. The airport noise question is perhaps the one exception that most people agree upon; that there is a very vital role for EPA to play along with FAA which is absolutely essential because it is the agency that has the noise

32

control considerations to put into the whole process. FAA is concerned about safety and the smooth flow of interstate traffic. The Congress is on record, again last year on record, in requiring that FAA's regulations with regard to airport noise should be framed with EPA's advice, with the requirement that EPA be consulted.

For EPA to play that consultative role appropriately, there has got to be personnel, there has got to be funding, and I am hopeful that the authorization bill will recognize that fact, and will provide the opportunities for us to deal with that problem.

The three individuals who are here are very dramatically affected by the airport noise problem. Two are from New York, and myself, of course, from Philadelphia. There are a great number of members of the Congress who are aware of airport noise; that is, their constituents are impacted by airport noise. I am confident that we can insure that the program that does exist is able to address that particular problem.

I appreciate your consideration and your support, and look forward to working with you individually and the organizations that you represent. Thank you very much.

Mr. FLORIO. Our last witness is Mr. Walter Barber, Jr., the Acting Administrator of U.S. Environment Protection Agency. We are pleased to welcome you before our committee. It has been learned that Mr. Barber has expressed his happiness that this is not the Greek Legislature; everyone knows how people bearing bad news fared in Greece. We are prepared to listen to his presentation.

Mr. Barber, welcome to the committee.

## STATEMENT OF WALTER C. BARBER, JR., ACTING ADMINISTRATOR, ENVIRONMENTAL PROTECTION AGENCY, ACCOMPANIED BY EDWARD F. TUERK, ACTING ASSISTANT ADMINISTRATOR FOR AIR NOISE AND RADIATION

Mr. BARBER. Thank you, Mr. Chairman.

Mr. FLORIO. May I ask, what is the status of the appointment of the Administrator? Has the Administrator been actually appointed?

Mr. BARBER. Named. I am not sure the nomination has been sent over yet.

Mr. SCHEUER. Do we know the identity of the Administrator?

Mr. BARBER. The identity of the named person is Mrs. Anne Gorsuch.

I have with me Mr. Ed Tuerk, the Acting Assistant Administrator for Air Noise and Radiation.

We have submitted a brief statement which I think we may as well introduce for the record.

Mr. FLORIO. Without objection, it will be made part of the record.

Mr. BARBER. I would like to compliment the committee and the previous witnesses for some of the most objective and thoughtful testimony that I have heard on environmental issues over the last several years that I have been in the business. I expect that there are substantial areas of agreement between the administration and the chairman as well as some of the witnesses who have spoken so far.

33

The administration has some significant reservations about the effectiveness of the noise regulatory program that EPA has been conducting and the desirability of continuing it. At this point alternatives for that regulatory program are being examined.

The administration's ongoing presumption is that the emphasis of noise control should be at the State and local levels. The question is how best to accomplish that. Over time, we obviously are working in a period of tight budget restrictions. The budget will be announced on March 10. We are not at liberty to discuss it in detail today. However, I think it is appropriate to note that all of EPA's programs will be scrutinized for budget reductions, as will all programs in the Federal Government, and we will be looking for ways to do business more efficiently. Associated with that will be both financial and personnel resource reductions throughout the agency.

We hope that we can do that in such a way as to keep the most environmentally effective parts of the program intact, and eliminate the parts that have been less effective. As I said, the EPA regulatory program for noise is one of the areas that we believe requires some careful scrutiny. I think that would conclude my opening comments, and we would be willing to answer any questions you might have.

[Mr. Barber's prepared statement follows:]

34

STATEMENT OF

WALTER C. BARBER, JR.

ACTING ADMINISTRATOR

U.S. ENVIRONMENTAL PROTECTION AGENCY

BEFORE THE

SUBCOMMITTEE ON COMMERCE, TRANSPORTATION, AND TOURISM

COMMITTEE ON ENERGY AND COMMERCE

HOUSE OF REPRESENTATIVES

FEBRUARY 24, 1981

Thank you, Mr. Chairman, for the opportunity to testify before this Committee on the implementation of the Noise Control Act, as amended by the Quiet Communities Act of 1978.

My testimony will focus on:

1) The growth of noise control activity at the State and local level; and

2) The status of the Agency's regulatory efforts in noise control.

