## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| QUIET COMMUNITIES, INC.<br>60 Thoreau St.<br>Suite 261<br>Concord, MA 01742; *and*<br><br>JEANNE M. KEMPTHORNE,<br>*Plaintiffs.*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY; *and*<br><br>MICHAEL S. REGAN, in his official capacity as<br>Administrator,<br><br>United States Environmental Protection Agency<br>Mail Code 1101A<br>1200 Pennsylvania Ave., N.W.<br>Washington, DC 20460,<br>*Defendants.* | Case No. 1:23-cv-01649-JMC |

## PLAINTIFFS' CONSOLIDATED REPLY AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Dated: March 18, 2024.

JEFFREY M. FELDMAN
D.C. Bar No. WA0032
Summit Law Group
315 Fifth Avenue S, Suite 1000
Seattle, WA 98104-2682
Tel: (206) 676-7000
jefff@summitlaw.com

SANNE KNUDSEN
*Admitted Pro Hac Vice*
WSBA Bar No. 52654

1

Regulatory Environmental Law & Policy Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 221-7443
sknudsen@uw.edu

ERICA PROULX
*Admitted Pro Hac Vice*
WSBA Bar No. 60155
Regulatory Environmental Law & Policy Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 616-7329
uwdiehlfellow@uw.edu

*Attorneys for Plaintiffs Quiet Communities, Inc., and Jeanne M. Kempthorne*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| QUIET COMMUNITIES, INC.<br>60 Thoreau St.<br>Suite 261<br>Concord, MA 01742; *and*<br><br>JEANNE M. KEMPTHORNE,<br>*Plaintiffs*.<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY; *and*<br><br>MICHAEL S. REGAN, in his official capacity as<br>Administrator,<br><br>United States Environmental Protection Agency<br>Mail Code 1101A<br>1200 Pennsylvania Ave., N.W.<br>Washington, DC 20460,<br>*Defendants*. | Case No. 1:23-cv-01649-JMC |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' CONSOLIDATED REPLY AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

i

## TABLE OF CONTENTS

INTRODUCTION................................................................................................. 1

ARGUMENT ...................................................................................................... 1

    I.    THERE IS NO CONGRESSIONAL ACQUIESCENCE THAT EXCUSES EPA'S INACTION 1

        A.    Unenacted Congressional Statements Cannot Amend the Law........................ 1

        B.    Congress Has Not Changed EPA's Duties Through an Act of Appropriations. 3

        C.    Insufficient Funding Does Not Change EPA's Obligations ............................. 5

    II.    NONE OF EPA'S ARGUMENTS MAKES A FORTY-YEAR DELAY REASONABLE ......... 6

    III.    PLAINTIFFS HAVE STANDING FOR ALL CLAIMS ...................................................... 9

        A.    Plaintiffs Have Standing as to Claim 4 (Failure to Set Noise Emission Standards)................................................................................................... 10

        B.    Plaintiffs Have Standing to Assert Claim 5 (Failures to Carry Out the Low-Noise-Emission Products Program) ................................................................ 14

        C.    EPA Does Not Challenge Standing as to NCA Section 4(c)(3) ..................... 16

    IV.    THIS COURT HAS SUBJECT MATTER JURISDICTION OVER EPA'S  FAILURES TO ACT UNDER SECTION 8 OF THE NCA ....................................................................... 16

    V.    PLAINTIFFS ARE ENTITLED TO RELIEF FOR EPA'S FAILURE TO COMPLY WITH DATE-CERTAIN DEADLINES FOR SETTING NOISE EMISSION STANDARDS.............. 19

        A.    EPA's Duty to Comply with Section 6 Is Time-Bound and Mandatory.......... 19

        B.    EPA's Own Records and Practice at the Time Indicate that the "Notice of Intent" Published in 1982 Was Not Intended to Be Final Agency Action....... 24

    VI.    EPA'S DUTIES UNDER SECTIONS 8 AND 15 OF THE NCA ARE MANDATORY......... 27

        A.    Section 8's Obligations to Designate and Label Products Capable of Generating or Mitigating Harm from Noise Are Mandatory .......................... 28

        B.    Section 15's Obligation to Promulgate Regulations Implementing an LNEP Program Are Mandatory ........................................................................... 32

    VII.    EPA'S DUTIES UNDER SECTIONS 4 AND 14 ARE DISCRETE ..................................... 33

        A.    The Quiet Communities Act Enumerates Several Discrete Duties.................. 35

        B.    EPA Concedes That Its Duty to Publish Section 4(c)(3) Reports Is Discrete . 36

CONCLUSION ................................................................................................. 37

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Air. All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*,
  365 F. Supp. 3d 118 (D.D.C. 2019) ........................................................................ 9

*Am. Lung Ass'n v. Reilly*,
  962 F.2d 258 (2d Cir. 1992) ................................................................................. 20

*Babamuradova v. Blinken*,
  633 F. Supp. 3d 1 (D.C. Cir. 2022) ................................................................. 29, 30

*Carpenters Indus. Council v. Zinke*,
  854 F.3d 1 (D.C. Cir. 2017) ......................................................................... 11, 13, 14

*Center for Biological Diversity v. Zinke*,
  260 F. Supp. 3d 11 (D.D.C. 2017) ....................................................................... 28

*Citizens for Responsibility & Ethics in Washington v. U.S. Department of Homeland Security*,
  387 F. Supp. 3d 33 (D.D.C. 2019) ................................................................. 34, 35

*Clapper v. Amnesty Int'l, USA*,
  568 U.S. 398 (2013) ............................................................................................. 15

*Env't Def. Fund v. Thomas*,
  870 F.2d 892 (2d Cir. 1989) ........................................................................... 21, 22

*Env't Def. v. Leavitt*,
  329 F. Supp. 2d 55 (D.D.C. 2004) ....................................................................... 20

*Five Flags Pipe Line Co. v. Dep't of Transp.*,
  854 F.2d 1438 (D.C. Cir. 1988) ........................................................................... 17

*Florida Power & Light Co.*,
  470 U.S. 729 (1985) ............................................................................................. 17

*Friends of the Earth v. U.S. E.P.A.*,
  934 F. Supp. 2d 40 (D.D.C. 2013) ................................................................. 21, 22

*Fryshman v. United States Commission for Preservation of America's Heritage Board*,
  422 F. Supp. 3d 1 (D.D.C. 2019) ................................................................. 34, 35

*Girouard v. United States*,
  328 U.S. 61 (1946) ................................................................................................. 4

*In re Aiken*,
  725 F.3d 255 (D.C. Cir. 2013) ................................................................ 5

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000) ..................................................... 31, 32

*In re Core Commc'ns, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ................................................................ 9

*In re Nat. Res. Def. Council*,
  645 F.3d 400 (D.C. Cir. 2011) .............................................................. 18

*Kennecott Copper Corporation v. Costle*,
  572 F.2d 1349 (9th Cir. 1978)............................................................... 29

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................ 6

*Maine Cmty. Health Options v. United States*,
  140 S. Ct. 1308 (2020) ...................................................................... 5, 6

*Mashpee Wampanoag Tribal Council, Inc. v. Norton*,
  336 F.3d 1094 (D.C. Cir. 2003) .............................................................. 9

*Massachusetts v. E.P.A.*,
  549 U.S. 497 (2007) ........................................................................ 10, 21

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ................................................................ 28, 34, 35, 36

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................ 14

*Posadas v. Nat'l City Bank of N.Y.*,
  296 U.S. 497 (1936) ................................................................................ 3

*Rapanos v. United States*,
  547 U.S. 715 (2006) ................................................................................ 4

*Robertson v. Seattle Audubon Soc'y*,
  503 U.S. 429 (1992) ................................................................................ 3

*SEC v. Sloan*,
  436 U.S. 103 (1978) ................................................................................ 4

iv

*Sierra Club v. Jackson*,
   813 F. Supp. 2d 149 (D.D.C. 2011) ................................................................ 17, 18

*Sierra Club v. Leavitt*,
   355 F. Supp. 2d 544 (D.D.C. 2005) ......................................................................... 22

*Sierra Club v. Thomas*,
   828 F.2d 783 (D.C. Cir. 1987) ........................................................................... 18, 20

*Telecommunications Research and Action Center v. Federal Communications Commission*
   ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984) ....................................................... 8, 9, 17

*Tenn. Valley Auth. v. Hill*,
   437 U.S. 153 (1978) ................................................................................................. 4

*Thompson v. Cherokee Nation of Okla.*,
   334 F.3d 1075 (Fed. Cir. 2003) ............................................................................... 4

*United States v. Langston*,
   118 U.S. 389 (1886) ................................................................................................. 5

*Zook v. McCarthy*,
   52 F. Supp. 3d 69 (D.D.C. 2014) ........................................................................... 23

STATUTES

5 U.S.C. § 706(1) ......................................................................................................... 9
17 U.S.C. § 110(a)(3) ................................................................................................. 29
33 U.S.C. § 1251(b) ..................................................................................................... 7
42 U.S.C. § 4901(a)(3) ................................................................................................. 7
42 U.S.C. § 4903 ................................................................................................... 33, 36
42 U.S.C. § 4903(c)(1) ..................................................................................... 10, 16, 36
42 U.S.C. § 4903(c)(3) ......................................................................................... 16, 36
42 U.S.C. § 4904(b) ............................................................................................. 19, 24
42 U.S.C. § 4904(c) ................................................................................................... 24
42 U.S.C. § 4904(d) ................................................................................................... 27
42 U.S.C. § 4905 ................................................................................................. passim
42 U.S.C. § 4905(a)(1)(B) ..................................................................................... 20, 29
42 U.S.C. § 4905(a)(2)(B) ......................................................................................... 20
42 U.S.C. § 4905(a)(3) ............................................................................................... 20
42 U.S.C. § 4907 ......................................................................................... 16, 18, 28
42 U.S.C. § 4907(a) ......................................................................................... 19, 28, 31
42 U.S.C. § 4907(b) ......................................................................................... 19, 28, 31
42 U.S.C. § 4911(a) ................................................................................................... 17
42 U.S.C. § 4913 ........................................................................................... 33, 35, 36
42 U.S.C. § 4913(c) ................................................................................................... 35
42 U.S.C. § 4913(e) ................................................................................................... 36

