# EXHIBIT 1

United States Government Accountability Office

Office of the General Counsel

# PRINCIPLES OF FEDERAL APPROPRIATIONS LAW

# Chapter 2
# The Legal Framework

## Fourth Edition
## 2016 Revision

This document, in conjunction with GAO, *Principles of Federal Appropriations Law*, 4th ed., 2016 rev., ch. 1, GAO-16-463SP (Washington, D.C.: Mar. 2016), supersedes chapters 1, 2, and 3 of GAO, *Principles of Federal Appropriations Law*, 3rd ed., GAO-04-261SP (Washington, D.C.: Jan. 2004). Chapters 4 through 15 of the third edition of *Principles of Federal Appropriations Law,* in conjunction with GAO, *Principles of Federal Appropriations Law: Annual Update to the Third Edition*, GAO-15-303SP (Washington, D.C.: Mar. 2015), remain the most currently available material on the topics discussed therein. Both *Principles* and the *Annual Update to the Third Edition* are available at www.gao.gov/legal/redbook/redbook.html.

# Contents


Chapter 2 The Legal Framework 2-1

A. Appropriations and Related Terminology 2-1
1. Budget Authority: Authority to Obligate 2-1
2. Appropriations: Authority to Draw Money from the Treasury 2-3
3. Contract Authority: Obligations in Advance of Appropriations 2-4
4. Offsetting Collections: Authority to Obligate Funds Collected 2-5
5. Borrowing Authority: Incurring Obligations Against Borrowed Amounts 2-6
6. Loan and Loan Guarantee Authority 2-8
7. Reappropriation 2-9
8. Classifications of Budget Authority 2-9
a. Classification Based on Duration 2-9
b. Classification Based on Presence or Absence of Monetary Limit 2-10
c. Classification Based on Permanency 2-10
d. Classification Based on Availability for New Obligations 2-10
B. The Budget and Appropriations Process 2-11
1. Historical Perspective 2-11
2. Executive Budgeting: the Budget and Accounting Act, 1921 2-15
3. Congressional Budgeting: the Congressional Budget Act of 1974 2-16
4. Appropriations: the Enactment of Budget Authority 2-17
a. The Legislative Process 2-17
b. Points of Order 2-19
c. Incorporation by Reference 2-21
d. What Constitutes an Appropriation 2-22
5. Budget Execution: the Obligation and Expenditure of Budget Authority 2-27
a. Making Amounts Available for Obligation: Apportionment and Allotment 2-27
b. Audits and Financial Management 2-28
c. Account Closing 2-29
6. Administrative Discretion 2-30
a. Failure or Refusal to Exercise Discretion 2-32
b. Regulations May Limit Discretion 2-34
c. Insufficient Funds 2-36
7. Transfer and Reprogramming 2-38
a. Transfer 2-38
b. Reprogramming 2-43
8. Impoundment: Precluding the Obligation or Expenditure of Budget Authority 2-47

9. Deficit Reduction: the Balanced Budget and Emergency Deficit Control Act 2-51

C. Authorizations versus Appropriations 2-54

1. Distinction between Authorization and Appropriation 2-54
2. Specific Problem Areas and the Resolution of Conflicts 2-56
   a. Introduction 2-57
   b. Variations in Amount 2-61
   c. Variations in Purpose 2-65
   d. Period of Availability 2-66
   e. Authorization Enacted After Appropriation 2-69
   f. Two Statutes Enacted on Same Day 2-71
   g. Ratification by Appropriation 2-72
   h. Repeal by Implication 2-76
   i. Lack of Authorization 2-79

D. Constitutional Limitations upon the Power of the Purse 2-82

E. General Provisions: When Construed as Permanent Legislation 2-85

1. Words of Futurity 2-86
2. Other Indicia of Permanence 2-89


This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# Chapter 2: The Legal Framework

## A. Appropriations and Related Terminology

This section discusses basic appropriations law terms that appear throughout this publication. Some of our discussion draws upon statutory definitions that apply in various budgetary contexts. We draw other definitions from administrative and judicial decisions, as well as from custom and usage in the budget and appropriations process.

The Comptroller General, in cooperation with the Treasury Department, Office of Management and Budget, and Congressional Budget Office, must maintain and publish standard terms and classifications for "fiscal, budget, and program information," giving particular consideration to the needs of the congressional budget, appropriations, and revenue committees. 31 U.S.C. § 1112(c). Federal agencies must use this standard terminology when they provide information to Congress. 31 U.S.C. § 1112(d).

GAO publishes the terminology developed pursuant to this authority in *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005) [hereinafter Glossary]. Unless otherwise noted, the terminology used throughout this publication is based on the Glossary. The following sections present some of the more important terminology in the budget and appropriations process. Many other terms will be defined in the chapters that deal specifically with them.

### 1. Budget Authority: Authority to Obligate

Congress finances federal programs and activities by providing "budget authority," which grants agencies authority to enter into financial obligations that will result in immediate or future outlays of government funds. As defined by the Congressional Budget Act, "budget authority" includes:

"(i) provisions of law that make funds available for obligation and expenditure (other than borrowing authority), including the authority to obligate and expend the proceeds of offsetting receipts and collections;

"(ii) borrowing authority, which means authority granted to a Federal entity to borrow and obligate and expend the borrowed funds, including through the issuance of promissory notes or other monetary credits;

"(iii) contract authority, which means the making of funds available for obligation but not for expenditure; and

"(iv) offsetting receipts and collections as negative budget authority, and the reduction thereof as positive budget authority."[1]

Only Congress may grant budget authority. Therefore, agency regulations cannot confer budget authority. A regulation may create a liability on the part of the government only if Congress has enacted the necessary budget authority and if the obligation is consistent with all applicable statutes. Without the necessary statutory authority, a regulation purporting to create a liability on the part of the government is invalid and not binding on the government.[2] For example, a claimant asserted that the War Department had a practice of paying for the transportation of officers' privately-owned horses. *Atchison, Topeka & Santa Fe Railroad Co. v. United States,* 55 Ct. Cl. 339 (1920). However, because Congress had not enacted any statute permitting the War Department to pay these personal expenses, the War Department could not pay them, despite any contrary practice or regulation.[3] *Id*.

Further illustrations may be found in the following decisions of the Comptroller General:

- Where the program statute provided that federal grants "shall be" a specified percentage of project construction costs, the grantor agency

[1] Section 3(2) of the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 622(2) and note, as amended by the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, §§ 13201(b) and 13211(a), 104 Stat. 1388, 1388-614 and 1388-620 (Nov. 5, 1990). Prior to the Congressional Budget Act, the term "obligational authority" was frequently used instead of budget authority.

[2] This tenet is rooted in the fundamental proposition that agency regulations are bound by the limits of the agency's statutory and organic authority. *Manhattan General Equipment Co. v. Commissioner of Internal Revenue*, 297 U.S. 129, 134 (1936); *Health Insurance Ass'n of America, Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994); *Killip v. Office of Personnel Management*, 991 F.2d 1564, 1569 (Fed. Cir. 1993).

[3] *See also Harris v. Lynn*, 555 F.2d 1357 (8th Cir. 1977), *cert. denied*, 434 U.S. 927 (1977) (agency cannot extend benefits by regulation to a class of persons not included within the authorizing statute); *Tullock v. State Highway Commission of Missouri*, 507 F.2d 712 (8th Cir. 1974) (agency cannot restrict class of "displaced persons" entitled to benefits by regulation that conflicts with the statutory definition); *Holland-America Line v. United States*, 53 Ct. Cl. 522 (1918) (agency cannot impose a liability by regulation that is not imposed by the statute itself), *rev'd on other grounds*, 254 U.S. 148 (1920); *Illinois Central Railroad Co. v. United States*, 52 Ct. Cl. 53 (Ct. Cl. 1917) (agency cannot bind government by regulation alone to pay for transportation of private property); B-201054, Apr. 27, 1981 (agency cannot forgive claims against the government or accept government liability by regulation without a clear statutory basis).

could not issue regulations providing a mechanism for reducing the grants below the specified percentage. 53 Comp. Gen. 547 (1974).

- Where a statute provided that administrative costs could not exceed a specified percentage of funds distributed to states under an allotment formula, the administering agency could not amend its regulations to relieve states of liability for over expenditures or to raise the ceiling. B-178564, July 19, 1977, *aff'd* 57 Comp. Gen. 163 (1977).
- Absent a clear statutory basis, an agency may not issue regulations establishing procedures to accept government liability or to forgive indebtedness based on what it deems to be fair or equitable. B-201054, Apr. 27, 1981. *See also* B-118653, July 15, 1969.
- Agencies should not incur obligations for food and light refreshments in reliance on a General Services Administration (GSA) travel regulation for which GSA has no authority. B-288266, Jan. 27, 2003.

*See also* 62 Comp. Gen. 116 (1983); 56 Comp. Gen. 943 (1977); B-201706, Mar. 17, 1981.

## 2. Appropriations: Authority to Draw Money from the Treasury

As we have seen in Chapter 1 in our discussion of the congressional "power of the purse," the Constitution permits the withdrawal of money from the Treasury only where Congress enacts an appropriation authorizing the payment. Therefore, an appropriation is a law authorizing the payment of funds from the Treasury. In addition, most appropriations also authorize agencies to incur obligations and to ultimately draw money from the Treasury to satisfy those obligations. Stated differently, most appropriations provide both budget authority and the authority to make payments from the Treasury. Such appropriations do not represent cash actually set aside in the Treasury. They represent legal authority granted by Congress to incur obligations and to make disbursements for the purposes, during the time periods, and up to the amount limitations specified in the appropriation acts. See *United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284 (4th Cir. 2002).

While other forms of budget authority may authorize agencies to incur obligations, the authority to incur obligations by itself is not sufficient to authorize payments from the Treasury. *See, e.g.*, *National Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 586 (D.C. Cir. 1977); *New York Airways, Inc. v. United States*, 369 F.2d 743 (Ct. Cl. 1966). Thus, at some point if obligations are paid, they are paid by and from an appropriation. Later in this chapter we discuss in more detail precisely what types of statutes constitute appropriations.

Congress may make an appropriation that grants authority to draw money from the Treasury but does not grant budget authority. Such an appropriation is known by a more specific term. For example, a "liquidating appropriation" provides authority to draw money from the Treasury to satisfy obligations incurred pursuant to contract authority (discussed in the next sub-section). A "deficiency appropriation" provides authority to satisfy obligations that exceeded an agency's available budget authority. The word "appropriation" appearing alone nearly always refers to a provision of law that grants both budget authority and authority to make payments from the Treasury.

Appropriations are identified on financial documents by means of "account symbols," which are assigned by the Treasury Department, based on the number and types of appropriations an agency receives and other types of funds it may control. An appropriation account symbol is a group of numbers, or a combination of numbers and letters, which identifies the agency responsible for the account, the period of availability of the appropriation, and the specific fund classification. Detailed information on reading and identifying account symbols is contained in the Treasury Financial Manual (I TFM 2-1500). Specific accounts for each agency are listed in a publication entitled Federal Account Symbols and Titles, issued quarterly as a supplement to the TFM.

## 3. Contract Authority: Obligations in Advance of Appropriations

Contract authority is a form of budget authority that permits agencies to incur obligations in advance of appropriations. *Glossary* at 22. It is to be distinguished from every government agency's inherent authority to use budget authority to enter into contracts necessary to carry out its statutory functions.

Contract authority itself is not an appropriation; it grants authority to enter into binding contracts but not the funds to make payments under them. Congress must provide funds to satisfy the contractual obligations, either by making a subsequent appropriation called a "liquidating appropriation" or by granting authority to use receipts or offsetting collections for this purpose. *See PCL Construction Service, Inc. v. United States*, 41 Fed. Cl. 242 (1998); *National Ass'n of Regional Councils v. Costle*, 564 F.2d 583, 586 (D.C. Cir. 1977); B-300167, Nov. 15, 2002; B-228732, Feb. 18, 1988. Contract authority constitutes budget authority. The subsequent liquidating appropriation does not grant authority to incur obligations and, therefore, is not budget authority. B-171630, Aug. 14, 1975.

Congress may provide contract authority in appropriation acts (for example, B-174839, Mar. 20, 1984) or, more commonly, in other types of legislation (for example, B-228732, Feb. 18, 1988). Either way, the authority must be specific. 31 U.S.C. § 1301(d).

Contract authority has a "period of availability" analogous to that for an appropriation. Unless otherwise specified, if it appears in an appropriation act in connection with a particular appropriation, its period of availability will be the same as that for the appropriation. If it appears in an appropriation act without reference to a particular appropriation, its period of availability, again unless otherwise specified, will be the fiscal year covered by the appropriation act. 32 Comp. Gen. 29, 31 (1952); B-76061, May 14, 1948. *See Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 331 n.4 (1999); *Costle*, 564 F.2d at 587–88. This period of availability refers to the time period during which the contracts must be entered into.

Since the contracts entered into pursuant to contract authority constitute obligations binding on the United States, Congress has little practical choice but to make the necessary liquidating appropriations. B-228732, Feb. 18, 1988; B-226887, Sept. 17, 1987. As the Supreme Court has put it:

> "The expectation is that appropriations will be automatically forthcoming to meet these contractual commitments. This mechanism considerably reduces whatever discretion Congress might have exercised in the course of making annual appropriations."

*Train v. City of New York*, 420 U.S. 35, 39 n.2 (1975). A failure or refusal by Congress to make the necessary appropriation would not defeat the obligation, and the party entitled to payment would most likely be able to recover in a lawsuit. *E.g.*, B-211190, Apr. 5, 1983.

## 4. Offsetting Collections: Authority to Obligate Funds Collected

The federal government receives money from numerous sources and in numerous contexts. Our interest from an appropriations law perspective is whether funds received by an agency are available for obligation without further congressional action.

For our purposes, we discuss two types of collections that may be received by the government: offsetting collections and offsetting receipts. *Offsetting collections* are collections authorized by law to be credited to appropriation or fund expenditure accounts. Generally, offsetting collections are collections resulting from business-type or market-oriented activities, such as the sale of goods or services to the public, and

intragovernmental transactions. For example, the Secretary of the Interior is authorized to collect recreation fees from visitors to national parks. These fees are available for expenditure without further appropriation by Congress. 16 U.S.C. § 6806.

Laws authorizing offsetting collections make them available for obligation to meet the account's purpose without further congressional action. Accordingly, because the receiving agency has the authority to obligate and expend offsetting collections, offsetting collections constitute budget authority.[4] Furthermore, as discussed earlier in this chapter, an appropriation is authority to incur obligations and to make payments from the Treasury for specified purposes. Thus, offsetting collections are an appropriation and are subject to the fiscal laws governing appropriated funds. B-230110, Apr. 11, 1988; 63 Comp. Gen. 285 (1984).

In contrast, *offsetting receipts* are collections that cannot be obligated and expended without further congressional action. Offsetting receipts are not available to an agency unless Congress appropriates them.[5] Offsetting receipts are not available to the receiving agency for obligation; accordingly, offsetting receipts do not constitute budget authority. An example of offsetting receipts is the motor vehicle and engine compliance program fee collected by EPA. These fees are deposited into the Environmental Services Special Fund but are not available to EPA without further appropriation. 42 U.S.C. § 7552.

## 5. Borrowing Authority: Incurring Obligations Against Borrowed Amounts

"Borrowing authority" is authority that permits agencies to incur obligations and make payments to liquidate the obligations out of borrowed moneys. Borrowing authority may consist of (a) authority to borrow from the Treasury; (b) authority to sell agency debt securities and, therefore, to borrow directly from the public; (c) authority to borrow from the Federal Financing Bank, or (d) some combination of the above.

Borrowing from the Treasury is the most common form and is also known as "public debt financing." Generally, GAO has expressed a preference for financing through direct appropriations rather than through borrowing

[4] The Congressional Budget Act defines budget authority as the authority provided by Federal law to incur financial obligations. *See* Congressional Budget Act § 3(2)(A)(i), 2 U.S.C. § 622(2)(A)(i). Budget authority includes provisions of law that make funds available for obligation and expenditure, *see Id.* § 3(2)(A)(i), § 622(2)(A)(i).

[5] Often, these may be deposited into what is known as a "receipt account."

authority on the grounds that the appropriations process provides enhanced congressional control. *E.g.*, B-301397, Sept. 4, 2003; B-141869, July 26, 1961. The Congressional Budget Act met this concern to an extent by requiring generally that new borrowing authority, as with new contract authority, be limited to the extent or amounts provided in appropriation acts. 2 U.S.C. § 651(a). GAO has recommended that borrowing authority be provided only to those accounts that can generate enough revenue in the form of collections from nonfederal sources to repay their debt. GAO, *Budget Issues: Budgeting for Federal Capital*, GAO/AIMD-97-5 (Washington, D.C.: Nov. 12, 1996); *Budget Issues: Agency Authority to Borrow Should Be Granted More Selectively*, GAO/AFMD-89-4 (Washington, D.C.: Sept. 15, 1989).[6] On occasion, however, GAO has recommended borrowing authority when supplemental appropriations might otherwise be necessary. *See* GAO, *Aviation Insurance: Federal Insurance Program Needs Improvements to Ensure Success*, GAO/RCED-94-151 (Washington, D.C.: July 15, 1994).

A type of borrowing authority specified in the expanded definition of budget authority contained in the Omnibus Budget Reconciliation Act of 1990 is monetary credits. The monetary credit is a relatively uncommon concept in government transactions. At the present time, it exists mostly in a handful of statutes authorizing the government to use monetary credits to acquire property such as land or mineral rights. Examples are the Rattlesnake National Recreation Area and Wilderness Act of 1980, discussed in 62 Comp. Gen. 102 (1982), and the Cranberry Wilderness Act, discussed in B-211306, Apr. 9, 1984.

Under the monetary credit procedure, the government does not issue a check in payment for the acquired property. Instead, it gives the seller "credits" in dollar amounts reflecting the purchase price. The holder may then use these credits to offset or reduce amounts it owes the government in other transactions that may, depending on the terms of the governing legislation, be related or unrelated to the original transaction. The statute may use the term "monetary credit" (as in the Cranberry legislation) or some other designation such as "bidding rights" (as in the Rattlesnake Act). Where this procedure is authorized, the acquiring agency does not need to have appropriations or other funds available to

[6] If an agency cannot repay with external collections, it must either extend its debt with new borrowings, seek appropriations to repay the debt, or seek to have the debt forgiven by statute. Repayment from external collections is the only alternative that reimburses the Treasury in any meaningful sense. *See* GAO/AFMD-89-4 at 17, 20.

cover the purchase price because no cash disbursement is made. An analogous device authorized for use by the Commodity Credit Corporation is "commodity certificates."[7]

## 6. Loan and Loan Guarantee Authority

A loan guarantee is any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a nonfederal borrower to a nonfederal lender. The government does not know whether or to what extent it may be required to honor the guarantee until there has been a default.

In the past, loan guarantees were expressly excluded from the definition of budget authority. Budget authority was created only when an appropriation to liquidate loan guarantee authority was made. This changed with the enactment of the Federal Credit Reform Act of 1990, effective starting with fiscal year 1992. Under this legislation, the "cost" of both loan and loan guarantee programs is budget authority. Cost means the estimated long-term cost to the government of a loan or loan guarantee (defaults, delinquencies, interest subsidies, etc.), calculated on a net present value basis, excluding administrative costs. Except for entitlement programs (the statute notes the guaranteed student loan program and the veterans' home loan guaranty program as examples) and certain Commodity Credit Corporation programs, new loan guarantee commitments may be made only to the extent budget authority to cover their costs is provided in advance or other treatment is specified in appropriation acts. Appropriations of budget authority are to be made to "credit program accounts," and the programs administered from revolving nonbudgetary "financing accounts."

The Federal Credit Reform Act reflects the thrust of proposals by GAO, the Office of Management and Budget, the Congressional Budget Office, and the Senate Budget Committee. *See* GAO, *Credit Reform: U.S. Needs Better Method for Estimating Cost of Foreign Loans and Guarantees*, GAO/NSIAD/GGD-95-31 (Washington, D.C.: Dec. 19, 1994); *Credit Reform: Case-by-Case Assessment Advisable in Evaluating Coverage and Compliance*, GAO/AIMD-94-57 (Washington, D.C.: July 28, 1994). *See also GAO, Budget Issues: Budgetary Treatment of Federal Credit Programs*, GAO/AFMD-89-42 (Washington, D.C.: Apr. 10,

[7] *See* GAO, *Farm Payments: Cost and Other Information on USDA's Commodity Certificates,* GAO/RCED-87-117BR (Mar. 26, 1987).

1989) (discussion of the "net present value" approach to calculating costs).

## 7. Reappropriation

The term "reappropriation" means congressional action to continue the availability, whether for the same or different purposes, of all or part of the unobligated portion of budget authority that has expired or would otherwise expire. Reappropriations are counted as budget authority in the first year for which the availability is extended.[8]

## 8. Classifications of Budget Authority

Appropriations are classified in different ways for different purposes. Some are discussed elsewhere in this publication. The following classifications, although phrased in terms of appropriations, apply equally to the broader concept of budget authority.

### a. Classification Based on Duration

(1) *One-year appropriation*: An appropriation that is available for obligation only during a specific fiscal year. This is the most common type of appropriation. It is also known as a "fiscal year" or "annual" appropriation.

(2) *Multiple year appropriation*: An appropriation that is available for obligation for a definite period of time in excess of one fiscal year.

(3) *No-year appropriation*: An appropriation that is available for obligation for an indefinite period. A no-year appropriation is usually identified by appropriation language such as "to remain available until expended."

[8] *Glossary* at 23. *See also* 31 U.S.C. § 1301(b) (reappropriation for a different purpose is to be accounted for as a new appropriation).

b. Classification Based on Presence or Absence of Monetary Limit

(1) *Definite appropriation*: An appropriation of a specific amount of money.

(2) *Indefinite appropriation*: An appropriation of an unspecified amount of money. An indefinite appropriation may appropriate all or part of the receipts from certain sources, the specific amount of which is determinable only at some future date, or it may appropriate "such sums as may be necessary" for a given purpose.

c. Classification Based on Permanency

(1) *Current appropriation*: An appropriation made by Congress in, or immediately prior to, the fiscal year or years during which it is available for obligation.

(2) *Permanent appropriation*: A "standing" appropriation which, once made, is always available for specified purposes and does not require repeated action by Congress to authorize its use.[9] Legislation authorizing an agency to retain and use receipts tends to be permanent; if so, it is a form of permanent appropriation.

d. Classification Based on Availability for New Obligations

(1) *Current* or *unexpired appropriation*: An appropriation that is available for incurring new obligations.

(2) *Expired appropriation*: An appropriation that is no longer available to incur new obligations, although it may still be available for the recording and/or payment (liquidation) of obligations properly incurred before the period of availability expired.

(3) *Canceled appropriation*: An appropriation whose account is closed, and is no longer available for obligation or expenditure for any purpose.

An appropriation may combine characteristics from more than one of the above groupings. For example, a "permanent indefinite" appropriation is open ended as to both period of availability and amount. Examples are

[9] This is similar to a no-year appropriation except that a no-year appropriation will be closed if there are no disbursements from the appropriation for two consecutive fiscal years, and if the head of the agency or the President determines that the purposes for which the appropriation was made have been carried out. 31 U.S.C. § 1555. In actual usage, the term "permanent appropriation" tends to be used more in reference to appropriations contained in permanent legislation, such as legislation establishing a revolving fund, while "no-year appropriation" is used more to describe appropriations found in appropriation acts.

31 U.S.C. § 1304 (payment of certain judgments against the United States) and 31 U.S.C. § 1322(b)(2) (refunding amounts erroneously collected and deposited in the Treasury).

## B. The Budget and Appropriations Process[10]

An appropriate subtitle for this section might be “Life Cycle of an Appropriation.” An appropriation has a conception, birth, death, and even an afterlife. The various phases in an appropriation’s “life cycle” may be identified as follows:

- executive budget formulation and transmittal,
- congressional action,
- budget execution and control,
- audit and review, and
- account closing.

### 1. Historical Perspective

The first general appropriation act, passed by Congress on September 29, 1789, appropriated a total of $639,000 and illustrates what was once a relatively uncomplicated process:

> “*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That there be appropriated for the service of the present year, to be paid out of the monies which arise, either from the requisitions heretofore made upon the several states, or from the duties on impost and tonnage, the following sums, viz. A sum not exceeding two hundred and sixteen thousand dollars for defraying the expenses of the civil list, under the late and present government; a sum not exceeding one hundred and thirty-seven thousand dollars for defraying the expenses of the department of war; a sum not exceeding one hundred and ninety thousand dollars for discharging the warrants issued by the late board of treasury, and remaining unsatisfied; and a sum not exceeding ninety-six thousand dollars for paying the pensions to invalids.”

1 Stat. 95. As the size and scope of the federal government have grown, so has the complexity of the appropriations and of the appropriations process.

