# EXHIBIT 2

Congressional Research Service
Informing the legislative debate since 1914

# Authorizations and the Appropriations Process

Updated May 16, 2023

**Congressional Research Service**
https://crsreports.congress.gov
R46497

Congressional Research Service
Informing the legislative debate since 1914

SUMMARY

R46497

May 16, 2023

**James V. Saturno**
Specialist on Congress and the Legislative Process

# Authorizations and the Appropriations Process

The U.S. Constitution grants Congress the "power of the purse" by prohibiting expenditures "but in Consequence of Appropriations made by Law." As a result, legislation to provide for government expenditures must adhere to the same requirements and conditions imposed on the lawmaking process as any other measure. There is no constitutional or general statutory prescription, however, that determines how this legislative power is to be exercised. Instead, the manner in which the House and Senate have chosen to exercise this authority is a construct of congressional rules and practices, which have evolved pursuant to the constitutional authority of each chamber to "determine the Rules of its Proceedings."

For discretionary spending, the exercise of this authority has resulted in the formalization of a process in which funding decisions are made in a two-step process, in which separate legislation to establish or continue federal agencies, programs, policies, projects, or activities is presumed to be enacted first, and legislation that provides funding for these purposes is presumed to follow. In order for this two-step process to work, congressional rules therefore distinguish between legislation that addresses questions of policy and that which addresses questions of funding and encourage their separate consideration. In common usage, the terms used to describe these types of measures are *authorizations* and *appropriations*, respectively.

- An *authorization* may generally be described as any statutory provision that defines the authority of the government to act. It can establish or continue a federal agency, program, project, or activity. Further, it may establish policies and restrictions and deal with organizational and administrative matters. It may also, explicitly or implicitly, authorize subsequent congressional action to provide appropriations. By itself, however, an authorization does not provide funding for government activities.
- An *appropriation* may generally be described as a statutory provision that provides budget authority, thus permitting a federal agency to incur obligations and make payments from the Treasury for specified purposes, usually during a specified period of time. Discretionary spending encompasses appropriations not mandated by existing law and therefore may be made available in appropriation acts in such amounts as Congress chooses.

This principle is framed in the standing rules of the House and Senate in terms of generally limiting appropriations to purposes previously authorized by law. Although this principle was generally observed in the early practices of both chambers, it did not become a formal part of House rules until 1837 and Senate rules until 1850. As a construct of chamber rules, this distinction is subject to interpretation by the House and Senate based on various technical issues related to the precedents of the respective chamber; the existence of legislation defining the legal authority for particular federal agencies, programs, policies, projects, or activities; and the relationship of such authority to the applicable appropriation.

In general, an appropriation is said to be authorized when it follows language defining the legal authority for a federal agency, program, policy, project, or activity that will be applicable in the same fiscal year for which the appropriation is to be enacted. In contrast, an appropriation is often described as "unauthorized" when no such authority has been enacted or, if previously enacted, has terminated or expired. Because this distinction is based on chamber rules, rather than a constitutional or general statutory requirement, Congress may choose nevertheless to appropriate funds. In such cases, according to the Government Accountability Office, "the enacted appropriation, in effect, carries its own authorization and is available to the agency for obligation and expenditure."

This report provides an analysis of the relation of authorizations and appropriations, the impact of this distinction on the consideration of appropriations measures, and its significance for understanding how appropriations and other legislation work in conjunction to determine how agencies may spend appropriated funds.

# Contents

Introduction ........................................................................ 1
The Development of Formal Rules ........................................................................ 2
The Evolving Form and Frequency of Authorizations ........................................................................ 3
House Rules ........................................................................ 4
Enforcement ........................................................................ 6
Senate Rules ........................................................................ 6
Enforcement ........................................................................ 8
The Relationship of Appropriations to Authorizations ........................................................................ 8
Appropriations in the Absence of Authorizations ........................................................................ 9
Authorizations in the Absence of Appropriations ........................................................................ 10

## Contacts

Author Information ........................................................................ 11

# Introduction

Article I, Section 9, of the U.S. Constitution, known as the Appropriations Clause, grants Congress the "power of the purse" by prohibiting expenditures "but in Consequence of Appropriations made by Law." As a result, legislation to provide for government expenditures must adhere to the same requirements imposed on the lawmaking process as any other measure. There is no constitutional prescription, however, that determines how this legislative power is to be exercised. Instead, the manner in which the House and Senate have chosen to exercise this authority is a construct of congressional rules and practices, which have evolved pursuant to the constitutional authority in Article I, Section 5, for each chamber to "determine the Rules of its Proceedings."