Growth of State and Local Noise Programs

Municipal noise legislation in this country dates back to at least 1852 with the passage of the City of Boston's peace and tranquility ordinance.  At the State level, nuisance type noise laws associated with vehicle mufflers date back to the 1940's.  The first quantitative State law was enacted in 1964 for trucks operating on the New York State Thruway.

As a general rule, however, noise was not recognized as a problem requiring governmental action until the 1970's.  As late as 1971, just two

35

States and 59 local governments had enacted any type of law. By contrast, during the last 10 years we have experienced a major development of noise legislation, with over 1000 municipalities and 27 States having enacted such legislation by this year.

Of these, 13 States and over 160 local communities have on-going active noise control programs which are enforced today. These programs cover 31 million people. This growth of active State and local programs has been especially rapid during the last four years when we have seen a 77 percent increase in the number of active programs.

## Status of Regulatory Efforts

Since we last appeared before this Committee, we have promulgated regulations for garbage trucks, motorcycles, motorcycle replacement exhaust systems, and certain railroad noise sources. In addition, the Agency has promulgated general labeling requirements and specific noise labeling requirements for hearing protectors. These regulations complement the regulations that are already in place for medium and heavy trucks, interstate motor carriers, railroad locomotives, rail cars, and portable air compressors. There has also been follow-up activity recently on the medium and heavy truck regulation and the garbage truck regulation.

In the fall of 1980, the Agency received petitions from International Harvester Company and Mack Trucks, Incorporated, for reconsideration of the 80 decibel standard for new medium and heavy trucks which was to take effect in 1982. Because of the recent downturn in the economic health of the truck manufacturing industry and an unforeseen increase in the demand for medium trucks with diesel engines, which are the most costly to quiet, the Agency decided to provide temporary relief by granting a one-year deferral of the standard. At the same time, the Agency has invited public

36

comments on whether or not a further deferral would be appropriate. This comment period closes in April.

Earlier this month, the Agency met with representatives of the garbage truck manufacturing industry to discuss problems they were having with the testing and reporting provisions of the garbage truck regulation. As a result of this meeting, the Agency agreed to reconsider the testing, reporting, and related requirements. Pending the outcome of the Agency's reconsideration, enforcement of the garbage truck regulation has been suspended to avoid causing unintended burdens on the industry.

As this Committee will remember, the Agency has been under court order to expand its regulation of railroad locomotives and rail cars to include additional railroad facilities and equipment. The court order was the result of a successful lawsuit by the Association of American Railroads seeking such coverage in order to achieve total preemption of State and local standards.

In compliance with the court order, the Agency promulgated regulations for four additional railroad noise sources in January 1980. The Agency also had planned to promulgate a comprehensive noise emission standard for railyards to be measured at the property line by January 23 of this year. However, in comments received by the Agency this fall, both State and local governments and the Association of American Railroads suggested that EPA need not promulgate any further regulations in order to meet the Court's mandate. An extension of time has been granted by the court for EPA to consider these comments and to seek a possible settlement to the court case.

Recently, by Executive Order, President Reagan has instructed all agency heads to weigh the cost of all major new regulations and to impose on taxpayers and industry the least expensive way to fulfill their congressional mandates. In addition, the President has asked his Task Force on Regulatory Relief to make a cost benefit review of major regulations and to propose changes in those that are especially burdensome. The Agency expects that several noise regulations will be included in this review to ensure that our noise regulations are cost-efficient and do not impose an undue burden on the economy.

This concludes my prepared statement. Thank you Mr. Chairman.

37

Mr. FLORIO. Mr. Barber, you heard the comment that I made at the outset of the hearing. I just wanted to get some clarification on this statement that "the revised EPA budget submission to the Congress assumes that there will be no EPA noise program after fiscal 1982."

On the revised budget submission to Congress, is that something that is initiated—I am asking procedurally—out of EPA, or is that something that flows to the Congress, EPA via OMB? I would be much less troubled if it was initiated by EPA via OMB than if I thought that EPA was initiating that submission to the Congress on its own, with the intention of having no noise control program after fiscal year 1982.

Mr. BARBER. The administration will submit the budget, and the budget will be prepared, summarized and provided through the Office of Management and Budget. Budget decisions, as I think anyone who has observed the process over the last several weeks realize, are in fact made by the President and the Director of the Office of Management and Budget.