42 U.S.C. § 4914 ............................................................................... 9, 14, 15, 16
42 U.S.C. § 4914(a)(3) ................................................................................. 15
42 U.S.C. § 4914(b)(5)(A) ............................................................................ 15
42 U.S.C. § 4914(c) ...................................................................................... 15
42 U.S.C. § 4914(h) ............................................................................... 16, 33
42 U.S.C. § 4915 .......................................................................................... 19
42 U.S.C. § 4915(a) ............................................................................... 17, 19
42 U.S.C. § 7401(a)(3) ................................................................................... 7
42 U.S.C. § 7409(d)(1) ................................................................................. 22
42 U.S.C. § 7411(b)(1)(A) ............................................................................ 29
42 U.S.C. § 7521(a)(1) .................................................................................. 21
44 U.S.C. § 3101 .......................................................................................... 34
54 U.S.C. § 312304(a)(1), (2) ....................................................................... 34

## OTHER AUTHORITIES

127 Cong. Rec. 15,401 (July 10, 1981) ........................................................... 2
H.R. 3071, 97th Cong. (1981) ......................................................................... 3
H.R. Rep. No. 92-842, reprinted in A Legislative History of the Noise Control Act of 1972
    (1974) ...................................................................................................... 30
H.R. Rep. No. 97-85 (May 19, 1981) ...................................................... 2, 3, 8
S. 1204, 97th Cong. (1981) ............................................................................. 3
S. Rep. No. 97-110 (May 15, 1981) ................................................................. 2
U.S. Const. art. I, § 7, cls. 2–3 ....................................................................... 2

## REGULATIONS

39 Fed. Reg. 6670 (Feb. 21, 1974) ................................................................ 33
40 Fed. Reg. 23,105 (May 28, 1975) .............................................................. 19
42 Fed. Reg. 2525 (Jan. 12, 1977) ................................................................. 19
42 Fed. Reg. 27,442 (May 21, 1977) .............................................................. 33
42 Fed. Reg. 6722 (Feb. 3, 1977) .................................................................. 19
44 Fed. Reg. 56,120 (Sept. 28, 1979) ....................................................... 30, 31
47 Fed. Reg. 54,107 (Dec. 1, 1982) ............................................................... 24
47 Fed. Reg. 54,108 (Dec. 1, 1982) ...................................................... 24, 25, 27
47 Fed. Reg. 54,111 (Dec. 1, 1982) ............................................................... 25
48 Fed. Reg. 32,502 (July 15, 1983) .............................................................. 25
48 Fed. Reg. 47,893 (Oct. 17, 1983) .............................................................. 26
49 Fed. Reg. 42,166 (Oct. 22, 1984) .............................................................. 26
50 Fed. Reg. 44,676 (Oct. 29, 1985) .............................................................. 26
51 Fed. Reg. 14,561 (Apr. 21, 1986) .............................................................. 26
51 Fed. Reg. 38,939 (Oct. 27, 1986) .............................................................. 26
52 Fed. Reg. 14,889 (Apr. 27, 1987) .............................................................. 26
53 Fed. Reg. 14,370 (Apr. 25, 1988) .............................................................. 26
53 Fed. Reg. 42,528 (Oct. 24, 1988) .............................................................. 26
54 Fed. Reg. 17,292 (Apr. 24, 1989) .............................................................. 26
54 Fed. Reg. 45,307 (Oct. 30, 1989) .............................................................. 26
56 Fed. Reg. 18,019 (Apr. 22, 1991) .............................................................. 26

56 Fed. Reg. 54,051 (Oct. 21, 1991) .......................................................................................... 26
57 Fed. Reg. 17,416 (Apr. 27, 1992) .......................................................................................... 26
57 Fed. Reg. 52,066 (Nov. 3, 1992) ........................................................................................... 26
58 Fed. Reg. 57,039 (Oct. 25, 1993) .......................................................................................... 26
59 Fed. Reg. 21,090 (Apr. 25, 1994) .......................................................................................... 26
60 Fed. Reg. 23,929 (May 8, 1995) ............................................................................................ 26
74 Fed. Reg. 39,150 (Aug. 5, 2009) ....................................................................................... 3, 30

**RULES OF PROCEDURE**

Fed. R. Civ. P. 56 .......................................................................................................................... 8
LCvR 7(n)(1) ................................................................................................................................. 8

## LIST OF EXHIBITS

**Exhibit 1:** U.S. Gov't Accountability Off., GAO-16-464SP, 4 *Principles of Federal Appropriations Law* (2016)

**Exhibit 2:** James V. Saturno, Cong. Rsch. Serv., R46497, Authorizations and the Appropriations Process (2023)

**Exhibit 3:** Cong. Rsch. Serv., R47600, Transfer and Reprogramming of Appropriations: An Overview (2023)

**Exhibit 4:** U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations Law* (2006)

**Exhibit 5:** Memorandum from Michael S. Regan, Administrator, Principles and Best Practices for Oversight of State Implementation and Enforcement of Federal Environmental Laws (Feb. 17, 2023)

**Exhibit 6:** Excerpts from "Transportation Noise: Federal Control and Abatement Responsibilities May Need to Be Revised," Report No. GAO/RCED-90-11 (Oct. 1989)

## INTRODUCTION

EPA admits that, for over forty years, it has failed to comply with the Noise Control Act ("NCA" or "Act"). EPA gives no indication that it plans to take action under the Act in the future. Rather, it raises a variety of justifications for its failure: that Congress has implicitly repealed the Act; that Plaintiffs lack standing; that this Court does not have subject matter jurisdiction; and that EPA has acted with reasonable dispatch or has not been required to act at all. None of these arguments suffices to excuse EPA's inaction. Some are belied and completely undermined by EPA's own statements and actions over the many years.

EPA's arguments that its inaction is reasonable because of Congressional acquiescence or insufficient funding fail as a matter of law. Plaintiffs are therefore entitled to summary judgment on Claims 1, 2, 3, and 8, for which EPA makes no other arguments. EPA's arguments as to standing, jurisdiction, or the nature of mandatory duties and discrete actions are likewise invalid. Plaintiffs are therefore entitled to summary judgment on all other claims.

## ARGUMENT

### I.   THERE IS NO CONGRESSIONAL ACQUIESCENCE THAT EXCUSES EPA'S INACTION

EPA argues that its four decades of noncompliance with the NCA is excused on the grounds of Congress's acquiescence and lack of appropriations. These arguments fail. The NCA has not been repealed or amended in any material way since 1978. EPA's obligations under the Act remain intact.

### A.   Unenacted Congressional Statements Cannot Amend the Law

EPA argues that its inaction is excused because Congress has "withdrawn" funding for the NCA, claiming that Congress made an "informed and deliberate approval of the plan to phase out federal noise control activities." Defs.' Mot. 6, 34–38. For support, EPA relies on the

circumstances and legislative history accompanying the incoming Presidential administration's 1981 recommendation for reduced funding based on that administration's "policy" that noise pollution should not be addressed at the federal level. Defs.' Mot. 6; S. Rep. No. 97-110, at 2 (May 15, 1981) (Defs.' Ex. 2); H.R. Rep. No. 97-85, at 3 (May 19, 1981) (Defs.' Ex. 3).

Congress acts in one way: by passing legislation through bicameralism and presentment. U.S. Const. art. I, § 7, cls. 2–3. Because the NCA has not been repealed or amended in any material way since 1978, EPA's mandatory duties under the Act remain the governing law and are not excused. Appropriations discussions, administrative policies, and views of members of Congressional subcommittees do not suffice to amend, repeal, or enact legislation.

In fact, when the administration asked to reduce funding for noise control in 1981, Congress knew that defunding alone would not relieve EPA of its duties. In a proposed bill, the Senate stated, "in order to accomplish the goal of the administration, it was necessary not only to reduce appropriations for the Environmental Protection Agency for this purpose *but also to very substantially amend* the Noise Control Act." 127 Cong. Rec. 15,401 (July 10, 1981) (emphasis added); *see also* H.R. Rep. No. 97-85, at 3–4.

Indeed, the views expressed by individual members of Congress during the 1981 budget process do not reflect broad consensus on noise policy. "The House and Senate differed substantially in their views on funding for the noise program." U.S. General Accounting Office, "Transportation Noise: Federal Control and Abatement Responsibilities May Need to Be Revised," Report No. GAO/RCED-90-11, at 16 (Oct. 1989) ("GAO Report") (Defs.' Ex. 6). Furthermore, the House subcommittee recommended that NCA work related to the Quiet Communities Act should "continue to be carried out as diligently as it has since enactment." H.R. Rep. No. 97-85, at 6. The House subcommittee also "disagree[d] with the [President's]

2

recommendation to discontinue the [Federal noise] program altogether," noting that "Congress has repeatedly upheld the Federal role to assist communities in their efforts to protect the public health and welfare from the adverse effects of uncontrolled noise." *Id.* at 3. That same subcommittee reiterated the continuing need for the NCA: "This Committee upholds the findings made by previous Congresses that noise presents a danger to the public health and welfare and that Federal commitment toward minimizing that threat should not be withdrawn, *even in the face of budget reductions*." *Id.* (emphasis added).

The incoming Presidential administration in 1981 wanted the NCA repealed, but after ample debate it did not secure enough votes to alter any of EPA's mandatory duties. Defs.' Mot. 7; H.R. 3071, 97th Cong. (1981); S. 1204, 97th Cong. (1981). Congress left the NCA intact. The relevant provisions enacted in 1972 and 1978 remain in effect today, unchanged.

Moreover, EPA's own behavior reflects that it knew its NCA obligations persisted after 1981. In its 2009 Federal Register notice of proposed rulemaking to revise the noise labeling standards for hearing protection devices, EPA cited the NCA as authority. 74 Fed. Reg. 39,150 (Aug. 5, 2009). In contrast with EPA's argument here that it "indefinitely" lost the power to act in 1981, EPA admits that it took action under the NCA as late as 2009. Defs.' Mot. 35, 38; Defs.' Answer ¶¶ 68, 70–71.

**B.     Congress Has Not Changed EPA's Duties Through an Act of Appropriations**

EPA asserts, with no citation, that Congress altered EPA's obligations through an act of appropriations. Defs.' Mot. 38. Congressional repeal of legislation via an appropriations bill, however, must be "clear and manifest." *Posadas v. Nat'l City Bank of N.Y.*, 296 U.S. 497, 503 (1936); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440 (1992). Legislative history and appropriation committee expressions are not sufficient. *Tenn. Valley Auth. v. Hill*, 437 U.S. 153,

193 (1978) ("Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress"); U.S. Gov't Accountability Off., GAO-16-464SP, 4 *Principles of Federal Appropriations Law* 2-59 (2016) ("GAO *Principles of Federal Appropriations Law*") ("it is the language of the appropriation act, and not the language of its legislative history, that is enacted into law") (attached as Ex. 1).[1]

Here, there is not one contemporaneous appropriations act that mentions repeal, major modification, or explicit and permanent withdrawal of funding from the NCA.[2] Silence is not acquiescence. *Girouard v. United States*, 328 U.S. 61, 69 (1946) ("It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law.").