[10] For a detailed discussion of the history of the budget and appropriations process, *see* Louis Fisher, *The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices,* 29 Cath. U. L. Rev. 51, 53–59 (1979). For a more current overview of the process, *see* Allen Schick, *The Federal Budget: Politics, Policy, Process*, 3rd Ed. (The Brookings Institution Press, 2007).

In 1789, the House established the Ways and Means Committee to report on revenues and spending, only to disband it that same year following the creation of the Treasury Department. The House Ways and Means Committee was re-established to function permanently in 1795 and was recognized as a standing committee in 1802.

On the Senate side, the Finance Committee was established as a standing committee in 1816. Up until that time, the Senate had referred appropriation measures to temporary select committees. By 1834, jurisdiction over all Senate appropriation bills was consolidated in the Senate Finance Committee.

In the mid-nineteenth century, a move was begun to restrict appropriation acts to only those expenditures that had been previously authorized by law. The purpose was to avoid the delays caused when legislative items or “riders” were attached to appropriation bills. Rules were eventually passed by both houses of Congress to require, in general, prior legislative authorizations for the enactment of appropriations.

Fiscal years allow financial transactions to be classified into particular time periods. The need for such temporal classification has been termed an “absolute necessity.” *Sweet v. United States*, 34 Ct. Cl. 377, 386 (1899). *See also Bachelor v. United States*, 8 Ct. Cl. 235, 238 (1872) (reasons for classifying transactions into fiscal years are “so obvious . . . that no one can fail to see their importance”). Prior to 1842, the government did not distinguish between fiscal year and calendar year. The practical needs of government led Congress to establish a fiscal year that does not run concurrently with the calendar year: one case explained that a different fiscal year arose for the sake of the “convenience of the public service in the administration of the expense, accounts, and estimates of the Government.”[11] *Sweet v. United States*, 34 Ct. Cl. at 386-87.

Under the financial strains caused by the Civil War, appropriations committees first appeared in both the House and the Senate, diminishing the jurisdiction of the Ways and Means and Finance Committees, respectively. Years later, the need for major reforms was again accentuated by the burdens of another war. Following World War I,

[11] From 1842 to 1976, the government’s fiscal year ran from July 1 to the following June 30. In 1974, Congress changed the fiscal year to run, starting with fiscal year 1977, from October 1 to September 30. 31 U.S.C. § 1102.

Congress passed the Budget and Accounting Act, 1921, Pub. L. No. 67-13, 42 Stat. 20 (June 10, 1921).

Before 1921, departments and agencies generally made individual requests for appropriations. These submissions were compiled for congressional review in an uncoordinated "Book of Estimates." The Budget and Accounting Act enhanced budgetary efficiency and aided in the performance of constitutional checks and balances through the budget process.[12] It required the President to submit a national budget each year and restricted the authority of the agencies to present their own proposals. *See* 31 U.S.C. §§ 1104, 1105. With this centralization of authority for the formulation of the executive branch budget in the President and the newly established Bureau of the Budget (now Office of Management and Budget), Congress also took steps to strengthen its oversight capability over fiscal matters by establishing what was then called the General Accounting Office.[13]

The decades immediately following World War II saw growth in both the size and the complexity of the federal budget. It became apparent that the congressional role in the "budget and appropriations" process centered heavily on the appropriations phase and placed too little emphasis on the budgetary phase. In other words, Congress responded to the President's spending and revenue proposals only through the cumulative result of individual pieces of legislation reached through an agglomeration of separate actions. Congress did not look at the budget as a whole, nor did it examine or vote on overall spending or revenues. There was no process by which Congress could establish its own spending priorities. Thus, the impetus for a congressional budget process began in the early 1970s. It was not created in a single step; rather, it was created in stages—and for the most part new pieces did not replace but were added to existing processes. As William G. Dauster, former Chief Counsel on the Committee on the Budget, put it: "[t]he law governing the budget process resembles nothing so much as sediment. It has accumulated in several statutes, each layered upon the prior one . . . [t]his incremental growth has created something of a legal

[12] A summary of the changes brought about by the Budget and Accounting Act may be found in *National Federation of Federal Employees v. Cheney,* 883 F.2d 1038, 1043–46 (D.C. Cir. 1989).

[13] Congress has redesignated the General Accounting Office as the Government Accountability Office. 31 U.S.C. § 702 note.

nettle." *Budget Process Law Annotated,* S. Print No. 103-49, at xxxv (1993).

Among the several statutes on the budget process is the Congressional Budget Act and Impoundment Control Act of 1974. It established a process for Congress to systematically consider the total federal budget and determine priorities for allocating budget resources. The design of programs and the allocation of spending within each mission area is left to the authorizing and appropriations committees. The focus is on overall fiscal policy and an allocation across priorities.[14]

The statute made several major changes to the existing budget and appropriations process. For example:

- It established a detailed calendar governing the various stages of the congressional budget and appropriations process. 2 U.S.C. § 631.
- It provided for congressional review of the President's budget, the establishment of target ceilings for federal expenditures through one or more concurrent resolutions, and the evaluation of spending bills against these targets. 2 U.S.C. §§ 632–642. Prior to this time, Congress had considered the President's budget only in the context of individual appropriation bills. To implement the new process, the law created Budget Committees in both the Senate and the House, and a Congressional Budget Office (CBO). 2 U.S.C. § 601. The law requires the CBO to prepare estimates of new budget authority, outlays, or revenue provided by bills or resolutions reported from committees of either house, or estimates of the costs that the government would incur in carrying out the provisions of the proposed legislation. 2 U.S.C. § 602.

[14] The second and more immediate motive for passage of the Congressional Budget and Impoundment Control Act was the dispute in the early 1970s related to the impoundment by President Nixon of billions of dollars of funds appropriated by Congress. *See* Committee on the Budget, United States Senate, *The Congressional Budget Process, An Explanation,* S. Print No. 105-67, at 8 (1998); H.R. Rep. No. 93-1101, at 3 (1974); H.R. Rep. No. 93-658, at 19 (1974).

- Prompted by the growth of "backdoor spending,"[15] it enhanced the role of the Appropriations Committees in reviewing proposals for contract authority, borrowing authority, and mandatory entitlements. 2 U.S.C. § 651.

The 1974 legislation also imposed limitations on the impounding of appropriated funds by the executive branch. 2 U.S.C. §§ 681–688.

## 2. Executive Budgeting: the Budget and Accounting Act, 1921

With this as an historical backdrop, the first step in the life cycle of an appropriation is the long and exhaustive administrative process of budget preparation and review, a process that may well take place several years before the budget for a particular fiscal year is ready to be submitted to Congress. The primary participants in the process at this stage are the agencies and individual organizational units, which review current operations, program objectives, and future plans, and the Office of Management and Budget (OMB),[16] which coordinates and formulates a consolidated budget submission.

Throughout this preparation period, there is a continuous exchange of information among the various federal agencies, OMB, and the President, including revenue estimates and economic outlook projections from the Treasury Department, the Council of Economic Advisers, the Congressional Budget Office, and the Departments of Commerce and Labor.

The President must submit his budget request to Congress on or before the first Monday in February of each year, for use during the following

[15] The term "backdoor spending" is a collective designation for authority provided in legislation other than appropriation acts to obligate the government to make payments. The most common forms of backdoor spending are borrowing authority, contract authority, and entitlement authority. *See* GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Jan. 2005). From the perspective of the appropriations committees, funding provided by these forms of authority causes their funding control to "sneak out" legislative "back doors."

[16] Part 1 of Reorganization Plan No. 2 of 1970 (84 Stat. 2085), designated the former Bureau of the Budget as OMB and transferred all the authority vested in the Bureau and its director to the President. By Executive Order No. 11541, July 1, 1970, the President in turn delegated that authority to the Director of OMB. OMB's primary functions include assistance to the President in the preparation of the budget and the formulation of the fiscal program of the government, supervision and control of the administration of the budget, centralized direction in executive branch financial management, and review of the organization and management of the executive branch.

fiscal year. 2 U.S.C. § 631.[17] Numerous statutory provisions, the most important of which are 31 U.S.C. §§ 1104–1109, prescribe the content and nature of the materials and justifications that must be submitted with the President's budget request. Specific instructions and policy guidance are contained in OMB Circular No. A-11.

## 3. Congressional Budgeting: the Congressional Budget Act of 1974

The next phase in the life cycle of an appropriation is sometimes referred to as "congressional budgeting." Under the Congressional Budget Act, Congress must agree on governmentwide budget totals. A timetable for congressional budget action is set forth in 2 U.S.C. § 631, with further detail in sections 632–656. Key steps in that timetable are summarized below.[18]

*February 15.* The Congressional Budget Office submits to the House and Senate Budget Committees its annual report required by 2 U.S.C. § 602(e). The report contains the Congressional Budget Office's analysis of fiscal policy and budget priorities.

*Within 6 weeks after President submits a budget request, or at such time as may be requested by the Committee on the Budget.* Each congressional committee with legislative jurisdiction submits to the appropriate Budget Committee its views and estimates on spending and revenue levels for the following fiscal year on matters within its jurisdiction. 2 U.S.C. § 632(d). The House and Senate Budget Committees then hold hearings and prepare their respective versions of a concurrent resolution, which is intended to be the overall budget plan against which individual appropriation bills are to be evaluated.

*April 15.* Congress completes action on the concurrent resolution, which includes a breakdown of estimated new budget authority and outlays for

[17] Section 1105(a) of title 31 of the United States Code states the requirement for a presidential budget submission slightly differently than 2 U.S.C. § 631: "On or after the first Monday in January but not later than the first Monday in February of each year, the President shall submit a budget of the United States Government for the following fiscal year."

[18] Some useful references discussing the congressional budget process are: GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at Appendix I (Overview of the Development and Execution of the Federal Budget), Appendix II (Federal Budget Formulation and Appropriations Processes); GAO, *Budget Process: Evolution and Challenges,* GAO/T-AIMD-96-129 (July 11, 1996); and Committee on the Budget, United States Senate, *The Congressional Budget Process, An Explanation,* S. Print No. 105-67 (revised Dec. 1998).

each major budget function. 2 U.S.C. § 632(a). The conference report on the concurrent resolution allocates the totals among individual committees. 2 U.S.C. § 633(a). The resolution may also include "reconciliation directives"—directives to individual committees to recommend legislative changes in revenues or spending to meet the goals of the budget plan. 2 U.S.C. § 641(a).

## 4. Appropriations: the Enactment of Budget Authority

### a. The Legislative Process

After completing work on its budget totals, Congress begins considering annual appropriations bills. In exercising the broad discretion granted by the Constitution, Congress can approve funding levels contained in the President's budget request, increase or decrease those levels, eliminate proposals, or add programs not requested by the administration.

In simpler times, Congress often made appropriations in the form of a single, consolidated appropriation act. The most recent *regular* consolidated appropriation act was the General Appropriation Act of 1951, Pub. L. No. 759, 64 Stat. 595 (Sept. 6, 1950). Since that time, Congress has generally made appropriations in a series of regular appropriation acts plus one or more supplemental appropriation acts. Most regular appropriation acts are organized based on one or more major departments and a number of smaller agencies (corresponding to the jurisdiction of appropriations subcommittees), although a few are based solely on function. An agency may receive funds under more than one appropriation act. The individual structures are of course subject to change over time. At the present time, there are 12 regular appropriation acts, as follows:

- Agriculture, Rural Development, Food and Drug Administration, and related agencies
- Commerce, Justice, Science, and related agencies
- Department of Defense
- Energy and Water Development and related agencies
- Financial Services and General Government
- Department of Homeland Security
- Department of the Interior, Environment, and related agencies

- Departments of Labor, Health and Human Services, and Education, and related agencies
- Legislative Branch
- Military Construction and Veteran Affairs, and related agencies
- Department of State, Foreign Operations, and related programs
- Departments of Transportation, Housing and Urban Development, and related agencies;

House consideration of the individual appropriation bills begins as each subcommittee of the House Appropriations Committee studies appropriation requests and evaluates the performance of the agencies within its jurisdiction. Typically, each subcommittee will conduct hearings at which federal officials give testimony concerning both the costs and achievements of the various programs administered by their agencies and provide detailed justifications for their funding requests. Eventually, each subcommittee reports a single appropriation bill for consideration by the entire committee. In turn, the House Appropriations Committee reports annual appropriations bills to the whole House. Under the Congressional Budget Act, the House Appropriations Committee should report the last annual appropriation bill by June 10, and the House should complete all action on appropriation bills by June 30. 2 U.S.C. § 631.

As the House passes individual appropriation bills, it sends them to the Senate. As in the House, the Senate considers each appropriation measure first in subcommittee, which then reports the bill the full Appropriations Committee, which then reports it to the full Senate. In the event of variations in the Senate and House versions of a particular appropriation bill, a conference committee, including representatives of both houses of Congress, is formed. The conference committee's role is to resolve all differences, but the full House and Senate must also vote to approve the conference report.

Following either the Senate's passage of the House version of an appropriation measure, or the approval of a conference report by both bodies, the enrolled bill is then sent to the President for signature or veto.

The Congressional Budget Act envisions completion of the process by October 1, the beginning of the new fiscal year.[19]

### b. Points of Order

The rules of the Senate and House of Representatives contain a number of requirements relevant to an understanding of appropriations law and the legislative process. For example, House Rule XXI(2) prohibits appropriations for objects not previously authorized by law.[20] Senate Rule XVI contains a similar but more limited prohibition.[21] Other examples are the prohibition against including general legislation in appropriation acts (Senate Rule XVI, House Rule XXI), and the prohibition against consideration by a conference committee of matters not committed to it by either House (Senate Rule XXVIII, House Rule XXII). The applicability of Senate and House rules is exclusively within the province of the particular House.[22]

In addition, rather than expressly prohibiting a given item, legislation may provide that it shall not be in order for the Senate or House to consider a bill or resolution containing that item. An important example is from the Congressional Budget Act of 1974, which defines "spending authority" as authority provided in laws other than appropriation acts to obligate the United States to make payments.[23] 2 U.S.C. § 651(c)(2). It is not in order for either house to consider any bill, resolution, or amendment containing certain types of new spending authority, such as contract authority, unless that bill, resolution, or amendment also provides that the new authority is to be effective for any fiscal year only to the extent provided in appropriation acts. 2 U.S.C. § 651(a). There are similar provisions

[19] Occasionally Congress does not complete the entire process by October 1, which typically results in the enactment of a stop-gap appropriations measure known as a continuing resolution. We discuss continuing resolutions further in Chapter 8.

[20] Citations to the Rules of the House are from the Rules of the House of Representatives, 114th Congress, Jan. 6, 2015.

[21] Citations to the Senate rules are from the Standing Rules of the Senate, S. Doc. No. 113-18, Nov. 4, 2013 (revised to Jan. 24, 2013).

[22] The Comptroller General will not render an opinion on these matters. *E.g.,* B-173832, Aug. 1, 1975.

[23] For further information on spending authority, see GAO, *Updated 1987 Inventory of Accounts with Spending Authority and Permanent Appropriations,* GAO/OGC-98-23 (Washington, D.C.: Jan. 19, 1998); *Budget Issues: Inventory of Accounts With Spending Authority and Permanent Appropriations, 1996,* GAO/AIMD-96-79 (Washington, D.C.: May 31, 1996).

pertaining to entitlement authority, which is statutory authority, whether temporary or permanent—

> "to make payments (including loans and grants), the budget authority for which is not provided for in advance by appropriation Acts, to any person or government if, under the provisions of the law containing that authority, the United States is obligated to make such payments to persons or governments who meet the requirements established by that law."

Entitlement authority is treated as spending authority during congressional consideration of the budget. In order to make entitlements subject to the reconciliation process, the Congressional Budget Act provides that proposed legislation providing new entitlement authority to become effective prior to the start of the next fiscal year will be subject to a point of order. 2 U.S.C. § 651(b)(1). Entitlement legislation, which would require new budget authority in excess of the allocation made pursuant to the most recent budget resolution, must be referred to the appropriations committees. Id. § 651(b)(2).

In addition, the Balanced Budget and Emergency Deficit Control Act of 1985 added a definition of "credit authority" to the Congressional Budget Act, specifically, "authority to incur direct loan obligations or to incur primary loan guarantee commitments." 2 U.S.C. § 622(10). Any bill, resolution, or conference report providing new credit authority will be subject to a point of order unless the new authority is limited to the extent or amounts provided in advance in appropriation acts.[24] 2 U.S.C. § 651(a).

The effect of these rules and of statutes like 2 U.S.C. § 651(a) is to subject the noncomplying bill to a "point of order." A point of order is a procedural objection raised on the House or Senate floor or in committees by a Member alleging a departure from a rule or statute governing the conduct of business. *See* GAO, *A Glossary of Terms Used in the Federal Budget Process* , GAO-05-734SP (Washington, D.C.: Sept. 2005). It differs from an absolute prohibition in that (a) it is always possible that no one will raise a point of order and (b) if raised, it may or may not be

[24] This is the same control device we have previously noted for contract authority. Although loan guarantee authority was not viewed as budget authority in 1985, the apparent rationale was that the control, if it is to be employed, must apply at the authorization stage because the opportunity for control no longer exists by the time liquidating budget authority becomes necessary. An example of a statute including this language is discussed in B-230951, Mar. 10, 1989.

sustained. Also, some laws, like the Congressional Budget Act, authorize points of order to be raised, and some measures may be considered under special resolutions waiving points of order.[25] If a point of order is raised and sustained, the offending provision is effectively killed and may be revived only if it is amended to cure the noncompliance.

The potential effect of a rule or statute subjecting a provision to a point of order is limited to the pre-enactment stage. If a point of order is not raised, or is raised and not sustained, the provision, if enacted, is no less valid. To restate, a rule or statute subjecting a given provision to a point of order has no effect or application once the legislation or appropriation has been enacted. 65 Comp. Gen. 524, 527 (1986); 57 Comp. Gen. 34 (1977); 34 Comp. Gen. 278 (1954); B-173832, Aug. 1, 1975; B-123469, Apr. 14, 1955; B-87612, July 26, 1949.

### c. Incorporation by Reference

Sometimes a statutory provision expressly refers to an outside source. This is known as incorporation by reference, and is the use of legislative language to make extra-statutory material part of the legislation by indicating that the extra-statutory material should be treated as if it were written out in full in the legislation. *See generally* Black's Law Dictionary 834 (9th ed. 2010). Incorporation by reference differs from the use of legislative history to construe statutes: a key characteristic of incorporation by reference is the express statutory reference to an outside source. No such express statutory reference exists when GAO or the courts make other uses of legislative history.

Incorporation by reference is a well-accepted legislative tool. Indeed, there are numerous instances in which the Supreme Court, for more than 100 years, has accepted incorporation by reference without objection. *See, e.g., Tennessee v. Lane*, 541 U.S. 509, 517 (2004); *United States v. Sharpnack*, 355 U.S. 286, 293 (1958); *In re Heath*, 144 U.S. 92, 94 (1892); *see also Hershey Foods Corp. v. Department of Agriculture*, 158 F. Supp. 2d 37 (D.D.C. 2001), *aff'd*, 293 F.3d 520 (D.C. Cir. 2002). In these cases, the language of the statute evidenced a clear congressional intent to incorporate by reference, and the referenced material was specifically ascertainable from the face of the legislative language, so all

[25] Usually, a point of order may be waived by a simple majority vote. However, in the Senate, waiver of some points of order requires a three-fifths vote. For example, waiver of the prohibition against consideration of nongermane amendments to budget resolutions requires a three-fifths vote of all members of the Senate. Pub. L. No. 93-344, § 305(b)(2).

would know with certainty the duties, terms, conditions, and constraints enacted into law.

In a 2008 decision, GAO considered the legal effect of seven appropriations provisions in the Consolidated Appropriations Act, 2008, that incorporated by reference specified passages of an explanatory statement of the House Committee on Appropriations that was printed in the Congressional Record on December 17, 2007. B-316010, Feb. 25, 2008. This explanatory statement contained more specific allocations for the agencies affected. After reviewing the language of the seven provisions, GAO determined that:

> "Because the language of the seven provisions clearly and unambiguously expresses an intent to appropriate amounts as allocated in the explanatory statement and because reference to the explanatory statement permits the agencies and others to ascertain with certainty the amounts and purposes for which these appropriations are available, these provisions establish the referenced allocations contained in the explanatory statement as legally binding restrictions on the agencies' appropriations."

*Id*. at 8. GAO thus concluded that the affected agencies were required to obligate and expend amounts appropriated in the seven provisions in accordance with the referenced allocations in the explanatory statement. *See also* B-319009, Apr. 27, 2010 (incorporation by reference for purposes of reprogramming requirement).

### d. What Constitutes an Appropriation

As we discussed in chapter 1, "any time the Congress specifies the manner in which a Federal entity shall be funded and makes such funds available for obligation and expenditure, that constitutes an appropriation, whether the language is found in an appropriation act or in other legislation."[26] B-193573, Dec. 19, 1979. Some agency activities, such as those arising from permanent provisions permitting the obligation and expenditure of amounts collected from user fees, are not financed by *annual* appropriations because Congress need not enact annual legislation authorizing the obligations and expenditures. Nonetheless, such activities are financed by appropriations and, absent any statute stating otherwise, such activities are subject to the limitations imposed by law upon the use of all appropriated amounts.

Occasionally, however, questions arise regarding whether a particular statute does indeed make amounts available for obligation and

[26] Later in this subsection we will discuss some rare exceptions to this rule.

expenditure—that is, whether the statute makes an appropriation. The starting point for any analysis to answer such a question is 31 U.S.C. § 1301(d), which provides:

> "A law may be construed to make an appropriation out of the Treasury or to authorize making a contract for the payment of money in excess of an appropriation only if the law specifically states that an appropriation is made or that such a contract may be made."

Thus, the rule is that the making of an appropriation must be expressly stated. An appropriation cannot be inferred or made by implication. *E.g.,* 50 Comp. Gen. 863 (1971).

Regular annual and supplemental appropriation acts present no problems in this respect as they will be apparent on their face. They, as required by 1 U.S.C. § 105, bear the title "An Act making appropriations . . . ." Other statutes that are not regular annual or supplemental appropriations acts may also explicitly state that they make an appropriation. *See, e.g.,* 31 U.S.C. § 1304(a) ("necessary amounts are appropriated to pay final judgments, awards, compromise settlements"); 31 U.S.C. § 1324 ("necessary amounts are appropriated to the Secretary of Treasury for refunding internal revenue collections"); B-321823, Dec. 6, 2011.

Though the making of an appropriation must be expressly stated, a statute need not use the word "appropriation." If the statute contains a specific direction to pay and a designation of the funds to be used, such as a direction to make a specified payment or class of payments "out of any money in the Treasury not otherwise appropriated," then this amounts to an appropriation. 63 Comp. Gen. 331 (1984); 13 Comp. Gen. 77 (1933). *See also* 34 Comp. Gen. 590 (1955).

For example, a private relief act that directs the Secretary of the Treasury to pay, out of any money in the Treasury not otherwise appropriated, a specified sum of money to a named individual constitutes an appropriation. 23 Comp. Dec. 167, 170 (1916). Another example involved a statute that authorized the Secretary of the Treasury to reimburse local fire departments or districts for costs incurred in fighting fires on federal property. B-160998, Apr. 13, 1978. Since the statute directed the Secretary to make payments "from any moneys in the Treasury not otherwise appropriated" (*i.e.,* it contained both the specific direction to pay and a designation of the funds to be used), the Comptroller General concluded that section 11 constituted a permanent indefinite appropriation.

Both elements of the test—that is, a specific direction to pay and a designation of funds to be used—must be present. Thus, a direction to pay without a designation of the source of funds is not an appropriation. For example, a private relief act that contains merely an authorization and direction to pay but no designation of the funds to be used does not make an appropriation. 21 Comp. Dec. 867 (1915); B-26414, Jan. 7, 1944.[27] Similarly, public legislation enacted in 1978 authorized the U.S. Treasury to make an annual prepayment to Guam and the Virgin Islands of the amount estimated to be collected over the course of the year for certain taxes, duties, and fees. While it was apparent that the prepayment at least for the first year would have to come from the general fund of the Treasury, the legislation was silent as to the source of the funds for the prepayments, both for the first year and for subsequent years. While the statute may have established a permanent authorization, it was not sufficient under 31 U.S.C. § 1301(d) to constitute an actual appropriation. B-114808, Aug. 7, 1979. (Congress subsequently made the necessary appropriation in Pub. L. No. 96-126, 93 Stat. 954, 966 (Nov. 27, 1979).)

The designation of a source of funds without a specific direction to pay is also not an appropriation. 67 Comp. Gen. 332 (1988).