For spending provided and controlled on an annual basis in appropriations acts—referred to as discretionary spending—the exercise of this authority has resulted in the formalization of a process in which funding decisions are made in a two-step process. First, legislation is enacted that establishes or continues federal agencies, programs, policies, projects, or activities, and legislation that provides funding for these purposes is presumed to follow. In order for this two-step process to work, congressional rules therefore distinguish between legislation that addresses questions of policy and that which addresses questions of funding and encourage their separate consideration.[1] In common usage, the terms used to describe these types of measures are *authorizations* and *appropriations*:

- An *authorization* may generally be described as any statutory provision that defines the authority of the government to act. It can establish or continue a federal agency, program, project, or activity. Further, it may establish policies and restrictions and deal with organizational and administrative matters. It may also, explicitly or implicitly, authorize subsequent congressional action to provide appropriations. By itself, however, an authorization does not provide spending authority.
- An *appropriation* may generally be described as a statutory provision that provides budget authority, thus permitting a federal agency to incur obligations and make payments from the Treasury for specified purposes, usually during a specified period of time.[2]

Authorizations are not limited by congressional rules to a specific duration. They may be permanent or they may have ''sunset'' provisions that require their periodic review. Appropriations, however, are enacted in a characteristically annual cycle. Limiting appropriations to purposes "previously authorized by law" imposes a general requirement for sequential action. It is not understood, however, to entail a requirement that authorizing legislation also be enacted on an annual (or periodic) cycle or in the same year as appropriations action.

The primary purpose of authorizations is to provide an agency with authority and direction that allows it to administer a program or engage in an activity. Measures that provide such authority are sometimes referred to as "organic" or "enabling" authorizations. Although authorizations do not provide spending authority, they may shape agency authority to obligate funds because an agency may perform only those functions for which it has received statutory authority in some

---

[1] House Rule XXI, clause 2, and Senate Rule XVI, paragraph 1.

[2] For more on appropriations, see CRS Report R47106, *The Appropriations Process: A Brief Overview*, by James V. Saturno and Megan S. Lynch,and CRS Report R46417, *Congress's Power Over Appropriations: Constitutional and Statutory Provisions*, by Sean M. Stiff.

form. Authorizing legislation may also include language that provides for an "authorizations of appropriations." While the inclusion of language providing an authorization of appropriations is common, it is not required under House or Senate rules.[3] In addition, most federal agencies operate under a patchwork of authorizing statutes that address various specific requirements and duties rather than a single statute that encompasses all of them.

Understanding the application of the requirement to determine whether an appropriation is for a purpose previously authorized by law can also be complicated because authorizations and appropriations may address a given issue in different ways or with differing degrees of specificity. Furthermore, there is no requirement in either chamber that the structure of either organic authorizations or authorizations of appropriations mirror the account structure in appropriations bills. As a consequence, it may be difficult to compare what is "authorized" with what is appropriated.

The relationship between authorizations and appropriations then is not always straightforward. In some cases, it may be difficult to determine whether the procedural requirement for something to be authorized by law is satisfied. In others, the interaction between authorizations and appropriations can potentially have an impact on the purposes for which an agency may obligate funds.

## The Development of Formal Rules

The principle of separate authorizations and appropriations is framed in the standing rules of the House and Senate by language generally limiting appropriations to purposes authorized by law. Although this principle was largely observed in the early practices of both chambers, it did not become a formal part of House rules until 1837 and Senate rules until 1850.[4]

According to *Hinds' Precedents*,[5] the origin of a formal rule mandating the separate consideration of policy legislation and appropriations can be traced to 1835, when the House discussed the increasing problem of delays in enacting appropriations.[6] A significant part of this delay was attributed to the inclusion in such bills of "debatable matters of another character, new laws which created long debates," and a proposal was made to strip appropriation bills of "everything