Mr. FLORIO. That was my understanding. Let me ask you very directly, do you feel that there is a need and a value to the noise program, whether it be as it is now or to be modified such that any suggestion that there be no program after fiscal year 1982 does not serve any particular public interest?

Mr. BARBER. Since I have been in this job for just a short time, and will be in it for just a few weeks, and since my business is air pollution as opposed to noise, I am a bit reluctant to comment on the appropriate role of the Federal Government. I think it is clear there is a noise problem. I think the noise problem in fact needs some additional attention. What role we prescribe for the Federal Government as opposed to State and local governments needs thought by people who are better prepared to analyze it than myself.

Mr. FLORIO. Aren't you or perhaps your associate prepared to say, particularly in light of the consensus that has evolved in the Congress over the last number of years, that there is a need to focus on local problems? The consensus upon which you commented regarding the rational presentation of the witnesses today is that there is a role for the Federal Government to play in providing technical expertise, so that we can have maximum local participation, and the existence of these local cost-effective programs. Doesn't that almost demand that there be at least a Federal local program to maximize the opportunities for these locally oriented programs?

Mr. BARBER. I think it does demand that there be a local program. The question is whether there is to be and what should be the nature of the Federal program along with the local program, and I think that is a question that has to be answered in the context of the status of programs of the local agencies and the State agencies now, the expected status a year, 2 and 3 years from now, how fast they come along, when can they get on their own feet and implement their programs with more independence, and how much assistance is needed for what period of time.

Mr. FLORIO. I understand all that, and I understand the question of degree. I understand the need for maybe changing the focus.

38

What I would like from someone is to tell me that whatever the focus, as long as we acknowledge that there is a problem, and that there is an opportunity for the localities to deal with this problem, given some assistance in terms of expertise, in terms of technology, that there is a role for the Federal Government to play justifies the existence of a Federal noise program.

Now, if there is no one that is prepared to say that and say, well, the problem does not exist to the point that there is no justification for a Federal program, then that is compatible with the suggestion that someone feels that after fiscal 1982 there will be no EPA noise program. That may very well be legitimate. I don't agree with it but at least it is consistent if one is prepared to say that there is no role for the Federal Government to play in noise programs.

Mr. BARBER. I think the position at this point would have to be stated that the role for the Federal Government beyond the next 18 months to 2 years is uncertain, and that it needs to be defined in the context of the status of the State and local programs and their ability to move with less or no Federal assistance. When that happens, or if that happens, is an issue yet to be resolved.

Mr. FLORIO. Let me just conclude on this one point, and not to beat a dead horse, we have talked about the local programs and everyone seems to feel that that is the best way to go. Let me address airport noise, that airport noise is not something that can be dealt with at a local level. There is a need for a national regulatory system with regard to noise control in the aviation industry, with regard to noise control in airports.

The Congress has spoken out very decisively that FAA and EPA should go forward to attempt to develop those types of regulations that are needed.

EPA's participation is absolutely essential as far as I am concerned, and therefore that in and of itself justifies EPA's participation in a noise program. Is there anything I have said with regard to airport noise that you violently disagree with?

Mr. BARBER. No, I don't think there is violent disagreement. We have two parts to the program. One is the aircraft noise standard part, which is FAA's responsibility. We haven't, as I understand it, done very much in that program area over the last several years.

Mr. FLORIO. That is another whole subject.

Mr. BARBER. The place that there seems to be the most bang for the buck now is in planning in the vicinity of local airports and in planning the operation at the airports in terms of real noise reductions to be achieved over the next 20 years, as opposed to another change in aircraft noise standards. So the question in terms of maximum payout, is how can we best achieve better operations of the equipment that we are going to have, because equipment that we are going to have is pretty well prescribed for the next increment of time.

Mr. FLORIO. Mr. Lent.

Mr. LENT. Thank you, Mr. Chairman.

Mr. Barber, is it fair to say that the administration is right now involved in evaluating the entire Noise Control Act and the rules and regulations that have been promulgated by the agency under that act, and that perhaps this administration is taking a fresh

39

look at ways to better achieve the goal of noise reduction in this country?

Mr. BARBER. I think that is an accurate characterization of the administration's plans. I think that is reflective of the plan for all of the agency's programs, noise being one of the early ones to be looked at.

Mr. LENT. Is it under consideration, for example, that airport noise control might be turned over exclusively to the FAA and give them a more specific role, and that railroad noise might be turned over to the Federal Railroad Administration, to give them a more specific role in regulating noise emanating from railroads?