Moreover, arguments for Congressional acquiescence are disfavored. *See, e.g.*, *Rapanos v. United States*, 547 U.S. 715, 749–50 (2006) (noting the Supreme Court's "oft-expressed skepticism toward reading the tea leaves of congressional inaction" and refusing to find Congressional acquiescence). This is true even in the context of long-term agency practices. *Tenn. Valley Auth.*, 437 U.S. at 192 ("[I]n *SEC v. Sloan*, 436 U.S. 103 (1978), we declined to presume general congressional acquiescence in a 34-year-old practice of the Securities and Exchange Commission, despite the fact that the Senate Committee *having jurisdiction over the Commission's activities* had long expressed approval of the practice." (emphasis in original)).

---

[1] The United States Government and Accountability Office's *Principles of Federal Appropriations Law*, cited by courts as authority on this issue, describes the principles that resolve "the relationship of appropriation acts to other statutes." GAO *Principles of Federal Appropriations Law*, at 2-57. *See Thompson v. Cherokee Nation of Okla.*, 334 F.3d 1075, 1084 (Fed. Cir. 2003).

[2] *See* Pub. L. No. 96-526, 94 Stat. 3044 (1980); Pub. L. No. 97-101, 95 Stat. 1417 (1981); Pub. L. No. 97-272, 96 Stat. 1160 (1982); Pub. L. No. 98-45, 97 Stat. 219 (1983); Pub. L. No. 98-371, 98 Stat. 1213 (1984).

### C.     Insufficient Funding Does Not Change EPA's Obligations

EPA also relies on claims of insufficient funding or the absence of earmarked funds to justify its inaction, arguing that Congress "did not appropriate any funding for EPA's noise control program for fiscal year 1983 and beyond" and "never restor[ed]" funding for the Act. Defs.' Mot. 7, 36. This argument fails: courts have long refused to find repeal by implication where appropriations are reduced but absent words "expressly, or by clear implication" modifying or repealing existing law. *United States v. Langston*, 118 U.S. 389, 394 (1886).

The law is clear: the absence of sufficient or earmarked appropriations by Congress does not excuse agency obligations or demonstrate Congressional acquiescence in an agency's inaction. *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) ("This Court's aversion to implied repeals is especially strong in the appropriations context. The Government must point to something more than the mere omission to appropriate a sufficient sum. The question, then, is whether the appropriations riders manifestly repealed or discharged the Government's uncapped obligation." (internal quotation marks and citations omitted)); *In re Aiken*, 725 F.3d 255, 266–67 (D.C. Cir. 2013) (holding that agencies may not ignore statutory mandates simply because Congress has not appropriated necessary funds and expressing separation of powers concerns if the executive branch were empowered to disregard federal law).

Only express language from Congress prohibiting EPA from spending funds on noise control would absolve EPA from carrying out its duties under the NCA. No such words exist.[3] "[I]f Congress fails to appropriate sufficient funds *without explicitly denying* their use for a

---

[3] None of EPA's appropriations bills before 1981 (when EPA actively carried out the mandates of the NCA) or after 1981 (in the years EPA claims Congress failed to fund the NCA) directed or denied funds for NCA purposes. *See* Pub. L. No. 94-116, 89 Stat. 581 (1975); Pub. L. No. 94-378, 90 Stat. 1095 (1976); Pub. L. No. 95-119, 91 Stat. 1073 (1977); Pub. L. No. 95-392, 92 Stat. 791 (1978); Pub. L. No. 96-103, 93 Stat. 771 (1979). *See also supra* note 2.

particular purpose, those statutory obligations still exist even though the agency may lack sufficient funds to satisfy them." James V. Saturno, Cong. Rsch. Serv., R46497, Authorizations and the Appropriations Process 10 (2023) (attached as Ex. 2).

In the absence of earmarked funds, EPA can use lump-sum appropriations to carry out its duties under the NCA: "The existence of a statute (organic legislation) imposing substantive functions upon an agency is itself sufficient authorization for the necessary appropriations" and "expiration of an authorization of appropriations does not prohibit an agency from using available appropriations to carry out a program required or permitted by existing enabling legislation." GAO *Principles of Federal Appropriations Law*, at 2-55; *see also* Cong. Rsch. Serv., R47600, Transfer and Reprogramming of Appropriations: An Overview 4 (2023) (attached as Ex. 3); *Maine Cmty. Health Options*, 140 S. Ct. at 1321–22.

While agencies cannot exceed the total amount of a lump-sum appropriation, they are not bound by restrictions in budget requests, congressional committee reports, or legislative history. U.S. Gov't Accountability Off., GAO-06-382SP, *Principles of Federal Appropriations Law* 6-6–6-7 (2006) ("GAO 2 *Principles of Federal Appropriations Law*") (attached as Ex. 4); *Lincoln v. Vigil*, 508 U.S. 182, 192–93 (1993). This rule applies even when an agency "repeatedly inform[s]" Congress of its intentions. GAO 2 *Principles of Federal Appropriations Law*, at 6-7, 6-20 (citing *Lincoln*, 508 U.S. at 194).

## II.   NONE OF EPA'S ARGUMENTS MAKES A FORTY-YEAR DELAY REASONABLE

In addition to arguing that implied repeal and insufficient funding make its delay reasonable, EPA makes two other arguments to justify its inaction. Neither withstands scrutiny.

First, EPA argues that its forty-year delay does not frustrate statutory purpose. Defs. Mot. 38. EPA contends that budget cuts were made in 1981 because the administration at that time,

6

along with some in Congress, believed noise pollution should be handled by state and local governments, and so Congress would have wanted EPA to step back. *Id.*

EPA bases this argument on a truncated and misleading quote from the NCA: "[t]he NCA itself declares that 'primary responsibility for control of noise rests with state and local governments.'" Defs.' Mot. 38 (quoting 42 U.S.C. § 4901(a)(3)). EPA elides the significant remainder of the sentence. What the statute actually says is, "while primary responsibility for control of noise rests with State and local governments, *Federal action is essential to deal with major noise sources in commerce control of which require national uniformity of treatment*." 42 U.S.C. § 4901(a)(3) (emphasis added).

The Clean Water Act and the Clean Air Act, two of the NCA's contemporaries, contain similar "primary responsibility" language that has posed no obstacle to EPA's compliance with these statutes' commands. 33 U.S.C. § 1251(b); 42 U.S.C. § 7401(a)(3). Congress regularly declares a policy of giving an important, even primary, role to states in pollution-control regimes while directing EPA to exercise leadership in protecting the shared national environment. *See, e.g.*, Memorandum from Michael S. Regan, Administrator, Principles and Best Practices for Oversight of State Implementation and Enforcement of Federal Environmental Laws (Feb. 17, 2023) (attached as Ex. 5) ("[C]ooperative federalism means that states and EPA as co-regulators have a shared commitment to work together to protect human health and the environment, taking advantage of the strengths and capabilities of both federal and state authorities.").

Similarly, Congress took a "yes, and" approach to noise control. By enacting the NCA to centralize certain informational and regulatory aspects of noise control, and by amending it in 1978 to add the Quiet Communities Act Amendments for EPA to further support local and state

efforts to regulate noise, Congress recognized that federal as well as state and local action are necessary.

Contrary to EPA's assertion, federal inaction has not furthered the stated goals of the NCA. Indeed, members of Congress were skeptical that the Reagan-era budget cuts to the NCA would empower state and local governments. The House Committee warned "that reduced Federal funding and the Administration's recommendation to discontinue the EPA program office as recommended by the Administration may have the effect of reducing the effectiveness of state and local programs." H.R. Rep. No. 97-85, at 6. This apprehension proved correct. Instead of empowering state and local governments, EPA disbanded support previously provided under the Quiet Communities Act, leaving state and local governments to address, on an ad hoc basis, what Congress directed EPA to do in a centralized manner. *See, e.g.*, GAO Report, at 72–73 (attached as Ex. 6) ("Another major focus of EPA's program was technical assistance to local governments in establishing effective noise control programs . . . . EPA's current assistance in these areas is very limited, and our work indicates that the activities of state noise control offices have not expanded to fill the void."); QCi Aff. ¶¶ 23, 36, 56–58, 96–98 (ECF 18-9).[4]

Thus, EPA's unreasonable delay frustrates statutory purpose, further supporting a finding for Plaintiffs under *Telecommunications Research and Action Center v. Federal Communications Commission* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984).

---

[4] EPA argues that the Court's review is limited to the administrative record. Defs.' Mot. 8–9. However, EPA never lodged a record as required by LCvR 7(n)(1). Because this is not a record review case, Plaintiffs are entitled under Fed. R. Civ. P. 56 to support their Motion for Summary Judgment with affidavits, declarations, documents, and "other materials." If this were a record review case, then the Court should take EPA's failure to lodge a record as an admission that it has no stated justification for its decision to abandon the NCA for forty years.

Second, EPA relies on *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094 (D.C. Cir. 2003), to argue that the elapsed time is not decisive in unreasonable-delay cases. But *Mashpee* does not stand for the proposition that lengthy delay can be excused by selective appeals to legislative history and other post-hoc rationalizations. *Mashpee* held only that elapsed time needed to be considered in the context of other *TRAC* factors. 336 F.3d at 1100. Moreover, *Mashpee* is distinguishable on its facts. The Mashpee Wampanoag Tribal Council sued the Bureau of Indian Affairs ("BIA") for taking too long to process its petition to become a federally recognized tribe. *Id.* at 1097. But BIA was not ignoring its duties, and granting relief based on elapsed time would have allowed Mashpee to jump the line ahead of other tribes. *Id.* at 1100–01.

Unlike in *Mashpee*, the sheer length of time of EPA's inaction is decisive here. *See In re Core Commc'ns, Inc.*, 531 F.3d 849, 857 (D.C. Cir. 2008); *Air. All. Hous. v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 131 (D.D.C. 2019). Ultimately, it is the "statutory scheme" that informs the rule of reason governing the timetable within which agencies are expected to act. *See TRAC*, 750 F.2d at 79–80. Here, Congress has done nothing to alter that calculus and there are no other competing *TRAC* factors that excuse delay. Thus, EPA's forty-year delay in performing each of the mandatory and discrete duties named in Plaintiffs' claims is unreasonable in violation of Section 706(1) of the APA.