Thus far, we have been talking about the authority to incur obligations and make payments that are not associated with any fee collections. In addition, a statute makes an appropriation if it (1) authorizes the collection of fees, and (2) makes the fees available for expenditure for a specified purpose. Such statutes constitute continuing or permanent appropriations; that is, the money is available for obligation or expenditure without further action by Congress. For example, Congress authorized the Commission on the Bicentennial to charge fees for the licensing of its logo, with the statute specifying that "[a]mounts charged . . . shall be available to the Commission." B-228777, Aug. 26, 1988. GAO concluded that the Commission "is authorized by its statute to retain and expend proceeds from the commercial licensing of its logo for authorized

[27] A few early cases will be found that appear inconsistent with the proposition stated in the text. *E.g.,* 6 Comp. Dec. 514, 516 (1899); 4 Comp. Dec. 325, 327 (1897). These cases predate the enactment on July 1, 1902 (32 Stat. 552, 560) of what is now 31 U.S.C. § 1301(d) and should be disregarded.

Commission purposes, subject to the same restrictions and limitations applicable to the use of all appropriated funds."[28] *Id*.

Similarly, Congress may create a "revolving fund"—that is, a fund that finances a cycle of business-like activities through amounts the fund receives. Legislation creating a revolving fund establishes a continuing appropriation which, unless restricted by the terms of the legislation, is available for obligation without further legislative action to carry out the fund's authorized purposes. B-204078.2, May 6, 1988. Often, a statute will specify a fund in the Treasury to which the collections are to be deposited. This is not essential, however. A statute that clearly makes receipts available for obligation or expenditure without further congressional action will be construed as authorizing the establishment of such a fund as a necessary implementation procedure. 59 Comp. Gen. 215 (1980) (42 U.S.C. § 5419); B-226520, Apr. 3, 1987 (nondecision letter) (26 U.S.C. § 7475). *See also* 13 Comp. Dec. 700 (1907).

Even if a statute does indeed grant an agency authority to obligate and expend funds, sometimes a related question arises, which is whether such obligations and expenditures are subject to restrictions that generally govern the availability of appropriated funds. First, "any time the Congress specifies the manner in which a Federal entity shall be funded and makes such funds available for obligation and expenditure, that constitutes an appropriation." B-193573, Dec. 19, 1979. However, as is the case with nearly any general principle, Congress may make an exception and provide in particular circumstances that an agency does *not* operate with appropriated funds even though it is an arm of the United States government. Such entities operate without the restrictions that apply to the use of appropriated funds, though these entities must operate consistently with their authorizing legislation. Some of these entities are known as "non-appropriated fund instrumentalities"; we discuss these in Chapter 15, *Miscellaneous Topics*.[29] In addition, some government

[28] Other examples include 59 Comp. Gen. 215 (1980) (mobile home inspection fees collected by the Secretary of Housing and Urban Development); B-197118, Jan. 14, 1980 (National Defense Stockpile Transaction Fund); and B-90476, June 14, 1950. *See also* 1 Comp. Gen. 704 (1922) (revolving fund created in appropriation act remains available beyond end of fiscal year where not specified otherwise).

[29] Other entities that are not known as "non-appropriated fund instrumentalities" also have funds that, by law, are not considered appropriated. For example, the Office of the Comptroller of the Currency imposes and collects particular fees from some financial institutions. By law these amounts are not considered appropriated funds. B-324857, Aug. 6, 2015.

corporations control funds that are not considered to be appropriated; these are also discussed in Chapter 15, *Miscellaneous Topics*. Finally, many federal agencies make grants to non-federal entities. These funds generally lose their character as "appropriated" when they pass to the grantee. We discuss this in Chapter 10, *Federal Assistance: Grants and Cooperative Agreements*.

However, non-appropriated fund instrumentalities and government corporations are rare exceptions to a vast general rule, which is that funds obligated and expended by federal entities are appropriated funds that are subject to the legal provisions that govern the availability of appropriated funds. For example, because a revolving fund is a continuing appropriation, funds obligated and expended from revolving funds are, as a general matter, subject to the legal provisions that govern the availability of appropriated funds.[30] This is true even if the revolving fund is not financed by annual appropriations. One case applying this rule involved the Tobacco User Fee Fund, which contained amounts collected from tobacco companies and was used to pay the salaries of tobacco inspectors in the Department of Agriculture. 63 Comp. Gen. 285 (1984). GAO concluded that amounts in the fund were appropriated and, therefore, that amounts in the fund were subject to restrictions on the payment of employee health benefits. *Id*.

Another case concerning whether particular funds are appropriated involved donated funds. The American Battle Monuments Commission had statutory authority to receive donations to fund construction of a memorial. B-275669.2, July 30, 1997. Some other entities, such as the Holocaust Memorial Council, had funds that by law were not considered appropriated; thus, they could obligate funds without regard for procurement requirements in the Federal Property and Administrative Services Act. Though the American Battle Monuments Commission argued that it should also be free of such requirements, GAO noted that

[30] We discuss issues related specifically to revolving funds and their status as appropriations in Chapter 12, *Acquisition and Provision of Goods and Services*. The Court of Appeals for the Federal Circuit once held that revolving funds did not constitute "appropriations" for the purpose of determining whether it and the Court of Federal Claims had jurisdiction over claims against the United States under the Tucker Act (28 U.S.C. § 1491). *Core Concepts of Florida, Inc. v. United States*, 327 F.3d 1331 (Fed. Cir. 2003), *cert. denied*, 540 U.S. 1046 (2003). The Federal Circuit subsequently overruled this holding and held that "the jurisdictional criterion is not how the government entity is funded or its obligations met, but whether the government entity was acting on behalf of the government." *Slattery v. United States*, 635 F.3d 1298 (Fed. Cir. 2011) (en banc).

Congress had not provided that the Commission's funds were not to be considered appropriated. Thus, GAO concluded that the donations were considered appropriated funds and, therefore, that the Commission was required to comply with the Federal Property and Administrative Services Act. Many other cases through the years have applied the principle that, unless Congress provides otherwise, funds obligated and expended by federal agencies are considered appropriated and are subject to the statutes governing the proper use of federal funds.[31]

## 5. Budget Execution: the Obligation and Expenditure of Budget Authority

The body of enacted appropriation acts for a fiscal year, as amplified by legislative history and the relevant budget submissions, becomes the government's financial plan for that fiscal year. The "execution and control" phase refers generally to the period of time during which the budget authority made available by the appropriation acts remains available for obligation. An agency's task during this phase is to spend the money Congress has given it to carry out the objectives of its program legislation.

### a. Making Amounts Available for Obligation: Apportionment and Allotment

The Office of Management and Budget apportions or distributes budgeted amounts to the executive branch agencies, thereby making funds in appropriation accounts (administered by the Treasury Department) available for obligation. 31 U.S.C. §§ 1511–1516. The apportionment system through which budget authority is distributed by time periods (usually quarterly) or by activities is intended to achieve an effective and orderly use of available budget authority, and to reduce the need for supplemental or deficiency appropriations. Each agency then makes

[31] *See*, *e.g.*, *American Federation of Government Employees v. Federal Labor Relations Authority*, 388 F.3d 405 (3rd Cir. 2004) (a particular working capital fund was appropriated and, therefore, not available for the reimbursement of personal expenses); *United Biscuit Co. v. Wirtz*, 359 F.2d 206, 212 (D.C. Cir. 1965), *cert. denied*, 384 U.S. 971 (1966) (military commissary purchases); 35 Comp. Gen. 615 (1986) (restrictions on reimbursement for certain telephone calls made from private residences); 65 Comp. Gen. 215 (1985) (funds received by National Park Service for visitor reservation services); 64 Comp. Gen. 756 (1985) (Tennessee Valley Authority power program funds); 63 Comp. Gen. 31 (1983), *aff'd upon reconsideration*, B-210657, May 25, 1984 (fees collected from federal credit unions); 60 Comp. Gen. 323 (1981) (Prison Industries Fund); 57 Comp. Gen. 311 (1978) (commissary surcharges); 50 Comp. Gen. 323 (1970); 35 Comp. Gen. 436 (1956); B-241488, Mar. 13, 1991 (Customs Service duty collections); B-193573, Jan. 8, 1979, *modified and aff'd*, B-193573, Dec. 19, 1979, and B-217578, Oct. 16, 1986 (Saint Lawrence Seaway Development Corporation); B-191761, Sept. 22, 1978; B-67175, July 16, 1947; and B-217281-O.M., Mar. 27, 1985 (federal procurement regulations applicable to Pension Benefit Guaranty Corporation revolving funds).

allotments pursuant to the OMB apportionments or other statutory authority. 31 U.S.C. §§ 1513(d), 1514. An allotment is a delegation of authority to agency officials that allows them to incur obligations within the scope and terms of the delegation.[32] These concepts will be discussed further in Chapter 5. Further detail on the budget execution phase may also be found in GAO, *A Glossary of Terms Used in the Federal Budget Process,* GAO-05-734SP (Washington, D.C.: Sept. 2005), and OMB Circular No. A-11, *Preparation, Submission and Execution of the Budget,* pt. 4, *Instructions on Budget Execution* (July 25, 2014).

### b. Audits and Financial Management

Every federal department or agency has the fundamental responsibility to ensure that its application of public funds adheres to the terms of the pertinent authorization and appropriation acts, as well as any other relevant statutory provisions. Ensuring the legality of proposed payments is one of the basic responsibilities of agency certifying officers. Executive agency management has the responsibility of establishing and maintaining appropriate accounting and internal controls. 31 U.S.C. § 3512(b). The Federal Managers' Financial Integrity Act of 1982[33] increased government-wide emphasis on internal accounting and administrative controls. Agencies must establish internal accounting and administrative control systems to provide reasonable assurance that obligations and costs apply with applicable law, that assets are safeguarded against waste, loss, unauthorized use, or misappropriation, and that revenues and expenditures are accounted for properly. These systems must be in accordance with standards prescribed by the Comptroller General (*see* GAO, *Standards for Internal Control in the Federal Government,* GAO-14-704G (Washington, D.C.: Sept.2014)), and agencies must conduct annual reviews of their systems in accordance with Office of Management and Budget (OMB) guidelines and report the results of these reviews to the President and to Congress. OMB Circular No. A-123, *Management Accountability and Control* (Dec. 21, 2004).

The Chief Financial Officers Act of 1990 established a Chief Financial Officer (CFO) in the cabinet departments and several other executive branch agencies (commonly known as the "CFO Act agencies"), and created the Office of Federal Financial Management within OMB to

---

[32] Note the distinction in terminology: Congress *appropriates,* OMB *apportions,* and the receiving agency *allots* (or allocates) within the apportionment.

[33] Pub. L. No. 97-255, 96 Stat. 814 (Sept. 8, 1982), *codified at* 31 U.S.C. §§ 3512(c) and (d).

oversee federal financial management policy. Pub. L. No. 101-576, 104 Stat. 2838 (Nov. 15, 1990). CFOs must work with OMB to develop and oversee financial management plans, programs, and activities within the agency. 31 U.S.C. §§ 901–903. The CFO Act, as amended, also provides for the preparation and audit of annual agency financial statements for executive branch agencies.[34] 35 U.S.C. § 3535. In addition, the Secretary of the Treasury, in coordination with the Director of the Office of Management and Budget, is required to annually prepare and submit to the President and the Congress a financial statement for the executive branch of the government that has been audited by GAO. 31 U.S.C. § 331(e). GAO also regularly audits federal programs under the various authorities that we summarize in chapter 1.

Many agencies also have an internal audit function performed by an Office of the Inspector General established under the Inspector General Act of 1978,[35] or other law. Inspectors General are charged with conducting and supervising audits and investigations, promoting economy, efficiency, and effectiveness, preventing and detecting fraud and abuse, and providing a means of keeping the head of the agency and Congress informed about problems and deficiencies relating to the agency's programs.

### c. Account Closing

In the final phase of our "life cycle" analogy, an appropriation "dies" in a sense at the end of its period of obligational availability. There is, however, an afterlife to the extent of any unexpended balances. Unexpended balances, both obligated and unobligated, retain a limited availability for five fiscal years following expiration of the period for which the source appropriation was made. At midnight on the last day of an appropriation's period of availability, the appropriation account expires and is no longer available for incurring new obligations. The expired appropriation remains available for 5 years for the purpose of paying obligations incurred prior to the account's expiration and adjusting obligations that were previously unrecorded or under recorded. 31 U.S.C. § 1553(a). After 5 years, the expired account is closed and the balances

[34] Requirements for audited agency financial statements were extended to virtually the entire executive branch by the Government Management Reform Act of 1994 (GMRA), Pub. L. No. 103-356 (Oct. 13, 1994), and the Accountability of Tax Dollars Act of 2002 (ATDA), Pub. L. No. 107-289 (Nov. 7, 2002).

[35] Pub. L. No. 95-452, 92 Stat. 1101 (Oct. 12, 1978), *codified as amended at* 5 U.S.C. app.

remaining are canceled. 31 U.S.C. § 1552(a). These concepts are discussed in Chapter 5.

## 6. Administrative Discretion

> "[S]ome play must be allowed to the joints if the machine is to work."

*Tyson & Brother v. Banton,* 273 U.S. 418, 446 (1927) (Justice Holmes, dissenting).

Throughout this publication, the reader will encounter frequent references to administrative discretion. The concept of discretion implies choice or freedom of judgment, and appears in a variety of contexts. There are many things an agency does every day that involve making choices and exercising discretion. There is often more than one way to do something, and reasonable minds may differ as to which way is the best. If a given choice is within the actor's legitimate range of discretion, then it is not illegal.

One type of discretion commonly occurs in the context of purpose availability. A decision may conclude that an appropriation is legally available for a particular expenditure if the agency, in its discretion, determines that the expenditure is a suitable means of accomplishing an authorized end. For example, as we will see in Chapter 4, an agency has discretionary authority to provide refreshments at award ceremonies under the Government Employees Incentive Awards Act, 31 U.S.C. §§ 4501–4507. Agency A may choose to do so while agency B chooses not to. As a matter of law, both agencies are correct, even though they chose differently.

Under the Administrative Procedure Act (APA), action that is "committed to agency discretion by law" is not subject to judicial review. 5 U.S.C. § 701(a)(2). One particularly important example is an agency's decision to allocate funds within a lump-sum appropriation. Such decisions are committed to agency discretion by law and, therefore, are not subject to judicial review. *Lincoln v. Vigil,* 508 U.S. 182 (1993). The Court noted that "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 191. *See also Hein v. Freedom From Religion Foundation, Inc.,*

551 U.S. 587 (2007); 55 Comp. Gen. 307 (1975); B-278121, Nov. 7, 1997.[36]

To say that an agency has freedom of choice in a given matter does not mean that there are no limits to that freedom. Discretion is not unbridled license. The decisions have frequently pointed out that discretion means legal discretion, not unlimited discretion. The point was stated as follows in 18 Comp. Gen. 285, 292 (1938):

> "Generally, the Congress in making appropriations leaves largely to administrative discretion the choice of ways and means to accomplish the objects of the appropriation, but, of course, administrative discretion may not transcend the statutes, nor be exercised in conflict with law, nor for the accomplishment of purposes unauthorized by the appropriation . . . ."

*See also* 72 Comp. Gen. 310, 311 (1993); 35 Comp. Gen. 615, 618 (1956); 4 Comp. Gen. 19, 20 (1924); 7 Comp. Dec. 31 (1900); 5 Comp. Dec. 151 (1898); B-253338, Nov. 23, 1993; B-130288, Feb. 27, 1957; B-49169, May 5, 1945; A-24916, Nov. 5, 1928.

One way to illustrate the concept of "legal discretion" is to visualize a person standing in the center of a circle. The circumference of the circle represents the limits of discretion, imposed either by law or by the difficult to define but nonetheless real concept of "public policy."[37] The person is free to move in any direction, to stay near the center or to venture close to the perimeter, even to brush against it, but must stay within the circle. If

[36] On the other hand, the Court also stated in *Lincoln v. Vigil* that "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." 508 U.S. at 193. The court explained that "an agency is not free simply to disregard statutory responsibilities." *Id.* In *In re Aiken County*, the D.C. Circuit addressed a Nuclear Waste Policy Act requirement, which provided that the Nuclear Regulatory Commission must consider the Department of Energy's license application to store nuclear waste at Yucca Mountain, Nevada, and issue a final decision within three years of its submission. 725 F.3d 255 (D.C. Cir. 2013). The Commission failed to meet the statutory deadline and did not take action to review the license application after an extension was granted. In granting a petition for a writ of mandamus against the Commission, the D.C. Circuit rebuked the Commission, noting that "the President and federal agencies may not ignore statutory mandates or prohibitions merely because of policy disagreement with Congress." *Id.* at 260. The court plainly stated: "Congress sets the policy, not the Commission." *Id.*

[37] *See, e.g., L'Orange v. Medical Protective Co.,* 394 F.2d 57 (6th Cir. 1968) (court may invalidate an act as "contrary to public policy" in the sense of being "injurious to the public," even where the act may not be expressly prohibited by statute).

our actor crosses the line of the circumference, he has exceeded or, to use the legal term, "abused" his discretion.

When GAO is performing its audit function, it may criticize a particular exercise of discretion as ill-conceived, inefficient, or perhaps wasteful. From the legal standpoint, however, there is no illegal expenditure as long as the actor remains within the circle. For example, a Coast Guard employee used his government purchase card to purchase beer brewing equipment and ingredients. GAO, *Purchase Cards: Control Weaknesses Leave DHS Highly Vulnerable to Fraudulent, Improper, and Abusive Activity*, GAO-06-957T (Washington, D.C.: July 2006), at 30. While on duty he brewed alcohol for consumption at social functions for the Coast Guard Academy.[38] Coast Guard personnel stated that the ingredients were purchased using funds from a private foundation, and GAO did not reach any conclusions about the legality of the purchases. Nonetheless, GAO pointed out that the brewing activities fell "short of prudent use of taxpayer dollars" and that the private funds "could have been spent for other purposes, for example educational grants, had they not been used to brew beer."

In addition, the size of the circle may vary. For example, as we will see in Chapter 15, section B, government corporations frequently have a broader range of discretion than noncorporate agencies.

### a. Failure or Refusal to Exercise Discretion

Where a particular action or decision is committed to agency discretion by law, the agency is under a legal duty to actually exercise that discretion. The failure or refusal to exercise discretion committed by law to the agency can be an abuse of discretion. As the following cases demonstrate, the fact of exercising discretion and the particular results of that exercise are two very different things.

We start with a Supreme Court decision, *Work v. United States ex rel. Rives,* 267 U.S. 175 (1925). That case involved section 5 of the Dent Act, ch. 94, 40 Stat. 1272, 1274 (Mar. 2, 1919), under which Congress authorized the Secretary of the Interior to compensate a class of people

[38] The Coast Guard Academy spent $800 on beer brewing ingredients to brew 532 bottles, or 12 batches, of beer. The Coast Guard estimated that it took two hours to brew, bottle, and label each batch of Coast Guard beer. Given a conservative approximate hourly labor rate of $15, it would cost over $13 for a six-pack of Coast Guard beer—considering the variable costs alone (ingredients and labor). The Coast Guard provided GAO with a detailed 5-year analysis showing a cost savings but the analysis failed to account for any labor costs.

who incurred losses in furnishing supplies or services to the government during World War I. The Secretary's determinations on particular claims were to be final and conclusive. The statute "was a gratuity based on equitable and moral considerations" (*id*. at 181), vesting the Secretary with the ultimate power to determine which losses should be compensated.

The plaintiff in *Rives* had sought *mandamus* to compel the Secretary to consider and allow a claim for a specific loss incurred as a result of the plaintiff's obtaining a release from a contract to buy land. The Secretary had previously denied the claim because he had interpreted the statute as not embracing money spent on real estate. In holding that the Secretary had done all that was required by law, the Court cited and distinguished a line of cases—

> "in which a relator in mandamus has successfully sought to compel action by an officer who has discretion concededly conferred on him by law. The relator [plaintiff] in such cases does not ask for a decision any particular way but only that it be made one way or the other."

*Id.* at 184.

The Secretary had made a decision on the claim, had articulated reasons for it, and had not exceeded the bounds of his statutory authority. That was enough. A court could compel the Secretary to actually exercise his discretion, that is, to act on a claim one way or the other, but could not compel him to exercise that discretion to achieve a particular result.

In *Simpkins v. Davidson,* 302 F. Supp. 456 (S.D. N.Y. 1969), the plaintiff sued to compel the Small Business Administration (SBA) to make a loan to him. The court found that the plaintiff was entitled to submit an application, and to have the SBA consider that application and reach a decision on whether or not to grant the loan. However, he had no right to the loan itself, and the court could not compel the SBA to exercise its discretion to achieve a specific result. A very similar case on this point is *Dubrow v. Small Business Administration,* 345 F. Supp. 4 (C.D. Cal. 1972). *See also* B-226121-O.M., Feb. 9, 1988, citing and applying these cases.

Another case involved a provision of the Farm and Rural Development Act that authorized the Secretary of Agriculture to forgo foreclosure on certain delinquent loans. The plaintiffs were a group of farmers who alleged that the Secretary had refused to consider their requests. The Court of Appeals for the Tenth Circuit held that the Secretary was required to consider the requests:

> "The word 'may,' the Secretary 'may' permit deferral, is, in our view, a reference to the discretion of the Secretary to grant the deferral upon a showing by a borrower. It does not mean as the Secretary argues that he has the discretion whether or not to implement the Act at all and not to consider any 'requests' under the statutory standards."

*Matzke v. Block,* 732 F.2d 799, 801 (10th Cir. 1984).

The Comptroller General applied these principles in a case concerning a statute that gave agencies discretionary authority to consider and settle certain employee personal property claims. 62 Comp. Gen. 641 (1983). GAO concluded that an agency could not adopt a policy of refusing all claims. While GAO would not purport to tell another agency which claims it should or should not consider—that part was discretionary—the decision noted that "a blanket refusal to consider all claims is, in our opinion, not the exercise of discretion" (*id.* at 643), and held "that an agency has the duty to actually exercise its discretion and that this duty is not satisfied by a policy of refusing to consider all claims" (*id.* at 645). Thus, for example, an agency would be within its discretion to make and announce a policy decision not to consider claims of certain types, such as claims for stolen cash, or to impose monetary ceilings on certain types of property, or to establish a minimum amount for the filing of claims. What it cannot do is disregard the statute in its entirety.

### b. Regulations May Limit Discretion

By issuing regulations, an agency may voluntarily (and perhaps even inadvertently) limit its own discretion. A number of cases have held that an agency must comply with its own regulations, even if the action is discretionary by statute.

The leading case is *United States ex rel. Accardi v. Shaughnessy,* 347 U.S. 260 (1954). The Attorney General had been given statutory discretion to suspend the deportation of aliens under certain circumstances, and had, by regulation, given this discretion to the Board of Immigration Appeals. The Supreme Court held that, regardless of what the situation would have been if the regulations did not exist, the Board was required under the regulations to exercise its own judgment, and it was improper for the Attorney General to attempt to influence that judgment, in this case, by issuing a list of "unsavory characters" he wanted to have deported. "In short, as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner." *Id.* at 267. Of course, the Attorney General could always amend his regulations, but an amendment could operate prospectively only.

Awards under the Government Employees Incentive Awards Act, 5 U.S.C. §§ 4501–4507, as we will discuss in Chapter 4, are wholly discretionary. GAO reviewed Army regulations that provided that "awards will be granted" if certain specified criteria were met, and noted that the Army had circumscribed its own discretion by committing itself to make an award if those conditions were met. B-202039, May 7, 1982. Reviewing Air Force regulations under similar legislation applicable to military personnel, the Court of Claims noted in *Griffin v. United States,* 215 Ct. Cl. 710, 714 (1978):

> "Thus, we think that the Secretary may have originally had uncontrolled and unreviewable discretion . . . but as he published procedures and guidelines, as he received responsive suggestions, as he implemented them and through his subordinates passed upon compensation claims, we think by his choices he surrendered some of his discretion, and the legal possibility of abuse of discretion came into the picture."

For additional authority on the proposition that an agency can, by regulation, restrict otherwise discretionary action, see *United States v. Nixon,* 418 U.S. 683 (1974); *Vitarelli v. Seaton,* 359 U.S. 535 (1959); *Service v. Dulles,* 354 U.S. 363 (1957); *United States v. Morgan,* 193 F.3d 252 (4th Cir. 1999); *Clarry v. United States,* 85 F.3d 1041 (2nd Cir. 1996); *Waldron v. Immigration & Naturalization Service,* 17 F.3d 511, 519 (2nd Cir. 1994); *Montilla v. Immigration & Naturalization Service,* 926 F.2d 162 (2nd Cir. 1991). *See also* B-316381, July 18, 2008; 67 Comp. Gen. 471 (1988).