---

[3] As expressed by the Government Accountability Office (GAO), "The existence of a statute (organic legislation) imposing substantive functions upon an agency that require funding for their performance is itself sufficient legal authorization for the necessary appropriations, regardless of whether the statute addresses the question of subsequent appropriations." GAO, *Principles of Federal Appropriations Law* (4th ed., 2016), GAO-16-464SP, ch. 2, (hereinafter cited as GAO, *Principles of Federal Appropriations Law*), p. 2-55. The General Accounting Office was established in Title III of the Budget and Accounting Act of 1921, Public Law 13, 67th Cong., 42 Stat. 20. The name was changed in 2004 to the Government Accountability Office, P.L. 108-271, 118 Stat. 811. Under 31 U.S.C. §712(1) GAO investigates on Congress's behalf "all matters related to the receipt, disbursement, and use of public money." Because it is a legislative branch entity, however, neither the executive branch nor the federal judiciary considers GAO's opinions to be controlling, although GAO's investigations and decisions create an extensive body of decisions discussing and applying federal appropriations law.

[4] For more on the development of historical practices, see Louis Fisher, "The Authorization-Appropriation Process in Congress: Formal Rules and Informal Practices," *Catholic University Law Review*, vol. 29 (1979-1980), pp. 51-105; CRS Report 84-106, *Legislation, Appropriations, and Budgets: The Development of Spending Decision-Making in Congress*, by Allen Schick (archived but available by request for congressional clients) (hereinafter cited as Schick, *Development of Spending Decision-Making in Congress*); and Jessica Tollestrup, "Changes in the Purposes and Frequency of Authorizations of Appropriations," in U.S. Congress, Senate Committee on Rules and Administration, *The Evolving Congress*, S.Prt. 113-30, 113th Cong., 2nd sess. (Washington: GPO, 2014), pp. 259-279.

[5] Asher C. Hinds, *Hinds' Precedents of the House of Representatives of the United States*, (Washington: GPO, 1907), vol. 4, ch. XCV, §3578.

[6] *Congressional Globe*, 24th Cong., 1st sess. (December 10, 1835), p. 20.

but were legitimate matters of appropriation, and such as were not … made the subject of a separate bill." Although the proposal was not adopted at the time, at the beginning of the following Congress (25th Congress, 1837-1839), language was added to the standing rules of the House that stated

> No appropriation shall be reported in such general appropriation bill, or be in order as an amendment thereto, for any expenditure not previously authorized by law.

A similar provision was added to the rules of the Senate on December 19, 1850 (31st Congress, 1849-1851).

## The Evolving Form and Frequency of Authorizations

Although these rules established a formal requirement establishing a separation between what are today termed authorizations and appropriations, they did not establish any requirement regarding the form in which legislation establishes programs or activities. Practices concerning the language and specificity of such provisions has varied greatly over time.

During the 19th century, authorizations were generally used for the initial establishment of programs, while control over the details of particular activities and amounts was achieved through language in annual appropriations acts. Authorization laws were typically enacted on a permanent basis and provided broad grants of authority to government departments and agencies. In these laws, the authorization of subsequent congressional action to provide appropriations was implied and did not include language authorizing a specific amount to be appropriated. That is, the general authorization in these laws included both the legal authority for the agency to act and the authority under congressional rules to subsequently appropriate funds to carry out such activities. Temporary authorizations were rare and were generally reserved for programs that were intended to be of a limited duration. It was annually enacted appropriations laws that generally contained the details directing how funds were to be expended.

As the size and scope of federal government activities increased during the 19th and early 20th centuries, congressional practices related to the form of authorizations and appropriations also changed. Authorization laws began to specify in greater detail the authority of agencies to conduct or administer broad classes of federal government programs and activities. At the same time, the form of appropriations also shifted to more general lump sums for purposes that were often identified by reference to an agency's statutory authority. In other words, appropriations legislation increasingly assumed that authorizing statutes would guide agencies regarding the use of funds.

Another significant change in the form of authorization laws began in the 1920s, when the phrase "authorized to be appropriated" came into usage. This practice became common enough that in 1937 alone there were more than 100 measures enacted into law with explicit authorizations of appropriations for definite amounts.[7] At a minimum, such provisions served as a recommendation by the legislative committees regarding the desired level of future appropriations. This practice, however, had broader implications for the role of the legislative committees in budgetary decisionmaking because of how the existing House and Senate rules prohibiting appropriations not authorized by law were interpreted and applied. Such explicit authorization of appropriations were interpreted as a procedural ceiling on the amount considered to be authorized by law, effectively limiting appropriations for specific purposes. As a result, legislative committees potentially could exert greater influence over subsequent funding decisions. In cases in which provisions specifying the amount or duration of future appropriations was considered to be

[7] Schick, *Development of Spending Decision-Making in Congress*, pp. 28-29.

impractical or inappropriate, legislative committees began to use indefinite language authorizing "such sums as are necessary."