Mr. BARBER. To my knowledge at this point, the analysis has not proceeded to institutional or administrative or organizational issues. We are still trying to prescribe the Federal role versus the State and local role as opposed to dividing the roles between the Federal agencies.

Mr. LENT. I have no further questions, Mr. Chairman.

Mr. FLORIO. Mr. Scheuer.

Mr. SCHEUER. Thank you, Mr. Chairman. Have you heard from the aircraft industry and cities and States as to how they view this recommendation for zero funding for implementation of noise control, and rescission of all existing noise regulations?

Mr. BARBER. We have not. There is no such proposal that has been made yet, so it would be a little premature for folks to comment on it. Any action we take on individual rules we would do through a notice and comment rulemaking process. The budget hasn't been released yet.

Mr. SCHEUER. Am I getting wrong signals from newspaper reports and other testimony? It is my understanding that the administration plans no funding for the Noise Control Act, and they will turn over the entire jurisdiction of airport noise regulations to cities and States. Am I laboring under a misapprehension?

Mr. BARBER. I think that may be a combination of bits and pieces.

Mr. SCHEUER. Yes, it is.

Mr. BARBER. The administration, to my knowledge, has not yet focused on the airport noise issue. The principal focus has been on the product noise issue and what the Federal role should be in product noise regulations, if any. That has been the prime focus of attention both in terms of currently enacted rules and rules for the future.

Mr. SCHEUER. Yes. I would like to call to your attention a letter dated February 18 that has been sent by Edward F. Tuerk, Acting Assistant Administrator for Air Noise and Radiation, to other staffers at EPA.

I would like unanimous consent to make this a part of the record, Mr. Chairman.

Mr. FLORIO. Mr. Scheuer, it has been made a part of the record.

[The following letter was received for the record:]

40

 UNITED STATES ENVIRONMENTAL PROTECTION AGENCY
WASHINGTON. D C. 20460

OFFICE OF
AIR, NOISE, AND RADIATION

February 18, 1981

SUBJECT: Placement of ONAC Personnel                    J :

FROM    : Edward F. Tuerk, Acting Assistant Administrator
          for Air, Noise and Radiation

MEMO TO: Walt Barber
         Jack Hidinger
         David Rosenbaum
         Paul Stolpman
         Mike Walsh

       As you are all aware, the revised EPA budget submission to
the Congress assumes that there will be no EPA Noise Program
after Fiscal Year 1982.   This decision creates a situation in
which it would be advantageous for current employees of the
Office of Noise Abatement and Control be placed in other
assignments, as available, on an expedited basis in order to
minimize individual uncertanties.

       To facilitate this transition, effective immediately I
am instituting a requirement that no position in your organ-
ization be filled without considering all qualified personnel
currently employed in the Noise Program.   All completed
personnel actions in which selection was not made of an
employee of the Noise Program must be accompanied by a state-
ment as to who was considered and the reasons for their
non-selection for my review prior to being acted on by Personnel.

cc: Personnel
    ₹Mr. Elkins;

BEST COPY AVAILABLE

41

Mr. SCHEUER. Very good.

The first sentence of this letter reads, "As you are all aware, the revised EPA budget submission to the Congress assumes that there will be no EPA noise program after fiscal 1982." Isn't that presumptively clear?

Mr. BARBER. I think the memorandum was a little bit premature. There is no revised EPA budget submission to the Congress. The President will make a submission on March 10; the budget doesn't yet exist.

The program is being looked at from the ground up in the budget process. The concern that prompted that particular letter happens to do with the civil service rules, and the way the agency is structured, and the fact that any dislocated people in the noise program would have very limited rights for placement in other components of the division. That was an effort to tell all offices to desist in filling vacancies until this settled out and we knew what we were going to be doing in order to provide maximum protection for the people on the staff, in the event that some are dislocated.

Mr. SCHEUER. So you are saying it is not to be taken as a given that the EPA noise program after fiscal year 1982 will be wiped out or that there is going to be——

Mr. BARBER. I would not take it as a given. We haven't even come close to the 1983 budget yet. The 1982 budget hasn't been finalized, and I think that is an issue yet to be resolved.

Mr. FLORIO. Will the gentleman yield?

Mr. SCHEUER. Of course.