### III.   PLAINTIFFS HAVE STANDING FOR ALL CLAIMS

EPA concedes standing on all but three claims: Claim 4, challenging EPA's failure to set noise emission standards for four products identified as major sources of noise in the 1970s (42 U.S.C. § 4905; Defs.' Mot. 11–14); Claim 5, challenging EPA's failure to "develop" or "implement" a low-noise-emission products ("LNEPs") program (42 U.S.C. § 4914; Defs.' Mot. 21–22); and Claim 8 only as it relates to EPA's failure to coordinate the noise control programs

of all federal agencies (42 U.S.C. § 4903(c)(1); Defs.' Mot. 22–23). Plaintiffs have standing as to each of these claims under settled law.

### A.    Plaintiffs Have Standing as to Claim 4 (Failure to Set Noise Emission Standards)

EPA asserts Plaintiffs have not been harmed by its failure to adopt noise emission standards for four products—rock drills, pavement breakers, truck transport refrigeration units, and power lawn mowers. EPA claims Plaintiffs have not alleged sufficient exposure to these products. EPA also argues that an order from this Court requiring EPA to set noise emission standards for these four products would fail to redress Plaintiffs' injuries.

Plaintiffs have demonstrated harm sufficient to confer standing. First, Plaintiffs suffer physical, recreational, financial, and informational harm from unregulated noise. Second, Plaintiffs have sufficiently demonstrated that their injuries flow from EPA's inaction for nearly half a century. They suffer these harms because no portfolio of products subject to noise emission standards exists; nor is there an accompanying portfolio of information that Plaintiffs can rely on when advocating for quieter products in their communities. Third, because EPA has abandoned its responsibilities under the NCA, an order from the Court requiring EPA to carry out its duties under Section 6 (42 U.S.C. § 4905) to regulate major sources of noise has the capacity to reduce Plaintiffs' exposure to harmful effects of noise. *See Massachusetts v. E.P.A.*, 549 U.S. 497, 524 (2007) (rejecting EPA's "erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum.").

EPA's failure to regulate major noise sources contributes to the misconception that noise is a nuisance and not a harmful pollutant. QCi Aff. ¶¶ 13–14, 21–22, 26, 30–33, 37, 53, 91–94. All of the affidavits submitted in support of standing—whether from members of Quiet Communities, Kempthorne, or Quiet Communities as an organization—describe the hours

affiants have spent, and continue to spend, at their own expense, advocating for their communities and local governments to alleviate their misery from exposure to excessive noise. They all describe the fundamental difficulty and financial resources expended in convincing others that noise is harmful. Eve Herron Aff. ¶ 31 (ECF 18-15); Jones Aff. ¶¶ 24–28, 33–49 (ECF 18-14); John Herron Aff. ¶¶ 41–58 (ECF 18-12); Leonard Aff. ¶ 24 (ECF 18-13).

EPA's inactions, including the failure to regulate major sources of noise in accordance with Section 6, result in in the collective ignorance by businesses, product manufacturers, local and state governments, and individual citizens about the need for such regulation at all levels of government. That ignorance about the health harms caused by noise causes both informational and financial injury to Plaintiffs. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 9 (D.C. Cir. 2017) (where financial injuries are asserted, a single "dollar of economic harm is still an injury-in-fact for standing purposes"). If EPA were ordered by this Court to propose noise emission standards for the four products identified as major sources of noise, EPA would be required to articulate, as part of that rulemaking, why noise is harmful and why noise emission standards for certain products are warranted. Then there would be a portfolio of regulation and information Plaintiffs could use to advocate for quieter products in their communities.

Setting noise emission standards also has the ability to redress some of Plaintiffs' physical and recreational harms because it would reduce the cumulative noise profile in the communities where members of Quiet Communities and Kempthorne live, allowing them to spend more time in and outside of their homes without experiencing harmful noise. Kempthorne, for example, describes the visceral, physical pain she feels when exposed to loud noise. Kempthorne Decl. ¶¶ 14–17 (ECF 18-10). She also describes how these exposures have increasingly caused her to retreat to the isolation of the indoors. Kempthorne Decl. ¶ 19. Others

have also detailed their retreat indoors because of unbearable noise in their backyards and communities. Eve Herron Aff. ¶ 20; John Herron Aff. ¶ 28; Jones Aff. ¶ 17; Williams Aff. ¶ 25 (ECF 18-11); Leonard Aff. ¶ 18.

In sum—through their informational, financial, physical, and recreational harms— Plaintiffs have demonstrated standing to challenge EPA's failure to set emission standards for all four of the products identified as major sources of noise in the 1970s.

Even if the Court follows the narrow approach suggested by EPA, Plaintiffs have standing as to lawn mowers. First, QCi has standing as an organization. QCi expends resources working with the lawncare industry and various communities to reduce the noise profile of products used in that industry. QCi Aff. ¶¶ 35, 42–80. Jamie Banks, President of QCi, explains that the expenditure of those resources is fairly traceable to EPA's failure to set noise emission standards for lawn mowers. QCi Aff. ¶¶ 69–79. Banks describes that she founded QCi in response to her own experience with trying to work from home with "nearly constant loud noise from gas-powered landscaping equipment—leaf blowers, string trimmers, *industrial mowers*." QCi Aff. ¶ 10 (emphasis added). An order requiring EPA to regulate lawn mowers would therefore redress QCi's injuries, allowing QCi to advocate for noise control in other areas.

Plaintiffs also have individual and associational standing to challenge EPA's failure to propose noise emission standards for lawn mowers. Plaintiffs have documented past and ongoing harms from exposure to lawncare equipment, which includes lawn mowers. *See* Kempthorne Decl. ¶ 6 (alleging harm from "mowing"); John Herron Aff. ¶ 8 (alleging harm from "landscaping equipment"); Jones Aff. ¶ 18 (alleging harm from "commercial landscapers"); Eve Herron Aff. ¶ 43 (explaining that she is "traumatized by the extreme commercial landscaping noise that continues").

These harms are ongoing. Even those individuals who have attempted to move away from intensely adverse experiences with landscaping noise continue to suffer from ongoing injury. Kempthorne has been plagued by noise from landscapers and street noise in all of her last three residences; moving to a less densely populated suburb or vertically to a sixth-floor apartment has not allowed her to escape her suffering on account of noise. Kempthorne Decl. ¶¶ 14, 17. John and Eve Herron, who are reluctantly uprooting their children in the hopes that they can escape the ongoing problems with landscaping noise in their current home, continue to bear the expense of a second mortgage. John Herron Aff. ¶ 63. All of them describe ongoing informational harm as they continue to try to convince landscaping businesses, local governments, and other community members to take seriously the harmful effects of noise from, among other things, commercial lawncare. *See, e.g.*, Jones Aff. ¶ 44.

An order from this Court directing EPA to propose noise emission standards for power lawn mowers would redress some of the harms alleged. Lowering the noise profile of lawn mowers—a centerpiece of the lawncare industry—would lower the overall noise profile of landscaping operations that adversely impact affiants. By insisting on separating lawn mowers from leaf blowers, EPA reads too much into the causation requirement. The D.C. Circuit has observed that "the judicial task of determining causation can be imprecise at times." *Carpenters Indus. Council*, 854 F.3d at 6. Accordingly, "[w]hen performing that inherently imprecise task of predicting or speculating about causal effects, common sense can be a useful tool." *Id.* Lawn mowers and leaf blowers are all part of the same core set of commercial landscaping operations that plague affiants. Common sense dictates that if EPA had regulated lawn mowers in 1978, there would likely have been positive spillover to the noise profile of other major products in the lawncare industry like leaf blowers.

In sum, Plaintiffs have demonstrated—through individual standing, associational standing, and organizational standing—that their injuries are fairly traceable to EPA's failure to regulate identified major sources of noise as required by Section 6 of the NCA. *See Carpenters Indus. Council*, 854 F.3d at 9 ("[If constitutional standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim." (internal quotation marks omitted)). They further demonstrate that those injuries would be at least partially redressed by an order from this Court directing EPA to perform its duties to set emission standards for truck transport refrigeration units, pavement breakers, rock drills, and power lawn mowers, for which EPA had an 18-month deadline that expired over thirty-five years ago.

**B.      Plaintiffs Have Standing to Assert Claim 5 (Failures to Carry Out the Low-Noise-Emission Products Program)**

EPA argues that Plaintiffs lack standing to challenge the Agency's failures under Section 15 (42 U.S.C. § 4914), which sets forth a program for federal certification and procurement of LNEPs. 42 U.S.C. § 4914. EPA contends that Plaintiffs have not alleged harm from EPA's failure to identify products that would qualify as LNEPs and that, in any event, such harms are not redressable. Defs.' Mot. 21. Still, EPA acknowledges that QCi has made allegations showing just that. *Id.*

QCi has laid out how (1) EPA's failure to set noise emission standards for lawn mowers as required by Section 6 of the Act has had compounding adverse effects on the implementation of the LNEP program under Section 15; and (2) EPA's obstruction of LNEP certification harms the organization's interests for which the organization has expended resources to counteract that harm. *See* QCi Aff. ¶¶ 39–51, 56–62, 70–80. This is more than enough to show organizational standing for harms alleged under Section 15. *See People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1095 (D.C. Cir. 2015).

Moreover, these injuries are redressable in combination with other claims Plaintiffs make. In Claim 4, Plaintiffs challenge EPA's failure to issue noise emission standards for certain categories of products. If the Court were to grant relief in response to Claim 4, EPA would then be able to "determine which products qualify" as LNEPs under Section 15. *See* 42 U.S.C. § 4914(a)(3) (defining LNEPs as "any product which emits noise in amounts significantly below the levels specified in noise emission standards under regulations applicable under section 4905"). In combination with relief granted under Claim 4, relief granted under Claim 5 would have the effect of enabling products to be certified as LNEPs and thus given priority in Federal product purchasing and use. *See* 42 U.S.C. § 4914(c). This would redress QCi's injuries by giving product manufacturers, including the manufacturers of lawn mowers, the incentive to create quieter products. It would also create a coordinated set of certification signals by which local governments, school districts, homeowner associations, and others could identify which products effectively reduce noise. Thus, QCi would not have to "devote so many resources to providing basic information on common issues that Congress envisioned would be more efficiently mitigated in a centralized fashion at the federal level." QCi Aff. ¶ 75.