Recent case law has recognized a number of limits, caveats, and nuances to the *Accardi* doctrine. While there are occasional exceptions, the doctrine generally will not be applied to bind an agency by its informal rules, policies, or other issuances that the court concludes are intended to provide internal guidance rather than to confer rights or benefits on the public. *See Farrell v. Department of the Interior,* 314 F.3d 584, 591 (Fed. Cir. 2002) (holding that agency statement that was not formally promulgated is not binding on the agency unless the agency intended to be bound by it). Even if a court concludes that a rule, or policy document, is binding on the agency under *Accardi,* the court may not invalidate the agency action if it concludes that the departure from the rule was nonprejudicial or "harmless error." *See Wilkinson v. Legal Services Corp.,* 27 F. Supp. 2d 32 (D.D.C. 1998). In addition, the courts are very reluctant to apply *Accardi* to criminal proceedings or exercises of prosecutorial-type discretion, such as an agency decision not to initiate an enforcement action. *See Carranza v. Immigration & Naturalization Service,* 277 F.3d 65, 68 (1st Cir. 2002); *United States v. Lee,* 274 F.3d 485 (8th Cir. 2001); *United States v. Shakir,* 113 F. Supp. 2d 1182

(M.D. Tenn. 2000); *United States v. Briscoe,* 69 F. Supp. 2d 738, 747 (D.V.I. 1999), *aff'd,* 234 F.3d 1266 (3rd Cir. 2000); *Nichols v. Reno,* 931 F. Supp. 748 (D. Colo. 1996); *Walker v. Reno,* 925 F. Supp. 124 (N.D. N.Y. 1995).

### c. Insufficient Funds

Sometimes the actual funding Congress appropriates for a program may fall short of original expectations. What is an agency to do when it finds that it does not have enough money to accommodate an entire class of beneficiaries? Obviously, it can ask Congress for more. However, as any program administrator knows, asking and getting are two different things. If the agency cannot get additional funding and the program legislation fails to provide guidance, the agency may, within its discretion, establish reasonable classifications, priorities, and/or eligibility requirements, as long as it does so on a rational and consistent basis.[39]

As the Supreme Court explained in a case involving an assistance program administered by the Bureau of Indian Affairs (BIA):

> "[I]t does not necessarily follow that the Secretary is without power to create reasonable classifications and eligibility requirements in order to allocate the limited funds available to him for this purpose. [Citations omitted.] Thus, if there were only enough funds appropriated to provide meaningfully for 10,000 needy Indian beneficiaries and the entire class of eligible beneficiaries numbered 20,000, it would be incumbent upon the BIA to develop an eligibility standard to deal with this problem, and the standard, if rational and proper, might leave some of the class otherwise encompassed by the appropriation without benefits. But in such a case the agency must, at a minimum, let the standard be generally known so as to assure that it is being applied consistently and so as to avoid both the reality and the appearance of arbitrary denial of benefits to potential beneficiaries."

*Morton v. Ruiz,* 415 U.S. 199, 230–31 (1974).

In one case, the plaintiff sued for construction differential subsidy payments under the Merchant Marine Act, administered by the Maritime Administration (MarAd). *Suwannee River Finance, Inc. v. United States,*

[39] Even under an entitlement program, an agency could presumably meet a funding shortfall by such measures as making prorated payments, but such actions would be only temporary pending receipt of sufficient funds to honor the underlying obligation. The recipient would remain legally entitled to the balance.

Issues similar to those involved with entitlement programs sometimes arise when payment recipients have a contractual relationship with the government. We discuss this issue further in Chapter 6, *Availability of Appropriations: Amount*.

7 Cl. Ct. 556 (1985). In response to a sudden and severe budget reduction, MarAd had cut off all subsidies for nonessential changes after a specified date, and had notified the plaintiff to that effect. Noting that "[a]fter this budget cut, MarAd obviously could no longer be as generous in paying subsidies as it had been before," the court held MarAd's approach to be "a logical, effective and time-honored method for allocating the burdens of shrinking resources" and well within its administrative discretion. *Id.* at 561.

In another example, due to a severe drought in the summer of 1980, the Small Business Administration (SBA) found that its appropriation was not sufficient to meet demand under its disaster loan program. B-202568, Sept. 11, 1981. Rather than treating applicants on a "first come, first served" basis, SBA amended its regulations to impose several new restrictions, including a ceiling of 60 percent of actual physical loss. GAO reviewed SBA's actions and found them completely within the agency's administrative discretion.

A conceptually related situation is a funding shortfall in an appropriation used to fund a number of programs. Again, the agency must allocate its available funds in some reasonable fashion. Mandatory programs take precedence over discretionary ones.[40] Within the group of mandatory programs, more specific requirements should be funded first, such as those with specific time schedules, with remaining funds then applied to the more general requirements. B-159993, Sept. 1, 1977; B-177806, Feb. 24, 1978 (nondecision letter). These principles apply equally, of course, to the allocation of funds between mandatory and nonmandatory expenditures within a single-program appropriation. *E.g.,* 61 Comp. Gen. 661, 664 (1982).

Other cases recognizing an agency's discretion in coping with funding shortfalls are *City of Los Angeles v. Adams,* 556 F.2d 40, 49–50 (D.C. Cir. 1977), and *McCarey v. McNamara,* 390 F.2d 601 (3rd Cir. 1968).

[40] A "mandatory program," as we use the term here, should not be confused with the entitlement programs previously noted. A mandatory program is simply one that Congress directs (rather than merely authorizes) the agency to conduct, but within the limits of available funding. Entitlement programs would take precedence over these mandatory programs.

## 7. Transfer and Reprogramming

For a variety of reasons, agencies have a legitimate need for a certain amount of flexibility to deviate from their budget estimates. Two ways to shift money are transfer and reprogramming. While the two concepts are related in this broad sense, they are nevertheless different.

### a. Transfer

Transfer is the shifting of funds between appropriations.[41] For example, if an agency receives one appropriation for Operations and Maintenance and another for Capital Expenditures, a shifting of funds from either one to the other is a transfer.

(1) Transfers are Prohibited without Statutory Authority

Agencies may transfer funds only when expressly authorized by law:

> "An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."

31 U.S.C. § 1532. In addition to this express prohibition, an unauthorized transfer would violate 31 U.S.C. § 1301(a) (which prohibits the use of appropriations for other than their intended purpose), would constitute an unauthorized augmentation of the receiving appropriation, and could, if the transfer led to overobligating the receiving appropriation, result in an Antideficiency Act (31 U.S.C. § 1341) violation as well. *E.g.*, B-286929, Apr. 25, 2001; B-248284.2, Sept. 1, 1992; B-222009-O.M., Mar. 3, 1986; 15 Op. Off. Legal Counsel 74 (1991).

Transfers without statutory authority are equally forbidden whether they are (1) transfers from one agency to another,[42] (2) transfers from one account to another within the same agency,[43] or (3) transfers to an

[41] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 95.

[42] 7 Comp. Gen. 524 (1928); 4 Comp. Gen. 848 (1925); 17 Comp. Dec. 174 (1910). Cases in which adequate statutory authority was found to exist are B-302760, May 17, 2004 (the transfer of funds from the Library of Congress to the Architect of the Capitol for construction of a loading dock at the Library is authorized), and B-217093, Jan. 9, 1985 (the transfer from Japan-United States Friendship Commission to Department of Education to partially fund study of Japanese education is authorized).

[43] 70 Comp. Gen. 592 (1991); 65 Comp. Gen. 881 (1986); 33 Comp. Gen. 216 (1953); 33 Comp. Gen. 214 (1953); 17 Comp. Dec. 7 (1910); B-286661, Jan. 19, 2001; B-206668, Mar. 15, 1982; B-178205.80, Apr. 13, 1976; B-164912-O.M., Dec. 21, 1977.

interagency or intra-agency working fund.[44] In each instance, statutory authority is required. An agency's erroneous characterization of a proposed transfer as a "reprogramming" is irrelevant. *See* B-202362, Mar. 24, 1981. Moreover, informal congressional approval of an unauthorized transfer of funds between appropriation accounts does not have the force and effect of law. B-248284.2, Sept. 1, 1992.

The prohibition applies even if the transfer is intended as a temporary expedient (for example, to alleviate a temporary exhaustion of funds) and the agency contemplates reimbursement. Thus, without statutory authority, an agency cannot "borrow" from another account or another agency. 36 Comp. Gen. 386 (1956); 13 Comp. Gen. 344 (1934); B-290011, Mar. 25, 2002.

The prohibition against transfer would not apply to "transfers" of an agency's administrative allocations within a lump-sum appropriation since the allocations are not legally binding.[45] This is a reprogramming, which we discuss below. Thus, where the then Department of Health, Education, and Welfare received a lump-sum appropriation covering several grant programs, it could set aside a portion of each program's allocation for a single fund to be used for "cross-cutting" grants intended to serve more than one target population, as long as the grants were for projects within the scope or purpose of the lump-sum appropriation. B-157356, Aug. 17, 1978.

(2) Transfers Authorized By Law

Statutory transfer authority does not require any particular "magic words." Of course the word "transfer" will help, but it is not necessary as long as the words that are used make it clear that transfer is being authorized. B-213345, Sept. 26, 1986; B-217093, Jan. 9, 1985; B-182398, Mar. 29, 1976 (letter to Senator Laxalt), modified on other grounds by 64 Comp. Gen. 370 (1985).

Some agencies have limited transfer authority either in permanent legislation or in appropriation act provisions. Such authority will

[44] 26 Comp. Gen. 545, 548 (1947); 19 Comp. Gen. 774 (1940); 6 Comp. Gen. 748 (1927); 4 Comp. Gen. 703 (1925).

[45] The agency must ensure that a transfer of administrative allocations does not, under its own fund control regulations, produce a violation of 31 U.S.C. § 1517(a), discussed further in Chapter 6.

commonly set a percentage limit on the amount that may be transferred from a given appropriation and/or the amount by which the receiving appropriation may be augmented. B-290659, Oct. 31, 2002; B-167637, Oct. 11, 1973. For example, the Department of Agriculture may make transfers between its appropriations. 7 U.S.C. § 2257. The amount of such transfers may not exceed seven percent of the "donor" appropriation and the receiving appropriation may not be augmented by more than seven percent except in extraordinary emergencies.[46] See also B-279886, Apr. 28, 1998 (noting five percent limit on transfer in Department of Justice appropriation).

If an agency has transfer authority of this type, its exercise is not precluded by the fact that the amount of the receiving appropriation had been reduced from the agency's budget request. B-151157, June 27, 1963. Also, the transfer statute is an independent grant of authority and, unless expressly provided otherwise, the percentage limitations do not apply to transfers under any separate transfer authority the agency may have. B-239031, June 22, 1990.

As mentioned above, Congress may also authorize one agency to transfer funds to another agency. For example, the Federal Transit Administration (FTA) must make a designated amount of funds appropriated to its capital investment grant program available to the Denali Commission. 49 U.S.C. § 5309(m)(6). Because FTA has specific direction to transfer the funds, it should make the transfers using the Department of Treasury's nonexpenditure transfer procedures, not the Economy Act or other interagency agreements. B-319189, Nov. 12, 2010.

The prohibition against transfer applies not only to interagency funds, but to the consolidation of all or parts of different appropriations of the same agency into a single fund as well. In a few instances, an agency may "pool" portions of agency unit appropriations to implement a particular statute. For example, an agency could transfer portions of unit appropriations to an agencywide pool to fund the Merit Pay System established by the Civil Service Reform Act of 1978. B-195775, Sept. 10, 1979. The transfers, while not explicitly authorized in the statute, were necessary to implement the law and carry out the legislative purpose. Similarly, the Treasury Department could pool portions of appropriations

[46] Cases construing this provision include 33 Comp. Gen. 214; B-218812, Jan. 23, 1987; B-123498, Apr. 11, 1955; and B-218812-O.M., July 30, 1985.

made to several separate bureaus to fund an Executive Development Program also authorized by the Civil Service Reform Act. 60 Comp. Gen. 686 (1981). However, pooling that would alter the purposes for which funds were appropriated is an impermissible transfer unless authorized by statute. *E.g.*, B-209790-O.M., Mar. 12, 1985. It is also impermissible to transfer more than the cost of the goods or services provided to an ordering agency. 70 Comp. Gen. 592, 595 (1991).

Congress may reappropriate an unexpended balance for a different purpose. Such funds cease to be available for the purposes of the original appropriation. 18 Comp. Gen. 564 (1938); A-79180, July 30, 1936. *Cf.* 31 U.S.C. § 1301(b) (reappropriation for different purpose to be accounted for as a new appropriation). If the reappropriation is of an amount "not to exceed" a specified sum, and the full amount is not needed for the new purpose, the balance not needed reverts to the source appropriation. 18 Comp. Gen. at 565.

(3) Transfer Authority of General Applicability, Including the Account Adjustment Statute

Under the account adjustment statute, an agency may temporarily charge one appropriation for an expenditure benefiting another appropriation of the same agency, as long as amounts are available in both appropriations and the accounts are adjusted to reimburse the appropriation initially charged during or as of the close of the same fiscal year. 31 U.S.C. § 1534. This statute facilitates "common service" activities. *See generally* S. Rep. No. 89-1284 (1966). For example, an agency procuring equipment to be used jointly by several bureaus or offices within the agency funded under separate appropriations may initially charge the entire cost to a single appropriation and later apportion the cost among the appropriations of the benefiting components.

Under the account adjustment statute, the Department of Homeland Security's Preparedness Directorate had authority to fund shared services that benefited the directorate as a whole by initially obligating the services against one appropriation within the directorate and then allocating the costs to the benefiting appropriations. B-308762, Sept. 17, 2007. However, the Directorate did not appear to properly allocate the costs. To the extent it did not properly record its obligations prior to the end of the fiscal year against each benefiting appropriation for the estimated value of the services each appropriation received, as required by the account adjustment statute, the Directorate improperly augmented its appropriations.

Another type of transfer authority is illustrated by 31 U.S.C. § 1531, which authorizes the transfer of unexpended balances incident to executive branch reorganizations, but only for purposes for which the appropriation was originally available. Cases discussing this authority include 31 Comp. Gen. 342 (1952) and B-92288 et al., Aug. 13, 1971.

(4) Restrictions Applicable to Transferred Amounts

The precise parameters of transfer authority will, of course, depend on the terms of the statute which grants it. As an initial matter, an amount transferred from one appropriation to another is available "for the same purpose and subject to the same limitations provided by the law appropriating the amount." 31 U.S.C. § 1532.

For example, funds withdrawn from other agencies' appropriations and credited to the Library of Congress FEDLINK revolving fund retained their time character and did not assume the time character of the FEDLINK revolving fund. B-288142, Sept. 6, 2001. The Library of Congress proposed retaining in the fund amounts of fiscal year money advanced by other agencies in earlier fiscal years when orders were placed and, to the extent the advances were not needed to cover the costs of the orders, applying the excess amounts to new orders placed in subsequent fiscal years. The Library pointed out that the law establishing the revolving fund made amounts in the fund available without fiscal year limitation. The Comptroller General concluded that "amounts withdrawn from a fiscal year appropriation and credited to a no year revolving fund, such as the FEDLINK revolving fund, are available for obligation only during the fiscal year of availability of the appropriation from which the amount was withdrawn." *Id.* Section 1532 is a significant control feature protecting Congress's constitutional prerogatives of the purse. Placing time limits on the availability of appropriations is a fundamental means of congressional control because it permits Congress to periodically review a given agency's programs and activities. Given the significance of time restrictions in preserving congressional powers of the purse, GAO looks for clear legislative expressions of congressional intent before interpreting legislation to override time limitations that Congress, through the appropriations process, has imposed on an agency's use of funds. The Comptroller General rejected the Library's view that the language in the FEDLINK statute overrode the time limitation imposed on funds transferred into FEDLINK because, until the Library had earned those

amounts by performing the services ordered from the Library, these transferred amounts were not a part of the corpus of FEDLINK.[47] *Id.*

Restrictions applicable to the receiving account but not to the donor account may or may not apply. Where transfers are intended to accomplish a purpose of the source appropriation (Economy Act transactions, for example), transferred funds have been held not subject to such restrictions.[48] *E.g.*, 21 Comp. Gen. 254 (1941); 18 Comp. Gen. 489 (1938); B-35677, July 27, 1943; B-131580-O.M., June 4, 1957. However, for transfers intended to permit a limited augmentation of the receiving account (7 U.S.C. § 2257, for example), this principle is arguably inapplicable in view of the fundamentally different purpose of the transfer.

Some transfer statutes have included requirements for approval by one or more congressional committees. In light of the Supreme Court's decision in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983), such "legislative veto" provisions are no longer valid. Whether the transfer authority to which the veto provision is attached remains valid depends on whether it can be regarded as severable from the approval requirement. This in turn depends on an evaluation, in light of legislative history and other surrounding circumstances, of whether Congress would have enacted the substantive authority without the veto provision. *See, e.g.*, 15 Op. Off. Legal Counsel 49 (1991) (the Justice Department's Office of Legal Counsel (OLC) concluded that an unconstitutional legislative veto provision of the Selective Service Act was severable from the statute's grant of authority to the President to obtain expedited delivery of military contracts); 6 Op. Off. Legal Counsel 520 (1982) (OLC concluded that a Treasury Department transfer provision was severable and therefore survived a legislative veto provision).

### b. Reprogramming

In 1985, the Deputy Secretary of Defense made the following statement:

> "The defense budget does not exist in a vacuum. There are forces at work to play havoc with even the best of budget estimates. The economy may vary in

---

[47] *See also* B-317878, Mar. 3, 2009; 23 Comp. Gen. 668 (1944); 31 Comp. Gen. 109, 114–15 (1951); 28 Comp. Gen. 365 (1948); 26 Comp. Gen. at 548; 18 Comp. Gen. 489 (1938); 17 Comp. Gen. 900 (1938); 17 Comp. Gen. 73 (1937); 16 Comp. Gen. 545 (1936); B-167034-O.M., Jan. 20, 1970.

[48] We discuss the Economy Act in detail in Chapter 12, *Acquisition and Provision of Goods and Services*.

> terms of inflation; political realities may bring external forces to bear; fact-of-life or programmatic changes may occur. The very nature of the lengthy and overlapping cycles of the budget process poses continual threats to the integrity of budget estimates. Reprogramming procedures permit us to respond to these unforeseen changes and still meet our defense requirements."[49]

The thrust of this statement, while made from the perspective of the Defense Department, applies at least to some extent to all agencies.

Reprogramming is the shifting of funds within an appropriation to purposes other than those contemplated at the time of appropriation. GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: Sept. 2005), at 85. More specifically, it is the application of appropriations within a particular account to purposes, or in amounts, other than those justified in the budget submissions or otherwise considered or indicated by congressional committees in connection with the enactment of appropriation legislation.[50] B-323792, Jan. 23, 2012; B-164912-O.M., Dec. 21, 1977. The term "reprogramming" appears to have come into use in the mid-1950s although the practice, under different names, predates that time.[51]

Reprogramming is best understood in comparison to the transfer. A transfer shifts budget authority from one appropriation to another. In contrast, a reprogramming shifts funds within a single appropriation. Agencies generally may transfer funds only with explicit statutory authority. 31 U.S.C. § 1532; 70 Comp. Gen. 592 (1991). In contrast, agencies generally are free to reprogram, even if doing so is inconsistent with the budget estimates presented to the Congress, as long as the resulting obligations and expenditures are consistent with the purpose restrictions applicable to the appropriation. See *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or

---

[49] *Reprogramming Action Within the Department of Defense: Hearing Before the House Armed Services Committee* (Sept. 30, 1985) (remarks prepared for delivery by The Honorable William H. Taft IV, Deputy Secretary of Defense, unprinted).

[50] The term "reprogramming" appears to have come into use in the mid-1950s although the practice, under different names, predates that time. Louis Fisher, *Presidential Spending Power*, 76–77 (1975). Fisher also briefly traces the evolution of the concept.

[51] *Id.* Fisher also briefly traces the evolution of the concept.

desirable way"); B-323792, Jan. 23, 2013; B-279338, Jan. 4, 1999; B-215002, Aug. 3, 1987; B-196854.3, Mar. 19, 1984 (Congress is "implicitly conferring the authority to reprogram" by enacting lump-sum appropriations); 55 Comp. Gen. 307 (1975); B-123469, May 9, 1955; 4B Op. Off. Legal Counsel 701 (1980) (discussing the Attorney General's authority to reprogram to avoid deficiencies). This is true even though the agency may already have administratively allotted the funds to a particular object. 20 Comp. Gen. 631 (1941). In some situations, an agency may be required to reprogram funds to satisfy other obligations. *E.g., Cherokee Nation of Oklahoma v. Leavitt,* 543 U.S. 631, 641–43 (2005) (government must reprogram unrestricted funds to cover contractual obligations); *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 552 n.9 (satisfaction of obligations under a settlement agreement).

For example, the United States Information Agency (USIA) received two appropriations: one for salaries and expenses and another for radio construction. B-248284.2, Sept. 1, 1992. USIA wished to obligate $4.6 million for an exhibition. Though its salaries and expenses appropriation was available for this purpose, the agency had insufficient funds remaining in that appropriation. Instead, USIA used its radio construction appropriation for the exhibition. Though the agency characterized its use of funds from the radio construction appropriation as a "reprogramming," the characterization was improper because the radio construction appropriation was not available for the purpose of funding an exhibition. *Id*. If USIA had the requisite statutory authority, it could have transferred the amount from its radio construction appropriation to its salaries and expenses appropriation. However, USIA lacked such transfer authority.

Though agencies generally have authority to reprogram funds, Congress may limit this authority. For example, Congress required the Commodity Futures Trading Commission to notify the Senate and House Committees on Appropriations prior to obligating or expending funds through a reprogramming to undertake certain enumerated activities.[52] B-323792, Jan. 23, 2013. In the face of such restrictions, a key question is whether a particular shifting of funds is, in fact, a reprogramming. A comparison to transfers is useful. Agencies may transfer amounts only if they have

[52] For further examples of statutory reprogramming controls, see B-319009, Apr. 27, 2010; B-283599.2, Sept. 29, 1999; B-279886, Apr. 28, 1998; B-164912-O.M., Dec. 21, 1977.

statutory authority. It is comparatively easy to assess a transfer: each appropriation is well-defined and delineated with specific language in an appropriations act. The shifting of funds from one of these appropriations to another is a transfer. In contrast, a reprogramming is a shifting of funds from one purpose to another within a single appropriation. The appropriations act does not set forth the subdivisions that are relevant to determine whether an agency has reprogrammed funds. Therefore, reference to the language of the relevant appropriations act sheds little light on whether a particular shifting of funds is indeed a reprogramming.

Nevertheless, it is imperative to define the necessary subdivisions to give meaning and force to statutory provisions that restrict an agency's authority to reprogram. Typically, the itemizations and categorizations in the agency's budget documents as well as statements in committee reports and the President's budget submission, contain the subdivisions within an agency's appropriation that are relevant to determine whether an agency has reprogrammed funds. B 323792, Jan. 23, 2013. For instance, for FY 2012, the Commodity Futures Trading Commission (CFTC) received a single lump-sum appropriation. *Id*. CFTC's FY 2012 budget request included an item within that lump sum to fund an Office of Proceedings. A reprogramming would occur if CFTC shifted amounts that it had previously designated to carry out the functions of the Office of Proceedings to carry out different functions.

Some statutory reprogramming restrictions also provide for committee approval. As in the case of transfer, under the Supreme Court's decision in *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983), statutory committee approval or veto provisions are no longer permissible. However, an agency may continue to observe committee approval procedures as part of its informal arrangements, although they would not be legally binding. B-196854.3, Mar. 19, 1984.

In addition to various statutory reprogramming restrictions, many non-statutory reprogramming arrangements exist between various agencies and their congressional oversight committees. These arrangements often include procedures for notification. These non-statutory arrangements do not have the force and effect of law. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *TVA v. Hill*, 437 U.S. 153, 191 (1978); 55 Comp. Gen. 307, 319 (1975). However, "we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences." *Lincoln*, 508 U.S. at 193. There are, at present, no

reprogramming guidelines applicable to all agencies. As one might expect, reprogramming policies, procedures, and practices vary considerably among agencies.[53] For example, in view of the nature of its activities and appropriation structure, the Defense Department has detailed and sophisticated procedures.[54]

## 8. Impoundment: Precluding the Obligation or Expenditure of Budget Authority

While an agency's basic mission is to carry out its programs with the funds Congress has appropriated, there is also the possibility that, for a variety of reasons, the full amount appropriated by Congress will not be expended or obligated by the administration. Under the Impoundment Control Act of 1974, an impoundment is an action or inaction by an officer or employee of the United States that delays or precludes the obligation or expenditure of budget authority provided by Congress. 2 U.S.C. §§ 682(1), 683.[55] The act applies to "Salaries and Expenses" appropriations as well as program appropriations. *See, e.g.,* B-320091, July 23, 2010; 64 Comp. Gen. 370, 375–76 (1985).