Another change in congressional practices concerning authorizations during the 20th century was the advent of periodic reauthorizations, particularly authorizations of appropriations for a limited number of fiscal years. In 1965, George Schultz, director of the Bureau of the Budget, in testimony before the Joint Committee on the Organization of Congress, expressed concern about the impact of periodic reauthorizations on the budget process as a whole, especially their contribution to delays in the appropriations process. He stated that at the end of World War II, an estimated 95% of programs, excluding one-time projects, were authorized on a long-term or indefinite basis, while 20 years later virtually one-third of the budget was dependent upon renewal of authorizing legislation each year.[8] The increased use of periodic reauthorizations by legislative committees in the postwar period occurred for a variety of purposes, including to better influence the actions of agencies, to influence appropriations outcomes, or to encourage closer review and oversight by Congress.[9]

# House Rules

Clause 2(a)(1) of House Rule XXI currently provides

> An appropriation may not be reported in a general appropriation bill, and may not be in order as an amendment thereto, for an expenditure not previously authorized by law, except to continue appropriations for public works and objects that are already in progress.

The rule generally requires that an authorization be enacted prior to House consideration of the relevant general appropriations bill.[10] It is not in order to simply make the availability of an appropriation contingent on the relevant authorization being enacted in the future or to limit the availability of funds to the amount authorized in future legislation as a means of meeting the requirement that an authorization be previously enacted. Thus, delaying the availability of an appropriation pending subsequent enactment of an authorization would not protect that appropriation against a point of order.[11]

The House considers an appropriation for a project or activity to be authorized if the relevant statute provides either broad or specific authority to engage in such projects or activities.[12] That is, it is not necessary that an authorizing statute provide the same level of detail or specificity as an appropriation so long as it might be subsumed under some broader authority. General grants of authority can constitute sufficient authorization to support appropriations depending on whether the general laws applicable to the function or department in question require a further, specific

[8] U.S. Congress, Joint Committee on the Organization of Congress, *Hearings before the Joint Committee on the Organization of Congress, Part 12, August 31 and September 9, 1965*, 89th Cong., 1st Sess. (Washington: GPO, 1965), p. 1779.

[9] Schick, *Development of Spending Decision-Making in Congress*, p. 39; Louis Fisher, "Annual Authorizations: Durable Roadblocks to Biennial Budgeting," *Public Budgeting and Finance* (Spring 1983), p. 34.

[10] Charles W. Johnson, John V. Sullivan, and Thomas J. Wickham Jr., *House Practice: A Guide to the Rules, Precedents and Procedures of the House*, 115th Cong., 1st sess. (Washington: GPO, 2017), (hereinafter cited as *House Practice*), ch. 4, §10. Clause 3 of Rule XVII requires that appropriations bills be considered in the Committee of the Whole, which is where the House usually considers amendments to appropriations bills. For further information, see CRS Report RL32200, *Debate, Motions, and Other Actions in the Committee of the Whole*, by Bill Heniff Jr. and Elizabeth Rybicki.

[11] *House Practice*, ch. 4, §10.

[12] *House Practice*, ch. 4, §12. In addition to statutes, an authorization can also be provided by a treaty that has previously been ratified by all parties. *House Practice*, ch. 4, §12.

authorization.[13] For example, a statute defining the authority of an agency, but also providing that the authorization of appropriations be only for such sums as subsequently authorized by law to carry out those functions, would require such authorizations of appropriations to be enacted in order for the appropriations to be considered authorized.[14]

Similarly, permanent authority in an enabling or organic statute is considered sufficient to meet the requirement that appropriations be authorized by law unless a "periodic authorization scheme" has been enacted or at some point in time "occupied the field."[15] A lapsed authorization would not be sufficient for an appropriation to be considered ''previously authorized'' under the language of the rule. Therefore, if an authorization is of limited duration and not reauthorized prior to its expiration, subsequent appropriations would not be considered "authorized by law."