Mr. FLORIO. We are obviously aware of the fact that the budget has not yet been submitted to the Congress but there is a passback process where OMB has sent back to EPA its budget recommendations, and that there is a passback provision for the fiscal 1983 budget as well as the 1982 budget.

Mr. BARBER. The fiscal 1983 budgets have not yet been given to the agencies. They are scheduled for later this spring.

Mr. FLORIO. But the 1982 have?

Mr. BARBER. The 1982 recommendations have been made in 1981. The final marks have not been achieved, and the process of budgeting involves various nominations of program areas that may be addressed, totals that the agency has to achieve, and then the agency and the Office of Management and Budget need to negotiate the final budget, which has not yet happened, but will happen between now and March 10.

Mr. FLORIO. If the gentleman will yield further. Fine, there is great value in this hearing, then, in the sense that notwithstanding the fact that we haven't got your numbers, I would hope that you would carry back to that whole process this committee's very strong feeling that there is a need to avoid any discussion about the total elimination of this program for 1983 or 1982. The sense of this committee—and I think I speak for the committee—that there is a need to emphasize those cost-effective programs, the programs you have heard reference made to, that the committee I think stands almost as one with regard to the need for EPA's continued presence in the area of airport noise regulation, and that this committee, if one reviews the record of the past deliberations of this committee, is more than inclined to look very closely at modifi-

42

cations in the overall regulatory scheme that the agency has been involved with, but feels very strongly about the need for the continued presence in EPA of a noise control program.

I thank the gentleman for yielding.

Mr. SCHEUER. Thank you, Mr. Chairman. I simply support the chairman's position. You know we are in an age where I think virtually every Member of Congress supports the concept of a regulatory process that is cost effective, where the benefits clearly outweigh costs, and where the regulatory system is that which cannot as appropriately be carried on by a lower level of government. The Federal Government should not be in the business of regulating sewer collection and traffic signals and so forth.

That is appropriate for municipal government, and anything that can be done at the State and municipal levels as effectively and as appropriately as at the Federal level ought to be passed down.

However, when you take an aircraft that starts in Boston and goes to New York, and Atlanta, and Dallas, and Fort Worth, it seems to me that that is intrinsically the kind of regulation that literally begs for some kind of universality and consistency across our country, and across State lines. I don't want to be the boy that cries wolf, but for the Federal Government to get out of the business of airport noise control, and out of the business of regulating aircraft noise standards to me would leave a nightmare of conflicting and inconsistent regulations at the State and city levels that would leave both airport operators and the aircraft manufacturers in a state of utter chaos. It is inconceivable to me that an administration that is looking for rationality in Government would do that.

We hope that as soon as you get some decisions over there, and get your act together on your basic philosophy, how our society approaches airport noise control, and approaches specifications for manufacture of aircraft as well as operations of aircraft, that you will come back to us and report to us.

There are 6 to 10 million Americans living near airports who suffer grieviously, whose quality of life is diminished and whose health prospects in terms of damaged hearing, cardiovascular disease, diabetes, arthritis, fetal damage, increased heart rate, high blood pressure are definitely impacted by aircraft noise, and you have three members here today crossing party lines, whose constituencies either are near major airports or include major airports, as does mine.

Kennedy Airport is in my district. It is very close to my distinguished colleague from Long Island, Mr. Lent, and Congressman Florio, Philadelphia Airport abuts your district, so we are not speaking just from emotion; we are speaking from very hard experience in dealing with those communities.

Congress and the administration have compromised, and compromised, and compromised again on aircraft noise. A few years ago we gave the industry 9 years to bring their existing aircraft into conformity with proper aircraft noise levels. That certainly gave them time to phase out their obsolete fleet and sell them around the world, and to some extent they have done that, and to some extent manufacturers have made capital investments in good faith, relying on the fact that a civilized society cares about the quality of

43

life of its people. Many aircraft manufacturers and many operators have invested vast sums in the retrofit operation.

Then the Congress and the administration, over my violent protest, gave some of the aircraft another 5 years on top of the 9 years, so we have been more than generous regarding the, sometimes precarious financial position of the airlines. We have not been oblivious to their costs at all.

It seems to me that it would be unthinkable for us to abandon the standards that we established that were initially very generous, and which we then extended for 5 years for some aircraft.

What we are talking about are very, very small dollars for a large industry that affects many, many millions of Americans, and I would hope that it would be seen that Federal regulation of airport noise and Federal regulation of aircraft manufacturer and aircraft operations, from the point of view of noise, is a classic example of the most cost-effective and the most justifiable kind of Federal regulation.