EPA relies on *Clapper v. Amnesty Int'l, USA*, 568 U.S. 398 (2013), to argue that redress is dependent on manufacturers submitting applications for LNEP certification and thus is speculative. Unlike in *Clapper*, where five "highly speculative" steps stood between the action plaintiffs' claims relied on, there are only two actors on whom LNEP certification is dependent: EPA and "[a]ny person seeking to have a class or model of product certified." *Id.* at 410–11; 42 U.S.C. § 4914(b)(5)(A). This is not a case where product manufacturers are simply failing to apply for LNEP certification despite EPA's compliance with the law. Rather, EPA is the reason why the LNEP program has gone nowhere. Because EPA has failed to carry out its duties under

Sections 6 and 15(h) of the Act (*infra* pp. 32–33), no other party can take steps toward LNEP identification, certification, testing, or purchase, all part of the statutory scheme Congress set out with the aim of reducing noise pollution. If this Court orders EPA to carry out its duties under Sections 6 and 15(h), a reasonable understanding of market incentives suggests that applications for certification will follow. QCi Aff. ¶ 70. This is not speculative.

For these reasons, Plaintiffs have standing to challenge EPA's failure to promulgate procedures required to implement Section 15.

### C.      EPA Does Not Challenge Standing as to NCA Section 4(c)(3)

EPA's argument in regard to Claim 8 is that Plaintiffs lack standing only as it relates to Section 4(c)(1), EPA's failure to "coordinate the programs of all Federal agencies relating to noise research and noise control." 42 U.S.C. § 4903(c)(1); Defs.' Mot. 21–22. Plaintiffs' Claim 8 is limited to EPA's failure to publish a report as required under Section 4(c)(3) (42 U.S.C. § 4903(c)(3)) . *See* Pls.' Mot. 10, 20, 28, 32. Because Plaintiffs do not assert a claim under Section 4(c)(1)(42 U.S.C. § 4903(c)(1), Plaintiffs do not address EPA's standing arguments as they relate to Claim 8.

### IV.   THIS COURT HAS SUBJECT MATTER JURISDICTION OVER EPA'S FAILURES TO ACT UNDER SECTION 8 OF THE NCA

EPA contends this Court does not have jurisdiction to hear Plaintiffs' Claim 6, which alleges that EPA has failed to comply with Section 8 of the NCA (42 U.S.C. § 4907). Defs.' Mot. 23. Section 8 requires EPA to issue regulations to designate and label two product categories: those capable of causing harm from noise and those capable of mitigating harm from noise. 42 U.S.C. § 4907.

The plain language of the NCA's citizen suit provision grants this Court exclusive jurisdiction over Section 8 claims alleging failure by EPA to perform nondiscretionary duties. 42

U.S.C. § 4911(a). The D.C. Circuit, in contrast, has exclusive jurisdiction to review certain final agency actions, including EPA's adoption of labeling regulations. 42 U.S.C. § 4915(a).

EPA argues that the D.C. Circuit's decision in *TRAC*, 750 F.2d 70 (D.C. Cir. 1984), compels a contrary result. *TRAC* is inapposite. That case held that a petition for a writ of mandamus to require FCC to decide petitioners' overcharge claims could not be filed in the district court given that the circuit court had exclusive jurisdiction over FCC's final decision on the pending claims under 28 U.S.C. § 2342 and 47 U.S.C. § 402. Here, in contrast, the NCA expressly gives the district court jurisdiction over claims alleging agency inaction. 42 U.S.C. § 4911(a). *Cf. Five Flags Pipe Line Co. v. Dep't of Transp.*, 854 F.2d 1438, 1441 (D.C. Cir. 1988) ("[T]his court simply is not at liberty to displace, or to improve upon, the jurisdictional choices of Congress—even when it legislates by potpourri—no matter how compelling the policy reasons for doing so."); *Sierra Club v. Jackson*, 813 F. Supp. 2d 149, 159 (D.D.C. 2011) ("ancillary jurisdiction can be invoked only 'in the absence of specific evidence of contrary congressional intent'" (quoting *Florida Power & Light Co.*, 470 U.S. 729, 743 (1985))).

Second, in *TRAC*, petitioners complained of FCC's "unexplained" delay in issuing an order in a matter that was pending before the agency at the time of appeal. 750 F.2d at 73. In effect, the petition for mandamus filed in *TRAC* sought an interlocutory order in the middle of an ongoing dispute before the agency. Here, EPA has taken no action in forty years. There is no pending matter before EPA. Unlike in *TRAC*, therefore, the D.C. Circuit would be asserting only speculative prospective jurisdiction over EPA's failure to act with regard to labeling regulations.

Third, *TRAC* is not as broad as EPA suggests. Recent courts have explained that "exclusive jurisdiction in the court of appeals under *TRAC* is a 'narrow exception . . . not properly extended to cases where the basis of prospective jurisdiction is a speculative chain of

events.'" *Sierra Club v. Jackson*, 813 F. Supp. 2d at 162 (quoting *In re Nat. Res. Def. Council*, 645 F.3d 400, 405 (D.C. Cir. 2011)). Thus, it "applies only 'when [1] the final agency action will be exclusively reviewable in the court of appeals *and* [2] the court is acting to protect its future jurisdiction.'" *Id.* (same (emphasis in original)).

In *Sierra Club v. Jackson*, plaintiffs challenged EPA's "Delay Notice" which stayed the effective date of two final rules under the Clean Air Act. 813 F. Supp. 2d at 152–53. The court of appeals had exclusive jurisdiction to review the substance of those final rules, and in fact there were petitions for review pending before the court of appeals. Nonetheless, the district court held *TRAC* did not strip it of jurisdiction to review the substance of the Delay Notice. Specifically, the court concluded there was no basis upon which the court of appeals would need to protect its future jurisdiction. *Id.* at 162. The court did so even though it acknowledged there could be some substantive overlap with the eventual review of the final rules. *Id.* at 160–61 ("substantive overlap is inherent in the 'unusual, bifurcated jurisdictional scheme' that divides jurisdiction under the Clean Air Act between the federal district and circuit courts" (quoting *Sierra Club v. Thomas*, 828 F.2d 783, 794 (D.C. Cir. 1987))).

This case is easier than *Sierra Club v. Jackson*. Here, there is no chance of substantive overlap because Plaintiffs' Section 8 claims involve issues of timing and do not require any substantive review of labeling regulations. There are no labeling regulations to review. There is no reason why the D.C. Circuit would need to act to protect its future jurisdiction and therefore *TRAC* does not oust this Court's power over Plaintiffs' Section 8 challenges.

In any event, this Court unquestionably has jurisdiction over claims arising under Section 8(a), which provides, "[t]he Administrator shall by regulation designate any product (or class thereof)—(1) which emits noise capable of adversely affecting the public health or welfare;

18

or (2) which is sold wholly or in part on the basis of its effectiveness in reducing noise." 42 U.S.C. § 4907(a). The D.C. Circuit's jurisdiction under Section 16 extends only to "any labeling regulation under Section 4907." 42 U.S.C. § 4915(a). Because the labeling regulations are mandated by Section 8(b), Section 16 only confers jurisdiction to the D.C. Circuit to review labeling regulations—not product designations under Section 8(a). Thus, EPA's failures to comply with Section 8(a) are within the jurisdiction of this Court and not the Circuit Court.

## V. PLAINTIFFS ARE ENTITLED TO RELIEF FOR EPA'S FAILURE TO COMPLY WITH DATE-CERTAIN DEADLINES FOR SETTING NOISE EMISSION STANDARDS

Between 1975 and 1978, EPA identified four types of products—truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills—as major sources of noise pursuant to Section 5(b) of the NCA (42 U.S.C. § 4904(b)). 40 Fed. Reg. 23,105 (May 28, 1975); 42 Fed. Reg. 2525 (Jan. 12, 1977); 42 Fed. Reg. 6722 (Feb. 3, 1977). EPA concedes that it never published proposed noise emission standards for any of these four products as required by Section 6 of the NCA. Defs.' Answer ¶¶ 45, 150–51.

EPA makes three arguments in an effort to avoid liability on Claim 4: (1) Plaintiffs lack standing to assert the Section 6 violations; (2) EPA's Section 6 duties are discretionary despite the 18-month deadline; and (3) EPA allegedly discharged its Section 6 duties when it published a "notice of intent" to withdraw certain products as major sources of noise in 1982. None of these arguments absolves EPA from liability. Not only do Plaintiffs have standing to assert these claims, as described above (*supra* pp. 10–14), but EPA's duties are mandatory and cannot be discharged through post-hoc claims of finality.

### A.   EPA's Duty to Comply with Section 6 Is Time-Bound and Mandatory

EPA argues that its Section 6 duty to publish proposed noise emission regulations for major sources of noise identified under Section 5(b) within 18 months of designation is

discretionary because it extends to only identified products "for which, in [the Administrator's] judgment, noise emission standards are feasible." 42 U.S.C. § 4905(a)(1)(B). EPA claims that unless and until the Administrator makes a feasibility determination, there is no time restriction and no duty to propose noise emission standards. Defs.' Mot. 15.

EPA is right that Section 6(a)(1) only requires it to develop noise emission standards when feasible. *See also* 42 U.S.C. § 4905(a)(3). But EPA is wrong that it has unbounded time within which to make that feasibility determination. Section 6(a)(1) must be read alongside Section 6(a)(2)(B), which says:

> In the case of any product described in paragraph (1) which is identified (or is part of a class identified) as a major source of noise in a report published under section 4904(b)(1) of this title after publication of the initial proposed regulations under subparagraph (A) of this paragraph, regulations under paragraph (1) for such product shall be proposed and published by the Administrator not later than eighteen months after such report is published.

42 U.S.C. § 4905(a)(2)(B). This language imposes a deadline that is tied to when EPA publishes a Section 5(b) report, not the date when EPA makes an unannounced feasibility determination.

EPA's interpretation gives no practical effect to Congress's 18-month deadline. The 18-month deadline exists to prod EPA to act once it has identified major sources of noise. *See Env't Def. v. Leavitt*, 329 F. Supp. 2d 55, 64 (D.D.C. 2004) ("Express deadlines . . . typically create nondiscretionary duties to act."); *see Am. Lung Ass'n v. Reilly*, 962 F.2d 258, 262 (2d Cir. 1992) ("when, as here, a statute sets forth a bright-line rule for agency action [with a deadline] . . . there is no room for debate—congress has prescribed a categorical mandate that deprives EPA of all discretion over the timing of its work." (citing *Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987))). Instead of respecting that date-certain deadline, EPA reads the statute to allow the agency to do what it did here—identify major sources of noise in Section 5(b) reports and then sit back for over thirty-five years without either publishing proposed emission standards or

explaining why such standards are infeasible. *Cf. Env't Def. Fund v. Thomas*, 870 F.2d 892, 900 (2d Cir. 1989) ("No discernible congressional purpose is served by creating such a bureaucratic twilight zone, in which many of the Act's purposes might become subject to evasion."). If Congress had wanted to give EPA an unbounded timeframe for making a feasibility determination, it could have tethered the 18-month deadline to that determination. It did not.