There are two types of impoundment actions: deferrals and rescission proposals. In a deferral, an agency temporarily withholds or delays funds from obligation or expenditure. The President is required to submit a special message to Congress reporting any deferral of budget authority. Deferrals are authorized only to provide for contingencies, to achieve savings made possible by changes in requirements or greater efficiency

[53] GAO reports in this area include: GAO, *Information on Reprogramming Authority and Trust Funds,* AIMD-96-102R (Washington, D.C.: June 7, 1996); *Economic Assistance: Ways to Reduce the Reprogramming Notification Burden and Improve Congressional Oversight,* GAO/NSIAD-89-202 (Washington, D.C.: Sept. 21, 1989) (foreign assistance reprogramming); *Budget Reprogramming: Opportunities to Improve DOD's Reprogramming Process,* GAO/NSIAD-89-138 (Washington, D.C.: July 24, 1989); *Budget Reprogramming: Department of Defense Process for Reprogramming Funds,* GAO/NSIAD-86-164BR (Washington, D.C.: July 16, 1986).

[54] *See* Department of Defense Financial Management Regulation 7000.14-R, vol. 3 ch. 6, *Reprogramming of DoD Appropriated Funds* (Sept. 2015).

[55] For a detailed discussion of impoundment before the 1974 legislation, see B-135564, July 26, 1973.

of operations, or as otherwise specifically provided by law.[56] A deferral may not be proposed for a period beyond the end of the fiscal year in which the special message reporting it is transmitted, although, for multiple year funds, nothing prevents a new deferral message covering the same funds in the following fiscal year. 2 U.S.C. §§ 682(1), 684.[57]

A rescission involves the cancellation of budget authority previously provided by Congress (before that authority would otherwise expire), and can be accomplished only through legislation. *See, e.g.,* B-322906, July 19, 2012 (update of statistical data concerning rescissions proposed and enacted since the passage of the Impoundment Control Act of 1974 through fiscal year 2011); GAO, *Impoundment Control Act: Use and Impact of Rescission Procedures,* GAO-10-320T (Washington, D.C.: Dec. 16, 2009) (testimony containing useful charts and reflections on the use of rescissions as a budget tool). The President must advise Congress of any proposed rescissions, again in a special message. The President is authorized to withhold budget authority that is the subject of a rescission proposal for a period of 45 days of continuous session following receipt of the proposal. Unless Congress acts to approve the

[56] These requirements are repeated in 31 U.S.C. § 1512(c), which prescribes conditions for establishing reserves through the apportionment process. The President's deferral authority under the Impoundment Control Act thus mirrors his authority to establish reserves under the Antideficiency Act. In other words, deferrals are authorized only in those situations in which reserves are authorized under the Antideficiency Act. GAO, *Impoundment Control: President's Third Special Impoundment Message for FY 1990,* GAO/OGC-90-4 (Washington, D.C.: Mar. 6, 1990). Deferrals for policy reasons are not authorized. 2 U.S.C. § 684(b).

[57] Under the original 1974 legislation, a deferral could be overturned by the passage of an impoundment resolution by either the House or the Senate. This "legislative veto" provision was found unconstitutional in *City of New Haven v. United States,* 809 F.2d 900 (D.C. Cir. 1987), and the statute was subsequently amended to remove it. *See* Pub. L. No. 100-119, § 206, 101 Stat. 754 (Sept. 29, 1987), *codified at* 2 U.S.C. § 684(b). Congress may, of course, enact legislation disapproving a deferral and requiring that the deferred funds be made available for obligation.

proposed rescission within that time, the budget authority must be made available for obligation. 2 U.S.C. §§ 682(3), 683, 688.[58]

The Impoundment Control Act requires the Comptroller General to monitor the performance of the executive branch in reporting proposed impoundments to Congress. A copy of each special message reporting a proposed deferral or rescission must be delivered to the Comptroller General, who then must review each such message and present his views to the Senate and House of Representatives. 2 U.S.C. § 685(b). If the Comptroller General finds that the executive branch has established a reserve or deferred budget authority and failed to transmit the required special message to Congress, the Comptroller General so reports to Congress. 2 U.S.C. § 686(a); GAO, *Impoundment Control: Deferrals of Budget Authority in GSA,* GAO/OGC-94-17 (Washington, D.C.: Nov. 5, 1993) (unreported impoundment of General Service Administration funds); *Impoundment Control: Comments on Unreported Impoundment of DOD Budget Authority,* GAO/OGC-92-11 (Washington, D.C.: June 3, 1992) (unreported impoundment of V-22 Osprey funds). The Comptroller General also reports to Congress on any special message transmitted by the executive branch that has incorrectly classified a deferral or a rescission. 2 U.S.C. § 686(b). GAO will construe a deferral as a *de facto* rescission if the timing of the proposed deferral is such that "funds could be expected with reasonable certainty to lapse before they could be obligated, or would have to be obligated imprudently to avoid that consequence." 54 Comp. Gen. 453, 462 (1974). Upon request, GAO will

[58] In 1996, the Congress enacted the Line Item Veto Act, Pub. L. No. 104-130, 110 Stat. 1200 (Apr. 9, 1996), which was codified at 2 U.S.C. §§ 691–692. The Line Item Veto Act (Veto Act) gave the President the power to "cancel in whole" three types of provisions already enacted into law: (1) any dollar amount of discretionary budget authority, (2) any item of new direct spending, or (3) any limited tax benefit. The Veto Act imposed procedures for the President to follow whenever he exercised this cancellation authority. The Veto Act also provided for expedited congressional consideration of bills introduced to disapprove the cancellations. The Supreme Court held that because the Veto Act established cancellation procedures that authorized the President, by canceling already enacted provisions of law, "to create a different law—one whose text was not voted on by either House of Congress or presented to the President for signature," it violated the Presentment Clause (U.S. Const. art. I, § 7) and thus was unconstitutional. *Clinton v. City of New York,* 524 U.S. 417, 448 (1998).

also assess whether executive branch agencies have withheld funds proposed for cancellation in the President's budget.[59]

If, under the Impoundment Control Act, the executive branch is required to make budget authority available for obligation (if, for example, Congress does not pass a rescission bill) and fails to do so, the Comptroller General is authorized to bring a civil action in the U.S. District Court for the District of Columbia to require that the budget authority be made available. 2 U.S.C. § 687.

The expiration of budget authority or delays in obligating it resulting from ineffective or unwise program administration are not regarded as impoundments unless accompanied by or derived from an intention to withhold the budget authority. B-229326, Aug. 29, 1989. Similarly, an improper obligation, although it may violate several other statutes, is generally not an impoundment. 64 Comp. Gen. 359 (1985).

There is also a distinction between deferrals, which must be reported, and "programmatic" delays, which are not impoundments and are not reportable under the Impoundment Control Act. A programmatic delay is one in which operational factors unavoidably impede the obligation of budget authority, notwithstanding the agency's reasonable and good faith efforts to implement the program. B-290659, July 24, 2002; GAO, *Impoundment Control: Deferral of DOD Budget Authority Not Reported,* GAO/OGC-91-8 (Washington, D.C.: May 7, 1991); *Impoundment Control: Deferrals of Budget Authority for Military Construction Not Reported,* GAO/OGC-91-3 (Washington, D.C.: Feb. 5, 1991). Since intent is a relevant factor, the determination requires a case-by-case evaluation of the agency's justification in light of all of the surrounding circumstances. A programmatic delay may become a reportable deferral if the programmatic basis ceases to exist.

Delays resulting from the following factors may be programmatic, depending on the facts and circumstances involved:

[59] In 2006, GAO reported to Congress that in 13 instances executive agencies had impounded funds that the President had proposed for cancellation. B-308011, Aug. 4, 2006; B-307122.2, Mar. 2, 2006. When the President proposed cancellation of these funds, the Administration had not submitted reports of impoundments under the Impoundment Control Act because, officials explained, the Administration was not withholding funds from obligation. In all 13 instances, the agencies released impounded funds as a result of GAO's inquiries. *Id.*

- conditions on availability for using funds not met (B-290659, July 24, 2002);
- contract delays due to shipbuilding design modification, verification, or changes in scope (GAO/OGC-90-4);
- uncertainty as to the amount of budget authority that will ultimately be available for the program (B-203057, Sept. 15, 1981; B-207374, July 20, 1982, noting that the uncertainty is particularly relevant when it "arises in the context of continuing resolution funding, where Congress has not yet spoken definitively");
- time required to set up the program or to comply with statutory conditions on obligating the funds (B-96983, B-225110, Sept. 3, 1987);
- compliance with congressional committee directives (B-221412, Feb. 12, 1986);
- delay in receiving a contract proposal requested from contemplated sole source awardee (B-115398, Feb. 6, 1978);
- historically low loan application level (B-115398, Sept. 28, 1976);
- late receipt of complete loan applications (B-195437.3, Feb. 5, 1988);
- delay in awarding grants pending issuance of necessary regulations (B-171630, May 10, 1976); and
- administrative determination of allowability and accuracy of claims for grant payments (B-115398, Oct. 16, 1975).

GAO did find an impoundment, as opposed to a programmatic delay, in a 1991 case. The Department of Defense withheld military construction funds to improve program efficiency, not because of an unavoidable delay. Because the Department did not take the necessary steps to implement the program while funds were temporarily unobligated, the withholding constituted an impoundment. B-241514.2, Feb. 5, 1991.

## 9. Deficit Reduction: the Balanced Budget and Emergency Deficit Control Act

The Balanced Budget and Emergency Deficit Control Act of 1985 (BBEDCA) established a process known as "sequestration" to enforce certain deficit reduction goals.[60] It was enacted to deal with a growing budget deficit (excess of total outlays over total receipts for a given fiscal year). 2 U.S.C. § 622(6). BBEDCA established ''maximum deficit

[60] Pub. L. No. 99-177, title II, 99 Stat. 1037, 1038 (Dec. 12, 1985).

amounts'' for fiscal years 1985 to 1990. Pub. L. No. 99-177, § 201(a)(1). If the deficit exceeded these statutory limits, the President was required to issue a sequestration order (a cancellation of budgetary resources) that would reduce all nonexempt spending by a uniform percentage. *Id.* § 252. In the spring of 1990, it became clear that the deficit was going to exceed BBEDCA maximum deficit limits by a considerable amount. To respond to these large deficits, President George H.W. Bush and congressional leadership convened negotiations on the budget in May 1990. The result was the Omnibus Budget Reconciliation Act of 1990.[61] Pub. L. No. 101-508, 104 Stat. 1388 (Nov. 5, 1990).

The Omnibus Budget Reconciliation Act of 1990 included the Budget Enforcement Act (1990 BEA), which provided a major overhaul of the BBEDCA procedures. The 1990 BEA effectively replaced BBEDCA's system of deficit limits with two enforcement mechanisms: limits on discretionary spending and a pay-as-you-go-requirement (PAYGO) for direct spending and revenue legislation.[62] If discretionary appropriations enacted exceeded the annual limits, then the law provided for a sequestration of budget authority. If Congress failed to achieve budget neutrality on direct spending, then there would be an offsetting sequestration of nonexempt mandatory accounts. The 1990 BEA required OMB and CBO to estimate new budget authority and outlays provided by any new legislation through a process that came to be called "scorekeeping." CBO would transmit its estimates to OMB, which would report any discrepancies to Congress. The 1990 BEA required that OMB's estimates be used to determine whether a sequestration was necessary.

In 1993, the discretionary spending limits and the PAYGO rules were extended through fiscal year 1998. Pub. L. No. 103-66, 107 Stat. 683 (Aug. 10, 1993). The 1997 Budget Enforcement Act (1997 BEA) again extended the discretionary spending caps and the PAYGO rules through fiscal year 2002. Pub. L. No. 105-33, title X, §§ 10203, 10205, 111 Stat. 251, 701–03 (Aug. 5, 1997). Although the overall discretionary spending caps expired in 2002, additional caps on Highway and Mass Transit spending established under the Transportation Equity Act for the

[61] The measure is discussed in S. Print No. 105-67.

[62] The term "direct spending" refers to "(A) budget authority provided by law other than appropriations Acts; (B) entitlement authority; and (C) the Supplemental Nutrition Assistance Program." 2 U.S.C. § 900(c)(8).

21st Century (TEA-21)[63] continued through fiscal year 2003, and another set of caps on conservation spending, established as part of the fiscal year 2001 Interior Appropriations Act,[64] were set through fiscal year 2006. In addition, the sequestration procedures were to apply through fiscal year 2006 to the conservation category. However, Public Law 107-312 eliminated the PAYGO sequestration requirement. Pub. L. No. 107-312, 116 Stat. 2456 (Dec. 2, 2002).

In addition to the statutory spending caps, Congress in fiscal year 1994 began including overall limits on discretionary spending in the concurrent budget resolution that have become known as congressional caps. H.R. Con. Res. 64, 103rd Cong. § 12(b) (1993). Congress established these caps to manage its internal budget process, while the BEA statutory caps continued to govern for sequestration purposes. The congressional caps were enforceable in the Senate by a point of order that prohibited the consideration of a budget resolution that exceeded the limits for that fiscal year (the point of order could be waived or suspended by a three-fifths vote). Although the statutory 1997 BEA limits expired at the end of fiscal year 2002, Congress continues to use the concurrent resolution on the budget to establish and enforce congressional budgetary limits. H.R. Con. Res. 95, 108th Cong. § 504 (2003).

In February 2010, the Statutory Pay-As-You-Go Act of 2010 (Statutory PAYGO) revived a version of the PAYGO requirement for direct spending and revenue legislation. Pub. L. No. 113-139, title I, 124 Stat. 8 (Feb. 12, 2010). Statutory PAYGO provides that if the net effect of direct spending and revenue legislation enacted in a year increases the deficit, then there will be a sequestration of nonexempt direct spending to eliminate the increase. 2 U.S.C. §§ 931–939.

In August 2011, the Budget Control Act of 2011 restored a sequestration process to enforce newly-enacted discretionary spending limits for fiscal years 2012 to 2021.[65] Pub. L. No. 112-25, 125 Stat. 240 (Aug. 2, 2011). These discretionary spending limits reduced projected spending by about $1 trillion. 2 U.S.C. § 901(c); B-324723, July 31, 2013. If new budget authority exceeds the discretionary spending limits in those fiscal years,

[63] Pub. L. No. 105-178, § 1102, 112 Stat. 107 (June 9, 1998).

[64] Pub. L. No. 106-291, 114 Stat. 922 (Oct. 11, 2000).

[65] The Budget Control Act was enacted largely as an amendment to BBEDCA.

then the law provides for a sequestration to eliminate the breach. 2 U.S.C. §§ 901, 901a.

The Budget Control Act also aimed to achieve additional deficit reduction by fiscal year 2021. The Act created the Joint Select Committee on Deficit Reduction, which was tasked with proposing legislation by December 2, 2011, to reduce the deficit by at least $1.2 trillion through fiscal year 2021. The Joint Committee failed to propose a bill by its statutory deadline, and Congress and the President subsequently failed to enact legislation. This failure triggered a new sequestration process, the so-called “Joint Committee sequestration,” to otherwise achieve the $1.2 trillion reduction. 2 U.S.C. § 901a. The law currently provides for annual reductions of discretionary spending through fiscal year 2021 and of direct spending through fiscal year 2025.

## C. Authorizations versus Appropriations

### 1. Distinction between Authorization and Appropriation

Appropriation acts must be distinguished from two other types of legislation: “enabling” or “organic” legislation and “appropriation authorization” legislation. Enabling or organic legislation is legislation that creates an agency, establishes a program, or prescribes a function, such as the Department of Education Organization Act or the Federal Water Pollution Control Act. While the organic legislation may provide the necessary authority to conduct the program or activity, it usually does not provide budget authority. Nor does organic legislation typically provide any form of an appropriation.

Appropriation authorization legislation, as the name implies, is legislation that authorizes the appropriation of funds to implement the organic legislation. It may be included as part of the organic legislation or it may be separate. As with organic legislation, appropriation authorization legislation typically does not provide budget authority or an appropriation:

> “The mere authorization of an appropriation does not authorize expenditures on the faith thereof or the making of contracts obligating the money authorized to be appropriated.”

16 Comp. Gen. 1007, 1008 (1937). *See also* 27 Comp. Dec. 923 (1921) (“The expression ‘authorized to be appropriated’ . . . clearly indicates that no appropriation is made or intended to be made, but the bill when

enacted becomes the authority of law for an expected appropriation in the future"); 67 Comp. Gen. 332 (1988); 37 Comp. Gen. 732 (1958); 35 Comp. Gen. 306 (1955); 26 Comp. Gen. 452 (1947); 15 Comp. Gen. 802 (1936); 4 Comp. Gen. 219 (1924); A 27765, July 8, 1929.

Agencies may incur obligations only after Congress grants budget authority. As discussed in section B.4 of this chapter, Congress may confer budget authority in any law. However, provisions conferring budget authority and authority to make payments to liquidate obligations nearly always appear in appropriations acts, not in organic legislation or in appropriation authorization legislation.

Like organic legislation, authorization legislation is considered and reported by the committees with legislative jurisdiction over the particular subject matter, whereas appropriation bills are exclusively within the jurisdiction of the appropriations committees.

There is no general requirement, either constitutional or statutory, that an appropriation act be preceded by a specific authorization act. *E.g.,* 71 Comp. Gen. 378, 380 (1992). The existence of a statute (organic legislation) imposing substantive functions upon an agency is itself sufficient authorization for the necessary appropriations. B-173832, July 16, 1976; B-173832, Aug. 1, 1975; B-111810, Mar. 8, 1974. Moreover, expiration of an authorization of appropriations does not prohibit an agency from using available appropriations to carry out a program required or permitted by existing enabling legislation. B-323433, Aug. 14, 2012 (Social Security Administration has adequate authority under organic legislation to continue mandatory and discretionary grant programs upon the expiration of an authorization of appropriations).

However, statutory requirements for authorizations do exist in a number of specific situations: for example, one provision states that "[a]ppropriations to carry out the provisions of this chapter shall be subject to annual authorization." Department of Energy Organization Act, § 660, 42 U.S.C. § 7270. Another provides that no funds may be appropriated for military construction, military procurement, and certain related research and development "unless funds therefor have been specifically authorized by law." 10 U.S.C. § 114(a). In addition, rules of the House of Representatives generally prohibit the reporting of an appropriation in a general appropriation bill for expenditures not previously authorized by law. *See* Rule XXI(2)(a)(1), Rules of the House of Representatives. The effect of this Rule is to subject the "offending" appropriation to a point of order. A more limited provision exists in Rule XVI, Standing Rules of the Senate.

An authorization act is basically a directive to Congress itself, which Congress is free to follow or alter (up or down) in the subsequent appropriation act. B-323433, Aug. 14, 2012. A statutory requirement for prior authorization is also essentially a congressional mandate to itself. Thus, for example, if Congress appropriates money to the Defense Department in violation of 10 U.S.C. § 114, there are no practical consequences. The appropriation is just as valid, and just as available for obligation, as if section 114 had been satisfied or did not exist.

Authorizations take many different forms, depending in part on whether they are contained in the organic legislation or are separate legislation. Authorizations contained in organic legislation may be "definite" (setting dollar limits either in the aggregate or for specific fiscal years) or "indefinite" (authorizing "such sums as may be necessary to carry out the provisions of this act"). An indefinite authorization serves little purpose other than to comply with House Rule XXI. Appropriation authorizations enacted as separate legislation resemble appropriation acts in structure, for example, the annual Department of Defense Authorization Acts.

In sum, the typical sequence is: (1) organic legislation; (2) authorization of appropriations, if not contained in the organic legislation; and (3) the appropriation act. While this may be the "normal" sequence, there are deviations and variations, and it is not always possible to neatly label a given piece of legislation. Consider, for example, the following:

> "The Secretary of the Treasury is authorized and directed to pay to the Secretary of the Interior . . . for the benefit of the Coushatta Tribe of Louisiana . . . out of any money in the Treasury not otherwise appropriated, the sum of $1,300,000."

Pub. L. No. 100-411, § 1(a)(1), 102 Stat. 1097 (Aug. 22, 1988). This is the first section of a law enacted to settle land claims by the Coushatta Tribe against the United States and to prescribe the use and distribution of the settlement funds. Applying the test described above in section B.4, it is certainly an appropriation—it contains a specific direction to pay and designates the funds to be used—but, in a technical sense, it is not an appropriation act. Also, it contains its own authorization. Thus, we have an authorization and an appropriation combined in a statute that is neither an authorization act (in the sense described above) nor an appropriation act.

## 2. Specific Problem Areas and the Resolution of Conflicts

## a. Introduction

Appropriation acts, as we have seen, do not exist in a vacuum. They are enacted against the backdrop of program legislation and, in many cases, specific authorization acts. This section deals with two broad but closely related issues. First, what precisely can Congress do in an appropriation act? Is it limited to essentially "rubber stamping" what has previously been authorized? Second, what does an agency do when faced with what it perceives to be an inconsistency between an appropriation act and some other statute?

The remaining portions of this section raise these issues in a number of specific contexts. In this introduction, we present four important principles. The resolution of problems in the relationship of appropriation acts to other statutes will almost invariably lie in the application of one or more of these principles.

First, Congress intends to achieve a consistent body of law. Therefore, multiple statutes should be construed harmoniously so as to give maximum effect to all of them wherever possible. *E.g., Posadas v. National City Bank of New York,* 296 U.S. at 503; *Strawser v. Atkins,* 290 F.3d 720 (4th Cir.), *cert. denied,* 537 U.S. 1045 (2002); B-290011, Mar. 25, 2002; 53 Comp. Gen. 853, 856 (1974); B-208593.6, Dec. 22, 1988. One particularly important consequence of this principle is that except as specified in the appropriation act, appropriations to carry out enabling or authorizing laws must be expended in accordance with the original authorization both as to the amount of funds to be expended and the nature of the work authorized. B-307720, Sept 27, 2007; B-258000, Aug. 31, 1994; B-220682, Feb. 21, 1986; B-204874, July 28, 1982; B-151157, June 27, 1963; 36 Comp. Gen. 240, 242 (1956); B-151157, June 27, 1963; B-125404, Aug. 31, 1956. While it is true that one Congress cannot bind a future Congress, nor can it bind subsequent action by the same Congress,[66] an authorization act is more than an academic exercise and its requirements must be followed unless changed by subsequent legislation.

[66] *United States v. Winstar Corp.,* 518 U.S. 839, 872 (1996) ("In his Commentaries, Blackstone stated the centuries-old concept that one legislature may not bind the legislative authority of its successors: 'Acts of parliament derogatory from the power of subsequent parliaments bind not. . . . Because the legislature, being in truth the sovereign power, is always of equal, always of absolute authority: it acknowledges no superior upon earth, which the prior legislature must have been, if it's [sic] ordinances could bind the present parliament.' 1 W. Blackstone, Commentaries on the Laws of England 90 (1765).")

Congress is free to amend or repeal prior legislation.[67] This leads to an important corollary to the principle that Congress intends to achieve a consistent body of law, which is that "repeals by implication" are disfavored, and statutes will be construed to avoid this result whenever reasonably possible. That is, courts generally will find that a statute repeals an earlier one only if the repeal is explicit. *E.g., Tennessee Valley Authority v. Hill,* 437 U.S. 153, 189–90 (1978); *Morton v. Mancari,* 417 U.S. 535, 549 (1974); *Posadas v. National City Bank of New York,* 296 U.S. 497, 503 (1936); B-307720, Sept. 27, 2007; B-290011, Mar. 25, 2002; B-261589, Mar. 6, 1996; 72 Comp. Gen. 295, 297 (1993); 64 Comp. Gen. 142, 145 (1984); 58 Comp. Gen. 687, 691–92 (1979); B-258163, Sept. 29, 1994; B-236057, May 9, 1990. Repeals by implication are particularly disfavored in the appropriations context. *Robertson v. Seattle Audubon Society,* 503 U.S. 429, 440 (1992).

A repeal by implication will be found only where "the intention of the legislature to repeal [is] clear and manifest." *Posadas,* 296 U.S. at 503. *See also* B-236057, May 9, 1990. The principle that implied repeals are disfavored applies with special weight when it is asserted that a general statute repeals a more specific statute. 72 Comp. Gen. at 297.

Second, if two statutes are in irreconcilable conflict, the more recent statute, as the latest expression of Congress, governs. As one court concluded in a statement illustrating the eloquence of simplicity, "[t]he statutes are thus in conflict, the earlier permitting and the later prohibiting," so the later statute supersedes the earlier. *Eisenberg v. Corning,* 179 F.2d 275, 277 (D.C. Cir. 1949). In a sense, the "last in time" rule is yet another way of expressing the repeal by implication principle. We state it separately to highlight its narrowness: it applies only when the two statutes cannot be reconciled in any reasonable manner, and then only to the extent of the conflict. *E.g.,* B-323157, May 21, 2012 ("[W]hen two, equally specific provisions are in irreconcilable conflict, the Supreme Court views the later act as an implied repeal of the earlier one to the extent of the conflict . . . . This is because the more recent enactment is the latest expression of Congress."); B-308715, Apr. 20, 2007 ("It is well established that a later enacted, specific statute will typically supersede a conflicting previously enacted, general statute to the extent of the inconsistency."). *See also Posadas,* 296 U.S. at 503; B-255979, Oct. 30, 1995; B-203900, Feb. 2, 1989; B-226389, Nov. 14, 1988; B-214172,

[67] Such amendments or repeals may not, however, violate the Constitution. We discuss this issue later in this subsection.