In instances where the authorization limits the amount of budget authority that may be appropriated, appropriations in excess of that amount are also considered to be unauthorized.[16]

That Congress has previously enacted appropriations for an unauthorized project or activity does not constitute a sufficient authorization for future appropriations under House rules.[17] An executive order, by itself, is not considered a valid authorization of appropriations "absent proof of its derivation from a statute enacted by Congress."[18]

Rule XXI, clause 2(a)(1), contains a provision that excepts appropriations that would continue "public works and objects already in progress" from the prohibition on unauthorized appropriations. Historically, this has been narrowly construed.[19] For example, this exception applies only to something tangible, such as a building or road, and not projects that are either more indefinite with respect to their completion (such as the gauging of streams) or intangible (such as an investigation). Furthermore, the project must actually be "in progress" and not merely in a preliminary stage such as selecting or purchasing a site for the construction of a building.[20] Some examples of things allowed as a continuation have included a topographical survey, the marking of a boundary line, and the recoinage of coins in the Treasury. Examples of projects disallowed include scientific investigations, extensions of foreign markets for goods, and the extension of an existing road.[21]

House rules related to unauthorized appropriations apply specifically to general appropriations bills. In the House, "general appropriations bills" are the annual appropriations acts (or any combination thereof) and any supplemental appropriations acts that cover more than one agency but not continuing appropriations acts.[22]

---

[13] *House Practice*.

[14] *House Practice*.

[15] Rules of the House of Representatives, in *House Manual, One Hundred Seventeenth Congress*, H.Doc. 116-177, 116th Cong., 2nd sess., [compiled by] Jason A. Smith, Parliamentarian (Washington: GPO, 2021) (hereinafter cited as *House Manual*), §1045.

[16] *House Practice*, ch. 4, §14.

[17] *House Practice*, ch. 4, §14.

[18] *House Practice*, ch. 4, §14.

[19] *House Practice*, ch. 4, §§24-26.

[20] *House Practice*, ch. 4, §26.

[21] See *House Manual*, §§1049-1051 for further examples of projects that have and have not been previously determined to fall under this exception.

[22] Under House precedents, a measure providing continuing appropriations for government agencies pending enactment of the regular appropriation bills is not considered a general appropriation bill because it does not provide appropriations on an annual basis and is therefore not subject to the prohibitions of Rule XXI, clause 2. Lewis (continued...)

### Enforcement

When an appropriations bill includes funding for a program or activity that is not considered to be authorized by law, it is often termed an "unauthorized" appropriation. In such cases, the House rule prohibiting such unauthorized appropriations is enforceable through points of order raised by Members from the floor during consideration of the appropriations bill and ruled on by the chair. A point of order against an appropriation as not being authorized may be raised against either an entire paragraph or a portion of a paragraph in a general appropriations bill or amendment thereto. If a point of order is raised against a provision of an appropriations bill as being unauthorized, the burden of proof is on the manager (normally the chair or ranking member of the committee that reported the measure) to demonstrate that the appropriation is authorized. If a point of order is raised against a provision in an amendment, the burden of proof is on the Member who introduced the amendment.[23] If the point of order is sustained against a provision, the provision is stricken from the bill, but consideration of the bill may continue. If the point of order is sustained against an amendment, its further consideration is out of order.[24]

The prohibitions against unauthorized appropriations under House rules may be waived by unanimous consent, pursuant to the bill's consideration under suspension of the rules, or under the terms of a special rule. Such special rules may waive points of order against the entire bill or specific provisions contained in the bill that violate Rule XXI, clause 2(a). It is also possible for points of order against potential floor amendments containing unauthorized appropriations to be similarly waived by a special rule. A waiver of points of order against provisions in the bill does not apply to amendments thereto unless the waiver is also made specifically applicable to amendments.[25]

## Senate Rules

The Senate has historically understood the meaning of *authorized by law* in broader terms than the House and thus prohibited appropriations as unauthorized in a more narrow set of circumstances.

Paragraph 1 of Senate Rule XVI currently provides

> On a point of order made by any Senator, no amendment shall be received to any general appropriation bill the effect of which will be to increase an appropriation already contained in the bill, or to add a new item of appropriation, unless it be made to carry out the provisions of some existing law, or treaty stipulation, or act or resolution previously passed by the Senate during that session; or unless the same be moved by direction of the Committee on Appropriations or a committee of the Senate having legislative jurisdiction of the subject matter, or proposed in pursuance of an estimate submitted in accordance with law.