If you say the Federal Government, can't get into the business of producing some kind of a systematic national standard on aircraft that hop all over the United States and land in a half dozen or a dozen communities in the space of 12 or 24 hours, then you really would have to say that the Federal Government should not be in the business of regulating anything.

I look forward very much to hearing from your new chairman when and if she is appointed or whoever is appointed after they have had a chance to consider this matter and after Vice President Bush and his distinguished colleagues on the new task force on the regulatory process have had a chance to consider this matter.

Thank you, Mr. Chairman.

Mr. FLORIO. Thank you very much.

Just in conclusion, Mr. Barber, when can we expect to receive from EPA the 5-year plan Congress has requested, and that I undertand has been completed as to EPA's activities in this noise-control program area?

Mr. BARBER. The plan hasn't reached my desk. It is at the Office of Management and Budget for review.

Mr. FLORIO. What relevancy has that got with regard to when we can receive it?

Mr. BARBER. I will have to find out and advise you. I just don't have an answer for you.

Mr. FLORIO. We would like to have it officially transmitted to us at your earliest convenience. To be frank, I have seen a copy of it, but I think it would be appropriate to have it officially transmitted to us as opposed to obtaining it through back windows. Parts of the plan address things that we have talked about today, particularly the major section on airport noise, stating in detail appropriate functions for EPA in terms of major areas of airport noise abatement planning in EPA, optimization of aircraft flight procedure roles, of airport land use management, et cetera. These are very important things that EPA has concluded they should be involved with, and now, at the 11th hour, to be told that this plan, which was developed in great detail, is somehow irrelevant causes us some apprehensions.

44

Mr. BARBER. I am not sure that anyone is saying that the plan is irrelevant. I think it is only fair that the new administration have an opportunity to consider the plan in the context of its overall proposals for environmental noise management at the Federal level. I will try to get back to you with a schedule for that.

Mr. FLORIO. Thank you.

Mr. BARBER. I will advise the new administrator of your views and your concern that we draw a line between the regulatory reform efforts on product rules and the regulatory reform efforts that may affect the aircraft-airport activities, and that we separate the regulatory reform efforts from the State and local efforts.

Mr. FLORIO. One last point you may also convey is the point that I made to one of the witnsses: that if we go forward in phasing out the regulatory scheme, other than the airport noise area, that it is not an attractive position at least for this member to conceive of ourselves of blanketing in ineffective regulations with preemption provisions. That is to say, that some of the regulations are in various states of finality, some are under court challenge, some are out there and the very interpretation of them being out there has the effect of precluding anyone from responding at the local level. So, should it be that this committee would make the determination that we are going to deemphasize regulation, I would think this committee would also consider eliminating the authority for all of those regular schemes, giving back to the localities the ability to deal with problems through local regulation.

Mr. BARBER. The issue of preemption is open and being discussed within the administration. There is nothing inherent in the regulatory reform concept that makes it pro business. The intent is to find the most efficient way to accomplish the goal. There is no suggestion that one would leave inefficient rules in place, and consequently preempt the marketplace, as a natural outcome of a regulatory reform activity.

Mr. FLORIO. I am aware of the fact that it may not be a conscious effort. I am not implying that it is a conscious effort. I am just saying that by virtue of the interpretations of different courts, and in the one specific situation I made reference to, I know that to be the case. But it goes throughout the whole regulatory system, that when the Federal Government undertakes a series of regulations, whether it be regulations to deal with the transportation of hazardous materials through communities or railroad noise, the courts have interpreted the existence, or the imminent existence, of a Federal regulatory scheme as precluding the ability of localities to act.

Now, we should have one or the other. If we are going to have a conscious national system of regulations, then one can make the argument that that should preclude the localities. On the other hand, if we don't have a national system, and we have something less which provides for no national regulation, the argument is made that the system almost being in operation precludes local regulation. That is unsatisfactory as far as I think the committee is concerned.

Mr. BARBER. The driving force is deregulation, not relaxed regulation. So I think the preemption issue will be addressed carefully by the administration.

45

Mr. FLORIO. Gentlemen, thank you very much.
Mr BARBER. Thank you.
Mr. FLORIO. The committee stands adjourned.
[The following statements, letters, mailgrams and telegrams were received for the record:]