EPA overreads the phrase "for which in his judgment." While this phrase appears in a number of provisions in environmental statutes, this Court and others have been reluctant to interpret it to afford EPA the unbridled discretion EPA has often claimed for itself. In *Friends of the Earth v. U.S. E.P.A.*, 934 F. Supp. 2d 40 (D.D.C. 2013), a case involving the Clean Air Act, this Court explained that the phrase "which in his judgment" cannot turn mandatory duties into discretionary ones:

> While the use of "in his judgment" reveals that Congress sought to assign the agency the responsibility to judge or determine *which* pollutants belong to the category the agency is required to regulate, it does not signal that Congress necessarily gave the agency complete discretion over whether and when to make that determination.

*Id.* at 49 (emphasis in original). The word "judgment" does not mean that EPA's responsibility for making the required determination is discretionary. *Id.*; *see also Massachusetts v. E.P.A.*, 549 U.S. 497, 533 (2007) ("the use of the word 'judgment' is not a roving license to ignore the statutory text").

The statutory provision at issue in *Friends of the Earth* requires EPA to propose emission standards for pollutants "which in his judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." 42 U.S.C. § 7521(a)(1). EPA cites that case in support of its position here, presumably because the court in *Friends of the Earth* concluded that the statutory language only imposes a mandatory duty once the

endangerment finding is made (and that there is no independent duty to make the endangerment finding on a particular timeline). 934 F. Supp. 2d at 48–54. But *Friends of the Earth* does not help EPA. Section 6 of the NCA and Section 202 of the Clean Air Act are structurally and rhetorically different in material ways. Most importantly, Section 202 does not impose a definitive statutory deadline to act.

The deadline makes a difference. In *Environmental Defense Fund v. Thomas*, 870 F.2d 892 (2d Cir. 1989), the Second Circuit was presented with the question of whether section 109(d) of the Clean Air Act imposed a nondiscretionary duty. *Id.* at 894. Section 109(d) states, "[n]ot later than December 31, 1980, and at five-year intervals thereafter, the Administrator shall complete a thorough review of the criteria published under [Section 108] . . . and promulgate such new standards as may be appropriate." 42 U.S.C. § 7409(d)(1). Similar to the argument EPA makes here, there EPA argued that the phrase "as may be appropriate" created a wholly discretionary duty to promulgate new standards. 870 F.2d at 898. The Second Circuit rejected that argument. *Id.* Rather, the court held, the statutory language imposes a nondiscretionary duty on EPA to make some formal decision within the time period specified by Congress—whether that is a decision to revise the standards or an explanation as to why no revisions were necessary. *Id.* at 900. The Second Circuit explained that allowing EPA to make no formal decision, either to revise or not revise, would leave "the matter in bureaucratic limbo" and make the purposes of the act "subject to evasion." *Id.* This Court has followed the logic of *Environmental Defense Fund v. Thomas* to find that a "shall" command in combination with a deadline creates a nondiscretionary duty to make a formal decision within the time period provided by Congress. *See, e.g.*, *Sierra Club v. Leavitt*, 355 F. Supp. 2d 544, 549–51 (D.D.C. 2005).

Taking the text and structure of the NCA together with the insights from these cases, a more natural reading of Section 6(a)—one that gives effect to all of its material terms—would require EPA to propose emission standards for products identified in a Section 5(b) report within the 18-month deadline or else explain why such standards would not be feasible. Such a reading respects the fact that while Congress intended EPA to set noise emission standards only when feasible, Congress did not give EPA unbounded discretion to avoid setting emission standards. And neither did Congress give EPA boundless time to make its determinations.

*Zook v. McCarthy*, 52 F. Supp. 3d 69 (D.D.C. 2014), cited by EPA, is distinguishable. *Zook* involved a statutory provision under the Clean Air Act that requires EPA to promulgate air quality criteria and NAAQS once an air pollutant is listed as a criteria pollutant under Section 108. *Id.* at 71–72. In that case, the court held that the listing of the air pollutant as a criteria pollutant triggered a mandatory duty to regulate. *Id.* at 74. As in *Zook*, EPA's mandatory duty under Section 6 of the NCA is triggered by a list (namely, the Section 5(b) report that identifies major sources of noise). Unlike in *Zook*, Plaintiffs here are not arguing that EPA has a mandatory duty to include particular products in its Section 5(b) report. For the four products at issue here, EPA has already identified them as major sources of noise. And in doing so, EPA triggered a mandatory duty under Section 6 just as listing a criteria pollutant would trigger a mandatory duty under the Clean Air Act provisions at issue in *Zook*.

In sum, the court should find EPA has a mandatory duty to publish proposed regulations for identified major sources of noise, or else explain why such regulations are infeasible, within 18 months of identifying those products in a Section 5(b) report. Any other reading of Section 6 conflicts with the plain intention to set firm deadlines for agency action and would require reading operative terms and deadlines out of the statute.

**B.     EPA's Own Records and Practice at the Time Indicate that the "Notice of Intent" Published in 1982 Was Not Intended to Be Final Agency Action**

EPA claims that a notice published in the Federal Register in 1982 proposing to withdraw truck transport refrigeration units, rock drills, pavement breakers, and power lawn mowers as major sources of noise (47 Fed. Reg. 54,108 (Dec. 1, 1982)) constituted a final agency action. Defs.' Mot. 17. EPA's post-hoc rationalization is unsupported by the actual text published in the Federal Register and EPA's practices at the time. It fails for five reasons.

First, EPA's post-hoc rationalization contradicts the actual words EPA used in the 1982 notice. The very first words of the header are "*Proposed* Withdrawal." 47 Fed. Reg. 54,108 (emphasis added). The first line of the summary states that the Administrator "*proposes* to withdraw certain products from the Agency's reports identifying major noise sources." *Id.* (emphasis added). Similarly: "[t]he actions *proposed* here are to revise the Agency's reports identifying major noise sources"; "[t]he principal authority for the *proposed* withdrawals rests in Section 5(b) and (c) of the Act"; on the basis of certain considerations "the administrator *proposes* to remove" the products from the list identified major sources of noise; and EPA "only *proposes* not to proceed with regulatory action at this time." *Id.* at 54,109–10 (emphases added). The notice invariably indicates that the noticed action was a proposal, not final agency action.

Second, EPA's argument is inconsistent with its own practice at the time. When EPA intended to make a withdrawal final, it said so clearly. For example, the Federal Register entry immediately preceding the 1982 notice is headed: "Action: Withdrawal of proposed standards." 47 Fed. Reg. 54,107 (Dec. 1, 1982). The action summary for that entry explains that it "*withdraws*" the Agency's previous proposed standards for railroad facilities and equipment. *Id.* (emphasis added). EPA states "this notice *withdraws* the proposed" standards and "this action

*withdraws*" its previous action. *Id.* at 54,108 (emphases added). There is no such language in the relevant 1982 notice of intent.

Third, EPA argues that the 1982 notice was a "present action, not a tentative step" because the notice was "styled as a 'notice of intent' and not as a 'notice of proposed rulemaking.'" Defs.' Mot. 19. EPA cites no authority for why EPA's header style carries the day when the text of the notice repeatedly describes proposed rather than final action.

And again, EPA's argument is inconsistent with its practice at the time. In an entry in the Federal Register that shortly follows the notice at issue here, EPA used the header "notice of intent" where EPA followed notice-and-comment rulemaking procedures. That entry applied to an action EPA took under the NCA for truck-mounted solid waste compactors. 47 Fed. Reg. 54,111 (Dec. 1, 1982). EPA followed this notice, not long after the close of the announced comment period, with notice of a final rule, which EPA also published in the Federal Register. 48 Fed. Reg. 32,502 (July 15, 1983). Contrary to EPA's argument here that forty years ago EPA would have styled an action in need of closure as a "notice of proposed rulemaking," EPA published this notice with the header "Action: *Notice of Intent*." 47 Fed. Reg. 54,111 (emphasis added). This refutes EPA's argument that "notice of intent" denoted final action in 1982.

Fourth, EPA argues that its intention to rescind its identification of four major sources of noise in the 1982 notice was sufficient and final for that purpose. Defs.' Mot. 19. In fact, the Agency had yet to reach a final decision. On October 17, 1983, EPA included the following in the executive branch's unified agenda published in the Federal Register of "current and upcoming rulemakings" under the NCA:

122. WITHDRAWAL OF PRODUCTS FROM THE AGENCY'S REPORTS IDENTIFYING MAJOR NOISE SOURCES AND WITHDRAWAL OF PROPOSED RULES . . . Abstract: This action withdraws certain products from the Agency's report identifying major noise sources issued under authority of

25

> Section 5(b)(1) of the Noise Control Act of 1972. These products are: Truck Transport Refrigeration Units, Power Lawn Mowers, Pavement Breakers, Rock Drills, Wheel and Crawler Tractors, and Buses . . . ."

48 Fed. Reg. 47,893 (Oct. 17, 1983). Despite its earlier description of a "notice of intent," here EPA *did* describe the 1982 notice as an "NPRM," i.e., a notice of proposed rulemaking. *Id.* EPA placed this entry in its unified agenda as a "regulation[] the agency is currently developing or plans to develop during the next 12 months." 48 Fed. Reg. 47,233. EPA, however, did not take action within the next year. In fact, EPA reprinted this same entry in its unified agenda every year from 1983 through 1994.[5] In 1995, without ever taking final action, EPA withdrew this item from the unified agenda. 60 Fed. Reg. 23,929 (May 8, 1995). EPA cannot now argue that it had obviously and finally completed the de-identification of the relevant major sources of noise with the 1982 notice when the unified agenda published by EPA in the Federal Register indicates that, for nearly 13 years, the Agency continued to propose taking final action that it never took.

Fifth, EPA argues that Plaintiffs "misread[] the statute's procedural requirements" and that the "NCA does not require EPA to proceed through the notice-and-comment rulemaking process in order to revise a Section 5(b) report identifying major sources of noise." Defs.' Mot. 18. EPA argues that "all that is required to withdraw EPA's identification of a major source of noise is a Federal Register notice announcing EPA's intent to do so." *Id.* at 19.