July 10, 1984, *aff'd upon reconsideration,* 64 Comp. Gen. 282 (1985). We will see later in this section that while the last in time rule can be stated with eloquent simplicity, its application is not always so simple.

Third, despite the occasional comment to the contrary in judicial decisions (a few of which we will note later), Congress can and does "legislate" in appropriation acts. *E.g., Strawser v. Atkins*, 290 F.3d 720, 734 (4th Cir. 2002) ("Where Congress chooses to amend substantive law in an appropriations rider, we are bound to follow Congress's last word on the matter even in an appropriations law."); *Preterm, Inc. v. Dukakis,* 591 F.2d 121 (1st Cir.), *cert. denied,* 441 U.S. 952 (1979); *Friends of the Earth v. Armstrong,* 485 F.2d 1 (10th Cir. 1973), *cert. denied,* 414 U.S. 1171 (1974); *Eisenberg,* 179 F.2d 275; *Tayloe v. Kjaer,* 171 F.2d 343 (D.C. Cir. 1948). It may well be that the device is "unusual and frowned upon." *Preterm,* 591 F.2d at 131. *See also Building & Construction Trades Department, AFL-CIO v. Martin,* 961 F.2d 269, 273 (D.C. Cir. 1992), *cert. denied,* 506 U.S. 915 (1992) ("While appropriations are 'Acts of Congress' which can substantively change existing law, there is a very strong presumption that they do not . . . and that when they do, the change is only intended for one fiscal year."). It also may well be that the appropriation act will be narrowly construed when it is in apparent conflict with authorizing legislation. *Calloway v. District of Columbia,* 216 F.3d 1, 9 (D.C. Cir. 2000); *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547, 1558 (D.C. Cir. 1984). Nevertheless, appropriation acts are, like any other statute, passed by both Houses of Congress and either signed by the President or enacted over a presidential veto. As such, and subject of course to constitutional strictures, they are "just as effective a way to legislate as are ordinary bills relating to a particular subject." *Friends of the Earth,* 485 F.2d at 9; *Envirocare of Utah Inc. v. United States,* 44 Fed. Cl. 474, 482 (1999).

Fourth, legislative history is not legislation. As useful and important as legislative history may be in resolving ambiguities and determining congressional intent, it is the language of the appropriation act, and not the language of its legislative history, that is enacted into law. *E.g., Shannon v. United States,* 512 U.S. 573, 583 (1994) (declining to give effect to "legislative history that is in no way anchored in the text of the statute."). As the Supreme Court stated in a case previously cited, which we will discuss in more detail later:

> "Expressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress . . . ."

*Tennessee Valley Authority v. Hill*, 437 U.S. at 191; see also *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993); *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075 (Fed. Cir. 2003).

These, then, are the "guiding principles" that will be applied in various combinations and configurations to analyze and resolve the problem areas identified in the remainder of this section. Many situations will require the application of multiple principles. For example, the Small Business Administration (SBA) believed there was a conflict between the spending levels established for certain programs in its authorizing legislation and the levels provided for the same programs in SBA's FY 1984 appropriations act, as fleshed out by an accompanying conference report. 64 Comp. Gen. 282 (1985). GAO concluded that the two statutes were not in conflict, that the appropriation did not implicitly repeal or amend the authorizations, and that the spending levels in the authorization were controlling. GAO explained that "an existing statutory limitation [here, the levels in the authorization act] cannot be superseded or repealed by statements, explanations, recommendations, or tables contained only in committee reports or in other legislative history." This case applied both the principle that Congress intends to achieve a consistent body of law and the principle that legislative history is not legislation.

A useful supplemental reference on many of the topics we discuss is Louis Fisher, *The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices,* 29 Cath. U.L. Rev. 51 (1979).

### b. Variations in Amount

(1) Appropriation exceeds authorization

Generally speaking, Congress is free to appropriate more money for a given object than the amount previously authorized:

> "While legislation providing for an appropriation of funds in excess of the amount contained in a related authorization act apparently would be subject to a point of order under rule 21 of the Rules of the House of Representatives, there would be no basis on which we could question otherwise proper expenditures of funds actually appropriated."

B-123469, Apr. 14, 1955.

The governing principle was stated as follows:

> "It is fundamental . . . that one Congress cannot bind a future Congress and that the Congress has full power to make an appropriation in excess of a cost limitation contained in the original authorization act. This authority is exercised as an incident to the power of the Congress to appropriate and regulate expenditures of the public money."

36 Comp. Gen. 240, 242 (1956). For example, the National Park Service could obligate its lump-sum construction appropriation for projects in various parks, even though such obligations would exceed the amounts authorized to be appropriated by an earlier law. B-148736, Sept. 15, 1977.

(2) Appropriation less than authorization

Congress is free to appropriate less than an amount authorized either in an authorization act or in program legislation, again, as in the case of exceeding an authorization, at least where it does so directly. *E.g.,* 53 Comp. Gen. 695 (1974). This includes the failure to fund a program at all, that is, not to appropriate any funds. *United States v. Dickerson,* 310 U.S. 554 (1940).

A case in point is *City of Los Angeles v. Adams,* 556 F.2d 40 (D.C. Cir. 1977). The Airport and Airway Development Act of 1970 authorized airport development grants "in aggregate amounts not less than" specified dollar amounts for specified fiscal years, and provided an apportionment formula. Pub. L. No. 91-258, title I, 84 Stat. 219 (May 21, 1970). Subsequent appropriation acts included specific limitations on the aggregate amounts to be available for the grants, less than the amounts authorized. The court concluded that both laws could be given effect by

limiting the amounts available to those specified in the appropriation acts, but requiring that they be distributed in accordance with the formula of the authorizing legislation. In holding the appropriation limits controlling, the court said:

> "According to its own rules, Congress is not supposed to use appropriations measures as vehicles for the amendment of general laws, including revision of expenditure authorization. . . . Where Congress chooses to do so, however, we are bound to follow Congress's last word on the matter even in an appropriations law."

*Id.* at 48–49.

Another relevant case is *Highland Falls-Fort Montgomery Central School District v. United States*, 48 F.3d 1166 (1995). The Impact Aid Act entitles school districts financially impacted as the result of a substantial federal presence in the school district to financial assistance to mitigate the impact. The Act entitled school districts to amounts as determined by the Department of Education that are attributable to each of three separate categories of impact: (1) federal ownership of property within a school district, (2) increases in school enrollments attributable to children of persons who reside or work on federal property, and (3) sudden and substantial increases in attendance by school children. The Act provides an allocation formula to be used by the Secretary if annual appropriations are inadequate to fully fund each of the three aid categories.

The annual appropriations acts for 1989 through 1993 did not provide enough money to fully fund each of the three categories of impact aid. However, in those years, Congress earmarked specific amounts for each category of impact aid in the appropriation act. The Department of Education followed the funding directives contained in the appropriations acts rather than the allocation formula contained in the Impact Aid Act for those fiscal years. One school district sued arguing that the Department should have applied the allocation formula and fully funded the first category (which would have resulted in the school district receiving more aid overall). The court found in favor of the Department of Education, which was relying on the most recent expression of congressional intent (here, the appropriations acts) to resolve the irreconcilable conflict between the impact aid formula and the appropriation earmarks.

Occasionally Congress enacts permanent legislation stating that particular payments will be made in the future. Congress may enact a subsequent appropriation that makes a smaller payment than was contemplated in the permanent legislation. Such a reduction is permissible and binding as long as the intent to reduce the amount of the

payment is clear. For example, permanent legislation set the salaries of certain territorial judges. *United States v. Fisher,* 109 U.S. 143 (1883). Congress subsequently appropriated a lesser amount, "in full compensation" for that particular year. The Court held that Congress had the power to reduce the salaries, and had effectively done so.[68] "It is impossible that both acts should stand. No ingenuity can reconcile them. The later act must therefore prevail . . . ." *Id.* at 146. *See also United States v. Mitchell,* 109 U.S. 146 (1883). In another case, the Court found a mandatory authorization effectively suspended by a provision in an appropriation act prohibiting the use of funds for the payment in question "notwithstanding the applicable portions of" the authorizing legislation. *United States v. Dickerson,* 310 U.S. 554 (1940).

In these cases, the "reduction by appropriation" was effective because the intent of the congressional action was unmistakable. The mere failure to appropriate sufficient funds is not enough. For example, the Court refused to find a repeal by implication in "subsequent enactments which merely appropriated a less amount . . . and which contained no words that expressly, or by clear implication, modified or repealed the previous law." *United States v. Langston,* 118 U.S. 389, 394 (1886); *see also In re Aiken County,* 725 F.3d 255, 260 (D.C. Cir. 2013); *United States v. Vulte,* 233 U.S. 509 (1914). A failure to appropriate in this type of situation will prevent administrative agencies from making payment, but, as in *Langston* and *Vulte,* is unlikely to prevent recovery by way of a lawsuit. *See also Wetsel-Oviatt Lumber Co., Inc. v. United States,* 38 Fed. Cl. 563, 570–571 (1997); *New York Airways, Inc. v. United States,* 369 F.2d 743 (Ct. Cl. 1966); *Gibney v. United States,* 114 Ct. Cl. 38 (1949).

Constitutional questions may arise if Congress attempts to repeal an entitlement that has already vested. The Supreme Court made the distinction between vested and non-vested entitlements clear:

> "No one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had

[68] Because the judges at issue were territorial judges, their authority did not derive from Article III of the Constitution. Therefore, Congress had authority to reduce their pay even after they had been appointed. *Clinton v. Englebrecht*, 80 U.S. 434, 447 (1871). In contrast, the pay of judges of courts established under Article III of the Constitution "shall not be diminished during their continuance in Office." U.S. Const., art. III, § 1; *see also Beer v. United States*, 696 F.3d 1174 (Fed. Cir. 2012) (Congress violated Article III, section I of the Constitution when it did not provide judicial salary increases that were contemplated by a previously enacted statute).

expected to be able to earn. . . . It is quite a different matter, however, for Congress to deprive a service member of pay due for services already performed, but still owing. In that case, the congressional action would appear in a different constitutional light."

*United States v. Larionoff*, 431 U.S. 864, 879 (1977).

(3) Earmarks in authorization act

In Chapter 5, section B, we set forth the various types of language Congress uses in appropriation acts when it wants to "earmark" a portion of a lump-sum appropriation as either a maximum or a minimum to be spent on some particular object. These same types of earmarking language can be used in authorization acts.

A number of cases have considered the question of whether there is a conflict when an authorization establishes a minimum earmark ("not less than," "shall be available only"), and the related appropriation is a lump-sum appropriation which does not expressly mention the earmark. Is the agency in this situation required to observe the earmark? Applying the principle that an appropriation must be expended in accordance with the related authorization unless the appropriation act provides otherwise, GAO has concluded that the agency must observe the earmark. 64 Comp. Gen. 388 (1985); B-220682, Feb. 21, 1986 ("an earmark in an authorization act must be followed where a lump sum is appropriated pursuant to the authorization"); B-207343, Aug. 18, 1982; B-193282, Dec. 21, 1978 (concluding that INS was required to make $2 million of its lump-sum appropriation available to investigate and prosecute alleged Nazi war criminals based on a $2 million earmark in its related authorization act). *See also* B-131935, Mar. 17, 1986. This result applies even though following the earmark will drastically reduce the amount of funds available for non-earmarked programs funded under the same appropriation. 64 Comp. Gen. at 391. (These cases can also be viewed as another application of the rule against repeal by implication.)

If Congress expressly appropriates an amount at variance with a previously enacted authorization earmark, the appropriation will control under the last in time rule. For example, an authorization act had expressly earmarked $18 million for the United Nations International Children's Emergency Fund (UNICEF) for specific fiscal years. 53 Comp. Gen. 695 (1974). A subsequent appropriation act provided a lump sum, out of which only $15 million was earmarked for UNICEF. The Comptroller General concluded that the $15 million specified in the appropriation act was controlling and represented the maximum available for UNICEF for that fiscal year.

### c. Variations in Purpose

As noted previously, it is only the appropriation, not the authorization by itself, that permits the incurring of obligations and the making of expenditures. It follows that an authorization does not, as a general proposition, expand the scope of availability of appropriations beyond what is permissible under the terms of the appropriation act. The authorized purpose must be implemented either by a specific appropriation or by inclusion in a broader lump-sum appropriation. Thus, an appropriation made for specific purposes is not available for related but more extended purposes contained in the authorization act but not included in the appropriation. 19 Comp. Gen. 961 (1940). *See also* 37 Comp. Gen. 732 (1958); 35 Comp. Gen. 306 (1955); 26 Comp. Gen. 452 (1947).

In addition to simply electing not to appropriate funds for an authorized purpose, Congress can expressly restrict the use of an appropriation for a purpose or purposes included in the authorization. *E.g.,* B-24341, Apr. 1, 1942 ("[W]hatever may have been the intention of the original enabling act it must give way to the express provisions of the later act which appropriated funds but limited their use").

Similarly, by express provision in an appropriation act, Congress can expand authorized purposes. For example, an appropriation expressly included two mandatory earmarks for projects beyond the scope of the related authorization. 67 Comp. Gen. 401 (1988). Noting that "the appropriation language provides its own expanded authorization for these programs," GAO concluded that the agency was required to reserve funds for the two mandatory earmarks before committing the balance of the appropriation for discretionary expenditures.

Except to the extent Congress expressly expands or limits authorized purposes in the appropriation act, the appropriation must be used in accordance with the authorization act in terms of purpose. Thus, GAO concluded that an appropriation to construct a bridge across the Potomac River pursuant to a statute authorizing construction of the bridge and prescribing its location was not available to construct the bridge at a slightly different location even though the planners favored the alternate location. B-125404, Aug. 31, 1956. Similarly, the Flood Control Act of 1970 authorized construction of a dam and reservoir for the Ellicott Creek project in New York. Subsequently, legislation was proposed to authorize channel construction instead of the dam and reservoir, but was not enacted. A continuing resolution made a lump-sum appropriation for flood control projects "authorized by law." The Comptroller General concluded that the appropriation did not repeal the prior authorization,

and that therefore, the funds could not properly be used for the alternative channel construction. B-193307, Feb. 6, 1979.

### d. Period of Availability

An authorization of appropriations, like an appropriation itself, may authorize appropriations to be made on a multiple year or no-year, as well as fiscal year, basis. The question we address here is the extent to which the period of availability specified in an authorization or enabling act is controlling. Congress can, in an appropriation act, enact a different period of availability than that specified in the authorization. Generally, the period of availability in the appropriations act controls. For instance, an appropriation of funds "to remain available until expended" (no-year) was found controlling over a provision in the authorizing legislation that authorized appropriations on a 2-year basis. B-182101, Oct. 16, 1974. *See also* B-149372, B-158195, Apr. 29, 1969 (two-year appropriation of presidential transition funds held controlling notwithstanding provision in Presidential Transition Act of 1963, which authorized services and facilities to former President and Vice President only for 6 months after expiration of term of office).

Until 1971, GAO considered whether appropriation language specifically referred to the authorization. If it did, then GAO considered the provisions of the authorization act—including any multiple year or no-year authorizations—to be incorporated by reference into the provisions of the appropriation act. This was regarded as sufficient to overcome 31 U.S.C. § 1301(c), which presumes that an appropriation is for one fiscal year unless the appropriation states otherwise, and to overcome the presumption of fiscal year availability derived from the enacting clause of the appropriation act. If the appropriation language did not specifically refer to the authorization act, the appropriation was held to be available only for the fiscal year covered by the appropriation act. 45 Comp. Gen. 508 (1966); 45 Comp. Gen. 236 (1965); B-147196, Apr. 5, 1965; B-127518, May 10, 1956; B-37398, Oct. 26, 1943. The reference had to be specific; the phrase "as authorized by law" was not enough. B-127518, May 10, 1956.

By 1971, however, Congress was enacting (and continues to enact) a general provision in all appropriation acts: "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." Now, if an appropriation act contains the provision quoted in the preceding paragraph, it will not be sufficient for an appropriation contained in that act to merely incorporate a multiple year or no-year authorization by reference. The effect of this general provision is to require the appropriation language to expressly provide for availability beyond one

year in order to overcome the enacting clause. B-319734, July 26, 2010; 50 Comp. Gen. 857 (1971).

The general provision resulted from the efforts of the House Committee on Appropriations in connection with the 1964 foreign aid appropriations bill. In its report on that bill, the Committee first described then-existing practice:

> "The custom and practice of the Committee on Appropriations has been to recommend appropriations on an annual basis unless there is some valid reason to make the item available for longer than a one-year period. The most common technique in the latter instances is to add the words 'to remain available until expended' to the appropriation paragraph.
>
> "In numerous instances, . . . the Congress has in the underlying enabling legislation authorized appropriations therefor to be made on an 'available until expended' basis. When he submits the budget, the President generally includes the phrase 'to remain available until expended' in the proposed appropriation language if that is what the Executive wishes to propose. The Committee either concurs or drops the phrase from the appropriation language."

H.R. Rep. No. 88-1040, at 55 (1963). The Committee then noted a situation in the 1963 appropriation that had apparently generated some disagreement. The President had requested certain refugee assistance funds to remain available until expended. The report goes on to state:

> "The Committee thought the funds should be on a 1-year basis, thus the phrase 'to remain available until expended' was not in the bill as reported. The final law also failed to include the phrase or any other express language of similar import. Thus Congress took affirmative action to limit the availability to the fiscal year 1963 only."

*Id.* at 56. The Committee then quoted what is now 31 U.S.C. § 1301(c), and stated:

> "The above quoted 31 U.S.C. [§ 1301(c)] seems clearly to govern and, in respect to the instant class of appropriation, to require *the act making the appropriation* to *expressly* provide for availability longer than 1 year if the enacting clause limiting the appropriations in the law to a given fiscal year is to be overcome as to any specific appropriation therein made. And it accords with the rule of reason and ancient practice to retain control of such an elementary matter wholly within the terms of the law making the appropriation. The two hang together. But in view of the question in the present case and the possibility of similar questions in a number of others, consideration may have to be given to revising the provisions of 31 U.S.C. [§ 1301(c)] to make its scope and meaning crystal clear and perhaps update it as may otherwise appear desirable."

*Id.* (emphasis in original).

Section 1301(c) was not amended, but soon after the above discussion appeared, appropriation acts started including the general provision stating that "[n]o part of any appropriation contained in this Act shall remain available for obligation beyond the current fiscal year unless expressly so provided herein." This added another ingredient to the recipe that had not been present in the earlier decisions, although it took several years before the new general provision began appearing in almost all appropriation acts.

When the issue arose again in a 1971 case, GAO considered the new appropriation act provision and the 1963 comments of the House Appropriations Committee. In that decision, GAO noted that "it seems evident that the purpose [of the new general provision] is to overcome the effect of our decisions . . . regarding the requirements of 31 U.S.C. [§ 1301(c)]," and further noted the apparent link between the discussion in House Report 1040 and the appearance of the new provision. 50 Comp. Gen. at 859. *See also* 58 Comp. Gen. 321 (1979); B-207792, Aug. 24, 1982. Thus, the appropriation act will have to expressly repeat the multiple year or no-year language of the authorization, or at least expressly refer to the specific section of the authorizing statute in which it appears.

Changes in the law from year to year may produce additional complications. For example, an authorization act provided that funds appropriated and apportioned to states would remain available for obligation for three fiscal years, after which time any unobligated balances would be reapportioned. This amounted to a no-year authorization. For several years, appropriations to fund the program were made on a no-year basis, thus permitting implementation of the authorization provision. Starting with fiscal year 1978, however, the appropriation act was changed and the funds were made available for two fiscal years. This raised the question of whether the appropriation act had the effect of overriding the apparently conflicting authorizing language, or if it meant merely that reapportionment could occur after two fiscal years instead of three, thus effectively remaining a no-year appropriation.

GAO concluded that the literal language and plain meaning of the appropriation act must govern. In addition to the explicit appropriation language, the appropriation acts contained the general provision restricting availability to the current fiscal year unless expressly provided otherwise therein. Therefore, any funds not obligated by the end of the 2-year period would expire and could not be reapportioned. B-151087, Feb. 17, 1982; B-151087, Sept. 15, 1981.

### e. Authorization Enacted After Appropriation

Our discussion thus far has, for the most part, been in the context of the typical sequence—that is, the authorization act is passed before the appropriation act. Sometimes, however, consideration of the authorization act is delayed and is enacted *after* the appropriation act. Determining the relationship between the two acts involves application of the same general principles we have been applying when the acts are enacted in the normal sequence.

The first step in the analysis is to attempt to construe the statutes together in some reasonable fashion. To the extent this can be done, there is no real conflict, and the reversed sequence of enactment will, in many cases, make no difference. Earlier, for example, we discussed the rule that a specific earmark in an authorization act must be followed when the related appropriation is an unspecified lump sum. In two of the cases cited for that proposition—B-220682, Feb. 21, 1986 and B-193282, Dec. 21, 1978—the appropriation act had been enacted prior to the authorization, a factor that did not affect the outcome.

For example, the 1979 Justice Department authorization act authorized a lump-sum appropriation to the Immigration and Naturalization Service (INS) and provided that $2 million "shall be available" for the investigation and prosecution of certain cases involving alleged Nazi war criminals. The 1979 appropriation act made a lump-sum appropriation to the INS but contained no specific mention of the Nazi war criminal item. The appropriation act was enacted on October 10, 1978, but the authorization act was not enacted until November. In response to a question as to the effect of the authorization provision on the appropriation, the Comptroller General advised that the two statutes could be construed harmoniously, and that the $2 million earmarked in the authorization act could be spent only for the purpose specified. It was further noted that the $2 million represented a minimum, but not a maximum. B-193282, Dec. 21, 1978, *amplified by* B-193282, Jan. 25, 1979. This is the same result that would have been reached if the normal sequence of enactment had been followed.

Similarly, a provision in the 1987 Defense Appropriation Act prohibited the Navy from including certain provisions in ship maintenance contracts. The 1987 authorization act, enacted after the appropriation, amended a provision in title 10 of the United States Code to require the prohibited provisions. Application of the last in time rule would have negated the appropriation act provision. However, it was possible to give effect to both provisions by construing the appropriation restriction as a temporary exemption from the permanent legislation in the authorization act.

B-226389, Nov. 14, 1988. Again, this is the same result that would have been reached if the authorization act were enacted first.

If the authorization and appropriation cannot be reasonably reconciled, the last-in-time rule will apply as it would under the typical sequence, except here, the result will differ because the authorization is the later enacted of the two. For example, the 1989 Treasury Department appropriation act contained a provision prohibiting placing certain components of the Department under the oversight of the Treasury Inspector General. A month later, Congress enacted legislation placing those components under the Inspector General's jurisdiction and transferring their internal audit staffs to the Inspector General "notwithstanding any other provision of law." But for the "notwithstanding" clause, it might have been possible to use the same approach as in B-226389 and find the appropriation restriction a temporary exemption from the new permanent legislation. In view of the "notwithstanding" clause, however, GAO found that the two provisions could not be reconciled, and concluded that the Inspector General legislation, as the later enactment, superseded the appropriation act provision. B-203900, Feb. 2, 1989.

Two other examples invoking the last in time rule can be found in dueling Defense Department authorization and appropriation act provisions. In one case, the Defense appropriations act for 1992 directed the Defense Department to extend a contract relating to the Civilian Heath and Medical Program for Uniformed Services (CHAMPUS) program for another year. However, the defense authorization act for 1992 countermanded that mandate and permitted the Defense Department to award a new contract. The Comptroller General had little difficulty concluding that the two provisions were irreconcilably in conflict. B-247119, Mar. 2, 1992. Indeed, the legislative history demonstrated that the drafters of the appropriation and authorization acts sought to trump each other on this point as their two bills proceeded through Congress. The more difficult issue was how to apply the last in time rule to the case. The complication was that, while Congress had completed action on the authorization bill first (one day before the appropriation bill), the President acted in the opposite order—signing the appropriation bill into law nine days before he signed the authorization bill. Noting that the date on which the President signs a bill is clearly the date it becomes law, the Comptroller General held that the authorization act was the later in time, and thus, its provisions controlled.

Just as with any other application of the last in time rule, the later enactment prevails only to the extent of the irreconcilable conflict.

B-61178, Oct. 21, 1946 (specific limitations in appropriation act not superseded by after-enacted authorization absent indication that authorization was intended to alter provisions of prior appropriation).