Because the House has historically originated appropriations measures, the Senate had developed the custom of considering House-passed appropriations bills rather than Senate-originated bills, and the rule was framed in terms of prohibiting amendments proposing additional

---

Deschler, *Deschler's Precedents of the United States House of Representatives* (hereinafter cited as *Deschler's Precedents*) (Washington: GPO, 1977), vol. 8, ch. 26, §1.2.

[23] *House Practice*, ch. 4, §13.

[24] *House Practice*, ch. 4, §67.

[25] *House Practice*, ch. 4, §68. See also CRS Report 98-433, *Special Rules and Waivers of House Rules*, by Megan S. Lynch.

appropriations.[26] There is no general prohibition in the standing rules of the Senate or the precedents against making appropriations for a project or program in the absence of an authorization.[27]

The prohibition on unauthorized appropriations found in Senate rules applies only in certain circumstances.[28] Provisions in the House-passed text of a general appropriations bill are not subject to points of order in the Senate, nor are provisions in a general appropriations bill originated by the Senate Committee on Appropriations or amendments to a House-passed bill reported by the committee.[29] Amendments containing unauthorized appropriations offered by direction of the authorizing committee with relevant jurisdiction are also allowed so long as they have been reported and referred to the Committee on Appropriations at least one day before consideration.[30] Effectively, then, the Senate's prohibition on unauthorized appropriations applies most significantly to amendments offered by individual Senators during floor consideration of a general appropriations bill.[31] While individual Senators may propose amendments increasing the amount appropriated if the project or activity is authorized, in cases where a specific amount has been authorized, the amendment must not cause appropriations to exceed that amount.[32]

In the Senate, an amendment to increase the amount of an appropriation to carry out an existing law would be in order if no specific amount is authorized or if the amount provided is within the amount authorized.[33]

To fulfill the requirements of this rule, an authorization must have been previously enacted or have been passed by the Senate during the current session of Congress prior to consideration of the relevant general appropriations bill. As in the House, provisions or stipulations of treaties constitute a valid authorization for the purposes of the Senate.[34] Amendments may be held in order as carrying out the provisions of an act or resolution (construed to mean bills or joint resolutions) passed by the Senate during that session but not a preceding session.[35]

Senate Rule XVI also allows appropriations "proposed in pursuance of an estimate submitted in accordance with law."[36] Such estimates can be provided in the President's annual budget request, as required by 31 U.S.C. §§1105(a) and 1107, or through deficiency and supplemental appropriations requests made after the President's budget request has been submitted to Congress.[37] To permit an appropriation not otherwise authorized, estimates must be transmitted to Congress officially from the President after having been prepared by the Office of Management

[26] The House has traditionally taken the view that its prerogative under Article I, clause 7, of the U.S. Constitution, known as the Origination Clause, encompasses the sole power to originate all general appropriation bills as well as all revenue bills. *Deschler's Precedents*, vol. 8, ch. 25 §13. Although the Senate does not concur with this interpretation, in practice it has generally deferred to the House's insistence on originating appropriations.

[27] See Floyd M. Riddick and Alan S. Frumin, *Riddick's Senate Procedure: Precedents and Practices*, 101st Cong., 2nd sess., S.Doc. 101-28 (Washington: GPO, 1992) (hereinafter cited as *Riddick's Senate Procedure*), p. 150.

[28] *Riddick's Senate Procedure*, p. 150.

[29] *Riddick's Senate Procedure*, p. 171.

[30] *Riddick's Senate Procedure*, p. 189.

[31] *Riddick's Senate Procedure*, p. 194.

[32] *Riddick's Senate Procedure*, p. 174.

[33] *Riddick's Senate Procedure*, p. 179.

[34] *Riddick's Senate Procedure*, p. 178.

[35] *Riddick's Senate Procedure*, p. 187.

[36] *Riddick's Senate Procedure*, p. 180.

[37] *Riddick's Senate Procedure*, p. 155.

and Budget.[38] An amendment offered by an individual Member or reported by a committee pursuant to this exception does not need to be printed and referred to the Committee on Appropriations a day in advance of being offered as would otherwise be required under Rule XVI, paragraph 3.[39] In these instances, an amendment to the bill is in order if the amount of appropriations comes within the limit estimated.[40] In instances where a specific level of budget authority has previously been authorized, however, a floor amendment that seeks to appropriate funds in excess of that amount, even if it falls within the amount contained in the budget estimate, is not in order.[41]

The application of Senate's rule is also distinct from that in the House because the term *general appropriations bills* means not only the annual appropriations acts (or any combination thereof) and any supplemental appropriations acts that cover more than one agency or purpose but also any continuing appropriations act that covers more than one agency or purpose.[42]

### Enforcement

As is the case in the House, the rules against unauthorized appropriations in the Senate are enforceable during floor consideration by points of order. In instances where an unauthorized appropriation that does not fall under any of the exceptions outlined above is offered as an amendment by a Senator, a point of order can be raised at any point prior to the amendment's disposition.[43] If such a point of order is raised, in practice, the burden of proof is on the Senator to demonstrate that the appropriation is authorized.