Ultimately, it is irrelevant whether EPA was required to follow the process it did. EPA defined the process for itself and, by its own terms, never drew its own process to a conclusion

---

[5] 49 Fed. Reg. 42,166 (Oct. 22, 1984); 50 Fed. Reg. 44,676 (Oct. 29, 1985); 51 Fed. Reg. 14,561 (Apr. 21, 1986); 51 Fed. Reg. 38,939 (Oct. 27, 1986); 52 Fed. Reg. 14,889 (Apr. 27, 1987); 53 Fed. Reg. 14,370 (Apr. 25, 1988); 53 Fed. Reg. 42,528 (Oct. 24, 1988); 54 Fed. Reg. 17,292 (Apr. 24, 1989); 54 Fed. Reg. 45,307 (Oct. 30, 1989); 56 Fed. Reg. 18,019 (Apr. 22, 1991); 56 Fed. Reg. 54,051 (Oct. 21, 1991); 57 Fed. Reg. 17,416 (Apr. 27, 1992); 57 Fed. Reg. 52,066 (Nov. 3, 1992); 58 Fed. Reg. 57,039 (Oct. 25, 1993); 59 Fed. Reg. 21,090 (Apr. 25, 1994).

that would constitute finality. EPA published a 1982 notice that merely proposed action and invited comment on that proposal. *See* 47 Fed. Reg. 54,108 (noting the deadline for comments as January 3, 1983). EPA for more than a decade published annual notices in the Federal Register indicating that final action had yet to be taken on the proposal. EPA ultimately removed that action from the notice-and-comment rulemaking process without any indication to the public that EPA had taken final action.

Even if EPA is not required to follow a notice-and-comment-type process for de-identification, it must still somewhere state clearly that it has taken final action. An entry in the Federal Register cannot be either the draft or final, depending on the Agency's whim and assertions four decades later. Congress required "[a]ny report (or revision thereof) under subsection (b)(1) identifying major sources of noise shall be published in the Federal Register." 42 U.S.C. § 4904(d). Surely it intended for the Agency to do so with passable clarity. To hold otherwise would insulate an agency action from review by allowing the agency to hold out its action as merely a proposal only to later contend that the action was actually final but that the statutory deadline for review has passed—as EPA does here. Defs.' Mot. 19 n.10.

Having identified truck transport refrigeration units, pavement breakers, rock drills, and power lawn mowers as major sources of noise; having never withdrawn that identification nor made a determination that noise emission standards for those products are infeasible; and having never published proposed regulations for those products within the time prescribed by Section 6 of the NCA, the Agency has failed to perform a nondiscretionary duty with a date-certain deadline in violation of the NCA and actionable via its citizen suit provision. Thus, Plaintiffs are entitled to summary judgment on Claim 4.

## VI.   EPA'S DUTIES UNDER SECTIONS 8 AND 15 OF THE NCA ARE MANDATORY

EPA argues that the duties imposed by Section 8, requiring EPA to designate and adopt labeling regulations for products that cause or mitigate harm from noise, and Section 15, requiring EPA to implement a low-noise-emission products program, are not mandatory and are therefore unenforceable. Defs.' Mot. 24–28.

Mandatory duties are those that are required. *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63 (2004) ("*SUWA*"). They include specific, nondiscretionary commands and definite acts that enable a court to order an agency *to* act without directing *how* it should act. *Id.* at 63–65. Contrary to EPA's argument, Sections 8 and 15 of the NCA impose duties that are mandatory duties that warrant relief here.

### A.    Section 8's Obligations to Designate and Label Products Capable of Generating or Mitigating Harm from Noise Are Mandatory

Section 8 requires readily identifiable work products and a process: by regulation, EPA must designate two types of products—those capable of causing harm from noise and those capable of mitigating such harm. 42 U.S.C. § 4907(a). Once designated, EPA must promulgate labeling regulations for those products. 42 U.S.C. § 4907(b).

Despite the "shall" commands, work product, and process prescribed by Congress, EPA argues that Section 8 imposes no mandatory duties. For support, EPA cites *Center for Biological Diversity v. Zinke*, 260 F. Supp. 3d 11 (D.D.C. 2017) ("*CBD*"), to argue that the word "shall" is not dispositive. Defs.' Mot. 26. *CBD* is distinguishable. Unlike the regulation at issue in *CBD*, there is no "as necessary," "in his judgement," or similar conditional language in Section 8 of the NCA. 260 F. Supp. 3d at 22. Furthermore, while the court in *CBD* held the duty to revise was linked to the regulation's "as necessary" language, it maintained the power of "shall" as imposing a mandatory duty of continuous review. *Id.* at 23.

EPA's citations to *Kennecott Copper Corporation v. Castle*, 572 F.2d 1349 (9th Cir. 1978), and *Babamuradova v. Blinken*, 633 F. Supp. 3d 1 (D.C. Cir. 2022), are also unhelpful. In *Kennecott Copper*, the Ninth Circuit Court of Appeals refused to compel agency action via the Clean Air Act's citizen suit provision where the statute provided the Administrator of EPA "shall approve . . . if he determines." 572 F.2d at 1354 (citing 17 U.S.C. § 110(a)(3)). The court found that, while the duty to approve is mandatory, the determination was discretionary. *Id.* Unlike here, that case was not based on an argument that EPA unreasonably delayed the required approval. In *Babamuradova*, the D.C. Circuit applied the word "shall" to the latter part of the statutory provision ("shall be reviewed and adjudicated by a consular officer") rather than to the former part ("[a]ll immigrant visa applications shall") to hold that the immigration statute at issue did not impose a nondiscretionary duty to adjudicate *all* visa applications. 633 F. Supp. 3d at 14. Importantly, the D.C. Circuit was careful to note that this reading did not mean the State Department could decline to process *any* visa applications. *Id.* at 15 (noting such circumstances would be "extreme").

EPA argues that the "best" reading of NCA's Section 8 is a conditional one, whereby the statute's mandatory duties are "conditional on the Administrator finding, in his judgment, that the product meets the criteria of Section 8(a)." Defs.' Mot. 28. But Congress knows how to include such conditional language if it wants to, as is evidenced by the cases cited, by other NCA provisions, and by provisions in other statutes. *See, e.g.*, 42 U.S.C. § 4905(a)(1)(B); 42 U.S.C. § 7411(b)(1)(A). In Section 8, there is no if-then statement like that in *Kennecott Copper*. Nor is there any alternate action that "shall" can attach to like in *Babamuradova* and *CBD*. Here, there are no qualifiers to the mandatory duties imposed by Congress. The "closer reading" of the statute Defendants urge here shows that "shall" is linked, absent any conditional language, to

designating products via regulation and to promulgating labeling regulations for such designated products. Defs.' Mot. 27.

Furthermore, when EPA published its "General Provisions for Product Noise Labeling" in 1979, described further below, EPA itself acknowledged that its duties under this Section are mandatory. *See* 44 Fed. Reg. 56,120, 56,124 (Sept. 28, 1979) (noting that "the product noise labeling program implements a nondiscretionary statutory requirement" and separately referring to Section 8 as a "Congressional mandate"). Moreover, a close reading of the legislative history EPA cites does not "reinforce" the discretionary nature of Section 8. Defs.' Mot. 27 n.12.[6]

As EPA notes, the Agency has developed a list of factors to consider in identifying products under Section 8(a), but it has not applied this list to any product regulations since it was developed in 1979. Defs.' Mot. 26–27. EPA does not and could not argue that there are *no* products that "emit[] noise capable of adversely affecting the public health or welfare," or that products sold on the basis of their effectiveness in reducing noise have not evolved since 1979, especially given its statements to the contrary. *See* 74 Fed. Reg. 39,150 (Aug. 5, 2009) (noting that labeling standards for hearing protection devices have "not been amended since 1979 and technologies have evolved and improved in the interim. . . . [T]his action should result in the availability of a new generation of significantly improved devices that are precluded from entering the marketplace as 'hearing protectors' by the 1979 regulation.").

This would be an "extreme" outcome under the statute that *Babamuradova* cautioned against. 633 F. Supp. 3d at 15; *see also In re Bluewater Network*, 234 F.3d 1305, 1307 (D.C. Cir.

---

[6] For example, EPA states that the legislative history notes "wide latitude" for EPA in "*designat[ing] sources*." Defs.' Mot. 27 n.12 (emphasis added). In fact, the language of the legislative history reads, "This section affords the Administrator wide latitude *in the drafting of regulations concerning notification of noise levels*." H.R. Rep. No. 92-842, at 16, reprinted in A Legislative History of the Noise Control Act of 1972, at 481 (1974) (emphasis added).

2000) (finding agency could not "avoid a congressional mandate to establish *some sort* of regulations" where it "never even attempted to promulgate" the required regulations and finding unreasonable delay under *TRAC* in light of the agency's "admission that it will do no more" (emphasis in original)). While EPA may contend it has to consider many factors in identifying and labeling products under Section 8, the failure to identify *any* products whatsoever under Section 8(a)(1), or any additional products under Section 8(a)(2), for forty years constitutes unreasonably delayed action.

To the extent EPA argues that it entirely fulfilled its obligations under Section 8 when it identified hearing protectors under Section 8(a)(2) and promulgated labeling regulations for them in the late 1970s, the statutory text and Agency statements prove that Section 8 is meant to apply to more than this one product category. Defs.' Mot. 26. First, the statute uses the phrases "any product (or class thereof)" and "for each product (or class thereof)," the plain reading of which indicates EPA's duty encompasses identifying more than "a" single product. 42 U.S.C. § 4907(a)–(b). Second, Section 8(a) is comprised of two, distinct subsections, requiring designation for two categories of products. Third, in its final rule establishing general provisions for product noise labeling, EPA repeatedly uses the plural noun "products," and states that "[t]here are many products which merit potential consideration under Section 8." 44 Fed. Reg. 56,121. Finally, in 1979, EPA recognized that its duties under Section 8 were ongoing. *Id.* at 56,120 ("The major purpose of this regulatory program is to provide accurate and understandable information on the noise generating or noise reducing properties of *new* products, so that the public can make meaningful comparisons concerning those properties when making decisions to use or buy the products." (emphasis added)); *see also id.* at 56,122 ("The following list

represents those factors which EPA *will* use in deciding on *products* it will consider for possible noise labeling regulatory action) (emphasis added)).

Lastly, EPA argues that its duties are not mandatory because it is unclear what specific relief could be fashioned by this Court. Defs.' Mot. 28. For this, EPA points to language in the Complaint as evidence that relief would have no endpoint. First, the nature of duties imposed by Congress is not driven by relief requested by any individual litigant in a Complaint. Second, Parties agreed to separately brief the issue of relief after a decision is rendered on the issue of liability. Joint Report ¶¶ 6, 8, 13 (ECF No. 16). Third, as explained above, there is no need for Plaintiffs to supply criteria by which EPA would implement its Section 8 duties because EPA has already developed and published criteria for designating products. The problem is not lack of criteria; the problem is that EPA walked away from its duties before ever applying those criteria. Fourth, *In re Bluewater Network*, which EPA cites in support, is dissimilar. In that case, the agency had a duty to adopt final rules for oil tankers in three bodies of water expressly provided by statute. The court rejected petitioners' attempt to expand the agency's obligations beyond that enumerated list, in part because petitioners "could not identify a single additional area" for which the statute imposed a duty. 234 F.3d at 1315. Here, unlike *In re Bluewater Network*, Plaintiffs are not asking the Court to impose a duty outside a prescribed statutory list; they are asking the Court to order EPA to use its own criteria to carry out a mandatory duty imposed by Congress.