### f. Two Statutes Enacted on Same Day

The Supreme Court has said that the doctrine against repeal by implication is even more forceful “where the one act follows close upon the other, at the same session of the Legislature.” *Morf v. Bingaman,* 298 U.S. 407, 414 (1936); *see also Auburn Housing Authority v. Martinez,* 277 F.3d 138, 145 (2nd Cir. 2002); B-277905, Mar. 17, 1998. Accordingly, the doctrine against repeal by implication reaches perhaps its strongest point (and the “last in time” rule is correspondingly at its weakest) when both statutes are enacted on the same day. Except in the very rare case in which the intent of one statute to affect the other is particularly manifest, it makes little sense to apply a last in time concept where the time involved is a matter of hours, or as in one case (B-79243, Sept. 28, 1948), 7 minutes. Thus, the starting point is the presumption—applicable in all cases but even stronger in this situation—that Congress intended both statutes to stand together. 67 Comp. Gen. 332, 335 (1988); B-204078.2, May 6, 1988.

When there is an apparent conflict between an appropriation act and another statute enacted on the same day, the approach is to make every effort to reconcile the statutes so as to give maximum effect to both. In some cases, it will be found that there is no real conflict. For example, one statute authorized certain Commodity Credit Corporation appropriations to be made in the form of current, indefinite appropriations, while the appropriation act, enacted on the same day, made line-item appropriations. There was no conflict because the authorization provision was a directive to Congress itself that Congress was free to disregard, subject to a possible point of order, when making the actual appropriation. 67 Comp. Gen. 332 (1988). Similarly, there was no inconsistency between an appropriation act provision, which required that Panama Canal Commission appropriations be spent only in conformance with the Panama Canal Treaty of 1977 and its implementing legislation, and an authorization act provision, enacted on the same day, requiring prior specific authorizations. B-204078.2, May 6, 1988.

In other cases, applying traditional rules of statutory construction will produce reconciliation. For example, if one statute can be said to be more specific than the other, they can be reconciled by applying the more specific provision first, with the broader statute then applying to any residual issues. *See* B-231662, Sept. 1, 1988; B-79243, Sept. 28, 1948.

Legislative history may also help. For example, authorizing legislation extended the life of the Solar Energy and Energy Conservation Bank to March 15, 1988. The 1988 appropriation, enacted on the same day, made a two-year appropriation for the Bank. Not only were there no indications of any intent for the appropriation to have the effect of extending the Bank's life, there were specific indications to the contrary. Thus, GAO regarded the appropriation as available, in theory for the full two-year period, except that the authority for anyone to obligate the appropriation would cease when the Bank went out of existence. B-207186, Feb. 10, 1989.

The most extreme situation, and one in which the last in time rule by definition cannot possibly apply, is two conflicting provisions in the same statute. Even here, the approaches outlined above will usually prove successful. *See, e.g.,* B-211306, June 6, 1983. We have found only one case in which two provisions in the same act were found irreconcilable. One provision in an appropriation act appropriated funds to the Army for the purchase of land; another provision a few pages later in the same act expressly prohibited the use of Army appropriations for the purchase of land. The Comptroller of the Treasury concluded, in a very brief decision, that the prohibition nullified the appropriation. 26 Comp. Dec. 534 (1920). The advantage of this result, although not stated this way in the decision, is that Congress would ultimately have to resolve the conflict and it is easier to make expenditures that have been deferred than to recoup money after it has been spent.

In one case, the fact that two allegedly conflicting provisions were contained in the same statute influenced the court to reconcile them. *Auburn Housing Authority v. Martinez,* 277 F.3d 138 (2nd Cir. 2002). The funding restriction provision used the word "hereafter," which, as the court acknowledged, ordinarily connotes permanence. However, the court nonetheless held that this provision applied only for the duration of the fiscal year and did not constitute an implied repeal of the other provision. The opinion observed in this regard:

> "Given the unique circumstances of this case, the court is not convinced that the mere presence of the word 'hereafter' in section 226 clearly demonstrates Congress's intent to repeal section 519(n). This could be a different case if sections 226 and 519(n) appeared in separate statutes, but that is not the question we consider in the instant appeal."

*Auburn Housing Authority*, 277 F.3d at 146.

### g. Ratification by Appropriation

"Ratification by appropriation" is the doctrine by which Congress can, by the appropriation of funds, confer legitimacy on an agency action that was

questionable when it was taken. Clearly Congress may ratify that which it could have authorized. *Swayne & Hoyt, Ltd. v. United States,* 300 U.S. 297, 301–02 (1937). It is also settled that Congress may manifest its ratification by the appropriation of funds. *Ex Parte Endo,* 323 U.S. 283, 303 n.24 (1944); *Brooks v. Dewar,* 313 U.S. 354, 360–61 (1941).

We must also emphasize that "ratification by appropriation is not favored and will not be accepted where prior knowledge of the specific disputed action cannot be demonstrated clearly." *District of Columbia Federation of Civic Ass'ns v. Airis,* 391 F.2d 478, 482 (D.C. Cir. 1968); *Associated Electric Cooperative, Inc. v. Morton,* 507 F.2d 1167, 1174 (D.C. Cir. 1974), *cert. denied,* 423 U.S. 830 (1975).

Thus, a simple lump-sum appropriation, without more, will generally not afford sufficient basis to find a ratification by appropriation. *Endo,* 323 U.S. at 303 n.24; *Airis,* 391 F.2d at 481–82; *Wade v. Lewis,* 561 F. Supp. 913, 944 (N.D. Ill. 1983); B-213771, July 10, 1984. The appropriation "must plainly show a purpose to bestow the precise authority which is claimed." *Endo,* 323 U.S. at 303 n.24. *Accord: Schism v. United States,* 316 F.3d 1259, 1289–1290 (Fed. Cir. 2002), *cert. denied,* 539 U.S. 910 (2003), 123 S. Ct. 2246 (2003) ("ratification ordinarily cannot occur in the appropriations context unless the appropriations bill itself expressly allocates funds for a specific agency or activity"); *A-1 Cigarette Vending, Inc. v. United States,* 49 Fed. Cl. 345, 354 (2001), *aff'd sub nom.* 304 F.3d 1349 (Fed. Cir. 2002), *cert. denied sub nom.* 538 U.S. 921 (2003) ("[S]imply because the lack of an appropriation demonstrates a lack of authority does not mean that an appropriation by itself will create such authority. . . . [A] general appropriation of funds for an overall program is not sufficient to bestow authority upon a particular aspect of an agency's program.").

Some courts have used language which, when taken out of context, implies that appropriations cannot serve to ratify prior agency action. *E.g., University of the District of Columbia Faculty Ass'n v. Board of Trustees of the University of the District of Columbia,* 994 F. Supp. 1, 10 (D.D.C. 1998), *aff'd,* 163 F.3d 616 (D.C. Cir. 1998). Nevertheless, while the doctrine may not be favored, it does exist. The courts demonstrate their reluctance to apply this doctrine by giving extra scrutiny to alleged ratifications by appropriation. Their reluctance to find such ratifications probably stems from a more general judicial aversion to interpreting appropriation acts as changing substantive law. Thus, one court observed:

> " [I]t is well recognized that Congress does not normally perform legislative functions—such as ratification—through appropriations bills. . . . This does not mean that Congress cannot effect a ratification through an appropriations bill, but it does mean that Congress must be especially clear about its intention to do so."

*Thomas v. Network Solutions, Inc.,* 2 F. Supp. 2d 22, 32 at n.12 (D.D.C. 1998), *aff'd,* 176 F.3d 500 (D.C. Cir. 1999), *cert. denied,* 528 U.S. 1115 (2000) (citations omitted).

We turn now to some specific situations in which the doctrine of ratification by appropriation has been accepted or rejected.

Presidential reorganizations have generated a large number of cases. Generally, when the President has created a new agency or has transferred a function from one agency to another, and Congress subsequently appropriates funds to the new agency or to the old agency for the new function, the courts have found that the appropriation ratified the presidential action. *Fleming v. Mohawk Wrecking & Lumber Co.,* 331 U.S. 111, 116 (1947); *Isbrandtsen-Moller Co. v. United States,* 300 U.S. 139, 147 (1937).

The transfer to the Equal Employment Opportunity Commission (EEOC) in 1978 of enforcement responsibility for the Age Discrimination in Employment Act and the Equal Pay Act produced a minor flood of litigation. Although the courts were not uniform, a clear majority found that the subsequent appropriation of funds to the EEOC ratified the transfer. *EEOC v. Dayton Power & Light Co.,* 605 F. Supp. 13 (S.D. Ohio 1984); *EEOC v. Delaware Dept. of Health & Social Services,* 595 F. Supp. 568 (D. Del. 1984); *EEOC v. New York,* 590 F. Supp. 37 (N.D. N.Y. 1984); *EEOC v. Radio Montgomery, Inc.,* 588 F. Supp. 567 (W.D. Va. 1984); *EEOC v. City of Memphis,* 581 F. Supp. 179 (W.D. Tenn. 1983); *Muller Optical Co. v. EEOC,* 574 F. Supp. 946 (W.D. Tenn. 1983), *aff'd on other grounds,* 743 F.2d 380 (6th Cir. 1984). *Contra EEOC v. Martin Industries,* 581 F. Supp. 1029 (N.D. Ala.), *appeal dismissed,* 469 U.S. 806 (1984); *EEOC v. Allstate Ins. Co.,* 570 F. Supp. 1224 (S.D. Miss. 1983), *appeal dismissed,* 467 U.S. 1232 (1984). Congress resolved any doubt by enacting legislation in 1984 to expressly ratify all prior reorganization plans implemented pursuant to any reorganization statute.[69]

[69] Pub. L. No. 98-532, 98 Stat. 2705 (Oct. 19, 1984), *codified at* 5 U.S.C. § 906 note.

On the other hand, a class of cases where ratification by appropriation was not found concern proposed construction projects funded under lump-sum appropriations where the effect would be either to expand the scope of a prior congressional authorization or to supply an authorization required by statute but not obtained. *Libby Rod & Gun Club v. Poteat,* 594 F.2d 742 (9th Cir. 1979); *National Wildlife Federation v. Andrus,* 440 F. Supp. 1245 (D.D.C. 1977); *Atchison, Topeka & Santa Fe Railway Co. v. Callaway,* 382 F. Supp. 610 (D.D.C. 1974); B-223725, June 9, 1987.

A few additional cases in which ratification by appropriation was found are summarized below:

- The Tennessee Valley Authority (TVA) had asserted the authority to construct power plants. TVA's position was based on an interpretation of its enabling legislation that the court found consistent with the purpose of the legislation although the legislation itself was ambiguous. The appropriation of funds to TVA for power plant construction ratified TVA's position. *Young v. Tennessee Valley Authority,* 606 F.2d 143 (6th Cir. 1979), *cert. denied,* 445 U.S. 942 (1980).
- The authority of the Postmaster General to conduct a mail transportation experiment was ratified by the appropriation of funds to the former Post Office Department under circumstances showing that Congress was fully aware of the experiment. The court noted that existing statutory authority was broad enough to encompass the experiment and that nothing prohibited it. *Atchison, Topeka & Santa Fe Railway Co. v. Summerfield,* 229 F.2d 777 (D.C. Cir. 1955), *cert. denied,* 351 U.S. 926 (1956).
- The authority of the Department of Justice to retain private counsel to defend federal officials in limited circumstances, while not explicitly provided by statute, is regarded as ratified by the specific appropriation of funds for that purpose. 2 Op. Off. Legal Counsel 66 (1978).
- Another Office of Legal Counsel opinion described instances in which Congress has ratified by appropriation the use of United States combat forces. The opinion concludes on this point:

> "In sum, basic principles of constitutional law—and, in particular, the fact that Congress may express approval through the appropriations process—and historical practice in the war powers area, as well as the bulk of the case law and a substantial body of scholarly opinion, support the conclusion that Congress can authorize hostilities through its use of the appropriations power. Although it might be the case that general funding statutes do not necessarily constitute

> congressional approval for conducting hostilities, this objection loses its force when the appropriations measure is directly and conspicuously focused on specific military action."[70]

Note that in all of the cases in which ratification by appropriation was approved, the agency had at least an arguable legal basis for its action. *See Airis,* 391 F.2d at 481 n.20; B-232482, June 4, 1990. The doctrine has not been used to excuse violations of law. Also, when an agency action is constitutionally suspect, the courts will require that congressional action be particularly explicit. *Greene v. McElroy,* 360 U.S. at 506–07; *Martin Industries,* 581 F. Supp. at 1033–37; *Muller Optical Co.,* 574 F. Supp. at 954.

The Comptroller General condensed the foregoing principles into this test for ratification by appropriation:

> "To conclude that Congress through the appropriations process has ratified agency action, three factors generally must be present. First, the agency takes the action pursuant to at least arguable authority; second, the Congress has specific knowledge of the facts; and third, the appropriation of funds clearly bestows the claimed authority."

B-285725, Sept. 29, 2000. In this case GAO rejected the District of Columbia government's assertion that Congress had ratified certain funding practices that otherwise violated the Antideficiency Act, 31 U.S.C. § 1341. Specifically, GAO concluded that information contained in the District's budget justifications did not constitute notice to Congress because it (1) lacked clarity and precision, (2) did not create any awareness that could be imputed to Congress as a whole, and (3) was not reflected in any legislative language that could reasonably be viewed as authorizing the practices in question.

### h. Repeal by Implication

We have on several occasions referred to the rule against repeal by implication. The leading case in the appropriations context is *Tennessee Valley Authority v. Hill,* 437 U.S. 153 (1978) (hereafter *TVA v. Hill*). In that case, Congress had authorized construction of the Tellico Dam and Reservoir Project on the Little Tennessee River, and had appropriated initial funds for that purpose. Subsequently, Congress passed the Endangered Species Act of 1973, 16 U.S.C. §§ 1531 *et seq*. Under the

[70] *Authorization for Continuing Hostilities in Kosovo, available at* www.justice.gov/sites/default/files/olc/opinions/2000/12/31/op-olc-v024-p0327_0.pdf, Dec. 19, 2000 (last visited Feb. 29, 2016).

provisions of that Act, the Secretary of the Interior declared the "snail darter," a 3-inch fish, to be an endangered species. It was eventually determined that the Little Tennessee River was the snail darter's critical habitat and that completion of the dam would result in extinction of the species. Consequently, environmental groups and others brought an action to halt further construction of the Tellico Project. In its decision, the Supreme Court held in favor of the plaintiffs, notwithstanding the fact that construction was well under way and that, even after the Secretary of the Interior's actions regarding the snail darter, Congress had continued to make yearly appropriations for the completion of the dam project.

The appropriation involved was a lump-sum appropriation that included funds for the Tellico Dam but made no specific reference to it. However, passages in the reports of the appropriations committees indicated that those committees intended the funds to be available notwithstanding the Endangered Species Act. The Court held that this was not enough. The doctrine against repeal by implication, the Court said, applies with even greater force when the claimed repeal rests solely on an appropriation act:

> "When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden."

*Id.* at 190. Noting that "[e]xpressions of committees dealing with requests for appropriations cannot be equated with statutes enacted by Congress" (*id.* at 191), the Court held that the unspecified inclusion of the Tellico Dam funds in a lump-sum appropriation was not sufficient to constitute a repeal by implication of the Endangered Species Act insofar as it related to that project.[71] In other words, the doctrine of ratification by appropriation we discussed in the preceding section does not apply, at least when the appropriation is an otherwise unspecified lump sum, where the effect would be to change an existing statutory requirement.

Some subsequent cases applying the concept of *TVA v. Hill* (although not all citing that case) include *Miccosukee Tribe of Indians of Florida v. U.S. Army Corps of Engineers*, 619 F.3d 1289 (11th Cir. 2010); *Donovan v. Carolina Stalite Co.,* 734 F.2d 1547 (D.C. Cir. 1984); 64 Comp. Gen. 282

[71] Less than 4 months after the Court's decision, Congress enacted legislation exempting the Tellico project from the Endangered Species Act. Endangered Species Act Amendments of 1978, Pub. L. No. 95-632, § 5, 92 Stat. 3751, 3761 (Nov. 10, 1978).

(1985); B-208593.6, Dec. 22, 1988; B-213771, July 10, 1984; B-204874, July 28, 1982; and B-193307, Feb. 6, 1979. For example, the otherwise unrestricted appropriation of coal trespass receipts to the Bureau of Land Management did not implicitly amend or repeal the provisions of the Federal Land Policy and Management Act prescribing the use of such funds. B-204874, July 28, 1982.

Thus, if Congress wants to use an appropriation act as the vehicle for suspending, modifying, or repealing a provision of existing law, it must do so advisedly, speaking directly and explicitly to the issue. *The Last Best Beef, LLC v. Dudas,* 506 F.3d 333 (4th Cir. 2007); *Miccosukee Tribe of Indians of Florida v. U.S*., 650 F. Supp. 2d 1235 (S.D. Fla., 2009).

The Supreme Court conveyed this message succinctly:

> "[A]lthough repeals by implication are especially disfavored in the appropriations context, Congress nonetheless may amend substantive law in an appropriations statute, as long as it does so clearly."

*Robertson v. Seattle Audubon Society,* 503 U.S. 429, 440 (1992) (citations omitted). In this case, the Court found an implied repeal by appropriation act to be clear and explicit.

Determining whether an appropriation implicitly repeals another statute requires an analysis of the particular statutory language involved. For example, in one case the court held that an annual appropriation restriction enacted for many years stating that "[n]one of the funds appropriated herein shall be available to investigate or act upon applications for relief from Federal firearms disabilities under 18 U.S.C. § 925(c)" clearly superseded the provision in title 18 of the United States Code. This case cited many other decisions that reached the same conclusion with respect to this particular appropriation language. *Pontarelli v. United States Department of the Treasury,* 285 F.3d 216 (3rd Cir. 2002). Another case finding a clear implied repeal by appropriation is *Bald Eagle Ridge Protection Ass'n, Inc. v. Mallory,* 119 F. Supp. 2d 473 (M.D. Pa. 2000), *aff'd,* 275 F.3d 33 (3rd Cir. 2001).

Examples of cases that reconciled the appropriation and other statutory provisions, and thus found no implied repeal include: *Strawser v. Atkins,* 290 F.3d 720 (4th Cir.), *cert. denied,* 537 U.S. 1045 (2002); *Auburn Housing Authority v. Martinez,* 277 F.3d 138 (2nd Cir. 2002); *Firebaugh Canal Co. v. United States,* 203 F.3d 568 (9th Cir. 2000); *Ramey v. Stevedoring Services of America,* 134 F.3d 954 (9th Cir. 1998); *Environmental Defense Center v. Babbitt,* 73 F.3d 867 (9th Cir. 1995).

Still other cases hold that appropriation restrictions alleged to be permanent in superseding other laws were effective only for a fiscal year. *E.g., Auburn Housing Authority,* 277 F.3d 138; *Building & Construction Trades Department, AFL-CIO v. Martin,* 961 F.2d 269, 273 (D.C. Cir.), *cert. denied,* 506 U.S. 915 (1992). In a related context, the court in *Williams v. United States,* 240 F.3d 1019 (Fed. Cir. 2001), *cert. denied,* 535 U.S. 911 (2002), disagreed with a series of Comptroller General decisions and held that appropriation language enacted in 1982 that required specific congressional authorization for pay raises for judges was not permanent legislation but expired at the end of fiscal year 1982.

In 2004, the Seventh Circuit interpreted appropriation restrictions to avoid repeal by implication. *City of Chicago v. Department of the Treasury,* 384 F.3d 429 (7th Cir. 2004). The City of Chicago had sued the former Bureau of Alcohol, Tobacco, and Firearms under the Freedom of Information Act (FOIA) to obtain access to certain information from the agency's firearms databases. The Court of Appeals for the Seventh Circuit held that the information was not exempt from disclosure under FOIA, and the agency appealed to the Supreme Court. While the appeal was pending, Congress enacted appropriations language for fiscal years 2003 and 2004 providing that no funds shall be available or used to take any action under FOIA or otherwise that would publicly disclose the information. On remand from the Supreme Court, the Seventh Circuit decided that the appropriations language had essentially no impact on the case. Citing a number of cases on the rule disfavoring implied repeals (particularly by appropriations act), the court held that the appropriations rider did not repeal FOIA or otherwise affect the agency's legal obligation to release the information in question. The court concluded that "FOIA deals only peripherally with the allocation of funds—its main focus is to ensure agency information is made available to the public." *City of Chicago,* 384 F.3d at 435. After the 2004 decision, the agency filed a request for rehearing. Before the rehearing, Congress passed the Consolidated Appropriations Act of 2005 specifying that no funds be used to provide the data sought by the City, and further provided that the data be "immune from judicial process." The court determined that this statutory language showed that Congress's "obvious intention . . . was to cut off all access to the databases for any reason." *City of Chicago v. Department of the Treasury,* 423 F.3d 777, 780 (7th Cir. 2005).

### i. Lack of Authorization

As we have previously noted, there is no general statutory requirement that appropriations be preceded by specific authorizations, although they may be required in some instances. Where authorizations are not required by law, Congress may, subject to a possible point of order, appropriate funds for a program or object that has not been previously

authorized or which exceeds the scope of a prior authorization. If so, the enacted appropriation, in effect, carries its own authorization and is available to the agency for obligation and expenditure. *E.g.,* 67 Comp. Gen. 401 (1988); B-219727, July 30, 1985; B-173832, Aug. 1, 1975.

It has also been held that, as a general proposition, the appropriation of funds for a program whose funding authorization has expired, or is due to expire during the period of availability of the appropriation, provides sufficient legal basis to continue the program during that period of availability, absent indication of contrary congressional intent. 65 Comp. Gen. 524 (1986); 65 Comp. Gen. 318, 320–21 (1986); 55 Comp. Gen. 289 (1975); B-131935, Mar. 17, 1986; B-137063, Mar. 21, 1966. For example, the Social Security Administration (SSA) should continue mandatory and discretionary grant programs, even when faced with expired authorizations of appropriations, where the relevant enabling legislation had not expired and the agency had an appropriation available to cover the costs of the programs. B-323433, Aug. 14, 2012. Following the enactment of legislation establishing the Work Incentives Planning and Assistance Program and the Protection and Advocacy for Beneficiaries of Social Security Program, Congress passed authorizations of appropriations to carry out the functions. SSA asserted that it could not continue the programs upon the expiration of the authorization of appropriations. Reminding SSA that there is no general requirement that an authorization of appropriations precede an appropriation, GAO held that enabling legislation provided the requisite authority to obligate agency appropriations in those situations where authorizations expire. The result in these cases follows in part from the fact that the total absence of appropriations authorization legislation would not have precluded the making of valid appropriations for the programs. *E.g.,* B-202992, May 15, 1981. In addition, as noted, the result is premised on the conclusion, derived either from legislative history or at least the absence of legislative history to the contrary, that Congress did not intend for the programs to terminate.[72]

[72] Congressional practice also firmly supports this conclusion since Congress appropriates huge sums each year to fund programs with expired authorizations. According to the Congressional Budget Office (CBO), appropriations for which specific authorizations had expired have ranged between about $90 billion and about $120 billion in recent fiscal years. *Unauthorized Appropriations and Senate Resolution 173: Hearing Before the Senate Committee on Rules and Administration,* 108th Cong. 3 (July 9, 2003) (statement by CBO Director Douglas Holtz-Eakin).

There are limits on how far this principle can be taken, depending on the particular circumstances. For example, a 1988 continuing resolution provided funds for the Solar Bank, to remain available until September 30, 1989. Legislation enacted on the same day provided for the Bank to terminate on March 15, 1988. Based in part on legislative history indicating the intent to terminate the Bank on the specified sunset date, GAO distinguished prior decisions in which appropriations were found to authorize program continuation and concluded that the appropriation did not authorize continuation of the Solar Bank beyond March 15, 1988. B-207186, Feb. 10, 1989.

In another example, section 8 of the Civil Rights Commission's authorizing act stated that "the provisions of this Act shall terminate on September 30, 1991." While Congress was actively working on reauthorization legislation for the Commission toward the end of fiscal year 1991, this legislation was not enacted until after September 30, 1991. Nevertheless, Congress had enacted a continuing resolution for the early part of fiscal year 1992 that specifically included funding for the Commission. The Comptroller General first observed that the line of cases discussed above permitting programs to continue after expiration of their authorization did not apply. Unlike the mere authorization lapse in those cases, the statute here provided that the Commission would "terminate" on September 30 of that fiscal year. The Comptroller General also distinguished the Solar Bank case, discussed above, since the provision for termination of the Commission was enacted long before the continuing resolution that provided for the Commission's funding after September 30. Ultimately, the funding provision for the Commission was irreconcilable with the section 8 termination provision and effectively suspended the operation of section 8. 71 Comp. Gen. 378 (1992). The decision noted the clear intent of Congress that the Commission continue to operate without interruption after September 30, 1991.