## The Relationship of Appropriations to Authorizations

As stated above, the distinction between authorizations and appropriations is a construct of congressional rules, as there is no constitutional requirement that an appropriation must be preceded by a specific act that authorizes the appropriation.[44] Appropriations are enacted, however, "against the backdrop of program legislation and, in many cases, specific authorization acts."[45] Therefore, in addition to having an impact on their consideration, the distinctions between authorizations and appropriations can have an impact in other ways. There are a number of circumstances in which the interaction of these two types of legislation (or the absence of one type) has the potential to have an impact on an agency, particularly the availability of funds with respect to amount, purpose, or period of availability. The Government Accountability Office outlines four general principles that guide their determinations regarding the availability of appropriated funds based on the relationship of appropriations to other statutes:[46]

---

[38] *Riddick's Senate Procedure*, p. 155.

[39] *Riddick's Senate Procedure*, pp. 179-180.

[40] *Riddick's Senate Procedure*, p. 191.

[41] *Riddick's Senate Procedure*, p. 210.

[42] *Riddick's Senate Procedure*, p. 159.

[43] *Riddick's Senate Procedure*, pp. 992-993.

[44] GAO, *Principles of Federal Appropriations Law*, p. 2-55.

[45] GAO, *Principles of Federal Appropriations Law*, p. 2-57.

[46] The principles used to resolve issues relating to appropriations and other statutes are described in GAO, *Principles of Federal Appropriations Law*, pp. 2-57 to 2-60. GAO has the statutory authority to provide Congress with decisions and (continued...)

1. Congress intends to achieve a consistent body of law. Therefore multiple statutes should be construed harmoniously wherever possible. In particular, unless otherwise specified in the appropriation act, appropriations to carry out an authorization must be expended in accordance with the authorization with respect to both the amount and the purpose. Furthermore, while Congress is free to amend or repeal prior legislation, it should be done directly and explicitly, and not by implication, so that statutes will be construed to avoid this result whenever reasonably possible.
2. If it is not possible to reconcile the meaning of two statutes in conflict, the more recent statute, as the latest expression of Congress, governs.
3. Although congressional rules are designed to limit it, Congress can and does "legislate" in appropriation acts. Ultimately, appropriation acts are, like any other statute, passed by both houses of Congress and either signed by the President or enacted over a presidential veto. As such, they have the same legal force and effect as ordinary bills relating to a particular subject.
4. Legislative history is not legislation, so congressional intent must be determined in the language of the appropriation act.

## Appropriations in the Absence of Authorizations

As the Comptroller General of the United States has explained

> Where authorizations are not required by law, Congress may, subject to a possible point of order, appropriate funds for a program or object that has not been previously authorized or which exceeds the scope of a prior authorization, in which event the enacted appropriation, in effect, carries its own authorization and is available to the agency for obligation and expenditure.[47]

Historically, as well as in recent years, Congress has on occasion appropriated money to fund programs with expired authorizations of appropriations. Because the distinction between authorizations and appropriations is a construct of congressional rules, it applies only to the consideration of legislation. If Congress appropriates funds for a program whose funding authorization has expired, that appropriation provides sufficient legal basis to continue the program during that period of availability absent indication of congressional intent to terminate the program.[48]

A few statutes, however, explicitly require that funds to carry out particular activities may not be appropriated unless they have been specifically authorized. For example, the Department of Energy Organization Act[49] included a provision requiring that "Appropriations to carry out the provisions of this Act shall be subject to annual authorization." The Foreign Assistance Act of 1971[50] included language stating that "no money appropriated to the Department of State under any law shall be available for obligation or expenditure with respect to any fiscal year commencing on or after July 1, 1972 … unless the appropriation thereof has been authorized by law enacted on or after February 7, 1972." Such statutory requirements for prior authorization are

legal opinions regarding the availability and use of appropriated funds by federal agencies. GAO, *Principles of Federal Appropriations Law*, ch. 1, p. 1-12.