### B. Section 15's Obligation to Promulgate Regulations Implementing an LNEP Program Are Mandatory

The duties prescribed in Section 15 requiring EPA to implement an LNEP program, especially when considered in the context of the Agency's duties under Sections 5 and 6 (*supra* pp. 14–16), are also mandatory.

Under Section 15, "[t]he Administrator shall promulgate the procedures required to implement this section within one hundred and eighty days after October 27, 1972." 42 U.S.C. § 4914(h). EPA is correct that in 1974 it promulgated some procedures pursuant to Section 15(h). 39 Fed. Reg. 6670 (Feb. 21, 1974). However, the 1974 regulations left gaps that EPA knew it needed to fill in order to fully comply with Section 15:

> Under Section 15 of the Act, EPA has published regulations prescribing procedures for the certification of Low-Noise-Emission Products (LNEP) . . . . The LNEP certification procedures refer to a "low-noise-emission criterion" . . . , and to a "suitable substitute decision" . . . . However, EPA stated in promulgating those procedures that they " . . . do not contain the low-noise-emission criterion nor do they contain the specific data requirements necessary for deciding whether the product is a 'suitable substitute.' These will be published at a later date."

42 Fed. Reg. 27,442 (May 21, 1977) (citing 39 Fed. Reg. 6670). Subsequently, EPA published a notice for proposed rulemaking to fill this gap. *Id.* But EPA never finalized that rulemaking and so the gaps remain. Defs.' Answer ¶¶ 52–53.

Through Claim 5, Plaintiffs ask the Court to compel the agency to carry out the specific command of Section 15(h) to "promulgate procedures required to implement this section," including filling the gap it concedes its 1974 regulation left. Plaintiffs do not ask the Court to tell the agency how they must fulfill this duty or to dictate what the procedures must be.

Thus, having demonstrated that EPA has failed to perform or unreasonably delayed (*supra* pp. 1–9) performance of mandatory actions under Sections 8 and 15 of the NCA, Plaintiffs are entitled to summary judgment on Claims 5 and 6.

## VII.   EPA's Duties Under Sections 4 and 14 Are Discrete

EPA argues that the duties imposed by Section 14 (42 U.S.C. § 4913), the Quiet Communities Act Amendments, and Section 4 (42 U.S.C. § 4903), requiring EPA to coordinate the noise control programs of all federal agencies, are not discrete. Defs.' Mot. 29–34.

EPA cites several cases to argue that Plaintiffs' Claims 7 and 8 are not tied to discrete actions. All of them are distinguishable. In *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004), plaintiffs sought to compel the agency to perform a specific action, prohibiting use of off-road vehicles ("ORVs"), under a general statutory provision that made no mention of ORVs. *Id.* at 63–67. Similarly, in *Fryshman v. United States Commission for Preservation of America's Heritage Board*, 422 F. Supp. 3d 1 (D.D.C. 2019), plaintiffs sought to compel the agency to prevent the Lithuanian government from building on a specific site based on the agency's general duties to "identify" sites in need of protection and to "encourage the preservation and protection" of such sites "by obtaining . . . assurances from foreign governments." *Id.* at 9–10 (citing 54 U.S.C. § 312304(a)(1), (2)). Unlike here, in *Fryshman*, the agency had "undeniably" been performing these duties and had "taken multiple actions" to protect sites in Lithuania, including the particular site at issue. *Id.* at 3, 10.

In *Citizens for Responsibility & Ethics in Washington v. U.S. Department of Homeland Security*, 387 F. Supp. 3d 33 (D.D.C. 2019), plaintiffs alleged a series of "isolated" agency failures under a "collection of scattered statutes that together govern the creation, management, and disposal of federal records." *Id.* at 38, 50 (internal quotation marks and citations omitted) ("*CREW*"). For example, in one claim, plaintiffs argued that the agency's failure to carry out a specific act, creating records linking separated children to adults with whom they were apprehended, violated the statute's requirement that "each Federal agency shall make and preserve records containing adequate and proper documentation." *Id.* at 50; 44 U.S.C. § 3101. The Court distinguished this holding from other cases where challenge to an agency's refusal to create *any* records pursuant to the Federal Records Act was allowed. *Id.* at 52–53 & n.8.

In contrast to all these cases, the specific actions Plaintiffs seek to compel are discrete

actions with discernible work products. The Court can readily order EPA to act without getting

embroiled in how it should act. *SUWA*, 542 U.S. at 63–67.

### A.      The Quiet Communities Act Enumerates Several Discrete Duties

The Quiet Communities Act Amendments of 1978, codified at Section 14 of the NCA,

present a punch list of tasks that EPA "shall" perform to promote the development of effective

state and local noise control programs. 42 U.S.C. § 4913.

Drawing on language that requires the Administrator to "administer a nationwide Quiet

Communities Program," (42 U.S.C. § 4913(c)), EPA argues that Section 14's duties are too

general and broad, too "programmatic" to be mandatory. Defs.' Mot. 31–32. EPA argues that

any order this Court might issue would "necessarily entangle" the Court in "abstract policy

disagreements." Defs.' Mot. 32–33 (quoting *SUWA*, 542 U.S. at 66).

However, an order compelling EPA to undertake specific actions spelled out and

mandated by the statute is perfectly possible. The language EPA relies on is merely prefatory.

Unlike the statutory provisions at issue in *SUWA*, *Fryshman*, and *CREW*, Section 14(c) goes on

to say, "which shall include, but not be limited to" five specific actions.[7] Therefore, the Court

would not be necessarily entangled in policy minutia. *Cf. SUWA*, 542 U.S. at 66.

EPA poses a number of questions meant to infuse Congress's Section 14 list of

commands with discretion. For example, EPA asks, "how many regional technical assistance

centers must EPA establish?" Defs.' Mot. 33. Finding an answer is not as hard as EPA makes

---

[7] To be clear, though the language says, "not limited to," Plaintiffs are not asking the Court to order any action not on Congress's readily discernible punch list.

out. Section 14 says EPA "shall . . . establish regional technical assistance centers." 42 U.S.C.
§ 4913(e). Congress uses the plural form of "centers," which ordinarily means more than one.

The same is true for other commands in Section 14. The hypothetical compliance
questions EPA asks are nothing like those the Supreme Court in *SUWA* described as "injecting
the judge into day-to-day agency management." 542 U.S. at 67. As to each item, the statute
plainly requires, at a minimum, more than nothing: more than zero grants, zero training
materials, zero equipment purchases, zero studies.

Compelling EPA to carry out each of the discrete duties enumerated in Section 14 does
not require pervasive oversight. The Court need not tell the agency *how* to achieve the Section's
broad mandate of promoting the development of effective state and local noise control programs.
Congress already did that in 1978 by setting forth an enumerated list of tasks, each accompanied
by a "shall" command. Plaintiffs simply ask that the Agency comply.

### B.      EPA Concedes That Its Duty to Publish Section 4(c)(3) Reports Is Discrete

Under Section 4(c)(3) EPA must "compile and publish, from time to time, a report on the
status and progress of Federal activities relating to noise research and noise control." 42 U.S.C.
§ 4903(c)(3). EPA concedes this is a mandatory and discrete duty. Defs.' Mot. App. A, 33 n.13.
Because EPA has failed to publish a report under Section 4(c)(3) since at least 1982, Plaintiffs
are entitled to relief for Claim 8 as to Section 4(c)(3)'s obligations. *See* Defs.' Answer ¶ 91.[8]

Thus, having demonstrated that EPA has failed to perform or unreasonably delayed
(*supra* pp. 1–9) performance of discrete actions under Sections 4 and 14 of the NCA, Plaintiffs
are entitled to summary judgment as to Claims 7 and 8.

---

[8] EPA argues that Section 4(c)(1) "does not require any discrete agency action." Defs.' Mot. 33.
Plaintiffs do not assert a claim under Section 4(c)(1) in either their Complaint or Motion for
Summary Judgment. *See* Pls.' Mot. 10, 20, 28, 32.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask this Court to deny EPA's motion and grant summary judgment as to liability in favor of Plaintiffs on each of Plaintiffs' claims. Plaintiffs respectfully request oral argument on Parties' motions at the Court's convenience.

Dated: March 18, 2024.

Respectfully submitted,

/s/ Jeffrey M. Feldman
Jeffrey M. Feldman (D.C. Bar No. WA0032)
Summit Law Group
315 Fifth Avenue S, Suite 1000
Seattle, WA 98104-2682
Tel: (206) 676-7000
jefff@summitlaw.com

/s/ Sanne Knudsen
Sanne Knudsen (*Admitted Pro Hac Vice*)
WSBA Bar No. 52654
Regulatory Environmental Law & Policy Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 221-7443
sknudsen@uw.edu

/s/ Erica Proulx
Erica Proulx (*Admitted Pro Hac Vice*)
WSBA Bar No. 60155
Regulatory Environmental Law & Policy Clinic
University of Washington School of Law
4293 Memorial Way NE
Seattle, WA 98195-0001
Tel: (206) 616-7329
uwdiehlfellow@uw.edu

*Attorneys for Plaintiffs Quiet Communities,*
*Inc., and Jeanne M. Kempthorne*

37

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QUIET COMMUNITIES, INC.<br>60 Thoreau St.<br>Suite 261<br>Concord, MA 01742; *and*<br><br>JEANNE M. KEMPTHORNE,<br>       *Plaintiffs.*<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY; *and*<br><br>MICHAEL S. REGAN, in his official capacity as<br>Administrator,<br><br>United States Environmental Protection Agency<br>Mail Code 1101A<br>1200 Pennsylvania Ave., N.W.<br>Washington, DC 20460,<br>       *Defendants.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 1:23-cv-01649-JMC<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CERTIFICATE OF SERVICE**

   I certify that on March 18, 2024, a copy of the foregoing was served by electronic means on all counsel of record by the Court's CM/ECF system.


            */s/ Jeffrey M. Feldman*
            Jeffrey M. Feldman (D.C. Bar No. WA0032)
            Summit Law Group
            315 Fifth Avenue S, Suite 1000
            Seattle, WA 98104-2682
            Tel: (206) 676-7000
            jefff@summitlaw.com