A device Congress has used on occasion to avoid this type of problem is an "automatic extension" provision under which funding authorization is automatically extended for a specified time period if Congress has not enacted new authorizing legislation before it expires. An example is discussed in B-214456, May 14, 1984.

Questions concerning the effect of appropriations on expired or about-to-expire authorizations have tended to arise more frequently in the context of continuing resolutions. The topic is discussed further, including several of the cases cited above, in Chapter 8.

Where specific authorization is statutorily required, the case may become more difficult. In *Libby Rod & Gun Club v. Poteat,* 594 F.2d 742 (9th Cir. 1979), the court held that a lump-sum appropriation available for dam construction was not, by itself, sufficient to authorize a construction project for which specific authorization had not been obtained as required by 33 U.S.C. § 401. The court suggested that *TVA v. Hill* and similar cases do not "mandate the conclusion that courts can never construe appropriations as congressional authorization," although it was not necessary to further address that issue in view of the specific requirement in that case. *Poteat,* 594 F.2d at 745–46. The result would presumably have been different if Congress had made a specific appropriation "notwithstanding the provisions of 33 U.S.C. § 401." It should be apparent that the doctrines of repeal by implication and ratification by appropriation are relevant in analyzing issues of this type.

## D. Constitutional Limitations upon the Power of the Purse

The Supreme Court recognized the breadth of the power of the purse, but also its limitations, in *South Dakota v. Dole*, 483 U.S. 203 (1987) (noting that"[Congress's] spending power is of course not unlimited."). In *Dole*, the Supreme Court listed what it referred to as four "general restrictions" on the spending power: (1) the exercise of the spending power must be in pursuit of the general welfare; (2) conditions imposed on the use of federal funds must be reasonably related to the articulated goals; (3) the intent of Congress to impose conditions must be authoritative and unambiguous; and (4) the action in question must not be prohibited by an independent constitutional bar. *Id*. at 207–08. *See also*, *e.g., Nevada v. Skinner*, 884 F.2d 445, 447–48 (9th Cir. 1989).

With respect to the fourth restriction, the courts have struck down several funding conditions as unconstitutional. For example:

- An appropriation act provision that prohibited the payment of salary to certain named individuals was an unconstitutional bill of attainder. *United States v. Lovett*, 328 U.S. 303 (1946).
- A court invalidated a provision in the 1989 District of Columbia appropriation act prohibiting the use of funds unless the District adopted legislation spelled out in the rider. The provision was struck down on First Amendment grounds. *Clarke v. United States*, 705 F. Supp. 605 (D.D.C. 1988), *aff'd*, 886 F.2d 404 (D.C. Cir. 1989), *vacated en banc as moot*, 915 F.2d 699 (D.C. Cir. 1990).
- The Supreme Court struck down a provision that prohibited grantees from representing clients in efforts to amend or otherwise challenge existing welfare law. *Legal Services Corp. v. Velazquez*, 531 U.S.

533 (2001). The provision interfered with the First Amendment rights of clients represented by LSC-funded attorneys.

- A court declared unconstitutional an appropriation provision forbidding the use of federal mass transit grant funds for any activity that promoted the legalization or medical use of marijuana, for example, posting an advertisement on a bus. *American Civil Liberties Union (ACLU) v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004). Relying on *Legal Services Corp*., the court held that the provision constituted "viewpoint discrimination" in violation of the First Amendment. ACLU, 319 F. Supp. 2d at 83–87.
- The Supreme Court overturned a funding condition in the United States Leadership Against HIV/AIDS, Tuberculosis, and Malaria Act of 2003. *AID v. Alliance for Open Society International, Inc*., ___ U.S. ___, 133 S. Ct. 2321 (2013). The condition required, among other things, that funding recipients agree that they oppose prostitution and sex trafficking in their award documents. This requirement violated the First Amendment. The Court said that the requirement "goes beyond preventing recipients from using funds in a way that would undermine the federal program. It requires them to pledge allegiance to the Government's policy of eradicating prostitution." 133 S. Ct. at 2332.

The *Dole* Court added that funding conditions would also exceed the Spending Clause if "the financial inducement offered by Congress might be so coercive as to pass the point at which 'pressure turns into compulsion.'" 483 U.S. at 211. Courts have been reluctant to find funding conditions as unduly coercive, though, with an important recent exception by the Supreme Court, discussed below. Examples of courts' reluctance include:

- In *Dole* itself, the Supreme Court found that a law conditioning states' receipt of federal highway funds on the adoption of a minimum drinking age of 21 was a valid use of Congress's spending power. 483 U.S. 203.
- The Supreme Court upheld the so-called Solomon Amendment, which denied federal grants to institutions of higher education that prohibit or prevent military recruitment on campus. *Rumsfeld v. Forum for Academic and Institutional Rights, Inc*., 547 U.S. 47, (2006). An association of law schools and faculty members challenged the constitutionality of the Solomon Amendment, arguing that it violated their First Amendment rights to oppose federal policies that prohibited homosexuals from serving openly in the military. The Supreme Court rejected these arguments, nothing that under the

Spending Clause, "Congress is free to attach reasonable and unambiguous conditions to federal financial assistance that educational institutions are not obliged to accept." 547 U.S. at 59.

- A court upheld a statutory provision known as the "Civil Rights Remedies Equalization Act," 42 U.S.C. § 2000d 7, which clearly conditioned a state's acceptance of federal funds on its waiver of its Eleventh Amendment immunity to suits under various federal antidiscrimination laws. *Barbour v. Washington Metropolitan Transit Authority*, 374 F.3d 1161 (D.C. Cir. 2004), *cert. denied*, 544 U.S. 904 (2005).
- The Supreme Court upheld a condition in the Children's Internet Protection Act (CIPA) as a legitimate exercise of congressional spending power. *United States v. American Library Ass'n, Inc.*, 539 U.S. 194 (2003). CIPA barred public libraries from receiving federal assistance to provide computer access to the Internet unless they installed software to block obscenity and child pornography and prevent minors from obtaining access to material harmful to them. Pub. L. No. 106-554, § 1711. The Court rejected the claim that CIPA constituted an impermissible coercion, explaining that CIPA did not penalize libraries that chose not to install the software. Rather, it simply precluded the use of taxpayer funds to subsidize those libraries that chose not to install such software. *Id*. at 2307–08.
- Several courts have rejected challenges to section 3 of the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc-1, which limits restrictions on the exercise of religion by persons institutionalized in a program or activity that receives federal financial assistance. *Cutter v. Wilkinson*, 544 U.S. 709 (2005); *Charles v. Verhagen*, 348 F.3d 601 (7th Cir. 2003); *Williams v. Bitner*, 285 F. Supp. 2d 593 (M.D. Pa. 2003), *aff'd in part*, remanded in part 455 F.3d 186 (3rd Cir. 2006).

The Supreme Court recently found that one federal funding condition went too far. The Court considered the constitutionality of a number of provisions in the Patient Protection and Affordable Care Act (PPACA). *National Federation of Independent Business v. Sebelius*, 567 U.S. ___, 132 S. Ct. 2566 (2012). One PPACA provision withheld all Medicaid funding from states that declined to participate in a Medicaid extension program. The Supreme Court held that this provision was not a valid exercise of Congress's spending power, as it coerced states to either accept the Medicaid expansion or risk losing all Medicaid funding. The Court explained that this would have an excessive impact on a state's budget. Accordingly, the Court severed this unconstitutional provision from the rest of the act.

## E. General Provisions: When Construed as Permanent Legislation

Appropriation acts, in addition to making appropriations, frequently contain a variety of provisions either restricting the availability of the appropriations or making them available for some particular use. Such provisions come in two forms: (a) "provisos" attached directly to the appropriating language and (b) general provisions. A general provision may apply solely to the act in which it is contained ("No part of any appropriation contained in this Act shall be used . . ."), or it may have general applicability ("No part of any appropriation contained in this or any other Act shall be used . . .").[73] General provisions may be phrased in the form of restrictions or positive authority.

Provisions of this type are no less effective merely because they are contained in appropriation acts. Congress may repeal, amend, or suspend a statute by means of an appropriation bill, so long as its intention to do so is clear. *Robertson v. Seattle Audubon Society*, 503 U.S. 429, 440 (1992); *McHugh v. Rubin*, 220 F.3d 53, 57 (2d Cir. 2000); *see also United States v. Dickerson*, 310 U.S. 554 (1940); *Cella v. United States*, 208 F.2d 783, 790 (7th Cir. 1953), *cert. denied*, 347 U.S. 1016 (1954); *NLRB v. Thompson Products, Inc.*, 141 F.2d 794, 797 (9th Cir. 1944); B-300009, July 1, 2003; 41 Op. Att'y Gen. 274, 276 (1956).

Congress likewise can enact general or permanent legislation in appropriation acts, but again its intent to do so must be clear:

> "While appropriations are 'Acts of Congress' which can substantively change existing law, there is a very strong presumption that they do not . . . and that when they do, the change is only intended for one fiscal year."

*Building & Construction Trades Department, AFL-CIO v. Martin*, 961 F.2d 269, 273 (D.C. Cir.), *cert. denied*, 506 U.S. 915 (1992). As another court put it:

> "Congress may create permanent, substantive law through an appropriations bill only if it is clear about its intentions. Put another way, Congress cannot rebut the presumption against permanence by sounding an uncertain trumpet."

---

[73] In recent decades, general provisions of governmentwide applicability—the "this or any other act" provisions—have often been consolidated in the annual Treasury and General Government appropriation acts. *E.g.,* Pub. L. No. 108-7, div. J, title I, § 104, 117 Stat. 11, 437 (Feb. 20, 2003) (fiscal year 2003). In recent years, these provisions appear in the Financial Services and General Government Appropriations Act. *See*, *e.g.*, Financial Services and General Government Appropriations Act, 2015, Pub. L. No. 113-235, div. E, title VII, 128 Stat. 2130, 2332, 2379 (Dec. 16, 2014).

*Atlantic Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003).

As discussed earlier in this chapter, rules of both the Senate and the House of Representatives prohibit the inclusion of general legislation in appropriation acts. Senate Rule XVI; House Rule XXI. However, this merely subjects the provision to a point of order and does not affect the validity of the legislation if the point of order is not raised, or is raised and not sustained. Thus, once a given provision has been enacted into law, the question of whether it is "general legislation" or merely a restriction on the use of an appropriation, that is, whether it might have been subject to a point of order, is academic.

This section deals with the question of when provisos or general provisions appearing in appropriation acts can be construed as permanent legislation.

Since an appropriation act is made for a particular fiscal year, the starting presumption is that everything contained in the act is effective only for the fiscal year covered. Thus, the rule is: A provision contained in an annual appropriation act is not to be construed to be permanent legislation unless the language used therein or the nature of the provision makes it clear that Congress intended it to be permanent. The presumption can be overcome if the provision uses language indicating futurity or if the provision is of a general character bearing no relation to the object of the appropriation. B-319414, June 9, 2010; 65 Comp. Gen. 588 (1986); 62 Comp. Gen. 54 (1982); 36 Comp. Gen. 434 (1956); 32 Comp. Gen. 11 (1952); 24 Comp. Gen. 436 (1944); 10 Comp. Gen. 120 (1930); 5 Comp. Gen. 810 (1926); 7 Comp. Dec. 838 (1901).

## 1. Words of Futurity

In analyzing a particular provision, the starting point in ascertaining Congress's intent is, as it must be, the language of the statute. The question to ask is whether the provision uses "words of futurity." The most common word of futurity is "hereafter" and provisions using this term have often been construed as permanent. For specific examples, see *Cella v. United States*, 208 F.2d at 790; 70 Comp. Gen. 351 (1991); 26 Comp. Gen. 354, 357 (1946); 2 Comp. Gen. 535 (1923); 11 Comp. Dec. 800 (1905); B-108245, Mar. 19, 1952; B-100983, Feb. 8, 1951; B-76782, June 10, 1948. However, use of the word "hereafter" may not guarantee that an appropriation act provision will be found to constitute permanent law. Thus, in *Auburn Housing Authority v. Martinez*, 277 F.3d 138 (2nd Cir. 2002), the court declined to give permanent effect to a provision that included the word "hereafter". The court acknowledged that

“hereafter” generally denoted futurity, but held that this was not sufficient to establish permanence in the circumstances of that case. To read “hereafter” as giving permanence to one provision would have resulted in repealing another provision enacted in the same act.[74] The court concluded that this result was not what Congress had intended.

As *Auburn Housing Authority* indicates, mere use of the word “hereafter” may not be adequate as an indication of future effect to establish permanence. Other facts such as the precise location of the word “hereafter” and the sense in which it is used are also important. Moreover, the use of the word “hereafter” may not be sufficient, for example, if it appears only in an exception clause and not in the operative portion of the provision, B-228838, Sept. 16, 1987, or if it is used in a way that does not necessarily connote futurity beyond the end of the fiscal year. *Williams v. United States*, 240 F.3d 1019, 1063 (Fed. Cir. 2001).

Words of futurity other than “hereafter” have also been deemed sufficient. Thus, there is no significant difference in meaning between “hereafter” and “after the date of approval of this act.” 65 Comp. Gen. at 589; 36 Comp. Gen. at 436; B-209583, Jan. 18, 1983. Similarly, an appropriations provision requiring an agency action “not later than one year” after enactment of the appropriations act, which would occur after the end of the fiscal year, is permanent because that prospective language indicates an intention that the provision survive past the end of the fiscal year. B-319414, June 9, 2010. Using a specific date rather than a general reference to the date of enactment produces the same result. B-287488, June 19, 2001; B-57539, May 3, 1946. “Henceforth” may also do the job. B-209583. So may specific references to future fiscal years. B-208354, Aug. 10, 1982. On the other hand, the word “hereinafter” was not considered synonymous with hereafter by the First Circuit Court of Appeals and was not deemed to establish a permanent provision. *Atlantic Fish Spotters Ass’n,* 321 F.3d 220. Rather, the court held that hereinafter is universally understood to refer only to what follows in the same writing (i.e., statute). Id. at 225–26.

[74] The appropriation provision in *Auburn Housing Authority* was aimed at countering another provision in the very same act. Thus, the court reasoned that the presumption against repeal by implication was particularly strong in this case. *Id.* at 146. The court also contrasted the hereafter provision with another provision in the same act that was more explicit as to permanence. The latter provision read in part: “[T]his subsection shall apply to fiscal year 1999 and each fiscal year thereafter.” *Id.* at 146–47.

One decision concluded that the words “at any time” were words of futurity in a provision which authorized reduced transportation rates to military personnel who were “given furloughs at any time.” 24 Comp. Gen. 436, Dec. 7, 1944. In that decision, however, the conclusion of permanence was further supported by the fact that Congress appropriated funds to carry out the provision in the following year as well and did not repeat the provision but merely referred to it.

The words “or any other act” in a provision addressing funds appropriated in or made available by “this or any other act” are not words of futurity. They merely refer to any other appropriation act for the same fiscal year. *Williams v. United States*, 240 F.3d at 1063; 65 Comp. Gen. 588; B-230110, Apr. 11, 1988; B-228838, Sept. 16, 1987; B-145492, Sept. 21, 1976.[75] *See also* A-88073, Aug. 19, 1937 (“this or any other appropriation”). Similarly, the words “notwithstanding any other provision of law” are not words of futurity and, standing alone, offer no indication as to the duration of the provision. B-271412, June 13, 1996; B-208705, Sept. 14, 1982.

The words “this or any other act” may be used in conjunction with other language that makes the result, one way or the other, indisputable. The provision is clearly not permanent if the phrase “during the current fiscal year” is added. *Norcross v. United States*, 142 Ct. Cl. 763 (1958). Addition of the phrase “with respect to any fiscal year” would indicate, all other potential considerations aside, that Congress intended the provision to be permanent. B-230110, Apr. 11, 1988. For example, in the 2006 Department of Justice Appropriations Act, as part of the language of ATF’s Salaries and Expenses appropriation, Congress included a proviso stating that “no funds appropriated under this or any other Act with respect to any fiscal year may be used to disclose part or all of the contents of the Firearms Trace System database” to anyone other than a law enforcement agency or a prosecutor in connection with a criminal investigation or prosecution. GAO determined that the proviso constituted permanent legislation because the forward-looking effect of the phrase “this or any other Act” coupled with the phrase “with respect to any fiscal year” indicates Congress’s intention that the provision be permanent. B-309704, Aug. 28, 2007; *see also* B-316510, July 15, 2008

[75] One early case found the words “or any other act” sufficient words of futurity. 26 Comp. Dec. 1066 (1920). A later decision, B-37032, Oct. 5, 1943, regarded their effect as inconclusive. Both of these cases must be regarded as implicitly modified by the consistent position expressed in the more recent decisions.

(a similar proviso in ATF's 2008 appropriation, using the phrase "beginning in fiscal year 2008 and thereafter," is also permanent law).

If words of futurity indicate permanence, it follows that a proviso or general provision that does not contain words of futurity will generally not be construed as permanent. 65 Comp. Gen. 588; 32 Comp. Gen. 11; 20 Comp. Gen. 322 (1940); 10 Comp. Gen. 120; 5 Comp. Gen. 810; 3 Comp. Gen. 319 (1923); B-209583, Jan. 18, 1983; B-208705, Sept. 14, 1982; B-66513, May 26, 1947; A-18614, May 25, 1927. The courts have applied the same analysis. *See United States v. Vulte*, 233 U.S. 509, 514 (1914); *Minis v. United States*, 40 U.S. (15 Pet.) 423 (1841); *Bristol-Myers Squibb Company v. Royce Laboratories, Inc.*, 69 F.3d 1130, 1136 (Fed. Cir. 1995); *United States v. International Business Machines Corp.*, 892 F.2d 1006, 1009 (Fed. Cir. 1989); *National Labor Relations Board v. Thompson Products, Inc.*, 141 F.2d 794 (9th Cir. 1944); *City of Hialeah v. United States Housing Authority*, 340 F. Supp. 885 (S.D. Fla. 1971).

In particular, the absence of the word "hereafter" is viewed as telling evidence that Congress did not intend a provision to be permanent. E.g., *Building & Construction Trades Department*, 961 F.2d at 273; *International Business Machines Corp.*, 892 F.2d at 1009; Department of Justice, Office of Legal Counsel, *Memorandum for James S. Gilliland, General Counsel, Department of Agriculture, Severability and Duration of Appropriations Rider Concerning Frozen Poultry Regulations*, June 4, 1996. For example, the court in *Building & Construction Trades Department* concluded that the absence of the word hereafter in an appropriation provision was more significant than the inclusion of other language that might have indicated permanence.

## 2. Other Indicia of Permanence

As the preceding paragraphs indicate, the language of the statute is the crucial determinant of whether a provision is permanent. However, other factors may also be taken into consideration. Thus, the repeated inclusion of a provision in annual appropriation acts indicates that it is not considered or intended by Congress to be permanent. 32 Comp. Gen. 11; 10 Comp. Gen. 120; B-270723, Apr. 15, 1996; A-89279, Oct. 26, 1937; 41 Op. Att'y Gen. at 279–80. However, where adequate words of futurity exist, the repetition of a provision in the following year's appropriation act has been viewed simply as an "excess of caution." 36 Comp. Gen. at 436. This factor is of limited usefulness, since the failure to repeat in subsequent appropriation acts a provision that does not contain words of futurity can also be viewed as an indication that Congress did not consider it to be permanent and simply did not want it to continue. See 18 Comp. Gen. 37 (1938); A-88073, Aug. 19, 1937. Thus,

if the provision does not contain words of futurity, then repetition or non-repetition lead to the same result—that the provision is not permanent. If the provision does contain words of futurity, then non-repetition indicates permanence but repetition, although it suggests non-permanence, is inconclusive.

The inclusion of a provision in the United States Code is relevant as an indication of permanence but is not controlling. B-319414, June 9, 2010; 36 Comp. Gen. 434; 24 Comp. Gen. 436. Failure to include a provision in the Code would appear to be of no significance. A reference by the codifiers to the failure to reenact a provision suggests non-permanence. 41 Op. Att'y Gen. at 280–81.

Legislative history is also relevant, but has been used for the most part to support a conclusion based on the presence or absence of words of futurity. See *Cella v. United States*, 208 F.2d at 790 n.1; *NLRB v. Thompson Products*, 141 F.2d at 798; 65 Comp. Gen. 588; B-277719, Aug. 20, 1997; B-209583, Jan. 18, 1983; B-208705, Sept. 14, 1982; B- 108245, Mar. 19, 1952; B-57539, May 3, 1946. In one case, a general provision requiring the submission of a report "annually to the Congress" was held not permanent in view of conflicting expressions of congressional intent. B-192973, Oct. 11, 1978. Legislative history by itself has not been used to find futurity where it is missing in the statutory language. See *Building & Construction Trades Department*, 961 F.2d at 274.

The degree of relationship between a given provision and the object of the appropriation act in which it appears or the appropriating language to which it is appended is a factor to be considered. If the provision bears no direct relationship to the appropriation act in which it appears, this is an indication of permanence. For example, a provision prohibiting the retroactive application of an energy tax credit provision in the Internal Revenue Code was found sufficiently unrelated to the rest of the act in which it appeared, a supplemental appropriations act, to support a conclusion of permanence. B-214058, Feb. 1, 1984. *See also* B-319414, June 9, 2010; 62 Comp. Gen. at 56; 32 Comp. Gen. 11; 26 Comp. Gen. at 357; B-37032, Oct. 5, 1943; A-88073, Aug. 19, 1937. The closer the relationship, the less likely it is that the provision will be viewed as permanent. A determination under rules of the Senate that a proviso is germane to the subject matter of the appropriation bill will negate an argument that the proviso is sufficiently unrelated as to suggest permanence. B-208705, Sept. 14, 1982.

The phrasing of a provision as positive authorization rather than a restriction on the use of an appropriation is an indication of permanence, but usually has been considered in conjunction with a finding of adequate words of futurity. B-319414, June 9, 2010; 36 Comp. Gen. 434; 24 Comp. Gen. 436.[76]

Finally, a provision may be construed as permanent if construing it as temporary would render the provision meaningless or produce an absurd result. 65 Comp. Gen. 352 (1986); 62 Comp. Gen. 54; B-200923, Oct. 1, 1982. These decisions dealt with a general provision designed to prohibit cost-of-living pay increases for federal judges "except as may be specifically authorized by Act of Congress hereafter enacted." Pub. L. No. 97-92, § 140, 95 Stat. 1183, 1200 (Dec. 15, 1981). The provision appeared in a fiscal year 1982 continuing resolution, which expired on September 30, 1982. The next applicable pay increase would have been effective October 1, 1982. Thus, if the provision were not construed as permanent, it would have been meaningless "since it would have been enacted to prevent increases during a period when no increases were authorized to be made." 62 Comp. Gen. at 56–57.[77] Similarly, GAO concluded that a provision with no words of futurity was permanent, because it was to become effective on the last day of the fiscal year. 9 Comp. Gen. 248 (1929). An alternative construction would have rendered the provision effective for only 1 day, which was clearly inconsistent with legislative intent. *See also* B-319414, June 9, 2010; B-270723, Apr. 15, 1996; 65 Comp. Gen. at 590; B-214058, Feb. 1, 1984.

In sum, the six additional factors mentioned above are all relevant indicia of whether a given provision should be construed as permanent.

---

[76] An early decision held a proviso to be permanent based solely on the fact that it was not phrased as a restriction on the use of the appropriation to which it was attached. 17 Comp. Dec. 146 (1910). This decision seems inconsistent with the weight of authority and certainly with the Supreme Court's decision in *Minis v. United States*, cited above.

[77] In *Williams v. United States,* 240 F.3d at 1026, the Court of Appeals for the Federal Circuit held that the provision addressed in these decisions was not permanent, referring to the "unmistakable language of Public Law 97-92 . . . terminating the effect of Section 140 in 1982." The court did not address the consequence, if any, of Congress's use of the word hereafter. The court did concede, however, that "even if Section 140 did not expire as of September 30, 1982, the 1989 Act falls well within the specific exception in that statute for an 'Act of Congress hereafter enacted.'" *Id.* at 1027. The 1989 Act the court referred to is the Ethics Reform Act, Pub. L. No. 101-194, 103 Stat. 1716 (Nov. 30, 1989), which entitled federal judges to cost-of-living pay increases whenever federal employees received a cost-of-living increase. The 1989 Act was enacted after the series of GAO decisions was issued that addressed the fiscal year 1982 law.

However, the presence or absence of words of futurity remains the crucial factor, and the additional factors have been used for the most part to support a conclusion based primarily on this presence or absence. Four of the factors—occurrence or nonoccurrence in subsequent appropriation acts, inclusion in United States Code, legislative history, and phrasing as positive authorization—have never been used as the sole basis for finding permanence in a provision without words of futurity. The two remaining factors—relationship to rest of statute and meaningless or absurd result—can be used to find permanence in the absence of words of futurity, but the conclusion is almost invariably supported by at least one of the other factors, such as legislative history.