[47] GAO, *Principles of Federal Appropriations Law*, p. 2-79.

[48] GAO, *Principles of Federal Appropriations Law*, p. 2-80.

[49] P.L. 95-91, 91 Stat. 965 in §660.

[50] P.L. 92-226, 86 Stat. 20 in §407(d).

effectively congressional directives to itself, which Congress is free to follow or alter in subsequent legislation. Thus, if Congress were to appropriate funds to a department in the absence of an explicit authorization, the appropriation would be just as valid, and just as available for obligation, as if the requirement had been satisfied or did not exist.[51]

## Authorizations in the Absence of Appropriations

Although an authorizing statute may authorize the subsequent enactment of appropriations to provide funds for agencies and programs (and may establish a specific ceiling that may be enforced at the time that the legislation providing the appropriation is considered), Congress may choose to fund such program at a lesser amount or not at all.[52] Furthermore, this is the case even when language in a bill authorizes an appropriation of not less than a certain amount for a specified purpose.[53]

The choice not to fund a program or activity may be for any reason. For example, Congress may be interested in limiting or denying funding to a federal agency to prevent it from taking actions that are required by law, such as to promulgate regulations, implement or enforce rules, initiate or operate programs, or take other specified actions. Unless otherwise provided by law, an agency that does not receive appropriations that can be used for a particular authorized program or activity has no discretionary power to use funding provided for other purposes (such as operations and maintenance) in order to carry out the unfunded activity (such as capital expenditures).[54] Therefore, Congress can directly limit or prevent agencies from engaging in activities that are otherwise permitted or required by statute by explicitly denying funds for such purposes.[55]

An authorizing statute that establishes a federal agency often creates statutory duties and obligations for that federal agency, including the responsibility to conduct certain acts, such as enforcement of particular laws that the agency is charged with administering. If an authorization of appropriations expires, or if Congress fails to appropriate sufficient funds without explicitly denying their use for a particular purpose, those statutory obligations still exist even though the agency may lack sufficient funds to satisfy them. The mere failure to appropriate sufficient funds is not enough to consider an agency's statutory duties or obligations to be repealed by implication.[56]

---

[51] GAO, *Principles of Federal Appropriations Law*, p. 2-56.

[52] GAO, *Principles of Federal Appropriations Law*, p. 2-61. This has been held in both the House and Senate. *Deschler's Precedents*, vol. 7, ch. 25, §2.1, states that the House has "the right to refuse to appropriate for any object either in whole or in part, even though that object may be authorized by law." *Riddick's Senate Procedure*, p. 153.

[53] The House has held that such language is not considered "a mandatory piece of legislation that must result in an appropriation" but "simply an authorization." *Deschler's Precednts*, vol. 7, ch. 25, §4.34.

[54] 31 U.S.C. §1532 provides, "An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." See CRS Report R43098, *Transfer and Reprogramming of Appropriations: An Overview of Authorities, Limitations, and Procedures*, by Michelle D. Christensen; and GAO, *Principles of Federal Appropriations Law*, pp. 2-38 to 2-43.

[55] For more, see CRS Report R41634, *Limitations in Appropriations Measures: An Overview of Procedural Issues*, by James V. Saturno.

[56] GAO, *Principles of Federal Appropriations Law*, p. 2-63, citing *United States* v. *Langston*, 118 U.S. 389, 394 (1886).

## Author Information

James V. Saturno
Specialist on Congress and the Legislative Process

## Acknowledgments

This report incorporates information from a prior CRS Report coauthored by Jessica Tollestrup, former Specialist on Congress and the Legislative Process, and Brian Yeh, former Legislative Attorney.

## Disclaimer

This document was prepared by the Congressional Research Service (CRS). CRS serves as nonpartisan shared staff to congressional committees and Members of Congress. It operates solely at the behest of and under the direction of Congress. Information in a CRS Report should not be relied upon for purposes other than public understanding of information that has been provided by CRS to Members of Congress in connection with CRS's institutional role. CRS Reports, as a work of the United States Government, are not subject to copyright protection in the United States. Any CRS Report may be reproduced and distributed in its entirety without permission from CRS. However, as a CRS Report may include copyrighted images or material from a third party, you may need to obtain the permission of the copyright holder if you wish to copy or otherwise use copyrighted material.