# EXHIBIT 4

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 2 of 728

United States Government Accountability Office

GAO

Office of the General Counsel

February 2006

# Principles of Federal Appropriations Law

# Third Edition

# Volume II

As of March 10, 2016, GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 1, GAO-16-463SP (Washington, D.C.: Mar. 2016), and GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, GAO-16-464SP (Washington, D.C.: Mar. 2016), supersede chapters 1, 2, and 3 of GAO, Principles of Federal Appropriations Law, 3rd ed., GAO-04-261SP (Washington, D.C.: Jan. 2004). Chapters 4 through 15 of the third edition of Principles of Federal Appropriations Law, in conjunction with GAO, Principles of Federal Appropriations Law: Annual Update to the Third Edition, GAO-15-303SP (Washington, D.C.: Mar. 2015), remain the most currently available material on the topics discussed therein. Both Principles and the Annual Update to the Third Edition are available at www.gao.gov/legal/red-book/overview.

This volume supersedes the Volume II, Second Edition of the Principles of Federal Appropriations Law, 1992.

The Security of this file is set to prevent a situation where linked references are appended to the PDF. If this change prevents an Acrobat function you need (e.g., to extract pages), use the the password “redbook” to revise the document security and enable the additional functions.

GAO

Accountability ★ Integrity ★ Reliability

GAO-06-382SP

**Abbreviations**

| | |
|---|---|
| APA | Administrative Procedure Act |
| BLM | Bureau of Land Management |
| CDA | Contract Disputes Act of 1978 |
| CCC | Commodity Credit Corporation |
| C.F.R. | Code of Federal Regulations |
| EAJA | Equal Access to Justice Act |
| EEOC | Equal Employment Opportunity Commission |
| FAR | Federal Acquisition Regulation |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| GSA | General Services Administration |
| HUD | Department of Housing and Urban Development |
| IRS | Internal Revenue Service |
| NRC | Nuclear Regulatory Commission |
| OMB | Office of Management and Budget |
| SBA | Small Business Administration |
| TFM | Treasury Financial Manual |
| U.S.C. | United States Code |
| URA | Uniform Relocation Assistance and Real Property Acquisition Policies Act |

This is a work of the U.S. government and is not subject to copyright protection in the United States. It may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

# Foreword

This is Volume II of *Principles of Federal Appropriations Law*, third edition. As we explained in the Foreword to the third edition of Volume I, publication of this volume continues our process of revising and updating the second edition of the "Red Book" and reissuing it in what will ultimately be a 3-volume looseleaf set with cumulative annual updates. This volume and all other volumes of *Principles*, including the annual updates, are available on GAO's Web site (www.gao.gov) under "Legal Products." The annual updates are only available online. The online updated versions contain hyperlinks to the GAO material cited. Check the GAO Web site for other interesting information, for example, materials from our annual Appropriations Law Forum.

Our objective in *Principles* is to present a basic reference work covering those areas of law in which the Comptroller General issues decisions, using text discussion with specific legal authorities to illustrate the principles discussed, their application, and exceptions. As we noted in our first volume, *Principles* should be used as a general guide and starting point, not as a substitute for original legal research. We measure our success in this endeavor by *Principles*' day-to-day utility to its federal and nonfederal audience. In this regard, we appreciate the many comments and suggestions we have received to date, and hope that our publication will continue to serve as a useful reference.

Anthony H. Gamboa
General Counsel

February 2006

[This page is intended to be blank. Please do not read it.]

# Detailed Table of Contents Volume II Chapters 6-11

## Chapter 6 Availability of Appropriations: Amount

**A. Introduction . . . 6-4**
**B. Types of Appropriation Language . . . 6-5**
1. Lump-Sum Appropriations . . . 6-5
   a. Effect of Budget Estimates . . . 6-10
   b. Restrictions in Legislative History . . . 6-12
   c. "Zero Funding" Under a Lump-Sum Appropriation . . . 6-24
2. Line-Item Appropriations and Earmarks . . . 6-26

**C. The Antideficiency Act . . . 6-34**
1. Introduction and Overview . . . 6-34
2. Obligation/Expenditure in Excess or Advance of Appropriations . . . 6-38
   a. Exhaustion of an Appropriation . . . 6-41
      (1) Making further payments . . . 6-41
      (2) Limitations on contractor recovery . . . 6-43
   b. Contracts or Other Obligations in Excess or Advance of Appropriations . . . 6-46
      (1) Proper recording of obligations . . . 6-46
      (2) Obligation in excess of appropriations . . . 6-47
      (3) Variable quantity contracts . . . 6-48
      (4) Multiyear or "continuing" contracts . . . 6-51
   c. Indemnification . . . 6-59
      (1) Prohibition against unlimited liability . . . 6-61
      (2) When indemnification may be permissible . . . 6-71
      (3) Statutorily authorized indemnification . . . 6-77
   d. Specific Appropriation Limitations/Purpose Violations . . . 6-79
   e. Amount of Available Appropriation or Fund . . . 6-84
   f. Intent/Factors beyond Agency Control . . . 6-86
   g. Exceptions . . . 6-88
      (1) Contract authority . . . 6-88
      (2) Other obligations "authorized by law" . . . 6-91
3. Voluntary Services Prohibition . . . 6-93
   a. Introduction . . . 6-93
   b. Appointment without Compensation and Waiver of Salary . . 6-95
      (1) The rules—general discussion . . . 6-95
      (2) Student interns . . . 6-102
      (3) Program beneficiaries . . . 6-104
      (4) Applicability to legislative and judicial branches . . . 6-105
   c. Other Voluntary Services . . . 6-105
   d. Exceptions . . . 6-110
      (1) Safety of human life . . . 6-111
      (2) Protection of property . . . 6-111

(3) Recent developments . . . . . . . . . . 6-112
e. Voluntary Creditors . . . . . . . . . . 6-116
4. Apportionment of Appropriations . . . . . . . . . . 6-116
a. Statutory Requirement for Apportionment . . . . . . . . . . 6-117
b. Establishing Reserves . . . . . . . . . . 6-122
c. Method of Apportionment . . . . . . . . . . 6-125
d. Control of Apportionments . . . . . . . . . . 6-127
e. Apportionments Requiring Deficiency Estimate . . . . . . . . . . 6-129
f. Exemptions from Apportionment Requirement . . . . . . . . . . 6-134
g. Administrative Division of Apportionments . . . . . . . . . . 6-136
h. Expenditures in Excess of Apportionment . . . . . . . . . . 6-139
5. Penalties and Reporting Requirements . . . . . . . . . . 6-143
a. Administrative and Penal Sanctions . . . . . . . . . . 6-143
b. Reporting Requirements . . . . . . . . . . 6-144
6. Funding Gaps . . . . . . . . . . 6-146

**D. Supplemental and Deficiency Appropriations . . . . . . . 6-159**

**E. Augmentation of Appropriations. . . . . . . . . . 6-162**

1. The Augmentation Concept . . . . . . . . . . 6-162
2. Disposition of Moneys Received: Repayments and Miscellaneous Receipts . . . . . . . . . . 6-166
a. General Principles . . . . . . . . . . 6-166
(1) The "miscellaneous receipts" statute . . . . . . . . . . 6-166
(2) Exceptions . . . . . . . . . . 6-170
(3) Timing of deposits . . . . . . . . . . 6-175
(4) Money received (or not received) "for the Government" 6-177
b. Contract Matters . . . . . . . . . . 6-184
(1) Excess reprocurement costs . . . . . . . . . . 6-184
(2) Other damage claims . . . . . . . . . . 6-188
(3) Refunds and credits . . . . . . . . . . 6-189
(4) "No-cost" contracts . . . . . . . . . . 6-191
c. Damage to Government Property and Other Tort Liability . 6-194
d. Fees and Commissions . . . . . . . . . . 6-199
e. Economy Act . . . . . . . . . . 6-202
f. Setoff . . . . . . . . . . 6-205
g. Revolving Funds . . . . . . . . . . 6-206
h. Trust Funds . . . . . . . . . . 6-208
i. Fines and Penalties . . . . . . . . . . 6-211
j. Miscellaneous Cases: Money to Treasury . . . . . . . . . . 6-212
k. Miscellaneous Cases: Money Retained by Agency . . . . . . . . . . 6-214
l. Money Erroneously Deposited as Miscellaneous Receipts . 6-216
3. Gifts and Donations to the Government . . . . . . . . . . 6-222
a. Donations to the Government . . . . . . . . . . 6-222

b. Donations to Individual Employees . . . . . . . . . . . . . . . . . . . . 6-231
(1) Contributions to salary or expenses . . . . . . . . . . . . . . . . 6-231
(2) Travel-related promotional items . . . . . . . . . . . . . . . . . . 6-234
4. Other Augmentation Principles and Cases . . . . . . . . . . . . . . . . 6-235

## Chapter 7 Obligation of Appropriations

**A. Introduction: Nature of an Obligation . . . . . . . . . . . . . . . 7-2**
**B. Criteria for Recording Obligations (31 U.S.C. § 1501) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-6**
1. Section 1501(a)(1): Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
a. Binding Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
b. Contract "in Writing" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-14
c. Requirement of Specificity . . . . . . . . . . . . . . . . . . . . . . . . . . 7-17
d. Invalid Award/Unauthorized Commitment . . . . . . . . . . . . . . . 7-18
e. Variations in Quantity to Be Furnished . . . . . . . . . . . . . . . . . 7-19
f. Amount to Be Recorded . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23
g. Administrative Approval of Payment . . . . . . . . . . . . . . . . . . . 7-26
h. Miscellaneous Contractual Obligations . . . . . . . . . . . . . . . . . 7-27
i. Interagency Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-28
(1) Economy Act agreements . . . . . . . . . . . . . . . . . . . . . . . . . 7-29
(2) Non-Economy Act agreements . . . . . . . . . . . . . . . . . . . . . 7-30
(3) "Binding agreement" requirement . . . . . . . . . . . . . . . . . . 7-31
(4) Orders from stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-33
(5) Project orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-33
2. Section 1501(a)(2): Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-35
3. Section 1501(a)(3): Interagency Orders Required by Law . . . . . 7-37
4. Section 1501(a)(4): Orders without Advertising . . . . . . . . . . . . . 7-39
5. Section 1501(a)(5): Grants and Subsidies . . . . . . . . . . . . . . . . . 7-39
a. Grants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-40
b. Subsidies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-42
6. Section 1501(a)(6): Pending Litigation . . . . . . . . . . . . . . . . . . . 7-44
7. Section 1501(a)(7): Employment and Travel . . . . . . . . . . . . . . . 7-45
a. Wages, Salaries, Annual Leave . . . . . . . . . . . . . . . . . . . . . . . 7-46
b. Compensation Plans in Foreign Countries . . . . . . . . . . . . . . . 7-48
c. Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
d. Uniform Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
e. Travel Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
f. State Department: Travel Outside Continental United States 7-51
g. Employee Transfer/Relocation Costs . . . . . . . . . . . . . . . . . . . 7-52
8. Section 1501(a)(8): Public Utilities . . . . . . . . . . . . . . . . . . . . . . 7-54
9. Section 1501(a)(9): Other Legal Liabilities . . . . . . . . . . . . . . . . 7-55
**C. Contingent Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-55**

**D. Reporting Requirements . . . . . . . . . . 7-58**
**E. Deobligation . . . . . . . . . . 7-59**

## Chapter 8 Continuing Resolutions

**A. Introduction . . . . . . . . . . 8-2**
1. Definition and General Description . . . . . . . . . . 8-2
2. Use of Appropriation Warrants . . . . . . . . . . 8-9
**B. Rate for Operations . . . . . . . . . . 8-10**
1. Current Rate . . . . . . . . . . 8-10
2. Rate Not Exceeding Current Rate . . . . . . . . . . 8-12
3. Spending Pattern under Continuing Resolution . . . . . . . . . . 8-15
a. Pattern of Obligations . . . . . . . . . . 8-15
b. Apportionment . . . . . . . . . . 8-18
4. Liquidation of Contract Authority . . . . . . . . . . 8-19
5. Rate for Operations Exceeds Final Appropriation . . . . . . . . . . 8-19
**C. Projects or Activities . . . . . . . . . . 8-21**
**D. Relationship to other Legislation . . . . . . . . . . 8-27**
1. Not Otherwise Provided For . . . . . . . . . . 8-27
2. Status of Bill or Budget Estimate Used as Reference . . . . . . . . . . 8-27
3. More Restrictive Authority . . . . . . . . . . 8-29
4. Lack of Authorizing Legislation . . . . . . . . . . 8-31
**E. Duration . . . . . . . . . . 8-35**
1. Duration of Continuing Resolution . . . . . . . . . . 8-35
2. Duration of Appropriations . . . . . . . . . . 8-36
3. Impoundment . . . . . . . . . . 8-38

## Chapter 9 Liability and Relief of Accountable Officers

**A. Introduction . . . . . . . . . . 9-4**
**B. General Principles . . . . . . . . . . 9-5**
1. The Concepts of Liability and Relief . . . . . . . . . . 9-5
a. Liability . . . . . . . . . . 9-5
b. Surety Bonding . . . . . . . . . . 9-8
c. Relief . . . . . . . . . . 9-9
2. Who Is an Accountable Officer? . . . . . . . . . . 9-11
a. Certifying Officers . . . . . . . . . . 9-13
b. Disbursing Officers . . . . . . . . . . 9-14
c. Cashiers . . . . . . . . . . 9-15
d. Collecting Officers . . . . . . . . . . 9-16
e. Other Agents and Custodians . . . . . . . . . . 9-17
3. Funds to Which Accountability Attaches . . . . . . . . . . 9-20
a. Appropriated Funds . . . . . . . . . . 9-20
(1) Imprest funds . . . . . . . . . . 9-20
(2) Flash rolls . . . . . . . . . . 9-23

(3) Travel advances . . . 9-25
b. Receipts . . . 9-26
c. Funds Held in Trust . . . 9-27
d. Items Which Are the Equivalent of Cash . . . 9-28
4. What Kinds of Events Produce Liability? . . . 9-29
5. Amount of Liability . . . 9-31
6. Effect of Criminal Prosecution . . . 9-33
a. Acquittal . . . 9-33
b. Order of Restitution . . . 9-34
**C. Physical Loss or Deficiency . . . 9-35**
1. Statutory Provisions . . . 9-35
a. Civilian Agencies . . . 9-35
b. Military Disbursing Officers . . . 9-38
2. Who Can Grant Relief? . . . 9-40
a. 31 U.S.C. § 3527(a) . . . 9-40
b. 31 U.S.C. § 3527(b) . . . 9-42
c. Role of Administrative Determinations . . . 9-43
3. Standards for Granting Relief . . . 9-45
a. Standard of Negligence . . . 9-45
b. Presumption of Negligence/Burden of Proof . . . 9-46
c. Actual Negligence . . . 9-48
d. Proximate Cause . . . 9-51
e. Unexplained Loss or Shortage . . . 9-54
f. Compliance with Regulations . . . 9-57
g. Losses in Shipment . . . 9-59
h. Fire, Natural Disaster . . . 9-60
i. Loss by Theft . . . 9-61
(1) Burglary: forced entry . . . 9-62
(2) Robbery . . . 9-63
(3) Riot, public disturbance . . . 9-63
(4) Evidence less than certain . . . 9-64
(5) Embezzlement . . . 9-68
j. Agency Security . . . 9-69
k. Extenuating Circumstances . . . 9-73
**D. Illegal or Improper Payment . . . 9-75**
1. Disbursement and Accountability . . . 9-75
a. Statutory Framework: Disbursement Under Executive Order No. 166 . . . 9-75
b. Automated Payment Systems . . . 9-78
c. Statistical Sampling . . . 9-81
d. Provisional Vouchers and Related Matters . . . 9-82
e. Facsimile Signatures and Electronic Certification . . . 9-84

f. GAO Audit Exceptions . . . . . 9-86
2. Certifying Officers . . . . . 9-88
a. Duties and Liability . . . . . 9-88
b. Applicability of 31 U.S.C. § 3528 . . . . . 9-94
c. Relief . . . . . 9-95
3. Disbursing Officers . . . . . 9-101
a. Standards of Liability and Relief . . . . . 9-101
b. Some Specific Applications . . . . . 9-108
(1) Fraudulent travel claims . . . . . 9-109
(2) Other cash payments fraudulently obtained . . . . . 9-110
(3) Military separation vouchers . . . . . 9-111
(4) Assignment of contract payments . . . . . 9-111
(5) Improper purpose/payment beyond scope of legal authority . . . . . 9-112
4. Check Losses . . . . . 9-113
a. Check Cashing Operations . . . . . 9-113
b. Duplicate Check Losses . . . . . 9-118
c. Errors in Check Issuance Process . . . . . 9-123
5. Statute of Limitations . . . . . 9-125
**E. Other Relief Statutes . . . . . 9-128**
1. Statutes Requiring Affirmative Action . . . . . 9-128
a. United States Court of Federal Claims . . . . . 9-128
b. The Legislative and Judicial Branches . . . . . 9-129
c. Savings Bond Redemption Losses . . . . . 9-130
2. Statutes Providing “Automatic” Relief . . . . . 9-130
a. Waiver of Indebtedness . . . . . 9-130
b. Compromise of Indebtedness . . . . . 9-130
c. Foreign Exchange Transactions . . . . . 9-131
d. Check Forgery Insurance Fund . . . . . 9-132
e. Secretary of the Treasury . . . . . 9-133
f. Other Statutes . . . . . 9-133
**F. Procedures . . . . . 9-134**
1. Reporting of Irregularities . . . . . 9-134
2. Obtaining Relief . . . . . 9-135
3. De Minimis Rule: Payments of $100 or Less . . . . . 9-136
4. Relief versus Grievance Procedures . . . . . 9-136
**G. Collection Action . . . . . 9-137**
1. Against Recipient . . . . . 9-137
2. Against Accountable Officer . . . . . 9-139
**H. Restitution, Reimbursement, and Restoration . . . . . 9-141**
1. Restitution and Reimbursement . . . . . 9-141
2. Restoration . . . . . 9-142

a. Adjustment Incident to Granting of Relief . . . . . . . . . . . . . . 9-142
b. Other Situations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9-143

## Chapter 10 Federal Assistance: Grants and Cooperative Agreements

**A. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-3**
**B. Grants versus Procurement Contracts . . . . . . . . . . . . . . 10-6**
1. Judicial and GAO Decisions on the Nature of Grants . . . . . . . . . 10-6
a. Contractual Aspects of Grants . . . . . . . . . . . . . . . . . . . . . . . . . 10-6
b. Differences between Grants and Contracts . . . . . . . . . . . . . . . 10-9
c. Grants as “Hybrids” . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-11
2. The Federal Grant and Cooperative Agreement Act . . . . . . . . . 10-13
a. Purposes and Provisions of the Act . . . . . . . . . . . . . . . . . . . . . 10-13
b. Agency Implementation of the Act . . . . . . . . . . . . . . . . . . . . . . 10-17
c. Decisions Interpreting the Act . . . . . . . . . . . . . . . . . . . . . . . . . 10-18
3. Competition for Discretionary Grant Awards . . . . . . . . . . . . . . . 10-25
**C. Some Basic Concepts . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-27**
1. The Grant as an Exercise of Congressional Spending Power . . 10-28
a. Constitutionality of Grant Conditions . . . . . . . . . . . . . . . . . . 10-28
(1) Conditions must be in pursuit of the general welfare and related to the purpose of the expenditure . . . . . . . 10-29
(2) Conditions must be unambiguous . . . . . . . . . . . . . . . . . 10-30
(3) Conditions must be otherwise constitutional . . . . . . . . 10-32
b. Effect of Grant Conditions . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-34
2. Availability of Appropriations . . . . . . . . . . . . . . . . . . . . . . . . . . 10-36
a. Purpose . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-36
b. Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-39
c. Amount . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-43
3. Agency Regulations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-45
a. General principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-45
b. Office of Management and Budget Circulars and the “Common Rules” . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-47
c. The Federal Financial Assistance Management Improvement Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-51
d. The “Cognizant Agency” Concept . . . . . . . . . . . . . . . . . . . . . 10-52
4. Contracting by Grantees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-53
5. Liability for Acts of Grantees . . . . . . . . . . . . . . . . . . . . . . . . . . 10-54
a. Liability to Grantee’s Contractors . . . . . . . . . . . . . . . . . . . . . 10-55
b. Liability for Grantee Misconduct . . . . . . . . . . . . . . . . . . . . . . 10-58
6. Types of Grants: Categorical versus Block . . . . . . . . . . . . . . . . 10-60
7. The Single Audit Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-63
**D. Funds in Hands of Grantee: Status and Application of Appropriation Restrictions . . . . . . . . . . . . . . . . . . . 10-68**

**E. Grant Funding . . . . . 10-76**
1. Advances of Grant/Assistance Funds . . . . . 10-77
2. Cash Management of Grants . . . . . 10-78
   a. General Rule on Interest on Grant Advances . . . . . 10-78
   b. State Governments and Interest on Grant Advances . . . . . 10-82
      (1) Intergovernmental Cooperation Act . . . . . 10-82
      (2) Decisions under the Intergovernmental Cooperation Act . . . . . 10-84
   c. Other Cash Management Requirements . . . . . 10-87
3. Program Income . . . . . 10-89
4. Cost-Sharing . . . . . 10-92
   a. Local or Matching Share . . . . . 10-93
      (1) General principles . . . . . 10-93
      (2) Hard and soft matches . . . . . 10-96
      (3) Matching one grant with funds from another . . . . . 10-97
      (4) Relocation allowances . . . . . 10-99
      (5) Payments by other than grantor agency . . . . . 10-100
   b. Maintenance of Effort . . . . . 10-102

**F. Obligation of Appropriations for Grants . . . . . 10-106**
1. Requirement for Obligation . . . . . 10-106
2. Changes in Grants . . . . . 10-107

**G. Grant Costs . . . . . 10-111**
1. Allowable versus Unallowable Costs . . . . . 10-111
   a. The Concept of Allowable Costs . . . . . 10-111
   b. Grant Cost Cases . . . . . 10-117
      (1) Scope of judicial review . . . . . 10-117
      (2) Court case examples . . . . . 10-119
      (3) GAO case examples . . . . . 10-124
   c. Note on Accounting . . . . . 10-126
2. Pre-Award Costs (Retroactive Funding) . . . . . 10-129

**H. Recovery of Grantee Indebtedness . . . . . 10-132**
1. Government's Duty to Recover . . . . . 10-132
2. Offset and Withholding of Claims Under Grants . . . . . 10-144

## Chapter 11 Federal Assistance: Guaranteed and Insured Loans

**A. Introduction . . . . . 11-3**
1. General Description . . . . . 11-3
2. Sources of Guarantee Authority . . . . . 11-8

**B. Budgetary and Obligational Treatment . . . . . 11-12**
1. Prior to Federal Credit Reform Act . . . . . 11-12
2. Federal Credit Reform Act of 1990 . . . . . 11-15
   a. Post-1991 Guarantee Commitments . . . . . 11-16

b. Pre-1992 Commitments . . . . . . . . 11-24
c. Entitlement Programs . . . . . . . . 11-25
d. Certain Insurance Programs . . . . . . . . 11-26

**C. Extension of Guarantees . . . . . . . . 11-26**

1. Coverage of Lenders (Initial and Subsequent) . . . . . . . . 11-26
a. Eligibility of Lender/Debt Instrument . . . . . . . . 11-26
b. Substitution of Lender . . . . . . . . 11-28
c. Existence of Valid Guarantee . . . . . . . . 11-29
d. Small Business Investment Companies . . . . . . . . 11-35
e. The Federal Financing Bank . . . . . . . . 11-37
2. Coverage of Borrowers . . . . . . . . 11-41
a. Eligibility of Borrowers . . . . . . . . 11-41
b. Substitution of Borrowers . . . . . . . . 11-42
c. Loan Purpose . . . . . . . . 11-43
d. Change in Loan Purpose . . . . . . . . 11-45
3. Terms and Conditions of Guarantees . . . . . . . . 11-46
a. Introduction . . . . . . . . 11-46
b. Property Insurance Programs under the National Housing Act . . . . . . . . 11-47
(1) Maximum amount of loan . . . . . . . . 11-47
(2) Maximum loan maturity . . . . . . . . 11-49
(3) Owner/lessee requirement . . . . . . . . 11-51
(4) Execution of the note . . . . . . . . 11-53
(5) Reporting requirement . . . . . . . . 11-54
(6) Payment of premiums . . . . . . . . 11-55
c. Small Business Administration Business Loan Program . . . 11-56
(1) Payment of guarantee fee . . . . . . . . 11-56
(2) Notice of default . . . . . . . . 11-58

**D. Rights and Obligations of Government upon Default . 11-59**

1. Nature of the Government's Obligation . . . . . . . . 11-59
2. Scope of the Government's Guarantee . . . . . . . . 11-62
3. Amount of Government's Liability . . . . . . . . 11-64
4. Liability of the Borrower . . . . . . . . 11-65
a. Veterans' Home Loan Guarantee Program . . . . . . . . 11-66
(1) Loans closed prior to 1990 . . . . . . . . 11-66
(2) Loans closed after December 31, 1989 . . . . . . . . 11-70
b. Debt Collection Procedures . . . . . . . . 11-71
5. Collateral Protection . . . . . . . . 11-73

[This page is intended to be blank. Please do not read it.]

# Availability of Appropriations: Amount


**A. Introduction . . . . . . . . . . 6-4**
**B. Types of Appropriation Language . . . . . . . . . . 6-5**
1. Lump-Sum Appropriations . . . . . . . . . . 6-5
a. Effect of Budget Estimates . . . . . . . . . . 6-10
b. Restrictions in Legislative History . . . . . . . . . . 6-12
c. "Zero Funding" Under a Lump-Sum Appropriation . . . . . . . . . . 6-24
2. Line-Item Appropriations and Earmarks . . . . . . . . . . 6-26
**C. The Antideficiency Act . . . . . . . . . . 6-34**
1. Introduction and Overview . . . . . . . . . . 6-34
2. Obligation/Expenditure in Excess or Advance of Appropriations . . . . . . . . . . 6-38
a. Exhaustion of an Appropriation . . . . . . . . . . 6-41
(1) Making further payments . . . . . . . . . . 6-41
(2) Limitations on contractor recovery . . . . . . . . . . 6-43
b. Contracts or Other Obligations in Excess or Advance of Appropriations . . . . . . . . . . 6-46
(1) Proper recording of obligations . . . . . . . . . . 6-46
(2) Obligation in excess of appropriations . . . . . . . . . . 6-47
(3) Variable quantity contracts . . . . . . . . . . 6-48
(4) Multiyear or "continuing" contracts . . . . . . . . . . 6-51
c. Indemnification . . . . . . . . . . 6-59
(1) Prohibition against unlimited liability . . . . . . . . . . 6-61
(2) When indemnification may be permissible . . . . . . . . . . 6-71
(3) Statutorily authorized indemnification . . . . . . . . . . 6-77
d. Specific Appropriation Limitations/Purpose Violations . . . . . 6-79
e. Amount of Available Appropriation or Fund . . . . . . . . . . 6-84
f. Intent/Factors beyond Agency Control . . . . . . . . . . 6-86
g. Exceptions . . . . . . . . . . 6-88
(1) Contract authority . . . . . . . . . . 6-88
(2) Other obligations "authorized by law" . . . . . . . . . . 6-91
3. Voluntary Services Prohibition . . . . . . . . . . 6-93
a. Introduction . . . . . . . . . . 6-93
b. Appointment without Compensation and Waiver of Salary . . 6-95
(1) The rules—general discussion . . . . . . . . . . 6-95
(2) Student interns . . . . . . . . . . 6-102
(3) Program beneficiaries . . . . . . . . . . 6-104
(4) Applicability to legislative and judicial branches . . . . . 6-105
c. Other Voluntary Services . . . . . . . . . . 6-105
d. Exceptions . . . . . . . . . . 6-110
(1) Safety of human life . . . . . . . . . . 6-111
(2) Protection of property . . . . . . . . . . 6-111
(3) Recent developments . . . . . . . . . . 6-112

e. Voluntary Creditors . . . . . . 6-116
4. Apportionment of Appropriations . . . . . . 6-116
a. Statutory Requirement for Apportionment . . . . . . 6-117
b. Establishing Reserves . . . . . . 6-122
c. Method of Apportionment . . . . . . 6-125
d. Control of Apportionments . . . . . . 6-127
e. Apportionments Requiring Deficiency Estimate . . . . . . 6-129
f. Exemptions from Apportionment Requirement . . . . . . 6-134
g. Administrative Division of Apportionments . . . . . . 6-136
h. Expenditures in Excess of Apportionment . . . . . . 6-139
5. Penalties and Reporting Requirements . . . . . . 6-143
a. Administrative and Penal Sanctions . . . . . . 6-143
b. Reporting Requirements . . . . . . 6-144
6. Funding Gaps . . . . . . 6-146

**D. Supplemental and Deficiency Appropriations . . . . . . 6-159**

**E. Augmentation of Appropriations. . . . . . . 6-162**
1. The Augmentation Concept . . . . . . 6-162
2. Disposition of Moneys Received: Repayments and Miscellaneous Receipts . . . . . . 6-166
a. General Principles . . . . . . 6-166
(1) The “miscellaneous receipts” statute . . . . . . 6-166
(2) Exceptions . . . . . . 6-170
(3) Timing of deposits . . . . . . 6-175
(4) Money received (or not received) “for the Government” 6-177
b. Contract Matters . . . . . . 6-184
(1) Excess reprocurement costs . . . . . . 6-184
(2) Other damage claims . . . . . . 6-188
(3) Refunds and credits . . . . . . 6-189
(4) “No-cost” contracts . . . . . . 6-191
c. Damage to Government Property and Other Tort Liability . 6-194
d. Fees and Commissions . . . . . . 6-199
e. Economy Act . . . . . . 6-202
f. Setoff . . . . . . 6-205
g. Revolving Funds . . . . . . 6-206
h. Trust Funds . . . . . . 6-208
i. Fines and Penalties . . . . . . 6-211
j. Miscellaneous Cases: Money to Treasury . . . . . . 6-212
k. Miscellaneous Cases: Money Retained by Agency . . . . . . 6-214
l. Money Erroneously Deposited as Miscellaneous Receipts . 6-216
3. Gifts and Donations to the Government . . . . . . 6-222
a. Donations to the Government . . . . . . 6-222
b. Donations to Individual Employees . . . . . . 6-231

(1) Contributions to salary or expenses . . . . . . . . . . . . . . . . 6-231
(2) Travel-related promotional items . . . . . . . . . . . . . . . . . . 6-234
4. Other Augmentation Principles and Cases . . . . . . . . . . . . . . . . . 6-235

# Availability of Appropriations: Amount

## A. Introduction

The two preceding chapters have discussed the purposes for which appropriated funds may be used and the time limits within which they may be obligated and expended. This chapter will discuss the third major concept of the "legal availability" of appropriations—restrictions relating to amount. It is not enough to know what you can spend appropriated funds for and when you can spend them. You also must know how much you have available for a particular object.

In this respect, the legal restrictions on government expenditures are different from those governing your spending as a private individual. For example, as an individual, you can buy a house and finance it with a mortgage that may run for 25 or 30 years. Since you do not have enough money to cover your full legal obligation under the mortgage, you sign the mortgage papers on the assumption that you will continue to have an income adequate to cover the mortgage. If your income diminishes substantially or, heaven forbid, disappears, and you are unable to make the payments, you lose the house. A government agency cannot operate this way. The main reason why is the Antideficiency Act, discussed in section C of this chapter.

Under the Constitution, Congress makes the laws and provides the money to implement them; the executive branch carries out the laws with the money Congress provides. Under this system, Congress has the "final word" as to how much money can be spent by a given agency or on a given program. Congress may give the executive branch considerable discretion concerning how to implement the laws and hence how to obligate and expend funds appropriated, but it is ultimately up to Congress to determine how much the executive branch can spend. In applying these concepts to the day-to-day operations of the federal government, it should be readily apparent that restrictions on purpose, time, and amount are very closely related. Again, the Antideficiency Act is one of the primary "enforcement devices." Its importance is underscored by the fact that it is the only one of the fiscal statutes to include both civil and criminal penalties for violation.

To ensure that the Antideficiency Act's prohibition against overobligating or overspending an appropriation remains meaningful, agencies must be restricted to the appropriations Congress provides. The rule prohibiting the unauthorized "augmentation" of appropriations, covered in section E of this chapter, is thus a crucial complement to the Antideficiency Act.

While Congress retains, as it must, ultimate control over how much an agency can spend, it does not attempt to control the disposition of every dollar. We began our general discussion of administrative discretion in Chapter 3 by quoting Justice Holmes' statement that "some play must be allowed to the joints if the machine is to work."[1] This is fully applicable to the expenditure of appropriated funds. An agency's discretion under a lump-sum appropriation is discussed in section F of this chapter.

## B. Types of Appropriation Language

Congress has been making appropriations since the beginning of the Republic. In earlier times when the federal government was much smaller and federal programs were (or at least seemed) much simpler, very specific line-item appropriations were more common.[2] In recent decades, however, as the federal budget has grown in both size and complexity, a lump-sum approach has become a virtual necessity.[3] For example, an appropriation act for an establishment the size of the Defense Department structured solely on a line-item basis would rival the telephone directory in bulk.

Over the course of this time, certain forms of appropriation language have become standard. This section will point out the more commonly used language with respect to amount.

### 1. Lump-Sum Appropriations

A *lump-sum appropriation* is one that is made to cover a number of specific programs, projects, or items. (The number may be as small as two.) In contrast, a *line-item appropriation* is available only for the specific object described.

---

[1] *Tyson & Brother United Theater Ticket Offices v. Banton*, 273 U.S. 418 (1927) (Holmes, J., dissenting).

[2] For fiscal year 1905, for example, Congress appropriated to the Department of Justice a specific line item of $3,000 for stationery. Legislative, Executive and Judicial Appropriations Act, 1905, ch. 716, 33 Stat. 85, 134 (Mar. 18, 1904). For fiscal year 2005, Congress appropriated to the Department of Justice a lump-sum appropriation of $124,100,000 for administrative expenses. Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2005, Pub. L. No. 108-447, div. B, title I, 118 Stat. 2809, 2853 (Dec. 8, 2004).

[3] As a result of appropriation account consolidation over the years, 200 accounts now cover 90 percent of all federal expenditures. Allen Schick, *The Federal Budget: Politics, Policy, and Process*, 229 (2000).

Lump-sum appropriations come in many forms. Many smaller agencies receive only a single appropriation, usually termed "Salaries and Expenses" or "Operating Expenses." All of the agency's operations must be funded from this single appropriation. Cabinet-level departments and larger agencies receive several appropriations, often based on broad object categories such as "operations and maintenance" or "research and development." For purposes of this discussion, a lump-sum appropriation is simply one that is available for more than one specific object.

The amount of a lump-sum appropriation is not derived through guesswork. It is the result of a lengthy budget and appropriation process. The agency first submits its appropriation request to Congress through the Office of Management and Budget, supported by detailed budget justifications. Congress then reviews the request and enacts an appropriation which may be more, less, or the same as the amount requested. Variations from the amount requested are usually explained in the appropriation act's legislative history, most often in committee reports.[4]

All of this leads logically to a question which can be phrased in various ways: How much flexibility does an agency have in spending a lump-sum appropriation? Is it legally bound by its original budget estimate or by expressions of intent in legislative history? How is the agency's legitimate need for administrative flexibility balanced against the constitutional role of the Congress as controller of the public purse?

The answer to these questions is one of the most important principles of appropriations law. The rule, simply stated, is this: Restrictions on a lump-sum appropriation contained in the agency's budget request or in legislative history are not legally binding on the department or agency unless they are carried into (specified in) the appropriation act itself, or unless some other statute restricts the agency's spending flexibility. This is an application of the fundamental principle of statutory construction that legislative history is not law and carries no legal significance unless "anchored in the text of

[4] *See* Chapter 1, section D. See also GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), Appendixes I and II, for an overview of the budget and appropriations process.

the statute." *Shannon v. United States*, 512 U.S. 573, 583 (1994).[5] Of course, the agency cannot exceed the total amount of the lump-sum appropriation, and its spending must not violate other applicable statutoryrestrictions.[6] The rule applies equally whether the legislative history is mere acquiescence in the agency's budget request or an affirmative expression of intent.

The rule recognizes the agency's need for flexibility to meet changing or unforeseen circumstances, yet preserves congressional control in several ways. First, the rule merely says that the restrictions are not *legally binding*. The practical wisdom of making the expenditure is an entirely separate question. An agency that disregards the wishes of its oversight or appropriations committees will most likely be called upon to answer for its digressions before those committees next year. An agency that fails to "keep faith" with the Congress may find its next appropriation reduced or limited by line-item restrictions. As Professor Schick put it:

> "What gives the appropriations reports special force is not their legal status but the fact that the next appropriations cycle is always less than one year away. An agency that willfully violates report language risks retribution the next time it asks for money. It may find this year's report language relocated to the next appropriations act, thereby giving it even less leeway than it had before. Or it may find the next time that the appropriations committees' guidance is more detailed and onerous or that its appropriation has been cut."[7]

That Congress is fully aware of these dynamics is evidenced by the following statement from a 1973 House Appropriations Committee report:

---

[5] See Chapter 2, section D.6 for a general discussion of the uses and limits of legislative history.

[6] For example, agencies and their employees are, of course, legally bound by apportionments and subdivisions of lump-sum appropriations. *See* 31 U.S.C. §§ 1517–1519. See also sections C.4 and C.5 of this chapter for a discussion of these requirements.

[7] Allen Schick, *The Federal Budget: Politics, Policy, and Process*, 238 (2000). *See also* John C. Roberts, *Are Congressional Committees Constitutional?: Radical Textualism, Separation of Powers, and the Enactment Process*, 52 Case Western Reserve L. Rev. 489, 563–64 (2001).

> "In a strictly legal sense, the Department of Defense could utilize the funds appropriated for whatever programs were included under the individual appropriation accounts, but the relationship with the Congress demands that the detailed justifications which are presented in support of budget requests be followed. To do otherwise would cause Congress to lose confidence in the requests made and probably result in reduced appropriations or line item appropriation bills."[8]

Justice Souter made the same point, writing for the Court in *Lincoln v. Vigil*, 508 U.S. 182 (1993):

> "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history). And, of course, we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences."

*Id.* at 193 (citations omitted).

Second, restrictions on an agency's spending flexibility exist through the operation of other laws. For example, a "Salaries and Expenses" appropriation may be a large lump sum, but much of it is in fact nondiscretionary because the salaries and benefits (*e.g.*, health insurance and retirement contributions) of agency employees constitute mandatory expenditures once fixed in accordance with the parameters established by law.[9] Third, reprogramming arrangements with the various committees provide another safeguard against abuse.[10]

Finally, Congress always holds the ultimate trump card. It has the power to make any restriction legally binding simply by including it in the

[8] Report of the House Committee on Appropriations on the 1974 Defense Department appropriation bill, H.R. Rep. No. 93-662, at 16 (1973).

[9] Louis Fisher, *Presidential Spending Power*, 72 (1975).

[10] See Chapter 2, section B.3.b for an overview of reprogramming concepts and practices, and Schick, *supra*, at 247–250.

appropriation act.[11] Thus, the treatment of lump-sum appropriations may be regarded as yet another example of the efforts of our legal and political systems to balance the conflicting objectives of executive flexibility and congressional control.[12]

Two common examples of devices Congress uses when it wants to restrict an agency's spending flexibility are line-item appropriations and earmarks. Congress uses other tools as well. The following are just two examples taken from the Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, 117 Stat. 11 (Feb. 20, 2003), the omnibus appropriation act for fiscal year 2003. The first is an example of a notice requirement:

> "[F]unds made available under this heading [Salaries and Expenses, Department of Housing and Urban Development] shall only be allocated in the manner specified in the report accompanying this Act unless the Committees on Appropriations . . . are notified of any changes in an operating plan or reprogramming. . ."

117 Stat. 499. The second is a proviso that incorporates by reference instructions found in a conference report:

> "*Provided*, That notwithstanding any other provision of law, the Office of Economic Adjustment . . . is authorized to make grants using funds made available under the heading 'Operation and Maintenance, Defense-Wide' in accordance

[11] This assumes, of course, that Congress is acting within its constitutional authority. See Chapter 1, section B for a general discussion of Congress's constitutional authority to appropriate and the limits on that authority. *Legal Services Corp. v. Velasquez*, 531 U.S. 533 (2001), provides an example of restrictive appropriation language that was declared unconstitutional.

[12] The effort has not always been free from controversy. One senator, concerned with what he felt was excessive flexibility in a 1935 appropriation, tried to make his point by suggesting the following:

> "Section 1. Congress hereby appropriates $4,880,000,000 to the President of the United States to use as he pleases.
>
> "Section 2. Anybody who does not like it is fined $1,000."

79 Cong. Rec. 2014 (1935) (remarks of Sen. Arthur Vandenberg), quoted in Fisher, *supra*, at 62–63.

> with the guidance provided in the Joint Explanatory Statement of the Committee of Conference for the Conference Report to accompany H.R. 5010 . . . and these projects shall hereafter be considered to be authorized by law."

117 Stat. 533.

The 1983 appropriation act for the Department of Housing and Urban Development contained a restriction incorporating by reference budget estimates that the Administration had provided:

> "Where appropriations in titles I and II of this Act are expendable for travel expenses and no specific limitation has been placed thereon, the expenditures for such travel expenses may not exceed the amounts set forth therefor in the budget estimates submitted for the appropriations . . . ."[13]

A provision prohibiting the use of a construction appropriation to start any new project for which an estimate was not included in the President's budget submission is discussed in 34 Comp. Gen. 278 (1954).

Also, the availability of a lump-sum appropriation may be restricted by provisions appearing in statutes other than appropriation acts, such as authorization acts.[14] For example, if an agency receives a line-item authorization and a lump-sum appropriation pursuant to the authorization, the line-item restrictions and earmarks in the authorization act will apply just as if they appeared in the appropriation act itself. The topic is discussed in more detail in Chapter 2, section C.

### a. Effect of Budget Estimates

Perhaps the easiest case is the effect of the agency's own budget estimate. The rule here was stated in 17 Comp. Gen. 147, 150 (1937) as follows:

[13] Pub. L. No. 97-272, § 401, 96 Stat. 1160, 1178 (Sept. 30, 1982).

[14] A recent example is section 1004(d) of the Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, 116 Stat. 2458, 2629–30 (Dec. 2, 2002), which imposes conditions on the Department's spending for financial system improvements.

> "The amounts of individual items in the estimates presented to the Congress on the basis of which a lump-sum appropriation is enacted are not binding on administrative officers unless carried into the appropriation act itself."

*See also Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075, 1085–86 (Fed. Cir. 2003), *aff'd sub nom.*, 543 U.S. ____, 125 S. Ct. 1172 (2005); B-63539, June 6, 1947; B-55277, Jan. 23, 1946; B-35335, July, 17, 1943; B-48120-O.M., Oct. 21, 1948. This is essentially the same rule as applied to allocations of amounts in congressional committee reports and other specifications in the legislative history concerning the use of lump-sum appropriations, which, as discussed later in this section, likewise have no legally binding effect unless tied to the appropriation language itself.

It follows that the lack of a specific budget request will not preclude an expenditure from a lump-sum appropriation which is otherwise legally available for the item in question. *E.g.*, B-278968, May 28, 1998; 72 Comp. Gen. 317, 319 (1993); 71 Comp. Gen. 411, 413 (1992).[15] To illustrate, the Administrative Office of the U.S. Courts asked for a supplemental appropriation of $11,000 in 1962 for necessary salaries and expenses of the Judicial Conference in revising and improving the federal rules of practice and procedure. The House of Representatives did not allow the increase but the Senate included the full amount. The bill went to conference but the conference was delayed and the agency needed the money. The Administrative Office then asked whether it could take the $11,000 out of its regular 1962 appropriation even though it had not specifically included this item in its 1962 budget request. Citing 17 Comp. Gen. 147, and noting that the study of the federal rules was a continuing statutory function of the Judicial Conference, the Comptroller General concluded as follows:

> "[I]n the absence of a specific limitation or prohibition in the appropriation under consideration as to the amount which may be expended for revising and improving the Federal Rules of practice and procedure, you would not be legally bound by your budget estimates or absence thereof.
>
> "If the Congress desires to restrict the availability of a particular appropriation to the several items and amounts

[15] On the other hand, inclusion of a budget estimate for a particular purpose can strengthen the case that the appropriation *is* available for that purpose. *See* B-285066.2, Aug. 9, 2000.

> thereof submitted in the budget estimates, such control may be effected by limiting such items in the appropriation act itself. Or, by a general provision of law, the availability of appropriations could be limited to the items and the amounts contained in the budget estimates. In the absence of such limitations an agency's lump-sum appropriation is legally available to carry out the functions of the agency."

B-149163, June 27, 1962. *See also* 20 Comp. Gen. 631 (1941); B-198234, Mar. 25, 1981; B-69238, Sept. 23, 1948. The same principle would apply where the budget request was for an amount less than the amount appropriated, or for zero. 2 Comp. Gen. 517 (1923); B-126975, Feb. 12, 1958.

### b. Restrictions in Legislative History

Often issues are raised when there are changes to or restrictions on a lump-sum appropriation imposed during the legislative process but not in the legislation itself. The "leading case" in this area is 55 Comp. Gen. 307 (1975), the so-called "*LTV* case." The Department of the Navy had selected the McDonnell Douglas Corporation to develop a new fighter aircraft. LTV Aerospace Corporation protested the selection, arguing that the aircraft McDonnell Douglas proposed violated the 1975 Defense Department Appropriation Act. The appropriation in question was a lump-sum appropriation of slightly over $3 billion under the heading "Research, Development, Test, and Evaluation, Navy." This appropriation covered a large number of projects, including the fighter aircraft in question. The conference report on the appropriation act had stated that $20 million was being provided for a Navy combat fighter, but that "[a]daptation of the selected Air Force Air Combat Fighter to be capable of carrier operations is the prerequisite for use of the funds provided." The Navy conceded that the McDonnell Douglas aircraft was not a derivative of the Air Force fighter and that its selection was not in accord with the instructions in the conference report. The issue, therefore, was whether the conference report was legally binding on the Navy. In other words, did the Navy act illegally by not choosing to follow the conference report?

The ensuing decision is GAO's most comprehensive statement on the legal availability of lump-sum appropriations. Pertinent excerpts are set forth below:

> "[C]ongress has recognized that in most instances it is desirable to maintain executive flexibility to shift around funds within a particular lump-sum appropriation account so that agencies can make necessary adjustments for

'unforeseen developments, changing requirements, . . . and legislation enacted subsequent to appropriations.' [Citation omitted.] This is not to say that Congress does not expect that funds will be spent in accordance with budget estimates or in accordance with restrictions detailed in Committee reports. However, in order to preserve spending flexibility, it may choose not to impose these particular restrictions as a matter of law, but rather to leave it to the agencies to 'keep faith' with the Congress. . . .

"On the other hand, when Congress does not intend to permit agency flexibility, but intends to impose a legally binding restriction on an agency's use of funds, it does so by means of explicit statutory language. . . .

"Accordingly, it is our view that when Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on Federal agencies. . . .

"We further point out that Congress itself has often recognized the reprogramming flexibility of executive agencies, and we think it is at least implicit in such [recognition] that Congress is well aware that agencies are not legally bound to follow what is expressed in Committee reports when those expressions are not explicitly carried over into the statutory language. . . .

"We think it follows from the above discussion that, as a general proposition, there is a distinction to be made between utilizing legislative history for the purpose of illuminating the intent underlying language used in a statute and resorting to that history for the purpose of writing into the law that which is not there. . . .

"As observed above, this does not mean agencies are free to ignore clearly expressed legislative history applicable to the

> use of appropriated funds. They ignore such expressions of intent at the peril of strained relations with the Congress. The Executive branch . . . has a practical duty to abide by such expressions. This duty, however, must be understood to fall short of a statutory requirement giving rise to a legal infraction where there is a failure to carry out that duty."

55 Comp. Gen. at 318, 319, 321, 325. Accordingly, GAO concluded that Navy's award did not violate the appropriation act and the contract therefore was not illegal.

The same volume of the Decisions of the Comptroller General contains another often-cited case, 55 Comp. Gen. 812 (1976), the *Newport News* case. This case also involved the Navy. This time, Navy wanted to exercise a contract option for construction of a nuclear powered guided missile frigate, designated DLGN 41. The contractor, Newport News Shipbuilding and Dry Dock Company, argued that exercising the contract option would violate the Antideficiency Act by obligating more money than Navy had in its appropriation.

The appropriation in question, the "Naval Vessels" appropriation, provided a lump sum for vessels, much of which was earmarked, including an earmark for DLGN: "For Naval vessels: for the Navy, $3,156,400,000, of which sum $244,300,000 shall be used only for the DLGN nuclear powered guided missile frigate program; . . ." The committee reports on the appropriation act and the related authorization act indicated that, out of the $244 million appropriated, $152 million was for construction of the DLGN 41 and the remaining $92 million was for long lead time activity on the DLGN 42. Clearly, if the $152 million specified in the committee reports for the DLGN 41 was legally binding, obligations resulting from exercise of the contract option would exceed the available appropriation.

The Comptroller General applied the "*LTV* principle" and held that the $152 million was not a legally binding limit on obligations for the DLGN 41. As a matter of law, the entire $244 million was legally available for the DLGN 41 because the appropriation act did not include any restriction. Therefore, in evaluating potential violations of the Antideficiency Act, the relevant appropriation amount is the total amount of the lump-sum appropriation minus sums already obligated, not the lower figure derived

from the legislative history.[16] As the decision recognized, Congress could have imposed a legally binding limit by the very simple device of appropriating a specific amount only for the DLGN 41, appropriating a specific amount only for the DLGN 42, or by incorporating the committee reports in the appropriation language.

This decision illustrates another important point: The terms "lump-sum" and "line-item" are relative concepts. The $244 million appropriation in the *Newport News* case could be viewed as a line-item appropriation in relation to the broader "Shipbuilding and Conversion" category, but it was also a lump-sum appropriation in relation to the two specific vessels included. This factual distinction does not affect the applicable legal principle. As the decision explained:

> "Contractor urges that *LTV* is inapplicable here since *LTV* involved a lump-sum appropriation whereas the DLGN appropriation is a more specific 'line item' appropriation. While we recognize the factual distinction drawn by Contractor, we nevertheless believe that the principles set forth in *LTV* are equally applicable and controlling here. . . . [I]mplicit in our holding in *LTV* and in the other authorities cited is the view that dollar amounts in appropriation acts are to be interpreted differently from statutory words in general. This view, in our opinion, pertains whether the dollar amount is a lump-sum appropriation available for a large number of items, as in *LTV*, or, as here, a more specific appropriation available for only two items."

55 Comp. Gen. at 821–22.

A precursor of *LTV* and *Newport News* provides another interesting illustration. In 1974, controversy and funding uncertainties surrounded the Navy's "Project Sanguine," a communications system for sending command and control messages to submerged submarines from a single transmitting location in the United States. The Navy had requested $16.6 million for Project Sanguine for Fiscal Year 1974. The House deleted the request; the Senate restored it; the conference committee compromised and approved

[16] Of course, all this meant was that there would be no Antideficiency Act violation at the time the option was exercised. The decision recognized that subsequent actions could still produce a violation. 55 Comp. Gen. at 826.

$8.3 million. The Sanguine funds were included in a $2.6 billion lump-sum Research and Development appropriation. Navy spent more than $11 million for Project Sanguine in Fiscal Year 1974. The question was whether Navy violated the Antideficiency Act by spending more than the $8.3 million provided in the conference report. GAO found that it did not, because the conference committee's action was not specified in the appropriation act and was therefore not legally binding. Significantly, the appropriation act did include a proviso prohibiting use of the funds for "full scale development" of Project Sanguine (not involved in the $11 million expenditure), illustrating that Congress knows perfectly well how to impose a legally binding restriction when it desires to do so. GAO, *Legality of the Navy's Expenditures for Project Sanguine During Fiscal Year 1974*, LCD-75-315 (Washington, D.C.: Jan. 20, 1975). *See also* B-168482-O.M., Aug. 15, 1974.

Similarly, the Department of Health, Education, and Welfare received a $12 billion lump-sum appropriation for public assistance in 1975. Committee reports indicated that $9.2 million of this amount was being provided for research and development activities of the Social and Rehabilitation Service. Since this earmarking of the $9.2 million was not carried into the appropriation act itself, it did not constitute a statutory limit on the amount available for the program. B-164031.3, Apr. 16, 1975.

GAO has applied the rule of the *LTV* and *Newport News* decisions in a number of additional cases and reports, several of which involve variations on the basic theme.[17] One variation involves something of a reverse *LTV* theme when agencies attempt to invoke legislative history to supply a legal basis for their action that is absent from the relevant statutory language. In B-278121, Nov. 7, 1997, the Library of Congress took the position that appropriation language earmarking $9,619,000 for a particular purpose, to remain available until expended, did not require the entire amount to be used exclusively for that purpose. Rather, the Library maintained, the figure constituted merely a "cap" or upper limit on the amount available for

[17] *See* B-285725, Sept. 29, 2000; B-278968, May 28, 1998; B-278121, Nov. 7, 1997; B-277241, Oct. 21, 1997; B-271845, Aug. 23, 1996; 71 Comp. Gen. 411, 413 (1992); 64 Comp. Gen. 359 (1985); 59 Comp. Gen. 228 (1980);B-258000, Aug. 31, 1994; B-248284, Sept. 1, 1992; B-247853.2, July 20, 1992; B-231711, Mar. 28, 1989; B-222853, Sept. 29, 1987; B-204449, Nov. 18, 1981; B-204270, Oct. 13, 1981; B-202992, May 15, 1981; B-157356, Aug. 17, 1978; B-159993, Sept. 1, 1977; B-163922, Oct. 3, 1975; GAO, *Internal Controls: Funding of International Defense Research and Development Projects*, GAO/NSIAD-91-27 (Washington, D.C.: Oct. 30, 1990).

the stated purpose. The Library pointed to the way in which the conference committee described the figures relative to this appropriation as implicitly supporting its position. GAO rejected the Library's interpretation of the statutory language and, in particular, its reliance on implications from the legislative history:

> "Because the language of the law is clear, we have no basis to resort to assumptions or inferences drawn from inexplicit statements contained in the conference report. When the Congress appropriates lump-sum amounts without statutorily restricting what can be done with these funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on federal agencies. 55 Comp. Gen. 307, 319 (1975). Implicit within this holding is the more basic proposition that an existing statutory provision cannot be superseded or repealed by statements, explanations, recommendations, or tables contained in committee reports or in other legislative history. *Id. In other words, if explanations or other comments in committee reports do not create any legally binding restrictions on an agency's discretionary authority to spend a lump-sum appropriation as it chooses, such comments certainly cannot supersede an existing statutory provision that establishes a legally binding amount that the agency may dispose of as an available appropriation.*"

B-278121, at 2 (emphasis supplied).

Similarly, the Comptroller General flatly rejected the notion that otherwise illegal agency actions could be ratified and thereby validated when the agency notified congressional committees of the actions and the committees expressed no objection. *See* B-285725, Sept. 29, 2000; B-248284, Sept. 1, 1992. The decision in B-285725 observed:

> "[N]othing we reviewed clearly communicates to the Congress that the District [of Columbia] was requesting that Congress ratify or otherwise validate an unauthorized disbursement made by the District in excess of an available appropriation let alone that the Congress enact legislation

> that expressly or impliedly authorizes the otherwise unauthorized action. While legislative history may be useful to clarify an ambiguity in legislative language, one may not refer to the legislative history to write into the law that which is not there. 55 Comp. Gen. 307, 325 (1975). The District would have us write into the language of the law something that is not even mentioned in the relevant committee reports."

The treatment of lump-sum appropriations as described above has been considered by the courts as well as GAO, and they reached the same result.[18] The United States Court of Appeals for the District of Columbia Circuit noted that lump-sum appropriations have a "well understood meaning" and stated the rule as follows:

> "A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit."

*International Union v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 825 (1985). The court in that case refused to impose a "reasonable distribution" requirement on the exercise of the agency's discretion, and found that discretion unreviewable. *Id.* at 862–63. *See also McCarey v. McNamara*, 390 F.2d 601 (3rd Cir. 1968); *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 547 n.6 (Ct. Cl. 1980).

One court, at odds with the weight of authority, concluded that an agency was required by 31 U.S.C. § 1301(a) (purpose statute) to spend money in accordance with an earmark appearing only in legislative history. *Blue Ocean Preservation Society v. Watkins*, 767 F. Supp. 1518 (D. Haw. 1991).

The Supreme Court's 1993 decision in *Lincoln v. Vigil*, 508 U.S. 182, put to rest any lingering uncertainty that might have existed on this point. Writing for a unanimous Court, Justice Souter quoted the rule stated in the *LTV*

[18] The Justice Department's Office of Legal Counsel also reached the same conclusion. *See, e.g.*, Memorandum for the General Counsel, United States Marshals Service, *USMS Obligation to Take Steps To Avoid Anticipated Appropriations Deficiency*, OLC Opinion, May 11, 1999; 16 Op. Off. Legal Counsel 77 (1992); 4B Op. Off. Legal Counsel 702 (1980); 4B Op. Off. Legal Counsel 674 (1980).

decision and described it as "a fundamental principle of appropriations law." *Id.* at 192. Specifically, the Court held that reprogrammings under lump-sum appropriations fall within the Administrative Procedure Act's exemption for actions "committed to agency discretion" (5 U.S.C. § 701(a)(2)) and, therefore, are not subject to judicial review. The Court said that the Administrative Procedure Act "makes clear that 'review is not to be had' in these rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *Lincoln*, 508 U.S. at 191.

*Lincoln* concerned a decision by the Indian Health Service to discontinue a health program that had exclusively assisted Indian children in the southwestern United States and to channel the funds into a nationwide program for similar purposes. While the program had been funded for some years under a lump-sum appropriation, it was never mentioned in the language of the appropriation acts. The Court stated in this regard:

> "The allocation of funds from a lump-sum appropriation is . . . traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way.
>
> * * * * *
>
> "[A]n agency's allocation of funds from a lump-sum appropriation requires a complicated balancing of a number of factors which are peculiarly within its expertise: whether its resources are best spent on one program or another; whether it is likely to succeed in fulfilling its statutory mandate; whether a particular program best fits the agency's overall policies; and, indeed, whether the agency has enough resources to fund a program at all. . . . [T]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities. Of course, an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes (though not, as we have seen, just in the legislative history). And, of course,

> we hardly need to note that an agency's decision to ignore congressional expectations may expose it to grave political consequences. But as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [5 U.S.C.] § 701(a)(2) gives the courts no leave to intrude."

508 U.S. at 192–93 (citations and internal quotations omitted).

The Court noted that while the agency had repeatedly informed Congress about the program in question, "as we have explained, these representations do not translate through the medium of legislative history into legally binding obligations." *Id.* at 194. Subsequent judicial decisions have, of course, followed this approach. *E.g.*, *State of California v. United States*, 104 F.3d 1086, 1093–94 (9th Cir.), *cert. denied*, 522 U.S. 806 (1997); *State of New Jersey v. United States*, 91 F.3d 463, 470–71 (3rd Cir. 1996); *Vizenor v. Babbitt*, 927 F. Supp. 1193 (D. Minn. 1996); *Allred v. United States*, 33 Fed. Cl. 349 (1995). *But see Ramah Navajo School Board, Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996).[19]

While *Lincoln*, *LTV*, and related decisions clearly affirm that agencies have very broad *legal* discretion when allocating funds under lump-sum appropriations, an important caveat must be noted: Such discretion obviously does not extend to allowing an agency to avoid contractual or other legal obligations imposed upon it. In other words, the agency cannot reprogram funds otherwise available for payments under a contract and then claim (at least successfully) that its hands are tied from making the contract payments. The Supreme Court's recent decision in *Cherokee Nation of Oklahoma v. Leavitt*, 543 U.S. 631, 125 S. Ct. 1172 (2005), illustrates this point.

[19] In *Ramah*, Congress had capped the amount appropriated for contract support cost payments under the Indian Self-Determination and Education Assistance Act, as amended, 25 U.S.C. §§ 450–450n, at less than the total amount all recipients would have received if paid their full allocations under the Act. The court rejected the government's argument (and the lower court's conclusion) that *Lincoln* precluded judicial review of the method the agency devised to distribute the reduced allocations. Distinguishing *Lincoln*, the court held that the Act provided sufficient law to apply in order to determine the legality of the agency's distribution method. Indeed, the court further held that the agency's distribution method violated the Act. The *Ramah* decision is discussed further in Chapter 2, section C.2, and Chapter 3, section C.5.

*Cherokee Nation of Oklahoma v. Leavitt* addressed the Indian Health Service's obligation to pay contract support costs under the Indian Self-Determination and Education Assistance Act, as amended, 25 U.S.C. §§ 450–450n.[20] The Act requires the Secretary of Health and Human Services,[21] at the request of Indian tribes, to enter into self-determination contracts whereby the tribes agree to administer programs and provide services that would otherwise be the responsibility of the federal government. *See generally* 25 U.S.C. § 450f. The federal government makes contract payments of not less than the amounts the government would have incurred in administering the programs directly, including, among other things, certain administrative contract support costs. *Id.* § 450j-1(a). With respect to contract funding, 25 U.S.C. § 450j-1(b) includes the following proviso:

> "Notwithstanding any other provision in this subchapter, the provision of funds under this subchapter is subject to the availability of appropriations and the Secretary is not required to reduce funding for programs, projects, or activities serving a tribe to make funds available to another tribe or tribal organization under this subchapter."

The *Cherokee Nation* litigation grew out of the government's refusal to pay the full support cost amounts claimed by the tribes under their contracts for certain fiscal years. The government maintained that appropriations for those fiscal years were insufficient to fund the full amounts. The Court disagreed. The Court noted that the self-determination contracts were no less legally binding than ordinary procurement contracts. *Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. at 1178–79. The contracts for the fiscal years in question were funded from lump-sum appropriations to the Indian Health Service that, the Court pointed out, far exceeded the total payments

[20] In *Cherokee Nation of Oklahoma v. Leavitt*, the Court disposed of three decisions from different appellate courts: *Thompson v. Cherokee Nation of Oklahoma*, 334 F.3d 1075 (Fed. Cir. 2003), which the Court affirmed, as well as *Cherokee Nation of Oklahoma v. Thompson*, 311 F.3d 1054 (10th Cir. 2002), and *Shoshone-Bannock Tribes of the Fort Hall Reservation v. Thompson*, 279 F.3d 660 (9th Cir. 2002), both of which the Court reversed. *Ramah Navajo School Board, Inc. v. Babbitt*, 87 F.3d 1338 (D.C. Cir. 1996), discussed previously, is another decision on this subject.

[21] The Act also applies to the Secretary of the Interior and programs administered by that department. However, the *Cherokee Nation of Oklahoma v. Leavitt* case concerned self-determination contracts for the provision of services by the Department of Health and Human Services' Indian Health Service.

due under the contracts and contained no restrictions on the amounts of such payments. *Id.* at 1177. The Court then recited two basic propositions asserted by the tribes that, it noted, the government had conceded.

The first was the "fundamental principle of appropriations law" recognized in *Lincoln* that when Congress appropriates lump-sum amounts unaccompanied by restrictions, a clear inference arises that it does not intend to impose legally binding restrictions and committee reports and other legislative history do not establish legally binding requirements. *Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. at 1177. The second was that—

> "as long as Congress has appropriated sufficient legally unrestricted funds to pay the contracts at issue, the Government normally cannot back out of a promise to pay on grounds of 'insufficient appropriations,' even if the contract uses language such as 'subject to the availability of appropriations,' and even if an agency's total lump-sum appropriation is insufficient to pay *all* the contracts the agency has made."

*Id.* In support of this proposition, the Court cited *Ferris v. United States*, 27 Ct. Cl. 542 (1892), and *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539 (Ct. Cl. 1980). To the same effect, the Court quoted the following statement from the government's brief on the law applicable to ordinary procurement contracts:

> "[I]f the amount of an unrestricted appropriation is sufficient to fund the contract, the contractor is entitled to payment *even if the agency has allocated the funds to another purpose* or assumes other obligations that exhaust the funds."

*Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. at 1179–80 (emphasis supplied).

The Court rejected the government's contentions that the provisos in 25 U.S.C. § 450j-1(b), quoted previously, precluded full payment under the contracts. The Court observed that the first proviso making funding "subject to the availability of appropriations" is frequently used language that simply makes clear that contracts cannot become binding in advance of appropriations or otherwise without regard to the availability of

appropriations. *Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. at 1180–81. "Since Congress appropriated adequate funds here," said the Court, the first proviso, "if interpreted as ordinarily understood, would not help the Government." *Id.* at 1181. The Court concluded that the second proviso, stating that the government need not reduce funding benefiting other tribes in order to fund self-determination contracts was likewise unavailing to the government:

> "The Government argues that these other funds, though legally unrestricted (as far as the appropriations statutes' language is concerned) were nonetheless unavailable to pay 'contract support costs' because the Government had to use those funds to satisfy a critically important need, namely, to pay the costs of 'inherent federal functions,' such as the cost of running the Indian Health Service's central Washington office. This argument cannot help the Government, however, for it amounts to no more than a claim that the agency has allocated the funds to another purpose, albeit potentially a very important purpose. If an important alternative need for funds cannot rescue the Government from the binding effect of its promises where ordinary procurement contracts are at issue, it cannot rescue the Government here, for we can find nothing special in the statute's language or in the contracts.
>
> * * * * *
>
> "We recognize that agencies may sometimes find that they must spend unrestricted appropriated funds to satisfy needs they believe more important than fulfilling a contractual obligation. But the law normally expects the Government to avoid such situations, for example, by refraining from making less essential contractual commitments; or by asking Congress in advance to protect funds needed for more essential purposes with *statutory* earmarks; or by seeking added funding from Congress; or, if necessary, by using unrestricted funds for the more essential purpose while leaving the contractor free to pursue appropriate legal remedies arising because the Government broke its contractual promise. The Government, without denying that this is so as a general matter of procurement law, says

> nothing to convince us that a different legal rule should apply here."

*Id.* at 1180 (citations omitted; emphasis supplied).[22]

Finally, the Court declined to construe an appropriation act provision enacted in a subsequent fiscal year as creating a statutory cap on funding for the years covered by the litigation. This later-enacted provision stated in part:

> "Notwithstanding any other provision of law . . . amounts appropriated to or earmarked in committee reports for the Indian Health Service . . . [for] payments to tribes . . . for contract support costs . . . are the total amounts available for fiscal years 1994 through 1998 for such purposes."[23]

The Court acknowledged that it was reasonable to interpret the language as restricting payments for the prior years. However, it opted not to do so since such an interpretation would treat the language as retroactively repudiating a binding government contract and thereby raising constitutional concerns. *Cherokee Nation of Oklahoma v. Leavitt*, 125 S. Ct. at 1182. The Court also rejected the government's contention that the language simply clarified that the prior ambiguous appropriation language was not unrestricted, concluding that there was nothing ambiguous about the prior language. *Id.* Rather, the Court treated the later-enacted language as affecting only unobligated carryover balances from the prior year appropriations.

### c. "Zero Funding" Under a Lump-Sum Appropriation

Does discretion under a lump-sum appropriation extend so far as to permit an agency to "zero fund" a particular program? Although there are few cases, the answer would appear, for the most part, to be yes, as long as the program is not mandatory and the agency uses the funds for other authorized purposes to avoid impoundment complications. *E.g.*, B-209680,

[22] The logical conclusion from the Court's finding that the Indian Self-Determination Act contracts are no different from ordinary procurement contracts is that the Indian Health Service, at the time it entered into the contracts, should have recorded an obligation against its appropriations for the full amount of the support costs to which the Tribes were entitled.

[23] Section 314 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105-277, 112 Stat. 2681, 2681-288 (Oct. 21, 1998).

Feb. 24, 1983 (agency could properly decide not to fund a program where committee reports on appropriation stated that no funds were being provided for that program, although agency would have been equally free to fund the program under the lump-sum appropriation); B-167656, June 18, 1971 (agency has discretion to discontinue a function funded under a lump-sum appropriation to cope with a shortfall in appropriations); 4B Op. Off. Legal Counsel 701, 704 n.7 (1980) (same point).

The more difficult question is whether the answer is the same where there is no shortfall problem and where it is clear that Congress wants the program funded. In *International Union v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984), *cert. denied*, 474 U.S. 825 (1985), discussed previously, the court upheld an agency's decision to allocate no funds to a program otherwise authorized for funding under a lump-sum appropriation. Although there was in that case a "congressional realization, if not a congressional intent, that nothing would be expended" for the program in question, 746 F.2d at 859, it seems implicit from the court's discussion of applicable law that the answer would have been the same if legislative history had "directed" that the program be funded. The same result would seem to follow from 55 Comp. Gen. 812 (1976), discussed above, holding that the entire unobligated balance of a lump-sum appropriation should be considered available for one of the objects included in the appropriation, at least for purposes of assessing potential violations of the Antideficiency Act.

In B-114833, July 21, 1978, the Department of Agriculture wanted to use its 1978 lump-sum Resource Conservation and Development appropriation to fund existing projects rather than starting any new ones, even though the appropriations committee reports indicated that the funds were for certain new projects. Since the language referring to new projects was stated in committee reports but not in the statute itself, the Department's proposed course of action was legally permissible.

In a very early, 1922 decision, 1 Comp. Gen. 623 (1922), GAO seemed to suggest that there are constraints on an agency's discretion. The appropriation in question provided for "rent of offices of the recorder of deeds, including services of cleaners as necessary, not to exceed 30 cents per hour, . . . $6,000." The Comptroller General held that the entire $6,000 could not be spent for rent. The decision stated:

> "[S]ince [the appropriation act] provides that the amount appropriated shall cover both rent and cleaning services, it

> must be held that the entire amount can not be used for rent alone.
>
> ". . . The law leaves to the discretion of the commissioners the question as to what portion of the amount appropriated shall be paid for rent and what portion shall be paid for services of cleaners, but it does not vest in the commissioners the discretion to determine that the entire amount shall be paid for rent and that the cleaning services shall be left unprovided for, or be provided for from other funds."

*Id.* at 624. As a practical matter it would not have been possible to rent office space and totally eliminate cleaning services, and the use of any other appropriation would have been clearly improper. A factor which apparently influenced the decision was that the "regular office force" was somehow being coerced to do the cleaning, and these were employees paid from a separate appropriation. *Id.*

## 2. Line-Item Appropriations and Earmarks

Congress may wish to specifically designate, or "earmark," part of a more general lump-sum appropriation for a particular object, as either a maximum, a minimum, or both.

An earmark refers to the portion of a lump-sum appropriation designated for a particular purpose.[24] The term earmark often is used interchangeably with the term "line item." In appropriations language, however, a line item is an appropriation that is dedicated for a specific purpose, rather than an amount *within* a lump-sum appropriation.[25] The following example of earmarking language in a lump-sum appropriation can be found in the Consolidated Appropriations Act of 2004:

[24] *See* GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 46–47.

[25] *See Glossary*, at 64.

> "For necessary administrative expenses of the domestic nutrition assistance programs funded under this Act, $138,304,000, of which $5,000,000 shall be available only for simplifying procedures, reducing overhead costs, . . . and prosecution of fraud and other violations of law . . ."[26]

In this example, the $5 million is an earmark.

Often, cases interpreting earmarks turn on congressional intent. *See*, *e.g.*, B-285794, Dec. 5, 2000 (use of statutory interpretation to determine whether the Community Development Block Grant (CDBG) heading requiring competition for assistance "under this heading" applied to an earmark within the CDBG lump-sum appropriation).

For simplicity of illustration, let us assume that we have a lump-sum appropriation of $1 million for "general construction" and a particular object within that appropriation is "renovation of office space." If the appropriation specifies "not to exceed" $100,000 for renovation of office space or "not more than" $100,000 for renovation of office space, then $100,000 is the maximum available for renovation of office space. 64 Comp. Gen. 263 (1985).[27] A specifically earmarked maximum may not be supplemented with funds from the general appropriation.

Statutory authority to transfer funds between appropriations may permit the augmentation of a "not to exceed" earmark in some cases. In 12 Comp. Gen. 168 (1932), it was held that general transfer authority could be used to increase maximum earmarks for personal services, subject to the percentage limitations specified in the transfer statute because, in this case, the transfer authority was remedial legislation designed to mitigate the impact of reduced appropriations. The decision pointed out that if the personal services earmark had been a separate line-item appropriation, the transfer authority would clearly apply. *Id.* at 170. Somewhat similarly, in 36 Comp. Gen. 607 (1957), funds transferred to an operating appropriation from a civil defense appropriation could be used to exceed an administrative expense limitation in the operating appropriation. Congress

[26] Pub. L. No. 108-199, div. A, title IV, 118 Stat. 3, 27 (Jan. 23, 2004).

[27] A "not to exceed" earmark was held not to constitute a maximum in 19 Comp. Gen. 61 (1939), where the earmarking language was inconsistent with other language in the general appropriation. This holding was based on an interpretation of the statute as a whole. See section D of Chapter 2 for additional information on statutory interpretation.

had imposed new civil defense functions but had neglected to adjust the administrative expenses limitation. However, in 33 Comp. Gen. 214 (1953), the Comptroller General held that general transfer authority could not be used to exceed a maximum earmark on an emergency assistance program where it was clear that Congress, aware of the emergency, intended that the program be funded only from the earmark. *See also* 18 Comp. Gen. 211 (1938). As in many cases, these decisions turned on congressional intent.

Under a "not to exceed" earmark, the agency is not required to spend the entire amount on the object specified. *See*, *e.g.*, *Brown v. Ruckelshaus*, 364 F. Supp. 258, 266 (C.D. Cal. 1973) ("the phrase 'not to exceed' connotes limitation, not disbursement"). If, in our hypothetical, the entire $100,000 is not used for renovation of office space, unobligated balances may—within the time limits for obligation—be applied to other unrestricted objects of the appropriation. B-290659, July 24, 2002; 31 Comp. Gen. 578, 579 (1952); 15 Comp. Dec. 660 (1909); B-4568, June 27, 1939.

If later in the fiscal year a supplemental appropriation is made for "renovation of office space," the funds provided in the supplemental may not be used to increase the $100,000 maximum for general construction unless the supplemental appropriation act so specifies. See section D of this chapter for a further discussion of supplemental appropriations.

An earmark that authorizes an agency to use a lump-sum appropriation for "not more than" a certain dollar amount has the same effect as a "not to exceed" earmark. For example, when the Department of State received a lump-sum appropriation for "International Organizations and Programs" authorizing it to make "not more than" $34 million of that lump sum available for the United Nations Population Fund (UNFPA), the Comptroller General concluded:

> "[W]hile the appropriation limits the State Department's use of the lump-sum appropriation for 'International Organizations and Programs' for UNFPA to no more than $34 million, it does not require by law that any amounts be used for UNFPA."

B-290659, July 24, 2002. In this case, the State Department could use the funds for UNFPA only after the Department ensured that UNFPA practices satisfied three statutory conditions, one of which was that UNFPA would not fund abortions. Pub. L. No. 107-115, § 576, 115 Stat. 2118, 2168 (Jan. 10, 2002). The Department had delayed obligating funds for UNFPA pending an analysis of a report of a team reviewing UNFPA's involvement in Chinese family planning practices, including the funding of abortions.[28]

Words like "not more than" or "not to exceed" are not the only ways to establish a maximum limitation. If the appropriation includes a specific amount for a particular object (such as "for renovation of office space, $100,000"), then the appropriation establishes a maximum that may not be exceeded. 36 Comp. Gen. 526 (1957); 19 Comp. Gen. 892 (1940); 16 Comp. Gen. 282 (1936).

Another device Congress has used to designate earmarks as maximum limitations is the following general provision:

> "Whenever in this Act, an amount is specified within an appropriation for particular purposes or objects of expenditure, such amount, *unless otherwise specified*, shall be considered as the maximum amount that may be expended for said purpose or object rather than an amount set apart *exclusively* therefor." (Emphasis added.)[29]

By virtue of the "unless otherwise specified" clause, the provision does not apply to amounts within an appropriation which have their own specific earmarking "words of limitation," such as "exclusively." 31 Comp. Gen. 578 (1952).

If a lump-sum appropriation includes several particular objects and provides further that the appropriation "is to be accounted for as one fund" or "shall constitute one fund," then the individual amounts are not limitations, the only limitation being that the total amount of the lump-sum

[28] While the Comptroller General concluded that the Department did not have to use funds for UNFPA, he cautioned that whenever an agency withholds fiscal year funds from obligation, it must release the funds with sufficient time remaining in the fiscal year to obligate them before the end of the fiscal year. B-290659, July 24, 2002.

[29] District of Columbia Appropriations Act, 2005, Pub. L. No. 108-335, § 301, 118 Stat. 1322, 1399 (Oct. 18, 2004).

appropriation cannot be exceeded. However, individual items within that lump-sum appropriation that include the "not to exceed" language will still constitute maximum limitations. 22 Comp. Dec. 461 (1916); 3 Comp. Dec. 604 (1897); A-79741, Aug. 7, 1936. The "one fund" language is generally used when Congress authorizes an agency to transfer unexpended balances of prior appropriations to a current appropriation. For example, the Energy and Water Development Appropriations Act for 2002 states that—

> "The unexpended balances of prior appropriations provided for activities in the Act may be transferred to appropriation accounts for such activities established pursuant to the title. Balances so transferred may be merged with funds in the applicable established accounts and thereafter may be accounted for as one fund for the same period as originally enacted."[30]

If Congress wishes to specify a minimum for the particular object but not a maximum, the appropriation act may provide "General construction, $1 million, of which not less than $100,000 shall be available for renovation of office space." B-137353, Dec. 3, 1959. *See also* 64 Comp. Gen. 388 (1985); B-131935, Mar. 17, 1986. If the phrase "not less than" is used, in contrast with the "not to exceed" language, portions of the $100,000 not obligated for renovation of office space may not be applied to the other objects of the appropriation. 64 Comp. Gen. at 394–95; B-128943, Sept. 27, 1956.

Another phrase Congress often uses to earmark a portion of a lump-sum appropriation is "shall be available." There are variations. For example, our hypothetical $1 million "renovation of office space" appropriation may provide that, out of the $1 million, $100,000 "shall be available" or "shall be available only" or "shall be available exclusively" for renovation of office space. Still another variation is "$1 million, including $100,000 for renovation of office space."

If the "shall be available" phrase is combined with the maximum or minimum language noted above ("not to exceed," "not less than," *etc.*), then the above rules apply and the phrase "shall be available" adds little. *See, e.g.*, B-137353, Dec. 3, 1959. However, if the earmarking phrase "shall be

[30] Pub. L. No. 107-66, § 305, 115 Stat. 486, 509 (Nov. 12, 2001).

available" is used without the "not to exceed" or "not less than" modifiers, the rules are not quite as firm.

Cases interpreting the "shall be available" and "shall be available only" earmarks are somewhat less than consistent. The earlier decisions proclaimed "shall be available" to constitute a maximum but not a minimum (B-5526, Sept. 14, 1939), although it could be a minimum if Congress clearly expressed that intent (B-128943, Sept. 27, 1956). Later cases held the earmark to constitute both a maximum and a minimum which could neither be augmented nor diverted to other objects within the appropriation. B-137353, Dec. 3, 1959; B-137353-O.M., Oct. 14, 1958. Another early decision held summarily that "shall be available only" results in a maximum which cannot be augmented. 18 Comp. Gen. 1013 (1939). Later decisions, however, have expressed the view that the effect of "shall be available only"—whether it is a maximum or a minimum—depends on the underlying congressional intent. 53 Comp. Gen. 695 (1974); B-142190, Mar. 23, 1960. Applying this test, the earmark in 53 Comp. Gen. 695 was found to be a maximum; similar language had been found a minimum in B-142190, which could be exceeded.

If the phrase "shall be available" may be said to contain an element of ambiguity, addition of the word "only" does not produce a plain meaning. The Claims Court, reviewing an authorization earmark for a Navy project known as RACER, commented:

> "[I]t is not apparent from the language of the authorization ($45 million 'is available only for') that Congress necessarily mandated the Navy to spend all $45 million on the RACER system. Rather, Congress may have merely intended to preclude the Navy from spending that $45 million on any other activities, *i.e.*, the money would be forfeited if not spent on the RACER system."

*Solar Turbines, Inc. v. United States*, 23 Cl. Ct. 142, 158 (1991).

Use of the word "exclusively" is somewhat more precise. The earmark "shall be available exclusively" is both a maximum which cannot be augmented from the general appropriation, and a minimum which cannot be diverted to other objects within the appropriation. B-102971, Aug. 24, 1951. Once again, however, clearly expressed congressional intent can produce a different result. B-113272-O.M., May 21, 1953; B-111392-O.M., Oct. 17, 1952 (earmark held to be a minimum only in both cases).

Similarly, the term "including" has been held to establish both a maximum and a minimum. A-99732, Jan. 13, 1939. As such, it cannot be augmented from a more general appropriation (19 Comp. Gen. 892 (1940)), nor can it be diverted to other uses within the appropriation (67 Comp. Gen. 401 (1988)).

To sum up, the most effective way to establish a maximum (but not minimum) earmark is by the words "not to exceed" or "not more than." The words "not less than" most effectively establish a minimum (but not maximum). These are all phrases with well-settled plain meanings. The "shall be available" family of earmarking language presumptively "fences in" the earmarked sum (both maximum and minimum), but is more subject to variation based upon underlying congressional intent.

Our discussion thus far has centered on the use of earmarking language to prescribe the amount available for a particular object. Earmarking language also may be used to vary the period of availability for obligation.

An earmarked amount within a lump-sum appropriation that is available without fiscal year limitation is neither a maximum nor a minimum if the funds have not been designated for a specific purpose. The earmark addresses only the time availability of the earmarked amount. For example, in the Legislative Branch Appropriations Act for 2004, the Salaries, Officers and Employees appropriations lump-sum account contained the following language:

> "For compensation and expenses of officers and employees, as authorized by law, $156,896,000, including: . . . for salaries and expenses of the Office of the Chief Administrative Officer, $111,141,000, of which $8,400,000 shall remain available until expended . . ."[31]

In this instance, the earmark extended the time period availability of $8,400,000 of the $111,141,000 appropriated for salaries and expenses but did not prescribe the amount available for a particular object.

In a 1997 decision, GAO determined that an earmark extending the time period also constituted a minimum for the purpose for which it was

[31] Pub. L. No. 108-83, 117 Stat. 1007, 1015 (Sept. 30, 2003).

earmarked. B-278121, Nov. 7, 1997 (nondecision letter). The Library of Congress Salaries and Expenses lump-sum appropriation stated as follows:

> "For necessary expenses of the Library of Congress not otherwise provided for . . . $227,016,000 . . . *Provided further*, That of the total amount appropriated, $9,619,000 is to remain available until expended for acquisition of books, periodicals, newspapers, and all other materials including subscriptions for bibliographic services for the Library . . ."[32]

GAO determined that the Library of Congress was required to make the entire $9,619,000 available for acquisition of books and materials, even if this required reducing other expenditures within the lump-sum appropriation.[33]

Finally, earmarking language may be found in authorization acts as well as appropriation acts. The same meanings apply. Several of the cases cited above involve authorization acts. *See*, *e.g.*, 64 Comp. Gen. 388 (1985); B-131935, Mar. 17, 1986.

[32] Pub. L. No. 105-55, 111 Stat. 1177, 1191–92 (Oct. 7, 1997).

[33] *But see* B-231711, Mar. 28, 1989 (appropriation provision earmarked portion of lump sum to remain available for an additional fiscal year for a specific purpose, but was neither maximum nor minimum limitation on amount available for particular object). While B-231711 was not explicitly overruled by B-278121, Nov. 7, 1997, it has little precedential value.

## C. The Antideficiency Act

### 1. Introduction and Overview

The Antideficiency Act is one of the major laws in the statutory scheme by which Congress exercises its constitutional control of the public purse. It has been termed "the cornerstone of Congressional efforts to bind the Executive branch of government to the limits on expenditure of appropriated funds."[34]

As with the series of funding statutes as a whole, the Antideficiency Act did not hatch fully developed but evolved over a period of time in response to various abuses. As we noted in Chapter 1, as late as the post-Civil War period, it was not uncommon for agencies to incur obligations in excess, or in advance, of appropriations. Perhaps most egregious of all, some agencies would spend their entire appropriations during the first few months of the fiscal year, continue to incur obligations, and then return to Congress for appropriations to fund these "coercive deficiencies."[35] These were obligations to others who had fulfilled their part of the bargain with the United States and who now had at least a moral—and in some cases also a legal—right to be paid. Congress felt it had no choice but to fulfill these commitments, but the frequency of deficiency appropriations played havoc with the United States budget.

The congressional response to abuses of this nature was the Antideficiency Act. Its history is summarized in the following paragraphs:[36]

> "Control in the execution of the Government's budgetary and financial programs is based on the provisions of section 3679 of the Revised Statutes, as amended . . ., commonly referred to as the Antideficiency Act. As the name . . .

[34] Hopkins & Nutt, *The Anti-Deficiency Act (Revised Statutes 3679) and Funding Federal Contracts: An Analysis*, 80 Mil. L. Rev. 51, 56 (1978).

[35] Hopkins & Nutt, at 57–58; Louis Fisher, *Presidential Spending Power*, 232 (1975).

[36] Senate Committee on Government Operations, *Financial Management in the Federal Government*, S. Doc. No. 87-11, at 45–46 (1961). In the Senate document, the Antideficiency Act is cited as "section 3679 of the Revised Statutes," a designation that is now obsolete.

implies, one of the principal purposes of the legislation was to provide effective control over the use of appropriations so as to prevent the incurring of obligations at a rate which will lead to deficiency (or supplemental) appropriations and to fix responsibility on those officials of Government who incur deficiencies or obligate appropriations without proper authorization or at an excessive rate.

"The original section 3679 . . . was derived from legislation enacted in 1870 [16 Stat. 251] and was designed solely to prevent expenditures in excess of amounts appropriated. In 1905 [33 Stat. 1257] and 1906 [34 Stat. 48], section 3679 . . . was amended to provide specific prohibitions regarding the obligation of appropriations and required that certain types of appropriations be so apportioned over a fiscal year as to 'prevent expenditures in one portion of the year which may necessitate deficiency or additional appropriations to complete the service of the fiscal year for which said appropriations are made.' Under the amended section, the authority to make, waive, or modify apportionments was vested in the head of the department or agency concerned. By Executive Order 6166 of June 10, 1933, this authority was transferred to the Director of the [Office of Management and Budget]. . . .

"During and following World War II, with the expansion of Government functions and the increase in size and complexities of budgetary and operational problems, situations arose highlighting the need for more effective control and conservation of funds. In order to effectively cope with these conditions it was necessary to seek legislation clarifying certain technical aspects of section 3679 of the Revised Statutes, and strengthening the apportionment procedures, particularly as regards to agency control systems. Section 1211 of the General Appropriation Act, 1951 [64 Stat. 765], amended section 3679 . . . to provide a basis for more effective control and economical use of appropriations. Following a recommendation of the second Hoover Commission that agency allotment systems should be simplified, Congress passed legislation in 1956 [70 Stat. 783] further amending section 3679 to provide that each agency work toward the

> objective of financing each operating unit, at the highest practical level, from not more than one administrative subdivision for each appropriation or fund affecting such unit. In 1957 [71 Stat. 440] section 3679 was further amended, adding a prohibition against the requesting of apportionments or reapportionments which indicate the necessity for a deficiency or supplemental estimate except on the determination of the agency head that such action is within the exceptions expressly set out in the law. The revised Antideficiency Act serves as the primary foundation for the Government's administrative control of funds systems."

In its current form, the law prohibits:

- Making or authorizing an expenditure from, or creating or authorizing an obligation under, any appropriation or fund in excess of the amount available in the appropriation or fund unless authorized by law. 31 U.S.C. § 1341(a)(1)(A).

- Involving the government in any contract or other obligation for the payment of money for any purpose in advance of appropriations made for such purpose, unless the contract or obligation is authorized by law. 31 U.S.C. § 1341(a)(1)(B).

- Accepting voluntary services for the United States, or employing personal services in excess of that authorized by law, except in cases of emergency involving the safety of human life or the protection of property. 31 U.S.C. § 1342.

- Making obligations or expenditures in excess of an apportionment or reapportionment, or in excess of the amount permitted by agency regulations. 31 U.S.C. § 1517(a).[37]

Subsequent sections of this chapter will explore these concepts in detail. However, the fiscal principles inherent in the Antideficiency Act are really quite simple. Government officials may not make payments or commit the United States to make payments at some future time for goods or services unless there is enough money in the "bank" to cover the cost in full. The "bank," of course, is the available appropriation.

The combined effect of the Antideficiency Act, in conjunction with the other funding statutes discussed throughout this publication, was summarized in a 1962 decision. The summary has been quoted in numerous later Antideficiency Act cases and bears repeating here:

> "These statutes evidence a plain intent on the part of the Congress to prohibit executive officers, unless otherwise authorized by law, from making contracts involving the Government in obligations for expenditures or liabilities beyond those contemplated and authorized for the period of availability of and within the amount of the appropriation under which they are made; to keep all the departments of the Government, in the matter of incurring obligations for expenditures, within the limits and purposes of appropriations annually provided for conducting their lawful functions, and to prohibit any officer or employee of the Government from involving the Government in any contract or other obligation for the payment of money for any purpose, in advance of appropriations made for such

[37] *See* S. Doc. No. 87-11, at 48; B-131361, Apr. 12, 1957. Further discussion of the Antideficiency Act from varying perspectives will be found in the following sources: James A. Harley, *Multiyear Contracts: Pitfalls and Quandaries*, 27 Public Contract L.J. 555 (1998); Col. James W. McBride, *Avoiding Antideficiency Act Violations on Fixed Price Incentive Contracts (The Hunt for Red Ink)*, June Army Lawyer (1994); Fenster & Volz, *The Antideficiency Act: Constitutional Control Gone Astray*, 11 Public Contract L.J. 155 (1979); Rollee H. Efros, *Statutory Restrictions on Funding of Government Contracts*, 10 Public Contract L.J. 254 (1978); Hopkins & Nutt, *The Anti-Deficiency Act (Revised Statutes 3679) and Funding Federal Contracts: An Analysis*, 80 Mil. L. Rev. 51 (1978); William J. Spriggs, *The Anti-Deficiency Act Comes to Life in U.S. Government Contracting*, 10 National Contract Management Journal 33 (1976–77); Col. John R. Frazier, *Use of Annual Funds with Conditional, Option, or Indefinite Delivery Contracts*, 8 A.F. JAG L. Rev. 50 (1966).

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 53 of 728



> purpose; and to restrict the use of annual appropriations to expenditures required for the service of the particular fiscal year for which they are made."

42 Comp. Gen. 272, 275 (1962).

To the extent it is possible to summarize appropriations law in a single paragraph, this is it. Viewed in the aggregate, the Antideficiency Act and related funding statutes "[restrict] in every possible way the expenditures and expenses and liabilities of the government, so far as executive offices are concerned, to the specific appropriations for each fiscal year." *Wilder's Case*, 16 Ct. Cl. 528, 543 (1880).

## 2. Obligation/Expenditure in Excess or Advance of Appropriations

The key provision of the Antideficiency Act is 31 U.S.C. § 1341(a)(1):[38]

> "(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—
>
> > "(A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; or
> >
> > "(B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law."

Not only is section 1341(a)(1) the key provision of the Act, it was originally the only provision, the others being added to ensure enforcement of the basic prohibitions of section 1341.

The law is not limited to the executive branch, but applies to any "officer or employee of the United States Government" and thus extends to all branches. Examples of legislative branch applications are B-303964, Feb. 3,

[38] Prior to the 1982 recodification of title 31 of the United States Code, the Antideficiency Act consisted of nine lettered subsections of what was then 31 U.S.C. § 665. The recodification scattered the law among several new sections. To better show the relationship of the material, our organization in this chapter retains the sequence of the former subsections.

2005 (Capitol Police use of the Legislative Branch Emergency Response Fund); B-303961, Dec. 6, 2004 (Architect of the Capitol); B-107279, Jan. 9, 1952 (Office of Legislative Counsel, House of Representatives); B-78217, July 21, 1948 (appropriations to Senate for expenses of Office of Vice President); 27 Op. Att'y Gen. 584 (1909) (Government Printing Office). Within the judicial branch, it applies to the Administrative Office of the United States Courts. *E.g.*, 50 Comp. Gen. 589 (1971). However, whether a federal judge is an officer or employee for purposes of 31 U.S.C. § 1341(a)(1) appears to remain an open question, at least in some contexts. *See Armster v. United States District Court*, 792 F.2d 1423, 1427 n.7 (9th Cir. 1986) (the Seventh Amendment of the Constitution prohibits suspension of civil jury trials for lack of funds, whether or not a judge is considered an employee or officer under the Antideficiency Act). The Antideficiency Act also applies to officers of the District of Columbia Courts. B-284566, Apr. 3, 2000.

Some government corporations are also classified as agencies of the United States Government, and to the extent they operate with funds which are regarded as appropriated funds, they too are subject to 31 U.S.C. § 1341(a)(1). *E.g.*, B-223857, Feb. 27, 1987 (Commodity Credit Corporation); B-135075-O.M., Feb. 14, 1975 (Inter-American Foundation). It follows that section 1341(a)(1) does not apply to a government corporation that is not an agency of the United States Government. *E.g.*, B-175155-O.M., July 26, 1976 (Amtrak). These principles are, of course, subject to variation if and to the extent provided in the relevant organic legislation.

There are two distinct prohibitions in section 1341(a)(1). Unless otherwise authorized by law, no officer or employee of the United States may (1) make any expenditure or incur an obligation *in excess* of available appropriations, or (2) make an expenditure or incur an obligation *in advance* of appropriations.

The distinction between obligating in excess of an appropriation and obligating in advance of an appropriation is clear in the majority of cases, but can occasionally become blurred. For example, an agency which tries to meet a current shortfall by "borrowing" from (*i.e.*, obligating against) the unenacted appropriation for the next fiscal year is clearly obligating in advance of an appropriation. *E.g.*, B-236667, Jan. 26, 1990. However, it is also obligating in excess of the currently available appropriation. Since both are equally illegal, determining precisely which subsection of 31 U.S.C. § 1341(a) has been violated is of secondary importance. In any

event, the point to be stressed here is that the law is violated not just when there are insufficient funds in an account when a payment becomes due. The very act of obligating the United States to make a payment when the necessary funds are not already in the account is also a violation of 31 U.S.C. § 1341(a). *E.g.*, B-300480, Apr. 9, 2003.

In B-290600, July 10, 2002, both the Office of Management and Budget (OMB) and the Airline Transportation Stabilization Board (ATSB) violated the Antideficiency Act when OMB apportioned, and ATSB obligated an appropriation, in advance of, and thus in excess of, its availability. The Air Transportation Safety and System Stabilization Act authorized the President to issue up to $10 billion in loan guarantees, and to provide the subsidy amounts necessary for such guarantees,[39] to assist air carriers who incurred losses resulting from the September 11, 2001, terrorist attacks on the United States. Pub. L. No. 107-42, title I, § 101(a)(1), 115 Stat. 230 (Sept. 22, 2001). Congress established the ATSB to review and decide on applications for these loan guarantees. The budget authority for the guarantees was available only "to the extent that a request, that includes designation of such amount as an emergency requirement . . . is transmitted by the President to Congress." *Id.* at § 101(b). The President had not submitted such a request at the time OMB apportioned the funds to ATSB and the ATSB obligated the funds; therefore, both OMB and ATSB made funds available in advance of their availability, violating the Antideficiency Act. See section C of this chapter for a discussion of the apportionment process.

Note that 31 U.S.C. § 1341(a) refers to overobligating and overspending the amount available in an "appropriation or fund." The phrase "appropriation or fund" refers to appropriation and fund accounts. An appropriation account is the basic unit of an appropriation generally reflecting each unnumbered paragraph in an appropriation act. Fund accounts include general fund accounts, intragovernmental fund accounts, special fund accounts, and trust fund accounts.[40] *See*, *e.g.*, 72 Comp. Gen. 59 (1992) (Corps of Engineers was prohibited by the Antideficiency Act from overobligating its Civil Works Revolving Fund's available budget authority).

[39] Pursuant to the Federal Credit Reform Act, agencies are required to have budget authority in advance to cover the long-term costs (*i.e.*, subsidy costs) of direct loans and loan guarantees. 2 U.S.C. § 661c(b).

[40] *See* GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 3–5.

Thus, for example, the Antideficiency Act applies to Indian trust funds managed by the Bureau of Indian Affairs. However, the investment of these funds in certificates of deposit with federally insured banks under authority of 25 U.S.C. § 162a does not, in GAO's opinion, constitute an obligation or expenditure for purposes of 31 U.S.C. § 1341. Accordingly, overinvested trust funds do not violate the Antideficiency Act unless the overinvested funds, or any attributable interest income, are obligated or expended by the Bureau. B-207047-O.M., June 17, 1983. *Cf.* B-303413, Nov. 8, 2004 (the Federal Communications Commission's (FCC) regulatory action to provide spectrum rights through a license modification instead of an auction did not violate section 1341; spectrum licenses that impose costs and expenses on the licensee do not constitute an obligation and expenditure of the FCC). GAO also views the Antideficiency Act as applicable to presidential and vice-presidential "unvouchered expenditure" accounts. B-239854, June 21, 1990 (internal memorandum).

## a. Exhaustion of an Appropriation

When we talk about an appropriation being "exhausted," we are really alluding to any of several different but related situations:

- Depletion of appropriation account (*i.e.*, fully obligated and/or expended).
- Similar depletion of a maximum amount specifically earmarked in a lump-sum appropriation.[41]
- Depletion of an amount subject to a monetary ceiling imposed by some other statute (usually, but not always, the relevant program legislation).

(1) <u>Making further payments</u>

In simple terms, once an appropriation is exhausted, the making of any further payments, apart from using expired balances to liquidate or make adjustments to valid obligations recorded against that appropriation, violates 31 U.S.C. § 1341. When the appropriation is fully expended, no further payments may be made in any case. If an agency finds itself in this position, unless it has transfer authority or other clear statutory basis for

[41] See section B of this chapter for a discussion of earmarking.

making further payments, it has little choice but to seek a deficiency[42] or supplemental appropriation from Congress, and to adjust or curtail operations as may be necessary. *E.g.*, B-285725, Sept. 29, 2000; 61 Comp. Gen. 661 (1982); 38 Comp. Gen. 501 (1959). For example, when the Corporation for National and Community Service obligated funds in excess of the amount available to it in the National Service Trust, the Corporation suspended participant enrollment in the AmeriCorps program and requested a deficiency appropriation from Congress.[43]

In many ways, the prohibitions in the Adequacy of Appropriations Act, 41 U.S.C. § 11, parallel those of 31 U.S.C. § 1341(a). The Adequacy of Appropriations Act states in part that—

> "No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment, except in the Department of Defense and in the Department of Transportation with respect to the Coast Guard when it is not operating as a service in the Navy, for clothing, subsistence, forage, fuel, quarters, transportation, or medical and hospital supplies, which, however, shall not exceed the necessities of the current year."

41 U.S.C. § 11(a). For example, a contract in excess of the available appropriation violates both statutes. *E.g.*, 9 Comp. Dec. 423 (1903). However, a contract in compliance with 41 U.S.C. § 11 can still result in a violation of the Antideficiency Act. Assessment of Antideficiency Act violations is not frozen at the point when the obligation is incurred. Even if the initial obligation was well within available funds, the Antideficiency Act can still be violated if upward adjustments cause the obligation to exceed available funds. *E.g.*, 55 Comp. Gen. 812, 826 (1976).

[42] See 31 U.S.C. §§ 1552(a), 1553(a), 1554(a), and Chapter 5, section D, for a discussion of expired and closed appropriation accounts.

[43] GAO, *Corporation for National and Community Service: Better Internal Control and Revised Practices Would Improve the Management of AmeriCorps and the National Service Trust*, GAO-04-225 (Washington, D.C.: Jan. 16, 2004).

What one authority termed the "granddaddy of all violations"[44] occurred when the Navy overobligated and overspent nearly $110 million from its "Military Personnel, Navy" appropriation during the years 1969–1972. GAO summarized the violation in a letter report, B-177631, June 7, 1973. While there may have been some concealment, GAO concluded that the violation was not the result of some evil scheme; rather, the "basic cause of the violation was the separation of the authority to create obligations from the responsibility to control them." The authority to create obligations had been decentralized while control was centralized in the Bureau of Naval Personnel.

Granddaddy was soon to lose his place of honor on the totem pole. Around November of 1975, the Department of the Army discovered that, for a variety of reasons, it had overobligated four procurement appropriations in the aggregate amount of more than $160 million and consequently had to halt payments to some 900 contractors. The Army requested the Comptroller General's advice on a number of potential courses of action it was considering. The resulting decision was 55 Comp. Gen. 768 (1976). The Army recognized its duty to mitigate the Antideficiency Act violation.[45] It was clear that without a deficiency appropriation, all the contractors could not be paid. One option—to use current appropriations to pay the deficiencies—had to be rejected because there is no authority to apply current funds to pay off debts incurred in a previous year. *Id.* at 773. An option GAO endorsed was to reduce the amount of the deficiencies by terminating some of the contracts for convenience, although the termination costs would still have to come from a deficiency appropriation unless there was enough left in the appropriation accounts to cover them. *Id.*

(2) <u>Limitations on contractor recovery</u>

If the Antideficiency Act prohibits any further payments when the appropriation is exhausted, where does this leave the contractor? Is the contractor expected to know how and at what rate the agency is spending its money? There is a small body of judicial case law which discusses the effect of the exhaustion of appropriations on government obligations. The

[44] Louis Fisher, *Presidential Spending Power*, 236 (1975).

[45] "We believe it is obvious that, once an Antideficiency Act violation has been discovered, the agency concerned must take all reasonable steps to mitigate the effects of the violation insofar as it remains executory." 55 Comp. Gen. at 772.

fate of the contractor seems to depend on the type of appropriation involved and the presence or absence of notice, actual or constructive, to the contractor on the limitations of the appropriation.

Where a contractor is but one party out of several to be paid from a general appropriation, the contractor is under no obligation to know the status or condition of the appropriation account on the government's books. If the appropriation becomes exhausted, the Antideficiency Act may prevent the agency from making any further payments, but valid obligations will remain enforceable in the courts. For example, in *Ferris v. United States*, 27 Ct. Cl. 542 (1892), the plaintiff had a contract with the government to dredge a channel in the Delaware River. The Corps of Engineers made him stop work halfway through the job because it had run out of money. In discussing the contractor's rights in a breach of contract suit, the court said:

> "A contractor who is one of several persons to be paid out of an appropriation is not chargeable with knowledge of its administration, nor can his legal rights be affected or impaired by its maladministration or by its diversion, whether legal or illegal, to other objects. An appropriation *per se* merely imposes limitations upon the Government's own agents; it is a definite amount of money entrusted to them for distribution; but its insufficiency does not pay the Government's debts, nor cancel its obligations, nor defeat the rights of other parties."

*Id*. at 546.

The rationale for this rule is that "a contractor cannot justly be expected to keep track of appropriations where he is but one of several being paid from the fund." *Ross Construction Corp. v. United States*, 392 F.2d 984, 987 (Ct. Cl. 1968). Other illustrative cases are *Dougherty ex rel. Slavens v. United States*, 18 Ct. Cl. 496 (1883), and *Joplin v. United States*, 89 Ct. Cl. 345 (1939). The Antideficiency Act may "apply to the official, but [does] not affect the rights in this court of the citizen honestly contracting with the Government." *Dougherty*, 18 Ct. Cl. at 503. Thus, it is settled that contractors paid from a general appropriation are not barred from recovering for breach of contract even though the appropriation is exhausted.

However, under a specific line-item appropriation, the answer is different. The contractor in this situation is deemed to have notice of the limits on the spending power of the government official with whom he contracts. A contract under these circumstances is valid only up to the amount of the available appropriation. Exhaustion of the appropriation will generally bar any further recovery beyond that limit. *E.g.*, *Sutton v. United States*, 256 U.S. 575 (1921); *Hooe v. United States*, 218 U.S. 322 (1910); *Shipman v. United States*, 18 Ct. Cl. 138 (1883); *Dougherty*, 18 Ct. Cl. at 503.

The distinction between the *Ferris* and *Sutton* lines of cases follows logically from the old maxim that ignorance of the law is no excuse. If Congress appropriates a specific dollar amount for a particular contract, that amount is specified in the appropriation act and the contractor is deemed to know it. It is certainly not difficult to locate. If, on the other hand, a contract is but one activity under a larger appropriation, it is not reasonable to expect the contractor to know how much of that appropriation remains available for it at any given time. A requirement to obtain this information would place an unreasonable burden on the contractor, not to mention a nuisance for the government as well.

In two cases in the 1960s, the Court of Claims permitted recovery on contractor claims in excess of a specific monetary ceiling. *See Anthony P. Miller, Inc. v. United States*, 348 F.2d 475 (Ct. Cl. 1965) (claim by Capehart Housing Act contractor); *Ross Construction Corp. v. United States*, 392 F.2d 984 (Ct. Cl. 1968) (claim by contractor for "off-site" construction ancillary to Capehart Act housing). The court distinguished between matters not the fault or responsibility of the contractor (for example, defective plans or specifications or changed conditions under the "changed conditions" clause), in which case above-ceiling claims are allowable, and excess costs resulting from what it termed "simple extras," in which case they are not. Without attempting to detail the fairly complex Capehart legislation here, we note merely that *Ross* is more closely analogous to the *Ferris* situation (392 F.2d at 986), while *Anthony P. Miller* is more closely analogous to the *Sutton* situation (392 F.2d at 987). The extent to which the approach reflected in these cases will be applied to the more traditional form of exhaustion of appropriations remains to be developed, although the *Ross* court intimated that it saw no real distinction for these purposes between a specific appropriation and a specific monetary ceiling imposed by other legislation (*id.*).

### b. Contracts or Other Obligations in Excess or Advance of Appropriations

It is easy enough to say that the Antideficiency Act prohibits you from obligating a million dollars when you have only half a million left in the account, or that it prohibits you from entering into a contract in September purporting to obligate funds for the next fiscal year that have not yet been appropriated. Many of the situations that actually arise from day to day, however, are not quite that simple. A useful starting point is the relationship of the Antideficiency Act to the recording of obligations under 31 U.S.C. § 1501.

(1) Proper recording of obligations

Proper recording practices are essential to sound funds control. An amount of recorded obligations in excess of the available appropriation is *prima facie* evidence of a violation of the Antideficiency Act, but is not conclusive. B-134474-O.M., Dec. 18, 1957.[46]

An example of this is B-300480, Apr. 9, 2003, in which the Corporation for National and Community Services failed to recognize and record obligations for national service educational benefits of AmeriCorps participants when it incurred that obligation. In that case, the Corporation made grant awards to state corporations, who, in turn, made subgrants to nonprofit entities, who enrolled participants. In its grant awards to the state corporations, the Corporation approved the enrollment of a specified number of new program participants. Because the Corporation in the grant agreement had committed to a specified number of new participants, the Corporation incurred an obligation for the participants' educational benefits at that time; without further action by the Corporation, the Corporation was legally required to pay education benefits of all participants, up to the number the Corporation had specified in the grant agreement, if the grantee and subgrantee, who needed no further approval from the Corporation, enrolled that number of new participants, and if they satisfied the criteria for benefits. The Corporation's failure to recognize and record its obligation did not ameliorate its violation of the Act. *See also* B-300480.2, June 6, 2003.

Also, in many situations, the amount of the government's liability is not definitely fixed at the time the obligation is incurred. An example is a

[46] GAO has cautioned, however, that an Antideficiency Act violation should not be determined solely on the basis of year-end reports prior to reconciliation and adjustment. B-114841.2-O.M., Jan. 23, 1986.

contract with price escalation provisions. A violation would occur if sufficient budget authority is not available when an agency must adjust a recorded obligation. *See*, *e.g.*, B-240264, Feb. 7, 1994 (an agency would incur an Antideficiency Act violation if it must adjust an obligation for an incrementally funded contract to fully reflect the extent of the *bona fide* need contracted for and sufficient appropriations are not available to support the adjustment).

This is illustrated in B-289209, May 31, 2002. After holding that the Coast Guard had wrongly used no-year funds from the Oil Spill Liability Trust Fund for administrative expenses, GAO concluded that the agency should adjust its accounting records by deobligating the incorrectly charged expenses and charging them instead to the proper appropriation. GAO advised the Coast Guard that these adjustments could result in a violation of the Antideficiency Act to the extent that there was insufficient budget authority, and that the agency should report any deficiency in accordance with the Antideficiency Act.

The incurring of an obligation in excess or advance of appropriations violates the Act, and this is not affected by the agency's failure to record the obligation. *E.g.*, 71 Comp. Gen. 502, 509 (1992); 65 Comp. Gen. 4, 9 (1985); 62 Comp. Gen. 692, 700 (1983); 55 Comp. Gen. 812, 824 (1976); B-245856.7, Aug. 11, 1992.

(2) Obligation in excess of appropriations

Incurring an obligation in excess of the available appropriation violates 31 U.S.C. § 1341(a)(1).[47] As the Comptroller of the Treasury advised an agency head many years ago, "your authority in the matter was strictly limited by the amount of the appropriation; otherwise there would be no limit to your power to incur expenses for the service of a particular fiscal year." 9 Comp. Dec. 423, 425 (1903). If you want higher authority, the Supreme Court has stated that, absent statutory authorization, "it is clear that the head of the department cannot involve the government in an obligation to pay any thing in excess of the appropriation." *Bradley v. United States*, 98 U.S. 104, 114 (1878).

[47] Determining the amount of available budget authority against which obligations may be incurred is covered later in this chapter in section C.2.e under the heading "Amount of Available Appropriation or Fund."

To take a fairly simple illustration, the statute was violated by an agency's acceptance of an offer to install automatic telephone equipment for $40,000 when the unobligated balance in the relevant appropriation was only $20,000. 35 Comp. Gen. 356 (1955).

In a 1969 case, the Air Force wanted to purchase computer equipment but did not have sufficient funds available. It attempted an arrangement whereby it made an initial down payment, with the balance of the purchase price to be paid in installments over a period of years, the contract to continue unless the government took affirmative action to terminate. This was nothing more than a sale on credit, and since the contract constituted an obligation in excess of available funds, it violated the Antideficiency Act. 48 Comp. Gen. 494 (1969).

(3) Variable quantity contracts

A leading case discussing the Antideficiency Act ramifications of "variable quantity" contracts (requirements contracts, indefinite quantity contracts, and similar arrangements) is 42 Comp. Gen. 272 (1962).[48] That decision considered a 3-year contract the Air Force had awarded to a firm to provide any service or maintenance work necessary for government aircraft landing on Wake Island. GAO questioned the legality of entering into a contract of more than 1 year since the Air Force had only a 1-year appropriation available. The Air Force argued that it was a "requirements" contract, that no obligation would arise unless or until some maintenance work was ordered, and that the only obligation was a negative one—not to buy service from anyone else but the contractor should the services be needed. GAO disagreed. The services covered were "automatic incidents of the use of the air field." There was no place for a true administrative determination that the services were or were not needed. There was no true "contingency" as the services would almost certainly be needed if the base were to remain operational. Accordingly, the contract was not a true requirements contract but amounted to a firm obligation for the needs of future years, and was therefore an unauthorized multiyear contract. As such, it violated the Antideficiency Act. The solution was to contract on an annual basis with renewal options from year to year, and, if that did not

[48] We cover the obligational treatment of contracts of this type in Chapter 7, section B.1.e, which should be read in conjunction with this section.

meet the Air Force's needs, then ask Congress for multiyear procurement authority.[49]

The Wake Island decision noted that the contract contained no provision permitting the Air Force to reduce or eliminate requirements short of a termination for convenience. *Id.* at 277. If the contract had included such a provision—and in the unlikely event that, given the nature of the contract, such a provision could have been meaningful—a somewhat different analysis might have resulted. Compare, for example, the situation in 55 Comp. Gen. 812 (1976). The exercise of a contract option required the Navy to furnish various items of government-furnished property (GFP), but another contract clause authorized the Navy to unilaterally delete items of GFP. If the entire quantity of GFP had to be treated as a firm obligation at the time the option was exercised, the obligation would have exceeded available appropriations, resulting in an Antideficiency Act violation. However, since the Navy was not absolutely obligated to furnish all the GFP items at the time the option was exercised, the Navy could avert a violation if it were able to delete enough GFP to stay within the available appropriation; if it found that it could not do so, the violation would then exist.[50] *See also* B-134474-O.M., Dec. 18, 1957.

In 47 Comp. Gen. 155 (1967), GAO considered an Air Force contract for mobile generator sets which specified minimum and maximum quantities to be purchased over a 12-month period. Since the contract committed the Air Force to purchase only the minimum quantity, it was necessary to obligate only sufficient funds to cover that minimum. *See also* B-287619, July 5, 2001. Subsequent orders for additional quantities up to the maximum were not legally objectionable as long as the Air Force had sufficient funds to cover the cost when it placed those orders. *See also*

[49] The authority was subsequently sought and granted. *See* 10 U.S.C. § 2306(g). For a discussion of multiyear contracting authority for defense and civilian agencies, which authorize obligating annual funds in advance of appropriations, see Chapter 5, section B.9.b.

[50] The rationale worked in that case because the Navy could stay within the appropriation by deleting a relatively small percentage of GFP. If the numbers had been different, such that the amount of GFP to be deleted was so large as to effectively preclude contractor performance, the analysis might well have been different. In a 1964 report, for example, GAO found the Antideficiency Act violated where the Air Force, to keep within a "minor military construction" ceiling, deleted needed plumbing, heating, and lighting from a building alteration contract, resulting in an incomplete facility, and subsequently charged the deleted items to Operation and Maintenance appropriations. GAO, *Continuing Inadequate Control over Programming and Financing of Construction*, B-133316 (Washington, D.C.: July 23, 1964), at 12–15.

19 Comp. Gen. 980 (1940). The fact that the Air Force, at the time it entered into the contract, did not have sufficient funds available to cover the maximum quantity was, for Antideficiency Act purposes, irrelevant. The decision distinguished the Wake Island case on the basis that nothing in the mobile generator contract purported to commit the Air Force to obtain any requirements over and above the specified minimum from the contractor.

In 63 Comp. Gen. 129 (1983), GAO found no Antideficiency Act problems with a General Services Administration "Multiple Award Schedule" contract under which no minimum purchases were guaranteed and no binding obligation would arise unless and until a using agency made an administrative determination that it had a requirement for a scheduled item.

Regardless of whether we are dealing with a requirements contract, indefinite quantity contract, or some variation, two points apply as far as the Antideficiency Act is concerned:

- Whether or not there is a violation at the time the contract is entered into depends on exactly what the government is obligated to do under the contract.
- Even if there is no violation at the time the contract is entered into, a violation may occur later if the government subsequently incurs an obligation under the contract in excess of available funds, for example, by electing to order a maximum quantity without sufficient funds to cover the quantity ordered.

A conceptually related situation is a contract that gives the government the option of two performances at different prices. The government can enter into such a contract without violating the Antideficiency Act as long as it has sufficient appropriations available at the time the contract is entered into to pay the lesser amount. For example, the Defense Production Act of 1950 authorizes the President to contract for synthetic fuels, but the contract must give the President the option to refuse delivery and instead pay the contractor the amount by which the contract price exceeds the prevalent market price at the time of the delivery. Such a contract would not violate the Antideficiency Act at the time it is entered into as long as sufficient appropriations are available to pay any anticipated difference between the contract price and the estimated market price at the time of performance. 60 Comp. Gen. 86 (1980). Of course, the government could

choose not to accept delivery unless there were sufficient appropriations available at that time to cover the full cost of the fuel under the contract.

An agreement to pay "special termination" costs under an incrementally funded contract creates a firm obligation, not a contingent liability, to pay the contractor because the contracting agency remains liable for the costs even if it decides not to fund the contract further. B-238581, Oct. 31, 1990.

(4) Multiyear or "continuing" contracts

A multiyear contract is a contract covering the needs or requirements of more than one fiscal year. Our discussion here presupposes a general familiarity with relevant portions of Chapter 5, primarily the nature of a fixed-term appropriation and the *bona fide* needs rule as it applies to multiyear contracts.

We start with some very basic propositions:

- A fixed-term appropriation (fiscal year or multiple year) may be obligated only during its period of availability.
- A fixed-term appropriation may be validly obligated only for the *bona fide* needs of that fixed term.
- The Antideficiency Act prohibits the making of contracts which exceed currently available appropriations or which purport to obligate appropriations not yet made.

As we have seen in Chapter 5, performance may extend into a subsequent fiscal year in certain situations. Also, as long as a contract is properly obligated against funds for the year in which it was made, actual payment can extend into subsequent years. Apart from these situations, and unless the agency either has specific multiyear contracting authority (*e.g.*, 62 Comp. Gen. 569 (1983)), is contracting in compliance with the multiyear contracting provisions of the Federal Acquisition Streamlining Act of 1994 (discussed below and in Chapter 5 in relation to the *bona fide* needs rule), or is operating under a no-year appropriation (*e.g.*, 43 Comp. Gen. 657 (1964)), the Antideficiency Act, together with the *bona fide* needs rule, prohibits contracts purporting to bind the government beyond the

obligational duration of the appropriation.[51] This is because the current appropriation is not available for future needs, and appropriations for those future needs have not yet been made. Citations to support this proposition are numerous.[52] The rule applies to any attempt to obligate the government beyond the end of the fiscal year, even where the contract covers a period of only a few months. 24 Comp. Gen. 195 (1944).

An understanding of the principles applicable to multiyear contracting begins with a discussion of a 1926 decision of the United States Supreme Court. An agency had entered into a long-term lease for office space with 1-year (*i.e.*, fiscal year) funds, but its contract specifically provided that payment for periods after the first year was subject to the availability of future appropriations. In *Leiter v. United States*, 271 U.S. 204 (1926), the Supreme Court specifically rejected that theory. The Court held that the lease was binding on the government only for one fiscal year, and it ceased to exist at the end of the fiscal year in which the obligation was incurred. It takes affirmative action to bring the obligation back to life. The Court stated its position as follows:

> "It is not alleged or claimed that these leases were made under any specific authority of law. And since at the time they were made there was no appropriation available for the payment of rent after the first fiscal year, it is clear that in so far as their terms extended beyond that year they were in violation of the express provisions of the [Antideficiency Act]; and, being to that extent executed without authority of law, they created no binding obligation against the United States after the first year. [Citations omitted.] A lease to the Government for a term of years, when entered into under an appropriation available for but one fiscal year, is binding on the Government only for that year. [Citations omitted.] And it is plain that, to make it binding for any subsequent year, it is necessary, not only that an appropriation be made

[51] Every violation of the *bona fide* needs rule does not necessarily violate the Antideficiency Act as well. Determinations must be made on a case-by-case basis. 71 Comp. Gen. 428, 431 (1992); B-235086.2, Jan. 22, 1992 (nondecision letter).

[52] *E.g.*, 67 Comp. Gen. 190 (1988); 66 Comp. Gen. 556 (1987); 61 Comp. Gen. 184, 187 (1981); 48 Comp. Gen. 471, 475 (1969); 42 Comp. Gen. 272 (1962); 37 Comp. Gen. 60 (1957); 36 Comp. Gen. 683 (1957); 33 Comp. Gen. 90 (1953); 29 Comp. Gen. 91 (1949); 27 Op. Att'y Gen. 584 (1909).

> available for the payment of the rent, but that the Government, by its duly authorized officers, affirmatively continue the lease for such subsequent year; thereby, in effect, by the adoption of the original lease, making a new lease under the authority of such appropriation for the subsequent year."

*Id.* at 206–07.

The Federal Acquisition Streamlining Act of 1994 (FASA) supplied the "specific authority of law" missing in *Leiter* to enable agencies to enter into multiyear contracts using fiscal year funds.[53] The multiyear contracts provision, codified at 41 U.S.C. § 254c, authorizes executive agencies, using fiscal year funds, to enter into multiyear contracts (defined as contracts for more than 1 but not more than 5 years) for the acquisition of property or services.

To take advantage of FASA, the agency must either (1) obligate the full amount of the contract to the appropriation current at the time it enters into the contract, or (2) obligate the costs of the first year of the contract plus termination costs. Of course, if the agency elects to obligate only the costs of the individual years for each year of the contract, the agency needs to obligate the costs of each such year against the appropriation current for that year. Contracts relying on FASA must provide that the contract will be terminated if funds are not made available for the continuation of the contract in any fiscal year covered by the contract. Funds available for termination costs remain available for such costs until the obligation for termination costs has been satisfied. 41 U.S.C. § 254c(b).

Importantly, FASA does not apply to all contracts that are intended to meet the needs of more than one fiscal year. Obviously, if multiple year or no-year appropriations are legally available for the full contract period, an agency need not rely on FASA. Also, certain contract forms do not constitute multiyear contracts within the scope of FASA. For example, in B-302358, Dec. 27, 2004, GAO determined that a Bureau of Customs and Border Protection procurement constituted an "indefinite-delivery, indefinite-quantity" (IDIQ) contract that was not subject to FASA. The

[53] See also 10 U.S.C. §§ 2306b and 2306c, which provide similar authority for defense agencies and the other agencies listed in 10 U.S.C. § 2302(1). FASA does not affect these authorities. 41 U.S.C. § 254c(e).

decision explained that, unlike a contract covered by FASA, an IDIQ contract does not obligate the government beyond its initial year. Rather, it obligates the government only to order a minimum amount of supplies or services. The cost of that minimum amount is recorded as an obligation against the appropriation current when the contract is entered into.[54]

*Leiter* provides the general framework governing the legality of contracts carrying potential liabilities beyond the fiscal year availability of the appropriations that funded them. While FASA provides the necessary authority to avoid the *Leiter* problems, the *Leiter* analysis remains relevant to the extent that FASA does not apply. Thus, GAO decisions interpreting *Leiter* before enactment of FASA still need to be considered. For example, GAO refused to approve an automatic, annual renewal of a contract for repair and storage of automotive equipment, even though the contract provided that the government had a right to terminate. The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations. 28 Comp. Gen. 553 (1949).

The Post Office wanted to enter into a contract for services and storage of government-owned highway vehicles for periods up to 4 years because it could obtain a more favorable flat rate per mile of operations instead of an item by item charge required if the contract was for 1 year only. GAO held that any contract for continuous maintenance and storage of the vehicles would be prohibited by 31 U.S.C. § 1341 because it would obligate the government beyond the extent of the existing appropriation. However, there would be no legal objection to including a provision that gave the government an affirmative option to renew the contract from year to year, not to exceed 4 years as specified in the statute authorizing the Postmaster to enter into these types of contracts. 29 Comp. Gen. 451 (1950).[55]

Where a contract gives the government a renewal option, it may not be exercised until appropriations for the subsequent fiscal year actually become available. 61 Comp. Gen. 184, 187 (1981). Under a 1-year contract

[54] See Chapter 7, section B.1.e for a further discussion of recording obligations under IDIQ and similar contracts.

[55] Some additional cases are 67 Comp. Gen. 190 (1988); 66 Comp. Gen. 556 (1987); 42 Comp. Gen. 272, 276 (1962); 37 Comp. Gen. 155, 160 (1957); 37 Comp. Gen. 60, 62 (1957); 36 Comp. Gen. 683 (1957); 9 Comp. Gen. 6 (1929); B-116427, Sept. 27, 1955. *See also Cray Research v. United States*, 44 Fed. Cl. 327 (1999).

with renewal options, the fact that funds become available in subsequent years does not place the government under an obligation to exercise the renewal option. *Government Systems Advisors, Inc. v. United States*, 13 Cl. Ct. 470 (1987), *aff'd*, 847 F.2d 811 (Fed. Cir. 1988).[56]

Note that, in *Leiter*, the inclusion of a contract provision conditioning the government's obligation on the subsequent availability of funds was to no avail. In this regard, see also 67 Comp. Gen. 190, 194 (1988); 42 Comp. Gen. 272, 276 (1962); 36 Comp. Gen. 683 (1957). If a "subject to availability" clause were sufficient to permit multiyear contracting, the effect would be automatic continuation from year to year unless the government terminated. If funds were not available and the government nevertheless permitted or acquiesced in the continuation of performance, the contractor would obviously be performing in the expectation of being paid.[57] Apart from questions of legal liability, the failure by Congress to appropriate the money might be viewed as a serious breach of faith. Congress, as a practical if not a legal matter, would have little real choice but to appropriate funds to pay the contractor. This is another example of a type of "coercive deficiency" the Antideficiency Act was intended to prohibit.[58] Thus, it is not enough for the government to retain the option to terminate at any time if sufficient funds are not available. Under *Leiter* and its progeny, the contract "dies" at the end of the fiscal year, and may be revived only by affirmative action by the government. This "new" contract is then chargeable to appropriations for the subsequent year.

Although today FASA and the Federal Acquisition Regulation recognize "subject to availability" clauses, such a clause, by itself, is not sufficient. FASA provides that a multiyear contract for purposes of FASA—

> "may provide that performance under the contract during the second and subsequent years of the contract is

[56] The Claims Court based its conclusion in part on *Leiter* and the Antideficiency Act; the Federal Circuit relied on the language of the contract.

[57] The Federal Acquisition Regulation states that encouraging a contractor to continue performance in the absence of funds violates the Antideficiency Act. 48 C.F.R. § 32.704(c) (2005). In this regard, section C.3 of this chapter discusses how the Antideficiency Act's prohibition against acceptance of voluntary services, 31 U.S.C. § 1342, prohibits contracting officers from soliciting or permitting a contractor to continue performance on a "temporarily unfunded" basis.

[58] See section C.1 of this chapter for a discussion of the coercive deficiency concept.

> contingent upon the appropriation of funds and (if it does so provide) may provide for a cancellation payment to be made to the contractor if such appropriations are not made."

41 U.S.C. § 254c(d). If an agency decides to include a "subject to availability" clause for the second and subsequent years, the agency also has to provide for possible termination. Availability clauses are required by the Federal Acquisition Regulation in several situations. While the prescribed contract clauses vary in complexity, they all have one thing in common—each requires the contracting officer to specifically notify the contractor in writing that the contractor may resume performance. For example: (1) contract actions initiated prior to the availability of funds;[59] (2) certain requirements and indefinite-quantity contracts;[60] (3) fully funded cost-reimbursement contracts;[61] (4) facilities acquisition and use;[62] and (5) incrementally funded cost-reimbursement contracts.[63] *See* 48 C.F.R. subpt. 32.7. The objective of these clauses is compliance with the Antideficiency Act and other fiscal statutes. *See ITT Federal Laboratories*, ASBCA No. 12987, 69-2 BCA ¶ 7,849 (1969), *rev'd and remanded on other grounds*, *ITT v. United States*, 453 F.2d 1283 (1972). What is not sufficient is a simple "subject to availability" clause which would permit automatic continuation subject to the government's right to terminate.

In B-259274, May 22, 1996, the Air Force exercised an option to a severable service contract that extended the contract from September 1, 1994, to August 31, 1995, using fiscal year 1994 funds.[64] However, the Air Force only had enough fiscal year 1994 budget authority to finance 4 months of the option period, leaving the remaining 8 months unfunded. The Air Force modified the agreement by adding a clause stating that the government's obligation beyond December 31, 1994, was subject to the availability of appropriations. Significantly, however, the clause further stated that no

[59] Availability of Funds, 48 C.F.R. § 52.232-18.

[60] Availability of Funds for the Next Fiscal Year, 48 C.F.R. § 52.232-19.

[61] Limitation of Cost, 48 C.F.R. § 52.232-20.

[62] Limitation of Cost (Facilities), 48 C.F.R. § 52.232-21.

[63] Limitation of Funds, 48 C.F.R. § 52.232-22.

[64] See section B.9.a of Chapter 5 for a discussion of severable service contracts that cross fiscal years.

legal liability on the part of the government would arise for contract performance beyond December 31, 1994, unless and until the contractor received notice in writing from the Air Force contracting officer that the contractor could continue work. GAO held that this clause converted the government's obligation for the remaining 8 months to no more than a negative obligation not to procure services elsewhere should such services be needed. Since this contractual obligation created no financial exposure on the part of the government, the Air Force had not violated the Antideficiency Act.

It may be useful at this point to reiterate the basic principle that, in the context of contractual obligations, compliance with the Antideficiency Act is determined first on the basis of when an obligation occurs, not when actual payment is scheduled to be made. In the case of a contract with an option to renew, for example, as long as sufficient funds are available to cover the initial contract, there is no violation at the time the contract is made. No obligation accrues for future option years unless and until the government exercises its option.

Another issue to consider with respect to multiyear contracts is the relationship between termination charges and the Antideficiency Act. As a general proposition, the government has the right to terminate a contract "for the convenience of the government" if that action is determined to be in the government's best interests. The Federal Acquisition Regulation prescribes the required contract clauses. 48 C.F.R. subpt. 49.5.[65] Under a termination for convenience, the contractor is entitled to be compensated, including a reasonable profit, for the performed portion of the contract, but may not recover anticipatory profits on the terminated portion. *E.g.*, 48 C.F.R. §§ 49.201, 49.202. Total recovery may not exceed the contract price. *Id.* § 49.207.

In the typical contract covering the needs of only one fiscal year, termination does not pose a problem. Under 48 C.F.R. § 49.207, the contractor's recovery cannot exceed the contract price; thus, the basic contract obligation will be sufficient to cover potential termination costs. Under a contract with options to renew, however, the situation may differ. A contractor who must incur substantial capital costs at the outset has a

[65] Where a termination for convenience clause is required by regulation, it will be read into the contract whether expressly included or not. *G.L. Christian & Associates v. United States*, 312 F.2d 418 and 320 F.2d 345 (Ct. Cl.), *cert. denied*, 375 U.S. 954 (1963).

legitimate concern over recovering these costs if the government does not renew. A device sometimes used to address this problem, albeit with limited success, is a clause requiring the government to pay termination charges or "separate charges" upon early termination. As discussed in Chapter 5, section B.8.c, separate charges have been found to violate the *bona fide* needs rule to the extent they do not reasonably relate to the value of current fiscal year requirements. *E.g.*, 36 Comp. Gen. 683 (1957), *aff'd*, 37 Comp. Gen. 155 (1957).

Separate charges also have been held to violate the Antideficiency Act. The leading case in this area is 56 Comp. Gen. 142 (1976), *aff'd*, 56 Comp. Gen. 505 (1977). The Burroughs Corporation protested the award of a contract to the Honeywell Corporation to provide automatic data processing (ADP) equipment to the Mine Enforcement and Safety Administration. If all renewal options were exercised, the contract would run for 60 months after equipment installation. The contract included a "separate charges" provision under which, if the government failed to exercise any renewal option or otherwise terminated prior to the end of the 60-month systems life, the government would pay a percentage of all future years' rentals based on Honeywell's "list prices" at the time of failure to renew or of termination. This provision violated the Antideficiency Act for two reasons. First, it would amount to an obligation of fiscal year funds for the requirements of future years. And second, it would commit the government to indeterminate liability because the contractor could raise its list or catalog prices at any time. The government had no way of knowing the amount of its commitment. Similar cases involving separate charges are 56 Comp. Gen. 167 (1976); B-216718.2, Nov. 14, 1984; and B-190659, Oct. 23, 1978.[66]

The Burroughs decision also offers guidance on when separate charges may be acceptable. One instance is where it is the only way the government can obtain its needs. Cited in this regard was 8 Comp. Gen. 654 (1929), a case involving the installation of equipment and the

[66] The Burroughs case was decided before the enactment of the FASA multiyear contracts provision. As discussed above, that provision now enables agencies to enter into contracts like the one at issue in the Burroughs case without running afoul of the Antideficiency Act as long as they follow the terms of the statute by either obligating the full contract amount against appropriations available at the time of the contract or obligating the first year costs plus estimated termination costs. With reference to termination costs, FASA requires the contract to include a clause stating that the contract shall be terminated if funds are not made available for its continuation in any fiscal year and provides that amounts obligated for termination costs shall remain available until the costs are paid. 41 U.S.C. § 254c(b).

procurement of a water supply from a town. There, however, the town was the only source of a water supply, a situation clearly inapplicable to a competitive industry like ADP. 56 Comp. Gen. at 157. In addition, separate charges are permissible if they, together with payments already made, reasonably represent the value of requirements actually performed. Thus, where the contractor has discounted its price based on the government's stated intent to exercise all renewal options, separate charges may be based on the "reasonable value (*e.g.*, ADP schedule price) of the actually performed work at termination based upon the shortened term." *Id.* at 158. However, termination charges may not be inconsistent with the termination for convenience clause remedy; for example, they may not exceed the value of the contract or include costs not cognizable under a "T for C." *Id.* at 157.

Where termination charges are otherwise proper, the Antideficiency Act also requires that the agency have sufficient funds available to pay them if and when the contingency materializes. *E.g.*, 62 Comp. Gen. 143 (1983); 8 Comp. Gen. 654, 657 (1929). *See also Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 362 (1994), *aff'd*, 39 F.3d 1198 (Fed. Cir. 1994) (agency complied with Antideficiency Act requirements by including termination costs as current obligations). This requirement is sometimes specified in multiyear contracting legislation. An example is 40 U.S.C. § 322, the Information Technology Fund. In operating the Fund, the General Services Administration is authorized to enter into information technology multiyear contracts if "amounts are available and adequate to pay the costs of the contract for the first fiscal year and any costs of cancellation or termination." *Id.* § 322(e)(1)(A). Congress may also, of course, provide exceptions. *E.g.*,B-174839, Mar. 20, 1984.

### c. Indemnification

Under an indemnification agreement, one party promises, in effect, to cover another party's losses. It is no surprise that the government is often asked to enter into indemnification agreements. The problem is that such agreements create a risk that the government, at some point in the future, may have to pay amounts in excess of available funds. Consequently, with one very limited exception discussed below, GAO and numerous courts have adhered to the rule that, absent express statutory authority, the government may not enter into an agreement to indemnify where the amount of the government's liability is indefinite, indeterminate, or

potentially unlimited.[67] Such an agreement would violate both the Antideficiency Act, 31 U.S.C. § 1341, and the Adequacy of Appropriations Act, 41 U.S.C. § 11, since it can never be said that sufficient funds have been appropriated to cover the government's indemnification exposure. As discussed in this section, indemnity clauses have been upheld under certain conditions:

- where the potential liability of the government was limited to a definite amount known at the time of the agreement, was within the amount of available appropriations, and was not otherwise prohibited by statute;
- where the indemnification agreement is a legitimate object of an appropriation, the agreement specifically provides that the amount of liability is limited to available appropriations, and there is no implication that Congress will, at a later date, appropriate funds to meet deficiencies; or
- where Congress has specifically authorized the agency to indemnify.

Although a provision limiting liability to appropriations available at the time a loss arises would prevent any overt Antideficiency Act or Adequacy of Appropriations Act violation by removing the "unlimited liability" objection, it could have disastrous fiscal consequences for the agency as well as present other, practical problems. For example, payment of an especially large indemnity obligation at the beginning of a fiscal year could wipe out the entire unobligated balance of the agency's appropriation for the rest of the fiscal year, forcing the agency to seek a supplemental appropriation to finance basic program activities. Conversely, if a liability arises toward the end of the fiscal year it is quite possible that no unobligated balance would be available for an indemnity payment, which means indemnification could prove largely illusory from the standpoint of the contractor or other "beneficiary."

Another practical problem concerns recording the obligations that may arise under indemnity clauses. The indemnity is a potential liability that may become an actual liability when some event outside of the

[67] The prohibition against incurring indefinite liabilities is not limited to indemnification agreements. It applies as well to types of liabilities such as contract termination charges. The cases are included in our preceding discussion of multiyear contracting. See section C.2.b of this chapter.

government's control is triggered, at which point the liability becomes a recordable obligation. This creates a fiscal dilemma, however. While the liability is not sufficiently definite at the time the indemnity agreement is made to formally record an obligation, good financial management requires that the agency recognize its contingent liability.[68] Although most of our cases do not directly address this issue, the ones that do, discussed below, have recommended either the obligation or administrative reservation[69] of sufficient funds to cover the potential liability. Clearly, however, this could create a fiscal nightmare where an estimate of potential liability could encompass the entire appropriation for the agency for that fiscal year, and tying up that entire sum would prevent the agency from meeting its mission.

What follows is a discussion of indemnification proposals in decisions issued over the years. As you will see, we have struggled with the practical problems posed by the inclusion of indemnity clauses in government contracts and agreements. For the past several years it has been our view that even if indemnification clauses are rewritten to meet the minimum requirements of the Antideficiency Act or Adequacy of Appropriations Act, there should be a clear governmentwide policy restricting their use. Given the potential liability of the government created by such clauses, exceptions to this policy should not be made without express congressional acquiescence, as has been done whenever Congress has decided that it was in the best interests of the government to assume the risks of having to pay off on an indemnity obligation. See, for example, 10 U.S.C. § 2354, 42 U.S.C. § 2210, and other examples given below.

(1) <u>Prohibition against unlimited liability</u>

As noted above, absent specific statutory authority, the government generally may not enter into an indemnification agreement which would impose an indefinite or potentially unlimited liability on the government. In plain English, you cannot purport to bind the government to unlimited liability. The rule is not some arcane GAO concoction. The Court of Claims stated in *California-Pacific Utilities Co. v. United States*, 194 Ct. Cl. 703, 715 (1971)):

[68] See section C.2.b of this chapter for a discussion of recording obligations.

[69] See section C.4.b of this chapter for a discussion on establishing reserves.

> "The United States Supreme Court, the Court of Claims, and the Comptroller General have consistently held that absent an express provision in an appropriation for reimbursement adequate to make such payment, [the Antideficiency Act, 31 U.S.C. § 1341] proscribes indemnification on the grounds that it would constitute the obligation of funds not yet appropriated. [Citations omitted.]"

For example, in an early case, the Interior Department, as licensee, entered into an agreement with the Southern Pacific Company under which the Department was to lay telephone and telegraph wires on property owned by the licensor in New Mexico. The agreement included a provision that the Department was to indemnify the Company against any liability resulting from the operation. Upon reviewing the indemnity provision, the Comptroller General found that it purported to impose indeterminate contingent liability on the government in violation of Revised Statutes § 3732, the predecessor to the Adequacy of Appropriations Act, 41 U.S.C. § 11. By including the indemnity provision, the contracting officer had exceeded his authority, and the provision was held void. 16 Comp. Gen. 803 (1937).

Similarly, an indefinite and unlimited indemnification provision in a lease entered into by the General Services Administration without statutory authority was held to impose no legal liability on the government since it violated the provisions of 31 U.S.C. § 1341 and 41 U.S.C. § 11. 35 Comp. Gen. 85 (1955).

In 59 Comp. Gen. 369 (1980), the National Oceanic and Atmospheric Administration (NOAA) desired to undertake a series of hurricane seeding experiments off the coast of Australia in cooperation with its Australian counterpart. The State Department, as negotiator, sought GAO's opinion on an Australian proposal under which the United States would agree to indemnify Australia against all damages arising from the activities. State recognized that an unlimited agreement would violate the Antideficiency Act and asked whether the proposal would be acceptable if it specified that the government's liability would be subject to the appropriation of funds by Congress for that purpose. GAO expressed dissatisfaction with this proposal because, even though it would impose no legal obligation unless or until funds are appropriated, it would impose a moral obligation on the

United States to make good on its promise.[70] There was a way out, however—insurance. Ordinarily, appropriations are not available to acquire insurance,[71] but GAO concluded that the government's policy of self-insurance did not apply here since the insurance would not be for the purpose of protecting against a risk to which the United States would be exposed but rather is the price exacted by Australia, as the United States' partner in an international venture, to protect Australia's interests. GAO said that NOAA could therefore purchase private insurance, with the premiums to be shared by the government of Australia, provided that the United States' liability under the agreement was limited to its share of the insurance premiums. NOAA's use of its appropriation for the United States' share of the insurance premium would simply be a necessary expense of the project.

Another decision applying the general rule held that the Federal Emergency Management Agency[72] could not agree to provide indeterminate indemnification to agents and brokers under the National Flood Insurance Act. B-201394, Apr. 23, 1981. If the agency considered indemnification necessary to the success of its program, it could either insert a provision limiting the government's liability to available appropriations or seek broader authority from Congress.

In B-201072, May 3, 1982, the Department of Health and Human Services questioned the use of a contract clause entitled "Insurance—Liability to Third Persons," found in the Federal Procurement Regulations (predecessor to the Federal Acquisition Regulation). The clause purported to permit federal agencies to agree to reimburse contractors, without limit, for liabilities to third persons for death, personal injury, or property damage, arising out of performance of the contract and not compensated by insurance, whether or not caused by the contractor's negligence. Since the clause purported to commit the government to an indefinite liability which could exceed available appropriations, the Comptroller General

[70] This is still another example of a so-called "coercive deficiency," particularly in light of the fact that the potential claimant was another sovereign nation and failure to honor the agreement would have international consequences. See section C.2.b of this chapter for a discussion of the "coercive deficiency" concept.

[71] For further information on the government's policy regarding self-insurance, see Chapter 4, section C.10.

[72] On March 1, 2003, the Federal Emergency Management Agency became part of the U.S. Department of Homeland Security.

found it in violation of the Antideficiency Act and the Adequacy of Appropriations Act. This decision was affirmed upon reconsideration in 62 Comp. Gen. 361 (1983), one of GAO's more comprehensive discussions of the indemnification problem.

For other cases applying or discussing the general rule, see B-260063, June 30, 1995; 35 Comp. Gen. 85 (1955); 20 Comp. Gen. 95, 100 (1940); 7 Comp. Gen. 507 (1928); 15 Comp. Dec. 405 (1909); B-242146, Aug. 16, 1991; B-117057, Dec. 27, 1957; A-95749, Oct. 14, 1938; 8 Op. Off. Legal Counsel 94 (1984); 2 Op. Off. Legal Counsel 219, 223–24 (1978). A brief letter report making the same point is GAO, *Agreements Describing Liability in Undercover Operations Should Limit the Government's Liability*, GGD-83-53 (Washington, D.C.: Mar. 15, 1983).

In some of the earlier GAO cases—for example, 7 Comp. Gen. 507 and 16 Comp. Gen. 803 (1937)—the Comptroller General offered as further support for the indemnification prohibition the then-existing principle that the United States was not liable for the tortious conduct of its employees. Of course, since the enactment of the Federal Tort Claims Act in 1946,[73] this is no longer true. Thus, the reader should disregard any discussion of the government's lack of tort liability appearing in the earlier cases. The thrust of those cases, namely, the prohibition against open-ended liability, remains valid.

The Comptroller General recognized a limited exception to the rule in 59 Comp. Gen. 705 (1980). In that decision, the Comptroller General held that the General Services Administration could agree to certain indemnity provisions in procuring public utility services for government agencies under the Federal Property and Administrative Services Act, 40 U.S.C. § 501. To apply the general rule against indemnification in this situation, the Comptroller General suggested, would constitute "an overly technical and literal reading of the Anti-Deficiency Act." *Id.* at 707. The decision reasoned as follows:

> "The procurement of goods or services from state-regulated utilities which are virtually monopolies is unique in important ways. As a practical matter, there is no other source for the needed goods or services. Moreover, the tariff requirements, such as this indemnification

[73] The Act is now codified at 28 U.S.C. §§ 2671–2680.

> undertaking, are applicable generally to all of the same class of customers of the utility, and are included in the tariff only after administrative proceedings in which the government has the opportunity to participate. The United States is not being singled out for discriminatory treatment nor, presumably, can it complain that the objectionable provision was imposed without notice and the opportunity for a hearing.
>
> "Under the circumstances, we have not objected in the past to the procurement of power by GSA under tariffs containing the indemnity clause and there is no reason to object to the purchase of power under contracts containing essentially the same indemnity clause. As noted already, this has of necessity been the practice in the past. The possibility of liability under the clause is in our judgment remote. In any event, we see little purpose to be served by a rule which prevents the United States from procuring a vital commodity under the same restrictions as other customers are subject to under the tariff if the utility insists that the restrictions are non-negotiable. However, because the possibility exists, however remote, that these agreements could result in future liability in excess of available appropriations, GSA should inform the Congress of the situation."

*Id.*

Subsequent decisions emphasize that the extent of the exception carved out by 59 Comp. Gen. 705 is limited to its facts. *See*, *e.g.*, B-260063, June 30, 1995; 62 Comp. Gen. 361 (1983); B-242146, Aug. 16, 1991. In B-197583, Jan. 19, 1981, GAO once again applied the general rule and held that the Architect of the Capitol could not agree to indemnify the Potomac Electric Power Company (PEPCO) for loss or damages resulting from PEPCO's performance of tests on equipment installed in government buildings or from certain other equipment owned by PEPCO which could be installed in government buildings to monitor electricity use for conservation purposes. GAO pointed to two distinguishing factors that justified—and limited—the exception in 59 Comp. Gen. 705. First, in 59 Comp. Gen. 705, there was no other source from which the government could obtain the needed utility services. Here, the testing and monitoring could be performed by

government employees. The second factor is summarized in the following excerpt from B-197583, Jan. 19, 1981:

> "An even more important distinction, though, is that unlike the situation in the GSA case [59 Comp. Gen. 705], the Architect has not previously been accepting the testing services or using the impulse device from PEPCO and has therefore not previously agreed to the liability represented by the proposed indemnity agreements. In the GSA case, GSA merely sought to enter a contract accepting the same service and attendant liability, previously secured under a non-negotiable tariff, at a rate more advantageous to the Government. Here, however, the Government has other means available to provide the testing and monitoring desired."

Thus, the case did not fall within the "narrow exception created by the GSA decision," and the proposed indemnity agreement was improper.

More recent decisions likewise reaffirm the general rule against open-ended indemnification agreements and reemphasize the limited application of the exception in 59 Comp. Gen. 705. In B-242146, Aug. 16, 1991, GAO held that the United States Park Police could not include in mutual assistance agreements with local law enforcement agencies a clause that the United States would indemnify the latter agencies against claims arising from police actions they took in national parks. Citing 62 Comp. Gen. 361 (1983) and other cases, the decision observed:

> "This Office has long held that absent statutory authority, indemnity provisions which subject the United States to indefinite or potentially unlimited contingent liability contravene the Antideficiency Act, 31 U.S.C. § 1341(a) . . . since it can never be said that sufficient funds have been appropriated to cover the contingency.
>
> "Here, the potential liability of the Park Police is unknown because the clause in question provides an indemnity for property damage and personal injury. There is no possible way to know at the time the [mutual assistance] memoranda are signed whether there are sufficient funds in the appropriation to cover a liability or when it arises under the

> indemnification clause because no one knows in advance how much the liability may be." (Footnote omitted.)

The decision rejected the argument that 59 Comp. Gen. 705 supported the indemnification clause in this case, stating:

> "[W]e were careful to point out in 62 Comp. Gen. at 364 . . . that 59 Comp. Gen. 705 should not serve as a precedent. Indeed, except for 59 Comp. Gen. 705, 'the accounting officers of the Government have never issued a decision sanctioning the incurring of an obligation for an open-ended indemnity in the absence of statutory authority to the contrary.' 62 Comp. Gen. 364–365."

In B-260063, June 30, 1995, GAO again distinguished 59 Comp. Gen. 705 in holding that a federal agency should not agree to indemnify a utility company for providing electricity to one of the agency's remote facilities. The decision pointed out that, unlike the situation in 59 Comp. Gen. 705, the indemnity clause proposed here was not part of a generally applicable tariff but would discriminate against the agency.

As indicated previously, the general rule against open-ended indemnity agreements has received consistent acceptance by the courts. Examples of court cases endorsing the general rule against open-ended indemnification are *Frank v. United States*, 797 F.2d 724, 727 (9th Cir. 1986); *Union Pacific Railroad Corp. v. United States*, 52 Fed. Cl. 730, 732–735 (2002); *Lopez v. Johns Manville*, 649 F. Supp. 149 (W.D. Wash. 1986), *aff'd on other grounds*, 858 F.2d 712 (Fed. Cir. 1988); *In re All Asbestos Cases*, 603 F. Supp. 599 (D. Hawaii 1984); *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1 (1987). Several of these are asbestos cases in which the courts rejected claims of an implied agreement to indemnify. In *Johns-Manville Corp.*, the court stated:

> "Contractual agreements that create contingent liabilities for the Government serve to create obligations of funds just as much as do agreements creating definite or certain liabilities. The contingent nature of the liability created by an indemnity agreement does not so lessen its effect on appropriations as to make it immune to the limitations of [the Antideficiency Act]."

12 Cl. Ct. at 25.

In *Hercules, Inc. v. United States*, 516 U.S. 417 (1996), the Supreme Court rejected the argument by a manufacturer of the Vietnam War-era defoliant "Agent Orange" that it had an implied-in-fact contract with the United States to indemnify it for tort damages arising from third-party claims against it. The Court noted that an implied-in-fact contract depends upon a meeting of the minds, and that such a meeting of the minds was unlikely given the rule against open-ended indemnity contracts:

> "There is . . . reason to think that a contracting officer would not agree to the open-ended indemnification alleged here. The Anti-Deficiency Act bars a federal employee or agency from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation. 31 U.S.C. § 1341. Ordinarily no federal appropriation covers contractors' payments to third-party tort claimants in these circumstances, and the Comptroller General has repeatedly ruled that Government procurement agencies may not enter into the type of open-ended indemnity for third-party liability that petitioner Thompson claims to have implicitly received under the Agent Orange contracts. We view the Anti-Deficiency Act, and the contracting officer's presumed knowledge of its prohibition, as strong evidence that the officer would not have provided, in fact, the contractual indemnification [petitioner] claims."

516 U.S. at 426–427 (footnotes omitted).

The Court cited several instances in which Congress had enacted statutory authorizations for indemnification, and noted that the existence of these statutory authorizations further militated against finding an implied contract to indemnify in this case:

> "These statutes [authorizing indemnification], set out in meticulous detail and each supported by a panoply of implementing regulations, . . . would be entirely unnecessary if an implied agreement to indemnify could arise from the circumstances of contracting. We will not interpret the [Agent Orange] contracts so as to render these statutes and regulations superfluous."

*Id*. at 429.[74]

The Federal Circuit's recent decision in *E.I. DuPont De Nemours & Company, Inc. v. United States*, 365 F.3d 1367 (Fed. Cir. 2004), provides an interesting twist. The issue in that case was whether an indemnity clause contained in a World War II-era contract required the United States to reimburse the contractor for environmental cleanup costs it incurred at the contract site as a result of liability imposed on it under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (popularly known as "CERCLA" or the "Superfund" law), 42 U.S.C. §§ 9601–9675.[75] The Court of Federal Claims had viewed the contract's indemnity clause as extending to CERCLA liability, but concluded that the general rule against open-ended indemnification applied to invalidate the clause under the Antideficiency Act:

> "Even though the Indemnification Clause was included in this contract and it is quite reasonable to assume that both the contracting officer and the contractor believed this Clause to place the risk of virtually all liabilities on the government rather than the contractor, the state of the law compels us to hold this clause to be void and unenforceable. . . .
>
> "Although we are of the opinion that the current state of the law compels the result expressed, this result is so totally at odds with the agreement the parties clearly made concerning reimbursement and indemnity, and plaintiff is so clearly entitled to the indemnity it seeks under the plain language of the contract it had with the government, made during truly emergency, wartime conditions, we suggest that plaintiff may want to consider the avenue for potential relief

[74] The Supreme Court's decision affirmed two Claims Court decisions that had similarly cited the general rule against indemnification agreements with respect to the Agent Orange contracts: *Wm. T. Thompson Co. v. United States*, 26 Cl. Ct. 17, 29 (1992); *Hercules Inc. v. United States*, 25 Cl. Ct. 616 (1992).

[75] See Major Randall J. Bunn, *Contractor Recovery for Current Environmental Cleanup Costs Under World War II-Era Government Indemnification Clauses*, 41 Air Force L. Rev. 163 (1997), for an extensive background discussion and analysis of the issues addressed in the *DuPont* case. This article also discusses at length the First War Powers Act and its successor, 50 U.S.C. § 1431 (Pub. L. No. 85-804, § 1, 72 Stat. 972 (Aug. 28, 1958)), which are referenced later in this section.

> available in a Congressional Reference case pursuant to 28 U.S.C. §§ 1492 & 2509."

*E.I. DuPont De Nemours & Company, Inc. v. United States*, 54 Fed. Cl. 361, 372–373 (2002).

The Federal Circuit reversed in *E.I. DuPont De Nemours & Company, Inc.*, 365 F.3d 1367. The court did not question the general rule against open-ended indemnity provisions; nor did it dispute the lower court's conclusion that the indemnity clause in the DuPont contract was originally invalid under that rule. However, the court concluded that the government in effect ratified the clause through actions taken under a subsequent statute—the Contract Settlement Act of 1944, at 41 U.S.C. §§ 101, 120(a)—that did permit such indemnity provisions. Thus, the court reasoned, the indemnity clause in this case satisfied the "otherwise authorized by law" exception in the Antideficiency Act, 31 U.S.C. § 1341(a)(1)(B). *E.I. DuPont De Nemours & Company, Inc.*, 365 F.3d at 1375–80.

Executive branch adjudicative bodies such as boards of contract appeals and the Federal Labor Relations Authority have also applied the general anti-indemnity rule. *See Appeals of National Gypsum Co.*, ASBCA No. 53259, 03-1 B.C.A. ¶ 32,054 (2002) (indemnity provision of World War II contract unenforceable because in violation of the Antideficiency Act and the Executive Order under which the contract was entered into); *KMS Development Co. v. General Services Administration*, GSBCA No. 12584, 95-2 B.C.A. ¶ 27, 663 (1995) (no implied-in-fact contract of indemnity since such a contract would be *ultra vires* as a violation of the Antideficiency Act); *National Federation of Federal Employees and U.S. Department of the Interior*, 35 F.L.R.A. 1034 (1990) (proposal to indemnify union against judgments and litigation expenses resulting from drug testing program held contrary to law and therefore nonnegotiable); *American Federation of State, County and Municipal Employees and U.S. Department of Justice*, 42 F.L.R.A. 412, 515–17 (1991) (similar proposal for drug testing indemnification).

In sum, the GAO decisions, court cases, and other administrative decisions reflect a clear rule against open-ended indemnification agreements (absent statutory authority). Indeed, the Supreme Court's opinion in *Hercules, Inc. v. United States*, 516 U.S. 417 (1996), discussed previously, commented upon the nearly uniform line of Comptroller General decisions on this point, noting that 59 Comp. Gen. 705 stood as the "one peculiar exception." 516 U.S. at 428.

(2) When indemnification may be permissible

Indemnification agreements may be proper if they are limited to available appropriations and are otherwise authorized. Before ever getting to the question of amount, for an indemnity agreement to be permissible in the first place, it must be authorized either expressly or under a necessary expense theory. 59 Comp. Gen. 369 (1980). The determination as to whether an expense is necessary as incident to the object of the applicable funding source is determined on a case-by-case basis.[76] Although GAO generally affords agencies broad discretion in determining whether a specific expenditure is reasonably related to the accomplishment of an authorized purpose, an agency's discretion in such matters is not unlimited. 18 Comp. Gen. 285, 292 (1938). GAO has had occasion both to approve and to disapprove contract indemnification provisions as necessary or incident to the object of the applicable funding source. *See*, *e.g.*, 63 Comp. Gen. 145, 150 (1984) (all but one indemnity provision in contracts for vessels were approved as incidental expenses under the Navy's authorized prepositioning ship chartering program); 59 Comp. Gen. 369 (disapproved—general statutory authority to carry out international programs did not provide authority for the United States to agree to provide complete indemnification of another country for all damages resulting from an international weather modification project); 42 Comp. Gen. 708, 712 (1963) (approved—obligation of an agency for damage or destruction that might arise under an indemnity clause in an aircraft rental contract was a necessary expense incident to the hiring of aircraft for which the agency's appropriation was expressly available); B-201394, Apr. 23, 1981 (disapproved—no specific appropriation was available to pay costs arising under a clause indemnifying agents and brokers under the National Flood Insurance program); B-137976, Dec. 4, 1958 (disapproved—an obligation arising under an indemnity provision in an agency's agreement for training with a nongovernment facility was not a necessary expense under the statute authorizing such training agreements).

Once you cross the purpose hurdle—that is, once you determine that the indemnification proposal you are considering is a legitimate object on which to spend your appropriations—you are ready to grapple with the unlimited liability issue.

[76] See Chapter 4, section B for a discussion of the necessary expense rule.

One way to deal with this issue is to specifically limit the amount of the liability assumed. Such a limitation of an indemnity agreement may come about in either of two ways: it may follow necessarily from the nature of the agreement itself or it may be expressly written into the agreement, coupled with an appropriate obligation or administrative reservation of funds. The latter alternative is the only acceptable one where the government's liability would otherwise be potentially unlimited.

For example, where the government rented buses to transport Selective Service registrants for physical examination or induction, there was no objection to the inclusion of an indemnity provision for damage to the buses caused by the registrants. This was a standard provision in the applicable motor carrier charter coach tariff. 48 Comp. Gen. 361 (1968). Potential liability was not indefinite since it was necessarily limited to the value of the motor carrier's equipment.

Similarly, under a contract for the lease of aircraft, the Federal Aviation Administration (FAA) could agree to indemnify the owner for loss or damage to the aircraft in order to eliminate the need to reimburse the owner for the cost of "hull insurance" and thereby secure a lower rental rate. The liability could properly be viewed as a necessary expense incident to hiring the aircraft, FAA had no-year appropriations available to pay for any such liability, and, as in the Selective Service case, the agreement was not indefinite because maximum liability was measurable by the fair market value of the aircraft. 42 Comp. Gen. 708 (1963). *See also* 22 Comp. Gen. 892 (1943) (Maritime Commission could amend contract to agree to indemnify contractor against liability to third parties, in lieu of reimbursing contractor for cost of liability insurance premiums, to the extent of available appropriations and provided liability was limited to the amount of coverage of the discontinued insurance policies replaced by the indemnity agreement).[77]

In B-114860, Dec. 19, 1979, the Farmers Home Administration asked whether it could purchase surety bonds or enter into an indemnity agreement in order to obtain the release of deeds of trust for borrowers in Colorado where the original promissory notes had been lost while in the

[77] The decision in 22 Comp. Gen. 892 is discussed in 62 Comp. Gen. 361, 362–63 (1983), and *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 23 (1987). The Claims Court noted the "significant deficiency" of 22 Comp. Gen. 892 in that it nowhere mentions the Antideficiency Act.

Administration's custody. Colorado law required one or the other where the canceled original note could not be delivered to the Colorado public trustee. GAO concluded that the indemnity agreement was permissible as long as it was limited to an amount not to exceed the original principal amount of the trust deed. The decision further advised that the Administration should reserve sufficient funds to cover its potential liability. The latter aspect of the decision was reconsidered in B-198161, Nov. 25, 1980. Reviewing the particular circumstances involved, GAO was unable to foresee situations in which the government might be required to indemnify the public trustee, and accordingly advised the Administration that the reservation of funds would not be necessary. While reservation of the funds may not have been necessary, GAO did state: "Although the liability which arises from an indemnity agreement to secure the release of a trust deed may be contingent, the maximum cost of liquidating that liability would normally be a recordable expense limited by the administration's annual budget authority."

In 63 Comp. Gen. 145 (1984), certain indemnification provisions in a ship-chartering agreement were found not to impose indefinite or potentially unlimited contingent liability because liability could be avoided by certain separate actions solely under the government's control.

In cases like the Selective Service bus case (48 Comp. Gen. 361) and the FAA aircraft case (42 Comp. Gen. 708), even though the government's potential liability is limited and determinable, this fact alone does not guarantee that the agency will have sufficient funds available should the contingency ripen into an obligation. This concern is met in one of two ways. The first is either to obligate or to reserve administratively sufficient funds to cover the potential liability, although this point has not been completely explored in past decisions. In particular cases, reservation may be determined unnecessary, as in B-198161, Nov. 25, 1980, discussed above. Also, naturally, a specific directive from Congress will render reservation of funds unnecessary. *See* B-159141, Aug. 18, 1967 (reservation of termination costs for supersonic aircraft contract). The second way is for the agreement to expressly limit the government's liability to appropriations available at the time of the loss with no implication that Congress will appropriate funds to make up any deficiency.

This second device—the express limitation of the government's liability to available appropriations—is sufficient to cure an otherwise fatally defective (*i.e.*, unlimited) indemnity proposal. For example, the government may in limited circumstances assume the risk of loss to

contractor-owned property. While the maximum potential liability would be determinable, it could be very large and the administrative reservation of funds is not feasible. Thus, without some form of limitation, such an agreement could result in obligations in excess of available appropriations. The rules concerning the government's assumption of risk on property owned by contractors and used in the performance of their contracts are set forth in 54 Comp. Gen. 824 (1975), *modifying* B-168106, July 3, 1974. The rules are summarized below:[78]

- If administratively determined to be in the best interest of the government, the government may assume the risk for contractor-owned property which is used solely in the performance of government contracts.

- The government may not assume the risk for contractor-owned property which is used solely for nongovernment work. If the property is used for both government and nongovernment work and the nongovernment portion is separable, the government may not assume the risk relating to the nongovernment work.

- Where the amount of a contractor's commercial work is so insignificant when compared to the amount of the contractor's government work that the government is effectively bearing the entire risk of loss by in essence paying the full insurance premiums, the government may assume the risk if administratively determined to be in the best interest of the government.

Any agreement for the assumption of risk by the government under the above rules must contain a clause to clearly provide that, in the event the government has to pay for losses, payments may not exceed appropriations available at the time of the losses, and that nothing in the contract may be considered as implying that Congress will at a later date appropriate funds sufficient to meet deficiencies. 54 Comp. Gen. at 827.

[78] The decision in 54 Comp. Gen. 824 overruled a portion of 42 Comp. Gen. 708 (the FAA aircraft lease case), discussed in the text, to the extent it held that there was no need to either obligate or reserve funds. Thus, in a situation like 42 Comp. Gen. 708, the agency would presumably have to either obligate or administratively reserve funds or include a provision that payments for losses may not exceed appropriations available at the time of the loss and nothing in the contract may be construed as implying that Congress will appropriate funds to meet any deficiencies at a later date.

A somewhat different situation was discussed in 60 Comp. Gen. 584 (1981), involving an "installment purchase plan" for automatic data processing equipment. Under the plan, the General Services Administration would make monthly payments until the entire purchase price was paid, at which time GSA would acquire unencumbered ownership of the equipment. GSA's obligation was conditioned on its exercising an option at the end of each fiscal year to continue payments for the next year. The contract contained a risk of loss provision under which GSA would be required to pay the full price for any equipment lost or damaged during the term of the contract. GAO concluded that the equipment should be treated as contractor-owned property for purposes of the risk of loss provision, and that the provision would be improper unless one of the following conditions were met:

- The contract includes the clause specified in 54 Comp. Gen. 824 limiting GSA's liability to appropriations available at the time of the loss and expressly precluding any inference that Congress would appropriate sufficient funds to meet any deficiency; or

- If the contract does not include these restrictions, then GSA must obligate sufficient funds to cover its possible liability under the risk of loss provision.

If neither of these conditions is met, the assumption of risk clause could violate the Antideficiency Act by creating an obligation in excess of available appropriations if any equipment is lost or damaged during the term of the contract.

In 1982, the Defense Department and the state of New York entered into a contract for New York to provide certain support functions for the 1980 Winter Olympic Games at Lake Placid. The contract provided for federal reimbursement of any disability benefits which New York might be required to pay in case of death or injury of persons participating in the operation. The contract specified that the government's liability could not exceed appropriations for assistance to the Games available at the time of a disabling event, and that the contract did not imply that Congress would appropriate funds sufficient to meet any deficiencies. Since these provisions satisfied the test of 54 Comp. Gen. 824, the indemnity agreement was not legally objectionable. B-202518, Jan. 8, 1982. Under this type of arrangement, GAO noted that an estimated amount should have been recorded as an obligation when the agency was notified that a disabling event had occurred. However, no violation of the Antideficiency Act

actually occurred in this case because sufficient funds remained available for obligation at the time New York filed its claim for indemnification under the contract.

Also, the decision in the National Flood Insurance Act case mentioned above (B-201394, Apr. 23, 1981) noted that the defect could have been cured by inserting a clause along the lines of the clause in 54 Comp. Gen. 824. The same point was made in B-201072, May 3, 1982, also discussed earlier. *See also National Railroad Passenger Corp. v. United States*, 3 Cl. Ct. 516, 521 (1983) (indemnification agreement between the Federal Railroad Administration and Amtrak did not violate Antideficiency Act where liability was limited to amount of appropriation).

However, as noted in the introduction to this section, over the years GAO has expressed the view that indemnity agreements, even with limiting language, should not be entered into without congressional approval in view of their potentially disruptive fiscal consequences to the agency.[79] 63 Comp. Gen. 145, 147 (1984); 62 Comp. Gen. 361, 368 (1983); B-242146, Aug. 16, 1991. If an agency thinks that indemnification agreements in a particular context are sufficiently in the government's interest, the preferable approach is for the agency to go to Congress and seek specific statutory authority. *See* B-201394, Apr. 23, 1981.

As discussed below, Congress has seen fit to enact legislation authorizing indemnification agreements when warranted by the circumstances. In 1986, the Chairman of the Subcommittee on Nuclear Regulation, Senate Committee on Environment and Public Works, in connection with proposed Price-Anderson Act amendments the committee was considering, asked GAO to identify possible funding options for a statutory indemnification provision. GAO's response, B-197742, Aug. 1, 1986, listed several options and noted the benefits and drawbacks of each from the perspective of congressional flexibility. The options ranged from creating a statutory entitlement with a permanent indefinite appropriation for payment (indemnity guaranteed but no congressional flexibility), to making payment fully dependent on the appropriations process (full congressional flexibility but no guarantee of payment). In between were

[79] To illustrate the potential fiscal consequences, an authorized indemnity agreement entered into in 1950 produced liability of over $64 million plus interest more than four decades later. *See E.I. Du Pont De Nemours & Co. v. United States*, 24 Cl. Ct. 635 (1991), *aff'd*, 980 F.2d 1440 (Fed. Cir. 1992).

various other devices such as contract authority, use of contract provisions such as those in 54 Comp. Gen. 824, and various forms of limited funding authority.[80]

The discussion in B-197742 highlights the essence of the indemnification funding problem:

> "An indemnity statute should generally include two features—the indemnification provisions and a funding mechanism. Indemnification provisions can range from a legally binding guarantee to a mere authorization. Funding mechanisms can similarly vary in terms of the degree of congressional control and flexibility retained. It is impossible to maximize both the assurance of payment and congressional flexibility. Either objective is enhanced only at the expense of the other. . . .
>
> * * * * *
>
> "If payment is to be assured, Congress must yield control over funding, either in whole or up to specified ceilings . . . . Conversely, if Congress is to retain funding control, payment cannot be assured in any legally binding form and the indemnification becomes less than an entitlement."

B-197742 at 9, 11.

(3) Statutorily authorized indemnification

When we first stated the anti-indemnity rule at the outset of this discussion, we noted that the rule applies in the absence of express statutory authority to the contrary. Naturally, an indemnification agreement, however open-ended it may be, will be "legal" if it is expressly authorized by statute.

One statutory exception to the indemnification rules exists for certain defense-related contracts by virtue of 50 U.S.C. § 1431, often referred to by

[80] Note that the Price-Anderson Act, at 42 U.S.C. § 2210(j), provided contract rather than indemnity authority to the Nuclear Regulatory Commission (NRC) to address indemnification and other financial protection that NRC is required to provide nuclear licensees, contractors, and others to cover the consequences of nuclear incidents.

its Public Law designation, Public Law 85-804.[81] The statute evolved from a temporary wartime measure, section 201 of the First War Powers Act, 1941, ch. 493, 55 Stat. 838, 839 (Dec. 18, 1941). The implementing details on indemnification are found in Executive Order No. 10789, as amended,[82] and Federal Acquisition Regulation (FAR), 48 C.F.R. part 50 (2005). For example, while the decision to indemnify under Public Law 85-804 is discretionary, B-287121, Mar. 20, 2001, such discretion must be exercised by the agency head and cannot be delegated. B-257139, Aug. 30, 1994, *citing* FAR, 48 C.F.R. § 50.201(d).

Other examples of statutory exceptions are:

- section 4 of the Price-Anderson Act, 42 U.S.C. § 2210, which provides contract authority permitting, among other things, indemnification agreements with Nuclear Regulatory Commission licensees and Department of Energy contractors to pay claims resulting from nuclear accidents;
- section 119 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9619, which authorizes indemnification of certain Superfund cleanup contractors against negligence (but not gross negligence or intentional misconduct);
- section 308 of the National Aeronautics and Space Act, 42 U.S.C. § 2458b, which authorizes the Administrator of the National Aeronautics and Space Administration (NASA) to indemnify users of NASA space vehicles against third party claims that are not covered by insurance;
- section 2354 of title 10, United States Code, which authorizes the military departments to indemnify research and development contractors against liability not covered by insurance; and

[81] Pub. L. No. 85-804, § 1, 72 Stat. 972 (Aug. 28, 1958).

[82] Exec. Order No. 10789, *Contracting Authority of Government Agencies In Connection With National Defense Functions*, 23 Fed. Reg. 8897 (Nov. 14, 1958), as amended, 50 U.S.C. § 1431 note. A decision approving an indemnity agreement under authority of the First War Powers Act is B-33801, Apr. 19, 1943. A later related decision is B-33801, Oct. 27, 1943. Both of these decisions involved the famed "Manhattan Project," although that fact is well-concealed. The decisions had been classified, but were declassified in 1986.

- section 7423(2) of title 26, United States Code, which authorizes indemnification of federal employees for damages awarded in suits involving their performance of duties under the Internal Revenue Code.

Congress also may enact legislation to provide indemnification for a specific or one-time event. For example, Congress specifically indemnified the manufacturers, distributors, and those who administered the swine flu vaccine purchased and used as part of the National Swine Flu Immunization Program of 1976 against liability for other than their own negligence to persons alleging personal injury or death arising out of the administration of such vaccine. Pub. L. No. 94-380, 90 Stat. 1113 (Aug. 12, 1976).

### d. Specific Appropriation Limitations/Purpose Violations

In Chapter 4 we covered in some detail 31 U.S.C. § 1301(a), which prohibits the use of appropriations for purposes other than those for which they were appropriated. As seen in that chapter, violations of purpose availability can arise in a wide variety of contexts—charging an obligation or expenditure to the wrong appropriation, making an obligation or expenditure for an unauthorized purpose, violating a statutory prohibition or restriction, *etc*. The question we explore in this section is the relationship of purpose availability to the Antideficiency Act. In other words, when and to what extent does a purpose violation also violate the Antideficiency Act?

Why does it matter whether you have violated one statute or two statutes? One reason is that, if the second statute is the Antideficiency Act, there are statutory reporting requirements and potential penalties to consider in addition to any administrative sanctions that agencies may impose through internal processes for violations of section 1301 alone.

A useful starting point is the following excerpt from 63 Comp. Gen. 422, 424 (1984):

> "Not every violation of 31 U.S.C. § 1301(a) also constitutes a violation of the Antideficiency Act. . . . Even though an expenditure may have been charged to an improper source, the Antideficiency Act's prohibition against incurring obligations in excess or in advance of available appropriations is not also violated unless no other funds were available for that expenditure. Where, however, no other funds were authorized to be used for the purpose in question (or where those authorized were already

> obligated), both 31 U.S.C. § 1301(a) and § 1341(a) have been violated. In addition, we would consider an Antideficiency Act violation to have occurred where an expenditure was improperly charged and the appropriate fund source, although available at the time, was subsequently obligated, making readjustment of accounts impossible."

First, suppose an agency charges an obligation or expenditure to the wrong appropriation account, either charging the wrong appropriation for the same time period, or charging the wrong fiscal year. The above passage from 63 Comp. Gen. 422 provides the answer—if the appropriation that should have been charged in the first place has sufficient available funds to enable the adjustment of accounts, there is no Antideficiency Act violation. The decision in 73 Comp. Gen. 259 (1994) illustrates this point. In that case, an agency had erroneously charged a furniture order to the wrong appropriation account, but had sufficient funds in the proper account to support an adjustment correcting the error. Thus, GAO concluded, there was no violation of the Antideficiency Act. *Id.* at 261. On the other hand, a violation exists if the proper account does not have enough money to permit the adjustment, and this includes cases where sufficient funds existed at the time of the error but have since been obligated or expended. *See also* 70 Comp. Gen. 592 (1991); B-222048, Feb. 10, 1987; B-95136, Aug. 8, 1979.

Other cases illustrating or applying this principle are 57 Comp. Gen. 459 (1978) (grant funds charged to wrong fiscal year); B-224702, Aug. 5, 1987 (contract modifications charged to expired accounts rather than current appropriations); and B-208697, Sept. 28, 1983 (items charged to General Services Administration Working Capital Fund which should have been charged to other operating appropriations). Actually, the concept of "curing" a violation by making an appropriate adjustment of accounts is not new. *See*, *e.g.*, 16 Comp. Dec. 750 (1910); 4 Comp. Dec. 314, 317 (1897). The Armed Services Board of Contract Appeals also has followed this principle. *New England Tank Industries of New Hampshire, Inc.*, ASBCA No. 26474, 88-1 BCA ¶ 20,395 (1987).[83]

[83] Although the Board's decision was vacated and remanded on other grounds by the Court of Appeals for the Federal Circuit, *New England Tank Industries of New Hampshire v. United States*, 861 F.2d 685 (Fed. Cir. 1988), the court noted its agreement with the Board's Antideficiency Act conclusions. *Id.* at 692 n.15.

The next situation to consider is an obligation or expenditure in excess of a statutory ceiling. This may be an earmarked maximum in a more general appropriation or a monetary ceiling imposed by some other legislation. An obligation or expenditure in excess of the ceiling violates 31 U.S.C. § 1341(a). See, for example, the following:

- *Monetary ceilings on minor military construction (10 U.S.C. § 2805):* 63 Comp. Gen. 422 (1984); GAO, *Continuing Inadequate Control Over Programming and Financing of Construction*, B-133316 (Washington, D.C.: July 23, 1964); *Review of Programming and Financing of Selected Facilities Constructed at Army, Navy, and Air Force Installations*, B-133316 (Washington, D.C.: Jan. 24, 1961).[84]

- *Monetary ceiling on lease payments for family housing units in foreign countries (10 U.S.C. § 2828(e)):* 66 Comp. Gen. 176 (1986); B-227527, B-227325, Oct. 21, 1987 (nondecision letter); GAO, *Leased Military Housing Costs in Europe Can Be Reduced by Improving Acquisition Practices and Using Purchase Contracts*, GAO/NSIAD-85-113 (Washington, D.C.: July 24, 1985), at 7–8.

- *Ceiling in supplemental appropriation:* B-204270, Oct. 13, 1981 (dollar limit on Standard Level User Charge payable by agency to General Services Administration).[85]

- *Ceiling in authorizing legislation:* 64 Comp. Gen. 282 (1985) (dollar limit on two Small Business Administration direct loan programs).

In a statutory ceiling case, the account adjustment concept described above may or may not come into play. If the ceiling represents a limit on the amount available for a particular object, then there generally will be no other funds available for that object and hence no "correct" funding source from which to reimburse the account charged. If, however, the ceiling represents only a limit on the amount available from a particular

[84] Another report in this series, making similar findings under a different statutory ceiling, is GAO, *Illegal Use of Operation and Maintenance Funds for Rehabilitation and Construction of Family Housing and Construction of a Related Facility*, B-133102 (Washington, D.C.: Aug. 30, 1963).

[85] This case also illustrates that the Antideficiency Act applies to interagency transactions the same as any other obligations or expenditures. *Cf.* B-247348, June 22, 1992 (nonreimbursable interagency personnel detail).

appropriation and not an absolute limit on expenditures for the object, as in the minor military construction cases, for example, then it may be possible to cure violations by an appropriate adjustment. 63 Comp. Gen. at 424.

The final situation is an obligation or expenditure for an object that is prohibited or simply unauthorized. In 60 Comp. Gen. 440 (1981), a proviso in the Customs Service's 1980 appropriation expressly prohibited the use of the appropriation for administrative expenses to pay any employee overtime pay in an amount in excess of $20,000. By allowing employees to earn overtime pay in excess of that amount, the Customs Service violated 31 U.S.C. § 1341. The Comptroller General explained the violation as follows:

> "When an appropriation act specifies that an agency's appropriation is not available for a designated purpose, and the agency has no other funds available for that purpose, any officer of the agency who authorizes an obligation or expenditure of agency funds for that purpose violates the Antideficiency Act. Since the Congress has not appropriated funds for the designated purpose, the obligation may be viewed either as being in excess of the amount (zero) available for that purpose or as in advance of appropriations made for that purpose. In either case the Antideficiency Act is violated."

*Id.* at 441.

In B-201260, Sept. 11, 1984, the Comptroller General advised that expenditures in contravention of the Boland Amendment would violate the Antideficiency Act (although none were found in that case). The Boland Amendment, an appropriation rider, provided that "[n]one of the funds provided in this Act may be used" for certain activities in Central America. In B-229732, Dec. 22, 1988, GAO found the Antideficiency Act violated when the Department of Housing and Urban Development used its funds for commercial trade promotion activities in the Soviet Union, an activity beyond its statutory authority. Similarly, a nonreimbursable interagency detail of an employee, contrary to a specific statutory prohibition, produced a violation in B-247348, June 22, 1992 (letter to Public Printer). All three cases also involved purpose violations and are consistent with

60 Comp. Gen. 440, the rationale being that expenditures would be in excess of available appropriations, which were zero.[86]

More recent GAO decisions likewise consistently apply the principle that the use of appropriated funds for unauthorized or prohibited purposes violates the Antideficiency Act (absent an alternative funding source) since zero funds are available for that purpose. B-302710, May 19, 2004 (use of funds in violation of statutory prohibition against publicity or propaganda); B-300325, Dec. 13, 2002 (appropriations used for unauthorized technical assistance purposes); B-300192, Nov. 13, 2002 (violation of appropriation rider prohibiting use of funds to implement an Office of Management and Budget memorandum); B-290005, July 1, 2002 (appropriation used to procure unauthorized legal services); 71 Comp. Gen. 402, 406 (1992) (unauthorized use of Training and Employment Services appropriation); B-246304, July 31, 1992 (potential violation of appropriation act "Buy American" provision); B-248284, Sept. 1, 1992 (nondecision letter) (reprogramming of funds to an unauthorized purpose).

One court reached a result that appears to interpret the Antideficiency Act somewhat differently. In *Southern Packaging and Storage Co. v. United States*, 588 F. Supp. 532 (D.S.C. 1984), the court found that the Defense Department had purchased certain combat meal products ("MRE") in violation of a "Buy American" appropriation rider, which provided that "[n]o part of any appropriation contained in this Act . . . shall be available" to procure items not grown or produced in the United States. The court rejected the contention that the violation also contravened the Antideficiency Act, stating:

> "There is no evidence in this case to show that [the Defense Personnel Supply Center] authorized expenditures beyond the amount appropriated by Congress for the procurement of the MRE rations and the component foods thereof."

*Id.* at 550.

[86] There are also a few older cases finding violations of both statutes, but they are of little help in attempting to formulate a reasoned approach. Examples are 39 Comp. Gen 388 (1959), which does not discuss the relationship, and 22 Comp. Gen. 772 (1943), which includes a rationale, now obsolete, based on the then-existing lack of authority to include interest stipulations in contracts.

Given the sparse discussion in the decision, the fact that Congress does not make specific appropriations for MRE rations, and the fact that the Antideficiency Act regulates both obligations and expenditures in excess of available authority, it is difficult to discern precisely how the *Southern Packaging* court would apply the Antideficiency Act. In any event, we have found no subsequent judicial or administrative decision that cites this aspect of the *Southern Packaging* opinion.

### e. Amount of Available Appropriation or Fund

Questions occasionally arise over precisely what assets an agency may count for purposes of determining the amount of available resources against which it may incur obligations.

The starting point, of course, is the unobligated balance of the relevant appropriation. In section F of this chapter, we discuss the rule that subdivisions of a lump-sum appropriation appearing in legislative history are not legally binding on the agency. They are binding only if carried into the appropriation act itself, or are made binding by some other statute. Thus, the entire unobligated balance of an unrestricted lump-sum appropriation is available for Antideficiency Act purposes. 55 Comp. Gen. 812 (1976).

Where an agency is authorized to retain certain receipts or collections for credit to an appropriation or fund under that agency's control, those receipts are treated the same as direct appropriations for purposes of obligation and the Antideficiency Act, subject to any applicable statutory restrictions. *E.g.*, 71 Comp. Gen. 224 (1992) (National Technical Information Service may use subscription payments to defray its operating expenses but, under governing legislation, may use customer advances only for costs directly related to firm orders).

In addition, certain other assets may be "counted" as available budget authority, that is, obligated against. For example, OMB Circular No. A-11 includes certain spending authority from offsetting collections as a form of "budget authority."[87] *See also* B-134474-O.M., Dec. 18, 1957. This does not mean anticipated receipts from transactions that have not yet occurred or orders that have not yet been placed. Thus, the Library of Congress could

[87] *See generally* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, §§ 20.4(b), 20.7, and 20.12 (June 21, 2005). See also the definitions of "Budget Authority" and "Collections" in GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 20–23, 28–30.

not retain in a revolving fund advances from federal agencies in excess of amounts needed to cover current orders in anticipation of applying the excess amounts to future orders. B-288142, Sept. 6, 2001. Obligations cannot be charged against anticipated proceeds from an anticipated sale of property. *See*, *e.g.*, B-209758, Sept. 29, 1983 (nondecision memorandum) (sale of assets seized from embezzler). Thus, the Customs Service violated the Antideficiency Act by obligating against anticipated receipts from future sales of seized property unless it had sufficient funds available from other sources to cover the obligation. B-237135, Dec. 21, 1989. Similarly, the Comptroller General found that the Air Force violated the Antideficiency Act by overobligating its Industrial Fund based on estimated or anticipated customer orders. *See* GAO, *The Air Force Has Incurred Numerous Overobligations in its Industrial Fund*, AFMD-81-53 (Washington, D.C.: Aug. 14, 1981); 62 Comp. Gen. 143, 147 (1983). Even where receivables are properly included as budgetary resources, an agency may not incur obligations against receipts expected to be received after the end of the current fiscal year without specific statutory authority. 51 Comp. Gen. 598, 605 (1972).

In 60 Comp. Gen. 520 (1981), GAO considered whether the General Services Administration (GSA) could obligate against the value of inventory in the General Supply Fund. GSA buys furniture and other equipment for other agencies through the General Supply Fund, a revolving fund established by statute. Agencies pay GSA either in advance or by reimbursement. For reasons of economy, GSA normally makes consolidated and bulk purchases of commonly used items. Concern over the application of the Antideficiency Act arose when, for several reasons, the Fund began experiencing cash flow problems. To help remedy its "cash flow" problems GSA wanted to consider the amount of available budget authority to include inventory as well as cash assets and advances.

The Comptroller General held that inventory in the General Supply Fund did not constitute a budgetary resource against which obligations could be incurred. The items in the inventory had already been purchased and could not be counted again as a new budgetary resource. Thus, for Antideficiency Act purposes, GSA could not incur obligations using the value of inventory as an available "budgetary resource."

Supplemental appropriations requested but not yet enacted obviously may not be counted as a budgetary resource. B-230117-O.M., Feb. 8, 1989.

### f. Intent/Factors beyond Agency Control

A violation of the Antideficiency Act does not depend on intent or lack of good faith on the part of contracting or other officials who obligate or pay in advance or in excess of appropriations. Although these factors may influence the applicable penalty, they do not affect the basic determination of whether a violation has occurred. 64 Comp. Gen. 282, 289 (1985). The Comptroller General once expressed the principle in the following passage which, although stated in a slightly different context, is equally applicable here:

> "Where a payment is prohibited by law, the utmost good faith on the part of the officer, either in ignorance of the facts or in disregard of the facts, in purporting to authorize the incurring of an obligation the payment of which is so prohibited, cannot take the case out of the statute, otherwise the purported good faith of an officer could be used to nullify the law."

A-86742, June 17, 1937.

To illustrate, a contracting officer at the United States Mission to the North Atlantic Treaty Organization accepted an offer for installation of automatic telephone equipment at twice the amount of the unobligated balance remaining in the applicable account. The Department of State explained that the contracting officer had misinterpreted GAO regulations and implementing State Department procedures. But for this misinterpretation, additional funds could have been placed in the account. State therefore felt that the transaction should not be considered in violation of the Act. GAO did not agree and held that the overobligation must be immediately reported as required by 31 U.S.C. § 1517(b). The official's state of mind was not relevant in deciding whether a violation had occurred. 35 Comp. Gen. 356 (1955).

An overobligation may result from external factors beyond the agency's control. Whether this will produce an Antideficiency Act violation depends on the particular circumstances. In 58 Comp. Gen. 46 (1978), the Army asked whether it could make payments to a contractor under a contract requiring payment in local (foreign) currency where the original dollar obligation was well within applicable funding limitations but, due to subsequent exchange rate fluctuations, payment would exceed those limitations. The Army argued that a payment under these circumstances should not be considered a violation of the Act because currency fluctuations are totally beyond the control of the contracting officer or any

other agency official. GAO disagreed. The fact that the contracting officer was a victim of circumstances does not make a payment in excess of available appropriations any less illegal. (It is, of course, as with state of mind, relevant in assessing penalties for the violation.) *See also* 38 Comp. Gen. 501 (1959) (severe adverse weather conditions or prolonged employee strikes generally are not sufficient to justify overobligation by former Post Office Department, but facts in a particular case could justify deficiency apportionment).

In apparent contrast, the Comptroller General stated in 62 Comp. Gen. 692, 700 (1983) that an overobligation resulting from a judicial award of attorney's fees under 28 U.S.C. § 2412(d), the Equal Access to Justice Act, would not violate the Antideficiency Act. *See also* 63 Comp. Gen. 308, 312 (1984) (judgments or board of contract appeals awards under Contract Disputes Act, same answer); B-227527, B-227325, Oct. 21, 1987 (nondecision letter) (amounts awarded by court judgment not counted in determining whether statutory ceiling on lease payments has been exceeded and Antideficiency Act thereby violated).

The distinction is based on the extent to which the agency can act to avoid the overobligation even though it is imposed by some external force beyond its control. Thus, the currency fluctuation decision stated:

> "[W]hen a contracting officer finds that the dollars required to continue or make final payment on a contract will exceed a statutory limitation he may terminate the contract, provided the termination costs will not exceed the statutory limitations. Alternatively, the contracting officer may issue a stop work order and the agency may ask Congress for a deficiency appropriation citing the currency fluctuation as the reason for its request."

58 Comp. Gen. at 48. Similarly, the Postmaster General could curtail operations if necessary. 38 Comp. Gen. 501, 504 (1959). *See also* 66 Comp. Gen. 176 (1986) (Antideficiency Act would not preclude Air Force from entering into lease for overseas family housing without provision limiting annual payments to statutory ceiling, even though certain costs could conceivably escalate above ceiling, where good faith cost estimates were well below ceiling and lease included termination for convenience clause). Where the agency could have acted to avert the overobligation but did not, there will be a violation. In contrast, in the case of a payment ordered by a court, comparable options (apart from seeking a deficiency appropriation)

are not available. (Curtailing activities after the overobligation has occurred to avoid compounding the violation is a separate question.)

### g. Exceptions

The Antideficiency Act by its own terms recognizes that Congress can and may grant exceptions. 31 U.S.C. § 1341(a). The statute prohibits contracts or other obligations in advance or excess of available appropriations, "unless authorized by law." This is nothing more than the recognition that Congress can authorize exceptions to the statutes it enacts.

(1) Contract authority

At the outset, it is necessary to distinguish between "contract authority" and the "authority to enter into contracts." A contract is simply a legal device employed by two or more parties to create binding and legally enforceable obligations in furtherance of some objective. The federal government uses contracts every day to procure a wide variety of goods and services. An agency does not need specific statutory authority to enter into contracts. It has long been established that a government agency has the inherent authority to enter into binding contracts in the execution of its duties. *Van Brocklin v. Tennessee*, 117 U.S. 151, 154 (1886); *United States v. Maurice*, 26 F. Case 1211, 1216–17 (No. 15,747) (C.C.D. Va. 1823). It should be apparent that these contracts, "authorized by law" though they may be, are not sufficient to constitute exceptions to the Antideficiency Act, else the Act would be meaningless.

For purposes of the Antideficiency Act exception, a contract authorized by law requires not only authority to enter into a contract, but authority to do so without regard to the availability of appropriations. While the former may be inherent, the latter must be conferred by statute. The most common example of this is "contract authority" as that term is defined and described in Chapter 2—statutory authority to enter into binding contracts without the funds adequate to make payments under them.

In some cases, the "exception" language will be unmistakably explicit. An example is the Price-Anderson Act, which provides authority to "make contracts in advance of appropriations and incur obligations without regard to" the Antideficiency Act. 42 U.S.C. § 2210(j). Other examples of clear authority, although perhaps not as explicit as the Price-Anderson Act, are discussed in 27 Comp. Gen. 452 (1948) (long-term operating-differential subsidy agreements under the Merchant Marine Act); B-211190, Apr. 5, 1983 (contracts with states under the Federal Boat Safety Act); B-164497.3, June 6, 1979 (certain provisions of the Federal-Aid Highway Act of 1973);

and B-168313, Nov. 21, 1969 (interest subsidy agreements with educations institutions under the Housing Act of 1950).

In an earlier case involving contract authority, GAO insisted that the Corps of Engineers had to include a "no liability unless funds are later made available" clause for any work done in excess of available funds. 2 Comp. Gen. 477 (1923). The Corps later had trouble with this clause because a Court of Claims decision, *C.H. Leavell & Co. v. United States*, 530 F.2d 878 (Ct. Cl. 1976), allowed the contractor an equitable adjustment for suspension of work due to a delay in enacting an appropriation to pay him, notwithstanding the "availability of funds" clause. In 56 Comp. Gen. 437 (1977), GAO overruled 2 Comp. Gen. 477, deciding that section 10 of the River and Harbor Act of 1922, 33 U.S.C. § 621, by expressly authorizing the Corps to enter into large multiyear civil works projects without seeking a full appropriation in the first year, constituted the necessary exception to the Antideficiency Act and a "funds available" clause was not necessary. This applies as well to contracts financed from the Corps' Civil Works Revolving Fund. B-242974.6, Nov. 26, 1991 (internal memorandum). The rationale of 56 Comp. Gen. 437 also has been applied to long-term fuel storage facilities contracts authorized by 10 U.S.C. § 2388. *New England Tank Industries of New Hampshire, Inc.*, ASBCA No. 26474, 88-1 BCA ¶ 20,395 (1987), *vacated on other grounds*, *New England Tank Industries of New Hampshire v. United States*, 861 F.2d 685 (Fed. Cir. 1988).

In 28 Comp. Gen. 163 (1948), the Comptroller General considered whether the Commissioner of Reclamation had budget authority to enter into certain contracts in advance of appropriations (contract authority). Congress had authorized the contract authority in an appropriation act but made it subject to a monetary ceiling. Since the contract authority was explicit, with no language making it contingent on appropriations being made at some later date, the Comptroller General concluded that the statute authorized the Commissioner to enter into a firm and binding contract.

The Bureau of Mines was authorized to enter into a contract (in advance of the appropriation) to construct and equip an anthracite research laboratory. The Bureau asked the General Services Administration (GSA) to enter into the contract on its behalf pursuant to section 103 of the Federal Property and Administrative Services Act of 1949, ch. 288, 63 Stat. 377, 380 (June 30, 1949), which provided that "funds appropriated to . . . other Federal agencies for the foregoing purposes [execution of contracts and supervision of construction] shall be available for transfer to and

expenditure by the [GSA]." GAO held that the Bureau's contract authority provided a sufficient legal basis for GSA to enter into contracts for construction of the laboratory pursuant to section 103. 29 Comp. Gen. 504 (1950).[88]

A somewhat different kind of contract authority is found in 41 U.S.C. § 11, the so-called Adequacy of Appropriations Act. An exception to the requirement to have adequate appropriations—or any appropriation at all—is made for procurements by the military departments for "clothing, subsistence, forage, fuel, quarters, transportation, or medical and hospital supplies, which, however, shall not exceed the necessities of the current year." By administrative interpretation, the Defense Department has limited this authority to emergency circumstances where immediate action is necessary. Department of Defense Financial Management Regulation 7000.14-R, vol. 3, ch. 12, ¶ 120201 (Jan. 31, 2001).

It should again be emphasized that to constitute an exception to 31 U.S.C. § 1341(a), the "contract authority" must be specific authority to incur the obligation in excess or advance of appropriations, not merely the general authority any agency has to enter into contracts to carry out its functions. Also, an appropriation obviously is needed to liquidate the contract obligation.

Congress may grant authority to contract beyond the fiscal year in terms which amount to considerably less than the type of contract authority described above. An example is 43 U.S.C. § 388, which authorizes the Secretary of the Interior to enter into certain contracts relating to reclamation projects "which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefore." *See PCL Construction Services, Inc. v. United States*, 41 Fed. Cl. 242, 257 (1998), *aff'd*, 96 Fed. Appx. 672 (Fed. Cir. 2004) (pursuant to 43 U.S.C. § 388, firm fixed-price contract awarded by the Bureau of Reclamation to construct a visitors center and parking structure at Hoover Dam could be incrementally funded without violating the Antideficiency Act). While this provision has been referred to as an exception to the Antideficiency Act (B-72020, Jan. 9, 1948), it authorizes only "contingent contracts" under

[88] The Public Buildings Act of 1959, Pub. L. No. 86-249, 73 Stat. 479 (Sept. 9, 1959), superseded the provisions of the 1949 legislation discussed in 29 Comp. Gen. 504. The substance of the Public Buildings Act of 1959 is codified in 40 U.S.C. §§ 3301–3315.

which there is no legal obligation to pay unless and until appropriations are provided. 28 Comp. Gen. 163 (1948). A similar example, discussed in B-239435, Aug. 24, 1990, is 38 U.S.C. § 230(c) (Supp. II 1990) (subsequently recodified at 38 U.S.C. § 316) which authorized the Department of Veterans Affairs to enter into certain leases for periods of up to 35 years but further provided that the government's obligation to make payments was "subject to the availability of appropriations for that purpose." For another example, see B-248647.2, Apr. 24, 1995, which discussed the Federal Triangle Development Act, 40 U.S.C. §§ 1101–1109. This act directed GSA to enter into a long-term lease and required the lease agreement to recognize that GSA could obligate funds for lease payments only on an annual basis. 40 U.S.C. § 1105. Therefore, the GSA multiyear lease agreement at issue was specifically "authorized by law" and did not violate the Antideficiency Act. B-248647.2 at fn. 3.

(2) <u>Other obligations "authorized by law"</u>

The "authorized by law" exception in 31 U.S.C. § 1341(a) applies to noncontractual obligations as well as to contracts. The basic approach is the same. The statutory authority must be more than just authority to undertake the particular activity. For example, statutory authority to acquire land and to pay for it from a specified fund is not an exception to the Antideficiency Act. 27 Comp. Gen. 662 (1921). It merely authorizes acquisitions to the extent of funds available in the specified source at the time of purchase. *Id.* Similarly, the authority to conduct hearings, without more, does not confer authority to do so without regard to available appropriations. 16 Comp. Dec. 750 (1910). Provisions in the District of Columbia Code requiring Saint Elizabeth's Hospital to treat all patients who meet admission eligibility requirements were held not to authorize the Hospital to operate beyond the level of its appropriations. If mandatory expenditures, together with nonmandatory expenditures, would cause a deficiency, the Hospital would have to reduce nonmandatory expenditures. 61 Comp. Gen. 661 (1982).

Congress may expressly state that an agency may obligate in excess of the amounts appropriated, or it may implicitly authorize an agency to do so by virtue of a law that necessarily requires such obligations. *See* B-262069, Aug. 1, 1995. Several cases have considered the effect of various statutory salary or compensation increases. If a statutory increase is mandatory and does not vest discretion in an administrative office to determine the amount, or if it gives some administrative body discretion to determine the amount, payment of which then becomes mandatory, the obligation is

deemed "authorized by law" for Antideficiency Act purposes. *See*, *e.g.*, 39 Comp. Gen. 422 (1959) (salary increases for Wage Board employees); B-168796, Feb. 2, 1970 (mandatory statutory increase in retired pay for Tax Court judges); B-107279, Jan. 9, 1952 (mandatory increases for certain legislative personnel). GAO has not treated the granting of increases retroactively to correct past administrative errors as creating the same type of exception. *See* 24 Comp. Gen. 676 (1945). Increases which are discretionary do not permit the incurring of obligations in excess or advance of appropriations. 31 Comp. Gen. 238 (1951) (discretionary pension increases); 28 Comp. Gen. 300 (1948).[89]

Some other examples of obligations authorized by law for Antideficiency Act purposes are:

- Defense Health Program obligations for medical services. B-287619, July 5, 2001.
- Mandatory pilot program in Vermont under Farms for the Future Act of 1990 (loan guarantees and interest assistance). B-244093, July 19, 1991.
- Mandatory transfer from one appropriation account to another where "donor" account contained insufficient unobligated funds. 38 Comp. Gen. 93 (1958).
- Provision in Criminal Justice Act of 1964 imposing unequivocal legislative directive for commencement of certain programs which would necessarily involve creation of financial obligations. B-156932, Aug. 17, 1965.
- Provision in District of Columbia Criminal Justice Act of 1974 (CJA), as amended, making attorney representation in CJA cases a mandatory expense. B-283599, Sept. 15, 1999. *See also* B-284566, Apr. 3, 2000.
- Statute authorizing Interstate Commerce Commission to order a substitute rail carrier to serve shippers abandoned by their primary

[89] The decision in 28 Comp. Gen. 300 concerned increases to Wage Board employees under legislation which is now obsolete (see 39 Comp. Gen. 422, cited in the text). However, it is still useful for the basic proposition that nonmandatory increases are not obligations "authorized by law" as that term is used in 31 U.S.C. § 1341(a). 28 Comp. Gen. at 302.

carrier in emergency situations, and to reimburse certain costs of the substitute carrier. B-196132, Oct. 11, 1979.

What are perhaps the outer limits of the "authorized by law" exception are illustrated in B-159141, Aug. 18, 1967. The Federal Aviation Administration (FAA) had entered into long-term, incrementally funded contracts for the development of a civil supersonic aircraft (SST). To ensure compliance with the Antideficiency Act, the FAA each year budgeted for, and obligated, sufficient funds to cover potential termination liability. The appropriations committees became concerned that unnecessarily large amounts were being tied up this way, especially in light of the highly remote possibility that the SST contracts would be terminated. In considering the FAA's 1968 appropriation, the House Appropriations Committee reduced the FAA's request by the amount of the termination reserve, and in its report directed the FAA not to obligate for potential termination costs. The Comptroller General advised that if the Senate Appropriations Committee did the same thing—a specific reduction tied to the amount requested for the reserve, coupled with clear direction in the legislative history—then an overobligation resulting from a termination would be regarded as authorized by law and not in violation of the Antideficiency Act.

## 3. Voluntary Services Prohibition

### a. Introduction

We previously discussed the Antideficiency Act prohibitions contained in section 1341 of title 31, United States Code. The next section of the Antideficiency Act is 31 U.S.C. § 1342:

> "An officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property. . . ."

This provision first appeared, in almost identical form, in a deficiency appropriation act enacted in 1884.[90] Although the original prohibition read "hereafter, no department or officer of the United States shall accept . . .," it was included in an appropriation for the then Indian Office of the Interior Department, and the Court of Claims held that it was applicable only to the Indian Office. *Glavey v. United States*, 35 Ct. Cl. 242, 256 (1900), *rev'd on other grounds*, 182 U.S. 595 (1901). The Comptroller of the Treasury continued to apply it across the board. *See*, *e.g.*, 9 Comp. Dec. 181 (1902). In any event, the applicability of the 1884 statute soon became moot because Congress reenacted it as part of the Antideficiency Act in 1905[91] and again in 1906.[92]

Prior to the 1982 recodification of title 31, section 1342 was subsection (b) of the Antideficiency Act, while the basic prohibitions of section 1341, previously discussed, constituted subsection (a). The proximity of the two provisions in the United States Code reflects their relationship, as section 1342 supplements and is a logical extension of section 1341. If an agency cannot directly obligate in excess or advance of its appropriations, it should not be able to accomplish the same thing indirectly by accepting ostensibly "voluntary" services and then presenting Congress with the bill, in the hope that Congress will recognize a "moral obligation" to pay for the benefits conferred—another example of the so-called "coercive deficiency."[93] In this connection, the chairman of the House committee responsible for what became the 1906 reenactment of the voluntary services prohibition stated:

> "It is a hard matter to deal with. We give to Departments what we think is ample, but they come back with a deficiency. Under the law they can [not] make these deficiencies, and Congress can refuse to allow them; but

---

[90] Act of May 1, 1884, ch. 37, 23 Stat. 17.

[91] Pub. L. No. 217, ch. 1484, § 4, 33 Stat. 1214, 1257 (Mar. 3, 1905).

[92] Pub. L. No. 28, ch. 510, § 3, 34 Stat. 27, 48–49 (Feb. 27, 1906).

[93] See section C.1 of this chapter for a discussion of the coercive deficiency concept. *See also PCL Construction Services, Inc. v. United States*, 41 Fed. Cl. 242, 251–260 (1998) (incrementally funded contract did not raise coercive deficiency issues where contract clauses clearly provided that contractor assumed the sole risk of working at a rate that would exhaust funding.)

> after they are made it is very hard to refuse to allow them . . . ."[94]

In addition, as we have noted previously, the Antideficiency Act was intended to keep an agency's level of operations within the amounts Congress appropriates for that purpose. The unrestricted ability to use voluntary services would permit circumvention of that objective. Thus, without section 1342, section 1341 could not be fully effective. Note that 31 U.S.C. § 1342 contains two distinct although closely related prohibitions: It bans, first, the acceptance of any type of voluntary services for the United States, and second, the employment of personal services "exceeding that authorized by law."

### b. Appointment without Compensation and Waiver of Salary

(1) The rules—general discussion

One of the evils that the "personal services" prohibition was designed to correct was a practice existing in 1884, whereby lower-grade government employees were being asked to "volunteer" their services for overtime periods in excess of the periods allowed by law. This enabled the agency to economize at the employees' expense but nevertheless generated claims by the employees.[95] Currently, 31 U.S.C. § 1342 serves a number of other purposes and is relevant in a number of contexts involving services by government employees or services which would otherwise have to be performed by government employees. For example, one court suggested that 31 U.S.C. § 1342 also is based in part on the principle that only public officials should be allowed to perform governmental functions. *See Suss v. American Society for the Prevention of Cruelty to Animals*, 823 F. Supp. 181, 189 (S.D.N.Y. 1993) ("The risks of abuse of power by private parties exercising functions involving [the] exercise of sovereign compulsion is one reason for the limitations imposed by federal law on the use of volunteers in implementing public sector programs."). However, as mentioned previously, the fundamental purposes embodied in section 1342 are to preserve the integrity of the appropriations process by avoiding "coercive deficiencies" and augmentations.

---

[94] 39 Cong. Rec. 3687 (1906), quoted in 30 Op. Att'y Gen. 51, 53–54 (1913).

[95] See 30 Op. Att'y Gen. 51, 54–55 (1913), discussing the legislative history of the 1884 prohibition.

One of the earliest questions to arise under 31 U.S.C. § 1342—and an issue that has generated many cases—was whether a government officer or employee, or an individual about to be appointed to a government position, could voluntarily work for nothing or for a reduced salary. Initially, the Comptroller of the Treasury ducked the question on the grounds that it did not involve a payment from the Treasury, and suggested that the question was appropriate to take to the Attorney General. 19 Comp. Dec. 160, 163 (1912).

The very next year, the Attorney General tackled the question when asked whether a retired Army officer could be employed as superintendent of an Indian school without additional compensation. In what has become the leading case construing 31 U.S.C. § 1342, the Attorney General replied that the appointment would not violate the voluntary services prohibition. 30 Op. Att'y Gen. 51 (1913). In reaching this conclusion, the Attorney General drew a distinction that the Comptroller of the Treasury thereafter adopted, and that GAO and the Justice Department continue to follow to this day—the distinction between "voluntary services" and "gratuitous services." The key passages from the Attorney General's opinion are set forth below:

> "[I]t seems plain that the words 'voluntary service' were not intended to be synonymous with 'gratuitous service' and were not intended to cover services rendered in an official capacity under regular appointment to an office otherwise permitted by law to be non-salaried. In their ordinary and normal meaning these words refer to service intruded by a private person as a 'volunteer' and not rendered pursuant to any prior contract or obligation . . . . It would be stretching the language a good deal to extend it so far as to prohibit *official* services without compensation in those instances in which Congress has not required even a minimum salary for the office.
>
> "The context corroborates the view that the ordinary meaning of 'voluntary services' was intended. The very next words 'or employ personal service in excess of that authorized by law' deal with *contractual* services, thus making a balance between 'acceptance' of 'voluntary service' (*i.e.*, the cases where there is no prior contract) and 'employment' of 'personal service' (*i.e.*, the cases where there is such prior contract, though unauthorized by law).

* * * * *

> "Thus it is evident that the evil at which Congress was aiming was not appointment or employment for authorized services without compensation, but the acceptance of unauthorized services not intended or agreed to be gratuitous and therefore likely to afford a basis for a future claim upon Congress. . . ."

*Id.* at 52–53, 55.

The Comptroller of the Treasury agreed with this interpretation:

> "[The statute] was intended to guard against claims for compensation. A service offered clearly and distinctly as gratuitous with a proper record made of that fact does not violate this statute against acceptance of voluntary service. An appointment to serve without compensation which is accepted and properly recorded is not a violation of [31 U.S.C. § 1342], and is valid if otherwise lawful."

27 Comp. Dec. 131, 132–33 (1920).

Two main rules emerge from 30 Op. Att'y Gen. 51 and its progeny. First, if compensation for a position is fixed by law, an appointee may not agree to serve without compensation or to waive that compensation in whole or in part. *Id.* at 56. This portion of the opinion did not break any new ground. The courts had already held, based on public policy, that compensation fixed by law could not be waived.[96] Second, and this is really just a corollary to the rule just stated, if the level of compensation is discretionary, or if the relevant statute prescribes only a maximum (but not a minimum), the compensation can be set at zero, and an appointment without compensation or a waiver, entire or partial, is permissible. *Id.;* 27 Comp. Dec. at 133.

[96] *Glavey v. United States*, 182 U.S. 595 (1901); *Miller v. United States*, 103 F. 413 (C.C.S.D.N.Y. 1900). *See also* 9 Comp. Dec. 101 (1902). Later cases following *Glavey* are *MacMath v. United States*, 248 U.S. 151 (1918), and *United States v. Andrews*, 240 U.S. 90 (1916). The policy rationale is that to permit agencies to disregard compensation prescribed by statute could work to the disadvantage of those who cannot, or are not willing to, accept the position for less than the prescribed salary. *See Miller*, 103 F. at 415–16.

Both GAO and the Justice Department have had frequent occasion to address these issues, and there are numerous decisions illustrating and applying the rules.[97]

In a 1988 opinion, the Justice Department's Office of Legal Counsel considered whether the Iran-Contra Independent Counsel could appoint Professor Laurence Tribe as Special Counsel under an agreement to serve without compensation. Applying the rules set forth in 30 Op. Att'y Gen. 51, the Office of Legal Counsel concluded that the appointment would not contravene the Antideficiency Act since the statute governing the appointment set a maximum salary but no minimum. Memorandum Opinion for the Acting Associate Attorney General, *Independent Counsel's Authority to Accept Voluntary Services—Appointment of Laurence H. Tribe*, OLC Opinion, May 19, 1988.

Similarly, the Comptroller General held in 58 Comp. Gen. 383 (1979) that members of the United States Metric Board could waive their salaries since the relevant statute merely prescribed a maximum rate of pay. In addition, since the Board had statutory authority to accept gifts, a member who chose to do so could accept compensation and then return it to the Board as a gift. Both cases make the point that compensation is not "fixed by law" for purposes of the "no waiver" rule where the statute merely sets a maximum limit for the salary.

A good illustration of the kind of situation 31 U.S.C. § 1342 is designed to prevent is 54 Comp. Gen. 393 (1974). Members of the Commission on Marihuana and Drug Abuse had, apparently at the chairman's urging, agreed to waive their statutory entitlement to $100 per day while engaged in Commission business. The year after the Commission ceased to exist, one of the former members changed his mind and filed a claim for a portion of the compensation he would have received but for the waiver. Since the $100 per day had been a statutory entitlement, the purported waiver was invalid and the former commissioner was entitled to be paid. Similar claims by any or all of the other former members would also have to be allowed. If insufficient funds remained in the Commission's now-expired appropriation, a deficiency appropriation would be necessary.

[97] Some cases in addition to those cited in the text are 32 Comp. Gen. 236 (1952); 23 Comp. Gen. 109, 112 (1943); 14 Comp. Gen. 193 (1934); 34 Op. Att'y Gen. 490 (1925); 30 Op. Att'y Gen. 129 (1913); 13 Op. Off. Legal Counsel 113 (1989); 3 Op. Off. Legal Counsel 78 (1979).

A few earlier cases deal with fact situations similar to that considered in 30 Op. Att'y Gen. 51—the acceptance by someone already on the federal payroll of additional duties without additional compensation. In 23 Comp. Gen. 272 (1943), for example, GAO concluded that a retired Army officer could serve, without additional compensation, as a courier for the State Department. The voluntary services prohibition, said the decision, does not preclude "the assignment of persons holding office under the Government to the performance of additional duties or the duties of another position without additional compensation." *Id.* at 274. Another World War II era decision held that American Red Cross Volunteer Nurses' Aides who also happened to be full-time federal employees could perform volunteer nursing services at Veterans Administration hospitals. 23 Comp. Gen. 900 (1944).

One thing the various cases discussed above have in common is that they involve the appointment of an individual to an official government position, permanent or temporary. Services rendered prior to appointment are considered purely voluntary and, by virtue of 31 U.S.C. § 1342, cannot be compensated. *Lee v. United States*, 45 Ct. Cl. 57, 62 (1910); B-181934, Oct. 7, 1974.[98] It also follows that post-retirement services, apart from appointment as a reemployed annuitant, are not compensable. 65 Comp. Gen. 21 (1985). In that case, an alleged agreement to the contrary by the individual's supervisor was held unauthorized and therefore invalid.

It also has been held that experts and consultants employed under authority of 5 U.S.C. § 3109 (the basic governmentwide authority for procuring expert and consultant services) may serve without compensation without violating the Antideficiency Act as long as it is clearly understood and agreed that no compensation is expected. 27 Comp. Gen. 194 (1947); 6 Op. Off. Legal Counsel 160 (1982). *Cf.* B-185952, Aug. 18, 1976 (uncompensated participation in pre-bid conference, on-site inspection, and bid opening by contractor engineer who had prepared specifications regarded as "technical violation" of 31 U.S.C. § 1342).

[98] While the principle in B-181934 remains valid, the decision was overruled by 55 Comp. Gen. 109 (1975) on factual grounds. Additional information showed that the individual involved in that case was a "*de facto* employee" performing under color of appointment and with a claim of right to the position. A "voluntary" employee has no such "color of appointment" or indicia of lawful employment.

Several of the decisions note the requirement for a written record of the agreement to serve without compensation. Proper documentation is important for evidentiary purposes should a claim subsequently be attempted. *E.g.*, 27 Comp. Gen. at 195; 26 Comp. Gen. 956, 958 (1947); 27 Comp. Dec. 131, 132–33 (1920); 2 Op. Off. Legal Counsel 322, 323 (1977). Specifically, the decisions state that the individuals should acknowledge in writing and in advance that they will receive no compensation and that they should explicitly waive any and all claims against the government on account of their service.

The rule that compensation fixed by statute may not be waived does not apply if the waiver or appointment without compensation is itself authorized by statute. The Comptroller General stated the principle as follows in 27 Comp. Gen. at 195:

> "[E]ven where the compensation for a particular position is fixed by or pursuant to law, the occupant of the position may waive his ordinary right to the compensation fixed for the position and thereafter forever be estopped from claiming and receiving the salary previously waived, *if there be some applicable provision of law authorizing the acceptance of services without compensation.*" (Emphasis in original.)

As noted above, the decision in 27 Comp. Gen. 194 cited as the provision authorizing the acceptance of services without compensation in that case what is now section 3109(b) of title 5, United States Code. Under section 3109(b), agencies may, when authorized by an appropriation or other act, procure the services of experts or consultants for up to 1 year without regard to other provisions of title 5 governing appointment and compensation. This authority is subject to a maximum rate of compensation in some cases, but there is no minimum rate.

In B-139261, June 26, 1959, GAO reiterated the above principle, and gave several additional examples of statutes sufficient for this purpose. The examples included the following statutory provisions that remain essentially the same in substance as they were in 1959:

- section 204(b) of title 29, United States Code, which authorizes the Administrator of the Labor Department's Wage and Hour Division to utilize voluntary and uncompensated services;

- section 401(7) of title 39, United States Code, which authorizes the Postal Service to accept gifts or donations of services or property; and

- section 210(b) of title 47, United States Code, which states that no provision of law shall be construed to prohibit common carriers from rendering free service to any agency of the government in connection with preparation for the national defense, subject to rules prescribed by the Federal Communications Commission.

At this point a 1978 case, 57 Comp. Gen. 423, should be noted. The decision held that a statute authorizing the Agency for International Development (AID) to accept gifts of "services of any kind" (22 U.S.C. § 2395(d)) did not permit waiver of salary by AID employees whose compensation was fixed by statute. Section 2395(d) is very similar to one of the examples given in B-139261, June 26, 1959, discussed above, of statutes that would authorize the acceptance of voluntary services. *See* 39 U.S.C. § 401(7). However, 57 Comp. Gen. 423 is distinguishable from B-139261, 27 Comp. Gen. 194, and the other voluntary services cases discussed previously. The question in 57 Comp. Gen. 423 was whether AID could invoke its gift-acceptance authority to justify paying regular federal employees less than the salaries prescribed by law. The decision held that it did not:

> "Section 2395(d) . . . authorizes the acceptance of gifts. Therefore, AID may accept services from private sources either gratuitously or at a fraction of their value. However, section 2395(d) does not authorize individuals to be appointed to regular positions having compensation rates fixed by or pursuant to statute at rates less than those specified. It, therefore, differs from the statute, which was the subject of 27 Comp. Gen. 194, *supra*, and accordingly is not a provision of law authorizing employees whose compensation is fixed by or pursuant to statute to waive any part of such compensation."

57 Comp. Gen. at 424–25.[99]

[99] Further support for the decision's conclusion that 22 U.S.C. § 2395(d) was addressed to services from private sources rather than federal employees can be found in the immediately preceding subsection, which states: "It is the sense of Congress that the President, in furthering the purposes of this [chapter], shall use to the maximum extent practicable the services and facilities of voluntary, nonprofit organizations registered with, and approved by, the Agency for International Development." 22 U.S.C. § 2395(c).

As noted earlier, 27 Comp. Gen. 194 concerned temporary experts or consultants. B-139261 concerned civilian volunteers who sought to provide services for an Air Force reserve center. Likewise, the other statutory examples cited in B-139261 clearly were aimed at individuals other than regular federal employees. Thus, 57 Comp. Gen. 423 appears to represent the sensible caveat that general statutory authorities to accept voluntary services or "gifts" of services do not supersede statutes providing for the compensation of federal employees and cannot be invoked to avoid the consequences of those statutes.

The rules for waiver of salary or appointment without compensation may be summarized as follows:

- If compensation is not fixed by statute, that is, if it is fixed administratively or if the statute merely prescribes a maximum but no minimum, it may be waived as long as the waiver qualifies as "gratuitous." There should be an advance written agreement waiving all claims.

- If compensation is fixed by statute, it may not be waived, the voluntary *versus* gratuitous distinction notwithstanding, without specific statutory authority. This authority generally may take the form of authority to accept donations of services or to employ persons without compensation.

- If the employing agency has statutory authority to accept gifts, the employee can accept the compensation and return it to the agency as a gift. Even if the agency has no such authority, the employee can still accept the compensation and donate it to the United States Treasury.

(2) Student interns

In 26 Comp. Gen. 956 (1947), the then Civil Service Commission asked whether an agency could accept the uncompensated services of college students as part of a college's internship program. The students "would be assigned to productive work, that is, to the regular work of the agency in a position which would ordinarily fall in the competitive civil service." The answer was no. Since the students would be used in positions the compensation for which was fixed by law, and since compensation fixed by law cannot be waived, the proposal would require legislative authority.

Thirty years later, the Justice Department's Office of Legal Counsel considered another internship program and provided similar advice. Without statutory authority, uncompensated student services that furthered the agency's mission, that is, "productive work," could not be accepted. 2 Op. Off. Legal Counsel 185 (1978).

In view of the long-standing rule, supported by decisions of the Supreme Court,[100] prohibiting the waiver of compensation for positions required by law to be salaried, GAO and Justice had little choice but to respond as they did. Clearly, however, this answer had its downside. It meant that uncompensated student interns could be used only for essentially "make-work" tasks, a benefit to neither the students nor the agencies.

The solution, apparent from both cases, was legislative authority, which Congress provided later in 1978 by the enactment of 5 U.S.C. § 3111. The statute authorizes agencies, subject to regulations of the Office of Personnel Management, to accept the uncompensated services of high school and college students, "[n]otwithstanding section 1342 of title 31," if the services are part of an agency program designed to provide educational experience for the student, if the student's educational institution gives permission, and if the services will not be used to displace any employee. 5 U.S.C. § 3111(b).

A paper entitled *A Part-Time Clerkship Program in Federal Courts for Law Students* by the Honorable Jack B. Weinstein and William B. Bonvillian, written in 1975 and printed at 68 F.R.D. 265, considered the use of law students as part-time law clerks, without pay, to mostly supplement the work of the regular law clerks in furtherance of the official duties of the courts. Based on the statute's legislative history and 30 Op. Att'y Gen. 51 (1913), previously discussed, Judge Weinstein concluded that the program did not violate the Antideficiency Act. Although this aspect of the issue is not explicitly discussed in the paper, it appears that the compensation of regular law clerks is fixed administratively. *See* 28 U.S.C. § 604(a)(5). In any event, the Administrative Office of the United States Courts was given authority in 1978 to "accept and utilize voluntary and incompensated (gratuitous) services." 28 U.S.C. § 604(a)(17).

[100] See footnote number 96, *supra*, and accompanying text.

(3) Program beneficiaries

Programs are enacted from time to time to provide job training assistance to various classes of individuals. The training is intended, among other things, to enable participants to enter the labor market at a higher level of skill. Questions have arisen under programs of this nature as to the authority of federal agencies to serve as employers.

A 1944 case, 24 Comp. Gen. 314, considered a vocational rehabilitation program for disabled war veterans. GAO concluded that 31 U.S.C. § 1342 did not preclude federal agencies from providing on-the-job training, without payment of salary, to program participants. The decision is further discussed in 26 Comp. Gen. 956, 959 (1947).

In 51 Comp. Gen. 152 (1971), GAO concluded that 31 U.S.C. § 1342 precluded federal agencies from accepting work by persons hired by local governments for public service employment under the Emergency Employment Act of 1971.[101] Four years later, GAO modified the 1971 decision, holding that a federal agency could provide work without payment of compensation to (*i.e.*, accept the free services of) trainees sponsored and paid by nonfederal organizations from federal grant funds under the Comprehensive Employment and Training Act of 1973.[102] 54 Comp. Gen. 560 (1975). The decision stated:

> "[C]onsidering that the services in question will arise out of a program initiated by the Federal Government, it would be anomalous to conclude that such services are proscribed as being voluntary within the meaning of 31 U.S.C. § [1342]. That is to say, it is our opinion that the utilization of enrollees or trainees by a Federal agency under the circumstances here involved need not be considered the acceptance of 'voluntary services' within the meaning of that phrase as used in 31 U.S.C. § [1342]."

*Id.* at 561.

[101] Pub. L. No. 92-54, 85 Stat. 146 (July 12, 1971).

[102] Pub. L. No. 93-203, 87 Stat. 839 (Dec. 28, 1973).

In B-211079.2, Jan. 2, 1987, the relevant program legislation expressly authorized program participants to perform work for federal agencies "notwithstanding section 1342 of title 31." The decision suggests that the statutory authority was necessary not because of the Antideficiency Act but to avoid an impermissible augmentation of appropriations. It is in any event consistent in result with 24 Comp. Gen. 314 and 54 Comp. Gen. 560. The relationship between voluntary service and the augmentation concept is explored later in this chapter in our discussion of augmentation of appropriations.

(4) Applicability to legislative and judicial branches

The applicability of 31 U.S.C. § 1342 to the legislative and judicial branches of the federal government does not appear to have been seriously questioned.

The salary of a Member of Congress is fixed by statute and therefore cannot be waived without specific statutory authority. B-159835, Apr. 22, 1975; B-123424, Mar. 7, 1975; B-123424, Apr. 15, 1955; A-8427, Mar. 19, 1925; B-206396.2, Nov. 15, 1988 (nondecision letter). However, as each of these cases points out, nothing prevents a Senator or Representative from accepting the salary and then, as several have done, donate part or all of it back to the United States Treasury.

In 1977, GAO was asked by a congressional committee chairman whether section 1342 applies to Members of Congress who use volunteers to perform official office functions. GAO responded, first, that section 1342 seems clearly to apply to the legislative branch. GAO then summarized the rules for appointment without compensation and advised that, to the extent that a particular employee's salary could be fixed administratively by the Member in any amount he or she chooses to set, that employee's salary could be fixed at zero. This once again was essentially an application of the rules set down decades earlier in 30 Op. Att'y Gen. 51 (1913) and 27 Comp. Dec. 131 (1920). *See also* B-69907, Feb. 11, 1977.

The salary of a federal judge is also "fixed by law"—even more so because of the constitutional prohibition against diminishing the compensation of a federal judge while in office. U.S. Const. art III, § 1. A case applying the standard "no waiver" rules to a federal judge is B-157469, July 24, 1974.

## c. Other Voluntary Services

Before entering the mainstream of the modern case law, two very early decisions should be noted. In 12 Comp. Dec. 244 (1905), the Comptroller of

the Treasury held that an offer by a meat-packing firm to pay the salaries of Department of Agriculture employees to conduct a pre-export pork inspection could not be accepted because of the voluntary services prohibition.[103] Similar cases have since come up, but they have been decided under the augmentation theory without reference to 31 U.S.C. § 1342. See 59 Comp. Gen. 294 (1980) and 2 Comp. Gen. 775 (1923), discussed later in section E of this chapter.

To restate, apart from the 1905 decision, which has not been followed since, the voluntary services prohibition has not been applied to donations of money. In another 1905 decision, a vendor asked permission to install an appliance on Navy property for trial purposes at no expense to the government. Presumably, if the Navy liked the appliance, it would then buy it. The Comptroller of the Treasury pointed out an easily overlooked phrase in the voluntary service prohibition—the services that are prohibited are voluntary services "for the United States." Here, temporary installation by the vendor for trial purposes amounted to service for his own benefit and on his own behalf, "as an incident to or necessary concomitant of a proper exhibition of his appliance for sale." Therefore, the Navy could grant permission without violating the Antideficiency Act as long as the vendor agreed to remove the appliance at his own expense if the Navy chose not to buy it. 11 Comp. Dec. 622 (1905). This case has not been cited since.

For the most part, the subsequent cases have been resolved by applying the "voluntary *versus* gratuitous" distinction first enunciated by the Attorney General in 1913 in 30 Op. Att'y Gen. 51, discussed above. The underlying philosophy is perhaps best conveyed in the following statement by the Justice Department's Office of Legal Counsel:

> "Although the interpretation of § [1342] has not been entirely consistent over the years, the weight of authority does support the view that the section was intended to eliminate subsequent claims against the United States for compensation of the 'volunteer,' rather than to deprive the government of the benefit of truly gratuitous services."

[103] It would now also contravene 18 U.S.C. § 209, which prohibits payment of salaries of government employees from nongovernmental sources. This statute did not exist at the time of the 1905 decision.

6 Op. Off. Legal Counsel 160, 162 (1982).

In an early formulation that has often been quoted since, the Comptroller General noted that:

> "The voluntary service referred to in [31 U.S.C. § 1342] is not necessarily synonymous with gratuitous service, but contemplates service furnished on the initiative of the party rendering the same without request from, or agreement with, the United States therefor. Services furnished pursuant to a formal contract are not voluntary within the meaning of said section."

7 Comp. Gen. 810, 811 (1928).

In 7 Comp. Gen. 810, a contractor had agreed to prepare stenographic transcripts of Federal Trade Commission public proceedings and to furnish copies to the Commission without cost, in exchange for the exclusive right to report the proceedings and to sell transcripts to the public. The decision noted that consideration under a contract does not have to be monetary consideration, and held that the contract in question was supported by sufficient legal consideration. While the case is thus arguably not a true "voluntary services" case, it has often been cited since, not so much for the actual holding but for the above-quoted statement of the rule.

For example, in B-13378, Nov. 20, 1940, the Comptroller General held that the Secretary of Commerce could accept gratuitous services from a private agency, created by various social science associations, which had offered to assist in the preparation of official monographs analyzing census data. The services were to be rendered under a cooperative agreement which specified that they would be free of cost to the government. The Commerce Department agreed to furnish space and equipment, but the monographs would not otherwise have been prepared.

Applying the same approach, GAO found no violation of 31 U.S.C. § 1342 for the Commerce Department to accept services by the Business Advisory Council, which were agreed in advance to be gratuitous. B-125406, Nov. 4, 1955. Likewise, the Commission on Federal Paperwork could accept free services from the private sector as long as they were agreed in advance to be gratuitous. B-182087-O.M., Nov. 26, 1975.

In a 1982 decision, the American Association of Retired Persons wanted to volunteer services to assist in crime prevention activities (distribute literature, give lectures, *etc.*) on Army installations. GAO found no Antideficiency Act problem as long as the services were agreed in advance, and so documented, as gratuitous. B-204326, July 26, 1982.

In B-177836, Apr. 24, 1973, the Army had entered into a contract with a landowner under which it acquired the right to remove trees and other shrubs from portions of the landowner's property incident to an easement. A subsequent purchaser of the property complained that some tree stumps had not been removed, and the Army proceeded to contract to have the work done. The landowner then submitted a claim for certain costs he had incurred incident to some preliminary work he had done prior to the Army's contract. Since the landowner's actions had been purely voluntary and had been taken without the knowledge or consent of the government, 31 U.S.C. § 1342 prohibited payment.

In 7 Comp. Gen. 167 (1927), a customs official had stored, in his own private boathouse, a boat which had been seized for smuggling whiskey. The customs official later filed a claim for storage charges. Noting that "the United States did not expressly or impliedly request the use of the premises and therefore did not by implication promise to pay therefor," GAO concluded that the storage had been purely a voluntary service, payment for which would violate 31 U.S.C. § 1342.

As if to prove the adage that there is nothing new under the sun, GAO considered another storage case over 50 years later, B-194294, July 12, 1979. There, an Agriculture Department employee had an accident while driving a government-owned vehicle assigned to him for his work. A Department official ordered the damaged vehicle towed to the employee's driveway, to be held there until it could be sold. Since the government did have a role in the employee's assumption of responsibility for the wreck, GAO found no violation of 31 U.S.C. § 1342 and allowed the employee's claim for reasonable storage charges on a *quantum meruit* basis.[104]

Section 1342 covers any type of service which has the effect of creating a legal or moral obligation to pay the person rendering the service. Naturally, this includes government contractors. *See PCL Construction Services*,

[104] See generally Chapter 12, section C.2.b in volume III of the second edition of *Principles of Federal Appropriations Law.*

*Inc. v. United States*, 41 Fed. Cl. 242, 257–260 (1998), quoting with approval from the second edition of *Principles of Federal Appropriations Law* on this point. The prohibition includes arrangements in which government contracting officers solicit or permit—tacitly or otherwise—a contractor to continue performance on a "temporarily unfunded" basis while the agency, which has exhausted its appropriations and cannot pay the contractor immediately, seeks additional appropriations. This was one of the options considered in 55 Comp. Gen. 768 (1976), discussed previously in connection with 31 U.S.C. § 1341(a). The Army proposed a contract modification which would explicitly recognize the government's obligation to pay for any work performed under the contract, possibly including reasonable interest, subject to subsequent availability of funds. The government would use its best efforts to obtain a deficiency appropriation. Certificates to this effect would be issued to the contractor, including a statement that any additional work performed would be done at the contractor's own risk. In return, the contractor would be asked to defer any action for breach of contract.

GAO found this proposal "of dubious validity at best." Although the certificate given to the contractor would say that continued performance was at the contractor's own risk, it was clear that both parties expected the contract to continue. The government expected to accept the benefits of the contractor's performance and the contractor expected to be paid—eventually—for it. This is certainly not an example of a clear written understanding that work for the government is to be performed gratuitously. Also, the proposal to pay interest was improper as it would compound the Antideficiency Act violation. Although 55 Comp. Gen. 768 does not specifically discuss 31 U.S.C. § 1342, the relationship should be apparent.

GAO's opinion in B-302811, July 12, 2004, provides a recent example of an appropriate "gratuitous services" type contract that did not run afoul of the 31 U.S.C. § 1342 prohibition against voluntary services. This decision concerned the General Services Administration's (GSA) proposed National Brokers Contract, under which GSA would award four real estate brokers exclusive rights to represent the United States with respect to all GSA real property leases. The brokers would be required to provide a range of services commonly offered in commercial leasing transactions such as assisting federal agencies in developing their space requirements, surveying the rental market, and negotiating and preparing leases. The proposal took the form of a "no-cost" contract in which GSA would make no payments to the brokers for their services. Rather, the brokers would

collect commissions from the landlords who leased property to the federal agencies. In approving the legality of this proposed arrangement, the decision observed:

> "Because the contract was constructed as a no cost contract, GSA will have no financial liability to brokers, and brokers will have no expectation of a payment from GSA. The acceptance of services without payment pursuant to a valid, binding no-cost contract does not augment an agency's appropriation nor does it violate the voluntary services prohibition. Although the brokers contract clearly expects that brokers will be remunerated by commissions from landlords, as is a common practice in the real estate industry, GSA does not require landlords to pay commissions. If a landlord were to fail to pay a broker, the broker would have no claim against GSA."

*Id.* at 7.[105]

### d. Exceptions

Two kinds of exceptions to 31 U.S.C. § 1342 have already been discussed—where acceptance of services without compensation is specifically authorized by law, and where the government and the volunteer have a written agreement that the services are to be rendered gratuitously with no expectation of future payment.

There is a third exception, written into the statute itself: "emergencies involving the safety of human life or the protection of property." The cases dealing with this statutory exception have arisen in a variety of contexts and are discussed below, along with recent developments.

[105] The July 12, 2004, opinion clarified an earlier opinion on the subject of the National Brokers Contract, B-291947, Aug. 15, 2003. Also, it distinguished another opinion, B-300248, Jan. 15, 2004, which held that the Small Business Administration improperly augmented its appropriations by requiring certain lenders to pay fees to an agency contractor. See section E.2.a of this chapter for a detailed discussion of the Small Business Administration opinion and how it compares with the GSA opinion.

(1) Safety of human life

In order to invoke this exception, the services provided to protect human life must have been rendered in a true emergency situation. What constitutes an emergency was discussed in several early decisions.

In 12 Comp. Dec. 155 (1905), a municipal health officer disinfected several government buildings to prevent the further spread of diphtheria. Several cases of diphtheria had already occurred at the government compound, including four that resulted in deaths. The Comptroller of the Treasury found that the services had been rendered in an emergency involving the loss of human life, and held accordingly that the doctor could be reimbursed for the cost of materials used and the fair value of his services.

In another case, the S.S. Rexmore, a British vessel, deviated from its course to London to answer a call for help from an Army transport ship carrying over 1,000 troops. The ship had sprung a leak and appeared to be in danger of sinking. The Comptroller General allowed a claim for the vessel's actual operating costs plus lost profits attributable to the services performed. The Rexmore had rendered a tangible service to save the lives of the people aboard the Army transport, as well as the transport vessel itself. 2 Comp. Gen. 799 (1923).

On the other hand, GAO denied payment to a man who was boating in the Florida Keys and saw a Navy seaplane make a forced landing. He offered to tow the aircraft over two miles to the nearest island, and did so. His claim for expenses was denied. The aircraft had landed intact and the pilot was in no immediate danger. Rendering service to overcome mere inconvenience or even to avoid a potential future emergency is not enough to overcome the statutory prohibition. 10 Comp. Gen. 248 (1930).

(2) Protection of property

The main thing to remember here is that the property must be either government-owned property or property for which the government has some responsibility. The standard was established by the Comptroller of the Treasury in 9 Comp. Dec. 182, 185 (1902) as follows:

> "I think it is clear that the statute does not contemplate property in which the Government has no immediate interest or concern; but I do not think it was intended to apply exclusively to property owned by the Government.

> The term 'property' is used in the statute without any qualifying words, but it is used in connection with the rendition of services for the Government. The implication is, therefore, clear that the property in contemplation is property in which the Government has an immediate interest or in connection with which it has some duty to perform."

In the cited decision, an individual had gathered up mail scattered in a train wreck and delivered it to a nearby town. The government did not "own" the mail but had a responsibility to deliver it. Therefore, the services came within the statutory exception and the individual could be paid for the value of his services.

Applying the approach of 9 Comp. Dec. 182, the Comptroller General held in B-152554, Feb. 24, 1975, that section 1342 did not permit the Agency for International Development to make expenditures in excess of available funds for disaster relief in foreign countries. A case clearly within the exception is 3 Comp. Gen. 979 (1924), allowing reimbursement to a municipality which had rendered firefighting assistance to prevent the destruction of federal property where the federal property was not within the territory for which the municipal fire department was responsible.

An exception was also recognized in 53 Comp. Gen. 71 (1973), where a government employee brought in food for other government employees in circumstances which would justify a determination that the expenditure was incidental to the protection of government property in an extreme emergency. In this case, the General Services Administration had to assemble and maintain for 5 days a cadre of approximately 175 special police in connection with the unauthorized occupation of a Bureau of Indian Affairs building. The police officers were required to perform tours of duty that sometimes extended to 24 hours. They were kept at the ready to reoccupy the building and they were not permitted to leave the marshalling area because of the imminence of court orders and administrative directives.

(3) <u>Recent developments</u>

During the past two decades, cases addressing the "emergencies involving the safety of human life or the protection of property" exception to 31 U.S.C. § 1342 have arisen primarily in the context of "funding gaps" where an agency is faced with an appropriations lapse (or potential lapse)

usually at the outset of a fiscal year. These cases are discussed in detail in section C.6 of this chapter. However, several points from that discussion are also relevant here. Most notably, in 1990, Congress amended 31 U.S.C. § 1342 by adding the following language:

> "As used in this section, the term 'emergencies involving the safety of human life or the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property."[106]

Two recent GAO decisions have considered the emergency exception to 31 U.S.C. § 1342 (including its 1990 amendment) in a context other than a funding gap. The question in B-262069, Aug. 1, 1995, was whether the District of Columbia could exceed its appropriation for certain programs, including Aid to Families with Dependent Children and Medicaid, without violating the Antideficiency Act. The main issue in that decision was whether the "unless authorized by law exception" to the Antideficiency Act in 31 U.S.C. § 1341(a)(1)(A) applied. GAO held that it did not. The decision also noted the existence of the emergencies exception to 31 U.S.C. § 1342, but held that it was likewise inapplicable:

> "An 'emergency' under section 1342 'does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property.' We are not presently aware of any facts or circumstances that would make this limited exception available to the District. See, 5 Op. O.L.C. 1, 7–11 (1981)."

B-262069 at 3, fn. 1.

The decision in B-262069 addressed a hypothetical situation; the District had not actually exceeded its appropriation there. Unfortunately, a subsequent opinion, B-285725, Sept. 29, 2000, involved the real thing. In that case, the District of Columbia Health and Hospitals Public Benefit Corporation (PBC) had incurred obligations and made payments in excess

[106] As explained in section C.6, this amendment was intended to guard against what might have been viewed as an overly broad application of one of the Attorney General's funding gap opinions.

of its appropriations. The PBC maintained that the emergency exception to 31 U.S.C. § 1342 as construed by the Attorney General applied; thus, there was no violation. GAO disagreed:

> "The funding gap situations discussed by the Attorney General arise typically at the beginning of a fiscal year because of the absence or expiration of budget authority under circumstances that are beyond an agency's control. In the present situation, the exhaustion of appropriations occurred during the fiscal year because of a rate of operations and obligations in excess of available resources. Viewed in this light, PBC's failure to regulate its activities and spending so as to operate within its available budget resources is not the type of 'emergency' covered either by the Attorney General's earlier opinions or 31 U.S.C. § 1342."

B-285725, Enclosure at 9.

The opinion acknowledged that PBC's ongoing functions of operating a hospital and clinics involved the provision of services essential to the protection of human life. However, the opinion observed that PBC, like many federal agencies engaged in protecting human life and safety, requested and received appropriations to cover these functions. It added:

> "Once the Congress enacts appropriation[s], it is incumbent on the PBC (and similarly situated federal agencies) to manage its resources to stay within the authorized level. Nothing in the District's Submission demonstrates that the PBC's exhaustion of appropriations prior to the end of the fiscal year was caused by some unanticipated event or events (*e.g.*, mass injuries resulting from hurricane, flood or other natural disasters) requiring PBC to provide services for the protection of life beyond the level it should have reasonably been expected to anticipate when it prepared its budget."

*Id.* By way of summary, the opinion observed:

> "While the failure of Congress to enact appropriations at the beginning of the fiscal year may qualify as an emergency event for purposes of section 1342, it would be a novel

> proposition, one that we are unwilling to endorse, to conclude that an agency's failure to manage and live within the resources provided for an activity involved in protecting human life permits it to incur obligations in excess of amounts provided. Nothing that we have been provided warrants the conclusion that the overobligations resulted from an unanticipated emergency rather than from the PBC's failure to manage and live within its budgetary resources during the fiscal year."[107]

B-285725 at 3.

In essence, B-285725 held that the emergencies exception to 31 U.S.C. § 1342 does not apply where an agency exceeds its appropriations—at least absent events beyond the agency's control that the agency (and presumably the Congress) could not have foreseen in determining the agency's funding levels.

In two opinions to the United States Marshals Service (USMS) in 1999 and 2000, the Office of Legal Counsel addressed a potential exhaustion of USMS appropriations, which never materialized: Memorandum Opinion for the General Counsel, United States Marshals Service, *USMS Obligation To Take Steps To Avoid Anticipated Appropriations Deficiency*, OLC Opinion, May 11, 1999, and Memorandum Opinion for the General Counsel, United States Marshals Service, *Continuation of Federal Prisoner Detention Efforts in the Face of a USMS Appropriations Deficiency*, OLC Opinion, Apr. 5, 2000. The opinions dealt with a potential exhaustion of appropriations for USMS prisoner-detention functions, but did not describe the circumstances giving rise to the potential exhaustion. While these opinions recognized the "affirmative obligation" on the part of agencies to manage available appropriations in order to avoid deficiencies, they did not address the important distinction between an exhaustion of appropriations (or funding gap) resulting from unforeseen circumstances and an exhaustion of appropriations resulting from the agency's failure to manage its operations within the limits of enacted appropriations. We would disagree with the Office of Legal Counsel opinions to the extent they could be read to suggest that regardless of the reasons for the exhaustion of

[107] Finally, the opinion noted that, even if the exception to section 1342 applied, it would not sanction the agency's actual disbursement of funds in excess of its appropriations. Thus, the agency violated the Antideficiency Act in any event.

appropriations, whenever an agency like USMS, whose statutory mission involves the protection of life and property, runs out of money, it has open-ended authority to continue to incur obligations under the Antideficiency Act's emergencies exception.[108] This is exactly the "coercive deficiency" that the Congress legislated against in enacting the Antideficiency Act.[109] *See* B-285725, Sept. 29, 2000. The Antideficiency Act was intended to keep agency operations at a level within the amounts that Congress appropriates for that purpose. If an agency concludes that it needs more funds than Congress has appropriated for a fiscal year, the agency should ask Congress to enact a supplemental appropriation; it should not continue operations without regard to the Antideficiency Act.

#### e. Voluntary Creditors

A related line of decisions are the so-called "voluntary creditor" cases. A voluntary creditor is an individual, government or private, who pays what he or she perceives to be a government obligation from personal funds. The rule is that the voluntary creditor cannot be reimbursed, although there are significant exceptions. For the most part, the decisions have not related the voluntary creditor prohibition to the Antideficiency Act, with the exception of one very early case (17 Comp. Dec. 353 (1910)) and two more recent ones (53 Comp. Gen. 71 (1973) and 42 Comp. Gen. 149 (1962)). The voluntary creditor cases are discussed in detail in Chapter 12, section C.4.c in volume III of the second edition of *Principles of Federal Appropriations Law*, dealing with claims against the United States.

## 4. Apportionment of Appropriations

Because of the apportionment and related provisions of the Antideficiency Act, 31 U.S.C. §§ 1511–1519, an agency generally does not have the full amount of its appropriations available to it at the beginning of the fiscal year. Apportionment is an administrative process by which, as its name suggests, appropriated funds are distributed to agencies in portions over the period of their availability. The Office of Management and Budget (OMB) apportions funds for executive branch agencies. 31 U.S.C. § 1513(b); Exec. Order No. 6166, § 16 (June 10, 1933), *at* 5 U.S.C. § 901 note. Appropriations for legislative branch agencies, the judicial branch,

[108] The opinions did acknowledge, of course, that USMS could not actually spend funds if its appropriations were exhausted. They also noted that a determination whether particular obligations would satisfy the emergencies exception could not be made in the abstract and would require case-by-case evaluation.

[109] See section C.2.b of this chapter for a discussion of the "coercive deficiency" concept.

the District of Columbia, and the International Trade Commission are apportioned by officials having administrative control of those funds. 31 U.S.C. § 1513(a). In addition to apportionment, appropriations are subject to further administrative subdivision by the heads of the agencies to which the appropriations are made. 31 U.S.C. § 1514.

Section 1517(a) of title 31 prohibits officers and employees of the federal and District of Columbia governments from making or authorizing an expenditure or obligation that exceeds an apportionment or the amount permitted under certain other subdivisions of appropriated funds. Agencies must report violations of section 1517(a) to the Congress and the President. Those who violate section 1517(a) are subject to administrative discipline as well as criminal penalties in the case of willful violations. *See* 31 U.S.C. §§ 1517(b), 1518, and 1519.

### a. Statutory Requirement for Apportionment

Subsection (a) of section 1512 establishes the basic requirement for the apportionment of appropriations:

> "(a) Except as provided in this subchapter, an appropriation available for obligation for a definite period shall be apportioned to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation for the period. An appropriation for an indefinite period and authority to make obligations by contract before appropriations shall be apportioned to achieve the most effective and economical use. An apportionment may be reapportioned under this section."

Although apportionment was first required legislatively in 1905,[110] the current form of the statute derives from a revision enacted in 1950 in section 1211 of the General Appropriation Act, 1951.[111] The 1950 revision was part of an overall effort by Congress to amplify and enforce the basic restrictions against incurring deficiencies in violation of the Antideficiency Act, 31 U.S.C. § 1341.

[110] Pub. L. No. 217, ch. 1484, 33 Stat. 1214, 1257 (Mar. 3, 1905).

[111] Pub. L. No. 759, ch. 896, 64 Stat. 595, 765 (Sept. 6, 1950).

Section 1512(a) requires that all appropriations be administratively apportioned so as to ensure their obligation and expenditure at a controlled rate which will prevent deficiencies from arising before the end of a fiscal year. Although section 1512 does not tell you who is to make the apportionment, section 1513 names the President as the apportioning official for most executive branch agencies. The President delegated the function to the Director of the Bureau of the Budget in 1933,[112] and it now reposes in the successor to that office, the Director of the Office of Management and Budget (OMB).[113] Legislative and judicial branch appropriations are apportioned by officials in those branches. 31 U.S.C. § 1513(a).

The term "apportionment" may be defined as follows:

> "The action by which [the apportioning official] distributes amounts available for obligation, including budgetary reserves established pursuant to law, in an appropriation or fund account. An apportionment divides amounts available for obligation by specific time periods (usually quarters), activities, projects, objects, or a combination thereof. The amounts so apportioned limit the amount of obligations that may be incurred. An apportionment may be further subdivided by an agency into allotments, suballotments, and allocations. In apportioning any account, some funds may be reserved to provide for contingencies or to effect savings made possible pursuant to the Antideficiency Act. Funds apportioned to establish a reserve must be proposed for deferral or rescission pursuant to the Impoundment Control Act of 1974 (2 U.S.C. §§ 681–688).
>
> "The apportionment process is intended to (1) prevent the obligation of amounts available within an appropriation or fund account in a manner that would require deficiency or supplemental appropriations and (2) achieve the most

[112] Exec. Order No. 6166, § 16 (June 10, 1933), *at* 5 U.S.C. § 901 note.

[113] Reorganization Plan No. 2 of 1970, 35 Fed. Reg. 7959, 84 Stat. 2085 (effective July 1, 1970), designated the Bureau of the Budget as OMB and transferred to the President all functions vested in the former Bureau of the Budget. Executive Order No. 11541, 35 Fed. Reg. 10737 (July 1, 1970), 31 U.S.C. § 501 note, transferred those functions to the Director of OMB.

> effective and economical use of amounts made available for obligation."[114]

Apportionment is required not only to prevent the need for deficiency or supplemental appropriations, but also to ensure that there is no drastic curtailment of the activity for which the appropriation is made. 36 Comp. Gen. 699 (1957). *See also* 38 Comp. Gen. 501 (1959). In other words, the apportionment requirement is designed to prevent an agency from spending its entire appropriation before the end of the fiscal year and then putting Congress in a position in which it must either enact an additional appropriation or allow the entire activity to come to a halt. 64 Comp. Gen. 728, 735 (1985). *See also* Memorandum Opinion for the General Counsel, United States Marshals Service, *USMS Obligation To Take Steps To Avoid Anticipated Appropriations Deficiency*, OLC Opinion, May 11, 1999 (opining that 31 U.S.C. § 1512(a) imposes "an affirmative obligation" on federal agencies to take steps to use their available funds in a way that will avoid the need for a deficiency or supplemental appropriations, citing 64 Comp. Gen. 728 and 36 Comp. Gen. 699).

In 36 Comp. Gen. 699, Post Office funds had been reapportioned in such a way that the fourth quarter funds were substantially less than those for the third quarter. The Comptroller General stated:

> "A drastic curtailment toward the close of a fiscal year of operations carried on under a fiscal year appropriation is a *prima facie* indication of a failure to so apportion an appropriation 'as to prevent obligation or expenditure thereof in a manner which would indicate a necessity for deficiency or supplemental appropriations for such period.' In our view, this is the very situation the amendment of the law in 1950 was intended to remedy."

36 Comp. Gen. at 703. *See also* 64 Comp. Gen. 728, 735–36 (1985). However, the mere fact that an agency faces a severe lack of funds and needs to curtail services late in a fiscal year does not necessarily mean that the apportioning authority has violated 31 U.S.C. § 1512(a). Programmatic

[114] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 12–13. *See also* OMB Circular No. A-11, pt. 4, *Instructions on Budget Execution*, §§ 120.1–120.5 (June 21, 2005). For a discussion of the Impoundment Control Act, see section D.3.b of Chapter 1.

factors that could not reasonably be foreseen at the time of an apportionment or reapportionment may affect the pattern or pace of spending over the course of the year. Also, as discussed hereafter in section C.4.e, the statute itself permits apportionments indicating the need for a deficiency or supplemental appropriation in certain limited circumstances.

A 1979 decision involved the Department of Agriculture's Food Stamp Program. The program was subject to certain spending ceilings which it seemed certain, given the rate at which the Department was incurring expenditures, that the Department was going to exceed. The Department feared that, if it was bound by a formula in a different section of its authorizing act to pay the mandated amount to each eligible recipient, it would have to stop the whole program when the funds were exhausted. Based on both the Antideficiency Act and the program legislation, GAO concluded that there had to be an immediate *pro rata* reduction for all participants. Discontinuance of the program when the funds ran out would violate the purpose of the apportionment requirement. A-51604, Mar. 28, 1979.

This is not to say that every subactivity or project must be carried out for the full fiscal year, on a reduced basis, if necessary. Section 1512(a) applies to amounts made available in an appropriation or fund. Where, for example, the then Veterans Administration (VA) nursing home program was funded from moneys made available in a general, lump-sum VA medical care appropriation, the agency was free to discontinue the nursing home program and reprogram the balance of its funds to other programs also funded under that heading. B-167656, June 18, 1971. (The result would be different if the nursing home program had received a line-item appropriation.)

The general rule against apportionments that indicate the need for a deficiency or supplemental appropriation does not preclude an agency from requesting an apportionment of all or most of its existing appropriations at the same time that it is seeking a supplemental so long as the agency has in place a plan that would enable it to function through the end of the fiscal year should Congress not enact the supplemental. 64 Comp. Gen. 728, 735 (1985). *See also* B-255529, Jan. 10, 1994. In 64 Comp. Gen. 728, the former Interstate Commerce Commission (ICC) had requested an apportionment of the full annual amount available to it under a continuing resolution at the outset of fiscal year 1985. At the same time, the ICC voted to seek a supplemental appropriation in order to avoid

severe staffing cuts that would have been required without it. The Comptroller General held that the apportionment was not improper:

> "As we have indicated, at the recommendation of its Managing Director the ICC adopted an operating plan for fiscal year 1985 which included a request for a supplemental appropriation. However, part of that operating plan was an emergency plan which would enable the ICC to operate for the entire fiscal year even without a supplemental. Under the plan, if the Congress did not enact a supplemental appropriation by the end of March, the Commission was to furlough all its employees for 1 day per week for the remainder of the year. This would allow the Commission to operate through the end of the fiscal year within the $48 million already appropriated. In fact a supplemental was not passed by the end of March and the furlough was implemented. . . .
>
> "[T]he actions taken by the ICC . . . demonstrate that from the time at which the Congress and the President approved legislation reducing ICC's funding below the requested level, every decision related to expenditures was made to avoid violation of the Antideficiency Act."

64 Comp. Gen. at 735.

The requirement to apportion applies not only to 1-year appropriations and other appropriations limited to a fixed period of time, but also to "no-year" money and even to contract authority (authority to contract in advance of appropriations). 31 U.S.C. §§ 1511(a), 1512(a). In the case of indefinite appropriations and contract authority, the requirement states only that the apportionment is to be made in such a way as "to achieve the most effective and economical use" of the budget authority. *Id.* § 1512(a).

Prior to the 1982 recodification of title 31 of the United States Code, the apportionment requirement applied explicitly to government corporations which are instrumentalities of the United States.[115] While the applicability of the requirement has not changed, the recodification dropped the explicit

[115] 31 U.S.C. § 665(d)(2) (1976 ed.).

language, viewing it as covered by the broad definition of "executive agency" in 31 U.S.C. § 102.[116] The authority of some government corporations to determine the necessity of their expenditures and the manner in which they shall be incurred is not sufficient to exempt a corporation from the apportionment requirement. 43 Comp. Gen. 759 (1964).

The apportionment process provides a set of administrative controls over the use of appropriations in addition to those Congress has imposed through the appropriations act itself. The apportionment process cannot alter or otherwise affect the operation of statutory requirements concerning the availability or use of appropriated funds. In this regard, OMB's guidance on apportionments states:

> ". . . The apportionment of funds should not be used as a means of resolving any question dealing with the legality of using funds for the purposes for which they are appropriated. Any questions as to the legality of using funds for a particular purpose must be resolved through legal channels."

OMB Circ. No. A-11, pt. 4, § 120.17.[117]

Furthermore, an apportioning official cannot apportion funds in advance of their availability for obligation or expenditure. In B-290600, July 10, 2002, OMB had apportioned certain budget authority for loan guarantees to the Air Transportation Stabilization Board pursuant to the Board's request. The statute enacting this budget authority had conditioned its availability such that the budget authority "shall be available only to the extent that a request . . . that includes designation of such amount as an emergency requirement . . . is transmitted by the President to Congress." The President had not transmitted this designation at the time of the apportionment. Therefore, GAO concluded that OMB and the Board had violated the Antideficiency Act. OMB and the Board recognized the violation and had already taken steps to avoid a recurrence.

### b. Establishing Reserves

Section 1512(c) of 31 U.S.C. provides as follows:

[116] See the codification note following 31 U.S.C. § 1511.

[117] Before 2002, OMB's guidance on apportionments was located in Circular No. A-34.

"(c)(1) In apportioning or reapportioning an appropriation, a reserve may be established only—

"(A) to provide for contingencies;

"(B) to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or

"(C) as specifically provided by law.

"(2) A reserve established under this subsection may be changed as necessary to carry out the scope and objectives of the appropriation concerned. When an official designated in section 1513 of this title to make apportionments decides that an amount reserved will not be required to carry out the objectives and scope of the appropriation concerned, the official shall recommend the rescission of the amount in the way provided in chapter 11 of this title for appropriation requests. Reserves established under this section shall be reported to Congress as provided in the Impoundment Control Act of 1974 (2 U.S.C. 681 *et seq.*)."

Section 1512(c) seeks to limit the circumstances in which the full appropriation is not apportioned or utilized and a reserve fund is established. Under this provision, the apportioning official is authorized to establish reserves only to provide for contingencies or to effect savings, unless the reserve is specifically authorized by statute.

At one time, this section was a battleground between the executive and legislative branches. The executive branch had relied on this portion of the Antideficiency Act to impound funds for general fiscal or economic policy reasons such as containment of federal spending and executive judgment of the relative merits, effectiveness, and desirability of competing federal programs (often referred to as "policy impoundments"). *See* 54 Comp. Gen. 453, 458 (1974); B-135564, July 26, 1973.

Prior to 1974, the predecessor of 31 U.S.C. § 1512(c) contained rather expansive language to the effect that a reserve fund could be established pursuant to "other developments subsequent to the date on which [the] appropriation was made available." 31 U.S.C. § 665(c)(2) (1970 ed.).

Despite this expansive language, the Comptroller General's position had been that the authority to establish reserves under the Antideficiency Act was limited to providing for contingencies or effecting savings which are in furtherance of, or at least consistent with, the purposes of an appropriation. B-130515, July 10, 1973. The Comptroller General did not interpret the law as authorizing a reserve of funds (*i.e.*, an impoundment) based upon general economic, fiscal, or policy considerations that were extraneous to the individual appropriation or were in derogation of the appropriation's purpose. B-125187, Sept. 11, 1973; B-130515, July 10, 1973. *See also State Highway Commission of Missouri v. Volpe*, 479 F.2d 1099, 1118 (8th Cir. 1973), which held that the right to reserve funds in order to "effect savings" or due to "subsequent events," *etc.*, must be considered in the context of the applicable appropriation statute.

The Impoundment Control Act of 1974[118] amended section 1512(c) by eliminating the "other developments" clause and by prohibiting the establishment of appropriation reserves except as provided under the Antideficiency Act for contingencies or savings, or as provided in other specific statutory authority. The intent was to preclude reliance on section 1512(c) as authority for "policy impoundments." *City of New Haven v. United States*, 809 F.2d 900, 906 (D.C. Cir. 1987); 54 Comp. Gen. 453 (1974); B-148898-O.M., Aug. 28, 1974.

The executive branch, however, continued to defer for policy reasons, arguing that section 1013 of the Impoundment Control Act provided authority, independent of the Antideficiency Act, to withhold funds from obligation temporarily for fiscal policy reasons. GAO agreed that this interpretation was consistent with the language of the Impoundment Control Act and with the statutory scheme, pointing out that Congress had reserved the power under the Impoundment Control Act to disapprove any deferral, particularly deferrals for fiscal policy reasons, as a counterweight to the President's power to defer. 54 Comp. Gen. at 455. At that time, the Impoundment Control Act provided for disapproval using a one-house veto. This counterweight vanished when the Supreme Court held one-house legislative veto provisions unconstitutional. *Immigration & Naturalization Service v. Chadha*, 462 U.S. 919 (1983). Accordingly, in a decision issued on January 20, 1987, the U.S. Court of Appeals for the District of Columbia invalidated section 1013, which was the sole general

[118] Pub. L. No. 93-344, title X, § 1002, 88 Stat. 297, 332 (July 12, 1974).

legislative authority for policy deferrals.[119] *City of New Haven*, 809 F.2d at 902, 905–09. In September of 1987, Congress reenacted section 1013(b) of the Impoundment Control Act, 2 U.S.C. § 684(b), without the unconstitutional legislative veto provision and reiterated that the same limits on appropriation reserves that appear in 31 U.S.C. § 1512(c) are the sole justifications for deferrals. *See* Pub. L. No. 100-119, § 206, 101 Stat. 754, 785 (Sept. 29, 1987). See Chapter 1, section D.3.b for a general discussion of impoundments and the Impoundment Control Act.

The Comptroller General discussed examples of permissible (*i.e.*, nonpolicy) reserves in 51 Comp. Gen. 598 (1972) and 51 Comp. Gen. 251 (1971). The first decision concerned the provisions of a long-term charter of several tankers for the Navy. The contract contained options to renew the charter for periods of 15 years. In the event that the Navy declined to renew the charter short of a full 15-year period, the vessels were to be sold by a Board of Trustees, acting for the owners and bondholders. Any shortfall in the proceeds over the termination value was to be unconditionally guaranteed by the Navy. GAO held that it would not violate the Antideficiency Act to cover this contingent liability by setting up a reserve. 51 Comp. Gen. 598 (1972). In 51 Comp. Gen. 251 (1971), GAO said that it was permissible to provide in regulations for a clause to be inserted in future contracts for payment of interest on delayed payments of a contractor's claim. Reserving sufficient funds from the appropriation used to support the contract to cover these potential interest costs would protect against potential Antideficiency Act violations.

In 1981, the Community Services Administration established a reserve as a cushion against Antideficiency Act violations while the agency was terminating its operations. Grantees argued that the reserve improperly reduced amounts available for discretionary grants. In *Rogers v. United States*, 14 Cl. Ct. 39, 46–47 (1987), *aff'd*, 801 F.2d 729 (Fed. Cir. 1988), *cert. denied*, 490 U.S. 1034 (1989), the court held that a reasonable reserve for contingencies was properly within the agency's discretion.

### c. Method of Apportionment

The remaining portions of 31 U.S.C. § 1512 are subsections (b) and (d), set forth below:

[119] The Court concluded that the one-house legislative veto was not severable from the Act's deferral provision, and invalidated that provision as well. *Id.*

> "(b)(1) An appropriation subject to apportionment is apportioned by—
>
> > "(A) months, calendar quarters, operating seasons, or other time periods;
> >
> > "(B) activities, functions, projects, or objects; or
> >
> > "(C) a combination of the ways referred to in clauses (A) and (B) of this paragraph.
>
> * * * * *
>
> "(d) An apportionment or reapportionment shall be reviewed at least 4 times a year by the official designated in section 1513 of this title to make apportionments."

Subsection (b) and (d) are largely technical, implementing the basic apportionment requirement of 31 U.S.C. § 1512(a). Section 1512(b) makes it clear that apportionments need not be made strictly on a monthly, quarterly, or other fixed time basis, nor must they be for equal amounts in each time period. The apportioning officer is free to take into account the "activities, functions, projects, or objects" of the program being funded and the usual pattern of spending for such programs in deciding how to apportion the funds. Absent some statutory provision to the contrary, OMB's determination is controlling. Thus, in *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 854 F.2d 40 (4th Cir. 1988), the court upheld OMB's quarterly apportionment of social services block grant funds, rejecting the state's contention that it should receive its entire annual allotment at the beginning of the fiscal year. Section 1512(d) requires a minimum of four reviews each year to enable the apportioning officer to make reapportionments or other adjustments as necessary.

Conversely, OMB may decide to apportion all or most of an available appropriation at the outset of a fiscal year. In B-255529, Jan. 10, 1994, GAO held that OMB's apportionments at the beginning of the fiscal year of the full amounts available for two State Department appropriation ("Contributions to International Organizations" and "Contributions for International Peacekeeping Activities") constituted an appropriate exercise of OMB's discretion. Quoting from an earlier opinion, B-152554, Feb. 17,

1972, the decision then observed that the amounts to be apportioned depended on the needs of the programs as determined by OMB:

> "It must be recognized that, with respect to a number of programs, particularly where grant or other assistance funds are involved, a large portion of the funds normally are obligated during the early part of the fiscal year. The pattern of obligations is much different than where, for example, an appropriation is primarily available for salaries and administrative expenses. In such case the expenditures would be comparatively constant throughout the year. The pattern of obligations, however, is primarily an administrative matter . . . [for resolution through] the apportionment process."

The decision pointed out that, according to the State Department, payments under the Contributions to International Organizations account traditionally were made in the first quarter of the fiscal year. Payments under the Peacekeeping account usually occurred as bills were received and funds were available, but the Department advised GAO that there was a large backlog of bills at the time funds became available, thereby justifying immediate apportionment of the entire annual appropriation.[120]

### d. Control of Apportionments

Section 1513 of title 31, United States Code, specifies the authorities and timetables for making the apportionments or reapportionments of appropriations required by section 1512. Section 1513(a) applies to appropriations of the legislative and judicial branches of the federal government, as well as appropriations of the International Trade Commission and the District of Columbia government.[121] It assigns authority to apportion to the "official having administrative control" of the

[120] The two decisions cited concerned apportionments that OMB made under continuing resolutions. As a general matter, the discussion of OMB's apportionment discretion would apply to any appropriation. For a discussion of continuing resolutions, see Chapter 8.

[121] A permanent provision of law included in the 1988 District of Columbia appropriation act states that appropriations for the D.C. government "shall not be subject to apportionment except to the extent specifically provided by statute." Pub. L. No. 100-202, § 135, 101 Stat. 1329, 1329-102 (1987). This provision appears to implicitly repeal 31 U.S.C. § 1513(a) as applied to the D.C. government.

appropriation.[122] Apportionment must be made 30 days before the start of the fiscal year for which the appropriation is made, or within 30 days after the enactment of the appropriation, whichever is later. The apportionment must be in writing.

Section 1513(b) deals with apportionments for the executive branch. The President is designated as the apportioning authority. As we have seen, the function has been delegated to the Director, Office of Management and Budget (OMB).[123] The Director of OMB has up to 20 days before the start of the fiscal year or 30 days after enactment of the appropriation act, whichever is later, to make the actual apportionment and notify the agency of the action taken. 31 U.S.C. § 1513(b)(2). Again, the apportionments must be in writing. Although primary responsibility for a violation of section 1512 lies with the Director of OMB, the head of the agency concerned also may be found responsible if he or she fails to send the Director accurate information on which to base an apportionment.

In B-163628, Jan. 4, 1974, GAO responded to a question from the chairman of a congressional committee about the power of OMB to apportion the funds of independent regulatory agencies, such as the Securities and Exchange Commission (SEC). The Comptroller General agreed with the chairman that independent agencies should generally be free from executive control or interference. The response then stated:

> "[T]he apportionment power may not lawfully be used as a form of executive control or influence over agency functions. Rather, it may only be exercised by OMB in the manner and for the purposes prescribed in 31 U.S.C. § [1512]—*i.e.*, to prevent obligation or expenditure in a manner which would give rise to a need for deficiency or supplemental appropriations, to achieve the most effective and economical use of appropriations and to establish reserves either to provide for contingencies or to effect savings which are in furtherance of or at least consistent with, the purposes of an appropriation.

[122] Neither section 1513 nor case law defines the phrase "official having administrative control." Consequently, the apportioning official for legislative and judicial appropriations is named by the head of the agency to whom the appropriation is made.

[123] See footnote 113, *supra*, and accompanying text.

> "As thus limited, the apportionment process serves a necessary purpose—the promotion of economy and efficiency in the use of appropriations. . . .
>
> * * * * *
>
> "[S]ince a useful purpose is served by OMB's proper exercise of the apportionment power, we do not believe that the potential for abuse of the power is sufficient to justify removing it from OMB."

Thus, the appropriations of independent regulatory agencies like the Securities and Exchange Commission (SEC) are subject to apportionment by OMB, but OMB may not lawfully use its apportionment power to compromise the independence of those agencies.

The Impoundment Control Act may permit OMB, in effect, to delay the apportionment deadlines prescribed in 31 U.S.C. § 1513(b). For example, when the President sends a rescission message to Congress, the budget authority proposed to be rescinded may be withheld for up to 45 days pending congressional action on a rescission bill. 2 U.S.C. §§ 682(3), 683(b). In B-115398.33, Aug. 12, 1976, GAO responded to a congressional request to review a situation in which an apportionment had been withheld for more than 30 days after enactment of the appropriation act. The President had planned to submit a rescission message for some of the funds but was late in drafting and transmitting his message. If the full amount contained in the rescission message could be withheld for the entire 45-day period, and Congress ultimately declined to enact the full rescission, release of the funds for obligation would occur only a few days before the budget authority expired. The Comptroller General suggested that, where Congress has completed action on a rescission bill rescinding only a part of the amount proposed, OMB should immediately apportion the amounts not included in the rescission bill without awaiting the expiration of the 45-day period. *See also* B-115398.33, Mar. 5, 1976.

### e. Apportionments Requiring Deficiency Estimate

In our discussion of the basic requirement for apportionment, we quoted 31 U.S.C. § 1512(a) to the effect that appropriations must be apportioned "to prevent obligation or expenditure at a rate that would indicate a necessity for a deficiency or supplemental appropriation." The requirement that appropriations be apportioned so as to avoid the need for

deficiency or supplemental appropriations is fleshed out in 31 U.S.C. § 1515 (formerly subsection (e) of the Antideficiency Act):

> "(a) An appropriation required to be apportioned under section 1512 of this title may be apportioned on a basis that indicates the need for a deficiency or supplemental appropriation to the extent necessary to permit payment of such pay increases as may be granted pursuant to law to civilian officers and employees (including prevailing rate employees whose pay is fixed and adjusted under subchapter IV of chapter 53 of title 5) and to retired and active military personnel.
>
> "(b)(1) Except as provided in subsection (a) of this section, an official may make, and the head of an executive agency may request, an apportionment under section 1512 of this title that would indicate a necessity for a deficiency or supplemental appropriation only when the official or agency head decides that the action is required because of—
>
> > "(A) a law enacted after submission to Congress of the estimates for an appropriation that requires an expenditure beyond administrative control; or
> >
> > "(B) an emergency involving the safety of human life, the protection of property, or the immediate welfare of individuals when an appropriation that would allow the United States Government to pay, or contribute to, amounts equired to be paid to individuals in specific amounts fixed by law or under formulas prescribed by law, is insufficient.
>
> "(2) If an official making an apportionment decides that an apportionment would indicate a necessity for a deficiency or supplemental appropriation, the official shall submit immediately a detailed report of the facts to Congress. The report shall be referred to in submitting a proposed deficiency or supplemental appropriation."

Section 1515 thus provides certain exceptions to the requirement of section 1512(a) that apportionments be made in such manner as to assure that the funds will last throughout the fiscal year and there will be no necessity for a deficiency appropriation. Under subsection 1515(a), deficiency apportionments are permissible if necessary to pay salary increases granted pursuant to law to federal civilian and military personnel. Under subsection 1515(b), apportionments can be made in an unbalanced manner (*e.g.*, an entire appropriation could be obligated by the end of the second quarter) if the apportioning officer determines that (1) a law enacted subsequent to the transmission of budget estimates for the appropriation requires expenditures beyond administrative control, or (2) there is an emergency involving safety of human life, protection of property, or immediate welfare of individuals in cases where an appropriation for mandatory payments to those individuals is insufficient.

Prior to 1957, what is now subsection 1515(b) prohibited only the *making* of an apportionment indicating the need for a deficiency or supplemental appropriation, so the only person who could violate this subsection was the Director of OMB. An amendment in 1957 made it equally a violation for an agency to *request* such an apportionment. *See* 38 Comp. Gen. 501 (1959). The exception in subsection 1515(b)(1)(A) for expenditures "beyond administrative control" required by a statute enacted after submission of the budget estimate may be illustrated by statutory increases in compensation, although many of the cases would now be covered by subsection (a). We noted several of the cases in our consideration of when an obligation or expenditure is "authorized by law" for purposes of 31 U.S.C. § 1341.[124] Those cases established the rule that a mandatory increase is regarded as "authorized by law" so as to permit overobligation, whereas a discretionary increase is not. The same rule applies in determining when an expenditure is "beyond administrative control" for purposes of 31 U.S.C. § 1515(b). Thus, statutory pay increases for Wage Board employees granted pursuant to a wage survey meet the test. 39 Comp. Gen. 422 (1959); 38 Comp. Gen. 538, 542 (1959). *See also* 45 Comp. Gen. 584, 587 (1966) (severance pay in fiscal year 1966).[125] Discretionary increases, just as they are not "authorized by law" for purposes of 31 U.S.C. § 1341, are not "beyond administrative control" for

[124] See section C.2.g of this chapter.

[125] The law mandating payment of severance pay was enacted after the start of fiscal year 1966, which is why the expenditures in that case would qualify under 31 U.S.C. § 1515(b).

purposes of section 1515(b). 44 Comp. Gen. 89 (1964) (salary increases to Central Intelligence Agency employees); 31 Comp. Gen. 238 (1951) (pension increases to retired District of Columbia police and firefighters).

The Wage Board exception was separately codified in 1957 and now appears at 31 U.S.C. § 1515(a), quoted above. Subsection 1515(a) reached its present form in 1987 when Congress expanded it to include pay increases granted pursuant to law to non-Wage Board civilian officers and employees and to retired and active military personnel.[126]

The "emergency" exceptions in subsection 1515(b)(1)(B) have not been discussed in GAO decisions, although a 1989 internal memorandum suggested that the exception would apply to Forest Service appropriations for fighting forest fires. B-230117-O.M., Feb. 8, 1989. The exceptions for safety of human life and protection of property appear to be patterned after identical exceptions in 31 U.S.C. § 1342 (acceptance of voluntary services), so the case law under that section would likely be relevant for construing the scope of the exceptions under section 1515(b). *See* 43 Op. Att'y Gen. 293, 5 Op. Off. Legal Counsel 1, 9–10 (1981) ("as provisions containing the same language, enacted at the same time, and aimed at related purposes, the emergency provisions of" sections 1342 and 1515(b)(1)(B) "should be deemed *in pari materia* and given a like construction"); Memorandum for the General Counsel, United States Marshals Service, *Continuation of Federal Prisoner Detention Efforts in the Face of a USMS Appropriation Deficiency*, OLC Opinion, Apr. 5, 2000 ("we think it clear that, if an agency's functions fall within § 1342's exception for emergency situations, the standard for the 'emergency' exception under § [1515(b)(1)(B)] also will be met"). *See also* Memorandum for the Director, Office of Management and Budget, *Government Operations in the Event of a Lapse in Appropriations*, OLC Opinion, Aug. 16, 1995, at 7, fn. 6.

It is less obvious that the converse would necessarily be true—that is, that an "emergency" for purposes of subsection 1515(b)(1)(B) automatically qualifies as an "emergency" for purposes of section 1342. As we pointed out in discussing section 1342, this section was amended in 1990 to add the following language:

[126] Pub. L. No. 100-202, § 105, 101 Stat. 1329, 1329-433 (Dec. 22, 1987) (1988 continuing resolution).

> "As used in this section, the term 'emergencies involving the safety of human life or the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property."

Such language was not added to subsection 1515(b)(1)(B). Thus, on its face, subsection 1515(b)(1)(B) may embody at least a slightly more flexible standard of "emergency" than section 1342, although we have found no cases addressing this point.

Importantly, the exceptions in 31 U.S.C. § 1515(b) are exceptions only to the prohibition against making or requesting apportionments requiring deficiency estimates; they are not exceptions to the basic prohibitions in 31 U.S.C. § 1341 against obligating or spending in excess or advance of appropriations. The point was discussed at some length in B-167034, Sept. 1, 1976. Legislation had been proposed in the Senate to repeal 41 U.S.C. § 11 (the Adequacy of Appropriations Act),[127] which prohibits the making of a contract, not otherwise authorized by law, unless there is an appropriation "adequate to its fulfillment," except in the case of contracts made by a military department for "clothing, subsistence, forage, fuel, quarters, transportation, or medical and hospital supplies." The question was whether, if 41 U.S.C. § 11 were repealed, the military departments would have essentially the same authority under section 1515(b).

The Defense Department expressed the view that section 1515(b) would not be an adequate substitute for the 41 U.S.C. § 11 exception which allows the incurring of obligations for limited purposes even though the applicable appropriation is insufficient to cover the expenses at the time the commitment is made. Defense commented as follows:

> "The authority to apportion funds on a deficiency basis in [31 U.S.C. § 1515(b)] does not, as alleged, provide authority to incur a deficiency. It merely authorizes obligating funds at a deficiency rate under certain circumstances, *e.g.*, a $2,000,000 appropriation can be obligated in its entirety at the end of the third quarter, but it does not provide authority to obligate one dollar more than $2,000,000."

[127] See section C.2.a of this chapter for a further discussion of 41 U.S.C. § 11.

Letter from the Deputy Secretary of Defense to the Chairman, House Armed Services Committee, Apr. 2, 1976 (quoted in B-167034, Sept. 1, 1976).

The Comptroller General agreed with the Deputy Secretary, stating:

> "[Section 1515(b)] in no way authorizes an agency of the Government actually to incur obligations in excess of the total amount of money appropriated for a period. It only provides an exception to the general apportionment rule set out in [31 U.S.C. § 1512(a)] that an appropriation be allocated so as to insure that it is not exhausted prematurely. [Section 1515(b)] says nothing about increasing the total amount of the appropriation itself or authorizing the incurring of obligations in excess of the total amount appropriated. On the contrary, as noted above, apportionment only involves the subdivision of appropriations already enacted by Congress. It necessarily follows that the sum of the parts, as apportioned, could not exceed the total amount of the appropriations being apportioned.
>
> "Any deficiency that an agency incurs where obligations exceed total amounts appropriated, including a deficiency that arises in a situation where it was determined that one of the exceptions set forth in [section 1515(b)] was applicable, would constitute a violation of 31 U.S.C. § [1341(a)] . . . ."

B-167034, Sept. 1, 1976.

### f. Exemptions from Apportionment Requirement

A number of exemptions from the apportionment requirement, formerly found in subsection (f) of the Antideficiency Act, are now gathered in 31 U.S.C. § 1516:

> "An official designated in section 1513 of this title to make apportionments may exempt from apportionment—
>
> > "(1) a trust fund or working fund if an expenditure from the fund has no significant effect on the financial operations of the United States Government;

"(2) a working capital fund or a revolving fund established for intragovernmental operations;

"(3) receipts from industrial and power operations available under law; and

"(4) appropriations made specifically for—

"(A) interest on, or retirement of, the public debt;

"(B) payment of claims, judgments, refunds, and drawbacks;

"(C) items the President decides are of a confidential nature;

"(D) payment under a law requiring payment of the total amount of the appropriation to a designated payee; and

"(E) grants to the States under the Social Security Act (42 U.S.C. 301 *et seq.*)."

Section 1516 is largely self-explanatory and the various enumerated exceptions appear to be readily understood. Note that the statute does not make the exemptions mandatory. It merely authorizes them, within the discretion of the apportioning authority (OMB). OMB's implementing instructions, OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, part 4, § 120 (June 21, 2005), have not adopted all of the exemptions permitted under the statute. For example, the Circular's list of funds exempted from apportionment pursuant to 31 U.S.C. § 1516 does not include trust funds or intragovernmental revolving funds. *See* OMB Cir. No. A-11, at § 120.7.

In addition, 10 U.S.C. § 2201(a) authorizes the President to exempt appropriations for military functions of the Defense Department from apportionment upon determining "such action to be necessary in the interest of national defense."

Another exemption, this one mandatory, is contained in 31 U.S.C. § 1511(b)(3): appropriations for "the Senate, the House of Representatives, a committee of Congress, a member, officer, employee, or office of either House of Congress, or the Office of the Architect of the Capitol or an officer or employee of that Office" are exempt from the apportionment requirement. The remainder of the legislative branch along with the judicial branch are subject to apportionment. *See* 31 U.S.C. § 1513(a).

### g. Administrative Division of Apportionments

Thus far, we have reviewed the provisions of the Antideficiency Act directed at the appropriation level and the apportionment level. The law also addresses agency subdivisions.

The first provision to note is 31 U.S.C. § 1513(d):

> "An appropriation apportioned under this subchapter may be divided and subdivided administratively within the limits of the apportionment."

Thus, administrative subdivisions are expressly authorized. The precise pattern of subdivisions will vary based on the nature and scope of activities funded under the apportionment and, to some extent, agency preference. The levels of subdivision below the apportionment level are, in descending order, allotment, suballotment, and allocation. See OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 20.3 (June 21, 2005), which notes under its definition of apportionment: "An apportionment may be further subdivided by an agency into allotments, suballotments, and allocations." As we will see later in our discussion of 31 U.S.C. § 1517(a), there are definite Antideficiency Act implications flowing from how an agency structures its fund control system.

The next relevant statute is 31 U.S.C. § 1514:[128]

> "(a) The official having administrative control of an appropriation available to the legislative branch, the judicial branch, the United States International Trade Commission, or the District of Columbia government, and, subject to the approval of the President, the head of each executive

[128] Prior to the 1982 recodification of title 31, sections 1513(d) and 1514 had been combined as subsection (g) of the Antideficiency Act.

agency (except the Commission) shall prescribe by regulation a system of administrative control not inconsistent with accounting procedures prescribed under law. The system shall be designed to—

> "(1) restrict obligations or expenditures from each appropriation to the amount of apportionments or reapportionments of the appropriation; and
>
> "(2) enable the official or the head of the executive agency to fix responsibility for an obligation or expenditure exceeding an apportionment or reapportionment.

"(b) To have a simplified system for administratively dividing appropriations, the head of each executive agency (except the Commission) shall work toward the objective of financing each operating unit, at the highest practical level, from not more than one administrative division for each appropriation affecting the unit."

Section 1514 is designed to ensure that the agencies in each branch of the government keep their obligations and expenditures within the bounds of each apportionment or reapportionment. The official in each agency who has administrative control of the apportioned funds is required to set up, by regulation, a system of administrative controls to implement this objective. The system must be consistent with any accounting procedures prescribed by or pursuant to law, and must be designed to (1) prevent obligations and expenditures in excess of apportionments or reapportionments, and (2) fix responsibility for any obligation or expenditure in excess of an apportionment or reapportionment.[129] Agency fund control regulations in the executive branch must be approved by OMB. *See* OMB Cir. No. A-11, pt. 4, § 150.7.

[129] See, in this regard, GAO, *Standards for Internal Control in the Federal Government*, GAO/AIMD-00-21.3.1 (Washington, D.C.: Nov. 9, 1999); GAO, *Policy and Procedures Manual for the Guidance of Federal Agencies*, title 7 (Washington, D.C.: May 18, 1993).

Subsection (b) of 31 U.S.C. § 1514 was added in 1956[130] and was intended to simplify agency allotment systems. Prior to 1956, it was not uncommon for agencies to divide and subdivide their apportionments into numerous "pockets" of obligational authority called "allowances." Obligating or spending more than the amount of each allowance was a violation of the Antideficiency Act as it then existed. The Second Hoover Commission (Commission on Organization of the Executive Branch of the Government) had recommended simplification in 1955. The Senate and House Committees on Government Operations agreed. Both committees reported as follows:

> "The making of numerous allotments which are further divided and suballotted to lower levels leads to much confusion and inflexibility in the financial control of appropriations or funds as well as numerous minor violations of [the Antideficiency Act]."

S. Rep. No. 84-2265, at 9 (1956); H.R. Rep. No. 84-2734, at 7 (1956). The result was what is now 31 U.S.C. § 1514(b).[131]

As noted, one of the objectives of 31 U.S.C. § 1514 is to enable the agency head to fix responsibility for obligations or expenditures in excess of apportionments. The statute encourages agencies to fix responsibility at the highest practical level, but does not otherwise prescribe precisely how this is to be done. Apart from subsection (b), the substance of section 1514 derives from a 1950 amendment to the Antideficiency Act.[132] In testimony on that legislation, the Director of the then Bureau of the Budget stated:

> "At the present time, theoretically, I presume the agency head is about the only one that you could really hold responsible for exceeding [an] apportionment. The revised section provides for going down the line to the person who creates the obligation against the fund and fixes the

[130] Pub. L. No. 863, ch. 814, § 3, 70 Stat. 782, 783 (Aug. 1, 1956).

[131] The historical summary in this paragraph is taken largely from 37 Comp. Gen. 220 (1957).

[132] Pub. L. No. 759, ch. 896, § 1211, 64 Stat. 595, 765 (Sept. 6, 1950).

> responsibility on the bureau head or the division head, if he is the one who creates the obligation."[133]

Thus, depending on the agency regulations and the level at which administrative responsibility is fixed, the violating individual could be the person in charge of a major agency bureau or operating unit, or it could be a contracting officer or finance officer.

Identifying the person responsible for a violation will be easy in probably the majority of cases. However, where there are many individuals involved in a complex transaction, and particularly where the actions producing the violation occurred over a long period of time, pinpointing responsibility can be much more difficult. Hopkins and Nutt, in their study of the Antideficiency Act, present the following as a sensible approach:

> "Generally, [the individual to be held responsible] will be the highest ranking official in the decision-making process who had knowledge, either actual or constructive, of (1) precisely what actions were taken and (2) the impropriety or at least questionableness of such actions. There will be officials who had knowledge of either factor. But the person in the best and perhaps only position to prevent the ultimate error—and thus the one who must be held accountable—is the highest one who is aware of both.[134]

Thus, Hopkins and Nutt conclude, where multiple individuals are involved in a violation, the individual to be held responsible "must not be too remote from the cause of the violation and must be in a position to have prevented the violation from occurring."[135]

### h. Expenditures in Excess of Apportionment

The former subsection (h) of the Antideficiency Act, now 31 U.S.C. § 1517(a), provides:

[133] *Hearings Before Senate Comm. on Appropriations on H.R. 7786*, 81st Cong., 2d Sess. 10 (1950), quoted in Hopkins & Nutt, *The Anti-Deficiency Act (Revised Statutes 3679) and Funding Federal Contracts: An Analysis*, 80 Mil. L. Rev. 51, 128 (1978).

[134] Memorandum for the Assistant Secretary of the Army (Financial Management), 1976, quoted in Hopkins & Nutt, *supra*, at 130.

[135] *Id.*

> "(a) An officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding—
>
> > "(1) an apportionment; or
> >
> > "(2) the amount permitted by regulations prescribed under section 1514(a) of this title."

Section 1517(a) must be read in conjunction with sections 1341, 1512, and 1514, previously discussed.

Subsection 1517(a)(1) prohibits obligations or expenditures in excess of an apportionment. Thus, an agency must observe the limits of its apportionments just as it must observe the limits of its appropriations. It follows that an agency cannot obligate or expend appropriations before they have been apportioned. Thus, GAO stated in B-290600, July 10, 2002:

> "The Antideficiency Act prohibits . . . the making or the authorizing of obligations or expenditures in advance of, or in excess of, available appropriations. 31 U.S.C. § 1341. An agency may obligate an appropriation only after OMB has apportioned it to the agency."

Since the Antideficiency Act requires an apportionment before an agency can obligate the appropriation, 31 U.S.C. § 1512(a), an obligation in advance of an apportionment violates the Act. *See* B-255529, Jan. 10, 1994. In other words, if zero has been apportioned, zero is available for obligation or expenditure.[136] When an agency anticipates a need to obligate appropriations upon their enactment, it may request (but not receive) an apportionment before a regular appropriation or continuing resolution has been enacted. Typically, for regular appropriation acts, agencies submit their apportionment requests to OMB by August 21 or within 10 calendar days after enactment of the appropriation, whichever is later. *See* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 120.30 (June 21, 2005). OMB permits agencies to submit requests on the day Congress completes action on the appropriation bill. *Id.* § 120.34. OMB encourages agencies to begin their preparation of apportionment requests as soon as the House and Senate have reached agreement on funding levels (*id.* § 120.30) and to discuss the proposed request with OMB representatives (*id.* § 120.34). OMB will entertain expedited requests and, for emergency funding needs, may approve the apportionment request by telephone or fax. *Id.* For continuing resolutions, OMB typically expedites the process by making "automatic" apportionments under continuing resolutions. *See* B-255529, Jan. 10, 1994; OMB Cir. No. A-11, § 123.5.

[136] *But see Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997), *cert. denied*, 525 U.S. 818 (1998). In that case, the Navy had exercised an option to extend a contract on October 1. The appropriation that Navy charged the obligation to was signed into law on October 1; however, OMB had not yet apportioned the appropriation. Cessna, trying to get out of the contract, argued that the obligation for the contract extension was not valid since it was made in advance of the apportionment. The court held that the provisions of the Antideficiency Act were only internal government operating requirements and, as such, they did not confer legal rights on outside parties. *Id.* at 1451–52. *See generally Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 552 n.9 (Ct. Cl. 1980); *Rough Diamond Co. v. United States*, 351 F.2d 636, 640, 642 (Ct. Cl. 1965), *cert. denied*, 383 U.S. 957 (1966).

In *dicta*, the court said that apportionment is not a prerequisite to the obligation of appropriated funds. The court noted that 31 U.S.C. § 1341 explicitly prohibits obligations both in excess of and (unless otherwise authorized) in advance of appropriations. By contrast, the court pointed out, the apportionment sections of title 31 explicitly prohibit only obligations exceeding an apportionment; they do not literally forbid obligations in advance of an apportionment. *Cessna*, 126 F.3d at 1450–51. The court also rejected Cessna's reliance on provisions of the Defense Department accounting manual that generally prohibited obligations in advance of an apportionment. The *Cessna dicta* has not been followed in any subsequent case.

Under some circumstances, an agency may have a legal duty to seek an additional apportionment from OMB. *Blackhawk Heating & Plumbing Co. v. United States*, 622 F.2d 539, 552 n.9 (Ct. Cl. 1980); *Berends v. Butz*, 357 F. Supp. 143, 155–56 (D. Minn. 1973). In *Berends v. Butz*, the Secretary of Agriculture had terminated an emergency farm loan program, allegedly due to a shortage of funds. The court found the termination improper and directed reinstatement of the program. Since the shortage of funds related to the amount apportioned and not the amount available under the appropriation, the court found that the Secretary had a duty to request an additional apportionment in order to continue implementing the program. The case does not address the nature and extent of any duty OMB might have in response to such a request.

Subsection 1517(a)(2) makes it a violation to obligate or expend in excess of an administrative subdivision of an apportionment to the extent provided in the agency's fund control regulations prescribed under section 1514. The importance of 31 U.S.C. § 1514 becomes much clearer when it is read in conjunction with 31 U.S.C. § 1517(a)(2). Section 1514 does not prescribe the level of fiscal responsibility for violations below the apportionment level. It merely recommends that the agency set the level at the highest practical point and suggests no more than one subdivision below the apportionment level. The agency thus, under the statute, has a measure of discretion. If it chooses to elevate overobligations or overexpenditures of lower-tier subdivisions to the level of Antideficiency Act violations, it is free to do so in its fund control regulations.

At this point, it is important to return to OMB Circular No. A-11. Since agency fund control regulations must be approved by OMB (*id.* § 150.7), OMB has a role in determining what levels of administrative subdivision should constitute Antideficiency Act violations. Under OMB Circular No. A-11, § 145.2, overobligation or overexpenditure of an allotment or suballotment are always violations. Overobligation or overexpenditure of other administrative subdivisions are violations only if and to the extent specified in the agency's fund control regulations. *See* 31 U.S.C. §§ 1514(a), 1517(a)(2).

In 37 Comp. Gen. 220 (1957), GAO considered proposed fund control regulations of the Public Housing Administration. The regulations provided for allotments as the first subdivision below the apportionment level. They then authorized the further subdivision of allotments into "allowances," but retained responsibility at the allotment level. The "allowances" were intended as a means of meeting operational needs

rather than an apportionment control device. GAO advised that this proposed structure conformed to the purposes of 31 U.S.C. § 1514, particularly in light of the 1956 addition of section 1514(b), and that expenditures in excess of an "allowance" would not constitute Antideficiency Act violations.

For further illustration, see 35 Comp. Gen. 356 (1955) (overobligation of allotment stemming from misinterpretation of regulations); B-95136, Aug. 8, 1979 (overobligation of regional allotments would constitute reportable violation unless sufficient unobligated balance existed at central account level to adjust the allotments); B-179849, Dec. 31, 1974 (overobligation of allotment held a violation of section 1517(a) where agency regulations specified that allotment process was the "principal means whereby responsibility is fixed for the conduct of program activities within the funds available"); B-114841.2-O.M., Jan. 23, 1986 (no violation in exceeding allotment subdivisions termed "work plans"); B-242974.6, Nov. 26, 1991 (nondecision memorandum) (under Defense Department regulations, overobligations of administrative subdivisions of funds that are exempt from apportionment do not constitute Antideficiency Act violations.).

## 5. Penalties and Reporting Requirements

### a. Administrative and Penal Sanctions

Violations of the Antideficiency Act are subject to sanctions of two types, administrative and penal. The Antideficiency Act is the only one of the title 31, United States Code, fiscal statutes to prescribe penalties of both types, a fact which says something about congressional perception of the Act's importance.

An officer or employee who violates 31 U.S.C. § 1341(a) (obligate/expend in excess or advance of appropriation), section 1342 (voluntary services prohibition), or section 1517(a) (obligate/expend in excess of an apportionment or administrative subdivision as specified by regulation) "shall be subject to appropriate administrative discipline including, when circumstances warrant, suspension from duty without pay or removal from office." 31 U.S.C. §§ 1349(a), 1518. For a case in which an official was reduced in grade and reassigned to other duties, see *Duggar v. Thomas*, 550 F. Supp. 498 (D.D.C. 1982) (upholding the agency's action against a charge of discrimination).

In addition, an officer or employee who "knowingly and willfully" violates any of the three provisions cited above "shall be fined not more than $5,000, imprisoned for not more than 2 years, or both." 31 U.S.C. §§ 1350, 1519. As far as GAO is aware, it appears that no officer or employee has ever been prosecuted, much less convicted, for a violation of the Antideficiency Act as of this writing. The knowing and willful failure to record an overobligation in order to conceal an Antideficiency Act violation is also a criminal offense. *See* 71 Comp. Gen. 502, 509–10 (1992) (discussing several relevant criminal provisions in title 18, United States Code).

Earlier in this chapter, we pointed out that factors such as the absence of bad faith or the lack of intent to commit a violation are irrelevant for purposes of determining whether a violation has occurred. However, intent *is* relevant in evaluating the assessment of penalties. Note that the criminal penalties are linked to a determination that the law was "knowingly and willfully" violated, but the administrative sanction provisions do not contain similar language. Thus, intent or state of mind *may* (and probably should) be taken into consideration when evaluating potential administrative sanctions (whether to assess them and, if so, what type), but *must* be taken into consideration in determining applicability of the criminal sanctions. Understandably, the provisions for fines and/or jail are intended to be reserved for particularly flagrant violations.

Finally, the administrative and penal sanctions apply only to violations of the three provisions cited—31 U.S.C. §§ 1341(a), 1342, and 1517(a). They do not, for example, apply to violations of 31 U.S.C. § 1512 (requiring that all appropriations be administratively apportioned so as to ensure obligation and expenditure at a controlled rate which will prevent deficiencies from arising before the end of a fiscal year). 36 Comp. Gen. 699 (1957).

### b. Reporting Requirements

Once it is determined that there has been a violation of 31 U.S.C. § 1341(a), 1342, or 1517(a), the agency head "shall report immediately to the President and Congress all relevant facts and a statement of actions taken." 31 U.S.C. §§ 1351, 1517(b). Further instructions on preparing the reports may be found in OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 145 (June 21, 2005). The reports are to be signed by the agency head. *Id.* § 145.7. The report to the President is to be forwarded through the Director of OMB. *Id.*

In the Consolidated Appropriations Act, 2005, Congress amended the Antideficiency Act to add that the heads of executive branch agencies and the Mayor of the District of Columbia shall also transmit "[a] copy of each report . . . to the Comptroller General on the same date the report is transmitted to the President and Congress."[137]

The report is to include all pertinent facts and a statement of all actions taken to address and correct the Antideficiency Act violation (any administrative discipline imposed, referral to the Justice Department where appropriate, new safeguards imposed, *etc.*). An agency also should include a request for a supplemental or deficiency appropriation when needed. It is also understood that the agency will do everything it can lawfully do to correct or mitigate the financial effects of the violation. For example, when the Fish and Wildlife Service improperly entered into contracts for legal services, we explained that there were a number of ways the Department of Interior could correct the Service's Antideficiency Act violations if unable to obtain a deficiency appropriation of the budget authority needed to cover amounts the Service paid to these contractors, including ratifying the contracts and covering their costs out of unobligated balances of the applicable fiscal year appropriation, or paying the contractors on a *quantum meruit* basis[138] out of unobligated balances. B-290005, July 1, 2002. *See also* B-255831, July 7, 1995; 55 Comp. Gen. 768, 772 (1976); B-223857, Feb. 27, 1987; B-114841.2-O.M., Jan. 23, 1986. In view of the explicit provisions of 31 U.S.C. § 1351, there is no private right of action for declaratory, mandatory, or injunctive relief under the Antideficiency Act. *Thurston v. United States*, 696 F. Supp. 680 (D.D.C. 1988).

Factors such as mistake, inadvertence, lack of intent, or the minor nature of a violation do not affect the duty to report. For example, the Office of Management and Budget (OMB) and the Air Transportation Stabilization

[137] 31 U.S.C. §§ 1351, 1517(b), as amended by Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. G, title II, § 1401, 118 Stat. 2809, 3192 (Dec. 8, 2004). See, in this regard, the Comptroller General's Memorandum to Heads of Departments, Agencies, and Others Concerned, *Transmission of Antideficiency Act Reports to the Comptroller General of the United States*, B-304335, Mar. 8, 2005.

[138] Payment under this authority is appropriate where there is no enforceable contractual obligation on the part of the government but where the government has received a benefit not prohibited by law conferred in good faith. See chapter 12, section C.2.b in volume III of the second edition of *Principles of Federal Appropriations Law* for a general discussion of *quantum meruit* claims.

Board (ATSB) were required to report an Antideficiency Act violation when, as discussed in section C.2 above, OMB erroneously apportioned, and ATSB erroneously obligated, funds to cover the subsidy cost of a loan guarantee prior to the availability of budget authority. B-290600, July 10, 2001. Of course, if the agency feels there are extenuating circumstances, it is entirely appropriate to include them in the report. 35 Comp. Gen. 356 (1955).

What if GAO uncovers a violation but the agency thinks GAO is wrong? The agency must still make the required reports, and must include an explanation of its disagreement. OMB Cir. No. A-11, § 145. *See also* GAO, *Anti-Deficiency Act: Agriculture's Food and Nutrition Service Violates the Anti-Deficiency Act*, GAO/AFMD-87-20 (Washington, D.C.: Mar. 17, 1987).

## 6. Funding Gaps

The term "funding gap" refers to a period of time between the expiration of an appropriation and the enactment of a new one. A funding gap is one of the most difficult fiscal problems a federal agency may have to face. As our discussion here will demonstrate, the case law reflects an attempt to forge a workable solution to a bad situation.

Funding gaps occur most commonly at the end of a fiscal year when new appropriations, or a continuing resolution, have not yet been enacted. In this context, a gap may affect only a few agencies (if, for example, only one appropriation act remains unenacted as of October 1), or the entire federal government. A funding gap may also occur if a particular appropriation becomes exhausted before the end of the fiscal year, in which event it may affect only a single agency or a single program, depending on the scope of the appropriation. In the latter case the lack of funds occurs as a consequence of unforeseen circumstances beyond the agency's control as opposed to the exhaustion of appropriations as a result of poor management.

Funding gaps occur for a variety of reasons. For one thing, the complexity of the budget and appropriations process makes it difficult at best for Congress and the President to get everything done on time. Add to this the enormity of some programs and the need to address budget deficits, and the scope of the problem becomes more apparent. Also, funding gaps are perhaps an inevitable reflection of the political process.

As GAO has pointed out, funding gaps, actual or threatened, are both disruptive and costly.[139] They also produce difficult legal problems under the Antideficiency Act. The basic question, easy to state but not quite as easy to answer, is—what is an agency permitted or required to do when faced with a funding gap? Can it continue with "business as usual," must it lock up and go home, or is there some acceptable middle ground?

In 1980, a congressional subcommittee asked GAO whether agency heads could legally permit employees to come to work when the applicable appropriation for salaries had expired and Congress had not yet enacted either a regular appropriation or a continuing resolution for the next fiscal year. The Comptroller General replied in B-197841, Mar. 3, 1980, that 31 U.S.C. §§ 1341(a) and 1342 were both violated if agency employees reported for work under those circumstances. Permitting the employees to come to work would result in an obligation to pay salary for the time worked, an obligation in advance of appropriations in violation of section 1341(a). With respect to section 1342, no one was suggesting that the employees were offering to work gratuitously, even assuming they could lawfully do so, which for the most part they cannot. The fact that employees were willing to take the risk that the necessary appropriation would eventually be enacted did not avoid the violation. Clearly, the employees still expected to be paid eventually. "During a period of expired appropriations," the Comptroller General stated, "the only way the head of an agency can avoid violating the Antideficiency Act is to suspend the operations of the agency and instruct employees not to report to work until an appropriation is enacted." B-197841, at 3.

Notwithstanding the literal effect of the Antideficiency Act, however, the Comptroller General went on to observe in B-197841, "[W]e do not believe that the Congress intends that federal agencies be closed during periods of expired appropriations." In this regard, the opinion pointed out that at the beginning of fiscal year 1980, GAO had prepared an internal memorandum to address its own operations in the event of a funding gap. The memorandum said, in effect, that employees could continue to come to work, but that operations would have to be severely restricted. No new obligations could be incurred for contracts or small purchases of any kind,

[139] *See*, *e.g.*, GAO, *Government Shutdown: Funding Lapse Furlough Information*, GAO/GGD-96-52R (Washington, D.C.: Dec. 1, 1995); *Government Shutdown: Permanent Funding Lapse Legislation Needed*, GAO/GGD-91-76 (Washington, D.C.: June 6, 1991); *Funding Gaps Jeopardize Federal Government Operations*, PAD-81-31 (Washington, D.C.: Mar. 3, 1981).

and of course the employees could not actually be paid until appropriations were enacted. The opinion further noted that the then chairman of the Senate Appropriations Committee had placed the 1980 GAO memorandum in the Congressional Record, and had described it as providing "common sense guidelines."[140] The opinion also pointed to the fact that when Congress enacted appropriations following a funding gap, it generally made the appropriations retroactive to the beginning of the fiscal year and included language ratifying obligations incurred during the funding gap.

"It thus appears," the opinion concluded, "that the Congress expects that the various agencies of the Government will continue to operate and incur obligations during a period of expired appropriations." Nevertheless, the opinion conceded that this approach would "legally produce widespread violations of the Antideficiency Act." B-197841, at 4. Therefore, the opinion reiterated GAO's support at that time for legislation then pending that would provide permanent statutory authority to continue the pay of federal employees during funding gaps. *Id.*[141]

Less than two months after GAO issued B-197841, the Attorney General issued his opinion to the President. The Attorney General essentially agreed with GAO's analysis that permitting employees to work during a funding gap would violate the Antideficiency Act, but concluded further that the approach outlined in the GAO internal memorandum went beyond what the Act permitted. 43 Op. Att'y Gen. 224, 4A Op. Off. Legal Counsel 16 (1980). The opinion stated:

> "[T]here is nothing in the language of the Antideficiency Act or in its long history from which any exception to its terms during a period of lapsed appropriations may be inferred. . . .
>
> * * * * *
>
> "[F]irst of all . . ., on a lapse in appropriations, federal agencies may incur no obligations that cannot lawfully be funded from prior appropriations unless such obligations are otherwise authorized by law. There are no exceptions to

[140] 125 Cong. Rec. 26974 (Oct. 1, 1979) (remarks of Sen. Magnuson).

[141] GAO commented on this legislation in B-197584, Feb. 5, 1980, and B-197059, Feb. 5, 1980. The legislation was not enacted.

> this rule under current law, even where obligations incurred earlier would avoid greater costs to the agencies should appropriations later be enacted.
>
> "Second, the Department of Justice will take actions to enforce the criminal provisions of the Act in appropriate cases in the future when violations of the Antideficiency Act are alleged. This does not mean that departments and agencies, upon a lapse in appropriations, will be unable logistically to terminate functions in an orderly way. . . . [A]uthority may be inferred from the Antideficiency Act itself for federal officers to incur those minimal obligations necessary to closing their agencies."

4A Op. Off. Legal Counsel at 19, 20.

This opinion stands for the proposition that agencies had little choice but to lock up and go home. A second opinion, 43 Op. Att'y Gen. 293, 5 Op. Off. Legal Counsel 1 (1981), went into much more detail on possible exceptions and should be read in conjunction with the 1980 opinion.

As set forth in the 1981 Attorney General opinion, the exceptions fall into two broad categories. The first category is obligations "authorized by law." Within this category, there are four types of exceptions:

- Activities funded with appropriations that do not expire at the end of the fiscal year, that is, multiple year and no-year appropriations.[142]

- Activities authorized by statutes that expressly permit obligations in advance of appropriations, such as contract authority (see section C.2.g of this chapter).

- Activities "authorized by necessary implication from the specific terms of duties that have been imposed on, or of authorities that have been invested in, the agency." To take the example given in the opinion, there will be cases where benefit payments under an entitlement program are funded from other than 1-year appropriations (*e.g.*, a trust

[142] This would also include certain revolving fund operations, but not those whose use requires affirmative authorization in annual appropriation acts. B-241730.2, Feb. 14, 1991 (Government Printing Office revolving fund).

fund), but the salaries of personnel who administer the program are funded by 1-year money. As long as money for the benefit payments remains available, administration of the program is, by necessary implication, "authorized by law," unless the entitlement legislation or its legislative history provides otherwise or Congress takes affirmative measures to suspend or terminate the program.

- Obligations "necessarily incident to presidential initiatives undertaken within his constitutional powers," for example, the power to grant pardons and reprieves. This same rationale would apply to legislative branch agencies that incur obligations "necessary to assist the Congress in the performance of its constitutional duties." B-241911, Oct. 23, 1990 (nondecision letter).

The second broad category reflected the exceptions authorized under 31 U.S.C. § 1342—emergencies involving the safety of human life or the protection of property (see also the discussion of this provision in section C.3.d of this chapter). The Attorney General suggested the following rules for interpreting the scope of this exception:

> "First, there must be some reasonable and articulable connection between the function to be performed and the safety of human life or the protection of property. Second, there must be some reasonable likelihood that the safety of human life or the protection of property would be compromised, in some degree, by delay in the performance of the function in question."

5 Op. Off. Legal Counsel at 8.

The Attorney General then cited the identical exception language in the deficiency apportionment prohibition of 31 U.S.C. § 1515, and noted that the Office of Management and Budget followed a similar approach in granting deficiency apportionments over the years.[143] Given the wide variations in agency activities, it would not be feasible to attempt an advance listing of functions or activities that might qualify under this exception. Accordingly, the Attorney General made the following recommendation:

[143] See section C.4 of this chapter for a more detailed discussion of apportionment authorities.

> "To erect the most solid foundation for the Executive Branch's practice in this regard, I would recommend that, in preparing contingency plans for periods of lapsed appropriations, each government department or agency provide for the Director of the Office of Management and Budget some written description, that could be transmitted to Congress, of what the head of the agency, assisted by its general counsel, considers to be the agency's emergency functions."

5 Op. Off. Legal Counsel at 11.

Lest this approach be taken too far, Congress added the following sentence to 31 U.S.C. § 1342:

> "As used in this section, the term 'emergencies involving the safety of human life or the protection of property' does not include ongoing, regular functions of government the suspension of which would not imminently threaten the safety of human life or the protection of property."

Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, § 13213(b), 104 Stat. 1388, 1388-621 (Nov. 5, 1990).

The conference report on the 1990 legislation explained the intent:

> "The conference report also makes conforming changes to title 31 of the United States Code to make clear that . . . ongoing, regular operations of the Government cannot be sustained in the absence of appropriations, except in limited circumstances. These changes guard against what the conferees believe might be an overly broad interpretation of an opinion of the Attorney General issued on January 16, 1981, regarding the authority for the continuance of Government functions during the temporary lapse of appropriations, and affirm that the constitutional power of the purse resides with Congress."

H.R. Conf. Rep. No. 101-964, at 1170 (1990).

The Ninth Circuit Court of Appeals added to the list of exceptions, holding the suspension of the civil jury trial system for lack of funds unconstitutional. *Armster v. United States District Court*, 792 F.2d 1423 (9th Cir. 1986). Faced with the potential exhaustion of appropriations for juror fees, the Administrative Office of the United States Courts, at the direction of the Judicial Conference of the United States, had sent a memorandum to all district court judges advising that civil jury trials would have to be suspended until more money was available.[144] Basing its holding on the Constitution and expressly declining to rule on the Antideficiency Act, the court held that a suspension for more than a "most minimal" time violated the seventh amendment. *Id.* at 1430. *See also Hobson v. Brennan*, 637 F. Supp. 173 (D.D.C. 1986). The court said that "we do not hold that the Anti-Deficiency Act requires the result suggested by the Administrative Office. If it did, its commands would, of course, have to yield to those of the Constitution."[145] *Armster*, 792 F.2d at 1430 n.13.

Since the appropriation was not yet actually exhausted, and since there was still ample time for Congress to provide additional funds, the court noted that its decision did not amount to ordering Congress to appropriate money. The court noted, but did not address, the far more difficult question of what would happen if the appropriation became exhausted and Congress refused to appropriate additional funds. *Armster*, 792 F.2d at 1430–31 and 1431 n.14.

This, then, is the basic framework. There are a number of exceptions to the Antideficiency Act which would permit certain activities to continue during a funding gap. For activities not covered by any of the exceptions, however, the agency must proceed with prompt and orderly termination or violate the Act and risk invocation of the criminal sanctions. A very brief restatement may be found in 6 Op. Off. Legal Counsel 555 (1982).

Within this framework, GAO and the Justice Department addressed a number of specific problems agencies encountered in coming to grips with funding gaps during the 1980s and early 1990s. For example, toward the

[144] The Administrative Office noted a combination of factors contributing to its projected shortfall, including Congress's decision to enact an appropriation in an amount less than the Administrative Office had requested and the appointment of new judges, which increased the number of jury trials. *Armster*, 792 F.2d at 1425 n.3.

[145] Although this case addressed an agency's projected exhaustion of its appropriations rather than a funding gap, the court's *dicta* would appear relevant for a funding gap.

end of fiscal year 1982, the President vetoed a supplemental appropriations bill. As a result, the Defense Department did not have sufficient funds to meet the military payroll. The total payroll obligation consisted of (1) the take-home pay of the individuals, and (2) various items the employing agency was required to withhold and transfer to someone else, such as federal income tax and Social Security contributions. The Treasury Department published a change to its regulations permitting a temporary deferral of the due date for payment of the withheld items, and the Defense Department, relying on the "safety of human life or protection of property" exception, used the funds it had available to pay military personnel their full take-home pay. The Attorney General upheld the legality of this action. 43 Op. Att'y Gen. 369, 6 Op. Off. Legal Counsel 27 (1982). The Comptroller General agreed, but questioned the blanket assumption that *all* military personnel fit within the exception. B-208985, Oct. 29, 1982; B-208951, Oct. 5, 1982. The extent to which this device might be available to civilian agencies would depend on (1) Treasury's willingness to grant a similar deferral, and (2) the extent to which the agency could legitimately invoke the emergency exception.

Additional cases dealing with funding gap problems are:

- Salaries of commissioners of Copyright Royalty Tribunal attach by virtue of their status as officers without regard to availability of funds. Salary obligation is therefore viewed as "authorized by law" for purposes of Antideficiency Act, and commissioners could be retroactively compensated for periods worked without pay during a funding gap. 61 Comp. Gen. 586 (1982).

- Richmond district office of Internal Revenue Service shut down for half a day in October 1986 due to a funding gap. Subsequent legislation authorized retroactive compensation of employees affected. GAO concluded that the legislation applied to intermittent as well as regular full-time employees, and held that the intermittent employees could be compensated in the form of administrative leave for time lost during the half-day furlough. B-233656, June 19, 1989.

- Witness who had been ordered to appear in federal court was stranded without money to return home when court did not convene due to funding gap. Cash disbursement to permit witness to return home or secure overnight lodging was held permissible since hardship circumstances indicated reasonable likelihood that safety of witness would be jeopardized. 5 Op. Off. Legal Counsel 429 (1981).

There are also a few cases addressing actions an agency has taken to forestall the effects of a funding gap. In 62 Comp. Gen. 1 (1982), the Merit Systems Protection Board, faced with a substantial cut in its appropriation, placed most of its employees on half-time, half-pay status in an attempt to stretch its appropriation through the end of the fiscal year. A subsequent supplemental appropriation provided the necessary operating funds. GAO advised that it was within the Board's discretion, assuming the availability of sufficient funds, to grant retroactive administrative leave to the employees who had been affected by the partial shutdown.

GAO reviewed another furlough plan in 64 Comp. Gen. 728 (1985). The Interstate Commerce Commission had determined that if it continued its normal rate of operations, it would exhaust its appropriation six weeks before the end of the fiscal year. To prevent this from happening, it furloughed its employees for one day per week. GAO found that the Commission's actions were in compliance with the Antideficiency Act. While the ICC was thus able to continue essential services, the price was financial hardship for its employees, plus "serious backlogs, missed deadlines and reduced efficiency." *Id.* at 732.

During the 1980s and early 1990s, GAO also issued several reports on funding gaps. The first was *Funding Gaps Jeopardize Federal Government Operations*, PAD-81-31 (Washington, D.C.: Mar. 3, 1981). In that report, GAO noted the costly and disruptive effects of funding gaps, and recommended the enactment of permanent legislation to permit federal agencies to incur obligations, but not disburse funds, during a funding gap. In the second report, *Continuing Resolutions and an Assessment of Automatic Funding Approaches*, GAO/AFMD-86-16 (Washington, D.C.: Jan. 29, 1986), GAO compared several possible options but this time made no specific recommendation. The Office of Management and Budget had pointed out, and GAO agreed, that automatic funding legislation could have the undesirable effects of (1) reducing pressure on Congress to make timely funding decisions, and (2) permitting major portions of the government to operate for extended periods without action by either House of Congress or the President. The ideal solution, both agencies agreed, is the timely enactment of the regular appropriation bills.

In *Managing the Cost of Government: Proposals for Reforming Federal Budgeting Practices*, GAO/AFMD-90-1 (Washington, D.C.: Oct. 1, 1989) at 28–29, GAO reiterated its support for the concept of an automatic continuing resolution in a form that does not reduce the incentive to

complete action on the regular appropriation bills. A 1991 GAO report analyzed the impact of a funding gap which occurred over the 1990 Columbus Day weekend and again renewed the recommendation for permanent legislation to, at a minimum, allow agencies to incur obligations to compensate employees during temporary funding gaps but not pay them until enactment of the appropriation. *Government Shutdown: Permanent Funding Lapse Legislation Needed*, GAO/GGD-91-76 (Washington, D.C.: June 6, 1991). The report stated:

> "In our opinion, shutting down the government during temporary funding gaps is an inappropriate way to encourage compromise on the budget. Beyond being counterproductive from a financial standpoint, a shutdown disrupts government services. In addition, forcing agency managers to choose who will and will not be furloughed during these temporary funding lapses severely tests agency management's ability to treat its employees fairly."

*Id.* at 9.

The history of funding gaps over recent decades reveals several distinct phases, which were captured in an analysis by a Congressional Research Service report to Congress entitled *Preventing Federal Government Shutdowns: Proposals for an Automatic Continuing Resolution*, No. RL30339 (Washington, D.C.: May 19, 2000) (hereafter "CRS Report"). The first phase, covering fiscal years 1977 through 1980, was a period in which agencies reacted to funding gaps along the lines suggested in GAO's opinion in B-197841, Mar. 3, 1980, described previously, by curtailing operations but not shutting down. During this period, there were 6 funding gaps that lasted from 8 to 17 days. *See* the CRS Report at 4, Table 1. The second phase, covering fiscal years 1981 through 1995, occurred under the stricter approach to funding gaps reflected in the Attorney General opinions described above. As the CRS Report notes, funding gaps during this period were less frequent and shorter. There were 11 funding gaps in all over this period, many of which took place over weekends. None lasted more than 3 days. *Id.*

The string of shorter funding gaps came to an abrupt halt in fiscal year 1996. As CRS reported, the unusually difficult and acrimonious budget negotiations for that year led to two funding gaps: the first was 5 days and the second, the longest in history, lasted for 21 days. *Id.* at 3, 5. Both of these funding gaps resulted in widespread shutdowns of government

operations. During the first funding gap, an estimated 800,000 federal employees were furloughed. During the second, about 284,000 employees were furloughed and another 475,000 continued to work in a nonpay status under the emergency exception to the Antideficiency Act.[146]

Not surprisingly, the events of 1995–1996 spawned additional legal opinions from the Office of Legal Counsel. These opinions essentially followed the legal framework described previously and did not break much new ground. However, they do illustrate the scope and application of the Antideficiency Act in different funding gap contexts. *See*, *e.g.*, Memorandum for the Attorney General, *Effect of Appropriations for Other Agencies and Branches on the Authority To Continue Department of Justice Functions During the Lapse in the Department's Appropriations*, OLC Opinion, Dec. 13, 1995 (if a suspension of the Justice Department's functions during the period of anticipated funding lapse would prevent or significantly damage the execution of those functions, the Department's functions and activities may continue); Memorandum for the Attorney General, *Participation in Congressional Hearings During An Appropriations Lapse*, OLC Opinion, Nov. 16, 1995 (Justice Department officials may testify at congressional hearings during a lapse in funding for the Department); Memorandum for the Counsel to the President, *Authority To Employ the Services of White House Office Employees During An Appropriations Lapse*, OLC Opinion, Sept. 13, 1995 (outlined the authorities that permitted White House employees to continue to work, but not actually be paid, during a funding gap); Memorandum for the Director of the Office of Management and Budget, *Government Operations in the Event of a Lapse in Appropriations*, OLC Opinion, Aug. 16, 1995 (reinforced the Justice Department's existing narrow interpretation that the emergency exception

[146] These figures are based on another CRS report, *Shutdown of the Federal Government: Causes, Effects, and Process*, No. 98-844 (Washington, D.C.: Nov. 1, 2003), at 2–3. For a discussion of the nature, background, and dynamics of the fiscal year 1996 funding gaps and shutdowns, see Anita S. Krishnakumar, *Reconciliation and the Fiscal Constitution: The Anatomy of the 1995–1996 Budget "Train Wreck,"* 35 Harv. J. On Legis. 589 (1998).

applied only in the case of an imminent threat or set of circumstances requiring immediate action).[147]

The 1995–1996 funding gaps also produced at least one lawsuit, although it did not reach a final decision on the merits. In *American Federation of Government Employees v. Rivlin*, Civ. A. No. 95-2115 (EGS) (D.D.C. Nov. 17, 1995), the plaintiffs sought a temporary restraining order to prevent the executive branch from requiring federal employees who had been designated "emergency" personnel to work during the funding gap. They contended that forcing employees to work without pay violated several personnel statutes and also constituted a misapplication of 31 U.S.C. § 1342 since many of the employees did not meet the emergency criteria under section 1342. The court denied the requested relief, observing:

> "[T]he court is not convinced at this juncture that plaintiffs will either suffer irreparable harm in the event a temporary restraining order is not issued or that the interests of the public will be best served by the issuance of a temporary restraining order. Plaintiffs essentially concede that if the court were to issue a TRO, the government would indeed be shut down, because the Executive Branch could not require its employees to work without compensation. Although undoubtedly the public has an interest in having the budget impasse resolved and indeed has an interest in the outcome of this judicial proceeding, one could easily imagine the chaos that would be attendant to a complete governmental shutdown. It is inconceivable, by any stretch of the imagination, that the best interests of the public at large would somehow be served by the creation of that chaos."

*American Federation of Government Employees*, slip. op. at 4.

[147] The August 1995 opinion was discussed at length and reaffirmed in a Memorandum for the General Counsel, United States Marshals Service, *Continuation of Federal Prisoner Detention Efforts in the Face of a USMS Appropriation Deficiency*, OLC Opinion, Apr. 5, 2000. Current Office of Management and Budget guidance still references the August 1995 opinion as well as the earlier opinions in 43 Op. Att'y Gen. 224 (1980) and 43 Op. Att'y Gen. 293 (1981) as the principal legal authorities governing what agencies can do during a funding gap. *See* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 124.1 (a) (June 21, 2005).

The court further observed that it was "purely speculative" whether any employees would actually go without pay since Congress had always appropriated funds to compensate employees for services rendered during a government shutdown. *Id.* The lawsuit was eventually dismissed as moot following resolution of the budget impasse. *American Federation of Government Employees v. Rivlin*, 995 F. Supp. 165 (D.D.C. 1998).

The current phase in the history of funding gaps commenced on the heels of the 1995–1996 government shutdowns and has featured, thus far, the total absence of funding gaps. While there have been delays in the enactment of regular appropriations, there has been no funding gap since 1996.

Of course, the potential for future funding gaps still exists and proposals for legislation to cushion their impact have been raised again in recent years. However, such proposals have met with little enthusiasm. GAO was more cautionary in its most recent comments on this subject. *See* GAO, *Budget Process: Considerations for Updating the Budget Enforcement Act*, GAO-01-991T (Washington, D.C.: July 19, 2001), at 12:

> "The periodic experience of government 'shutdowns'—or partial shutdowns when appropriations bills have not been enacted—has led to proposals for an automatic continuing resolution. The automatic continuing resolution, however, is an idea for which the details are critically important. Depending on the detailed structure of such a continuing resolution, the incentive for policymakers—some in the Congress and the President—to negotiate seriously and reach agreement may be lessened."

For example, GAO pointed out that some negotiators might find the "default position" specified in an automatic continuing resolution to be preferable to proposals on the table.

Likewise, several efforts to enact an automatic continuing resolution in recent years have been unsuccessful. In 1997, President Clinton vetoed a

supplemental appropriations bill that contained such a provision. In 2000, the House of Representatives rejected such a proposal in a floor vote.[148]

## D. Supplemental and Deficiency Appropriations

A supplemental appropriation may be defined as "[a]n act appropriating funds in addition to those already enacted in an annual appropriation act." GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005) (*Glossary*), at 93. The *Glossary* adds that:

> "Supplemental appropriations provide additional budget authority usually in cases where the need for funds is too urgent to be postponed until enactment of the regular appropriation bill. Supplementals may sometimes include items not appropriated in the regular bills for lack of timely authorizations."

*Id.*

The *Glossary,* at 43, defines a deficiency appropriation as "[a]n appropriation made to pay obligations for which sufficient funds are not available."

There is an important distinction between supplemental appropriations and deficiency appropriations. A supplemental appropriation "supplements the original appropriation," 4 Comp. Dec. 61 (1897); that is, it provides additional appropriations to cover additional obligations to meet needs identified by the executive branch and concurred in by Congress *in advance of* the obligational event. A deficiency appropriation is an appropriation made to pay obligations for which sufficient funds were not available *at the time* the obligations were incurred. 27 Comp. Gen. 96 (1947); 25 Comp. Gen. 601, 604 (1946); 4 Comp. Dec. 61, 62 (1897). The need for deficiency appropriations often results from violations of the Antideficiency Act, and they can be made in the same fiscal year as the overobligated appropriation or in a later year. Notwithstanding the

[148] These legislative actions are described in the Congressional Research Service report, *Preventing Federal Government Shutdowns: Proposals for an Automatic Continuing Resolution*, cited previously. Other automatic continuing resolution bills have been introduced but died in committee. *See* H.R. 29, 107th Cong. (2000); H.R. 3744, 107th Cong. (2001).

distinctions between supplemental and deficiency appropriations, Congress often will use supplemental appropriations bills as the legislative vehicle for enacting deficiency appropriations, just as Congress may use a supplemental appropriations bill as the legislative vehicle to enact new appropriations in addition to those supplementing appropriations already enacted.

Because a supplemental appropriation "supplements the original appropriation," it "partakes of its nature, and is subject to the same limitations as to the expenses for which it can be used as attach by law to the original appropriation" unless otherwise provided. 4 Comp. Dec. 61. *See also* 27 Comp. Gen. 96 (1947); 25 Comp. Gen. 601 (1946); 20 Comp. Gen. 769 (1941). This means that a supplemental appropriation is subject to the purpose and time limitations, plus any other applicable restrictions, of the appropriation being supplemented.

Thus, an appropriation made to supplement the regular annual appropriation of a given fiscal year is available beyond the expiration of that fiscal year only to liquidate obligations incurred within the fiscal year. The unobligated balance of a supplemental appropriation will expire at the end of the fiscal year in the same manner as the regular annual appropriation. *See* 27 Comp. Gen. 96; 4 Comp. Dec. 61; 3 Comp. Dec. 72 (1896). Of course, Congress can enact a supplemental appropriation, just like any other appropriation, to be available until expended (no-year). *E.g.*, 36 Comp. Gen. 526 (1957); B-72020, Jan. 9, 1948.

Unless otherwise provided, a restriction contained in an annual appropriation act will apply to funds provided in a supplemental appropriation act even though the restriction is not repeated in the supplemental. For example, a restriction in a foreign assistance appropriation act prohibiting the use of funds for assistance to certain countries would apply equally to funds provided in a supplemental appropriation for foreign assistance for the same fiscal year. B-158575, Feb. 24, 1966. Similarly, a provision in an annual appropriation act that "no part of any appropriation for the Bureau of Reclamation contained in *this* Act shall be used for the salaries and expenses" (emphasis added) of certain officials who were not qualified engineers would apply as well to Bureau funds appropriated in supplemental appropriation acts for the same fiscal year, so long as the supplemental appropriation adds funds to amounts already enacted in the regular appropriation, but not to any new appropriations enacted in the supplemental appropriation act. B-86056, May 11, 1949. The rule applies to supplemental authorizations as well as

supplemental appropriations. B-106323, Nov. 27, 1951. If a supplemental appropriation act includes a new appropriation which is separate and distinct from the appropriations being supplemented, restrictions contained in the original appropriation act will not apply to the new appropriation unless specifically provided. *Id.* The fiscal year limitations of the original appropriation, however, would still apply.

The rule that supplemental appropriations are subject to restrictions contained in the regular appropriation act being supplemented applies equally to specific dollar limitations. Thus, if a regular annual appropriation act specifies a maximum limitation for a particular object, either by using the words "not to exceed" or otherwise, a more general supplemental appropriation for the same fiscal year does not authorize an increase in that limitation. 19 Comp. Gen. 324 (1939); 4 Comp. Gen. 642 (1925); B-71583, Feb. 20, 1948; B-66030, May 9, 1947. Naturally, this principle will not apply if the supplemental appropriation specifically provides for the object in question. 19 Comp. Gen. 832 (1940).

New restrictions appearing in a supplemental appropriation act may or may not reach back and apply to balances remaining in the original annual appropriation, depending on the precise statutory language used. Thus, without more, a restriction in a supplemental applicable by its terms to "this appropriation" would apply only to the supplemental funds. B-31546, Jan. 12, 1943. *See also* 31 Comp. Gen. 543 (1952).

At one time, supplemental appropriation acts specified that the funds were for the same objects and subject to the same limitations as the appropriations being supplemented. The then Bureau of the Budget wanted to delete this language pursuant to its mandate to eliminate unnecessary words in appropriations.[149] The Comptroller General agreed that the language was unnecessary, pointing out that these conditions would apply even without being explicitly stated in the supplemental appropriation acts themselves. B-13900, Dec. 17, 1940.

In addition to supplementing prior appropriations, a supplemental appropriation act may make entirely new appropriations and enact new

[149] Prior to the 1982 recodification of title 31, the mandate was found in 31 U.S.C. § 623. The recodifiers thought those words themselves were unnecessary, and the concept is now included in the general mandate in 31 U.S.C. § 1104(a) to "use uniform terms" in requesting appropriations.

legislative provisions which are separate and distinct from those made by an earlier appropriation act. Where a supplemental appropriation act contains new legislation, whether permanent or temporary, the new legislation will take effect on the date the supplemental is enacted absent a clear intent to make it retroactive. 20 Comp. Gen. 769 (1941). In the cited decision, a supplemental appropriation enacted late in fiscal year 1941 for the first time permitted payment of transportation expenses of certain military dependents. The provision was held effective on the date of enactment of the supplemental act and not on the first day of fiscal year 1941.

A supplemental appropriation also may add funds to a lump-sum appropriation for a new object. If the original appropriation was not available for that object, then the supplemental amounts to a new appropriation that is, in effect, distinct from the lump-sum appropriation. For example, a fiscal year 1957 supplemental appropriation for the Maritime Administration provided $18 million for a nuclear-powered merchant ship under the heading "ship construction." Funds for the nuclear-powered ship had been sought under the regular "ship construction" lump-sum appropriation for fiscal year 1957, but had been denied. Under the circumstances, the Comptroller General found that the supplemental appropriation amounted to a specifically earmarked maximum for the vessel, and that the agency could not exceed the $18 million by using funds from the regular appropriation. 36 Comp. Gen. 526 (1957).

## E. Augmentation of Appropriations

### 1. The Augmentation Concept

As a general proposition, an agency may not augment its appropriations from outside sources without specific statutory authority. When Congress makes an appropriation, it also is establishing an authorized program level. In other words, it is telling the agency that it cannot operate beyond the level that it can finance under its appropriation. To permit an agency to operate beyond this level with funds derived from some other source without specific congressional sanction would amount to a usurpation of the congressional prerogative. Restated, the objective of the rule against augmentation of appropriations is to prevent a government agency from

undercutting the congressional power of the purse by circuitously exceeding the amount Congress has appropriated for that activity. As one recent decision put it:

> "When Congress establishes a new program or activity, it also must decide how to finance it. Typically it does this by appropriating funds from the U.S. Treasury. In addition to providing necessary funds, a congressional appropriation establishes a maximum authorized program level, meaning that an agency cannot, absent statutory authorization, operate beyond the level that can be paid for by its appropriations. An agency may not circumvent these limitations by augmenting its appropriations from sources outside the government. One of the objectives of these limitations is to prevent agencies from avoiding or usurping Congress' 'power of the purse."

B-300248, Jan. 15, 2004 (citations omitted).

There is no statute which, in those precise terms, prohibits the augmentation of appropriated funds. The concept does nevertheless have an adequate statutory basis, although it must be derived from several separate enactments. Specifically:

- 31 U.S.C. § 3302(b), the "miscellaneous receipts" statute.
- 31 U.S.C. § 1301(a), restricting the use of appropriated funds to their intended purposes. Early Comptroller of the Treasury decisions often based the augmentation prohibition on the combined effect of 31 U.S.C. §§ 3302(b) and 1301(a). *See*, *e.g.*, 17 Comp. Dec. 712 (1911); 9 Comp. Dec. 174 (1902).
- 18 U.S.C. § 209, which prohibits the payment of, contribution to, or supplementation of the salary of a government officer or employee as compensation for his or her official duties from any source other than the government of the United States.

The augmentation concept manifests itself in a wide variety of contexts. One application is the prohibition against transfers between appropriations without specific statutory authority. An unauthorized transfer is an improper augmentation of the receiving appropriation. *E.g.*, 23 Comp. Gen. 694 (1944); B-206668, Mar. 15, 1982. In B-206668, a department

received a General Administration appropriation plus separate appropriations for the administration of its component bureaus. The unauthorized transfer of funds from the bureau appropriations to the General Administration appropriation was held to be an improper augmentation of the latter appropriation. Likewise, the Department of Labor illegally augmented its departmental management account by "pooling" funds from component appropriations in order to purchase computer equipment where the costs borne by the components far exceeded the value of the equipment they received. 70 Comp. Gen. 592 (1991). The Comptroller General rejected the Department's characterization of this transaction as a "reprogramming," viewing it instead as an unauthorized transfer among appropriations.

As with the transfer prohibition itself, however, the augmentation rule has no application at the agency allotment level within the same appropriation account. 70 Comp. Gen. 601 (1991). It also should be apparent that the augmentation rule is related to the concept of purpose availability. A very early case pointed out that charging a general appropriation when a specific appropriation is exhausted not only violates 31 U.S.C. § 1301(a) by using the general appropriation for an unauthorized purpose, but also improperly augments the specific appropriation. [1] Bowler, First Comp. Dec. 257, 258 (1894). However, the augmentation rule is most closely related to the subject of this chapter—availability as to amount—because it has the effect of restricting executive spending to the amounts appropriated by Congress. In this respect, it is a logical, perhaps indispensable, complement to the Antideficiency Act.

For the most part, although the cases are not entirely consistent, GAO has distinguished between receipts of money and receipts of services, dealing with the former under the augmentation rule and the latter under the voluntary services prohibition (31 U.S.C. § 1342).[150] For example, in B-13378, Nov. 20, 1940, a private organization was willing to donate either funds or services. Since the agency lacked statutory authority to accept gifts, acceptance of a cash donation would improperly augment its appropriations. Acceptance of services was distinguished, however, and addressed in relation to the limits on acceptance of voluntary services set forth in 31 U.S.C. § 1342. GAO drew the same distinction in B-125406, Nov. 4, 1955. See also B-287738, May 16, 2002, distinguishing between

[150] For a further discussion of the voluntary services prohibition, see section C.3 of this chapter.

agency acceptance of money as compensation for damage to government property, which would constitute an augmentation if retained in agency appropriations, and acceptance of actual repairs to the property, which would be permissible.[151]

In apparent conflict with these cases, however, is B-211079.2, Jan. 2, 1987, which stated that, without statutory authority, an agency would improperly augment its appropriations by accepting the uncompensated services of "workfare" participants to do work which would normally be done by the agency with its own personnel and funds. Logic would seem to support the formulation in B-211079.2. Certainly, if I wash your car without charge or if I give you money to have it washed, the result is the same—the car gets washed and your own money is free to be used for something else. Be that as it may, the majority of the cases support limiting the augmentation rule to the receipt of money. In the final analysis, the distinction probably makes little practical difference. In view of 31 U.S.C. § 1342, limiting the augmentation rule to the receipt of funds does not mean that the rule can be negated by the unrestricted acceptance of services.[152]

In a 1991 case, 70 Comp. Gen. 597, GAO concluded that the then Interstate Commerce Commission (ICC) would not improperly augment its appropriations by permitting private carriers to install computer equipment at the ICC headquarters, to facilitate access to electronically filed rate tariffs. Installation was viewed as a reasonable exercise of the ICC's statutory authority to prescribe the form and manner of tariff filing by those over whom the agency has regulatory authority. Somewhat similar in

[151] In a 1984 decision, GAO found that acceptance by the Federal Communications Commission of booth space and utility services at industry trade shows did not augment the Commission's appropriation because "no money changed hands, nor was money paid on the Commission's behalf to anyone else." 63 Comp. Gen. 459, 461 (1984). GAO found that there was a "mutually beneficial arrangement" between the Commission and trade show promoters that was "neither an augmentation of appropriations nor an illegal retention of a gift." *Id.* For a discussion of "no-cost" contract, see section E.2.b of this chapter.

[152] Akin to B-211079.2, the decision in B-286182, Jan. 11, 2001, suggested that acceptance of services might be considered an improper augmentation in some circumstances. That decision concerned a settlement agreement in a rate case whereby a company agreed to provide telecommunications equipment and services valued at $1.53 million to the District of Columbia courts for the purpose of facilitating access to the legal system. The decision concluded, however, that there was no augmentation issue in this case because the courts had statutory gift-acceptance authority, which is discussed in section E.3 of this chapter.

concept to the workfare case, however, the decision suggests that use of the equipment for other purposes, such as word processing by ICC staff, would be an improper augmentation, and advised the ICC to establish controls to prevent this. *See also* B-277521, July 31, 1997 (granting the Radio and TV Correspondents Association a permit to locate equipment in the Capitol in order to broadcast events would not constitute an augmentation of congressional appropriations since the equipment is not for official business use of the government).

## 2. Disposition of Moneys Received: Repayments and Miscellaneous Receipts

### a. General Principles

(1) The "miscellaneous receipts" statute

A very important statute in the overall scheme of government fiscal operations is 31 U.S.C. § 3302(b), known as the "miscellaneous receipts" statute. Originally enacted on March 3, 1849 (ch. 110, 9 Stat. 398), 31 U.S.C. § 3302(b) states:

> "Except as provided in section 3718(b) of this title, an official or agent of the Government receiving money for the Government from any source shall deposit the money in the Treasury as soon as practicable without deduction for any charge or claim."[153]

Penalties for violating 31 U.S.C. § 3302(b) are found in 31 U.S.C. § 3302(d), and include the possibility of removal from office. In addition, if funds which should have been deposited in the Treasury (but were not) are lost or stolen, the official may be personally liable. *E.g.*, 20 Op. Att'y Gen. 24 (1891) (liability would attach where funds, which disbursing agent had placed in bank which was not an authorized depositary, were lost due to bank failure).

[153] The exception referenced as section 3718(b) now appears in section 3718(d). It permits agencies to contract for assistance in the collection of debts due the United States, and to pay the contractor from the amounts recovered. For a decision addressing the scope and application of this exception, see 72 Comp. Gen. 85 (1993).

"It is difficult to see," said an early decision, "how a legislative prohibition could be more clearly expressed." 10 Comp. Gen. 382, 384 (1931). Simply stated, any money an agency receives for the government from a source outside of the agency must be deposited into the Treasury. This means deposited into the general fund ("miscellaneous receipts") of the Treasury,not into the agency's own appropriations, even though the agency's appropriations may be technically still "in the Treasury" until the agency actually spends them.[154] The Comptroller of the Treasury explained the distinction in the following terms:

> "It [31 U.S.C. § 3302(b)] could hardly be made more comprehensive as to the moneys that are meant and these moneys are required to be paid 'into the Treasury.' This does not mean that the moneys are to be added to a fund that has been appropriated *from* the Treasury and may be in the Treasury or outside. [Emphasis in original.] It seems to me that it can only mean that they shall go into the general fund of the Treasury which is subject to any disposition which Congress might choose to make of it. This has been the holding of the accounting officers for many years . . . [citations omitted]. If Congress intended that these moneys should be returned to the appropriation from which a similar amount had once been expended it could have been readily so stated, and it was not."

22 Comp. Dec. 379, 381 (1916). *See also* 5 Comp. Gen. 289 (1925).

The term "miscellaneous receipts" does not refer to any single account in the Treasury. Rather, it refers to a number of receipt accounts under the heading "General Fund." These are all listed in the Treasury Department's *Federal Account Symbols and Titles Book*, recently revised according to the *Treasury Financial Manual Announcement No. A-2005-04*, May 2005. The revised version can be accessed at www.fms.treas.gov/fastbook (last visited September 15, 2005).

[154] As a general proposition, an agency's appropriations do remain "in the Treasury" until needed for a valid purpose. Unless Congress expressly so provides, an agency may not have its appropriations paid over directly to it to be held pending disbursement. 21 Comp. Gen. 489 (1941).

In addition to 31 U.S.C. § 3302(b), several other statutes require that moneys received in various specific contexts be deposited as miscellaneous receipts.[155] Examples are:

- 7 U.S.C. §§ 384, 2241, 2246, 2247 (proceeds from sale of various products by Secretary of Agriculture);

- 16 U.S.C. § 499 (revenue from the national forests, such as timber sales and proceeds from hunting, fishing, and camping permits, subject to the deductions specified in 16 U.S.C. §§ 500 and 501);

- 19 U.S.C. § 527 (customs fines, penalties, and forfeitures);

- 40 U.S.C. § 571 (proceeds from the transfer of excess property or the sale of surplus public property, except as otherwise provided in subchapter IV of chapter 5 of title 40).[156]

Although it is preferable, it is not necessary that the statute use the words "miscellaneous receipts." A statute requiring the deposit of funds "into the Treasury of the United States" will be construed as meaning the general fund of the Treasury. 27 Comp. Dec. 1003 (1921).

To understand the significance of 31 U.S.C. § 3302(b) and related statutes, it is necessary to recall the provision in article I, section 9, clause 7 of the U.S. Constitution, the so-called "Appropriations Clause," directing that "No Money shall be drawn from the Treasury but in Consequence of Appropriations made by Law." Once money is deposited into a "miscellaneous receipts" account, it takes an appropriation to get it out. *E.g.*, 3 Comp. Gen. 296 (1923); 2 Comp. Gen. 599, 600 (1923); 13 Comp. Dec. 700, 703 (1907). Thus, the effect of 31 U.S.C. § 3302(b) is to ensure

[155] Several specific references to miscellaneous receipts in the pre-1982 version of title 31 were deleted in the recodification because they were regarded as covered by the general prescription of the new section 3302. An example is the so-called User Charge Statute. The pre-recodification version, 31 U.S.C. § 483a, required fees to be deposited as miscellaneous receipts. The current version, 31 U.S.C. § 9701, omits the requirement because, as the Revision Note points out, it is covered by § 3302.

[156] Section 571 stems from the Federal Property and Administrative Services Act of 1949, ch. 288, 63 Stat. 377 (June 30, 1949). Prior to this law, proceeds from the sale of public property were required to be deposited as miscellaneous receipts under the more general authority of what is now 31 U.S.C. § 3302(b). *See Mammoth Oil Co. v. United States*, 275 U.S. 13, 34 (1927); *Pan-American Petroleum & Transport Co. v. United States*, 273 U.S. 456, 502 (1927). (These are the notorious "Teapot Dome" cases.)

that the executive branch remains dependent upon the congressional appropriation process. Viewed from this perspective, 31 U.S.C. § 3302(b) emerges as another element in the statutory pattern by which Congress retains control of the public purse under the separation of powers doctrine. *See* B-302825, Dec. 22, 2004; B-303413, Nov. 8, 2004, at 9; B-287738, May 16, 2002; 51 Comp. Gen. 506, 507 (1972); 11 Comp. Gen. 281, 283 (1932). *See also* 10 Comp. Gen. 382, 383 (1931) (the intent is that "all the public moneys shall go into the Treasury; appropriations then follow").

As the court observed in *Scheduled Airlines Traffic Offices v. Department of Defense*, 87 F.3d 1356, 1361 (D.C. Cir. 1996), the miscellaneous receipts statute "derives from and safeguards a principle fundamental to our constitutional structure, the separation-of-powers precept embedded in the Appropriations Clause" (U.S. Const. art I, § 9, cl. 7). *See also* Kate Stith, *Congress' Power of the Purse*, 97 Yale L. J. 1343 (1988). Professor Stith notes that the miscellaneous receipts statute "articulates the Principle of the Public Fisc: All monies of the federal government must be claimed as public revenues, subject to public control through constitutional processes." *Id.* at 1364. This is indeed an important role for a statute that she describes as having such an "unfortunately bland and unrevealing name." *Id.* at 1365.

Accordingly, for an agency to retain and credit to its own appropriation moneys which it should have deposited into the general fund of the Treasury is an improper augmentation of the agency's appropriation. This applies even though the appropriation is a no-year appropriation. 46 Comp. Gen. 31 (1966). (No-year status relates to duration, not amount.)

Receipts in the form of "monetary credits" are treated for deposit and augmentation purposes the same as cash. 28 Comp. Gen. 38 (1948) (use by government of monetary credits received as payment for sale of excess electric power held unauthorized unless agency transfers corresponding amount from its appropriated funds to miscellaneous receipts). This will not apply, however, where it is clear that the appropriation or other legislation involved contemplates a different treatment. B-125127, Feb. 14, 1956 (transfer to miscellaneous receipts not required where settlement of accounts was to be made on "net balance" basis). *See also* B-283731, Dec. 21, 1999 (Defense Department has specific statutory authority to accept credits under contracts for travel-related services); 62 Comp. Gen. 70, 74–75 (1982) (credit procedure which would differ from treatment of cash receipts recognized in legislative history). When an agency is entitled to retain a fund in its appropriations (see section E.2.a, below), it

may accept the refund in the form of a credit against future payments due to the party owing the refund instead of requiring the party to issue a separate refund check. 72 Comp. Gen. 63, 64 (1992).

(2) Exceptions

Exceptions to the miscellaneous receipts requirement fall into two broad categories, statutory and nonstatutory:

- An agency may retain moneys it receives if it has statutory authority to do so. In other words, 31 U.S.C. § 3302(b) will not apply if there is specific statutory authority for the agency to retain the funds. *E.g.*, 72 Comp. Gen. 164, 165–66 (1993) and cases cited.[157]

- Receipts that qualify as "repayments" to an appropriation may be retained to the credit of that appropriation and are not required to be deposited into the General Fund. B-302366, July 12, 2004; 6 Comp. Gen. 337 (1926); 5 Comp. Gen. 734, 736 (1926); B-138942-O.M., Aug. 26, 1976.

Repayments falling within the above nonstatutory exception may be further defined in terms of two general classes, reimbursements and refunds, as follows:

- Reimbursements are sums received as a result of commodities sold or services furnished either to the public or to another government account, which are authorized by law to be credited directly to a specific appropriation.

- Refunds are repayments for excess payments and are to be credited to the appropriation or fund accounts from which the excess payments were made. They must be directly related to previously recorded expenditures and are reductions of those expenditures. Refunds to

[157] In addition to instances described elsewhere in the text, the following are examples of statutory exceptions to section 3302(b): 42 U.S.C. § 8287 (measured savings from energy savings performance contracts), discussed in B-287488, June 19, 2001; 42 U.S.C. § 8256 and note (rebates received by federal agencies from utility companies on account of energy-saving measures), discussed in B-265734, Feb. 13, 1996; and 38 U.S.C. § 1729A (compensatory settlement amounts under the Federal Medical Care Recovery Act stemming from care provided at Department of Veterans Affairs facilities), discussed in Memorandum Opinion for the Assistant Attorney General, Civil Division, *Miscellaneous Receipts Act Exception for Veterans' Health Care Recoveries*, OLC Opinion, Dec. 3, 1998.

appropriations represent amounts collected from outside sources for payments made in error, overpayments, or adjustments for previous amounts disbursed.

*See*, *e.g.*, 62 Comp. Gen. 70, 73 (1982); *see also*, GAO, *Policy and Procedures Manual for the Guidance of Federal Agencies*, title 7, § 5.4 (Washington, D.C.: May 18, 1993).

As used in the above definitions, the term "reimbursement" generally refers to situations in which retention by the agency is authorized by statute. The term "refund" embraces a category of mostly nonstatutory exceptions in which the receipt is directly related to, and is a direct reduction of, a previously recorded expenditure. Thus, the recovery of an erroneous payment or overpayment which was erroneous at the time it was made qualifies as a refund to the appropriation originally charged. *E.g.*, B-139348, May 12, 1959 (utility overcharge refund); B-138942-O.M., Aug. 26, 1976 (collections resulting from disallowances by GAO under the "Fly America Act"). Also, the return of an authorized advance, such as a travel advance, is a refund.

At this point, an important distinction must be made. Moneys collected to reimburse the government for expenditures previously made are not automatically the same as "adjustments for previous amounts disbursed." Reimbursements must generally, absent statutory authority to the contrary, be deposited as miscellaneous receipts. The mere fact that the reimbursement is related to the prior expenditure—although this is an indispensable element of an authorized refund—is not in itself sufficient to remove the transaction from the scope of 31 U.S.C. § 3302(b). *See*, *e.g.*, 16 Comp. Gen. 195 (1936); 24 Comp. Dec. 694 (1918); 22 Comp. Dec. 253 (1915); B-45198, Oct. 27, 1944. The controlling principles were stated as follows in two early decisions:

> "The question as to whether moneys collected to reimburse the Government for expenditures previously made should be used to reimburse the appropriations from which the expenditures were made or should be covered into the general fund of the Treasury has often been before the accounting officers of the Treasury and this office, and it has been uniformly held that in the absence of an express provision in the statute to the contrary, such funds should be covered in as miscellaneous receipts."

5 Comp. Gen. 289, 290 (1925).

> "On the other hand, if the collection involves a refund or repayment of moneys paid from an appropriation in excess of what was actually due such refund has been held to be properly for credit to the appropriation originally charged . . . ."

5 Comp. Gen. 734, 736 (1926).

The key language in the above passage is "in excess of what was actually due." Apart from the more obvious situations—refunds of overpayments, erroneous payments, unused portions of authorized advances—the type of situation contemplated by the "adjustments for previous amounts disbursed" portion of the definition is illustrated by 23 Comp. Gen. 652 (1944). The Agriculture Department was authorized to enter into cooperative agreements with states for soil conservation projects. Some states were prohibited by state law from making advances and were limited to making reimbursements after the work was performed. In these cases, Agriculture initially put up the state's share and was later reimbursed. The Comptroller General held that Agriculture could credit the reimbursements to the appropriation charged for the project. The distinction between this type of situation and the simpler "related to a previous expenditure" situation in which the money must go to miscellaneous receipts lies in the nature of the agency's obligation. Here, Agriculture was not required to contribute the state's share; it could simply have foregone the projects in those states which could not advance the funds. This is different from a situation in which the agency is required to make a given expenditure in any event, subject to later reimbursement. In 23 Comp. Gen. 652, the agency made payments larger than it was required to make, knowing that the "excess" of what it paid over what it had to pay would (or at least was required to) be returned. *See also* 64 Comp. Gen. 431 (1985); 61 Comp. Gen. 537 (1982); B-69813, Dec. 8, 1947; B-220911.2-O.M., Apr. 13, 1988. For more recent decisions dealing with an agency's authority to retain "excess" payments, see B-271127.2, Jan. 30, 1997; 73 Comp. Gen. 321 (1994).

The rationale for crediting refunds to an appropriation account is to enable the account to be made whole for the overpayment that gave rise to the refund. As a recent decision pointed out, the refund exception to the general requirement of section 3302(b) "simply restores to the appropriation amounts that should not have been paid from the appropriation." B-302366, July 12, 2004. It follows that the exception does

not permit crediting refunds to appropriations in amounts *greater* than the overpayment. The decision in B-302366 illustrates this point. In that case, a Department of Energy contractor turned over to the department a refund it had received from the State of Washington for taxes which the contractor had previously paid and for which it had been reimbursed by the department. Along with the tax refund, the contractor also turned over to the department an additional amount it had received from the state as interest on the refunded taxes. GAO agreed with the department that the tax refund itself could be credited to the appropriation originally used to reimburse the contractor for the tax payment. However, the decision held that the additional amount representing interest could not be credited to the appropriation but must be returned to the Treasury as miscellaneous receipts pursuant to 31 U.S.C. § 3302(b):

> "The nonstatutory refund exception . . . does not allow the department to retain the interest paid by the state. Because the nonstatutory exception operates simply and solely to restore to an appropriation amounts that should not have been paid from the appropriation, crediting an amount in excess of that paid from the appropriation would improperly augment the appropriation."

In this regard, the decision rejected the department's suggestion that the interest payment could be regarded as merely restoring the appropriation to an amount adjusted for inflation. The decision noted that Congress does not appropriate on a net present value basis. Likewise, GAO has held that agencies may retain and credit to their appropriations refunds in the form of recoveries under the False Claims Act (31 U.S.C. § 3729) to the extent that they represent compensatory damages to reimburse erroneous payments, but not "exemplary" damages in the nature of penalties. B-281064, Feb. 14, 2000; 69 Comp. Gen. 260 (1990).

For other examples of refunds that may be retained to the credit of an appropriation, see 65 Comp. Gen. 600 (1986) (rebates from Travel Management Center contractors); 62 Comp. Gen. 70 (1982) (partial repayment of contribution to International Natural Rubber Organization occasioned by addition of new members); B-139348, May 12, 1959 (refund of overcharge by public utility); and B-209650-O.M., July 20, 1983 (same).

It should be noted that crediting refunds to agency appropriations is permissive, not mandatory. Thus, the Comptroller General advised the General Services Administration that rebates received from travel

management contractors could be deposited to the general fund of the Treasury if the small amounts involved did not justify the cost of processing these payments to the credit of the agency appropriation accounts that "earned" them. 73 Comp. Gen. 210 (1994). The Comptroller General also approved crediting *de minimis* ($100 or less) rebates to currently available accounts rather than the prior year accounts that earned them. 72 Comp. Gen. 63 (1992). However, the Comptroller General refused to extend this *de minimis* exception to rebates that could aggregate $1,000 or more. 72 Comp. Gen. 109 (1993).

A repayment is credited to the appropriation initially charged with the related expenditure, whether current or expired. If the appropriation is still current, then the funds remain available for further obligation within the time and purpose limits of the appropriation. However, if the appropriation has expired for obligational purposes (but has not yet been closed), the repayment must be credited to the expired account, not to current funds. *See* 23 Comp. Gen. 648 (1944); 6 Comp. Gen. 337 (1926); B-138942-O.M., Aug. 26, 1976. If the repayment relates to an expired appropriation, crediting the repayment to current funds is an improper augmentation of the current appropriation unless authorized by statute. B-114088, Apr. 29, 1953. These same principles apply to a refund in the form of a credit, such as a credit for utility overcharges. B-139348, May 12, 1959; B-209650-O.M., July 20, 1983.[158] *Cf.* B-260063, June 30, 1995, fn. 3 (there is no authority for an agency to hold refunds of erroneous payments in an interest bearing account pending final payment to a contractor since such refunds should be credited to the appropriation account initially charged with the erroneous payment). Once an appropriation account has been closed in accordance with 31 U.S.C. §§ 1552(a) or 1555, repayments must be deposited as miscellaneous receipts regardless of how they would have been treated prior to closing. 31 U.S.C. § 1552(b). *See also* B-260993, June 26, 1996; B-257905, Dec. 26, 1995; 73 Comp. Gen. 210, 211 (1994).

Where funds are authorized to be credited to an appropriation, restrictions on the basic appropriation apply to the credits as well as to the amount originally appropriated. A-95083, June 18, 1938.

[158] It should not be automatically assumed that every form of credit accruing to the government under a contract will qualify as a refund to the appropriation. *See*, *e.g.*, B-302366, July 12, 2004; A-51604, May 31, 1977.

The fact that some particular reimbursement is authorized or even required by law is not, standing alone, sufficient to overcome 31 U.S.C. § 3302(b). *E.g.*, 67 Comp. Gen. 443 (1988); 22 Comp. Dec. 60 (1915); 1 Comp. Dec. 568 (1895). The accounting for that reimbursement—whether it may be retained by the agency and, if so, how it is to be credited—will depend on the terms of the statute. Some statutes, for example, permit reimbursements to be credited to current appropriations regardless of which appropriation "earned" the reimbursement. *See*, *e.g.*, 10 U.S.C. § 2208(g); 10 U.S.C. § 2210(a)(1); 22 U.S.C. § 2392(c); 22 U.S.C. § 2509(g). As a general proposition, however, this practice, GAO has pointed out, diminishes congressional control.[159]

As might be expected, there have been a great many decisions involving the miscellaneous receipts requirement. It is virtually impossible to draw further generalizations from the decisions other than to restate the basic rule: An agency must deposit into the General Fund of the Treasury any funds it receives from sources outside of the agency unless the receipt constitutes an authorized repayment or unless the agency has statutory authority to retain the funds for credit to its own appropriations.

(3) Timing of deposits

As to the timing of the deposit in the Treasury, 31 U.S.C. § 3302(b) says merely "as soon as practicable." There is another statute, however, now found at 31 U.S.C. § 3302(c), which provides in relevant part:

> "(1) A person having custody or possession of public money, including a disbursing official having public money not for current expenditure, shall deposit the money without delay in the Treasury or with a depositary designated by the Secretary of the Treasury under law. Except as provided in paragraph (2), money required to be deposited pursuant to this subsection shall be deposited not later than the third day after the custodian receives the money. . . .

[159] For further discussion of these concepts in the context of statutes applicable to the Defense Department, see GAO, *Reimbursements to Appropriations: Legislative Suggestions for Improved Congressional Control*, FGMSD-75-52 (Washington, D.C.: Nov. 1, 1976). A more recent report made a similar point in relation to agencies crediting user fee proceeds to their appropriations. GAO, *Federal User Fees: Budgetary Treatment, Status, and Emerging Management Issues*, GAO/AIMD-98-11 (Washington, D.C.: Dec. 19, 1997).

> "(2) The Secretary of the Treasury may by regulation prescribe that a person having custody or possession of money required by this subsection to be deposited shall deposit such money during a period of time that is greater or lesser than the period of time specified by the second sentence of paragraph (1)."

This statute, formerly designated as Revised Statutes § 3621, originated on March 3, 1857 (ch. 114, 11 Stat. 249). It was amended on May 28, 1896 (ch. 252, § 5, 29 Stat. 179), to specify a deadline of 30 days. The time limit was reduced to 3 days by section 2652(b)(1) of the Deficit Reduction Act of 1984, Pub. L. No. 98-369, div. B. title VI, 98 Stat. 494, 1152 (July 18, 1984).

A Treasury Department regulation urges agencies to "achieve same day deposit of money." When same day deposit is not cost-effective or is impracticable, the regulation generally requires next-day deposit. 31 C.F.R. § 206.5 (2005).[160]

As a general proposition, section 3302(c) and the Treasury regulations place an outer limit on what is practicable under section 3302(b). 11 Comp. Gen. 281, 283–84 (1932); 10 Comp. Gen. 382, 385 (1931). The deadline applies to all receipts, including those to be credited to an appropriation account (which, of course, is "in the Treasury"), not just those for deposit as miscellaneous receipts. *E.g.*, 10 Comp. Gen. 382.

The deposit timing requirements of 31 U.S.C. § 3302(c) and the implementing Treasury regulations apply as well when public moneys are held by nonfederal custodians. Thus, GAO found that these requirements were violated where the Department of Veterans Affairs (VA) allowed contractors to hold payments it collected on VA loans in an interest-bearing account for 30 days or more before transferring the payments to the Treasury. *See* GAO, *Internal Controls: VA Lacked Accountability Over Its Direct Loan and Loan Sale Activities*, GAO/AIMD-99-24 (Washington, D.C.: Mar. 24, 1999), at 16–18.

[160] Further guidance is contained in I *Treasury Financial Manual* chapter 6-8000. For example, the *Manual* provides at section 6-8030.20 that collections totaling less than $5,000 may be accumulated and deposited when the total reaches $5,000. However, deposits must be made at least weekly regardless of amount.

(4) Money received (or not received) "for the Government"

As originally enacted, 31 U.S.C. § 3302(b) required deposit into the Treasury of moneys received "for the use of the United States."[161] The 1982 codification of title 31 changed this language to moneys received "for the Government."[162] The meaning, of course, is the same. There is no distinction between money received for the use of the United States and money received for the use of a particular agency; such a distinction would largely nullify the statute.

Although the concept of money received "for the use of the United States" or "for the Government" does not lend itself to precise definition, both the Comptroller General and the courts have applied this concept broadly, consistent with the key role and purpose of section 3302(b), in preserving Congress's constitutional power of the purse. For example, as one recent decision observed:

> "[T]he miscellaneous receipts statute . . . requires that money received for the use of the United States be deposited in the Treasury unless otherwise authorized by law. Court cases and decisions of this Office make clear that an agency cannot avoid the miscellaneous receipts statute simply by changing the form of its transactions to avoid the receipt of money otherwise owed to it."

B-303413, Nov. 8, 2004. See also B-300826, Mar. 3, 2005, at 6, noting that an agency cannot avoid section 3302(b) by authorizing a contractor to charge fees to outside parties and keep the payments in order to offset costs that would otherwise be borne by agency appropriations.

Neither of the above-cited decisions actually involved transactions that violated section 3302(b). However, another recent Comptroller General opinion held that a fee arrangement between the Small Business Administration (SBA) and a contractor did violate 31 U.S.C. § 3302(b) and constituted an improper augmentation of SBA's appropriations. B-300248,

[161] Act of March 3, 1849, ch. 110, 9 Stat. 398.

[162] Pub. L. No. 97-258, § 1, 96 Stat. 877, 948 (Sept. 13, 1982).

Jan. 15, 2004.[163] This case concerned SBA's "Preferred Lender Program" (PLP). Lenders in this program, so-called "PLP lenders," had authority to make loans without prior SBA approval; however, the law specifically required SBA to conduct assessments of these lenders at least annually. SBA contracted with a firm to assist in conducting the required assessments. Under the contract, assessments were conducted by a review team consisting of an SBA employee and one or more employees of the contractor. The SBA employees, of course, were paid from agency appropriations. However, the contractor was compensated from fees that SBA imposed on the PLP lenders and that the lenders paid directly to the contractor.

SBA maintained that the fee proceeds did not constitute "money for the Government" within the application of 31 U.S.C. § 3302(b) since they were paid directly to the contractor as compensation for the contractor's work. The agency also argued that "no-cost" contracts such as this were largely beyond the reach of the augmentation rule or section 3302(b). The Comptroller General rejected these arguments, holding that SBA had "effectively retained and used the fees without specific authorization" and that the agency's "constructive disposition" of the fees violated section 3302(b). In essence, the opinion reasoned that the fee arrangement amounted to shifting to PFP lenders an expense imposed upon SBA incident to carrying out its statutory duties that should be borne by the agency's appropriations:

> "SBA's position . . . is in conflict with our prior decisions and not supported by the courts. A government official or agent is deemed to receive money for the government under the Miscellaneous Receipts Statute if the money is to be used to bear the expenses of the government or pay the government obligations. . . . SBA's functions clearly include conducting oversight of PLP lenders, whether the review is conducted by SBA's own employees or with the assistance of a contractor. These functions are among the purposes for which Congress appropriates funds to SBA . . . Thus the fees paid by PLP lenders represent expenses SBA would have to pay from its appropriations regardless of whether the expenses were for actions performed by SBA employees or

[163] The opinion also concluded that the fee arrangement was not authorized under the user charge statute, 31 U.S.C. § 9701, or under provisions of SBA's organic legislation.

> by a contractor's employees. SBA has devised an arrangement by which another party incurs these expenses, in effect using the PLP review fees to substitute for appropriated funds in paying the cost of the PLP reviews."

B-300248 at 7.

The courts also have given broad application to the section 3302(b) concept of money received "for the Government." In *Reeve Aleutian Airways*, *Inc. v. Rice*, 789 F. Supp. 417 (D.D.C. 1992), the Air Force had awarded a contract to a commercial air carrier (MarkAir) to provide passenger and cargo service to a remote base in the Aleutian Islands. The carrier's revenue would be derived almost entirely from fares either purchased directly or reimbursed by the United States (military personnel, their dependents, and government contractor employees). The contract granted the carrier landing rights and ground support at the base, and the contractor agreed to return a specified portion of its receipts as a "concession fee," to be deposited in the base morale, welfare, and recreation fund. In upholding a disappointed bidder's challenge to the award, the court stated:

> "[T]he so-called concession fees to be paid by MarkAir were 'public monies' both in the sense that they would be paid by MarkAir exclusively to purchase the use of property of the United States and in the sense that the funds were or were derived directly from public sources—United States taxpayers and the creditors of the United States who have lent it funds to cover expenses which exceed its revenue. Obviously, innovation consistent with the law should be encouraged but this transaction so plainly violates the express terms of 31 U.S.C. § 3302(b) . . . that it should be nipped in the bud."

*Reeve Aleutian Airways*, 789 F. Supp. at 421.

Since there was no authority to divert the funds from the Treasury to the welfare fund, and since the diversion would actually increase the cost to the government, the court found the contract award to be arbitrary and capricious and declared the contract "null, void and of no force and effect." *Id*. at 423.

In a case it regarded as "virtually identical" to *Reeve Aleutian Airways*, the United States Court of Appeals for the District of Columbia held that a Department of Defense contract solicitation requiring payment of the portion of concession fees derived from unofficial travel to a morale fund rather than to the Treasury violated 31 U.S.C. § 3302(b). *Scheduled Airlines Traffic Offices, Inc. v. Department of Defense*, 87 F.3d 1356, 1363 (D.C. Cir. 1996).[164] The court stated:

> "Mindful of both the plain language of the Miscellaneous Receipts statute and its underlying purpose to preserve congressional control of the appropriations power, we have no doubt that concession fees for unofficial travel constitute 'money for the Government' within the meaning of the statute. Travel agents pay the fees pursuant to contracts awarded by agencies of the United States, doing so in consideration for government resources—the right to occupy agency office space, to utilize government services associated with that space, and to serve as the exclusive on-site travel agent."

*Id.* at 1362. The court was not persuaded by the argument that the required payments to the morale fund did not violate 31 U.S.C. § 3302(b) since they were attributable entirely to commissions on unofficial travel purchased with private funds:

> "This argument is inconsistent with the statute's unequivocal language. Government officials must deposit in the Treasury 'money for the Government *from any source*.' 31 U.S.C. § 3302(b) (emphasis added). The original source of the money—whether from private parties or the government—is thus irrelevant."

*Id.*[165]

[164] The court's disposition in *Scheduled Airlines* differed from a Comptroller General decision that had denied a protest against this solicitation. 73 Comp. Gen. 310 (1994).

[165] Subsequently, Congress enacted legislation that specifically authorized Defense agencies to enter into contracts of the type invalidated in *Scheduled Airlines Traffic Offices* that permit a portion of commissions from unofficial travel to be deposited into nonappropriated morale funds. 10 U.S.C. § 2646. See, in this regard, B-283731, Dec. 21, 1999.

In two decisions, GAO found that the Environmental Protection Agency (EPA) and the Federal Election Commission did not violate the miscellaneous receipts statute when they engaged contractors to respond to public requests for information and to charge, and retain, fees for the service. In B-166506, Oct. 20, 1975, the Environmental Protection Agency (EPA) had a number of contracts with private firms for the processing, storage, and retrieval of various kinds of recorded environmental information. Much of this information was of value to private parties and available under the Freedom of Information Act (FOIA), 5 U.S.C. § 552. Fees collected by an agency under FOIA must be deposited as miscellaneous receipts. Here, however, EPA proposed advising requesting parties to deal directly with the contractors, who would charge and retain fees for providing the data, although the requestors would retain the right to deal with EPA. GAO approved the proposal, concluding that fees charged by the contractors in these circumstances did not constitute money received for the government.

The EPA decision viewed the contract arrangement as an alternative to the FOIA process for satisfying information requests and reasoned that the contractors acted as "independent entrepreneurs" rather than as agents of EPA in providing such information. The decision cautioned, however, that the fees charged and retained by the contractors could not exceed the fees which EPA could charge if it provided the services directly. Thus, the fees could include the direct costs of document search and duplication, but not costs associated with developing the information. In 61 Comp. Gen. 285 (1982), GAO provided similar advice to the Federal Election Commission in connection with requests from the public for microfilm copies of its reports, citing B-166506, Oct. 20, 1975.

It may be hard to reconcile the EPA and Federal Election Commission decisions with more recent decisions, and they should be approached with caution. The contractor fee arrangements in both of these cases clearly had at least the indirect effect of relieving the agencies of expenses incident to the performance of their statutory obligations that otherwise would have been paid from their appropriations.

In a recent decision, GAO considered whether an agency improperly avoided the miscellaneous receipts statute by structuring a regulatory action so that money would not be owed to the government. B-303413, Nov. 8, 2004. The Federal Communications Commission proposed to provide spectrum rights to a private company through a "license modification" in which the company would not pay the government for the

spectrum but would pay certain costs incurred by it and other spectrum users. If the Federal Communications Act of 1934, as amended, at 47 U.S.C. § 309(j), required the Commission to license the spectrum through auction instead of a license modification, then the Commission's proposed regulatory action would improperly avoid the government's receipt of money otherwise owed to it and thus would violate the miscellaneous receipts statute. GAO found the Commission's proposed regulatory action to be within the scope of its authority under the Federal Communications Act, at 47 U.S.C. § 316(a)(1), and concluded that the license modification did not violate the miscellaneous receipts statute.

Both the Comptroller General and the courts have on occasion held that certain receipts of money did not constitute the receipt of moneys within the scope of 31 U.S.C. § 3302(b). In B-205901, May 19, 1982, a railroad had furnished 15,000 gallons of fuel to the Federal Bureau of Investigation (FBI) for use in an undercover investigation of thefts of diesel fuel from the railroad. The railroad and FBI agreed that the fuel or the proceeds from its sale would be returned upon completion of the investigation. In view of 31 U.S.C. § 3302(b), the FBI then asked whether money generated from the sale of the fuel had to be deposited in the Treasury as miscellaneous receipts. In one sense, it could be argued that the money was received "for the use of the United States," in that the FBI planned to use it as evidence. However, the Comptroller General pointed out, this is not the kind of receipt contemplated by 31 U.S.C. § 3302(b). The decision concluded that "[f]unds are received for the use of the United States only if they are to be used to bear the expenses of the Government or to pay the obligations of the United States." Therefore, there was no legal barrier to returning the funds to the railroad.

In another case, GAO held that misconduct fines levied on Job Corps participants by the Labor Department need not be treated as money received for the Government for purposes of 31 U.S.C. § 3302(b). The governing legislation specifically authorized "reductions of allowances" as a disciplinary measure. Labor felt that, in some cases, immediate collection of a cash fine from the individual's pocket would be more effective. Finding a legislative intent to confer broad discretion in matters of enrollee discipline, GAO agreed that the cash fines could be regarded as a form of disciplinary allowance reduction, and accordingly credited to Job Corps appropriations. B-130515, Aug. 18, 1970. GAO followed the same approach in a similar question several years later in 65 Comp. Gen. 666, 671 (1986). The two Job Corps decisions relied heavily on the language of the

program statute involved in those cases and appear to have little, if any, application beyond that statute.

In 64 Comp. Gen. 217 (1985), a food service concession contract required the contractor to reserve a percentage of income to be used for the replacement of government-owned equipment. The reserve was found not to constitute money for the Government within the meaning of 31 U.S.C. § 3302(b). GAO distinguished an earlier decision, 35 Comp. Gen. 113 (1955), on the basis that the reserve here constituted "a mere bookkeeping entry" whereas the proposal in the 1955 case would have required the actual transfer of funds to a bank account. 64 Comp. Gen. at 219.

In *Thomas v. Network Solutions, Inc.*, 176 F.3d 500 (D.C. Cir. 1999), *cert. denied*, 528 U.S. 1115 (2000), the court concluded that fees charged by a party to a cooperative agreement did not constitute money for the government and thus were not subject to deposit into the Treasury under 31 U.S.C. § 3302(b). In *Thomas*, the National Science Foundation (NSF) entered into a cooperative agreement with Network Solutions to register Internet domain names and provide related services to the registrants. In return, Network Solutions was permitted to charge registrants a fee and to retain the fee as payment for its services. The plaintiff domain registrants challenged the legality of the registration fees. Relying in part on the above-cited Comptroller General decisions dealing with EPA and the Federal Election Commission, the plaintiffs asserted, among other things, that the fees exceeded the amount that NSF itself could have imposed under the user charges statute, 31 U.S.C. § 9701, had the agency provided domain registration services directly. The court rejected this argument and distinguished the Comptroller General decisions on the basis that Network Solutions was not assisting NSF in performing a statutory duty imposed upon it. Since Congress did not require NSF or any other federal agency to register Internet domain names, the registration was not a government service. Thus, neither 31 U.S.C. § 9701 nor 31 U.S.C. § 3302(b) applied. *Thomas*, 176 F.3d at 510–12.

Finally, several of the trust fund cases discussed hereafter in section E.2.h of this chapter also address the money received "for the Government" concept. As explained in section E.2.h, the general rule is that funds properly received by an agency in a trust capacity are not subject to section 3302(b); however, there are exceptions and limits to this general rule.

### b. Contract Matters

(1) Excess reprocurement costs

We use the term "excess reprocurement costs" here to include two factually different but conceptually related situations:

- *Original contractor defaults.* Agency still needs the work done and contracts with someone else to complete the work, almost invariably at a cost higher than the original contract price. Original contractor is liable to the government for these "excess reprocurement costs."
- *Defective work by original contractor.* Agency incurs additional expense to correct defective work. Contractor is liable for the amount of this additional expense.

Disposition of amounts recovered in these situations has generated numerous cases. Generally, the answer depends on the timing of the recovery in relation to the agency's reprocurement or corrective action and the status of the applicable appropriation. The objective is to avoid the depletion of currently available appropriations to get what the government was supposed to get under the original obligation. The rules were summarized, and the case law reviewed, in 65 Comp. Gen. 838 (1986).

The rules are as follows:

- If, at the time of the recovery from the original contractor, the agency has not yet incurred the additional expense, the agency may retain the amount recovered to the extent necessary to fund the reprocurement or corrective measures. The collection is credited to the appropriation obligated for the original contract, without regard to the status of that appropriation. Even if that appropriation has expired and is generally no longer available for obligation, it usually can still be used to fund the reprocurement or corrective measures under the "replacement contract" theory until it closes.[166]

[166] *See* Chapter 5, section B.6. The basic rule is that where it becomes necessary to terminate a contract because of the contractor's default, the funds obligated under the original contract are available, beyond their original period of availability, for purposes of funding a contract to complete the unfinished work. *Id.* As discussed in section B.6, certain conditions must be met in order to invoke the replacement contract rule. Excess reprocurement costs recovered from defaulting contractors cannot be retained by an agency in its appropriations and applied to a new contract if the reprocurement does not constitute an appropriate replacement contract. *Cf.* B-242274, Aug. 27, 1991 (applying this principle in the context of recovered liquidated damages).

- If, at the time of recovery from the original contractor, the agency has already incurred the additional reprocurement or corrective expense, the agency may retain the recovery for credit to the applicable appropriation, to the extent necessary to reimburse itself, if that appropriation is still available for obligation.

- If the appropriation has expired and is no longer available for obligation, the recovery should go to miscellaneous receipts.[167]

These rules apply equally to default and defective work situations but vary with the type and status of the appropriation involved. If the appropriation used to fund the original contract is a no-year appropriation, the recovery may be credited to that appropriation regardless of whether the agency has or has not yet actually incurred the additional costs. If the appropriation is an annual or multiple year appropriation and the agency has not yet incurred the additional costs as of the time of recovery, the agency may credit the collection to the appropriation regardless of whether it is still current or expired up until the time the account closes. In the case of an annual or multiple year appropriation, where the agency has already incurred the reprocurement or corrective costs as of the time of recovery, the agency may retain the recovery if the appropriation is still available for obligation, but not if it has expired. (Where the excess costs have already been incurred and the appropriation has expired at the time of recovery, it is too late to avoid a depletion of currently available funds.)

Prior to 1983, essentially two separate lines of cases dealt with defective work and default. The defective work cases had always applied the above principles, although not necessarily in those terms. Some illustrative cases are summarized below:

- Supplies delivered by a contractor were found upon inspection to be unsatisfactory for use, that is, not in accordance with the terms of the contract. A refund by the contractor could be credited to the

[167] In 1990, subsequent to the decision in 65 Comp. Gen. 838 and many of the other decisions discussed in this section, Congress amended the statutory provisions applicable to the closing of appropriation accounts and the disposition of account balances. *See generally* Chapter 5, section D. These statutory changes do not fundamentally affect the substantive rules discussed in this section, although the changes they make in the time periods that appropriation accounts retain their identity after they expire for obligation purposes and before they close may affect the practical application of those rules in particular circumstances.

appropriation originally charged, on the theory that the payment was improperly made from the appropriation in the first instance. The appropriation involved was an annual appropriation, and the corrective costs had not been paid as of the time of the recovery. 8 Comp. Gen. 103 (1928).

- An amount recovered from a contractor's surety because the work failed to meet specifications, after the contractor had received final payment, was regarded as in the nature of a reduction in contract price representing the value of unfinished work, and therefore amounted to the recovery of an unauthorized overpayment. It could thus be deposited in the appropriation charged with the contract and expended for completion of the work. The appropriation involved was a no-year appropriation. 34 Comp. Gen. 577 (1955).

- Recovery for defective work could be credited to an expired annual appropriation. Because the corrective work had not yet been undertaken, the funds would remain available for that corrective work under the "replacement contract" theory. 44 Comp. Gen. 623 (1965).

In default cases, however, the decisions had consistently held for several decades that excess reprocurement costs recovered from defaulting contractors had to be deposited as miscellaneous receipts.[168]

The two lines of cases met in a 1983 decision, 62 Comp. Gen. 678. That decision recognized that there was no real reason to distinguish between default and defective work for purposes of accounting for recoveries. The rules should be the same in both situations. Accordingly, 62 Comp. Gen. 678 modified the prior default cases and held, in effect, that the rules previously applied in the defective work cases should be applied in the future to all excess reprocurement cost cases "without reference to the event that gave rise to the need for the replacement contract—that is, whether occasioned by a default or by defective workmanship." *Id.* at 681. The decision further held that the Bureau of Prisons could retain damages

[168] *E.g.*, 46 Comp. Gen. 554 (1966); 40 Comp. Gen. 590 (1961); 27 Comp. Gen. 117 (1947); 14 Comp. Gen. 729 (1935); 14 Comp. Gen. 106 (1934); 10 Comp. Gen. 510 (1931); 8 Comp. Gen. 284 (1928); 26 Comp. Dec. 877 (1920); 23 Comp. Dec. 352 (1916); A-26073, Mar. 20, 1929, *aff'd upon reconsideration*, A-26073, Aug. 8, 1929; A-24614, June 20, 1929. The rule was applied regardless of whether the funds were actually collected back from the contractor or merely withheld from future contract payments due. 52 Comp. Gen. 45 (1972).

recovered from a contractor charged with defective work, for credit to the appropriation which had been used to replace the defective work.

The 1983 decision added another new element: Where the recovery, by virtue of factors such as inflation or underbidding, exceeds the amount paid to the original contractor, any amounts recovered over and above what is actually necessary to fund the reprocurement or corrective work (or to reimburse the appropriation charged with that work, if it is still currently available) must be deposited in the Treasury as miscellaneous receipts. Authority to retain funds enables the agency to get what it originally bargained for, not to make a "profit" on the transaction. 62 Comp. Gen. at 683.

Logically, the proceeds of a forfeited performance bond should be available to the contracting agency if and to the extent necessary to fund a replacement contract to complete the work of the original contract, and this was the holding in 64 Comp. Gen. 625 (1985).

In 65 Comp. Gen. 838 (1986), GAO reviewed the evolution of the case law on excess reprocurement costs, restated the rules, and pointed out that in no case had GAO approved agency retention of recovered funds where the reprocurement or corrective costs "had already been paid from an appropriation which, at the time of the recovery, was no longer available for obligation." *Id.* at 841 n.5.

Before leaving the subject, it may be helpful to again summarize the rules in a slightly different manner. Considering the status and the timing of agency action, in the following five categories, an agency may retain amounts recovered to the extent necessary to fund the reprocurement or corrective work, or to reimburse itself for costs already incurred:

- No-year appropriation where recovery was made before agency incurs additional costs.
- No-year appropriation where additional costs were incurred prior to recovery.
- Annual or multiple year appropriation where recovery is made before the agency incurs additional costs and the appropriation is still current at time of recovery.

- Annual or multiple year appropriation where additional costs were incurred prior to recovery and the appropriation is still current at time of recovery.

- Annual or multiple year appropriation where recovery is made before the agency incurs additional costs and the appropriation expired at time of recovery.

Finally, the recovery goes to the Treasury as miscellaneous receipts when an agency has annual or multiple year appropriations where additional costs were incurred prior to recovery and the appropriation had expired at time of recovery.

(2) Other damage claims

One form of other damage claims is liquidated damages. Liquidated damages constitute a specific amount of money stipulated in advance by the contracting parties as the measure of damages for certain breaches of the contract, such as failure to meet applicable performance deadlines. *See* B-148493, Mar. 25, 1963. *See also* 44 Comp. Gen. 623 (1965). The traditional rule for liquidated damages is that they may be credited to the appropriation originally charged in circumstances similar to those applicable to excess reprocurement costs, as discussed above. 44 Comp. Gen. 623; 23 Comp. Gen. 365 (1943); 9 Comp. Gen. 398 (1930); 18 Comp. Dec. 430 (1911). *See also* B-237421, Sept. 11, 1991. The rationale for retaining liquidated damages in the appropriation account rather than depositing them in the Treasury as miscellaneous receipts is that liquidated damages effect an authorized reduction in the price of the individual contract concerned, and also that this would make the damages available for return to the contractor should the liability subsequently be relieved. B-242274, Aug. 27, 1991. However, where this rationale does not apply—for example, in a case where the contractor did nothing and therefore earned nothing and remission of liquidated damages under 41 U.S.C. § 256a[169] had been denied—the liquidated damages should be deposited in the Treasury as miscellaneous receipts. 46 Comp. Gen. 554 (1966). Likewise, as in

[169] This section provides that whenever a federal contract includes a provision for liquidated damages for delay, the Secretary of the Treasury may, upon the recommendation of the head of the procuring agency, remit all or part of the damages if such action would be just and equitable. The Comptroller General formerly exercised this remission function, but it was transferred by law to the executive branch in 1996. See the codification note following 41 U.S.C. § 256a.

B-242274, Aug. 27, 1991, liquidated damages cannot be retained and used to fund reprocurements that do not constitute "replacement contracts" for the contract that gave rise to the liquidated damages.

In some liquidated damage situations, the agency will not have incurred any additional reprocurement or corrective costs. This might happen in a case where an agency received liquidated damages for delay in performance but the contractor's performance, though late, was otherwise satisfactory. In other cases, however, the agency will incur additional costs. In the situation described in 46 Comp. Gen. 554, for example, the agency would presumably need to reprocure, in which event it could retain the liquidated damages in accordance with the rules for excess reprocurement costs just discussed. 64 Comp. Gen. 625 (1985) (modifying 46 Comp. Gen. 554 to that extent). Consistent with these rules, liquidated damages credited to an expired appropriation may not be used for work which is not part of a legitimate replacement contract. B-242274, Aug. 27, 1991.

(3) Refunds and credits

As discussed previously, the general rule is that refunds, which include returns of erroneous or excess contract payments as well as adjustments to previous contract payments, represent an exception to the miscellaneous receipts deposit requirement of 31 U.S.C. § 3302(b) and are to be credited to the appropriation or fund accounts from which the original payments were made.[170] Thus, refunds received by the government under a price redetermination clause may be credited to the appropriation from which the contract was funded. 33 Comp. Gen. 176 (1953). *Contra* 24 Comp. Gen. 847, 851 (1945).[171]

Refunds received by the government under a warranty clause may be considered as an adjustment in the contract price and therefore credited to the appropriation originally charged under the contract. 34 Comp. Gen. 145 (1954). The same result applies where the warranty refund is in the form of a replacement purchase credit. 27 Comp. Gen. 384 (1948). (These cases

[170] See section E.2.a of this chapter and 65 Comp. Gen. 600 (1986).

[171] The 1953 decision is inconsistent with the 1945 decision on this point and appears to have effectively overruled the latter decision.

are conceptually related to the “defective work” cases discussed earlier, and the result follows logically from the result in those cases.)

Not all contract adjustments qualify as “refunds” for purposes of the section 3302(b) exception. In B-265727, July 19, 1996, the Securities and Exchange Commission (SEC) asked whether it could reduce its obligation of appropriated funds for its building lease to reflect the reduced rent SEC paid as a result of a sublease. Under the arrangement in question, an SEC employee group subleased parking in the building from the SEC but paid the landlord directly for this sublease. SEC deducted these payments under the sublease from its own lease payments. Relying on the two cases cited above—34 Comp. Gen. 145 and 27 Comp. Gen. 384—SEC argued that the sublease payment was a “refund” that it could use to reduce the rental payments from its appropriations. GAO rejected this argument, holding that SEC’s use of amounts paid by the sublessee to reduce the obligation created by SEC’s own lease with the landlord constituted an improper augmentation of its appropriations. The decision stated:

> “In situations where we treated a contract adjustment or price renegotiation as a refund that could be credited to an appropriation like those cited by the SEC . . . the ‘refund’ reflected a change in the amount the government owed its contractor based on the contractor’s performance or a change in the government’s requirements.”

It went on to point out that neither of these factors was present in the SEC case.

A different type of credit was discussed in 53 Comp. Gen. 872 (1974). Prospective timber sale purchasers were to be required to make certain property surveys, the cost of which would be credited against the sale price. Forest Service appropriations had previously financed the surveys. GAO viewed the proposal as an unauthorized augmentation of those appropriations. Similarly, the Department of Agriculture could not apply savings in the form of credits accrued under a contract for the handling of food stamp sales receipts to offset the cost of a separate data collection contract, even though both contracts were necessary to the same program objective. A-51604, May 31, 1977.

Credits in the form of rebates may be credited to agency accounts where they meet the criteria for refunds, that is, they represent adjustments to previous expenditures from those accounts and thus serve to make the

accounts whole. In 65 Comp. Gen. 600 (1986), GAO held that agencies could credit rebates of travel agent commissions to the appropriations charged with the costs of federal employee travel that included those commissions. *See also* 73 Comp. Gen. 210 (1994); 72 Comp. Gen. 109 (1993); 72 Comp. Gen. 63 (1992). On the other hand, rebates that do not meet these criteria must be deposited into the Treasury pursuant to 31 U.S.C. § 3302(b) unless the agency has specific statutory authority to retain them. Thus, in a 1996 decision, GAO observed that energy efficiency rebates received by the SEC from a local utility company did not meet the criteria for refunds. B-265734, Feb. 13, 1996, at fn. 1. Nevertheless, GAO held that, because SEC had the necessary specific statutory authority,[172] it could credit half of an energy efficiency rebate to the accounts that funded its energy and water conservation activities.

Recoveries of amounts paid under fraudulent contracts constitute "refunds" that may be deposited to the credit of the appropriation charged with the payments until the appropriation account is closed. Once the account is closed, the recoveries should be deposited to the general fund of the Treasury to the credit of the appropriate receipt account. B-257905, Dec. 26, 1995.

If a contract requires the government to pay a deposit on containers and provides for a refund by the contractor of the deposit upon return of the empty containers by the government, the refund may be credited to the appropriation from which the deposit was paid. B-8121, Jan. 30, 1940. However, if the contract establishes a time limit for the government to return the empty containers and provides further that thereafter title to the containers shall be deemed to pass to the government, a refund received from the contractor after expiration of the time limit is treated as a sale of surplus property and must be deposited as miscellaneous receipts. 23 Comp. Gen. 462 (1943).

(4) <u>"No-cost" contracts</u>

The federal government sometimes enters into so-called "no-cost" contracts to obtain services. Typically, the contractor receives no compensation from the government. B-300248, Jan. 15, 2004. In 63 Comp. Gen. 459 (1984), GAO considered whether the Federal Communications

[172] See 42 U.S.C. § 8256(c)(5)(A), which authorizes such credits for most agencies, subject to appropriation.

Commission could accept offers from industry trade show promoters of "rent-free" exhibition space and "other free services" intended to entice the Commission to participate in industry trade shows. The Commission's participation in a trade show entailed erecting an exhibition booth and placing staff members and equipment there for the duration of the show in order to educate the public and respond to questions about the Commission and its activities. *Id.* at 459–60. The Commission felt that it could not afford to rent space from the promoters; the promoters, realizing that the Commission's presence at their show would be a "drawing card," offered the Commission rent-free space, as well as free electricity and other services necessary to support the Commission's display. *Id.* GAO found a "mutually beneficial arrangement" between the Commission and the promoters, although it did not refer to the mutually beneficial arrangement as a no-cost contract:

> "[I]t is to the advantage of the promoters to solicit the Commission's participation and to waive the usual fees. [At the same time,] acceptance of the free space and services affords [the Commission] with an additional opportunity to inform the public . . . at no increased cost to the agency."

*Id.*

Several recent GAO decisions have addressed no-cost contracts in relation to the miscellaneous receipts statue, 31 U.S.C. § 3302(b). As a study of these decisions will show, an agency considering a no-cost contract should approach the proposed contract with a great deal of care lest the agency find that it has incurred a constructive augmentation.

In one case, a no-cost contract arrangement was specifically authorized by law and thus obviously did not violate section 3302(b). *See* B-283731, Dec. 21, 1999 (no-cost contract for travel services authorized by 10 U.S.C. § 2646). In two related decisions, GAO also held that the General Services Administration's proposed no-cost national real estate brokers contract would not violate section 3302(b). B-302811, July 12, 2004; B-291947, Aug. 15, 2003. Under the proposed contract, real estate brokers would provide lease acquisition and related services to federal agencies without cost to the government. Rather, consistent with industry practice, their compensation would take the form of commissions paid by the lessors. In affirming the legality of this arrangement, the decision in B-302811 observed:

> "Because the contract was constructed as a no cost contract, GSA will have no financial liability to brokers, and brokers will have no expectation of a payment from GSA. The acceptance of services without payment pursuant to a valid, binding no-cost contract does not augment an agency's appropriation nor does it violate the voluntary services prohibition. Although the brokers contract clearly expects that brokers will be remunerated by commissions from landlords, as is a common practice in the real estate industry, GSA does not require landlords to pay commissions. If a landlord were to fail to pay a broker, the broker would have no claim against GSA."

However, the fact that an agency makes no direct payment for contractor services does not necessarily mean that arrangement constitutes a no-cost contract with no implications under 31 U.S.C. § 3302(b). In B-300248, Jan. 15, 2004, discussed at length in section E.2 of this chapter, the contractor was compensated from fees that the Small Business Administration (SBA) imposed on lenders and that the lenders paid directly to the contractor. The opinion rejected SBA's argument that the "no-cost" nature of the contract took it outside the application of the normal augmentation and miscellaneous receipts principles:

> "SBA's assertion regarding no-cost contracts . . . is misplaced. Although we have observed that no-cost contracts do not *per se* violate the prohibition against augmentation, we have neither applied nor endorsed the principle that an agency may avoid the prohibition merely by requiring third parties to pay for an agency's contractual commitment."

GAO's opinion in B-302811, July 12, 2004, elaborated on the distinction between the SBA contract, which was found to be a "constructive augmentation" in violation of section 3302(b), and the GSA contract, which did not constitute an illegal augmentation:

> "The important difference between the GSA and SBA contracts is that under GSA's contract with brokers, brokers offer their services without any expectation of payment from GSA, whereas under SBA's contract, the contractor offered its services only after SBA agreed to impose a fee on

its preferred lenders to cover the contractor's costs and to require the lenders to pay that fee to the contractor."

### c. Damage to Government Property and Other Tort Liability

As a general proposition, amounts recovered by the government for loss or damage to government property cannot be credited to the appropriation available to repair or replace the property, but must be deposited in the Treasury as miscellaneous receipts. B-287738, May 16, 2002 (damage to government buildings); 64 Comp. Gen. 431 (1985) (damage to government motor vehicle); 26 Comp. Gen. 618 (1947) (recovery from insurance company for damage to government vehicle); 3 Comp. Gen. 808 (1924) (loss of Coast Guard vessel resulting from collision).[173] While the recovery may well be "related" to a prior expenditure for repair of the property, it does not constitute a refund in the form of an "adjustment" of a previous disbursement that would qualify for crediting to agency accounts. 64 Comp. Gen. 431, 433 (1985).

There are statutory exceptions to this general proposition. One involves property purchased and maintained by the General Services Administration from the General Supply Fund, a revolving fund established by 40 U.S.C. § 321. By virtue of 40 U.S.C. § 321(b)(2), recoveries for loss or damage to General Supply Fund property are credited to the General Supply Fund. This includes recoveries from other federal agencies for damage to GSA motor pool vehicles. 59 Comp. Gen. 515 (1980).

Another is 16 U.S.C. § 579c, which authorizes the Forest Service to retain the proceeds of bond forfeitures resulting from failure to complete performance under a permit or timber sale contract, and money received from a judgment, compromise, or settlement of a government claim for present or potential damage to lands or improvements under the administration of the Forest Service. If the receipt exceeds the amount necessary to complete the required work or make the needed repairs, the excess must be transferred to miscellaneous receipts. This provision is discussed in 67 Comp. Gen. 276 (1988), holding that the proceeds of a bond forfeiture could be used to reimburse a general Forest Service appropriation which had been charged with the cost of repairs.

[173] Additional cases for this proposition are 35 Comp. Gen. 393 (1956); 28 Comp. Gen. 476 (1949); 15 Comp. Gen. 683 (1936); 5 Comp. Gen. 928 (1926); 20 Comp. Dec. 349 (1913); 14 Comp. Dec. 87 (1907); and 9 Comp. Dec. 174 (1902).

In addition, where an agency has statutory authority to retain income derived from the use or sale of certain property, and the governing legislation evinces an intent for the particular program or activity to be self-sustaining, the agency may also retain recoveries for loss or damage to that property. 27 Comp. Gen. 352 (1947) (recovery from party responsible for loss or damage); 24 Comp. Gen. 847 (1945) (recovery from insurer); 22 Comp. Gen. 1133 (1943) (same).

There is also a nonstatutory exception to the general proposition. Where a private party responsible for loss or damage to government property agrees to replace it in kind or to have it repaired to the satisfaction of the proper government officials and to make payment directly to the party making the repairs, the arrangement is permissible and the agency is not required to transfer an amount equal to the cost of the repair or replacement to miscellaneous receipts.[174] This principle was first recognized in 14 Comp. Dec. 310 (1907) and has been followed, either explicitly or implicitly, ever since. *E.g.*, B-287738, May 16, 2002; 67 Comp. Gen. 510 (1988); B-87636, Aug. 4, 1949; B-128209-O.M., July 12, 1956. The exception applies even though the money would have to go to miscellaneous receipts if the responsible party paid it directly to the government. 67 Comp. Gen. at 511; B-87636, Aug. 4, 1949. For an apparent "exception to the exception" based on the specific legislation involved, see 28 Comp. Gen. 476 (1949).

Logically, the nonstatutory exception in 14 Comp. Dec. 310 appears difficult to support. It is, in fact, an extremely rare instance in which decisions have sanctioned doing indirectly something that cannot be done directly. Be that as it may, the exception has been followed since 1907 and appears firmly entrenched. Thus, in B-128209-O.M., July 12, 1956, GAO addressed the relationship between 14 Comp. Dec. 310 and 28 Comp. Gen. 476, stating that "14 Comp. Dec. 310 has been followed for almost 50 years and we have never expressed disagreement with the conclusion reached therein." The exception does not disturb the rule itself; it is "nothing more than an exception that may be advantageous if the timing of repair and payment can be made to coincide." 64 Comp. Gen. 431, 433 (1985).

[174] A 1943 case suggested a different result, that is, the agency might have to transfer the value of the repairs to miscellaneous receipts, if the agency had a specific appropriation for repair or replacement of the property in question. 22 Comp. Gen. 1133, 1137 (1943). GAO indicated in 67 Comp. Gen. 510 (1988) that this would not be the case, although 67 Comp. Gen. 510 did not deal with a specific repair appropriation, which would appear to be a rare case in any event.

Compensation paid by an insurance company for damage to government property caused by a contractor may not be used to augment the agency's appropriation used for the contract. Therefore, absent specific statutory authority, the moneys, whether paid to the government or to the contractor, are for deposit into the Treasury as miscellaneous receipts. B-287738, May 16, 2002; 67 Comp. Gen. 129 (1987); 48 Comp. Gen. 209 (1968). The retention of insurance proceeds was also at issue in B-93322, Apr. 19, 1950, an apparent exception based on the particular circumstances involved. In that case, the General Services Administration had entered into a contract for renovation of the Executive Mansion. The contract required the contractor to carry adequate fire and hazard insurance. The renovation project had been undertaken under a specific appropriation which was enough for the initial cost but would not have been sufficient for repairs in the event of a fire or other hazard. Since the renovation was a "particular job of a temporary nature," and since a contrary result would defeat the purpose of the appropriation, the Comptroller General held that insurance proceeds received if a covered risk occurred could be retained and used for the cost of repairs. *Id.* at 4.[175]

The rule that recoveries for loss or damage to government property must be deposited as miscellaneous receipts applies equally to recoveries from common carriers for government property lost or damaged in transit. 46 Comp. Gen. 31 (1966); 28 Comp. Gen. 666 (1949); 22 Comp. Dec. 703 (1916); 22 Comp. Dec. 379 (1916). There is a narrow exception in cases where the freight bill on the shipment of the property lost or damaged equals or exceeds the amounts paid for repairs and both are payable from the same appropriation, in which event the bill is reduced and the amount deducted to cover the cost of repairs is allowed to remain to the credit of the appropriation. 21 Comp. Dec. 632 (1915), *as amplified by* 8 Comp. Gen. 615 (1929) and 28 Comp. Gen. 666 (1949). The rule and exception are discussed in 46 Comp. Gen. 31 and in B-4494, Sept. 19, 1939. Also, as with receipts in general, the miscellaneous receipts requirement does not apply if the appropriation or fund involved is made reimbursable by statute. 46 Comp. Gen. at 33–34.

In 50 Comp. Gen. 545 (1971), the Comptroller General held that the requirement to deposit as miscellaneous receipts recoveries from carriers for property lost or damaged in transit does not apply to operating funds of

[175] As these cases demonstrate, the government occasionally purchases insurance; however, it is a self-insurer in most areas. *See generally* Chapter 4, section C.10.

the National Credit Union Administration. The decision noted that, under 12 U.S.C. § 1755, the Administration's funds consist entirely of fees and assessments collected from member credit unions and do not include any general revenue appropriations. Thus, the recoveries should go to the source that bore the costs of the transactions that gave rise to them.

What happens when one federal agency damages the property of another agency? Under the so-called "interdepartmental waiver doctrine," the general rule is that funds available to the agency causing the damage may not be used to pay claims for damages by the agency whose property suffered the damage. 65 Comp. Gen. 910, 911 (1986); 46 Comp. Gen. 586, 587 (1966). The interdepartmental waiver doctrine is based primarily on the concept that property of the various agencies is not the property of separate entities but rather of the government as a single entity, and there can be no reimbursement by the government for damages to or loss of its own property. B-302962, June 10, 2005; 46 Comp. Gen. at 586, 587. However, as GAO pointed out in B-302962, this general rule also has a well-established exception:

> "The interdepartmental waiver doctrine does not apply . . . where an agency has statutory authority to retain income derived from the use or sale of certain property, and the governing legislation shows an intent for the particular program or activity to be self-sustaining. 24 Comp. Gen. 847 (1945). Thus, where an agency operation is financed through reimbursements or a revolving fund, the prohibition does not apply. 65 Comp. Gen. 910 (1986). *See also* 3 Comp. Gen. 74, 75 (1923). In such cases, the agency should recover amounts sufficient to cover loss or damage to property financed by the reimbursements or revolving fund, regardless of whether that damage is caused by another federal agency or a private party, and deposit those funds into the revolving fund. *See* 65 Comp. Gen. 910. The rationale for this exception is that the revolving fund, established to operate like a self-sustaining business, should not bear the cost for 'other than objects for which the fund was created.' *Id.*"

The decision in B-302962 held that the exception to the interdepartmental waiver doctrine applied in the case of damage to facilities of the National Archives and Records Administration whose operations were financed by a revolving fund. Thus, the Administration should collect from other federal

agencies, their contractors, or the Administration's own contractors, as the case may be, amounts sufficient to repair damages they caused to the Administration's facilities and deposit those amounts into the revolving fund.

While the preceding cases involved loss or damage to property, the United States may also recover amounts resulting from tortious injury to persons, for example, under the so-called Federal Medical Care Recovery Act, 42 U.S.C. § 2651. *See*, *e.g.*, 57 Comp. Gen. 781 (1978). Such recoveries, absent express congressional authorization, must be deposited in the Treasury as miscellaneous receipts. 52 Comp. Gen. 125 (1972). Because of a statutory exception to the miscellaneous receipts statute, the Department of Veterans Affairs may retain recoveries under the Federal Medical Care Recovery Act to the extent of medical care or services furnished under chapter 17 of title 38, United States Code. The recoveries may be deposited into the Department of Veterans Affairs Medical Care Collections Fund. Memorandum Opinion for the Assistant Attorney General, Civil Division, *Miscellaneous Receipts Act Exception for Veterans' Health Care Recoveries*, OLC Opinion, Dec. 3, 1998 (construing 38 U.S.C. § 1729A).

A case involving the Military Personnel and Civilian Employees Claims Act of 1964, 31 U.S.C. § 3721, provides a good illustration of an adjustment to a prior disbursement, that is, an authorized refund which the agency may retain for credit to the disbursing appropriation. The statute authorizes agencies to pay claims by their employees for personal property lost or damaged incident to service. In cases where there may be third-party liability (*e.g.*, an insurer or carrier), the agency has a choice. It may pay the entire amount of the employee's claim and be subrogated to the employee's claim against the third party, or it may require the employee to pursue the third-party claim first. If the agency chooses the former option, it may retain any third-party recoveries for credit to the appropriation used to pay the claim. 61 Comp. Gen. 537 (1982). An agency adopting the former policy, the decision stated,

> "will be making payments in some cases that are, strictly speaking, higher than are required. In such cases, it is entirely legitimate to treat a third-party recovery as a reduction in the amount previously disbursed rather than as an augmentation of the agency's appropriation."

*Id.* at 540.

A comparison of 61 Comp. Gen. 537 to the Federal Medical Care Recovery Act case discussed above, 52 Comp. Gen. 125 (1972), illustrates the distinction previously discussed with respect to applying the definition of "refund"—61 Comp. Gen. 537 is an example of an adjustment to an amount previously disbursed; 52 Comp. Gen. 125 illustrates a collection which must go to miscellaneous receipts even though it is "related" to a prior expenditure.

### d. Fees and Commissions

Federal agencies must have statutory authority both (1) to charge fees for their programs and activities in the first instance and (2), even if they have fee-charging authority, to retain in their appropriations and use the amounts collected. *See*, *e.g.*, B-300826, Mar. 3, 2005; B-300248, Jan. 15, 2004. Thus, fees and commissions paid either to the government itself or to a government employee for activities relating to official duties must be deposited in the Treasury as miscellaneous receipts, absent statutory authority to the contrary.

In the case of fees paid directly to the government, the result is a simple application of 31 U.S.C. § 3302(b). Thus, the following items must be deposited as miscellaneous receipts:

- Commissions from the use of pay telephones in government buildings. 59 Comp. Gen. 213 (1980); 44 Comp. Gen. 449 (1965); 23 Comp. Gen. 873 (1944); 14 Comp. Gen. 203 (1934); 5 Comp. Gen. 354 (1925); B-4906, Oct. 11, 1951.

- Fees and related reimbursable incidental expenses paid to the Department of Agriculture in connection with the investigation of and issuance of certifications of quality on certain farm products. 2 Comp. Gen. 677 (1923).

- Fees collected under the Freedom of Information Act. 4B Op. Off. Legal Counsel 684, 687 (1980).

- Fees for copying and shipping documents by the Office of Federal Housing Enterprise Oversight as part of discovery in administrative proceedings before that agency. B-302825, Dec. 22, 2004.

Of course, if and to the extent expressly authorized by statute an agency may retain fees and use them to offset operating costs. *See*, *e.g.*, 2 U.S.C. § 68-7(b) (fees and other charges collected for services provided by the Senate Office of Public Records); 7 U.S.C. § 7333(k)(3) (fees for certain

services collected by the Commodity Credit Corporation); 28 U.S.C. § 1921(e) (fees collected by the United States Marshals Service for service of civil process and judicial execution seizures and sales, to the extent provided in advance in appropriation acts); 28 U.S.C. § 1931 (specified portions of filing fees paid to the clerk of court). The relevant legislation will determine precisely what may be retained. *E.g.*, 34 Comp. Gen. 58 (1954).

Training fees illustrate both the general rule and statutory exceptions. Under the Government Employees Training Act, an agency may extend its training programs to employees of other federal agencies on a reimbursable or nonreimbursable basis. 5 U.S.C. § 4104. The agency, unless it receives appropriations for interagency training, may retain the fees. B-241269, Feb. 28, 1991 (nondecision letter). Similarly, an agency may admit state and local government employees to its training programs and may charge a fee or waive it in whole or in part. 42 U.S.C. § 4742(a). Under 42 U.S.C. § 4742(b), the agency that provided the training is authorized to credit its appropriation for reimbursement of fees received. The agency may also admit private persons to its training programs on a space-available and fee basis, but, unless it has statutory authority to the contrary, the agency must deposit the fees as miscellaneous receipts. B-271894, July 24, 1997; 65 Comp. Gen. 666 (1986); 42 Comp. Gen. 673 (1963); B-241269, Feb. 28, 1991; B-190244, Nov. 28, 1977.

Parking fees assessed by federal agencies under the authority of 40 U.S.C. § 586 are to be credited to the appropriation or fund originally charged for providing the service. However, any amounts collected in excess of the actual cost of providing the service must be deposited as miscellaneous receipts. 55 Comp. Gen. 897 (1976). Statutes other than 40 U.S.C. § 586 may authorize parking fees, in which event the terms of the particular statute must be examined. For example, parking fees at Department of Veterans Affairs medical facilities are addressed in 38 U.S.C. § 8109. Originally, the fees had to go to miscellaneous receipts under 31 U.S.C. § 3302(b). 45 Comp. Gen. 27 (1965). However, 38 U.S.C. § 8109 was amended, and the fees now go into a revolving fund.

Income derived from the installation and operation of vending machines on government-owned or controlled property is generally for deposit as miscellaneous receipts. 32 Comp. Gen. 124 (1952); A-44022, Aug. 14, 1944. There are, however, two major exceptions. First, if an employee association with administrative approval makes a contractual arrangement with the vendor, the employee group may retain the income. 32 Comp.

Gen. 282 (1952); B-112840, Feb. 2, 1953. Second, under the Randolph-Sheppard Act, 20 U.S.C. § 107d-3, vending machine income in certain cases must go to blind licensee-operators or state agencies for the blind. *See* B-238937, Mar. 22, 1991; B-199132, Sept. 10, 1980 (nondecision letters).

Donations, which are voluntary, and fees and assessments, which are not, require different dispositions of amounts collected.[176] Statutory authority to accept gifts and donations does not include fees and assessments exacted involuntarily. 25 Comp. Gen. 637, 639 (1946); B-195492, Mar. 18, 1980; B-225834.2-O.M., Apr. 11, 1988. However, on occasion, GAO has held that gift-acceptance authorities extended to certain payments that were not wholly gratuitous or purely voluntary. *See* B-286182, Jan. 11, 2001 (statutory authority of the District of Columbia courts to accept gifts permits acceptance of services provided as part of an administrative settlement in a rate case); B-232482, June 4, 1990 (not improper for Commerce Department to treat certain registration fees as "contributions" within scope of 22 U.S.C. § 2455(f)). For a discussion of the difference between the statutory authority to accept donations and the authority to charge fees to cover the costs of services provided, see B-272254, Mar. 5, 1997.

Fees paid to individual employees require a two-step analysis. The first step is the principle that the earnings of a government employee in excess of the regular compensation gained in the course of or in connection with his or her services belong to the government. *See*, *e.g.*, 62 Comp. Gen. 39, 40 (1982) and cases cited (military member must remit to the government fee for service on state jury while he was not in leave status). The second step is the application of 31 U.S.C. § 3302(b). Using this analysis, GAO has held that agencies must deposit such fees as miscellaneous receipts in the following instances:

- An honorarium paid to an Army officer for lecturing at a university in his capacity as an officer of the United States. 37 Comp. Gen. 29 (1957).

- Fees collected from private individuals by government employees for their services as notaries public. 16 Comp. Gen. 306 (1936).

- Witness fees and any allowances for travel and subsistence, over and above actual expenses, paid to federal employees for testifying in

[176] See section E.3 of this chapter for a discussion of gifts and donations.

certain state court proceedings. 36 Comp. Gen. 591, 592 (1957); 23 Comp. Gen. 628 (1944); 15 Comp. Gen. 196 (1935); B-160343, Nov. 23, 1966.

Applying the same analysis, a proposal under which a nonprofit corporation funded entirely by private industry would pay monthly "bonuses" to Army enlistees to encourage enlistment and satisfactory service, even if otherwise proper, could not be implemented without specific statutory authority, because the payments could not be retained by the enlistees but would have to be deposited in the Treasury under 31 U.S.C. § 3302(b). B-200013, Apr. 15, 1981.

### e. Economy Act

The Economy Act, 31 U.S.C. §§ 1535 and 1536, authorizes the inter- and intra-departmental furnishing of materials or performance of work or services on a reimbursable basis.[177] It is a statutory exception to the miscellaneous receipts statute, 31 U.S.C. § 3302(b), authorizing a performing agency to credit reimbursements to the appropriation or fund charged in executing its performance.[178] Crediting Economy Act reimbursements to agency appropriations is not mandatory. The performing agency may, at its discretion, deposit reimbursements for both direct and indirect costs in the Treasury as miscellaneous receipts. 57 Comp. Gen. 674, 685 (1978), *modifying* 56 Comp. Gen. 275 (1977). There is one area in which the performing agency has no discretion. Reimbursements may not be credited to an appropriation against which no charges have been made in executing the order.[179] This would constitute an improper augmentation of the credited appropriation(s). As noted in section E.4 of this chapter, this also applies to appropriations available in different time periods. *See* B-288142, Sept. 6, 2001. Such reimbursements must therefore be deposited into the General Fund as miscellaneous receipts. An example would be crediting reimbursement for depreciation

[177] See section B.1 of Chapter 15 for a more detailed discussion of the Economy Act. Chapter 15 also discusses a variety of other interagency ordering authorities including working capital funds, special revolving funds, franchise funds, and program-specific funds.

[178] Temporary credits among appropriations are authorized by 31 U.S.C. § 1534, which generally provides for common service charges to more than one appropriation. *See* Chapter 2, section B.3.a.

[179] Compare 10 U.S.C. § 2205(a), which provides that reimbursements to Defense Department appropriations under the Economy Act and similar authorities may be credited to authorized accounts and are available for obligation for the same period as the funds in the account so credited.

to an appropriation that did not bear any costs of the transaction. If the appropriation that bore the costs is no longer available, the reimbursement for depreciation must be deposited into the Treasury as miscellaneous receipts. 57 Comp. Gen. at 685–86. An agency must deobligate funds at the end of their availability period to the extent that obligations for Economy Act work exceed costs incurred for that work. 31 U.S.C. § 1535(d). *See* B-286929, Apr. 25, 2001; 39 Comp. Gen. 317, 319 (1959); 34 Comp. Gen. 418, 421–22 (1955). Likewise, where performance of an Economy Act order extends beyond a fiscal year and is funded by more than one fiscal year appropriation, the reimbursement must be split between the two appropriations based on the work actually performed by each. B-301561, June 14, 2004 (nondecision letter).

Reimbursement under the Economy Act is to be made on the basis of "actual cost" as determined by the performing agency. 31 U.S.C. § 1535(b). Advance payments based on estimated costs are authorized, but the final payment amount must be adjusted to account for actual costs. 31 U.S.C. § 1535(b), (d); B-282601, Sept. 27, 1999; B-260993, June 26, 1996. *See also* GAO, *DFOH Financial Management*, GAO/AIMD-96-167R (Washington, D.C.: Sept. 30, 1996). While agencies have some flexibility in determining costs, their determinations must be reasonable in order to avoid an augmentation. B-257823, Jan. 22, 1998; B-250377, Jan. 28, 1993.[180] In reviewing cost issues under the Economy Act, GAO's role is to assess the general accuracy and reasonableness of a performing agency's charges, not to "recompute" those charges. B-257823, Jan. 22, 1998.

Failure to obtain reimbursement for all required costs in a reimbursable Economy Act transaction improperly augments the appropriations of the ordering agency. 57 Comp. Gen. 674, 682 (1978). Thus, an ordering agency must reimburse all appropriate costs incurred by the performing agency even if they exceed those agreed upon so long as the ordering agency received the benefit of the added costs. B-260993, June 26, 1996. The ordering agency's obligation to reimburse such additional costs remains

[180] The cited decisions note, for example, that agencies can use standard costs for items provided from inventory as well as standard costs for transportation and labor. While the standard cost for inventory items may be based on the latest cost to acquire the item provided, it may not be the cost to acquire a more technologically advanced item. Also, reimbursement must include reasonable amounts for both direct and indirect costs. Of course, agencies may have more latitude to set rates under other, more specific statutes. *See*, *e.g.*, 10 U.S.C. § 2205(b); Department of Defense Financial Management Regulation 7000.14-R, vol. 11A, ch. 3, *Economy Act Orders* (April 2000), *available at* www.defenselink.mil/comptroller/fmr/11A/index.html (last visited September 15, 2005).

even if those costs are not identified until years later and after the appropriation of the ordering agency originally charged for the transaction has closed. In this event, the additional costs are payable from the ordering agency's current appropriations for the same general purpose. B-260993, June 26, 1996. By the same token, the performing agency must return to the ordering agency advance payments that exceeded actual costs. 72 Comp. Gen. 120 (1993).

On occasion, the costs may be so out of proportion as to undercut the legitimacy of a purported Economy Act transaction altogether. In 70 Comp. Gen. 592 (1991), the Labor Department cited the Economy Act as authority to combine funds from a number of different departmental appropriation accounts for component agencies in order to purchase computer equipment for a department-wide network. However, the value of equipment provided to the various components under this arrangement did not match their contributions. For example, one component paid about four times more than the value of the equipment it received. Accordingly, the Comptroller General held that this arrangement was not a legitimate Economy Act transaction or reprogramming. Rather, it constituted an unauthorized transfer of appropriations that resulted in a subsidy to, and thus an improper augmentation of, the department's central management account. 70 Comp. Gen. at 594–96.

Finally, the general authority of the Economy Act cannot be used to overcome 31 U.S.C. § 3302(b) if the transaction in question is governed by a more specific statutory authority. In B-241269, Feb. 28, 1991, the Treasury Department's Financial Management Service asked whether it could invoke the Economy Act to retain reimbursements for training it provided to employees of other federal and state agencies as well as a few nongovernmental participants. GAO responded that the reimbursements were governed not by the Economy Act but by other statutory authorities dealing specifically with federal training programs. These statutory authorities allowed the agency that provided training to credit its appropriations for reimbursements on behalf of federal and other governmental participants. However, since the statutes did not cover nongovernmental trainees, they could not provide an exception from section 3302 that applied to them. Thus, the fees paid by nongovernmental participants must be deposited into the General Fund of the Treasury as miscellaneous receipts.[181]

[181] This and related decisions are also discussed in section E.2.d of this chapter.

The Comptroller General has applied Economy Act cost-reimbursement principles by analogy to interagency transactions conducted under other statutory authority requiring reimbursement where that authority does not otherwise specify the basis for reimbursement. *See* 72 Comp. Gen. 159 (1993). *Cf.* B-276509, Aug. 28, 1998 (implicitly following Economy Act principles). However, rules that are unique to the Economy Act, such as the deobligation requirement of 31 U.S.C. § 1535(d), do not apply to interagency transactions carried out under other statutory authorities. B-302760, May 17, 2004.

### f. Setoff

Collections by setoff may be factually distinguishable from direct collections, but the effect on the appropriation is the same. If crediting an agency appropriation with a direct collection in a particular instance would result in an improper augmentation, then retaining an amount collected by setoff would equally constitute an improper augmentation. Thus, setoffs must be treated the same as direct collections. If an agency could retain a direct collection in a given situation, it can retain the setoff. However, if a direct collection would have to go to miscellaneous receipts, the setoff also has to go to miscellaneous receipts. In this latter situation, the agency must take the amount of the setoff from its own appropriation and transfer it to the General Fund of the Treasury. *E.g.*, 2 Comp. Gen. 599 (1923); 20 Comp. Dec. 349 (1913).

A hypothetical situation will illustrate. Suppose a contractor negligently damages a piece of government equipment and becomes liable to the government in the amount of $500. Suppose further that an employee of the contracting agency, in a separate transaction, negligently damages property of the contractor. The contractor files a claim under the Federal Tort Claims Act and the agency settles the claim for $600. Neither party disputes the validity or amount of either claim. The agency sets the contract debt off against the tort claim and makes a net payment to the contractor of $100. However, if the agency stops here and if it lacks specific statutory authority to retain offsets, it has augmented its appropriation to the tune of $500. If the tort claim had never occurred and the agency collected the $500 from the contractor, the $500 would have to go to miscellaneous receipts (see "Contract Matters," above). Conversely, if the contract claim did not exist, the agency would end up paying $600 on the tort claim. Now, combining both claims, if both were paid without setoff, the net result would be that the agency is out $600. The setoff cannot operate to put the agency's appropriation in a better position than it would have been in had the agency and contractor simply exchanged checks. Thus, in addition to paying the contractor $100, the agency must

deposit $500 from its own appropriation into the Treasury as miscellaneous receipts.

A different type of "setoff" occurs under the Back Pay Act, 5 U.S.C. § 5596. When an agency pays an employee back pay under the Back Pay Act, it must deduct amounts the employee earned through other employment during the time period in question. The agency simply pays the net amount. There is no requirement to transfer the amount of the deduction for outside earnings to miscellaneous receipts. 31 Comp. Gen. 318 (1952). The deduction for outside earnings is not really a collection; it is merely part of the statutory formula for determining the amount of the payment.

### g. Revolving Funds

A major exception to the requirements of 31 U.S.C. § 3302(b) is the revolving fund.[182] For most revolving funds, receipts are credited directly to the fund and are available, without further appropriation by Congress, for expenditures to carry out the purposes of the fund. An agency must have statutory authority to establish a revolving fund. The enabling statute will specify the receipts that may be credited to the fund and the purposes for which they may be expended. An example is the General Services Administration's "General Supply Fund," noted above under "Damage to Government Property." Receipts that are properly for deposit to a revolving fund are, obviously, exempt from the miscellaneous receipts requirement of section 3302(b). *E.g.*, B-271894, July 24, 1997 (explaining when a revolving fund may retain receipts and when it must deposit receipts into the Treasury as miscellaneous receipts).

However, the existence of a revolving fund does not automatically signal that 31 U.S.C. § 3302(b) will never apply. Thus, where the statute establishing the fund does not authorize the crediting of receipts of a given type into the fund, those receipts must be deposited in the Treasury as miscellaneous receipts. To credit those receipts to the revolving fund would augment the revolving fund. *See*, *e.g.*, B-302825, Dec. 22, 2004 (the Office of Federal Housing Enterprise Oversight had authority to collect and deposit into its Oversight Fund annual assessments from the Federal National Mortgage Association and the Federal Home Loan Mortgage Corporation; its authority to conduct administrative and enforcement actions did not permit it to retain copying fees charged for document discovery). *See also* 69 Comp. Gen. 260 (1990); 40 Comp. Gen. 356 (1960); 23 Comp. Gen. 986 (1944); 20 Comp. Gen. 280 (1940).

[182] See section C of Chapter 15 for a much more detailed discussion of revolving funds.

Augmentation of a revolving fund may occur in other ways, depending on the nature of the fund and the terms of the governing legislation:

- While the Bureau of Land Management has authority to retain funds collected as a result of coal trespasses on federal lands, to use those funds to repair damage to the specific lands involved in the trespass, and, within the Bureau's discretion, to refund any excess, the Bureau may not retain an excess of collections over repair costs which the Bureau determines is inappropriate to refund. To retain such amounts in the revolving fund to be used for other purposes would augment the revolving fund. The Bureau must deposit this amount in the Treasury as miscellaneous receipts. B-204874, July 28, 1982.

- The Corps of Engineers provides construction contract supervision and administrative services to other agencies and has a revolving fund (the supervision and administration, or S&A, revolving fund) that it uses to cover its S&A costs. The Corps changes its customer agencies a flat rate for this service so that, over time, its S&A revolving fund will break even. Where the Air Force (a customer agency) received an amount from an Air Force contractor for additional expenses incurred by the government as a result of the contractor's defective workmanship, the Corps could cover into its S&A revolving fund only that portion representing S&A costs that the Corps had actually charged the Air Force, regardless of the amount collected from the contractor. 65 Comp. Gen. 838 (1986). To avoid augmenting its S&A revolving fund, the Corps had to deposit amounts in excess of that portion into miscellaneous receipts. *Id.* *See also* B-237421, Sept. 11, 1991.

- Although the Corps of Engineers may choose to offer training to nongovernmental personnel on a limited space-available basis, such training is not within the scope of the Corps' revolving fund for furnishing facilities and services for other government agencies. Therefore, any fees it receives for training nongovernmental personnel must be deposited to the Treasury under 31 U.S.C. § 3302(b) rather than being credited to Corps' revolving fund. B-271894, July 24, 1997.

- The Tennessee Valley Authority (TVA) cannot credit to its revolving fund double and treble damages recovered under the False Claims Act. Since these damages are in the nature of penalties rather than compensation for actual losses, TVA must deposit them to the Treasury as miscellaneous receipts. TVA has no authority to augment its revolving fund with proceeds that exceed costs it has incurred and that

are unrelated to its commercial and proprietary activities. B-281064, Feb. 14, 2000.

Legislation that merely authorizes, or even requires, that certain expenditures be reimbursed is not sufficient to create a revolving fund. Reimbursements must be deposited as miscellaneous receipts unless the statute specifically authorizes retention by the agency. 67 Comp. Gen. 443 (1988); 22 Comp. Dec. 60 (1915); 1 Comp. Dec. 568 (1895).

### h. Trust Funds

Moneys properly received by a federal agency in a trust capacity are not subject to 31 U.S.C. § 3302(b) and thus do not have to be deposited in the Treasury as miscellaneous receipts, unless otherwise required.[183] B-303413, Nov. 8, 2004; 60 Comp. Gen. 15, 26 (1980); 27 Comp. Gen. 641 (1948). Other authorities supporting this general proposition are *Emery v. United States*, 186 F.2d 900, 902 (9th Cir.), *cert. denied*, 341 U.S. 925 (1951) (money paid to the United States under court order as refund of overcharges by persons who had violated rent control legislation was held in trust for tenants and could be disbursed to them without need for appropriation); *Varney v. Warehime*, 147 F.2d 238, 245 (6th Cir.), *cert. denied*, 325 U.S. 882 (1945) (assessments levied against milk handlers to defray certain wartime expenses were trust funds and did not have to be covered into the Treasury); 62 Comp. Gen. 245, 251–52 (1983) (proceeds from sale of certain excess stockpile materials where federal agency was acting on behalf of foreign government); B-223146, Oct. 7, 1986 (moneys received by Pension Benefit Guaranty Corporation when acting in its trustee capacity); B-23647, Feb. 16, 1942 (taxes and fines collected in foreign territories occupied by American armed forces).

In addition, receipts generated by activities financed with trust funds are generally credited to the trust fund and not deposited as miscellaneous receipts. *United States v. Sinnott*, 26 F. 84 (D. Ore. 1886) (proceeds from sale of lumber made at Indian sawmill were to be applied for benefit of Indians and were not subject to 31 U.S.C. § 3302(b)); B-166059, July 10, 1969 (recovery for damage to property purchased with trust funds). *See also* 50 Comp. Gen. 545, 547 (1971). In 51 Comp. Gen. 506 (1972), GAO advised the Smithsonian Institution that receipts generated by various activities at the National Zoo need not be deposited as miscellaneous

[183] Chapter 17, section D discusses trust funds in far greater detail. *See also* 31 U.S.C. §§ 1321–1323.

receipts. The Smithsonian is financed in part by trust funds and in part by appropriated funds.

In a 1991 case, an agency had discovered a $10,000 bank account belonging to an employee morale club which had become defunct. No documentation of the club's creation or dissolution could be located. Thus, if the club had ever provided for the disposition of its funds, it could no longer be established. Clearly, the money was not received for the use of the government for purposes of 31 U.S.C. § 3302(b). It was equally clear that the money could not be credited to the agency's appropriations. GAO advised that the money could be turned over to a successor employee morale organization to be used for its intended purposes. If no successor organization stepped forward, the funds would have to be deposited in a Treasury trust account in accordance with 31 U.S.C. § 1322. B-241744, May 31, 1991 (nondecision letter).

There are limits on the extent to which trust funds can legitimately avoid the application of 31 U.S.C. § 3302(b). The Justice Department's Office of Legal Counsel has cautioned against carrying the trust theory too far in the case of trusts created by executive action rather than statute. For example, the United States and the Commonwealth of Virginia sued a transportation company for causing an oil spill in the Chesapeake Bay. A settlement was proposed under which the defendant would donate money to a private waterfowl preservation organization. The Justice Department's Office of Legal Counsel found that the proposal would contravene 31 U.S.C. § 3302(b). 4B Op. Off. Legal Counsel 684 (1980). The opinion did not question that section 3302(b) could be overcome by a statutorily created trust or in other circumstances where money is "given to the government which is not available to the United States for disposition on its own behalf." *Id.* at 687. However, it listed the following weaknesses in a nonstatutory trust argument:

> "(1) that trusts created by nonstatutory executive action could indeed be used to circumvent legislative prerogatives in the appropriations area; (2) that to some extent all money held in the Treasury . . . is received 'in trust' for the citizenry and (3) that Congress has created or recognized trust funds explicitly in numerous cases and implicitly in others, but it has neglected to do so in this context."

*Id.* at 687–68 (footnotes omitted).

The opinion also noted that the applicability of section 3302(b) was not affected simply because the government did not physically receive any funds. Rather, "constructive receipt" of funds is sufficient to trigger the statute:

> "In our view, the fact that no cash actually touches the palm of a federal official is irrelevant for purposes of § [3302(b)], if a federal agency could have accepted possession and retains discretion to direct the use of the money. The doctrine of constructive receipt will ignore the form of a transaction in order to get to its substance. . . . Since we believe that money available to the United States and directed to another recipient is constructively 'received' for purposes of § [3302(b)], we conclude that the proposed settlement is barred by that statute."

*Id.* at 688.

There was a solution in that case, however. Since the United States had not suffered any monetary loss, it was not required to seek damages. The proposed contribution by the defendant could be attributed to the co-plaintiff, Virginia, which of course was not subject to 31 U.S.C. § 3302(b). *Id.*[184]

Along the lines of the Office of Legal Counsel opinion discussed above, the court in *Motor Coach Industries, Inc. v. Dole*, 725 F.2d 958 (4th Cir. 1984), rejected a nonstatutory trust arrangement developed by the Federal Aviation Administration (FAA) in order to finance increased surface transportation to Dulles International Airport. FAA agreed to waive landing fees it charged airlines using Dulles if they agreed to establish and contribute to an "Air Carriers Trust Fund," which would be used to purchase additional ground transport buses to serve Dulles. The court observed:

> "[T]he trust arrangement both undermined the integrity of the congressional appropriation process and ignored substantive duties under the procurement statutes. Viewed realistically, the Trust was an attempt by the FAA to divert

[184] The opinion noted that the proposed settlement would be authorized under subsequent amendments to the governing legislation.

> funds from their intended destination—the United States Treasury. Although the purpose for which the FAA sought the funds was laudable, its methods certainly cannot be praised. Were the contract between the Trust and [the transport company] left intact, the agency's end-run around the normal appropriation channels would have been successful, enabling it effectively to supplement its budget by $3 million without congressional action."

725 F.2d at 968 (footnote omitted).

### i. Fines and Penalties

Generally speaking, moneys collected as a fine or penalty must be deposited in the Treasury as miscellaneous receipts pursuant to 31 U.S.C. § 3302(b). *E.g.*, B-281064, Feb. 14, 2000 (double or treble damages under the False Claims Act, which constitute "exemplary" or punitive rather than compensatory damages); 70 Comp. Gen. 17 (1990) (civil penalties assessed against Nuclear Regulatory Commission licensees); 69 Comp. Gen. 260 (1990) (penalties—as opposed to the recovery of actual losses—under the False Claims Act); 47 Comp. Gen. 674 (1968) (dishonored checks); B-235577.2-O.M., Nov. 9, 1989 (civil penalties under Food Stamp Act).

In B-210210, Sept. 14, 1983, the Comptroller General held that the Commodity Futures Trading Commission lacked authority to enter into a settlement agreement under which a party charged with violation of the Commodity Exchange Act would donate funds to an educational institution with no relationship to the violation. The decision pointed out that monetary penalties imposed by the Commission were subject to deposit into the Treasury under 31 U.S.C. § 3302(b) and rejected the Commission's characterization of the donation as a "voluntary contribution" as opposed to a "penalty":

> "Despite the statement that the donations would not supplant the Commission's regular practice of imposing monetary penalties as part of a settlement, it is difficult to distinguish the proposed donations from money penalties. The money would be donated as a result of an enforcement action and in consideration of not imposing some further sanction or penalty. It is difficult for us to conceive of a situation under the proposed plan where one making the payment would not consider the payment a penalty."

Another case concluded that, without statutory authority, permitting a party who owes a penalty to contribute to a research project in lieu of paying the penalty amounts to a circumvention of 31 U.S.C. § 3302(b) and improperly augments the agency's research appropriations. 70 Comp. Gen. 17 (1990). A case saying essentially the same thing in the context of Clean Air Act violations is B-247155, July 7, 1992, *aff'd on reconsideration*, B-247155.2, Mar. 1, 1993.

GAO considered similar issues in several cases involving consent orders between the Department of Energy and oil companies charged with violation of federal oil price and allocation regulations. The Department has limited authority to use recovered overcharge funds for restitution purposes, and in fact has a duty to attempt restitution. However, to the extent this cannot reasonably be accomplished or funds remain after restitution efforts have been exhausted, the funds may not be used for energy-related programs with no restitution nexus but must be deposited in the Treasury pursuant to 31 U.S.C. § 3302(b). 62 Comp. Gen. 379 (1983); 60 Comp. Gen. 15 (1980). It is equally unauthorized to give the funds to charity or to use them to augment appropriations for administering the overcharge refund program. B-200170, Apr. 1, 1981.

To the same effect is *United States v. Smithfield Foods, Inc.*, 982 F. Supp. 373 (E.D. Va. 1997). Smithfield was assessed a civil penalty of over $12 million for violating the Clean Water Act. The trial judge initially ordered the government to submit a proposal for "allocation" of the penalty with an emphasis on directing all or part of the penalty toward restoration of the Chesapeake Bay and its tributaries. The Government responded that, since the Clean Water Act did not specify an alternative disposition, the penalty must be paid into the Treasury pursuant to 31 U.S.C. § 3302(b). The court "regretfully agree[d]" that the penalty proceeds could not be directed toward local environmental projects. *Smithfield Foods*, 982 F. Supp. at 375.

### j. Miscellaneous Cases: Money to Treasury

In addition to the categories discussed above, there have been numerous other decisions involving the disposition of receipts in various contexts. Some cases in which the Comptroller General held that receipts of a particular type must be deposited in the Treasury as miscellaneous receipts under 31 U.S.C. § 3302(b) or related statutes are set forth below.

- Costs awarded to the United States by a court under 28 U.S.C. § 2412. 47 Comp. Gen. 70 (1967).

- Interest earned on grant advances by grantees other than states. *E.g.*, 69 Comp. Gen. 660 (1990).

- Interest earned by grantees on unauthorized loans of grant funds. 71 Comp. Gen. 387 (1992).

- Interest improperly earned on federal grant funds by various agencies of the District of Columbia government. B-283834, Feb. 24, 2000.

- Reimbursements received for child care services provided by federal agencies for their employees under authority of 40 U.S.C. § 590. 67 Comp. Gen. 443, 448–49 (1988).

- Receipts generated by undercover operations by law enforcement agencies. 67 Comp. Gen. 353 (1988); 4B Op. Off. Legal Counsel 684, 686 (1980). In GAO's opinion, however, short-term operations (a card game or dice game, for example) may be treated as single transactions. 67 Comp. Gen. 353, clarifying B-201751, Feb. 17, 1981. Thus, 31 U.S.C. § 3302(b) need not be read as requiring an undercover agent participating in a card game to leave the table to make a miscellaneous receipts deposit after every winning hand. If, however, the agent ends up with winnings at the end of the game, the money cannot be used to offset expenses of the operation.[185] Related cases are 5 Comp. Gen. 289 (1925) and 3 Comp. Gen. 911 (1924) (moneys used to purchase evidence for use in criminal prosecutions and recovered when no longer needed for that purpose must be deposited as miscellaneous receipts).

- Proceeds from silver and gold sold as excess property by the Interior Department as successor to the American Revolutionary Bicentennial Administration. (The silver and gold had been obtained by melting down unsold commemorative medals which had been struck by the

[185] The Federal Bureau of Investigation and the Drug Enforcement Administration now have statutory authority to retain and use the proceeds from undercover operations, subject to certain conditions. See Pub. L. No. 102-395, § 102(b), 106 Stat. 1838 (Oct. 10, 1992), which was continued in effect by Pub. L. No. 104-132, § 815(d), 110 Stat. 1315 (Apr. 24, 1996), and extended to the Bureau of Alcohol, Tobacco, Firearms, and Explosives by Pub. L. No. 108-447, div. B, title I, § 116, 118 Stat. 2809, 2870 (Dec. 8, 2004). *See* 28 U.S.C. § 533 note. Other agencies have similar authority. *See also* 8 U.S.C. § 1363a(a)(3) (Immigration and Naturalization Service); 19 U.S.C. § 2081(a)(2) (Customs Service); 26 U.S.C. § 7608(c)(1)(B) and (C) (Internal Revenue Service).

Treasury Department for sale by the American Revolutionary Bicentennial Administration.) B-200962, May 26, 1981.

- Income derived from oil and gas leases on "acquired lands" (as distinguished from "public domain lands") of the United States used for military purposes. B-203504, July 22, 1981.

### k. Miscellaneous Cases: Money Retained by Agency

Most cases in which an agency may credit receipts to its own appropriation or fund involve the areas previously discussed: authorized repayments, Economy Act transactions, revolving funds, or the other specific situations noted. There is another group of cases, not susceptible to further generalization, in which an agency simply has specific statutory authority to retain certain receipts. Examples are:

- Forest Service may retain moneys paid by permittees on national forest lands representing their *pro rata* share under cooperative agreements for the operation and maintenance of waste disposal systems under the Granger-Thye Act, 16 U.S.C. § 572 (1970). 55 Comp. Gen. 1142 (1976).

- Customs Service may, under 19 U.S.C. § 1524, retain charges collected from airlines for preclearance of passengers and baggage at airports in Canada, for credit to the appropriation originally charged with providing the service. 48 Comp. Gen. 24 (1968).

- Overseas Private Investment Corporation may retain interest on loans of excess foreign currencies made under the Foreign Assistance Act of 1961, as amended, 22 U.S.C. § 2196. 52 Comp. Gen. 54 (1972).

- The African Development Foundation, by virtue of its statutory gift-acceptance authority, may retain funds it receives from certain African governments in order to supplement its grants. B-300218, Mar. 17, 2003.

- Payroll deductions for government-furnished quarters under 5 U.S.C. § 5911 are retained in the appropriation(s) or fund(s) from which the employee's salary is paid. 59 Comp. Gen. 235 (1980), *as modified by* 60 Comp. Gen. 659 (1981). However, if the employee pays directly rather than by payroll deduction, the direct payments must go to

miscellaneous receipts unless the agency has specific statutory authority to retain them. 59 Comp. Gen. at 236.[186]

- Under the Mineral Lands Leasing Act of 1920, 30 U.S.C. § 191, receipts from the sale or lease of public lands are distributed in the manner specified in the statute. This was held to include the proceeds of bid deposits forfeited by successful mineral lease bidders who fail to execute the lease. 65 Comp. Gen. 570 (1986).

- By virtue of provisions in the Job Training Partnership Act[187] and annual appropriation acts, certain receipts generated by Job Corps Centers may be retained for credit to the Labor Department appropriation from which the Centers are funded. 65 Comp. Gen. 666 (1986).

- Legislation establishing the Commission on the Bicentennial of the United States Constitution authorized the Commission to retain revenues derived from its licensing activities but did not address sales revenues. Sales revenues, therefore, had to be deposited as miscellaneous receipts. B-228777, Aug. 26, 1988.

In the occasional case, the authority may be less than specific. In B-114860, Mar. 20, 1975, for example, based on the broad authority of the National Housing Act, GAO advised that the Department of Housing and Urban Development could require security deposits from tenants in HUD-owned multifamily projects. Consistent with practice in the private sector, the deposit would be considered the property of the tenant and held in an escrow account, to be either returned to the tenant upon completion of the lease or forfeited to the government in cases of breach.

A final case we will note is 24 Comp. Gen. 514 (1945), an exception stemming from the particular funding arrangement involved rather than a specific statute. The case dealt with certain government corporations that did not receive annual appropriations but instead received annual authorizations for expenditures from their capital funds for administrative expenses. An appropriation act had imposed a limit on certain

[186] For agencies funded under the annual Interior Department and Related Agencies appropriation acts, the rentals, whether collected by payroll deduction or otherwise, go into a “special fund” maintained by each agency to be used for maintenance and operation of the quarters. 5 U.S.C. § 5911 note.

[187] Pub. L. No. 97-300, 96 Stat. 1324 (Oct. 13, 1982).

communication expenditures and provided that savings resulting from the limit "shall not be diverted to other use but shall be covered into the Treasury as miscellaneous receipts." The Comptroller General construed this as meaning returned to the source from which made available. In the case of the corporations in question, this meant that the savings could be returned to their capital funds.

### l. Money Erroneously Deposited as Miscellaneous Receipts

The various accounts that comprise the heading "miscellaneous receipts" are just that—they are receipt accounts, not expenditure or appropriation accounts. As noted earlier, by virtue of the Constitution, once money is deposited into miscellaneous receipts, it takes an appropriation to get it back out. What, therefore, can be done if an agency deposits some money into miscellaneous receipts by mistake?

This question really involves two separate situations. In the first situation, an agency receives funds which it is authorized, under the principles discussed above, to credit to its own appropriation or fund, but erroneously deposits them as miscellaneous receipts. The decisions have always recognized that the agency can make an appropriate adjustment to correct the error. In an early case, the Interior Department sold some property and deposited the proceeds as miscellaneous receipts when in fact it was statutorily authorized to credit the proceeds to its reclamation fund. The Interior Department then requested a transfer of the funds back to the reclamation fund, and the Secretary of the Treasury asked the Comptroller of the Treasury if it was authorized. Of course it was, replied the Comptroller:

> "This is not taking money out of the Treasury in violation of paragraph 7, section 9, Article I of the Constitution . . . .
>
> "The proceeds of the sale . . . have been appropriated by law. Taking it from the Treasury and placing it to the credit in the Treasury of the appropriation to which it belongs violates neither the Constitution nor any other law, but simply corrects an error by which it was placed to the unappropriated surplus instead of to the appropriation to which it belongs."

12 Comp. Dec. 733, 735 (1906).

This concept has consistently been followed. *See* 45 Comp. Gen. 724 (1966); 3 Comp. Gen. 762 (1924); 2 Comp. Gen. 599 (1923). *Cf.* B-275490, Dec. 5, 1996.[188] The concept also has been applied to permit correction of some errors in accounts that had been closed and their balances canceled pursuant to 31 U.S.C. §§ 1552 or 1555. *See* 72 Comp. Gen. 343 (1993). This decision held that, while canceled balances cannot be restored for purposes of recording obligations or making disbursements, bookkeeping records of closed accounts can be adjusted to correct obvious accounting errors. The decision was prompted by the Defense Department's request that the Treasury Department reopen some of its accounts in order to record disbursements against those accounts for payments that, according to Defense, had been made from those accounts before cancellation but had not been properly charged against the accounts. The decision emphasized that—

> "Treasury's authority to correct the accounts relates only to obvious clerical errors such as misplaced decimals, transposed digits, or transcribing errors that result in inadvertent cancellations of budget authority, and is not meant to serve as a palliative for deficiencies in DOD's accounting systems."

72 Comp. Gen. at 346.

A subsequent decision again stressed that while patently erroneous appropriation transactions can and often must be corrected, the authority to make corrections "extends only to clerical and administrative errors, not all misjudgments and miscalculations by government officials." B-286661, Jan. 19, 2001, at fn. 5.

In the second situation, a private party pays money to a federal agency, the agency deposits it as miscellaneous receipts, and it is subsequently determined that the party is entitled to a refund. Here, in contrast to the first situation, an appropriation is necessary to get the money out. *E.g.*, 3 Comp. Gen. 296 (1923).

[188] The reverse adjustment is made when funds which should have been deposited as miscellaneous receipts are erroneously credited to an appropriation. The remedy is a transfer from the appropriation to the appropriate miscellaneous receipts account. *E.g.*, B-48722, Apr. 16, 1945.

There is a permanent indefinite appropriation for refunding collections "erroneously received and covered" that are not properly chargeable to any other appropriation. 31 U.S.C. § 1322(b)(2). The availability of this appropriation depends on exactly where the receipts were deposited. If the amount subject to refund was credited to some specific appropriation account, the refund is chargeable to the same account. If, however, the receipt was deposited in the general fund as miscellaneous receipts, then the appropriation made by 31 U.S.C. § 1322(b)(2) is available for the refund, provided that the amount in question was "erroneously received and covered." B-257131, May 30, 1995; 71 Comp. Gen. 464 (1992); 61 Comp. Gen. 224 (1982); 55 Comp. Gen. 625 (1976); 17 Comp. Gen. 859 (1938). Also, the 31 U.S.C. § 1322(b) appropriation is not available as a source for adjusting an erroneous intra-governmental transfer between two appropriation accounts since such an adjustment does not involve a "refund" of funds "erroneously received" by the government. B-286661, Jan. 19, 2001, at fn. 6.

Examples of cases in which use of the "Moneys Erroneously Received and Covered" appropriation was found authorized are 71 Comp. Gen. 464 (1992) (refund to investment company of late filing fee upon issuance of order by Securities and Exchange Commission exempting company from filing deadline for fiscal year in question); 63 Comp. Gen. 189 (1984) (Department of Energy deposited overcharge recoveries from oil companies into general fund instead of first attempting to use them to make restitution refunds); B-217595, Apr. 2, 1986 (interest collections subsequently determined to have been erroneous).

One case, 53 Comp. Gen. 580 (1974), combined elements of both situations. The Army Corps of Engineers had been authorized to issue discharge permits under the Refuse Act Permit Program. The program was statutorily transferred in 1972 to the Environmental Protection Agency. Under the user charge statute, 31 U.S.C. § 9701, both the Corps and EPA had charged applicants a fee. In some cases, the fees had been deposited as miscellaneous receipts before the applications were processed. The legislation that transferred the program to EPA also provided that EPA could authorize states to issue the permits. However, there was no provision that authorized EPA to transfer to the states any fees already paid. Thus, some applicants found that they had paid a fee to the Corps or EPA, received nothing for it, and were now being charged a second fee by the state for the same application. EPA felt that the original fees should be refunded. So did the applicants.

GAO noted that the user charge statute contemplates that the federal agency will furnish something in exchange for the fee. Since this had not been done, the fees could be viewed as having been erroneously deposited in the general fund. However, the fees had not been erroneously received—the Corps and EPA had been entirely correct in charging the fees in the first place—so the appropriation made by 31 U.S.C. § 1322(b)(2) could not be used. There was a way out, but the refunds would require a two-step process. The Corps and EPA should have deposited the fees in a trust account[189] and kept them there until the applications were processed, at which time depositing as miscellaneous receipts would have been proper. Thus, EPA could first transfer the funds from the general fund to its suspense account as the correction of an error, and then make the refunds directly from the suspense account.

In cases where the "Moneys Erroneously Received and Covered" appropriation is otherwise available, it is available without regard to whether the original payment was made under protest. 55 Comp. Gen. 243 (1975).

The appropriation made by 31 U.S.C. § 1322(b)(2) for Refund of Moneys Erroneously Received and Covered is available only to refund amounts actually received and deposited. If a given refund bears interest, for example, a refund claim approved by a contracting officer under the Contract Disputes Act, the interest portion must be charged to the contracting agency's operating appropriations for the fiscal year in which the award is made. B-217595, Apr. 2, 1986.

If an agency collects money from someone to whom it owes a refund from a prior transaction, it should not simply deposit the net amount. The correct procedure is to deposit the new receipt into the general fund (assuming that is the proper receptacle), and then make the refund using the "Moneys Erroneously Received and Covered" appropriation. B-19882, Oct. 28, 1941; A-96279, Sept. 15, 1938. However, GAO has approved offsetting a refund against future amounts due from the same party in cases where there is a continuing relationship, but suggested that the party be given the choice. B-217595, Apr. 2, 1986, at 4.

[189] *See also* B-3596, A-51615, Nov. 30, 1939. Use of a deposit fund suspense account is equally acceptable. B-158381, June 21, 1968.

Clearly, if the receipt cannot be regarded as erroneous, 31 U.S.C. § 1322(b)(2) is not available. *E.g.*, *Lee v. United States*, 33 Fed. Cl. 374 (1995); 53 Comp. Gen. 580 (1974); B-146111, July 6, 1961. Citing several of the Comptroller General decisions discussed previously, the court in *Lee* held that a filing fee appropriately paid by a litigant and deposited into the Treasury was not subject to refund under section 1322(b)(2). *Lee*, 33 Fed. Cl. at 381–84. Also, the "Moneys Erroneously Received and Covered" appropriation is available only where the amount to be refunded was deposited into the general fund. *E.g.*, 11 Comp. Dec. 300 (1904). If a refund is due of moneys deposited somewhere other than the general fund, some other basis must be sought.

*Republic National Bank of Miami v. United States*, 506 U.S. 80 (1992), and the varied opinions of the Justices it spawned, illustrate how perplexing the issues can be when it comes to retrieving from the Treasury funds that should not have been deposited there. *Republic National Bank* was an "*in rem*" forfeiture action against property (a house) that the government alleged had been purchased with income from illegal drug trafficking. The bank intervened, claiming to be an innocent owner of the property by virtue of its mortgage interest. With the consent of the bank, the property was sold and the proceeds were held by the U.S. marshal pending the outcome of the litigation. The trial court rejected the bank's claim and ordered the sale proceeds forfeited to the United States. The bank appealed; however, when it did not seek to stay execution of the judgment the government had the marshal deposit the sales proceeds into the Assets Forfeiture Fund of the Treasury. Once this occurred, the government sought to dismiss the appeal as moot. The government argued that since the proceeds were now in the Treasury, they could not be withdrawn without an appropriation and, thus, the courts could provide no remedy to the bank.

When the case reached the Supreme Court, all of the Justices rejected the government's argument and agreed that the bank could be paid if it prevailed on the merits. However, they were deeply split as to the rationale. Justice Blackmun, author of most of the Court's opinion in *Republic National Bank*, characterized the government's position as being that, by virtue of the Constitution's Appropriations Clause, "absent an appropriation, *any* funds that find their way into a Treasury account must remain there, regardless of their ownership." 506 U.S. at 89. Rejecting this position as producing "bizarre" and "absur[d]" results, Justice Blackmun concluded that an appropriation was not necessary. He reasoned that money involved in a pending *in rem* forfeiture proceeding could not be

regarded as "public funds" within the scope of the Appropriations Clause where the very purpose of the proceeding was to sort out their proper ownership. Furthermore, he observed:

> "Contrary to the Government's broad submission here, the Comptroller General has long assumed that, in certain situations, an erroneous deposit of funds into a Treasury account can be corrected without a specific appropriation. See 53 Comp. Gen. 580 (1974); 45 Comp. Gen. 724 (1966); 3 Comp. Gen. 762 (1924); 12 Comp. Dec. 733, 735 (1906); Principles of Federal Appropriations Law, at 5-79 to 5-81. Most of these cases have arisen where money intended for one account was accidentally deposited in another. It would be unrealistic, for example, to require congressional authorization before a data processor who misplaces a decimal point can 'undo' an inaccurate transfer of Treasury funds. The Government's absolutist view of the scope of the Appropriations Clause is inconsistent with these commonsense understandings."

*Republic National Bank*, 506 U.S. at 92.

However, Chief Justice Rehnquist, joined by four other Justices, wrote the opinion of the Court on this point. The Chief Justice expressed "difficulty accepting the proposition that funds which have been deposited into the Treasury are not public money, regardless of whether the Government's ownership of those funds is disputed." *Id.* at 93. He added, "even if there are circumstances in which funds that have been deposited into the Treasury may be returned absent an appropriation, I believe it unnecessary to plow that uncharted ground here." *Id.* at 95. Instead, he concluded that the judgment fund appropriation under 31 U.S.C. § 1304 would be available to provide a source of payment if the bank prevailed in the case.

Justice Blackmun had rejected the Chief Justice's judgment fund rationale for two reasons. First, he viewed the judgment fund as being limited to the payment of money judgments. Second, he pointed out that the proceeds from the *in rem* action were not in the judgment fund. Rather, they were in

the Treasury Assets Forfeiture Fund. *See Republic National Bank*, 506 U.S. at 91, fn. 6.[190]

Finally, in their separate opinions, Justice White and Justice Stevens both expressed displeasure over the need to address the Appropriations Clause issue, indicating surprise that the Government would advance "such a transparently fallacious position." *See* 506 U.S. at 97–99.

## 3. Gifts and Donations to the Government

### a. Donations to the Government

It has long been recognized that the United States (as opposed to a particular agency) may receive and accept gifts. No particular statutory authority is necessary. As the Supreme Court has said: "Uninterrupted usage from the foundation of the Government has sanctioned it." *United States v. Burnison*, 339 U.S. 87, 90 (1950). The gifts may be of real property or personal property, and they may be testamentary (made by will) or *inter vivos* (made by persons who are not dead yet). Monetary gifts to the United States go to the general fund of the Treasury and present no augmentation problem since there is no appropriation to augment.

However, as the Supreme Court held in the *Burnison* case, a state may prohibit testamentary gifts by its domiciliaries to the United States. Also, a state may impose an inheritance tax on property bequeathed to the United States. *United States v. Perkins*, 163 U.S. 625 (1896). The tax is not regarded as a constitutionally impermissible tax on federal property "since the tax is imposed upon the legacy before it reaches the hands of the government. The legacy becomes the property of the United States only after it has suffered a diminution to the amount of the tax . . . ." *Id.* at 630.

While gifts to the United States do not require statutory authority, gifts to an individual federal agency stand on a different footing. The rule is that a government agency may not accept for its own use (*i.e.*, for retention by the agency or credit to its own appropriations) gifts of money or other

[190] In B-259065, Dec. 21, 1995, the Comptroller General sided with Justice Blackmun on this point, holding that awards against the United States for the return of forfeited cash or cash proceeds of forfeited property that had been deposited in the Justice Department's Assets Forfeiture Fund should be satisfied from that fund.

property in the absence of specific statutory authority. 16 Comp. Gen. 911 (1937). As the Comptroller General said in that decision, "[w]hen the Congress has considered desirable the receipt of donations . . . it has generally made specific provision therefor . . . ." *Id.* at 912. *See also* B-286182, Jan. 11, 2001; B-289903, Mar. 4, 2002 (nondecision letter).

Thus, acceptance of a gift of money or other property by an agency lacking statutory authority to do so is an improper augmentation. *E.g.*, B-286182, Jan. 11, 2001 (District of Columbia Courts statutory gift-acceptance authority permitted receipt of a private company's contribution of telecommunications services and equipment). If an agency does not have statutory authority to accept donations of money, it must turn the money in to the Treasury as miscellaneous receipts. *E.g.*, B-139992, Aug. 31, 1959 (proceeds of life insurance policy designating federal agency as beneficiary). Under the Federal Property and Administrative Services Act of 1949, as amended, agencies without gift retention authority must report gifts of property to the General Services Administration (GSA) and the property is treated in accordance with its regulations. *See* 40 U.S.C. § 121; 41 C.F.R. §§ 102-36.410 and 102-36.415 (2005). Gifts from foreign governments or entities must also be reported to GSA and treated in accordance with 41 C.F.R. § 102-36.420 and part 101-49.

For purposes of this discussion, the term "gifts" may be defined as "gratuitous conveyances or transfers of ownership in property without any consideration." B-286182, Jan. 11, 2001; 25 Comp. Gen. 637, 639 (1946); B-217909, Sept. 22, 1986. A receipt that does not meet this definition does not become a gift merely because the agency characterizes it as one. For example, a fee paid for the privilege of filming a motion picture in a national park is not a gift and must be deposited as miscellaneous receipts rather than in the agency's trust fund. 25 Comp. Gen. 637. *See also* B-89294, Aug. 6, 1963. Similarly, a reduction of accrued liability in fulfillment of a contractual obligation is not a donation for purposes of a statute authorizing appropriations to match "donations." B-183442, Oct. 21, 1975 (statute indicated that only gifts may be matched and payment in satisfaction of a contractual debt is not a gift). On the other hand, some payments that are not wholly voluntary or gratuitous may occasionally qualify for acceptance as gifts or contributions. *See* B-286182, Jan. 11, 2001 (District of Columbia Court System may accept and use a contribution of telecommunication services and equipment from a telecommunication company as part of a settlement agreement in a rate case); B-232482, June 4, 1990 (payments of fees by nongovernment participants for services provided as part of Department of Commerce-sponsored international

trade shows are considered "contributions" under specific language in Commerce's appropriation act).

A number of departments and agencies have statutory authority to accept gifts. A partial listing is contained in B-149711, Aug. 20, 1963 (although dated, B-149711 is still useful since there is no more recent comprehensive compilation of these authorities). The statutory authorizations contain varying degrees of specificity as to precisely what may be accepted (money, property, services, *etc.*). For example, the State Department's general gift statute, 22 U.S.C. § 2697, authorizes the State Department to accept gifts of money or property, real or personal, and, in the Secretary's discretion, conditional gifts. A case discussing this statute is 67 Comp. Gen. 90 (1987) (United States Information Agency may accept donations of radio programs prepared by private syndicators for broadcast over Voice of America facilities). Another is 70 Comp. Gen. 413 (1991) (United States Information Agency may accept donations of foreign debt). Authority to accept voluntary services does not include donations of cash. A-86115, July 15, 1937; A-51627, Mar. 15, 1937. For a further discussion of voluntary services, see section C.3 of this chapter.

The authority of the Defense Department to accept gifts is found in several statutes. First, the Defense Department may accept contributions of money or real or personal property "for use by the Department of Defense" from any person, foreign government, or international organization. The money and proceeds from the sale of property are credited to the Defense Cooperation Account in the Treasury. The money is not automatically available to Defense, but is available for obligation or expenditure only in the manner and to the extent provided in appropriation acts. 10 U.S.C. § 2608. Second, the Department may accept services, supplies, real property, or the use of real property under a mutual defense or similar agreement or as reciprocal courtesies, from a foreign government for the support of any element of United States armed forces in that country. 10 U.S.C. § 2350g. These authorities formed the basis for the United States to accept contributions from foreign governments and others to defray the costs of the 1991 military operations in the Persian Gulf. *See* GAO, *Operations Desert Shield/Storm: Foreign Government and Individual Contributions to the Department of Defense*, GAO/NSIAD-92-144 (Washington, D.C.: May 11, 1992). Other limited-purpose authorities available to the military are found in 10 U.S.C. §§ 2601–2607.

We also should note a statute tailor-made for the philanthropist desiring to make a donation for the express purpose of reducing the national debt.

(Some people mistakenly think they already do this in April of each year.) The Secretary of the Treasury may accept gifts of money, obligations of the United States, or other intangible personal property made for the express purpose of reducing the public debt. Gifts of other real or personal property for the same purpose may be made to the Administrator of the General Services Administration. 31 U.S.C. § 3113.

Assuming the existence of the requisite statutory authority, it is quite easy to make a gift to the government. The essential elements of a gift are donative intent, delivery, and acceptance. There are no particular forms required. A simple letter to the appropriate agency head transmitting the funds for the stated purpose will suffice. *See* B-274855, Jan. 23, 1997; B-157469, July 24, 1974 (nondecision letter).

A 1980 GAO study found that, during fiscal year 1979, 41 government agencies received a total of $21.6 million classified as gift revenue. *See* GAO, *Review of Federal Agencies' Gift Funds*, FGMSD-80-77 (Washington, D.C.: Sept. 24, 1980). The report pointed out that the use of gift funds dilutes congressional oversight because the funds do not go through the appropriation process. The report recommended that agencies be required to more fully disclose gift fund operations in their budget submissions.

The issue raised in most gift cases is the purpose for which gift funds may be used. This ultimately depends on the scope of the agency's statutory authority and the terms of the gift. Gift funds are accounted for as trust funds. They generally must be deposited in the Treasury as trust funds under 31 U.S.C. § 1321(b), to be disbursed in accordance with the terms of the trust. In 16 Comp. Gen. 650, 655 (1937), the Comptroller General stated:

> "Where the Congress authorizes Federal officers to accept private gifts or bequests for a specific purpose, often subject to certain prescribed conditions as to administration, authority must of necessity be reposed in the custodians of the trust fund to make expenditures for administration in such a manner as to carry out the purposes of the trust and to comply with the prescribed conditions thereof without reference to general regulatory and prohibitory statutes applicable to public funds."

While this passage correctly states the trust fund concept, agencies have sometimes misconstrued it to mean that they have free and unrestricted use of donated funds. This is not the case. On the one hand, donated funds

may not be subject to all of the restrictions applicable to direct appropriations. Yet on the other hand, gift funds constitute appropriated funds unless Congress provides otherwise[191] and they are still "public funds" in a very real sense. As GAO stated in B-274855, Jan. 23, 1997:

> "[F]unds available to agencies are considered appropriated, regardless of their source, if they are made available for collection and expenditure pursuant to specific statutory authority. *See* B-215042, April 12, 1985. This means that although donated funds may not be subject to all the restrictions applicable to direct appropriations, they are still public funds. *See* B-197565, May 13, 1980."

*Id.* at 3. *See also* B-275669.2, July 30, 1997. Consequently, gift funds can be used only in furtherance of authorized agency purposes and incident to the terms of the trust. *See* B-300218, Mar. 17, 2003; B-195492, Mar. 18, 1980.

An interesting illustration of this point occurred in B-16406, May 17, 1941. A citizen had bequeathed money in her will to a hospital. When the will was made, the hospital belonged to the state of Louisiana. By the time the will was probated, however, it had been acquired by the United States. Louisiana was concerned that the bequest might, if deposited in the United States Treasury, be diverted from the decedent's intent. There was no need for concern, the Comptroller General advised. The money would have to be deposited as trust funds and would be available for expenditure only for the purposes specified in the trust, that is, for the hospital.

In evaluating the propriety of a proposed use of gift funds, it is first necessary to examine the precise terms of the statute authorizing the agency to accept the gift. Limitations imposed by that statute must be followed. Thus, under a statute which authorized the Forest Service to accept donations "for the purpose of establishing or operating any forest research facility," the Forest Service could not turn over unconditional gift funds to a private foundation under a cooperative agreement, with the foundation to invest the funds and use the proceeds for purposes other than establishing or operating forest research facilities. 55 Comp. Gen. 1059 (1976). *See also* B-198730, Dec. 10, 1986 (funds donated to

[191] *See*, *e.g.*, 36 U.S.C. § 2307 (specifically provides that funds donated to the United States Holocaust Memorial Museum are not to be regarded as appropriated funds and are not subject to requirements or restrictions applicable to appropriated funds).

Library of Congress to further purposes of Library's Center for the Book could not be used for unrelated Library programs); 40 Op. Att'y Gen. 66 (1941) (Library of Congress could not, without statutory authority, share income from donated property with Smithsonian Institution).

Under a statute authorizing the Federal Board for Vocational Education to accept donations to be used "in connection with the appropriations hereby made or hereafter to be made, to defray the expenses of providing and maintaining courses of vocational rehabilitation," the funds could be used only to supplement the Board's regular appropriations and could not be used for any expense not legally payable from the regular appropriation. The statute here conferred no discretion. 27 Comp. Dec. 1068 (1921).

If an agency is authorized to accept gifts, the funds may be used to augment a "not to exceed" earmark applicable to that purpose. B-52501, Nov. 9, 1945. (Although the statute involved in B-52501, the predecessor of 10 U.S.C. § 2608 noted above, no longer exists, the point of the decision is still valid.)

Once it is determined that the proposed use will not contravene the terms of the agency's authorizing statute, the agency will have some discretion under the trust fund concept. For example, donated funds may be used for entertainment only if the entertainment will further a valid function of the agency for which the donated funds were provided, if the government could not accomplish the function as effectively without the expenditure, and if the expenditure does not violate any restrictions imposed by the donor on the use of the funds. 46 Comp. Gen. 379 (1966); B-195492, Mar. 18, 1980; B-170938, Oct. 30, 1972; B-142538, Feb. 8, 1961. *See also* B-152331, Nov. 19, 1975 (involving a trust fund which included both gift and non-gift funds). It follows that donated funds may not be used for entertainment which does not bear a legitimate relationship to official agency purposes. 61 Comp. Gen. 260 (1982), *aff'd upon reconsideration*, B-206173, Aug. 3, 1982 (donated funds improperly used for breakfast for Cabinet wives and Secretary's holiday party).

The trust fund concept was also applied in 36 Comp. Gen. 771 (1957). The Alexander Hamilton Bicentennial Commission had been given statutory authority to accept gifts and wanted to use the donations to award Alexander Hamilton Commemorative Scholarships. The Commission was to have a brief existence and would not have sufficient time to administer the scholarship awards. The Comptroller General held that the Commission could, prior to the date of its expiration, transfer the funds to a

responsible private organization for the purpose of enabling proper administration of the scholarship awards. The distinction between this case and 55 Comp. Gen. 1059, mentioned above, is that in 36 Comp. Gen. 771, the objective of transferring the funds to a private organization was to better carry out an authorized purpose. In 55 Comp. Gen. 1059, the objective was to enable the funds to be used for unauthorized purposes.

Another case illustrating permissible administrative discretion under the trust fund concept is B-131278, Sept. 9, 1957. A number of persons had made donations to St. Elizabeth's Hospital to enable it to buy an organ for its chapel. The donors (organ donors?) had made the gifts on the condition that the Hospital purchase a high-quality (expensive) organ. When the Hospital issued its invitation for bids on the organ, the specifications were sufficiently restrictive so as to preclude offers on lower quality organs. The decision found this to be entirely within the Hospital's discretion in using the gift funds in accordance with their terms.

As noted above, however, the agency's discretion in administering its gift funds is not unlimited. Thus, for example, an agency may not use gift funds for purely personal items such as greeting cards that do not further agency purposes for which the gift funds were donated. 47 Comp. Gen. 314 (1967). *See also* B-195492, Mar. 18, 1980 (when an agency uses trust funds for what appear to be personal purposes, it has the burden of showing that this use furthers the trust purposes).

The particular statutory scheme will determine the extent to which donated funds are subject to other laws governing the expenditure of public funds. In two cases, for example, where a designated activity was to be carried out solely or primarily with donated funds, GAO found that the recipient agency could invest the gift funds in non-Treasury interest-bearing accounts and was not required to comply with the Federal Property and Administrative Services Act of 1949 (FPASA), 41 U.S.C. § 251–266, or the Federal Acquisition Regulation (FAR), 48 C.F.R. §§ 1.104 and 12.101. 68 Comp. Gen. 237 (1989) (Christopher Columbus Quincentenary Jubilee Commission); B-211149, Dec. 12, 1985 (Holocaust Memorial Council). However, these cases were distinguished in B-275669.2, July 30, 1997, in which GAO determined that the American Battle Monuments Commission charged with establishing the World War II memorial must use donated funds for contracts in accordance with the FPASA and FAR since neither the authorizing legislation nor the legislative history indicated an intention to exempt the Commission from such requirements.

Gifts that would require the government to incur significant expenses in future years present special issues. Although there are no recent cases, indications are that the agency needs specific statutory authority—not merely general authority to accept gifts—since the agency's appropriations would not otherwise be available to make the future expenditures. For example, an individual made a testamentary gift to a United States naval hospital. The will provided that the money was to be invested in the form of a memorial fund, with the income to be used for specified purposes. The Comptroller General objected to this, finding that the gift appeared to be conditional and that "the United States would become, in effect, a trustee for charitable uses, would never gain a legal title to the money, but would have the burden and obligation of administering in perpetuity a trust fund . . . ." 11 Comp. Gen. 355, 366 (1932). Also, absent specific authorization by Congress, appropriations would not be available for the expenses of administering the trust. Therefore, absent congressional authorization to accept the donation "as made," it could not be accepted either by the naval hospital, *id.*, or by the Treasury Department, A-40707, Dec. 15, 1936. *See Story v. Snyder*, 184 F.2d 454, 456 (D.C. Cir.), *cert. denied*, 340 U.S. 866 ((1950) ("gifts to the United States which involve any duty, burden, or condition, or are made dependent upon some future performance by the United States, are not accepted by the Government unless by the express authority of Congress"). *See also* 10 Comp. Gen. 395 (1931); 22 Comp. Dec. 465 (1916);[192] 30 Op. Att'y Gen. 527 (1916). A few of the cases (*e.g.*, 10 Comp. Gen. 395 and 30 Op. Att'y Gen. 527) have tied the result to the Antideficiency Act prohibition against incurring obligations in advance of appropriations, reasoning that acceptance would, in effect, create an unauthorized and unfunded contractual commitment to incur future expenses. *See* 10 Comp. Gen. at 398.

A question that received little attention in the past is whether an agency with statutory authority to accept gifts may use either appropriated funds or donated funds to solicit the gifts. GAO found that the Holocaust Memorial Council may use either appropriated or donated funds to hire a fund-raiser, but the cases have little precedential value since the legislation involved included specific authority to solicit as well as accept donations. *See* B-211149, Dec. 12, 1985; B-211149, June 22, 1983.

[192] Some wag once said, jokingly we think, that if you looked hard enough you could probably find a case dealing with the use of appropriated funds to buy dog food. 22 Comp. Dec. 465 is it.

An interesting, and hopefully unique, situation presented itself in B-230727, Aug. 1, 1988. Congress had enacted legislation to establish a Commission on Improving the Effectiveness of the United Nations, to be funded solely from private contributions. Pub. L. No. 100-204, title VII, pt. B, § 727, 101 Stat. 1331, 1394 (Dec. 22, 1987). The effective date of the legislation was March 1, 1989. Unfortunately, the legislation failed to provide a mechanism for anyone (Treasury Department or General Services Administration, for example) to accept and account for donations prior to the effective date, and the Commission itself could not do so since it had no legal existence. Thus, unless the statute were amended to authorize some other agency to act on the Commission's behalf, potential donors could not make contributions prior to the effective date since there was no one authorized to accept them.

In 1995, GAO was asked whether, under the Public Health Service's gift acceptance statute, 42 U.S.C. § 238(a), the National Institutes of Health (NIH), a component of the Public Health Service, may use its appropriated funds to apply for grants from nongovernmental sources, a kind of solicitation of funds. GAO determined that, since NIH had the authority to accept grants as conditional gifts under the statute, it could use its appropriated funds to cover the costs incurred in applying for such grants. B-255474, Apr. 3, 1995.

Finally, if an agency is authorized to accept gifts, it may also accept a loan of equipment by a private party without charge to be used in connection with particular government work. The agency's appropriations for the work will be available for repairs to the equipment, but only to the extent necessary for the continued use of the equipment on the government work, and not after the government's use has terminated. 20 Comp. Gen. 617 (1941). In one case, GAO approved the loan of private property to a federal agency by one of its employees, without charge and apparently without statutory authority, where the agency administratively determined that the equipment was necessary to the discharge of agency functions and the loan was in the interest of the United States. 22 Comp. Gen. 153 (1942). The decision stressed, however, that the practice of borrowing property should not be encouraged since it might give rise to claims against the government or questions about favors received or expected by the persons loaning the property. The decision seems to have been based in part on wartime needs and its precedent value would therefore seem minimal. *See*, *e.g.*, B-168717, Feb. 18, 1970.

## b. Donations to Individual Employees

(1) Contributions to salary or expenses

As a general proposition, unless authorized by statute, private contributions to the salary or expenses of a federal employee are improper. First, they may in some circumstances violate 18 U.S.C. § 209, which prohibits the supplementation of a government employee's salary from private sources. "The evils of such, were it permitted, are obvious." *Exchange National Bank v. Abramson*, 295 F. Supp. 87, 90 (D. Minn. 1969). For purposes of 18 U.S.C. § 209, the proverb that it is better to give than to receive does not work. Both the giving and the receiving are criminal offenses under the statute. The employee would presumably violate the law by receiving more than he or she is entitled to receive under applicable statutes and regulations. 33 Op. Att'y Gen. 273, 275 (1922) (object of the predecessor to 18 U.S.C. § 209 was that "no Government official or employee should serve two masters to the prejudice of his unbiased devotion to the interests of the United States"). For further discussion of section 209, see the Memorandum Opinion for the General Counsel, Federal Bureau of Investigation, *Applicability of 18 U.S.C. § 209 to Acceptance by FBI Employees of Benefits under the "Make a Dream Come True" Program*, OLC Opinion, Oct. 28, 1997. See also the Office of Government Ethics, *Standards of Ethical Conduct for Employees of the Executive Branch*, 5 C.F.R. part 2635 (2005) (implementing 18 U.S.C. § 201), which prohibit an employee from accepting gifts from persons whose interests may be substantially affected by the employee.

Second, they are improper as unauthorized augmentations. To the extent the private contribution replaces the employee's government salary, it is a direct augmentation of the employing agency's appropriations. To the extent the contribution supplements the government salary, it is an augmentation in an indirect sense, the theory being that when Congress appropriates money for an activity, all expenses of that activity must be borne by that appropriation unless Congress specifically provides otherwise.

An early case in point is 2 Comp. Gen. 775 (1923). The American Jewelers' Protective Association offered to pay the salary and expenses of a customs agent for one year on the condition that the agent be assigned exclusively for that year to investigate jewelry smuggling. The Comptroller General found the arrangement improper, for the two reasons noted above. Whether the payments were to be made directly to the employee or to the agency by way of reimbursement was immaterial.

Most questions in this area involve schemes for private entities to pay official travel expenses. From the sheer number of cases GAO has considered, one cannot help feeling that the bureaucrat must indeed be a beloved creature. A long series of decisions established the proposition that donations from private sources for official travel to conduct government business constituted an unlawful augmentation unless the employing agency had statutory authority to accept gifts. If the agency had such authority, the donation could be made to the agency, not the individual employee, and the agency would then reimburse the employee in accordance with applicable travel laws and regulations, with the allowances reduced as appropriate in the case of contributions in kind.[193]

One problem with this system was the lack of uniformity in treatment, varying with the agency's statutory authority. Congress addressed the situation in the Ethics Reform Act of 1989, Pub. L. No. 101-194, § 302, 103 Stat. 1716, 1745 (Nov. 30, 1989), codified at 31 U.S.C. § 1353. Subsection (a) provides as follows:

> "Notwithstanding any other provision of law, the Administrator of General Services, in consultation with the Director of the Office of Government Ethics, shall prescribe by regulation the conditions under which an agency in the executive branch (including an independent agency) may accept payment, or authorize an employee of such agency to accept payment on the agency's behalf, from non-Federal sources for travel, subsistence, and related expenses with respect to attendance of the employee (or the spouse of such employee) at any meeting or similar function relating to the official duties of the employee. Any cash payment so accepted shall be credited to the appropriation applicable to such expenses. In the case of a payment in kind so accepted, a pro rata reduction shall be made in any entitlement of the employee to payment from the Government for such expenses."

GSA's implementing regulations are found at 41 C.F.R. chapter 304 (2005). Thus, as long as acceptance complies with the statute and regulations,

[193] Some cases from this series are 59 Comp. Gen. 415 (1980); 55 Comp. Gen. 1293 (1976); 49 Comp. Gen. 572 (1970); 46 Comp. Gen. 689 (1967); 36 Comp. Gen. 268 (1956); 26 Comp. Dec. 43 (1919).

there is no longer an augmentation problem. The existence or lack of separate statutory authority to accept gifts is immaterial.

Another relevant statute, which seemingly overlaps 31 U.S.C. § 1353 to some extent but was left untouched by it, is 5 U.S.C. § 4111, enacted as part of the Government Employees Training Act, Pub. L. No. 85-507, 72 Stat. 327 (July 7, 1958). Under this provision, an employee may accept (1) contributions and awards incident to training in nongovernment facilities, and (2) payment of travel, subsistence, and other expenses incident to attendance at meetings, but only if the donor is a tax-exempt nonprofit organization. If an employee receives a contribution in cash or in kind under this section, travel and subsistence allowances are subject to an "appropriate reduction."

Section 4111 authorizes the *employee* to accept the donation. It does not authorize the *agency* to accept the donation, credit it to its appropriations, and then reimburse the employee. 55 Comp. Gen. 1293 (1976). An employee who receives an authorized donation after the government has already paid the travel expenses cannot keep everything. The employee must refund to the government the amount by which his or her allowances would have been reduced had the donation been received before the allowances were paid. The agency may then credit this refund to its travel appropriation as an authorized repayment. *Id.* at 1294–95. *See also* 41 C.F.R. § 304-9.5.

The statute requires an "appropriate reduction" in travel payments in order to preclude the agency from paying for something that has already been reimbursed by an authorized private organization. An employee being reimbursed on an "actual expense" basis should not be claiming items which would duplicate private reimbursements. Thus, the agency is not required to reduce the actual expense entitlement by the value of provided meals. 64 Comp. Gen. 185 (1985). However, the value of subsistence items furnished in kind must be deducted where the employee is being reimbursed on a per diem basis. *Id.* at 188; 49 Comp. Gen. 572, 576 (1970).

The authority conferred by 5 U.S.C. § 4111 is expressly limited to organizations exempt from taxation under section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) (religious, charitable, scientific, educational, *etc.*). It does not extend to organizations which may be tax-exempt under other portions of section 501. B-225986, Mar. 2, 1987. Also, it does not apply to an organization whose application for exemption under section 501(c)(3) has not yet been approved; subsequent approval is not

retroactive for purposes of 5 U.S.C. § 4111. B-225264, Nov. 24, 1987 (nondecision letter).

Donations made under the express condition that they be used for some unauthorized purpose should be returned to the donor. 47 Comp. Gen. 319 (1967).

(2) Travel-related promotional items

Over the years, commercial airlines and others have devised a variety of programs to reward frequent customers. Promotional materials awarded to customers may take various forms—bonus trips, reduced-fare coupons, cash, merchandise, credits toward future goods or services, *etc*. Government employees traveling on government business are eligible for these promotional items the same as anyone else. Historically, statutes, regulations, and case law had maintained that the government employee, with certain exceptions, could not keep such promotional items. The fundamental principle underlying the prior decisions and regulations in this area was that any benefit, cash payment or otherwise, received by a government employee from private sources incident to or resulting from the performance of official duty was regarded as having been received on behalf of the government and was the property of the government.[194]

On December 28, 2001, the President signed into law a provision that federal employees may retain travel-related promotional items for personal use. Pub. L. No. 107-107, div. A, title XI, subtitle B, § 1116, 115 Stat. 1012, 1241 (Dec. 28, 2001), 5 U.S.C. § 5702 note. The law specifically provides that a federal traveler who receives a promotional item (such as frequent flyer miles, upgrades, or access to carrier clubs or facilities) as a result of using travel or transportation services obtained at federal government

[194] GAO's decisions involving promotional items obtained as a result of government-sponsored travel were decided under its claims settlement authority and predate the transfer of this authority to the executive branch in 1995. For details of this transfer see B-275605, Mar. 17, 1997. GAO has not issued decisions on such promotional items subsequent to that transfer. In testimony before the House of Representative's Subcommittee on Technology and Procurement Policy of the Committee on Government Reform, the Comptroller General spoke in favor of proposals that would allow employees who travel on government business to keep their frequent flyer miles, describing it as a "small benefit but one that private sector employers commonly provide their people as part of a mosaic of competitive employee benefits." GAO, *Human Capital: Building the Information Technology Workforce to Achieve Results*, GAO-01-1007T (Washington, D.C.: July 31, 2001), at 23.

expense may retain those items for personal use if the item is obtained under the same terms as those offered to the general public and at no additional cost to the government. The Federal Travel Regulation addresses promotional items in 41 C.F.R. part 301-53 (2005).

## 4. Other Augmentation Principles and Cases

As pointed out earlier in our introductory comments, the augmentation theory is relevant in a wide variety of contexts. The most common applications are the areas previously discussed—the spectrum of situations involving the miscellaneous receipts statute and the acceptance of gifts. This portion of the discussion will present a sampling of cases to illustrate other applications of the theory.

Another way of stating the augmentation rule is that when Congress appropriates funds for an activity, the appropriation represents a limitation Congress has fixed for that activity, and all expenditures for that activity must come from that appropriation absent express authority to the contrary. Thus, a federal institution is normally not eligible to receive grant funds from another federal institution. It is not necessary for the grant statute to expressly exclude federal institutions as eligible grantees; the rule will apply based on the augmentation theory unless the grant statute expressly includes federal institutions. 57 Comp. Gen. 662, 664 (1978); 23 Comp. Gen. 694 (1944); B-114868, Apr. 11, 1975.[195]

The improper treatment of reimbursable transactions may result in an augmentation. An example of this type of transaction is an order under the Economy Act, 31 U.S.C. § 1535.[196] Thus, if a given reimbursement must be credited to the appropriation that "earned" it (*i.e.*, that financed the transaction), and that appropriation has expired, crediting the reimbursement to current funds is an improper augmentation. *E.g.*, 72 Comp. Gen. 109, 110 (1993); B-242274, Aug. 27, 1991. However, a *de minimis* exception to this rule was recognized in 72 Comp. Gen. 63 (1992). This decision held that a refund of $100 or less that related to an expired account could be treated as a credit against a future invoice to the party owing the refund, and thus applied to a current account since the cost of

[195] GAO has no decisions addressing whether a federal agency with gift acceptance authority may receive a gift of money transferred to it from another federal agency.

[196] Economy Act transactions are described in more detail in section E.2.e of this chapter, above, and in section B.1 of Chapter 15.

processing a separate refund check would exceed the amount of the refund. The decision reasoned that this approach would save the government money and have an insignificant impact on the agency's account integrity. *Id.* at 64. The decision in 72 Comp. Gen. 109 (1993), which was issued shortly thereafter, underscored that this exception applied to *de minimis* amounts of $100 or less and did not apply to refunds that regularly exceeded $1,000. 72 Comp. Gen. at 110.

Some statutes give an agency the option of crediting reimbursements either to current funds or to the appropriation that financed the transaction. *E.g.*, 10 U.S.C. §§ 2205 and 2210; 22 U.S.C. § 2392(c) and (d).[197] Even here, however, crediting a reimbursement to an appropriation that bears no relationship to the transaction would be an unauthorized augmentation. B-132900-O.M., Nov. 1, 1977.

Likewise, treating a transaction which should be reimbursed as nonreimbursable may result in an improper augmentation. For example, an agency receives appropriations to do its own work, not that of another agency. Accordingly, as a general proposition, interdepartmental loans of personnel on a nonreimbursable basis improperly augment the appropriations of the receiving agency. 65 Comp. Gen. 635 (1986); 64 Comp. Gen. 370 (1985). Such nonreimbursable loans also constitute a misuse of the detailing agency's appropriation under 31 U.S.C. § 1301. B-247348, June 22, 1992.

Reimbursement by one agency to another in situations which are not the proper subject of an Economy Act agreement or where reimbursement is not otherwise statutorily authorized is improper for several reasons: It is an unauthorized transfer of appropriations; it violates 31 U.S.C. § 1301(a) by using the reimbursing agency's appropriations for other than their intended purpose; and it is an improper augmentation of the appropriations of the agency receiving the reimbursement. (The cases do not always cite all of these theories; they again illustrate the close interrelationship of the various concepts discussed throughout this publication.) The situation arises, for example, when agencies attempt to use the Economy Act for a "service" that is a normal part of the providing agency's mission and for which it receives appropriations.

[197] For a discussion of some of these statutes as well as related and predecessor provisions, see B-179708-O.M., Dec. 1, 1975, and B-179708-O.M., July 21, 1975.

To illustrate, an agency acquiring land cannot reimburse the Justice Department for the legal expenses incurred incident to the acquisition because these are regular administrative expenses of the Justice Department for which it receives appropriations. 16 Comp. Gen. 333 (1936). Similarly, an agency cannot reimburse the Treasury Department for the administrative expenses incurred in making disbursements on its account. 17 Comp. Gen. 728 (1938).

Federal agencies may not reimburse the Patent Office for services performed in administering the patent and trademark laws since the Patent Office is required by law to furnish these services and receives appropriations for them. 33 Comp. Gen. 27 (1953). Nor may they reimburse the Library of Congress for recording assignments of copyrights to the United States. 31 Comp. Gen. 14 (1951). *See also* 40 Comp. Gen. 369 (1960) (Interior Department may not charge other agencies for the cost of conducting hearings incident to the validation of unpatented mining claims, although it may charge for other services in connection with the validation which it is not required to furnish); B-211953, Dec. 7, 1984 (General Services Administration may not seek reimbursement for costs of storing records which it is required by law to store and for which it receives appropriations).

The Merit Systems Protection Board may not accept reimbursement from other federal agencies for travel expenses of hearing officers to hearing sites away from the Board's regular field offices. Holding the hearings is not a service to the other agency, but is a Board function for which it receives appropriations. The inadequacy of the Board's appropriations to permit sufficient travel is legally irrelevant. 59 Comp. Gen. 415 (1980), *aff'd upon reconsideration*, 61 Comp. Gen. 419 (1982). Where an agency provides personnel to act as hearing officers for another agency, it may be reimbursed if it is not required to provide the officers (B-192875, Jan. 15, 1980) but may not be reimbursed if it is required to provide them (32 Comp. Gen. 534 (1953)). Likewise, the Export-Import Bank cannot charge its customers for travel expenses incurred by Bank employees in transacting their business. B-277254, Mar. 5, 1997.

A client agency must bear from its own appropriations costs it incurs in assisting the Justice Department to defend it in litigation. Such support costs, which may include substantial temporary services provided by the agency's staff lawyers and paralegals, cannot be billed to Justice. 73 Comp. Gen. 90 (1994), *citing* 39 Comp. Gen. 643 (1960).

The decision in 70 Comp. Gen. 601 (1991) provides a variant on this principle. That decision approved the Army Civilian Appellate Review Agency's practice of obtaining reimbursement from other Army components for costs it incurred in investigating grievances filed by employees of the other components. For one thing, both the Review Agency and the other components were funded from the same appropriation in most instances; thus, there could be no augmentation. However, even when different appropriations were involved, the other component's appropriation could be charged pursuant to 31 U.S.C. § 1534. Indeed, the decision pointed out that such charges were "precisely the kind of situation contemplated by section 1534" since the Review Agency assisted the other components in satisfying their obligation to provide a grievance resolution process for their employees. 70 Comp. Gen. at 604.

Augmentation issues also can arise when an agency is trying to decide which of its appropriations to use for a given object. In 68 Comp. Gen. 337 (1989), for example, the Railroad Retirement Board wanted to make performance awards to personnel in its Office of Inspector General (IG), and was unsure whether to charge its appropriation for the IG's office or its general appropriation. A reasonable argument could be made to support either choice. Thus, the Board could make an election as long as it remained consistent thereafter. Since there was no indication that the IG appropriation was intended to be the exclusive funding source for the performance awards, using the general appropriation would not result in an improper augmentation of the IG appropriation.[198]

A somewhat analogous situation could arise if an agency agrees to reduce or forgo receipts to which it is entitled, and the party owing those receipts agrees in return to make some expenditure which would otherwise have to be borne by a separate appropriation of the same agency. GAO examined such a situation in B-77467, Nov. 8, 1950, involving the leasing of lands under the Bankhead-Jones Farm Tenant Act at reduced rentals on condition that the lessees in return perform certain improvements to the land. There was no augmentation in that case, however, since the statute expressly authorized the leasing with or without consideration and on such

[198] No augmentation requiring an election between potential funding sources exists, however, where the law clearly authorizes an agency to use both sources interchangeably in order to supplement each other. *See* B-272191, Nov. 4, 1997, *distinguishing* 68 Comp. Gen. 337.

terms as the Secretary of Agriculture determined would best accomplish the purposes of the act.

The following cases illustrate other situations which GAO found would result in unauthorized augmentations:

- The Customs Service may not charge the party-in-interest for travel expenses of customs employees incurred incident to official duties performed at night or on a Sunday or holiday. 43 Comp. Gen. 101 (1963); 3 Comp. Gen. 960 (1924). *See also* 22 Comp. Dec. 253 (1915).Department of Energy may not use overcharge refunds collected from oil companies to pay the administrative expenses of its Office of Hearings and Appeals. B-200170, Apr. 1, 1981.

- Proposal for airlines to reimburse Treasury to permit Customs Service to hire additional staff to reduce clearance delays at Miami airport was unauthorized in that it would augment appropriations made by Congress for that service. 59 Comp. Gen. 294 (1980).

# Obligation of Appropriations

**A. Introduction: Nature of an Obligation . . . . . . . . . . . . . . . .7-2**
**B. Criteria for Recording Obligations (31 U.S.C. § 1501) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7-6**
1. Section 1501(a)(1): Contracts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
a. Binding Agreement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
b. Contract “in Writing” . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-14
c. Requirement of Specificity . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-17
d. Invalid Award/Unauthorized Commitment . . . . . . . . . . . . . . . . 7-18
e. Variations in Quantity to Be Furnished . . . . . . . . . . . . . . . . . . . 7-19
f. Amount to Be Recorded . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-23
g. Administrative Approval of Payment . . . . . . . . . . . . . . . . . . . . . 7-26
h. Miscellaneous Contractual Obligations . . . . . . . . . . . . . . . . . . . 7-27
i. Interagency Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-28
(1) Economy Act agreements . . . . . . . . . . . . . . . . . . . . . . . . . 7-29
(2) Non-Economy Act agreements . . . . . . . . . . . . . . . . . . . . . 7-30
(3) “Binding agreement” requirement . . . . . . . . . . . . . . . . . . . 7-31
(4) Orders from stock . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-33
(5) Project orders . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-33
2. Section 1501(a)(2): Loans . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-35
3. Section 1501(a)(3): Interagency Orders Required by Law . . . . . 7-37
4. Section 1501(a)(4): Orders without Advertising . . . . . . . . . . . . . . 7-39
5. Section 1501(a)(5): Grants and Subsidies . . . . . . . . . . . . . . . . . . . 7-39
a. Grants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-40
b. Subsidies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-42
6. Section 1501(a)(6): Pending Litigation . . . . . . . . . . . . . . . . . . . . . 7-44
7. Section 1501(a)(7): Employment and Travel . . . . . . . . . . . . . . . . . 7-45
a. Wages, Salaries, Annual Leave . . . . . . . . . . . . . . . . . . . . . . . . . 7-46
b. Compensation Plans in Foreign Countries . . . . . . . . . . . . . . . . 7-48
c. Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
d. Uniform Allowance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
e. Travel Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-49
f. State Department: Travel Outside Continental United States 7-51
g. Employee Transfer/Relocation Costs . . . . . . . . . . . . . . . . . . . 7-52
8. Section 1501(a)(8): Public Utilities . . . . . . . . . . . . . . . . . . . . . . . 7-54
9. Section 1501(a)(9): Other Legal Liabilities . . . . . . . . . . . . . . . . . 7-55
**C. Contingent Liabilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7-55**
**D. Reporting Requirements . . . . . . . . . . . . . . . . . . . . . . . . . .7-58**
**E. Deobligation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7-59**

# Obligation of Appropriations

## A. Introduction: Nature of an Obligation

You, as an individual, use a variety of procedures to spend your money. Consider the following transactions:

- You walk into a store, make a purchase, and pay at the counter with cash, check, or debit card.

- You move to another counter and make another purchase with a credit card. No money changes hands at the time, but you sign a credit form which states that you promise to pay upon being billed.

- You call the local tree surgeon to remove some ailing limbs from your favorite sycamore. He quotes an estimate and you arrange to have the work done. The tree doctor arrives while you are not at home, does the work, and slips his bill under your front door.

- You visit your family dentist to relieve a toothache. The work is done and you go home. No mention is made of money. Of course, you know that the work wasn't free and that the dentist will bill you.

- You now visit your family lawyer to sue the dentist and the tree surgeon. The lawyer takes your case and you sign a contingent fee contract in which you agree that the lawyer's fee will be one-third of any amounts recovered.

Numerous other variations could be added to the list but these are sufficient to make the point. The first example is a simple cash transaction. The legal liability to pay and the actual disbursement of money occur simultaneously. The rest of the examples all have one essential thing in common: You first take some action which creates the legal liability to pay—that is, you "obligate" yourself to pay—and the actual disbursement of money follows at some later time. The obligation occurs in a variety of ways, such as placing an order or signing a contract.

The government spends money in much the same fashion except that it is subject to a variety of statutory restrictions. The simple "cash transaction" or "direct outlay" involves a simultaneous obligation and disbursement and represents a minor portion of government expenditures. The major portion of appropriated funds are first obligated and then expended. The subsequent disbursement "liquidates" the obligation. Thus, an agency "uses" appropriations in two basic ways—direct expenditures (disbursements) and obligations. There is no legal requirement for you as

an individual to keep track of your "obligations." For the government, there is.

The concept of "obligation" is central to appropriations law. As will be demonstrated in the discussion below, this is because of the principle, one of the most fundamental, that an obligation must be charged against the relevant appropriation in accordance with the rules relating to purpose, time, and amount. The term "available for obligation" is used throughout this publication to refer to availability as to purpose, time, and amount. This chapter will explore exactly what an obligation is.

It would be nice to start with an all-inclusive and universally applicable definition of "obligation." However, because of the immense variety of transactions in which the government is involved, GAO has defined "obligation" only in the most general terms and has instead analyzed on a case-by-case basis the nature of the particular transaction at issue to determine whether an obligation has been incurred. B-192282, Apr. 18, 1979; B-116795, June 18, 1954.

The most one finds in the decisions are general statements referring to an obligation in such terms as "a definite commitment which creates a legal liability of the Government for the payment of appropriated funds for goods and services ordered or received." B-116795, June 18, 1954. *See also* B-300480.2, June 6, 2003; B-272191, Nov. 4, 1997; B-265901, Oct. 14, 1997; 21 Comp. Gen. 1162, 1163 (1941) (circular letter); B-222048, Feb. 10, 1987; B-82368, July 20, 1954; B-24827, Apr. 3, 1942. From the earliest days, the Comptroller General has cautioned that the obligating of appropriations must be "definite and certain." A-5894, Dec. 3, 1924.

Another definition of an "obligation" that one finds in the decisions takes a slightly broader perspective:

> "A legal duty on the part of the United States which constitutes a legal liability or which could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States . . ."

42 Comp. Gen. 733, 734 (1963).

Thus, in very general and simplified terms, an "obligation" is some action that creates a legal liability or definite commitment on the part of the government, or creates a legal duty that could mature into a legal liability

by virtue of an action that is beyond the control of the government. Payment may be made immediately or in the future. GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 70. *See also McDonnell Douglas Corp. v. United States*, 37 Fed. Cl. 295, 301, *order modified*, 39 Fed. Cl. 665 (1997); OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, §§ 20.3, 20.5 (June 21, 2005).

An advance of funds to a working fund[1] does not in itself serve to obligate the funds. *See* B-180578-O.M., Sept. 26, 1978. The same result holds for funds transferred to a special "holding account" established for administrative convenience. B-118638, Nov. 4, 1974 (appropriations for District of Columbia Public Defender Service under control of the Administrative Office of the U.S. Courts are not obligated by transfer to a "Judiciary Trust Fund" established by the Administrative Office).

The typical question on obligations is framed in terms of when the obligation may or must be "recorded," that is, officially charged against the spending agency's appropriations. Restated, what action is necessary or sufficient to create an obligation? This is essential in determining what fiscal year to charge, with all the consequences that flow from that determination. It is also essential to the broader concern of congressional control over the public purse.

Before proceeding with the specifics, two general points should be noted. First, an obligation arises when the definite commitment is made, even though the actual payment may not take place until a future fiscal year. B-300480.2, June 6, 2003; 56 Comp. Gen. 351 (1977); 23 Comp. Gen. 862 (1944). Second, for appropriations law purposes, the term "obligation" includes both matured and unmatured commitments. A matured commitment is a legal liability that is currently payable. An unmatured commitment is a liability which is not yet payable but for which a definite commitment nevertheless exists. For example, a contractual liability to pay for goods which have been delivered and accepted has "matured." The liability for monthly rental payments under a lease is largely unmatured although the legal liability covers the entire rental period. Both types of liability are "obligations." The fact that an unmatured liability may be

[1] A working fund account is established to receive advance payment from other agencies or accounts. 14 Comp. Gen. 25 (1934). For an example, see 10 U.S.C. § 2208, which authorizes working capital funds in the Department of Defense.

subject to a right of cancellation does not negate the obligation. A-97205, Feb. 3, 1944, at 9–10.[2]

A recent decision illustrates this point. In B-300480, Apr. 9, 2003, GAO determined that the Corporation for National and Community Service (Corporation), the parent body of the AmeriCorps national service program, incurred a legal liability for the award of AmeriCorps national service educational benefits at the time it entered into a grant agreement to provide educational benefits to AmeriCorps participants. Participants in the AmeriCorps program who successfully completed a required term of service earned a national service educational award that could be used to pay for post-secondary education. The Corporation awarded grants to state service commissions, which awarded subgrants to the nonprofit groups—the entities that actually enrolled the AmeriCorps participants. When the Corporation awarded a grant to a state service commission, it entered into a binding agreement authorizing the state service commissions to provide grant awards to a specified number of new participants in the AmeriCorps program. The Corporation argued that it did not incur an obligation for an education award until the time of enrollment because the Corporation could modify the terms and conditions of a grant, including suspension of enrollment, prior to the enrollment of all positions initially approved in a grant. GAO disagreed and explained that:

> "The fact that the government may have the power to amend unilaterally a contract or agreement does not change the nature or scope of the obligation incurred at time of award. Were it otherwise, every government contract that permits the government to terminate the contract for the convenience of the government (48 C.F.R. § 49.502), or to modify the terms of the contract at will (48 C.F.R. §§ 52.243-1, 243-2, 243-3), would not be an obligation of the government at time of award. Long-standing practice and logic both of the Congress (31 U.S.C. § 1501, 41 U.S.C. § 5) and the accounting officers of the government (B-234957, July 10, 1989, B-112131, Feb. 1, 1956) have rejected such a view."

[2] An "unmatured liability" as described in this paragraph is different from a "contingent liability" as discussed in section C of this chapter.

B-300480, Apr. 9, 2003. GAO concluded that because the Corporation had taken an action that could mature into a legal liability for the education benefits by virtue of actions taken by the grantee and participants, not the Corporation, the Corporation incurred an obligation at the time of grant award. *Id.* Subsequently, GAO issued a second decision, B-300480.2, June 6, 2003, which elaborated upon and affirmed the April decision.

## B. Criteria for Recording Obligations (31 U.S.C. § 1501)

The overrecording and the underrecording of obligations are equally improper. Both practices make it impossible to determine the precise status of the appropriation and can lead to other adverse consequences. Overrecording (recording as obligations items that are not) is usually done to inflate obligated balances and reduce unobligated balances of appropriations expiring at the end of a fiscal year. Underrecording (failing to record legitimate obligations) may result in violating the Antideficiency Act. 31 U.S.C. § 1341.[3] A 1953 decision put it this way:

> "In order to determine the status of appropriations, both from the viewpoint of management and the Congress, it is essential that obligations be recorded in the accounting records on a factual and consistent basis throughout the Government. Only by the following of sound practices in this regard can data on existing obligations serve to indicate program accomplishments and be related to the amount of additional appropriations required."

32 Comp. Gen. 436, 437 (1953). *See also* GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 3.5.A. (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM).

The standards for the proper recording of obligations are found in 31 U.S.C. § 1501(a), originally enacted as section 1311 of the Supplemental Appropriation Act, 1955, Pub. L. No. 83-663, 68 Stat. 800, 830 (Aug. 26, 1954). A Senate committee has described the origin of the statute as follows:

> "Section 1311 of the Supplemental Appropriation Act of 1955 resulted from the difficulty encountered by the House

[3] For further discussion of the Antideficiency Act, see Chapter 6, section C.

> Appropriations Committee in obtaining reliable figures on obligations from the executive agencies in connection with the budget review. It was not uncommon for the committees to receive two or three different sets of figures as of the same date. This situation, together with rather vague explanations of certain types of obligations particularly in the military department[s], caused the House Committee on Appropriations to institute studies of agency obligating practices.
>
> * * * * *
>
> "The result of these examinations laid the foundation for the committee's conclusion that loose practices had grown up in various agencies, particularly in the recording of obligations in situations where no real obligation existed, and that by reason of these practices the Congress did not have reliable information in the form of accurate obligations on which to determine an agency's future requirements. To correct this situation, the committee, with the cooperation of the General Accounting Office and the Bureau of the Budget, developed what has become the statutory criterion by which the validity of an obligation is determined. . . ."[4]

Thus, the primary purpose of 31 U.S.C. § 1501 is to ensure that agencies record only those transactions which meet specified standards for legitimate obligations. 71 Comp. Gen. 109 (1991); 54 Comp. Gen. 962, 964 (1975); 51 Comp. Gen. 631, 633 (1972); B-192036, Sept. 11, 1978.[5]

Subsection (a) of 31 U.S.C. § 1501 prescribes specific criteria for recording obligations. The subsection begins by stating that "[a]n amount shall be

[4] Senate Committee on Government Operations, *Financial Management in the Federal Government*, S. Doc. No. 87-11, at 85 (1961).

[5] Although 31 U.S.C. § 1501 does not expressly apply to the government of the District of Columbia, GAO has expressed the view that the same criteria should be followed. B-180578, Sept. 26, 1978. This is because the proper recording of obligations is the only way to assure compliance with 31 U.S.C. § 1341, a portion of the Antideficiency Act, which does expressly apply to the government of the District of Columbia. District of Columbia Self-Government and Governmental Reorganization Act (so-called "Home Rule" Act), Pub. L. No. 93-198, § 603(e), 87 Stat. 774, 815 (Dec. 24, 1973).

recorded as an obligation of the United States Government only when supported by documentary evidence" and then goes on to specify nine criteria for recording obligations. Note that the statute requires "documentary evidence" to support the recording in each instance. In one sense, these nine criteria taken together may be said to comprise the "definition" of an obligation.[6]

If a given transaction does not meet any of the criteria, then it is not a proper obligation and may not be recorded as one. Once one of the criteria is met, however, the agency not only may but must at that point record the transaction as an obligation. While 31 U.S.C. § 1501 does not explicitly state that obligations must be recorded as they arise or are incurred, it follows logically from an agency's responsibility to comply with the Antideficiency Act. GAO has made the point in decisions and reports in various contexts. *E.g.*, B-302358, Dec. 27, 2004; 72 Comp. Gen. 59 (1992); 65 Comp. Gen. 4, 6 (1985); B-242974.6, Nov. 26, 1991; B-226801, Mar. 2, 1988; B-192036, Sept. 11, 1978; A-97205, Feb. 3, 1944, at 10; GAO, FGMSD-75-20 (Washington, D.C.: Feb. 13, 1975) (untitled letter report); GAO, *Substantial Understatement of Obligations for Separation Allowances for Foreign National Employees*, B-179343, (Washington, D.C.: Oct. 21, 1974), at 6.

It is important to emphasize the relationship between the existence of an obligation and the act of recording. Recording evidences the obligation but does not create it. If a given transaction is not sufficient to constitute a valid obligation, recording it will not make it one. *E.g.*, B-197274, Feb. 16, 1982 ("reservation and notification" letter held not to constitute an obligation, act of recording notwithstanding, where letter did not impose legal liability on government and subsequent formation of contract was within agency's control). Conversely, failing to record a valid obligation in no way diminishes its validity or affects the fiscal year to which it is properly chargeable. *E.g.*, B-226782, Oct. 20, 1987 (letter of intent, executed in fiscal year 1985 and found to constitute a contract, obligated fiscal year 1985 funds, notwithstanding agency's failure to treat it as an obligation). *See also* 63 Comp. Gen. 525 (1984); 38 Comp. Gen. 81, 82–83 (1958).

The precise amount of the government's liability should be recorded as the obligation where that amount is known. However, where the precise amount is not known at the time the obligation is incurred, an obligation

[6] S. Doc. No. 87-11, at 86.

amount must still be recorded on a preliminary basis. How to determine this amount is discussed in section B.1.f of this chapter. See also OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 20.5 (June 21, 2005) for guidance on how to record obligation amounts in certain situations. As more precise data on the liability becomes available, the obligation must be periodically adjusted, that is, the agency must deobligate funds or increase the obligational level as the case may be. 7 GAO-PPM § 3.5.D; B-300480, Apr. 9, 2003.

Adjustments to recorded obligations, like the initial recordings themselves, must be supported by documentary evidence. The use of statistical methods to make adjustments "lacks legal foundation if the underlying transactions cannot be identified and do not support the calculated totals." B-236940, Oct. 17, 1989; GAO, *Financial Management: Defense Accounting Adjustments for Stock Fund Obligations Are Illegal*, GAO/AFMD-87-1 (Washington, D.C.: Mar. 11, 1987), at 6.

A related concept is the allocation of obligations for administrative expenses (utility costs, computer services, *etc.*) between or among programs funded under separate appropriations. There is no rule or formula for this allocation apart from the general prescription that the agency must use a supportable methodology. Merely relying on the approved budget is not sufficient. *See* GAO, *Financial Management: Improvements Needed in OSMRE's Method of Allocating Obligations*, GAO/AFMD-89-89 (Washington, D.C.: July 28, 1989). An agency may initially charge common-use items to a single appropriation as long as it makes the appropriate adjustments from other benefiting appropriations before or as of the end of the fiscal year. 31 U.S.C. § 1534; 70 Comp. Gen. 601 (1991). The allocation must be in proportion to the benefit. 70 Comp. Gen. 592 (1991).

Further procedural guidance may be found in OMB Circular No. A-11, at § 20.5; the Treasury Financial Manual; and title 7 of GAO's *Policy and Procedures Manual for Guidance of Federal Agencies*. For the most part, the statutory criteria in 31 U.S.C. § 1501(a) reflect standards that had been developed in prior decisions of the Comptroller General over the years. *See*, *e.g.*, 18 Comp. Gen. 363 (1938); 16 Comp. Gen. 37 (1936). The remainder of this section will explore the nine specific recording criteria.

## 1. Section 1501(a)(1): Contracts

Subsection (a)(1) of 31 U.S.C. § 1501 establishes minimum requirements for recording obligations for contracts. Specifically, there must be documentary evidence of—

> "(1) a binding agreement between an agency and another person (including an agency) that is—
>
> > "(A) in writing, in a way and form, and for a purpose authorized by law; and
> >
> > "(B) executed before the end of the period of availability for obligation of the appropriation or fund used for specific goods to be delivered, real property to be bought or leased, or work or service to be provided."

As seen in Chapter 5, the general rule for obligating fiscal year appropriations by contract is that the contract imposing the obligation must be made within the fiscal year sought to be charged and must meet a *bona fide* need of that fiscal year. *E.g.*, B-272191, Nov. 4, 1997; B-235086, Apr. 24, 1991; 37 Comp. Gen. 155 (1957). This discussion will center on the timing of the obligation from the perspective of 31 U.S.C. § 1501(a)(1).

Subsection (a)(1) actually imposes several different requirements—

- a binding agreement;
- in writing;
- for a purpose authorized by law;
- executed before the expiration of the period of obligational availability; and
- a contract calling for *specific* goods, real property, work, or services.

### a. Binding Agreement

An agreement must be legally binding (offer, acceptance, consideration, made by authorized official). As stated in a 1991 decision:

> "The primary purpose of section 1501(a)(1) is to 'require that there be an *offer* and *acceptance* imposing liability on

> both parties.' 39 Comp. Gen. 829, 831 (1960). Hence the government may record an obligation under section 1501 only upon evidence that both parties to the contract willfully express the intent to be bound."

71 Comp. Gen. 109, 110 (1991) (emphasis in original). To be binding, however, an agreement does not have to be the final "definitized" contract. The legislative history of subsection (a)(1) makes this clear. The following excerpt is taken from the conference report:

> "Section 1311(a)(1) precludes the recording of an obligation unless it is supported by documentary evidence of a binding agreement between the parties as specified therein. It is not necessary, however, that the binding agreement be the final formal contract on any specified form. The primary purpose is to require that there be an offer and an acceptance imposing liability on both parties. For example, an authorized order by one agency on another agency of the Government, if accepted by the latter and meeting the requirement of specificity, *etc.*, is sufficient. Likewise, a letter of intent accepted by a contractor, if sufficiently specific and definitive to show the purposes and scope of the contract finally to be executed, would constitute the binding agreement required."[7]

The following passage from 42 Comp. Gen. 733, 734 (1963) remains a useful general prescription:

> "The question whether Government funds are obligated at any specific time is answerable only in terms of an analysis of written arrangements and conditions agreed to by the United States and the party with whom it is dealing. If such analysis discloses a legal duty on the part of the United States which constitutes a legal liability or which could mature into a legal liability by virtue of actions on the part of the other party beyond the control of the United States, an obligation of funds may generally be stated to exist."

[7] H.R. Rep. No. 83-2663, at 18 (1954), *quoted in* B-118654, Aug. 10, 1965.

In 35 Comp. Gen. 319 (1955), and 59 Comp. Gen. 431 (1980), the Comptroller General set forth the factors that must be present in order for a binding agreement to exist for purposes of 31 U.S.C. § 1501(a)(1) with respect to contracts awarded under competitive procedures:

- Each bid must have been in writing.
- The acceptance of each bid must have been communicated to the bidder in the same manner as the bid was made. If the bid was mailed, the contract must have been placed in the mails before the close of the fiscal year. If the bid was delivered other than by mail, the contract must have been delivered in like manner before the end of the fiscal year.
- Each contract must have incorporated the terms and conditions of the respective bid without qualification. Otherwise, it must be viewed as a counteroffer and there would be no binding agreement until accepted by the contractor.

To illustrate, where the agency notified the successful bidder of the award by telephone near the end of fiscal year 1979 but did not mail the contract document until fiscal year 1980, there was no valid obligation of fiscal year 1979 funds. 59 Comp. Gen. 431 (1980). *See also Goldberger Foods v. United States*, 23 Cl. Ct. 295, 302–303, *aff'd*, 960 F.2d 155 (Fed. Cir. 1992); B-159999-O.M., Mar. 16. 1967; B-235086, Apr. 24, 1991; 35 Comp. Gen. 319 (1955). A document is considered "mailed" when it is placed in the custody of the Postal Service (given to postman or dropped in mailbox or letter chute in office building); merely delivering the document to an agency messenger with instructions to mail it is insufficient. 59 Comp. Gen. 431, 433 (1980); B-235086, Apr. 24, 1991. Similarly, there was no recordable obligation of fiscal year 1960 funds where the agency erroneously mailed the notice of award to the wrong bidder and did not notify the successful bidder until the first day of fiscal year 1961. 40 Comp. Gen. 147 (1960). It is important to note that, in the above cases, the obligation was invalid only with respect to the fiscal year the agency wanted to charge. The agency could still proceed to finalize the obligation but would have to charge funds current in the subsequent fiscal year.

A mere request for additional supplies under a purchase order with no indication of acceptance of the request does not create a recordable obligation. 39 Comp. Gen. 829 (1960). Similarly, a work order or purchase

order may be recorded as an obligation only where it constitutes a binding agreement for specific work or services. 34 Comp. Gen. 459 (1955).

A "letter of intent" is a preliminary document that may or may not constitute an obligation. At one extreme, it may be nothing more than an "agreement to agree" with neither party bound until execution of the formal contract. *E.g.*, B-201035, Feb. 15, 1984, at 5. At the other extreme, it may contain all the elements of a contract, in which event it will create binding obligations. The crucial question is whether the parties intended to be bound, determinable primarily from the language actually used. *Saul Bass & Associates v. United States*, 505 F.2d 1386 (Ct. Cl. 1974). For a good example of a letter of intent creating contractual obligations, see B-226782, Oct. 20, 1987.

A letter of intent which amounts to a contract is also called a "letter contract." In the context of government procurement, it is used most commonly when there is insufficient time to prepare and execute the full contract before the end of the fiscal year. As indicated in the legislative history quoted earlier, a "letter of intent" accepted by the contractor may form the basis of an obligation if it is sufficiently specific and definitive to show the purpose and scope of the contract. 21 Comp. Gen. 574 (1941); B-127518, May 10, 1956. Letters of intent should be used "only under conditions of the utmost urgency." 33 Comp. Gen. 291, 293 (1954). Under the Federal Acquisition Regulation (FAR), letter contracts may be used—

> "when (1) the Government's interests demand that the contractor be given a binding commitment so that work can start immediately and (2) negotiating a definitive contract is not possible in sufficient time to meet the requirement. However, a letter contract should be as complete and definite as feasible under the circumstances."

48 C.F.R. § 16.603-2(a) (2005).

The amount to be obligated under a letter contract is the government's maximum liability under the letter contract itself, without regard to additional obligations anticipated to be included in the definitive contract or, restated, the amount necessary to cover expenses to be incurred by the contractor prior to execution of the definitive contract. The obligation is recorded against funds available for obligation at the time the letter contract is issued. 34 Comp. Gen. 418, 421 (1955); B-197274, Sept. 23, 1983;

B-197274, Feb. 16, 1982; B-127518, May 10, 1956. *See also* FAR, 48 C.F.R. §§ 16.603-2(d), 16.603-3(a).

Once the definitive contract is executed, the government's liability under the letter contract is merged into it. If definitization does not occur until the following fiscal year, the definitive contract will obligate funds of the latter year, usually in the amount of the total contract price less an appropriate deduction relating to the letter contract. B-197274, Sept. 23, 1983. The cited decision, at page 5, specifies how to calculate the deduction as follows:

> "The definitized contract then supports obligating against the appropriation current at the time it is entered into since it is, in fact, a *bona fide* need of that year. The amount of the definitized contract would ordinarily be the total contract cost less either the actual costs incurred under the letter contract (when known) or the amount of the maximum legal liability permitted by the letter contract (when the actual costs cannot be determined)."

Letter contracts should be definitized within 180 days, or before completion of 40 percent of the work to be performed, whichever occurs first. FAR, 48 C.F.R. § 16.603-2(c). Also, letter contracts should not be used to record excess obligations as this distorts the agency's funding picture. *See* GAO, *Contract Pricing: Obligations Exceed Definitized Prices on Unpriced Contracts*, GAO/NSIAD-86-128 (Washington, D.C.: May 2, 1986).

### b. Contract "in Writing"

Although the binding agreement under 31 U.S.C. § 1501(a)(1) must be "in writing," the "writing" is not necessarily limited to words on a piece of paper. The traditional mode of contract execution is to affix original handwritten signatures to a document (paper) setting forth the contract terms. Change is in the winds, however, and traditional interpretations are being reassessed in light of advancing computer technologies. In 1983, GAO's legal staff, in an internal memorandum to one of GAO's audit divisions, took note of modern legal trends and advised that the "in writing" requirement could be satisfied by computer-related media which produce tangible recordings of information, such as punch cards, magnetic cards, tapes, or disks. B-208863(2)-O.M., May 23, 1983.

Eight years later, the Comptroller General issued his first formal decision on the topic, 71 Comp. Gen. 109 (1991). The National Institute of Standards and Technology (NIST) asked whether federal agencies could use certain

Electronic Data Interchange (EDI) technologies to create valid contractual obligations for purposes of 31 U.S.C. § 1501(a). Yes, replied the Comptroller, as long as there are adequate safeguards and controls to provide no less certainty and protection of the government's interests as under a "paper and ink" method. The decision states:

> "We conclude that EDI systems using message authentication codes which follow NIST's Computer Data Authentication Standard . . . or digital signatures following NIST's Digital Signature Standard, as currently proposed, can produce a form of evidence that is acceptable under section 1501."

71 Comp. Gen. at 111. In 2000, Congress enacted the Electronic Signatures in Global and National Commerce Act,[8] which confirmed the legality of digital signatures in any transaction in or affecting interstate or foreign commerce. Section 101(a) of the act provides:

> "In General.—Notwithstanding any statute, regulation, or other rule of law . . . with respect to any transaction in or affecting interstate or foreign commerce—
>
> > (1) a signature, contract, or other record relating to such transaction may not be denied legal effect, validity, or enforceability solely because it is in electronic form; and
> >
> > (2) a contract relating to such transaction may not be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation."

While there may be some room for interpretation as to what constitutes a "writing" for purposes of 31 U.S.C. § 1501(a)(1), the writing, in some acceptable form, must exist. Under the plain terms of the statute, an oral agreement may not be recorded as an obligation. In *United States v. American Renaissance Lines, Inc.*, 494 F.2d 1059, 1062 (D.C. Cir.), *cert. denied*, 419 U.S. 1020 (1974), the court found that 31 U.S.C.

[8] Pub. L. No. 106-229, § 101(a), 114 Stat. 464 (June 30, 2000).

§ 1501(a)(1) "establishes virtually a statute of frauds" for the government[9] and held that neither party can judicially enforce an oral contract in violation of the statute.

However, the Court of Claims and its successors, the Claims Court and United States Court of Federal Claims, have taken the position that 31 U.S.C. § 1501(a)(1) does not bar recovery "outside of the contract" where sufficient additional facts exist for the court to infer the necessary "meeting of minds" (contract implied-in-fact). *Narva Harris Construction Corp. v. United States*, 574 F.2d 508 (Ct. Cl. 1978); *Johns-Manville Corp. v. United States*, 12 Cl. Ct. 1, 19–20 (1987). *Cf. Kinzley v. United States*, 661 F.2d 187 (Ct. Cl. 1981) (documentary evidence of employment of persons sufficient to support oral employment contract for purposes of 31 U.S.C. § 1501(a)(7)). In *Pacord, Inc. v. United States*, 139 F.3d 1320 (9th Cir. 1998), the court relied on *Narva Harris Construction Corp.* in holding that, even though the Federal Acquisition Regulation (FAR) generally requires contracts to be in writing,[10] an oral contract may be enforced if the plaintiff "can establish sufficient facts, beyond a mere oral agreement, for the court to infer the existence of an implied-in-fact contract." *Pacord*, 139 F.3d at 1323.

These would be examples of subsequently imposed liability where the agency did not record—and lawfully could not have recorded—an obligation when the events giving rise to the liability took place. If a contractor received a judgment in this type of situation, the obligational impact on the contracting agency would depend on whether the case was subject to the Contract Disputes Act. If the Act applies, the judgment would be payable initially from the permanent judgment appropriation (31 U.S.C. § 1304), to be reimbursed by the agency from currently available appropriations. *See* 41 U.S.C. §§ 612(a)–(c); B-252754, Oct. 6, 1994. If the Act does not apply, the judgment would be paid from the judgment

[9] A "statute of frauds" is a law requiring contracts to be in writing in order to be enforceable. Most, if not all, states have some version of such a statute. Strictly speaking, as the Comptroller General has noted, there is no federal statute of frauds. 39 Comp. Gen. 829, 831 (1960). *See also* 55 Comp. Gen. 833 (1976).

[10] The FAR defines "contracts" as including "all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing." This provision also provides that "[i]n writing, writing, or written means any worded or numbered expression that can be read, reproduced, and later communicated, and includes electronically transmitted and stored information." 48 C.F.R. § 2.101 (2005).

appropriation without reimbursement, and there would thus be no obligational impact on the agency.

In B-118654, Aug. 10, 1965, GAO concluded that a notice of award signed by the contracting officer and issued before the close of the fiscal year did not satisfy the requirements of 31 U.S.C. § 1501(a)(1) where it incorporated modifications of the offer as to price and other terms which had been agreed to orally during negotiations. The reason is that there was no evidence in writing that the contractor had agreed to the modifications. GAO conceded, however, that the agency's argument that there was documentary evidence of a binding agreement for purposes of section 1501(a)(1) was not without merit. In view of this and since the agency was in the process of changing its contracting procedures to assure adequate documentary evidence of both the offer and the acceptance, we did not insist on any appropriation adjustments.

In a 1977 decision, however, GAO concluded that a signed contract that included ambiguous terms relating to pricing might not be defeated where the ambiguity was resolved by telephone conversations that were incorporated by reference into an award letter, even though there was no written record of the conversations showing agreement by both parties. The Comptroller General concluded that the potential defect in any event would not afford a basis for a third party (in this case a protesting unsuccessful offeror) to object to the contract's legality. 56 Comp. Gen. 768, 775 (1977).

### c. Requirement of Specificity

The statute requires documentary evidence of a binding agreement for *specific* goods or services. An agreement that fails this test is not a valid obligation.

For example, a State Department contract under the Migration and Refugee Assistance Program establishing a contingency fund "to provide funds for refugee assistance by any means, organization or other voluntary agency as determined by the Supervising Officer" did not meet the requirement of specificity and therefore was not a valid obligation. B-147196, Apr. 5, 1965.

Similarly, a purchase order which lacks a description of the products to be provided is not sufficient to create a recordable obligation. B-196109, Oct. 23, 1979. In the cited decision, a purchase order for "regulatory, warning, and guide signs based on information supplied" on requisitions to be issued did not validly obligate fiscal year 1978 funds where the requisitions were not sent to the supplier until after the close of fiscal year

1978. *See also* 70 Comp. Gen. 481 (1991) (advances to establish an imprest fund to finance unspecified future cash payments do not meet the statutory requirements for recording obligations).

### d. Invalid Award/Unauthorized Commitment

Where a contract award is determined to be invalid, the effect is that no binding agreement ever existed as required by 31 U.S.C. § 1501(a)(1) and therefore there was no valid obligation of funds. 38 Comp. Gen. 190 (1958); B-157360, Aug. 11, 1965. As discussed in Chapter 5, section B.6, under more recent authorities the original obligation is not extinguished for all purposes, and those amounts originally obligated remain available post-expiration to fund a valid "replacement contract." 70 Comp. Gen. 230 (1991); 68 Comp. Gen. 158 (1988). Where the invalidity is determined under a bid protest, which will presumably cover most such instances, the extended availability described in the GAO decisions is statutorily defined as 100 days after the final ruling on the protest. 31 U.S.C. § 1558(a). Thus, cases like 38 Comp. Gen. 190 must be regarded as modified to this extent. Of course, amounts originally obligated do not survive post-expiration for anything other than a valid replacement contract. B-270723, Apr. 15, 1996.

Where the Comptroller General awards bid preparation costs to a successful protester under authority of 31 U.S.C. § 3554(c), payment should be charged to the agency's procurement appropriations current at the time GAO issued its decision. If the agency must verify the amount of bid preparation costs to which the protester is entitled prior to payment, the agency should record an estimated obligation, using GAO's decision as the obligating document. Upon verification, the obligation is adjusted up or down as necessary, on the basis of the documents submitted by the protester to substantiate the amount. B-199368.4, Jan. 19, 1983 (nondecision letter).

Claims against the government resulting from unauthorized commitments raise obligation questions in two general situations. If the circumstances surrounding the unauthorized commitment are sufficient to give rise to a contract implied-in-fact, it may be possible for the agency to ratify the unauthorized act. If the ratification occurs in a subsequent fiscal year, the obligation is chargeable to the prior year, that is, the year in which the need presumably arose and the claimant performed. B-208730, Jan. 6, 1983. However, before an agency chooses to ratify the obligation, it first must assure that sufficient prior year unobligated funds remain available to cover the ratification. *Id.*; B-290005, July 1, 2002. If ratification is not available for whatever reason, the only remaining possibility for payment is a *quantum meruit* recovery under a theory of contract implied-in-law. The

*quantum meruit* theory permits payment in limited circumstances even in cases where there was no valid obligation, for example, where the contractor has made partial delivery operating under what he believed to be a valid contract. B-303906, Dec. 7, 2004; B-251668, May 13, 1993; B-118428, Sept. 21, 1954. *See also* 67 Comp. Gen. 507 (1988). The obligational impact is the same as for ratification—payment is chargeable to the fiscal year in which the claimant performed. B-210808, May 24, 1984; B-207557, July 11, 1983.

### e. Variations in Quantity to Be Furnished

In some types of contracts, the quantity of goods to be furnished or services to be performed may vary. The quantity may be indefinite or it may be stated in terms of a definite minimum with permissible variation. Variations may be at the option of the government or the contractor. The obligational treatment of this type of contract depends on the exact nature of the contractual liability imposed on the government.

Before proceeding, it is important to define some terms. A *requirements contract* is one in which the government agrees to purchase all of its needs for the particular item or service during the contract period from the contractor, and the contractor agrees to fill all such needs. Federal Acquisition Regulation (FAR), 48 C.F.R. § 16.503(a) (2005); *Modern Systems Technology Corp. v. United States*, 979 F.2d 200, 206 (Fed. Cir. 1992); *Torncello v. United States*, 681 F.2d 756, 761 (Ct. Cl. 1982). An *indefinite-quantity contract* is one in which the contractor agrees to supply whatever quantity the government may order, within limits, with the government under no obligation to use that contractor for all of its requirements. FAR, 48 C.F.R. § 16.504(a); *Hemet Valley Flying Service Co. v. United States*, 7 Cl. Ct. 512, 515–16 (1985); *Mason v. United States*, 615 F.2d 1343, 1346 n.5 (Ct. Cl.), *cert. denied*, 449 U.S. 830 (1980); B-302358, Dec. 27, 2004. Under either type of contract, the government orders specific quantities from time to time by issuing a document variously termed a work order, task order, delivery order, *etc*.

In a requirements contract, the government must state a realistic estimated total quantity. An agency may obtain its estimate from records of previous requirements and consumption, or by other means, and should base the estimate on the most current information available. FAR, 48 C.F.R. § 16.503(a)(1); B-190855, Mar. 31, 1978; B-188426, Sept. 20, 1977. It is not legally necessary that requirements contracts place a minimum or a maximum limit upon the estimated requirements. B-256312, June 6, 1994; B-226992.2, July 13, 1987. *See also Unlimited Enterprises, Export-Import, Inc.*, ASBCA No. 34825, 88-3 BCA ¶ 20,908 (1988). However, the FAR

provides that "[t]he contract shall state, if feasible, the maximum limit of the contractor's obligation to deliver and the Government's obligation to order." 48 C.F.R. § 16.503(a)(2). Needs must relate to the contract period. 21 Comp. Gen. 961, 964 (1942).

If, in the exercise of good faith, the anticipated requirements simply do not materialize, the government is not obligated to purchase the stated estimate or indeed, if no requirements arise, to place any orders with the contractor beyond any required minimum. 47 Comp. Gen. 365, 370 (1968). *See also Appeal of Shepard Printing*, GPOBCA No. 37-92 (1994); *AGS-Genesys Corp.*, ASBCA No. 35302, 89-2 BCA ¶ 21,702 (1989); *World Contractors, Inc.*, ASBCA No. 20354, 75-2 BCA ¶ 11,536 (1975). The contractor assumes the risk that nonguaranteed requirements may fall short of expectations, and has no claim for a price adjustment if they do. *Medart, Inc. v. Austin*, 967 F.2d 579 (Fed. Cir. 1992); 37 Comp. Gen. 688 (1958). If, however, the government attempts to meet its requirements elsewhere, including the development of in-house capability, or if failure to place orders with the contractor for valid needs is otherwise found to evidence lack of good faith, liability will result. *E.g.*, *Rumsfeld v. Applied Companies, Inc.*, 325 F.3d 1328 (Fed. Cir), *cert. denied*, 540 U.S. 981 (2003); *Torncello*, 681 F.2d at 768–69; *Cleek Aviation v. United States*, 19 Cl. Ct. 552 (1990); *Appeal of MDP Construction, Inc.*, ASBCA No. 49527, 96-2 BCA ¶ 28,525 (1996); *Viktoria Transport GmbH & Co.*, ASBCA No. 30371, 88-3 BCA ¶ 20,921 (1988); *California Bus Lines*, ASBCA No. 19732, 75-2 BCA ¶ 11,601 (1975); *Henry Angelo & Sons, Inc.*, ASBCA No. 15082, 72-1 BCA ¶ 9356 (1972); B-182266, Apr. 1, 1975.

An indefinite-quantity contract, under current regulations, must include a minimum purchase requirement which must be more than nominal. FAR, 48 C.F.R. § 16.504(a)(2); B-302358, Dec. 27, 2004. An indefinite-quantity contract without a minimum purchase requirement is regarded as illusory and unenforceable. It is no contract at all. *Torncello*, 681 F.2d at 761; *Mason*, 615 F.2d at 1346 n.5; *Howell v. United States*, 51 Fed. Cl. 516 (2002); *Rice Lake Contracting, Inc. v. United States*, 33 Fed. Cl. 144, 152–53 (1995); *Modern Systems Technology Corp. v. United States*, 24 Cl. Ct. 360 (1991). Apart from the specified minimum, the government is free to obtain its requirements from other contractors. *Government Contract Services, Inc.*, GSBCA No. 8447, 88-1 BCA ¶ 20,255 (1987); *Alta Construction Co.*, PSBCA No. 1395, 87-2 BCA ¶ 19,720 (1987).

An indefinite-delivery, indefinite-quantity (IDIQ) contract is a form of an indefinite-quantity contract. As with other indefinite quantity contracts, an

IDIQ contract must require the government to order, and the contractor to furnish, at least a stated minimum quantity of supplies or services. FAR, 48 C.F.R. § 16.504(a). While the agency may place orders at any time during a fixed period, actual delivery dates during that period are undefined. After award of an IDIQ contract, the government places task or delivery orders with the contractor (or contractors) as the government's needs become definite. B-302358, Dec. 27, 2004. IDIQs have historically provided a way to expeditiously fill certain government needs. *See* GAO, *Contract Management: Few Competing Proposals for Large DOD Information Technology Orders*, NSIAD-00-56 (Washington, D.C.: Mar. 20, 2000), at 5.

What does all this signify from the perspective of obligating appropriations? As we noted at the outset, the obligational impact of a variable quantity contract depends on exactly what the government has bound itself to do. A fairly simple generalization can be deduced from the decisions: In a variable quantity contract (requirements or indefinite-quantity), any required minimum purchase must be obligated when the contract is executed; subsequent obligations occur as work orders or delivery orders are placed, and are chargeable to the fiscal year in which the order is placed. B-302358, Dec. 27, 2004.

Thus, in a variable quantity contract with no guaranteed minimum—or any analogous situation in which there is no liability unless and until an order is placed—there would be no recordable obligation at the time of award. B-302358, Dec. 27, 2004; B-259274, May 22, 1996; 63 Comp. Gen. 129 (1983); 60 Comp. Gen. 219 (1981); 34 Comp. Gen. 459, 462 (1955); B-124901, Oct. 26, 1955 ("call contract").[11] Obligations are recorded as orders are placed.

The same approach applies to a contract for a fixed quantity in which the government reserves an option to purchase an additional quantity. The contract price for the fixed quantity is an obligation at the time the contract is entered into; the reservation of the option ripens into an obligation only if and when the government exercises the option. 19 Comp. Gen. 980 (1940). *See also* B-287619, July 5, 2001 (for medical services provided through civilian contracted care, DOD's legal liability for at-risk payment is determined by the fixed price established by the contract and should be recorded at the time DOD executes the contract, and again when it executes any subsequent options).

[11] As cases such as 63 Comp. Gen. 129 illustrate, there can be many variations on the basic indefinite-quantity theme.

An application of these concepts also can be found at B-192036, Sept. 11, 1978. The National Park Service entered into a construction contract for the development of a national historic site. Part of the contract price was a "contingent sum" of $25,000 for "Force Account Work," described in the contract as miscellaneous items of a minor nature not included in the bid schedule. No "Force Account Work" was to be done except under written orders issued by the contracting officer. Since a written order was required for the performance of work, no part of the $25,000 could be recorded as an obligation unless and until such orders were issued and accepted by the contractor. That portion of the master contract itself which provided for the Force Account Work was not sufficiently specific to create an obligation.

In a 1955 case, the Army entered into a contract for the procurement of lumber. The contract contained a clause permitting a 10 percent overshipment or undershipment of the quantity ordered. This type of clause was standard in lumber procurement contracts. The Comptroller General held that the Army could obligate the amount necessary to pay for the maximum quantities deliverable under the contract. 34 Comp. Gen. 596 (1955). Here, the quantity was definite and the government was required to accept the permissible variation.

In another 1955 case, the General Services Administration had published in the Federal Register an offer to purchase chrome ore up to a stated maximum quantity. Formal agreements would not be executed until producers made actual tenders of the ore. The program published in the Federal Register was a mere offer to purchase and GSA could not obligate funds to cover the total quantity authorized. Reason: there was no mutual assent and therefore no binding agreement in writing until a producer responded to the offer and a formal contract was executed. B-125644, Nov. 21, 1955.

So-called "level of effort" contracts are conceptually related to the "variation in quantity" cases. In one case, the Environmental Protection Agency entered into a cost-plus-fixed-fee contract for various services at an EPA facility. The contractor's contractual obligation was expressed as a "level of effort" in terms of staff-hours. The contractor was to provide up to a stated maximum number of direct staff-hours, to be applied on the basis of work orders issued during the course of the contract. Since the government was obligated under the contract to order specific tasks, the contract was sufficiently definitive to justify recording the full estimated contract amount at the time of award. B-183184, May 30, 1975. *See also*

58 Comp. Gen. 471, 474 (1979); B-199422, June 22, 1981 (nondecision letter).

### f. Amount to Be Recorded

As noted previously, where the precise amount of the government's liability is defined at the time the government enters into the contract that is the amount to be recorded. For example, in the simple firm fixed-price contract, the contract price is the recordable obligation. The possibility that the contractor may not perform up to the level specified in the contract does not provide a basis for recording less than the full contract price as the obligation. However, for many types of obligations, the precise amount of the government's liability cannot be known at the time the liability is incurred. As summarized in our preliminary discussion of 31 U.S.C. § 1501(a), some initial amount must still be recorded. The agency should then adjust this initial obligation amount up or down periodically as more precise information becomes available.[12]

GAO decisions, as well as GAO's *Policy and Procedures Manual for Guidance of Federal Agencies*,[13] indicate that, in general, the agency should use its best estimate to record the initial amount where the amount of the government's final liability is undefined. *E.g.*, 56 Comp. Gen. 414, 418 (1977); 50 Comp. Gen. 589 (1971). Section 3.5.D of the *Manual* further provides that, where an estimate is used, the basis for the estimate and the computation must be documented.

For example, in 50 Comp. Gen. 589, GAO considered the accounting procedures used by the Administrative Office of the United States Courts (Administrative Office) with respect to paying court-appointed attorneys in federal criminal cases. GAO held that at the time of appointment of such attorneys a contractual obligation was created on the part of the government to pay the reasonable costs of the representation, although the exact amount of such obligation remained to be determined. Such obligations must, therefore, be charged against the appropriations current

[12] This discussion addresses the amount to be recorded when the amount of the liability is undefined, and is not to be confused with a discussion of contingent liabilities. For example, for an indefinite-delivery, indefinite-quantity contract, any liability in excess of the government's minimum commitment, as defined in the contract, is a contingent liability—that is, contingent on the government placing future orders with the contractor. For that reason, at the time the government enters into the contract, the government has no liability above the minimum specified in the contract, and thus incurs no obligation for future orders. We discuss contingent liabilities in section C of this chapter.

[13] Title 7, § 3.5.D (Washington, D.C.: May 18, 1993).

at the time of appointment. *Id.* at 590–91. The proper procedure for charging these obligations was described as follows:

> "[U]pon the appointment of an attorney by the court, a copy of the order of appointment is sent to [the Administrative Office] for the purpose of estimating the obligation to be charged against the current appropriation. This estimate made by [the Administrative Office] is based on past average costs per case and the fact that the [Criminal Justice Act] sets dollar limits on the amount of compensation a court-appointed attorney may receive."

*Id.* at 589. The appropriation account current at the time of appointment was thus charged until the voucher reflecting the actual costs was approved (which could occur in a subsequent fiscal year), at which point the estimated amounts were adjusted accordingly.[14]

Decisions dealing with certain kinds of contract obligations provide more specific rules. Under a fixed-price contract with escalation, price redetermination, or incentive provisions, the amount to be obligated initially is the fixed price stated in the contract or the target price in the case, for example, of a contract with an incentive clause. B-255831, July 7, 1995; 34 Comp. Gen. 418 (1955); B-133170, Jan. 29, 1975; B-206283-O.M., Feb. 17, 1983. Thus, in an incentive contract with a target price of $85 million and a ceiling price of $100 million, the proper amount to record initially as an obligation is the target price of $85 million. 55 Comp. Gen. 812, 824 (1976). *See also McDonnell Douglas Corp. v. United States*, 39 Fed. Cl. 665 (1997). The agency must increase or decrease the amount recorded (*i.e.*, the target price) to reflect price revisions at the time such revisions are made or determined pursuant to the provisions of the contract. 34 Comp. Gen. at 420–21. When obligations are recorded based on a target price, the agency should establish appropriate safeguards to guard against violations of the Antideficiency Act. This usually means the administrative reservation of sufficient funds to cover potential liability.

[14] The decision in 50 Comp. Gen. 589 is offered here as an example of a methodology for estimating obligations. Beginning with fiscal year 1977 the Judiciary has received no-year appropriations to pay court appointed attorneys. *See* Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriation Act, 1977, Pub. L. No. 94-362, title IV, 90 Stat. 937, 953 (July 14, 1976); Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. B, title III, 118 Stat. 2809, 2892 (Dec. 8, 2004).

B-255831, July 7, 1995; 34 Comp. Gen. at 420–21; B-206283-O.M., Feb. 17, 1983.

The two recent decisions involving the Corporation for National and Community Service, discussed previously in section A of this chapter, held that the Corporation must record the government's full liability under the grant at the time of grant award. B-300480, Apr. 9, 2003, *aff'd*, B-300480.2, June 6, 2003. Under the grant agreements involved, the Corporation agreed to fund a specified number of AmeriCorps program participants. This number could be converted into a precise dollar amount. Thus, the Corporation incurred an obligation to pay the maximum dollar amount if the grantee fully performed under the grant agreement and enrolled the specified number of participants. While the grantee might ultimately fail to enroll the number of participants called for in the grant agreement, the extent of the grantee's performance under the grant was entirely within the grantee's control. The decisions rejected contentions by the Corporation and the Office of Management and Budget that the initial grant obligation should be recorded on the basis of estimates that reflected past experience. As the April 9, 2003 decision observed:

> "For purposes of identifying the amount of the Corporation's obligation at grant award . . . the grantee and subgrantee, by their actions in enrolling participants, ultimately control the amount of the Corporation's liability. If the amount of liability of the government is under the control of the grantee, not the Corporation, the government should obligate funds to cover the maximum amount of the liability. *See*, *e.g.*, B-238581, Oct. 31, 1990; B-197274, Sept. 23, 1983."[15]

In this regard, the result in the two 2003 decisions is really no different from the obligation rule that applies to a simple fixed-price contract. There, the government incurs a firm obligation to pay a specified amount provided, of course, that the contractor fully performs under the contract. The possibility that the contractor may not perform up to the level

[15] Subsequently, Congress passed legislation clarifying the method by which the Corporation should record obligations, authorizing the Corporation to record as an obligation an estimate based on a formula that takes into consideration historical rates of enrollment in the program. Pub. L. No. 108-45, § 2(b), 117 Stat. 844 (July 3, 2003). *See also* 149 Cong. Rec. S8163–64 (2003) (statement of Sen. Bond).

specified in the contract does not provide a basis for recording less than the full contract price as the obligation.

### g. Administrative Approval of Payment

In some instances, a liability does not arise until the agency formally reviews and approves a payment. In these instances, of course, the agency should not record an obligation for payment until it approves the payment. (The review and approval here refers to a process in addition to the normal review and approval of the voucher by a certifying and disbursing officer that is always required.) For example, under Internal Revenue Service (IRS) regulations, IRS has no financial liability to its informants until it has evaluated the worth of the information and assessed and collected any underpaid taxes and penalties stemming from that information. It is at this point that an appropriate IRS official determines that a reward should be paid and its amount, and it is at this point that IRS incurs a recordable obligation. B-137762.32, July 11, 1977.

In 46 Comp. Gen. 895 (1967), GAO approved the then Veterans Administration's (VA) practice of recording obligations for fee-basis outpatient treatment of eligible veterans at the time the agency administratively approved the vouchers. VA had established a review and approval process to determine whether the government should accept liability; therefore, no obligation arose until that time. *See also* B-133944, Jan. 31, 1958; B-92679, July 24, 1950.

GAO followed 46 Comp. Gen. 895 in a decision concerning the Defense Department's TRICARE health care program, B-287619, July 5, 2001. The decision concluded that the Defense Department did not incur a liability for the costs of medical services provided under the so-called "pass through" arrangement of the TRICARE program until the Department processed and approved a claim—that is, until the Department determined that the beneficiary was eligible to receive treatment, the services provided were allowable, and the amount billed was proper. Thus, claims-approval was the appropriate time at which to record an obligation.

By way of contrast, the obligation for the expenses of a court-appointed attorney under the Criminal Justice Act of 1964 (CJA) arises at the time of appointment, not later when the expenses are approved, because of the terms of the Act. 50 Comp. Gen. 589 (1971). Under section 2 of the CJA, as amended, 18 U.S.C § 3006A, the court's order of appointment establishes contractual liability, even though the exact amount of the obligation is not determinable until the attorney's payment voucher is approved. The court's review of the voucher is intended only to ensure the reasonableness of the

expenses incurred. Thus, GAO held that payment must be charged to the funds available for the fiscal year in which the appointment was made. Beginning with fiscal year 1977 the Judiciary has received no-year appropriations to pay court appointed attorneys. *See* Departments of State, Justice, and Commerce, the Judiciary, and Related Agencies Appropriation Act, 1977, Pub. L. No. 94-362, title IV, 90 Stat. 937, 953 (July 14, 1976); Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. B, title III, 118 Stat. 2809, 2892 (Dec. 8, 2004).

### h. Miscellaneous Contractual Obligations

The core issue in many of the previously discussed cases has been when a given transaction ripens into a recordable obligation, that is, precisely when the “definite commitment” occurs. Many of the cases do not fit neatly into categories. Rather, the answer must be derived by analyzing the nature of the contractual or statutory commitments in the particular case.

A 1979 case dealt with a lease arrangement entered into by the Peace Corps in Korea. Under a particular type of lease recognized by Korean law, the lessee does not make installment rental payments. Instead, the lessee makes an initial payment of approximately 50 percent of the assessed valuation of the property. At the end of the lease, the lessor is required to return the entire initial payment. The lessor makes his profit by investing the initial payment at the local interest rate. Since the lease is a binding contractual commitment and since the entire amount of the initial payment may not be recoverable for a number of reasons, GAO found it improper to treat the initial payment as a mere advance or an account receivable (as in the case of travel advances) and thus not reflected as an obligation. Rather, the amount of the initial payment must be recorded as an obligation chargeable to the fiscal year in which the lease is entered into, with subsequent returns to be deposited in the Treasury as miscellaneous receipts. B-192282, Apr. 18, 1979.

Several cases deal with court-related obligations. For example, the obligation for fees of jurors, including retroactive increases authorized by 28 U.S.C. § 1871, occurs at the time the jury service is performed. 54 Comp. Gen. 472 (1974). See also the discussion of attorney fee payments in section B.1.g of this chapter. The recording of obligations for land commissioners appointed to determine just compensation in land condemnation cases was discussed in B-184782, Feb. 26, 1976, and 56 Comp. Gen. 414 (1977).[16] The rules derived from these decisions are as follows:

- The obligation occurs at the time of appointment and is chargeable to the fiscal year of appointment if a specific case is referred to the commission in that fiscal year.
- Pendency of an action will satisfy the *bona fide* needs rule and will be sufficient to support the obligation even though services are not actually performed until the following fiscal year.
- Appointment of a "continuous" land commission creates no obligation until a particular action is referred to it.
- An amended court order increasing the compensation of a particular commissioner amounts to a new obligation and the full compensation is chargeable to the appropriation current at the time of the amended order.
- A valid obligation occurs under the above principles even though the order of appointment does not expressly charge the costs to the United States because, under the Constitution, the costs cannot be assessed against the condemnee.

### i. Interagency Transactions

It is not uncommon for federal agencies to provide goods or services to other federal agencies. Section 1501 addresses these interagency transactions in two places. Subsection (a)(3) addresses interagency orders

[16] Beginning with fiscal year 1978, the appropriation to compensate land commissioners was switched from the Justice Department to the Judiciary and since then has been a no-year appropriation. See the appropriation entitled "Fees of Jurors and Commissioners" in the Judiciary Appropriation Act, 1978, Pub. L. No. 95-86, title IV, 91 Stat. 419, 434–35 (Aug. 2, 1977), and in the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, div. B, title III, 118 Stat. 2809, 2892–93 (Dec. 8, 2004). We retain the above summary here to illustrate the analysis and because it may have use by analogy in similar situations.

required by law. We discuss these transactions in section B.3 of this chapter. Subsection (a)(1) addresses the obligational requirements of all other interagency transactions: "a binding agreement between an agency and another person (*including an agency*)" (emphasis added). To distinguish these other transactions from those required by law, these transactions are often referred to as "voluntary orders." This section discusses voluntary orders. Because voluntary orders are covered by section 1501(a)(1), obligations for many voluntary orders are recorded in the same manner as for contracts. However, the authority that governs the interagency transaction, not contract practices, determines the obligational treatment of a voluntary order.

(1) Economy Act agreements

A major source of authority for voluntary interagency agreements is the Economy Act, 31 U.S.C. §§ 1535, 1536. An Economy Act agreement is recorded as an obligation of the ordering agency at the time the ordering agency enters into the agreement.[17] However, Economy Act agreements are subject to one additional requirement. Under 31 U.S.C. § 1535(d), if the ordering agency obligated a fixed-year appropriation, the ordering agency must deobligate the obligation at the end of the fiscal year to the extent that the performing agency has not incurred an obligation, that is, (1) has not provided the requested item to the ordering agency, (2) has not performed the requested service, or (3) has not entered into a valid contract with another person to provide the requested item or service to the ordering agency. 39 Comp. Gen. 317 (1959); 34 Comp. Gen. 418, 421–22 (1955). It was, for example, improper for the Library of Congress to use annual funds transferred to it under Economy Act agreements and not obligated by it prior to the end of the fiscal year to provide services in the following fiscal year. GAO, *Financial Audit: First Audit of the Library of Congress Discloses Significant Problems*, GAO/AFMD-91-13 (Washington, D.C.: Aug. 22, 1991). The reason for this requirement is to prevent the Economy Act from being used to extend the obligational life of an appropriation

[17] The determination of whether an interagency agreement is "binding" for purposes of recording under 31 U.S.C. § 1501(a)(1) is made in the same manner as if the contract were with a private party—examining precisely what the parties have "committed" themselves to do under the terms of the agreement. However, an agreement between two government agencies cannot be legally "enforced" against a defaulting agency in the sense of compelling performance or obtaining damages. Enforcement against another agency is largely a matter of comity and good faith. Thus, the term "binding" in the context of interagency agreements reflects the undertakings expressed in the agreement without regard to the legal consequences (or lack thereof) of nonperformance.

beyond that provided by law. 31 Comp. Gen. 83, 85 (1951). The deobligation requirement of 31 U.S.C. § 1535(d) does not apply to obligations against no-year appropriations. 39 Comp. Gen. 317, 319 (1959). For more background information on obligation and deobligation under the Economy Act, see Chapter 15, section B.1; B-302760, May 17, 2004; B-288142, Sept. 6, 2001; and B-301561, June 14, 2004 (nondecision letter).

(2) Non-Economy Act agreements

Where the agreement is based on some statutory authority other than the Economy Act, the recording of the obligation is still governed by 31 U.S.C. § 1501(a)(1). However, the deobligation requirement of 31 U.S.C. § 1535(d) does not apply. In this situation, the obligation will remain payable in full from the appropriation initially charged, regardless of when performance occurs, in the same manner as contractual obligations generally, subject, of course, to the *bona fide* needs rule and to any restrictions in the legislation authorizing the agreement. *E.g.*, B-302760, May 17, 2004 (interagency agreement pursuant to 2 U.S.C. § 141(c) for renovation of loading dock); B-289380, July 31, 2002 (interagency agreement pursuant to the section 27(g) of the Consumer Product Safety Act, 15 U.S.C. § 2076(g)); B-286929, Apr. 25, 2001 (interagency agreement pursuant to what is now 40 U.S.C. § 322 for implementation of a declassification information management system); 51 Comp. Gen. 766 (1972) (interagency agreement pursuant to section 303(a) of the former Manpower Development and Training Act of 1962, 42 U.S.C. § 2613(a) (1964) for training of air traffic controllers). Thus, it is necessary to determine the specific statutory authority supporting the interagency agreement in order to properly obligate a requesting agency's appropriation. The following examples illustrate these principles.

The National Park Service (NPS) of the Department of Interior entered into a series of agreements during fiscal year 1998 with the National Resource Conservation Service of the Department of Agriculture to obtain soil surveys at various NPS locations. Each agreement delineated specific tasks organized in two or three phases across several fiscal years, culminating in the publication of a final soil survey report for each location. GAO concluded that the agreements were entered into primarily under the authority of 16 U.S.C. § 460*l*-1(g) and thus were not subject to the deobligation requirement of 31 U.S.C. § 1535(d). However, since NPS provided insufficient information for GAO to determine whether the

agreements were for severable or nonseverable services for purpose of complying with the *bona fide* needs rule,[18] GAO returned the case to NPS in order to make the requisite determinations and adjust its accounts accordingly. B-282601, Sept. 27, 1999.

The Administrative Office of United States Courts and the General Services Administration entered into an agreement during fiscal year 1976 for design and implementation of an automated payroll system that was authorized by 40 U.S.C. § 759 (1976) (a provision of law that has since been repealed), rather than the Economy Act. The work was to be performed during fiscal years 1976 and 1977. Since the agreement met the requirements of 31 U.S.C. § 1501(a)(1), it was properly recordable as a valid obligation against fiscal year 1976 funds and was not subject to 31 U.S.C. § 1535(d). 55 Comp. Gen. 1497 (1976).

The Army Corps of Engineers entered into agreement with Department of Housing and Urban Development (HUD) to perform flood insurance studies pursuant to orders placed by HUD. Since the agreement presumably required the Corps to perform as HUD placed the orders, a recordable obligation would arise when HUD placed an order under the agreement. Since the agreement was authorized by the National Flood Insurance Act,[19] rather than the Economy Act, funds obligated by an order would remain obligated even though the Corps did not complete performance (or contract out for it) until following the fiscal year. B-167790, Sept. 22, 1977.

(3) "Binding agreement" requirement

Regardless of whether the Economy Act or other interagency transaction authority governs the transaction, a voluntary interagency order is recordable under 31 U.S.C. § 1501(a)(1) only if it constitutes a binding agreement that meets the other criteria of that subsection. If it does, the applicability or nonapplicability of 31 U.S.C. § 1535(d) then becomes relevant. If it does not, an obligation arises only when the performing agency has completed the work or has awarded contracts to have the work done. *See* 59 Comp. Gen. 602 (1980); 39 Comp. Gen. 829 (1960); 34 Comp. Gen. 705, 708 (1955); 23 Comp. Gen. 88 (1943); B-193005, Oct. 2, 1978;

[18] See Chapter 5, section B for a discussion of the *bona fide* needs rule.

[19] 42 U.S.C. § 4101(A) (1970 and Supp. V 1975).

B-180578-O.M., Sept. 26, 1978. For example, Military Interdepartmental Procurement Requests (MIPR) are viewed as authorized by the Economy Act. An MIPR is considered a binding agreement for obligation purposes under 31 U.S.C. § 1501(a)(1). It is subject to the deobligation requirement of 31 U.S.C. § 1535(d) and is thus ultimately chargeable to appropriations current when the performing component incurs valid obligations. 59 Comp. Gen. 563 (1980); 34 Comp. Gen. 418, 422 (1955).

In B-193005, Oct. 2, 1978, GAO considered the procurement of crude oil for the Strategic Petroleum Reserve. The Federal Property and Administrative Services Act of 1949[20] authorized the General Services Administration (GSA) to procure materials for other federal agencies as well as to delegate such authority. GSA delegated the authority to procure fuel commodities to the Secretary of Defense, who redelegated the authority to the Defense Fuel Supply Center (DFSC). Thus, the Department of Energy (DOE) could procure oil through the DFSC in a non-Economy Act transaction. An order placed by DOE with DFSC prior to the expiration of the period of availability of the appropriation to be charged could be recorded as an obligation against such appropriation under 31 U.S.C. § 1501(a)(1) if it constituted a "binding agreement." Further, the appropriation that was obligated would remain available to liquidate contracts awarded by DFSC. This result would have been precluded by 31 U.S.C. § 1535(d) had the transaction been governed by the Economy Act.

In 59 Comp. Gen. 602 (1980), GAO considered the procedure by which the then Bureau of Alcohol, Tobacco, and Firearms (ATF) ordered "strip stamps" from the Bureau of Engraving and Printing. (These are the excise tax stamps one sees pasted across the caps of liquor bottles.) GAO reviewed pertinent legislation and concluded that ATF was not "required by law" to procure its strip stamps from the Bureau of Engraving and Printing. Since individual orders were not binding agreements, it was immaterial in one important respect whether the order was governed by the Economy Act or some other law; in neither event could ATF's funds remain obligated beyond the last day of a fiscal year to the extent an order remained unfilled. Funds could be considered obligated at the end of a fiscal year only to the extent that stamps were printed or in process or that the Bureau of Engraving and Printing had entered into a contract with a third party to provide them.

[20] Ch. 288, 63 Stat. 377 (June 30, 1949).

(4) Orders from stock

The obligational treatment of orders for items to be delivered from stock of the requisitioned agency derives from 32 Comp. Gen. 436 (1953). An order for items to be delivered from stock is a recordable obligation if (1) it is intended to meet a *bona fide* need of the fiscal year in which the order is placed or to replace stock used in that fiscal year[21] and (2) the order is firm and complete. To be firm and complete, the order must request prompt delivery of specific available stock items for a stated consideration and must be accepted by the supplying agency in writing. "Available" means on hand or routinely on order. However, acceptance is not required for common-use stock items which are on hand or on order and will be delivered promptly.

Materials which are specially manufactured or otherwise created for a particular purpose in order to satisfy an order are not "stock." 44 Comp. Gen. 695 (1965). Likewise, an order for an item not stocked by the requisitioned agency (or, if out of stock, not routinely on order) is not a recordable obligation until the requisitioned agency purchases the item or executes a contract for it. The reason is that such an order does not mature into a binding agreement until the requisitioned agency executes the order or purchases the item(s) needed to fill it; before then, it is merely an offer subject to acceptance by the requisitioned agency's performance. B-193005, Oct. 2, 1978. The basic rules in this area were established by 34 Comp. Gen. 705 (1955).

Although the foregoing rules were developed prior to the enactment of 31 U.S.C. § 1501(a)(1), they continue to govern the recording of obligations under that statute. 34 Comp. Gen. 705; 34 Comp. Gen. 418, 422 (1955).

(5) Project orders

Historically, "project orders" refer to orders authorized by 41 U.S.C. § 23,[22] which provides:

[21] The fact that the replacement stock will not be used until the following year will not defeat an otherwise valid obligation. *See* 73 Comp. Gen. 259 (1994); 44 Comp. Gen. 695 (1965).

[22] The Coast Guard has virtually identical authority in 14 U.S.C. § 151.

> "All orders or contracts for work or material or for the manufacture of material pertaining to approved projects heretofore or hereafter placed with Government-owned establishments shall be considered as obligations in the same manner as provided for similar orders or contracts placed with commercial manufacturers or private contractors, and the appropriations shall remain available for the payment of the obligations so created as in the case of contracts or orders with commercial manufacturers or private contractors."[23]

GAO has interpreted this statute, which was derived from earlier appropriation act provisions for the military departments appearing shortly after World War I,[24] as applying only to transactions between the military departments and establishments owned by the Defense Department for work related to military projects. 72 Comp. Gen. 172, 173 (1993); B-95760, June 27, 1950. Thus, the decision in 72 Comp. Gen. 172 held that the Economy Act, rather than 41 U.S.C. § 23, applies to Defense Department transactions with other federal agencies, in this case a Department of Defense request for research assistance from the Library of Congress.

A project order is a valid and recordable obligation when the order is issued and accepted, regardless of the fact that performance may not be accomplished until after the expiration of the fiscal year. 1 Comp. Gen. 175 (1921); B-135037-O.M., June 19, 1958. The statute does not, however, authorize the use of the appropriations so obligated for the purpose of replenishing stock used in connection with the order. A-25603, May 15, 1929. The requirement of specificity applies to project orders the same as any other recordable obligations under 31 U.S.C. § 1501(a)(1). B-126405, May 21, 1957.

Since a project order is not an Economy Act transaction, the deobligation requirement of 31 U.S.C. § 1535(d) does not apply. 34 Comp. Gen. 418, 422 (1955). *See also* 16 Comp. Gen. 752 (1937). Also, unlike the Economy Act,

[23] The term "approved projects," as used in 41 U.S.C. § 23, has no special meaning. It refers simply to "projects that have been approved by officials having legal authority to do so." B-171049-O.M., Feb. 17, 1972.

[24] Thus 41 U.S.C. § 23 predates enactment of § 1311 of the Supplemental Appropriations Act of 1955, now codified at 31 U.S.C. § 1501, and, like the Economy Act, provides an early statutory authority to obligate an appropriation on the basis of an interagency transaction.

41 U.S.C. § 23 does not authorize advance payment. Thus, advance payment for project orders is not authorized unless permitted by some other statute. B-95760, June 27, 1950.

## 2. Section 1501(a)(2): Loans

Under 31 U.S.C. § 1501(a)(2), a recordable obligation exists when there is documentary evidence of "a loan agreement showing the amount and terms of repayment."

A loan agreement is essentially contractual in nature. Thus, to have a valid obligation, there must be a proposal by one party and an acceptance by another. Approval of the loan application must be communicated to the applicant within the fiscal year sought to be charged, and there must be documentary evidence of that communication. B-159999-O.M., Mar. 16, 1967. Where a loan application is made in one fiscal year and approval is not communicated to the applicant until the following fiscal year, the obligation is chargeable to the later year. *Id.*; B-159999-O.M., Dec. 14, 1966.

Telegraphic notification of approval of a loan application where the amount of the loan and terms of repayment are thereby agreed upon is legally acceptable. B-159999-O.M., Dec. 14, 1966.

To support a recordable obligation under section 1501(a)(2), the agreement must be sufficiently definite and specific, just as in the case of section 1501(a)(1) obligations. To illustrate, the United States and the government of Brazil entered into a loan agreement in 1964. As a condition precedent to any disbursement under the agreement, Brazil was to furnish a statement covering utilization of the funds. The funds were to be used for various economic and social development projects "as may, from time to time, be agreed upon in writing" by the governments of the United States and Brazil. While the loan agreement constituted a valid binding contract, it was not sufficiently definite or specific to validly obligate fiscal year 1964 funds. The basic agreement was little more than an "agreement to agree," and an obligation of funds could arise only when a particular "utilization statement" was submitted and approved. B-155708-O.M., Apr. 26, 1965.

Prior to fiscal year 1992, the amount to be recorded in the case of a loan was quite simple—the face amount of the loan. From the budgetary perspective, however, this was undesirable because the obligation was indistinguishable from any other cash outlay. By disregarding at the obligational stage the fact that loans are supposed to be repaid, this treatment did not reflect the true cost to the government of direct loan

programs. Congress addressed the situation in the Federal Credit Reform Act of 1990 (FCRA), Pub. L. No. 101-508, § 13201, 104 Stat. 1388, 1388-609 (Nov. 5, 1990), codified at 2 U.S.C. §§ 661–661f). The general approach of the FCRA is to require the advance provision of budget authority to cover the subsidy portion of direct loans (in recognition of the fact that not all loans are repaid), with the non-subsidy portion (the portion expected to be repaid) financed through borrowings from the Treasury. The Office of Management and Budget has issued detailed instructions for implementing the FCRA's requirements that appear in OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, part 5 (June 21, 2005).[25]

The FCRA defines "direct loan" as "a disbursement of funds by the Government to a non-Federal borrower under a contract that requires the repayment of such funds with or without interest." 2 U.S.C. § 661a(1). A "direct loan obligation" is "a binding agreement by a Federal agency to make a direct loan when specified conditions are fulfilled by the borrower." *Id.* § 661a(2). The "cost" of a direct loan is the estimated long-term cost to the government, taking into consideration disbursements and repayments, calculated on a net present value basis at the time of disbursement. *Id.* § 661a(5).

Unless otherwise provided by statute, new direct loan obligations may be incurred only to the extent that budget authority to cover the subsidy costs is provided in advance. 2 U.S.C. § 661c(b). Under this provision, the typical appropriation will include both an appropriation of budget authority for the subsidy costs and a program ceiling (total face amount of loans supportable by the cost appropriation). The appropriation is made to a "program account." When a direct loan obligation is incurred, its cost is obligated against the program account. *See generally* OMB Cir. No. A-11, at § 185.10. The actual funding is done through a revolving, nonbudget "financing account." Loan repayments are credited to the financing account. *See generally* OMB Cir. No. A-11, at § 185.11. The overobligation or overexpenditure of either the loan subsidy or the credit level supportable by the enacted subsidy violates the Antideficiency Act. *See* OMB Cir. No. A-11, at § 145.3.

[25] The FCRA applies to new direct loan obligations incurred on or after October 1, 1991. The budgetary and obligational treatment of guaranteed and insured loans is discussed in Chapter 11, section B.

### 3. Section 1501(a)(3): Interagency Orders Required by Law

The third standard for recording obligations, 31 U.S.C. § 1501(a)(3), is "an order required by law to be placed with [a federal] agency."

Subsection (a)(3) means exactly what it says. An order placed with another government agency is recordable under this subsection only if it is required by statute or statutory regulation to be placed with the other agency. The subsection does not apply to orders that are merely authorized rather than required. 34 Comp. Gen. 705 (1955).

An order required by law to be placed with another agency is not an Economy Act transaction. Therefore, the deobligation requirement of 31 U.S.C. § 1535(d) does not apply. 35 Comp. Gen. 3, 5 (1955). The fact that the work will be performed in the next fiscal year does not defeat the obligation as long as the *bona fide* need test is met. B-302760, May 17, 2004; 59 Comp. Gen. 386 (1980); 35 Comp. Gen. 3. Also, the fact that the work is to be accomplished and reimbursement made through use of a revolving fund is immaterial. 35 Comp. Gen. 3; 34 Comp. Gen. 705.

A common example of "orders required by law" is printing and binding to be done by the Government Printing Office (GPO). 44 U.S.C. § 501.[26] The rule is that a requisition for printing services may be recorded as an obligation when placed if (1) there is a present need for the printing and (2) the requisition is accompanied by copy or specifications sufficient for GPO to proceed with the job.

Thus, a requisition by the Commission on Fine Arts for the printing of "Sixteenth Street Architecture, Volume I" placed with GPO in fiscal year 1977 and accompanied by manuscript and specifications obligated fiscal year 1977 funds and was chargeable in its entirety to fiscal year 1977, notwithstanding that the printing would be done in the following fiscal year. 59 Comp. Gen. 386 (1980). However, a requisition for U.S. Travel Service sales promotional literature placed with GPO near the end of fiscal year 1964 did not obligate fiscal year 1964 funds where no copy or manuscript was furnished to GPO until fiscal year 1965. 44 Comp. Gen. 695 (1965). For other printing cases illustrating these rules, see 29 Comp. Gen. 489 (1950); 23 Comp. Gen. 82 (1943); B-154277, June 5, 1964; B-123964,

[26] See B-300192, Nov. 13, 2002, regarding the constitutionality of this and related statutory provisions.

Aug. 23, 1955; B-114619, Apr. 17, 1953; B-50663, June 30, 1945; B-35807, Aug. 10, 1943; B-34888, June 21, 1943.

After an agency certifies that it requires the services of GPO, the Public Printer is required to furnish an estimate of the cost of the services to the ordering agency, which then may make a requisition for performance from GPO. The estimate is the amount that the ordering agency should obligate against its appropriation and establishes a ceiling that GPO may not exceed without first providing the ordering agency a new estimate and obtaining a requisition from an authorized official of the ordering agency. 44 U.S.C. §§ 1102(c), 1103. Thus GPO was not authorized to exceed its estimate of $14,000 and incur expenses amounting to $304,334 without first notifying and obtaining the approval of an authorized official of the requisitioning agency, in this case the Environmental Protection Agency. B-259208, Mar. 6, 1996. Further, the printing estimate alone, even if written, is not sufficient to create a valid and recordable obligation unless it is accompanied by the placement of an order. B-182081, Jan. 26, 1977, *aff'd*, B-182081, Feb. 14, 1979. In the cited decision, there was no valid obligation before the ordering commission went out of existence and its appropriations ceased to be available for further obligation. Therefore, there was no appropriation available to reimburse GPO for work done under the invalid purported obligation.

GPO is required by law to print certain congressional materials such as the Congressional Record, and receives a "Printing and Binding" appropriation for this purpose. For items such as these where no further request or authorization is required, a copy of the basic law authorizing the printing and a copy of the appropriation constitute the obligating documents. B-123964, Aug. 23, 1955.

Another common "order required by law" situation is building alteration, management, and related services to be performed by the General Services Administration. For example, a job order by the Social Security Administration for building repairs validly obligated funds of the fiscal year in which the order was placed, by virtue of subsection (a)(3), notwithstanding that GSA was unable to perform the work until the following fiscal year. 35 Comp. Gen. 3 (1955). *See also* B-158374, Feb. 21, 1966. However, this result assumes compliance with the *bona fide* need concept. Thus, an agreement for work incident to the relocation of Federal Power Commission employees placed in fiscal year 1971 did not validly obligate fiscal year 1971 funds where it was clear that the relocation was not required to, and would not, take place, nor would the space in question

be made tenantable, until the following fiscal year. B-95136-O.M., Aug. 11, 1972. Orders placed with GSA are further discussed in 34 Comp. Gen. 705 (1955).

As noted earlier, GAO has expressed the view that the recording criteria of 31 U.S.C. § 1501(a) should be followed in evaluating obligations of the government of the District of Columbia. Thus, orders by a department of the District of Columbia government for repairs and improvements which are required by statute or statutory regulation to be placed with the District of Columbia Department of General Services and performed through use of the Repairs and Improvements Working Fund create valid obligations when the orders are placed. B-180578-O.M., Sept. 26, 1978.

## 4. Section 1501(a)(4): Orders without Advertising

The fourth recording standard in 31 U.S.C. § 1501(a)(4) is—

> "an order issued under a law authorizing purchases without advertising
>
> (A) when necessary because of a public exigency;
>
> (B) for perishable subsistence supplies; or
>
> (C) within specific monetary limits."

Subsection (a)(4) is limited to statutorily authorized purchases without advertising in the three situations specified. The subsection must be self-explanatory as there appear to be no Comptroller General decisions under it.

## 5. Section 1501(a)(5): Grants and Subsidies

The fifth recording standard in 31 U.S.C. § 1501(a)(5) requires that the obligation be supported by documentary evidence of a grant or subsidy payable:

> "(A) from appropriations made for payment of, or contributions to, amounts required to be paid in specific amounts fixed by law or under formulas prescribed by law;
>
> "(B) under an agreement authorized by law; or

"(C) under plans approved consistent with and authorized by law."

The recording statute refers to grants and subsidies although federal assistance may be characterized in many ways. See Chapters 10 and 11, respectively, for a more comprehensive discussion of the concepts of federal assistance in the form of grants and cooperative agreements and federal assistance in the form of guaranteed and insured loans.

### a. Grants

In order to properly obligate an appropriation for an assistance program, some action creating a definite liability against the appropriation must occur during the period of the obligational availability of the appropriation. In some situations, the obligating action under section 1501(a)(5) involves a discretionary action by an agency of awarding a grant that is evidenced by a grant agreement. The particular document will vary and may be in the form of an agency's approval of a grant application or a letter of commitment. *See* B-289801, Dec. 30, 2002; 39 Comp. Gen. 317 (1959); 37 Comp. Gen. 861, 863 (1958); 31 Comp. Gen. 608 (1952); B-128190, June 2, 1958; B-114868.01-O.M., Mar. 17, 1976.

Generally, in order to properly obligate federal assistance funds, there must be some action to establish a firm commitment on the part of the United States. This commitment must be unconditional. 50 Comp. Gen. 857, 862 (1971). There must be documentary evidence of the grant award and this requirement is not satisfied by the mere reservation or earmarking of amounts in accounting records for the purpose of having them available should an application for a grant be submitted and approved. *Champaign County, Illinois v. United States Law Enforcement Assistance Administration*, 611 F.2d 1200 (7th Cir. 1979); B-126372, Sept. 18, 1956. Finally, the award terms must be communicated to the official grantee, and where the grantee is required to comply with certain prerequisites, such as putting up matching funds, the prerequisite must also be accepted by the grantee during the period of availability of the grant funds.

An illustration of this latter requirement is B-220527, Dec. 16, 1985. The Economic Development Administration made an "offer of grant" to a Connecticut municipality that would have required a substantial outlay of funds by the municipality. The offer was accepted by a town official who had no authority to accept the grant. By its own municipal ordinance, only the town council could accept a grant offer. By the time the town marshaled the resources to fulfill its obligations under the grant and the unauthorized acceptance was ratified by the town council, the federal

funds had expired for obligational purposes. GAO held that no valid grant obligation on the part of the government had ever been made. *See also* B-164990, Jan. 10, 1969, finding an attempted obligation invalid where the program legislation required approval of a proposed grant by the state governor and he had not yet agreed, even though the award instruments had already been executed.

Applying the above principles, the Comptroller General found that a document entitled "Approval and Award of Grant" used by the Economic Development Administration was sufficient for recording grant obligations under the local public works program because it "reflects the Administration's acceptance of a grant application; specifies the project approved and the amount of funding; and imposes a deadline for affirmation by the grantee." B-126652, Aug. 30, 1977. Once the appropriation has been properly obligated, performance by the grantee and the actual disbursement of funds may extend beyond the period of obligational availability. B-300480, Apr. 9, 2003, *aff'd*, B-300480.2, June 6, 2003; B-289801, Dec. 30, 2002; 31 Comp. Gen. 608, 610 (1952); 20 Comp. Gen. 370 (1941); B-37609, Nov. 15, 1943; B-24827, Apr. 3, 1942; B-124374-O.M., Jan. 26, 1956.

If the above requirements are not met, then the appropriation is not obligated. Thus, the Comptroller General determined that the attempted obligation was invalid in B-164990, Sept. 6, 1968, where the grantee corporation was not in existence when the obligation was recorded. Also, the relevant program legislation must be examined to see if there are any additional requirements.

In other situations, the obligating action for purposes of 31 U.S.C. § 1501(a)(5)(A) may take place by operation of law under a statutory formula grant or by virtue of actions authorized by law to be taken by others that are beyond the control of the agency (even when the precise amount of the obligation is not determined until a later time). When this occurs, the documentary evidence used to support the accounting charge against the appropriation is a reflection of, not the creation of, the obligation under the particular law and usually is generated subsequent to the time that the actual obligation arose. 63 Comp. Gen. 525 (1984); B-164031(3).150, Sept. 5, 1979. Thus where an agency is required to allocate funds to states on the basis of a statutory formula, the formula establishes the obligation to each recipient rather than the agency's allocation since, if the allocation is erroneous, the agency must adjust the

amounts paid each recipient. 41 Comp. Gen. 16 (1961); B-164031(3).150, Sept. 5, 1979.

The rules for deobligation and reobligation of assistance funds are the same as for other obligations generally. Program legislation in a given case may, of course, provide for different treatment. For example, B-211323, Jan. 3, 1984, considered a provision of the Public Works and Economic Development Act of 1965[27] under which funds apportioned to states remained available to the state until expended. Under that particular provision, funds deobligated as the result of a cost underrun could be reobligated by the state, without fiscal year limitation, for purposes within the scope of the program statute. For a discussion of obligation and deobligation of funds under the now defunct Comprehensive Employment and Training Act (the predecessor of the Job Training Partnership Act) in the context of the Impoundment Control Act, see B-200685, Apr. 27, 1981.

### b. Subsidies

There have been relatively few cases dealing with the obligational treatment of subsidies, although the principles should parallel those for grants since they both derive from 31 U.S.C. § 1501(a)(5). This may be explained by the fact that some courts when confronted with the necessity to determine the meaning of "subsidy" (when used in a statute that does not define the word) have done so in a manner that is remarkably similar to the commonly used definitions of a grant. (See the discussion of grants in Chapter 10, section B). Thus a subsidy has been defined as "a grant of public funds or property by a government to a private person to assist in establishment or support of an enterprise deemed advantageous to public…" *In re Hooper's Estate*, 359 F.2d 569, 575–76 (3rd Cir.), *cert. denied sub. nom*, 385 U.S. 903 (1966). *See also Satellite Broadcasting & Communications Ass'n of America v. FCC*, 146 F. Supp. 2d 803, 829–30 (E.D. Va.), *aff'd*, 275 F.3d 337 (4th Cir. 2001), *cert. denied*, 536 U.S. 922 (2002); *Kennecott Copper Corp. v. State Tax Commission*, 60 F. Supp. 181 (D. Utah 1944) *rev'd*, 150 F.2d 905 (10th Cir. 1945), *aff'd*, 327 U.S. 573 (1946); *Los Angeles County v. State Department of Public Health*, 322 P.2d 968, 973 (Cal. App. 2nd Dist. 1958).

The few GAO decisions in this area treat subsidies in a manner similar to grants for obligational purposes. In 50 Comp. Gen. 857 (1971) GAO considered legislation authorizing the former Federal Home Loan Bank Board to make "interest adjustment" payments to member banks. The

[27] 42 U.S.C. § 3153 (1976 and Supp. IV 1980).

payments were designed to adjust the effective rates of interest charged by member banks on short- and long-term borrowing, the objective being to stimulate residential construction for low- and middle-income families. Funds were appropriated to the Board for this purpose on a fiscal year basis. GAO concluded that an obligation arose for purposes of 31 U.S.C. § 1501(a)(5) when a Federal Home Loan Bank made a firm and unconditional commitment in writing to a member institution, provided that the commitment letter included a reasonable expiration date. The funds would have to be deobligated to the extent that a member institution failed to execute loans prior to the specified expiration date.

In 65 Comp. Gen. 4 (1985), GAO advised the Department of Education that mandatory interest subsidies under the Guaranteed Student Loan Program should be recorded as obligations on a "best estimate" basis as they arise, even if the recordings would exceed available budgetary resources. Since the subsidies are not discretionary obligations but are imposed by law, there would be no Antideficiency Act violation. The decision overruled an earlier case (B-126372, Sept. 18, 1956) which had held that the recording of obligations for mail rate subsidies to air carriers could be deferred until the time of payment. 65 Comp. Gen. at 8 n.3.

In 64 Comp. Gen. 410 (1985), GAO considered obligations by the Department of Housing and Urban Development for operating subsidies to state public housing authorities for low-income housing projects. Under the governing statute and regulations, the amount of the subsidy was determined upon HUD's approval of the state's annual operating budget, although the basic commitment stemmed from an annual contribution contract. HUD's practice, primarily for states whose fiscal year coincides with that of the federal government, was to record the obligation on the basis of an estimate, issued in a letter of intent. GAO found this to be legally permissible, but cautioned that HUD was required to adjust the obligation up or down once it approved the operating budget.

A 1983 decision, B-212145, Sept. 27, 1983, discusses the use of estimates subject to subsequent adjustment for the recording of obligations for payments in lieu of taxes under 31 U.S.C. §§ 6901–6906.

From the perspective of the recording of obligations, these two decisions—64 Comp. Gen. 410 and B-212145—are simply applications of the general principle, previously noted, that best estimates should be recorded when more precise information is not available, subject to later adjustment.

For additional discussion see Chapter 5, section B.10, relating to the application of the *bona fide* needs rule to grants and cooperative agreements and Chapter 10 relating to the obligation of appropriations for grants.

## 6. Section 1501(a)(6): Pending Litigation

The sixth standard for recording obligations is "a liability that may result from pending litigation." 31 U.S.C. § 1501(a)(6).

Despite its seemingly broad language, subsection (a)(6) has very limited application. Most judgments against the United States are paid from a permanent indefinite appropriation, 31 U.S.C. § 1304. Accordingly, since the expenditure of agency funds is not involved, judgments payable under 31 U.S.C. § 1304 have no obligational impact on the respondent agency.

Not all judgments against the United States are paid from the permanent judgment appropriation. Several types are payable from agency funds. However, the mere fact that a judgment is payable from agency funds does not make it subject to subsection (a)(6). Thus far, the Comptroller General has applied subsection (a)(6) in only two situations—land condemnation (35 Comp. Gen. 185 (1955)) and certain impoundment litigation (54 Comp. Gen. 962 (1975)). In land condemnation proceedings, the appropriation is obligated when the request is made to the Attorney General to institute the proceedings. 34 Comp. Gen. 418, 423 (1955); 34 Comp. Gen. 67 (1954); 17 Comp. Gen. 664 (1938); 4 Comp. Gen. 206 (1924). In impoundment litigation, the Comptroller General has held that when the impounded balance is obligated under subsection (a)(6) as a liability which might result from the pending litigation, the balance so obligated may be used without further appropriation action. 54 Comp. Gen. 962.

However, with limited exceptions, pending litigation itself does not create an obligation against the United States for purposes of section 1501(a)(6). *Rochester Pure Waters District v. EPA*, 960 F.2d 180, 186 (D.C. Cir. 1992) (citing 35 Comp. Gen. 185 and 54 Comp. Gen. 962). The plaintiff in *Rochester* sought an injunction to restore appropriated funds that Congress had rescinded pending adjudication of a claim the plaintiff was pursuing against the Environmental Protection Agency that would have been payable from the rescinded funds. The court held that it lacked statutory or constitutional authority to grant the requested relief.

As stated in 35 Comp. Gen. at 187, subsection (a)(6) requires recording an obligation in cases where the government is definitely liable for the

payment of money out of available appropriations and the pending litigation is for the purpose of determining the amount of the government's liability. Thus, for judgments payable from agency appropriations in other than land condemnation and impoundment cases, the standard of 35 Comp. Gen. 185 should be applied to determine whether an obligation must be recorded.

In cases where a judgment will be payable from agency funds but recording is not required, 35 Comp. Gen. 185 suggested that the agency should nevertheless administratively reserve sufficient funds to cover the contingent liability to avoid a possible violation of the Antideficiency Act. *Id.* at 187. While the administrative reservation may still be a good idea for other reasons, the majority of more recent cases (cited and summarized in Chapter 6, section C.2.f under the heading "Intent/Factors Beyond Agency Control") have taken the position that overobligations resulting from court-ordered payments do not violate the Antideficiency Act.[28]

It should be apparent that the preceding discussion applies to money judgments— judgments directing the payment of money. 62 Comp. Gen. 527 (1983); 61 Comp. Gen. 509 (1982). In some types of litigation, a court may order an agency to take some specific action. While compliance will result in the expenditure of agency funds, this type of judgment is not within the scope of 35 Comp. Gen. 185. While we have found no cases, it seems clear from the application of 31 U.S.C. § 1501(a) in other contexts that no recordable obligation would arise while this type of litigation is still "pending."

## 7. Section 1501(a)(7): Employment and Travel

Under 31 U.S.C. § 1501(a)(7), obligations are recordable when supported by documentary evidence of "employment or services of persons or expenses of travel under law," which covers a variety of loosely related obligations.

[28] Apart from the considerations discussed here, pending litigation as well as potential litigation and other legal claims, may require disclosure as a contingent liability in an agency's financial statements. *See generally* Federal Accounting Standards Advisory Board, *Accounting for Liabilities of the Federal Government*, SFFAS No. 5, ¶¶ 33, 35–42 (Dec. 20, 1995), as amended by SFFAS No. 12 (December 1998), *available at* www.fasab.gov/codifica.html (last visited September 15, 2005).

### a. Wages, Salaries, Annual Leave

Salaries of government employees, as well as related items that flow from those salary entitlements such as retirement fund contributions, are obligations at the time the salaries are earned, that is, when the services are rendered. B-303961, Dec. 6, 2004; B-302911, Sept. 7, 2004; B-287619, July 5, 2001; 24 Comp. Gen. 676, 678 (1945). For example, in 38 Comp. Gen. 316 (1958), the Commerce Department wanted to treat the salaries of employees performing administrative and engineering services on highway construction projects as part of the construction contract costs. Under this procedure, the anticipated expenses of the employees, salaries included, would be recorded as an obligation at the time a contract was awarded. However, the Comptroller General held that this would not constitute a valid obligation under 31 U.S.C. § 1501. The employee expenses were not part of the contract costs and could not be obligated before the services were performed.

Section 1501(a)(7) is not limited to permanent federal employees. It applies as well to persons employed in other capacities, such as temporary or intermittent employees or persons employed under a personal services contract. In *Kinzley v. United States*, 661 F.2d 187 (Ct. Cl. 1981), for example, the court found various agency correspondence sufficient compliance with subsection (a)(7) to permit a claim for compensation for services rendered as a project coordinator. Unlike subsection (a)(1), the court pointed out, subsection (a)(7) does not require a binding agreement in writing between the parties, but only documentary evidence of "employment or services of persons." *Id.* at 191.

For persons compensated on an actual expense basis, it may be necessary to record the obligation as an estimate, to be adjusted when the services are actually performed. Documentation requirements to support the obligation or subsequent claims are up to the agency. *E.g.*, B-217475, Dec. 24, 1986.

When a pay increase is granted to wage board employees, the effective date of the increase is governed by 5 U.S.C. § 5344. This effective date determines the government's liability to pay the additional compensation. Therefore, the increase is chargeable to appropriations currently available for payment of the wages for the period to which the increases apply. B-287619, July 5, 2001; 39 Comp. Gen. 422 (1959). This is true regardless of the fact that appropriations may be insufficient to discharge the obligation and the agency may not yet have had time to obtain a supplemental appropriation. The obligation in this situation is considered "authorized by

law" and therefore does not violate the Antideficiency Act. 39 Comp. Gen. at 426.

Annual leave status "is synonymous with a work or duty status." 25 Comp. Gen. 687 (1946). As such, annual leave obligates appropriations current at the time the leave is taken. *Id.*; 50 Comp. Gen. 863, 865 (1971); 17 Comp. Gen. 641 (1938). Except for employees paid from revolving funds (25 Comp. Gen. 687), or where there is some statutory indication to the contrary (B-70247, Jan. 9, 1948), the obligation for terminal leave is recorded against appropriations for the fiscal year covering the employee's last day of active service. 25 Comp. Gen. at 688; 24 Comp. Gen. 578, 583 (1945).

Bonuses such as performance awards or incentive awards obligate appropriations current at the time the awards are made. Thus, for example, where performance awards to Senior Executive Service officials under 5 U.S.C. § 5384 were made in fiscal year 1982 but actual payment had to be split between fiscal year 1982 and fiscal year 1983 to stay within statutory compensation ceilings, the entire amount of the awards remained chargeable to fiscal year 1982 funds. 64 Comp. Gen. 114, 115 n. 2 (1984). The same principle would apply to other types of discretionary payments; the administrative determination creates the obligation. *E.g.*, B-80060, Sept. 30, 1948.

Employees terminated by a reduction in force (RIF) are entitled by statute to severance pay. 5 U.S.C. § 5595. Severance pay is obligated on a pay period by pay period basis. Thus, where a RIF occurs near the end of a fiscal year and severance payments will extend into the following fiscal year, it is improper to charge the entire amount of severance pay to the fiscal year in which the RIF occurs. B-200170, July 28, 1981.

GAO reached a different result in B-200170, Sept. 24, 1982. The United States Metric Board was scheduled to terminate its existence on September 30, 1982. Legislative history indicated that the Board's fiscal year 1982 appropriation was intended to include severance pay, and no appropriations had been requested for fiscal year 1983. Under these circumstances, severance payments to be made in fiscal year 1983 were held chargeable to the fiscal year 1982 appropriation. A contrary result would have meant that the fiscal year 1982 funds would expire, and Congress would have had to appropriate the same funds again for fiscal year 1983.

### b. Compensation Plans in Foreign Countries

By statute, the State Department is required to establish compensation plans for foreign national employees of the Foreign Service in foreign countries. The plans are to be "based upon prevailing wage rates and compensation practices . . . for corresponding types of positions in the locality of employment," to the extent consistent with the public interest. 22 U.S.C. § 3968(a)(1).

Under subsection (b) of 22 U.S.C. § 3968, other government agencies are authorized to administer foreign national employee compensation programs in accordance with the applicable provisions of the Foreign Service Act. This provision, for example, authorized the Defense Department to establish a pension and life insurance program for foreign national employees in Bermuda, provided that it corresponded to prevailing local practice. 40 Comp. Gen. 650 (1961).

Section 3968(c) of title 22, United States Code, authorizes the Secretary of State to prescribe regulations for local compensation plans applicable to all federal agencies. To the extent this authority is not exercised, however, the statute does not otherwise require that a plan established by another agency conform to the State Department's plan. An agency establishing a local plan should, to the extent not regulated by State, coordinate with other agencies operating in the locality. 40 Comp. Gen. at 652. (As a practical matter, two agencies operating in the same locality should not develop substantially different plans, assuming both legitimately reflect prevailing local practice.)

To the extent the authority of 22 U.S.C. § 3968 is exercised in a given country, the obligational treatment of various elements of compensation may vary from what would otherwise be required. For example, Colombian law provides for the advance payment of accrued severance pay to help the employee purchase or make improvements on a home. Thus, under a compensation plan for foreign national employees in Colombia, severance pay would be recorded as an obligation against the fiscal year appropriation current at the time of accrual. B-192511, Feb. 5, 1979.

While 22 U.S.C. § 3968 authorizes compensation plans based on local practice, it does not permit automatic disregard of all other laws of the United States. Thus, under the Colombian severance pay program noted above, if the employee subsequently is terminated for cause or otherwise loses eligibility, the agency must proceed with collection action under the Federal Claims Collection Act, local practice to the contrary notwithstanding. B-192511, June 8, 1979. Similarly, accrued severance pay

retains its status as United States funds up to actual disbursement and is therefore subject to applicable fiscal and fund control requirements. B-199722, Sept. 15, 1981 (severance pay plan in Jordan).

In several foreign countries, foreign nationals employed by the United States are entitled to be paid a "separation allowance" when they resign, retire, or are otherwise separated through no fault of their own. The allowance is based on length of service, rate of pay at time of separation, and type of separation. Unlike severance pay for federal employees, these separation allowances represent binding commitments which accrue during the period of employment. As such, they should be recorded as obligations when they are earned rather than when they are paid. GAO, FGMSD-76-25 (Washington, D.C.: Oct. 17, 1975); FGMSD-75-20 (Washington, D.C.: Feb. 13, 1975); *Substantial Understatements of Obligations for Separation Allowances for Foreign National Employees*, B-179343, (Washington, D.C.: Oct. 21, 1974). (These three items are GAO reports, the first two being untitled letter reports.) *See also* B-226729, May 18, 1987; B-192511, Feb. 5, 1979.

### c. Training

The obligation for training frequently stems from a contract for services and to that extent is recordable under subsection (a)(1) rather than subsection (a)(7) of 31 U.S.C. § 1501. The rules for training obligations are summarized in Chapter 5, section B.5.

### d. Uniform Allowance

The Federal Employees Uniform Act, 5 U.S.C. § 5901, authorizes a uniform allowance for each employee required by statute or regulation to wear a uniform. The agency may furnish the uniform or pay a cash allowance. Where an agency elects to pay an allowance, the obligation arises when the employee incurs the expense and becomes entitled to reimbursement. Thus, the appropriation chargeable is the one currently available at the time the employee makes the expenditure or incurs the debt. 38 Comp. Gen. 81 (1958).

### e. Travel Expenses[29]

The obligation of appropriations for expenses relating to travel was an extremely fertile area and generated a large number of decisions before 31 U.S.C. § 1501 was enacted. The cases seem to involve every conceivable permutation of facts involving trips or transactions covering more than one

[29] This section does not apply to travel incident to employee transfers. The rules for employee transfers are set forth separately in section B.7.g of this chapter.

fiscal year. The enactment of 31 U.S.C. § 1501 logically prompted the question of how the new statute affected the prior decisions. It did not, replied the Comptroller General. Thus, the starting point is that subsection (a)(7) incorporates prior GAO decisions on obligations for travel. 35 Comp. Gen. 183 (1955); 34 Comp. Gen. 459 (1955).

The leading case in this area appears to have been 35 Comp. Gen. 183, which states the pertinent rules. The rules for travel may be summarized as follows: The issuance of a travel order in itself does not constitute a contractual obligation. The travel order is merely an authorization for the person specified to incur the obligation. The obligation is not incurred until the travel is actually performed or until a ticket is purchased, provided in the latter case the travel is to be performed in the same fiscal year the ticket is purchased. 35 Comp. Gen. at 185. A 1991 decision, 70 Comp. Gen. 469, reaffirmed the principle that the expenses of temporary duty travel are chargeable to the fiscal year or years in which they are actually incurred.

Some of the earlier cases in this evolutionary process are as follows:

- Where tickets are purchased in one fiscal year and the travel is performed in the following fiscal year, the obligation is chargeable to the year in which the travel is performed, even though early purchase of the tickets may have been necessary to assure reservations. 27 Comp. Gen. 764 (1948); 26 Comp. Gen. 131 (1946).

- A "continuous journey" involving more than one segment obligates funds of the fiscal year in which the ticket was purchased, as long as the trip starts in that same fiscal year. However, procurement of transportation en route is a new obligation. Similarly, a round-trip ticket obligates funds at the time of purchase as long as the trip starts in the same fiscal year. However, if the return portion of the ticket cannot be used and a separate return ticket must be purchased, a new obligation is created. 26 Comp. Gen. 961 (1947); A-36450, May 27, 1931.

- Per diem incident to official travel accrues from day to day. Per diem allowances are chargeable to appropriations current when the allowances accrue (*i.e.*, when the expenditures are made). Thus, where travel begins in one fiscal year and extends into the next fiscal year, the per diem obligation must be split along fiscal year lines, even though the cost of the travel itself may have been chargeable in its entirety to the prior fiscal year. 23 Comp. Gen. 197 (1943).

- Reimbursement on a mileage basis is chargeable to the fiscal year in which the major portion of the travel occurred. If travel is begun sufficiently prior to the end of a fiscal year to enable the employee to complete a continuous journey before the close of the fiscal year, the obligation is chargeable entirely to that year. However, if the travel is begun so late in the fiscal year that the major portion of it is performed in the succeeding fiscal year, it is chargeable to appropriations for the succeeding year. 9 Comp. Gen. 458, 460 (1930); 2 Comp. Dec. 14 (1895).

- Where (1) an employee is authorized to travel by privately owned vehicle at not to exceed the constructive cost of similar travel by rail, (2) the trip starts in one fiscal year and extends into the following fiscal year, and (3) the journey would have been completed in the prior year had rail travel been used, the travel expense is chargeable to the fiscal year in which the travel began. 30 Comp. Gen. 147 (1950).

Other cases involving obligations for travel expenses are: 16 Comp. Gen. 926 (1937); 16 Comp. Gen. 858 (1937); 5 Comp. Gen. 1 (1925); 26 Comp. Dec. 86 (1919); B-134099, Dec. 13, 1957; A-30477, Apr. 20, 1939; A-75086, July 29, 1936; A-69370, Apr. 10, 1936.

### f. State Department: Travel Outside Continental United States

By virtue of 22 U.S.C. § 2677, appropriations available to the State Department for travel and transportation outside the continental United States "shall be available for such expenses when any part of such travel or transportation begins in one fiscal year pursuant to travel orders issued in that year, notwithstanding the fact that such travel or transportation may not be completed during that same fiscal year." This provision appeared in appropriation acts starting in 1948 and was subsequently made permanent and codified. It has the effect of excluding State Department travel or transportation outside the continental United States from some of the earlier decisions. The authority is permissive rather than mandatory. 42 Comp. Gen. 699 (1963).

Section 2677 of title 22 applies to temporary duty travel as well as travel incident to change of duty station. 71 Comp. Gen. 494 (1992). In either case, expenses are chargeable to the year in which the travel is ordered as long as some travel-related expense is also incurred in that year, even though the physical travel may not begin until the following year. *Id.* Travel-related expenses in this context include miscellaneous incidental expenses such as inoculations and passports as long as they are not incurred at a time so far removed from the actual travel as to question their legitimacy as incident to the travel. 30 Comp. Gen. 25 (1950). The statute

also permits charging the prior year for expenses incurred under amended travel orders issued in the subsequent fiscal year as long as some part of the travel or transportation began in the prior fiscal year. 29 Comp. Gen. 142 (1949).

The statute does not permit retroactive charging of an expired appropriation. Thus, the Comptroller General found it improper to issue a travel authorization in one fiscal year designating the succeeding fiscal year as the appropriation to be charged, and then, at the start of the succeeding fiscal year, cancel the authorization and replace it with a new authorization retroactively designating the prior year. 42 Comp. Gen. 699 (1963).

### g. Employee Transfer/Relocation Costs

A government employee transferred to a new duty station is entitled to various allowances, primarily travel expenses of the employee and his or her immediate family, and transportation and temporary storage of household goods. 5 U.S.C. § 5724. In addition, legislation enacted in 1967, now found at 5 U.S.C. § 5724a, authorized several types of relocation expenses for transferred employees. Specifically, they are: (1) per diem allowance for employee's immediate family en route between old and new duty station; (2) expenses of one house-hunting trip to new duty station; (3) temporary quarters allowance incident to relocation; (4) certain expenses of real estate transactions incurred as a result of the transfer; and (5) a miscellaneous expense allowance.

The leading case on the obligation of employee transfer expenses is 64 Comp. Gen. 45 (1984). The rule is that "for all [reimbursable] travel and transportation expenses of a transferred employee, the agency should record the obligation against the appropriation current when the employee is issued travel orders." *Id.* at 48. This treatment applies to expenses stemming from employee transfers; it does not apply to expenses stemming from temporary duty. 70 Comp. Gen. 469 (1991).

The rule of 64 Comp. Gen. 45 applies to obligations for extensions of temporary quarters subsistence expenses—the obligation is chargeable to the year in which the transfer order was issued. 64 Comp. Gen. 901 (1985). It also applies to dislocation allowances payable to members of the armed services incident to a permanent change of station move. 67 Comp. Gen. 474 (1988).

Agencies have discretionary authority under 5 U.S.C. § 5724c to contract with private firms for arranging the purchase of a transferred employee's old residence. Since this service is wholly discretionary and in no way an

"entitlement," the agency's obligation to a relocation firm stems from its contract with the firm, not from the employee's transfer. Thus, the obligation under one of these arrangements occurs when a purchase order under the contract is awarded. 66 Comp. Gen. 554 (1987). Since the obligation is evidenced by a written contract, it would be recorded under 31 U.S.C. § 1501(a)(1).

The decision at 64 Comp. Gen. 45 overruled prior inconsistent decisions such as 28 Comp. Gen. 337 (1948) (storage) and B-122358, Aug. 4, 1976 (relocation expenses under 5 U.S.C. § 5724a). In assessing the impact of 64 Comp. Gen. 45, however, care must be taken to determine precisely what has been overruled and what has not. For example, since 64 Comp. Gen. 45 dealt with reimbursable expenses, prior decisions addressing the transportation of household goods shipped directly by the government presumably remain valid.[30]

Also, 35 Comp. Gen. 183 (1955) should not be regarded as overruled, notwithstanding language to the contrary in 64 Comp. Gen. 45. There are two reasons for this. First, 35 Comp. Gen. 183 was not limited to employee transfers, but dealt with travel in other contexts as well, situations not involved in the 1984 decision. Second, 35 Comp. Gen. 183 states, at page 185:

> "It may be stated, however, that we have no objection to recording tentatively as obligations the estimated cost of transportation to be purchased and reimbursements therefor to be earned, including reimbursements for transportation of household effects, within the current fiscal year at the time the travel orders are actually issued where it is administratively determined desirable in order to avoid certain additional accounting requirements; but all estimated amounts for travel and related expenses so recorded should be adjusted to actual obligations periodically . . . "

This is not very different from the holding of 64 Comp. Gen. 45.

[30] If the government ships the goods, the obligation occurs when a carrier picks up the goods pursuant to a government bill of lading. If separate bills of lading are issued covering different segments of the shipment, each bill of lading is a separate and distinct obligation. *E.g.*, 31 Comp. Gen. 471 (1952).

## 8. Section 1501(a)(8): Public Utilities

Under 31 U.S.C. § 1501(a)(8), a recordable obligation arises when there is documentary evidence of "services provided by public utilities."[31]

Government agencies are not required to enter into contracts with public utilities when charges are based on rates that are fixed by regulatory bodies. However, contracts may be used if desired by the utility or the agency. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 6.2.C.5 (Washington, D.C.: May 18, 1993).

If there is a contract, monthly estimates of the cost of services to be performed, based on past experience, may be recorded as obligations. If there is no contract, obligations should be recorded only on the basis of services actually performed. 34 Comp. Gen. 459, 462 (1955). *See also* B-287619, July 5, 2001; B-259274, May 22, 1996.

A statute relating to obligations for public utility services is 31 U.S.C. § 1308. Under this law, in making payments for telephone services and for services like gas or electricity where the quantity is based on metered readings, the entire payment for a billing period which begins in one fiscal year and ends in another is chargeable to appropriations current at the end of the billing period. If the charge covers several fiscal years, 31 U.S.C. § 1308 does not apply. A charge covering several fiscal years must be prorated so that the charge to any one fiscal year appropriation will not exceed the cost of service for a 1-year period ending in that fiscal year. 19 Comp. Gen. 365 (1939). GAO has construed this statute as applicable to teletypewriter services as well. 34 Comp. Gen. 414 (1955).

The General Services Administration is authorized to enter into contracts for public utility services for periods not exceeding 10 years. 40 U.S.C. § 501(b)(1)(B).[32] A contract for the procurement of telephone equipment and related services has been held subject to this provision even where the provider was not a "traditional" form of public utility. 62 Comp. Gen. 569 (1983). Noting that the concept of what constitutes "public utility service"

[31] Prior to the 1982 recodification of title 31, United States Code, section 1501(a)(7) included public utilities as well as employment and travel expenses. The recodification logically separated public utilities into a new subsection since it is unrelated to the other items. Thus, pre-1982 materials refer to eight subsections whereas there are now nine.

[32] The military departments have authority to enter into utility service contracts for up to 50 years in connection with the conveyance of a utility system from the department to the service provider. *See* 10 U.S.C. § 2688(c)(3).

is flexible, the decision emphasized that the nature of the product or service provided rather than the nature of the provider should govern for purposes of 40 U.S.C. § 501(b)(1)(B). 62 Comp. Gen. at 575. The decision also concluded that GSA is not required to obligate the total estimated cost of a multiyear contract under 40 U.S.C. § 501(b)(1)(B), but is required to obligate only its annual costs. 62 Comp. Gen. at 572, 576.

### 9. Section 1501(a)(9): Other Legal Liabilities

The final standard for recording obligations, 31 U.S.C. § 1501(a)(9), is documentary evidence of any "other legal liability of the Government against an available appropriation or fund." This is sort of a catch-all category designed to pick up valid obligations which are not covered by 31 U.S.C. §§ 1501(a)(1)–(a)(8). 34 Comp. Gen. 418, 424 (1955).

Thus far, the decisions provide very little guidance on the types of situations that might be covered by subsection (a)(9). The few decisions that mention subsection (a)(9) generally cite it in conjunction with one of the other subsections and stop short of a definitive statement as to its independent applicability. *See*, *e.g.*, 54 Comp. Gen. 962 (1975) (impoundment litigation); B-192511, Feb. 5, 1979 (severance pay plan under 22 U.S.C. § 3968).

Another case, although not specifically citing subsection (a)(9), pointed out a situation that would seemingly qualify under that subsection: estimates of municipal tax liabilities on United States property located in foreign countries, based on tax bills received in prior years. 35 Comp. Gen. 319 (1955).

Thus, subsection (a)(9) must be applied on a case-by-case basis. If a given item is a legal liability of the United States, if appropriations are legally available for the item in terms of purpose and time, and if the item does not fit under any of the other eight subsections, then subsection (a)(9) should be considered.

## C. Contingent Liabilities

Up to this point in Chapter 7, we have discussed obligations: what they are and how and when to record them. As pointed out in the previous sections of this chapter, the core attribute of an obligation recordable under 31 U.S.C. § 1501 is that it creates a definite legal liability on the part of the federal government. While the precise amount of the liability may be undefined initially, an "obligational event," reflecting a definite liability,

may occur even though the amount of the liability at that time is undefined. A "contingent liability" is fundamentally different. In contrast to a definite liability, a contingent liability does not create an obligation unless and until the contingency materializes.

Contingent liabilities take different forms depending on the circumstances. However, whatever form it takes, a contingent liability by definition lacks the definiteness that is essential to the concept of an obligation. Thus, GAO defines a "contingent liability" generically as "[a]n existing condition, situation, or set of circumstances that poses the *possibility* of a loss to an agency that will ultimately be resolved when one or more events occur or fail to occur."[33]

Contingent liabilities are not recordable as obligations under section 1501 of title 31.[34] Rather, a contingent liability ripens into a recordable obligation for purposes of section 1501 only if and when the contingency materializes. *E.g.*, 62 Comp. Gen. 143, 145–46 (1983); 37 Comp. Gen. 691–92 (1958); GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 3.5.C (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM).

The contingent liability poses somewhat of a fiscal dilemma. On the one hand, it is by definition (and absent special statutory treatment) not sufficiently definite to support the recording of an obligation. Yet on the other hand, sound financial management may dictate that it somehow be recognized. Indeed, if completely disregarded, a contingent liability could mature into an actual liability and result in an Antideficiency Act violation. Agencies have a legal obligation to take reasonable steps to avoid situations in which contingent liabilities become actual liabilities that result in Antideficiency Act violations. This may include the

[33] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 35 (emphasis added).

[34] Outside the framework of 31 U.S.C. § 1501, however, Congress has provided special treatment for certain contingent liabilities in order to better capture their budgetary impact. Most notably, the Federal Credit Reform Act of 1990, 2 U.S.C. §§ 661–661, changed the normal budgetary treatment of loans and loan guarantees by establishing that for most programs, loan guarantee commitments cannot be made unless the Congress has appropriated budget authority in advance to cover their estimated losses (known as "credit subsidy costs"). See Chapter 11, section B, for a detailed discussion of the budgetary and obligational treatment of loan and loan guarantee programs under the Federal Credit Reform Act.

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 312 of 728



"administrative reservation" or "commitment" of funds, as well as taking other actions to prevent contingencies from materializing.[35]

For example, in B-238201, Apr. 15, 1991, the General Services Administration (GSA) was faced with a contingent liability that could become an actual liability. GSA was engaged in litigation concerning an Illinois statute authorizing the taxation of government property purchased under an installment contract. GSA had entered into arrangements to purchase buildings in Illinois on an installment basis, so there was a potential for tax liability, including back taxes, which would be assessed if the Illinois statute was upheld. Since the litigation was extending over fiscal years and the outcome was in doubt, GSA accrued amounts from the fiscal years involved as loss contingencies for the potential tax liability. GAO agreed with GSA's approach and stated:

> "Because the underlying legal liability of the Government has yet to be established, the potential tax liability of the [property] is not sufficiently definite to be recorded as an obligation. However, GSA has not actually obligated funds for this purpose, . . . Instead, in terms of fiscal operations, it is possible for GSA officials to have recorded the potential liability as a commitment through the budgetary account 'Commitments Available for Obligation' in the Standard General Ledger. This accounting procedure reflects allotments or other available funds which were earmarked in anticipation of a potential obligation and is used for purposes of effective financial planning."

*Id.* *See also* 35 Comp. Gen. 185, 187 (1955) (GAO recommended reserving funds as a means to avoid potential Antideficiency Act violations from contingent liabilities involving pending litigation in cases where it was believed that claims against the government were meritorious).

In addition to the obligational accounting treatment of contingent liabilities, agencies need to be aware of the financial accounting treatment of contingent liabilities. Contingent liabilities may be sufficiently important to warrant recognition in a footnote to pertinent financial statements. 62 Comp. Gen. 143, 146 (1983); 37 Comp. Gen. at 692. S*ee also* Federal

[35] *See* 7 GAO-PPM § 3.5.F; B-238201, Apr. 15, 1991 (nondecision letter).

Accounting Standards Advisory Board, *Accounting for Liabilities of the Federal Government*, SSFAS No. 5, ¶¶ 35–42 (Dec. 20, 1995), *as amended by* SSFAS No. 12 (December 1998) (provides guidance on the appropriate accounting treatment of contingent liabilities in financial statements).

## D. Reporting Requirements

When 31 U.S.C. § 1501 was originally enacted in 1954,[36] it required each agency to prepare a report each year on the unliquidated obligations and unobligated balance for each appropriation or fund under the agency's control. The reports were to be submitted to the Senate and House Appropriations Committees, the (then) Bureau of the Budget, and GAO. GAO was often asked by the appropriations committees to review these reports.

After several years of reviewing reports, the appropriations committees determined that the requirement had served its purpose, and Congress amended the law in 1959 to revise and relax the reporting procedures. The current reporting requirements are found at 31 U.S.C. §§ 1108(c) and 1501(b).

Under 31 U.S.C. § 1108(c), each agency, when submitting requests for appropriations to the Office of Management and Budget, must report that "the statement of obligations submitted with the request contains obligations consistent with section 1501 of this title." *See* 39 Comp. Gen. 422, 425 (1959). The reports must be certified by officials designated by the agency head. OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, § 51.1 (June 21, 2005). The certification must be supported by adequate records, and the agency must retain the records and certifications in such form as to facilitate audit and reconciliation. Officials designated to make the certifications may not redelegate the responsibility.[37]

The conference report on the original enactment of 31 U.S.C. § 1501 specified that the officials designated to make the certifications should be persons with overall responsibility for the recording of obligations, and "in

[36] *See* Pub. L. No. 83-663, § 1311(b), 68 Stat. 800, 830 (Aug. 26, 1954).

[37] *See* GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 3.8.A (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM).

no event should the designation be below the level of the chief accounting officer of a major bureau, service, or constituent organizational unit."[38]

The person who makes certifications under 31 U.S.C. § 1108(c) is not a "certifying officer" for purposes of personal accountability for the funds in question. Although he or she may be coincidentally an "authorized certifying officer," the two functions are legally separate and distinct. B-197559-O.M., May 13, 1980.

The statute does not require 100 percent verification of unliquidated obligations prior to certification. Agencies may use statistical sampling. B-199967-O.M., Dec. 3, 1980.

In the case of transfer appropriation accounts under interagency agreements, the certification official of the spending agency must make the certifications to the head of the advancing agency and not to the head of the spending agency. 7 GAO-PPM § 3.8.A.

Finally, 31 U.S.C. § 1501(b) provides that any statement of obligations furnished by any agency to the Congress or to any congressional committee "shall include only those amounts that are obligations consistent with subsection (a) of this section."

## E. Deobligation

The definition of the term "deobligation" is an agency's cancellation or downward adjustment of previously incurred obligations. Deobligated funds may be reobligated within the period of availability of the appropriation. For example, annual appropriations may be reobligated in the fiscal year for which the funds were appropriated, while multiyear or no-year appropriated funds may be reobligated in the same or subsequent fiscal years.[39] Deobligations occur for a variety of reasons. Examples are:

- Liquidation in amount less than amount of original obligation. *E.g.*, B-207433, Sept. 16, 1983 (cost underrun); B-183184, May 30, 1975

[38] H.R. Rep. No. 83-2663, 18 (1954), quoted in *Financial Management in the Federal Government*, S. Doc. No. 87-11, 88 (1961), and in 50 Comp. Gen. 857, 862 (1971).

[39] *See* GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 44 and 85.

(agency called for less work than maximum provided under level-of-effort contract). *See also* B-286929, Apr. 25, 2001.

- Cancellation of project or contract.
- Initial obligation determined to be invalid.
- Reduction of previously recorded estimate.
- Correction of bookkeeping errors or duplicate obligations.

In addition, deobligation may be statutorily required in some instances. An example is 31 U.S.C. § 1535(d), requiring deobligation of appropriations obligated under an Economy Act agreement to the extent the performing agency has not incurred valid obligations under the agreement by the end of the fiscal year. See section B.1.i of this chapter for a further discussion of recording obligations in Economy Act transactions.

For the most part, there are no special rules relating to deobligation. Rather, the treatment of deobligations follows logically from the principles previously discussed in this and preceding chapters. Thus funds deobligated within the original period of obligational availability are once again available for new obligations just as if they had never been obligated in the first place. Naturally, any new obligations are subject to the purpose, time, and amount restrictions governing the source appropriation. Funds deobligated after the expiration of the original period of obligational availability are not available for new obligations. B-286929, Apr. 25, 2001; 64 Comp. Gen. 410 (1985); 52 Comp. Gen. 179 (1972). They may be retained as unobligated balances in the expired account until the account is closed, however, and are available for adjustments in accordance with 31 U.S.C. § 1553(a).

A proper and unliquidated obligation should not be deobligated unless there is some valid reason for doing so. Absent a valid reason, it is improper to deobligate funds solely to "free them up" for new obligations. To do so risks violating the Antideficiency Act. For example, where a government check issued in payment of some valid obligation cannot be promptly negotiated (if, for example, it is returned as undeliverable), it is improper to deobligate the funds and use them for new obligations. 15 Comp. Gen. 489 (1935); A-44024, Sept. 21, 1942. (The two cited decisions deal with provisions of law which have since changed, but the thrust of the decisions remains the same.) The Antideficiency Act violation would occur

if the payee of the original check subsequently shows up and demands payment but the funds are no longer available because they have been reobligated and the account contains insufficient funds. This does not preclude an agency from exercising flexibility in the use of its appropriations so long as the agency does not risk an Antideficiency Act violation. B-272191, Nov. 4, 1997.

Under some programs, an agency provides funds to an intermediary which in turn distributes the funds to members of a class of beneficiaries. The agency records the obligation when it provides, or legally commits itself to provide, the funds to the intermediary. It is undesirable for many reasons to permit the intermediary to hold the funds indefinitely prior to reallocation. Unless the program legislation provides otherwise, the agency may establish a reasonable cutoff date at which time unused funds in the hands of the intermediary are "recaptured" by the agency and deobligated. GAO recommended such a course of action in 50 Comp. Gen. 857 (1971). If recapture occurs during the period of availability, the funds may be reobligated for program purposes; if it occurs after the period of availability has ended, the funds expire absent some contrary direction in the governing legislation. *Id.; Dabney v. Reagan*, No. 82 Civ. 2231-CSH (S.D.N.Y. Mar. 21, 1985).

Congress may occasionally by statute authorize an agency to reobligate deobligated funds after expiration of the original period of availability. This is called "deobligation-reobligation" (or "deob-reob") authority. Such authority exists only when expressly granted by statute. Deobligation-reobligation authority generally contemplates that funds will be deobligated only when the original obligation ceases to exist and not as a device to effectively augment the appropriation. *See* B-173240-O.M., Jan. 23, 1973. Also, absent statutory authority to the contrary, "deob-reob" authority applies only to obligations and not to expenditures. Thus, repayments to an appropriation after expiration of the original period of obligational availability are not available for reobligation. B-121836, Apr. 22, 1955.

# Continuing Resolutions

**A. Introduction . . . . . . . . . . 8-2**
1. Definition and General Description . . . . . . . . 8-2
2. Use of Appropriation Warrants . . . . . . . . 8-9

**B. Rate for Operations . . . . . . . . . . 8-10**
1. Current Rate . . . . . . . . 8-10
2. Rate Not Exceeding Current Rate . . . . . . . . 8-12
3. Spending Pattern under Continuing Resolution . . . . . . . . 8-15
   a. Pattern of Obligations . . . . . . . . 8-15
   b. Apportionment . . . . . . . . 8-18
4. Liquidation of Contract Authority . . . . . . . . 8-19
5. Rate for Operations Exceeds Final Appropriation . . . . . . . . 8-19

**C. Projects or Activities . . . . . . . . . . 8-21**

**D. Relationship to other Legislation . . . . . . . . . . 8-27**
1. Not Otherwise Provided For . . . . . . . . 8-27
2. Status of Bill or Budget Estimate Used as Reference . . . . . . . . 8-27
3. More Restrictive Authority . . . . . . . . 8-29
4. Lack of Authorizing Legislation . . . . . . . . 8-31

**E. Duration . . . . . . . . . . 8-35**
1. Duration of Continuing Resolution . . . . . . . . 8-35
2. Duration of Appropriations . . . . . . . . 8-36
3. Impoundment . . . . . . . . 8-38

# Continuing Resolutions

## A. Introduction

### 1. Definition and General Description

The term "continuing resolution" may be defined as follows:

> "An appropriation act that provides budget authority for federal agencies, specific activities, or both to continue in operation when Congress and the President have not completed action on the regular appropriation acts by the beginning of the fiscal year."[1]

For the most part, continuing resolutions are temporary appropriation acts. With a few exceptions to be noted later, they are intended by Congress to be stop-gap measures enacted to keep existing federal programs functioning after the expiration of previous budget authority and until regular appropriation acts can be enacted. B-300673, July 3, 2003. Congress resorts to the continuing resolution when there is no regular appropriation for a program or agency, perhaps because the two houses of Congress have not yet agreed on common language, because authorizing legislation has not yet been enacted, or because the President has vetoed an appropriation act passed by Congress. 58 Comp. Gen. 530, 532 (1979). Also, given the size and complexity of today's government, the consequent complexity of the budget and appropriations process, and the occasionally differing policy objectives of the executive and legislative branches, it sometimes becomes difficult for Congress to enact all of the regular appropriation acts before the fiscal year ends.

Continuing resolutions are nothing new. GAO has found administrative decisions discussing them as far back as the 1880s.[2] At one time, they were called "temporary resolutions." The term "continuing resolution" came into widespread use in the early 1960s.[3]

[1] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 35–36.

[2] 4 Lawrence, First Comp. Dec. 116 (1883); 3 Lawrence, First Comp. Dec. 213 (1882).

[3] For a brief historical sketch, see Library of Congress, Congressional Research Service, *Budget Concepts and Terminology: The Appropriations Phase*, No. GGR 74-210, ch. V (1974), at 31–32, which identifies what may have been the first continuing resolution, an 1876 resolution (ch. 157, 19 Stat. 65 (June 30, 1876)) requested by President Grant.

In the 20 years from fiscal years 1962 to 1981, 85 percent of the appropriation bills for federal agencies were enacted after the start of the fiscal year and thus necessitated continuing resolutions. GAO has discussed the problems inherent in this situation in several reports. *See*, *e.g.*, GAO, *Updated Information Regarding Funding Gaps and Continuing Resolutions*, GAO/PAD-83-13 (Washington, D.C.: Dec. 17, 1982); *Funding Gaps Jeopardize Federal Government Operations*, PAD-81-31 (Washington, D.C.: Mar. 3, 1981). In 24 of the fiscal years between fiscal years 1977 and 2004, Congress and the President did not complete action on a majority of the 13 regular appropriations by the start of the fiscal year. In eight of those years, they did not finish any of the bills by the start of the new fiscal year.[4] Twenty-one continuing resolutions were enacted for fiscal year 2001.

The periodic experience of government "shutdowns," or partial shutdowns, when appropriations bills have not been enacted has led to proposals for an automatic continuing resolution. The automatic continuing resolution, however, is an idea for which the details are critically important. Depending on the detailed structure of such a continuing resolution, the incentive for policymakers—some in the Congress and the President—to negotiate seriously and reach agreement may be lessened. If the goal of the automatic continuing resolution is to provide a little more time for resolving issues, it could be designed to permit the incurrence of obligations to avoid a funding gap, but not the outlay of funds to liquidate the new obligations. This would allow agencies to continue operations for a period while the Congress completes appropriations actions. GAO, *Budget Process: Considerations for Updating the Budget Enforcement Act*, GAO-01-991T (July 19, 2001). Funding gaps and the legal problems they present are discussed in greater detail in Chapter 6, section C.6.

Continuing resolutions are enacted as joint resolutions making continuing appropriations for a certain fiscal year or portion of the fiscal year. Although enacted in this form rather than as an "act," once passed by both houses of Congress and approved by the President, a continuing resolution becomes a public law and has the same force and effect as any other statute. *Oklahoma v. Weinberger*, 360 F. Supp. 724, 726 (W.D. Okla. 1973);

[4] Library of Congress, Congressional Research Service (CRS), *The Congressional Appropriations Process: An Introduction*, No. 97-6845 (Dec. 6, 2004), at 15. *See also* CRS, *Duration of Continuing Resolutions in Recent Years*, No. RL32614 (Apr. 22, 2005); CRS, *Continuing Appropriations Acts: Brief Overview of Recent Practices*, No. RL30343 (Jan. 10, 2005).

B-152554, Dec. 15, 1970. Since a continuing resolution is a form of appropriation act, it often will include the same types of restrictions and conditions that are commonly found in regular appropriation acts. *See*, *e.g.*, B-210603, Feb. 25, 1983 (ship construction appropriation in continuing resolution making funds available "only under a firm, fixed price type contract"). Indeed, continuing resolutions typically incorporate by reference restrictions and conditions from regular appropriations acts. *See*, *e.g.*, Pub. L. No. 108-309, § 102, 118 Stat. 1137, 1138 (Sept. 30, 2004). Having said this, however, it is necessary to note that continuing resolutions, at least those in what GAO considers the "traditional form," differ considerably from regular appropriation acts.

Continuing resolutions may take different forms. The "traditional" form, used consistently except for a few years in the 1980s, employs essentially standard language and is clearly a temporary measure. An example of this form is Public Law 108-309, the first continuing resolution for fiscal year 2005, which provided funding authority from October 1 through November 20, 2004. Section 101 appropriates:

> "Such amounts as may be necessary under the authority and conditions provided in the applicable appropriations Act for fiscal year 2004 for continuing projects or activities including the costs of direct loans and loan guarantees (not otherwise specifically provided for in this joint resolution) which were conducted in fiscal year 2004, at a rate for operations not exceeding the current rate, and for which appropriations, funds, or other authority was made available in the following appropriations Acts . . ."

Section 101 then references most of the regular appropriation acts for fiscal year 2004.

Public Law 108-309 also contains a number of additional typical provisions, including the following:

> "SEC. 102. Appropriations made by section 101 shall be available to the extent and in the manner which would be provided by the pertinent appropriations Act."

> "SEC. 104. No appropriation or funds made available or authority granted pursuant to section 101 shall be used to initiate or resume any project or activity for which

> appropriations, funds, or other authority were not available during fiscal year 2004."
>
> "SEC. 107. Unless otherwise provided for in this joint resolution or in the applicable appropriations Act, appropriations and funds made available and authority granted pursuant to this joint resolution shall be available until (a) enactment into law of an appropriation for any project or activity provided for in this joint resolution, or (b) the enactment into law of the applicable appropriations Act by both Houses without any provision for such project or activity, or (c) November 20, 2004, whichever first occurs."

When enacting continuing resolutions in this form, there is clear indication that Congress intends and expects that the normal authorization and appropriation process will eventually produce appropriation acts which will replace or terminate the budget authority contained in the resolution. Thus, a continuing resolution of this type generally provides that funds appropriated for an activity by the resolution will no longer be available for obligation if the activity is later funded by a regular appropriation act, or Congress indicates its intent to end the activity by enacting an applicable appropriation act without providing for the activity. 58 Comp. Gen. at 532. See also section 107 of Public Law 108-309, quoted above. Obligations already incurred under the resolution, however, may be liquidated.

GAO's decision in B-300673, July 3, 2003, illustrates the interplay between funding under a continuing resolution and a later-enacted regular appropriation. The fiscal year 2003 appropriation act for the legislative branch authorized the House of Representatives Chief Administrative Officer to use that Office's salaries and expenses appropriation to pay certain expenses of the House Child Care Center for "fiscal year 2003 and each succeeding fiscal year." Pub. L. No. 108-7, § 108, 117 Stat. 11, 355 (Feb. 20, 2003). Previously, a revolving fund paid those expenses. However, since Public Law 108-7 was not enacted until February 20, 2003, fiscal year 2003 expenses for the Child Care Center were initially charged to the revolving fund under continuing resolutions. With enactment of Public Law 108-7, GAO held that the Chief Administrative Officer's salaries and expenses appropriation should fund the Child Care Center expenses retroactive to the beginning of fiscal year 2003 and that this appropriation should reimburse the revolving fund for the fiscal year 2003 expenses initially charged to it under the continuing resolutions. The decision stated

that the fact that payments were initially made during a period covered by a continuing resolution was not significant since the regular appropriation, once enacted, supersedes the continuing resolution and governs the amount and period of availability.

Unlike regular appropriation acts, continuing resolutions in their traditional form do not usually appropriate specified sums of money. Rather, they usually appropriate "such amounts as may be necessary" for continuing projects or activities at a certain "rate for operations." The rate for operations may be the amount provided for the activity in an appropriation act that has passed both houses of Congress but has not become law; the lower of the amounts provided when each house has passed a different act; the lower of the amounts provided either in an act which has passed only one house or in the administration's budget estimate; the amount specified in a particular conference report; the lower of either the amount provided in the budget estimate or the "current rate"; or simply the current rate. Therefore, in order to determine the sum of money appropriated for any given activity by this type of continuing resolution, it is necessary to examine documents other than the resolution itself. Some continuing resolutions have used a combination of "formula appropriations" of the types described in this paragraph and appropriations of specific dollar amounts. An example is the fiscal year 1996 continuing resolution, Pub. L. No. 104-69, 109 Stat. 767 (Dec. 22, 1995).

There are times when Congress acknowledges at the outset that it is not likely to enact one or more regular appropriation acts during the current fiscal year.[5] See, for example, the 1980 continuing resolution, Pub. L. No. 96-86, 93 Stat. 656 (Oct. 12, 1979), which provided budget authority for the legislative branch for the entire fiscal year.

For a few years in the 1980s, Congress used a very different form of continuing resolution, simply stringing together the complete texts of appropriation bills not yet enacted and enacting them together in a single "omnibus" package. This approach reached its extreme in the 1988 continuing resolution, Pub. L. No. 100-202, 101 Stat. 1329 (Dec. 22, 1987), which included the complete texts of all 13 of the regular appropriation

[5] In November 1995, perhaps anticipating numerous continuing resolutions for fiscal year 1996, for example, Congress suspended for the remainder of that session the requirement in 1 U.S.C. § 107 that the resolutions be printed on parchment for presentation to the President. Pub. L. No. 104-56, title II, § 201, 109 Stat. 548, 553 (Nov. 20, 1995).

bills. This form of continuing resolution differs from the traditional form in two key respects:

- Unlike the traditional continuing resolution, the "full text" version amounts to an acknowledgement that no further action on the unenacted bills will be forthcoming, and consequently provides funding for the remainder of the fiscal year.

- When the entire text of an appropriation bill is incorporated into a continuing resolution, the appropriations are in the form of specified dollar amounts, the same as if the individual bill had been enacted.

The "full text" format generally does not raise the same issues of statutory interpretation that arise under the traditional format. However, it produces new ones. For example, in a continuing resolution which consolidates the full texts of what would otherwise have been several separate appropriation acts, GAO has construed the term "this act" as referring only to the individual "appropriation act" in which it appears rather than to the entire continuing resolution. B-230110, Apr. 11, 1988.

While the omnibus approach of the 1988 resolution may appear convenient, it generated considerable controversy because, among other reasons, it is virtually "veto-proof"—the President has little choice but to sign the bill or bring the entire government to an abrupt halt. *See Presidential Remarks on the Signing of the Continuing Appropriations for Fiscal Year 1988 and the Omnibus Budget Reconciliation Act of 1987 Into Law*, 23 Weekly Comp. Pres. Doc. 1546, 1547 (Dec. 22, 1987).

There was no continuing resolution for fiscal year 1989. All 13 of the appropriation bills were enacted on time, for what was reported to be the first time in 12 years.[6] For fiscal year 1990, Congress reverted to the traditional type of continuing resolution. *See* Pub. L. No. 101-100, 103 Stat. 638 (Sept. 29, 1989). Nor were there any continuing resolutions for fiscal years 1995 and 1997. The start of the 1997 fiscal year was met with an omnibus appropriations act which added five regular appropriations bills to a sixth regular appropriations bill. Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996). The remaining seven bills were enacted separately.

[6] Irvin Molotsky, *All Spending Bills Completed on Time*, N.Y. Times, Oct. 2, 1988, at 27.

Questions arising under continuing resolutions can be grouped loosely into two broad categories. First are questions in which the fact that a continuing resolution is involved is purely incidental, in other words, questions which could have arisen just as easily under a regular appropriation act. For example, one of the issues considered in B-230110, Apr. 11, 1988, was whether certain provisions in the 1988 resolution constituted permanent legislation. Cases in this category are included with their respective topics throughout this publication and are not repeated in this chapter.

Second are issues that are unique to continuing resolutions, and these are the focus of the remainder of this chapter. For the most part, the material deals with the traditional form of continuing resolution as it is this form that uses concepts and language found only in continuing resolutions.

One point that should emerge from the GAO decisions and opinions is the central role of legislative intent. To be sure, legislative intent cannot change the plain meaning of a statute; Congress must enact what it intends in order to make it law. However, there are many cases in which the statutory language alone does not provide a clear answer, and indications of congressional intent expressed in well-established methods, viewed in light of the purpose of the continuing resolution, will tip the balance.

In one case, for example, a continuing resolution provided a lump-sum appropriation for the National Oceanic and Atmospheric Administration's research and facilities account, and provided further for the transfer of $1.8 million from the Fisheries Loan Fund. The first continuing resolution for 1987 included the transfer provision and was signed into law on October 1, 1986. The Fisheries Loan Fund was scheduled to expire at "the close of September 30, 1986." Under a strictly technical reading, the $1.8 million ceased to be available once the clock struck midnight on September 30. However, the Comptroller General found the transfer provision effective, noting that a contrary result would "frustrate the obvious intent of Congress." B-227658, Aug. 7, 1987.

Similarly, appropriations for the United States Commission on Civil Rights contained in a fiscal year 1992 continuing resolution were found to have extended the existence of the Commission beyond its termination on September 30, 1991. "When viewed in their entirety, legislative actions on the Commission's reauthorization and appropriation bills, together with their legislative history, clearly manifest an intent by Congress for the

Commission to continue to operate after September 30, 1991." 71 Comp. Gen. 378, 381 (1992).

While many of the continuing resolution provisions to be discussed will appear highly technical (because they are highly technical), there is an essential logic to them, evolved over many years, which is more readily seen from the perspective not of a specific case or problem, but of the overall goals and objectives of continuing resolutions and their relationship to the rest of the budget and appropriations process.

## 2. Use of Appropriation Warrants

Funds, including funds appropriated under a continuing resolution, are drawn from the Treasury by means of an appropriation warrant (FMS Form 6200).[7] A warrant is the official document issued pursuant to law by the Secretary of the Treasury upon enactment of an appropriation that establishes the amount of money authorized to be withdrawn from the Treasury.[8] Under 31 U.S.C. § 3323(a), warrants authorized by law are to be signed by the Secretary of the Treasury and countersigned by the Comptroller General. However, under the authority of section 3326(a) of title 31, United States Code, the Secretary of the Treasury and the Comptroller General have issued several joint regulations phasing out the countersignature requirement.[9] First, Department of the Treasury-General Accounting Office Joint Regulation No. 5 (Oct. 18, 1974) waived the requirement for all appropriations *except continuing resolutions*. Next, Treasury-GAO Joint Regulation No. 6 (Oct. 1, 1983) further simplified the process by requiring issuance of a warrant and countersignature under a continuing resolution only once, for the total amount appropriated, unless a subsequent resolution changed the annual amount. Finally, Treasury-GAO Joint Regulation No. 7, effective January 1, 1991, eliminated the countersignature requirement completely.

---

[7] 1 TFM 2-2025 (Dec. 15, 2004).

[8] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 101.

[9] Treasury-GAO Joint Regulations are included in Appendix II to Title 7 of the GAO *Policy and Procedures Manual for Guidance of Federal Agencies* (Washington, D.C.: May 18, 1993). Because of their nature, they are not published in the Federal Register. Some of the earlier ones, but not those noted in the text, were published in the annual "Comp. Gen." volumes. Title 7 of the Policy and Procedures Manual is the only GAO reference in which the regulations and amendments can be found together in a single location, available at www.gao.gov/special.pubs/ppm.html (last visited September 15, 2005).

## B. Rate for Operations

### 1. Current Rate

The current rate, as that term is used in continuing resolutions, is equivalent to the total amount of money which was available for obligation for an activity during the fiscal year immediately prior to the one for which the continuing resolution is enacted.

The term "current rate" is used in continuing resolutions to indicate the level of spending which Congress desires for a program. For example, a resolution may appropriate sufficient funds to enable a program to operate at a rate for operations "not in excess of the current rate," or at a rate "not in excess of the lower of the current rate" or the rate provided in a certain bill. It is possible to read the term "current rate" as referring to either the amount of money available for the program in the preceding year, or an amount of money sufficient to enable continuation of the program at the level of the preceding year. The two can be very different.

As a general proposition, GAO regards the term "current rate" as referring to a sum of money rather than a program level. *See*, *e.g.*, 58 Comp. Gen. 530, 533 (1979); B-194362, May 1, 1979. Thus, when a continuing resolution appropriates in terms of the current rate, the amount of money available under the resolution will be limited by that rate, even though an increase in the minimum wage may force a reduction in the number of people participating in an employment program (B-194063, May 4, 1979), or an increase in the mandatory level of assistance will reduce the number of meals provided under a meals for the elderly program (B-194362, May 1, 1979).

The term "current rate" refers to the rate of operations carried on within the appropriation for the prior fiscal year. B-152554, Dec. 6, 1963. The current rate is equivalent to the total appropriation, or the total funds which were available for obligation, for an activity during the previous fiscal year. *Edwards v. Bowen*, 785 F.2d 1440 (9th Cir. 1986); B-300167, Nov. 15, 2002; B-255529, Jan. 10, 1994; 64 Comp. Gen. 21 (1984); 58 Comp. Gen. 530, 533 (1979); B-194063, May 4, 1979; B-194362, May 1, 1979. Funds administratively transferred from the account during the fiscal year, under authority contained in substantive legislation, should not be deducted in determining the current rate. B-197881, Apr. 8, 1980; B-152554, Nov. 4, 1974.

It follows that funds transferred into the account during the fiscal year pursuant to statutory authority should be excluded. B-197881, Apr. 8, 1980.

In those instances in which the program in question has been funded by 1-year appropriations in prior years, the current rate is equal to the total funds appropriated for the program for the previous fiscal year. *See*, *e.g.*, B-271304, Mar. 19, 1996; 64 Comp. Gen. at 22; 58 Comp. Gen. 530; B-194362, May 1, 1979. In those instances in which the program has been funded by multiple year or no-year appropriations in prior years, the current rate is equal to the total funds appropriated for the previous fiscal year plus the total of unobligated budget authority carried over into that year from prior years. 58 Comp. Gen. 530; B-152554, Oct. 9, 1970.

One apparent deviation from this calculation of current rate occurred in 58 Comp. Gen. 530, a case involving the now obsolete Comprehensive Employment and Training Act program. In that decision, the Comptroller General, in calculating the current rate under the 1979 continuing resolution, included funds appropriated in a 1977 appropriation act and obligated during 1977. Ordinarily, only funds appropriated by the fiscal year 1978 appropriation act, and carry-over funds unobligated at the beginning of fiscal year 1979, would have been included in the current rate. However, Congress did not appropriate funds for this activity in the fiscal year 1978 appropriation act. In this instance the funds appropriated in 1977 were included because it was clear from the legislative history of the appropriation act that Congress intended these funds to be an advance of appropriations for fiscal year 1978. Thus, in order to ascertain the actual amount available for the activity for fiscal year 1978, it was necessary to include the advance funding provided by the 1977 appropriation act. The rationale used in this decision would apply only when it is clear that Congress was providing advance funding for the reference fiscal year in an earlier year's appropriation act.

Where funding for the preceding fiscal year covered only a part of that year, it may be appropriate to "annualize" the previous year's appropriation in order to determine the current rate. This was the result in 61 Comp. Gen. 473 (1982), in which the fiscal year 1981 appropriation for a particular program had been contained in a supplemental appropriation act and was intended to cover only the last quarter of the fiscal year. The current rate for purposes of the fiscal year 1982 continuing resolution was four times the fiscal year 1981 figure.

Prior year supplemental appropriations also count in calculating the current rate. In this regard, section 103 of Public Law 108-309, 118 Stat. 1137, 1138 (Sept. 30, 2004), discussed above, provides: "The appropriations Acts listed in section 101 shall be deemed to include miscellaneous and supplemental appropriation laws enacted during fiscal year 2004."

There are exceptions to the rule that current rate means a sum of money rather than a program level. For example, GAO construed the fiscal year 1980 continuing resolution as appropriating sufficient funds to support an increased number of Indochinese refugees in view of explicit statements by both the Appropriations and the Budget Committees that the resolution was intended to fund the higher program level. B-197636, Feb. 25, 1980. Also, the legislative history of the fiscal year 1981 continuing resolution (Pub. L. No. 96-369, 94 Stat. 1351 (Oct. 1, 1980)) indicated that in some instances current rate must be interpreted so as to avoid reducing existing program levels.

It is always preferable for the exception to be specified in the resolution itself. Starting with the first continuing resolution for fiscal year 1983 (Pub. L. No. 97-276, 96 Stat. 1186 (Oct. 2, 1982)), Congress began appropriating for the continuation of certain programs "at a rate to maintain current operating levels." GAO has construed this language as meaning sufficient funds to maintain the program in question at the same operating level as at the end of the immediately preceding fiscal year. B-209676, Apr. 14, 1983; B-200923, Nov. 16, 1982 (nondecision letter). Recent continuing resolutions have included similar language for entitlement and other mandatory payments: "activities shall be continued at the rate to maintain program levels under current law."[10]

## 2. Rate Not Exceeding Current Rate

When a resolution appropriates funds to continue an activity at a rate for operations "not in excess of the current rate," the amount of funds appropriated by the resolution is equal to the current rate less any unobligated balance carried over into the present year.

As discussed in the preceding section, the current rate is equivalent to the total amount of funds that was available for obligation for a project or

[10] Pub. L. No. 108-309, § 126 (first continuing resolution for fiscal year 2005). *See also* Pub. L. No. 108-84, § 112, 117 Stat. 1042, 1044 (Sept. 30, 2003) (first continuing resolution for fiscal year 2004).

activity in the preceding fiscal year. When the continuing resolution appropriates funds to continue an activity at a rate for operations "not in excess of the current rate," it is the intent of Congress that the activity have available for obligation in the present fiscal year no more funds than it had available for obligation in the preceding fiscal year. Therefore, if there is a balance of unobligated funds which can be carried over into the present fiscal year because the funds are multiple year or no-year funds, this balance must be deducted from the current rate in determining the amount of funds appropriated by the continuing resolution. If this were not done, the program would be funded at a higher level in the present year than it was in the preceding year, which is not permitted by the language of the resolution. *See* 58 Comp. Gen. 530, 535 (1979).

For example, suppose a continuing resolution for fiscal year 2006 were to appropriate sufficient funds to continue an activity at a rate not exceeding the current rate, and the current rate, or the total amount which was available for obligation in fiscal year 2005, is $1,000,000. Of this amount, suppose $100,000 of multiple year funds remains unobligated at the end of fiscal year 2005, and is available for obligation in fiscal year 2006. If the activity is to operate at a rate not to exceed the current rate, $1,000,000, then the resolution appropriates no more than the difference between the current rate and the carryover from 2005 to 2006, or $900,000. If the resolution were interpreted as appropriating the full current rate, then a total of $1,100,000 would be available for fiscal year 2006, and the activity would be able to operate at a rate in excess of the current rate, a result prohibited by the language of the resolution.

An unobligated balance which does not carry over into the present fiscal year (the more common situation) does not have to be deducted. B-152554, Nov. 4, 1974.

A commonly encountered form of continuing resolution formula appropriation is an amount not in excess of the current rate or the rate provided in some reference item, whichever is lower. The reference item may be an unenacted bill, a conference report, the President's budget estimate, *etc*. When the current rate produces the lower figure—the situation encountered in 58 Comp. Gen. 530—the above rule applies and an unobligated carryover balance must be deducted to determine the amount appropriated by the continuing resolution. However, when the current rate is not the lower of the two referenced items, the rule does not necessarily apply.

To illustrate, a continuing resolution appropriated funds for the Office of Refugee Resettlement at a rate for operations not in excess of the lower of the current rate or the rate authorized by a bill as passed by the House of Representatives. The rate under the House-passed bill was $50 million. The current rate was $77.5 million, of which $39 million remained unobligated at the end of the preceding fiscal year and was authorized to be carried over into the current fiscal year. If the continuing resolution had simply specified a rate not in excess of the current rate, or if the rate in the House-passed bill had been greater than the current rate, it would have been necessary to deduct the $39 million carryover balance from the $77.5 million current rate to determine the maximum funding level for the current year. Here, however, the rate in the House-passed bill was the lower of the two.

Reasoning that the current rate already includes an unobligated carryover balance, if any, whereas the rate in the House-passed bill did not include a prior year's balance, and supported by the legislative history of the continuing resolution, the Comptroller General concluded that the amount available for the current year was the amount appropriated by the resolution, $50 million, plus the unobligated carryover balance of $39 million, for a total of $89 million. 64 Comp. Gen. 649 (1985). The decision distinguished 58 Comp. Gen. 530, stating that "the rule with respect to deduction of unobligated balances in 58 Comp. Gen. 530 is not applicable where the lower of two referenced rates is not the current rate." *Id.* at 652–53. The case went to court, and the Ninth Circuit Court of Appeals reached the same result. *Edwards v. Bowen*, 785 F.2d 1440 (9th Cir. 1986).

In sum, if a continuing resolution appropriates the lower of the current rate or the rate in some reference item, you compare the two numbers to determine which is lower before taking any unobligated carryover balance into account. If the current rate is lower, you then deduct the carryover balance to determine the funding level under the continuing resolution. If the rate in the reference item is lower, the funding level is the reference rate plus the carryover balance unless it is clear that this is not what was intended.

## 3. Spending Pattern under Continuing Resolution

### a. Pattern of Obligations

An agency may determine the pattern of its obligations under a continuing resolution so long as it operates under a plan which will keep it within the rate for operations limit set by the resolution. If an agency usually obligates most of its annual budget in the first month or first quarter of the fiscal year, it may continue that pattern under the resolution. If an agency usually obligates funds uniformly over the entire year, it will be limited to that pattern under the resolution, unless it presents convincing reasons why its pattern must be changed in the current fiscal year.

Continuing resolutions are often enacted to cover a limited period of time, such as a month or a calendar quarter. The time limit stated in the resolution is the maximum period of time during which funds appropriated by the resolution are available for obligation.

However, this limited period of availability does not affect the amount of money appropriated by the resolution. The rate for operations specified in the resolution, whether in terms of an appropriation act which has not yet become law, a budget estimate, or the current rate, is an annual amount. The continuing resolution, in general, regardless of its period of duration, appropriates this full annual amount. *See* B-271304, Mar. 19, 1996; B-152554, Nov. 4, 1974.

Because the appropriation under a continuing resolution is the full annual amount, an agency may generally follow any pattern of obligating funds, so long as it is operating under a plan which will enable continuation of activities throughout the fiscal year within the limits of the annual amount appropriated. Thus, under a resolution with a duration of one month, and which appropriates funds at a rate for operations not in excess of the current rate, the agency is not necessarily limited to incurring obligations at the same rate it incurred them in the corresponding month of the preceding year if the agency can establish that it is operating under a flexible plan that would enable continuation of activities throughout the fiscal year. B-152554, Dec. 6, 1963. The same principle applies when the resolution appropriates funds at a rate to maintain current operating levels. B-209676, Apr. 14, 1983.

However, the pattern of obligations in prior years does provide a framework for determining the proper pattern of obligations under the

continuing resolution. For example, if the activity is a formula grant program in which nearly all appropriated funds are normally obligated at the beginning of the fiscal year, then the full annual amount should be made available to the agency under the resolution, even though the resolution may be in effect for only 1 month. However, if the activity is salaries and expenses, in which funds are normally obligated uniformly throughout the year, then the amount made available to the agency should be only one-twelfth of the annual amount under a 1-month resolution or one-fourth of the annual amount under a calendar quarter resolution. B-152554, Feb. 17, 1972.

For example, GAO determined that OMB properly apportioned, and the State Department properly obligated, 75 percent of funds appropriated by a fiscal year 1994 continuing resolution (Pub. L. No. 103-88, 107 Stat. 977 (Sept. 30, 1993)) for payments to the United Nations. It was State Department policy to defer payment of the United States' general assessment of United Nations contributions to the fourth quarter of the calendar year, which is the first quarter of the fiscal year. As a matter of normal practice, the State Department also made peacekeeping payments when bills were received to the extent funds were available. We found that the advance apportionment and obligation for the United Nations assessment and peacekeeping payments with funds appropriated by the fiscal year 1994 continuing resolution did not violate either the continuing resolution or the provisions of title 31, United States Code, controlling apportionment of funds. B-255529, Jan. 10, 1994.

Congress can, of course, alter the pattern of obligations by the language of the resolution. For example, if the resolution limits obligations in any calendar quarter to one-fourth of the annual rate, the agency is limited to that one-fourth rate regardless of its normal pattern of obligations. B-152554, Oct. 16, 1973. Further, even if the resolution itself does not have such limitations, but the legislative history clearly shows the intent of Congress that only one-fourth of the annual rate be obligated each calendar quarter, only this amount should be made available unless the agency can demonstrate a real need to exceed that rate. B-152554, Nov. 4, 1974.

Beginning with fiscal year 1996, Congress to date has included the following two provisions in continuing resolutions:

> ". . . for those programs that had high initial rates of operation or complete distribution of funding at the beginning of the fiscal year in fiscal year [1995] because of

> distributions of funding to States, foreign countries, grantees, or others, similar distributions of funds for fiscal year [1996] shall not be made and no grants shall be awarded for such programs funded by this resolution that would impinge on final funding prerogatives."
>
> "This joint resolution shall be implemented so that only the most limited funding action of that permitted in the resolution shall be taken in order to provide for continuation of projects and activities."

Pub. L. No. 104-31, §§ 113, 114, 109 Stat. 278, 281 (Sept. 30, 1995).[11]

GAO considered these provisions in B-300167, Nov. 15, 2002. That decision involved the Federal Highway Administration's (FHWA) distribution of federal aid to highways funds to the states under a continuing resolution for fiscal year 2003, Pub. L. No. 107-229, 116 Stat. 1465 (Sept. 30, 2002).

FHWA had determined its distributions to the states at 4/365ths of the current rate of $31.8 billion since that was the previous fiscal year's obligation limitation under the 2002 Department of Transportation appropriations act referenced by the continuing resolution. FHWA's consistent historical practice was to allocate funds to the states on a pro-rata basis by multiplying the percentage of the year covered by the continuing resolution by the rate for the continuing resolution (at the time the anticipated length of the continuing resolution was 4 days, hence FHWA's 4/365ths distribution).

OMB, however, apportioned a total amount of $27.7 billion to FHWA during the term of the continuing resolution to refrain from "impinging on final funding prerogatives" per the first provision quoted above, thereby reducing the amount FHWA had available for allocation to the states from 4/365ths of $31.8 billion to 4/365ths of $27.7 billion. OMB reasoned that because the program traditionally makes available all of the budgetary resources subject to limitation for allocation to the states at the beginning of the fiscal year, had OMB apportioned the full amount of the fiscal year

[11] *See also* Pub. L. No. 108-309, §§ 110, 111, 118 Stat. 1137, 1138–39 (Sept. 30, 2004). Our review did not reveal any relevant legislative history concerning the intent of Congress in adopting these provisions.

2002 level, then any subsequent effort by Congress to enact an obligation limitation of less than $31.8 billion could have been compromised.

GAO found that OMB had no basis to further reduce the level of highway spending below the current rate established in fiscal year 2002. Based on the plain language of the first provision above, it only applies to programs that (1) had "high initial rates of operation or a complete distribution" of funds at the beginning of the prior fiscal year (assuming the normal appropriations process), and where (2) a "similar distribution of funds" under the continuing resolution would impinge on Congress's final funding prerogatives. In other words, the provision can only be applied to reduce or limit the distribution of the current rate for a program (as defined in the continuing resolution) if both prongs of the two-part test are met. Since FHWA's long-standing practice of distributing highway funds under a continuing resolution on a pro-rata basis fully protects congressional funding prerogatives, and does so in a manner that is consistent with the second provision (and is far more restrictive than would be true under the first provision), GAO concluded that OMB was not justified under the two provisions to set the level of highway spending at $27.7 billion.

Congress subsequently resolved the dispute between OMB and FHWA by including a specific provision in its second amendment to the continuing resolution establishing an annual rate of operations of $31.8 billion for FHWA provided that total obligations for the program not exceed $27.7 billion while operating under the resolution, Pub. L. No. 107-240, § 137, 116 Stat. 1492, 1495 (Oct. 11, 2002).

### b. Apportionment

The requirement that appropriations be apportioned by the Office of Management and Budget, imposed by the Antideficiency Act, applies to funds appropriated by continuing resolution as well as regular appropriations.[12] *See generally* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, pt. 4, § 120.1 (June 21, 2005).

Typically, OMB has permitted some continuing resolution funds to be apportioned automatically. OMB Cir. No. A-11, § 123.5. For example, if a given continuing resolution covers 10 percent of a fiscal year, OMB may permit 10 percent of the appropriation to be apportioned automatically, meaning that the agency can obligate this amount without seeking a specific apportionment. Under such an arrangement, if program

[12] For a more general discussion of apportionment, see Chapter 6, section C.4.

requirements produced a need for additional funds, the agency would have to seek an apportionment from OMB for the larger amount.

Apportionment requirements may vary from year to year because of differences in duration and other aspects of applicable continuing resolutions. A device OMB has commonly used to announce its apportionment requirements for a given fiscal year is an OMB Bulletin reflecting the particular continuing resolution for that year.[13]

## 4. Liquidation of Contract Authority

When in the preceding fiscal year Congress has provided an agency with contract authority, the continuing resolution must be interpreted as appropriating sufficient funds to liquidate that authority to the extent it becomes due during the period covered by the continuing resolution.

When an activity operates on the basis that in one year Congress provides contract authority to the agency and in the next year appropriates funds to liquidate that authority, then a continuing resolution in the second year must be interpreted as appropriating sufficient funds to liquidate the outstanding contract authority. The term "contract authority" means express statutory authority to incur contractual obligations in advance of appropriations.[14] Thus, there is no "rate for operations" limitation in connection with the liquidation of due debts based on validly executed contracts entered into under statutory contract authority. In this context, rate for operations limitations apply only to new contract authority for the current fiscal year. B-114833, Nov. 12, 1974.

## 5. Rate for Operations Exceeds Final Appropriation

If an agency operating under a continuing resolution incurs obligations within the rate for operations limit, but Congress subsequently appropriates a total annual amount less than the amount of these obligations, the obligations remain valid. B-152554, Feb. 17, 1972.

[13] *See, e.g.*, OMB Bulletin No. 04-05, *Apportionment of the Continuing Resolution(s) for Fiscal Year 2005* (Sept. 30, 2004). For a detailed review of apportionment of funds appropriated or authority granted by the fiscal year 2003 continuing resolution, see B-300373, Dec. 20, 2002.

[14] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 21.

For example, a continuing resolution for a period of 1 month may have a rate for operations limitation of the current rate. The activity being funded is a grant program and the agency obligates the full annual amount during the period of the resolution. Congress then enacts a regular appropriation act which appropriates for the activity an amount less than the obligations already incurred by the agency. Under these circumstances, the obligations incurred by the agency remain valid obligations of the United States.

Having established that the "excess" obligations remain valid, the next question is how they are to be paid. At one time, GAO took the position that an agency finding itself in this situation must not incur any further obligations and must attempt to negotiate its obligations downward to come within the amount of the final appropriation. B-152554, Feb. 17, 1972. If this is not possible, the agency would have to seek a supplemental or deficiency appropriation. This position was based on a provision commonly appearing in continuing resolutions along the following lines:

> "Expenditures made pursuant to this joint resolution shall be charged to the applicable appropriation, fund, or authorization whenever a bill in which such applicable appropriation, fund, or authorization is contained is enacted into law."[15]

However, the 1972 opinion failed to take into consideration another provision commonly included in continuing resolutions:

> "Appropriations made and authority granted pursuant to this joint resolution shall cover all obligations or expenditures incurred for any program, project, or activity during the period for which funds or authority for such project or activity are available under this joint resolution."[16]

When these two provisions are considered together, it becomes apparent that the purpose of the first provision is merely to emphasize that the funds

[15] *E.g.*, Pub. L. No. 108-309, § 108, 118 Stat. 1137, 1138 (Sept. 30, 2004). Comparable provisions have been included in continuing resolutions for over a century. See, for example, the fiscal year 1883 continuing resolution ( Pub. L. No. 38, 22 Stat. 384 (June 30, 1882)) discussed in 3 Lawrence, First Comp. Dec. 213 (1882).

[16] *E.g.*, Pub. L. No. 108-309, § 105.

appropriated by the continuing resolution are not in addition to the funds later provided when the applicable regular appropriation act is enacted. Accordingly, GAO modified the 1972 opinion and held that funds made available by a continuing resolution remain available to pay validly incurred obligations which exceed the amount of the final appropriation. 62 Comp. Gen. 9 (1982). *See also* 67 Comp. Gen. 474 (1988); B-207281, Oct. 19, 1982.

Thus, obligations under a continuing resolution are treated as follows:

> "When an annual appropriation act provides sufficient funding for an appropriation account to cover obligations previously incurred under the authority of a continuing resolution, any unpaid obligations are to be charged to and paid from the applicable account established under the annual appropriation act. Similarly, to the extent the annual act provides sufficient funding, those obligations which were incurred and paid during the period of the continuing resolution must be charged to the account created by the annual appropriation act. On the other hand, to the extent the annual appropriation act does not provide sufficient funding for the appropriation account to cover obligations validly incurred under a continuing resolution, the obligations in excess of the amount provided by the annual act should be charged to and paid from the appropriation account established under authority of the continuing resolution. [Footnote omitted.] Thus the funds made available by the resolution must remain available to pay these obligations."

62 Comp. Gen. 9, 11–12 (1982). Thus, as GAO had advised in 1972, agencies are still required to make their best efforts to remain within the amount of the final appropriation. The change recognized in 62 Comp. Gen. 9 is that, to the extent an agency is unable to do so, the appropriation made by the continuing resolution remains available to liquidate the "excess" obligations.

## C. Projects or Activities

"Projects or activities" as used in continuing resolutions may have two meanings. When determining which government programs are covered by the resolution, and the rate for operations limit, the term "project or

activity" refers to the total appropriation rather than to specific activities. When determining whether an activity was authorized or carried out in the preceding year, the term "project or activity" may refer to the specific activity. The following paragraphs will elaborate.

The term "projects or activities" is sometimes used in continuing resolutions to indicate which government programs are to be funded and at what rate. Thus a resolution might appropriate sufficient funds to continue "projects or activities provided for" in a certain appropriation bill "to the extent and in the manner" provided in the bill or as provided for in prior year appropriation acts. *See*, *e.g.*, Pub. L. No. 108-309, §§ 101, 102, 118 Stat. 1137–38 (Sept. 30, 2004).

Occasionally Congress will use only the term "activities" by appropriating sufficient funds "for continuing the following activities, but at a rate for operations not in excess of the current rate." *See*, *e.g.*, Pub. L. No. 97-51, § 101(d), 95 Stat. 958, 961 (Oct. 1, 1981). When used in this context, "projects or activities" or simply "activities" does not refer to specific items contained as activities in the administration's budget submission or in a committee report. Rather, the term refers to the appropriation for the preceding fiscal year. B-204449, Nov. 18, 1981.[17] Thus, if a resolution appropriates funds to continue projects or activities under a certain appropriation at a rate for operations not exceeding the current rate, the agency is operating within the limits of the resolution so long as the total of obligations under the appropriation does not exceed the current rate. Within the appropriation, an agency may fund a particular activity at a higher rate than that activity was funded in the previous year and still not violate the current rate limitation, assuming of course that the resolution itself does not provide to the contrary.

An exception to the interpretation that projects or activities refers to the appropriation in existence in the preceding fiscal year occurred in 58 Comp. Gen. 530 (1979). In prior years, Comprehensive Employment and

[17] This position also follows from decisions such as B-162447, Mar. 8, 1971, read in conjunction with decisions on the availability of lump-sum appropriations. Of course, if the appropriation for the preceding fiscal year was a line-item appropriation, then the scope of "project or activity" will be defined accordingly. *See* 66 Comp. Gen. 484 (1987) (Special Defense Acquisition Fund, a revolving fund made available by annual "limitation on obligations" provisions, held a "project or activity" for purposes of appropriating language in a continuing resolution).

Training Act (CETA)[18] programs had been funded in two separate appropriations, Employment and Training Assistance and Temporary Employment Assistance. The individual programs under the two appropriations differed only in that the number of jobs provided under Temporary Employment Assistance depended on the condition of the national economy.

Concurrently with the enactment of the 1979 continuing resolution, Congress amended the CETA authorizing legislation so that certain programs previously operating under the Temporary Employment Assistance appropriation were to operate in fiscal year 1980 under the Employment and Training Assistance appropriation. Under these circumstances, if the phrase "activities under the Comprehensive Employment and Training Act" in the continuing resolution had been interpreted as referring to the two separate appropriations made in the preceding year, and the current rates calculated accordingly, there would have been insufficient funds available for the now increased programs under the Employment and Training Assistance appropriation, and a surplus of funds available for the decreased programs under the Temporary Employment Assistance appropriation. To avoid this result, the Comptroller General interpreted the 1979 continuing resolution as appropriating a single lump-sum amount for all CETA programs, based on the combined current rates of the two appropriation accounts for the previous year. *See* 58 Comp. Gen. at 535–36.

Of course, as we noted earlier, continuing resolutions are really just short term appropriations that bridge the gaps that occasionally arise between the end of appropriations for one fiscal year and the start of appropriations for the next.[19] For this reason, continuing resolutions usually refer only to those projects and activities for which annual funding has expired—on account of which funding is being provided. It should be remembered that most, but not all, of the government is funded under annual appropriations. Those projects and activities which are funded by multiple year and no-year appropriations are not usually directly affected by continuing resolutions. Thus, it would be a mistake to read the failure of a continuing resolution to address funding for the rest of the government as an implicit

[18] Pub. L. No. 93-203, 87 Stat. 839 (Dec. 28, 1973).

[19] *See* GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005) at 35–36 (definition of "Continuing Appropriation/Continuing Resolution").

prohibition on undertaking other projects or activities that are, in fact, funded from other appropriations not covered by the continuing resolution.[20]

The term "projects or activities" has also been used in continuing resolutions to prohibit the use of funds to start new programs. Thus, many resolutions have contained a section stating that no funds made available under the resolution shall be available to initiate or resume any project or activity which was not conducted during the preceding fiscal year. When used in this context, the term "projects or activities" refers to the individual program rather than the total appropriation. *See* 52 Comp. Gen. 270 (1972); 35 Comp. Gen. 156 (1955).

One exception to this interpretation occurred in B-178131, Mar. 8, 1973. In that instance, in the previous fiscal year funds were available generally for construction of buildings, including plans and specifications. However, a specific construction project was not actually under way during the previous year. Nonetheless it was decided that, because funds were available generally for construction in the previous year, this specific project was not a new project or activity and thus could be funded under the continuing resolution.[21]

In more recent years, Congress has resolved the differing interpretations of "project or activity" by altering the language of the new program limitation. Rather than limiting funds to programs which were actually conducted in the preceding year, the more recent resolutions prohibit use of funds appropriated by the resolution for "any project or activity for which appropriations, funds, or other authority were not available" during the

[20] *See* 19 Op. Off. Legal Counsel 278 (1995) (requester was proceeding from the mistaken belief that a continuing resolution implicitly prohibits all obligations or expenditures except those expressly provided for in the resolution itself; activity at issue was funded by a no-year appropriation).

[21] For this exception to work, however, the previous appropriation must have afforded adequate authority to undertake the construction. See 4 Lawrence, First Comp. Dec. 116 (1883), which concluded that Howard University violated the Antideficiency Act while operating under a continuing resolution. The University undertook building repairs that were not authorized by the outgoing appropriation or the continuing resolution, and could not defend its violation by pointing to new authority pending (and eventually enacted) during the continuing resolution that would have authorized the repairs.

preceding fiscal year.[22] Thus, if an agency had authority and sufficient funds to carry out a particular program in the preceding year, that program is not a new project or activity regardless of whether it was actually operating in the preceding year.

A variation occurred in 60 Comp. Gen. 263 (1981). A provision of the Higher Education Act[23] authorized loans to institutions of higher education from a revolving fund, not to exceed limitations specified in appropriation acts. Congress had not released money from the loan fund since 1978. The fiscal year 1981 continuing resolution provided funds to the Department of Education based on its regular fiscal year 1981 appropriation bill as passed by the House of Representatives. The House-passed version included $25 million for the higher education loans. Since the continuing resolution did not include a general prohibition against using funds for projects not funded during the preceding fiscal year, the $25 million from the loan fund was available under the continuing resolution, notwithstanding that the program had not been funded in the preceding year.

Another variation can be seen in *In re Uncle Bud's, Inc.*, 206 B.R. 889 (Bankr. M.D. Tenn., 1997). In a fiscal year 1997 continuing resolution, Pub. L. No. 104-99, title II, § 211, 110 Stat. 26, 37–38 (Jan. 26, 1996), Congress amended the Bankruptcy Code to require the U.S. Trustee to impose and collect a new quarterly fee as part of the bankruptcy process. *Uncle Bud's*, 206 B.R. at 897. Some debtors argued that the new fee was barred because it constituted a "new activity." The bankruptcy court disagreed, noting that, while the fee itself was new, the U.S. Trustee had long been required to collect other fees imposed by law. The court reasoned that the continuing resolution language was intended to limit spending to previous year levels. The new fee did not require the expenditure of additional funds—rather, it brought in more revenues. Accordingly, the bankruptcy court concluded that collection of the new fee represented, not a new project or activity, but the continuation of activities undertaken in the previous year. *Id.* On appeal, while other parts of the bankruptcy court's ruling were reversed, this part was upheld and even expanded when the district court gave retroactive effect to the provision

[22] *See, e.g.*, Pub. L. No. 108-309, § 104 (first continuing resolution for fiscal year 2005, discussed above).

[23] Pub. L. No. 96-374, § 731, 94 Stat. 1367, 1475 (Oct. 3, 1980).

imposing the new fees. *See Vergos v. Uncle Bud's, Inc., No. 3-97-0296 (M.D. Tenn., Aug. 17, 1998)*.

Under the right set of circumstances, the projects or activities limitation can also have the effect of blocking existing programs. For example, in *Environmental Defense Center v. Babbitt*, 73 F.3d 867 (9th Cir. 1995), the Secretary of the Interior was sued for failing to determine whether to list the California red-legged frog under the Endangered Species Act, 16 U.S.C. § 1533(b)(6)(A). The Secretary acknowledged that the only actions that remained to be taken before the frog's status could be settled were the agency's in-house review and its final decision-making. *Babbitt*, 73 F.3d at 871–72. However, the Secretary argued he could not take those steps because, in 1995, Congress had enacted an appropriations rider which rescinded some of that fiscal year's funds and barred the remaining funds for that year from being used to make any determination that a species was threatened or endangered.[24] *See* Emergency Supplemental Appropriations and Rescissions for the Department of Defense to Preserve and Enhance Military Readiness Act of 1995, Pub. L. No. 104-6, 109 Stat. 73, 86 (Apr. 10, 1995). Although the supplemental rider applied only to fiscal year 1995 funds, the ban was effectively continued into fiscal year 1996 by the projects or activities limitation in the continuing resolution under which the government was being funded when the lawsuit was brought. *Babbitt*, 73 F.3d at 870.

Continuing Resolutions can carry over restrictions on projects and activities that applied under prior year appropriations riders. The court held that neither the appropriations rider nor the projects or activities limitation repealed the Secretary's duty to determine whether the California red-legged frog is endangered, but they did bar the Secretary from complying with that duty by denying him funding for that purpose. *Id.* at 871–72. As the court explained:

> "[E]ven though completion of the process may require only a slight expenditure of funds, . . . taking final action on the California red-legged frog listing proposal would necessarily require the use of appropriated funds. The use of any

[24] For a further discussion of the effect of appropriations riders, see Chapter 1, section B, and the update of that section in GAO, *Principles of Federal Appropriations Law: Annual Update of the Third Edition*, GAO-05-354SP (Washington, D.C.: March 2005), available at www.gao.gov/legal.htm (last visited September 15, 2005).

> government resources—whether salaries, employees, paper, or buildings—to accomplish a final listing would entail government expenditure. The government cannot make expenditures, and therefore cannot act, other than by appropriation."

*Id.*

## D. Relationship to other Legislation

### 1. Not Otherwise Provided For

Continuing resolutions often appropriate funds to continue projects "not otherwise provided for." This language limits funding to those programs which are not funded by any other appropriation act. Programs which received funds under another appropriation act are not covered by the resolution even though the authorizing legislation which created the program is mentioned specifically in the continuing resolution. *See* B-183433, Mar. 28, 1979. For example, if a resolution appropriates funds to continue activities under the Social Security Act, and a specific program under the Social Security Act has already been funded in a regular appropriation act, the resolution does not appropriate any additional funds for that program.

### 2. Status of Bill or Budget Estimate Used as Reference

When a continuing resolution appropriates funds at a rate for operations specified in a certain bill or in the administration's budget estimate, the status of the bill or estimate on the date the resolution passes is controlling, unless the resolution specifies some other reference date.

A continuing resolution will often provide funds to continue activities at a rate provided in a certain bill that has passed one or both houses of Congress, or at the rate provided in the administration's budget estimate. In such instances, the resolution is referring to the status of the bill or budget estimate on the date the resolution became law. B-164031(2).17, Dec. 5, 1975; B-152098, Jan. 30, 1970.

For example, the resolution may provide that activities are to be continued at the current rate or at the rate provided in the budget estimate, whichever

is lower. The budget estimate referred to is the one in existence at the time the resolution is enacted, and the rate for operations cannot be increased by a subsequent upward revision of the budget estimate. B-164031(2).17, Dec. 5, 1975.

Similarly, if a resolution provides that activities are to continue at the rate provided in a certain appropriation bill, the resolution is referring to the status of the bill on the date the resolution is enacted. A later veto of the bill by the President would not affect the continuation of programs under the resolution. B-152098, Jan. 15, 1973.

Where a continuing resolution provides funds based on a reference bill, this includes restrictions or limitations contained in the reference bill, as well as the amounts appropriated, unless the continuing resolution provides otherwise. 33 Comp. Gen. 20 (B-116069, July 10, 1953);[25] B-199966, Sept. 10, 1980. In *National Treasury Employees Union v. Devine*, 733 F.2d 114 (D.C. Cir. 1984), the court construed a provision in a reference bill prohibiting the implementation of certain regulations, accepting without question the restriction as having been "enacted into law" by a continuing resolution which provided funds "to the extent and in the manner provided for" in the reference bill. *See also Environmental Defense Center v. Babbitt*, 73 F.3d 867 (9th Cir. 1995); *Connecticut v. Schweiker*, 684 F.2d 979 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1207 (1983). Obviously, the same result applies under a "full text" continuing resolution, that is, a continuing resolution that enacts the full text of a reference bill "to be effective as if" the reference bill "had been enacted into law as the regular appropriation Act." B-221694, Apr. 8, 1986.

A provision in a continuing resolution using a reference bill may incorporate legislative history, in which event the specified item of legislative history will determine the controlling version of the reference bill. For example, an issue in *American Federation of Government Employees v. Devine*, 525 F. Supp. 250 (D.D.C. 1981), was whether the 1982 continuing resolution prohibited the Office of Personnel Management from funding coverage of therapeutic abortions in government health plans. The resolution funded employee health benefits "under the authority and conditions set forth in H.R. 4121 as reported to the Senate on September 22, 1981." An earlier version of H.R. 4121 had included a provision barring the funding of therapeutic abortions. However, the bill as reported to the full

[25] Two decisions begin on the same page, hence the variation in citation format.

Senate by the Appropriations Committee on September 22, 1981, dropped the provision. Accordingly, the court held that the continuing resolution could not form the basis for refusing to fund therapeutic abortions in the plaintiff's 1982 health plan. *Devine*, 525 F. Supp. at 254.

In previous years, it was also not uncommon for a continuing resolution to appropriate funds as provided in a particular reference bill at a rate for operations provided for in the conference report on the reference bill. *See, e.g.*, Pub. L. No. 99-103, § 101(c), 99 Stat. 471, 472 (Sept. 30, 1985). At a minimum, this will include items on which the House and Senate conferees agreed, as reflected in the conference report. If the resolution also incorporates the "joint explanatory statement" portion of the conference report, then it will enact those amendments reported in "technical disagreement" as well. *See* B-221694, Apr. 8, 1986; B-205523, Nov. 18, 1981; B-204449, Nov. 18, 1981.

## 3. More Restrictive Authority

The "more restrictive authority," as that term is used in continuing resolutions, is the version of a bill which gives an agency less discretion in obligating and disbursing funds under a certain program.

Continuing resolutions will often appropriate funds to continue projects or activities at the rate provided in either the version of an appropriation act that has passed the House or the version that has passed the Senate, whichever is lower, "or under the more restrictive authority." Under this language, the version of the bill which appropriates the lesser amount of money for an activity will be controlling. If both versions of the bill appropriate the same amount, the version which gives the agency less discretion in obligating and disbursing funds under a program is the more restrictive authority and will be the reference for continuing the program under the resolution. B-210922, Mar. 30, 1984; B-152098, Mar. 26, 1973; B-152554, Dec. 15, 1970.

However, this provision may not be used to amend or nullify a mandatory provision of prior permanent law. To illustrate, the Federal Housing Administration was required by a provision of permanent law to appoint an Assistant Commissioner to perform certain functions. The position subsequently became controversial. For the first month of fiscal year 1954, the agency operated under a continuing resolution which included the "more restrictive authority" provision. Language abolishing the position had been contained in one version of the reference bill, but not both. The bill, when subsequently enacted, abolished the position.

Under a strict application of the "more restrictive authority" provision, it could be argued that there was no authority to continue the employment of the Assistant Commissioner during the month covered by the continuing resolution. Noting that "laws are to be given a sensible construction where a literal application thereof would lead to unjust or absurd consequences, which should be avoided if a reasonable application is consistent with the legislative purpose," the Comptroller General held that the Assistant Commissioner could be paid his salary for the month in question. B-116566, Sept. 14, 1953. The decision concluded:

> "[M]anifestly the [more restrictive authority] language . . . was not designed to amend or nullify prior permanent law which theretofore required, or might thereafter require, the continuance of a specific project or activity during July 1953. . . .
>
> * * * * *
>
> ". . . Accordingly, it is concluded that the words 'the lesser amount or the more restrictive authority' as used in [the continuing resolution] had reference to such funds and authority as theretofore were provided in appropriations for [the preceding fiscal year], and which might be changed, enlarged or restricted from year to year."

In addition, continuing resolutions frequently provide that a provision "which by its terms is applicable to more than one appropriation" and which was not included in the applicable appropriation act for the preceding fiscal year, will not be applicable to funds or authority under the resolution unless it was included in identical form in the relevant appropriation bill as passed by both the House and the Senate. Thus, in 52 Comp. Gen. 71 (1972), a provision in the House version of the 1973 Labor Department appropriation act prohibited the use of "funds appropriated by this Act" for Occupational Safety and Health Act (OSHA)[26] inspections of firms employing 25 persons or less. The Senate version contained the identical version except that "15" was substituted for "25." The continuing resolution for that year contained both the "more restrictive authority" and the "applicable to more than one appropriation" provisions. The

[26] Pub. L. No. 91-596, 84 Stat. 1590 (Dec. 29, 1970).

Comptroller General concluded that, even though the House provision was more restrictive, the OSHA provision did not apply to funds under the continuing resolution since it had not been contained in the 1972 appropriation act and by its terms it was applicable to more than one appropriation (*i.e.*, it applied to the entire appropriation act). *See also* B-210922, Mar. 30, 1984; B-142011, Aug. 6, 1969.

For purposes of the "applicable to more than one appropriation" provision, GAO has construed the "applicable appropriation act for the preceding fiscal year" as meaning the regular appropriation act for the preceding year and not a supplemental. B-210922, Mar. 30, 1984. (The cited decision also illustrates some of the complexities encountered when the appropriation act for the preceding year was itself a continuing resolution.)

## 4. Lack of Authorizing Legislation

In order for a government agency to carry out a program, the program must first be authorized by law and then funded, usually by means of regular appropriations. This section deals with the relationship of continuing resolutions to programs whose authorization has expired or is about to expire. The common issue is the extent to which a continuing resolution provides authority to continue the program after expiration of the underlying authorization.

As the following discussion will reveal, there are no easy answers. The cases frequently involve a complex interrelationship of various legislative actions (or inactions) and are not susceptible to any meaningful formulation of simple rules. For the most part, the answer is primarily a question of intent, circumscribed of course by statutory language and aided by various rules of statutory construction.

We start with a fairly straightforward case. Toward the end of fiscal year 1984, Congress was considering legislation (S. 2456) to establish a commission to study the Ukrainian famine of 1932–33. The bill passed the Senate but was not enacted into law before the end of the fiscal year. The fiscal year 1985 continuing resolution provided that "[t]here are hereby appropriated $400,000 to carry out the provisions of S. 2456, as passed by the Senate on September 21, 1984."[27] If this provision were not construed as authorizing the establishment and operation of the commission as well

[27] Pub. L. No. 98-473, § 136, 98 Stat. 1837, 1973 (Oct. 12, 1984).

as the appropriation of funds, it would have been absolutely meaningless. Accordingly, GAO concluded that the appropriation incorporated the substantive authority of S. 2456. B-219727, July 30, 1985. The result was supported by clear and explicit legislative history.

In a 1975 case, GAO held that the specific inclusion of a program in a continuing resolution will provide both authorization and funding to continue the program despite the expiration of the appropriation authorization legislation. Thus, for example, if the continuing resolution specifically states that the School Breakfast Program is to be continued under the resolution, the program may be continued although funding authorization legislation for the program expires prior to or during the period the resolution is in effect. 55 Comp. Gen. 289 (1975). The same result would follow if the intent to continue the program was made particularly clear in legislative history. 65 Comp. Gen. 318, 320–21 (1986).

The result in 55 Comp. Gen. 289 flows from two concepts. First, the continuing resolution, as the later enactment, is the more recent expression of congressional intent. Second, if Congress can appropriate funds in excess of a specific ceiling in authorizing legislation, which it can, then it should be able to appropriate funds to continue a program whose funding authorization is about to expire, at least where the authorization of appropriations is not a legal prerequisite to the appropriation itself.

However, the "rule" of 55 Comp. Gen. 289 is not an absolute and the result in any given case will depend on several variables. Although not spelled out as such in any of the decisions, the variables may include: the degree of specificity in the continuing resolution; the apparent intent of Congress with respect to the expired program; whether what has expired is an authorization of appropriations or the underlying program authority itself;

and the duration of the continuing resolution (short-term *versus* full fiscal year).[28]

In one case, for example, "all authority" under the Manpower Development and Training Act (MDTA)[29] terminated on June 30, 1973. The program was not specifically provided for in the 1974 continuing resolution, and the authority in fact was not reestablished until enactment of the Comprehensive Employment and Training Act (CETA)[30] six months later. Under these circumstances, the Claims Court held that, in the absence of express language in the continuing resolution or elsewhere, contracts entered into during the gap between expiration of the MDTA and enactment of CETA were without legal authority and did not bind the government. *Consortium Venture Corp. v. United States*, 5 Cl. Ct. 47 (1984), *aff'd mem.*, 765 F.2d 163 (Fed. Cir. 1985).

In another case, recent Defense Department authorization acts, including the one for fiscal year 1985, had authorized a test program involving payment of a price differential to "labor surplus area" contractors. The test program amounted to an exemption from permanent legislation prohibiting the payment of such differentials. The 1985 provision expired, of course, at the end of fiscal year 1985. The 1986 continuing resolution made no specific provision for the test program nor was there any evidence of congressional intent to continue the test program under the resolution. (This lack of intent was confirmed when the 1986 authorization act was subsequently enacted without the test program provision.) GAO found that the Defense Logistics Agency's failure to apply the price differential in evaluating bids on a contract awarded under the continuing resolution

[28] *See also* 71 Comp. Gen. 378, 380–81 (1992):

> "While the outcome in these cases varies, they are all grounded in the same principle. The Congress may revive or extend an act by any form of words which makes clear its intention to do so. *Kersten v. United States*, 161 F.2d 337 (10th Cir. 1947), *cert. denied*, 331 U.S. 851. Furthermore, when the Congress desires to extend, amend, suspend or repeal a statute, it can accomplish its purpose by including the requisite language in an appropriations or other act of Congress. The whole matter depends on the intention of Congress as expressed in statute. *United States v. Will*, 449 U.S. 200, 221–222 (1980) and *United States v. Burton*, 888 F.2d 682, 685 (10th Cir. 1989)."

[29] Pub. L. No. 87-415, 76 Stat. 23 (Mar. 15, 1962).

[30] Pub. L. No. 93-203, 87 Stat. 839 (Dec. 28, 1973).

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 351 of 728



(even though the differential had been included in the solicitation issued prior to the close of fiscal year 1985) was not legally objectionable. 65 Comp. Gen. 318 (1986).

A more difficult case was presented in B-207186, Feb. 10, 1989. Congress enacted two pieces of legislation on December 22, 1987. One was a temporary extension of the Solar Bank, which had been scheduled to go out of existence on September 30, 1987. Congress had enacted several temporary extensions while it was considering reauthorization, the one in question extending the Bank's life to March 15, 1988. The second piece of legislation was the final continuing resolution for 1988 which funded the government for the remainder of the fiscal year. The resolution included a specific appropriation of $1.5 million for the Solar Bank, with a 2-year period of availability.

If the concept of 55 Comp. Gen. 289 were applied, the result would have been that the specific appropriation in the continuing resolution, in effect, reauthorized the Solar Bank as well. However, the "later enactment of Congress" concept has little relevance when both laws are enacted on the same day. In addition, in contrast to 55 Comp. Gen. 289, there was no indication of congressional intent to continue the Solar Bank beyond the March 1988 expiration date. Therefore, GAO distinguished prior cases,[31] found that the two pieces of legislation could be reconciled, and concluded that the resolution merely appropriated funds for the Bank to use during the remainder of its existence.

Another case involving a sunset provision is 71 Comp. Gen. 378 (1992). The legislation establishing the United States Commission on Civil Rights provided for the Commission to terminate on September 30, 1991. During fiscal year 1991, Congress was working on the Commission's reauthorization and its regular fiscal year 1992 appropriation. Although both bills passed both houses of Congress, neither was enacted into law by September 30. The first continuing resolution for fiscal year 1992, with a cutoff date of October 29, 1991, expressly provided funds for activities included in the Commission's yet-unenacted 1992 appropriations bill. It was clear from all of this that Congress intended the Commission to

[31] GAO had also applied the concept of 55 Comp. Gen. 289 in 65 Comp. Gen. 524 (1986), holding that a specific provision in a regular appropriation act permitted the continuation of an activity whose organic authority had expired at the end of the preceding fiscal year. *See also* B-164031(3), Jan. 3, 1973.

continue operating beyond September 30. Thus, the continuing resolution effectively suspended the sunset date and authorized the Commission to operate until October 28, 1991, when the regular 1992 appropriation act was enacted, at which time the regular appropriation provided similar authority until November 26, when the reauthorization was enacted.

Appropriation bills sometimes contain provisions making the availability of the appropriations contingent upon the enactment of additional authorizing legislation. If a continuing resolution used a bill with such a provision as a reference, and if the authorizing legislation was not enacted, the amount contained in the appropriation bill, and therefore the amount appropriated by the continuing resolution, would be zero. To avoid this possibility, a continuing resolution may contain a provision suspending the effectiveness of such "contingency" provisions for the life of the resolution.[32] Such a suspension provision will be applicable only until the referenced appropriation bill is enacted into law. 55 Comp. Gen. at 294.

# E. Duration

## 1. Duration of Continuing Resolution

Continuing resolutions generally provide that the budget authority provided for an activity by the resolution shall remain available until (a) enactment into law of a regular appropriation for the activity, (b) enactment of the applicable appropriation by both houses of Congress without provision for the activity, or (c) a fixed cutoff date, whichever occurs first.[33] Once either of the first two conditions occurs, or the cutoff date passes, funds appropriated by the resolution are no longer available for obligation and new obligations may be incurred only if a regular appropriation is made or if the termination date of the resolution is extended.

The period of availability of funds under a continuing resolution can be extended by Congress by amending the fixed cutoff date stated in the resolution. B-165731(1), Nov. 10, 1971; B-152098, Jan. 30, 1970. The

[32] *E.g.*, Pub. L. No. 102-109, § 109, 105 Stat. 551, 553 (Sept. 30, 1991) (1992 continuing resolution).

[33] *E.g.*, Pub. L. No. 108-309, § 107, 118 Stat. 1137, 1138 (Sept. 30, 2004).

extension may run beyond the session of Congress in which it is enacted. B-152554, Dec. 15, 1970.

Thus, some fiscal years have seen a series of continuing resolutions, informally designated "first," "second," *etc.*, up to "final." This happens as Congress extends the fixed cutoff date for short time periods until either all the regular appropriation acts are enacted or Congress determines that some or all of the remaining bills will not be enacted individually, in which event relevant portions of the resolution will continue in effect for the remainder of the fiscal year.

The second condition of the standard duration provision—enactment of the appropriation by both houses of Congress without provision for the activity—will be considered to have occurred only when it is clear that Congress intended to terminate the activity. Thus, in B-164031(1), Mar. 14, 1974, although regular and supplemental appropriation acts had been enacted without provision for a program, the Comptroller General decided that funds for the program were still available under the continuing resolution. In this case, the legislative history indicated that in enacting the regular appropriation act, Congress was providing funding for only some of the programs normally funded by this act and was deferring consideration of other programs, including the one in question. Therefore, the second condition was not applicable. Moreover, because supplemental appropriations are intended to provide funding only for new or additional needs, omission of the program from the supplemental did not trigger the second cutoff provision.

As discussed previously, once the applicable appropriation is enacted into law, expenditures made under the continuing resolution are charged to that appropriation, except that valid obligations incurred under the continuing resolution in excess of the amount finally appropriated are charged to the account established under the continuing resolution.

## 2. Duration of Appropriations

For the most part, the duration (period of obligational availability) of an appropriation under a short-term continuing resolution does not present problems. If you have, say, only 1 month to incur obligations under a continuing resolution, it matters little that the corresponding appropriation in a regular appropriation act might be a multiple year or no-year appropriation. Also, once the regular appropriation is enacted, it supersedes the continuing resolution and governs the period of availability.

B-300673, July 3, 2003. Questions may arise, however, under continuing resolutions whose duration is the balance of the fiscal year.

For example, the continuing resolution for fiscal year 1979 included the standard duration provision described above, with a cutoff date of September 30, 1979, the last day of the fiscal year. However, a provision in the Comprehensive Employment and Training Act (CETA), 29 U.S.C. § 802(B) (1976), stated that "notwithstanding any other provision of law, unless enacted in specific limitation of the provisions of this subsection," appropriations to carry out the CETA program shall remain available for 2 years. Applying the principle that a specific provision governs over a more general one, it was held that funds appropriated for CETA under the continuing resolution were available for obligation for 2 years in accordance with the CETA provision. B-194063, May 4, 1979; B-115398.33, Mar. 20, 1979.

A few years earlier, the United States District Court for the District of Columbia had reached the same result in a case involving grants to states under the Elementary and Secondary Education Act. *Pennsylvania v. Weinberger*, 367 F. Supp. 1378, 1384–85 (D.D.C. 1973). The court stated, "[i]t is a basic premise of statutory construction that in such circumstances the more specific measure . . . is to be held controlling over the general measure where inconsistencies arise in their application." *Id.* at 1385.

Application of the same principle produced a similar result in B-199966, Sept. 10, 1980. The 1980 continuing resolution appropriated funds for foreign economic assistance loans by referencing the regular 1980 appropriation bill which had passed the House but not the Senate. For that type of situation, the resolution provided for continuation of projects or activities "under the appropriation, fund, or authority granted by the one House [which had passed the bill]." The House-passed bill gave the economic assistance loan funds a 2-year period of availability. The continuing resolution also included the standard duration provision with a cutoff date of September 30, 1980. Since the duration provision applied to the entire resolution whereas the provision applicable to the loan funds had a narrower scope, the latter provision was the more specific one and the loan funds were therefore held to be available for 2 years. See also 60 Comp. Gen. 263 (1981) for further discussion of similar continuing resolution language.

In some instances, an extended period of availability is produced by a specific exemption from the standard duration provision. For example, the

1983 continuing resolution provided foreign assistance funds "under the terms and conditions" set forth in the Foreign Assistance Appropriation Act of 1982, and further exempted that appropriation from the duration provision. Since under the 1982 act, appropriations for the African Development Fund were to remain available until expended, appropriations to the Fund under the continuing resolution were also no-year funds. B-212876, Sept. 21, 1983. In view of the express exemption from the duration provision, there was no need to apply the "specific *versus* general" rule because there was no conflict. *See also* B-210922, Mar. 30, 1984.

## 3. Impoundment

The duration of a continuing resolution is relevant in determining the application of the Impoundment Control Act. Impoundment in the context of continuing resolutions was discussed in a letter to the Chairman of the House Budget Committee, B-205053, Dec. 31, 1981. Generally, a withholding from obligation of funds provided under a continuing resolution would constitute an impoundment. Where the continuing resolution runs for only part of the fiscal year, the withholding, even if proposed for the duration of the continuing resolution, should be classified as a deferral rather than a rescission. Withholding funds during a temporary continuing resolution is different from withholding them for the life of a regular annual appropriation in that, in the former situation, Congress is still deliberating over the regular funding levels. Also, deferred funds are not permanently lost when a continuing resolution expires if a subsequent funding measure is passed.

Under this interpretation, classification as a rescission would presumably still be appropriate where a regular appropriation is never passed, the agency is operating under continuing resolution authority for the entire fiscal year, and the timing of a withholding is such that insufficient opportunity would remain to utilize the funds. *See* B-115398, May 9, 1975.

Impoundment issues under continuing resolutions may arise in other contexts as well. *See*, *e.g.*, 64 Comp. Gen. 649 (1985) (failure to make funds available based on good faith disagreement over treatment of carryover balances in calculating rate for operations held not to constitute an illegal rescission); B-209676, Apr. 14, 1983 (no improper impoundment where funds were apportioned on basis of budget request although continuing resolution appropriated funds at rate to maintain program level, as long as apportionment was sufficient to maintain requisite program level).

# Liability and Relief of Accountable Officers

**A. Introduction . . . . . . . . . 9-4**
**B. General Principles . . . . . . . . . 9-5**
1. The Concepts of Liability and Relief . . . . . . . . . 9-5
a. Liability . . . . . . . . . 9-5
b. Surety Bonding . . . . . . . . . 9-8
c. Relief . . . . . . . . . 9-9
2. Who Is an Accountable Officer? . . . . . . . . . 9-11
a. Certifying Officers . . . . . . . . . 9-13
b. Disbursing Officers . . . . . . . . . 9-14
c. Cashiers . . . . . . . . . 9-15
d. Collecting Officers . . . . . . . . . 9-16
e. Other Agents and Custodians . . . . . . . . . 9-17
3. Funds to Which Accountability Attaches . . . . . . . . . 9-20
a. Appropriated Funds . . . . . . . . . 9-20
(1) Imprest funds . . . . . . . . . 9-20
(2) Flash rolls . . . . . . . . . 9-23
(3) Travel advances . . . . . . . . . 9-25
b. Receipts . . . . . . . . . 9-26
c. Funds Held in Trust . . . . . . . . . 9-27
d. Items Which Are the Equivalent of Cash . . . . . . . . . 9-28
4. What Kinds of Events Produce Liability? . . . . . . . . . 9-29
5. Amount of Liability . . . . . . . . . 9-31
6. Effect of Criminal Prosecution . . . . . . . . . 9-33
a. Acquittal . . . . . . . . . 9-33
b. Order of Restitution . . . . . . . . . 9-34
**C. Physical Loss or Deficiency . . . . . . . . . 9-35**
1. Statutory Provisions . . . . . . . . . 9-35
a. Civilian Agencies . . . . . . . . . 9-35
b. Military Disbursing Officers . . . . . . . . . 9-38
2. Who Can Grant Relief? . . . . . . . . . 9-40
a. 31 U.S.C. § 3527(a) . . . . . . . . . 9-40
b. 31 U.S.C. § 3527(b) . . . . . . . . . 9-42
c. Role of Administrative Determinations . . . . . . . . . 9-43
3. Standards for Granting Relief . . . . . . . . . 9-45
a. Standard of Negligence . . . . . . . . . 9-45
b. Presumption of Negligence/Burden of Proof . . . . . . . . . 9-46
c. Actual Negligence . . . . . . . . . 9-48
d. Proximate Cause . . . . . . . . . 9-51
e. Unexplained Loss or Shortage . . . . . . . . . 9-54
f. Compliance with Regulations . . . . . . . . . 9-57
g. Losses in Shipment . . . . . . . . . 9-59
h. Fire, Natural Disaster . . . . . . . . . 9-60

i. Loss by Theft . . . . . . . . . . 9-61
(1) Burglary: forced entry . . . . . . . . . . 9-62
(2) Robbery . . . . . . . . . . 9-63
(3) Riot, public disturbance . . . . . . . . . . 9-63
(4) Evidence less than certain . . . . . . . . . . 9-64
(5) Embezzlement . . . . . . . . . . 9-68
j. Agency Security . . . . . . . . . . 9-69
k. Extenuating Circumstances . . . . . . . . . . 9-73
**D. Illegal or Improper Payment . . . . . . . . . . 9-75**
1. Disbursement and Accountability . . . . . . . . . . 9-75
a. Statutory Framework: Disbursement Under Executive Order No. 166 . . . . . . . . . . 9-75
b. Automated Payment Systems . . . . . . . . . . 9-78
c. Statistical Sampling . . . . . . . . . . 9-81
d. Provisional Vouchers and Related Matters . . . . . . . . . . 9-82
e. Facsimile Signatures and Electronic Certification . . . . . . . . . . 9-84
f. GAO Audit Exceptions . . . . . . . . . . 9-86
2. Certifying Officers . . . . . . . . . . 9-88
a. Duties and Liability . . . . . . . . . . 9-88
b. Applicability of 31 U.S.C. § 3528 . . . . . . . . . . 9-94
c. Relief . . . . . . . . . . 9-95
3. Disbursing Officers . . . . . . . . . . 9-101
a. Standards of Liability and Relief . . . . . . . . . . 9-101
b. Some Specific Applications . . . . . . . . . . 9-108
(1) Fraudulent travel claims . . . . . . . . . . 9-109
(2) Other cash payments fraudulently obtained . . . . . . . . . . 9-110
(3) Military separation vouchers . . . . . . . . . . 9-111
(4) Assignment of contract payments . . . . . . . . . . 9-111
(5) Improper purpose/payment beyond scope of legal authority . . . . . . . . . . 9-112
4. Check Losses . . . . . . . . . . 9-113
a. Check Cashing Operations . . . . . . . . . . 9-113
b. Duplicate Check Losses . . . . . . . . . . 9-118
c. Errors in Check Issuance Process . . . . . . . . . . 9-123
5. Statute of Limitations . . . . . . . . . . 9-125
**E. Other Relief Statutes . . . . . . . . . . 9-128**
1. Statutes Requiring Affirmative Action . . . . . . . . . . 9-128
a. United States Court of Federal Claims . . . . . . . . . . 9-128
b. The Legislative and Judicial Branches . . . . . . . . . . 9-129
c. Savings Bond Redemption Losses . . . . . . . . . . 9-130
2. Statutes Providing “Automatic” Relief . . . . . . . . . . 9-130
a. Waiver of Indebtedness . . . . . . . . . . 9-130

b. Compromise of Indebtedness . . . . . . . . . . 9-130
c. Foreign Exchange Transactions . . . . . . . . . . 9-131
d. Check Forgery Insurance Fund . . . . . . . . . . 9-132
e. Secretary of the Treasury . . . . . . . . . . 9-133
f. Other Statutes . . . . . . . . . . 9-133

**F. Procedures. . . . . . . . . . 9-134**

1. Reporting of Irregularities . . . . . . . . . . 9-134
2. Obtaining Relief . . . . . . . . . . 9-135
3. De Minimis Rule: Payments of $100 or Less . . . . . . . . . . 9-136
4. Relief versus Grievance Procedures . . . . . . . . . . 9-136

**G. Collection Action . . . . . . . . . . 9-137**

1. Against Recipient . . . . . . . . . . 9-137
2. Against Accountable Officer . . . . . . . . . . 9-139

**H. Restitution, Reimbursement, and Restoration . . . . . . . . . . 9-141**

1. Restitution and Reimbursement . . . . . . . . . . 9-141
2. Restoration . . . . . . . . . . 9-142
a. Adjustment Incident to Granting of Relief . . . . . . . . . . 9-142
b. Other Situations . . . . . . . . . . 9-143

# Liability and Relief of Accountable Officers

## A. Introduction

The concept that a person should be held accountable for funds in his or her care is not peculiar to the government. If you get a job as a cashier at your local supermarket and come up short at the end of the day, you will probably be forced to make up the shortage from your own pocket. The store manager does not have to prove the loss was your fault. The very fact that the money is not there is sufficient to make you liable. Of course, if your cash register is emptied by an armed robber and you are in no way implicated, you will be off the hook.

Just like a private business enterprise, the government can lose money in many ways. For example, it can be physically lost, stolen, paid out improperly, or embezzled. Sometimes the money is recovered; often it is not. If government funds are lost because of some employee's misconduct or carelessness, and if the responsible employee is not required to make up the loss, the result is that the taxpayer ends up paying twice for the same thing, or paying for nothing.

When you accept the job at the supermarket, you do so knowing perfectly well that you will be potentially liable for losses. There is no reason why the government should operate any differently. If anything, there is a stronger case for the liability of government employees since they are, in effect, trustees for the taxpayers (themselves included). As the Comptroller General once stated, "A special trust responsibility exists with regard to public monies and with this special trust goes personal financial responsibility." B-161457, Oct. 30, 1969. This chapter will explore these concepts—the liability and relief of government officers and employees who are entrusted with public funds or who have certain specific responsibilities in their disbursement. In government language, they are called "accountable officers."[1]

[1] This chapter deals solely with accountability for funds by those classified as accountable officers. Other types of accountability—accountability by employees who are not accountable officers or accountability for property other than funds—are covered in Chapter 13 in volume III of the second edition of *Principles of Federal Appropriations Law*.

# B. General Principles

## 1. The Concepts of Liability and Relief

### a. Liability

The concept of accountability for public funds in the form of strict personal liability evolved during the nineteenth century. Its origins can be traced to a number of congressional enactments, some dating back to the Nation's infancy. The legislation establishing the Department of the Treasury in 1789 included a provision requiring the Comptroller of the Treasury to "direct prosecutions for all delinquencies of officers of the revenue."[2] A few years later, in 1795, Congress authorized the Comptroller to require "any person who has received monies for which he is accountable to the United States" to render "all his accounts and vouchers, for the expenditure of the said monies," and to commence suit against anyone failing to do so.[3]

In 1846, Congress mandated that all government officials safeguard public funds in their custody. The statute provided that—

> "all public officers of whatsoever character, be, and they are hereby, required to keep safely, without loaning, using, depositing in banks, or exchanging for other funds than as allowed by this act, all the public money collected by them, or otherwise at any time placed in their possession and custody, till the same is ordered, by the proper department or officer of the government, to be transferred or paid out . . . ."

Act of August 6, 1846, ch. 90, § 6, 9 Stat. 59, 60. This statute still exists, in modernized form, at 31 U.S.C. § 3302(a).

These are civil provisions. Congress also addressed fiscal accountability in a variety of criminal statutes. An important one is the Act of June 14, 1866, ch. 122, 14 Stat. 64, which declared it to be the duty of disbursing officers to

[2] Act of September 2, 1789, ch. XII, § 3, 1 Stat. 65, 66.

[3] Act of March 3, 1795, ch. XLVIII, § 1, 1 Stat. 441.

use public funds entrusted to them "only as . . . required for payments to be made . . . in pursuance of law," and made it a felony for a disbursing officer to, among other things, "apply any portion of the public money intrusted to him" for his own use or for any purpose not prescribed by law.[4]

The strict liability of accountable officers became firmly established in a series of early Supreme Court decisions. In 1845, the Court upheld liability in a case where money had been stolen with no fault or negligence on the part of the accountable officer. In an often-quoted passage, the Court said:

> "Public policy requires that every depositary of the public money should be held to a strict accountability. Not only that he should exercise the highest degree of vigilance, but that 'he should keep safely' the moneys which come to his hands. Any relaxation of this condition would open a door to frauds, which might be practiced with impunity. A depositary would have nothing more to do than to lay his plans and arrange his proofs, so as to establish his loss, without laches on his part. Let such a principle be applied to our postmasters, collectors of the customs, receivers of public moneys, and others who receive more or less of the public funds, and what losses might not be anticipated by the public?"

*United States v. Prescott*, 44 U.S. (3 How.) 578, 588–89 (1845). While some might view this passage as unduly cynical of human nature, it makes the important point that the laws relating to the liability and relief of accountable officers are intended not only to give the officers incentive to guard against theft by others, but also to protect against dishonesty by the officers themselves.

An 1872 case, *United States v. Thomas*, 82 U.S. (15 Wall.) 337, recognized that the liability announced in *Prescott*, while strict, was not absolute. In that case, the Court refused to hold a customs official liable for funds which had been forcibly taken by Confederate forces during the Civil War.

[4] This statute also still exists and is found at 18 U.S.C. § 653. Other criminal provisions relevant to accountable officers include 18 U.S.C. § 643 (failure to render accounts), 18 U.S.C. § 648 (misuse of public funds), and 18 U.S.C. § 649 (failure to deposit). The four provisions of title 18 of the United States Code cited in this note apply to "all persons charged with the safe-keeping, transfer, or disbursement of the public money." 18 U.S.C. § 649(b).

In formulating its conclusion, the Court recognized two exceptions to the strict liability rule:

> "[N]o rule of public policy requires an officer to account for moneys which have been destroyed by an overruling necessity, or taken from him by a public enemy, without any fault or neglect on his part."

*Id.* at 352. The exceptions, however, are limited. In *Smythe v. United States*, 188 U.S. 156 (1903), the Court reviewed its precedents, including *Prescott* and *Thomas*, and upheld the liability of a Mint official for funds that had been destroyed by fire, finding the loss attributable neither to "overruling necessity" nor to a public enemy.

The standard that has evolved from the cases and statutes noted is one of strict liability. It is often said that an accountable officer is, in effect, an "insurer" of the funds in his or her charge. *E.g.*, B-258357, Jan. 3, 1996; 64 Comp. Gen. 303, 304 (1985); 54 Comp. Gen. 112, 114 (1974); 48 Comp. Gen. 566, 567 (1969); 6 Comp. Gen. 404, 406 (1926). *See also United States v. Heller*, 1 F. Supp. 1, 6 (D. Md. 1932). The liability is automatic and arises by operation of law at the moment a physical loss occurs or an erroneous payment is made. *E.g.*, B-291001, Dec. 23, 2002; 70 Comp. Gen. 12, 14 (1990); 54 Comp. Gen. at 114.

In addition to the applicable statutory provisions, courts have sometimes cited public policy considerations as a basis for an accountable officer's strict liability. *E.g.*, *Prescott*, 44 U.S. at 587–88 ("The liability of the defendant . . . arises out of . . . principles which are founded upon public policy"); *Heller*, 1 F. Supp. at 6 (strict liability "is imposed as a matter of public policy").

As discussed in section B.2 of this chapter, accountable officer liability does not attach to individuals who are not accountable officers even if they played a part—even a crucial part—in causing an improper payment. By the same token, an accountable officer's liability is not diminished because other individuals induced—or even ordered—the improper payment. For example, in B-271021, Sept. 18, 1996, an official of the Equal Employment Opportunity Commission (EEOC) submitted a memorandum to the director of an EEOC district office asking the district director to provide a travel advance in order to enable a nongovernment witness to appear in an agency proceeding. The official concluded his request as follows: "If there is a subsequent determination that the funds should not have been

disbursed for the aforementioned purpose, I will assume liability for repayment of the funds." The district director ordered the travel advance to be made; his order was passed on to an accountable officer, Mr. Guthrie, who complied with it and issued the travel advance. EEOC headquarters later determined that the payment was unauthorized and disallowed it. GAO affirmed the disallowance, stating:

> "The fact that Mr. Guthrie may have received instructions from superiors to make the improper payment does not relieve him of responsibility for the deficiency in his account resulting from the improper payment. *See* 55 Comp. Gen. 297 (1975); 49 Comp. Gen. 38 (1969)."

B-271021 at 4. The other EEOC official's statement offering to assume liability if the payment proved to be erroneous was equally unavailing to Mr. Guthrie. The decision observed:

> "This statement . . . has no effect on the liability of Mr. Guthrie for the deficiency in his account, which is fixed by statute and regulation. The government, accordingly, need look no further than Mr. Guthrie for restitution of the deficiency."

*Id.* at 5.

Similarly, a long line of GAO decisions holds that an accountable officer is liable even where his or her subordinates actually made the improper payment. *See, e.g.*, B-274364, B-276306, Apr. 23, 1997; B-260369, June 5, 1995; B-241019.2, Feb. 7, 1992; B-246418, Feb. 7, 1992, and decisions cited.[5] As these decisions point out, however, relief from liability is appropriate where the supervising accountable officer maintained and ensured effective implementation of an adequate system of procedures and controls to avoid errors.

### b. Surety Bonding

The early cases also based liability on the accountable officer's bond. Prior to 1972, the fidelity bonding of accountable officers was required by law.

[5] As discussed in section B.2.b of this chapter, where more than one accountable officer is involved—for example, a subordinate cashier who actually made an improper payment and a supervising accountable officer in whose name the account is held—both are liable.

*See*, *e.g.*, 22 Comp. Gen. 48 (1942); 21 Comp. Gen. 976 (1942). As an examination of the statement of the case in decisions such as *United States v. Prescott*, 44 U.S. (3 How.) 578 (1845), *United States v. Thomas*, 82 U.S. (15 Wall.) 337 (1872), and *Smythe v. United States*, 188 U.S. 156 (1903), demonstrates, the terms of the bond were very similar to, and in fact were derived from, the 1846 "keep safely" legislation quoted above. Thus, while the bond gave the government a more certain means of recovery, it did not impose upon accountable officers any duties that were not already required by statute.[6]

In a 1962 report, GAO concluded that bonding was not cost-effective,[7] and recommended legislation to repeal the bonding requirement. GAO, *Review of the Bonding Program for Employees of the Federal Government*, B-8201 (Washington, D.C.: Mar. 29, 1962). Congress repealed the requirement in 1972, and accountable officers are no longer bonded. Indeed, 31 U.S.C. § 9302 generally prohibits federal agencies from requiring or obtaining surety bonds to cover their officers and employees in carrying out official duties. The last sentence of 31 U.S.C. § 9302 specifically states that the prohibition against surety bonds "does not affect the personal financial liability" of individual officers or employees. Thus elimination of the bonding requirement has no effect on the legal liability of accountable officers. 54 Comp. Gen. 112 (1974); B-191440, May 25, 1979.

### c. Relief

The early cases and statutes previously noted made no mention of relief from liability.[8] "Relief" in this context means an action, taken by someone with the legal authority to do so, which absolves an accountable officer from liability for a loss. Prior to the World War II period, with limited exceptions for certain accountable officers of the armed forces, an accountable officer had but two relief options available. First, a disbursing

[6] The bonding requirement had been for the protection of the government, not the accountable officer. Under the bonding system, if the United States was compensated for a loss by the bonding company, the company succeeded to the rights of the United States and could seek reimbursement from the accountable officer. 68 Comp. Gen. 470, 471 (1989); B-186922, Apr. 8, 1977.

[7] Originally, accountable officers had to pay for their own bonds. 33 Comp. Gen. 7 (1953). Legislation effective January 1, 1956, authorized the government to pay. Pub. L. No. 84-323, ch. 683, 69 Stat. 618 (Aug. 9, 1955).

[8] The "public enemy" situation dealt with in *United States v. Thomas*, 82 U.S. (15 Wall.) 337 (1872), discussed in section B.1.a of this chapter, is not an example of relief. It is an example of a situation in which liability did not attach to begin with.

officer could bring an action in what was then the Court of Claims (now the United States Court of Federal Claims) under 28 U.S.C. § 2512.[9] Of course, the officer would probably need legal representation and would incur other expenses, none of which were reimbursable. Second, and this became the most common approach, was private relief legislation, a burdensome process for amounts which were often relatively small. There was no mechanism for providing relief at the administrative level, however meritorious the case. 4 Comp. Gen. 409 (1924); 27 Comp. Dec. 328 (1920).

Starting in 1941, Congress enacted a series of relief statutes, and there is now a comprehensive statutory scheme for the administrative relief of accountable officers who are found to be without fault. The major portion of this chapter deals with the application of this legislation.

It is important to distinguish between liability and relief. It is not the denial of relief that makes an accountable officer liable. As noted previously, the basic legal liability of an accountable officer arises automatically by virtue of the loss and is not affected by any lack of fault or negligence on the officer's part. Relief is a separate process and may take lack of fault into consideration to the extent authorized by the governing statute.[10] B-291001, Dec. 23, 2002; 54 Comp. Gen. 112 (1974); B-167126, Aug. 28, 1978.

[9] Section 2512, which had its origins in the early 1900s, provides:

> "Whenever the United States Court of Federal Claims finds that any loss by a disbursing officer of the United States was without his fault or negligence, it shall render a judgment setting forth the amount thereof, and the [Government Accountability Office] shall allow the officer such amount as a credit in the settlement of his accounts."

28 U.S.C. § 2512. While the statute is still on the books, it has not been applied in over 50 years.

[10] The passage of time, however, can eliminate the government's ability to enforce liability in improper payment cases, even without relief. See, for example, section D.5 of this chapter, discussing the 3-year statute of limitations that generally applies to holding accountable officers liable for erroneous payments, and B-287043, May 29, 2001. Therefore, in order to protect the government's position, agencies should move promptly to address an accountable officer's liability. Implications in a few cases such as 70 Comp. Gen. 616, 622–23 (1991), that an agency can never enforce an accountable officer's liability for an improper payment unless it has first submitted the matter to GAO are misleading. See GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, ch. 8 (Washington, D.C.: May 18, 1993), which describes agencies' specific responsibilities in this area.

## 2. Who Is an Accountable Officer?

An accountable officer is any government officer or employee who by reason of his or her employment is responsible for or has custody of government funds. B-288163, June 4, 2002; 62 Comp. Gen. 476, 479 (1983); 59 Comp. Gen. 113, 114 (1979); B-257068, Oct. 22, 1994; B-188894, Sept. 29, 1977. Accountable officers encompass such officials as certifying officers, disbursing officers, collecting officers, and other employees who by virtue of their employment have custody of government funds.

Clearly, the relevant statutory provisions are the first place one looks for the source of authority conferring the status of "accountable officer" and establishing the responsibilities and liabilities that go with it. Does this leave any room for agencies to create "accountable officers" by administrative action? Until recently, GAO decisions indicated that agencies could impose accountable officer status and liability so long as they did so by specific regulation. *See* B-247563.3, Apr. 5, 1996; B-260369, June 15, 1995; 72 Comp. Gen. 49, 52 (1992); B-241856, Sept. 23, 1992, and decisions cited. These decisions reasoned that such liability, duly imposed by regulation, could be regarded as part of the employee's "employment contract." However, in B-280764, May 4, 2000, GAO reconsidered its position and held that accountable officer status and liability can *only* be created by statute. The 2000 decision overruled prior inconsistent decisions.[11]

The decision in B-280764 concerned a Defense Department regulation that authorized the Department's certifying officers to designate as "accountable officials" certain employees engaged in developing, verifying, approving, and processing salary payments. Specifically, the regulation defined "accountable officials" as "DOD military and civilian personnel, who are designated in writing and not otherwise accountable under applicable law, who provide source information, data or service . . . to a certifying or disbursing officer in support of the payment process." *Id.* at 3. The regulation further provided that these employees would be pecuniarily liable for erroneous payments resulting from negligence in performing their duties. *Id.*

In analyzing the validity of the regulation in B-280764, GAO invoked the "unassailable proposition" that the federal employment relationship is

[11] Among the prior inconsistent decisions specifically mentioned were 72 Comp. Gen. 49 (1992) and B-241856, Sept. 23, 1992.

primarily governed by statute rather than contract or common law concepts, and that this is equally true when it comes to disciplining or penalizing employees. *Id.* at 3. In this regard, the decision cited a number of judicial opinions, including *Bush v. Lucas*, 462 U.S. 367 (1983); *United States v. Gilman*, 347 U.S. 507 (1954); and *United States v. Standard Oil Co.*, 332 U.S. 301 (1947). Applying these principles, GAO concluded that the Defense Department regulation could not stand since it lacked the necessary statutory authorization:

> "Here, as in the cases noted above, Congress has not spoken to the issue of the liability of government employees who provide information to certifying officers that they rely on when performing their statutory function. . . . Yet Congress has clearly legislated in detail on many features of the certifying and disbursing function as well as the government's employer-employee relationship. With respect to the certifying and disbursing function, Congress has specifically provided for the personal pecuniary liability of certifying and disbursing officers, but, significantly, has not extended liability beyond these officers to those governmental employees whose work supports these functions. . . . Pecuniary liability for negligent conduct, administratively imposed, is no less a penalty than would be an employee's judicially created obligation to indemnify the government for losses resulting from his negligent conduct. As noted above, the Supreme Court counseled in *Gilman*, *Standard Oil Co*. and *Bush v. Lucas* that these issues are for Congress to resolve. We think the same holds true for administrative extensions of personal liability beyond the existing statutory parameters."

B-280764, May 4, 2000, at 5–6 (footnotes omitted).

In B-280764, GAO did not question the merits of extending accountability and potential pecuniary liability to more Defense Department employees, only the means of accomplishing that objective. In 2002, Congress added a

new section 2773a to title 10, United States Code, which supplied the Department with the requisite statutory authority to designate additional accountable officials.[12]

### a. Certifying Officers

Certifying officers play a significant role in the accountability for public funds. A certifying officer is a government officer or employee whose job is or includes certifying vouchers (including voucher schedules or invoices used as vouchers) for payment. B-280764, May 4, 2000. A certifying officer differs from other accountable officers in one key respect: the certifying officer has no public funds in his or her physical custody. Rather, accountability is statutorily prescribed because of the nature of the certifying function. A certifying officer's liability, discussed in detail later in this chapter, is established by 31 U.S.C. § 3528. In brief, certifying officers are responsible for the legality of proposed payments and are liable for the amount of illegal or improper payments resulting from their certifications.

Prior to enactment of the National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, 110 Stat. 186 (Feb. 10, 1996), the military departments were subject to a different system of accountability. The certifying officer provisions in section 3528 of title 31 of the United States Code did not apply to them. *See* 31 U.S.C. § 3528(d) (1994). Instead, the military departments operated under a system of subordinate and supervisory disbursing officers. Supervisory disbursing officers (often called "finance and accounting officers") had responsibility and liability for the correctness of payments similar to that of a certifying officer in a civilian agency. *See* B-266001, May 1, 1996, for a general description of this system. Section 913 of Public Law 104-106 amended various provisions of titles 10, 31, and 37 of the United States Code to change the system of accountability of the military departments. Among other things, section 913 authorized the designation and appointment of certifying officers within the military departments. The purpose of this authorization was to strengthen internal controls within the military departments by providing a separation of duties between officials who authorized payments (certifying officers) and those who made payments (disbursing officers), thereby placing the military departments more in line with financial procedures in the civilian agencies. S. Rep. No. 104-112, at 279 (1995).

[12] This provision was enacted by section 1005 of the Bob Stump National Defense Authorization Act for Fiscal Year 2003, Pub. L. No. 107-314, 116 Stat. 2458, 2631–32 (Dec. 2, 2002).

A great many government officials make official "certifications" of one type or another, but this does not make them certifying officers for purposes of accountability and liability. *E.g.*, B-247563.4, Dec. 11, 1996 (voucher auditors who "certified" invoices for payment by accountable officers did not thereby become authorized certifying officers themselves). As discussed above, this status can only be conferred by statute. Thus, the concepts of accountability and relief discussed in this chapter apply only to "authorized certifying officers" who certify vouchers upon which moneys are to be paid out by disbursing officers in discharging a debt or obligation of the government. 23 Comp. Gen. 953 (1944). This may in appropriate circumstances include the head of a department or agency. 31 U.S.C. § 3325(a)(1); 21 Comp. Gen. 976, 979 (1942). An authorized certifying officer must be so designated in writing. 31 U.S.C. § 3325(a)(1); I TFM § 4-1140 (Aug. 18, 1997).

Thus, an employee who "certified" overtime assignments in the sense of a timekeeper verifying that employees worked the hours of overtime claimed could not be held liable for resulting overpayments under an accountable officer theory. B-197109, Mar. 24, 1980. The same approach applies to various post-certification administrative actions, the rule being that once a voucher has been duly certified by an authorized official, subsequent administrative processing does not constitute certification for purposes of 31 U.S.C. § 3528. 55 Comp. Gen. 388, 390 (1975). For example, the Comptroller General has held that 31 U.S.C. § 3528 does not apply to an "approving officer" who approves vouchers after they have been duly certified. 21 Comp. Gen. 841 (1942).

## b. Disbursing Officers

A disbursing officer is an officer or employee of a federal department or agency, civilian or military, designated to disburse moneys and render accounts in accordance with laws and regulations governing the disbursement of public funds. The term is essentially self-defining. As one court has stated:

> "We do not find the term 'disbursing officer' statutorily defined, probably because it is self-definitive. It can mean nothing except an officer who is authorized to disburse funds of the United States."

*Romney v. United States*, 167 F.2d 521, 526 (D.C. Cir.), *cert. denied*, 334 U.S. 847 (1948).

Whether an employee is a disbursing officer depends more on the nature of the person's duties than on the title of his or her position. In some cases, the job title will be "disbursing officer." This is the title for the disbursing officers of the Treasury Department who disburse funds for most civilian agencies under 31 U.S.C. § 3321. For the military departments, which generally do their own disbursing, the title may be "finance and accounting officer." As a general proposition, any employee to whom public funds are entrusted for the purpose of making payments from those funds will be regarded as a disbursing officer. *See* B-151156, Dec. 30, 1963.

There may be more than one disbursing officer for a given transaction. Military disbursing operations, at least as they existed prior to enactment of the National Defense Authorization Act for Fiscal Year 1996,[13] provide an example. The account was often held in the name of a supervisory official such as a Finance and Accounting Officer, with the actual payment made by some subordinate (agent, cashier, deputy, *etc.*). Both were regarded as disbursing officers for purposes of liability and relief although, as we will discuss later, the standards for relief differ. *E.g.*, B-261312, Feb. 5, 1995; 62 Comp. Gen. 476, 479–80 (1983); B-248532, Oct. 26, 1992; B-245127, Sept. 18, 1991; B-240280, May 22, 1991. The principle of joint liability in the case of multiple disbursing officers applies outside the military departments as well. *See* B-288163, June 4, 2002 (clerk and deputy clerk of a bankruptcy court).

### c. Cashiers

A cashier is a federal officer or employee who has been designated as a cashier by an official delegated authority to make such designations and who is thereby authorized to perform limited cash disbursing functions or other cash operations. Department of the Treasury Financial Management Service, *Manual of Procedures and Instructions for Cashiers* (hereafter *Cashier's Manual*), § IV (April 2001), at 4. Cashiers are designated in writing. *Id.* § III, at 3 (cashier is appointed by completing a specified form).

[13] Pub. L. No. 104-106, 110 Stat. 186 (Feb. 10, 1996); see discussion of this statute in section B.2.a of this chapter.

Cashiers who are authorized to make payments from funds advanced to them are regarded as a category of disbursing officer. They deal primarily with petty cash funds known as "imprest funds."[14] Cashiers outside the military departments exercise disbursing functions pursuant to a delegation of authority from the Secretary of the Treasury under 31 U.S.C. § 3321(b). *Cashier's Manual*, § II, at 2. With respect to disbursing functions under 31 U.S.C. § 3321, cashiers are divided into five categories: (1) Class A Cashier (may not advance imprest funds to another cashier except to an alternate); (2) Class B Cashier (may advance imprest funds to alternate or subcashier); (3) Class D Cashier (receives funds solely for change-making purposes); (4) Subcashier (may receive imprest funds from a Class B or D cashier); and (5) Alternate to a Cashier or Subcashier (functions during short absences of the cashier but may act simultaneously if required by workload). *Cashier's Manual*, § IV, at 4; § V, at 12–13; App. 1, at 16–17.

Cashiers are personally liable for any loss or shortage of funds in their custody unless relieved by proper authority. Like other accountable officers, they are regarded as "insurers" and are subject to strict liability. B-258357, Jan. 3, 1996. Further discussion of the role and responsibilities of cashiers may be found in sections IV and V of the *Cashier's Manual*.

For the most part, a cashier will be operating with funds advanced by his or her own employing agency. In some situations, however, such as an authorized interagency agreement, the funds may be advanced by another agency. Liability and relief are the same in either case. 65 Comp. Gen. 666, 675–77 (1986).

### d. Collecting Officers

Collecting officers are those who receive or collect money for the government, such as Internal Revenue collectors or Customs collectors. Collecting officers are accountable for all money collected. *E.g.*, 59 Comp. Gen. 113, 114 (1979); 3 Comp. Gen. 403 (1924); 1 Comp. Dec. 191 (1895); B-201673 *et al.*, Sept. 23, 1982. For example, an Internal Revenue collector is responsible for the physical safety of taxes collected, must pay over to the government all taxes collected, and must make good any money lost or stolen while in his or her custody unless relieved. *E.g.*, 60 Comp. Gen. 674 (1981). However, under a lockbox arrangement whereby tax payments are mailed to a financial institution at a post office box and then wired to a Treasury account, Internal Revenue Service officials are not accountable

[14] See section B.3.a of this chapter for a discussion of imprest funds.

for funds in the possession of the financial institution since they do not gain custody or control over those funds. B-223911, Feb. 24, 1987.

The clerk of a bankruptcy court, if one has been appointed under 28 U.S.C. § 156(b), is the accountable officer with respect to fees paid to the court, as prescribed by 28 U.S.C. § 1930, by parties commencing a case under the Bankruptcy Code. 28 U.S.C. § 156(f). This provision, added in 1986, essentially codified the result of two GAO decisions issued the previous year, 64 Comp. Gen. 535 (1985) and B-217236, May 22, 1985. See also B-288163, June 4, 2002, for a more recent decision following the same approach.

In some situations, certain types of receipts may be collected by a contractor. Since the contractor is not a government officer or employee, the various accountable officer statutes discussed throughout this chapter do not apply, and the contractor's liability is governed by the terms of the contract. For example, a parking service contract with the General Services Administration required the contractor to collect parking fees at certain government buildings and to remit those fees to GSA on a daily basis. One day, instead of remitting the receipts, an official of the contractor took the money home in a paper bag and claimed to have been robbed in a parking lot near her residence. When GSA withheld the amount of the loss from contract payments, the contractor tried to argue that the risk of loss should fall upon the government. The Claims Court disagreed. Since the contract terms were clear and the contractor failed to comply, the contractor was held responsible for the loss. *Miracle Contractors, Inc. v. United States*, 5 Cl. Ct. 466 (1984).

The Department of Agriculture has statutory authority to use volunteers to collect user fees in national forests. The volunteers, private individuals, are to be bonded, with the cost of the bonds paid by the Department. 16 U.S.C. § 460*l*-6a(k). In 68 Comp. Gen. 470 (1989), GAO concurred with the Department that the volunteers could be regarded as agents of the Forest Service and, as such, eligible for relief for non-negligent losses. The practical significance of this decision is that it would be difficult to recruit volunteers if they faced potential liability for non-negligent losses, a possibility that would exist even under a surety bond. *Id.* at 471.

### e. Other Agents and Custodians

Officers and employees who do not fit into any of the preceding categories, and who may not even be directly involved in government fiscal operations, are occasionally given custody of federal funds and thereby become accountable officers for the funds placed in their charge. Note in this

connection that the "safekeeping" mandate of 31 U.S.C. § 3302(a) (made unmistakably clear by reference to the original 1846 language quoted in section B.1.a of this chapter) applies to any government employee, regardless of job description, to whom public funds are entrusted in connection with the performance of government business. *See*, *e.g.*, B-170012, Feb. 3, 1972.

Examples of employees in this general custodial category include: a messenger sent to the bank to cash checks, B-226695, May 26, 1987; a Department of Energy special counsel with control over petroleum overcharge refunds, B-200170, Apr. 1, 1981; State Department employees responsible for packaging and shipping funds to an overseas embassy, B-193830, Oct. 1, 1979; a special messenger delivering cash to another location, B-188413, June 30, 1977; and an officer in charge of a laundry operation on an Army base who had been advanced public funds to be held as a change fund, B-155149, Oct. 21, 1964.

As with disbursing officers, there may be more than one accountable officer in a given case, and the concept of accountability is not limited to the person in whose name the account is officially held nor is it limited to the person or persons for whom relief is officially requested. For example, accounts in the regional offices of the U.S. Customs Service are typically held in the name of the Regional Commissioner. While the Regional Commissioner is therefore an accountable officer with respect to that account, subordinate employees who actually handle the funds are also accountable officers. B-197324, Mar. 7, 1980; B-193673, May 25, 1979. The same principle applies to the various service centers of the Internal Revenue Service. *E.g.*, 60 Comp. Gen. 674 (1981).

As demonstrated by the Customs and Internal Revenue Service situations, as well as the many cases involving military finance and accounting officers, a supervisory official will be an accountable officer if that official has actual custody of public funds, or if the account is held in the official's name, regardless of who has physical custody. B-271017, Aug. 12, 1996. Absent these factors, however, a supervisor is not an accountable officer

and does not become one merely because he or she supervises one. *E.g.*, B-266245, Oct. 24, 1996; 72 Comp. Gen. 49, 51–52 (1992); B-214286, July 20, 1984; B-194782, Aug. 13, 1979.[15]

In each case, it is necessary to examine the particular facts and circumstances to determine who had responsibility for or custody of the funds during the relevant stages of the occurrence or transaction. In B-193830, Oct. 1, 1979, money shipped from the State Department to the American Embassy in Paraguay never reached its destination. While the funds were chargeable to the account of the Class B cashier at the Embassy, the State Department employees responsible for packaging and shipping the funds were also accountable officers with respect to that transaction. In another case, a new Class B cashier had been recommended at a Peace Corps office in Western Samoa, and had in fact been doing the job, but his official designation was not made until after the loss in question. Since the new cashier, even though not yet formally designated, had possession of the funds at the time of the loss, he was an accountable officer. However, since the former cashier retained responsibility for the imprest fund until formally replaced, he too was an accountable officer. B-188881, May 8, 1978.

In sum, any government officer or employee who physically handles government funds, even if only occasionally, is accountable for those funds while in his or her custody.

It may be impossible, in rare cases, to specify exactly who the proper accountable officer is. For example, the Drug Enforcement Administration used a flash roll of 650 $100 bills and discovered that 15 bills had been replaced by counterfeits scattered throughout the roll. (The "roll" was actually a number of stacks.) The roll had been used in a number of investigations and in each instance, the transactions (transfers from cashier to investigators, returns to cashier, transfers between different groups of investigators) were recorded on receipts and the money was counted. While it was thus possible to determine precisely who had the roll on any given day, there was no way to determine when the substitution took place and hence to establish to whom the loss should be attributed. B-191891, June 16, 1980. *See also* B-288284.2, Mar. 7, 2003 ("The lack of a

[15] Note that, in light of B-280764, May 4, 2000, discussed previously, 72 Comp. Gen. 49 and B-266245 are no longer controlling to the extent they suggest that an agency can impose liability on supervisors solely by regulation, without specific statutory authority.

paper trail makes assignment of responsibility for the improper payment impossible. In situations like this, where there is no basis for attributing a loss or improper payment to one particular individual, we have determined that no one can be held liable."); B-235368, Apr. 19, 1991 ("[F]ailure to follow . . . procedures for transferring the fund to the alternate cashier makes assignment of responsibility for the loss impossible; there is no audit trail permitting placement of accountability, and no individual had exclusive control over the fund.").

## 3. Funds to Which Accountability Attaches

When we talk about the liability of accountable officers, we deliberately use the broad term "public funds." As a general proposition, for purposes of accountability, "public funds" consist of three categories: appropriated funds, funds received by the government from nongovernmental sources, and funds held in trust. It is important to emphasize that when we refer to certain funds as "nonaccountable" in the course of this discussion, all we mean is that the funds are not subject to the laws governing the liability and relief of accountable officers. Liability for losses may still attach on some other basis.

### a. Appropriated Funds

Appropriated funds are accountable funds. The funds may be in the Treasury, which is where most appropriated funds remain pending disbursement, or they may be in the form of cash advanced to a government officer or employee for some authorized purpose.

(1) Imprest funds

As noted previously, the definitions of the various types of cashier refer primarily to the use of "imprest funds." An imprest fund is essentially a petty cash fund. More specifically, it is a fixed-cash fund (*i.e.*, a fixed dollar amount) advanced to a cashier for cash disbursements or other cash requirement purposes as specifically authorized. An imprest fund may be either a stationary fund, such as a change-making fund, or a revolving fund. Department of the Treasury Financial Management Service, *Manual of Procedures and Instructions for Cashiers* (hereafter *Cashier's Manual*), App. 1 (April 2001), at 17 (definition of "imprest fund").

Historically, imprest funds were commonly used for such things as small purchases, travel advances, and authorized emergency salary payments. On November 9, 1999, however, the Treasury Department's Financial Management Service issued a policy directive that required federal agencies to eliminate imprest funds by October 1, 2001, except for certain waived payments.[16] According to the directive's preamble, the main impetus for eliminating imprest funds was the strong preference for making payments by electronic funds transfer (EFT). Specifically, the National Performance Review had issued a report recommending the elimination of imprest funds in favor of using EFT transactions.[17] Furthermore, the Debt Collection Improvement Act of 1996 generally mandated the use of EFT payments as of January 1, 1999, subject to waiver by the Secretary of the Treasury under certain circumstances.[18]

Under the Treasury policy directive, two conditions must be met in order for imprest funds to be used after October 1, 2001. First, the use of funds must qualify for waiver of the statutory prohibition against non-EFT payments under standards prescribed in 31 C.F.R. § 208.4. Second, the payment must meet additional standards for waiver specified in the policy directive. Given the waiver authorities, imprest funds have not been completely eliminated. Thus, the discussion that follows retains some relevance.

Current guidance on the use of imprest funds is contained primarily in the *Cashier's Manual* and in the Federal Acquisition Regulation (FAR), 48 C.F.R. §§ 13.305-1–13.305-4. Agencies using imprest funds are required to issue their own implementing regulations as well. FAR, 48 C.F.R. § 13.305-2(c). Except to the extent specified in an agency's own regulations (*e.g.*, B-220466 *et al.*, Dec. 9, 1986), there are no special subject matter limitations on the kinds of services payable from imprest funds. 65 Comp. Gen. 806 (1986); B-242412, July 22, 1991. Of course, like any other appropriated funds, imprest funds may not be used for a purpose that is not

[16] This policy directive and its accompanying preamble can be found at www.fms.treas.gov/imprest/regulations.html (last visited September 15, 2005).

[17] National Performance Review, "From Red Tape to Results: Creating A Government That Works Better And Costs Less," *The Report on the Elimination of Imprest Funds in the Federal Government Through the Use of Electronic Commerce*, Department of the Treasury, Financial Management Service (January 1996).

[18] 31 U.S.C. § 3332(f), added by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, title III, § 31001(x)(1)(A), 110 Stat. 1321, 1321-376 (Apr. 26, 1996).

authorized under the applicable appropriation. B-243411, July 30, 1991 (imprest fund not available for purchase of electric shoe polisher).

Imprest funds of the revolving type are replenished to the fixed amount as spent or used. As replenishments are needed, replenishment vouchers are submitted through the certifying officer to the disbursing officer. Replenishment vouchers must be supported by receipts or other evidence of the expenditures.

At any given time, an imprest fund may consist of cash, uncashed government checks, and other documents such as unpaid reimbursement vouchers, sales slips, invoices, or other receipts for cash payments. An imprest fund cashier must at all times be able to account for the full amount of the fund. *Cashier's Manual*, § IV at 8. For example, if a cash box containing a $1,000 imprest fund disappears, and at the time of disappearance the box contained $500 in cash and $500 in receipts for which reimbursement vouchers had not yet been issued, the loss to the government is the full $1,000 and the cashier is accountable for that full amount. A cashier's failure to keep adequate records, thus making proper reconciliation impossible, is negligence. B-189084, Jan. 15, 1980.

Loss of a replenishment check before it reaches the cashier is not a situation requiring relief of the cashier. The proper procedure in such a situation is to report the loss to the disbursing office that issued the check to obtain a replacement. B-203025, Oct. 30, 1981.

If it is in the government's interests, a checking account may be set up in a private bank for imprest fund disbursements as long as adequate control procedures are developed. B-117566, Apr. 29, 1959. Use of depositary accounts must be approved by the agency head or designee and is authorized only for cash withdrawal transactions. *Cashier's Manual*, § IV at 10–11. The account may be interest-bearing, in which event any interest earned must be deposited in the Treasury as miscellaneous receipts. *Id.* at 11.

The method of imprest fund accountability changed starting with fiscal year 1985. Prior to that time, funds advanced to cashiers by Treasury disbursing officers were not "charged" to the agency's appropriations at the time of the advance but were carried on the disbursing officers' records of accountability. The cashiers were regarded as agents of the disbursing officers. In fact, it was common to refer to cashiers as "agent cashiers." *E.g.*, A-89775, Mar. 21, 1945. Charges were made to the applicable

appropriation or fund accounts only when replenishment checks were issued. Relief requests had to be submitted through the Treasury's Chief Disbursing Officer.

In 1983, the Treasury Department proposed removing imprest fund advances from the disbursing officers' accountability inasmuch as the transactions were beyond the disbursing officers' control. GAO concurred. B-212819-O.M., May 25, 1984. The current procedures are discussed in 70 Comp. Gen. 481 (1991). In brief, the charge to the agency's appropriation is now made at the time of the initial advance. However, since the advance does not qualify as an obligation under 31 U.S.C. § 1501, the charge must be in the form of a "commitment" or "reservation." In general, the actual obligation occurs when the advance is used and the cashier seeks replenishment. The preliminary charge is necessary to protect against violating the Antideficiency Act. Except for certain procedural matters (relief requests are no longer processed through the applicable disbursing officer), the changes have no effect on the cashier's liability as an accountable officer.

An alternative approach to managing imprest funds is the "third-party draft" procedure described in I TFM § 4-3000 (Aug. 3, 2000). In brief, an agency may retain a contractor to provide the agency with payment instruments, not to exceed certain amounts, drawn on the contractor's account. The face value of an individual third-party draft generally may not exceed $10,000, and third-party drafts for routine imprest payments are limited to $2,500. *Id.* § 4-3020.10. The agency then uses these drafts for its imprest fund transactions and reimburses the contractor for properly payable drafts that the contractor has paid. Since the funds being disbursed from the imprest fund under the third-party draft system are not government funds, personal liability does not attach to the cashier who issues the draft. *Id.* § 4-3020; GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 6.8.B (Washington, D.C.: May 18, 1993); B-247563.4, Dec. 11, 1996; B-247563.3, Apr. 5, 1996. However, this obviously does not mean that third-party drafts can or should be used to circumvent restrictions on the use of appropriated funds.

(2) Flash rolls

Law enforcement officers on undercover assignments frequently need a supply of cash to support their operations, for example, to purchase contraband or to use as a gambling stake. This money, often advanced

from an imprest fund, is called a "flash roll." By the very nature of the activities involved, flash roll money is at high risk to begin with.

It is clear that a flash roll in the hands of a law enforcement agent retains its status as government funds. *Garcia v. United States*, 469 U.S. 70 (1984) (flash roll held to be money of the United States for purposes of 18 U.S.C. § 2114, which makes it a criminal offense to assault a custodian of government money). However, flash roll money will be accountable in some situations and nonaccountable in others, depending on the nature of the loss. If the loss is within the risk inherent in the operation, such as the suspect absconding with the money, it is not viewed as an "accountable officer" loss but may be handled internally by the agency. If the agency, under its internal investigation procedures, finds the agent with custody of the funds to have been negligent, it should hold the agent liable to the extent provided in its regulations. Otherwise, it may simply record the loss as a necessary expense against the appropriation which financed the operation. If, on the other hand, the loss occurs in the course of the operation but is unrelated to carrying out its purpose, the accountable officer laws apply. The decision first recognizing this distinction is 61 Comp. Gen. 313 (1982), applying it in the context of Drug Enforcement Administration undercover operations.[19]

The fact pattern in the *Garcia* case illustrates the nonaccountable situation. A Secret Service agent had been given a flash roll to buy counterfeit currency from suspects in Miami. The agent met the suspects in a park. One of the suspects pulled a semi-automatic pistol and demanded the money. Other Secret Service agents rushed to the scene and apprehended the suspects, one of whom was trying to run off with the money. Of course there was no loss since the money was recovered. If the second suspect had gotten away with the money, however, the loss could have been treated as an expense of the operation, without the need to seek relief for anyone. GAO decisions finding flash roll losses "nonaccountable" under the standards of 61 Comp. Gen. 313 are B-238222, Feb. 21, 1990 (suspect stole flash roll during drug arrest); B-232253, Aug. 12, 1988 (informant stole money provided to rent undercover apartment); and B-205426, Sept. 16, 1982 (federal agent robbed at gunpoint while trying to purchase illegal firearms).

[19] Prior decisions, such as B-192010, Aug. 14, 1978, which had treated all flash roll losses as accountable officer losses, were modified accordingly. 61 Comp. Gen. at 316.

An example of a case which remains subject to the accountable officer laws is B-218858, July 24, 1985. A federal agent, posing as a narcotics trafficker, stopped at a telephone booth to make a call. Two women approached the booth, which did not have a door. One diverted the agent's attention while the other picked his pocket. The loss, while certainly incident to the undercover operation, was unrelated to its central purpose. Relief was granted. Other cases are:

- Agent set shoulder bag containing flash money on airport counter and left it unattended for several minutes while making ticket arrangements; relief denied. 64 Comp. Gen. 140 (1984).
- Briefcase containing funds stolen when agent set it down in coffee shop for 15–20 seconds to remove jacket; relief granted. B-210507, Apr. 4, 1983.
- Agent left funds in glove compartment while making phone call in high crime area; agent found negligent. B-220492, Dec. 10, 1985.

As 64 Comp. Gen. 140 and B-210507 point out, losses which occur while flash money is being transported to the location where it is intended to be used are at best incidental to the operation and are thus governed by the accountable officer laws.

The conspicuous display of a flash roll is not in and of itself negligence where necessary to the agent's undercover role. B-194919, Nov. 26, 1980.

(3) Travel advances

Travel advances are authorized by 5 U.S.C. § 5705. The statute expressly directs the recovery, from the traveler or from his or her estate, of advances not used for allowable travel expenses. Like imprest funds, travel advances can still be used but their use is now the exception rather than the common practice. Section 2 of the Travel and Transportation Reform Act of 1998, Pub. L. No. 105-264, 112 Stat. 2350 (Oct. 19, 1998), 5 U.S.C. § 5701 note, generally mandates the use of government contractor-issued travel charge cards for payment of official government travel. Under the General Services Administration regulations implementing this statute, travel advances are authorized only if an exemption from use of a travel charge card has been granted. 41 C.F.R. §§ 301-51.1, 301-51.5.

A travel advance is "based upon the employee's prospective entitlement to reimbursement" (B-178595, June 27, 1973) and is essentially for the convenience of the traveler. Travel advances in the hands of the traveler are regarded as nonaccountable and hence not governed by the accountable officer laws. Rather, they are treated as loans for the personal benefit of the traveler. As such, if the funds are lost or stolen while in the traveler's custody, regardless of the presence or absence of fault attributable to the traveler, the funds must be recovered as provided by 5 U.S.C. § 5705, and the accountable officer relief statutes do not apply. 54 Comp. Gen. 190 (1974); B-206245, Apr. 26, 1982; B-183489, June 30, 1975; B-254089, Sept. 10, 1993 (nondecision letter). The same principle applies to traveler's checks. 64 Comp. Gen. 456, 460 (1985).

In many cases, a messenger or some other clerical employee picks up the funds for the traveler. If the funds are lost or stolen while in the intermediary's custody, and use of the intermediary was the traveler's choice, the intermediary is the agent of the traveler and the traveler, having constructively received the funds, remains liable. B-204387, Feb. 24, 1982; B-200867, Mar. 30, 1981. However, if use of the intermediary is required by agency or local policy, then the intermediary is the agent of the government and the traveler is not liable. 67 Comp. Gen. 402 (1988).

Even though the accountable officer relief statutes do not apply, it may be possible to effectively "relieve" the non-negligent traveler by considering a claim under the Military Personnel and Civilian Employees' Claims Act of 1964, 31 U.S.C. § 3721, to the extent permissible under the agency's implementing regulations. B-208639, Oct. 5, 1982; B-197927, Sept. 12, 1980.

Travel advances returned to government custody for reasons such as postponement of the travel regain their status as accountable funds, and an employee receiving custody of these funds is governed by the laws relating to the liability and relief of accountable officers. B-200404, Feb. 12, 1981; B-170012, Mar. 14, 1972; B-170012, May 3, 1971. Also, where an advance greatly exceeds the employee's legitimate travel expense needs and it is clear that the excess is intended to be used for operational purposes, the excess over reasonable needs may be treated as accountable funds and not part of the "loan." B-196804, July 1, 1980.

### b. Receipts

In our definitions of governmental receipts and offsetting collections in Chapter 2, we noted that the government receives funds from nongovernment sources (a) from the exercise of its sovereign powers (*e.g.*, tax collections, customs duties, court fines), and (b) from a variety of

business-type activities (*e.g.*, sale of publications). These collections, whether they are to be deposited in the Treasury as miscellaneous receipts or credited to some agency appropriation or fund, are accountable funds from the moment of receipt. Some examples are: B-288163, June 4, 2002, and 64 Comp. Gen. 535 (1985) (both cases involved registry funds and fees paid to bankruptcy court); 60 Comp. Gen. 674 (1981) (tax collections); B-200170, Apr. 1, 1981 (petroleum overcharge refunds); and B-194782, Aug. 25, 1980 (recreational fee collections).

### c. Funds Held in Trust

When the government holds private funds in a trust capacity, it is obligated, by virtue of its fiduciary duty, to pay over those funds to the rightful owners at the proper time. Thus, although the funds are not appropriated funds, they are nevertheless accountable funds. The principle has been stated as follows:

> "[T]he same relationship between an accountable officer and the United States is required with respect to trust funds of a private character obtained and held for some particular purpose sanctioned by law as is required with respect to public funds."

6 Comp. Gen. 515, 517 (1927). *See also Woog v. United States*, 48 Ct. Cl. 80 (1913).

A common example is the Department of Veterans Affairs (VA) "Personal Funds of Patients" (PFOP) account. Patients, upon admission to a VA hospital, may deposit personal funds in this account for safekeeping and use as needed. Upon release, the balance is returned to the patient. Patient funds in the PFOP account have been consistently treated as accountable funds. 68 Comp. Gen. 600 (1989); 68 Comp. Gen. 371 (1989); B-226911, Oct. 19, 1987; B-221447, Apr. 2, 1986; B-215477, Nov. 5, 1984; B-208888, Sept. 28, 1984.

Another example is private funds of litigants deposited in a registry account of a court of the United States, to be held pending distribution by order of the court in accordance with 28 U.S.C. §§ 2041 and 2042. These are also accountable funds under the trust capacity concept. B-288163, June 4, 2002; 64 Comp. Gen. 535 (1985); 6 Comp. Gen. 515 (1927); B-200108, B-198558, Jan. 23, 1981. *See also Osborn v. United States*, 91 U.S. 474 (1875) (court can summarily compel restitution of funds improperly withdrawn from registry account by former officers).

Other situations applying the trust capacity concept are B-288284.2, Mar. 7, 2003, and B-288284, May 29, 2002 (embassy employees' funds held on their behalf in a Suspense Deposit Abroad account administered by the State Department); B-238955, Apr. 3, 1991 (Overseas Consular Service fund from which embassy consular officers authorize payment for funerals and other expenses); 67 Comp. Gen. 342 (1988) (Indian trust accounts administered by Bureau of Indian Affairs); 17 Comp. Gen. 786 (1938) (United States Naval Academy laundry fund); B-190205, Nov. 14, 1977 (foreign currencies accepted in connection with accommodation exchanges authorized by 31 U.S.C. § 3342); and A-22805, Nov. 30, 1929 (funds taken from prisoners at the time of their confinement, to be held in their behalf). *See also* B-239955, June 18, 1991 (Treasury Department personnel are held accountable for loss of damaged currency held in Treasury mailroom pending replacement); 69 Comp. Gen. 314 (1990) (BIA may contract with private bank for ministerial aspects of trust fund disbursements, but government disbursing officer must retain responsibility for managerial and judgmental aspects).

Not all nongovernment funds in the custody of a government official are held in a trust capacity. For example, in B-164419-O.M., May 20, 1969, GAO distinguished between funds of a foreign government held by the United States incident to a cooperative agreement (trust capacity funds), and funds of a private contractor held by a government official for safekeeping as a favor to the contractor. The latter situation was a mere bailment for the benefit of the contractor, and the official was not an accountable officer with respect to those funds.

### d. Items Which Are the Equivalent of Cash

The concepts of accountability and liability discussed in this chapter apply primarily to money. However, for reasons which should be apparent, accountability also attaches to certain noncash items which are negotiable by the bearer or are otherwise the equivalent of cash. Examples are:

- Food stamps. B-221580, Oct. 24, 1986 (nondecision letter).
- Government Transportation Requests. B-239387, Apr. 24, 1991.
- Military payment certificates. B-127937-O.M., Aug. 2, 1956.
- Receipts signed by employees acknowledging that they were advanced funds to make small purchases. B-288014, May 17, 2002.

- Traveler's checks in the custody of an accountable officer. 64 Comp. Gen. 456 (1985); B-235147.2, Aug. 14, 1991.

- Treasury bonds with interest coupons attached. B-190506, Nov. 28, 1977, *aff'd on reconsideration*, B-190506, Dec. 20, 1979.

In the reconsideration of B-190506, Dec. 20, 1979, it was contended that loss of the bonds did not really result in a loss to the government because neither the bonds nor the coupons had been cashed and a "stop notice" had been placed with the Federal Reserve Bank. GAO could not agree, however, since the bonds were bearer bonds and the stop notice does not completely extinguish the government's liability to pay on them. (The Treasury Department no longer issues coupon bonds, although many older ones are still outstanding.)

## 4. What Kinds of Events Produce Liability?

The generic term for losses which trigger an accountable officer's liability is "fiscal irregularity." *See* GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.2 (Washington, D.C.: May 18, 1993). Fiscal irregularities are divided into two broad categories: (1) physical loss or deficiency, and (2) illegal or improper payment. Since, as we will see, the relief statutes are expressly tied to these categories, the proper classification of a fiscal irregularity is the essential first step in determining which statute to apply.

A working definition of "physical loss or deficiency" may be found in B-202074, July 21, 1983:

> "In sum, 'physical loss or deficiency' includes such things as loss by theft or burglary, loss in shipment, and loss or destruction by fire, accident, or natural disaster. It also includes the totally unexplained loss, that is, a shortage or deficiency with absolutely no evidence to explain the disappearance. . . . Finally, . . . losses resulting from fraud or embezzlement by subordinate finance personnel may . . . be treated as physical losses."

This definition has been repeated in several subsequent decisions such as 70 Comp. Gen. 616, 621 (1991) and 65 Comp. Gen. 881, 883 (1986). A loss resulting from a bank failure would also be treated as a physical loss. *See* 18 Comp. Gen. 639 (1939).

The second type of fiscal irregularity is the "illegal, improper, or incorrect payment." 31 U.S.C. §§ 3527(c), 3528(a)(4). The key word here is "payment"—"the disbursement of public funds by a disbursing officer or his subordinate." B-202074, July 21, 1983. Improper payments include such things as payments obtained by fraud, whether by nongovernment persons or by government employees other than subordinate finance personnel; erroneous payments or overpayments resulting from human or mechanical error attributable to the government; payments prohibited by statute; and disbursements for unauthorized purposes. The legislative history of 31 U.S.C. § 3527(c), the improper payment relief statute for disbursing officers, describes an improper payment as a payment "which the Comptroller General finds is not in strict technical conformity" with the law. Excerpts from the pertinent committee reports are quoted in 49 Comp. Gen. 38, 40 (1969) and in B-202074, cited above.

A loss resulting from an uncollectible personal check may be an improper payment or a physical loss, depending on the circumstances. If the loss results from an authorized check-cashing transaction, it is an improper payment because government funds were disbursed to the bearer. 70 Comp. Gen. 616 (1991). However, if the check is tendered to pay an obligation owed to the United States or to purchase something from the government, the loss, to the extent an accountable loss exists, would be a physical loss. In this connection, Treasury regulations provide:

> "Government officers accept checks received subject to collection. If a check cannot be collected in full or is lost or destroyed before collection, the agency making the deposit must obtain the proper payment. Payment by check is not effective until the full proceeds are received."

I TFM § 5-2010 (Oct. 4, 2001). If a personal check is accepted subject to collection, and if the government does not exchange value for the check, any resulting loss is not a loss within the scope of the accountable officer laws and may be adjusted administratively by the agency. If, however, an accountable officer purports to accept a personal check in satisfaction of an obligation due the United States (rather than for collection only), or if the government parts with something of value in exchange for the check (*e.g.*, sale of government property), a resulting loss is treated as a physical loss. B-201673 *et al.*, Sept. 23, 1982. *See also* 3 Comp. Gen. 403 (1924); A-44019, Mar. 15, 1934; A-24693, Oct. 30, 1929. The distinction is summarized in the following passage from B-201673:

> "If a check tendered in payment of a fine, duty, or penalty becomes uncollectible, it may be argued that the Government incurs a loss in the sense that it does not have money to which it was legally entitled, but it has not lost anything that it already had. When the check is in exchange for property, the Government has lost the property, the value of which is measured by the agreed-upon sales price. Of course, recovery of the property will remove or mitigate the loss."

The concept of B-201673 has also been applied to a check seized as forfeiture under 31 U.S.C. §§ 5316 and 5317(b), and subsequently returned as uncollectible. B-208398, Sept. 29, 1983.

A conceptually similar case is B-216279, Oct. 9, 1984. A teller at a Customs Service auction gave a receipt to a customer and negligently failed to collect the tendered funds. It was suggested that there was no loss because the teller never had physical possession of the funds. However, the applicable relief statute (31 U.S.C. § 3527) uses the terms "physical loss or deficiency" in the disjunctive, and there was clearly a deficiency in the teller's account to the extent of the property turned over in exchange for the lost payment.

While every fiscal irregularity by definition involves a loss or deficiency for which someone is accountable, not every loss or deficiency is a fiscal irregularity which triggers accountability. For example, an accountable officer is not liable for interest lost on collections which should have been deposited promptly but were not. 64 Comp. Gen. 303 (1985) (failure to deposit collections in designated depositary); B-190290, Nov. 28, 1977 (increased interest charges on funds borrowed from Treasury, no net loss to United States).

Also, losses resulting from the imperfect exercise of judgment in routine business operations, where no law has been violated, do not create accountable officer liability. 65 Comp. Gen. 881 (1986) (loss to Internal Revenue Service Tax Lien Revolving Fund caused by sale of property for substantially less than amount for which it had been redeemed).

## 5. Amount of Liability

As a general proposition, the amount for which an accountable officer is liable is easy to determine: It is the amount of the physical loss or improper payment, reduced by any amounts recovered from the recipient (thief,

improper payee, *etc.*). *E.g.*, 65 Comp. Gen. 858 (1986); B-194727, Oct. 30, 1979.

There is an exception, discussed in 65 Comp. Gen. at 863–64, in which amounts recovered from the recipient should not be used to reduce the amount of the accountable officer's liability. A loss may result from a series of transactions spanning several years, each transaction giving rise to a separate debt. By the time the loss is discovered, recovery from the accountable officer may be partially barred by the 3-year statute of limitations found in 31 U.S.C. § 3526(c). This, however, does not affect the indebtedness of the recipient which, in this situation, will exceed the liability of the accountable officer. Under the Federal Claims Collection Standards,[20] a debtor owing multiple debts may specify the allocation of a voluntary partial payment. If the recipient/debtor fails to so specify, or if payment is involuntary, the collecting agency may allocate the money among the various debts in accordance with the best interests of the United States. 31 C.F.R. § 901.3(c)(4). Generally, "the best interests of the United States are clearly served by applying payments made by the recipients to the class of debt for which only the recipients are liable" (65 Comp. Gen. at 864), that is, those for which recovery from the accountable officer is time-barred. Thus, in this type of situation, partial recoveries from the recipient should first be applied to the time-barred debt of the accountable officer until any such amounts have been recouped, and only thereafter used to reduce the accountable officer's remaining liability.

A judgment obtained against some third party (improper payee, thief, *etc.*) is only "potential unrealized value" and does not reduce the accountable officer's liability until it is actually collected. B-147747, Dec. 28, 1961; B-194727, Oct. 30, 1979 (nondecision letter).

The liability of an accountable officer does not include interest and penalties assessed against the recipient. 64 Comp. Gen. 303 (1985); B-235037, Sept. 18, 1989.

The liability of an accountable officer resulting from the payment of fraudulent travel claims is the amount of the fraudulent payment and does not include nonfraudulent amounts paid for the same day(s). 70 Comp. Gen. 463 (1991). Previously GAO had included both, under the so-called

[20] Current Federal Claims Collection Standards, issued jointly by the Departments of Justice and Treasury, are in 31 C.F.R. parts 900–904 (2005).

"tainted day" rule.[21] The 1991 decision distinguishes fraudulent payees from fraudulent claimants, concluding that the tainted day rule does not apply to *paid* claims. That decision was modified in 72 Comp. Gen. 154 (1993) to make clear that rejected use of the tainted day rule was to be applied prospectively only from the date of the prior decision, May 6, 1991.

When determining the amount of a loss for which an accountable officer is to be held liable, the government does not "net" overages against shortages. In GAO's view, such "netting" would weaken internal controls over the accounting for cash balances. B-212370, Nov. 15, 1983; B-199447, Mar. 17, 1981.[22] As noted in B-199447, overages must generally be deposited in the Treasury as miscellaneous receipts.

In almost all cases, the amount of an accountable officer's liability is precisely determinable at the outset. It may be reduced by recoveries, but it will not increase. One exception is illustrated in B-239387, Apr. 24, 1991, in which an agency held an employee accountable for a booklet of missing or stolen Government Transportation Requests. Because the amount of the government's loss could not be known until the GTRs were actually used and the government forced to honor them, additional liability accrued as each GTR was used over time.

## 6. Effect of Criminal Prosecution

As we noted previously, the body of law governing the liability and relief of accountable officers is designed not only to induce proper care but also to protect against dishonesty by the officers themselves. This section summarizes the relationship between criminal prosecution and civil liability.

### a. Acquittal

Acquittal in a criminal proceeding does not extinguish civil liability and does not bar subsequent civil actions to enforce that liability as long as they are remedial rather than punitive. *Helvering v. Mitchell*, 303 U.S. 391

[21] Under the tainted day rule, a fraudulent claim for reimbursement for any part of a single day's subsistence expenses "taints" the entire day's claim with fraud and thus precludes reimbursement for nonfraudulent items as well. 70 Comp. Gen. at 465. This rule carries a punitive element that is appropriate for those who defraud the government but not for accountable officers who are victims of the fraud. *See* 72 Comp. Gen. 154, 156 (1993).

[22] A statutorily authorized instance of "netting" gains and deficiencies in an account is 31 U.S.C. § 3342(c)(2) (certain check-cashing and exchange transactions), discussed later in this chapter in section D.4.

(1938). The reason is the difference in burden of proof. Acquittal means only that the government was unable to prove guilt beyond a reasonable doubt, a standard higher than that for civil liability. "That acquittal on a criminal charge is not a bar to a civil action by the Government, remedial in its nature, arising out of the same facts on which the criminal proceeding was based has long been settled." *Id.* at 397. *See also* B-239134, Apr. 22, 1991 (nondecision letter) (conviction on only a portion of the loss).

The rules are the same for acquittal (or reversal of a conviction) by a military court-martial. B-235048, Apr. 4, 1991. *See also Serrano v. United States*, 612 F.2d 525 (Ct. Cl. 1979) (acquittal held not to bar agency from imposing civil liability and withholding pay of accountable officer).

It follows that an accountable officer's civil liability will be unaffected by the fact that a grand jury has refused to return an indictment. B-186922, Apr. 8, 1977.

### b. Order of Restitution

A court may order a defendant to make monetary restitution to the victim, either as part of the sentence (18 U.S.C. § 3556) or as a condition of probation (18 U.S.C. § 3563(b)(2)). In either case, the relevant terms and procedures are governed by 18 U.S.C. §§ 3663 and 3664. Restitution may be ordered in a lump sum or in installments. 18 U.S.C. § 3664(f)(3). These are general criminal statutes and would apply fully where the defendant is an accountable officer and the United States is the victim as well as the prosecutor.

The statutory scheme clearly recognizes the possibility of subsequent civil proceedings by the United States as victim against the accountable officer. Any amounts paid to a victim under a restitution order must be set off against amounts recovered in a subsequent civil action. 18 U.S.C. § 3664(j)(2). In such an action, the previously convicted defendant cannot deny the "essential allegations" of the offense. 18 U.S.C. § 3664(k)(1).

Where restitution is ordered in full, payable in installments, it has been held that the victim may nevertheless obtain a civil judgment for the unpaid balance, even though there has been no default in the installment payments. *Teachers Insurance and Annuity Association v. Green*, 636 F. Supp. 415 (S.D.N.Y. 1986). "Future payments that do not fully compensate a victim in present value terms cannot be a bar to a civil judgment." *Id.* at 418. *See also* B-128437-O.M., Aug. 3, 1956.

Where restitution is ordered in an amount less than the full amount of the loss, civil liability for the balance would remain, subject to the statutory setoff requirement. *See* 64 Comp. Gen. 303 (1985), reaching this result under a prior version of the legislation. The decision further suggests that, if the record indicates that the court thought it was ordering restitution in full, it might be desirable to seek amendment of the restitution order. Obviously, the fact of conviction precludes any consideration of administrative relief. *Id.* at 304.

The preceding paragraphs are presented from the perspective of restitution by the accountable officer. Similar principles would apply with respect to restitution by a responsible party other than the accountable officer. *See, e.g.*, B-193673, May 25, 1979, *modified on other grounds by* B-201673 *et al.*, Sept. 23, 1982 (partial restitution by thief reduces amount of accountable officer's liability). *See also* B-270863, June 17, 1996. For example, where the Department of Justice enters into a settlement with a culpable third party compromising a claim of the government, the liability of the accountable officer is terminated for any amounts of the claim in excess of the settlement. *See* B-235048, Apr. 4, 1991.

## C. Physical Loss or Deficiency

### 1. Statutory Provisions

The two principal statutes authorizing administrative relief from liability for the physical loss or deficiency of public funds are 31 U.S.C. §§ 3527(a) and 3527(b). Subsection (a) applies to the civilian agencies and subsection (b) applies to accountable officers of the armed forces.

#### a. Civilian Agencies

The physical loss or deficiency relief statute applicable to accountable officers generally, 31 U.S.C. § 3527(a), was originally enacted in 1947. Pub. L. No. 321, ch. 441, 61 Stat. 720 (Aug. 1, 1947). Its justification, similar to that for all relief statutes, was summarized by the Senate Committee on Expenditures in the Executive Departments as follows:

> "The justification . . . is that, at the present time, relief of the kind with which this bill is concerned is required to be granted either through passage of a special relief bill by the Congress or by the filing of suit by the responsible person in

> the United States Court of Claims, the latter to be done at the personal expense of the responsible person. Both methods are costly and time consuming."

S. Rep. No. 80-379, at 1 (1947).

Before the actual relief mechanism is triggered, two threshold conditions must be satisfied. First, the loss must be a physical loss or deficiency and not an improper payment. 31 U.S.C. § 3527(a)(2). Second, the person for whom relief is desired must be an "accountable officer."[23] The legislative history confirms that this includes the general custodial category:

> "There are many agents of the Government who do not disburse but who, nevertheless, are fully responsible for funds . . . entrusted to their charge and, for that reason, the committee bill has been broadened to include that class of personnel."

S. Rep. No. 80-379, at 2.

Once it has been determined that there has been a physical loss or deficiency of "public money, vouchers, checks, securities, or records" for which an accountable officer is liable, the statute authorizes the Comptroller General to grant relief from that liability if the head of the agency involved makes two administrative determinations (31 U.S.C. § 3527(a)(1)), and if the Comptroller General agrees with those determinations (31 U.S.C. § 3527(a)(3)). *E.g.*, B-288014, May 17, 2002.

First, the agency head must determine that the accountable officer was carrying out official duties at the time of the loss, or that the loss was attributable to the act or omission of a subordinate of the accountable officer. B-241820, Jan. 2, 1991. Note that this is stated in the disjunctive. The second part, loss attributable to a subordinate, is designed to cover the situation, found in several agencies such as the Internal Revenue Service and the Customs Service, in which the account is in the name of a supervisory official who does not actually handle the funds. In this

[23] This statute will not apply to certifying officers since they do not have actual custody of funds. However, a certifying officer could conceivably have other duties or supervisory responsibilities and thus be accountable, and eligible for relief under 31 U.S.C. § 3527(a), in that capacity.

situation, both persons are accountable, and relief of one does not necessarily mean relief of the other. *See* B-270863, June 17, 1996; B-265853, Jan. 23, 1996.

Second, the agency head must determine that the loss was not attributable to fault or negligence on the part of the accountable officer. This determination is necessary regardless of which part of the first determination applies. Thus, while lack of fault does not affect the automatic imposition of liability, it does provide the basis for relief. *See*, *e.g.*, B-288166, Mar. 11, 2003; B-258357, Jan. 3, 1996.

Generally, the requirement that the accountable officer must have been acting in the discharge of official duties does not present problems. Thus, in the typical case, the central question becomes whether GAO is able to concur with the administrative determination that the loss occurred without fault or negligence on the part of the accountable officer. In reviewing relief cases over the years, GAO has developed a number of standards, the application of which to a given case requires a careful analysis of the particular facts. Many factors may bear on the conclusion in any given case, and the result will be determined by the interrelationship of these factors.

Section 3527(a) applies to accountable officers of "an agency," defined in 31 U.S.C. § 101 as any "department, agency, or instrumentality of the United States Government." Thus, section 3527(a) has been construed as applicable to the judicial branch (B-200108, B-198558, Jan. 23, 1981; B-197021, May 9, 1980; B-191440, May 25, 1979; B-185486, Feb. 5, 1976), and to agencies of the legislative branch (B-192503-O.M., Jan. 8, 1979, denying relief to a GAO employee). GAO has not specifically considered whether it applies to the Senate or House of Representatives. Section 3527(a) has also been construed as applicable to those government corporations which are subject to GAO's accounts settlement authority. B-88578, Aug. 21, 1951; B-88578-O.M., Aug. 21, 1951.

### b. Military Disbursing Officers

The need for physical loss relief authority for military disbursing officers became highlighted during World War I when several ships were sunk with funds and records on board. The first permanent administrative relief statute was enacted in 1919 and applied only to the Navy.[24] The Army received similar statutory authority in 1944.[25] The two were combined in 1955 and expanded to cover all of the military departments.[26] The legislation was later codified at 31 U.S.C. § 3527(b). The origins of the 1919 law are described in 7 Comp. Gen. 374, 377–78 (1927); the statutory evolution is detailed in B-202074, July 21, 1983. The statute applies to both civilian and military personnel of the various military departments. B-151156, Dec. 30, 1963. As discussed later, section 3527(b) was further amended in 1996 to expand the coverage of the section to all military accountable officials and to include erroneous payments. However, since the requirements and procedures regarding physical loss or deficiency were not altered, we retain the discussion of the earlier version of section 3527(b) to give context to our decisions predating the 1996 amendments.

As with section 3527(a), two threshold conditions had to be satisfied before the relief mechanism came into play. First, like section 3527(a), the pre-1996 section 3527(b) applied only to physical losses or deficiencies and not to improper payments. 31 U.S.C. § 3527(b)(1)(B); 7 Comp. Gen. 374 (1927); 2 Comp. Gen. 277 (1922); B-202074, July 21, 1983. The statute was intended to authorize relief in appropriate cases for losses "such as losses by fire, ship sinkings, thefts or physical losses resulting from enemy action or otherwise." B-75978, June 1, 1948. Thus, a loss in shipment was cognizable under section 3527(b). B-200437, Oct. 21, 1980. However, the making of a travel advance to an employee who terminated his employment without accounting for the advance was not a physical loss but rather "a payment voluntarily made by the disbursing officer in the course of his duties." B-75978, June 1, 1948.

Second—and here the two statutes differ—section 3527(b) applied only to disbursing officers and not to nondisbursing accountable officers. B-194782, Aug. 13, 1979; B-194780, Aug. 8, 1979; B-151156, Dec. 30, 1963; B-144467, Dec. 19, 1960 ("while all disbursing officers are accountable

[24] Pub. L. No. 8, ch. 9, 41 Stat. 131, 132 (July 11, 1919).

[25] Pub. L. No. 476, ch. 552, 58 Stat. 800 (Dec. 13, 1944).

[26] Pub. L. No. 365, ch. 803, 69 Stat. 687 (Aug. 11, 1955).

officers, all accountable officers are not disbursing officers"). As each of the cited cases points out, physical loss relief for nondisbursing accountable officers of the military departments had to be sought under 31 U.S.C. § 3527(a).

Section 3527(b) was also similar to section 3527(a) in that, once it had been determined that a loss is properly cognizable under the statute, the applicable agency head must determine that (1) the disbursing officer was carrying out official duties at the time of the loss or deficiency (prior versions of the statute, and hence many GAO decisions, use the military term "line of duty status"), and (2) the loss occurred without fault or negligence on the part of the disbursing officer. The first determination, 31 U.S.C. § 3527(b)(1)(A), did not expressly include the "loss attributable to subordinate" clause found in section 3527(a). However, it was applied in the same manner. *See* B-155149, Oct. 21, 1964; B-151156, Dec. 30, 1963.

The administrative determinations under section 3527(b)(2) were conclusive on GAO. 31 U.S.C. § 3527(b)(2). Thus, once the determinations were made, the granting of relief was mandatory, and GAO had no discretion in the matter. Under section 3527(a), agency determinations on the threshold issues—what is a physical loss and who is a disbursing officer—were not conclusive. B-151156, Dec. 30, 1963.

As noted above and in sections B.2 and C.2.b of this chapter, the statutory scheme for military accountable officers was changed by section 913 of Public Law No. 104-106, div. A, title IX, subtitle B, 110 Stat. 186, 410–12 (Feb. 10, 1996). Section 913 amended a number of provisions in titles 10, 31, and 37 of the United States Code to authorize the designation and appointment of certifying and disbursing officials within the Department of Defense (including military departments, defense agencies, and field activities) to clearly delineate a separation of duties and accountabilities between personnel who authorize payments (certifying officers) and personnel who make payments (disbursing officers). In doing so, section 913 also amended 31 U.S.C. § 3527(b) to apply to all accountable

officials of the armed forces, not just disbursing officers,[27] and included a new section 3527(b)(1)(B) to provide relief for erroneous payments.

## 2. Who Can Grant Relief?

### a. 31 U.S.C. § 3527(a)

The statute confers the authority to grant relief on the Comptroller General.[28] At one time, every case, no matter how small the amount, involved an exchange of correspondence—a letter from the agency to GAO requesting relief, and a letter from GAO back to the agency granting or denying it. By 1969, after 20 years of experience under the statute, a set of standards had developed, and it became apparent that there was no need for GAO to actually review every case. In that year, GAO inaugurated the practice of setting a dollar amount, initially $150, below which GAO delegated its authority to the agencies to apply the standards and to grant or deny relief accordingly without the need to obtain formal concurrence from GAO.

GAO has raised the amount several times over the years and has used various formats to announce the increase.[29] The current ceiling is $3,000. *See* B-243749, Oct. 22, 1991. The authorization applies to all physical losses or deficiencies; however, with a few exceptions to be noted later, it does

[27] As discussed earlier in section B.2 of this chapter, the Department of Defense has been given the authority to hold other "departmental accountable officers," besides certifying and disbursing officers, liable financially for illegal or erroneous payments resulting from their negligence. 10 U.S.C. § 2773a. This would include employees whose duty it was to provide information, data, or services that are directly relied upon by a certifying official in the certification of vouchers for payment.

[28] The Department of Justice has opined that the provisions of 31 U.S.C. §§ 3527 and 3528 are unconstitutional insofar as they authorize the Comptroller General, an officer of the legislative branch, to relieve executive branch officials from liability. *See, e.g.*, *Comptroller General's Authority to Relieve Disbursing and Certifying Officials from Liability*, 15 Op. Off. Legal Counsel 80 (1991). We are aware of no judicial opinion addressing the constitutionality of 31 U.S.C. §§ 3527 and 3528. Other than sections 3527 and 3528, there are no statutes granting federal administrative officers the authority to relieve accountable officers.

[29] The $150 authorization was established by B-161457, Aug. 1, 1969 (circular letter). It was raised to $500 in 1974. B-161457, Aug. 14, 1974 (circular letter); 54 Comp. Gen. 112 (1974). A 1983 revision to title 7 of GAO, *Policy and Procedures Manual for Guidance of Federal Agencies* (hereafter referred to as GAO-PPM), § 8.9.C (Washington, D.C.: July 14, 1983) raised it to $750, and another revision on February 12, 1990, raised it to $1,000. The *Manual* was last revised on May 18, 1993.

not extend to improper payments.[30] 61 Comp. Gen. 646 (1982); 59 Comp. Gen. 113 (1979). As stated in 61 Comp. Gen. at 647:

> "For the most part, the law governing the physical loss or deficiency of Government funds is clear, and most cases center around the determination of whether there was any contributing negligence on the part of the accountable officer. Our numerous decisions in this area should provide adequate guidance to agencies in resolving most smaller losses."

The $3,000 limitation applies to "single incidents or the total of similar incidents which occur about the same time and involve the same accountable officer." 7 GAO-PPM § 8.9.C. Thus, two losses arising from the same theft, one under the limit and one over, should be combined for purposes of relief. B-189795, Sept. 23, 1977. In B-193380, Sept. 25, 1979, an impress fund cashier discovered a $300 shortage while reconciling her cash and subvouchers. A few days later, her supervisor, upon returning from vacation, found an additional $500 missing. Since the losses occurred under very similar circumstances, GAO agreed with the agency that they should be treated together for purposes of seeking relief. Another case, B-187139, Oct. 25, 1978, involved losses of $1,500, $60, and $50. Since there was no indication that the losses were related, the agency was advised to separately resolve the $60 and $50 losses administratively. (The ceiling was $500 at the time of B-193380 and B-187139.) Likewise, in B-260862, June 6, 1995, GAO granted relief to an imprest fund cashier from liability for the loss of $3,939 missing from a safe, apparently due to theft, but did not grant relief for an $820 shortage allegedly due to a bookkeeping error discovered the day prior to the theft. The $820 shortage was referred back to the agency for resolution since it was under the $3,000 limit.

Thus, in cases of physical loss or deficiency, it is necessary to request relief from GAO only if the amount involved is $3,000 or more. For below-ceiling losses, GAO's concurrence is, in effect, granted categorically provided the matter is properly cognizable under the statute, the agency makes the required determinations, and the administrative resolution is accomplished in accordance with the standards set forth in the GAO decisions. *E.g.*, B-252809, Apr. 7, 1993; B-206817, Feb. 10, 1983; B-204740, Nov. 25, 1981.

[30] For example, losses resulting from mechanical or clerical errors during the check issuance process were included in the authorization. B-245586, Nov. 12, 1991.

Each agency should maintain a central control record of its below-ceiling resolutions, should document the basis for its decisions, and should retain that documentation for subsequent internal or external audit or review. 7 GAO-PPM § 8.9.C. Also, agencies should ensure the independence of the official or entity making the relief decisions. B-243749, Oct. 22, 1991.

If an agency inadvertently submits a relief request to GAO for a below-ceiling loss, GAO's policy is simply to return the case with a brief explanation. *E.g.*, B-214086, Feb. 2, 1984. GAO will also provide any further guidance that may appear helpful. *See*, *e.g.*, B-249796, Feb. 9, 1993.

As a practical matter, GAO's authorization for below-ceiling administrative resolution is relevant only where the agency believes relief should be granted. In these cases, the need for an exchange of correspondence is eliminated, and the relief process is quicker, more streamlined, and less costly. If the agency believes relief should not be granted, its refusal to support relief effectively ends the matter regardless of the amount. GAO will not review an agency's refusal to grant relief in a below-ceiling case. B-247581, June 4, 1992; 59 Comp. Gen. 113, 114 (1979).

### b. 31 U.S.C. § 3527(b)

Like 31 U.S.C. § 3527(a), section 3527(b) also specifies the Comptroller General as the relieving authority. However, by virtue of the mandatory nature of section 3527(b), the monetary ceiling concept used in civilian relief cases has much less relevance to military disbursing officer losses.

By circular letter B-198451, Feb. 5, 1981, GAO notified the military departments of a change in procedures under the pre-1996 version of 31 U.S.C. § 3527(b) pertaining to relief for physical loss or deficiency of funds. Since GAO has no discretion with respect to the agency determinations and relief is mandatory as long as the determinations are made, there is no need for GAO to review any of those determinations on a case-by-case basis. Thus, there is no need for the agency to submit a formal request for relief regardless of the amount involved. As long as the case is properly cognizable under 31 U.S.C. § 3527(b) (*i.e.*, it involves a disbursing officer and a physical loss or deficiency), it is sufficient for purposes of compliance with the statute for the agency to make the required determinations and to retain the documentation on file for audit purposes. *See* B-303671, Dec. 3, 2004. Of course, should there be a question as to whether a particular case is properly cognizable under the statute, GAO is available to provide guidance.

As noted above and in sections B.2 and C.1.b of this chapter, the statutory scheme for military accountable officers was changed by section 913 of Public Law No. 104-106, div. A, title IX, subtitle B, 110 Stat. 186, 410–12 (Feb. 10, 1996). Section 913 amended a number of provisions in titles 10, 31, and 37 of the United States Code to authorize the designation and appointment of certifying and disbursing officials within the Department of Defense (including military departments, defense agencies, and field activities) to clearly delineate a separation of duties and accountabilities between personnel who authorize payments (certifying officers) and personnel who make payments (disbursing officers). In doing so, section 913 also amended 31 U.S.C. § 3527(b) to apply to all accountable officials of the armed forces, not just disbursing officers,[31] and included a new section 3527(b)(1)(B) to provide relief for erroneous payments made by military accountable officials. As in the case of a physical loss or deficiency, the finding of the Secretary involved regarding whether the circumstances warrant relief is conclusive on the Comptroller General. GAO has not yet addressed relief of military accountable officials for erroneous payments under the revised section 3527(b).

### c. Role of Administrative Determinations

Both of the relief statutes described above require two essentially identical administrative determinations as prerequisites to granting relief. It is the making of those determinations that triggers the ability to grant relief. If the agency cannot in good faith make those determinations, the legal authority to grant administrative relief simply does not exist, regardless of the amount involved and regardless of who is actually granting relief in any given case. GAO will not review an agency's refusal to make the determinations under either statute, and has no authority to "direct" an agency to make them. In this sense, an agency's refusal to make the required determinations is final. The best discussion of this point is found in 59 Comp. Gen. 113 (1979) (case arose under section 3527(a) but point applies equally to both statutes).

While GAO's role under section 3527(a) is somewhat broader than under section 3527(b), that role is still limited to concurring with determinations made by the agency. GAO cannot make those determinations for the

[31] As discussed earlier in section B.2 of this chapter, the Department of Defense has been given the authority to hold other "departmental accountable officers," besides certifying and disbursing officers, liable financially for illegal or erroneous payments resulting from their negligence. 10 U.S.C. § 2773a. This would include employees whose duty it was to provide information, data, or services that are directly relied upon by a certifying official in the certification of vouchers for payment.

agency. If they are absent, whatever the reason, relief cannot be granted regardless of the apparent merits of the case. There are numerous decisions to this effect. A few of them are B-248804.2, July 5, 1994; B-217209, Dec. 11, 1984; B-204464, Jan. 19, 1982;[32] and B-197616, Mar. 24, 1980. The determinations are as much required in below-ceiling cases as they are in cases submitted to GAO. 72 Comp. Gen. 49 (1992); 59 Comp. Gen. 113 (1979); B-247581, June 4, 1992.

On occasion GAO has been willing to infer a determination that the loss occurred while the accountable officer was carrying out official duties where that determination was not expressly stated but the facts make it clear and there is no question that relief would be granted. *E.g.*, B-244723, Oct. 29, 1991; B-235180, May 11, 1989; B-199020, Aug. 18, 1980; B-195435, Sept. 12, 1979. However, the determination of no contributing fault or negligence will not be inferred but must be expressly stated. B-241478, Apr. 5, 1991. It is not sufficient to state that the investigative report did not produce affirmative evidence of fault or negligence. B-167126, Aug. 9, 1976. Nor is it sufficient to state that there is "no evidence of willful misconduct." B-217724, Mar. 25, 1985. *See also* 70 Comp. Gen. 389, 390 (1991) ("The mere administrative determination that there is no evidence of fault or negligence will not adequately rebut the presumption of negligence.").

As a practical matter, it will simplify the relief process if the agency's request explicitly states all required determinations. It is best simply to follow the wording of the statute.

Agency determinations required by a relief statute must be made by an agency official authorized to do so. *E.g.*, B-184028, Oct. 24, 1975. Section 3527(a) requires determinations by the "head of the agency." Section 3527(b) specifies the "appropriate Secretary." Of course in most cases the authority under either statute will be delegated. It has been held that, absent a clear expression of legislative intent to the contrary, the authority to make determinations under these statutes may be delegated only to officials authorized by law to act in place of the agency head, or to an Assistant Secretary. 29 Comp. Gen. 151 (1949). Many agency heads have separate statutory authority to delegate and redelegate, and this of course will be sufficient. *See*, *e.g.*, 22 U.S.C. § 2651a(a)(4) (Secretary of State). As far as GAO is concerned, the form of the delegation is immaterial

[32] In this case relief was later granted when the agency provided GAO with the requisite determinations. B-204464, May 12, 1983.

although it should, of course, be in writing. Documentation of delegations need not be furnished to GAO, nor need it be specified in relief requests, but should be available if requested. *See* GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.9.B (Washington, D.C.: May 18, 1993).

If, under agency procedures, the determinations are made in the first instance by someone other than the designated official (*e.g.*, a board of inquiry), the relief request must explicitly state the designated official's concurrence. B-207062, July 20, 1982.

## 3. Standards for Granting Relief

### a. Standard of Negligence

Again, it is important to distinguish between liability and relief. The presence or absence of negligence has nothing to do with an accountable officer's basic liability. The law is not that an accountable officer is liable for negligent losses. The officer is strictly liable for all losses, but may be relieved if found to be free from fault or negligence. It has frequently been stated that an accountable officer must exercise "the highest degree of care in the performance of his duty." *E.g.*, 48 Comp. Gen. 566, 567–68 (1969); B-186922, Aug. 26, 1976. *See also* 72 Comp. Gen. 49, 53 (1992) ("high standard of care"). Statements of this type, however, have little practical use in applying the relief statutes.

In evaluating the facts to determine whether or not an accountable officer was negligent, GAO applies the standard of "reasonable care." 54 Comp. Gen. 112 (1974); B-196790, Feb. 7, 1980. This is the standard of simple or ordinary negligence, not gross negligence. 54 Comp. Gen. at 115; B-158699, Sept. 6, 1968. The standard has been stated as what the reasonably prudent and careful person would have done to take care of his or her own property of like description under like circumstances. B-288166, Mar. 11, 2003 (failure to record checks mailed for deposit "not a common practice for many reasonably prudent and careful people handling their own collections"); B-257120, Dec. 13, 1994 (leaving cash under truck seat not "an action that a reasonably prudent and careful person would have taken"). This is an objective standard, that is, it does not vary with such factors as the age and experience of the particular accountable officer. *See*, *e.g.*, 70 Comp. Gen. 389, 390 (1991). Likewise, inadequate training or supervision does not affect the standard. B-257120, Dec. 13, 1994.

The doctrine of comparative negligence (allocating the loss based on the degree of fault) does not apply under the relief statutes. B-211962, July 20, 1983; B-190506, Nov. 28, 1977.

### b. Presumption of Negligence/Burden of Proof

The mere fact that a loss or deficiency has occurred gives rise to a presumption of negligence on the part of the accountable officer. The presumption may be rebutted by evidence to the contrary, but it is the accountable officer's burden to produce the evidence. The government does not have to produce evidence to establish that the accountable officer was at fault in order to hold the officer liable. Rather, to be entitled to relief, the accountable officer must produce evidence to show that there was no contributing fault or negligence on his or her part, that is, that he or she exercised the requisite degree of care.

This rule originated in decisions of the Court of Claims under 28 U.S.C. § 2512, before any of the administrative relief statutes existed, and has been consistently followed. An early statement is the following from *Boggs v. United States*, 44 Ct. Cl. 367, 384 (1909):

> "[T]here is at the outset a presumption of liability, and the burden of proof must rest upon the officer who has sustained the loss."

A later case quoting and applying *Boggs* is *O'Neal v. United States*, 60 Ct. Cl. 413 (1925). More recently, the court said:

> "[T]he Government does not have the burden of proving fault or negligence on the part of plaintiff; plaintiff has the sole burden of proving that he was without fault or negligence in order to qualify for [relief]."

*Serrano v. United States*, 612 F.2d 525, 532–33 (Ct. Cl. 1979).

GAO follows the same rule, stating it in literally dozens of relief cases. *E.g.*, B-288014, May 17, 2002; B-271896, Mar. 4, 1997; 72 Comp. Gen. 49, 53 (1992);

67 Comp. Gen. 6 (1987); 65 Comp. Gen. 876 (1986); 54 Comp. Gen. 112 (1974); 48 Comp. Gen. 566 (1969).[33]

The amount and types of evidence that will suffice to rebut the presumption vary with the facts and circumstances of the particular case. However, there must be affirmative evidence. It is not enough to rely on the absence of implicating evidence, nor is the mere administrative determination that there was no fault or negligence, unsupported by evidence, sufficient to rebut the presumption. *E.g.*, B-272613, Oct. 16, 1996 (assertions of "the absence of negligence, or mere administrative determinations that there was no fault or negligence on the part of the accountable officer are not sufficient to rebut the presumption of negligence when unsupported by the evidence."); B-257120, Dec. 13, 1994 (accountable officer "must rebut presumption with convincing evidence that the loss was not caused by the accountable officer's negligence or lack of reasonable care."); B-242830, Sept. 24, 1991 (mere absence of evidence implicating the accountable officer in the loss is not sufficient to rebut the presumption of negligence.). *See also* 70 Comp. Gen. 12, 14 (1990); B-204647, Feb. 8, 1982; B-167126, Aug. 9, 1976.

If the record clearly establishes that the loss resulted from burglary or robbery, the presumption is easily rebutted. *See*, *e.g.*, B-288014, May 17, 2002; B-265856, Nov. 9, 1995, and cases cited therein. But the evidence does not have to explain the loss with absolute certainty. If the evidence is not all that clear, the accountable officer may still be able to rebut the presumption by presenting evidence tending to corroborate the likelihood of theft or showing that some factor beyond his or her control was the proximate cause of the loss. If such evidence exists, and if the record shows that the accountable officer complied fully with all applicable regulations and procedures, the agency's determination of no fault or negligence will usually be accepted and relief granted. *See*, *e.g.*, B-260862, June 6, 1995; B-242830, Sept. 24, 1991.

GAO will consider the results of a polygraph (lie detector) test as an additional factor in the equation, but does not regard those results,

[33] Many decisions prior to 1970, such as 48 Comp. Gen. 566, dealt with postal employees. Since enactment of the Postal Reorganization Act of 1970, responsibility for the relief of postal employees is with the United States Postal Service. 39 U.S.C. § 2601; 50 Comp. Gen. 731 (1971); B-164786, Oct. 8, 1970. While the Comptroller General no longer relieves postal employees, the principles enunciated in the earlier decisions are nonetheless applicable to other accountable officers.

standing alone, as dispositive. This applies whether the results are favorable (B-260862, June 6, 1995; B-206745, Aug. 9, 1982, *rev'd on submission of additional evidence*, B-206745, May 11, 1983; B-204647, Feb. 8, 1982; B-142326, Mar. 31, 1960; B-182829-O.M., Feb. 3, 1975) or unfavorable (B-209569, Apr. 13, 1983. *See also* B-192567, Aug. 4, 1983, *aff'd upon reconsideration*, B-192567, June 21, 1988).

Another situation in which the presumption is easily rebutted is where the accountable officer does not have control of the funds at the time of the loss. An example is losses occurring while the accountable officer is on leave or duty absence. As a practical matter, relief will be granted unless there is evidence of actual contributing negligence on the part of the accountable officer. B-196960, Nov. 18, 1980; B-184028, Mar. 2, 1976; B-175756-O.M., June 14, 1972. Of course, where contributing negligence exists, relief will be denied and the role of the presumption never comes into play. B-182480, Feb. 3, 1975.

The presumption of negligence may be criticized as unduly harsh. It is, however, necessary both in order to preserve the concept of accountability and to protect the government against dishonesty as well as negligence. *See* B-191440, May 25, 1979; B-167126, Aug. 28, 1978. As stated in one decision, the presumption of negligence—

> "is a reasonable and legal basis for the denial of relief where the accountable officers have control of the funds and the means available for their safekeeping but the shortage nevertheless occurs without evidence of forcible entry or other conclusive explanation which would exclude negligence as the proximate cause of the loss."

B-166519, Oct. 6, 1969. Indeed, if liability is strict and automatic, a legal presumption against the accountable officer is virtually necessary as a starting point.

### c. Actual Negligence

If the facts indicate negligence on the part of the accountable officer, and if it appears that the negligence was the proximate cause of the loss, then relief must be denied.

One group of cases involves failure to lock a safe. It is negligence for an accountable officer to place money in a safe in an area which is accessible to others, and then leave the safe unlocked for a period of time when he or she is not physically present. *E.g.*, B-190506, Nov. 28, 1977; B-139886,

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 404 of 728



July 2, 1959. It is also negligence to leave a safe unattended in a "day lock" position. B-199790, Aug. 26, 1980; B-188733, Mar. 29, 1979, *aff'd*, B-188733, Jan. 17, 1980; B-187708, Apr. 6, 1977. Compare these cases with B-180863, Apr. 24, 1975, in which an accountable officer who had left a safe on "day lock" was relieved in view of her lack of knowledge or instruction regarding the day lock mechanism. Thus, an accountable officer who leaves a safe unlocked (either by leaving the door open or closing the door but not rotating the combination dial), and then leaves the office for lunch or for the night will be denied relief. B-204173, Jan. 11, 1982, *aff'd*, B-204173, Nov. 9, 1982; B-183559, Aug. 28, 1975; B-180957, Apr. 24, 1975; B-142597, Apr. 9, 1960; B-181648-O.M., Aug. 21, 1974.

Merely being physically present may not be enough. A degree of attentiveness, dictated by the circumstances and common sense, is also required. In B-173710-O.M., Dec. 7, 1971, relief was denied where the cashier did not lock the safe while a stranger, posing as a building maintenance man, entered the cashier's cage ostensibly to repair the air conditioning system and erected a temporary barrier between the cashier and the safe.

Another group involves the failure to use available security facilities. As we will see in our discussion of agency security, a good rule of thumb for the accountable officer is: You do the best you can with what is available to you. Failure to do so, without compelling justification, does not meet the standard of reasonable care. Some examples in which relief was denied are:

- Accountable officer left unlocked cash box in safe to which several other persons had access. B-172614-O.M., May 4, 1971; B-167596-O.M., Aug. 21, 1969.

- Cashier left funds overnight in locked desk drawer instead of safe provided for that purpose. B-177730-O.M., Feb. 9, 1973.

- Cashier left funds in unlocked drawer while at lunch instead of locked drawer provided for that purpose. B-161229-O.M., Apr. 20, 1967.

- Funds disappeared from bar-locking file cabinet. Combination safe was available but not used. B-192567, June 21, 1988.

Inattentiveness or simple carelessness which facilitates a loss may constitute negligence and thus preclude relief. 64 Comp. Gen. 140 (1984)

(shoulder bag with money left unattended on airport counter for several minutes); B-257120, Dec. 13, 1994 (cash left under a truck seat); B-233937, May 8, 1989 (bag with money set on ledge in crowded restaurant); B-208888, Sept. 28 1984 (evidence suggested that funds were placed on desk and inadvertently knocked into trash can); B-127204, Apr. 13, 1956 (pay envelopes left on top of desk in cashier's cage 19 inches from window opening on hallway to which many persons had access).

The best way to know how much cash you have is to count it. Failure to do so where reasonable prudence would dictate otherwise is negligence. B-247581, June 4, 1992 (alternate cashier failed to count cash upon receipt from principal or upon return to principal); B-206820, Sept. 9, 1982 (accountable officer handed money over to another employee without counting it or obtaining receipt); B-193380, Sept. 25, 1979 (cashier cashed checks at bank and failed to count the cash received).

A deficiency in an accountable officer's account caused by the acceptance of a counterfeit note constitutes a physical loss for purposes of 31 U.S.C. § 3527(a). B-140836, Oct. 3, 1960; B-108452, May 15, 1952; B-101301, July 19, 1951. Whether accepting counterfeit money is negligence depends on the facts of the particular case, primarily whether the counterfeit was readily detectable. B-271895, Sept. 3, 1996 ("super-dollars"). *See also* B-239724, Oct. 11, 1990; B-191891, June 16, 1980; B-163627-O.M., Mar. 11, 1968. (Relief was granted in these four cases.) If the quality of the counterfeit is such that a prudent person in the same situation would question the authenticity of the bill, relief should not be granted. B-155287, Sept. 5, 1967. Also, failure to check a bill against a posted list of serial numbers will generally be viewed as negligence. B-155287, Sept. 5, 1967; B-166514-O.M., July 23, 1969. Finally, failure without compelling justification to use an available counterfeit detection machine is negligence. B-243685, July 1, 1991.

Other examples of conduct which does or does not constitute negligence are scattered throughout this chapter, for example, in the sections on compliance with regulations and agency security. In all cases, including those which cannot be neatly categorized, the approach is to apply the standard of reasonable care to the conduct of the accountable officer in light of all surrounding facts and circumstances. For example, in B-196790, Feb. 7, 1980, a patient at a then Veterans Administration hospital, patient "X," had obtained a cashier's check from a bank on May 9, 1978. On September 12, 1978, another patient, patient "Y," presented the check at the hospital for deposit to patient X's personal funds account. On the following day, patient X withdrew the money and left. The bank refused to honor the

check because, unknown to hospital personnel, patient X had gone to the bank on May 17, stated that he had never received the check, and the bank had refunded its face value. As noted in the decision, patient X had "cleverly managed to double his bank account by collecting the same funds twice." The issue was whether it was negligence for the hospital cashier to accept the check dated four months earlier or to permit patient X to withdraw the funds the day after the check was deposited. GAO considered the nature of a cashier's check, noted the absence of applicable regulations, applied the reasonable care standard, and granted relief, but recommended that the agency pursue further collection efforts against the bank.

### d. Proximate Cause

An accountable officer may be found negligent and nevertheless relieved from liability if it can be shown that the negligence was not the "proximate cause" of the loss or shortage. *E.g.*, B-272613, Oct. 16, 1996, fn. 2; B-235147, Aug. 14, 1991. A precise definition of the term "proximate cause" does not exist.[34] The concept means that, first, there must be a cause-and-effect relationship between the negligence and the loss. In other words, the negligence must have contributed to the loss. However, as one authority notes, the cause of an event can be argued in a philosophical sense to "go back to the dawn of human events" and its consequences can "go forward to eternity." Prosser and Keeton, § 41. Obviously a line must be drawn someplace. Thus, the concept also means that the cause-and-effect relationship must be reasonably foreseeable; that is, a reasonably prudent person should have anticipated that a given consequence could reasonably follow from a given act.

Before proceeding, we must refer again to the accountable officer's burden of proof. The Court of Claims said, in *Serrano v. United States*, 612 F.2d 525, 531–32 (Ct. Cl. 1979):

> "It is argued that the . . . fault or negligence involved must be the *proximate cause* of the loss. Thus the Secretary . . . could not deny relief unless the loss was proximately attributable to plaintiff. This argument has no merit. If such

[34] "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser and Keeton, *The Law of Torts*, § 41 (5th ed. 1984). *See Fedorczyk v. Caribbean Cruise Lines*, 82 F.3d 69, 73 (3rd Cir. 1996).

> an argument were to be accepted by this court, it would shift the burden of proof . . . to the Government. . . .
>
> "Shifting of the burden of proof, and forcing the Government to prove that plaintiff's conduct was a proximate cause of the loss, would be intolerable. This shift would negate the special responsibility that disbursing officers have in handling public funds." (Emphasis in original.)

Thus, the government does not have to prove causation any more than it has to prove negligence. Rather, the accountable officer who has been negligent must, in order to be eligible for relief, show that some other factor or combination of factors was the proximate cause of the loss, or at least that the totality of evidence makes it impossible to fix responsibility. B-272613, Oct. 16, 1996 (relief denied when accountable officer failed to provide plausible evidence that some factor other than his negligence was the proximate cause of the loss).

In analyzing proximate cause, it may be helpful to ask certain questions. First, if the accountable officer had not been negligent, would the loss have occurred anyway? If the answer to this question is yes, the negligence is not the proximate cause of the loss and relief will probably be granted. However, it may not be possible to answer this question with any degree of certainty. If not, the next question to ask is whether the negligence was a "substantial factor" in bringing about the loss. If this question is answered yes, relief will probably be denied. A couple of simple examples will illustrate:

- An accountable officer leaves cash visible and unguarded on a desk top while at lunch, during which time the money disappears. There can be no question that the negligence was the proximate cause of the loss.

- As noted previously, failure to count cash received at a bank window is negligence. Suppose, however, that the accountable officer is attacked and robbed by armed marauders while returning to the office. The failure to count the cash, even though negligent, would not be the proximate cause of the loss since presumably the robbers would have taken the entire amount anyway.

Another good illustration is B-201173, Aug. 18, 1981. Twelve armed men in two Volkswagen minibuses broke into the West African Consolidated

Services Center at the American Embassy in Lagos, Nigeria. They forcibly entered the cashier's office and proceeded to carry the safe down the stairs. The burglars dropped the safe while carrying it, the safe opened upon being dropped, and the burglars took the money and fled. The reason the safe opened when dropped was that the cashier had not locked it, clearly an act of negligence. However, even if the safe had been locked, the burglars would presumably have continued to carry it away, loaded it onto their minibus, and forcibly opened it somewhere else. Thus, the cashier's failure to lock the safe, while negligent, was not the proximate cause of the loss.

Proximate cause considerations are often relevant in cases involving weaknesses in agency security, and the topic is explored further under the Agency Security heading in section C.3.j of this chapter.

The following are a few additional examples of cases in which relief was granted even though the accountable officer was or may have been negligent, because the negligence was found not to be the proximate cause of the loss or deficiency.

- Accountable officer left safe combination in unlocked desk drawer. Burglars found combination and looted safe. Had this been the entire story, relief could not be granted. However, burglars also pried open locked desk drawers throughout the office. Thus, locking the desk drawer would most likely not have prevented the theft. B-229587, Jan. 6, 1988.

- Accountable officer in Afghanistan negligently turned over custody of funds to unauthorized person. Money was taken by rioters in severe civil disturbance. Relief was granted because negligence was not the proximate cause of the loss. (Whether the person holding the funds was or was not an authorized custodian was not a matter of particular concern to the rioters.) B-144148-O.M., Nov. 1, 1960.

- Cashier discovered loss upon return from 2-week absence. It could not be verified whether she had locked the safe when she left. However, time of loss could not be pinpointed, other persons worked out of the same safe, and it would have been opened daily for normal business during her absence. Thus, even if she had failed to lock the safe (negligence), proximate cause chain was much too conjectural. B-191942, Sept. 12, 1979.

Even if there is a clearly identified intervening cause, relief may still be denied depending on the extent to which the accountable officer's negligence facilitated the intervening cause or contributed to the loss. In such a case, the negligence will be viewed as the proximate cause notwithstanding the intervening cause. The following cases will illustrate.

- Accountable officer failed to make daily deposits of collections as required by regulations. Funds were stolen from locked safe in burglary. Relief was denied because officer's negligence was proximate cause of loss in that funds would not have been in the safe to be stolen if they had been properly deposited. B-71445, June 20, 1949. *See also* B-203726, July 10, 1981; B-164449, Dec. 8, 1969; B-168672-O.M., June 22, 1970.

- Accountable officer negligently left safe on "day lock" position (door closed, dial or handle partially turned but not rotated, so that partial turning in one direction, without knowledge of combination, will permit door to open). Thief broke into premises, opened safe without using force, and stole funds. Relief was denied because negligence facilitated theft by making it possible for thief to open safe without force or knowledge of combination. B-188733, Mar. 29, 1979, *aff'd*, B-188733, Jan. 17, 1980.

- Although cash was stolen, negligence by the accountable officer in placing the cash under the seat of a truck while she went shopping enabled the theft to occur and was thus the proximate cause of the loss. Accordingly, relief was denied. B-257120, Dec. 13, 1994.

### e. Unexplained Loss or Shortage

The cases cited under the Actual Negligence heading all contained clear evidence of negligence on the part of the accountable officer. Absent a proximate cause issue, these cases are relatively easy to resolve. Such evidence, however, is not necessary in order to deny relief in the situation we refer to as the "unexplained loss or shortage." In the typical case, a safe is opened at the beginning of a business day and money is found missing, or an internal audit reveals a shortage in an account. There is no evidence of negligence or misconduct on the part of the accountable officer; there is no evidence of burglary or any other reason for the disappearance. All that is known with any certainty is that the money is gone. In other words, the loss or shortage is totally unexplained. In many cases, a formal investigation confirms this conclusion.

The presumption of negligence has perhaps its clearest impact in the unexplained loss situation. If the burden of proof is on the accountable officer to establish eligibility for relief, the denial of relief follows necessarily. Since there is no evidence to rebut the presumption, there is no basis on which to grant relief. *See*, *e.g.*, B-272613, Oct. 16, 1996; 70 Comp. Gen. 389 (1991); B-238955, Apr. 3, 1991. The presumption and its application to unexplained losses were discussed in 48 Comp. Gen. 566, 567–68 (1969) as follows:

> "While there is no positive or affirmative evidence of negligence on the part of [the accountable officer] in connection with this loss, we have repeatedly held that positive or affirmative evidence of negligence is not necessary, and that the mere fact that an unexplained shortage occurred is, in and of itself, sufficient to raise an inference or presumption of negligence. A Government official charged with the custody and handling of public moneys . . . is expected to exercise the highest degree of care in the performance of his duty and, when funds . . . disappear without explanation or evident reason, the presumption naturally arises that the responsible official was derelict in some way. Moreover, granting relief to Government officials for unexplained losses or shortages of this nature might tend to make such officials lax in the performance of their duties."[35]

The rationale is fairly simple. Money does not just get up and walk away. If it is missing, there is an excellent chance that someone took it. If the accountable officer exercised the requisite degree of care and properly safeguarded the funds, it is unlikely that anyone else could have taken the money without leaving some evidence of forced entry. Therefore, where there is no evidence to explain a loss, the leading probabilities are that the accountable officer either took the money or was negligent in some way that facilitated theft by someone else. Be that as it may, denial of relief in an unexplained loss case is not intended to imply dishonesty by the particular accountable officer; it means merely that there was insufficient evidence to rebut the applicable legal presumption. *See* B-122688, Sept. 25,

[35] A few additional examples are 70 Comp. Gen. 389 (1991); B-213427, Dec. 13, 1983, *aff'd upon reconsideration*, B-213427, Mar. 14, 1984; B-159987, Sept. 21, 1966.

1956. *See also* B-258357, Jan. 3, 1996 (loss of receipts creates "unexplained loss" from imprest fund for which cashier is liable).

Despite the strictness of the rule, there are many unexplained loss cases in which the presumption can be rebutted and relief granted. *See*, *e.g.*, B-242830, Sept. 24, 1991. By definition, the evidence will not be sufficient to "explain" the loss; otherwise there would not be an unexplained loss to begin with. There is no simple formula to apply in determining the kinds or amount of evidence that will rebut the presumption. It is necessary to evaluate the totality of available evidence, including statements by the accountable officer and other agency personnel, investigation reports, and any relevant circumstantial evidence. *Compare* B-206745, Aug. 9, 1982 (denial of relief in "unexplained loss" case), *with* B-206745, May 11, 1983 (*reversing on submission of additional evidence* B-206745, Aug. 9, 1982).

In some cases, for example, it may be possible to reasonably conclude that any negligence that may have occurred was not the proximate cause of the loss. These cases tend to involve security weaknesses and are discussed under the Agency Security heading, section C.3.j of this chapter. The evidence, in conjunction with the lack of any evidence to the contrary and the agency's "no fault or negligence" determination, supports the granting of relief. For example, relief from an unexplained loss was granted in B-271896, Mar. 4, 1997, when a cashier was forced to operate in a lax security environment. In this case, agency management allowed other employees access to the cash area of the cashier's office, failed to fix a safe combination lock that had been broken for over a week, and failed to heed repeated warnings to correct the security deficiencies. *See also* B-235147.2, Aug. 14, 1991 (proximate cause of loss was "general lack of concern and sense of laxity" that pervaded agency).

Since the burden of proof rests with the accountable officer, the accountable officer's own statements take on a particular relevance in establishing due care, and relief should never be denied without obtaining and carefully analyzing them. Naturally, the more specific and detailed the statement is, and the more closely tied to the time of the loss, the more helpful it will be. While the accountable officer's statement is obviously self-serving and may not be enough if there are no other supporting factors, it has been enough to tip the balance in favor of granting relief when

combined with other evidence, however slight or circumstantial, which by itself would not have been sufficient.[36]

### f. Compliance with Regulations

If a particular activity of an accountable officer is governed by a regulation, failure to follow that regulation will be considered negligence. If that failure is the proximate cause of a loss or deficiency, relief must be denied. 70 Comp. Gen. 12 (1990); 54 Comp. Gen. 112, 116 (1974). The relationship of this rule to the standard of reasonable care discussed earlier is the premise that the prudent person exercising the requisite degree of care will become familiar with, and will follow, applicable regulations. Indeed, it has been stated that accountable officers have a duty to familiarize themselves with pertinent Treasury Department and agency rules and regulations. B-229207, July 11, 1988; B-193380, Sept. 25, 1979.

Treasury Department regulations on disbursing, applicable to all agencies for which Treasury disburses under 31 U.S.C. § 3321, are found in volume I of the *Treasury Financial Manual*, especially part 4, "Disbursing," and part 5, "Deposit Regulations." The Treasury regulations establish general requirements for sound cash control, and failure to comply may result in the denial of relief. *E.g.*, 70 Comp. Gen. 12 (1990) (cashier kept copy of safe combination taped to underside of desk pull-out panel).[37]

The same principle applies with respect to violations of individual agency regulations and written instructions. *E.g.*, B-193380, Sept. 25, 1979 (cashier violated agency regulations by placing the key to a locked cash box in an unlocked cash box and then leaving both in a locked safe to which more than one person had the combination). The decision further pointed out

---

[36] *E.g.*, B-242830, Sept. 24, 1991 (cashier's statement supported by another employee; safe had been opened for only one transaction in early afternoon); B-214080, Mar. 25, 1986 (cashier made sworn and unrefuted statement to local police and Secret Service); B-210017, June 8, 1983 (cashier's statement corroborated by witness); B-188733, Mar. 29, 1979, *aff'd* Jan 17, 1980 (forcible entry to office but not to safe itself; cashier's statement that he locked safe on day of robbery accepted).

[37] Losses by agency cashiers typically involve "imprest funds." As discussed above, in 1999, Treasury required that federal agencies eliminate agency imprest funds by Oct. 1, 2001. Department of the Treasury, "Imprest Fund Policy Directive," Nov. 9, 1999. (Exceptions may be made only for certain payments typically involving national security, law enforcement, small payments, overseas payments, or emergencies. *See* 31 C.F.R. § 208.) Guidance regarding those imprest funds for which a waiver has been granted is contained in Department of the Treasury, Financial Management Service, *Manual of Procedures and Instructions for Cashiers (Cashier's Manual)* (April 2001). See the further discussion of imprest funds and the *Cashier's Manual* in section B.3.a of this chapter.

that oral instructions to the cashier to leave the cash box unlocked could not be considered to supersede published agency regulations. However, if agency regulations are demonstrably ambiguous, relief may be granted. B-169848-O.M., Dec. 8, 1971. *See also* B-288166, Mar. 11, 2003 (accountable officer granted relief when he complied with agency regulations).

Negligence will not be imputed to an accountable officer who fails to comply with regulations where full compliance is prevented by circumstances beyond his or her control. This recognizes the fact that compliance is sometimes up to the agency and beyond the control of the individual. For example, violating a regulation which requires that funds be kept in a safe is not negligence where the agency has failed to provide the safe. B-78617, June 24, 1949. Note, however, that instructions from superiors to disregard regulations do not, in themselves, relieve an accountable officer of responsibility to follow those regulations. *See*, *e.g.*, B-271021, Sept. 18, 1986 (improper payment case).

Also, as with other types of negligence, failure to follow regulations will not prevent the granting of relief if the failure was not the proximate cause of the loss or deficiency. B-229207, July 11, 1988; B-229587, Jan. 6, 1988; B-185666, July 27, 1976. *See also Libby v. United States*, 81 F. Supp. 722, 727 (Ct. Cl. 1948). In B-185666, for example, a cashier kept her cash box key and safe combination in a sealed envelope in an unlocked desk drawer, in violation of the *Cashier's Manual*. Relief was nevertheless granted because the seal on the envelope had not been broken and the negligence could therefore not have contributed to the loss.

While failure to comply with regulations is generally considered negligence, the converse is not always true. To be sure, the fact that an accountable officer has complied with all applicable regulations and instructions is highly significant in evaluating eligibility for relief. It is not conclusive, however, because the accountable officer might have been negligent in a matter not covered by the regulations. In a 1979 case, an accountable officer accepted a $10,000 personal check at a Customs auction sale and turned over the property without attempting to verify the existence or adequacy of the purchaser's account. The check bounced. It was not clear whether existing regulations applied to that situation. Even without regulations, however, accepting a personal check for a large amount without attempting verification was viewed as not meeting the standard of reasonable care, and relief was denied. B-193673, May 25, 1979, *modified on other grounds*, B-201673 *et al.*, Sept. 23, 1982.

### g. Losses in Shipment

Government funds are occasionally lost or stolen in shipment. The Postal Service or other carrier is the agent of the sender, and funds in shipment remain in the "custody" of the accountable officer who shipped them until delivered, notwithstanding the fact that they are in the physical possession of the carrier. B-185905-O.M., Apr. 23, 1976. Thus, a loss in shipment is a physical loss for which an accountable officer is liable.

For the most part, relief for losses in shipment is the same as relief for other losses, and the rules discussed in this chapter with respect to negligence and proximate cause apply. For example, relief was denied in one case because transmitting cash by ordinary first-class mail rather than registered or certified mail was held not to meet the reasonable care standard. B-164450-O.M., Sept. 5, 1968.

However, relief for losses in shipment differs from relief for other losses in one important respect. A loss in shipment is not viewed as an "unexplained loss" and there is no presumption of negligence. B-164450-O.M., Sept. 5, 1968. The reason for this distinction is that there is no basis to infer negligence when a loss occurs while funds are totally beyond the control of the accountable officer. Thus, where funds are lost in shipment, in the absence of positive evidence of fault or negligence, an accountable officer will be relieved if he or she conformed fully with applicable regulations and procedures for the handling and safeguarding of the funds and they were nevertheless lost or stolen. B-142058, Mar. 18, 1960; B-126362, Feb. 21, 1956; B-119567, Jan. 10, 1955; B-95504, June 16, 1950.

The Government Losses in Shipment Act (GLISA), 40 U.S.C. §§ 17301–17309, authorizes agencies to file claims with the Treasury Department for funds or other valuables lost or destroyed in shipment. *See generally* B-244473.2, May 13, 1993. The Treasury Department has a revolving fund for the payment of these claims and has issued regulations, found at 31 C.F.R. parts 361 and 362, to implement the statute. The Treasury Department will generally disallow a claim unless there has been strict compliance with the statute and regulations. *See*, *e.g.*, B-200437, Oct. 21, 1980.

If a loss in shipment occurs, the agency should first consider filing a claim under GLISA, and should seek relief only if this fails. 70 Comp. Gen. 9 (1990). Denial of a GLISA claim should prompt further inquiry since it suggests the possibility that someone at the point of shipment may have been negligent, but it will not automatically preclude the granting of relief. For example, it is possible for a claim to be denied for reasons that do not

suggest negligence. In B-126362, Feb. 21, 1956, the accountable officer had reimbursed the government from personal funds, and a claim under GLISA was denied because there was no longer any loss. GAO nevertheless granted relief and the accountable officer was reimbursed.

Disallowance of a GLISA claim for failure to strictly comply with the regulations carries with it an even stronger suggestion of negligence, but it is still appropriate to examine the facts and circumstances of the particular case to evaluate the relationship of the noncompliance to the loss. For example, GAO granted relief in B-191645, Oct. 5, 1979, despite the denial of a GLISA claim, because there was no question that the funds had arrived at their initial destination although they never reached the intended recipient. Even if there had been negligence at the point of shipment, it could not have been the proximate cause of the loss. *See also* B-193830, Oct. 1, 1979, and B-193830, Mar. 30, 1979 (both cases arising from the same loss).

### h. Fire, Natural Disaster

Earlier in this chapter, we noted the Supreme Court's conclusion in *United States v. Thomas*, 82 U.S. (15 Wall.) 337, 352 (1872), that strict liability (and hence the need for relief) would not attach in two situations: funds destroyed by an "overruling necessity" and funds taken by a "public enemy," provided there is no contributing fault or negligence by the accountable officer. The Court gave only one example of an "overruling necessity":

> "Suppose an earthquake should swallow up the building and safe containing the money, is there no condition implied in the law by which to exonerate the receiver from responsibility?"

*Id.* at 348. We are aware of no subsequent judicial attempts to further define "overruling necessity," although some administrative formulations have used the term "acts of God." *E.g.*, 48 Comp. Gen. 566, 567 (1969). Thus, at the very least, assuming no contributing fault or negligence, an accountable officer is not liable for funds lost or destroyed in an earthquake, and hence there is no need to seek relief. Contributing negligence might occur, for example, if an accountable officer failed to periodically deposit collections and funds were therefore on hand which should not have been. *See* B-71445, June 20, 1949.

GAO granted relief in one case involving an earthquake, B-229153, Oct. 29, 1987, in which most of the funds were recovered. While arguably there was no need to seek relief in that case, it makes no difference as a practical

matter since relief would be granted as a matter of routine unless there is contributing negligence, in which event the accountable officer would be liable even under *Thomas*.

More recently, GAO relieved an accountable officer from liability for the loss of the "confidential fund" of the Secret Service field office resulting from the destruction of the World Trade Center on Sept. 11, 2001. B-300677, June 19, 2003. *See also* B-249372, Aug. 13, 1992 (rioting forced evacuation of the American embassy in Somalia, resulting in loss of funds in safe).

Whatever the scope of the "overruling necessity" exception, it is clear that it does not extend to destruction by fire, even though money destroyed by fire is no longer available to be used by anyone else and can be replaced simply by printing new money. In *Smythe v. United States*, 188 U.S. 156, 173–74 (1903), the Supreme Court declined to apply *Thomas* and expressly rejected the argument that an accountable officer's liability for notes destroyed by fire should be limited to the cost of printing new notes. *See also* 1 Comp. Dec. 191 (1895), in which the Comptroller of the Treasury similarly declined to apply the *Thomas* exception to a loss by fire. Thus, a loss by fire is a physical loss for which the accountable officer is liable, but for which relief will be granted under 31 U.S.C. § 3527 if the statutory conditions are met. Examples are B-212515, Dec. 21, 1983, and B-203726, July 10, 1981.

### i. Loss by Theft

If money is taken in a burglary, robbery, or other form of theft, the accountable officer will be relieved of liability if the following conditions are met:

- There is sufficient evidence that a theft took place;[38]
- There is no evidence implicating, or indicating contributing negligence by, the accountable officer; and
- The agency has made the administrative determinations required by the relief statute.

The fact patterns tend to fall into several well-defined categories.

[38] The mere designation of a loss as a "burglary" without supporting evidence is not enough to remove it from the "unexplained loss" category. *E.g.*, B-210358, July 21, 1983.

(1) Burglary: forced entry

Forced entry cases tend to be fairly straightforward. In the typical case, a government office is broken into while the office is closed for the night or over a weekend, and money is stolen. Evidence of the forced entry is clear. As long as there is no evidence implicating the accountable officer, no other contributing fault or negligence, and the requisite administrative determinations are made, relief is granted. A few examples follow:[39]

- Burglars broke into the welding shop at a government laboratory, took a blowtorch and acetylene tanks to the administrative office and used them to cut open the safe. B-242773, Feb. 20, 1991.

- Cashier's office was robbed over a weekend. Office had been forcibly entered, but there was no evidence of forced entry into the safe. Federal Bureau of Investigation found no evidence of negligence or breach of security by any government personnel associated with the office. B-193174, Nov. 29, 1978. *See also* B-260862, June 6, 1995.

- Persons unknown broke front door lock of Bureau of Indian Affairs office in Alaska and removed safe on sled. Sled tracks led to an abandoned building in which the safe was found with its door removed. B-182590, Feb. 3, 1975.

- Unsecured bolt cutters found on premises used to remove safe padlock. No contributing negligence because there was no separate facility in which to secure the tools. B-202290, June 5, 1981.

The same principles apply to theft from a hotel room. 69 Comp. Gen. 586 (1990); B-229847, Jan. 29, 1988. Note, however, that relief was not granted in the case of a theft of cash stashed under the front seat of a locked vehicle left in an area where several vehicles had been broken into recently, since leaving cash in such a manner was not a prudent way to safeguard the funds. B-257120, Dec. 13, 1994.

[39] There are numerous forced entry cases in which GAO granted relief under similar circumstances. A few additional examples are B-241820, Jan. 2, 1991; B-239780, June 18, 1990; B-230607, June 20, 1988; B-205428, Dec. 31, 1981; B-201651, Feb. 9, 1981.

(2) Robbery

In this situation, one or more individuals, armed or credibly pretending to be armed, rob an accountable officer. Again, as long as there is no evidence implicating the accountable officer and no contributing negligence, relief is granted. The accountable officer is not expected to risk his or her life by resisting. Depending on the circumstances, it is not necessary that the thief be, or pretend to be, armed. An example is the common purse-snatching incident. B-197021, May 9, 1980; B-193866, Mar. 14, 1979. Some illustrative robbery cases follow:[40]

- Armed robber forced cashier to open the safe at gunpoint, shot the cashier, and stole the funds. B-261261, Aug. 31, 1995.
- Gunman entered cashier's office, knocked cashier unconscious, and robbed safe. B-235458, Aug. 23, 1990.
- Man entered cashier's office in a veterans hospital and handed cashier a note demanding all of her $20 bills. Although he did not display a weapon, he said he was armed. B-191579, May 22, 1978. A very similar case is B-237420, Dec. 8, 1989 (man gave cashier note indicating bomb threat; upon running off with the money, he left a second note saying "no bomb").

(3) Riot, public disturbance

This category includes the popular pastime of ransacking American embassies. The Supreme Court's second exception in *United States v. Thomas*, 82 U.S. (15 Wall.) 337 (1872) (see Fire, Natural Disaster in section C.3.h of this chapter) to an accountable officer's strict liability is funds taken by a "public enemy." That case concerned the Civil War. As with the "overruling necessity" exception, we are aware of no further definition of "public enemy" in this context, and the cases cited here have consistently been treated as accountable officer losses. In any event, relief

[40] Some other examples are B-260915, Apr. 3, 1995; B-217773, Mar. 18, 1985; B-211945, July 18, 1983; and B-201126, Jan. 27, 1981.

is routinely granted unless there is contributing negligence. Thus, GAO granted relief in the following cases:[41]

- Armed soldiers forced entry into U.S. Information Agency compound in Beirut, Lebanon, and looted safe. B-195435, Sept. 12, 1979.
- Cash equivalents stolen when embassy in Belgrade, Federal Republic of Yugoslavia, was ransacked. B-288014, May 17, 2002.
- Funds taken during attack on American Embassy in Tehran, Iran. B-229753, Dec. 30, 1987; B-194666, Aug. 6, 1979 (separate attacks, both occurring in 1979).
- Loss of Secret Service confidential funds resulting from terrorist attack on World Trade Center on September 11, 2001. B-300677, June 19, 2003.
- Safes looted by Cuban detainees during prison riot. B-232252, Jan. 5, 1989; B-230796, Apr. 8, 1988.

(4) Evidence less than certain

In all of the cases cited above dealing with forced entry, armed robbery, or rioting, the fact that a theft had taken place was beyond question. However, there are many cases in which the evidence of theft is not all that clear. The losses are unexplained in the sense that what happened cannot be determined with any certainty. The problem then becomes whether the indications of theft are sufficient to classify the loss as a theft and thereby to rebut the presumption of negligence.

These tend to be the most difficult cases to resolve. The difficulty stems from the fact, which we have noted previously, that the accountable officer laws are designed to protect the government against dishonesty as well as negligence. On the one hand, an accountable officer who did all he or she could to safeguard the funds should be relieved of liability. But on the other hand, the application of the relief statutes should not provide a blueprint for (or absolution from) dishonesty. Recognizing that complete certainty is impossible in many if not most cases, the decisions try to

[41] Further examples are B-249372, Aug. 13, 1992 (Somalia); B-230606.2, Sept. 6, 1988 (Iran); B-227422, June 18, 1987 (Tripoli); B-207059, July 1, 1982 (Chad); and B-190205, Nov. 14, 1977 (Zaire).

achieve a balance between these two considerations. Thus, GAO gives weight to the administrative determinations and to statements of the individuals concerned, but these factors cannot be conclusive and the decision will be based on all of the evidence. Other relevant factors include how and where the safe combination was stored, when it was last changed, whether the combination dial was susceptible of observation while the safe was being opened, access to the safe and to the facility itself, and the safeguarding of keys to cash boxes.

For example, in B-198836, June 26, 1980, funds were kept in the bottom drawer of a four-drawer file cabinet. Each drawer had a separate key lock and the cabinet itself was secured by a steel bar and padlock. Upon arriving at work one morning, the cashier found the bottom drawer slightly out of alignment with several pry marks on its edges. A police investigation was inconclusive. GAO viewed the evidence as sufficient to support a conclusion of burglary and, since the record contained no indication of negligence on the part of the cashier, granted relief.

In another case, a safe was found unlocked with no signs of forcible entry. However, there was evidence that a thief had entered the office door by breaking a window. The accountable officer stated that he had locked the safe before going home the previous evening, and there was no evidence to contradict this or to indicate any other negligence. GAO accepted the accountable officer's uncontroverted statement and granted relief. B-188733, Mar. 29, 1979. *See also* B-260862, June 6, 1995; B-242830, Sept. 24, 1991; B-210017, June 8, 1983.

In B-170596-O.M., Nov. 16, 1970, the accountable officer stated that she had found the padlock on and locked in reverse from the way she always locked it. Her statement was corroborated by the agency investigation. In addition, the lock did not conform to agency specifications, but this was not the cashier's responsibility. She had used the facilities officially provided for her. Relief was granted.

Relief was also granted in B-170615-O.M., Nov. 23, 1971, *reversing upon reconsideration* B-170615-O.M., Dec. 2, 1970. In that case, there was some evidence that the office lock had been pried open but there were no signs of forcible entry into the safe. This suggested the possibility of negligence either in failing to lock the safe or in not adequately safeguarding the combination. However, the accountable officer's supervisor stated that he (the supervisor) had locked the safe at the close of business on the preceding workday, and two safe company representatives provided

statements that the safe was vulnerable and could have been opened by anyone with some knowledge of safe combinations. *See also* B-242830, Sept. 24, 1991.

The occurrence of more than one loss under similar circumstances within a relatively short time will tend to corroborate the likelihood of theft. B-199021, Sept. 2, 1980; B-193416, Oct. 25, 1979. In B-199021, two losses occurred in the same building within several weeks of each other. All agency security procedures had been followed and the record indicated that the cashier had exercised a very high degree of care in safeguarding the funds. In B-193416, the first loss was totally unexplained, and the entire cash box disappeared a week later. The safe combination had been kept in a sealed envelope in a "working safe" to which other employees had access. Although the seal on the envelope was not broken, an investigation showed that, while the combination could not be read by holding the envelope up to normal light, it could be read by holding it up to stronger light. In neither case was there any evidence of forcible entry or of negligence on the part of the accountable officer. Balancing the various relevant factors in each case, GAO granted relief.

The disappearance of an entire cash box will also be viewed as an indication of theft. However, this factor standing alone will not be conclusive since there is nothing to prevent a dishonest employee from simply taking the whole box rather than a handful of money from it. Signs of forced entry to the safe or file cabinet will naturally reinforce the theft conclusion. *E.g.*, B-229136, Jan. 22, 1988; B-186190, May 11, 1976. Far more difficult are cases in which a cash box disappears with no signs of forcible entry to the container in which it was kept. Note the various additional factors viewed as relevant in each of the following cases:

- Police were able to open file cabinet with a different key, and other thefts had occurred around the same time. Relief granted. B-223602, Aug. 25, 1986.

- Safe was not rated for burglary protection and could have been opened fairly easily by manipulating the combination dial. Relief granted. B-189658, Sept. 20, 1977.

- Supervisor's secretary maintained a log of all safe and bar-lock combinations, a breach of security which could have resulted in the compromise of the combination. Relief granted. B-189896, Nov. 1, 1977.

- Cashier locked safe and checked it in the presence of a guard. Several other employees had access to the safe combination. Relief granted. B-173133-O.M., Dec. 10, 1973. Multiple access also contributed to the granting of relief in B-241201.2, Apr. 15, 1992; B-235167, Jan. 8, 1990; B-217945, July 23, 1985; and B-212605, Apr. 19, 1984.[42]

- Safe was malfunctioning at time of loss. Relief granted. B-183284, June 17, 1975.

- Extensive security violations attributable to agency. Relief granted. B-211649, Aug. 2, 1983. *See also* B-235167, Jan. 8, 1990; B-197799, June 18, 1980.

- Some evidence of forced entry to door of cashier's office but not to safe or safe drawer. Cash box later found in men's room. Negligence by cashier in improperly storing keys and safe combination in unlocked desk drawer not proximate cause of loss since seal on envelope was found intact. Relief granted. B-185666, July 27, 1976. *Compare* 70 Comp. Gen. 12 (1990) (cashier denied relief because she negligently stored the cash box key, not in an envelope, in the back of her top center desk drawer which did not lock and kept a copy of the safe combination taped to the underside of an accessible pull-out panel on her desk).

- Cash box disappeared during 2-week absence of cashier. Even assuming cashier negligently failed to lock safe prior to her absence, there was no way to establish this as the proximate cause of the loss since box had been kept in a "working safe" which would have been opened daily in her absence. Relief granted. B-191942, Sept. 12, 1979.

- Cashier went on leave without properly securing key to file cabinet or entrusting it to an alternate. Relief denied. B-182480, Feb. 3, 1975.

- Cashier had been experiencing difficulty trying to lock the safe and stated she might have left it unlocked inadvertently. Relief denied. B-184028, Mar. 2, 1976.

[42] A key inquiry in this type of case, and a crucial factor in deciding whether to grant or deny relief, is the extent to which the accountable officer is responsible for the nonexclusive access to the safe combination.

To summarize the "cash box" cases, the disappearance of an entire cash box suggests theft but is not conclusive. In such cases, even though the cause of the loss cannot be definitely attributed, relief will probably be granted if there is uncontroverted evidence that the safe was locked, no other evidence of contributing fault or negligence on the part of the accountable officer, and especially if there are other factors present tending to corroborate the likelihood of theft. In no case has relief been granted based solely on the fact that a cash box disappeared; without more, it is simply another type of unexplained loss for which there is no basis for relief.

(5) Embezzlement

The term "embezzlement" means the fraudulent misappropriation of property by someone to whom it has lawfully been entrusted. *Black's Law Dictionary* 540 (7th ed. 1999). Losses due to embezzlement or fraudulent acts of subordinate finance personnel, acting alone or in collusion with others, are treated as physical losses and relief will be granted if the statutory conditions are met. B-260563, Mar. 31, 1995; B-244113, Nov. 1, 1991; B-202074, July 21, 1983, at 6; B-211763, July 8, 1983; B-133862-O.M., Nov. 29, 1957; B-101375-O.M., Apr. 16, 1951.

An illustrative group of cases involves the embezzlement of tax collections, under various schemes, by employees of the Internal Revenue Service (IRS). In each case the IRS pursued the perpetrators, and most were prosecuted and convicted. The IRS recovered what it could from the (now former) employees, and sought relief for the balance for the pertinent supervisor in whose name the account was held. In each case, GAO agreed with the "no fault or negligence" determination and granted relief. B-270863, June 17, 1996; B-265853, Jan. 23, 1996; B-260563, Mar. 31, 1995; B-244113, Nov. 1, 1991; B-226214 *et al.*, June 18, 1987; B-215501, Nov. 5, 1984; B-192567, Nov. 3, 1978; B-191722, Aug. 7, 1978; B-191781, June 30, 1978.

The accountable officer in each of the IRS cases was a supervisor who did not actually handle the funds. The approach to evaluating the presence or absence of negligence when the accountable officer is a supervisor is to review the existence and adequacy of internal controls and procedures and to ask whether the accountable officer provided reasonable supervision. If internal controls and management procedures are reasonable and were being followed, relief will be granted. As noted in B-226214 *et al.*, June 18, 1987, the standard does not expect perfection and recognizes that a clever

criminal scheme can outwit the most carefully established and supervised system. *See also* B-270863, June 17, 1996; B-260563, Mar. 31, 1995.

Losses resulting from the fraudulent acts of other than subordinate finance personnel (*e.g.*, payments on fraudulent vouchers) are not physical losses but must be treated as improper payments. *See* B-287043, May 29, 2001; 2 Comp. Gen. 277 (1922); B-248517, Oct. 20, 1992; B-202074, July 21, 1983; B-76903, July 13, 1948; B-133862-O.M., Nov. 29, 1957.

### j. Agency Security

In evaluating virtually any physical loss case, physical security—the existence, adequacy, and use of safekeeping facilities and procedures—is a crucial consideration. The Department of the Treasury Financial Management Service's *Manual of Procedures and Instructions for Cashiers* (hereafter *Cashier's Manual)* (April 2001) sets forth many of the requirements.[43] For example, the *Cashier's Manual* provides that safe combinations should be changed annually, whenever there is a change of cashiers, or when the combination has been compromised, and prescribes procedures for safeguarding the combination. It also reflects what is perhaps the most fundamental principle of sound cash control—that an employee with custody of public funds should have exclusive control over those funds. In addition, agencies should have their own specific regulations or instructions tailored to individual circumstances. *Cashier's Manual*, § VI at 14.

The first step in analyzing the effect of a security violation or deficiency is to determine whether the violation or deficiency is attributable to the accountable officer or to the agency. Two fundamental premises drive this analysis: (1) the accountable officer is responsible for safeguarding the funds in his or her custody; and (2) the agency is responsible for providing adequate means to do so. Adequate means includes both physical facilities and administrative procedures.

Basically, if the accountable officer fails to use the facilities and procedures that have been provided, this failure will be viewed as negligence and, unless some other factor appears to be the proximate cause of the loss, will preclude the granting of relief. Several examples have been previously cited under the Actual Negligence heading, section C.3.c of this chapter.

[43] See also the discussion of the *Cashier's Manual* and imprest funds in sections B.2.c and B.3.a of this chapter.

Another element of the accountable officer's responsibility is the duty to report security weaknesses to appropriate supervisory personnel. *E.g.*, 63 Comp. Gen. 489, 492 (1984), *rev'd on other grounds*, 65 Comp. Gen. 876 (1986). If the agency fails to respond, a loss attributable to the reported weakness is not the accountable officer's fault. *E.g.*, B-235147.2, Aug. 14, 1991; B-208511, May 9, 1983.

Ultimately, an accountable officer can do no more than use the best that has been made available, and relief will not be denied for failure to follow adequate security measures which are beyond the accountable officer's control. *E.g.*, B-226947, July 27, 1987 (U.S. Mint employees stole coins from temporarily leased facility which was incapable of adequate security); B-207062, May 12, 1983 (agent kept collections in his possession because, upon returning to office at 4:30 p.m., he found all storage facilities locked and all senior officials had left for the day); B-210245, Feb. 10, 1983 (lockable gun cabinet was the most secure item available); B-186190, May 11, 1976 (funds kept in safe with padlock because combination safe, which had been ordered, had not yet arrived); B-78617, June 24, 1949 (agency failed to provide safe). Of course, the accountable officer is expected to act to correct weaknesses that are subject to his or her control. B-127204, Apr. 13, 1956.

The principle that relief will be granted if the agency fails to provide adequate security and that failure is viewed as the proximate cause of the loss manifests itself in a variety of contexts. One group of cases involves multiple violations. In B-182386, Apr. 24, 1975, imprest funds were found missing when a safe was opened for audit. The accountable officer was found to be negligent for failing to follow approved procedures. However, the agency's investigation disclosed a number of security violations attributable to the agency. Two cashiers operated from the same cash box; transfers of custody were not documented; the safe combination had not been changed despite several changes of cashiers; at least five persons knew the safe combination. The agency, in recommending relief, concluded that the loss was caused by "pervasive laxity in the protection and administration of the funds . . . on all levels." GAO agreed, noting that the lax security "precludes the definite placement of responsibility" for the loss, and granted relief.

In several later unexplained loss cases (no sign of forcible entry, no indication of fault or negligence on the part of the accountable officer), GAO has regarded overall lax security on the part of the agency, similar to that in B-182386, as the proximate cause of the loss and thus granted relief.

B-271896, Mar. 4, 1997; B-243324, Apr. 17, 1991; B-229778, Sept. 2, 1988; B-226847, June 25, 1987; B-217876, Apr. 29, 1986; B-211962, Dec. 10, 1985; B-211649, Aug. 2, 1983. All of these cases involved numerous security violations beyond the accountable officer's control, and several adopt the "pervasive laxity" characterization of B-182386.

However, in order for relief to be granted, security weaknesses attributable to the agency need not rise to the level of "pervasive laxity" encountered in the cases cited in the preceding paragraph. Thus, relief will usually be granted where several persons other than the accountable officer have access to the funds through knowledge of the safe combination since "multiple access" makes it impossible to attribute the loss to the accountable officer. B-241201.2, Apr. 15, 1992; B-235368, Apr. 19, 1991; B-235072, July 5, 1989; B-228884, Oct. 13, 1987; B-214080, Mar. 25, 1986; B-211233, June 28, 1983; B-209569, Apr. 13, 1983; B-196855, Dec. 9, 1981; B-199034, Feb. 9, 1981. Additional cases are cited in our earlier discussion of missing cash boxes.

If multiple access to a safe will support the granting of relief for otherwise unexplained losses, it follows that multiple access to a cash box or drawer will have the same effect. The *Cashier's Manual* provides that cashiers should never work out of the same cash box or drawer. *Cashier's Manual*, § VI at 14. Violation of this requirement, where beyond the control of the accountable officer, is a security breach that, in appropriate cases, has supported the granting of relief. B-227714, Oct. 20, 1987; B-204647, Feb. 8, 1982. If it is necessary for more than one cashier to work out of the same safe, the safe should preferably have separate built-in locking drawers rather than removable cash boxes. B-191942, Sept. 12, 1979.

The following security deficiencies have also contributed to the granting of relief:

- Cash box could be opened with other keys. B-203646, Nov. 30, 1981; B-197270, Mar. 7, 1980.

- Crimping device used to seal cash bags did not use sequentially numbered seals and was accessible to several employees. B-246988, Feb. 27, 1992.

- Failure to change safe combination as required by Treasury regulations. B-211233, June 28, 1983; B-196855, Dec. 9, 1981. (Both cases also involve multiple access.)

- Safe combination and key to cash drawer were kept in an unlocked desk drawer. B-177963-O.M., Mar. 21, 1973. (The result would most likely be different if the violation were the fault of the accountable officer or if the accountable officer passively acquiesced in the breach. *See* B-185666, July 27, 1976.)

- Safe combination could be read through the sealed envelope in which it was kept. B-243324, Apr. 17, 1991.

- Safe malfunctioning, defective, or otherwise not secure. B-271896, Mar. 4, 1997; B-221447, June 1, 1987; B-215477, Nov. 5, 1984; B-183284, June 17, 1975.

The preceding cases are mostly unexplained losses. It naturally follows that security violations of the type noted will contribute to rebutting the presumption of negligence in cases where there is clear evidence of theft. In B-184493, Oct. 8, 1975, for example, there was evidence of forced entry to the office door but not to the safe. The record showed that, despite the accountable officer's best efforts, it was impossible for him to shield the dial from observation while opening the safe. In view of the office layout, the position of the safe, and the number of persons allowed access to the office, GAO granted relief.[44] Other examples are: B-241201.2, Apr. 15, 1992, B-243324, Apr. 17, 1991, and B-180664-O.M., Apr. 23, 1974 (multiple access to safe); and B-170251-O.M., Oct. 24, 1972 (insecure safe).

If there is evidence of negligence on the part of the accountable officer in conjunction with security deficiencies attributable to the agency, the accountable officer's negligence must be balanced against the agency's negligence. Relief may be granted or denied based largely on the proximate cause analysis. As with the unexplained loss cases, relief has been granted in a number of cases where the agency's violations could be said to amount to "pervasive laxity." B-235147.2, Aug. 14, 1991; B-197799, June 19, 1980; B-182386, Apr. 24, 1975; B-169756-O.M., July 8, 1970. Similarly, agency security violations which do not amount to pervasive laxity may support the granting of relief. Such violations must either be the proximate cause of the loss or make it impossible to attribute the loss to the accountable officer. In a 1971 case, for example, a cashier kept the combinations to three safes on an adding machine tape in her wallet. The

[44] An explanation of this type may or may not be sufficient, depending on the particular facts. *See* B-170012, Aug. 11, 1970; B-127204, Apr. 13, 1956.

agency failed to change the combinations after the wallet was stolen. Also, safe company representatives stated that one safe was vulnerable and could readily have been opened. The fact that only the vulnerable safe had been robbed supported the conclusion that the stolen combinations had not been used. B-170615-O.M., Nov. 23, 1971. Other cases in which agency security violations were found to override negligence by the accountable officer are B-232744, Dec. 9, 1988 (safe combination not changed despite several requests by accountable officer following possible compromise); B-205985, July 12, 1982 (multiple access, safe combination not changed as required); B-199128, Nov. 7, 1980 (multiple access); B-191440, May 25, 1979 (two cashiers working out of same drawer).

The result in these cases should not be taken too far. Poor agency security does not guarantee relief; it is merely another factor to consider in the proximate cause equation. Another relevant factor is the nature and extent of the accountable officer's efforts to improve the situation.

Where security weaknesses exist, a supervisor will normally be in a better position to take or initiate corrective action, and a supervisor who is also an accountable officer may be found negligent for failing to do so. 63 Comp. Gen. 489 (1984), *rev'd upon reconsideration*, 65 Comp. Gen. 876 (1986) (new evidence presented); 60 Comp. Gen. 674, 676 (1981). However, a new supervisor should not be held immediately responsible for the situation he or she inherited. B-209715, Apr. 4, 1983 (supervisor relieved in pervasive laxity situation where loss occurred only a week after he became accountable).

A close reading of the numerous security cases reveals the somewhat anomalous result that an accountable officer who works in a sloppy operation stands a much better chance of being relieved than one who works in a well-managed office. True as this may be, it would be wrong to hold accountable officers liable for conditions beyond their control. Rather, the solution lies in the proper recognition and implementation of the responsibility of each agency, mandated by the Federal Managers' Financial Integrity Act of 1982, 31 U.S.C. § 3512(c)(1), to safeguard its assets against loss and misappropriation.

### k. Extenuating Circumstances

Since relief under 31 U.S.C. §§ 3527(a) and (b) is a creature of statute, it must be granted or denied solely in accordance with the statutory conditions. When Congress desires that "equitable" concerns be taken into

consideration, it expressly so states. Examples are waiver statutes such as 5 U.S.C. § 5584 and 10 U.S.C. § 2774.[45] In contrast, the physical loss relief statutes do not authorize the granting of relief on the basis of equitable considerations or extenuating or mitigating circumstances.

Thus, where an accountable officer has been found negligent, the following factors have been held not relevant, nor are they sufficient to rebut the presumption of negligence:

- Acceptance of extra duties by the accountable officer; shortage of personnel. B-186127, Sept. 1, 1976.

- Financial hardship of having to repay loss. B-239387, Apr. 24, 1991; B-241478, Apr. 5, 1991; B-216279.2, Dec. 30, 1985.

- Good work record; long period of loyal and dependable service; evidence of accountable officer's good reputation and character. B-241478, Apr. 5, 1991; B-204173, Nov. 9, 1982; B-170012, Aug. 11, 1970; B-158699, Sept. 6, 1968.

- Heavy work load. 67 Comp. Gen. 6 (1987); 48 Comp. Gen. 566 (1969); B-241201, Aug. 23, 1991, *rev'd on reconsideration*, B-241201.2, Apr. 15, 1992 (reversed on other grounds—new evidence submitted indicating multiple access).

- Inexperience; inadequate training or supervision. 70 Comp. Gen. 389 (1991); B-257120, Dec. 13, 1994; B-189084, Jan. 3, 1979; B-191051, July 31, 1978.

[45] These statutory provisions authorize, in certain circumstances, the waiver of claims against federal employees and service members for recovery of erroneous payments of pay and allowances "the collection of which would be against equity and good conscience and not in the best interests of the United States."

# D. Illegal or Improper Payment

## 1. Disbursement and Accountability

In order to understand the laws governing liability and relief for improper payments, and how the application of those laws evolved over the last quarter of the twentieth century, it is helpful to start by summarizing, from the accountability perspective, a few points relating to how the federal government disburses its money.

### a. Statutory Framework: Disbursement Under Executive Order No. 6166

For most of the nineteenth century and the early decades of the twentieth century, federal disbursement was decentralized. Each agency had its own disbursing office(s), and the function was performed by a small army of disbursing officers and clerks (who were accountable officers) scattered among the various agencies and throughout the country. In part, the reason for this was the primitive state of communication and transportation then existing. One of the weaknesses of this system was that, in many cases, vouchers were prepared, examined, and paid by the same person. 20 Comp. Dec. 859, 869 (1914). This resulted in the growth of large disbursing offices in several agencies, some of which exceeded in size that of the Treasury Department. GAO, *Annual Report of the Comptroller General of the United States for the Fiscal Year Ended June 30, 1939* (Washington, D.C.: 1939), at 98.

From the perspective of accountability for improper payments, the modern legal structure of federal disbursing evolved in three major steps. First, Congress enacted legislation on August 23, 1912,[46] the remnants of which are found at 31 U.S.C. § 3521(a), to prohibit disbursing officers from preparing and auditing their own vouchers. With this newly mandated separation of voucher preparation and examination from actual payment, payment was accomplished by having some other administrative official "certify" the correctness of the voucher to the disbursing officer. The 1912 legislation was thus the genesis of what would later become a new class of accountable officer—the certifying officer.

Disbursing officers remained accountable for improper payments, the standard now reflecting the more limited nature of the function. Since the

[46] Pub. L. No. 299, ch. 350, 37 Stat. 375.

1912 law was intended to prohibit the disbursing officer from duplicating the detailed voucher examination already performed by the certifying officer, disbursing officers were held liable only for errors apparent on the face of the voucher, as well as, of course, payments prohibited by law or for which no appropriation was available. 20 Comp. Dec. 859 (1914). In a sense, the 1912 statute operated in part as a relief statute, with credit being allowed or disallowed in the disbursing officer's account based on the application of this standard. *E.g.*, 4 Comp. Gen. 991 (1925); 3 Comp. Gen. 441 (1924).

The second major step in the evolution was section 4 of Executive Order No. 6166, signed by President Roosevelt on June 10, 1933 (*see* note at 5 U.S.C. § 901). The first paragraph of section 4, codified at 31 U.S.C. § 3321(a), consolidated the disbursing function in the Treasury Department, eliminating the separate disbursing offices of the other executive departments. The second paragraph, codified at 31 U.S.C. § 3321(b), authorizes Treasury to delegate disbursing authority to other executive agencies for purposes of efficiency and economy. The third paragraph gave new emphasis to the certification function:

> "The Division of Disbursement [Treasury Department] shall disburse moneys only upon the certification of persons by law duly authorized to incur obligations upon behalf of the United States. The function of accountability for improper certification shall be transferred to such persons, and no disbursing officer shall be held accountable therefor."

The following year, Executive Order No. 6728, May 29, 1934 (*see* note at 5 U.S.C. § 901), exempted the military departments from the centralization. This exemption, an exemption for the United States Marshals Service which originated in a 1940 reorganization plan, and an exemption for certain expenditures of the Coast Guard[47] are codified at 31 U.S.C. § 3321(c). Executive Order No. 6166 provided the framework for the disbursing system still in effect today. Apart from the specified exemptions, the certifying officer is now an employee of the spending agency, and the disbursing officer is an employee of the Treasury Department.

[47] The Coast Guard exemption was added by Pub. L. No. 104-201, div. A, title X, § 1009(a)(1), 110 Stat. 2422, 2633 (Sept. 23, 1996).

Disbursing officers continued to be liable for their own errors, as under the 1912 legislation. *E.g.*, 13 Comp. Gen. 469 (1934). However, a major consequence of Executive Order No. 6166 was to make the certifying officer an accountable officer as well. The certifying officer became liable for improper payments "caused solely by an improper certification as to matters not within the knowledge of or available to the disbursing officer." 13 Comp. Gen. 326, 329 (1934). *See also* 15 Comp. Gen. 986 (1936); 15 Comp. Gen. 362 (1935).

Over the next few years, confusion and disagreement developed as to the precise relationship of certifying officers and disbursing officers with respect to liability for improper payments. In the *Annual Report of the Comptroller General of the United States for the Fiscal Year Ended June 30, 1940* (Washington, D.C.: 1941) at pages 63–66, GAO summarized the problem and recommended legislation to specify the allocation of responsibilities "to provide the closest possible relationship between liability and fault" (*id.* at 64).

The third major evolutionary step was the enactment of Public Law No. 77-389, ch. 641, 55 Stat. 875 (Dec. 29, 1941) to implement GAO's recommendation. Section 1, 31 U.S.C. § 3325(a), reflects the substance of the third paragraph of Executive Order No. 6166, § 4, quoted above. It requires that a disbursing officer disburse money only in accordance with a voucher certified by the head of the spending agency or an authorized certifying officer who, except for some interagency transactions, will also be an employee of the spending agency. As with the amended Executive Order No. 6166 itself, section 3325(a) does not apply to disbursements of the military departments or certain expenses of the Coast Guard. 31 U.S.C. § 3325(b). The rest of the statute, which we will discuss in detail later, delineates the responsibilities of certifying and disbursing officers and provides a mechanism for the administrative relief of certifying officers. (Comparable authority to relieve disbursing officers from liability for improper payments was not to come about until 1955.) Further detail on the federal disbursement system may be found in the *Treasury Financial Manual*, volume I, part 4 (2004), and GAO's *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, chapter 6 (Washington, D.C.: May 18, 1993).

It should be apparent that control of the public treasury must repose in the hands of federal officials. However, this does not mean that every task in the disbursement process must be performed by a government employee. For example, GAO has advised that the Bureau of Indian Affairs is

authorized as a matter of law to contract with a private bank to perform certain ministerial or operational aspects of disbursing Indian trust fund money, such as printing checks, delivering checks to payees, and debiting amounts from accounts. However, in order to comply with 31 U.S.C. §§ 3321 and 3325, a federal disbursing officer must retain managerial and judgmental responsibility. 69 Comp. Gen. 314 (1990). The decision concluded:

> "[W]e see no reason to object to a contractual arrangement whereby a private contractor provides disbursement services, so long as a government disbursing officer remains responsible for reviewing and overseeing the disbursement operations through agency installed controls designed to assure accurate and proper disbursements."

*Id.* at 319. To intrude further into this responsibility would require clear statutory authority. *E.g.*, B-210545-O.M., June 6, 1983 (Indian Health Service would need statutory authority to use fiscal intermediaries to pay claims by providers; memorandum cites examples of such authority in Medicare legislation).

### b. Automated Payment Systems

The statutory framework we have just described came into existence at a time when all disbursing was done manually. The certifying officer and his or her staff would review the supporting documentation for each payment voucher. The certifying officer would then sign the voucher, certifying to its legality and accuracy, and send it on to the disbursing officer. The increased use of automated payment systems has changed the way certifying officers must operate. Perhaps the clearest example is payroll certification. A certifying officer may be asked to certify a grand total accompanied by computer tapes containing payrolls involving millions of dollars. There is no way the certifying officer can verify that each payment is accurate and legal. Even if it were reasonably possible, the cost of doing it would be prohibitive.

With the onslaught of the computer age, it was natural and inevitable to ask how accountability would function in a computerized environment. Since many of the assumptions of a manual system were unrealistic under an automated system, something had to change. GAO reviewed the impact of computerization in a report entitled *New Methods Needed for Checking Payments Made by Computers*, FGMSD-76-82 (Washington, D.C.: Nov. 7, 1977). The report recognized that, while the certifying officer's basic legal liability remains, the conditions in which a certifying officer may be

relieved under an automated payment system must be different to reflect the new realities. The approach to relief in this context stems from the following premises discussed in the report:

- In automated systems, evidence that the payments are accurate and legal must relate to the system rather than to individual transactions.
- Certifying and disbursing officers should be provided with information showing that the system on which they are largely compelled to rely is functioning properly.
- Reviews should be made at least annually, supplemented by interim checks of major system changes, to determine that the automated systems are operating effectively and can be relied on to produce payments that are accurate and legal.

The report then concluded:

> "In the future, when a certifying or disbursing officer requests relief from an illegal, improper, or incorrect payment made using an automated system, GAO will continue to require the officer to show that he or she was not negligent in certifying payments later determined to be illegal or inaccurate. However, consideration will be given to whether or not the officer possessed evidence at the time of the payment approval that the system could be relied on to produce accurate and legal payments. In cases in which the designated assistant secretary or comparable official provides the agency head and GAO with a written statement that effective system controls could not be implemented prior to voucher preparation and certifies that the payments are otherwise proper, GAO will not consider the absence of such controls as evidence of negligence in determining whether the certifying official should be held liable for any erroneous payment prior to receipt of an advance decision. Of course, the traditional requirements that due care be exercised in making the payments and that diligent effort be made to recoup any erroneous payments will still be considered in any requests for waiver of liability. Also, should the certifying official fail to take reasonable steps to establish adequate controls for future payments, the reasons for such failure will be taken into account in any

> requests for waiver of liability concerning such future payments."

FGMSD-76-82, at 17–18.

A few years later, the concepts and premises of the GAO report were explored and reported, with implementing recommendations, in a key study by the Joint Financial Management Improvement Program entitled *Assuring Accurate and Legal Payments—The Roles of Certifying Officers in Federal Government* (Washington, D.C.: June 1980).[48] Further guidance from the internal control perspective may be found in GAO, *Public Key Infrastructure: Examples of Risks and Internal Control Objectives Associated with Certification Authorities*, GAO-04-1023R (Washington, D.C.: Aug. 10, 2004); GAO, *Streamlining the Payment Process While Maintaining Effective Internal Control*, GAO/AIMD-21.3.2 (Washington, D.C.: May 1, 2000); GAO, *Policy and Procedures Manual for Guidance of Federal Agencies* (hereafter GAO-PPM), title 7 (Washington, D.C.: May 18, 1993); OMB Circular No. A-123, *Management Accountability and Control* (June 21, 1995); and OMB Circular No. A-127, *Financial Management Systems* (July 23, 1993). See also a GAO publication entitled *Critical Factors in Developing Automated Accounting and Financial Management Systems*, Document Accession No. 132042 (Washington, D.C.: January 1987).

Thus, in considering requests for relief under an automated payment system where verification of individual transactions is impossible as a practical matter, the basic question will be the reasonableness of the certifying officer's reliance on the system to continually produce legal and accurate payments. B-178564, Jan. 27, 1978 (confirming the conceptual feasibility of using automated systems to perform preaudit functions under various child nutrition programs). *See also* B-201965, June 15, 1982. Contexts in which system reliance is relevant are discussed in B-291001, Dec. 23, 2002 (proposed time and attendance system); 59 Comp. Gen. 85 (1989) (automated "ZIP plus 4" address correction system); 59 Comp.

[48] The JFMIP was a joint undertaking of GAO, the Office of Management and Budget, the Treasury Department, and the Office of Personnel Management, working in cooperation with each other and other federal agencies to improve financial management practices in the federal government. Leadership and program guidance were provided by the four principals of JFMIP—the Comptroller General, the Secretary of the Treasury, and the Directors of OMB and OPM. Although JFMIP ceased to exist as a stand-alone organization as of December 1, 2004, the JFMIP principals continue to meet at their discretion.

Gen. 597 (1980) (electronic funds transfer program). Regardless of what system is used, there is of course no authority to make known overpayments. B-205851, June 17, 1982; B-203993-O.M., July 12, 1982.

### c. Statistical Sampling

Statistical sampling is a procedure whereby a random selection of items from a universe is examined, and the results of that examination are then projected to the entire universe based on the laws of probability. In 1963, the Comptroller General held that reliance on a statistical sampling plan for the internal examination of vouchers prior to certification would not operate to relieve a certifying officer from liability for improper or erroneous payments. 43 Comp. Gen. 36 (1963). GAO recognized in the decision that an adequate statistical sampling plan could produce overall savings to the government, but was forced to conclude that it was not authorized under existing law.

In response to this, Congress enacted legislation in 1964, now found at 31 U.S.C. §§ 3521(b)–(d). The statute authorizes agency heads, upon determining that economies will result, to prescribe the use of adequate and effective statistical sampling procedures in the prepayment examination of disbursement vouchers.

As originally enacted, 31 U.S.C. § 3521(b) was limited to vouchers not exceeding $100. A 1975 amendment to the statute removed the $100 limit and authorized the Comptroller General to prescribe maximum dollar limits. The current limit is $2,500. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies* (hereafter GAO-PPM), title 7, § 7.4.E (Washington, D.C.: May 18, 1993). For further guidance, see 7 GAO-PPM App. III, and GAO, *Using Statistical Sampling*, GAO/PEMD-10.1.6 (Washington, D.C.: May 2, 1992). For vouchers over the prescribed limit, unless GAO has approved an exception (7 GAO-PPM App. III, § B), 43 Comp. Gen. 36 would continue to apply.

The relevance of all this to accountable officers is spelled out in the statute. A certifying or disbursing officer acting in good faith and in conformity with an authorized statistical sampling procedure will not be held liable for any certification or payment on a voucher which was not subject to specific examination because of the procedure. However, this does not affect the liability of the payee or recipient of the improper payment, and relief may be denied if the agency has not diligently pursued collection action against the recipient. 31 U.S.C. §§ 3521(c)–(d). See B-254436, Mar. 1, 1994, where GAO found that disbursing and certifying officers are not liable for payments made on unaudited vouchers under the statistical sampling

procedure provided that the agency carries out diligent collection actions on any improper payment.

GAO has approved the use of statistical sampling to test the reliability of accelerated payment or "fast pay" systems. *See*, *e.g.*, GAO, *Streamlining the Payment Process While Maintaining Effective Internal Control*, GAO/AIMD-21.3.2 (Washington, D.C.: May 1, 2000); 60 Comp. Gen. 602, 606 (1981). In 67 Comp. Gen. 194 (1988), GAO for the first time considered the use of statistical sampling for post-payment audit in conjunction with "fast pay" procedures. The question arose in connection with a General Services Administration proposal to revise its procedures for paying and auditing utility invoices. GAO approved the proposal in concept, subject to several conditions: (1) the economic benefit to the government must exceed the risk of loss; (2) the plan must provide for a meaningful sampling of all invoices not subject to 100 percent audit; and (3) the plan must provide a reliable and defensible basis for the certification of payments. GAO then considered and approved GSA's specific plan in 68 Comp. Gen. 618 (1989). As a general proposition, however, approaching the problem through system improvements is preferable to an alternative that involves relaxing controls or audit requirements. 7 GAO-PPM § 7.4.F.

### d. Provisional Vouchers and Related Matters

Apart from questions of automation or statistical sampling, proposals arise from time to time, prompted by a variety of legitimate concerns, to expedite or simplify the payment process. Proposals of this type invariably raise the potential for overpayments or erroneous payments. Therefore, their consequences in terms of the liability and relief of certifying and disbursing officers must always be considered.

A 1974 case involved a proposal by the Environmental Protection Agency for the certification of "provisional vouchers" for periodic payments under cost-type contracts. Under the proposal, monthly vouchers certified for payment would be essentially unaudited except for basic mathematical and cumulative cost checks, subject to adjustment upon audit when the contract is completed. Under this system, as with statistical sampling, some errors could escape detection. However, certifying officers would not have the benefit of the protection afforded by the statistical sampling legislation. Since there would be a complete audit upon contract completion, the provisional vouchers could be certified upon a somewhat lesser standard of prepayment examination, but GAO pointed out that any such system should provide, at a minimum, for periodic audit of the provisional vouchers. To better protect the certifying officers, GAO suggested following a Defense Department procedure under which "batch

audits" of accumulated vouchers are conducted as frequently as deemed necessary based on the reliability of each contractor's accounting and billing procedures, but not less than annually, again subject to final audit upon contract completion. B-180264, Mar. 11, 1974.

In order to meet processing deadlines, time and attendance forms are often "certified" by appropriate supervisory personnel before the end of the pay period covered, raising the possibility that information for the latter days of the pay period may turn out to be erroneous. Since necessary adjustments can easily be made in the subsequent pay period and since the risk of loss to the government is viewed as remote, the provisional certification of payroll vouchers based on these "provisional" time and attendance records is acceptable. B-145729, Aug. 17, 1977 (internal memorandum).

Simplification plans may be prompted by nothing more exotic than understaffing of audit resources. In B-201408, Apr. 19, 1982, an agency proposed an "audit resources utilization plan" whereby it would (1) attempt to identify high risk contractors through preaward questionnaires; (2) for low risk contracts below a monetary limit, substitute desk audits for field contract audits; and (3) encourage the use of systems audits where possible. GAO found no "conceptual objection" to the proposal, noting that the final audits discussed in B-180264, Mar. 11, 1974, did not necessarily have to be field audits, but emphasized that high risk contractors should be subject to contract audits in all cases. The decision also discusses the certifying officer's role.

Another type of simplification proposal involves lessening the degree of scrutiny on small payments. For example, the Department of Veterans Affairs (VA) is authorized to reimburse certain low-cost supplies furnished to veterans under statutory training and rehabilitation programs. Experience taught the VA that participants could reasonably be expected to incur at least $35 of reimbursable supply expenses. The VA proposed to waive documentation and review requirements on invoices of up to $35 for miscellaneous supplies, and to pay essentially unsupported invoices up to that amount.[49] GAO concurred, but added that the VA should be able to demonstrate that prior audits have not revealed a significant number of false or inappropriate claims, and that it has internal controls adequate to

[49] Invoices may be used in place of vouchers to support disbursements as long as they contain all required information. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 6.2.C (Washington, D.C.: May 18, 1993); I TFM 4-2025.20.

detect multiple claims for the same individual. B-221949, June 30, 1987. An unstated consequence of the decision is that a certifying officer who relied on the system, assuming it was set up in accordance with the specified criteria, would be relieved from liability should any of the payments turn out to be erroneous.

### e. Facsimile Signatures and Electronic Certification

Signature devices other than the traditional pen-and-ink signature are called "facsimile signatures." The term has been defined as "an impression of a signature made by a rubber stamp, metal plate, or other mechanical contrivance." B-194970, July 3, 1979. As a general proposition, there is no prohibition on the use of facsimile signatures on financial documents as long as adequate controls and safeguards are observed. The rule was stated as follows in B-48123, Nov. 5, 1965 (nondecision letter):

> "Generally, an acceptable facsimile of a signature may be made by a rubber stamp impression or may be reproduced on a metal plate or by other mechanical contrivances, the validity of which is derived from a signed original. An otherwise proper document may be so authenticated mechanically with the knowledge and consent or under an express delegation of authority from the signer of the original provided that appropriate safeguards are observed in those respects."

The rule has statutory recognition. In any federal statute unless otherwise specified, the term "signature" includes "a mark when the person making the same intended it as such." 1 U.S.C. § 1; 71 Comp. Gen. 109 (1991) (definition of writing in 1 U.S.C. § 1 encompasses electronic data interchange technologies); 65 Comp. Gen. 806, 810 (1986).

When facsimile signatures are to be used by government officials, the safeguards should include:

- Standards for the authorization of the use of facsimile signatures,

- An enumeration of the types of documents on which facsimile signatures may be used,

- Physical control of the signature device to prevent unauthorized use, and

- Notification to officials authorized to use facsimile signatures that use of a signature device in no way lessens their responsibility or liability.

B-140697, Oct. 28, 1959 (approving use of facsimile signatures in the execution of contracts). Other cases approving the use or acceptance of facsimile signatures are 40 Comp. Gen. 5 (1960) (use by Air Force on purchase orders for small purchases); 33 Comp. Gen. 297 (1954) (certification of invoice bearing only rubber stamp signature of vendor); B-194970, July 3, 1979 (certification of voucher/purchase order bearing only facsimile signature of contracting officer); B-150395, Dec. 21, 1962 (use by Navy on purchase orders); B-126776-O.M., Mar. 5, 1956 (use by Army on certificates of availability of government quarters and/or mess in support of military travel vouchers); B-104590, Sept. 12, 1951 (use on vouchers in federal educational grant programs).[50]

A more recent case held that payment could be certified on the basis of a contractor's facsimile ("fax") invoice, again provided that the agency has adequate internal controls to guard against fraud and overpayments and it determines that accepting facsimiles is beneficial to and cost-effective for the government. See B-242185, Feb. 13, 1991, citing several cases authorizing the acceptance of carbon copies.

One place where facsimile signatures are not permitted is the Standard Form 210, the signature/designation card for certifying officers which must be filed with the Treasury Department and which must bear the certifying officer's original, manual signature. 1 TFM 4-1125.

Most of the cases cited thus far have involved relatively primitive devices such as rubber stamps or signature machines. When we move into the realm of computerized data transmission, the equipment is far more sophisticated but the underlying principles are the same—there is no prohibition but there must be adequate safeguards.

In the 1980s, GAO and the Treasury Department began to consider the feasibility of electronic certification of payment vouchers. In a 1984 memorandum to one of GAO's audit divisions, GAO's General Counsel agreed with the Treasury Department that there is no specific legal requirement that a certifying officer's certification be limited to writing on

[50] An early case, B-36459, Apr. 6, 1944, suggesting that use of facsimile signatures somehow required GAO approval has not been followed and should be disregarded.

paper. Then, applying the precedent of the earlier rubber stamp cases, the memorandum concluded that electronic certification, with adequate safeguards, was not legally objectionable. The "signature" could be an appropriate symbol adopted by the certifying officer, which should be unique, within the certifying officer's sole control or custody, and capable of verification by the disbursing officer. B-216035-O.M., Sept. 20, 1984.

Treasury subsequently developed a proposal for a prototype electronic certification system, which GAO found to adequately satisfy the statutory requirements for voucher certification and payment. B-216035-O.M., Sept. 25, 1987.[51] In 1998, Congress enacted legislation that required executive agencies to implement procedures for the use and acceptance of electronic signatures. Government Paperwork Elimination Act, Pub. L. No. 105-277, § 1703, 112 Stat. 2681, 2681-749 (Oct. 21, 1998), *at* 44 U.S.C. § 3504 note. The E-Government Act of 2002 contains a provision to ensure the compatibility of executive agency methods for use and acceptance of electronic signatures.[52] Treasury issued guidelines in 1998 for the full implementation of an electronic certification system as the required method of submission of vouchers and schedule of payments to the Financial Management Service. 1 TFM 4-2030.10. The guidelines provide that an authorized ECS (electronic certifying system) certifying officer "will be held responsible for the correctness of the facts stated on the voucher or its supporting documents, and to the effect that payment is proper from the appropriations shown on the basic voucher or voucher-schedule." 1 TFM 4-2040.10.

### f. GAO Audit Exceptions

"Taking an exception" is a device GAO uses to formally notify an accountable officer of a fiscal irregularity which may result in personal liability. Today, this device is very rarely used. At one time, accountable officers had to submit all of their account documents to GAO, and GAO "settled" the accounts (31 U.S.C. § 3526(a)) by physically examining each piece of paper. Exceptions were common during that era. The nature of the process has evolved in recent decades in recognition of the increased responsibility of agencies in establishing their own financial systems and controls. Account settlement now is more a matter of systems evaluation and the review of administrative surveillance and the effectiveness of

[51] A related issue is the use of electronic technology in creating obligations under 31 U.S.C. § 1501. For more information on this topic, see the discussion in Chapter 7.

[52] Pub. L. No. 107-347, § 203, 116 Stat. 2899, 2912 (Dec. 17, 2002), *at* 44 U.S.C. § 3501 note.

collection and disbursement procedures. Examination of individual transactions by GAO is minimal. *See* GAO, *Policy and Procedures Manual for Guidance of Federal Agencies* (hereafter GAO-PPM), title 7, § 8.5 (Washington, D.C.: May 18, 1993). However, fiscal irregularities still come to GAO's attention in various ways (through its normal audit activities, agency irregularity reports, *etc.*), and GAO may invoke the exception procedure when warranted by the circumstances. The process is summarized in 7 GAO-PPM § 8.6. Examples are noted in 65 Comp. Gen. 858, 861 (1986), *modified by* 70 Comp. Gen. 463 (1991) (massive travel fraud scheme), and B-194727, Oct. 30, 1979 (fraudulent misappropriation of mass transit grant funds by government employee).

The first step in the exception process is the issuance of a "Notice of Exception" to the agency concerned. The issuance of a Notice of Exception does not itself constitute a definite determination of liability. It has been described as "in the nature of a challenge to the propriety of a certifying officer's action in certifying the voucher for payment." B-69611, Oct. 27, 1947. The certifying or disbursing officer, through his or her agency, then has the opportunity to respond to the exception. It is the accountable officer's responsibility to establish the propriety of the payment. 13 Comp. Gen. 311 (1934). If the reply to the exception is satisfactory, the exception is withdrawn. *E.g.*, B-78091, Nov. 2, 1948. If the reply does not provide a satisfactory basis to remove the exception, the item is "disallowed" in the account.

Technically, the term "disallowance" applies only to disbursing officers since a certifying officer does not have physical custody of funds and does not have an "account" in the same sense that a disbursing officer does. Thus, strictly speaking, GAO "disallows an expenditure" in the account of a disbursing officer and "raises a charge" against a certifying officer. *See* 32 Comp. Gen. 499, 501 (1953); A-48860, Apr. 14, 1950. For account settlement purposes, a certifying officer's "account" consists of the certified vouchers and supporting documents on the basis of which payments have been made by a disbursing officer and included in the disbursing officer's account for a particular accounting period. B-147293-O.M., Feb. 21, 1962.

The taking of an exception does not preclude submission of a relief request under applicable relief legislation. As a practical matter, if the agency has been unable to respond satisfactorily to the Notice of Exception, the likelihood of there being adequate basis for relief is diminished

correspondingly. However, as in 65 Comp. Gen. 858, it can happen, and the possibility should therefore not be dismissed.

## 2. Certifying Officers

### a. Duties and Liability

As we have seen, a certifying officer is the official who certifies a payment voucher to a disbursing officer. The responsibility and accountability of certifying officers are specified in 31 U.S.C. § 3528(a), part of the previously noted 1941 legislation enacted to clarify the roles of accountable officers under Executive Order No. 6166, June 10, 1933 (*see* note at 5 U.S.C. § 901). The certifying officer is responsible for (1) the existence and correctness of the facts stated in the certificate, voucher, and supporting documentation; (2) the correctness of computations on the voucher; and (3) the legality of a proposed payment under the appropriation or fund involved. The statute further provides that a certifying officer will be accountable for the amount of any "illegal, improper, or incorrect" payment resulting from his or her false or misleading certification, as well as for any payment prohibited by law or which does not represent a legal obligation under the appropriation or fund involved.

There is a recurring appropriation act provision, discussed in section C.4.b of Chapter 4 under the heading "Employment of Aliens," which bars the use of appropriated funds to pay the compensation of a government employee who is not a United States citizen, subject to certain exceptions. The provision applies only to employees whose post of duty is in the continental United States. Thus, a certifying officer (or disbursing officer) in the continental United States must be a U.S. citizen unless one of the exceptions applies. There is no comparable requirement applicable to employees outside the continental United States. B-206288-O.M., Aug. 4, 1982.

A certifying officer must normally be an employee of the agency whose funds are being spent, but may be an employee of another agency under an authorized interagency transaction or agreement. 72 Comp. Gen. 279 (1993); 59 Comp. Gen. 471 (1980); 44 Comp. Gen. 100 (1964).

A certifying officer is liable the moment an improper payment is made as the result of an erroneous or misleading certification. *E.g.*, 54 Comp. Gen. 112, 114 (1974). This is true whether the certification involves a matter of fact, a question of law, or a mixed question of law and fact.

55 Comp. Gen. 297, 298 (1975) (citing several other cases). As a general proposition, the government looks first to the certifying officer for reimbursement even though some other agency employee may be liable to the certifying officer under administrative regulations. 32 Comp. Gen. 332 (1953); 15 Comp. Gen. 962 (1936). The fact that a certifying officer receives instructions from superiors to make the improper payment does not relieve him from liability. B-271021, Sept. 18, 1996. Also, the certifying officer's liability does not depend on the government's ability or lack of ability to recoup from the recipient of the improper payment. 31 Comp. Gen. 17 (1951); 28 Comp. Gen. 17, 20 (1948). What this means is that the government is not obligated to seek first to recoup from the recipient, although it frequently does so, and of course any recovery from the recipient will reduce the certifying officer's liability, at least in most cases.

Occasionally there may be two certifying officers involved with a given payment, so-called "successive certifications." The rule is that the responsibility of the certifying officer certifying the basic voucher is not diminished by the subsequent action. GAO stated the principle as follows in a letter to the Secretary of the Treasury, B-142380, Mar. 30, 1960:

> "Where the certifying officer who certifies the voucher and schedule of payments is different from the certifying officer who certifies the basic vouchers, . . . the certifying officer who certifies the basic vouchers is responsible for the correctness of such vouchers and the certifying officer who certifies the voucher-schedule is responsible only for errors made in the preparation of the voucher-schedule."

*See also* 67 Comp. Gen. 457 (1988).

An illustration of how this principle may apply is 55 Comp. Gen. 388 (1975), involving the liability of General Services Administration certifying officers under interagency service and support agreements with certain independent agencies. Under the arrangement in question, the agency would assume certification responsibility for the basic expenditure vouchers, but they would be processed for final payment through GSA, with GSA preparing and certifying a master voucher and schedule to be accompanied by a master magnetic tape. Again quoting the above passage from B-142380, GAO concluded that the legal liability of the GSA certifying officer would be limited to errors made in the final processing. See also 72 Comp. Gen. 279 (1993), where a State Department certifying officer could certify an "emergency extraordinary expense voucher," submitted by

a Defense Attaché, which was not accompanied by supporting documentation because of security considerations. The certifying officer was only responsible for errors made on his own processing of the voucher and not for the underlying propriety of the certification by the Defense Attaché.

Similarly, the statutory accountability does not apply to an official who certifies an "adjustment voucher" used to make adjustments between accounts or funds in the Treasury in respect of an obligation already paid and which therefore does not involve paying money out of the Treasury to discharge an obligation. 23 Comp. Gen. 953 (1944). Although certification even in this situation should not be reduced to a "matter of form," the accountability would attach to the certifying officer who certified the basic payment voucher. *See* 23 Comp. Gen. 181, 183–84 (1943).

The function of certification is not perfunctory, but involves a high degree of responsibility. 55 Comp. Gen. 297, 299 (1975); 20 Comp. Gen. 182, 184 (1940). This responsibility is not alleviated by the press of other work. B-147747, Dec. 28, 1961.[53] It also involves an element of verification, the extent of which depends on the circumstances. For example, a voucher for goods or services should be supported by evidence that the goods were received or the services performed. 39 Comp. Gen. 548 (1960). Agencies are authorized to implement fast pay processes using certain controls to pay vendors subject to post-payment verification of the receipt and acceptance of goods and services ordered and the accuracy of invoices received. Federal Acquisition Regulation (FAR), 48 C.F.R. pt. 13 (2005); GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 7.4.D (Washington, D.C.: May 18, 1993). Generally, an independent investigation of the facts is not contemplated. *E.g.*, B-257334, June 30, 1995; 28 Comp. Gen. 571 (1949). Similarly, where proper administrative safeguards exist, certifying officers need not examine time, attendance, and leave records in order to certify the correctness of amounts shown on payrolls submitted to them. 31 Comp. Gen. 17 (1951).[54] A 1982 decision, 61 Comp. Gen. 477, reviewed the safeguards proposed by a Bonneville Power Administration certifying officer for certifying recurring payments

[53] But see B-138601, Jan. 18, 1960, in which the volume of work was taken into consideration in a somewhat extreme case.

[54] Many of the cases noted in the text, such as 31 Comp. Gen. 17, arose under manual systems. While they would still apply under a manual system, it is important to keep in mind the previously discussed differences in approach between manual and automated systems.

to a regional planning body and found them adequate to satisfy 31 U.S.C. § 3528. In the case of a compensatory damages award in settlement of an employee discrimination claim, certifying officers needed to ensure that all the items covered in the lump sum payment were statutorily permissible, that the amount of the payment did not exceed statutory limits, and that correct administrative procedures were followed. B-257334, June 30, 1995.

An example of the role of a certifying officer in verifying a payment is in B-301184, Jan. 15, 2004, in which certifying officers twice questioned payment for the cost of food at a program that was offered to employees at their permanent duty station for which appropriated funds were not available. In the decision, it was stated that:

> "In matters such as this, we carefully consider the views of certifying officers who request a decision pursuant to 31 U.S.C. § 3529(a)(2), in addition to those positions advanced by the agency's program officials, because the agency's certifying officers are the agency officials who, statutorily, are responsible for the propriety of all expenditures. 31 U.S.C. § 3528(a)(3) ('A certifying official certifying a voucher is responsible for . . . the legality of a proposed payment under the appropriation or fund involved'). Unlike other agency officials, certifying officers are personally financially liable for improper payments that they certify. 31 U.S.C. § 3528(a)(4) ('A certifying official certifying a voucher is responsible for . . . repaying a payment . . . (A) illegal, improper or incorrect because of an inaccurate or misleading certificate; (B) prohibited by law; or (C) that does not represent a legal obligation under the appropriation or fund involved')."

Whatever else the certifying officer's verification burden may or may not involve, it certainly involves questioning items on the face of vouchers or supporting documents, which simply do not look right. For example, a certifying officer who certifies a voucher for payment in the full amount claimed, disregarding the fact that the accompanying records indicate an outstanding indebtedness to the government against which the sum claimed is available for offset, is accountable for any resulting overpayment. 28 Comp. Gen. 425 (1949). Similarly, certifying a voucher in the full amount within a prompt payment discount period without taking the discount will result in liability for the amount of the lost discount. However, a certifying officer is not liable for failing, even if negligently, to

certify a voucher within the time discount period. 45 Comp. Gen. 447 (1966).

A clear illustration of a certifying officer's responsibility and liability occurred when a Department of Transportation employee fraudulently misappropriated more than $850,000 in 1977. The fraud was discovered by virtue of the employee's ostentatious purchases, including several luxury automobiles and a "topless" bar in Washington, D.C. The employee was found guilty and sent to jail. However, investigation revealed negligence on the part of a Department certifying officer. The employee had perpetrated the fraud by inserting his own name on six payment vouchers for Urban Mass Transportation Administration grants. Each voucher contained a list of approximately ten payees with individual amounts, and the total amount, and each had been certified by the certifying officer. The negligence occurred in one of two ways. If the employee inserted his own name and address on the voucher before presenting it to the certifying officer, the certifying officer was negligent in not spotting the name of an individual (whose name he should have known) with an address in suburban Maryland on a list of payees the rest of which were mass transit agencies. If the employee presented a partial voucher and added his own name after it was certified, the total as presented to the certifying officer could not have agreed with the sum of the individual amounts, and the certifying officer was negligent in not verifying the computation. GAO raised exceptions to the certifying officer's account, and advised the Department of Transportation that it must proceed with collection action against the certifying officer for the full amount of the excepted payments less any amounts recovered from the employee or through the sale of assets, like the topless bar, which the Justice Department seized. *See* B-194727, Oct. 30, 1979. Apparently in view of the clear negligence, relief was never requested.

At this point, it should be noted that no one involved in the process remotely expects that the government will be able to recover several hundred thousand dollars from a certifying officer, or from any other accountable officer, except perhaps one who has him(her)self stolen the money. However, the burden of having to repay even a portion in cases of losses of this size sends an important message and reinforces the certain if indeterminable deterrent effect of the statute.

Certifying officers should not certify payment vouchers that are unsupported by pertinent documentation indicating that procedural safeguards regarding payment have been observed. Vouchers that are

deficient in this regard should be returned to the appropriate administrative officials for proper approvals and supporting documents. B-257334, June 30, 1995; B-179916, Mar. 11, 1974.

An area in which a certifying officer's duty to question is minimal is payments to a contractor determined under a statutory or contractual disputes procedure. In the absence of fraud or bad faith by the contractor, a payment determination made under a disputes clause procedure is final and conclusive and may not be questioned by a certifying officer, GAO, or the Justice Department. *S&E Contractors, Inc. v. United States*, 406 U.S. 1 (1972); B-201408, Apr. 19, 1982. It does not follow that any administrative settlement is entitled to the same effect. In B-239592, Aug. 23, 1991, GAO found that an "informal settlement" of a personnel action between an agency and one of its employees was without legal authority and found the certifying officer liable for the unauthorized payments. (A subsequent letter, B-239592.2, Sept. 1, 1992, clarified that this meant the authorized certifying officer, not an official who had signed certain documents as "approving official" but was not responsible for determining the legality of the payment.)

A different issue involving an administrative settlement arose in 67 Comp. Gen. 385 (1988). After an investigation by federal and state officials, the Forest Service determined that it was responsible for a fire in a national forest in Oregon, and reimbursed the state for fire suppression expenses incurred under a cooperative agreement. Subsequently, a private landowner sued for damages resulting from the same fire, and the court made a finding of fact that the Forest Service was not liable. The certifying officer was concerned that the court's finding might have the effect of invalidating the prior payment to Oregon and making him liable for an erroneous payment. The decision concluded that the payment was proper when made, and that the court finding did not impose any duty on the certifying officer to reopen and reexamine it. *See also* B-262110, Mar. 19, 1997, where the Environmental Protection Agency used a cooperative agreement to provide for payment of the costs of travel and related expenses by nonfederal attendees of an EPA conference. If EPA had used a procurement agreement, as required, these costs would not have been allowable. Relief was granted the certifying officer and recipient of the funding because both acted in good faith in fulfilling obligations and had no basis for questioning the use of the inappropriate agreement.

A certifying officer has the statutory right to seek and obtain an advance decision from the Comptroller General regarding the lawfulness of any

payment to be certified. 31 U.S.C. § 3529.[55] This procedure will insulate the certifying officer against liability. Following the advice of agency counsel, on the other hand, does not guarantee protection against liability. *E.g.*, 55 Comp. Gen. 297 (1975). Having said this, we do not wish to imply that consulting agency counsel is a pointless gesture. *See* B-257893, June 1, 1995 (certifying officer's good faith was demonstrated, in part, by reliance on agency counsel approval of settlement agreement). On the contrary, it is to be encouraged. Seeking internal legal advice prior to certification of matters on which the certifying officer is unsure will in many cases obviate any need for an advance decision. In other cases it may help define those situations in which consulting GAO may be desirable.

As a final note, the Treasury Department has published a supplement to the Treasury Financial Manual entitled *Now That You're a Certifying Officer* (revised March 2005), which can be found at www.fms.treas.gov/publications.html (last visited September 15, 2005). Written expressly for certifying officers, it provides a good overview of the importance of the job and the responsibilities which accompany it.

### b. Applicability of 31 U.S.C. § 3528

There are two major exceptions to 31 U.S.C. § 3528(a). First, it applies only to the executive branch. While section 3528(a) is not limited by its terms to the executive branch, 31 U.S.C. § 3325(a), the basic requirement that disbursing officers disburse only upon duly certified vouchers, is expressly limited to the executive branch, and sections 3325(a) and 3528(a) originated as sections 1 and 2 of the same 1941 enactment. Thus, GAO has concluded that 31 U.S.C. § 3528(a) does not apply to the legislative branch. 21 Comp. Gen. 987 (1942); B-191036, July 7, 1978; B-236141.2, Feb. 23, 1990 (internal memorandum). *See also* B-39695, Mar. 27, 1945. It has also been held that 31 U.S.C. § 3325(a) does not apply to the judicial branch. B-6061, A-51607, Apr. 27, 1942. It follows that section 3528(a) would be equally inapplicable to the judicial branch. B-236141.2, cited above. In 1996, the

[55] The General Accounting Office Act of 1996, Pub. L. No. 104-316, title II, § 204, 110 Stat. 3826, 3845–46, (Oct. 19, 1996), amended the Comptroller General's authority under 31 U.S.C. § 3529 and transferred the authority to issue advance decisions with respect to transferred settlement functions under the Act to the Director of OMB, who in turn delegated specific functions to the Departments of Defense and Treasury, the General Services Administration, and the Office of Personnel Management. The Comptroller General retains the authority to issue decisions to disbursing or certifying officers and heads of agencies on matters involving the use of appropriated funds that do not involve settling a claim or other functions transferred to OMB. In addition, the Comptroller General retains the authority under 31 U.S.C. §§ 3527 and 3528 to grant relief to disbursing and certifying officers. *See* B-275605, Mar. 17, 1997.

United States Code was amended to authorize the designation and appointment of certifying and disbursing officers within the Department of Defense. *See* National Defense Authorization Act for Fiscal Year 1996, Pub. L. No. 104-106, div. A, title IX, subtitle B, § 913, 110 Stat. 186, 410–12 (Feb. 10, 1996). Previously, 31 U.S.C. § 3528 specifically exempted military departments from its applicability except for departmental pay and expenses in the District of Columbia.

Some legislative branch agencies now have their own legislation patterned after 31 U.S.C. § 3528. See statutes listed in section E.1.b of this chapter. Until recently, GAO decisions indicated that agencies that do not have their own legislation, including legislative branch agencies, nevertheless had the authority, within their discretion, to create their own certifying officers and to make them accountable by administrative regulation. The 1990 memorandum cited above, B-236141.2, contains a detailed discussion. *See also* B-247563.3, Apr. 5, 1996; B-260369, June 15, 1995; 21 Comp. Gen. at 989. These decisions reasoned that such liability, duly imposed by regulation, could be regarded as part of the employee's "employment contract." However, in B-280764, May 4, 2000, GAO reconsidered its position in a case involving the Department of Defense (DOD) and held that accountable officer status and liability can *only* be created by statute. GAO found no authority that would permit DOD to impose pecuniary liability by regulation on officials whom it refers to as "accountable officials" (but who are not certifying or disbursing officers) for erroneous payments resulting from information that they "negligently provide" to certifying officers. The 2000 decision overruled prior inconsistent decisions, which would include those applying to legislative branch agencies. There is a further discussion of B-280764 in section B.2 of this chapter.

### c. Relief

Informally known as the Certifying Officers' Relief Act, 31 U.S.C. § 3528(b) establishes a mechanism for the administrative relief of certifying officers governed by 31 U.S.C. § 3528(a).[56] There are two standards for relief. The Comptroller General may relieve a certifying officer from liability for an illegal, improper, or incorrect payment upon determining that—

- the certification was based on official records and the certifying officer did not know, and by reasonable diligence and inquiry could not have discovered, the actual facts; or

[56] For a discussion of military certifying officers as of 1996, see sections B.2, C.1.b, and C.2.b.

- the obligation was incurred in good faith, the payment was not specifically prohibited by statute, and the United States received value for the payment.

Under either standard, relief may be denied if the agency fails to diligently pursue collection action against the recipient of the improper payment. 31 U.S.C. § 3528(b)(2).

Unlike the physical loss relief statutes previously discussed, 31 U.S.C. § 3528(b) does not require administrative determinations by the agency as a prerequisite to relief. The determinations under section 3528(b) are made by the Comptroller General. Also, the relief standards under section 3528(b) are stated in the alternative; relief may be granted if either of the two standards can be established. It makes no difference whether the improper payment is discovered by GAO or the agency concerned. B-137435-O.M., Oct. 14, 1958. Relief is discretionary (the statute says "may relieve"), although no case has been discovered in which a certifying officer who met either of the standards was not relieved.

There is no special form of request under 31 U.S.C. § 3528(b). Relief may be requested by the agency on behalf of the certifying officer, or directly by the certifying officer. *See*, *e.g.*, 31 Comp. Gen. 653 (1952) (example of the latter). Relief requests must present sufficient information to permit GAO to make one of the required findings. *E.g.*, B-288284, May 29, 2002; B-251994, Sept. 24, 1993; B-191900, July 21, 1978.

One of the objectives of 31 U.S.C. § 3528(b) was to reduce the volume of private relief legislation recommended on behalf of certifying officers. The legislative history of the statute indicates that an agency should seek relief from GAO before considering relief legislation. As to those "less meritorious cases" in which relief may be denied, relief legislation remains an available option. 30 Comp. Gen. 298 (1951).

The first relief standard, 31 U.S.C. § 3528(b)(1)(A), relates essentially to the certification of incorrect facts, and permits relief if the certification was based on official records and if the certifying officer did not know, and could not reasonably have learned, the actual facts. GAO has never attempted to formulate a general rule as to what acts may support relief from the certification of incorrect facts. Rather, the approach is as stated in 55 Comp. Gen. 297, 299–300 (1975):

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 452 of 728



> "[W]e have sought to apply the relief provisions by considering the practical conditions and procedures under which certifications of fact are made. Consequently, the diligence to be required of a certifying officer before requests for relief under the act will be considered favorably is a matter of degree dependent upon the practical conditions prevailing at the time of certification, the sufficiency of the administrative procedures protecting the interest of the Government, and the apparency of the error."

For example, Social Security Administration certifying officers who certify large numbers of awards each month may, apart from obvious errors, rely on the award documents presented for certification. B-119248-O.M., Apr. 14, 1954. Moreover, in B-247563.3, Apr. 5, 1996, we recognized that certifying officers located at automated finance centers at the Department of Veterans Affairs rely, necessarily, on the integrity of the automated payment system as a whole and do not physically examine hard copy documentation (vouchers) in each and every case. The reasonableness of the certifying officer's reliance on an automated payment system must be based on a "showing that the system on which they rely is functioning properly and reviews should be made at least annually to determine that the automated payment system is operating effectively and can be relied upon to make accurate and legal payments." *Id.*

In B-237419, Dec. 5, 1989, relief was granted to a Forest Service certifying officer who certified the refund of a timber purchaser's cash bond deposit without knowing that the refund had already been made. The certifying officer had followed proper procedures by checking to see if the money had been refunded, but did not discover the prior payment because it had not been properly recorded. Also, the agency was pursuing collection efforts against the payee.

In B-254385, Mar. 22, 1994, relief was granted to a certifying officer at the National Science Foundation (NSF) who certified a payment to the wrong contractor because an incorrect code had been entered into NSF's automated payment system. We noted that because of the high volume of payments, it would be an undue burden to require the certifying officer to examine the supporting materials of each payment. GAO's *Policy and Procedures Manual for Guidance of Federal Agencies* recognizes the impracticality of requiring accountable officers to examine, personally, each transaction and advises that accountable officers may rely on the adequacy of automated systems and controls and the personnel who

operate these systems and process individual transactions. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 7.2(A), (Washington, D.C.: May 18, 1993).

Another case in which relief was granted under 31 U.S.C. § 3528(b)(1)(A) is B-246415, July 28, 1992. A certifying officer paid a contract invoice to a financing institution to which payments had been assigned under the Assignment of Claims Act without discovering that the contract file contained a prior assignment. The contracting officer had erroneously acknowledged the second assignment when he should have either rejected it or invalidated the first one. The agency remained liable to the first assignee and was unable to recover the improper payment from the second. The certifying officer had checked the contract file, and neither agency procedures nor reasonable diligence required her to keep looking once she found what appeared on its face to be a properly acknowledged assignment. The case also illustrates how an agency (the Panama Canal Commission in this case) should respond to a loss—by reviewing its procedures to determine if they can be improved, within reason, to prevent recurrence. In this instance, the agency began requiring that contract files include a "milestone" log and that assignments be tabbed in the file and reviewed prior to acknowledgment. *See also* B-287043, May 29, 2001.

In B-288284.2, Mar. 7, 2003, due to widespread violence in the Republic of the Congo, the staff of the American Embassy in Kinshasa was evacuated to the Embassy in Brazzaville in June 1993. During this crisis, Air Afrique apparently threatened to cut off its transportation services to embassy personnel unless a payment was made for evacuating embassy pets during a similar crisis in 1991. The certifying officer certified the payment, relying on fiscal data provided over the telephone by Kinshasa staff. (This same certifying officer had not authorized the 1991 payment, questioning it as being personal expenses of embassy staff.) We granted relief to the certifying officer under 31 U.S.C. § 3528(b)(1)(A), noting that given the circumstances in the Congo at that time and the urgency of the need to evacuate government employees and their families from a dangerous situation, it would have been an undue burden to require that the certifying officer seek further documentation or personally examine supporting materials behind the Kinshasa official's authorization and transmission of fiscal data.

As a general rule, however, a certifying officer may not escape liability for losses resulting from improper certification merely by stating either that he was not in a position to determine that each item on a voucher was

correctly stated, or that he must depend on the correctness of the computations of his subordinates. A certifying officer who relies upon statements and computations of subordinates must assume responsibility for the correctness of their statements and computations, unless it can be shown that neither the certifying officer nor his or her subordinates, in the reasonable exercise of care and diligence, could have known the true facts. 55 Comp. Gen. 297, 299 (1975); 26 Comp. Gen. 578 (1947); 20 Comp. Gen. 182 (1940).

In 49 Comp. Gen. 486 (1970), a certifying officer asked if he would be held accountable where his own agency would not tell him exactly what he was being asked to certify. The agency took the position that the expenses in question were confidential and could be disclosed only to those with a need to know, which did not include the certifying officer. GAO disagreed. The situation would be different if the agency were operating under "unvouchered expenditure" authority such as 31 U.S.C. § 3526(e)(2). Under that type of authority, a certifying officer who is not informed of the object or purpose of the expenditure is not accountable for its legality. 24 Comp. Gen. 544 (1945). In the case at hand, however, the agency had no such authority. Therefore, the certifying officer would not be protected against liability if he certified a voucher without knowing what it represented. As GAO pointed out several years later, any other answer would defeat the purpose of the certification requirement, which is to protect the United States against illegal or erroneous payments. 55 Comp. Gen. 297, 299 (1975). Except for statutorily authorized unvouchered expenditures, "I don't know and they wouldn't tell me" cannot be sufficient.

The second relief standard, 31 U.S.C. § 3528(b)(1)(B), contains three elements, all of which must be satisfied—obligation incurred in good faith, payment not specifically prohibited, United States received value for the payment. If a certifying officer qualifies for relief under this standard, it becomes irrelevant whether he or she could also have qualified under the first standard. This is particularly useful because, in many cases, what would constitute reasonable diligence and inquiry for purposes of the first standard is far from clear.

There is no simple formula for determining good faith. An important factor in evaluating good faith for purposes of 31 U.S.C. § 3528 is whether the certifying officer had, or reasonably should have had, doubt regarding the propriety of the payment and, if so, what he or she did about it. Whether the certifying officer reasonably should have been in doubt depends on a weighing of all surrounding facts and circumstances and cannot be

resolved by any "hard and fast rule." 70 Comp. Gen. 723, 726 (1991). In many cases, good faith is found simply by the absence of any evidence to the contrary. *Id.* *See also* B-262110, Mar. 19, 1997.

At one time, the failure to obtain an advance decision from GAO on matters considered doubtful was viewed as an impediment to establishing good faith. *E.g.*, 14 Comp. Gen. 578, 583 (1935). Depending on the circumstances, following the advice or instructions of some administrative official in lieu of seeking an advance decision may not constitute "reasonable inquiry" under the first relief standard of 31 U.S.C. § 3528. 31 Comp. Gen. 653 (1952). However, it has become increasingly recognized that consulting agency counsel is a relevant factor in demonstrating good faith under the second standard. B-191900, July 21, 1978; B-127160, Apr. 3, 1961. In B-250884, Mar. 18, 1993, GAO granted relief to a certifying officer who relied, not on agency counsel directly, but on agency guidelines, which had been reviewed by agency counsel. (GAO also noted in that decision that agency guidelines had been subsequently revised.) Similarly, in B-257893, June 1, 1995, GAO found that the certifying officer's good faith was demonstrated, in part, by reliance on a settlement agreement which had been approved by agency counsel.

To understand the second element—"no law specifically prohibited the payment"—it is helpful to note the language of the original 1941 enactment, which was "the payment was not contrary to any statutory provision specifically prohibiting payments of the character involved." Pub. L. No. 389, ch. 641, 55 Stat. 875–76 (Dec. 29, 1941). This means statutes that expressly prohibit payments for specific items or services. 70 Comp. Gen. 723, 726 (1991); B-191900, July 21, 1978. In B-300192, Nov. 13, 2002, we described section 117 of Public Law No. 107-229, 116 Stat. 1465, 1468 (Sept. 30, 2002) (the fiscal year 2003 continuing resolution) as amended, as such a statute. Section 117 prohibits the use of fiscal year 2003 appropriated funds to pay for printing of the budget of the United States other than by the Government Printing Office. Other examples are 31 U.S.C. § 1348(a) (telephones in private residences) and 44 U.S.C. § 3702 (newspaper advertisements without prior written authorization).

Under this interpretation, the phrase "no law specifically prohibited the payment" is not the same as the more general "payment prohibited by law." It does not include violations of general fiscal statutes such as the

Antideficiency Act (31 U.S.C. § 1341) or the general purpose statute (31 U.S.C. § 1301(a)). B-142871-O.M., Sept. 15, 1961.[57]

The third element, value received, normally implies the receipt of goods or services with a readily determinable dollar value. *E.g.*, B-241879, Apr. 26, 1991 (automatic data processing equipment maintenance contract extended without proper delegation of procurement authority, services were performed). *But cf.* B-303177, Oct. 20, 2004 (certifying officer denied relief where government did not receive any value as a result of the erroneous payments). However, in appropriate circumstances, an intangible item may constitute value received where the payment in question has achieved a desired program result. In B-257893, June 1, 1995, for example, the National Archives and Records Administration received the benefits associated with avoiding litigation and related costs by entering into a settlement agreement, despite the fact that the agreement had improperly included the payment of attorney fees. *See also* B-250884, Mar. 18, 1993; B-191900, July 21, 1978; B-127160, Apr. 3, 1961.

## 3. Disbursing Officers

### a. Standards of Liability and Relief

As with certifying officers, the responsibilities and accountability of disbursing officers are mandated by statute. A disbursing officer in the executive branch must (1) disburse money only in accordance with vouchers certified by the head of the spending agency or an authorized certifying officer, and (2) examine the vouchers to the extent necessary to determine that they are (a) in proper form, (b) certified and approved, and (c) correctly computed on the basis of the facts certified. The disbursing officer is accountable for these functions, except that accountability for the correctness of computations lies with the certifying officer. 31 U.S.C. § 3325(a). Disbursing officers render their accounts quarterly. 31 U.S.C. § 3522(a)(1).

[57] One case, B-222048, Feb.10, 1987, implying that an Antideficiency Act violation would preclude relief under 31 U.S.C. § 3528(b)(1)(B), is inconsistent with the weight of authority as discussed in the text.

The administrative relief provision for nonmilitary disbursing officers is 31 U.S.C. § 3527(c), enacted in 1955.[58] The Comptroller General is authorized to relieve present or former disbursing officers from liability for deficiencies in their accounts resulting from illegal, improper, or incorrect payments, upon determining that the payment was not the result of bad faith or lack of reasonable care by the disbursing officer. The determination may be made by the agency and concurred in by GAO, or it may be made by GAO on its own initiative. As in the case of certifying officers, relief may be denied if the agency concerned fails to diligently pursue collection action against the recipient of the improper payment.

The statute further provides that the granting of relief under section 3527(c) does not affect the liability or authorize the relief of the beneficiary or recipient of the improper payment nor does it diminish the government's duty to pursue collection action against the beneficiary or recipient. 31 U.S.C. § 3527(d)(2).

In contrast with the certifying officer relief statute, 31 U.S.C. § 3527(c) is not limited to the executive branch. *E.g.*, B-288163, June 4, 2002; B-200108, B-198558, Jan. 23, 1981 (judicial branch).

The relief statute contemplates the consideration of individual cases and does not authorize the blanket relief of unknown disbursing officers for unknown amounts. B-165743, May 11, 1973.

Once it is determined that there has been an improper payment for which a disbursing officer is accountable, and that relief is desired, the primary issue is whether the payment was or was not the result of bad faith or lack of reasonable care on the part of the disbursing officer. "Bad faith" is difficult to define with any precision. It is somewhere between negligence and actual dishonesty, and closer to the latter. Bad faith cases tend to be relatively uncommon. Far more common are cases involving the reasonable care standard. This standard—whether the disbursing officer exercised reasonable care under the circumstances—is the legal definition of negligence and is the same standard applied in physical loss cases. 65 Comp. Gen. 858, 861–62 (1986); 54 Comp. Gen. 112 (1974).

[58] Pub. L. No. 365, ch. 803, 69 Stat. 687 (Aug. 11, 1955). See also section B.2.b, including the discussion of military disbursing officers.

The determination of whether a payment was or was not the result of bad faith or lack of due care must be made on the basis of the facts and circumstances surrounding the particular payment in question. A high error rate in the disbursing office involved does not automatically establish lack of due care in the making of a particular payment nor does a low error rate and a record of an exemplary operation automatically establish due care. B-141038-O.M., Nov. 17, 1959; B-136027-O.M., June 13, 1958. The continued existence of an "inherently dangerous" procedure, however, does indicate lack of due care on the part of the responsible disbursing officer. B-162629-O.M., Nov. 9, 1967.

It is difficult, if not impossible, to state hard and fast rules applicable inflexibly to all cases involving relief under the provisions of 31 U.S.C. § 3527(c). What may be considered good faith and the exercise of due care in one set of circumstances may not be so considered in another. However, it may be stated generally that GAO will grant relief where (1) the agency has made proper efforts to collect from the recipient of the improper payment, (2) the agency has determined that the payment was not the result of bad faith or lack of due care on the part of the disbursing officer, and (3) no evidence to the contrary is available. Also, relief may be granted without the administrative determination where due care and the absence of bad faith are evident from the facts.

Actual negligence which contributes to an improper payment will, of course, preclude the granting of relief. For example, making a payment on the basis of documents which have been obviously altered, without first seeking clarification, is not the exercise of due care. B-233276, Oct. 31, 1989, *aff'd upon reconsideration*, B-233276, June 20, 1990; B-138593-O.M., Feb. 18, 1959; B-135910-O.M., July 14, 1958. Similarly, relief was denied in the following cases:

- Disbursing officer made duplicate payments on voucher schedule covering payments already made. Disbursing officer had requested guidance on new procedures, and "duplicate" schedule with instructions had been sent to her in response to that request, with a cover letter clearly stating that the schedule covered payments previously made. The payment could only have been due to lack of due care. B-142051, Mar. 22, 1960.

- Disbursing officer continued to pay New Mexico gasoline tax after State Attorney General and Judge Advocate General had both concluded that the United States was not liable for the tax. Although

the disbursing officer was aware of the rulings, he claimed that he had not received specific instructions to stop paying. B-135811, May 29, 1959.

- Disbursing officer reimbursed imprest fund on the basis of fictitious requisitions not supported by dealers' invoices or delivery slips. B-137723-O.M., Dec. 10, 1958.

As with physical losses, failure to follow applicable regulations is generally regarded as negligence, and if an improper payment is attributable to that failure, relief will be denied. For example, in B-271608, June 21, 1996, relief was denied a disbursing officer who failed to exercise due care, as evidenced by his failure to follow prescribed procedures. *See also* 54 Comp. Gen. 112, 116 (1974); 44 Comp. Gen. 160 (1964).

In B-271021, Sept. 18, 1996, a disbursing officer failed to follow regulations and was denied relief, even though the disbursing officer had received instructions from superiors to make the improper payment. Compliance with regulations will help establish due care, but the mere fact of compliance with regulations which are clearly insufficient may not always satisfy the standard. B-192558, Dec. 7, 1978.

The concept of proximate cause is also applicable, and relief is appropriate where any negligence that may have existed was not the proximate cause of the improper payment. In one case, for example, local operating procedures at a military installation were found inadequate because they permitted personal checks to be cashed without checking identification cards. However, since the cashiers checked ID cards on their own initiative, and did so in the case for which relief was sought, the inadequacy could not have contributed to the loss. B-221415, Mar. 26, 1986. Also, in B-288163, June 4, 2002, a bankruptcy judge had ordered a disbursing officer to pay funds to a false claimant. In that case, we found that the disbursing officer's error was not the proximate cause of the loss because the judge had ordered the payment. For other examples, see B-227436, July 2, 1987, and B-217663, July 16, 1985.

The essence of negligence is the existence of a duty to exercise reasonable care in a particular situation and the violation of that duty. In B-188744, July 15, 1977, a Bureau of Indian Affairs disbursing officer erroneously made a payment to the wrong heir. Unknown to him, the probate and title determinations on which he had based the payment had been reopened and revised. Under established procedures, the disbursing officer was neither

required nor expected to verify inheritance determinations. Since the verification was not within the scope of his duty, and was not something anyone in his position would reasonably be expected to do, there was no lack of due care. *See also* B-137223-O.M., Jan. 18, 1960. Thus, negligence will generally not be imputed to a disbursing officer where payment is made on the basis of facts of record upon which the disbursing officer is or reasonably can be expected to rely, even though such facts are subsequently found to be erroneous. This assumes that there is nothing on the face of the documents presented to the disbursing officer which should reasonably have alerted him or her that something appeared to be wrong.

A disbursing officer is accountable for payments made by his or her subordinates. However, relief may be granted under 31 U.S.C. § 3527(c) if the improper payment was not the result of bad faith or lack of due care attributable to the disbursing officer personally. B-141038-O.M., Nov. 17, 1959. Where the actual disbursement is made by a subordinate, relief for the supervisory disbursing officer requires a showing that the disbursing officer exercised adequate supervision. Adequate supervision in this context means that the disbursing officer (1) maintained an adequate system of controls and procedures to avoid errors, and (2) took appropriate steps to ensure that the system was effective and was being followed at the time of the payment in question. *E.g.*, 62 Comp. Gen. 476, 480 (1983). A relief request must contain sufficient information to enable an independent evaluation. B-235037, Sept. 18, 1989.

GAO has not attempted to define the elements of an adequate supervisory system. There can in fact be no fixed formula, as the system will vary based on such factors as the size of the disbursing operation and the types of payments or transactions involved. Nevertheless, several elements which commonly appear in good systems can be identified (although no single case lists them as such):

- *Compliance with agency regulations*. For example, a disbursing office at an American embassy will need to ensure compliance with any pertinent directives or financial management regulations of the State Department. *See* B-271896, Mar. 4, 1997.

- *Locally developed instructions (often called standard operating procedures or SOPs) tailored to the needs of the particular disbursing office*. Relief requests should include copies of any relevant SOPs. In B-241019, Aug. 19, 1991, we initially denied relief to a supervisory disbursing officer because the record did not contain evidence either

that (1) the officer maintained an adequate system of procedures and controls (SOPs were inadequate), or (2) that the officer took steps to ensure that the procedures were implemented effectively. (This case was reversed upon reconsideration in B-241019.2, Feb. 7, 1992, when additional information pertaining to the procedures was provided to GAO.) While SOPs are extremely helpful, the lack of a written SOP will not in and of itself cause a system to "flunk" the relief standard. *E.g.*, B-215226, Apr. 16, 1985.

- *Training.* This includes both initial training for new personnel and periodic refresher training, again tailored to the needs of the particular office. Training in this context does not necessarily mean formal classroom training, but may be in the form of on-the-job training and may include such devices as reading files which are circulated periodically and especially when pertinent changes occur.

- *Periodic review or inspection by the supervisor.* The forms this may take will vary with the size and nature of the operation.

The adequacy of a supervisory system is not, nor could it realistically be, measured against a zero-error standard. Many cases have made the point that a skillfully executed criminal scheme can occasionally outwit an adequate and well-supervised system. *E.g.*, B-241880, Aug. 14, 1991; B-202911, June 29, 1981. Similarly, human error will occur even in the most carefully established and supervised system. The best system cannot be expected to eliminate or detect every clerical error by a subordinate. *E.g.*, B-224961, Sept. 8, 1987; B-212336, Aug. 8, 1983.

The cases also recognize that, in a large operation, the supervisory disbursing officer cannot reasonably be expected to personally review every check that is issued or every cash payment that is made. *E.g.*, B-215734, Nov. 5, 1984 (check cashed with fraudulent endorsement); B-194877, July 12, 1979 (amounts of two payments inadvertently switched, resulting in overpayment to one payee); B-187180, Sept. 21, 1976 (wrong amounts inserted on checks). *See also* B-266001, May 1, 1996. Thus, it is possible for a supervisor to be relieved for an error by a subordinate which, if attributable to the disbursing officer personally, would have resulted in the denial of relief. We previously cited several cases denying relief for payments made on the basis of obviously altered documents. These were cases in which the disbursing officer saw or should have seen the documents. Relief has been granted for similar losses occurring in otherwise adequate systems under which the supervisor was not required

to see, and in fact did not see, the altered document. B-141038-O.M., Nov. 17, 1959.

Where the subordinate who made the payment is also an accountable officer (a cashier, for example), the standard for relieving the subordinate is whether the individual complied with established procedures and whether anything occurred which should reasonably have made the individual suspicious that something was wrong. *E.g.*, B-246418, Feb. 3, 1992; B-233997.3, Nov. 25, 1991; B-241880, Aug. 14, 1991. Depending on the particular facts, in cases involving two disbursing officers accountable for a payment, one a supervisor and the other a subordinate, it is possible for relief to be granted to both, denied to both, or granted to one and denied to the other. Examples of cases applying the above standards in which relief was granted to both the supervisor and the subordinate disbursing officer are B-271017, Aug. 12, 1996, and B-260753, Jan. 11, 1996. Examples of cases applying the above standards in which relief was granted to the supervisor but not the subordinate are: B-260369, June 15, 1995 (cashier failed to follow procedures); B-231503, June 28, 1988 (cashier failed to observe annotations on voucher); and B-214436, Apr. 6, 1984 (agency declined to seek relief for subordinate who had failed to follow established procedures).

In our coverage of physical loss cases, we emphasized the importance of statements by the accountable officer. The principle applies equally in improper payment cases. The existence of adequate controls and procedures is usually documented, but this is not always the case, and the passage of time may make it impossible to locate a copy of the specific version of the SOPs in effect at the time of the payment. Also, testimony of the accountable officer(s) and other involved persons is often the only way of establishing how the controls and procedures were being implemented at the time of the payment. While the disbursing officer's own statement is obviously not disinterested and cannot be regarded as conclusive, it is always given appropriate weight and, as with unexplained loss cases, has often been enough to tip the balance in favor of relief where the record contains no controverting evidence or where documentary evidence is no longer available. Examples are B-234962, Sept. 28, 1989; B-215226, Apr. 16, 1985; B-217637, Mar. 18, 1985; B-216726, Jan. 9, 1985; B-215833, Dec. 21, 1984; and B-212603 *et al.*, Dec. 12, 1984.

Finally, a disbursing officer has the same statutory right as a certifying officer to obtain an advance decision from the Comptroller General. 31 U.S.C. § 3529.[59] *See* B-270801, Mar. 19, 1996. Obviously, if the decision is to serve the purpose of protecting the disbursing officer, the request must include the facts which gave rise to the doubt. 20 Comp. Gen. 759 (1941). Following administrative advice in lieu of seeking a GAO decision may, depending on the circumstances, bear upon the issue of whether the disbursing officer exercised due care. *E.g.*, 49 Comp. Gen. 38 (1969). We previously noted that consulting agency counsel will help a certifying officer establish good faith. There is no reason why it should not equally help a disbursing officer establish good faith and due care, although it may not be enough if the advice received flies in the face of contrary information in the hands of the disbursing officer. *E.g.*, 65 Comp. Gen. 858 (1986), *aff'd upon reconsideration*, B-217114.5, June 8, 1990, *modified on other grounds*, 70 Comp. Gen. 463 (1991). Whichever course of action is chosen, the disbursing officer faced with a doubtful payment needs to do something. The road to relief will be very difficult if a disbursing officer who is admittedly in doubt proceeds to make the payment without consulting either GAO or appropriate agency officials. *See* 23 Comp. Gen. 578 (1944).

### b. Some Specific Applications

The federal government disburses money in an immense variety of situations—payments to employees (salary, allowances, awards), payments to contractors, payments under assistance programs, payments to various claimants, *etc*. Every situation in which proper payments can be made presents the potential for improper payments, resulting from such things as fraud, government error, or the misapplication of legal authority or limitations. To illustrate some of the situations that may arise, we present here a selection of improper payments for which relief has been sought under 31 U.S.C. § 3527(c). In each case, the relief question was approached by applying the principles and standards discussed in the previous section D.3.a. As noted above in sections B.2, C.1.b, and C.2.b of this chapter, the statutory scheme for military accountable officers was

[59] Effective on the date of enactment, section 204 of the General Accounting Office Act of 1996, Pub. L. No. 104-316, 110 Stat. 3826, 3845–46 (Oct. 19, 1996), amended the Comptroller General's authority under 31 U.S.C. § 3529 and transferred the authority to issue advance decisions with respect to the claims settlement functions transferred by section 211 of the Act to the Director of OMB or to the agency to which the function was delegated. The Comptroller General retains the authority to issue decisions to disbursing or certifying officers and heads of agencies on matters involving the use of appropriated funds that do not involve settling a claim or other function transferred to OMB.

changed by section 913 of Public Law No. 104-105, div. A, title IX, subtitle B, 110 Stat. 186, 410–12 (Feb. 10, 1996). Section 913 amended 31 U.S.C. § 3527(b) to apply to all accountable officials of the armed forces and included a new section 3527(b)(1)(B) providing relief for erroneous payments made by military accountable officials. As in the case of a physical loss or deficiency, the finding of the Secretary involved regarding whether the circumstances warrant relief is conclusive on the Comptroller General. GAO has not yet addressed relief of military accountable officials for erroneous payments under the revised section 3527(b). Nevertheless, consideration of the principles addressed in the following cases is still useful.

(1) Fraudulent travel claims

Cases under this heading range from single payments to massive schemes. They involve two distinct situations—fraudulently obtained travel advances and payments based on fraudulent travel vouchers.

In B-240654, Feb. 6, 1991, an imposter, using falsified travel orders and a phony military identification card, obtained travel advances at six Air Force bases totaling nearly $74,000. The Air Force was able to identify the imposter and he was arrested, but committed suicide before trial. *See also* B-248532, Oct. 26, 1992; B-248251, June 30, 1992. In another case, an individual stole an identification card from an athletic locker at the Pentagon and used it to obtain travel advances at several Army installations. The fraud was successful because the thief bore a sufficient resemblance to the card's owner. B-217440, B-217440.2, Apr. 16, 1985; B-217440, Feb. 13, 1985. The losses in these cases were attributed to skillfully executed criminal activities. Other cases involving fraudulently obtained travel advances include B-261312, Feb. 5, 1995; B-246371, June 23, 1992; B-234962, Sept. 28, 1989; B-221395, Mar. 26, 1986.

The second group of cases is similar except that the fraudulent document is a travel voucher rather than a travel order. Several related cases involve a conspiracy carried out over several years by employees of the Army Corps of Engineers. Basically, the employees presented vouchers based on fraudulent lodging receipts, often provided by friends or relatives. The scheme eluded detection for several years until it was discovered that the providers of the receipts, who had "verified" the accuracy of the receipts to the Corps, were themselves participants in the fraud. The disbursing officer in one district was relieved in part, but relief was denied for payments made after he had received information putting him on notice of

the possibility of fraud. 65 Comp. Gen. 858 (1986). In another district, the disbursing officer stopped making payments immediately upon being advised of the investigation, and was relieved in full. B-217114.2, Feb. 3, 1988.

A simpler situation is B-215737, Nov. 5, 1984, in which an individual presented to an Army cashier a travel voucher which had been issued to someone else. Relief was granted to the Finance and Accounting Officer, but denied to the cashier because she failed to compare the name on the presenter's identification card with the (different) name on the voucher. Some additional fraudulent travel voucher cases are B-241880, Aug. 14, 1991; B-229274, Jan. 15, 1988; B-222915, Sept. 16, 1987; B-213824, July 13, 1987; and B-224832, July 2, 1987.

(2) Other cash payments fraudulently obtained

It may be noted, somewhat cynically, that if there is a way to obtain cash from the federal government, someone will try to do it fraudulently. In some cases, losses can be prevented by the exercise of due care. In 68 Comp. Gen. 371 (1989), for example, an individual deposited two "Greenback Money Drafts" in the patients' account at a Department of Veterans Affairs hospital. These are drafts, resembling checks, which the issuing bank provides to various public places. A person with an account in the issuing bank can sign one of the forms and cash it elsewhere. The back of the form explicitly states, "You must call [the issuing bank] before cashing," so that the bank can verify the existence of the account and the sufficiency of funds. In this instance, the cashier accepted the drafts without calling the issuing bank, the patient withdrew the funds shortly thereafter, and it was subsequently discovered that the drafts had been fraudulently negotiated. Relief was denied because of the cashier's negligent failure to follow the explicit printed instructions.

In another case, relief was denied to a cashier who made a cash payment to a courier without requiring any identification. The courier turned out to be an imposter. B-178953, Aug. 8, 1973.

In many cases, due care will not prevent the loss, and relief is granted. Illustrative cases involving miscellaneous military cash payments, similar to the travel advance cases noted above, are B-245127, Sept. 18, 1991 (transient/reaccession payment); B-226174, June 18, 1987 (casual payment); B-215226, Apr. 16, 1985 (special reenlistment bonus); and B-209717.2, July 1, 1983 (military pay voucher with separation orders).

Relief was denied to a cashier in another casual payment case, B-227209, Aug. 5, 1987, for neglecting to spot inconsistencies on the face of the voucher.

(3) Military separation vouchers

The cases under this heading involve overpayments on military separation vouchers attributable to government error rather than fraud on the part of the recipient. In each case, the supervisory disbursing officer was relieved, illustrating the previously noted proposition that even a well-established and carefully supervised system of controls and procedures cannot be expected to totally eliminate human error.

In B-230842, Apr. 13, 1988, and B-227412, July 2, 1987, a cashier made an overpayment by using the amount from the wrong block on the voucher. In B-228946, Jan. 15, 1988, the cashier failed to clear a previous transaction from her adding machine. In all three cases, the agency sought relief for the supervisor while holding the cashier liable. Similar cases are B-222685, June 20, 1986; B-221453, June 18, 1986; and B-212293, Nov. 21, 1983. Relief has been granted to the cashier in cases where the cashier followed applicable procedures and the error was attributable to someone else. *E.g.*, B-226614, May 6, 1987; B-221471, Jan. 7, 1986.

(4) Assignment of contract payments

Under the Assignment of Claims Act, 31 U.S.C. § 3727 and 41 U.S.C. § 15, when a contractor assigns future contract payments to a financing institution (assignee), the assignee must file written notice of the assignment and a copy of the assignment with the pertinent disbursing officer. Once this is done, the government's obligation is to make future payments to the assignee, and payments made directly to the contractor are erroneous. In B-270715, July 23, 1996, an assignment bound the government, even though notice of the assignment was not given to the agency as required under the Act, because the agency was fully aware of the assignment and had "recognized" the assignment.

In B-213720, Oct. 2, 1984, an assignment under an Army Corps of Engineers contract was properly filed with the disbursing officer, who acknowledged receipt but neglected to retain a copy. Also, a copy was inexplicably not placed in the contract file. A few months later, an invoice was submitted clearly stating that payment should be made to the assignee bank. A voucher examiner functioning as a certifying officer failed to make

appropriate inquiry to confirm the existence of the assignment and instead followed the advice of the purchasing agent to pay the contractor. The disbursing officer then made payment to the contractor, notwithstanding the information on the face of the invoice indicating the existence of an assignment. Since the Army voucher examiner was not a statutory certifying officer, primary liability remained with the disbursing officer. Given the disbursing officer's failure to retain a copy of the assignment and to verify the proper payee, relief was denied.

However, in B-270801, Mar. 19, 1996, a disbursing officer was relieved of liability for payment to a contractor, although there had been an assignment made to a financial corporation. The corporation had mailed a copy of the assignment to the disbursing office, as required, but the mailroom apparently lost the copy. The disbursing officer had followed established procedures and did not have actual notice of the assignment.

In other cases in which a military finance and accounting officer is responsible for both certifying and disbursing functions, relief has been granted where the errors are solely those of subordinates and there is no lack of due care attributable to the disbursing officer personally. B-216246, May 22, 1985 (voucher examiner/certifying officer failed to follow standard operating procedures, nothing on face of voucher to suggest existence of assignment); B-214273, Dec. 11, 1984 (unknown clerk had misfiled notice of assignment, office processed over 3,000 vouchers a month and could pre-audit only on random basis).

(5) Improper purpose/payment beyond scope of legal authority

Most improper purpose and similar cases will be certifying officer cases. Those that involve disbursing officers are either military cases or disbursements by imprest fund cashiers.[60] The point to remember is that relief is governed by the standards of 31 U.S.C. § 3527(c), and the fact that a payment is unauthorized does not automatically indicate lack of due care.

Several imprest fund cashiers have been relieved where the vouchers were proper on their face and included approvals by appropriate agency officials, including a contracting officer. B-221940, Oct. 7, 1987

[60] On November 9, 1999, Treasury issued a policy directive requiring that federal agencies eliminate agency imprest funds, with certain exceptions, by October 1, 2001. See section B.3.a of this chapter for more information on imprest funds.

(refreshments at seminar); B-211265, June 28, 1983 (air purifier); B-203553, Feb. 22, 1983 (air purifier). Prior approvals of similar purchases may also be relevant in establishing due care. 61 Comp. Gen. 634, 637 (1982). Note that the purchase in each case was not plainly illegal. Refreshments may be authorized under the Government Employees Training Act and air purifiers are authorized in some situations.[61] Also, in B-302993, June 25, 2004, GAO considered whether particular expenditures that were once viewed as personal expenses of the employee may in certain circumstances be considered an official expense of the agency.

In B-217668, Sept. 12, 1986, relief was denied to an Army Finance and Accounting Officer who purchased beer for troops engaged in a joint military exercise. While the beer could have been purchased with nonappropriated funds (or—dare we suggest—paid for by the individuals who drank it), it is not an appropriate use of the taxpayers' money. The decision recognized that relief might nevertheless be possible if the standards for relief of a supervisor under 31 U.S.C. § 3527(c) were met, but the record did not contain sufficient information to enable an independent judgment.

## 4. Check Losses

### a. Check Cashing Operations

Check cashing by disbursing officers is governed by 31 U.S.C. § 3342. Subsection (a) authorizes disbursing officers to—

> "(1) cash and negotiate negotiable instruments payable in United States currency or currency of a foreign country;
>
> "(2) exchange United States currency, coins, and negotiable instruments and currency, coins, and negotiable instruments of foreign countries; and
>
> "(3) cash checks drawn on the Treasury to accommodate United States citizens in a foreign country, but only if—

[61] See the discussion of refreshments in section C.5.b and air purifiers in section C.13.c of Chapter 4.

> "(A) satisfactory banking facilities are not available in the foreign country; and
>
> "(B) a check is presented by the payee who is a United States citizen."

Transactions under subsections (a)(1) and (a)(2) are authorized for official purposes or to accommodate certain classes of persons, including government personnel and their dependents under certain circumstances, hospitalized veterans, contractors working on government projects, authorized nongovernmental agencies operating with government agencies, federal credit unions, and members of the military forces of an allied or coalition nation participating in a combined operation, combined exercise, or combined humanitarian or peacekeeping mission with the U.S. military if certain conditions are met. 31 U.S.C. § 3342(b). These are sometimes called "accommodation transactions." The statute applies to legislative branch (and presumably judicial branch) agencies as well as executive branch agencies. 64 Comp. Gen. 152 (1984). The Treasury Department is authorized to issue implementing regulations and may delegate that authority to other agencies. 31 U.S.C. § 3342(d).

In 1999, the Treasury Department directed agencies to eliminate most imprest funds, so accommodation transactions are now limited mainly to Department of Defense and Department of State overseas offices.[62] Furthermore, internal Defense Department and State Department regulations allow accommodation transactions only if local commercial banking facilities are not available or are inadequate. Department of Defense Financial Management Regulation No. 7000.14-R, vol. 5, ch. 4, *Check Cashing Service* (January 2004); Department of State Foreign Affairs Handbook, 4-FAH-3 H361.2, *Guidelines for Authorizing Accommodation Exchange*.

Of particular relevance here are 31 U.S.C. §§ 3342(c)(2) and (c)(4):

> "(2) The head of an agency having jurisdiction over a disbursing official may offset, within the same fiscal year, a deficiency resulting from a transaction under subsection (a) of this section with a gain from a transaction under

[62] See the discussion of Treasury's November 9, 1999, policy directive on imprest funds in section B.3.a of this chapter.

> subsection (a). A gain in the account of a disbursing official not used to offset deficiencies under subsection (a) shall be deposited in the Treasury as miscellaneous receipts.
>
> * * * * *
>
> "(4) Amounts necessary to adjust for deficiencies in the account of a disbursing official because of transactions under subsection (a) of this section are authorized to be appropriated."

One important application of the offsetting authority of 31 U.S.C. § 3342(c)(2) is losses resulting from certain foreign currency exchange transactions, and cases involving this application are noted later in this chapter. However, nothing in the statute limits it to foreign exchange transactions. The offsetting authority applies by its terms to "a deficiency resulting from a transaction under subsection (a)," and this includes check cashing operations as authorized by subsections (a)(1) and (b).

Decisions rendered shortly after the statute was enacted applied it to uncollectible checks cashed over forged endorsements and explicitly recognized the statute as a form of relief. The first such case was 27 Comp. Gen. 211 (1947), stating at 213:

> "Since the cashing of a check is an operation authorized under the act, any loss arising out of such transaction properly may be considered as coming within the purview of the term 'any deficiencies' for which relief is contemplated under the act."

This holding was followed in 27 Comp. Gen. 663 (1948). The original version of 31 U.S.C. § 3342, enacted in 1944,[63] did not include the offsetting authority. *See* B-39771, Sept. 26, 1950. It was added in 1953.[64] Thus, the "relief" referred to in 27 Comp. Gen. 211 and 27 Comp. Gen. 663 was simply the authority to use agency appropriations to adjust the deficiencies. Both cases involved the Army, which at the time received annual appropriations

[63] Pub. L. No. 554, ch. 716, 58 Stat. 921 (Dec. 20, 1944).

[64] Pub. L. No. 61, ch. 115, § 2, 67 Stat. 61, 62 (June 16, 1953).

for this purpose. The Army was thus in a position to invoke the statute, and the adjustments had the effect of relieving the disbursing officers.

For the next four decades, the principles established by 27 Comp. Gen. 211 saw little use, and check cashing losses during that period were mostly treated as improper payments requiring relief under whatever authorities were available (31 U.S.C. § 3527(c) since 1955). A 1991 decision to the Air Force, 70 Comp. Gen. 616, changed this and, in effect, reverted to the approach of 27 Comp. Gen. 211, now augmented by the offsetting authority. After reviewing precedent and legislative history, the decision concluded that—

> "section 3342 may be applied to check cashing losses. Thus, an agency may use section 3342 to offset losses from cashing uncollectible checks with gains from other section 3342(a) activities."

Offsetting under section 3342(c)(2) is done on a fiscal-year basis. An uncollectible check becomes a deficiency not when it is cashed by the disbursing officer, but when it is dishonored and returned to be charged to the disbursing officer's account. If these events occur in different fiscal years, the deficiency is chargeable to the latter year. B-120737, Dec. 27, 1954. If an item is charged as a deficiency in one year and collected in a subsequent year, the collection should be charged to the fiscal year account in which the collection is made regardless of the fiscal year in which the deficiency was charged. *Id.*

For checks cashed within the authority of 31 U.S.C. § 3342, following the procedures of that statute eliminates the need to pursue relief under 31 U.S.C. § 3527(c). If there is a net gain in an account for a given fiscal year, the net gain is deposited in the Treasury as miscellaneous receipts and that ends the matter. If there is a net loss, and the agency is able to make an adjustment from an available appropriation, the adjustment clears the disbursing officer's account and similarly ends the matter. A net loss resulting from the application of 31 U.S.C. § 3342(c) is not an Antideficiency Act violation. 61 Comp. Gen. 649 (1982).

It must be emphasized that 31 U.S.C. § 3342 does not make an agency's appropriations available for these adjustments. It merely authorizes appropriations for that purpose. For disbursing officers within the Department of Defense, permanent authority exists to use appropriated funds for "losses in the accounts of disbursing officials and agents in

accordance with law." 10 U.S.C. § 2781(2). Civilian agencies will need comparable authority which may be in the form of permanent legislation, specific appropriations, or specific language in a lump-sum appropriation (for example, "including adjustments as authorized by 31 U.S.C. § 3342").

The July 1991 decision made two other very important points. First, the offsetting authority of 31 U.S.C. § 3342 is discretionary. An agency is not required to use it, but retains the option of refusing to adjust a disbursing officer's account, in which event the relief avenue of 31 U.S.C. § 3527(c) remains available.

Second, while good faith and due care are prerequisites to relief under 31 U.S.C. § 3527(c), section 3342 contains no comparable requirement. Thus, the use of section 3342 does not require findings of good faith and due care. Decisions stating or implying the contrary, such as 27 Comp. Gen. 211, were modified to that extent. Be that as it may, it is undesirable as a matter of policy to use 31 U.S.C. § 3342 to relieve a disbursing officer for losses attributable to bad faith or lack of due care, and an agency is well within its discretion to decline use of those procedures in such cases.

The discretion to use 31 U.S.C. § 3342 applies only to checks cashed within the scope of the statute. Losses resulting from checks cashed beyond the scope of that authority (*i.e.*, not for an official purpose or for a person not within one of the classes specified in subsection 3342(b)) may not be offset or adjusted under the authority of section 3342, but are improper payments for which administrative relief is available only under 31 U.S.C. § 3527(c). 70 Comp. Gen. 420 (1991); B-127608-O.M., May 28, 1956.

The losses under consideration—uncollectible check losses resulting from check cashing operations—fall into several distinct but related fact patterns. Cases cited below which predate GAO's July 1991 decision are all section 3527(c) relief cases resolved under the principles and standards previously discussed; all could now be resolved under the offset and adjustment authority of 31 U.S.C. § 3342.

- *Uncollectible personal check.* Cases in this category tend to involve either of two general situations:
  - Thief steals someone else's personal checks and cashes them in conjunction with stolen or fraudulent identification. B-246418, Feb. 3, 1992; B-240440, Mar. 27, 1991; B-212588, Aug. 14, 1984.

- Thief cashes checks from a fraudulently established checking account in the name of some other real or fictitious person. B-229827, Jan. 14, 1988; B-221415, Mar. 26, 1986; B-220737, B-220981, Dec. 10, 1985.

- *Fraudulent endorsement of government check.* In this situation, a thief steals a legitimately issued government check (paycheck, tax refund check, *etc.*) and cashes it with the aid of stolen or fraudulent identification. *E.g.*, B-227436, July 2, 1987; B-216726, Jan. 9, 1985; B-214436, Apr. 6, 1984.

- *Fraudulent alteration of amount on government check.* If the amount is fraudulently raised by the payee, the liability of the disbursing officer is the difference between the original amount and the fraudulent amount. B-228859, Sept. 11, 1987. If the amount is altered and the check cashed by someone other than the payee, the disbursing officer's liability is the full amount of the payment. B-221144, Apr. 22, 1986. The opportunity for fraudulent alteration of amounts naturally decreases when the amount is also spelled out in words on the face of the check. 62 Comp. Gen. 476, 481 (1983). However, spelling the amount out in words is not required on government checks, and Treasury checks generally do not do so. *See* I TFM § 4-5035.50d. If a disbursing officer is in compliance with the TFM and applicable agency regulations, relief will not be denied solely because the amount is not written out in words. 65 Comp. Gen. 299 (1986); B-209697, Nov. 21, 1983.

- *Postal money order.* The authority of 31 U.S.C. § 3342(a)(1) is not limited to checks but applies to "negotiable instruments" generally, which includes postal money orders. *E.g.*, B-217663, July 16, 1985 (fraudulent alteration of amount); B-213874, Sept. 6, 1984 (forged endorsement).

The Department of Defense has established strict internal controls for accommodation transactions, which aim to virtually preclude fraudulent transactions and thus limits the grounds for granting relief to a disbursing officer who cashes a forged instrument. Department of Defense Financial Management Regulation No. 7000.14-R, vol. 5, ch. 4, *Check Cashing Service* (January 2004).

### b. Duplicate Check Losses

A duplicate check loss, as we use the term here, is a loss resulting when (1) a payee claims nonreceipt of an original check, (2) the government issues a replacement check, and (3) both checks are negotiated.

Replacement checks are issued under the authority of 31 U.S.C. § 3331. If an original check "is lost, stolen, destroyed in any part, or is so defaced that the value to the owner or holder is impaired," the Secretary of the Treasury may issue a replacement check, and may delegate that authority to other agencies. 31 U.S.C. §§ 3331(b) and (g). The Secretary has discretionary authority to require an indemnification agreement from the owner or holder prior to issuing the replacement check. *Id.* § 3331(e).

The current system for issuing replacement checks, developed by the Treasury Department in the mid-1980s, is reflected in 31 C.F.R. parts 245 and 248 and I TFM chapter 4-7000.[65] In brief, upon receipt of a claim for loss or nonreceipt of an original check, the spending agency may certify a new payment. 31 C.F.R. § 245.5. In agencies for which Treasury disburses, an agency certifying officer certifies the replacement check to a Treasury disbursing officer. For agencies which do their own disbursing, most notably the military departments, the "recertification" is an internal procedure based on agency as well as Treasury regulations. The replacement check, which has a different serial number from the original check, is called a "recertified check." Formerly, most replacement checks were "substitute checks" with the same serial number as the original check. With the implementation of the recertification procedure, Treasury announced that substitute checks would generally no longer be available.[66]

The Treasury regulations specify the responsibilities of the payee. If the original check shows up before the claimant receives the replacement check, the claimant should notify the agency and follow the agency's instructions. 31 C.F.R. § 245.8(a). If the original check shows up after receipt of the replacement check, the claimant is to return the original to the issuing agency. "Under no circumstances should both the original and replacement checks be cashed." *Id.* § 245.8(b).

Payees do not always read Treasury regulations, however, and sometimes cash both checks. Since the agency's obligation is to make payment once, cashing both checks results in an erroneous payment for which some

[65] Prior approaches had produced complex problems and were unsatisfactory. *See* 62 Comp. Gen. 91 (1982); GAO, *Millions Paid Out in Duplicate and Forged Government Checks*, AFMD-81-68 (Washington, D.C.: Oct. 1, 1981).

[66] The regulations now use the term "substitute check" only in 31 C.F.R. part 248 in the context of "depositary checks," checks drawn on accounts maintained in depositary banks in U.S. territories or foreign countries.

accountable officer is liable unless relieved. In the most common situation, the payee cashes both checks. The first check satisfies the government's original obligation, and issuing the replacement check is an authorized transaction. Thus, the loss occurs "when the second check is wrongfully presented and paid. (The actual sequence in which the payee negotiates the original check and the replacement check is immaterial.)" 62 Comp. Gen. 91, 94 (1982). Depending on the agency and the nature of the error, the proper relief statute will be either 31 U.S.C. § 3528 (certifying officer) or 31 U.S.C. § 3527(c) (disbursing officer). For the military departments, even though they may employ a "recertification" procedure, the proper statute is section 3527(c). 66 Comp. Gen. 192, 194 (1987).

GAO's first relief decision under the recertification procedure was 65 Comp. Gen. 811 (1986). Relief for a duplicate check loss is granted if (1) the accountable officer followed applicable regulations and procedures, (2) there is no indication of bad faith, and (3) the agency has pursued or is pursuing adequate collection action to recover the overpayment. *Id.* at 812. This is essentially the same standard that had been applied under the former "substitute check" system. *E.g.*, 65 Comp. Gen. 812, 813 (1986); 62 Comp. Gen. 91, 97 (1982). A few more recent cases applying this standard are B-260753, Jan. 11, 1996 (Air Force); 70 Comp. Gen. 298 (1991) (Navy); B-237343, Jan. 23, 1991 (Army); and B-232773, Jan. 12, 1989 (Defense Logistics Agency). Of course, relief cannot be granted until a loss actually occurs. 70 Comp. Gen. 9, 12 (1990); 66 Comp. Gen. 192, 194 (1987). The documentation required to support a relief request in a duplicate check case is spelled out in B-221720, May 8, 1986, and includes such things as copies of both checks, the claim of nonreceipt, the agency's stop payment request, Treasury's debit voucher, and documentation of collection efforts.

If the disbursing officer is a supervisor and the duplicate check is actually issued by a subordinate, both are accountable officers for purposes of liability and relief. B-271017, Aug. 12, 1996; B-260639, June 15, 1995; 62 Comp. Gen. 476, 479–80 (1983). The relief standards are those set forth in section D.3.a of this chapter for improper payments generally. As with other relief situations, lack of due care, failure to follow established procedures for example, will not preclude relief if it was not the proximate cause of the loss. 70 Comp. Gen. 298 (1991); B-225932, Mar. 27, 1987.

Treasury regulations encourage, but do not require, the agency to obtain a signed statement from the claimant before issuing or certifying a replacement check. I TFM § 4-7060.20a. If the agency's own regulations require the statement, failure to obtain it will generally be regarded as lack

of due care. Relief is granted or denied depending upon whether lack of due care was the proximate cause of the improper payment. B-225932, Mar. 27, 1987. If the statement is obtained but turns out to be a misrepresentation, it is not the accountable officer's fault. B-247062, June 9, 1992. In 70 Comp. Gen. 9 (1990), GAO advised the Navy that it could waive its own requirement for claimant statements where a box containing over 4,600 checks was lost en route to the Philippines, and obtaining individual statements prior to issuing replacement checks would have caused undue delay and hardship.

GAO has expressed concern over issuing replacement checks prematurely, that is, without giving the original check a reasonable time to arrive. While the timing is essentially a matter of agency discretion, it is also a factor which may bear upon the issue of due care. 63 Comp. Gen. 337 (1984). Timing should include risk assessment. Thus, a shorter waiting period may be appropriate where the payee has a continuing relationship with the agency and recoupment by offset is therefore presumably easier. I TFM § 4-7060.20e; B-226116, Feb. 20, 1987. As a general proposition, GAO has said that it will not raise a question solely on the basis of a 3-day waiting period, but it might be a factor to be considered in determining whether a disbursing officer has exercised due care. 63 Comp. Gen. 337; I TFM § 4-7060.20a. For checks mailed prior to the actual payment date, the 3-day period may include mailing days. B-230658, June 14, 1988. A waiting period of less than 3 days needs to be specifically justified. *See* B-215433, B-215515, July 2, 1984. A good example is B-246369, Feb. 3, 1992 (payee who was in Virginia could not have received original check inadvertently mailed to Florida).

It is possible, although the cases are (and should be) rare, for duplicate check losses to occur with checks issued to a bank under direct deposit procedures. Recoupment efforts should be directed against the bank which made the error, leaving it to the bank to then recover from the individual depositor as an independent transaction. B-215431, B-215432, Jan. 2, 1985. Related decisions arising from the same set of losses are B-215432.3, Aug. 22, 1991 (finally granting relief upon documentation of collection efforts), and B-215432 *et al.*, July 6, 1984.

An agency's internal controls and procedures form an important line of defense against duplicate check losses. One agency, for example, will issue a recertified check prior to obtaining the status of the original check only if the employee has sufficient funds in his or her retirement account to cover a potential loss, and requires specific clearances upon termination of

employment. These procedures, GAO commented, "will better safeguard federal funds." B-232615, Sept. 28, 1988. Agencies should also develop guidelines for dealing with persons requesting several replacement checks within a relatively short time period. Three replacement check requests within an 11-month period, for example, should trigger some concern. B-221398, Sept. 19, 1986. Guidelines may include such things as counseling employees to take advantage of direct deposit procedures and delaying recertification until the status of the original check has been determined. The exact content of any such guidelines is up to the agency. B-217947, B-226384, Mar. 27, 1987; B-220500, Sept. 12, 1986. Indemnification agreements may be desirable in some circumstances, even where not required. *See* 66 Comp. Gen. 192, 194–95 (1987). Chargeback data received from Treasury should be processed and forwarded to the pertinent finance office as promptly as possible. B-226316 *et al.*, Apr. 9, 1987.

Cases occasionally present variations on the factual theme, but the basic relief approach is the same. *E.g.*, B-226769, July 29, 1987 (agency issued replacement for wrong amount); B-195396, Oct. 1, 1979 (agency inadvertently issued two replacement checks).

In our coverage of physical losses, we discussed the dollar amount GAO has established, currently $3,000, below which agencies may grant relief without the need for GAO involvement. In October 1991, GAO started extending the limit selectively to certain categories of improper payments, one of which is duplicate check losses. For duplicate check losses not exceeding $3,000, agencies may grant or deny relief administratively, without the need for GAO concurrence, in accordance with applicable statutes, regulations, and GAO decisions. B-243749, Oct. 22, 1991 (civilian); B-244972, Oct. 22, 1991 (military).[67] Section C.2 of this chapter contains more detail on how the $3,000 limit operates.

In the cases cited and discussed thus far, it was the payee who negotiated both checks. Where the original check is fraudulently negotiated by someone else, the situation is a bit different. Here, the replacement check rather than the original check satisfies the government's obligation to the payee, and the loss results from negotiating the original check. 66 Comp. Gen. 192, 194 (1987). More precisely, the loss results from *payment* on the original check since there is nothing improper or incorrect in *issuing* the

[67] The process actually started with a limited authorization for the Army, B-214372, Oct. 9, 1987, which was revoked by the more inclusive B-244972.

original check. *Id.* If forgery is established, Treasury will seek to recover from the bank which negotiated the check. *See* B-232772, Oct. 17, 1989.

### c. Errors in Check Issuance Process

The October 1991 decisions just cited authorizing administrative resolution of duplicate check losses not exceeding $3,000 extended the authorization to another category of erroneous payments—those resulting from "mechanical and/or clerical errors during the check issuance process." Thus, agencies may grant or deny relief for losses in this category within the monetary ceiling, as with duplicate check losses, in accordance with applicable statutes, regulations, and GAO decisions. B-243749, Oct. 22, 1991(civilian); B-244972, Oct. 22, 1991 (military). The relief standards are the same as those previously discussed for other types of improper or erroneous payments.

Cases under this heading may result from any type of check payment—salary payments, payments to contractors, benefit payments, *etc.*—and include a variety of fact patterns. A few cases involving erroneous tax refund checks will illustrate. In each case, the disbursing officer was a director of one of Treasury's regional financial centers (formerly called disbursing centers), a supervisory official. In B-241098, B-241137, Dec. 27, 1990, the printing system rejected two checks and automatically produced substitutes; the printing operator failed to remove and void the original checks; the originals and substitutes were issued and cashed by the payees. In B-187180, Sept. 21, 1976, a keypunching error transposed two numerals, resulting in issuance of a check for $718 instead of the correct amount of $178. In B-235037, Sept. 18, 1989, an overpayment was made due to an error during the "typing operation and proof reading process." Relief was granted in the first two cases by applying the standards for relieving a supervisor; in the third, it was denied because the request contained neither a description of relevant controls and procedures nor statements by the individuals concerned.

As demonstrated in B-241098, B-241137 (where the IRS printing system rejected two tax refund checks and automatically produced substitutes and the printing operator failed to void the originals), most mechanical errors are not purely mechanical, but involve human error as well, such as failure to spot the error during a verification process. Also, many of these cases involve the issuance of duplicate checks, the difference between these and the previously discussed duplicate check losses being that these losses do not result from a claim of nonreceipt but from the simultaneous issuance of duplicate checks attributable to government error. Similar cases involving other types of payments are B-239371, June 13, 1990; B-239094, June 13,

1990; B-237082 *et al.*, May 8, 1990; B-235044 *et al.*, Mar. 20, 1990; and B-235036, Oct. 17, 1989. Some factual variations follow:

- Machine that stuffs checks into envelopes was misaligned, obscuring the names and addresses. Treasury decided to shred the original checks and reissue them. One of the originals was inadvertently delivered rather than shredded, causing a duplicate payment. B-245586, Nov. 12, 1991 (relief granted).

- Due to mechanical failure, a checkprinting machine failed to advance a voucher schedule and a second check was issued to a person with the same name but different middle initial than the correct payee. A clerk failed to notice the error during verification. In view of the volume of work at the disbursing center, the error was viewed as the type that will occasionally escape even in a well-established and carefully supervised system. B-195106, July 12, 1979 (relief granted).

- Malfunction of feed mechanism on printing machine caused one check to skip, printing the inscription on the next check. The first check was replaced without noticing the duplicate; both checks were issued. Relief was granted on the same basis as in B-195106. B-212431, Nov. 21, 1983.

"Clerical error" means human error without contributing mechanical malfunction. Relief standards remain the same. The cases noted in the following groupings, as with the last three tax refund cases cited above, are intended to illustrate factual variations.

- *Payment of wrong amount*. The person preparing a check for a military separation voucher misread a dollar sign as the number "8," and printed a check for $899 instead of the correct amount of $99. B-238863, July 11, 1991 (relief granted). A voucher examiner preparing a partial payment to a contractor erroneously used the total amount due on the contract instead of the amount of the partial payment. B-227410, Aug. 18, 1987 (relief granted).

- *Payment to wrong person*. A clerk consolidating two contract payment vouchers in a single check payable to a credit union erroneously listed only one account number, causing an overpayment to one contractor and necessitating a replacement check to the other. B-238802, Dec. 31, 1990 (relief granted). Further examples are: B-254385, Mar. 22, 1994 (incorrect processing code generated payment

to wrong contractor; relief granted); B-234197, Mar. 15, 1989 (misreading of documents resulted in payment to subcontractor instead of prime contractor; relief granted); B-212336, Aug. 8, 1983 (voluntary child support allotment paid to wrong person due to error in assignment of organization code; relief granted); B-192109, June 3, 1981 (check issued to wrong person with slightly different name than correct payee; relief granted); and B-194877, July 12, 1979 (amounts of two checks inadvertently switched; relief granted).

- *Duplicate payment*. Treasury Financial Center was issuing replacements for a batch of mutilated checks. One mutilated check became separated from the rest and was erroneously released along with its replacement. A computer operator had failed to verify each replacement check against the corresponding mutilated check. Because controls were in place which would have prevented the error had they been followed, and considering the large volume of work at the disbursing center, relief was granted to the disbursing officer, the center's director. (The computer operator is not an accountable officer.) B-231551, Sept. 12, 1988 (relief granted).

Most duplicate payments are recovered, but many either are not or involve the expense of collection action or litigation. Especially in the area of payments to contractors, duplicate payment losses can involve large amounts. Duplicate payments are considered improper payments, reportable under the Improper Payments Information Act, Pub. L. No. 107-300, 116 Stat. 2350 (Nov. 26, 2002). GAO has emphasized the importance of adequate internal controls, as well as strong support and active involvement from agency management, the administration, and Congress, in reducing duplicate payments and other types of improper payments. *See* GAO, *Financial Management: Status of the Governmentwide Efforts to Address Improper Payment Problems*, GAO-04-99 (Washington, D.C.: Oct. 17, 2003); *General Services Administration Needs to Improve Its Internal Controls to Prevent Duplicate Payments*, GAO/AFMD-85-70 (Washington, D.C.: Aug. 20, 1985); *Strengthening Internal Controls Would Help the Department of Justice Reduce Duplicate Payments*, GAO/AFMD-85-72 (Washington, D.C.: Aug. 20, 1985). A case involving a duplicate payment to a contractor in which relief was granted on the basis of adequate controls is B-241019.2, Feb. 7, 1992.

## 5. Statute of Limitations

The accounts of accountable officers must be settled by GAO within 3 years "after the date the Comptroller General receives the account."

31 U.S.C. § 3526(c)(1). Once this 3-year period has expired, no charges may be raised against the account except for losses due to fraud or criminal action on the part of the accountable officer. *Id.* § 3526(c)(2). Enacted in 1947,[68] this legislation effectively operates as a limitation on establishing an accountable officer's liability for improper expenditures. As the Defense Department pointed out in recommending the legislation, a time limitation is desirable because passage of time diminishes the chances of recovering from the payee or recipient, leaving the liability solely with the accountable officer. S. Rep. No. 80-99 (1947).

Unlike other statutes of limitations which merely affect the remedy (for example, by barring the commencement of legal proceedings), 31 U.S.C. § 3526(c) completely eliminates the debt. B-181466, Nov. 19, 1974 (nondecision letter). Once an account has been settled, it cannot be reopened (except for fraud or criminality, as noted above), and the authority to grant or deny relief no longer exists. Thus, an accountable officer can escape liability for an improper expenditure if the government does not raise a charge against the account within the 3-year period. *E.g.*, 62 Comp. Gen. 498 (1983); B-223372, Dec. 4, 1989; B-198451.2, Sept. 15, 1982. Once an accountable officer's liability has been timely established, section 3526(c) does not limit the government's recovery from that officer. 31 U.S.C. § 3526(c)(4)(B). An accountable officer's liability can be established by the officer's agreement to repay the erroneous payment or by a denial of relief made by the agency. 70 Comp. Gen. 616 (1991); B-258735, Dec. 15, 1994.

The statute of limitations of 31 U.S.C. § 3526(c) applies only to improper payments and not to physical losses or deficiencies. B-260563, Mar. 31, 1995; 60 Comp. Gen. 674 (1981). An accountable officer's liability for a physical loss or deficiency is wholly independent of anyone's "raising a charge" against that officer's account.

The original version of 31 U.S.C. § 3526(c) was enacted at a time when accounts were physically transmitted to GAO for settlement, GAO reviewed every piece of paper, and then issued a certificate of settlement to the accountable officer, "disallowing" credit for questionable items. As a result of changes in audit methods, this is no longer done. Rather, accounts are now retained by the various agencies, and an account is regarded as settled by operation of law at the end of the 3-year period except for

[68] Pub. L. No. 72, ch. 78, 61 Stat. 101 (May 19, 1947).

unresolved items. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.7 (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM).

To reflect these changes in audit procedures, the date a "substantially complete" account is in the hands of the agency and available for audit is now generally considered as the point from which the 3-year period begins to run. *E.g.*, B-258735, Dec. 15, 1994. Assuming that supporting documents are available at the end of the time period covered by an accountable officer's statement of accountability, this will usually mean the date on which that statement of accountability is certified. 7 GAO-PPM § 8.7. For example, in B-251994, Sept. 24, 1993, the agency's disbursing officer prepared monthly statements of accountability, and thus the 3-year period for both the disbursing and certifying officer would begin on the last day of the month covered by the accountability statement that included the improper payment.[69]

There are situations, however, in which the 3-year period does not begin to run until some later date. Where a loss is due to fraud, the period begins when the loss is discovered and reported to appropriate agency officials. B-272615, May 19, 1997; B-270442.2, Feb. 12, 1996. Where an agency has no way of knowing that an improper payment has occurred until it receives a debit voucher from the Treasury Department (duplicate check losses, for example), the 3-year period begins to run when the agency receives the debit voucher. B-226393, Apr. 29, 1988. If the date of receipt cannot be determined, the date of the debit voucher is used.[70] *Id.*

If an irregularity has not been resolved by the agency within 2 years from the time the statute of limitations begins to run, the irregularity should at that time be reported to GAO. This may be in the form of a relief request or

[69] Unlike disbursing officers, certifying officers are not custodians of public funds, and thus do not have accounts and statements of accountability in the same manner disbursing officers do. For purposes of audit and settlement, GAO considers the certifying officer's account to be the certified vouchers and supporting papers relating to payments made by a disbursing officer over a particular accounting period. In other words, for payments comprising a disbursing officer's statement of accountability, the 3-year period is essentially the same for the disbursing officer and for the certifying officers on whose certifications the disbursing officer relied. B-251994, Sept. 24, 1993.

[70] Prior decisions had not been entirely clear on precisely which date to use. *E.g.*, B-220689, Sept. 24, 1986 (date of debit voucher); B-213874, Sept. 6, 1984 (inclusion in statement of accountability). B-226393 established the propositions stated in the text and modified prior decisions accordingly.

a copy of the agency's irregularity report. This is designed to provide adequate time to consider a relief request or to otherwise prevent expiration of the statute of limitations where necessary. 7 GAO-PPM § 8.4.C. *See also* 62 Comp. Gen. 476, 480 (1983); B-227538, July 8, 1987; B-217741, Oct. 15, 1985. Of course, nothing prevents an agency from seeking relief sooner if appropriate.

As noted above, the 3-year limitation does not apply to losses attributable to fraud or other criminal action by the accountable officer. 31 U.S.C. § 3526(c)(2). It is automatically suspended during war. *Id.* § 3526(c)(3). And it may be suspended by the Comptroller General with respect to a specific item to get additional evidence or explanation necessary to settle an account. *Id.* § 3526(g). This may be in the form of a timely Notice of Exception (B-226176, May 26, 1987), or other written notification (B-272615, May 19, 1997; B-270715, July 23, 1996). The mere submission of a relief request within the 3-year period, however, is not sufficient to toll the 3-year statute of limitations. 62 Comp. Gen. 91, 98 (1982); B-220689, Sept. 24, 1986.

Finally, 31 U.S.C. § 3526(c) deals solely with the liability of an accountable officer. It has no effect on the liability of the payee or recipient of an improper payment. It does not establish a limitation on recoveries against the improper payee or recipient nor does it affect the agency's obligation to pursue collection action against the payee or recipient. 31 U.S.C. § 3526(c)(4)(A); *Arnold v. United States*, 404 F.2d 953 (Ct. Cl. 1968); B-205587, June 1, 1982. Nor does 31 U.S.C. § 3526(c) affect an agency's ability to pay a voluntary creditor's claim for reimbursement, which is governed by 31 U.S.C. § 3702. B-278805, July 21, 1999.

## E. Other Relief Statutes

The relief statutes discussed thus far—31 U.S.C. §§ 3527(a), (b), (c), and 3528—are the ones most commonly encountered and will cover the vast majority of cases. Several others exist, however. Our listing here is not intended to be complete.

### 1. Statutes Requiring Affirmative Action

The statutes in this group are similar to 31 U.S.C. §§ 3527 and 3528 in that they require someone to actually make a relief decision.

#### a. United States Court of Federal Claims

The relief authority of the Court of Federal Claims is found in two provisions of law:

> "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim by a disbursing officer of the United States or by his administrator or executor for relief from responsibility for loss, in line of duty, of Government funds, vouchers, records or other papers in his charge."

28 U.S.C. § 1496.

> "Whenever the United States Court of Federal Claims finds that any loss by a disbursing officer of the United States was without his fault or negligence, it shall render a judgment setting forth the amount thereof, and the [Government Accountability Office] shall allow the officer such amount as a credit in the settlement of his accounts."

28 U.S.C. § 2512.

These provisions, which originated together in legislation enacted in 1866,[71] predate all of the other relief statutes and were once the only relief mechanism available apart from private relief legislation. The Supreme Court has termed this legislation "a very curious provision" in that it permits a disbursing officer to establish a defense to a claim which "the government can only establish judicially in some other court." *United States v. Clark*, 96 U.S. (6 Otto) 37, 43 (1877). In effect, it authorizes the Court of Federal Claims to render a declaratory (as opposed to money) judgment. *Ralcon, Inc. v. United States*, 13 Cl. Ct. 294, 300 (1987). Now, in view of the comprehensive scheme of administrative relief that Congress has enacted, this statute is rarely used.

### b. The Legislative and Judicial Branches

Since 31 U.S.C. § 3728, the primary certifying officer relief statute, does not apply to the legislative or judicial branches, Congress has enacted specific statutes for several legislative branch agencies and for the judicial branch authorizing or requiring the designation of certifying officers, establishing their accountability, and authorizing the Comptroller General to grant relief. Patterned after 31 U.S.C. § 3728, they are: 2 U.S.C. § 142b (Library of Congress), 2 U.S.C. § 142e (Congressional Budget Office), 2 U.S.C. § 142*l* (Office of Compliance), 2 U.S.C. § 1904 (Capitol Police), and 44 U.S.C. § 308

[71] Act of May 9, 1866, ch. 75, 14 Stat. 44.

(Government Printing Office). The relevant provision for the judicial branch is 28 U.S.C. § 613.

#### c. Savings Bond Redemption Losses

Losses resulting from the redemption of savings bonds are replaced from the fund used to pay claims under the Government Losses in Shipment Act. 31 U.S.C. § 3126(a). The statute further provides that "an officer or employee of the Department of the Treasury is relieved from liability to the United States Government for the loss when the Secretary [of the Treasury] decides that the loss did not result from the fault or negligence of the . . . officer, or employee." Relief is mandatory if the government does not give the officer or employee written notice of his or her liability or potential liability within 10 years from the date of the erroneous payment. *Id.*

### 2. Statutes Providing "Automatic" Relief

The statutes in this group either (1) provide that taking a certain authorized action which might otherwise be regarded as creating a loss will not result in accountable officer liability, or (2) authorize the resolution of certain losses in such a manner as not to produce liability.

#### a. Waiver of Indebtedness

Many statutes authorize the government to waive the recovery of indebtedness resulting from various overpayments or erroneous payments if certain conditions are met. Waiver statutes commonly include a provision to the effect that accountable officers will not be held liable for any amounts waived. For example, the statutes authorizing waiver of overpayments of pay and allowances require that full credit be given in the accounts of accountable officers for any amounts waived under the statute. 5 U.S.C. § 5584(d) (civilian employees); 10 U.S.C. § 2774(d) (military personnel); 32 U.S.C. § 716(d) (National Guard). Once waiver is granted, the payment is deemed valid and there is no need to consider the question of relief. *E.g.*, B-184947, Mar. 21, 1978. This result applies even where relief has been denied under the applicable relief statute. B-177841-O.M., Oct. 23, 1973.

Examples of comparable provisions in other waiver statutes are 5 U.S.C. § 8129(c) (overpayments under Federal Employees Compensation Act), 38 U.S.C. § 5302(d) (overpayment of veterans' benefits), and 42 U.S.C. § 404(c) (Social Security Act).

#### b. Compromise of Indebtedness

Under the Federal Claims Collection Act as amended, if a debt claim is compromised in accordance with the statute and implementing

regulations, no accountable officer will be held liable for the portion unrecovered by virtue of the compromise. 31 U.S.C. § 3711(c).

### c. Foreign Exchange Transactions

Earlier in this chapter we discussed 31 U.S.C. § 3342(c), which authorizes, with respect to activities authorized under section 3342(a), losses to be offset against gains on a fiscal-year basis, and also authorizes appropriations to make adjustments for net losses. Our prior discussion was in the context of check cashing operations. Another important use of 31 U.S.C. § 3342(c) is accounting for certain foreign exchange losses. To implement this authority in the foreign exchange area, the Treasury Department has issued regulations in I TFM part 4, chapter 9000, and has established an account entitled "Gains and Deficiencies on Exchange Transactions." *See* I TFM § 4-9065.10. As with the check cashing context, the relevant point here is that the use of 31 U.S.C. § 3342(c) accomplishes the necessary account adjustment and obviates the need to seek relief for any accountable officer. B-249796, Feb. 9, 1993.

One use of the Gains and Deficiencies account is the adjustment of losses due to exchange rate fluctuations. *E.g.*, 70 Comp. Gen. 616 (1991) (agency has discretion whether to offset gains and losses); 64 Comp. Gen. 152 (1984) (restoration of losses in Library of Congress foreign currency accounts attributable to currency devaluations); 61 Comp. Gen. 649 (1982) (determination of proper exchange rate); B-245760, Jan. 16, 1992 (devaluation of Laotian currency). However, in order to use the Gains and Deficiencies account, losses must result from "disbursing officer transactions" of the type authorized by 31 U.S.C. § 3342(a). 45 Comp. Gen. 493 (1966). In that case, the American Embassy in Cairo had made a payment for certain property in Egyptian pounds. The sales agreement was not executed and the money was refunded. At the time of the refund, the exchange rate had changed and the same amount of Egyptian pounds was worth less in U.S. dollars, resulting in a loss to the account. GAO agreed with the Treasury Department that the loss resulted from an administrative collection and not from a disbursing officer transaction, and should therefore be borne by the relevant program appropriation rather than the Gains and Deficiencies account.

GAO has also considered the use of the Gains and Deficiencies account in a number of cases involving Vietnamese and Cambodian currency after the American evacuation from those countries in the mid-1970s. 56 Comp. Gen. 791 (1977). *See also* 61 Comp. Gen. 132 (1981) (piaster currency physically abandoned or left in accounts in Vietnam chargeable to Gains and Deficiencies); B-197708, Apr. 8, 1980 (Vietnamese and Cambodian

currency received by Treasury from U.S. disbursing officers at exchange rate in effect at time of evacuation subsequently became valueless; loss held to be of the type contemplated by 31 U.S.C. § 3342(c)). However, U.S. currency which was thought to have been burned but which subsequently turned up in the United States had to be treated as a physical loss. 56 Comp. Gen. at 793–96. (Relief was granted for this loss under 31 U.S.C. § 3527(a) in B-209978, July 18, 1983.)

### d. Check Forgery Insurance Fund

The Check Forgery Insurance Fund is a revolving fund the purpose of which is to make replacement payments to payees whose Treasury checks have been lost or stolen and cashed over a forged endorsement in limited situations.31 U.S.C. § 3343. Before the Fund may be used, three conditions must be satisfied: (1) the check is lost or stolen without fault of the payee; (2) the check is subsequently negotiated over the payee's forged endorsement; and (3) the payee did not participate in any part of the proceeds of the check. *Id.* § 3343(b). Any recoveries from a forger, a transferee, or party on the check are restored to the Fund. *Id.* § 3343(d).

A forged endorsement for purposes of the statute has been held to include an unauthorized endorsement purported to be made in a representative capacity. *Strann v. United States*, 2 Cl. Ct. 782 (1983) (plaintiff's attorney endorsed tax refund check without authority). The third condition, participation in the proceeds, does not require a knowing participation. *Koch v. Department of Health, Education, and Welfare*, 590 F.2d 260 (8th Cir. 1978); *Duden v. United States*, 467 F.2d 924 (Ct. Cl. 1972). In *Duden*, for example, the plaintiff's former husband endorsed her name on a tax refund check and subsequently paid her part of the proceeds for support. She had no way of knowing that the payment came from those proceeds. While the endorsement was held not to be a forgery under the facts involved, the court also noted that the plaintiff's participation in the proceeds would preclude recovery from the Check Forgery Insurance Fund. *Duden*, 467 F.2d at 930.

The bank presenting a check to the Treasury for payment guarantees the genuineness of prior endorsements. 31 C.F.R. § 240.3. Thus, in many cases, the government will be able to recover from the presenting bank. *E.g.*, *Olson v. United States*, 437 F.2d 981, 986–87 (Ct. Cl.), *cert. denied*, 404 U.S. 939 (1971).

There is no mention of accountable officers in 31 U.S.C. § 3343. However, a payment from the Check Forgery Insurance Fund means that only one payment is charged to the appropriations of the agency incurring the

original obligation, with the effect that no accountable officer of that agency incurs any liability. *See* B-10929, Feb. 1, 1972.

### e. Secretary of the Treasury

Enacted in 1947,[72] 31 U.S.C. § 3333 provides that the Secretary of the Treasury will not be liable for payments made "in due course and without negligence" of checks drawn on the Treasury or a depositary, or other obligations guaranteed or assumed by the United States, and that the Comptroller General "shall credit" the appropriate accounts for such payments. At one time, many duplicate check losses were handled under 31 U.S.C. § 3333. *See* 62 Comp. Gen. 91 (1982). It was Treasury's practice to accumulate the cases and submit them in groups, for example, B-115388, Oct. 12, 1976, and B-71585, Sept. 22, 1955, with credit being allowed as a matter of routine. With the development of Treasury's previously discussed recertification procedure, much of the need to invoke 31 U.S.C. § 3333 evaporated. While many of the earlier cases involved an exchange of correspondence between Treasury and GAO, nothing in the statute requires it, especially since GAO no longer maintains accounts and "relief" is mandatory anyway.

### f. Other Statutes

There are several other statutes affecting the liability of accountable officers in a variety of contexts. A few of them are:

- *5 U.S.C. § 8321*. Accountable officers are not liable for payments in violation of statutes prescribing forfeiture of retirement annuities or retired pay as long as the payments are made "in due course and without fraud, collusion, or gross negligence." The reason for this statute was to avoid having to deny relief under 31 U.S.C. § 3528(b) for payments made in good faith solely because the payments are specifically prohibited by law. B-122068, Mar. 18, 1955.

- *31 U.S.C. § 3521(c)*. Previously noted, this statute protects accountable officers from liability for losses under an authorized statistical sampling procedure to audit vouchers.

- *31 U.S.C. § 3528(c)*. Certifying officials are not liable for overpayments made to a common carrier if the overpayment occurred only because the administrative audit before payment did not verify transportation rates, freight classifications, or land-grant deductions

[72] Pub. L. No. 333, ch. 455, 61 Stat. 730 (Aug. 4, 1947).

and the Administrator of General Services has determined that verification by a prepayment audit would not adequately protect the interests of the government.

- *42 U.S.C. § 659(f)*. Disbursing officers are not liable for a payment under a garnishment process for enforcement of child support and alimony obligations which is "regular on its face" and in compliance with 42 U.S.C. § 659. *See* 73 Comp. Gen. 194 (1994); 61 Comp. Gen. 229 (1982).

# F. Procedures

## 1. Reporting of Irregularities

Agencies are required to document each fiscal irregularity that affects the account of an accountable officer whose accounts are required to be settled by GAO under 31 U.S.C. § 3526, regardless of how it is discovered. The report is retained as part of the account records and a copy provided to the accountable officer and to GAO if the irregularity is not resolved within 2 years after the date the accounts are made available for audit. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.4.B (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM). The contents of the report are set forth in 7 GAO-PPM § 8.12.A, and include such things as a description of how the irregularity occurred and a description of any known procedural deficiencies and corrective action.

The agency's next job is to attempt to resolve the irregularity, most importantly by pursuing collection action against the improper payee or recipient where possible. Recovery of the funds of course ends the matter. If the funds cannot be recovered and the case is one in which the agency may grant relief without GAO involvement, consideration of relief is the next step. If the matter is resolved administratively in either of these ways, the record should be further documented as specified in 7 GAO-PPM § 8.12.B (required administrative determinations, *etc.*). There is no need to report resolved irregularities to GAO.

If the irregularity cannot be resolved administratively within 2 years after the date the account is available for audit, and if the loss exceeds the monetary limit established for administrative resolution, the agency should then submit to GAO a copy of the updated irregularity report and a relief request if appropriate. 7 GAO-PPM § 8.4.C. This 2-year guideline is

especially important for improper payments in view of the 3-year statute of limitations of 31 U.S.C. § 3526(c).[73] Thus, below-ceiling losses need not be reported to GAO at all; above-ceiling losses should be reported only if unresolved at the end of the 2-year period. Of course, the agency may request relief sooner if desired.

## 2. Obtaining Relief

The GAO official designated to exercise the Comptroller General's authority under the various relief statutes is the Managing Associate General Counsel for Goal 3, Office of General Counsel, who is responsible for appropriations law matters. Relief requests where GAO action is necessary should be addressed to GAO's Office of General Counsel. The request may be in simple letter format and should include all items specified in GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.12.C (Washington, D.C.: May 18, 1993). These include a copy of the irregularity report, a description of collection actions taken, and any required administrative determinations. Of particular importance is a written statement by the accountable officer or a notation that the accountable officer chooses not to submit a separate statement. The accountable officer's liability arises by operation of law and the government is not required to prove negligence. Therefore, it is important that all accountable officers be given the opportunity to include a statement in their relief requests because they have the burden of demonstrating that the loss occurred without any fault or negligence on their part. *Id.* Relief will be granted or denied in the form of a letter addressed to the official who submitted the request.

In any case in which GAO has denied relief, the agency, or the accountable officer through appropriate administrative channels, may ask GAO to reconsider. GAO will not hesitate to reverse a decision shown to be wrong. Any request for reconsideration should set forth the errors which the applicant believes have been made and should include evidence (not mere unsupported allegations) to support the basis for relief, for example, that the original denial failed to consider certain evidence or to give it appropriate weight or relied too heavily on other evidence in the record. Denials of relief are often based not so much on the merits of the case but

[73] The 3-year limitation period begins to run when the agency's accounts are substantially complete for audit purposes (*i.e.*, when various documents supporting the applicable statement of accountability are available to the agency and GAO for audit). *See* 7 GAO-PPM § 8.7.

simply on the failure of the original request to include sufficient information to enable an independent evaluation. Of course, if the agency cannot or is unwilling to make a required statutory determination, there is nothing GAO can do and a request for reconsideration is pointless.

## 3. *De Minimis* Rule: Payments of $100 or Less

In B-161457, July 14, 1976, a circular letter to all department and agency heads, and disbursing and certifying officers, the Comptroller General advised as follows:

> "[I]n lieu of requesting a decision by the Comptroller General for items of $25 or less, disbursing and certifying officers may hereafter rely upon written advice from an agency official designated by the head of each department or agency. A copy of the document containing such advice should be attached to the voucher and the propriety of any such payment will be considered conclusive on the General Accounting Office in its settlement of the accounts involved."

The amount has since been raised to $100. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.3 (Washington, D.C.: May 18, 1993). This does not preclude a certifying or disbursing officer from seeking a decision if deemed necessary since the entitlement to advance decisions is statutory, but it does provide a means for simplifying the payment of very small amounts. An accountable officer is not liable for a payment made under this authority even if the payment is later found to be improper or erroneous. The $100 threshold applies equally to questions arising after payment has been made. 61 Comp. Gen. 646, 648 (1982).

## 4. Relief *versus* Grievance Procedures

Federal employees have the right to organize and to bargain collectively with respect to conditions of employment. 5 U.S.C. § 7102. Collective bargaining agreements may include negotiated grievance procedures, which may in turn provide for dispute resolution by binding arbitration. *Id.* § 7121. The Federal Labor Relations Authority (FLRA) decides questions of an agency's duty to bargain in good faith under 5 U.S.C. § 7105(a)(2)(E). Agencies have a duty to bargain in good faith to the extent not inconsistent with federal law. *Id.* § 7117. The FLRA also decides appeals alleging that an arbitration award is contrary to federal law. *Id.* § 7122.

Since the authority to relieve accountable officers is provided by statute, both GAO and the FLRA have determined that negotiated grievance procedures may not be used as a substitute for making the relief decision. B-213804, Aug. 13, 1985; *National Treasury Employees Union and Internal Revenue Service*, 14 F.L.R.A. 65 (1984). The same result applies to the State Department's separate statutory grievance procedures. 67 Comp. Gen. 457 (1988).

However, a grievance procedure may encompass an agency head's determination that an accountable officer is negligent, as distinguished from the actual relief decision. See *National Treasury Employees Union and Internal Revenue Service*, 33 F.L.R.A. 229 (1988), citing 59 Comp. Gen. 113 (1979) for the proposition that GAO's statutory role does not arise until after the agency head has made the requisite determination under section 3527 for disbursing officials.

# G. Collection Action

## 1. Against Recipient

A person who receives money from the government to which he or she is not entitled, however innocently, has no right to keep it. The recipient is indebted to the government, and the agency making the improper or erroneous payment has a duty to attempt to recover the funds, wholly independent of any question of liability or relief of an accountable officer. The duty to aggressively pursue collection action and the means of doing so are found primarily in the Federal Claims Collection Act as amended by the Debt Collection Improvement Act of 1996, at 31 U.S.C. § 3711, and the implementing regulations in the Federal Claims Collection Standards, 31 C.F.R. parts 900–904,[74] the details of which are covered elsewhere in this publication. Indeed, many of the statutes we have previously discussed emphasize that the relief process does not diminish this duty. *E.g.*, 31 U.S.C. §§ 3333(b), 3343(g), 3526(c)(4), 3527(d)(2).

[74] The Standards were previously promulgated jointly by the Department of Justice and GAO and were published at 4 C.F.R. parts 101–105. However, the Secretary of the Treasury was subsequently added as a co-promulgator and the Comptroller General removed. *See* Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001(d)(2)(A), 110 Stat. 1321, 1321-359 (Apr. 26, 1996); General Accounting Office Act of 1996, Pub. L. No. 104-316, § 115(g)(1), 110 Stat. 3826, 3834–35 (Oct. 19, 1996).

Recovery from the improper payee or recipient removes the accountable officer's liability regardless of whether relief has or has not been sought because there is no longer any loss. However, merely "flagging" the retirement account of an employee who has received an overpayment, for possible collection at some unpredictable future time, is not enough as it would delay indefinitely the final settlement of the account. 31 Comp. Gen. 17 (1951).

In a sense, the recipient and the unrelieved accountable officer share an element of joint liability. The occasional decision has referred to this as "joint and several" liability, but it has been pointed out that this is incorrect. *E.g.*, B-228946, Jan. 15, 1988. If two debtors are "jointly and severally" liable, the creditor has the option of collecting the full amount from either, with the debtor who pays then having a right of contribution against the remaining debtor(s). Certainly no one would suggest that someone who has defrauded the government and repays the debt has any right of contribution against the accountable officer. Also, under joint and several liability, the creditor may seek to collect a portion from each debtor. The agency in an accountable officer loss has no such option. B-212602, Apr. 5, 1984. The agency's first obligation is to seek recovery from the recipient. The recipient of an improper payment is liable for the full amount, with any amounts collected used to reduce the accountable officer's liability. *Id.;* 30 Comp. Gen. 298, 300 (1951). *See also* 62 Comp. Gen. 476, 478–79 (1983); 54 Comp. Gen. 112, 114 (1974).

So strong is this duty to seek recovery from the improper payee or recipient that the two primary relief statutes for improper payments explicitly authorize GAO to deny relief if the agency has failed to diligently pursue collection action against the recipient. 31 U.S.C. §§ 3527(c) (disbursing officers), 3528(b)(2) (certifying officers). *See also* B-271017, Aug. 12, 1996. GAO is extremely reluctant to deny relief solely on the basis of inadequate collection action because often the failure is attributable to the agency rather than the accountable officer. However, it has been done. *E.g.*, B-234815, Oct. 3, 1989 (disbursing officer failed to initiate collection action despite repeated advice from agency counsel).

Adequate collection action means compliance with the Federal Claims Collection Act and Standards. 62 Comp. Gen. 476, 478–79 (1983); B-233870, May 30, 1989. Accordingly, once it has been determined that the improper payments were not the result of bad faith or a lack of reasonable care on the part of the accountable officer, the issue is whether the agency undertook diligent collection agency. B-270715, July 23, 1996. A single

demand letter is generally not enough, and an agency should pursue additional means of collection if there is no response to the letter. 62 Comp. Gen. 91, 98 (1982). *See also* 31 C.F.R. § 901.2. Resort to the Federal Claims Collection Act and Standards includes those collection measures, as and to the extent authorized, which result in collection of less than the full amount, for example, compromise. A compromise, including one by the Justice Department, not only resolves the claim against the recipient but operates as well to relieve the accountable officer for any amounts unrecovered because of the compromise. 31 U.S.C. § 3711(d); 65 Comp. Gen. 371 (1986). Whether or not the accountable officer is entitled to relief does not affect the compromise authority. B-154400-O.M., Jan. 29, 1968. However, 31 U.S.C. § 3711(c) does not apply to any liability which may fall upon one who is not an accountable officer. B-235048, Apr. 4, 1991. The authority to suspend or terminate collection action is also available, but only in accordance with the claims collection act and regulations. 67 Comp. Gen. 457, 464 (1988); B-253582, Dec. 13, 1993; B-212337, Feb. 17, 1984; B-211660, Dec. 15, 1983. Unlike a compromise, the termination of collection action against the recipient does not eliminate the accountable officer's liability for any unrecovered balance. 67 Comp. Gen. at 464.

Adequate collection action also requires referral of the claim to the appropriate collection office within the agency without undue delay. GAO has advised the Army, for example, that a delay of more than 3 months will generally not be regarded as diligent. 65 Comp. Gen. 811 (1986); B-227187, June 16, 1987; B-227218, June 5, 1987.

While diligent collection action is a necessary element of the relief equation, the fact that collection efforts have been unsuccessful, however diligent, does not by itself provide the basis for relieving the accountable officer. B-141838, Feb. 8, 1960; B-114042, Oct. 31, 1956.

## 2. Against Accountable Officer

If a loss cannot be recovered from the thief or other improper payee or recipient, and relief cannot be granted to the accountable officer, the accountable officer becomes indebted to the government for the amount involved. At that point, it is the agency's responsibility to initiate collection action against the accountable officer in accordance with the Federal Claims Collection Act and Standards. *E.g.*, B-223726, June 26, 1987; B-177430, Oct. 30, 1973.

If the accountable officer is still employed by the government, additional statutes come into play. Offset against salary is prescribed by 5 U.S.C. § 5512(a):

> "The pay of an individual in arrears to the United States shall be withheld until he has accounted for and paid into the Treasury of the United States all sums for which he is liable."

This statute does not apply to ordinary debtors but only to accountable officers. 37 Comp. Gen. 344 (1957); 23 Comp. Gen. 555 (1944); B-248376, Jan. 11, 1993. It has also been held that the provisions of 5 U.S.C. § 5512(a) are mandatory and cannot be waived. 64 Comp. Gen. 606 (1985); 39 Comp. Gen. 203 (1959); 19 Comp. Gen. 312 (1939).

The application of 5 U.S.C. § 5512(a) to certain military accountable officers is limited by 37 U.S.C. § 1007(a), which prohibits withholding the pay "of an officer" under section 5512 unless the indebtedness is "admitted by the officer or shown by the judgment of a court, upon a special order issued in the discretion of the Secretary of Defense,[75] or upon denial of relief of an officer under 31 U.S.C. § 3527." Subsection 1007(a) applies to "officers," meaning commissioned or warrant officers, and not to enlisted personnel or civilian accountable officers. 37 Comp. Gen. 344, 348 (1957). The admission may be oral or written but, if oral, a certificate of a commissioned officer that the accountable officer clearly and unequivocally admitted the shortage would be sufficient evidence. 42 Comp. Gen. 83 (1962). The discretion to apply 5 U.S.C. § 5512(a) exists only in the absence of an admission or court judgment. *Id.*

The original version of 5 U.S.C. § 5512(a), enacted in 1828,[76] provided that "no money shall be paid" to the person in arrears until the debt is repaid. Thus, several early decisions exist for the somewhat barbaric proposition that the statute requires complete stoppage of pay. *E.g.*, 9 Comp. Gen. 272 (1930); 7 Comp. Gen. 4 (1927). While these and similar early decisions have not been explicitly overruled, the current view is that the statute will be

[75] The special order is issued in the discretion of the Secretary of Homeland Security in the case of an officer of the Coast Guard when the Coast Guard is operating as a service in the Navy. 37 U.S.C. § 1007(a).

[76] Act of January 25, 1828, ch. 2, 4 Stat. 246.

satisfied by withholding in reasonable installments. 64 Comp. Gen. 606 (1985); B-180957-O.M., Sept. 25, 1979. The amount of the installment payments will be determined by the agency. B-241478, Apr. 5, 1991. Collection in installments is also authorized when operating under 37 U.S.C. § 1007(c) for members of the uniformed services. For employees no longer on the payroll, offset under 5 U.S.C. § 5512(a) has been held to embrace collection from retirement funds to the extent authorized. *Parker v. United States*, 187 Ct. Cl. 553, 559 (1969); 39 Comp. Gen. 203, 206 (1959). GAO has also approved "flagging" the retirement account of an accountable officer still on the payroll. B-217114, Feb. 29, 1988.

When applying 5 U.S.C. § 5512(a) or 37 U.S.C. § 1007(a), the procedures to be followed are those prescribed by 31 C.F.R. § 901.3 for administrative offsets under 31 U.S.C. § 3716. 64 Comp. Gen. 142 (1984).

If pay is withheld under 5 U.S.C. § 5512(a), the statute provides a means to obtain judicial review of the indebtedness. Under 5 U.S.C. § 5512(b), GAO is required, upon the request of the individual or his or her agent or attorney to immediately report the balance due to the Attorney General, and the Attorney General is required within 60 days to order suit to be commenced against the individual. This provision was part of the original 1828 legislation, several decades prior to either the Tucker Act or the establishment of the Court of Claims, at a time when there was no other means available for the accountable officer to initiate judicial proceedings. It now exists as one way among several. Installment deductions are not required to stop during the litigation; if the accountable officer prevails, amounts collected are refunded. 64 Comp. Gen. 606, 608 (1985). Examples of referrals under 5 U.S.C. § 5512(b) are included at 64 Comp. Gen. 605 (1985); B-217114.7, May 6, 1991; and B-220492, Dec. 10, 1985.

# H. Restitution, Reimbursement, and Restoration

## 1. Restitution and Reimbursement

In the present context, restitution means the repayment of a loss by an accountable officer from personal funds; reimbursement means the refunding to an accountable officer of amounts previously paid in restitution. Prior to 1955, there was no statutory authority to permit the

reimbursement of an accountable officer who had made restitution to the government for a physical loss. Once an accountable officer made restitution (if, for example, the agency required it), the decisions held that there was no longer a deficiency in the account for which relief could be considered. 27 Comp. Gen. 404 (1948); B-101301, July 19, 1951.

Legislation in 1955 amended what is now 31 U.S.C. § 3527(a) and 31 U.S.C. § 3527(b) to expressly authorize reimbursement of the accountable officer for any amounts paid in restitution, if relief is granted.[77] Accordingly, restitution by the accountable officer in physical loss cases is no longer an impediment to the granting of relief. *E.g.*, B-155149, Oct. 21, 1964; B-126362, Feb. 21, 1956. The 1955 legislation amended only the physical loss relief statutes. There is no comparable reimbursement authority in the improper payment relief statutes, 31 U.S.C. §§ 3527(c) and 3528. B-226393, Apr. 29, 1988; B-223840, Nov. 5, 1986; B-128557, Sept. 21, 1956.

An obvious limitation on the reimbursement authority was illustrated in B-187021, Jan. 19, 1978. An imprest fund cashier sought reimbursement, claiming that she had discovered money missing from her cash box and replaced it from personal funds. However, by virtue of her actions in initially concealing the loss, she was unable to show that the loss had in fact ever occurred. Since the loss could not be established, reimbursement was denied. Thus, an accountable officer should always report a loss before making restitution.

## 2. Restoration

Restoration of an account suffering a loss or deficiency—an accounting adjustment to restore the shortage with funds from some other source—is authorized under two provisions of law, 31 U.S.C. §§ 3527(d) and 3530. The Comptroller General is required by 31 U.S.C. § 3530(c) to prescribe implementing regulations. These are found in title 7 of GAO's *Policy and Procedures Manual for Guidance of Federal Agencies*, § 8.14 (Washington, D.C.: May 18, 1993).

### a. Adjustment Incident to Granting of Relief

If relief is granted under either 31 U.S.C. § 3527(a) or 31 U.S.C. § 3527(c), GAO may authorize restoration of the account. Under subsection (d), restoration is accomplished by charging either an appropriation specifically available for that purpose or, if there is no such appropriation,

[77] Pub. L. No. 334, ch. 694, 69 Stat. 626 (Aug. 9, 1955).

the appropriation or fund available for the accountable function. *See* B-288163, June 4, 2002. The charge is made to the fiscal year in which the adjustment is made, and not the fiscal year in which the loss occurred. Subsection (d) applies only to subsections (a) and (c), and not to subsection (b) (military disbursing officers). However, the military departments have separate authority in 10 U.S.C. §§ 2777(b) and 2781. There is no restoration provision in 31 U.S.C. § 3528, which sets out the responsibilities and relief from liability for certifying officials.

Whenever account adjustment is deemed necessary, the agency should include in its relief request a citation (account symbol) to the appropriation it proposes to charge. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.14.A (Washington, D.C.: May 18, 1993) (hereafter GAO-PPM). In cases where agencies are authorized to grant relief without GAO involvement, they may also exercise the restoration authority of 31 U.S.C. § 3527(d) without GAO involvement. 7 GAO-PPM § 8.14.C.

A 1957 decision, 37 Comp. Gen. 224, considered the application of 31 U.S.C. § 3527(d) where one agency is disbursing funds on behalf of other agencies. State Department disbursing officers overseas, acting under delegations from the Treasury Department, were authorized to receive and disburse funds on behalf of other government agencies as well as the State Department. If the services were sufficiently extensive to warrant reimbursement, State charged the "user" agencies. Construing 31 U.S.C. § 3527(d), the Comptroller General held that losses in such a situation for which relief was granted but which could not be related to the functions of any particular agency or agencies should be charged to State Department appropriations because they were the appropriations available for the accountable function. "This phraseology clearly is intended to mean the appropriation of the department or agency to which the expenses of carrying on the particular disbursing function are chargeable." 37 Comp. Gen. at 226. Such adjustments could then be considered as part of the costs of the disbursing function for purposes of determining charges assessed against the user agencies and thus distributed to all user agencies in the same manner as other costs. *Id.* Twenty years later, GAO reached the same result with respect to losses of United States currency incident to the 1975 evacuation from Vietnam. 56 Comp. Gen. 791, 796–97 (1977).

### b. Other Situations

If a loss is due to fault or negligence by an accountable officer, and the agency head determines that the loss is uncollectible, the amount of the loss may be restored by a charge to the appropriation or fund available for

the expenses of the accountable function. 31 U.S.C. § 3530(a). Uncollectible includes uncollectible from the accountable officer. *E.g.*, B-177910, Feb. 20, 1973. As with adjustments under 31 U.S.C. § 3527(d), section 3530(a) requires the loss to be charged to the appropriation available for the fiscal year in which the adjustment is made (appropriation "currently available"). This authority applies (1) where relief is denied, or (2) where the agency does not seek relief, the uncollectibility determination being required in either event. Representative cases are B-271608, June 21, 1996; B-235405, Mar. 19, 1990; B-219246, Sept. 9, 1985; B-188715, Jan. 31, 1978; and B-167827, Feb. 4, 1975.

Assuming the statutory conditions are met, adjustments under 31 U.S.C. § 3530 are made directly by the agency with no need for specific authorization or concurrence from GAO. GAO, *Policy and Procedures Manual for Guidance of Federal Agencies*, title 7, § 8.14.D (Washington, D.C.: May 18, 1993). Restoration under section 3530 is merely an accounting adjustment and does not affect the accountable officer's personal liability. 31 U.S.C. § 3530(b). Thus, although the adjustment is premised on a determination of uncollectibility, collection efforts should resume if warranted by future developments. B-241725, Feb. 19, 1991.

The statutes described above, 31 U.S.C. §§ 3527(d) and 3530, will cover most situations in which restoration is needed in that relief is mostly either granted or denied or not sought. There are, however, situations in which neither statute applies. For example, a thief fraudulently obtained over $10,000 from the patients trust account at a Department of Veterans Affairs (VA) hospital. He was convicted and ordered to make restitution. The restitution order was lifted 3 years later, but the VA had by then recovered only a small portion of the loss. The VA decided that pursuing the thief any further would be fruitless, and it had previously determined that there had been no fault or negligence by the accountable officer.

The VA was faced with a dilemma. Clearly the loss had to be restored since the trust account consisted of money belonging to patients, and just as clearly VA's operating appropriations were the only available source. The problem was how to get there. Since the 3-year statute of limitations on account settlement (31 U.S.C. § 3526(c)) had expired, relief could no longer be considered, so 31 U.S.C. § 3527(d) could not be used. Equally unavailing was 31 U.S.C. § 3530 since the loss did not result from the accountable officer's fault or negligence. However, since the VA had an undisputed obligation as trustee to return the trust funds to their rightful owners upon demand, the loss could be viewed as an expense of managing the trust

fund. The solution therefore was to restore funds from the unobligated balance of VA's operating appropriation for the fiscal year in which the loss occurred. 68 Comp. Gen. 600 (1989). *See also* B-239955, June 18, 1991. The authority to make adjustments from the unexpended balances of prior years' appropriations is now found in 31 U.S.C. § 1553(a). Once an account has been closed, generally five fiscal years after expiration,[78] 31 U.S.C. § 1553(b) requires that the adjustment be charged, within certain limits, to current appropriations. Thus, the authority now found in 31 U.S.C. § 1553 may provide an alternative if neither 31 U.S.C. § 3527(d) nor 31 U.S.C. § 3530 is available. Of course, if the account to be restored has itself been closed pursuant to 31 U.S.C. §§ 1552(a) or 1555, restoration is no longer possible.

[78] *See* 31 U.S.C. § 1552(a).

# Federal Assistance: Grants and Cooperative Agreements

**A. Introduction . . . . . . . . . . 10-3**
**B. Grants versus Procurement Contracts . . . . . . . . . . 10-6**
1. Judicial and GAO Decisions on the Nature of Grants . . . . . . . . . 10-6
   a. Contractual Aspects of Grants . . . . . . . . . 10-6
   b. Differences between Grants and Contracts . . . . . . . . . 10-9
   c. Grants as "Hybrids" . . . . . . . . . 10-11
2. The Federal Grant and Cooperative Agreement Act . . . . . . . . . 10-13
   a. Purposes and Provisions of the Act . . . . . . . . . 10-13
   b. Agency Implementation of the Act . . . . . . . . . 10-17
   c. Decisions Interpreting the Act . . . . . . . . . 10-18
3. Competition for Discretionary Grant Awards . . . . . . . . . 10-25
**C. Some Basic Concepts . . . . . . . . . . 10-27**
1. The Grant as an Exercise of Congressional Spending Power . . 10-28
   a. Constitutionality of Grant Conditions . . . . . . . . . 10-28
      (1) Conditions must be in pursuit of the general welfare and related to the purpose of the expenditure . . . . . . . 10-29
      (2) Conditions must be unambiguous . . . . . . . . . 10-30
      (3) Conditions must be otherwise constitutional . . . . . . . . 10-32
   b. Effect of Grant Conditions . . . . . . . . . 10-34
2. Availability of Appropriations . . . . . . . . . 10-36
   a. Purpose . . . . . . . . . 10-36
   b. Time . . . . . . . . . 10-39
   c. Amount . . . . . . . . . 10-43
3. Agency Regulations . . . . . . . . . 10-45
   a. General principles . . . . . . . . . 10-45
   b. Office of Management and Budget Circulars and the "Common Rules" . . . . . . . . . 10-47
   c. The Federal Financial Assistance Management Improvement Act . . . . . . . . . 10-51
   d. The "Cognizant Agency" Concept . . . . . . . . . 10-52
4. Contracting by Grantees . . . . . . . . . 10-53
5. Liability for Acts of Grantees . . . . . . . . . 10-54
   a. Liability to Grantee's Contractors . . . . . . . . . 10-55
   b. Liability for Grantee Misconduct . . . . . . . . . 10-58
6. Types of Grants: Categorical versus Block . . . . . . . . . 10-60
7. The Single Audit Act . . . . . . . . . 10-63
**D. Funds in Hands of Grantee: Status and Application of Appropriation Restrictions . . . . . . . . . . 10-68**
**E. Grant Funding . . . . . . . . . . 10-76**
1. Advances of Grant/Assistance Funds . . . . . . . . . 10-77
2. Cash Management of Grants . . . . . . . . . 10-78
   a. General Rule on Interest on Grant Advances . . . . . . . . . 10-78

b. State Governments and Interest on Grant Advances . . . . . . . 10-82
(1) Intergovernmental Cooperation Act . . . . . . . . . . . . . . . . 10-82
(2) Decisions under the Intergovernmental Cooperation Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-84
c. Other Cash Management Requirements . . . . . . . . . . . . . . . . 10-87
3. Program Income . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-89
4. Cost-Sharing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-92
a. Local or Matching Share . . . . . . . . . . . . . . . . . . . . . . . . . . 10-93
(1) General principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-93
(2) Hard and soft matches . . . . . . . . . . . . . . . . . . . . . . . . . 10-96
(3) Matching one grant with funds from another . . . . . . . . 10-97
(4) Relocation allowances . . . . . . . . . . . . . . . . . . . . . . . . . 10-99
(5) Payments by other than grantor agency . . . . . . . . . . . . 10-100
b. Maintenance of Effort . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-102
**F. Obligation of Appropriations for Grants . . . . . . . . . . 10-106**
1. Requirement for Obligation . . . . . . . . . . . . . . . . . . . . . . . . . . 10-106
2. Changes in Grants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-107
**G. Grant Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-111**
1. Allowable versus Unallowable Costs . . . . . . . . . . . . . . . . . . . 10-111
a. The Concept of Allowable Costs . . . . . . . . . . . . . . . . . . . . . 10-111
b. Grant Cost Cases . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-117
(1) Scope of judicial review . . . . . . . . . . . . . . . . . . . . . . . . 10-117
(2) Court case examples . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-119
(3) GAO case examples . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-124
c. Note on Accounting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10-126
2. Pre-Award Costs (Retroactive Funding) . . . . . . . . . . . . . . . . . 10-129
**H. Recovery of Grantee Indebtedness . . . . . . . . . . . . . . . 10-132**
1. Government's Duty to Recover . . . . . . . . . . . . . . . . . . . . . . . . 10-132
2. Offset and Withholding of Claims Under Grants . . . . . . . . . . . 10-144

# Federal Assistance: Grants and Cooperative Agreements

## A. Introduction

The federal government provides assistance in many forms, financial and otherwise. Assistance programs are designed to serve a variety of purposes. Objectives may include fostering some element of national policy, stimulating private sector involvement, or furnishing aid of a type or to a class of beneficiaries the private market cannot or is unwilling to otherwise accommodate. The term "assistance" is statutorily defined in many federal laws. For example, the Federal Program Information Act broadly defines "assistance" as "the transfer of anything of value for a public purpose of support or stimulation authorized by [law]." 31U.S.C. § 6101(3). A similar definition of "assistance" is found in the Intergovernmental Cooperation Act, which adds the qualification, for purposes of that act, that the federal government provide such a transfer through grant or contractual arrangements. 31 U.S.C. § 6501(1). Another definition is provided in the Single Audit Act, which defines "Federal financial assistance" as "assistance that nonfederal entities receive or administer in the form of grants, loans, loan guarantees, property, cooperative agreements, interest subsidies, insurance, food commodities, direct appropriations, or other assistance." 31 U.S.C. § 7501(a)(5).[1]

Grants constitute one form of federal assistance. The Intergovernmental Cooperation Act defines a grant as "money, or property provided instead of money, that is paid or provided by the United States Government under a fixed annual or total authorization, to" an eligible beneficiary. 31 U.S.C. § 6501(4)(A) and (B). The act defines eligible beneficiaries as including state and local governments as well as certain private nonprofit organizations. *Id.* The act specifically excludes from this definition such things as a loan, shared revenue, and payments under a research and development procurement contract. *Id.* § 6501(4)(C). Similarly, GAO's budget glossary defines a grant as a "federal financial assistance award making payment in cash or in kind for a specified purpose," adding: "The term 'grant' is used broadly and may include a grant to nongovernmental recipients as well as one to a state or local government, while the term

[1] The Intergovernmental Cooperation Act and the Single Audit Act are discussed later in this chapter.

'grant-in-aid' is commonly used to refer only to a grant to a state or local government."[2]

Thus, a federal grant is a form of assistance authorized by statute in which a federal agency (the grantor) transfers something of value to a party (the grantee) for a purpose, undertaking, or activity of the grantee that the government has chosen to assist. The "thing of value" is usually money, but may, depending on the program legislation, also include property or services.[3] The grantee, again depending on the program legislation, may be a state or local government, a nonprofit organization, or a private individual or business entity. Federal grants to state and local governments comprise the largest category, involving federal outlays of more than $406 billion in fiscal year 2004, which constituted 17.7 percent of total federal outlays and 3.5 percent of Gross Domestic Product.[4]

The past four decades have witnessed a dramatic growth in federal grants, both in absolute dollar terms and as a proportion of total federal spending. The domestic Working Group's recent publication, *Guide to Opportunities for Improving grant Accountability* (Washington, D.C.: October 2005), at 1–2, illustrates this growth.[5] The *Guide* focuses on grants to state and

[2] GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 60. The drafters of the Federal Grant and Cooperative Agreement Act of 1977, 31 U.S.C. §§ 6301–6308, discussed in section B.2 of this chapter, opted against including a separate statutory definition for the term "grant-in-aid" in favor of using the simpler term "grant" to encompass all such transactions regardless of the identity of the recipient. S. Rep. No. 95-449, at 9 (1977).

[3] The earliest grant programs were land grants. Monetary grants appear to have entered the stage in 1879, but they are largely a 20th century development. Madden, *The Constitutional and Legal Foundations of Federal Grants*, in *Federal Grant Law* 9 (M. Mason ed. 1982). One example of land grants is the Morrill Act of 1862, Pub. L. No. 37-108, 12 Stat. 503 (July 2, 1862), through which Congress assisted states with higher education by providing land grants to establish universities focused on agriculture, mechanics, and military science. Library of Congress, Congressional Research Service, No. RL30705, *Federal Grants to State and Local Governments: A Brief History* (Feb. 19, 2003), at 3–4.

[4] Office of Management and Budget, *Budget of the United States Government*, *Fiscal Year 2006*, *Historical Tables* (Washington, D.C. 2005), at 221.

[5] The Domestic Working Group, chaired by the Comptroller General, consists of 19 federal, state, and local audit organizations. Its purpose is to identify current and emerging challenges of mutual interest and to explore opportunities for greater collaboration within the intergovernmental audit community. The *Guide* describes a number of ideas and best practices to enhance grant management and administration. It covers several topics that are discussed in this chapter. An electronic copy of the *Guide* can be found at www.epa.gov/oig/dwg/reports (last visited November 5, 2005).

local governments, which make up about 80 percent of all federal grants. In 1960, such grants amounted to approximately $7 billion, representing about 7 percent of the total federal outlays. In the President's budget request for fiscal year 2006, about $450 billion was included to fund over 700 grant programs. As noted above, this represents over 17 percent of total federal outlays.

"Cooperative agreements" constitute another form of federal assistance relationship. As we will discuss in section B of this chapter, cooperative agreements are very much like grants in that they are used to transfer something of value to the recipient in order to accomplish a public purpose as authorized by law. The key difference is that the federal agency providing the assistance has more involvement with the recipient in carrying out the activity being funded under a cooperative agreement than it does in the case of a grant. Given the similarity between these two forms of assistance, our discussion of grants in the remainder of this chapter applies as well to cooperative agreements except as otherwise noted. Indeed, the distinction between grants and cooperative agreements is rarely, if ever, the focus of GAO and judicial decisions. Rather, as discussed hereafter, the decisions typically involve issues concerning the use of procurement contracts versus assistance relationships.

In July 2005, according to the most recent information available from the *Catalog of Federal Domestic Assistance*,[6] 58 federal agencies administered 1,621 assistance programs. To be sure, a large number of these are not grant programs since the *Catalog* includes loan and loan guarantee programs plus certain types of nonfinancial assistance. Nevertheless, it is a safe statement that there are hundreds of federal grant programs administered by dozens of agencies.

Grant programs typically are governed by detailed legislation and even more detailed regulations. As a result, many judicial and administrative grant cases are not amenable to broad treatment in this chapter since they

[6] The *Catalog of Federal Domestic Assistance* is published annually by the General Services Administration and the Office of Management and Budget pursuant to 31 U.S.C. § 6104 and OMB Circular No. A-89, *Federal Domestic Assistance Program Information* (Aug. 17, 1984). The *Catalog* is a governmentwide list of financial and nonfinancial federal assistance programs, projects, services, and activities administered by federal agencies that provide assistance or benefits to the American public. 31 C.F.R. § 205.2 (2005). The most recently updated print edition and the more frequently updated on-line version can both be accessed through the *Catalog*'s website at www.cfda.gov (last visited September 15, 2005).

hinge on specific statutory or regulatory provisions having limited general applicability. Nevertheless, it is still possible to extract a number of principles of "grant law" from the perspective of the availability and use of appropriated funds. Before we do so, it is necessary to discuss the differences and similarities of grants, cooperative agreements, and procurement contracts.

## B. Grants *versus* Procurement Contracts

From the perspective of legal analysis, what precisely is a grant and when is it the appropriate funding vehicle for a federal agency to use? How do grants differ from contracts and what do they have in common? This section will explore these and related questions. We will first discuss judicial and GAO case law that often applies some basic contract law principles to grants but also recognizes significant differences between grants and contracts, particularly federal procurements. (As noted previously, grants are essentially the same as cooperative agreements for purposes of these cases.) We will then discuss statutory and administrative principles that have been developed to clarify the distinctions among grants, contracts, and cooperative agreements and when each should be used by a federal agency.

### 1. Judicial and GAO Decisions on the Nature of Grants

#### a. Contractual Aspects of Grants

Courts frequently look to contract law principles to define the rights and obligations of the parties to a federal grant. In particular, the courts view the acceptance of a grant of federal funds subject to conditions that must be met by the grantee as creating a "contract" between the United States and the grantee. The "grant as a type of contract" approach evolved from early Supreme Court decisions. In what may be the earliest case on the subject, the government had made a grant of land to a state on the condition that the state would use the land, or the proceeds from its sale, for certain reclamation purposes. The Court stated:

> "It is not doubted that the grant by the United States to the State upon conditions, and the acceptance of the grant by the State, constituted a contract. All the elements of a contract met in the transaction—competent parties, proper

> subject-matter, sufficient consideration, and consent of minds."

*McGee v. Mathis*, 71 U.S. (4 Wall.) 143, 155 (1866). *See also United States v. Northern Pacific Railway Co.*, 256 U.S. 51, 63–64 (1921).

The Supreme Court has consistently followed this approach in upholding conditions that Congress imposes upon recipients of federal grants. *See, e.g.*, *Jackson v. Birmingham Board of Education*, 544 U.S. ___, 125 S. Ct. 1497 (2005); *Davis v. Monroe County Board of Education*, 526 U.S. 629 (1999); *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). Consistent with the analogy to contract principles, the key consideration in many of these cases is whether the grantee was sufficiently aware of the condition to constitute acceptance of it. As the Court observed in *Jackson*, 125 S. Ct. at 1509:

> "When Congress enacts legislation under its spending power, that legislation is 'in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions.' *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17, 101 S. Ct. 1531, 67 L.Ed.2d 694 (1981). As we have recognized, '[t]here can . . . be no knowing acceptance [of the terms of the contract] if a State is unaware of the conditions [imposed by the legislation on its receipt of funds].' *Ibid.*"[7]

Lower courts also have applied contract principles to grants in various contexts: to enforce grantee compliance with grant conditions;[8] to determine jurisdiction under the Tucker Act (28 U.S.C. § 1491) for claims

[7] See section C.1.b of this chapter for further discussion of congressional use of grants in the exercise of its constitutional spending power. Congress's spending power is also discussed in Chapter 1, section B.

[8] *E.g.*, *United States v. Miami University*, 91 F. Supp. 2d 1132, 1142–44 (S.D. Ohio 2000), *aff'd*, 294 F.3d 797 (6th Cir. 2002); *United States v. Frazer*, 297 F. Supp. 319, 322–23 (M.D. Ala. 1968); *United States v. Sumter County School District No. 2*, 232 F. Supp. 945, 950 (E.D.S.C. 1964); *United States v. County School Board*, 221 F. Supp. 93, 99–100 (E.D. Va. 1963).

against the United States;[9] and to analyze the nature of the government's obligations under a particular grant statute or agreement.[10]

GAO decisions likewise analogize grants to contracts for certain purposes. *E.g.*, B-303927, June 7, 2005; 68 Comp. Gen. 609 (1989); 50 Comp. Gen. 470 (1970); 42 Comp. Gen. 289, 294 (1962); 41 Comp. Gen. 134, 137 (1961); B-232010, Mar. 23, 1989; B-167790, Jan. 15, 1973. In 50 Comp. Gen. 470, for example, a medical teaching facility, recipient of a reimbursement-type construction grant under a federal statute, was caught in a cash flow crisis because disbursement of grant funds was much less frequent than its contractor's need for progress payments. The question was whether the grant could be regarded as a "contract or claim" so the recipient could assign future grant proceeds to a bank in return for an interim loan, pursuant to the Assignment of Claims Act, 41 U.S.C. § 15. Under the Assignment of Claims Act, any party that has or will have a right to payment of $1,000 or more under a contract with the U.S. government may assign this right to a bank, trust company, or other financing company, assuming the party meets all the requirements of the Act. *Id.* § 15(b). Noting that the accepted grant constituted a "valid contract" and that assignment was not prohibited by the program legislation, regulations of the grantor agency, or the terms of the grant agreement, GAO concluded that assignment under the Assignment of Claims Act was permissible.

[9] *E.g.*, *Pennsylvania Department of Public Welfare v. United States*, 48 Fed. Cl. 785 (2001); *Moore v. United States*, 48 Fed. Cl. 394 (2000); *Thermalon Industries, Ltd. v. United States*, 34 Fed. Cl. 411 (1995); *Cole County Regional Sewer District v. United States*, 22 Cl. Ct. 551 (1991); *County of Suffolk v. United States*, 19 Cl. Ct. 295 (1990); *Kentucky ex rel. Cabinet for Human Resources v. United States*, 16 Cl. Ct. 755, 762 (1989); *Rogers v. United States*, 14 Cl. Ct. 39, 44 (1987); *Idaho Migrant Council, Inc. v. United States*, 9 Cl. Ct. 85, 88–89 (1985); *Missouri Health & Medical Organization, Inc. v. United States*, 641 F.2d 870 (Ct. Cl. 1981); *Texas v. United States*, 537 F.2d 466 (Ct. Cl. 1976). While most of these cases use language carefully crafted to avoid confusion between a grant agreement and a "traditional," that is, procurement, contract, the essence of the jurisdictional finding is that the grant claim is based on some form of "contract." The Tucker Act cases are discussed in more detail later in section B.2.c of this chapter in relation to the Federal Grant and Cooperative Agreement Act.

[10] *E.g.*, *Knight v. United States*, 52 Fed. Cl. 243 (2002), *rev'd on other grounds*, 65 Fed. Appx. 286 (Fed. Cir. 2003); *Pennsylvania Department of Public Welfare v. United States*; *Henke v. Department of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996); *Arizona v. United States*, 494 F.2d 1285 (Ct. Cl. 1974). *See also City of Manassas Park v. United States*, 633 F.2d 181 (Ct. Cl.), *cert. denied*, 449 U.S. 1035 (1980) (claim found to be noncontractual, but agreement referred to as "grant contract" and grantor-grantee relationship as "privity of contract").

## b. Differences between Grants and Contracts

As indicated above, the researcher will find a body of judicial and GAO case law standing for the proposition that there are certain contractual aspects to a grant relationship. It does not follow, however, nor has GAO or (to our knowledge) any court suggested, that all of the trappings of a procurement contract somehow attach to a grant. While grant relationships have certain "contractual" relationships, the contract analogy has its limits.

Take, for example, the issue of consideration. While the typical grant agreement may well include sufficient legal consideration from the standpoint of supporting a legal obligation, it may be quite different from the consideration found in procurement contracts. As noted earlier in this chapter, a grant is a form of assistance to a designated class of recipients authorized by statute to meet recognized needs. Grant needs, by definition, are not needs for goods or services required by the federal government itself. The needs are those of a nonfederal entity, whether public or private, which the Congress has decided to assist as being in the public interest.

An illustration of where this distinction on the issue of consideration can lead is 41 Comp. Gen. 134 (1961). That decision involved a statutory provision authorizing grants to states for the construction of sewage treatment works, up to a stated percentage of estimated costs, with the grantee to pay all remaining costs. Strong demand for limited funds meant that grants were frequently awarded for amounts less than the permissible ceiling. The question was whether these grants could be amended in a subsequent fiscal year to increase the amount to, or at least closer to, the statutory ceiling. If a straight "grant equals contract" approach had been applied, the answer would have been no, unless the government received additional consideration. However, GAO concluded that the amendments were authorized, noting that the "consideration" flowing to the government under these grants (in sharp contrast with procurement contracts) consisted only of "the benefits to accrue to the public and the United States" through use of the funds to construct the desired facilities. *Id.* at 137.

In recognition of the essential distinctions between a grant agreement and a procurement contract, the Supreme Court has stated:

> "Although we agree . . . that . . . [the] grant agreements [at issue] had a contractual aspect, . . . the program cannot be viewed in the same manner as a bilateral contract governing a discrete transaction. . . . Unlike normal contractual

undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."

*Bennett v. Kentucky Department of Education*, 470 U.S. 656, 669 (1985). The state in that case had argued that, since the grant was "in the nature of a contract," the Court should apply the principle, drawn from contract law, that ambiguities in the grant agreement should be resolved against the government as the drafting party. *Id.* at 666. Based on the analysis summarized in the quoted passage, the Supreme Court declined to do so.

Similarly, the contract law doctrine of "impossibility of performance" has been held inapplicable to a grant. *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 762 F.2d 406 (4th Cir. 1985). In that case, the government had imposed a zero error standard on states under a grant program. The state argued that error-free administration was impossible. While agreeing with that factual proposition, the court nevertheless held that the zero tolerance level was permissible under the governing statute and regulations. The impossibility of performance doctrine, said the court, "relates to commercial contracts and not to grant in aid programs." *Id.* at 409.

A 1971 decision, 51 Comp. Gen. 162, illustrates another distinction. In that case, the Comptroller General concluded that an ineligible grantee could not be reimbursed for expenditures under *quantum meruit* principles. *Quantum meruit* is a "contract-implied-in law" theory founded on the principle that a party who receives a tangible benefit from another is entitled to compensation. In the typical grant situation, the grantee's activities are not performed solely for the direct benefit of the government and the government does not receive any measurable, tangible benefit in the traditional contract sense.

Similarly, the courts are reluctant to apply the "contract implied in fact" concept in the grant context. *E.g.*, *Capitol Boulevard Partners v. United States*, 31 Fed. Cl. 758 (1994); *Blaze Construction, Inc. v. United States*, 27 Fed. Cl. 646 (1993); *Eubanks v. United States*, 25 Cl. Ct. 131 (1992); *Somerville Technical Services v. United States*, 640 F.2d 1276 (Ct. Cl. 1981). The reasoning, in part, is that a grant is a sovereign act binding the government only to the extent of its express undertakings.

In *American Hospital Association v. Schweiker*, 721 F.2d 170 (7th Cir. 1983), *cert. denied*, 466 U.S. 958 (1984), the court rejected the contention

that otherwise valid regulations of the Department of Health and Human Services impaired contractual rights of grantees under the Hill-Burton hospital assistance program:

> "[T]he relationship between the government and the hospitals here cannot be wholly captured by the term 'contract' and the analysis traditionally associated with that term. . . . The contract analogy thus has only limited application."

721 F.2d at 182–83. Additionally, the court in *United States v. Kensington Hospital*, 760 F. Supp. 1120 (E.D. Pa. 1991), refused to apply the Anti-Kickback Act of 1986[11] to government claims for fraud under the Medicare and Medicaid programs, finding that the government's relationship with its grantees under these programs could not be characterized as "prime contracts" for purposes of the Act.

Finally, appropriations law restrictions may not apply to grants in the same manner as they apply to contracts. Thus, GAO has held that the principle of "severability," as embodied in the *bona fide* needs rule for purposes of contracts, is irrelevant to assistance agreements. *See* B-289801, Dec. 30, 2002 (dealing with multiple year Education Department grants); B-229873, Nov. 29, 1988 (dealing with Small Business Administration cooperative agreements). These cases are discussed in section C.1 of this chapter.

### c. Grants as "Hybrids"

Perhaps most aptly, some courts have described grants as "hybrid" instruments in view of both their similarities to and differences from contracts. *Mayor and City Council of Baltimore v. Browner*, 866 F. Supp. 249, 252 (D. Md. 1994); *Town of Fallsburg v. United States*, 22 Cl. Ct. 633, 642 (1991). In this regard, the court in *Browner* stated: "Essentially, grants are contracts with statutory and regulatory terms superimposed upon them." 866 F. Supp. at 252. The court held that the appropriate standard of judicial review depended on the nature of the dispute before it. If the issues arose under the grant statute or regulations (as they did in this case), the court would review the agency's actions under an abuse of discretion standard; other issues would be considered contractual and subject to *de*

[11] The Anti-Kickback Act of 1986, Pub. L. No. 99-634, § 2 (a), 100 Stat. 3523 (Nov. 7, 1986), codified at 41 U.S.C. §§ 51–58, imposes criminal and civil sanctions against subcontractors who provide money, gifts, or other "kickbacks" to prime contractors in order to secure their subcontracts as part of a larger government contract.

*novo* review applying contract law principles. *Fallsburg*, which the *Browner* court followed, took the same approach in determining the appropriate standard for judicial review. See also, to the same effect, *United States v. Hatcher*, 922 F.2d 1402, 1406–07 (9th Cir. 1991), in which the court reviewed the federal funding agency's actions under the Administrative Procedure Act rather than contract law principles since the issues arose under the program statute (in this case a program of individual scholarships).

Other cases have followed the same approach without specifically referring to grants as hybrids. These cases emphasize that the rights and obligations of the parties, while contractual in nature, cannot be determined solely by reference to the terms of the grant agreement itself. Rather, the court must also look to such sources as the applicable grant statute, its legislative history, the grantor agency's regulations, and applicable Office of Management and Budget guidance. *See*, *e.g.*, *Westside Mothers v. Haveman*, 289 F.3d 852, 858 (6th Cir.), *cert. denied*, 537 U.S. 1045 (2002); *Institute for Technology Development v. Brown*, 63 F.3d 445, 449 (5th Cir. 1995).

In sum, it is clear that the many varied rules and principles of contract law will not be automatically applied to grants. Nevertheless, it is equally clear that the creation of a grant relationship results in certain legal obligations flowing in both directions (grantor and grantee) that will be enforceable by the application of some basic contract rules. As the then Claims Court (now Court of Federal Claims) stated:

> "[A] notice of a federal grant award in return for the grantee's performance of services can create cognizable obligations to the extent of the government's undertakings therein."

*Community Relations-Social Development Commission v. United States*, 8 Cl. Ct. 723, 725 (1985). Thus, if a grantee does what it has committed itself to do and incurs allowable costs, the government is obligated to pay. *E.g.*, B-181332, Dec. 28, 1976. Conversely, the government has a right to expect that the grantee will use the grant funds only for authorized grant purposes and only in accordance with the terms and conditions of the grant. The right of a grantor agency to oversee the expenditure of funds by the grantee to ensure that the money is used only for authorized purposes, and the grantee's corresponding duty to account to the grantor for its use of the funds, are implicit in the grant relationship and are not dependent upon

specific language in the authorizing legislation. *See*, *e.g.*, B-303927, June 7, 2005; 64 Comp. Gen. 582 (1985).

## 2. The Federal Grant and Cooperative Agreement Act

### a. Purposes and Provisions of the Act

Long-standing confusion and concern over federal agency use of grant relationships *versus* procurement relationships led the Commission on Government Procurement, in its 1972 report, to recommend the enactment of legislation to distinguish assistance from procurement and to further refine the concept of assistance by clearly distinguishing grants from cooperative agreements.[12] While Congress did not enact all of the Commission's recommendations, it did enact these two in the form of the Federal Grant and Cooperative Agreement Act of 1977, Pub. L. No. 95-224, 92 Stat. 3 (Feb. 3, 1978), codified at 31 U.S.C. §§ 6301–6308. Referring to the Commission's findings, the report on this legislation by the then Senate Committee on Governmental Affairs (now the Senate Committee on Homeland Security and Governmental Affairs) observed:

> "No uniform statutory guideline exists to express the sense of Congress on when executive agencies should use either grants, cooperative agreements or procurement contracts. Failure to distinguish between procurement and assistance relationships has led to both the inappropriate use of grants to avoid the requirements of the procurement system, and to unnecessary red tape and administrative requirements in grants."

S. Rep. No. 95-449, at 6 (1977).

The Federal Grant and Cooperative Agreement Act was enacted to—

> "prescribe criteria for executive agencies in selecting appropriate legal instruments to achieve—

[12] *See generally* 3 *Report of the Commission on Government Procurement*, chs. 1–3 (Dec. 31, 1972).

(A) uniformity in their use by executive agencies;

(B) a clear definition of the relationships they reflect; and

(C) a better understanding of the responsibilities of the parties to them."

31 U.S.C. § 6301(2). To achieve these purposes, the act established standards that agencies are to use in selecting the most appropriate funding vehicle: a procurement contract, a grant, or a cooperative agreement. The standards are contained in sections 4, 5, and 6 of the act, codified at 31 U.S.C. §§ 6303–6305, which are summarized below:

- *Procurement contracts*. An agency is to use a procurement contract when "the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the *direct benefit or use* of the United States Government." 31 U.S.C. § 6303 (emphasis added).

- *Grant agreements*. An agency is to use a grant agreement when the principal purpose of the relationship is to transfer a thing of value [money, property, services, *etc.*] to the recipient "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," and "substantial involvement is *not* expected" between the agency and the recipient when carrying out the contemplated activity. 31 U.S.C. § 6304 (emphasis added).

- *Cooperative agreements*. An agency is to use a cooperative agreement when the principal purpose of the relationship is to transfer a thing of value to the recipient "to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government," and "substantial involvement *is* expected" between the agency and the recipient when carrying out the contemplated activity. 31 U.S.C. § 6305 (emphasis added).

The Federal Grant and Cooperative Agreement Act authorizes the Director of the Office of Management and Budget (OMB) to provide additional guidance in interpreting the act to "promote consistent and efficient use of

procurement contracts, grant agreements, and cooperative agreements." 31 U.S.C. § 6307(1). OMB published such guidance on August 18, 1978 (43 Fed. Reg. 36860), which is still in effect.[13]

The Federal Grant and Cooperative Agreement Act's basic criterion on when to use a procurement contract rather than one of the two assistance arrangements (a grant or cooperative agreement) is clear and turns on the underlying purpose of the arrangement: If the federal agency's primary purpose is to acquire goods or services for the direct benefit or use of the government, then a procurement contract must be used. On the other hand, the act calls for use of a grant or a cooperative agreement when the agency's primary purpose is to provide assistance for the recipient to use in order to accomplish a public objective authorized by law. Thus, procurement contracts differ from either grants or cooperative agreements in terms of their basic purpose.

Under the act, a grant and a cooperative agreement are closely related assistance arrangements with essentially the same basic purpose: to encourage the recipient of funding to carry out activities in furtherance of a public goal. The difference is the degree of involvement between the federal agency and the recipient in the performance of the activity being funded. When the involvement is expected to be "substantial," the act requires use of a cooperative agreement rather than a grant. The act does not define "substantial" in this context. However, the Senate report on the Federal Grant and Cooperative Agreement Act provided the following examples of situations that might require substantial federal involvement:

- federal project management or federal program or administrative assistance would be helpful due to the novelty or complexity involved (for example, in some construction, information systems development, and demonstration projects);

- federal/recipient collaboration in performing the work is desirable (for example, in collaborative research, planning or problem solving);

[13] For two articles discussing the OMB guidance, see Paul G. Dembling, *The Federal Grant and Cooperative Agreement Act: Its Use and Misuse*, 51 Federal Lawyer 12 (February 2004); Kurt M. Rylander, *Scanwell Plus: Challenging the Propriety of a Federal Agency's Decision to Use a Federal Grant and Cooperative Agreement*, 28 Pub. Cont. L. J. 69 (Fall 1998).

- federal monitoring is desirable to permit specified kinds of direction or redirection of the work because of interrelationships among projects in areas such as applied research; and

- federal involvement is desirable in the early stages of ongoing programs, such as welfare or law enforcement programs, where standards are being developed or the application of standards requires a period of adjustment until recipient capability has been developed.

S. Rep. No. 95-449, at 9–10. The OMB guidance expands on what substantial involvement means. *See* 43 Fed. Reg. at 36863.

It should be emphasized that substantial involvement here refers to federal participation in the *performance* of the funded activity. This should not be taken to imply that a federal grantor agency lacks an *oversight* role when lack of substantial involvement calls for the use of a grant.[14] Quite the contrary, GAO has held that grantor agencies have an affirmative duty to oversee grant performance and that, "[a]s a matter of law, a grantor agency may not disassociate itself from the performance of its grant." B-303927, June 7, 2005, at 8–9. The decision in B-303927 cited a provision of the Single Audit Act, 31 U.S.C. § 7504(a)(1) ("Each Federal agency shall, in accordance with guidance issued by the Director [of the Office of Management and Budget], . . . monitor non-federal entity use of Federal awards"), as well as GAO and judicial decisions that emphasize the contractual nature of grant obligations.

The Federal Grant and Cooperative Agreement Act authorizes OMB to exempt a transaction or program of an executive agency from its application. *Id.* § 6307(2). The original act provided this exemption authority only on a temporary basis. However, Congress later made the authority permanent. Pub. L. No. 97-162, 96 Stat. 23 (Apr. 1, 1982). The legislative history of Public Law 97-162 noted that OMB had used the exemption authority sparingly (only for nonmonetary grants and certain revenue sharing programs) and stated the expectation that future exemptions would likewise be few in number and limited to individual transactions or programs. S. Rep. No. 97-180, at 2 (1981).

[14] In this regard, OMB guidance specifically states that substantial involvement refers to performance of the funded activity rather than oversight. 43 Fed. Reg. at 36863.

Specific legislation may also exempt programs from the Federal Grant and Cooperative Agreement Act's requirements. This was the case in B-279338, Jan. 4, 1999, where a provision of the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450e-1, made such an exemption. In view of this exemption, the Comptroller General upheld the Interior Department's use of a contract, rather than a grant, to fund a land acquisition for an Indian tribe using authority in the Self-Determination Act that ordinarily applied to a grant program.

### b. Agency Implementation of the Act

In determining the correct funding instrument to use, the threshold question to consider is whether the agency has statutory authority to engage in assistance transactions at all. While federal agencies generally have "inherent" authority to enter into contracts to procure goods or services for their own use, there is no comparable inherent authority to enter into assistance relationships, that is, to give away the government' s money or property, either directly or by the release of vested rights, to benefit someone other than the government. 65 Comp. Gen. 605, 607 (1986); B-210655, Apr. 14, 1983. Therefore, the relevant legislation must be studied to determine whether an assistance relationship is authorized at all, and if so, under what circumstances and conditions. *See*, *e.g.*, 64 Comp. Gen. 582, 584 (1985); 59 Comp. Gen. 1, 8 (1979).

It is important to note that the Federal Grant and Cooperative Agreement Act does not expand an agency's substantive authority in this regard. While the act provides criteria for examining whether an arrangement should be a contract, grant, or cooperative agreement, determinations of whether an agency has authority to enter into such arrangements in the first instance must be based on the agency's authorizing or program legislation. Once the necessary underlying authority is found, the legal instrument (contract, grant, or cooperative agreement) that fits the arrangement as contemplated must be used, using the statutory definitions for guidance as to which instrument is appropriate.

The analysis of the agency's program authority is not a matter of discretion; the requisite authority either is there or it is not. In this regard, however, the focus should be on the substance of an agency's program authority rather than the particular labels used or not used. In this connection, a Senate Committee on Governmental Affairs report stated:

> "[The Federal Grant and Cooperative Agreement Act] was never intended to be an independent grant of authority to agencies to enter into assistance or contractual

> relationships where no such authority can be found in authorizing legislation. Rather, it was and is intended to force agencies to use a legal instrument that, according to the criteria established by the Act, matches the intended and authorized relationship—regardless of the terminology used in existing legislation to characterize the instrument to be used in the transaction."[15]

Further discussion on this point may be found in B-196872-O.M., Mar. 12, 1980, and a GAO report entitled *Agencies Need Better Guidance for Choosing Among Contracts, Grants, and Cooperative Agreements*, GGD-81-88 (Washington, D.C.: Sept. 4, 1981).

### c. Decisions Interpreting the Act

It is important that an agency identify the appropriate funding instrument because procurement contracts are subject to a variety of statutory and regulatory requirements that generally do not apply to assistance transactions. If the type of relationship is not determined properly, assistance arrangements could be used to evade competition and other legal requirements applicable to procurement contracts. Conversely, legitimate assistance awards should not be burdened by all of the formalities of procurement contracts. The following decisions illustrate how the act's criteria have been applied.

In 61 Comp. Gen. 428 (1982), GAO agreed with the Department of Energy's use of a cooperative agreement with a private company to design and construct a "prototype solar parabolic dish/sterling engine system module," finding that the proposal's primary purpose was to encourage development and early market entry rather than to acquire the particular item for its own use, although it would eventually have governmental applications. Therefore, GAO held that the arrangement did not constitute a procurement contract requiring competition.

In contrast, some decisions have held that a procurement contract is the appropriate instrument. For example, the Comptroller General determined in B-262110, Mar. 19, 1997, that the Environmental Protection Agency should have acquired conference support services using a procurement contract rather than a cooperative agreement because the support services

[15] S. Rep. No. 97-180, at 4 (1981). This report is on legislation that amended the original act rather than direct legislative history on the original act. Nevertheless, it is important as a clear statement from one of the relevant jurisdictional committees.

were a direct benefit to the agency. Similarly, the Comptroller General concluded in B-257430, Sept. 12, 1994, that the Office of Personnel Management (OPM) should have used a procurement contract to obtain survey services because the services directly benefited OPM by providing OPM assistance in performing the agency's statutory duty and because OPM exercised significant influence over the survey arrangements.[16]

The issue of whether an agency was improperly using an assistance instrument instead of a procurement contract has also been raised in judicial decisions. The court in *Chem Service, Inc. v. Environmental Monitoring Systems Laboratory*, 12 F.3d 1256 (3rd Cir. 1993), after reviewing the relevant authorizing legislation and its legislative history, held that the plaintiff company could challenge whether a cooperative research and development agreement between the Environmental Protection Agency and a private laboratory actually constituted a procurement contract that should have been subject to competition requirements under federal law.

One common situation in which the question of the principal purpose of the funding relationship is raised is the so-called "third party" or "intermediary" situation where a federal agency provides assistance to specified recipients by using an intermediary. In these situations, it is necessary to examine the agency's program authority to determine the authorized forms of assistance. The agency's relationship with the intermediary should normally be a procurement contract if the intermediary is not itself a member of a class eligible to receive assistance from the government. In other words, if an agency program contemplates provision of technical advice or services to a specified group of recipients, the agency may provide the advice or services itself or hire an intermediary to do it for the agency. In that case, the proper vehicle to fund the intermediary is a procurement contract. The agency is "buying" the services of the intermediary for its own purposes, to relieve the agency of the need to provide the advice or services with its own staff. Thus, it is acquiring the services for "the direct benefit or use of the United States Government,"

[16] Additional decisions holding that a procurement contract rather than an assistance instrument should have been used are: 67 Comp. Gen. 13 (1987), *aff'd upon reconsideration*, B-227084.6, Dec. 19, 1988 (operation of research and training programs at a government facility funded by Maritime Administration); 65 Comp. Gen. 605 (1986) (proposed study, sponsored by Council on Environmental Quality, of risks and benefits of certain pesticides, intended for use by federal regulatory agencies); B-210655, Apr. 14, 1983 (funding by Department of Energy of college campus forums on nuclear energy).

which mandates the use of a procurement contract under the Federal Grant and Cooperative Agreement Act.

On the other hand, if the program purpose contemplates support to certain types of intermediaries to provide consultation or other specified services to third parties, the Comptroller General has approved the agency's choice of a grant rather than a contract as the preferred funding vehicle. Thus, in 58 Comp. Gen. 785 (1979), the Comptroller General found that the Department of Commerce could properly award a noncompetitive grant to an intermediary organization to provide management and technical assistance to minority business firms. Although the point was not detailed in the decision, the agency clearly had the requisite program authority to provide grant assistance to the intermediary.

The Comptroller General came to the opposite conclusion in 61 Comp. Gen. 637 (1982). In that case, the Department of Housing and Urban Development had awarded a cooperative agreement to a nonprofit organization to provide technical assistance to certain block grant recipients. While the department's authority to provide technical assistance to the block grant recipients was clear, there was no authority to provide assistance to the intermediary organization. The essence of the intermediary transaction was the acquisition of services for ultimate delivery to authorized recipients. Thus, the Comptroller General concluded that a procurement contract should have been used.

The Senate committee report on legislation that amended the original Federal Grant and Cooperative Agreement Act addressed the intermediary issue and agreed with GAO's interpretation:

> "The choice of instrument for an intermediary relationship depends solely on the principal federal purpose in the relationship with the intermediary. The fact that the product or service produced by the intermediary may benefit another party is irrelevant. What is important is whether the federal government's principal purpose is to acquire the intermediary's services, which may happen to take the form of producing a product or carrying out a service that is then delivered to an assistance recipient, or if the government's principal purpose is to assist the intermediary to do the same thing. Where the recipient of an award is not receiving assistance from the federal agency but is merely used to provide a service to another entity

which is eligible for assistance, the proper instrument is a procurement contract."

S. Rep. No. 97-180, at 3 (1981).

The foregoing cases deal with the specific issue of which funding instrument to use, procurement contract versus assistance agreement. However, the analysis required by the Federal Grant and Cooperative Agreement Act may also be relevant when the main issue concerns the applicability of other federal laws to a particular funding instrument. The following cases provide examples.

In B-196690, Mar. 14, 1980, the Interior Department asked whether it could use its 1978 and 1979 appropriations to fund expenses of the American Samoan Judiciary related to entertainment and the purchase of motor vehicles. Using the guidelines of the Federal Grant and Cooperative Agreement Act, the Comptroller General reviewed the relationship between the Interior Department and the American Samoan Judiciary and concluded that it was essentially a grant relationship. Therefore, restrictions such as those relating to entertainment and motor vehicles that would apply to the direct expenditure of appropriations by the federal government or through a contractor did not apply to expenditures by the grant recipient, absent some provision to the contrary in the appropriation, agency regulations, or grant agreement.[17] For fiscal year 1980, Congress changed the statutory language to specifically appropriate funds "for grants to the judiciary in American Samoa," thus removing any doubt that the Samoan Judiciary is a grant recipient. Pub. L. No. 96-126, 93 Stat. 954, 965 (Nov. 27, 1979).

In 59 Comp. Gen. 424 (1980), the Comptroller General viewed the Environmental Protection Agency's public participation program of providing financial assistance to certain intervenors in proceedings before the agency as essentially a grant relationship rather than a contractual one. Accordingly, the decision held that 31 U.S.C. § 3324, which generally prohibits the government from making payments for goods or services in

[17] Of course, similar restrictions on allowable costs can be, and frequently are, imposed on grantees. For example, entertainment costs are unallowable grant costs under several OMB circulars. *See* OMB Circular No. A-21, *Cost Principles for Educational Institutions* (May 10, 2004), Attachment J, § 17; OMB Circular No. A-122, *Cost Principles for Non-profit Organizations* (May 10, 2004), Attachment B, § 14. Section G of this chapter discusses grant cost issues in more detail.

advance of delivery,[18] did not to preclude participants from receiving funds in advance of the completion of their participation, subject to the provision of adequate fiscal controls.

In another case, B-290900, Mar. 18, 2003, the Comptroller General held that the general requirement under 44 U.S.C. § 501 that the Government Printing Office perform printing and binding "for the government" did not apply to the publication of an educational brochure about the Michigan Lighthouse Project that the Bureau of Land Management (BLM) had helped to fund. The Michigan Lighthouse Project involved a cooperative agreement between BLM and other federal, state, and nonprofit entities to preserve historical lighthouses. While the decision did not refer specifically to the Federal Grant and Cooperative Agreement Act, it did apply reasoning similar to the analysis called for by the act. The decision noted that the brochure was published as part of the cooperative agreement and thus generally benefited all of the parties to the agreement. Accordingly, for the same reason that the transaction did not involve work "for the government" within the meaning of 44 U.S.C. § 501, it did not represent the acquisition of services principally "for the direct benefit or use of the United States Government."

Judicial decisions also have considered the Federal Grant and Cooperative Agreement Act in considering the applicability of other laws. In *Hammond v. Donovan*, 538 F. Supp. 1106 (W.D. Mo. 1982), the court held that the relationship between the Labor Department and a state employment office was a grant, and therefore not subject to a statute requiring that certain procurement contracts contain an affirmative action for veterans provision. The court in *Partridge v. Reich*, 141 F.3d 920 (9th Cir. 1998), reached the same conclusion in rejecting the contention that a grant was subject to the same statute considered in *Hammond*.

Before leaving the subject of the Federal Grant and Cooperative Agreement Act, it is worth highlighting some judicial decisions that have considered the act in relation to a topic discussed in the previous section: whether and to what extent grants and cooperative agreements should be regarded as contracts.

[18] For a more detailed explanation of 31 U.S.C. § 3324 and advance payments in general, see Chapter 5, section C. For more on advance payments in the grant context, see section E of this chapter.

The issue in several of the cases is whether assistance agreements can give rise to enforceable contract rights and obligations. The Tucker Act gives the Court of Federal Claims jurisdiction over claims against the United States "founded . . . upon any express or implied contract with the United States . . ." 28 U.S.C. § 1491(a)(1). In *Trauma Service Group, Ltd. v. United States*, 33 Fed. Cl. 426 (1995), the court determined that a memorandum of agreement (MOA) between the Defense Department and a health care provider was a cooperative agreement within the meaning of the Federal Grant and Cooperative Agreement Act. Reasoning that all federal agreements must fall into one of the act's three categories, the court reasoned that the MOA, therefore, could not be a contract for purposes of the Tucker Act. *Trauma Service Group*, 33 Fed. Cl. at 429–30. Accordingly, the court dismissed the claim.

Another judge of the same court came to the opposite conclusion in a case decided just a few months later, *Thermalon Industries, Ltd. v. United States*, 34 Fed. Cl. 411 (1995). The *Thermalon* court held that a National Science Foundation research grant could give rise to contract rights enforceable under the Tucker Act so long as the grant embodied the traditional elements of a contract: offer, acceptance by an officer having authority to bind the United States, and consideration. The court rejected the agency's argument that the Federal Grant and Cooperative Agreement Act precluded treating the grant as a contract for Tucker Act purposes:

> "There is no suggestion in the [Federal Grant and Cooperative Agreement Act] that procurement contracts are the only type of contracts enforceable under the Tucker Act or that grant agreements that satisfy all of the ordinary requirements for a government contract should not be classified as contracts enforceable under the Tucker Act."

*Thermalon*, 34 Fed. Cl. at 417. Considering the Federal Grant and Cooperative Agreement Act's legislative history, the court viewed that act as addressing "a very different set of concerns" than Tucker Act contract jurisdiction. *Id.* at 418. To the extent that its interpretation of the act was inconsistent with the analysis in *Trauma Service Group*, the court "respectfully disagree[d] with that analysis." *Id.* at fn. 4.

Later, in *Trauma Service Group, Ltd. v. United States*, 104 F.3d 1321 (1997), the Court of Appeals for the Federal Circuit affirmed the Federal Claims Court's dismissal in that case, but actually sided with the *Thermalon* decision's analysis on the Federal Grant and Cooperative

Agreement Act point. The Federal Circuit determined that the plaintiff in *Trauma Service Group* had not established a violation of any duty owed to it under the terms of the MOA; thus, there could be no breach of contract. However, the Federal Circuit rejected the lower court's conclusion that a cooperative agreement could *never* be a contract for purposes of the Tucker Act:

> "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government. *See City of El Centro*, 922 F.2d at 820; *Thermalon*, 34 Fed.Cl. at 414. As such, contrary to the opinion of the trial court, a MOA can also be a contract—whether this one is, we do not decide."

104 F.3d at 1326. Most recently, the Court of Federal Claims in *Pennsylvania Department of Public Welfare v. United States*, 48 Fed. Cl. 785, 790–91 (2001), reiterated in *dicta* that a grant could confer jurisdiction under the Tucker Act if it contained all of the elements of a contract. In this regard, the court cited its prior decision in *Trauma Service Group* as well as the *Thermalon* decision and a number of cases that preceded the enactment of Federal Grant and Cooperative Agreement Act. However, the court held that the grant in the case before it did not include the necessary elements of a contract.

Other courts have also declined to interpret the Federal Grant and Cooperative Agreement Act as precluding the treatment of assistance agreements as contracts for purposes unrelated to determining the appropriate funding instrument for a federal agency to use. *See Henke v. Department of Commerce*, 83 F.3d 1445 (D.C. Cir. 1996) (Privacy Act disclosure exemption, 5 U.S.C. § 552a(k)(5), pertaining to "Federal contracts" applied to a National Science Foundation grant that embodied the essential elements of a contract); *United States v. President & Fellows of Harvard College*, 323 F. Supp. 2d 151 (D. Mass. 2004) (cooperative agreements between the Agency for International Development and Harvard were contracts for purposes of a breach of contract action initiated by the United States).

By way of summary, the Federal Grant and Cooperative Agreement Act provides criteria that agencies must use in deciding which funding

instrument to use from among contracts, grants, and cooperative agreements. This choice assumes, of course, that the agency has the requisite statutory authority to enter into assistance relationships in the form of a grant or cooperative agreement. The Federal Grant and Cooperative Agreement Act does not in itself supply such authority. Legal issues concerning the choice of instrument invariably focus on procurement versus assistance relationships, with the underlying concern often being whether competition requirements should apply. The Comptroller General and the courts may also look to the criteria in the Federal Grant and Cooperative Agreement Act to classify a funding transaction for purposes of determining the applicability of other laws. In this context, however, the clear weight of authority is that the act's classifications are not mutually exclusive. Thus, something that is clearly a "grant" for purposes of the act still may be a "contract" or at least have contract features for purposes of other laws.[19]

## 3. Competition for Discretionary Grant Awards

Grant programs are either mandatory or discretionary. In a mandatory grant program, Congress directs awards to one or more classes of prospective recipients who meet specific criteria for eligibility, in specified amounts. These grants, sometimes called "entitlement" or "formula" grants, are often awarded on the basis of statutory formulas.[20] While the grantor agency may disagree on the application of the formula, it has no basis to refuse to make the award altogether. *City of Los Angeles v. Coleman*, 397 F. Supp. 547 (D.D.C. 1975). Thus, questions of grantee selection, and hence of competition, do not arise. The concept of competition can only apply when the grantor has discretion to choose one applicant over another. Therefore, the following discussion is limited to discretionary grants.

The Federal Grant and Cooperative Agreement Act encourages competition in assistance programs where appropriate, in order to identify

[19] For additional background on many of the cases and issues discussed in this section, see Andreas Baltatzis, *The Changing Relationship Between Federal Grants and Federal Contracts*, 32 Pub. Cont. L. J. 611 (Spring 2003); Jeffrey C. Walker, *Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act*, 26 Pub. Cont. L. J. 683 (Summer 1997).

[20] *See, e.g.*, B-289801, Dec. 30, 2002, at fn. 1, referring to an Education Department regulation (now found at 34 C.F.R. § 75.200 (2005)), that describes the difference between discretionary and formula grants.

and fund the best possible projects to achieve program objectives. 31 U.S.C. § 6301(3). This, however, is merely a statement of purpose. There are few other legislative pronouncements specifying how this objective is to be achieved, certainly nothing approaching the detail and specificity of statutes applicable to procurement contracts such as the Competition in Contracting Act of 1984.[21] Statutory requirements for competition in grantee selection do exist in certain contexts, but they tend to be very general and do not specify actual procedures. Two examples involving the Department of Defense are 10 U.S.C. § 2361(a)(1) (competitive procedures required for Defense Department research and development grants to colleges and universities), and 10 U.S.C. § 2196(i)(competitive procedures also required for Defense Department manufacturing engineering education grants).

In view of the essential differences between grants and procurement contracts, GAO has declined to use its bid protest mechanism, prescribed to assure the fairness of awards of contracts, to rule on the propriety of individual grant awards.[22] That is, GAO will not consider a complaint by a rejected applicant that it should have received the grant rather than the recipient to whom it was actually awarded. *See*, *e.g.*, B-203096, May 20, 1981; B-199247, Aug. 21, 1980; B-199147, June 24, 1980; B-190092, Sept. 22, 1977. This does not affect GAO's jurisdiction to render decisions on the legality of federal expenditures, however, so GAO can and will render decisions on the legality of grant awards in terms of compliance with applicable statutes and regulations. Of course, GAO may also evaluate competition in grant awards from an audit perspective. One such evaluation is GAO, *Discretionary Grants: Opportunities to Improve Federal Discretionary Award Practices*, GAO/HRD-86-108 (Washington, D.C.: Sept. 15, 1986).

[21] Pub. L. No. 98-369, div. B, title VII, 98 Stat. 494, 1175 (July 18, 1984) (*codified in scattered sections of* titles 10, 31, and 41, United States Code).

[22] Under various statutory and regulatory authorities, GAO has served for more than 75 years as an independent forum for the resolution of disputes (commonly referred to as "bid protests") concerning the award of federal contracts. See 31 U.S.C. §§ 3551–3556 and 4 C.F.R. pt. 21 (2005), which are the current statutory and regulatory provisions. For more information on the bid protest function, see GAO, *Bid Protests at GAO: A Descriptive Guide*, GAO-03-539SP (Washington, D.C.: 2003). A copy of the *Guide* can be found on the GAO web site at www.gao.gov/decisions/bidpro/bidpro.htm (last visited September 15, 2005).

GAO has adopted a similar position with respect to cooperative agreements. *See*, *e.g.*, B-255780, Nov. 23, 1993, in which the Comptroller General dismissed a protest against the Small Business Administration's use of a cooperative agreement to obtain management and technical assistance services because a provision in the Small Business Act gave the agency the discretion to choose whether to provide such services through grants, cooperative agreements, or procurement contracts. GAO will not consider a "protest" against the award of a cooperative agreement unless it appears that a conflict of interest exists or that the agency is using the cooperative agreement to avoid the competition requirements of the procurement laws and regulations (*i.e.*, in violation of the Federal Grant and Cooperative Agreement Act). *See*, *e.g.*, B-281439.3, 281439.4, Mar. 23, 1999; B-260514, June 16, 1995; 64 Comp. Gen. 669 (1985); 61 Comp. Gen. 428 (1982); B-258267, Dec. 21, 1994; B-256586, B-256586.2, May 9, 1994; B-255780, Nov. 23, 1993; B-216587, Oct. 22, 1984. Again, this refers to review under GAO's "bid protest" jurisdiction and does not affect review under GAO's other available authorities.

In summary, assuming the proper instrument has been selected, GAO will not question funding decisions in discretionary federal assistance programs. B-228675, Aug. 31, 1987 (denial of an application for funding renewal was held to be a policy matter within the grantor agency's discretion because nothing in the program legislation provided otherwise and the agency had complied with all the applicable procedural requirements. *See also City of Sarasota v. Environmental Protection Agency*, 813 F.2d 1106 (11th Cir. 1987) (court declined to review agency refusal to award grant for construction of a wastewater treatment project); *Massachusetts Department of Correction v. Law Enforcement Assistance Administration*, 605 F.2d 21 (1st Cir. 1979) (court upheld agency's refusal to award grant, finding that procedural deficiencies, even though they amounted to "sloppiness," were not sufficiently grave as to deprive the applicant of fair consideration).

## C. Some Basic Concepts

A number of principles have evolved that are unique to grant law. These will be discussed in subsequent sections of this chapter. Many cases, however, involve the application of principles of law which are not unique to grants. As a general proposition, the fundamental principles of appropriations law discussed in preceding chapters apply to grants just as they apply to other expenditures. This section is designed to highlight a few of these areas, each of which is covered in detail elsewhere in this publication, and to show how they may apply in assistance contexts.

## 1. The Grant as an Exercise of Congressional Spending Power

When Congress enacts grant legislation and provides appropriations to fund the grants, it is exercising the spending power conferred upon it by the Constitution.[23] As such, it is clear that Congress has the power to attach terms and conditions to the availability or receipt of grant funds, either in the grant legislation itself or in a separate enactment. *Oklahoma v. Civil Service Commission*, 330 U.S. 127 (1947) (provision of Hatch Act prohibiting political activity by employees of state or local government agencies receiving federal grant funds upheld as within congressional power). *See also West Virginia v. United States Department of Health & Human Services*, 289 F.3d 281 (4th Cir. 2002) (upholding amendment to Medicaid legislation requiring states to recoup expenses from estates of deceased beneficiaries).

In *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (citations omitted), the Supreme Court observed:

> "'[T]he power of Congress to authorize expenditure of public moneys for public purposes is not limited by the direct grants of legislative power found in the Constitution.' Thus, objectives not thought to be within Article I's 'enumerated legislative fields' . . . may nevertheless be attained through the use of the spending power and the conditional grant of federal funds."

### a. Constitutionality of Grant Conditions

The Supreme Court and lower courts have repeatedly affirmed the power of Congress to attach conditions to grant funds provided that the conditions are (1) in pursuit of the general welfare, (2) expressed unambiguously, (3) reasonably related to the purpose of the expenditure, and (4) not in violation of other constitutional provisions. *New York v. United States*, 505 U.S. 144, 171–72 (1992). In this case, the Supreme Court upheld the constitutionality of statutory grant conditions that imposed on states milestones for disposing of radioactive waste, although it declared unconstitutional another aspect of the statute. The following are additional examples of cases upholding grant conditions: *United States v. American*

[23] U.S. Const. art. I, § 8, cl. 1 is often referred to as the principal source of congressional spending power. Congress may be acting under other enumerated powers as well. "Congress is not required to identify the precise source of its authority when it enacts legislation." *Nevada v. Skinner*, 884 F.2d 445, 449 n. 8 (9th Cir. 1989), *cert. denied*, 493 U.S. 1070 (1990). For additional background on the congressional "power of the purse," see Chapter 1, section B.

*Library Association*, 539 U.S. 194 (2003) (requiring public libraries to use Internet filters in order to receive federal subsidies); *South Dakota v. Dole*, 483 U.S. 203, 207–08 (1987) (withholding a percentage of federal highway funds from states that do not adopt a minimum drinking age of 21); *Nevada v. Skinner*, 884 F.2d 445 (9th Cir. 1989), *cert. denied*, 493 U.S. 1070 (1990) (conditioning the receipt of federal highway funds on state adoption of the national speed limit). The following cases illustrate application of the criteria for grant conditions set forth in *New York v. United States*.[24]

(1) <u>Conditions must be in pursuit of the general welfare and related to the purpose of the expenditure</u>

These two criteria tend to overlap. In *Hodges v. Thompson*, 311 F.3d 316 (4th Cir. 2000), *cert. denied sub nom.*, 540 U.S. 811 (2003), the court found that both criteria were satisfied by a statutory provision requiring states develop and maintain automated child support enforcement data processing systems as a condition to receipt of funds under the Temporary Assistance to Needy Families (TANF) program. As to the "general welfare" criterion, the court agreed with the lower court that "Congress made a considered judgment that the American people would benefit significantly from the enhanced enforcement of child-support decrees and the diminution of the number of parents who are able to avoid their obligations simply by moving across local or state lines." *Hodges*, 311 F.3d at 316. As to the "reasonably related" criterion, the court recognized "a complementary relationship between efficient child support enforcement and the broader goals of providing assistance to needy families through the TANF program." *Id.* In *Sabri v. United States*, 541 U.S. 600 (2004), the Supreme Court sustained the constitutionality of a federal criminal statute that proscribed bribery of officials of state or local government agencies that received at least $10,000 annually in federal funds. In rejecting a challenge that the statute exceeded Congress's spending power because it did not require a nexus between the bribe and a use of federal funds, the Court observed:

> "Congress has authority under the Spending Clause to appropriate federal monies to promote the general

[24] Cases dealing with the validity of conditions attached to grants (and other forms of federal spending) also are discussed in Chapter 1, section B, and the update of that section in GAO, *Principles of Federal Appropriations Law: Annual Update of the Third Edition*, GAO-05-354SP (Washington, D.C.: March 2005), available at www.gao.gov/legal.htm (last visited September 15, 2005).

> welfare . . . and it has corresponding authority under the Necessary and Proper Clause . . . to see to it that taxpayer dollars appropriated under that power are in fact spent for the general welfare, and not frittered away in graft or on projects undermined when funds are siphoned off or corrupt public officers are derelict about demanding value for dollars. . . . It is true, just as Sabri says, that not every bribe or kickback offered or paid to agents of governments covered by [the statute] will be traceably skimmed from specific federal payments, or show up in the guise of a *quid pro quo* for some dereliction in spending a federal grant. . . . But this possibility portends no enforcement beyond the scope of federal interest, for the reason that corruption does not have to be that limited to affect the federal interest. Money is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value."

*Sabri*, 541 U.S. at 605–06.

(2) Conditions must be unambiguous

As discussed before in section B.1, the Supreme Court has characterized conditions Congress attaches to federal grants as "much in the nature of a contract." *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 17 (1981). Consistent with the contract analogy, it is particularly important that grant conditions be expressed with sufficiently clarity to establish knowing acceptance on the part of the grantees. As the Court stated in Pennhurst:

> "The legitimacy of Congress' power to legislate under the spending power . . . rests on whether the [recipient] voluntarily and knowingly accepts the terms of the 'contract.' . . . There can, of course, be no knowing acceptance if a [recipient] is unaware of the conditions or is unable to ascertain what is expected of it. Accordingly, if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously."

*Id*. at 17.

One recent case on this point is J*ackson v. Birmingham Board of Education*, 544 U.S. ___, 125 S. Ct. 1497 (2005). The plaintiff in *Jackson*, a male and former coach of a high school girls' basketball team, sued the school board under a federal statute prohibiting "sex discrimination" by recipients of education grant funds. He alleged that his firing was in retaliation for complaining that the girls' team was not receiving equal access to athletic equipment and facilities. The school board countered that it lacked adequate notice that it could be held liable under the statute, which did not explicitly prohibit retaliation against persons who complained about discrimination. The Court rejected the school board's argument on the basis that the board should have been on notice of a series of prior Supreme Court decisions that consistently construed the statute broadly to encompass diverse forms of intentional discrimination, and that retaliation was clearly a form of intentional discrimination. *Jackson*, 125 S. Ct. at 1509–10. *See also Garrett v. University of Alabama at Birmingham Board of Trustees*, 344 F.3d 1288 (11th Cir. 2003), holding that a statutory provision unambiguously conditioned the receipt by states of federal grant funds on a waiver of their Eleventh Amendment immunity to certain claims and that, by continuing to accept federal funds, the state agencies waived their immunity.

By contrast, an *en banc* decision in *Commonwealth of Virginia Department of Education v. Riley*, 106 F.3d 559 (4th Cir. 1997), held that a statutory provision was not sufficiently clear to impose a binding condition on the use of grant funds. Riley involved a provision of the Individuals with Disabilities in Education Act that required recipients of grant funds under the act to ensure all children with disabilities the right to a free appropriate public education. 20 U.S.C. § 1412(1) (Supp. 1996). The federal Department of Education determined that the state of Virginia's policy of discontinuing free public education for students (both disabled and nondisabled) who were expelled or suspended for a lengthy period violated this provision of the act. When the state appealed, a Fourth Circuit panel agreed with the Education Department. However, the court, *en banc*, held that the statute was insufficiently unambiguous to require that the state, as a condition of receiving the grant funds, continue to provide education for expelled or suspended students. Which interpretation of the statute was better in the abstract was not the question, said the court. Rather, citing *South Dakota v. Dole* and *Pennhurst*, the court held:

> "The question is whether, *in unmistakably clear terms*, Congress has conditioned the States' receipt of federal funds upon the provision of educational services to those handicapped students expelled for misconduct unrelated to their handicap: '[I]f Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . .'"

*Riley*, 106 F.3d at 566 (emphasis in original).[25]

(3) <u>Conditions must be otherwise constitutional</u>

Grant conditions obviously may not violate other federal constitutional provisions. While courts rarely strike down grant conditions on constitutional grounds, they have done so in two recent cases. In *Legal Services Corp. v. Velasquez*, 531 U.S. 533 (2001), the Supreme Court held that a statutory provision prohibiting Legal Service Corporation grantees from representing clients in efforts to amend or otherwise challenge existing welfare law violated the First Amendment by interfering with the free speech rights of the clients. The court in *American Civil Liberties Union v. Mineta*, 319 F. Supp. 2d 69 (D.D.C. 2004), declared unconstitutional a statutory provision that prohibited the use of federal mass transit grant funds for any activity that promoted the legalization or medical use of marijuana. Relying on *Legal Services Corp. v. Velasquez*, the court held that the provision constituted "viewpoint discrimination" in violation of the First Amendment. *Mineta*, 319 F. Supp. 2d at 83–87.

Even if a grant condition satisfies all of the *New York v. United States* criteria as discussed above, could it still be unconstitutionally coercive? Although it appears that no court has ever invalidated a federal grant condition on grounds of pure "coerciveness," this possibility is frequently discussed in the case law. A leading example is *West Virginia v. United States Department of Health & Human Services*, 289 F.3d 281 (4th Cir. 2002). In that case, West Virginia challenged on Tenth Amendment grounds a statutory provision requiring that as a condition to participating in the Medicaid program, states implement a program to recover certain expenditures from the estates of deceased Medicaid beneficiaries. Failure

[25] Subsequent to the decision in *Riley*, Congress amended the statute to explicitly require continuation for children with disabilities "who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A).

to comply could result in a loss of all or part of the state's federal Medicaid reimbursement.[26] The state did not contend that the condition violated any of the criteria in *New York v. United States*. Rather, West Virginia viewed the estate recovery program as "bad public policy" but maintained that it had no practical option to reject it. The state had participated in Medicaid for almost 30 years before "Congress changed the rules of the game" and mandated the estate recovery program. Withdrawal of its federal Medicaid funds at this stage would cause its health care system to "effectively collapse."

The court struggled with this argument. It cited several Supreme Court decisions in suggesting that compliance with the *New York v. United States* criteria might not be enough to immunize a grant condition from constitutional jeopardy:

> "[T]he Supreme Court has cautioned that 'in some circumstances the financial inducement [to comply with a condition imposed upon the receipt of federal funds] offered by Congress might be so coercive as to pass the point at which pressure turns into compulsion.' . . . Thus, while Congress may use its spending powers to encourage the states to act, it may not coerce the states into action. If the Congressional action amounts to coercion rather than encouragement, then that action is not a proper exercise of the spending powers but is instead a violation of the Tenth Amendment."

*West Virginia*, 289 F.3d at 286–87. The opinion then discussed at length decisions from the Fourth Circuit and other circuits that differed, largely on a conceptual level, as to whether there was a viable "coercion theory" applicable to federal grant conditions. It concluded in this regard:

> "[W]e are aware of no decision from any court finding a conditional grant to be impermissibly coercive. Although the Supreme Court has more than once referred to the existence of the coercion theory . . . its cases have provided little guidance for determining when the line between encouragement and coercion is crossed."

[26] These provisions are found at 42 U.S.C. §§ 1396p(b)(1) (requirement) and 1396c (penalty for noncompliance).

*Id.* at 289. In fact, it noted that "most courts faced with the question have effectively abandoned any real effort to apply the coercion theory." *Id.* at 290. Ultimately, the court rejected West Virginia's coercion argument on the basis that the federal government was unlikely to take drastic action against the state:

> "If the government in fact withheld the entirety of West Virginia's [Medicaid funding] because of the state's failure to implement an estate recovery program, then serious Tenth Amendment questions would be raised. . . . In reality, however, the government threatened to withhold 'all *or part* of [West Virginia's] Federal financial participation in the State's Medicaid Program.' . . . This small difference in language makes all the difference in our analysis."

*Id.* at 291–92 (emphasis added).

### b. Effect of Grant Conditions

A valid grant condition imposed by or pursuant to a federal statute is binding on the recipient and will prevail over inconsistent state law:

> "There is of course no question that the Federal Government, unless barred by some controlling constitutional prohibition, may impose the terms and conditions upon which its money allotments to the States shall be disbursed, and that any state law or regulation inconsistent with such federal terms and conditions is to that extent invalid."

*King v. Smith*, 392 U.S. 309, 333 n.34 (1968); *see also Townsend v. Swank*, 404 U.S. 282 (1971) (state statute inconsistent with eligibility criteria of Aid to Families with Dependent Children legislation held invalid); *United States v. Miami University*, 294 F.3d 797, 808 (6th Cir. 2002) (federal government has inherent power to sue to enforce conditions imposed on the recipients of federal grants); *State of Kansas v. United States*, 214 F.3d 1196 (10th Cir.), *cert. denied*, 531 U.S. 1035 (2000) (rejecting a state challenge to restrictions imposed on child support enforcement program under federal law); *S.J. Groves & Sons v. Fulton County*, 920 F.2d 752, 763–64 (11th Cir.), *cert. denied*, 501 U.S. 1252 and 500 U.S. 959 (1991) (valid grantor agency regulations may preempt state law).

When Congress has imposed a valid condition on the receipt of grant funds, the condition is, in effect, a "condition precedent" to the recipient's participation in the program.[27] Unless permitted under the program legislation, the condition may not be waived or omitted even though a given state may not be able to participate because state law or the state constitution precludes compliance. *North Carolina ex rel. Morrow v. Califano*, 445 F. Supp. 532 (E.D.N.C. 1977), *aff'd mem.*, 435 U.S. 962 (1978). *See also Hodges v. Thompson*, 311 F.3d 316 (4th Cir. 2002), *cert. denied sub nom.*, 540 U.S. 811 (2003)(program requirement that state approved plan include automated data processing and information retrieval system was not coercive and agency has no discretion to deviate from the statutory noncompliance penalty provisions); 43 Comp. Gen. 174 (1963).

Once federal conditions attach, there are limits to what a grantee can do to "de-federalize" the funded project or activity in order to free itself of the condition. In *Ross v. Federal Highway Administration*, 162 F.3d 1046 (10th Cir. 1998), the state of Kansas had been working on a federally funded highway project for many years. However, one segment of the project had been stalled for 3 years because of environmental concerns and the ability of the parties to finalize a supplemental environmental impact statement. To resolve the impasse, state and local officials decided to proceed with this segment using only nonfederal funds. The Federal Highway Administration agreed and initiated action to terminate the environmental impact statement process on the basis that this segment of the project was no longer a "major federal action." This strategy failed, however, when environmentalists sued and the court in *Ross* held that completion of the segment continued to be a major federal action even if locally funded:

> "At the advanced stage of the trafficway project, it was simply too late for the state of Kansas to convert the eastern segment into a local project. Since 1986, local, state and federal authorities scheduled, programmed and worked on the trafficway as a joint federal-state project. The federal nature of the trafficway was so pervasive that the Kansas authorities could not rid the project of federal involvement simply by withdrawing the last segment of the project from federal funding."

[27] Of course, it is also within the power of Congress to authorize the making of unconditional grants. *See* B-80351, Sept. 30, 1948.

162 F.3d at 1052–53. The court acknowledged that the state had the right to select which of its highway projects would receive federal assistance, but said that this option could not be used to circumvent federal environmental laws. *Id.* at 1053. Ross cited and followed two very similar decisions: *Scottsdale Mall v. State of Indiana*, 549 F.2d 484 (7th Cir. 1977), *cert. denied*, 434 U.S. 1008 (1978), and *San Antonio Conservation Society v. Texas Highway Dept.*, 446 F.2d 1013 (5th Cir. 1971), *cert. denied*, 406 U.S. 933 (1972).

## 2. Availability of Appropriations

As with obligations and expenditures in general, a federal agency may provide financial assistance only to the extent authorized by law and available appropriations. Thus, the three elements of legal availability—purpose, time, and amount—apply equally to assistance funds.

### a. Purpose

As stated in 31 U.S.C. § 1301(a), appropriations may be used only for the purpose(s) for which they were made.[28] One of the ways in which this fundamental proposition manifests itself in the grant context is the principle that grant funds may be obligated and expended only for authorized grant purposes. What is an "authorized grant purpose" is determined by examining the relevant program legislation, legislative history, and appropriation acts.

GAO considered this issue in a recent decision, B-303927, June 7, 2005. Congress appropriated funds to the Department of Labor to assist in response and recovery following the September 11, 2001, terrorist attacks on the United States. The appropriation earmarked $125 million for the purpose of payment to the New York Workers' Compensation Board for "processing of claims related to the terrorist attacks." The Labor Department distributed the funds to the Board through a grant. The Board did not use the funds to process claims, but gave them to other New York state entities to reimburse those entities for claims they had paid on behalf of victims. GAO held that use of the funds for this purpose was inconsistent with the language of the appropriation. By contrast, GAO held in another "purpose" case, B-248111, Sept. 9, 1992, that grant funds were available for the activities in question based on the language of the authorizing statute and its legislative history.

[28] We discuss the concept of the availability of appropriations as to purpose in detail in Chapter 4.

Disaster relief assistance legislation, found at 42 U.S.C. §§ 5122–5206, authorizes, among other things, federal financial contributions to state and local governments for the repair or replacement of public facilities damaged by a major disaster. Decisions under a prior version of this legislation had construed public facilities as including municipal airports (42 Comp. Gen. 6 (1962)), including airport facilities that had been leased to private parties for the purpose of generating income for airport maintenance (49 Comp. Gen. 104 (1969)). Assistance could also extend to a sewage treatment plant, but not one which was not completed, and thus not in operation, at the time of the damage. 45 Comp. Gen. 409 (1966). Unlike the earlier legislation, the current statute defines "public facility," 42 U.S.C. § 5122(8), and specifically includes airport and sewage treatment facilities.

The following are additional examples of decisions dealing with the purpose availability of grant funds:

- Airport development grants under Federal Airport Act may include runway sealing projects which are shown to be part of reconstruction or repair rather than normal maintenance. 35 Comp. Gen. 588 (1956). *See also* B-60032, Sept. 9, 1946 (grants under same legislation may be made for acquisition of land or existing privately owned airports, to be used as public airports, regardless of whether construction or repair work is immediately contemplated).

- Mining Enforcement and Safety Administration is authorized to make grants to a labor union to fund emergency medical technician training program for coal miners since the proposal bears a sufficiently close relationship to coal mine safety to come within the scope of the governing program legislation, 30 U.S.C. § 951 (1970). B-170686, Nov. 8, 1977.

- Public Health Service grants for support of research training were found authorized under the Public Health Service Act, as amended.[29] B-161769, June 30, 1967.

Grant funds provided by lump-sum appropriation are subject to the usual rule that an agency may reallocate discretionary funds within that appropriation as long as it uses those funds for purposes authorized under

[29] Pub. L. No. 86-798, 74 Stat. 1053 (Sept. 15, 1960).

the applicable appropriation and program statute.[30] The court's decision in *Illinois Environmental Protection Agency v. EPA*, 947 F.2d 283 (7th Cir. 1991), illustrates this point. Under the Clean Air Act, the Environmental Protection Agency (EPA) could prescribe plans to implement air quality standards for states that failed to submit adequate plans. The act also authorized air pollution control grants to states, funded under EPA's lump-sum Abatement, Control, and Compliance appropriation. Under its regulations, EPA divided available funds into nonmandatory annual allotments for each state. The regulations also authorized EPA to set aside a portion of the unawarded allotments to support federal implementation programs where required because of the absence of adequate state programs. One state argued that the set-aside policy amounted to a diversion of funds from their intended purpose and, therefore, violated 31 U.S.C. § 1301(a). The court first upheld the regulation as a permissible interpretation of EPA's authority under the Clean Air Act. The court then found that there was no purpose violation because (a) the relevant appropriation act did not earmark any specific amount for grants to states, and (b) EPA was still using the set-aside funds for air pollution abatement programs, which was their intended purpose.

The Comptroller General has applied essentially the same reasoning in several decisions dealing with grant funds. For example, in B-157356, Aug. 17, 1978, the then Department of Health, Education, and Welfare's Office of Human Development Services (OHD) received a lump-sum appropriation covering a number of grant programs administered by various OHD components. The department wanted to make what it termed "cross-cutting" grants to fund research or demonstration projects that would benefit more than one target population (*e.g.*, aged, children, Native Americans). To do this, each OHD component receiving grant funds under the lump-sum appropriation was asked to contribute a portion of its grant funds to a pool that would be used for approved cross-cutting grants. Since the lump-sum appropriation did not restrict the department's internal allocation of funds for any given program, GAO approved the concept, provided that the grants were limited to projects within the scope of grant programs funded by the lump-sum appropriation, a condition necessary to assure compliance with 31 U.S.C. § 1301(a). See also B-258000, Aug. 31, 1994, in which GAO held that a lump-sum Forest Service appropriation could be used to make a congressionally earmarked grant in a specific

[30] See Chapter 6, section F for a more detailed discussion of agency discretion under lump-sum appropriations.

amount to the Texas Reforestation Foundation where the proviso containing the earmark did not identify who should make the grant or the source of funds to be used.

Funds provided for specific grants in the form of earmarked line-item appropriations cannot be diverted to other purposes. In 72 Comp. Gen. 317 (1993), GAO held that the General Services Administration lacked authority to establish a "reserve account" for the expenses of administering a grant program through a percentage set aside from line-item appropriations of grant funds that had been awarded to various grantees. Since Congress provided specific amounts for specific purposes, the agency could not reduce the amount of the line-itemed grants in order to cover the cost of administration, notwithstanding post-enactment "approval" by a congressional subcommittee.

### b. Time

Funds must be obligated by the grantor agency within their period of availability.[31] The period of availability of appropriated funds is the period of time provided by law in which the administering agency has to obligate the funds. B-271607, June 3, 1996. The statutory requirement for recording obligations extends to all actions necessary to constitute a valid obligation, and includes, of course, grant obligations (31 U.S.C. § 1501(a)(5)).[32] Proper recording of grant obligations facilitates compliance with the "time of obligation" requirement by ensuring that agencies have adequate budget authority to cover their obligations. *See* B-300480, Apr. 9, 2003, *aff'd in* B-300480.2, June 6, 2003.

In the context of discretionary grants, the obligation generally occurs at the time of award. *See, e.g.*, B-289801, Dec. 30, 2002; 31 Comp. Gen. 608 (1952).[33] Thus, in B-300480, Apr. 9, 2003, *aff'd in* B-300480.2, June 6, 2003, GAO held that an obligation arises when the Corporation for National and

[31] See the discussion of the Availability of Appropriations as to Time in Chapter 5.

[32] See Chapter 7 for a general discussion of recording obligations and Chapter 7, section B.5 for a specific discussion of recording requirements for grant obligations.

[33] The particular obligating document varies and can include an agency's approval of a grant application or a letter of commitment. *See* 39 Comp. Gen. 317 (1959); 37 Comp. Gen. 861, 863 (1958). Section 1501(a)(5) of title 31, United States Code, lists three forms of documentary evidence for grant obligations: (A) an appropriation providing for payment in a specific amount fixed by law or under a formula prescribed by law (*i.e.*, a mandatory or formula grant); (B) an agreement authorized by law; or (C) plans approved consistent with law.

Community Service awards grants authorizing the grantees to enroll a specified number of participants into the education programs it funds. At that time, the Corporation incurs a recordable obligation in the amount of its maximum liability for those benefits since, at that point, the grantee rather than the Corporation controls the actual level of participant enrollment. *Id.*

An obligation under a discretionary grant program generally does not exist absent a binding grant award. Thus, GAO concluded that a valid grant never came into existence when an "offer of grant" made by the Economic Development Administration to a Connecticut municipality was accepted by a town official who did not have authority to accept the grant, and the funds expired for obligation purposes before the town was able to ratify the unauthorized acceptance. B-220527, Dec. 16, 1985. The town later submitted a claim for reimbursement of its expenses, based on an "equitable estoppel" argument. Since the nonexistence of the grant was attributable to the town's actions and not those of the federal agency, the claim could not be allowed. B-220527, Aug. 11, 1987. *See also* B-206244, June 8, 1982.

The "*bona fide* needs rule," which is a basic principle of time availability, holds that an appropriation is available for obligation only to fulfill a genuine or *bona fide* need of the period of availability for which the appropriation was made.[34] This rule applies to grants and cooperative agreements as well as to other types of obligations or expenditures. *See, e.g.*, 73 Comp. Gen 77 (1994); 64 Comp. Gen. 359 (1985); B-229873, Nov. 29, 1988. However, as discussed hereafter, the manner in which the rule applies differs somewhat in the context of grants and other assistance transactions, as opposed to transactions in which the federal government is obtaining goods and services by contract.

The specific issue that arises in the grant decisions is whether the principle of "severability," a key element in applying the *bona fide* needs rule to contracts, has any relevance to assistance transactions. The principle of severability requires determining whether services that an agency seeks to obtain (usually by contract) are part of a single undertaking that fulfills an agency need of the fiscal year charged, or whether the services are severable in nature and fulfill a recurring need of the agency from fiscal year to fiscal year. If the services are severable, the *bona fide* needs rule

[34] See Chapter 5, section B, for a comprehensive discussion of the *bona fide* needs rule.

restricts use of the appropriation to obtaining that portion of the services needed during its period of availability.

In a 1985 decision, 64 Comp. Gen. 359, GAO applied the severability principle to National Institutes of Health (NIH) research grants. The decision concluded that the grants in question were severable, and therefore, NIH violated the *bona fide* needs rule by awarding them for 3 years using 1-year appropriations. The decision did express some reservations about this result:

> "[W]e recognize that there are fundamental differences between a contract for materials or services and a research grant. The severability concept is not altogether analogous to the NIH research grants, which resemble subsidies rather than contracts for services."

64 Comp. Gen. at 365. Another decision, 73 Comp. Gen. 77 (1994), applied the severability principle to cooperative agreements. This decision held that certain cooperative agreements providing for the periodic issuance of project-specific research work orders were nonseverable and, therefore, could not be funded incrementally from 1-year appropriations.

In B-229873, Nov. 29, 1988, however, GAO held that the Small Business Administration (SBA) did not violate the *bona fide* needs rule when it used a 1-year appropriation on the last day of the fiscal year to award cooperative agreements to Small Business Development Centers, even though the Centers would not use the money until the next fiscal year. Contrasting these cooperative agreements to service contracts that were subject to the severability principle, the decision observed:

> "[T]he purpose of the Small Business Development Centers appropriation is to fund an assistance program for non-federal entities which, in turn, are expected to use the funds, together with some of their own, to fulfill a public purpose. Although the purpose of the program is to provide assistance to Centers for a 1-year period, it really does not matter when the Center begins or completes its tasks. The statutory purpose was fulfilled once a grant or cooperative agreement was awarded during the period of availability of the appropriation for obligation; in other words, the award constitutes the obligation, and upon award, the funds belong to the awardee."

The decision in B-229873 distinguished 64 Comp. Gen. 359 rather than overruling it.

A more recent decision, B-289801, Dec. 30, 2002, seems to lay to rest any vestiges of the severability principle as applied to grants or cooperative agreements. In approving the Education Department's practice of awarding certain education grants for 5 years using 1-year appropriations, this decision stated flatly that "for grants, the principle of severability is irrelevant to a *bona fide* need determination." Elaborating upon this conclusion, the decision explained:

> "We believe the application of the *bona fide* need rule found in the SBA case [B-229873] is the correct approach. It expressly recognizes the fundamental difference between a contract and a grant or cooperative agreement and the significance this difference has on a *bona fide* need analysis. Contracts and grants are transactions that fulfill significantly different needs of an agency, the former to acquire goods and services and the latter to provide financial assistance. B-222665, July 2, 1986 (principal purpose of a grant is to transfer something of value to the recipient to carry out a legislatively established public policy instead of acquiring goods or services for the direct benefit or use of the United States). . . .
>
> "The SBA decision is also more in keeping with past decisions, where we have routinely permitted agencies to award grants using fiscal year funds irrespective of the fact that the funds would not be expended until some time after the end of the fiscal year."

The decision observed that the relevant consideration was not the principle of severability but the applicable program legislation, and concluded in this regard:

> "In our opinion, Education's award of 5-year grants is both consistent with program objectives and within its discretion under the program legislation. Under the program legislation, Education is not merely required to provide financial assistance, it is to ensure through various ways that students who have received services under the . . . program continue to receive those services from year-to-

> year until completion of high school. Awarding grants 5 years in duration will aid in ensuring the continuity of grantee services to . . . students which the programs legislation seeks to provide. Therefore, Education is fulfilling its *bona fide* need under this program when it awards these 5-year grants."

Appropriations for grant programs are generally subject to the same time availability rules as other appropriations. Thus, for example, when Congress expressly provides that a grant appropriation "shall remain available until expended" (no-year appropriation), the funds remain available until they are obligated and expended by the grantor agency subject to the account closing statute, 31 U.S.C § 1555. It should be emphasized that the time availability of grant appropriations governs the grantor agency's obligation and expenditure of the funds; it does not limit the time in which the grantee must use the funds once it has received them. *Id*. Of course, the grant statute or the grantor agency may impose time limits on a grantee's use of funds. *See City of New York v Shalala*, 34 F.3d 1161 (2nd Cir. 1994); *Mayor and City Council of Baltimore v. Browner*, 866 F. Supp. 249 (D. Md. 1994).

### c. Amount

The Antideficiency Act, 31 U.S.C. § 1341(a), among other things, requires that federal agencies avoid incurring obligations in excess of the amount available in their appropriations.[35] Of course, grant obligations and expenditures are subject to the act. Restrictions on the availability of a lump-sum appropriation are not legally binding unless incorporated expressly or by reference in the appropriation act itself. Thus, a plan to award fewer National Institutes of Health biomedical research grants, funded under a lump-sum appropriation, than the number of grants provided for in congressional committee reports was not unlawful, as long as all the funds were properly obligated for authorized grant purposes. 64 Comp. Gen. 359 (1985). *See also* B-157356, Aug. 17, 1978.

[35] For a general discussion of the Antideficiency Act, see Chapter 6, section C, and for amount availability, see Chapter 6, section C.2.e.

Minimum earmarks (*e.g.*, "not less than" or "shall be available only") in an authorization act were found controlling where a later-enacted appropriation act provided a lump sum considerably less than the amount authorized but nevertheless sufficient to meet the earmark requirements. 64 Comp. Gen. 388 (1985).[36] The grantor agency will have more discretion where the earmark is a maximum ("not to exceed") or where it is expressed only in legislative history. B-171019, Mar. 2, 1977. *See also* 72 Comp. Gen. 317 (1993) (General Services Administration may not divert a portion of earmarked grants to cover administrative costs); *compare Association of Metropolitan Water Agencies v. Browner*, 24 F. Supp. 2d 83 (D.D.C. 1998) (agency was not obligated to set aside funds for health effects research earmarked in an authorization act where Congress never clearly made an appropriation pursuant to the specific authorization containing the earmark).

In the absence of a contrary provision in the applicable program statute, regulations, or grant agreement, there is no basis to object to a grantee's allocation of grant funds as long as the funds were spent for eligible grant activities. B-260990, June 13, 1996; 69 Comp. Gen. 600 (1990). *See also* 71 Comp. Gen. 310 (1992) (allowing grantees to retain reasonable profit or fees under Small Business Administration policy directive).

As the cases cited below illustrate, a federal institution is generally not eligible to receive grant funds from another federal source unless the program legislation so provides. The reason is that the grant funds would improperly augment the appropriations of the receiving institution. For example:

- Federal grant funds for nurse training programs could not be allotted to St. Elizabeths Hospital since it was already receiving appropriations to maintain and operate its nursing school. 23 Comp. Gen. 694 (1944).

- Haskell Indian Junior College, fully funded by the Bureau of Indian Affairs, was not eligible to receive grant funds from federal agencies other than the Bureau of Indian Affairs since Congress had already provided for its needs by direct appropriations. B-114868, Apr. 11, 1975.

[36] See Chapter 2, section C, for a general discussion of the interplay between authorization and appropriation acts.

The Office of Education could not make a library support grant to the National Commission on Libraries and Information Science as it would be an improper augmentation of the Commission's appropriations. 57 Comp. Gen. 662, 664 (1978).

## 3. Agency Regulations

### a. General principles[37]

Legislation establishing an assistance program frequently will define the program objectives and leave it to the administering agency to fill in the details by regulation. Thus, agency regulations are of paramount importance in assessing the parameters of grant authority. These regulations, if properly promulgated and within the bounds of the agency's statutory authority, have the force and effect of law and may not be waived on a retroactive or *ad hoc* basis. *See generally* B-300912, Feb. 6, 2004. *See also* 57 Comp. Gen. 662 (1978) (eligibility standards); B-163922, Feb. 10, 1978 (grantee's liability for improper expenditures); B-130515, July 17, 1974; B-130515, July 20, 1973 (matching share requirements). However, the prohibition against waiver does not necessarily apply to regulations that are merely "internal administrative guidelines" as long as the government's interests are adequately protected. *See* 60 Comp. Gen. 208, 210 (1981).

The operation of several of these principles is illustrated in B-203452, Dec. 31, 1981. The Federal Aviation Administration (FAA) revised its regulations to permit indirect costs to be charged to Airport Development Aid Program grants. A grantee filed a claim for reimbursement of indirect costs incurred prior to the change in the FAA regulations, arguing that the charging of indirect costs was required by a Federal Management Circular (superseded by OMB Circulars) even before FAA recognized it in its own regulations. GAO first pointed out that Federal Management Circulars are internal management tools. They do not have the binding effect of law so as to permit a third party to assert them against a noncomplying agency. This being the case, there was no impediment to FAA's revising its regulations without making the revision retroactive as long as both the old and the new regulations were within the scope of FAA's legal authority. *See also Pueblo Neighborhood Health Centers, Inc. v. United States Department of Health & Human Services*, 720 F.2d 622, 625–26 (10th Cir.

[37] See Chapter 3, section C for a general discussion of agency regulations and administrative law principles applicable to them.

1983) (department's grant application manual is an internal agency publication rather than a regulation with force and effect of law, so that deviations from it, in this case use of an ineligible member on a funding review panel, did not require reversal of agency action).

Regulations of the grantor agency will generally be upheld as long as they are within the agency's statutory authority, issued in compliance with applicable procedural requirements, and not arbitrary or capricious. The courts have sustained grant regulations in many contexts. *See*, *e.g.*, *Southeast Kansas Community Action Program*, *Inc. v. Secretary of Agriculture*, 967 F.2d 1452 (10th Cir. 1992) (upholding a regulatory amendment to eliminate appeal procedures for nonrenewal of a grant program administrator's contract); *Gallegos v. Lyng*, 891 F.2d 788 (10th Cir. 1989) (upholding the authority of the Department of Agriculture to impose by regulation strict liability on states for lost or stolen food stamp coupons). Similarly, it was within the discretion of the Environmental Protection Agency under the Clean Water Act to prescribe regulations making wastewater treatment grants available only for the construction of new facilities and not for the acquisition of preexisting facilities. *Cole County Regional Sewer District v. United States*, 22 Cl. Ct. 551 (1991). *See also Mayor & City Council of Baltimore v. Browner*, 866 F. Supp. 249 (D. Md. 1994) (upholding agency's enforcement of cut-off dates for completion of city's federally funded sewerage facilities). Another illustration is *American Hospital Association v. Schweiker*, 721 F.2d 170 (7th Cir. 1983), *cert. denied*, 466 U.S. 958 (1984), upholding regulations imposing community service and uncompensated care requirements on recipients of Hill-Burton hospital construction grants.

The informal rulemaking requirements (notice and comment) of the Administrative Procedure Act (APA) do not apply to grant regulations. 5 U.S.C. § 553(a)(2) (the rulemaking requirements do not apply to "a matter relating to . . . grants. . ."). Several agencies, however, have published statements committing themselves to comply with the APA in developing grant regulations and have thereby effectively waived the exemption. *See*, *e.g.*, *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994); *Flagstaff Medical Center*, *Inc. v. Sullivan*, 962 F.2d 879, 885 (9th Cir. 1992). Even if an agency has voluntarily waived the APA exemption for grants, other APA exemptions may still apply. *See*, *e.g.*, *Chief Probation Officers of California v. Shalala*, 118 F.3d 1327 (9th Cir. 1997) (agency rule was

interpretive, not legislative and, thus, not invalid for failure to follow APA rulemaking requirements).[38]

Wholly apart from what the courts might or might not do, an agency's discretion in funding matters is subject to congressional oversight as well. Congress, if it disfavors an agency's actual or proposed exercise of otherwise legitimate discretion, can statutorily restrict that discretion, at least prospectively, either by amending the program legislation or by inserting the desired restrictions in appropriation acts. For an example of the latter, see B-300912, Feb. 6, 2004 (finding that federally granted rights-of-way for construction of highways constituted a final rule prohibited from taking effect by appropriations act provision). *See also* B-238997.4, Dec. 12, 1990. Also, agency grant regulations may be subject to review by GAO and Congress under the Congressional Review Act, Pub. L. No. 104-121, title II, subtitle E, § 251, 110 Stat. 847, 868 (Mar. 29, 1996), codified at 5 U.S.C. §§ 801–808.[39]

### b. Office of Management and Budget Circulars and the "Common Rules"

Federal grants and cooperative agreements are typically subject to a wide range of substantive and other requirements under the particular program statutes as well as implementing agency regulations and other guidance that applies to them. However, they are governed as well by many additional cross-cutting requirements that are common to most assistance programs. These include federal statutory provisions made applicable to recipients of federal funds, such as the prohibitions against lobbying with grant funds under the so-called "Byrd Amendment" codified at 31 U.S.C. § 1352.[40] They also include a number of administrative requirements dealing with such subjects as audit and record-keeping and the allowability of costs. The importance of the cross-cutting agency regulations and centralized management guidance from the Office of Management and Budget (OMB) is apparent throughout this chapter. The current structure for these requirements developed in the late 1980s.

Prior to 1988, each agency issued grant management regulations to govern grants and cooperative agreements it made, although OMB Circular

[38] See Chapter 3, section A, for additional discussion of the APA and the informal rulemaking process.

[39] For a more detailed discussion of the Congressional Review Act, see Chapter 3, section A.1.c.

[40] For more on the Byrd Amendment, see Chapter 4, section C.11.d.

No. A-102 did provide some governmentwide guidance for grants to state and local governments. (Another circular, No. A-110, provided some guidance for grants to other types of grantees.) In 1987, a memorandum from the President directed the Office of Management and Budget (OMB) to revise Circular No. A-102 to specify uniform, governmentwide terms and conditions for grants to state and local governments, and directed executive branch departments and agencies to propose and issue common regulations adopting these terms and conditions *verbatim*, modified where necessary to reflect inconsistent statutory requirements. 23 Weekly Comp. Pres. Doc. 254 (Mar. 12, 1987). The Presidential memorandum observed in part:

> "Circular A-102 was a significant step toward the simplification of grants management at the time. However, after 16 years, some of the provisions are out of date, there are gaps where the standards do not cover important areas, and agencies have interpreted the circular in numerous different ways in their regulations."

*Id.* at 255. Pursuant to this direction, the first iteration of what has come to be known as the "common rule" system was published for comment on June 9, 1987 (52 Fed. Reg. 21820–21862), issued in final on March 11, 1988 (53 Fed. Reg. 8033–8103), and generally made effective as of October 1, 1988. Later that year, OMB proposed a similar revision to Circular No. A-110, dealing with grants to institutions of higher education, hospitals, and other nonprofit organizations. 53 Fed. Reg. 44710 (Nov. 4, 1988). The structure of each circular was similar, featuring a brief introduction followed by attachments with detailed guidance on specific topics.

There are currently a total of six OMB circulars on grants, but only three apply to any one type of grantee. Their coverage breaks down as follows:[41]

- States, local governments, and Indian Tribes: Circular No. A-87 (May 10, 2004) for cost principles and Circular No. A-102 (Aug. 29, 1997) for administrative requirements.

[41] *See* www.whitehouse.gov/omb/grants/attach.html (last visited September 15, 2005).

- Educational institutions: Circular No. A-21 (May 10, 2004) for cost principles and Circular No. A-110 (Sept. 30, 1999) for administrative requirements.

- Nonprofit organizations: Circular No. A-122 (May 10, 2004) for cost principles and Circular No. A-110 (Sept. 30, 1999) for administrative requirements.

- All grantees: Circular No. A-133 (June 27, 2003) for audit requirements.

The OMB circulars provide guidance only to federal grantor agencies; they do not apply directly to grantees. Therefore, each grantor agency has issued largely identical sets of regulations that prescribe requirements that are binding on their grantees. These are technically the so-called "common rules." At present, each grantor agency has a set of four common rules. Two of the common rules are based on OMB's grants management circulars covering cost principles, administrative requirements, audit, *etc*. A third common rule deals with the Byrd Anti-Lobbying Amendment, mentioned previously. The fourth common rule, discussed hereafter, deals with suspension and debarment and drug-free workplace requirements.

A compilation showing where each agency's common rule regulations are codified in the Code of Federal Regulations may be found at www.whitehouse.gov/omb/grants/chart.html (last visited September 15, 2005). Since the common rule regulations are essentially the same for each federal grantor agency, we will use the Department of Agriculture version in the remainder of this chapter when citing to and illustrating the application of the common rules.[42] The Department of Agriculture's regulations are codified as follows:

- Grants management common rule for states, local governments, and Indian tribes, 7 C.F.R. pt. 3016 (2005).

- Grants management common rule for universities and nonprofit organizations, 7 C.F.R. pt. 3019.

- Nonprocurement suspension and debarment and Drug-Free Workplace Act common rule, 7 C.F.R. pt. 3017.

[42] OMB is in the process of consolidating and streamlining its circulars and the common rules in title 2 of the Code of Federal Regulations. *See* 69 Fed. Reg. 26,276 (May 11, 2004).

- Byrd Anti-Lobbying Amendment common rule, 7 C.F.R. pt. 3018.

As noted previously, the common rules establish consistency and uniformity among federal agencies in the management of grants and cooperative agreements. They were intended to supersede uncodified manuals and handbooks unless required by statute or approved by OMB. Thus, the Department of Agriculture's regulations provide at 7 C.F.R. § 3016.5:

> "All other grants administration provisions of codified program regulations, program manuals, handbooks and other nonregulatory materials which are inconsistent with this part are superseded, except to the extent they are required by statute, or authorized in accordance with the [OMB] exception provision in § 3016.6."

With respect to grants and grantees covered by the common rules, additional administrative requirements are to be in the form of codified regulations published in the Federal Register. 7 C.F.R. § 3016.6(a).

As noted above, in addition to implementing OMB's grants management circulars, the common rule format has been used in two other grant-related contexts. One implements the Byrd Anti-Lobbying Amendment, discussed previously. The common rule on this subject was issued by 28 grantor agencies on February 26, 1990. 55 Fed. Reg. 6736.

The other common rule implements provisions relating to suspension and debarment and drug-free workplaces. On February 18, 1986, as part of the government's effort to combat fraud, waste, and abuse, the President signed Executive Order No. 12549, which directed the establishment of a system for debarment and suspension in the assistance context.[43] OMB implemented the executive order by developing common rule language, entitled "Government-wide Debarment and Suspension (Nonprocurement)," that was adopted by over 25 grantor agencies and patterned generally on comparable provisions for procurement contracts in the Federal Acquisition Regulation. This common rule was originally published at 53 Fed. Reg. 19160 (May 26, 1988). It was revised and republished in 2003 in a version that incorporates provisions implementing

[43] Exec. Order No. 12549, *Debarment and Suspension*, 51 Fed. Reg. 6370 (Feb. 18, 1986).

the Drug-Free Workplace Act of 1988 (41 U.S.C. §§ 701–707).[44] 68 Fed. Reg. 66,534 (Nov. 26, 2003).

With respect to suspension and debarment, a person (including business entities and units of government) who is debarred is excluded from federal assistance and benefits, financial and nonfinancial, under federal programs and activities for a period of up to 3 years, possibly longer. Causes of debarment include certain criminal convictions, antitrust violations, a history of unsatisfactory performance, and failure to pay a single substantial debt or a number of outstanding debts owed to the federal government. See generally 7 C.F.R. pt. 3017, subpart H, for provisions relating to debarment. Suspension is a temporary exclusion, usually pending the completion of an investigation involving one or more of the causes for debarment. See generally 7 C.F.R. pt. 3017, subpart G, for provisions relating to suspension. The General Services Administration (GSA) is responsible for compiling and distributing a list of debarred or suspended persons. The list, now called the Excluded Parties List System, is maintained by GSA's Office of Acquisition Policy and is available electronically. *See generally* 7 C.F.R. pt. 3017, subpart E.

### c. The Federal Financial Assistance Management Improvement Act

The Federal Financial Assistance Management Improvement Act of 1999, Pub. L. No. 106-107 (Nov. 20, 1999), 113 Stat. 1486, 31 U.S.C. § 6101 note, was enacted to improve the management and performance of federal financial assistance programs. The act required federal agencies to develop and implement a plan that would, among other things, streamline and simplify application, administrative, and reporting procedures for financial assistance programs. Pub. L. No. 106-107, § 5(a). It also required OMB to direct, coordinate, and assist federal agencies in establishing a common application and reporting system that would include uniform administrative rules for assistance programs across different federal agencies. *Id.* § 6(a)(1)(C).

In furtherance of the act's requirements, OMB is working to consolidate all six of its grants-related circulars as well as the agency common rules into a new title 2 of the Code of Federal Regulations. *See* 69 Fed. Reg. 26,276 (May 11, 2004). Under this approach, title 2 will include the full text of each circular. In their portions of title 2, the grantor agencies will simply adopt by reference the text of the OMB circulars together with any agency-

[44] The provisions of the Drug-Free Workplace Act dealing specifically with federal grantees appear in 41 U.S.C. § 702.

specific additions, exceptions, or clarifications. This will avoid the need for each individual agency to repeat separately the content of the OMB circulars as they now do in their common rules. 69 Fed. Reg. at 26,277. OMB began this process by publishing Circular No. A-110 as 2 C.F.R. part 215 (2005). It recently added three more circulars: numbers A-21, A-87, and A-122. *See* 70 Fed. Reg. 51,880; 51,910; 51,927 (Aug. 31, 2005).

Apart from providing for regulatory consolidation and streamlining, the Federal Financial Assistance Management Improvement Act contained a number of other provisions designed to improve federal assistance processes and performance. It also imposed additional responsibilities on the agencies and OMB. Section 7 of Public Law 106-107 mandated a GAO evaluation of the effectiveness of the act. GAO reported the results of its evaluation in *Grants Management: Additional Actions Needed to Streamline and Simplify Processes*, GAO-05-335 (Washington, D.C.: Apr. 18, 2005). *See also* GAO, *Federal Assistance: Grant System Continues to Be Highly Fragmented*, GAO-03-718T (Washington, D.C.: Apr. 29, 2003).

### d. The "Cognizant Agency" Concept

Finally, to simplify relations between federal grantees and awarding agencies, OMB established the "cognizant agency" concept, under which a single agency represents all others in dealing with grantees in common areas.[45] In this case, the cognizant agency reviews and approves grantees' indirect cost rates. Approved rates must be accepted by other agencies, unless specific program regulations restrict the recovery of indirect costs.

OMB published a list of cognizant agency assignments for some state agencies, cities and counties on January 6, 1986 (51 Fed. Reg. 552). The cognizant agency for governmental units not on that list is the one that provides the most grant funds to the entity. The Department of Health and Human Services (HHS) is the cognizant agency for all States and most cities. The cognizant agency for other organizations is determined by calculating which federal agency provides the most grant funding. For example, the Department of the Interior is the cognizant agency for all Indian tribal governments, and for hospitals, HHS serves as the cognizant agency.

---

[45] The information here is taken from OMB's web site at www.whitehouse.gov/omb/grants/attach.html (last visited September 15, 2005).

## 4. Contracting by Grantees

Grantees commonly enter into contracts with third parties in the course of performing their grants. While the United States is not a party to the contracts, the grantee must nevertheless comply with any requirements imposed by statute, regulation, or the terms of the grant agreement, in awarding federally assisted contracts. 54 Comp. Gen. 6 (1974). Violation of applicable procurement standards may result in the loss of federal funding. *See Town of Fallsburg v. United States*, 22 Cl. Ct. 633 (1991).

For a period of nearly 10 years, GAO undertook a limited review of the propriety of contract awards made by a grantee in furtherance of grant purposes, upon request of a prospective contractor. This limited review role was announced in 40 Fed. Reg. 42406 (Sept. 12, 1975). (While these reviews were conducted in a manner similar to bid protests, mentioned previously in section B.4 of this chapter, GAO called the requests for review “complaints” rather than “protests.”) GAO applied the same limited review to contracts awarded under cooperative agreements. 59 Comp. Gen. 758 (1980).

GAO’s review was designed primarily to ensure that the “basic principles” of competitive bidding were applied. 55 Comp. Gen. 390, 393 (1975). Numerous decisions were rendered in this area. *E.g.*, 57 Comp. Gen. 85 (1977) (nonapplicability of Buy American Act); 55 Comp. Gen. 1254 (1976) (state law applicable when indicated in grant); 55 Comp. Gen. 413 (1975) (nonapplicability of Federal Procurement Regulations).

By 1985, many agencies had developed their own review procedures, and the number of complaints filed with GAO steadily decreased. Determining that its review of grantee contracting was no longer needed, GAO discontinued its limited review in January 1985. 50 Fed. Reg. 3978 (Jan. 29, 1985); 64 Comp. Gen. 243 (1985). The body of decisions issued during the 1975–1985 period should nevertheless remain useful as guidance in this area.

In a 1980 report, GAO reviewed the procurement procedures of selected state and local government grantees and nonprofit organizations in five states. The report concluded that the state and local governments generally had in place and followed sound procurement procedures (somewhat less so for the nonprofits), but also found a number of weak spots, many of which are now addressed in OMB directives. *See* GAO, *Spending Grant Funds More Efficiently Could Save Millions*, PSAD-80-58 (Washington, D.C.: June 30, 1980).

With respect to state and local governments, standards for grantee procurement are set forth in the common rules. Using our Department of Agriculture example, its version of this rule is 7 C.F.R. § 3016.36. These rules require, among other things, that grantees and subgrantees have protest procedures to resolve disputes over their procurements. *Id.* § 3016.36(b)(12). Federal grantor agencies review protests against grantee and subgrantee awards that involve violations of federal law or regulations (including the procurement standards in the common rules) or of the grantee's or subgrantee's protest procedures. *Id.* Grantor agencies are authorized, but not required, to review grantee/subgrantee procurements on other grounds. *See* Supplementary Information Statement, 53 Fed. Reg. 8034, 8039 (Mar. 11, 1988).

An agency that has a review procedure for grantee procurement will be held to established precepts of administrative law in applying those procedures. For example, in *Niro Atomizer, Inc. v. EPA*, 682 F. Supp. 1212 (S.D. Fla. 1988), the court instructed the agency to either follow its established procedures or announce that it was changing them, giving the parties notice and an opportunity to rebut. However, the court in *A-G-E Corp. v. United States*, 968 F.2d 650 (8th Cir. 1992), rejected a challenge that the common rules did not go far enough in regulating grantee procurements. The plaintiffs objected to a provision then in the common rules that permitted state grantees to apply resident preferences to their procurements.[46] The court viewed the common rules as embodying internal executive branch management directives and held that the plaintiffs lacked standing to challenge them absent a showing that they were inconsistent with federal law.

## 5. Liability for Acts of Grantees

It is often said that the federal government is not liable for the unauthorized acts of its agents, "agents" in this context referring to the government's own officers and employees. If this is true with respect to those who clearly are agents of the government, it logically must apply with even greater force to those who are not its agents. Grantees, for purpose of imposing legal

[46] The current version of the rule, 7 C.F.R. § 3016.36(c)(2), provides generally that:

> "Grantees and subgrantees will conduct procurements in a manner that prohibits the use of statutorily or administratively imposed in-State or local geographical preferences in the evaluation of bids or proposals, except in those cases where applicable Federal statutes expressly mandate or encourage geographic preference."

liability on the United States, are not "agents" of the government. While the demarcation is not perfect, we divide our discussion into two broad areas, contractual liability and liability for grantee misconduct.

### a. Liability to Grantee's Contractors

For the United States to be contractually liable to some other party, there must be "privity of contract," that is, a direct contractual relationship between the parties. When a grantee under a federal grant enters into a contract with a third party (contractor), there is privity between the United States and the grantee, and privity between the grantee and the contractor, but no privity between the United States and the contractor and hence, as a general proposition, no liability.

Perhaps the leading case in this area is *D.R. Smalley & Sons, Inc. v. United States*, 372 F.2d 505 (Ct. Cl.), *cert. denied*, 389 U.S. 835 (1967). The plaintiff contractor had entered into a highway construction contract with the state of Ohio. The project was funded on a cost-sharing basis, with 90 percent of total costs to come from federal-aid highway funds. The contractor lost nearly $3 million on the project, recovered part of its loss from the state of Ohio, and then sued the United States to recover the unpaid balance. The contractor argued that Ohio was really the agent of the United States for purposes of the project because, among other things, the contract had been drafted pursuant to federal regulations, the United States approved the contract and all changes, and the United States was funding 90 percent of the costs.

The court disagreed. Since there was no privity of contract between the United States and the contractor, the government was not liable. The involvement of the government in various aspects of the project did not make the state the agent of the federal government for purpose of creating contractual liability, express or implied. The court stated:

> "The National Government makes many hundreds of grants each year to the various states, to municipalities, to schools and colleges and to other public organizations and agencies for many kinds of public works, including roads and highways. It requires the projects to be completed in accordance with certain standards before the proceeds of the grant will be paid. Otherwise the will of Congress would be thwarted and taxpayers' money would be wasted. . . . It would be farfetched indeed to impose liability on the Government for the acts and omissions of the parties who contract to build the projects, simply because it requires the

> work to meet certain standards and upon approval thereof reimburses the public agency for the part of the costs."

*Id*. at 507. Some later cases applying the Smalley concept are *Malone v. United States*, 34 Fed. Cl. 257 (1995); *Blaze Construction, Inc. v. United States*, 27 Fed. Cl. 646 (1993); *Somerville Technical Services, Inc. v. United States*, 640 F.2d 1276 (Ct. Cl. 1981); *Housing Corporation of America v. United States*, 468 F.2d 922 (Ct. Cl. 1972); *Cofan Associates, Inc. v. United States*, 4 Cl. Ct. 85 (1983); 68 Comp. Gen. 494 (1989).

The *Cofan* case presented an interesting variation in that the claimant was a disappointed bidder rather than a contractor, trying to recover under the theory, well-established in the law of procurement contracts, that there is an implied promise on the part of the government to fairly consider all bids. This did not help the plaintiff, however, since again there was no privity with the government. In this regard, the court observed:

> "[I]t is now firmly established that a person who enters into a contract with [a grantee] to perform services on a project funded in part by loans or grants-in-aid from the United States may not thereby be deemed to have entered into a contract with the United States. Nor is the result any different because the United States has imposed guidelines or restrictions on the use of funds, including procurement procedures."

4 Cl. Ct. at 86. *See also Pendleton v. United States*, 47 Fed. Cl. 480 (2000) (federal participation in state reclamation project was not sufficient to support plaintiffs' claim for compensable Fifth Amendment taking against the United States).

Another variation occurred in 47 Comp. Gen. 756 (1968). A contractor had succeeded in recovering increased costs from a state grantee. Under *Smalley*, it was clear that the government could not be held legally liable for the proportionate share of the recovery. However, it was apparent that the increased costs were due to the fact that erroneous soil profile information furnished by the state had contributed to an unrealistically low bid by the contractor. Under these circumstances, GAO advised that the grantor agency and the state could enter into a voluntary modification of the grant agreement to recognize the damage recovery as a project cost. *See also* B-167310, July 31, 1969.

In limited circumstances, there is a device that may be available to a contractor to have its claim considered by the federal government, illustrated by B-181332, Dec. 28, 1976.[47] In that case, an agency had erroneously refused to fund a grant after it had been approved and the grantee's contractor had incurred expenses in reliance on the approval. There clearly was no privity between the contractor and the United States. However, GAO recognized a procedural device drawn from the law of procurement contracts, and accepted a claim filed by the grantee (with whom the United States did have privity) "for and on behalf of" the contractor, in which the grantee acknowledged liability to the contractor only if and to the extent that the government was liable to the grantee. In effect, the contractor was prosecuting the claim in the name of the grantee. This device is potentially useful only where the government's liability to the grantee can be established. *See also* 68 Comp. Gen. 494, 495–96 (1989); 9 Comp. Gen. 175 (1929). A different type of contract, an employment contract, was the subject of 66 Comp. Gen. 604 (1987), in which GAO concluded, applying *Smalley*, that the United States was not liable to a former employee of a grantee for unpaid salary. The grantor agency had funded all allowable costs under the grant, and the grantee's transgression was not the liability of the United States.

As if to provide the adage that anything that can happen will happen, a 1983 case combined all of the elements noted above. The Agency for International Development (AID) made a rural development planning grant to Bolivia. Bolivia contracted with a private American company to perform certain functions under the grant, and the company in turn entered into employment contacts with various individuals. The contract with the private company (but not the grant itself) was terminated, the company terminated the employment contracts, and the individuals then sought to recover benefits provided under Bolivian law. Clearly, AID was not legally liable to the individual claimants. However, some of the benefits to some of the claimants could qualify as allowable costs under the grant and could be paid, if approved by AID and the grantee, to the extent grant funds remained available. B-209649, Dec. 23, 1983.

[47] This decision and others described here arose under GAO's former statutory authority to settle claims by or against the United States. This authority has been transferred from GAO to executive branch agencies. See notes following 31 U.S.C. § 3702. However, the principles stated in the decisions remain relevant.

### b. Liability for Grantee Misconduct

A number of cases have involved attempts to impose liability on the United States under the Federal Tort Claims Act.[48] The act makes the United States liable, with various exceptions, for the tortious conduct of its officers, employees, or agents acting within the scope of their employment. As a general proposition, a grantee is not an agent or agency of the government for purposes of tort liability.

An important Supreme Court case is *United States v. Orleans*, 425 U.S. 807 (1976), holding that a community action agency funded under a federal grant was not a "federal agency" for purposes of the Federal Tort Claims Act. The case arose from a motor vehicle accident involving plaintiff Orleans and an individual acting on behalf of the grantee. The Court first noted that the Federal Tort Claims Act "was never intended, and has not been construed by this Court, to reach employees or agents of all federally funded programs that confer benefits on people." *Orleans*, 425 U.S. at 813. The Court then stated, and answered, the controlling test:

> "[T]he question here is not whether the [grantee] receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government.
>
> * * * * *
>
> "The Federal Government in no sense controls 'the detailed physical performance' of all the programs and projects it finances by gifts, grants, contracts, or loans."

*Id*. at 815–16.

Thus, the general rule is that the United States is not liable for torts committed by its grantees. Neither the fact of federal funding nor the degree of federal involvement encountered in the typical grant (approval, oversight, inspections, *etc*.) is sufficient to make the grantee an agent of the United States of purposes of tort liability. Liability could result, however, if the federal involvement reached the level of detailed supervision of day-to-day operations noted in *Orleans*. An example is *Martarano v. United States*, 231 F. Supp. 805 (D. Nev. 1964) (state employee under cooperative

[48] The act's principal provisions are found at 28 U.S.C. §§ 2671–2680.

agreement working under direct control and supervision of federal agency).

In another group of cases, attempts have been made to find the United States liable under the Federal Tort Claims Act for allegedly negligent performance of its oversight role under a grant. The courts have found these claims covered by the "discretionary function" exception to Federal Tort Claims Act liability.[49] *Mahler v. United States*, 306 F.2d 713 (3rd Cir.), *cert. denied*, 371 U.S. 923 (1962), followed in *Daniel v. United States*, 426 F.2d 281 (5th Cir. 1970), and *Rayford v. United States*, 410 F. Supp. 1051 (M.D. Tenn. 1976). *See also Rothrock v. United States*, 883 F. Supp. 333 (S.D. Ind. 1994), *aff'd*, 62 F.3d 196 (7th Cir. 1995).

In areas not covered by the Federal Tort Claims Act, the potential for individual liability cannot be disregarded. One such area is the so-called "constitutional tort," or an action for damages based on an alleged violation of federal constitutional rights perpetrated under color of law. For example, an official of the Indian Health Service, acting jointly with a state official, told a nonprofit intermediary that further funding would be conditioned on the dismissal of an employee whom they thought was performing inadequately. The intermediary fired the employee, who then sued the state official and the federal official in their individual capacities. The suit against the federal defendant was based directly on the Fifth Amendment, for deprivation of a property interest (the plaintiff's job) without due process. The court first found that there had been a due process violation, and that the defendants were not entitled to qualified immunity because their conduct exceeded the scope of their authority. *Merritt v. Mackey*, 827 F.2d 1368 (9th Cir. 1987). The court noted that there was no basis for imposing liability on the United States. *Id.* at 1373–74. In the second published appellate decision in the case, the court affirmed a monetary damage award and an award of attorney's fees against the individual officials. The federal official was personally liable for the fee

[49] The discretionary function exception excludes from the act's coverage—

> "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

28 U.S.C. § 2680(a).

award under 42 U.S.C. § 1988 because he had acted in concert with a state official. *Merritt v. Mackey*, 932 F.2d 1317 (9th Cir. 1991). *See also Downey v. Coalition Against Rape and Abuse, Inc.*, 143 F. Supp. 2d 423 (D.N.J. 2001), applying reasoning similar to *Merritt* in the context of a state-funded grant.

However, the law concerning constitutional torts is unsettled. The concept of constitutional torts originated with *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and has been applied in many subsequent cases dealing with a range of constitutional rights. Recently, however, the Supreme Court has taken a narrow view of this concept. Of particular relevance here, the Supreme Court held in *Correctional Services Corp. v. Malesko*, 534 U.S. 61 (2001), that a prisoner could not maintain a constitutional tort action against a private organization that operated a detention facility under a federal contract. The Court indicated that constitutional tort actions under *Bivens* can be maintained only against individual federal officers or employees; thus, such actions do not lie against "private entities acting under color of federal law" nor do they lie against federal agencies. *Malesko*, 534 U.S. at 66–74.

In light of *Malesko*, it is unclear whether cases like *Merritt v. Mackey, supra*, would be decided the same way today. *Malesko* suggests that, as a general proposition, federal contractors and grantees and their employees would not be subject to liability for constitutional torts. Likewise, federal agencies would not have constitutional tort liability. It is possible that individual federal employees (like the one in *Merritt*) could still be held liable for inducing a grantee to violate someone's constitutional rights. However, it is questionable whether a court would impose tort liability on a federal employee who induced a violation if the party who actually committed the violation could not be liable. For additional background on this subject, see Michael B. Hedrick, *New Life for a Good Idea: Revitalizing Efforts to Replace the Bivens Action with a Statutory Waiver of the Sovereign Immunity of the United States for Constitutional Tort Suits*, 71 Geo. Wash. L. Rev. 1055 (2003).

## 6. Types of Grants: Categorical *versus* Block

A categorical grant is a grant to be used only for a specific program or for narrowly defined activities. A categorical grant may be allocated on the basis of a distribution formula prescribed by statute or regulation ("formula grant"), or it may be made for a specific project ("project grant"). A block

grant is a grant given to a governmental unit, usually a state, to be used for a variety of activities within a broad functional area.[50] Block grants are usually formula grants. Under a block grant, the state is responsible for further distribution of the money. States naturally prefer block grants because they increase the states' spending flexibility and at least in theory reduce federal control. *See generally* Library of Congress, Congressional Research Service, *Federal Grants to State and Local Governments: Overview and Characteristics*, No. RS20669 (Nov. 27, 2002), at 3–5; GAO, *Grant Programs: Design Features Shape Flexibility, Accountability, and Performance Information*, GAO/GGD-98-137 (Washington, D.C.: June 22, 1998), at 3 ("In practice, the 'categorical' and 'block' grant labels and their underlying definitions represent the ends of a continuum and overlap considerably in its middle range.").

During the 1960s and 1970s, although some block grant programs were in existence, the emphasis was largely on categorical grants. The Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub. L. No. 97-35, 95 Stat. 357 (Aug. 13, 1981), attempted to put a halt to this trend. *See* Library of Congress, Congressional Research Service, *Federal Grants to State and Local Governments: A Brief History*, No. RL30705 (Feb. 19, 2003), at 10. The act merged and consolidated several dozen categorical grant programs into block grants. GAO, *Block Grants: Characteristics, Experience, and Lessons Learned*, GAO/HEHS-95-74 (Washington, D.C.: Feb. 9, 1995), at 7–9, App. II.

In the mid-1990s, GAO cited the fiscal year 1996 budget resolution in reporting that Congress had "shown a strong interest in consolidating narrowly defined categorical grant programs for specific purposes into broader purpose block grants." GAO, *Block Grants: Issues in Designing Accountability Provisions*, GAO/AIMD-95-226 (Washington, D.C.: Sept. 1, 1995), at 1. In 2003, however, GAO testified that, although Congress had made further efforts to consolidate categorical grant programs over the years, "each period of consolidation was followed by a proliferation of new federal programs." GAO, *Federal Assistance: Grant System Continues to Be Highly Fragmented*, GAO-03-718T (Washington, D.C.: Apr. 29, 2003), at 4.

[50] These distinctions are discussed under the definition of "Grant" in GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 60–61.

Although GAO could still report in 2003 that block grants were "one way Congress has chosen to consolidate related programs," GAO also reported on certain "hybrid" approaches, including "consolidated categorical" grants, that would consolidate a number of narrower categorical programs while retaining standards and accountability for discrete federal performance goals, and "Performance Partnership Agreements," in which states can shift federal funds across programs but are held accountable for discrete or negotiated measures of performance. GAO-03-718T, at 15; GAO, *Homeland Security: Reforming Federal Grants to Better Meet Outstanding Needs*, GAO-03-1146T (Washington, D.C.: Sept. 3, 2003), at 11–13.[51]

Block grants reduce federal involvement in that they transfer much of the decision-making to the grantee and reduce the number of separate grants that must be administered by the federal government. It is a misconception, however, to think that block grants are "free money" in the sense of being totally free from federal "strings." *See*, *e.g.*, GAO/HEHS-95-74, at App. III, "Accountability Requirements of 1981 Block Grants."

Restrictions on the use of block grant funds may derive from the organic legislation itself. For example, several of the OBRA programs include such items as limitations on allowable administrative expenses, prohibitions on the use of funds to purchase land or construct buildings, "maintenance of effort" provisions, and anti-discrimination provisions. Other OBRA provisions of general applicability (Pub. L. No. 97-35, §§ 1741–1745) impose reporting and auditing requirements, and require states to conduct public hearings as a prerequisite to receiving funds in any fiscal year. Another more recent example is the Temporary Assistance for Needy Families (TANF) block grants, for which Congress established time limits and work requirements for adults receiving aid. GAO, W*elfare Reform: With TANF*

[51] GAO has issued a number of reports on block grants, including the following: *Early Observations on Block Grant Implementation*, GAO/GGD-82-79 (Washington, D.C.: Aug. 24, 1982); *Lessons Learned From Past Block Grants: Implications for Congressional Oversight*, GAO/IPE-82-8 (Washington, D.C.: Sept. 23, 1982); *A Summary and Comparison of the Legislative Provisions of the Block Grants Created by the 1981 Omnibus Budget Reconciliation Act*, GAO/IPE-83-2 (Washington, D.C.: Dec. 30, 1982); *Block Grants: Overview of Experiences to Date and Emerging Issues*, GAO/HRD-85-46 (Washington, D.C.: Apr. 3, 1985); and *Community Development: Oversight of Block Grant Needs Improvement*, GAO/RCED-91-23 (Washington, D.C.: Jan. 30, 1991). GAO has also published a comprehensive catalog of formula grants, intended for use as a resource document: *Grant Formulas: A Catalog of Federal Aid to States and Localities*, GAO/HRD-87-28 (Washington, D.C.: Mar. 23, 1987).

*Flexibility, States Vary in How They Implement Work Requirements and Time Limits*, GAO-02-770 (Washington, D.C.: July 5, 2002) at 3.

Applicable restrictions are not limited to those contained in the program statute itself. Other federal statutes applicable to the use of grant funds must also be followed. *See*, *e.g.*, *Ely v. Velde*, 451 F.2d 1130 (4th Cir. 1971), holding that the National Historic Preservation Act and the National Environmental Policy Act applied to the then Law Enforcement Assistance Administration in making a block grant to Virginia under the Safe Streets Act. A later and related decision in the same case is 497 F.2d 252 (4th Cir. 1974). *See also Forum for Academic & Institutional Rights v. Rumsfeld*, 390 F.3d 219 (3rd Cir. 2004), *cert. granted*, 125 S. Ct. 1977 (2005) (reviewing statute withholding funding to educational institutions that deny U.S. military access to campus for recruiting purposes); *Barbour v. Washington Metropolitan Area Transit Authority*, 374 F.3d 1161 (D.C. Cir. 2004), *cert. denied*, 125 S. Ct. 1591 (2005) (public transit authority's acceptance of federal grant funds resulted in a waiver of its immunity to a Rehabilitation Act claim); *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 854 F.2d 40 (4th Cir. 1988) (requirement for apportionment by Office of Management and Budget applicable to funds under Social Services Block Grant); 6 Op. Off. Legal Counsel 605 (1982) (Uniform Relocation Assistance Act applicable to Community Development block grant); 6 Op. Off. Legal Counsel 83 (1982) (various antidiscrimination statutes applicable to Elementary and Secondary Education and Social Services block grants).

If applicable, these additional restrictions may impose legal responsibilities on grantees. *See*, *e.g.*, GAO, *Native American Housing: Information on HUD's Housing Programs for Native Americans*, GAO/RCED-97-64, (Washington, D.C.: Mar. 28, 1997), at 14 (Indian hiring preference and Davis-Bacon Act). Thus the block grant mechanism does not totally remove federal involvement nor does it permit the circumvention of federal laws applicable to the use of grant funds. In this latter respect, a block grant is legally no different from a categorical grant.

The common rule for uniform administrative requirements does not apply to the OBRA block grants. *See*, *e.g.*, 7 C.F.R. § 3016.4(a)(2).

## 7. The Single Audit Act

We noted in our introduction to this chapter that federal grants to state and local governments exceed $400 billion a year. With expenditures of this magnitude, it is essential that there be some way to assure accountability

on the part of the grantees. The traditional means of assuring accountability has been the audit.

Prior to 1984, there were no statutory uniform audit requirements for state and local government grantees. Audits were performed on a grant or program basis and requirements varied with the program legislation. Under this system, gaps in audit coverage resulted because some entities were audited infrequently or not at all. Also, overlapping requirements produced duplication and inefficiency with multiple audit teams visiting the same entity and reviewing the same financial records. Congress addressed the problem by enacting the Single Audit Act of 1984, Pub. L. No. 98-502, 98 Stat. 2327 (Oct. 19, 1984), codified at 31 U.S.C. §§ 7501–7507.[52]

The 1984 act's objectives were to improve the financial management of state and local governments receiving federal financial assistance; establish uniform requirements for audits of federal financial assistance provided to state and local governments; promote the efficient and effective use of audit resources; and ensure that federal departments and agencies, to the extent practicable, rely upon and use audit work done pursuant to the act. Pub. L. No. 98-502, § 1(b). The 1984 act required each state and local entity that that received $100,000 or more in federal financial assistance (either directly from a federal agency or indirectly through another state or local entity) in any fiscal year to undergo a comprehensive, single audit of its financial operations. The 1984 act also required entities receiving between $25,000 and $100,000 in federal financial assistance to have either a single audit or a financial audit required by the programs that provided the federal funds.[53] An informative discussion of the need for the 1984 legislation, with references to several

[52] For an early review of the implementation of the original act, see GAO, *Single Audit Act: Single Audit Quality Has Improved but Some Implementation Problems Remain*, GAO/AFMD-89-72 (Washington, D.C.: July 27, 1989).

[53] State and local entities receiving less than $25,000 in federal funds in any fiscal year were not required to have a financial audit.

reports by GAO and the Joint Financial Management Improvement Program (JFMIP),[54] may be found in H.R. Rep. No. 98-708 (1984).

In 1996, the Single Audit Act of 1984 underwent a major overhaul. Prior to 1996, state and local governments followed one set of audit requirements and Indian tribes and nonprofit organizations, including educational institutions, followed another. The Single Audit Act Amendments of 1996[55] established uniform requirements for audits of federal awards[56] administered by all nonfederal entities, not just state and local governments. In addition, the 1996 amendments, in order to reduce any burdens on nonfederal entities and to promote the efficient and effective use of audit resources, increased the dollar threshold needed to trigger an audit and based the audit requirement on an amount expended rather than on an amount received.

As a result, any nonfederal entity, defined as a state, local government, or nonprofit organization, that expends federal awards equal to or in excess of $500,000[57] in any fiscal year shall have either a single audit or a program-specific audit for such fiscal year. Audits are conducted annually. However, biennial audits are permissible for state and local governments that are required by their constitution or by a statute, in effect on January 1,

[54] On December 1, 2004, the principals of the JFMIP (GAO, Department of Treasury, Office of Management and Budget (OMB), and Office of Personnel Management) signed an agreement that reassigned responsibility for financial management policy and oversight effectively eliminating JFMIP as a stand-alone organization. OMB issued a memorandum on December 2, 2004, that discusses in detail the changes to JFMIP's role, the transfer of JFMIP's Project Management Office to the CFO Council, the creation of a new Financial Systems Integration Committee of the CFO Council, and other transition issues. OMB, *Memorandum for Chief Financial Officers Council, Realignment of Responsibilities for Federal Financial Management Policy and Oversight* (Dec. 2, 2004), *available at* http://www.whitehouse.gov/omb (last visited September 15, 2005).

[55] Pub. L. No. 104-156, 110 Stat. 1396 (July 5, 1996).

[56] Federal awards include federal cost-reimbursement contracts, grants, loans, loan guarantees, property, cooperative agreements, interest subsidies, insurance, food commodities, direct appropriations, or other assistance, but does not include amounts received as reimbursement for services rendered to individuals. 31 U.S.C. § 7501(a)(4), (5).

[57] Every 2 years, the Director of OMB shall review the dollar threshold amount for requiring the audits and may adjust the dollar amount consistent with the purposes of the Single Audit Act, as amended. 31 U.S.C. § 7502(a)(3). In 2004, OMB adjusted the dollar threshold to $500,000. For fiscal years ending on or before December 30, 2003, the threshold is $300,000. *See* OMB Web site *at* http://www.whitehouse.gov/omb/financial/fin_single_audit.html (last visited September 15, 2005).

1987, to undergo audits less frequently than annually. Also any nonprofit organization that had biennial audits for all biennial periods ending between July 1, 1992, and January 1, 1995, is also permitted to undergo its audits biennially.

The audit is to be conducted by an independent auditor in accordance with generally accepted government auditing standards. 31 U.S.C. § 7502(c). These standards are found in GAO's publication *Government Auditing Standards*,[58] commonly known as the "Yellow Book." The Director of OMB, after consultation with the Comptroller General, and appropriate officials from federal, state, and local governments and nonprofit organizations, is required to prescribe guidance to implement the Single Audit Act, as amended. 31 U.S.C. § 7505(a). Guidance for implementing the act can be found in OMB Circular No. A-133, A*udits of States*, *Local Governments*, *and Non-Profit Organizations* (June 27, 2003).[59]

The annual audit shall either cover the operations of the entire nonfederal entity or include a series of audits that cover departments, agencies, and other organizational units as long as the audit encompasses the financial statements and schedule of expenditures of the federal awards for each unit. 31 U.S.C. § 7502(d). If the nonfederal entity expends federal awards only under one program and is not required otherwise to receive a financial statement audit, it may elect to have a program-specific audit. 31 U.S.C. § 7502(a)(1)(C). Performance audits[60] are not required except as authorized by the Director. 31 U.S.C. §7502(c).

The statute (31 U.S.C. § 7502(e)) requires the auditor to:

- determine whether the financial statements are presented fairly in all material respects in conformity with generally accepted accounting principles;

[58] GAO, *Government Auditing Standards*, GAO-03-673G (Washington, D.C.: June 2003).

[59] In March 2004, OMB issued a Compliance Supplement to Circular No. A-133. The supplement can be found at http://www.whitehouse.gov/omb/circulars/a133_compliance/04/04toc.html (last visited September 15, 2005).

[60] Performance audits encompass a wide variety of objectives, including objectives related to assessing program effectiveness and results; economy and efficiency; internal control; and compliance with legal or other requirements and are described in more detail in Chapter 2 of the *Government Auditing Standards*, GAO-03-673G.

- determine whether the schedule of expenditures of federal awards is presented fairly in all material respects in relation to the financial statements taken as a whole;

- with respect to internal controls pertaining to the compliance requirements for each major program,

  - obtain an understanding of such internal controls;

  - assess control risk; and

  - perform tests of controls unless the controls are deemed o be ineffective; and

- determine whether the nonfederal entity has complied with the provisions of laws, regulations, and contracts or grants pertaining to federal awards that have a direct and material effect on each major program. ("Major programs" are defined in 31 U.S.C. § 7501(a)(12)).

If the audit discloses any audit findings, the nonfederal entity needs to prepare a corrective action plan to eliminate the audit findings or a statement explaining why corrective action is not necessary. 31 U.S.C. § 7502(i). The corrective action plan needs to be consistent with the audit resolution standard promulgated by the Comptroller General as part of the standards for internal controls in the federal government[61] pursuant to 31 U.S.C. § 3512(c). The federal agency that provided the federal award needs to review the audit to determine whether prompt and corrective action has been taken regarding the audit findings. 31 U.S.C. § 7502(f)(1)(B).

GAO has reported over the last few years that more action is needed at both the nonfederal and federal level to ensure that audit findings are responded to, corrected, and tracked. *See*, *e.g.*, GAO, *Single Audit: Actions Needed to Ensure That Findings Are Corrected*, GAO-02-705 (Washington, D.C.: June 26, 2002); *Single Audit: Single Audit Act Effectiveness Issues*, GAO-02-877T (Washington, D.C.: June 26, 2002); *Compact of Free Association: Single Audits Demonstrate Accountability Problems Over Compact Funds*, GAO-04-7 (Washington, D.C.: Oct. 7, 2003);

[61] *See* GAO, *Standards for Internal Control in the Federal Government*, AIMD-00-21.3.1 (Washington, D.C.: November 1999).

*American Samoa: Accountability for Key Federal Grants Needs Improvement*, GAO-05-41 (Washington, D.C.: Dec. 17, 2004).

The nonfederal entity is required to transmit a reporting package, which shall include the financial statements, auditor opinion, and corrective action plan, if necessary, to a federal clearinghouse for public inspection. 31 U.S.C. § 7502(h),(i). Report packages can be viewed by going to the Federal Audit Clearinghouse Home Page at http://harvester.census.gov/sac (last visited September 15, 2005).

OMB's guidance in Circular No. A-133 includes criteria for determining the appropriate charges to federal awards for the cost of audits. Section 230 of the Circular provides that, unless prohibited by law, the costs of audits are allowable charges to the federal awards. The charges may be considered a direct cost or an allocated indirect cost, as determined in accordance with the provisions of applicable OMB cost principles circulars, the Federal Acquisition Regulation (48 C.F.R. pts. 30 and 31), or other applicable cost principles or regulations.

Audits conducted under the Single Audit Act, as amended, are in lieu of any other financial audit required by the nonfederal entity by any other federal law or regulation. 31 U.S.C. § 7503(a). However, that does not prohibit a federal agency from conducting or arranging for its own audit of the federal award if necessary to carry out the federal agency's responsibilities under a federal law or regulation; it only requires that the federal agency pay for the cost of such an audit. 31 U.S.C. § 7503(b), (e).

The law also requires the Comptroller General to monitor provisions in bills and resolutions reported by the committees of the Senate and the House of Representatives that require financial audits of nonfederal entities that receive federal awards, and report to the appropriate congressional committees any such provisions that are inconsistent with the Single Audit Act, as amended. 31 U.S.C. § 7506.

## D. Funds in Hands of Grantee: Status and Application of Appropriation Restrictions

Expenditures by grantees for grant purposes are not subject to all the same restrictions and limitations imposed on direct expenditures by the federal government. For this reason, grant funds in the hands of a grantee have been said to largely lose their character and identity as federal funds. The Comptroller General stated the principle as follows:

> "It consistently has been held with reference to Federal grant funds that, when such funds are granted to and accepted by the grantee, the expenditure of such funds by the grantee for the purposes and objects for which made [is] not subject to the various restrictions and limitations imposed by Federal statute or our decisions with respect to the expenditure, by Federal departments and establishments, of appropriated moneys in the absence of a condition of the grant specifically providing to the contrary."

43 Comp. Gen. 697, 699 (1964). Thus, except as otherwise provided in the program statute, regulations,[62] or the grant agreement, the expenditure of grant funds by a state government grantee is subject to the applicable laws of that state rather than federal laws applicable to direct expenditures by federal agencies. 16 Comp. Gen. 948 (1937). The rule applies "with equal if not greater force" when the grantee is another sovereign nation. B-80351, Sept. 30, 1948.

One group of cases[63] involves restrictions on employee compensation and related payments. Examples are:

- Appropriation act provision prohibiting use of federal funds to pay salaries of persons engaging in a strike against the United States Government, did not apply to funds granted to states to assist in enforcing Fair Labor Standards Act[64] and Walsh-Healey Public Contracts Act.[65] The funds were not "salaries" as such; they were grant funds to reimburse states for services of state employees, and therefore were state rather than federal funds. 28 Comp. Gen. 54 (1948). *See also* 39 Comp. Gen. 873 (1960).

[62] These regulations include, of course, Office of Management and Budget circulars and the common rules that implement them. As discussed in many other portions of this chapter, the circulars and the common rules impose a number of restrictions on a grantee's use of funds.

[63] Some of the decisions cited may involve statutory restrictions on federal expenditures that have been changed or repealed since the decisions were issued. The cases are cited solely to illustrate the application of the grant rule and thus remain valid to that extent.

[64] Act of June 25, 1938, ch. 676, 52 Stat. 1066.

[65] Act of June 30, 1936, ch. 881, 49 Stat. 2038.

- Requirement for specific authorizing legislation to use public funds to pay employer contributions for federal employee's health and life insurance benefits does not apply to use of federal grant funds to contribute to state group health and life insurance programs for state employees. 36 Comp. Gen. 221 (1956).

- Restrictions on retired pay not applicable to retired military officers working on grant-funded state project. 14 Comp. Gen. 916 (1935), *modified on other grounds*, 36 Comp. Gen. 84 (1956).

- Federal restrictions on dual compensation for federal employees are inapplicable to grantee employees. B-153417, Feb. 17, 1964.

The rule has been applied in a variety of other contexts as well. One example is the area of state and local taxes. Thus, federal immunity from payment of certain sales taxes does not apply to a state grantee since the grantee is not a federal agent. The grant funds lose their federal character and become state funds. Therefore, the state grantee may pay a state sales tax on purchases made with federal grant funds if the tax applies equally to purchases made from all nonfederal funds. 37 Comp. Gen. 85 (1957). See also B-177215, Nov. 30, 1972, applying the same reasoning for purchases made by a contractor who was funded by a federal grantee. Similarly, a state tax on the income of a person paid from federal grant funds involves no question of federal tax immunity. 14 Comp. Gen. 869 (1935).

The following is a sampling of other restrictions which have been found inapplicable to grantee expenditures:

- Adequacy of Appropriations Act (41 U.S.C. § 11) and prohibition on entering into contracts for construction or repair of public buildings, or other public improvements, in excess of amount specifically appropriated for that purpose (41 U.S.C. § 12). B-173589, Sept. 30, 1971.

- Prohibition in 31 U.S.C. § 1343 on purchasing aircraft without specific statutory authority. 43 Comp. Gen. 697 (1964) (permissible for grantee under National Science Foundation research grant). *See also* B-196690, Mar. 14, 1980 (purchase of motor vehicle). However, an agency may not acquire excess aircraft or passenger vehicles by transfer for use by its grantees. 55 Comp. Gen. 348 (1975).

- Prohibition in 31 U.S.C. § 1345 on payment of nonfederal person's travel and lodging expenses to attend a meeting. 55 Comp. Gen. 750 (1976).

- Requirement for specific authority in order to establish a revolving fund. (Federal agency would need specific authority in view of 31 U.S.C. § 3302(b)). 44 Comp. Gen. 87(1964).

Where assistance funds are provided to the District of Columbia under a program of assistance to the states which defines "state" as including the District of Columbia, statutory restrictions expressly applicable to the District of Columbia remain applicable with respect to the assistance funds even though they would not necessarily apply to the assistance funds in the hands of the other states. 34 Comp. Gen. 593 (1955); 17 Comp. Gen. 424 (1937); A-90515, Dec. 23, 1937.

When applying the general rule that grantee expenditures are not subject to the same restrictions as direct federal expenditures, it is important to keep in mind that grantees are, of course, obligated to spend grant funds for the purposes and objectives of the grant and consistent with any statutory or other conditions attached to the use of the grant funds. *See*, *e.g.*, B-303927, June 7, 2005; 42 Comp. Gen. 682 (1963); 2 Comp. Gen. 684 (1923). These conditions may include implied requirements, such as the implied requirement to adhere to "basic principles" of open and competitive bidding in the case of grantee contracts. 55 Comp. Gen. 390 (1975). They also include statutorily authorized requirements, as in the case of the Office of Personnel Management's authority to establish merit standards for grantees under 42 U.S.C. § 4728(b) (Intergovernmental Personnel Act of 1970). Statutory restrictions on lobbying with public funds may also apply to grantee expenditures.

Grant recipients, because they receive federal government assistance, must comply with several federal statutes that prohibit various types of discrimination. Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d) prohibits discrimination on the basis of race, color, or national origin under any program or activity receiving federal financial assistance. The Rehabilitation Act of 1973 (29 U.S.C. § 794) similarly prohibits discrimination against individuals with disabilities. The Age Discrimination Act of 1975 further extends prohibited discrimination (42 U.S.C. § 6102).

Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) prohibits sex discrimination in education programs or activities receiving federal financial assistance. Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2) prohibits employment discrimination by grantees on the basis of sex as well as race, color, religion, or national origin for all employers who

have 15 or more employees. In addition, several grant statutes contain their own anti-discrimination provisions and include sex discrimination. *E.g.*, 42 U.S.C. § 5309 (prohibiting discrimination in federally funded community development programs); 20 U.S.C. § 7231d(b)(2)(C) (magnet school grant applicants must provide assurances that they will not discriminate).

Statements in some of the cases to the effect that grant funds upon being paid over to the grantee are no longer federal funds should not be taken out of context. The fact that grant funds in the hands of a grantee are no longer viewed as federal funds for certain purposes does not mean that they lose their character as federal funds for all purposes. *See In re Universal Security & Protection Service, Inc.*, 223 B.R. 88, 92–93 (Bankr. E.D. La. 1998). It has been held that the government retains a "property interest" in grant funds until they are actually spent by the grantee for authorized purposes.[66] This property interest may take the form of an "equitable lien," stemming from the government's right to ensure that the funds are used only for authorized purposes, or a "reversionary interest" (funds that can no longer be used for grant purposes revert to the government). *In re Alpha Center, Inc.*, 165 B.R. 881, 884–85 (Bankr. S.D. Ill. 1994). By virtue of this property interest, the funds, and property purchased with those funds to the extent unrestricted title has not vested in the grantee, are not subject to judicial process without the government's consent. *E.g.*, *Henry v. First National Bank of Clarksdale*, 595 F.2d 291, 308–09 (5th Cir. 1979), *cert. denied*, 444 U.S. 1074 (1980).

Likewise, in *Department of Housing and Urban Development v. K. Capolino Construction Corp.*, No. 01 Civ. 390 (JGK) (S.D.N.Y., May 7, 2001), the court granted the agency's request for an injunction to prevent the use of federal low-income housing grant funds to satisfy a judgment in a defamation action against the grantee:

> "The Supreme Court held in *Buchanan v. Alexander*, 45 U.S. (4 How.) 20–21, (1846), that federal funds in the hands of a grantee remain the property of the federal government unless and until expended in accordance with the terms of the grant and are not subject to attachment or garnishment. That decision, despite its age, remains the law today. . . .

[66] See section G.1.a. of this chapter for further discussion of this point in the context of grant costs and accountability.

> Unless the federal government consents, sovereign immunity prevents federal funds from being subject to attachment or garnishment proceedings."

Slip op. at 4.

The concept is illustrated in two cases from the U.S. Court of Appeals for the Seventh Circuit. In *Palmiter v. Action, Inc.*, 733 F.2d 1244 (7th Cir. 1984), the court rejected the argument that grant funds lose their federal character when placed in the grantee's bank account, and held that federal grant funds in the hands of a grantee are not subject to garnishment to satisfy a debt of the grantee. The holding would presumably not apply where the grantee had actually spent its own money and the federal funds were paid over as reimbursement. *Id.* at 1249. The court considered a similar issue in the context of a bankruptcy petition filed by a grantee under Chapter 7 of the Bankruptcy Code. *In re Joliet-Will County Community Action Agency*, 847 F.2d 430 (7th Cir. 1988). The issue was whether grant funds in the hands of the grantee, as well as personal property purchased with grant money, were assets of the bankrupt and therefore subject to the control of the trustee in bankruptcy. Directing the trustee to abandon the assets, the court held that they remained the property of the federal government. In the course of reaching this result, the court noted that unpaid creditors of the bankrupt could, to the extent their claims were within the scope of the grant, be paid by the grantor agency out of the recovered funds. *Id.* at 433–35.

A case discussing both *Palmiter* and *Joliet-Will* and reaching a similar result is *In re Southwest Citizens' Organization for Poverty Elimination*, 91 B.R. 278 (Bankr. D.N.J. 1988). A grantee, which had purchased a number of motor vehicles with Head Start grant funds, filed a Chapter 11 bankruptcy petition. The Department of Health and Human Services sought return of the property, contending that the bankrupt's title was subject to the government's right to require transfer to another grantee under the program legislation and regulations. The trustee argued that the motor vehicles were property of the bankruptcy estate, and that the trustee's interest superseded any interest of the government. After a detailed review of precedent, the court directed the trustee to return the

vehicles to the federal grantor, concluding that the government's rights amounted to a reversionary interest.[67]

Another theory occasionally encountered but which appears to have received little in-depth discussion is the theory that a grantee holds grant funds, and property purchased with those funds, in the capacity of a trustee. For example, in *Joliet-Will*, 847 F.2d at 432, the court held that the grantee was essentially "a trustee, custodian, or other intermediary, who . . . is merely an agent for the disbursal of funds belonging to another," and that the grantee's "ownership" was nominal, like that of a trustee. The trust concept finds support in an early Supreme Court decision, *Stearns v. Minnesota*, 179 U.S. 223, 249 (1900), a land grant case in which the Court discussed the grant in trust terms.

However, this trust theory cannot create a federal interest where one does not logically exist. In one case, *Transit Express*, *Inc. v. Ettinger*, 246 F.3d 1018 (7th Cir. 2001), a firm that offered to provide drivers to a grantee sued the Federal Transit Administration because the grantee did not choose to contract with it to drive vans that were purchased with the grant funds. The federal grant had been used only to purchase the vans, not to fund the operations of the grantee. Thus, the court ruled that the presence of federal grant funds as a source to finance purchase of the vans under the federal program was completely irrelevant to the grantee's actions in obtaining drivers for the vans. Specifically, the court stated that "federal funds lurking in the background of this case cannot serve as an independent basis for establishing jurisdiction." *Id.* at 1026. As a result, the contractor's complaint was dismissed.

Another area in which grant funds in the hands of a grantee continue to be treated as federal funds is the application of federal criminal statutes dealing with theft of money or property belonging to the United States. There are numerous cases in which the courts have applied various provisions of the Criminal Code, such as 18 U.S.C. § 641, to the theft or

[67] In a bankruptcy case that considered several of the personal property cases discussed above, the court held that with regard to real property, a trustee enjoys the rights of a *bona fide* purchaser and is, thus, entitled to notice of another's claim to the real property. *In re Premier Airways, Inc. v. United States Department of Transportation*, 303 B.R. 295 (Bankr. W.D.N.Y. 2003). Therefore, the court determined that a trustee's interest in real property purchased with federal grant funds was superior to that of the federal grantor agency where the grantor agency failed to perfect its interest in the real property as a matter of record prior to the grantee's commencement of the bankruptcy proceeding.

embezzlement of grant funds or grant property in the hands of grantees. Examples involving a variety of grant programs are *Hayle v. United States*, 815 F.2d 879 (2nd Cir. 1987) (violation of 18 U.S.C. § 641); *United States v. Harris*, 729 F.2d 441 (7th Cir. 1984) (violation of 18 U.S.C. § 657); *United States v. Hamilton*, 726 F.2d 317 (7th Cir. 1984) (violation of 18 U.S.C. § 665(a)); *United States v. Montoya*, 716 F.2d 1340 (10th Cir. 1983) (violation of 18 U.S.C. § 287); *United States v. Smith*, 596 F.2d 662 (5th Cir. 1979) (violation of 18 U.S.C. § 641); *United States v. Rowen*, 594 F.2d 98 (5th Cir.), *cert. denied*, 444 U.S. 834 (1979) (violation of 18 U.S.C. § 641).

In each of these cases, the court rejected the argument that the statute did not apply because the funds or property were no longer federal funds or property. It makes no difference whether the funds are paid to the grantee in advance or by reimbursement (*Montoya*, 716 F.2d at 1344), or that the funds may have been commingled with nonfederal funds (*Hayle*, 815 F.2d at 882). The holdings are based on the continuing responsibility of the federal government to oversee the use of the funds. *E.g.*, *Hayle*, 815 F.2d at 882; *Hamilton*, 726 F.2d at 321. The result would presumably be different in the case of grant funds paid over outright with no continuing federal oversight or supervision. *E.g.*, *Smith*, 596 F.2d at 664.

Lastly, the presence of federal grant funds had an unusual impact on an age discrimination case brought against a federally-funded private organization. The plaintiff in *Neukirchen v. Wood County Head Start, Inc.*, 53 F.3d 809 (7th Cir. 1995), had obtained a money judgment for age discrimination against a local Head Start organization. She attempted to collect the judgment by executing against personal property the organization owned, including items of property purchased with grants funds that had a unit acquisition cost of less than $1,000. The then applicable regulations provided that once such property was no longer needed for grant purposes, it could be retained or disposed of by the grantee with no further obligation to the federal government.[68] The plaintiff argued that the federal government retained no interest in property subject to this provision. The argument proved unavailing. Citing *Joliet-Will*, *supra*, the court stated:

[68] *See Neukirchen*, 53 F.3d at 812. As the court noted, this rule is no longer in effect and has been replaced by more stringent accountability requirements. *Id.* at 813, n. 4. For the current common rules on this subject, see, for example, 7 C.F.R. §§ 3019.32–3019.37.

> "It is clear in this circuit that property purchased with federal grant funds constitutes federal property. . . . It is also axiomatic that the doctrine of sovereign immunity prevents a judgment creditor from attaching federal property, absent consent by the United States."

*Neukirchen*, 53 F.3d at 811–12. The court was not persuaded that the rule for property costing less than $1,000 created an exception:

> "Given the overwhelming control that the Secretary [of Health and Human Services] exercises over property purchased with federal funds and the corresponding lack of discretion on Wood County's part, we do not believe that the absence of specific regulations requiring Wood County to reconvey to the United States property costing less than $1,000 commands a different result. We, therefore, conclude that *Joliet-Will's* rationale requires that property purchased with federal grant funds, including property costing less than $1000, constitutes federal property."

*Id.* at 813. The result would be different, the court noted, for property that was in fact no longer needed; however, that was not true of the property at issue. *Id.* at n.4. Thus, even though the grantee had violated federal law in discriminating against the plaintiff, the majority of the grantee's assets were immune from execution since they had been purchased with federal funds, a result that the court described as "paradoxical, indeed." *Id.* at 814.

## E. Grant Funding

Trillions of dollars in cash move into and out of the United States Treasury every year, and the federal government has a responsibility to the taxpayer to efficiently manage this cash flow in terms of collection, internal controls, investment, and disbursement. In the disbursement part of this process, good cash management practices include not paying the bills too late or too early. Timely disbursement of funds to resolve current liabilities as they come due yields positive results for the federal government both by avoiding late payment penalties and maximizing the time during which the cash reserves earn a return for the government through short-term investments.

The need for sound cash management in the federal government plays an important role in the funding of grants and other assistance awards.

Although grants are not subject to the general prohibition against advance payment of public funds, they are subject to laws and regulations intended to prevent grantees from earning interest on cash reserves at the expense of the federal government. The general rule is that interest earned on grant funds pending their use for program purposes belongs to the federal government. Special rules apply to state governmental grantees under the Intergovernmental Cooperation Act[69] and the Cash Management Improvement Act,[70] discussed in section E.2.b of this chapter. Once the grant funds have been used for program purposes, however, cash generated by the grant funds is generally treated as program income that belongs to the grantee.

In addition to cash management concerns, grant funding also involves consideration of whether the federal government should bear the entire cost of program activities or require the grantee to shoulder part of the financial burden. If the grant program does provide for cost sharing, this is usually accomplished through either a local/matching share provision or a maintenance of effort provision.

## 1. Advances of Grant/Assistance Funds

The framework for managing cash flow in the federal government generally prohibits federal agencies from paying for goods or services before receiving them. However, the general statutory prohibition against the advance payment of public funds, 31 U.S.C. § 3324,[71] does not apply to grants. This is because the primary purpose of assistance awards is to assist authorized recipients and not to obtain goods or services for the government. Thus, the policy behind the advance payment prohibition has much less force in the case of assistance awards than in the case of procurement contracts. Accordingly, the Comptroller General has held that 31 U.S.C. § 3324 does not preclude advance funding in authorized grant relationships; unless restricted by the program legislation or the applicable appropriation, the authority to make grants is sufficient to satisfy the requirements of 31 U.S.C. § 3324. 60 Comp. Gen. 208 (1981); 59 Comp. Gen. 424 (1980); 41 Comp. Gen. 394 (1961). As stated in 60 Comp. Gen. at 209, "[t]he policy of payment upon receipt of goods or services is simply

[69] Pub. L. No. 90-577, 82 Stat. 1098 (Oct. 16, 1968).

[70] Pub. L. No. 101-453, 104 Stat. 1058 (Oct. 24, 1990).

[71] For an in-depth discussion of advance payments, see Chapter 5, section C.

inconsistent with assistance relationships where the Government does not receive anything in the usual sense."

This does not mean that there can never be an advance payment problem in a grant case. Because the authority to advance funds must, at least in a general sense, be founded on the program legislation, advance payments would probably not be authorized under an assistance program that provided for payment by reimbursement. Also, the Comptroller General found advance payment violations in two grant-related cases from the 1970s involving the College Work-Study Program: 56 Comp. Gen. 567 (1977) and B-159715, Aug. 18, 1972. Under the College Work-Study Program as it existed in the 1970s when these two cases were decided, a student was placed with an employer, which might have been a federal agency. The student's salary was paid from two sources: 80 percent was paid by the college under a Department of Education grant, and the remaining 20 percent was paid by the employer. In the 1972 case, an employing federal agency proposed to advance pay the college's 80 percent share of the student's salary and then seek reimbursement of this amount at a later date from the college. The Comptroller General found this advance payment arrangement to violate 31 U.S.C. § 3324. Five years later, in 56 Comp. Gen. 567 the Comptroller General found a violation of the same statute when the agency/employer proposed to advance its 20 percent share to the college, which would in turn place the funds in an escrow account for payment to the student after the work was performed.

## 2. Cash Management of Grants

### a. General Rule on Interest on Grant Advances

One problem with the advance funding of assistance awards is that the recipient may draw down funds before the funds are actually needed. This is a matter of concern for several reasons. For one thing, advances under an assistance program are intended to accomplish the program purposes and not to profit the recipient other than in the manner and to the extent specified in the program. But there is another reason. When money is drawn from the Treasury before it is needed, or in excess of current needs, the federal government loses the use of the money. The principle was expressed as follows:

> "When Federal receipts are insufficient to meet expenditures, the difference is obtained through borrowing; when receipts exceed expenditures, outstanding debt can be reduced. Thus, advancing funds to organizations outside the Government before they are needed either unnecessarily increases borrowings or decreases the opportunity to reduce the debt level and thereby increases interest costs to the Federal Government."

B-146285, Oct. 2, 1973, at 3. Thus, premature drawdown not only profits the grant recipient, but does so at the expense of the rest of the taxpayers.

To reduce premature drawdowns and thus promote efficient cash management in the federal government in its grant funding, yet not discourage advance funding of grants in appropriate circumstances, a default rule has developed. The Comptroller General has consistently held that, except as otherwise provided by law, interest earned by grantees on funds advanced by the United States under an assistance agreement pending their application to grant purposes belongs to the United States rather than to the grantee. Such interest is to be accounted for as funds of the United States and must be deposited in the Treasury as miscellaneous receipts under 31 U.S.C. § 3302(b). For example, in B-251863, Aug. 27, 1993, the Comptroller General applied this rationale in refusing to approve the proposal of the Fish and Wildlife Service to provide $584,930 to a nonprofit grantee over a 5-year period by advancing the grantee $500,000 and allowing the grantee to earn $84,930 in interest during that time to retain and use for grant purposes. *See also* 71 Comp. Gen. 387 (1992); 69 Comp. Gen. 660 (1990); 42 Comp. Gen. 289 (1962); 40 Comp. Gen. 81 (1960); B-203681, Sept. 27, 1982; B-192459, July 1, 1980; B-149441, Apr. 16, 1976; B-173240, Aug. 30, 1973.[72]

If the grantee is unable to document the actual amount of interest earned on the grant advances, the general rule is that the grantor agency should use the "Treasury tax and loan account" rate prescribed by 31 U.S.C. § 3717 for debts owed to the United States. 69 Comp. Gen. 660 (1990). If,

[72] Limitations on the use of interest earned on advance funds are also contained in the common rules. *See*, *e.g.*, 7 C.F.R. § 3016.21(i)(2005) (state and local government grantees); 7 C.F.R. § 3019.22(*l*) (other grantees). For example, section 3016.21(i) requires nonexempt grantees and subgrantees to "promptly, but at least quarterly, remit interest earned on advances to the Federal agency." However, it does permit them to keep up to $100 per year in interest to pay administrative expenses.

however, the grantee is a state, then interest will be determined in accordance with 31 U.S.C. § 6503(c)(1), discussed hereafter.

Except for states, discussed separately in the section immediately following, the general rule that the United States owns interest earned on grant advances applies whether the grantee is a public or private entity. The rationale for the rule is that unless expressly provided otherwise, funds are paid out to a grantee to accomplish the grant purposes, not for the grantee to invest the money and earn interest at the expense of the Treasury. Thus, grant funds are to be applied promptly to the grant purposes. 1 Comp. Gen. 652 (1922).

In 40 Comp. Gen. 81 (1960), the Comptroller General held that interest on foreign currencies advanced by the Department of Agriculture under cooperative agreements, earned between the time the funds were advanced and the time they were used, could not be retained for program purposes but had to be returned to the Treasury for deposit in the General Fund as miscellaneous receipts. In 42 Comp. Gen. 289 (1962), the rule was applied with respect to State Department grants to American-sponsored schools and libraries overseas. The Comptroller General stated, "[t]here can be no doubt that only the Congress is legally empowered to give away the property or money of the United States." *Id.* at 293. The decision further concluded that the enabling legislation did not provide sufficient authority to use the grant funds to establish a permanent interest-bearing endowment fund. In B-149441, Feb. 17, 1987, the Comptroller General found that since the National Endowment for the Humanities had no authority in its program legislation to permit its grantees to establish an endowment fund with grant moneys, the Endowment could not authorize its grantees to accomplish the same purpose with matching funds.

Citing both 42 Comp. Gen. 289 and B-149441, discussed immediately above, the Comptroller General held in 70 Comp. Gen. 413 (1991) that legislative authority would be required for a "debt for equity swaps" proposal whereby the United States Information Agency (USIA) would purchase discounted foreign debt from commercial lenders and transfer the notes to grantees in the foreign country, who would in turn exchange the notes for local currency or local currency denominated bonds and use the income thus generated for program activities. However, since USIA has statutory authority to accept conditional gifts, the Comptroller General held that USIA could accept a donation of foreign debt and use the principal and income for authorized activities in accordance with the conditions specified.

The rule does not apply, however, if earning interest is consistent with the grant purposes. Thus, in B-230735, July 20, 1988, where use of grant funds to establish an endowment trust was authorized by law, the Comptroller General concluded that the grantee could use income from the endowment as nonfederal matching funds on other grants, as long as such use was consistent with the terms and conditions of the grant agreement.

In B-192459, July 1, 1980, a grantee transferred grant funds to a trustee under a complex construction financing arrangement. The trustee was independent, that is, not an agent of the grantee, and the grantee could not get the funds back upon demand. The Comptroller General determined that the transfer to the trustee was in the nature of a disbursement for grant purposes. Therefore, interest earned by the trustee after the transfer could be treated as grant income and retained under the terms of the grant agreement. However, interest on grant funds placed in bank accounts and certificates of deposit by the grantee prior to transfer to the trustee had to be returned to the Treasury. The grantor agency lacked the authority to permit the grantee to retain interest earned on grant funds prior to their application to grant purposes.

In 64 Comp. Gen. 103 (1984), the Agency for International Development advanced grant funds to the government of Egypt, which in turn advanced these funds to certain local and provincial elements of that government. Since the purpose of the grant was to assist Egypt in its efforts to decentralize certain governmental functions by developing experience at the local level in managing and financing selected projects, the Comptroller General concluded that the advances of funds by the government of Egypt to the local and provincial entities could legitimately be viewed as disbursements for grant purposes. Thus, the subgrantees could retain interest earned on those advances. However, in another 1984 case also involving the Agency for International Development, the Comptroller General found that subgrantees could not retain interest on funds advanced to them by the grant recipient under a cooperative agreement whose purpose was to help develop certain technologies because the grantor agency had advanced these funds to the grantee before the grantee had a legitimate program need for the funds. 64 Comp. Gen. 96 (1984). Both decisions followed the approach set forth in B-192459, July 1, 1980, summarized above.

In evaluating the disposition of interest income, an important determinant is whether the interest was earned before or after the grant funds were applied to authorized grant purposes. The key word here is “authorized.”

For example, under the Community Development Block Grant program, grantee cities and counties may use the funds to make loans for certain community projects. Grantees may retain interest earned on those loans for grant-related uses as a type of "program income," that is, grant-related income, which is discussed in more detail in section E.4 of this chapter. However, if a loan is later found to be ineligible under the program, the funds were never used for an authorized grant purpose, and interest earned by the grantee must be paid over to the United States for deposit as miscellaneous receipts. 71 Comp. Gen. 387 (1992).

Congress can, of course, legislatively make exceptions to the rule by providing assistance in the form of an unconditional gift or by other appropriate statutory provisions. *See*, *e.g.*, 44 Comp. Gen. 179 (1964) (provision in appropriation act exempting educational institutions from liability for interest under certain Public Health Service Act grants); B-175155, June 11, 1975 (interest rule not applicable with respect to "grants" to Amtrak).[73]

### b. State Governments and Interest on Grant Advances

(1) Intergovernmental Cooperation Act

Prior to 1968, the prohibition on retention of interest income applied to states as well as to other grantees. 20 Comp. Gen. 610 (1941); 3 Comp. Gen. 956 (1924); 26 Comp. Dec. 505 (1919); 24 Comp. Dec. 403 (1918); A-46031, Jan. 16, 1933. There was no reason to draw a distinction. This, of course, was premised on the absence of any statutory guidance.

The treatment of interest on grant advances to state governments is now governed by the Intergovernmental Cooperation Act of 1968, Pub. L. No. 90-577, 82 Stat. 1098 (Oct. 16, 1968), codified at 31 U.S.C. §§ 6501–6508. The law evolved in two stages. The original Intergovernmental Cooperation Act created what was to be, for 22 years, the major exception to the rule that interest on grant advances belongs to the United States. The 1968 statute first codified the requirement for federal grantor agencies

[73] A conceptually related case is 71 Comp. Gen. 310 (1992), which upheld a Small Business Administration regulation providing for a reasonable profit to grantees under the Small Business Innovation Development Act.

to schedule the transfer of grant funds so as to minimize the time elapsing between transfer and grantee disbursement.[74] The statute then provided: "States shall not be held accountable for interest earned on grant-in-aid funds, pending their disbursement for program purposes." Pub. L. No. 90-577, § 203.

The theory behind the Intergovernmental Cooperation Act was that federal grantor agencies could control the release of grant funds and thereby preclude situations from arising in which state grantees would be in a position to earn excessive interest on grant advances. If the timing of the release of funds was properly managed, interest the state might earn would be too small to be a matter of concern. The statutory exception was not intended to create a windfall for state grantees. *See Pennsylvania Office of Budget v. Department of Health & Human Services*, 996 F.2d 1505 (3rd Cir.), *cert. denied*, 510 U.S. 1010 (1993).[75]

The original statutory exception for interest on grant advances did not prove satisfactory, however. Grantor agencies complained of premature drawdown of grant advances while grantee states complained of slow federal payment in reimbursement situations. Congress responded by amending 31 U.S.C. § 6503 in section 5 of the Cash Management Improvement Act of 1990, Pub. L. No. 101-453, 104 Stat. 1058, 1059 (Oct. 24, 1990). The 1990 amendment was intended to address both the federal and state concerns. Thus, the House report on the legislation, H.R. Rep. No. 101-696, at 3–4 (1990), stated:

> "Under current law, the States need not account to the Federal Government for interest earned on Federal funds disbursed to the States prior to payment to program beneficiaries. However, when the Federal Government complains of undue profits made by the States as a result of early drawdown of Federal funds, the States are quick to point out numerous instances where they lose interest

[74] In B-146285, Apr. 10, 1978, the Comptroller General concluded that the Intergovernmental Cooperation Act did not repeal by implication a statute which prescribed both the timing schedule and the amount of payments under a particular assistance program, but rather was geared primarily to programs without statutory payment schedules.

[75] The opinion in *Pennsylvania Office of Budget* provides a useful discussion of the background, purposes, and legislative history of the interest exception in the original Intergovernmental Cooperation Act. *See* 996 F.2d at 1510–12.

> opportunities because the Federal Government is slow to reimburse them for the monies the States advance to fund Federal programs. This bill seeks to provide a fair and equitable resolution to these differences between the Federal Government and the States."

The Cash Management Improvement Act retained the general requirement of 31 U.S.C. § 6503 to minimize the time elapsing between transfer of funds from the Treasury to the grantee and grantee disbursement of those funds for program purposes. It also provided sanctions to enforce this requirement. These provisions are discussed further in section E.2.c of this chapter. With respect to interest, the act amended 31 U.S.C. § 6503(c) to provide that for *advance payment programs*, unless inconsistent with program purposes the state must pay interest to the United States from the time the funds are transferred to the state's account to the time they are paid out by the state for program purposes. Interest payments are to be deposited in the Treasury as miscellaneous receipts. For *reimbursement programs*, the United States must pay interest to the state from the time of payout by the state to the time the federal funds are deposited in the state's bank account. 31 U.S.C. § 6503(d). Interest in both directions (*i.e.*, from states to the federal government under 31 U.S.C. § 6503(c) and from the federal government to states under 31 U.S.C. § 6503(d)) is to be paid annually, at a rate based on the yield of 13-week Treasury bills, using offset to the extent provided in Treasury regulations. *Id.* §§ 6503(c), (d), (i).[76]

(2) Decisions under the Intergovernmental Cooperation Act

(i) State entities covered

The original Intergovernmental Cooperation Act applied only to states and their agencies or instrumentalities; it did not extend to "political subdivisions" of states, such as cities, towns, counties, or special districts created by state law. Pub. L. No. 90-577, § 102, 82 Stat. 1098, 1099 (Oct. 16, 1968), *codified at* 31 U.S.C. §§ 6501–6508. The Cash Management Improvement Act, Pub. L. No. 101-453, 104 Stat. 1058 (Oct. 24, 1990), expanded the relevant definition to apply to "an agency, instrumentality, or fiscal agent" of a state, including territories and the District of Columbia,

[76] The interest provisions of the Cash Management Improvement Act took effect during the second half of 1993. Pub. L. No. 101-453, § 5(e), as amended by the Cash Management Improvement Act of 1992, Pub. L. No. 102-589, § 2, 106 Stat. 5133 (Nov. 10, 1992).

but the definition retains the exclusion for "a local government of a State," such as a city, county, or town. 31 U.S.C. § 6501(9). Thus, GAO decisions under the original Intergovernmental Cooperation Act should remain relevant in determining which entities are "states" in this context. What constitutes a covered state entity under the act is further refined in implementing Treasury Department regulations at 31 C.F.R. § 205.2 (2005).

In 56 Comp. Gen. 353 (1977), the Comptroller General addressed how to determine which state entities were covered by the Intergovernmental Cooperation Act, concluding as follows:

> "[A] Federal grantor agency is not required by the Intergovernmental Cooperation Act of 1968 and its legislative history to accept the Bureau of the Census' classification of an entity . . . in determining whether that entity is a State agency or instrumentality or a political subdivision of the State. It is bound by the classification of the entity in State law. Only in the absence of a clear indication of the status of the entity in State law may it make its own determination based on reasonable standards, including resort to the Bureau of the Census' classifications."

*Id.* at 357. If the classification under state law is not clear and unambiguous, the grantee may be required to obtain a legal opinion from the state Attorney General in order to assist in making the determination. *Id.*

In a more recent case dealing with the current statutory definition, the Federal Circuit found that the Massachusetts Bay Transportation Authority (MBTA) was an instrumentality of the Commonwealth of Massachusetts and was therefore entitled under 31 U.S.C. § 6503(d) to interest on reimbursement payments from the federal government. *Massachusetts Bay Transportation Authority v. United States*, 129 F.3d 1226, 1236–37 (Fed. Cir. 1997). In arriving at this conclusion, the court noted that the MBTA was located within the state's Executive Office of Transportation and Construction and that the members of MBTA's board of directors were appointed and removed by the state's governor. The court also found it significant that the MBTA had been defined as a state instrumentality in a Comptroller General decision (56 Comp. Gen. 353 (1977)) and in an opinion of the Massachusetts Attorney General.

(ii) Grants covered by the former interest exemption

The exception to the prohibition against retention of interest income by state grantees in the original Intergovernmental Cooperation Act was held to apply to pass-through situations where states are the primary recipients of grant funds, which are then passed on to subgrantees. In B-171019, Oct. 16, 1973, the Comptroller General concluded that the exception applied to political subdivisions, which were subgrantees of states. The Justice Department reached the same conclusion in 6 Op. Off. Legal Counsel 127 (1982). Subsequent decisions applied the exception to nongovernmental subgrantees as well, recognizing that there was no basis to distinguish between governmental and nongovernmental subgrantees. 59 Comp. Gen. 218 (1980), *aff'd*, B-196794, Feb. 24, 1981.

Other cases under the version of the Intergovernmental Cooperation Act that predated the Cash Management Improvement Act may remain relevant as well. For example, the statute does not necessarily apply to funds in contexts other than those specified. Thus, in 62 Comp. Gen. 701 (1983), the Comptroller General concluded that a subgrantee under a Labor Department grant to a state was not entitled to retain interest it had earned by investing funds received from the Internal Revenue Service as a refund of Federal Insurance Contributions Act (social security) taxes. In *North Carolina v. Heckler*, 584 F. Supp. 179 (E.D.N.C. 1984), the court found the statute inapplicable in a situation in which the state had wrongfully obtained federal funds and earned interest on them pending repayment to the government.

In two recent judicial decisions, courts agreed with the federal government that the act's exemption did not apply because the transactions at issue did not constitute grants covered by the act. In *California State University v. Riley*, 74 F.3d 960, 964–65 (9th Cir. 1996), the Ninth Circuit held that, contrary to the state's contention, "Pell grants" were not "grants" under the act's definition. Paraphrasing the language of 31 U.S.C. § 6501(4), which remains the same today, the court stated:

> "The 'grants' that are the subject of the ICA [Intergovernmental Cooperation Act] are grants to *states*, local governments, or beneficiaries *under a state plan or program administered by the state*."

*Riley*, 74 F.3d at 964 (emphasis in original). Under the Pell grant program, the state university did not administer the grants but acted merely as a

conduit for disbursing the Pell grants, which were provided directly from the federal government to students meeting the eligibility requirements. Similarly, the court in *New York Department of Social Services v. Shalala*, 876 F. Supp. 29 (S.D.N.Y. 1994), *aff'd*, 50 F.3d 179 (2nd Cir. 1995), determined that a state agency could not retain interest earned on payments received from the federal government as reimbursement for administering federal Social Security disability programs. The court held that the payments did not constitute a "grant" for purposes of the Intergovernmental Cooperation Act since the statute specifically excludes from its definition of a grant "a payment to a State or local government as complete reimbursement for costs incurred in paying benefits or providing services to persons entitled to them under a law of the United States." *Id.* at 33. *See* 31 U.S.C. § 6501(4)(C)(vii).

### c. Other Cash Management Requirements

Our discussion up to now has focused exclusively on the treatment of interest earned on federal grant funds. However, there are other important cash management considerations and additional relevant requirements in the Cash Management Improvement Act, Pub. L. No. 101-453, 104 Stat. 1058 (Oct. 24, 1990), and its implementing regulations.[77] Some of these are highlighted below.

Section 4 of the act added a new section 3335 to title 31, United States Code, which imposes a general requirement for federal agencies to provide for the "timely disbursement" of federal funds to eligible recipients in accordance with regulations prescribed by the Secretary of the Treasury. 31 U.S.C. § 3335(a).[78] If an agency fails to comply with this requirement, the Secretary may collect from the agency a charge in an amount the Secretary determines to be the cost to the general fund of the Treasury caused by the noncompliance. 31 U.S.C. § 3335(b). The charge is to be deposited into the Treasury as miscellaneous receipts and is to be derived, to the maximum extent possible, from funds available to the offending agency for administrative operations rather than from program accounts. *Id.* §§ 3335(c) and (d). The Secretary's authority to collect charges is permissive rather than mandatory and, according to the legislative history, is to be "restricted to cases of egregious or repeated noncompliance, and

[77] For a summary of the Cash Management Improvement Act and a review of its initial years in operation, see GAO, *Financial Management: Implementation of the Cash Management Improvement Act*, GAO/AIMD-96-4 (Washington, D.C.: Jan. 8, 1996).

[78] Disbursement is to be accomplished through cash, checks, electronic funds transfer, or any other means identified by the Treasury Secretary.

[not to] be used in a routine manner to finance interest costs incurred by the Federal Government." H.R. Rep. No. 101-696, at 7 (1990).

Section 5 of the Cash Management Improvement Act also amended 31 U.S.C. § 6503 to provide more specific requirements that apply to assistance programs administered by the states. Section 6503, as so amended, directs both federal grantor agencies and state grantees, consistent with Treasury regulations, to "minimize the time elapsing between transfer of funds from the United States Treasury and the issuance or redemption of checks, warrants, or payments by other means" by the state grantee for program purposes. 31 U.S.C. § 6503(a). Furthermore, it requires the Secretary of the Treasury to enter into an agreement with each state receiving grant funds that prescribes fund transfer methods and procedures, as chosen by the state and approved by the Secretary. 31 U.S.C. § 6503(b). If an agreement cannot be reached with a particular state, the Secretary is authorized to establish default procedures for that state by regulation. 31 U.S.C. § 6503(b)(3).

The Treasury Department's regulations implementing the Cash Management Improvement Act are codified at 31 C.F.R. parts 205 and 206 (2005). Part 205 contains those provisions most relevant to assistance programs. *See*, *e.g.*, 31 C.F.R. §§ 205.8 (default procedures in the absence of a Treasury-state agreement); 205.11 and 205.33 (requirements for fund transfers and drawdowns); 205.19 (calculation of interest); 205.34 (federal oversight and compliance responsibilities).

The crux of the government's policy related to timeliness, as stated in 31 C.F.R. §§ 205.11 and 205.33, is that federal agencies must limit a funds transfer to a state to the minimum amounts needed by the state and must time the disbursement to be in accord with the actual, immediate cash requirements of the State in carrying out a federal assistance program. Similarly, a state must minimize the time between the drawdown of federal funds from the federal government and their disbursement for federal program purposes. In B-244617, Dec. 24, 1991 (nondecision letter), GAO concurred with a determination by the Social Security Administration that a period of 15 months between a state's drawdown and disbursement of federal funds for state employee retirement contributions did not meet the latter requirement.

Although the above discussion focuses on state grantees, the same cash management concerns apply, of course, with respect to other recipients of federal assistance. Thus, similar requirements for other grantees can be

found in Office of Management and Budget circulars and agency regulations. See, for example, the cash management provisions of the Department of Agriculture's common rules applicable to local government grantees as well as states (7 C.F.R. § 3016.20) and those applicable to institutions of higher education and nonprofit organizations (7 C.F.R. §§ 3019.21 and 22).

The authority of a state to require its own grantees to account to it for funds it makes available to them is generally a matter within the discretion of the state. *See* B-196794, Jan. 28, 1983 (nondecision letter) (observing that each state "has the primary responsibility for employing whatever form of organization and management procedures it feels is necessary to assure proper and efficient administration of the funds advanced"). However, the common rules include some minimal internal control and accountability standards for state grantees in relation to their subgrantees. For example, the Department of Agriculture common rule in 7 C.F.R. § 3016.20(b)(7) provides, in part, with respect to cash management:

> "Grantees must establish reasonable procedures to ensure the receipt of reports on subgrantees' cash balances and cash disbursements in sufficient time to enable them to prepare complete and accurate cash transactions reports to the awarding agency. When advances are made by letter-of-credit or electronic transfer of funds methods, the grantee must make drawdowns as close as possible to the time of making disbursements. Grantees must monitor cash drawdowns by their subgrantees to assure that they conform substantially to the same standards of timing and amount as apply to advances to the grantees."

## 3. Program Income

Once grant funds have been applied to their grant purposes, they still can generate income, directly or indirectly, in various ways. This, as distinguished from interest on grant advances, is called "program income." Program income is defined broadly under the common rules as "gross income received by the grantee or subgrantee directly generated by a grant supported activity, or earned only as a result of the grant agreement during the grant period." *See*, *e.g.*, 7 C.F.R. § 3016.25(b) (2005). Program income may include such things as income from the sale of commodities, fees for services performed, and usage or rental fees. *See*, *e.g.*, 7 C.F.R. § 3016.25(a). Grant-generated income may also include investment income, although this will be uncommon. *See* B-192459, July 1, 1980.

Although included in the broad common rule definition of program income, income from the sale of real property receives special treatment and is governed instead by the common rule on real property. *See*, *e.g.*, 7 C.F.R. §§ 3016.25(f), 3016.31, 3019.24(g). This difference was important in B-290744, Sept. 13, 2002, in which the Comptroller General found that the Transportation Equity Act for the 21st Century[79] did not alter the common rule related to program income and the proceeds of the sale of real property that the grantee no longer needs for the originally authorized purpose. The decision thus concluded that the federal government had retained its percentage interest in the proceeds Massachusetts had earned from the sale of excess property acquired with Federal Highway Trust funds. The Comptroller General determined that the 1998 statute did not remove the federal character of the federal interest in the real property that was sold.

In contrast to income earned on grant advances, program income (other than proceeds from real property sales) does not automatically acquire a federal character and is not required to be deposited in the Treasury as miscellaneous receipts. It may, unless the grant provides otherwise, be retained by the grantee for grant-related use. 44 Comp. Gen. 87 (1964); 41 Comp. Gen. 653 (1962); B-192459, July 1, 1980; B-191420, Aug. 24, 1978. In 44 Comp. Gen. 87, the Comptroller General concluded that a grantee could establish a revolving fund with grant income in the absence of a contrary provision in the grant agreement. However, the initial amount of a revolving fund established from either the principal of a grant or the income generated under the grant, when returned to the grantor agency upon completion of the grant, may not be considered a return of grant funds for further use by the grantor but must be deposited in the Treasury as miscellaneous receipts. B-154996, Nov. 5, 1969.

Under the common rules, there are three generally recognized methods for the treatment of program income:

- *Deduction*. Deduct program income from total allowable costs to determine net costs on which grantor and grantee shares will be based. This approach results in savings to the federal government because the income is used to reduce contributions rather than to increase program size.

[79] Pub. L. No. 105-178, § 1303, 112 Stat. 107, 227 (June 9, 1998).

- *Addition.* Add income to the funds committed to the project, to be used for program purposes. This approach increases program size.

- *Cost-sharing or matching.* Use income to finance any applicable nonfederal matching requirements. Under this approach, the federal contribution and program size remain the same.

*See*, *e.g.*, 7 C.F.R. §§ 3016.25(g), 3019.24(b).

Although the common rules provide for three alternative treatments of program income, the deduction method is the default rule with the methods or a combination of them being used only if specified by the applicable federal agency regulations or grant agreement. *See*, *e.g.*, 7 C.F.R. § 3016.25(g). The rule further provides:

> "In specifying alternatives, the Federal agency may distinguish between income earned by the grantee and income earned by subgrantees and between the sources, kinds, or amounts of income. When Federal agencies authorize the alternatives in paragraphs (g)(2) and (3) of this section, program income in excess of any limits stipulated shall also be deducted from outlays."

*Id.*

The common rules provide that the deduction method is the default rule for program income earned by state and local government grantees as described above. The common rules likewise make deduction the default in the treatment of program income for most other grantees, the exception being research grants for which addition is the default. *See*, *e.g.*, 7 C.F.R. §§ 3019.24(b)–(d); 2 C.F.R. §§ 215.24(b)–(d). An illustration of the application of the deduction method can be found in *Pennsylvania Department of Public Services v. Health & Human Services*, 80 F.3d 796 (3rd Cir. 1996), which involved revenue the state earned from a fee charged for filing a child support case in the state. The court held that the fee revenue was program income, which the state had to deduct from the total allowable program costs in order to determine the net costs on which the federal and state shares were to be based.

Some types of program income are subject to special rules:

- Proceeds from the sale of real and personal property provided by the federal government or purchased in whole or in part with federal funds. Special rules are set forth in the common rules. *See*, *e.g.*, 7 C.F.R. §§ 3016.25(f), 3016.31, 3016.32, 3019.24(g), 3019.32, 3019.34. *See also* B-290744, Sept. 13, 2002.

- Royalties received as a result of copyrights or patents produced under a grant. A special rule states that this income may be treated as other program income if specified in applicable agency regulations or the grant agreement. *See* 7 C.F.R. §§ 3016.25(e), 3019.24(h). *See also* B-186284, June 23, 1977; GAO, *Administration of the Science Education Project "Man: A Course of Study" (MACOS)*, MWD-76-26 (Washington, D.C.: Oct. 14, 1975).

## 4. Cost-Sharing

Federal grant funds constitute a significant portion of the total expenditures of state and local governments. In fiscal year 2004, federal grants made up 25 percent of the total expenditures of state and local governments. *Analytical Perspectives*, *Budget of the United States Government for Fiscal Year 2006* (Feb. 7, 2005), at 131. When the federal government chooses to provide financial assistance to some activity, it may also choose to fund the entire cost, but it is not required to do so. *City of New York v. Richardson*, 473 F.2d 923, 928 (2nd Cir.), *cert. denied sub nom.*, 412 U.S. 950 (1973). "[T]he judgment whether to [provide assistance], and to what degree, rests with [Congress]." *Id.* Thus, a program statute may provide for full funding, or it may provide for "cost-sharing," that is, financing by a mix of federal and nonfederal funds. Reasons for cost-sharing range from budgetary considerations to a desire to stimulate increased activity on the part of the recipient. The two primary cost-sharing devices are "matching share" provisions and "maintenance of effort" provisions. For a detailed analysis and critique of both devices, see GAO, *Federal Grants: Design Improvements Could Help Federal Resources Go Further*, GAO/AIMD-97-7 (Washington, D.C.: Dec. 18, 1996). *See also* GAO, *Block Grants: Issues in Designing Accountability Provisions*, GAO/AIMD-95-226 (Washington, D.C.: Sept. 1, 1995).

## a. Local or Matching Share

(1) General principles

A matching share provision is one under which the grantee is required to contribute a portion of the total project cost. The "match" may be 50-50, or any other mix specified in the governing legislation. A matching share provision typically prescribes the percentages of required federal and nonfederal shares. However, the legislation need not provide explicitly for a nonfederal share. A statute authorizing assistance not in excess of a specified percentage of project costs will normally be interpreted as requiring a local share of nonfederal funds to make up the difference. (The rest of the money has to come from someplace.)

As discussed in more detail in section E.5.a of this chapter, a grantee generally may not use funds received under one federal grant program to meet its nonfederal share under another federal grant program. *See* B-270654, May 6, 1996 (private nonprofit corporation could not use general support funds it received from the State Department as the nonfederal match for other federal grants it received from the Agency for International Development and the United States Information Agency); B-214278, Jan. 25, 1985 (funds from the Farmers Home Administration's Water and Waste Disposal Development Grant Program could not be used to satisfy the nonfederal match requirement of the Environmental Protection Agency's treatment works construction grant program). Congress can, of course, enact a statutory exception that expressly permits this method of funding the nonfederal share. *See*, *e.g.*, B-239907, July 10, 1991 (Community Development Block Grants (CDBG) can constitute the nonfederal share because one of the statutorily authorized activities for CDBG funds is providing the nonfederal share for other federal grant programs that are listed in the community's annual CDBG application document).

When a federal agency enters into an assistance agreement with an eligible recipient, an entire project or program is approved. Where a local share is required, this agreement includes an estimate of the total costs, that is, a total that will exceed the amount to be borne by the federal government. The additional contribution that is needed to supply full support for the anticipated costs is the local, or nonfederal, matching share. Once the agreement is accepted, the assistance recipient is committed to providing the nonfederal share if it wishes to continue with the grant. *E.g.*, B-130515, July 20, 1973. Failure to meet this commitment may result in the disallowance of all or part of otherwise allowable federal share costs.

Matching share requirements are often intended to "assure local interest and involvement through financial participation." 59 Comp. Gen. 668, 669 (1980). Such requirements may also serve to hold down federal costs. The theory behind the typical matching share requirement may be summarized as follows:

> "In theory, the fiscal lure of Federal grants entices State and local governments into allocating new resources to satisfy the non-Federal match for programs they otherwise would not have funded on their own. While State and local jurisdictions may not be willing or able to fully fund a program from their own resources, they would most likely agree to spend new resources on the same project if most of the project costs were paid by the Federal Government."

GAO, *Proposed Changes in Federal Matching and Maintenance of Effort Requirements for State and Local Governments*, GGD-81-7 (Washington, D.C.: Dec. 23, 1980), at 9. This approach has been termed "cooperative federalism." *E.g.*, *King v. Smith*, 392 U.S. 309, 316 (1968). It is also known as the "federal carrot." *See City of New York v. Richardson*, 473 F.2d 923, 928 (2nd Cir.), *cert. denied sub nom.*, 412 U.S. 950 (1973).

Matching requirements are most commonly found in the applicable program legislation. However, they may also be found in appropriation acts. *E.g.*, 58 Comp. Gen. 524 (1979); 31 Comp. Gen. 459 (1952). A matching provision in an appropriation act, like any other provision in an appropriation act, will apply only to the fiscal year(s) covered by the act or the appropriation to which it applies, unless otherwise specified. 58 Comp. Gen. at 527.

If a program statute authorizes grants but neither provides for nor prohibits cost-sharing, the grantor agency may in some cases be able to impose a matching requirement administratively by regulation. The test is the underlying congressional intent. If legislative history indicates an intent for full federal funding, then the statute will generally be construed as requiring a 100 percent federal share. B-226572, June 25, 1987; B-169491, June 16, 1980. However, cost-sharing regulations have been regarded as valid when the statute was silent and it could reasonably be concluded that Congress left the matter to the judgment of the administering agency. B-130515, July 17, 1974; B-130515, July 20, 1973. Such regulations may be waived uniformly and prospectively, but may not be waived on a retroactive and *ad hoc* basis. *Id.*

Matching funds, as with the federal assistance funds themselves, can be used only for authorized grant purposes. B-230735, July 20, 1988; B-149441, Feb. 17, 1987. In the latter case, the Comptroller General concluded that the National Endowment for the Humanities (NEH) could not divert state matching funds to establish private endowments that, under existing authorities, could not have been created by a direct award of NEH funds. *See also* 42 Comp. Gen. 289, 295 (1962). Also, unless otherwise specified in the governing legislation, a grantee may match only a portion of the funds potentially available to it, and thereby receive a correspondingly smaller grant. 16 Comp. Gen. 512 (1936).

Under a cost-sharing assistance program funded by advance payments of the federal contribution, the Comptroller General has held that the advances may be made prior to the disbursement of the nonfederal share as long as adequate assurances exist (*e.g.*, by contractual commitments) that the local share will be forthcoming. 60 Comp. Gen. 208 (1981). *See also* 23 Comp. Gen. 652 (1944) (payment by federal agency of local share under cooperative agreement, subject to contractual agreement to reimburse).

Where the statute authorizing federal assistance specifies the federal share of an approved program as a specific percentage of the total cost, the grantor agency is required to make awards to the extent specified and has no discretion to provide a lesser (or greater) amount. *Manatee County, Florida v. Train*, 583 F.2d 179, 183 (5th Cir. 1978); 53 Comp. Gen. 547 (1974); B-197256, Nov. 19, 1980. However, where the federal share is defined by statutory language that specifies a maximum federal contribution but no minimum, the agency can provide a lesser amount. 50 Comp. Gen. 553 (1971).

Although most cost-sharing programs are in terms of a fixed federal share, some programs may provide for a declining federal share. Under a declining share program in the Regional Rail Reorganization Act, the Comptroller General concluded that the federal share could be determined in the year the grant was made, notwithstanding the fact that the grantee would not actually incur the costs until the following fiscal year. B-175155, July 29, 1977. Another cost-sharing variation is the "aggregate match," in which the nonfederal share is determined by cumulating the grantee's contributions from prior time periods. An example is discussed in 58 Comp. Gen. 524 (1979).

(2) Hard and soft matches

The program statute may define or limit the types of assets that may be applied to the nonfederal share. A provision limiting the nonfederal share to cash contributions is called a "hard match." In 31 Comp. Gen. 459 (1952), the matching share was described in the appropriation act that required it as an "amount available." In the absence of legislative history to support a broader meaning, the Comptroller General concluded that the matching share must be in the form of money and that the value of other nonmonetary contributions could not be considered. A more explicit "hard match" requirement is discussed in 52 Comp. Gen. 558 (1973), in which the Comptroller General concluded that the matching share, while it must be in the form of money, could include donated funds as well as grantee funds. While the program discussed in 52 Comp. Gen. 558 no longer exists, the case remains useful for this point and for the detailed review of legislative history illuminating the purpose and intent of the "hard match" provision.

Congress continues to include hard match requirements in laws providing for cost sharing with federal grants. For example, the Transportation Equity Act for the 21st Century established job access and reverse commute grants, which require that the grantee provide at least 50 percent of the funding for each project and that the nonfederal share—

> "(i) shall be provided *in cash* from sources other than revenues from providing mass transportation, but may include amounts received under a service agreement; and
>
> "(ii) may be derived from amounts appropriated to or made available to a department or agency of the Federal Government (other than the Department of Transportation) that are eligible to be expended for transportation."

Pub. L. No. 105-178, § 3037(h), 112 Stat. 107, 390 (June 9, 1998) (emphasis added).

The program legislation may expressly authorize the inclusion of assets other than cash in the nonfederal contribution. *See* 56 Comp. Gen. 645 (1977). An example is found in the Klamath River Basin Fishery Resources Restoration Act, Pub. L. No. 99-552, 110 Stat. 3080 (Oct. 27, 1986), codified at 16 U.S.C. §§ 460ss–460ss-6, which requires that at least 50 percent of the cost of developing and implementing the program come from nonfederal

sources but explicitly states that noncash assets may count toward the nonfederal share. That statute specifically states:

> "In addition to cash outlays, the Secretary [of the Department of Interior] shall consider as financial contributions by a non-federal source the value of in kind contributions and real and personal property provided by the source for purposes of implementing the program."

16 U.S.C. § 460ss-5(b)(2).

If, however, the legislation is silent with respect to the types of assets that may be counted, the statute will generally be construed as permitting an "in-kind" or "soft" match, that is, the matching share may include the reasonable value of property or services as well as cash. 52 Comp. Gen. 558, 560 (1973); B-81321, Nov. 19, 1948. The valuation of in-kind contributions can get complicated. An example is 31 Comp. Gen. 672 (1952) (value of land could not include the cost or value of otherwise unallowable improvements to the land previously added by the grantee).

Current valuation standards for state and local governments are found in the common rule captioned "Matching or Cost Sharing." *See, e.g.*, 7 C.F.R. § 3016.24. For institutions of higher education, hospitals, and other nonprofit organizations, such standards can be found in 7 C.F.R. § 3019.23, also captioned "Cost Sharing or Matching."

(3) Matching one grant with funds from another

As noted in the preceding section, an important and logical principle is that neither the federal nor the nonfederal share of a particular grant program may be used by a grantee to match funds provided under another federal grant program unless specifically authorized by law. In other words, a grantee may not (1) use funds received under one federal grant as the matching share under a separate grant, nor may it (2) use the same grantee dollars to meet two separate matching requirements. B-270654, May 6, 1996; 56 Comp. Gen. 645 (1977); 47 Comp. Gen. 81 (1967); 32 Comp. Gen. 561 (1953); 32 Comp. Gen. 141 (1952); B-214278, Jan. 25, 1985; B-212177, May 10, 1984; B-130515, July 20, 1973; B-229004-O.M., Feb. 18,

1988; B-162001-O.M., Aug. 17, 1967. See also the common rule at 7 C.F.R. § 3016.24(b). A contrary rule would largely nullify the cost-sharing objective of stimulating new grantee expenditures.[80]

Normally, exceptions to the rule are in the form of express statutory authority. A prominent example is section 105(a)(9) of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5305(a)(9), which authorizes community development block grant funds to be used as the nonfederal share under any other grant undertaken as part of a community development program. *See* 59 Comp. Gen. 668 (1980); 56 Comp. Gen. 645 (1977); B-239907, July 10, 1991. The 1991 opinion concluded that community development block grant regulations no longer apply once the funds have been applied as a match under another grant program, at least where applying the regulations would substantially interfere with use of the funds under the receiving grant. *See also* 52 Comp. Gen. 558, 564 (1973); 32 Comp. Gen. 184 (1952).

In 59 Comp. Gen. 668, GAO considered a conflict between two statutes, the Housing and Community Development Act, 42 U.S.C. §§ 5301–5321, which, as noted, permits federal grant funds to fill a nonfederal matching requirement, and the Coastal Zone Management Act of 1972, as amended, which provides for cost-sharing grants but expressly prohibits the use of federal funds received from other sources to pay a grantee's matching share. 16 U.S.C. §§ 1454, 1455, and 1464(c). Finding that the statutory language could not be reconciled, and noting further that there was no helpful legislative history under either statute, the Comptroller General concluded, as the most reasonable result consistent with the purposes of both statutes, that community development block grant funds were available to pay the nonfederal share of Coastal Zone Management Act grants for projects properly incorporated as part of a grantee's community development program. See also B-229004-O.M., Feb. 18, 1988, which essentially followed 59 Comp. Gen. 668 and concluded that community development block grant funds could be used for the matching share of certain grants under the Stewart B. McKinney Homeless Assistance Act, Pub. L. No. 100-77, 101 Stat. 482 (July 22, 1987).

[80] By way of contrast, this general rule does not apply to federal loans. The reason is that loans, unlike grants, are expected to be repaid and the recipient is thus, at least ultimately, using its own funds. Of course, the proposed use of the funds must be authorized under the loan program legislation. B-207211-O.M., July 9, 1982. *See also* B-214278, Jan. 25, 1985.

A somewhat less explicit exception is discussed in 57 Comp. Gen. 710 (1978), holding that funds distributed to states under Title II of the Public Works Employment Act of 1976, as amended, 42 U.S.C. §§ 6721–6736 (called the "countercyclical revenue sharing program"), may be applied to the states' matching share under the Medicaid program. GAO agreed with the Treasury Department that Title II payments amounted to "general budget support as opposed to categorical or block grants or contracts" (57 Comp. Gen. at 711), a form of revenue sharing, and thus should be construed in the context of the (since repealed) General Revenue Sharing Program. General Revenue Sharing was characterized by a "no strings on local expenditures" policy, evidenced by the fact that a provision in the original legislation barring the use of funds as the nonfederal share in other federal programs had been repealed. Stressing the strong analogy between Title II and General Revenue Sharing, the decision concluded that implicit in the "no strings" policy was the authority to apply Title II funds to a state's matching share under Medicaid. For a description of the former General Revenue Sharing Program, see, for example, GAO, *Federal Assistance: Temporary State Fiscal Relief*, GAO-04-736R (Washington, D.C.: May 7, 2004) and *Federal Grants: Design Improvements Could Help Federal Resources Go Further*, GAO/AIMD-97-7 (Washington, D.C.: Dec. 18, 1996).

It should also be noted that where any federal assistance funds are used as nonfederal matching funds for another grant, such use must be consistent with the grant under which they were originally awarded as well as the grant they are intended to implement. 59 Comp. Gen. 668; 57 Comp. Gen. at 715; B-230735, July 20, 1988.

Funds received by a property owner from a federal agency as just compensation for property taken by eminent domain belong to the owner outright and do not constitute a "grant." Therefore, they may be used as the nonfederal share of a grant from another federal agency, even where the taking and the grant relate to the same project. B-197256, Nov. 19, 1980.

(4) Relocation allowances

Federally assisted programs which result in the displacement of individuals and business entities may, apart from eminent domain payments, result in the payment of relocation allowances under the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, as amended 42 U.S.C. §§ 4601–4655. Under the statute, authorized relocation payments provided by a state incident to a federally assisted project which results in relocations are to be treated in the same manner as other project costs.

Thus, under a program statute which provides for a 90 percent federal contribution, 90 percent of authorized relocation payments will be reimbursable as an allowable program cost. In other words, any applicable matching share requirement will apply equally to the relocation payments. B-215646, Aug. 7, 1984.

(5) Payments by other than grantor agency

Of course there is nothing wrong with grantees receiving funds from more than one federal source, including other federal grants for which they are eligible. If the grants are administered by different agencies, each agency is making payments under its own program. Occasionally, an agency is asked to make payments not associated with any of its own assistance programs, to a grantee or grant beneficiary under some other agency's program. The cases fall into two groups.

The first situation involves services performed by an assistance beneficiary to an agency other than the grantor agency. Under the College Work-Study Program, not to exceed 75, or 90 in certain cases, percent of the student's salary is paid by the college under a Department of Education grant, with the remainder paid by the employer. 42 U.S.C. § 2753(b)(5). The "employer" may be another federal agency. 46 Comp. Gen. 115 (1966). In addition to the salary contribution, the employing agency may pay unreimbursed administrative costs such as social security taxes and compensation insurance. 50 Comp. Gen. 553 (1971); 46 Comp. Gen. 115. However, an agency may not, without statutory authority, participate in a work-study program authorized by state law and not coordinated with the federal program. B-159715, Dec. 18, 1978.

The authority to pay administrative costs under the work-study program is based on the cost-sharing nature of that program. Absent comparable cost-sharing provisions, there is no authority to pay administrative costs. 61 Comp. Gen. 242 (1982) (agency to which employee had been assigned under former Comprehensive Employment and Training Act lacked authority to reimburse grantee for retirement contributions).

The second group of cases involves projects which benefit other federal facilities. Under program legislation which does not give the grantor agency discretion to reduce the federal share, the grantor agency is not authorized to exclude from total cost a portion of an otherwise eligible project solely because that portion would provide service to another federal facility. 59 Comp. Gen. 1 (1979). Where the grantor agency has

reduced its contribution because a portion of the project would serve another federal facility, the "benefited agency" normally would not be authorized to make up the shortfall without receiving additional consideration above and beyond the improved service it would have received anyway. B-189395, Apr. 27, 1978. However, if Congress chooses to appropriate funds to the benefited agency to make up the shortfall, the benefited agency may make otherwise proper contributions without requiring additional legal consideration as long as its contribution, when added to the amount contributed by the grantor agency, does not exceed the statutorily specified federal share. 59 Comp. Gen. 1; B-198450, Oct. 2, 1980; B-199534, B-200086, Oct. 2, 1980.

The illustration given in 59 Comp. Gen. 1 may help to clarify these principles. Suppose the statutory federal share is 75 percent and the total project cost is $10 million. The federal share is 75 percent of $10 million, or $7.5 million. Now suppose the grantor agency determines that 20 percent of the project will serve another federal facility. Under 59 Comp. Gen. 1, it is improper for the grantor agency to reduce total cost by 20 percent (*i.e.*, from $10 million to $8 million) and to then contribute only 75 percent of the $8 million, for a federal share of $6 million. The correct federal share should have remained 75 percent of $10 million.

Suppose further that the grantor agency has made the reduction and Congress appropriates money to the benefited agency to make up the shortfall. Using the same hypothetical figures, the benefited agency may contribute $1.5 million (20 percent of the federal share of $7.5 million) as the federal share of that portion of the project attributable to its use, without further legal consideration. However, as mentioned above, its contribution, when added to the contribution of the grantor agency, may not exceed the specified statutory share unless further legal consideration is received by the government.

The decision at 59 Comp. Gen. 1 and the two October 1980 decisions resulted from a disagreement between GAO and the Environmental Protection Agency over grant funding policy under the Federal Water Pollution Control Act, commonly known as the Clean Water Act, codified at 33 U.S.C. §§ 1251–1387. The Act authorized EPA to make 75 percent[81] construction grants for wastewater treatment systems. EPA construed the

[81] Subsequent legislation reduced the percentage of the federal share under this program. Pub. L. No. 97-117, § 7, 95 Stat. 1623, 1625 (Dec. 29, 1981). *See* B-207211-O.M., July 9, 1982.

statute as permitting it to proportionately reduce its contribution to the extent a project benefits other federal facilities. As noted, GAO concluded that EPA lacked authority to reduce its contribution below 75 percent, and that the benefited agencies could not make up the shortfall. EPA disagreed, and to resolve the funding impasse, Congress, apparently as a temporary expedient, provided funds to certain agencies, specifically the Army and the Navy. However, Congress did not provide funds for the Air Force to offset the reduced grants, and the issue arose again in B-194912, Aug. 24, 1981. The Comptroller General reaffirmed GAO's position and concluded that, absent specific congressional approval, the appropriations of the Air Force were not available to make up for the reduced grant amounts.

### b. Maintenance of Effort

Suppose the state of New Euphoria spends around a million dollars a year for the control of noxious pests. After several years, the continued proliferation of noxious pests leads Congress to conclude that the program is not going as well as everyone might like, and that federal financial assistance is in order. Congress therefore enacts legislation and appropriates funds to provide annual pest-control grants of half a million dollars to each affected state.

New Euphoria applies for and receives its grant. Like most other states, however, New Euphoria is strapped for money and faced with various forms of taxpayer revolt. While the state government certainly believes that noxious pests merit control, it would, if it had free choice in the matter, rather use the money on what it regards as higher priority programs. The state uses the $500,000 federal grant for its pest control program; it has no choice because it has contractually committed itself with the federal government to do so as a condition of receiving the grant. However, it then takes $500,000 of its own money away from pest control and applies it to other programs. If the purpose of the federal grant legislation is simply to provide general financial support to New Euphoria, that purpose has been accomplished and the state has clearly benefited. But if the federal purpose is to fund an increased level of pest control activity, the objective has just as clearly been frustrated.

When Congress wants to avoid this result, a device it commonly uses is the "maintenance of effort" requirement. Under a maintenance of effort provision, the grantee is required, as a condition of eligibility for federal funding, to maintain its financial contribution to the program at not less than a stated percentage (which may be 100 percent or less) of its contribution for a prior time period, usually the previous fiscal year. The purpose of maintenance of effort is to ensure that the federal assistance

results in an increased level of program activity, and that the grantee, as did New Euphoria, does not simply replace grantee dollars with federal dollars. GAO has observed that maintenance of effort, since it requires a specified level of grantee spending, "effectively serves as a matching requirement." GAO, *Proposed Changes in Federal Matching and Maintenance of Effort Requirements for State and Local Governments*, GAO/GGD-81-7 (Washington, DC: Dec. 23, 1980), at 2.

GAO has also observed that a grant for something the grantee is already spending its own money on is, without maintenance of effort, little more than another form of revenue sharing.

> "When Federal grant money is used to substitute for ongoing or planned State and local expenditures, the ultimate effect of the Federal program funds is to provide fiscal relief for recipient States and localities rather than to increase service levels in the program area. When fiscal substitution occurs, narrow-purpose categorical Federal programs enacted to augment service levels are transformed, in effect, into broad purpose fiscal assistance like revenue sharing. Maintenance of effort provisions, if effective, can prevent substitution and ensure that the Federal grant is used by the grantee for the specific purpose intended by the Congress."

GAO/GGD-81-7, at 48–49. *See also* GAO, *Block Grants: Issues in Designing Accountability Provisions*, GAO/AIMD-95-226, (Washington, D.C.: Sept. 1, 1995), at 17–18.

One type of maintenance of effort requirement is illustrated by the following provision from the Clean Air Act, 42 U.S.C. § 7405(c)(1):

> "No [air pollution control] agency shall receive any grant under this section during any fiscal year when its expenditures of non-Federal funds for recurrent expenditures for air pollution control programs will be less than its expenditures were for such programs during the preceding fiscal year. . . ."

A variation is found in 20 U.S.C. § 7901, which is applicable to certain education grants. The basic requirement is in section 7901(a):

> "A local educational agency may receive funds under a covered program for any fiscal year only if the State educational agency finds that either the combined fiscal effort per student or the aggregate expenditures of the agency and the State with respect to the provision of free public education by the agency for the preceding fiscal year was not less than 90 percent of the combined fiscal effort or aggregate expenditures for the second preceding fiscal year."

Maintenance of effort statutes will invariably provide fiscal sanctions if the grantee does not meet its commitment. Sanction provisions are of two types. Under one version, the grantee's allocation of federal funds is reduced in the same proportion as its contribution fell below the required level. For example, 20 U.S.C. § 7901(b)(1) provides:

> "The State educational agency shall reduce the amount of the allocation of funds under a covered program in any fiscal year in the exact proportion by which a local educational agency fails to meet the requirement of subsection (a) of this section by falling below 90 percent of both the combined fiscal effort per student and aggregate expenditures (using the measure most favorable to the local agency)."

The second and more severe version is illustrated by the Clean Air Act provision quoted above and discussed in B-209872-O.M., Mar. 23, 1984, an internal GAO memorandum. Under this version, the grantee, falling short of its maintenance of effort commitment, loses all grant funds under the program for that fiscal year. GAO has endorsed the enactment of legislation making proportionate reduction the standard rather than total withdrawal. GAO/GGD-81-7, at 71.

Some maintenance of effort statutes authorize the administering agency to waive the requirement for a specified time period if some natural disaster or other unforeseen event caused the funding shortfall. An illustration is 20 U.S.C. § 7901(c):

> "The Secretary may waive the requirements of this section if the Secretary determines that a waiver would be equitable due to—

(1) exceptional or uncontrollable circumstances, such as a natural disaster; or

(2) a precipitous decline in the financial resources of the local educational agency."

If a grantee fails to meet its commitment and the noncompliance cannot be waived, any disbursement of federal funds in excess of the amount permitted by the program statute must generally be recovered. 51 Comp. Gen. 162 (1971). Failure to require repayment of such funds "would, in effect, constitute the giving away of United States funds without authority of law." *Id.* at 165.[82]

A variation of the maintenance of effort provision is the so-called "nonsupplant" provision, which requires that federal funds be used to supplement, and not supplant, nonfederal funds which would otherwise have been made available. Nonsupplant is sometimes used in conjunction with maintenance of effort. For example, in addition to coverage under the maintenance of effort provision at 20 U.S.C. § 7901, quoted above, certain education grant programs are also covered under 20 U.S.C. § 6321(b)(1):

> "A State educational agency or local educational agency shall use Federal funds received under this part only to supplement the funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under this part, and not to supplant such funds."

GAO has reported on the difficulty with monitoring and enforcing nonsupplant provisions. *See* GAO, *Disadvantaged Students: Fiscal Oversight of Title I Could Be Improved*, GAO-03-377 (Washington, D.C.: Feb. 28, 2003); *Welfare Reform: Challenges in Maintaining a Federal-State Fiscal Partnership*, GAO-01-828 (Washington, D.C.: Aug. 10, 2001);

[82] See Chapter 10, section H for a general discussion of recovery of grantee indebtedness.

GAO/GGD-81-7, at 71.[83] These reports noted that in flexible grant environments, a strong maintenance of effort provision may prove more useful than a traditional nonsupplant requirement. While a nonsupplant provision might limit the intended breadth of a block grant by locking states into a pre-established funding priorities, a strong maintenance of effort provision might both limit substituting federal funds for state and local funds while providing greater state discretion. GAO-03-377, at 25; GAO-01-828, at 47.

## F. Obligation of Appropriations for Grants

### 1. Requirement for Obligation

As with any other type of expenditure, the expenditure of federal assistance program funds requires an obligation that is proper in terms of purpose, time, and amount, and the obligation must be properly recorded.[84] With respect to recording of the obligation in the grant or subsidy context, 31 U.S.C. § 1501(a)(5) requires that the obligation be supported by documentary evidence of a grant payable—

> "(A) from appropriations made for payment of, or contributions to, amounts required to be paid in specific amounts fixed by law or under formulas prescribed by law;

---

[83] The 1980 report also noted:

> "Most Federal program officials we contacted agreed that nonsupplant is difficult, if not impossible, to enforce because it calls for an external judgment on what grantees would have done if Federal funds were not available. Basically, this calls for a Federal agency to assess the motives behind particular changes in State and local plans or budgets and to judge whether the presence of Federal grant funds drove the particular State or local action."

GAO/GGD-81-7, at 54.

[84] The purpose, time, and amount requirements are essentially the same for grants as for other expenditures. What constitutes an obligation in the grant context, and what will or will not satisfy 31 U.S.C. § 1501(a)(5), are discussed in more detail in section C.2 of this chapter and in Chapter 7, section B.5.

"(B) under an agreement authorized by law; or

"(C) under plans approved consistent with and authorized by law."

Briefly stated, the "obligational event" for a grant generally occurs at the time of grant award. Therefore, this is when the grantor agency must record an obligation under 31 U.S.C. § 1501(a)(5), not when the grantee draws down the funds or when the grantee incurs its own obligations. *See* B-300480, Apr. 9, 2003, *aff'd*, B-300480.2, June 6, 2003.

## 2. Changes in Grants

Changes in grants may come about for a variety of reasons: the original grantee may be unable to perform, the grant amount may be increased, there may be a redefinition of objectives, *etc*. If the change occurs in the same fiscal year (or longer period if a multiple year appropriation is involved) in which the original grant was made, there is no obligation problem as long as the amount of the appropriation available for obligation is not exceeded. If, however, the change occurs in a later fiscal year, the question becomes whether the amended grant remains chargeable to the appropriation initially obligated or whether it constitutes a new obligation chargeable to appropriations current at the time the change is made. As pointed out in 58 Comp. Gen. 676, 680 (1979), the cases have identified three closely related areas of concern that must be satisfied before a change may be viewed as a so-called "replacement grant," that is, not as creating a new obligation that must be charged to the current appropriation:

- the *bona fide* need for the grant project must continue;
- the purpose of the grant from the government's standpoint must remain the same; and
- the revised grant must have the same scope.

The "scope" of a grant, as stated in 58 Comp. Gen. at 681—

"grows out of the grant purposes. These purposes must be referred to in order to identify those aspects of a grant that make up the substantial and material features of a particular

grant which in turn fix the scope of the Government's obligation."

As a general proposition, a grant amendment which changes the scope of the grant or which makes the award to an entirely different grantee (not a successor to the original grantee), and which is executed after the appropriation under which the original grant was made has ceased to be available for obligation, may not be charged to the original appropriation. 58 Comp. Gen. 676 (1979). If the amendment amounts to a substitute grant, it extinguishes the old obligation and creates a new one. *Id.* at 678. The new obligation is chargeable to the appropriation available at the time the new obligation is created. *Id.* There are also situations where a grant amendment creates a new obligation chargeable to the later appropriation without extinguishing the original obligation. *Id.* In either event, if the grantor agency does not recognize that the change creates a new obligation when the change is made, there is a potential Antideficiency Act violation. On the other hand, a change which qualifies as a "replacement grant" remains chargeable to the original appropriation. 57 Comp. Gen. 205, 208–09 (1978). Of course, an agency with the requisite program authority can change the scope of a grant if current appropriations are used. 60 Comp. Gen. 540, 543 (1981).

The clearest example of a change that creates a new obligation is where the amount of the award is increased. If the grantee has no legal right stemming from the original grant agreement to compel execution of the amendment, the increase in amount is a new obligation chargeable to appropriations current when the change is made. 41 Comp. Gen. 134 (1961); 39 Comp. Gen. 296 (1959); 37 Comp. Gen. 861 (1958). However, an upward adjustment in a "provisional indirect cost rate" contained in a grant award, which contemplated a possible increase in the indirect cost rate at a later date, does not constitute an additional or new award. 48 Comp. Gen. 186 (1968). Payments resulting from such an adjustment are chargeable to the appropriation originally obligated by the grant. *Id.* Similarly, the increase in a grant award to cover the cost of audits that were required under the original grant agreement was within the scope of the grant awards. 72 Comp. Gen. 175 (1993). Payments necessary to cover the audit costs can be made out of the expired appropriations that were originally obligated for the grants. *Id.*

As a general rule, when a recipient of a grant is unable to implement the grant as originally contemplated, and an alternative grantee is designated subsequent to the expiration of the period of availability for obligation of

the grant funds, the award to the alternative grantee must be treated as a new obligation and is not properly chargeable to the appropriation current at the time the original grant was made. B-164031(5), June 25, 1976; B-114876, A-44014, Jan. 21, 1960.

However, it is possible in certain situations to make an award to an alternative grantee after expiration of the period of availability for obligation where the alternative award amounts to a "replacement grant" and is substantially identical in scope and purpose to the original grant. 57 Comp. Gen. 205 (1978); B-157179, Sept. 30, 1970. In the latter decision, the Comptroller General did not object to the use of unexpended grant funds originally awarded to the University of Wisconsin to engage Northwestern University in a new fiscal year to complete the unfinished project. Approval was granted because the project director had transferred from the University of Wisconsin to Northwestern University and he was viewed by all the parties as the only person capable of completing the work. The decision also noted that the original grant was made in response to a *bona fide* need then existing, and that the need for completing the project continued to exist.[85]

GAO has also indicated that it might be possible in certain situations to develop procedures to designate an alternate grantee at the time an award is made to the principal grantee, provided that all of the criteria for selection of the principal and required administrative action are also met concerning the alternate, with the sole exception that the award to the alternate is not mailed to it pending a determination as to whether the principal actually complies with the terms of the award. The validity of any such procedure would have to be assessed on a case-by-case basis. B-114876, July 29, 1960; B-114876, Mar. 15, 1960.

A shift in the community to be served by the grant may constitute a new obligation depending on the circumstances. Thus, in B-164031(5), June 25, 1976, the original grantee ran into financial difficulties and was unable to utilize a hospital modernization award under the Hill-Burton program. The Comptroller General found that a proposal to shift the award to another hospital would constitute a new undertaking rather than a replacement grant since the hospitals were over 100 miles apart and served essentially different communities.

[85] See section C.2.b of this chapter for a discussion of the applicability of the *bona fide* needs rule to grants.

An enlargement of the community to be served will not necessarily constitute a new obligation. The grant in 58 Comp. Gen. 676 (1979) was to set up a demonstration community service volunteer program. The grant defined the number of participants deemed necessary to generate the desired test results. The geographic site for which the grant was awarded was expected to produce the necessary number of volunteers, but did not. It was held that the geographical area could be expanded to produce the desired number of volunteers. The modification in these circumstances would not constitute a new and separate undertaking and could be funded from the appropriation originally obligated.

A change in the research objectives of a grant will constitute a new obligation notwithstanding that some aspects of the original grant and the modification may be related. 57 Comp. Gen. 459 (1978). *See also* 39 Comp. Gen. 296 (1959).

A 1969 decision involved amendments by the National Institute of Mental Health which would change the use of grant funds from construction to renovation and vice-versa beyond the period of obligational availability. Since the amendments met the statutory eligibility criteria, since they would still accomplish the original grant objectives, and since they involved neither a change in grantees nor an increase in amount, they were held permissible under the original obligations. B-74254, Sept. 3, 1969.

# G. Grant Costs

## 1. Allowable *versus* Unallowable Costs

### a. The Concept of Allowable Costs

Recipients of assistance awards are expected to use the assistance funds for the purposes for which they were awarded, subject to any conditions that may attach to the award. Expenditures or costs that meet the grant purposes and conditions are termed "allowable costs." An expenditure which is not for grant purposes or is contrary to a condition of the grant is not an allowable cost and may not be properly charged to the grant.

Allowable costs are determined on the basis of the relevant program legislation, regulations, including OMB circulars and the common rules, and the terms of the grant agreement. First and foremost, of course, is the program statute. Thus, where the legislation and legislative history of a program clearly limited the purposes for which grant funds could be used, grantees could not use grant funds for nonspecified purposes, including one for which Congress had provided funds under a separate appropriation. 35 Comp. Gen. 198 (1955). In 55 Comp. Gen. 652 (1976), however, a statute prohibiting certain costs was held to apply only to direct costs and, absent legislative history to the contrary, did not preclude use of standard indirect cost rates even though technically a percentage of the indirect cost rates could be attributed to the prohibited items.

The role of agency regulations is illustrated by *California v. United States*, 547 F.2d 1388 (9th Cir.), *cert. denied*, 434 U.S. 824 (1977). Under the Federal-Aid Highway Act, 23 U.S.C. § 120, the United States pays 90 percent of the "total cost" of certain highway construction, with "cost" being defined to include the cost of right-of-way acquisition. The Federal Highway Administration had issued a policy memorandum stating that program funds would not be used to pay interest on any portion of a condemnation award or settlement for more than 30 days after the money is deposited with the court. California challenged the restriction. The court said:

> "Certainly, Congress must have intended that the statutory obligation to pay 90 percent of the total cost must include some corresponding right to impose reasonable limitations

> upon such costs, rather than to leave the Federal Treasury at the mercy of unfettered discretion by the State as to what expenditures may be made and charged accordingly."

*Id.* at 1390. The court saw no need to decide whether the policy memorandum rose to the level of a "regulation." Either way, it was a reasonable exercise of the agency's authority to administer the program. *See also Louisiana Department of Highways v. United States*, 604 F.2d 1339 (Ct. Cl. 1979) (Federal Highway Administration regulation disallowing costs of grantee settlements of worthless claims).

Several GAO decisions illustrate the significance of the grant agreement. For example, where a grant application specified that certain costs would be incurred and the program legislation was ambiguous as to whether those costs should be allowed, the grantor agency was held bound by the grant agreement, that is, by its acceptance of the application. B-118638.101, Oct. 29, 1979.

As discussed previously, the Office of Management and Budget (OMB) prescribes guidance on federal assistance cost principles. This guidance is found in a series of OMB Circulars: No. A-21, *Cost Principles for Educational Institutions* (May 10, 2004); No. A-87, *Cost Principles for State, Local, and Indian Tribal Governments* (May 10, 2004); and No. A-122, *Cost Principles for Non-profit Organizations* (May 10, 2004). These circulars are incorporated in the common rules issued by the individual grantor agencies. The Department of Agriculture common rules, for example, reference the OMB cost principles at 7 C.F.R. § 3016.22(b) (2005).[86]

As explained in OMB Circular No. A-87, Attachment A (*General Principles for Determining Allowable Costs*), allowable costs are of two types, direct and indirect.[87] Direct costs are items that are specifically identifiable and

[86] See section C.3.b of this chapter for a discussion of the nature and evolution of the common rules. As in earlier sections, we will cite to the Department of Agriculture version of the common rules for ease of presentation.

[87] Section D of Attachment A of the circular explains that there is no universal rule for classifying certain costs as either direct or indirect under every accounting system. "A cost may be direct with respect to some specific service or function, but indirect with respect to the Federal award or other final cost objective." *Id.* § D.2. The most important requirement is to treat each cost item consistently in like circumstances as either direct or indirect.

attributable to a particular final cost objective. *Id.* § E.1. In other words, direct costs are obligations or expenditures of a recipient which can be tied to a particular award. For example, if a recipient purchases an item of equipment necessary to carry out a particular award, the purchase price is a direct cost under that award. *Id.* § E.2.c. Indirect costs are costs incurred for common objectives which cannot be directly charged to any single cost objective. *Id.* § F.1. A common example is depreciation. The concept of indirect costs is essentially an accounting device to permit the allocation of overhead in proportion to benefit. *See* B-203681, Sept. 27, 1982.

The over-allocation of indirect costs is unauthorized and therefore unallowable. The reason is that 31 U.S.C. § 1301(a) restricts the use of appropriated funds to the purposes for which they were appropriated, and payment of the over-allocation would not serve the purposes of the appropriation. B-203681, Sept. 27, 1982.

A grantee may generally substitute other allowable costs for costs which have been disallowed, subject to any applicable cost ceiling. If additional funds become available as the result of a cost disallowance, those funds should be used to pay any "excess" allowable costs which could not be paid previously because of the ceiling. 68 Comp. Gen. 247, 248–49 (1989). The courts have also applied this concept in one form or another. In *Institute for Technology Development v. Brown*, 63 F.3d 445, 450–52 (5th Cir. 1995), the court explicitly followed the GAO approach and allowed cost-substitution. The court in *New York v. Riley*, 53 F.3d 520 (2nd Cir. 1995), referred to a similar administrative practice by the Department of Education, which it called "equitable offset," whereby the Department could permit a grantee to substitute allowable costs for disallowed costs that could have been—but never were—charged to a grant. However, the court described this practice as embodying "concepts of equity, not entitlement as a matter of right." *Id.* at 522. In any event, its applicability was a moot point in this case since the grantee could not document any potential allowable costs to substitute for costs that had been disallowed. *Id.*

The familiar cost overrun is not the exclusive province of the government contractor. Assistance recipients may also incur overruns. A claim resulting from an overrun under a cooperative agreement was denied in B-206272.5, Mar. 26, 1985, because, under the agreement, the agency was not obligated to fund overruns unless it chose to amend the agreement and, in its discretion, it had declined to do so. *Cf.* B-209649, Dec. 23, 1983 (labor benefits awarded by court to employees of grantee's contractor could be

regarded as indirect costs under grant terms, as long as applicable ceiling on indirect costs was not exceeded).

Issues concerning allowable grant costs often involve technical disputes over accounting principles and practices that take place far from the public spotlight. However, a major and very public controversy arose in the early 1990s centering on questionable items that universities were claiming as indirect "overhead" costs under federal research grants. These problems are detailed in Lynn McGuire, *Federal Research Grant Funding at Universities: Legislative Waves From Auditors Diving Into Overhead Cost Pools*, 23 Journal of College and University Law 563 (Winter 1997). Inquiries into alleged improper charges, which were spearheaded by the House Committee on Energy and Commerce's Subcommittee on Oversight and Investigations, included a series of congressional hearings, GAO reviews, audits by executive branch agencies, and a report on the ABC television program *20/20*. The allegations involved many of the nation's leading academic institutions such as Harvard Medical School, Stanford University, the University of California at Berkeley, and the Massachusetts Institute of Technology. Alleged improper charges included depreciation for a 72-foot yacht, a public relations trip to Paris, a Nile River cruise, a Saint Patrick's Day party, football tickets for potential university donors, and the purchase of an antique commode for the residence of a retired university chancellor. The problems resulted from what GAO described as "breakdowns in several key areas of the system dealing with indirect costs." GAO, *Federally Sponsored Research: Indirect Costs Charged by Selected Universities*, GAO/T-RCED-92-20 (Washington, D.C.: Jan. 29, 1992), at 9. In that testimony, GAO identified the main areas of breakdown as follows:

- Inadequate criteria in OMB Circular No. A-21 for determining allowable costs and how to allocate them among university functions;
- Inadequate university systems and controls to ensure that only allowable indirect costs were charged to the federal government; and

- Lax oversight on the part of cognizant federal agencies that were responsible for auditing particular universities.[88]

Remedial actions at the federal level included major revisions to enhance the guidance contained in OMB Circular No. A-21 and improved auditing procedures by the cognizant federal agencies. *See* McGuire, 23 J.C. & U.L. at 576–80.

Where a cost is not allowable, as far as the government is concerned, the recipient still has the funds. If the grant funds have already been paid over to the grantee and no allowable costs of an equal amount are subsequently incurred, the recipient is required to return the amount of the improper charge to the government. *E.g.*, *Utah State Board for Vocational Education v. United States*, 287 F.2d 713 (10th Cir. 1961). The United States "has a reversionary interest in the unencumbered balances of such grants, including any funds improperly applied." 42 Comp. Gen. 289, 294 (1962). *See also* B-198493, July 7, 1980. This requirement cannot be waived. B-171019, June 3, 1975. Thus, the Comptroller General has held that an agency cannot waive its statutory regulations to relieve a grantee of its liability for improper expenditures. B-163922, Feb. 10, 1978. Similarly, an agency may not amend its regulations to relieve a grantee's liability for expenditures for administrative costs in excess of a statutory limitation. B-178564, July 19, 1977, *aff'd*, 57 Comp. Gen. 163 (1977).

The courts have endorsed the principle that the federal government has a reversionary interest in grant funds until they are properly applied and accounted for. Citing *Buchanan v. Alexander*, 45 U.S. (4 How.) 20 (1846), one court observed that a federal agency "has a strong and surprisingly ancient claim for its right to require the repayment of all funds which cannot be proven to have been spent on legitimate, allowable costs." *City of New York v. Sullivan*, No. 91 Civ. 2959 (RWS), (S.D.N.Y. Jan. 4, 1993), slip op. at 11, *rev'd on other grounds sub nom.*, 34 F.3d 1161 (2nd Cir. 1994). The court elaborated on this point as follows:

> "Since federal money belongs to the federal government until actually spent on allowable costs, the [agency's]

[88] Two other GAO products dealing with this subject are *Federal Research: System for Reimbursing Universities' Indirect Costs Should be Reevaluated*, GAO/RCED-92-203 (Washington, D.C.: Aug. 26, 1992), and *Federally Sponsored Research: Indirect Costs Charged by Stanford University*, GAO/T-RCED-91-18 (Washington, D.C.: Mar. 13, 1991).

> decision—that the City must present source documentation which proves to [the agency's] satisfaction that the money was drawn down to cover . . . [appropriate costs] or else return the money to the federal government—is not capricious or arbitrary."

*City of New York v. Sullivan*, slip op. at 11. Other recent decisions applying the reversionary interest concept in different contexts are *In re Universal Security and Protection Service, Inc.*, 223 B.R. 88, 91–92 (Bankr. E.D. La. 1998); *In re Alpha Center, Inc.*, 165 B.R. 881, 884 (Bankr. S.D. Ill 1994); and *Department of Housing and Urban Development v. K. Capolino Construction Corp.*, No. 01 Civ. 390 (JGK), (S.D.N.Y. 2001), slip. op. at 4–6.

While not directed specifically at the problems described above, Congress enacted two laws during the 1990s to streamline, simplify, and thereby improve auditing and administration of federal assistance programs: the Single Audit Act Amendments of 1996, Pub. L. No. 104-156, 110 Stat. 1396 (July 5, 1996), amending 31 U.S.C. §§ 7501–7507, and the Federal Financial Assistance Management Improvement Act of 1999, Pub. L. No. 106-107, 113 Stat. 1486 (Nov. 20, 1999).[89]

GAO has continued to review issues relating to the appropriateness of grant costs and the processes by which they are determined. Examples include: *Grants Management: EPA Actions Taken against Nonprofit Grant Recipients in 2002*, GAO-04-383R (Washington, D.C.: Jan. 30, 2004); *Disadvantaged Students: Fiscal Oversight of Title I Could Be Improved*, GAO-03-377 (Washington, D.C.: Feb. 28, 2003); *Environmental Protection: EPA's Oversight of Nonprofit Grantees' Costs Is Limited*, GAO-01-366 (Washington, D.C.: Apr. 6, 2001); *Federal Research Grants: Compensation Paid to Graduate Students at the University of California*, GAO/OSI-99-8 (Washington, D.C.: June 22, 1999); *Department of Transportation: University Research Activities Need Greater Oversight*, GAO/RCED-94-175 (Washington, D.C.: May 13, 1994); and *Federal Research: Minor Changes Would Further Improve New NSF Indirect Cost Guidance*, GAO/RCED-93-140 (Washington, D.C.: June 3, 1993).

[89] These statutes are discussed in section C of this chapter. Public Law 104-156 was based in part on recommendations contained in GAO, *Single Audit: Refinements Can Improve Usefulness*, GAO/AIMD-94-133 (Washington, D.C.: June 21, 1994).

### b. Grant Cost Cases

Grant cost cases are extremely difficult to categorize because what is allowable under one assistance program may not be allowable under another. Also, the cases frequently turn on complex accounting and factual issues that are unique to the particular case. Accordingly, summaries of a number of cases are given below with little further attempt to generalize. However, it is first important to describe one recurring theme that runs through most of the cases and often appears to have a decisive effect on the outcome: the high degree of judicial deference accorded to agency findings of fact and interpretations of the applicable statutes and regulations.

(1) Scope of judicial review

Grant cost cases typically come to the courts in the form of appeals from an agency determination that often follows an administrative hearing by an agency appeals board.[90] These court cases are generally governed by the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706. Under the most relevant scope of review standards, an agency action will be sustained unless it is arbitrary, capricious, an abuse of discretion, not otherwise in accordance with law, procedurally flawed, or unsupported by substantial evidence. *See* 5 U.S.C. §§ 706(2)(A), (D), (E). Likewise, the courts will generally accord considerable deference to the agency's interpretation of the applicable statutes and regulations, although the precise extent of deference varies.[91] One recent grant cost case described the standards of review as follows:

> "Under the APA, we may set aside agency action only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The standard is a narrow one, and the reviewing court may not substitute its judgment for that of the agency. However, the agency must articulate a rational connection between the facts found and the conclusions made. Also, we must give substantial

[90] For example, a number of the court cases discussed below are appeals from decisions of the Department of Health and Human Services Departmental Appeals Board (DAB). According to the DAB's Web site, it hears disputes that may involve as much as $1 billion in grant funds annually. *See* www.hhs.gov/dab/background.html (last visited September 15, 2005).

[91] See Chapter 3, section B, for a general discussion of the extent of judicial deference to agency interpretations.

> deference to an agency's interpretation of its own regulations."

*Public Utility District No. 1 of Snohomish County, Washington v. Federal Emergency Management Agency*, 371 F.3d 701, 706 (9th Cir. 2004) (citations and internal quotation marks omitted).

Concerning the deference due agency regulatory interpretations, the court in *Public Utility District No. 1* cited *Thomas Jefferson University v. Shalala*, 512 U.S. 504 (1994). In *Thomas Jefferson University*, the Supreme Court sustained the agency's interpretation of a regulation dealing with the reimbursement of costs under the Medicare program, applying the following standards:

> "The APA . . . commands reviewing courts to hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A). We must give substantial deference to an agency's interpretation of its own regulations. Our task is not to decide which among several competing interpretations best serves the regulatory purpose. Rather, the agency's interpretation must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation. In other words, we must defer to the Secretary's interpretation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation."

512 U.S. at 512 (citations and internal quotation marks omitted).

Another grant cost case that also cited *Thomas Jefferson University* illustrates the decisive role that deference to agency interpretations can play. In *Alabama v. Shalala*, 124 F. Supp. 2d 1250 (M.D. Ala. 2000), the court acknowledged that both the grantee and the federal agency presented reasonable interpretations of the applicable cost criteria, but concluded that the agency's interpretation must take precedence since it was "reasonable and not arbitrary or capricious." *Id.* at 1259.

Of course, even an agency determination that might otherwise be within its discretion will be overturned if it is procedurally defective. For example, the court in *Arizona v. Thompson*, 281 F.3d 248 (D.C. Cir. 2002), did not

question the authority of the Department of Health and Human Services (HHS) to direct the allocation of common administrative costs among the multiple grant programs that they benefited, in accordance with a general principle in the then-current OMB Circular No. A-87 (Aug. 27, 1997), at Attachment A, § C.3.a. However, the court rejected the department's directive because it rested on the faulty premise that the Temporary Assistance for Needy Families (TANF) program statute mandated this cost allocation method:

> "[The] determination was made in reliance on HHS' mistaken belief that the statute gave it no choice in the matter. Although nothing we have said necessarily precludes HHS, in the exercise of its discretion, from relying on the principles of Circular A-87 to determine the most appropriate cost allocation rule to apply to TANF, that is not the course the Department followed in this case."

281 F.3d at 259. *See also Nebraska Department of Health & Human Services v. United States Department of Health & Human Services*, 340 F. Supp. 2d 1 (D.D.C. 2004) (rejecting a similar cost allocation directive on the basis that it constituted a substantive rule issued without the notice-and-comment rulemaking required by the Administrative Procedure Act).

(2) Court case examples

With the scope of review considerations in mind, we turn to some specific case examples.

Under the cost principles OMB Circular No. A-87, contributions to a reserve for self-insurance are an allowable grant cost if certain conditions are met. However, Alabama violated OMB Circular No. A-87 by transferring the federal share of excess self-insurance reserves from its state insurance fund to its general treasury fund to be used for purposes unrelated to the federal grants that supplied the insurance contributions. *Alabama v. Shalala*, 124 F. Supp. 2d 1250 (M.D. Ala. 2000), affirming a decision of the Department of Health and Human Services Departmental Appeals Board (DAB).[92] The court rejected Alabama's argument that appropriate costs

[92] The version of OMB Circular No. A-87 applicable to the transfers at issue was dated January 28, 1981. *Alabama*, 124 F. Supp. 2d at 1253, fn.2. The self-insurance reserve provision in that version was in Attachment B, § C.4(c). *Id.* at 1254.

were incurred, and the transaction was in effect complete once the grant funds were initially paid into the state insurance fund. Instead, the court held that the insurance contributions retained their character as federal funds and remained subject to OMB Circular No. A-87 until they were disbursed by the state insurance fund. *Id.* at 1257–60.[93] The court also rejected Alabama's argument that a subsequent amendment to Circular No. A-87 which specifically prohibited the transfer of the federal share of insurance contributions to other state funds demonstrated that such transfers were appropriate before the amendment. *Id.* at 1257, fn. 9 ("the amendments may have made more explicit requirements that had always existed under the cost principles and other sources of federal appropriations law").[94]

In a case very similar to *Alabama v. Shalala*, the court in *Oklahoma ex rel. Office of State Finance v. United States*, 292 F.3d 1261 (10th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003), affirmed the DAB's disallowance of a portion of federal contributions for the health benefits of state employees who administered federal programs. The disallowance was triggered by the state's transfer of the funds from an insurance reserve fund to a general fund to be used for state educational expenditures rather than state employee health benefits. The court held that the amended version of OMB Circular No. A-87 was dispositive and "singularly fatal" to the state's appeal:

> "OMB [Circular No.] A-87's definition of 'cost' excludes 'transfers to a general or similar fund.' . . . Federal monies forwarded to Oklahoma's Clearing Fund represent unrecoverable 'transfers to a general or similar fund.' Thus, there is no need to ascertain when federal money loses its federal nature, or even if the monies Oklahoma is attempting to be reimbursed for are necessary and reasonable expenditures. The money diverted to the Clearing Fund fails to qualify as a reimbursable cost in the first instance."

[93] In this regard, the court relied on *Pennsylvania Department of the Budget v. United States Department of Health & Human Services*, 996 F.2d 1505 (3rd Cir.), *cert. denied*, 510 U.S. 1010 (1993), discussed previously in section E of this chapter.

[94] The current version of OMB Circular No. A-87 (May 10, 2004) retains this prohibition at Attachment B, § 22.d(5) ("Whenever funds are transferred from a self-insurance reserve to other accounts (*e.g.*, general fund), refunds shall be made to the Federal Government for its share of funds transferred, including earned or imputed interest from the date of transfer.").

*Oklahoma*, 292 F.3d at 1264.

The Federal Emergency Management Agency (FEMA) acted reasonably in reducing a grantee's fringe benefit overhead reimbursement for overtime labor from a uniform rate of 36 percent to about 10 percent, which approximated the actual overtime labor costs to the grantee. *Public Utility District No. 1 of Snohomish County, Washington v. Federal Emergency Management Agency*, 371 F.3d 701 (9th Cir. 2004). The grantee utility district argued that FEMA was attempting to "rewrite" the grant conditions by reducing the reimbursement rate based on a post-award audit by the agency's inspector general since use of the 36 percent flat rate constituted a common accounting practice that was not prohibited by the grant terms. The court rejected this argument, holding that the language in OMB Circular No. A-87 making fringe benefits allowable costs "to the extent that the benefits are reasonable and are required by law" provided a basis for reducing the costs via a post-award audit:

> "We need not ponder whether the District's use of a uniform fringe benefit overhead rate is a 'proper' or commonly-accepted method of accounting for such expenses. This fact remains: the District has never challenged FEMA's contention that the District's actual fringe benefit expenses for overtime labor for work attributable to the 1995 and 1996 storms was about ten percent, as opposed to the thirty-six percent billed by the District.
>
> "The District's use of the thirty-six percent rate resulted in a sizable windfall—in excess of $600,000—for the District. That this windfall may have resulted from the District's use of an accepted accounting practice is of no consequence. . . . FEMA did not act in an arbitrary and capricious manner by challenging the District's use of the thirty-six percent fringe benefit rate, where the use of the rate resulted in FEMA paying District expenses having nothing to do with the disasters for which federal relief was given."

*Public Utility*, 371 F.3d at 710. The court also sustained FEMA's reduction of other costs reimbursed to the grantee based on the results of the inspector general audit, concluding that the disallowances were not arbitrary or capricious. *Id.* at 711–13.

The court affirmed a Department of Health and Human Services DAB decision upholding the denial of reimbursement for interest costs incurred by the state in acquiring computer equipment to be used to administer several social service programs partly funded by federal grants. *New York v. Shalala*, 959 F. Supp. 614 (S.D.N.Y. 1997), *aff'd*, 143 F.3d 119 (2nd Cir. 1998). Again, the court held that the disallowances constituted a valid application of the cost principles embodied in OMB Circular No. A-87 and, in turn, incorporated into Department of Health and Human Services regulations. Among other things,[95] the state argued that (1) the applicable statutes provided for reimbursement of "necessary" expenses, (2) interest was a necessary expense, and (3) therefore, the circular's exclusion of interest violated the statutes. However, the court held that, since the relevant statutes did not specifically address reimbursement of interest, the federal agencies had discretion to determine whether and to what extent interest constituted a "necessary" expense:

> "[The state's] . . . interpretation . . . may be as reasonable as the Secretary's; however, this is not the standard the Court applies in reviewing an agency's construction of a statute. Even where the State offers a reasonable alternative interpretation of a statute, the decision of where to 'draw the line' with respect to reimbursing costs is left to the discretion of the agency. HHS's interpretation of the Statutes need only be reasonable—it need not be the *only* reasonable interpretation."

*New York*, 959 F. Supp. at 620–21 (emphasis in original; citations omitted).

The court in *Delta Foundation, Inc. v. United States*, 303 F.3d 551 (5th Cir. 2002), affirmed a DAB decision that sustained a series of cost disallowances arising from an inspector general audit of community

---

[95] The state also argued, to no avail, that OMB lacked authority to prescribe government-wide cost principles and that the Department of Health and Human Services violated the notice and comment provisions of the Administrative Procedure Act in incorporating the circular into its own regulations. On the former point, the court stated:

> "OMB has been deemed 'the President's principal arm for the exercise of his managerial functions.' . . . One such managerial function is to provide federal agencies with consistent, government-wide policy guidance."

*New York*, 959 F. Supp. at 618. On the latter point, it observed that the state was on notice of the circular's provisions and failed to object to them for at least 20 years. *Id.* at 619.

development block grants. The case is quite fact-specific, but it illustrates the principles of deference to agency findings and interpretations discussed previously. It also demonstrates the importance of grantee compliance with record-keeping and cost-documentation requirements. For example, the court observed with reference to certain disallowed costs:

> "As the Board correctly noted, the Circular [OMB Circular No. A-122] requires that Delta supply time records reflecting 'the distribution of activity of each employee' and 'account for the total activity for which employees are compensated.' . . . The Board's refusal to accept Delta's 'good word' in place of the required documentation is certainly not arbitrary and capricious."

*Delta Foundation*, 303 F.3d at 570. *But see Institute for Technology Development v. Brown*, 63 F.3d 445, 454–58 (5th Cir. 1995) (decision is somewhat unusual since the court *rejected* the agency's determination that depreciation did not constitute an allowable cost under the applicable regulations and grant agreements, prompting a dissent criticizing the majority for not deferring to the agency on this point).

In *Missouri Department of Social Services v. United States Department of Education*, 953 F.2d 372 (8th Cir. 1992), the court affirmed the agency's right to recover excess salary costs paid to the grantee. The court agreed that the grantee did not maintain adequate accounting procedures and records to apportion its employees' salaries between time relating to the federal grants and time spent on nongrant activities, as required by federal regulations. The court also upheld the agency's determination that the grantee's circumstances did not meet the requirements of a regulation excusing the repayment of unallowable costs in the presence of "mitigating circumstances." *Id.* at 376.

*Board of Trustees of Public Employees' Retirement Fund of Indiana v. Sullivan*, 936 F.2d 988 (7th Cir. 1991), *cert denied*, 502 U.S. 1072 (1992), affirmed a decision by the DAB that the grantee was reimbursed excess payments for the retirement benefits of state employees who administered federal grant programs. An audit had determined that the state made retirement contributions on behalf of state employees administering federal grants that were greater than its contributions for state employees who performed only nonfederal activities and were wholly state funded. The court agreed that this violated the federal cost principle that, in order

to be allowable, a cost must be consistent with policies, regulations, and procedures that apply uniformly to both federally assisted and other activities of the grantee:

> "Whatever the state actually pays to state workers is the benchmark for measuring the federal government's share. Indiana pays its public workers partly in cash and partly in promises. Indiana is free to make that choice for itself but may not claim 100% in cash up front from the federal government if it is unwilling to put the retirement program for other state employees on an equivalently well-funded basis."

*Sullivan*, 936 F.2d at 992.

Litigation costs incurred by grantees in suing the United States were found unallowable under the Nuclear Waste Policy Act of 1982, 42 U.S.C. §§ 10101–10226. *Nevada v. Herrington*, 827 F.2d 1394 (9th Cir. 1987).

(3) GAO case examples

GAO has also had occasion over the years to consider grant cost issues. The following are examples of GAO decisions discussing various grant programs.

GAO held that the Asia Foundation may not use its general support grant funds from the Department of State to match other federal grants from the Agency for International Development and the United States Information Agency. Generally, funds derived from other federal grants do not qualify as matching funds unless statutorily authorized. The Asia Foundation does not have specific statutory authority to use grant funds to match other federal grants. B-270654, May 6, 1996.

Under applicable OMB Circulars, the cost of grant audits is an allowable cost. Therefore, the National Endowment for the Humanities could provide grant funds to nonprofit institutions to cover such audit costs, and could increase a grant award to accommodate such costs where the initial award was inadequate for this purpose. 72 Comp. Gen. 175, 177 (1993).

Recovery of antitrust damages by a state grantee stemming from a grant-financed project serves to reduce the actual costs of the grantee and must be accounted for to the government. This is true even where the United

States has declined to participate in the cost of the antitrust action. 57 Comp. Gen. 577 (1978). However, the United States is not entitled to share in treble damages. *Id.*; 47 Comp. Gen. 309 (1967). Out-of-pocket expenses incurred by the state in effecting the recovery should be shared by the federal government in the same proportion as the recovered damages. B-162539, Oct. 11, 1967.

Where a grantee paid a nondiscriminatory sales tax on otherwise proper expenditures with grant funds, the taxes are not taxes imposed on the United States and are allowable. 37 Comp. Gen. 85 (1957). However, property taxes were held not allowable under a construction grant because they represent operating costs rather than construction costs. B-166506, Feb. 14, 1973.

The payment of expert witness fees was found unrelated to the purposes of a research grant. 42 Comp. Gen. 682 (1963).

Construction of a bridge could not be paid for out of federal aid highway funds where the construction was necessitated by a flood control project and not as a highway project. 41 Comp. Gen. 606 (1962).

Buses acquired by a city under a "mass transportation" grant could be used for charter service, an unauthorized grant purpose, where such use was merely incidental to the primary use of the buses for authorized mass transit purposes. B-160204, Dec. 7, 1966.

The salary of an individual hired to evaluate the Upward Bound Program at a grantee college was disallowed as a grant cost, because the grant document contained no provision for such an expenditure and the applicable program guidelines specified that evaluation was not an allowable expense. B-161980, Nov. 23, 1971.

The cost of a luncheon for top officials of the Department of Human Resources, District of Columbia Government, was disallowed as an improper administrative expense under a social services program grant under Title XX of the Social Security Act, 42 U.S.C. § 1397a. B-187150, Oct. 14, 1976.

Ordinarily, increased project costs resulting from grantee negligence giving rise to justified claims for damages would not be allowable. However, a damage award was viewed as a recognizable cost element where the grantee's error had contributed to an unrealistically low initial cost, but an

amendment to the grant was required before the increased costs could be allowed. 47 Comp. Gen. 756 (1968).

Under a Federal Airport Act (Act of May 13, 1946, ch. 251, 60 Stat. 170) program providing for federal payment of a specified percentage of allowable project costs, the fair value of land and equipment donated to the grantee could be treated as an allowable cost because failure to do so would, in effect, penalize the grantee for the contributions of "public spirited citizens." B-81321, Nov. 19, 1948.

### c. Note on Accounting

Cost principles on which a grant award is conditioned are binding on the grantee. B-203681, Sept. 27, 1982. It is the grantee's responsibility to maintain adequate fiscal records to support the allowable costs claimed. With respect to the common rules applicable to state and local governments, see generally 7 C.F.R. § 3016.20. Section 452(a) of the General Education Provisions Act, as amended, 20 U.S.C. § 1234a(a), illustrates the importance of compliance with record-keeping requirements. It provides that the Secretary of Education's burden of establishing a *prima facie* case for recovery of misspent grant funds is satisfied where the grantee fails to maintain records required by law or fails to afford the Secretary access to such records.

As a number of the cases discussed above demonstrate, the courts tend to require strict adherence to grantee cost documentation and record-keeping requirements. Thus, the court observed in *Montgomery County v. United States Department of Labor*, 757 F.2d 1510, 1512–13 (4th Cir. 1985):

> "[T]he County contends that it is inequitable to equate its record-keeping failure with a misspending of federal monies and to require it to repay virtually all of the funds expended by its subgrantee . . . In support of its contention, the County asserts that the purposes of CETA [the Comprehensive Employment and Training Act] were met by [the subgrantee's] performance and cites corrective steps which the County has since taken. . . . We are unpersuaded.
>
> * * * * *
>
> "Record keeping is at the heart of the federal oversight and evaluation provisions of CETA and its implementing regulations. Only by requiring documentation to support

> expenditures is the [Department of Labor] able to verify that billions of federal grant dollars are spent for the purposes intended by Congress. Unless the burden of producing the required documentation is placed on recipients, federal grantees would be free to spend funds in whatever way they wished and obtain virtual immunity from wrongdoing by failing to keep required records. Neither CETA nor the regulations permit such anomalous results."

The above passage was quoted with approval in *Louisiana Department of Labor v. United States Department of Labor*, 108 F.3d 614, 618 (5th Cir.), *cert. denied*, 522 U.S. 823 (1997). The court in this case reached a similar result, adding:

> "We conclude that the final decision of the Secretary is based on substantial evidence, and that the state and the [grantee] and its subgrantees cavalierly disregarded the accounting requirements and procurement procedures specified by the JTPA [Job Training Partnership Act] and the accompanying regulations. Federal grant recipients who are entrusted with public funds are bound to fulfill that public trust by discharging their duties in strict compliance with the requirements established by Congress. Accordingly, we emphasize that the procedural requirements of the JTPA are not merely hortatory ideals; they are obligatory duties. Grant recipients who . . . fail to honor these procedural requirements, dishonor and disserve the public trust."

108 F.3d at 620. *See also City of Newark v. United States Department of Labor*, 2 F.3d 31, 34–35 (3rd Cir. 1993), to the same effect.

In one case, GAO did concur in a proposal by a grantor agency to adopt a method of calculation that disallowed less than the entire amount of a grant where the grantee had maintained inadequate records. B-186166, Aug. 26, 1976. In this case, a university had received a series of federal research grants spanning a number of years. The university had no records to document its disposition of grant funds for periods prior to fiscal year 1974. Audits of available university records for grant expenditures in fiscal years 1974 and 1975 disclosed certain unallowable costs. The GAO decision held that the grantor agency had discretion to disallow the same proportion of

funds for the years for which no documentation was available as were disallowed for the periods for which records existed.

In a variety of cases involving the Medicare and Medicaid programs, courts have approved cost reimbursement disallowances on the basis of error rate statistical data, such as errors imputed from a quality control system. In *Georgia v. Califano*, 446 F. Supp. 404, 409–10 (N.D. Ga. 1977), the court upheld the determination of overpayments under the Medicaid program on the basis of statistical sampling, in view of the "practical impossibility" of individual claim-by-claim audit. The court also noted that, under the pertinent federal regulations, the state was given the opportunity to present evidence before the disallowance became final. *See also Ratanasen v. California Department of Health Services*, 11 F.3d 1467, 1469–71 (9th Cir. 1993); *Chaves County Home Health Service, Inc. v. Sullivan*, 931 F.2d 914 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 1091 (1992); *Webb v. Shalala*, 49 F. Supp. 2d 1114, 1123 (W.D. Ark. 1999) and cases cited. Likewise, random sampling has been sustained as an audit technique to identify improper expenditures of vocational rehabilitation grant funds. *Michigan Department of Education v. United States Department of Education*, 875 F.2d 1196, 1205 (6th Cir. 1989) ("audit of the thousands of cases comprising the universe of cases would be impossible. . . . [and] . . . a final determination is not made until the state has had an opportunity to present its own evidence of an error in the audit").

In *Maryland v. Mathews*, 415 F. Supp. 1206 (D.D.C. 1976), a case involving the then Aid to Families with Dependent Children program, the court held that an agency can establish by regulation a withholding of federal financial participation in a specified amount set by a tolerance level, as long as the tolerance level is reasonable and supported by an adequate factual basis. The regulation involved in the specific case, however, did not meet the test and was found to be arbitrary and therefore invalid. It also has been held that, if setting a tolerance level is discretionary, the agency can set it at zero. *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 762 F.2d 406 (4th Cir. 1985); *California v. Settle*, 708 F.2d 1380 (9th Cir. 1983). See also *United States v. Texas*, 507 U.S. 529 (1993), which involved statutory and regulatory provisions that required states to reimburse the federal government for a portion of the replacement costs of lost or stolen food stamps exceeding specified tolerance levels. (The validity of these requirements was not contested in this case.)

## 2. Pre-Award Costs (Retroactive Funding)

"Retroactive funding" means the funding of costs incurred by a grantee before the grant was awarded. Three separate situations arise: (1) costs incurred prior to award but after the program authority has been enacted and the appropriation became available; (2) costs incurred prior to award and after program authority was enacted but before the appropriation became available; and (3) costs incurred prior to both program authority and appropriation availability.

*Situation (1)*: In this situation, the grantee seeks to charge costs incurred before the grant was awarded (in some cases even before the grantee submitted its application) but after both the program legislation and the implementing appropriation were enacted.

There is no rule or policy that generally restricts allowable costs to those incurred after the award of a grant. However, agencies may adopt such a policy by regulation. B-197699, June 3, 1980. Thus, in a number of cases, grant-related costs incurred prior to award, but after the program was authorized and appropriated funds were available for obligation, have been allowed where (a) there was no contrary indication in the language or legislative history of the program statute or the appropriation, (b) allowance was not prohibited by the regulations of the grantor agency, and (c) the agency determined that allowance would be in the best interest of carrying out the statutory purpose. 32 Comp. Gen. 141 (1952); 31 Comp. Gen. 308 (1952); B-197699, June 3, 1980; B-133001, Mar. 9, 1979; B-75414, May 7, 1948. (The above criteria are not specified as such in any of the cases cited but are derived from viewing all of the cases as a whole.)

*Situation (2)*: In this situation, pre-award costs are incurred after program legislation has been enacted, but before an appropriation becomes available.

Prior to the Comptroller General's decision in 56 Comp. Gen. 31 (1976), a "general rule" was commonly stated to the effect that absent some indication of contrary intent, an appropriation could not be used to pay grant costs where the grantee's obligation arose before the appropriation implementing the enabling legislation became available. 45 Comp. Gen. 515 (1966); 40 Comp. Gen. 615 (1961); 31 Comp. Gen. 308 (1952); A-71315, Feb. 28, 1936.

In 56 Comp. Gen. 31, the Comptroller General reviewed the earlier decisions and concluded that there was no legal requirement for a general rule prohibiting the use of grant funds to pay for costs incurred prior to the

availability of the applicable appropriation. Rather, the determination should be made on a case-by-case basis. Thus, the decision announced:

> "We would prefer to base each decision from now on on the statutory language, legislative history, and particular factors operative in the particular case in question, rather than on a general rule."

*Id.* at 35.

In reviewing the earlier decisions, the Comptroller General found that each had been correctly decided on its own facts. Thus, retroactive funding was prohibited in 40 Comp. Gen. 615 (1961), 31 Comp. Gen. 308 (1952), and A-71315, Feb. 28, 1936. However, in each of those cases, there was some manifestation of an affirmative intent that funds be used only for costs incurred subsequent to the appropriation. For example, 31 Comp. Gen. 308 concerned grants to states under the Federal Civil Defense Act.[96] The committee reports and debates on a supplemental appropriation to fund the program contained strong indications that Congress did not intend that the money be used to retroactively fund expenses incurred by states prior to the appropriation. By way of contrast, there were no such indications in the situation considered in 56 Comp. Gen. 31 (matching funds provided to states under the Land and Water Conservation Fund Act of 1965[97]). Accordingly, 56 Comp. Gen. 31 did not overrule the earlier decisions, but merely modified them to the extent that GAO would no longer purport to apply a "general rule" in this area.

In determining whether retroactive funding is authorized, relevant factors are evidence and clarity of congressional intent, the degree of discretion given the grantor agency, and the proximity in time of the cost being incurred to the grant award. As in Situation (1), significant factors also include the agency's own regulations and the agency's determination that funding the particular costs in question will further the statutory purpose. Accordingly, the authority will be easier to find where an agency has broad discretion and favorable legislative history. With this approach, retroactive funding authority may be found to exist (as in 56 Comp. Gen. 31), or not to exist (as in 40 Comp. Gen. 615).

[96] Pub. L. No. 81-920, 64 Stat. 1245 (Jan. 12, 1951).

[97] Pub. L. No. 88-578, 78 Stat. 897 (Sept. 3, 1964).

Case 1:23-cv-01649-JMC Document 22-4 Filed 03/18/24 Page 632 of 728



If an agency wishes to recognize retroactive funding in limited situations in its regulations, it must, in order to avoid potential Antideficiency Act problems, make it clear that no obligation on the part of the government can arise prior to the availability of an appropriation. Of course, the grant itself cannot be made until the appropriation becomes available. 56 Comp. Gen. at 36.

*Situation (3)*: In this situation, the grantee seeks to charge costs incurred not only before the appropriation became available, but also before the program authority was enacted.

Costs incurred prior to both the program authorization and the availability of the appropriation may generally not be funded retroactively. *See* 56 Comp. Gen. 31 (1976); 32 Comp. Gen. 141 (1952); B-11393, July 25, 1940. GAO recognizes that there may possibly be exceptions even to this rule (56 Comp. Gen. at 35), but thus far there are no decisions identifying any.

One final situation deserves mention. In each of the retroactive funding cases cited above, the grant was in fact subsequently awarded. In B-206244, June 8, 1982, a state had applied for an Interior Department grant under the Youth Conservation Corps Act, 16 U.S.C. §§ 1701–1706 (1976), and later withdrew its application due to funding uncertainties. The state then filed a claim for various expenses it had incurred in anticipation of the grant. GAO held that payment would violate both the program legislation and the purpose statute, 31 U.S.C. § 1301(a). Interior's appropriation was intended to accomplish grant purposes, but the state's expenses did not accomplish any grant purposes since the grant was never made.

# H. Recovery of Grantee Indebtedness

## 1. Government's Duty to Recover

This section is intended to summarize the application of "debt collection law" in the context of assistance programs, and to highlight a few issues in which the fact that a grant is involved may be of special relevance.[98]

Claims in favor of the United States against an assistance recipient may arise for a variety of reasons. As a general proposition, it has been the view of both GAO and the executive branch that the United States has not only a right but a duty to recover amounts owed to it, and that this duty exists without the need for specific statutory authority. This applies to assistance recipients just as it would apply to other debtors. The Federal Claims Collection Standards require each agency to "aggressively collect all debts arising out of activities of, or referred or transferred for collection services to, that agency." 31 C.F.R. § 901.1(a) (2005).[99] *See*, *e.g.*, 7 C.F.R. § 3016.52(a) (the Department of Agriculture's common rule on collection of amounts due):

> "Any funds paid to a grantee in excess of the amount to which the grantee is finally determined to be entitled under the terms of the award constitute a debt to the Federal Government. If not paid within a reasonable period after demand, the Federal agency may reduce the debt by:
>
> > "(1) Making an administrative offset against other requests for reimbursements,

[98] The General Accounting Office Act of 1996, Pub. L. No. 104-316, 110 Stat. 3826 (Oct. 19, 1996), transferred the Comptroller General's claims settlement authority, and related authorities, to the executive branch. Thus, executive branch agencies are now primarily responsible for prescribing guidance on claims collection matters. *See* B-303906, Dec. 7, 2004, at 2.

[99] As part of the transfer of claims-related functions referenced in the preceding footnote, the Attorney General and the Secretary of the Treasury now prescribe the Federal Claims Collection Standards. *See* 31 U.S.C. § 3711(d)(2); 31 C.F.R. § 900.1(a).

"(2) Withholding advance payments otherwise due to the grantee, or

"(3) Other action permitted by law."

For example, grant funds erroneously awarded to an ineligible grantee must be recovered by the agency responsible for the error, including expenditures the grantee incurred before receiving notice that the agency's initial determination had been made in error. 51 Comp. Gen. 162 (1971); B-146285, B-164031, Apr. 19, 1972. The cited decisions recognize that there might be exceptional circumstances in which full recovery might not be required, but exceptions would have to be considered on an individual basis. *See also* 18 Op. Off. Legal Counsel 74, 76 (1994) ("In the . . . context of federal grants to state and local agencies, courts have stated that the federal government may use principles of restitution to recover monies that were granted for specific purposes and then used in contravention of those purposes, even in the absence of statutory authority expressly permitting such recovery.").

In a recent case, federal grant funds given by the U.S. Department of Labor to the New York Workers' Compensation Board to meet its expenses related to the September 11, 2001, terrorist attack on the World Trade Center were improperly transferred by the Board to other New York State entities. B-303927, June 7, 2005. Despite the fact that both the Department and the Board contributed to the misunderstandings that resulted in the payments to the other entities, GAO concluded that the Department should seek recovery of the funds improperly transferred unless the Secretary of Labor seeks and obtains congressional ratification of the grant expenditures to date. *Id.* at 10.

Similarly, where an agency misapportions formula grant funds so that some states receive excess funds, the excess must be recovered. If the misapportionment resulted in other states receiving less than their formula amount, the apportionments of all of the states involved must be appropriately adjusted. B-275490, Dec. 5, 1996, at fn. 10; 41 Comp. Gen. 16 (1961).

Courts have upheld the authority of federal agencies to seek recovery of assistance payments where the grantee has not used those payments for authorized purposes within a prescribed period or where the grantee has not accounted for the funds within a reasonable period of time. In *Mayor and City Council of Baltimore v. Browner*, 866 F. Supp. 249 (D. Md. 1994),

the court rejected the city's challenge to the Environmental Protection Agency's authority to impose cut-off dates for use of grant funds for construction of sewage treatment facilities:

> "The City argues that the imposition of cut-off dates is inappropriate absent specific authority in the Clean Water Act, the regulations pertaining to the administration of grants, or the terms of the grant offer or acceptance forms. However the presence of project period start and finish dates on each grant award and the repeated references throughout the regulations to time limits and schedules for grant-funded projects anticipate such actions. . . .
>
> "Although the establishment of cut-off dates is not explicitly provided for in the relevant regulations, they are obviously implied and required to lend force to the provisions regulating the timing of grant-funded projects. Otherwise, the establishment of time limits would be a meaningless exercise for grantor and grantee. EPA must have a method to attain reimbursement of funds already disbursed when a project exceeds its time limit. Cut-off dates are simply the enforcement of the limits specifically provided for in the regulations in the context of grant funds disbursed proactively. The regulations in question are not 'arbitrary, capricious, or manifestly contrary' to [the Clean Water Act] and a policy of imposing cut-off dates for grant funding is not invalid."

866 F. Supp. at 251–52 (footnotes omitted).

*City of New York v. Shalala*, 34 F.3d 1161 (2nd Cir. 1994), concerned Head Start grant funds paid to the city and distributed by the city to its constituent agencies over a period of years but which the constituent agencies had not yet disbursed for valid program purposes. The Department of Health and Human Services eventually disallowed these accumulated balances. The Departmental Appeals Board sustained the department's disallowances. The Head Start statute did not specifically empower the department to disallow accumulated balances on the basis of their age and lack of documentation that the funds had been properly disbursed. *City of New York*, 34 F.3d at 1166–67. Nevertheless, the court held that the department "acted reasonably in deciding that, after a certain period of time, the City was no longer entitled to postpone its accounting

obligations." *Id.* at 1168. The court also rejected the city's argument that the department could not apply a rule treating accounts receivable as bad debt once they became more than two years old. *Id.* at 1170.

Where, under an assistance program, the government is authorized or required to recover funds for whatever reason, the Federal Claims Collection Act of 1966, as amended, 31 U.S.C. §§ 3711–3720E,[100] and the joint Treasury Department-Justice Department implementing regulations (Federal Claims Collection Standards, 31 C.F.R. parts 900–904) apply unless the program legislation under which the claim arises or some other statute provides otherwise. *See* 31 C.F.R. § 900.1(a).

Indebtedness to the United States may also result from the misuse of grant funds. *E.g.*, *Utah State Board for Vocational Education v. United States*, 287 F.2d 713 (10th Cir. 1961); *Mass Transit Grants: Noncompliance and Misspent Funds by Two Grantees in UMTA's New York Region*, GAO/RCED-92-38 (Washington, D.C.: Jan. 23, 1992). The cases usually arise when the grantor agency disallows certain costs. Here again the government's position has been that the right to recover exists independent of statute, supplemented or circumscribed by any statutory provisions that may apply. *See*, *e.g.*, B-198493, July 7, 1980; B-163922, Feb. 10, 1978. As discussed hereafter, the government's right to recover has come under attack by recipients, particularly during the 1980s, but such attacks rarely succeed.

What we present here is by no means an exhaustive cataloguing of the cases. Our selection is designed to serve three purposes: (1) summarize what the law appears to be as of the date of this publication; (2) reflect any discernible trends; and (3) point out some issues that may be of more general relevance. As a general proposition, the courts have looked first to the program legislation and usually have concluded that adequate authority to support the government's right of recovery can be found in, or deduced from, the enabling statute.

The cases we selected for purposes of illustration are drawn largely from two massive grant programs (perhaps more accurately described as collections of programs) that have operated in various forms and under

[100] Major amendments to the original 1966 Act were made by the Debt Collection Act of 1982, Pub. L. No. 97-365, 96 Stat. 1749 (Oct. 25, 1982), and the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, 1321-358 (Apr. 26, 1996).

many statutory iterations for decades: Title I of the Elementary and Secondary Education Act (ESEA), and the Comprehensive Employment and Training Act (CETA).[101] Both of these programs have undergone extensive legislative changes over the years. The most recent major amendments to ESEA were enacted by the No Child Left Behind Act of 2001, Pub. L. No. 107-110, 115 Stat. 1425 (Jan. 8, 2002). CETA was replaced in 1982 by the Job Training Partnership Act, Pub. L. No. 97-300, 96 Stat. 1322 (Oct. 13, 1982). The most recent major amendments to this program were enacted by the Workforce Investment Act of 1998, Pub. L. No. 105-220, 112 Stat. 936 (Aug. 7, 1998). We chose these programs because they both generated a large volume of litigation on a variety of relevant topics. Apart from whatever value specific cases may have by analogy to other programs, the material illustrates the kinds of issues that have arisen and the approach the courts, including the Supreme Court, have taken in resolving them.

ESEA included a provision, very common in grant program legislation, requiring the states to provide adequate assurances to the Department of Education that grant funds would be used only on qualifying programs. In addition, the law was amended in 1978 to give the Secretary of Education explicit authority to direct the repayment of misspent grant funds from non-ESEA sources. 20 U.S.C. § 2835(b) (1982).[102] Prior to this amendment, the statute had provided simply that payments under Title I shall take into account the extent to which any previous payment to the same state was greater or less than it should have been.

Two states argued that the 1978 amendments did not apply to misspent funds prior to 1978, and that the government's sole remedy with respect to pre-1978 funds was to withhold future grant funds, in which event the state would simply undertake a smaller Title I program. The government argued that the right to recover existed both under the pre-1978 law and under the common law. The Supreme Court held that the pre-1978 version of the law clearly gave the government the right to recover misspent funds. *Bell v.*

[101] The original source of Title I of ESEA was the Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27 (Apr. 11, 1965). CETA was originally enacted as the Comprehensive Employment and Training Act of 1973, Pub. L. No. 93-203, 87 Stat. 839 (Dec. 28, 1973).

[102] *See* 20 U.S.C. § 7844 for current provisions governing grantee assurances, and 20 U.S.C. §§ 1234a–1234b for provisions dealing with recovery of misused grant funds.

*New Jersey*, 461 U.S. 773 (1983). The pre-1978 language in question provided that ESEA payments—

> "shall take into account the extent (if any) to which any previous payment to such State educational agency under this title (whether or not in the same fiscal year) was greater or less than the amount which should have been paid to it."

Pub. L. No. 89-10, § 207(a)(1). The Court held that the plain terms of this language as well as its legislative history recognized the federal government's right to recover misused funds. It rejected as "no more than remotely plausible" the state's alternative interpretation that this language merely authorized the government to reduce future grants. The Court described the consequences of the state's interpretation, which it clearly considered untenable, as follows:

> "[T]he Federal Government recovers nothing: it pays less, but it receives correspondingly less in the way of Title I programs. Under that reading, the State would have no liability to the Federal Government for misspent funds."

*Bell*, 461 U.S. at 783, fn. 8. Apart from the holding itself and its significance with respect to any program statutes with similar language,[103] two other points from this decision are noteworthy:

- The existence and amount of the state's debt are to be determined administratively by the agency in the first instance, subject to judicial review. *Id*. at 791–92. (This is the same approach used in the Federal Claims Collection Standards for debt collection generally.)

- Because the Court found adequate authority in the statute, it declined to rule on the existence of a common-law right. *Id*. at 782 n.7.

In a 1981 case, a lower court had found a common-law right of recovery along with the ESEA statutory right. *West Virginia v. Secretary of Education*, 667 F.2d 417 (4th Cir. 1981). A 1987 case also upheld the

[103] The court in *Ledbetter v. Shalala*, 986 F.2d 428, 433–34 (11th Cir.), *cert. denied*, 510 U.S. 1010 (1993), followed *Bell*, holding that substantively identical language in the Older Americans Act (42 U.S.C. § 3029(a)) likewise conferred a right to recover misspent grant funds.

government's common-law right of recovery, at least to the extent of overallocations or other erroneous payments. *California Department of Education v. Bennett*, 829 F.2d 795, 798 (9th Cir. 1987).

Two years after *Bell*, the Supreme Court considered another issue arising from the same litigation and held that the 1978 amendments to ESEA were not retroactive for purposes of determining whether funds had been misspent. *Bennett v. New Jersey*, 470 U.S. 632 (1985). What is important here is the more general rule the Court announced, namely, that substantive rights and obligations under federal grant programs are to be determined by reference to the law in effect when the grants were made. *Id.* at 638–41.

The Court also rejected an argument that recovery would be inequitable because the state acted in good faith. The role of the reviewing court is to determine if the proper legal standards are applied. If they are, a court has "no independent authority to excuse repayment based on its view of what would be the most equitable outcome." *Id.* at 646. In any event, said the Court, "we find no inequity in requiring repayment of funds that were spent contrary to assurances provided by the State in obtaining the grants." *Id.* at 645.

In *Bennett v. Kentucky Department of Education*, 470 U.S. 656 (1985), decided on the same day as *Bennett v. New Jersey*, the Court reaffirmed the government's right of recovery under ESEA Title I:

> "The State gave certain assurances as a condition for receiving the federal funds, and if those assurances were not complied with, the Federal Government is entitled to recover amounts spent contrary to the terms of the grant agreement."

470 U.S. at 663. The Court further concluded that neither "substantial compliance" by the state nor the absence of bad faith would absolve the state from its liability. *Id.* at 663–65. See also B-229068-O.M., Dec. 23, 1987, applying Kentucky to grants under Title V of the Surface Mining Control and Reclamation Act of 1977.[104] Other cases likewise hold that general equitable considerations cannot override specific agreements and

[104] Pub. L. No. 95-87, 91 Stat. 445, 467 (Aug. 3, 1977).

regulations governing grant transactions. *E.g.*, *Missouri Department of Social Services v. United States Department of Education*, 953 F.2d 372, 375–76 (8th Cir. 1992); *Maine v. Shalala*, 81 F. Supp. 2d 91 (D. Me. 1999). In the latter case, the court observed:

> "Boiled down, Plaintiff contends that to allow the federal government to recover its overpayments in fiscal years 1993 and 1994, while denying the State its proposed offset for federal contributions that should have been made relative to the State's supplemental contributions from 1982 through 1993, is simply unfair. . . .
>
> "Principles of equity and fairness must, and do, play a fundamental role in our system of justice. . . . But the principle of fairness cannot be the beginning, middle, and end of a legal analysis, especially in a case such as this where the transactions at issue are specifically and intricately governed by regulations and statutes. This is not a contract dispute between two lay people. This is a highly-regulated, complex legal transaction between a state and the federal government. In that light, [the state's] reliance on 'broad, nontechnical principles of substantive fairness and equity' rings hollow."

81 F. Supp. 2d at 95. *See also Maryland Department of Human Resources v. United States Department of Agriculture*, 976 F.2d 1462, 1480–81 (4th Cir. 1992).

One point in *Bell* seems to have generated some uncertainty. The Court noted that the Secretary "has not asked us to decide what means of collection are available to him, but only whether he is a creditor. Since the case does not present the issue of available remedies, we do not address it." *Bell*, 461 U.S. at 779 n.4. Thus, the Court did not approve or disapprove of any particular remedy. This led one court to conclude that the Bell analysis requires two separate questions: whether the federal government has a right of recovery and, if so, what remedies are available to it. *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 763 F.2d 1441, 1455 (D.C. Cir. 1985) (holding that government has statutory right of recovery under Title XX of Social

Security Act[105]). However, another court expressed doubt over the existence of such a dichotomy, construing the Supreme Court's silence in *Bennett v. Kentucky Department of Education* as approval of the means of recovery employed in that case, a direct repayment order. *St. Regis Mohawk Tribe v. Brock*, 769 F.2d 37, 49 n.16 (2nd Cir. 1985), *cert. denied*, 476 U.S. 1140 (1986) (right of recovery under Comprehensive Employment and Training Act). The *St. Regis* court went on to conclude that "Congress left it to the Secretary to establish additional remedial procedures, consistent with the purposes of the legislation, to insure compliance by prime sponsors." 769 F.2d at 50.

Another group of cases involves the former CETA program. There is a strong parallel to the ESEA cases in that the original CETA included general authority to adjust payments to reflect prior overpayments or underpayments, and was amended in 1978 to explicitly authorize the Secretary of Labor to recover misspent funds by ordering repayment from non-CETA funds.[106] Essentially following *Bell*, a rather long line of cases upheld the Labor Department's right, under the pre-1978 CETA, to recover misspent funds and to do so by directing repayment from non-CETA funds. *City of Gary v. United States Department of Labor*, 793 F.2d 873 (7th Cir. 1986); *St. Regis Mohawk Tribe, supra; Mobile Consortium v. United States Department of Labor*, 745 F.2d 1416 (11th Cir. 1984); *California Tribal Chairman's Association v. United States Department of Labor*, 730 F.2d 1289 (9th Cir. 1984); *North Carolina Commission of Indian Affairs v. United States Department of Labor*, 725 F.2d 238 (4th Cir.), *cert. denied*, 469 U.S. 828 (1984); *Texarcana Metropolitan Area Manpower Consortium v. Donovan*, 721 F.2d 1162 (8th Cir. 1983); *Lehigh Valley Manpower Program v. Donovan*, 718 F.2d 99 (3rd Cir. 1983); *Atlantic County v. United States Department of Labor*, 715 F.2d 834 (3rd Cir. 1983).

The *St. Regis* (769 F.2d at 47), *California Tribal* (730 F.2d at 1292), and *North Carolina* (725 F.2d at 240) courts, as had the Supreme Court in *Bell*, declined to comment on the existence of a common-law right of recovery. The *Texarcana* court noted that its decision was consistent with prior decisions recognizing the common-law right. 721 F.2d at 1164. None of the cases purported to deny that right. More recently, the court in *Harrod v.*

[105] 42 U.S.C. §§ 1397–1397f.

[106] See 29 U.S.C. § 2934(c)–(d) for the current version of this authority.

*Glickman*, 206 F.3d 783, 789 (8th Cir. 2000), similarly endorsed the federal government's broad authority to recover improper payments:

> "The appellants also contend that the agency's attempt to seek reimbursement of their disaster relief payments in 1994 was untimely, because the agency action was final when the government paid the benefits in 1989, and the agency had no authority to seek reimbursement years after a final agency action. We disagree.
>
> "We have long held that the common law permits the government to recover funds that its agents wrongfully or erroneously paid, even absent specific legislation authorizing the recovery. *See Collins v. Donovan*, 661 F.2d 705, 708 (8th Cir.1981); *see also Texarkana Metro. Area Manpower Consortium v. Donovan*, 721 F.2d 1162, 1164 (8th Cir. 1983). The Supreme Court has stated, 'Ordinarily, recovery of Government funds, paid by mistake to one having no just right to keep the funds, is not barred by the passage of time.' *United States v. Wurts*, 303 U.S. 414, 416, 58 S. Ct. 637, 82 L. Ed. 932 (1938). The government's right to recover funds paid out erroneously 'is not barred unless Congress has clearly manifested its intention to raise a statutory barrier.' *Id.*"

The court also held that estoppel ordinarily will not apply against the federal government in the absence of affirmative evidence of misconduct. *Harrod*, 206 F.3d at 789.

Another group of CETA cases concerned a provision which required the Secretary of Labor to investigate any complaint alleging improprieties and to issue a final determination not later than 120 days after receiving the complaint. The consequences of failing to meet the 120-day deadline became a hotly litigated issue. The lower courts split, some holding that failure to meet the deadline barred the Labor Department from attempting to recover misused funds, while others held that the failure did not bar further action. Using an analysis which should be useful in a variety of situations, the Supreme Court resolved the conflict in *Brock v. Pierce County*, 476 U.S. 253 (1986), holding that the mere use of the word "shall" in the statute did not remove the power to act after 120 days.

An additional CETA case that deserves mention is *Board of County Commissioners v. United States Department of Labor*, 805 F.2d 366 (10th Cir. 1986). In that case, the court held that funds embezzled by an employee of a CETA grantee are "misspent" for purposes of the government's right of recovery. The grantee had argued that the funds were not "misspent" because it had never spent them. "No CETA regulation lists embezzlement as an allowable cost," rejoined the court. *Id.* at 368.

Finally, three cases dealing with the transition between CETA and the statute that immediately followed it—the Job Training Partnership Act (JTPA)—further illustrate judicial support for the federal government's right to recover misspent funds. The JTPA contained language stating that its provisions "shall not affect administrative or judicial proceedings . . . begun between October 13, 1982 and September 30, 1984," under CETA. 29 U.S.C. § 1591(e) (1988). Several CETA grantees argued that this language barred recovery of misspent CETA grant funds unless administrative or judicial proceedings were begun prior to September 30, 1984. This argument drew a decidedly chilly response from the courts. The opinion in *City of Newark v. United States Department of Labor*, 2 F.3d 31, 34 (3rd Cir. 1993) was typical:

> "We can identify no basis for adopting this convoluted construction of the statute. In particular, Newark has called our attention to no provision in the JTPA that would, indeed, bar the Secretary from recovering misspent funds, and which would thereby 'affect' administrative proceedings commenced after September 30, 1984 in the manner Newark suggests. In the absence of any such JTPA provision, we cannot merely presume that Congress used the word 'affect' to mean 'bar' or 'preclude.'
>
> "Indeed, it would appear, to the contrary, that Congress in no way intended the passage of the JTPA to hinder the Secretary's efforts to recoup misspent or mismanaged funds granted under CETA."

The court went on to cite congressional committee reports expressing concern over the abuse of CETA funds and the need to recover them. The courts reached the same result in *Inland Manpower Association v. Department of Labor*, 882 F.2d 343 (9th Cir. 1989), and *St. Clair County*

*CETA*, *Michigan v. United States Department of Labor*, No. 89-3829 (6th Cir. 1990).[107]

Where does all this leave us? Certainly the government's right to recover under programs with statutory provisions similar to the former ESEA Title I and CETA programs would seem to be settled. In more general terms, several lower courts have recognized the government's basic right to recover under the common law.[108] While the Supreme Court declined to address the common law issue in *Bell*, its later decision in *West Virginia v. United States*, 479 U.S. 305 (1987) seems instructive.

The issue in *West Virginia* was whether the United States could recover "prejudgment interest on a debt arising from a contractual obligation to reimburse the United States for services rendered by the Army Corps of Engineers." 479 U.S. at 306. Applying federal common law, a unanimous Supreme Court held that it could.[109] While this was not a grant case nor was the government's right to collect the underlying debt in dispute, it would not seem to require a huge leap in logic to infer a recognition of an inherent right in the government to recover amounts owed to it.

In sum, the government's assertion of an inherent (*i.e.*, common law) right to recover sums owed to it under assistance programs thus far has withstood assault. The issue may be largely moot at this juncture, however, since the courts invariably find a right to recover in the provisions of the applicable statutes, regulations, and/or grant agreements.

[107] These courts also noted that, in any event, audits had commenced before September 30, 1984, and held that administrative proceedings were "begun" for purposes of the statute once audits were initiated.

[108] See, in addition to the cases cited in the text, *Tennessee v. Dole*, 749 F.2d 331, 336 (6th Cir. 1984), *cert. denied*, 472 U.S. 1018 (1985) (Federal-Aid Highway Act); *Woods v. United States*, 724 F.2d 1444 (9th Cir. 1984) (Food Stamp Act); *Mount Sinai Hospital v. Weinberger*, 517 F.2d 329 (5th Cir. 1975), *cert. denied*, 425 U.S. 935 (1976) (Medicare); *Pennsylvania Department of Transportation v. United States*, 643 F.2d 758, 764 (Ct. Cl.), *cert. denied*, 454 U.S. 826 (1981) (Federal-Aid Highway Act).

[109] In a subsequent case, *United States v. Texas*, 507 U.S. 529 (1993), the Court addressed an issue left open in *West Virginia* and held that the Debt Collection Act did not limit the government's common law right to seek pre-judgment interest.

## 2. Offset and Withholding of Claims Under Grants

Offset and withholding are two closely related remedies. While the terms are sometimes used interchangeably, they are not the same. Offset, in the context of grantee indebtedness, refers to a reduction in grant payments to a grantee who is indebted to the United States where the debt arises under a separate assistance program or is owed to an agency other than the grantor agency. Withholding is the act of holding back funds from the same grant or program in which the violation or other basis for creating the government's claim occurred. In a sense, withholding may be viewed as a type of offset.

GAO has adopted a "policy rule" that offset or withholding should not be used where it would have the effect of defeating or frustrating the purposes of the grant. *E.g.*, B-171019, Dec. 14, 1976; B-186166, Aug. 26, 1976. The application of this rule depends upon the nature and purpose of the assistance program. "Individual consideration must be given to each instance." B-182423, Nov. 25, 1974. Naturally, this consideration must include any relevant provisions of the program legislation, agency regulations, or the grant agreement.

In 43 Comp. Gen. 183 (1963), for example, a farmer who was receiving payments under the Soil Bank Act,[110] administered by the Department of Agriculture, was indebted to the United States for unpaid taxes. Since the basic purpose of the Soil Bank Act was to protect and increase farm income, GAO decided that whether those payments should be applied to the recovery of an independently arising debt was a matter within Agriculture's discretion, based on Agriculture's determination "as to the extent to which such withholding would tend to effectuate or defeat the purposes of the [Soil Bank Act]." *Id.* at 185. Similarly, relying heavily on the Treasury Department's interpretation of the State and Local Fiscal Assistance Act of 1972[111] (general revenue sharing, since repealed), GAO concluded in B-176781-O.M., Dec. 6, 1974, that offset against revenue sharing funds payable to a city was inappropriate to recover an overpayment to that city under a Federal Aviation Administration grant. Thus, agencies have some discretion in the matter.

[110] Pub. L. No. 540, ch. 327, 70 Stat. 188 (May 28, 1956), *repealed by* Pub. L. No. 89-321, § 601, 79 Stat. 1187, 1206 (Nov. 3, 1965).

[111] Pub. L. No. 92-512, 86 Stat. 919 (Oct. 20, 1972).

It has been somewhat easier to conclude that offset will frustrate grant objectives where grant payments are made in advance of grantee performance. *E.g.*, 55 Comp. Gen. 1329 (1976); B-171019, Dec. 14, 1976. This is true to the extent the grantee is able to reduce its level of performance. Take, for example, a grant to construct a hospital. If a debt is offset against grant advances and the grantee can simply forgo the project and not build the hospital, there is no meaningful recovery. The federal government ends up keeping its own money, the grantee pays nothing, and the losers are the intended beneficiaries of the assistance, the patients who would have used the hospital. To this extent, an offset would accomplish nothing. This was the same analysis used for rejecting offset, for example, in B-171019, Dec. 14, 1976. As noted previously, the Supreme Court invoked essentially the same rationale in *Bell v. New Jersey*, 461 U.S. 773 (1983), in rejecting the state's argument that future grant payments could be reduced to satisfy its past indebtedness.

The problem was highlighted in a 1982 GAO report, *Federal Agencies Negligent in Collecting Debts Arising From Audits*, AFMD-82-32 (Washington, D.C.: Jan. 22, 1982). The report first noted GAO's policy and its rationale:

> "[I]t is normally inappropriate for the Government to offset debts against an advance of funds to a grantee unless there is assurance that the same level of grant performance will be maintained.
>
> ". . . When the offset is not replaced with non-Federal funds, there has, in effect, been no repayment. The scope of the program has simply been reduced and the intended recipient of the benefits loses by the amount of the audit disallowance."

*Id.* at 26. The report then recommended that grantor agencies "require grantee debtors to certify that their payment of audit-related debts has not reduced the level of performance of any Federal program," and monitor those assurances through grant management and audit follow-up. *Id.* at 28.

The concept also appeared in B-186166, Aug. 26, 1976, in which the Department of Agriculture was exploring options to recover misapplied and unaccounted-for funds advanced to a university under research grants. Agriculture proposed crediting the indebtedness against allowable indirect grant costs. This would be done by requiring the university to document

that it was expending the amount of earned indirect costs on approved program grants, thus maintaining the agreed-upon performance level. GAO concurred cautiously, on the condition that the grantee voluntarily agree to this approach. Should this method fail to satisfy the indebtedness, GAO further noted that the grantee was a state university and advised Agriculture to seek offset against other amounts owed to the state by the federal government.

Whatever impediments may exist in the case of grant advances, offset will be more readily available under reimbursement-type grants. *E.g.*, 55 Comp. Gen. 1329, 1332 (1976). Nevertheless, the general policy rule still applies. Thus, in B-163922.53, Apr. 30, 1979, the Comptroller General advised the Departments of Labor and Transportation that disallowed costs under a Labor Department grant could be offset against reimbursements due under a Federal Highway Administration grant, but that Transportation still "must make the determination on a case-by-case basis as to whether offset will impair the program objectives."

When the GAO decisions cited in the preceding paragraphs were issued, the offset referred to was essentially nonstatutory. Administrative offset received a statutory basis with the enactment of section 10 of the Debt Collection Act of 1982, 31 U.S.C. § 3716. The corresponding portion of the Federal Claims Collection Standards, revised at that time to reflect the 1982 legislation, was 4 C.F.R. § 102.3.

As originally enacted in 1982, the administrative offset provided by 31 U.S.C. § 3716 did not apply to debts owed by state and local governments. *See* 31 U.S.C. § 3701(c) (1982). However, the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, § 31001(d)(1), 110 Stat. 1321, 1321-358–59 (Apr. 26, 1996), amended 31 U.S.C. § 3701(c) to eliminate the offset exemption for state and local governments. The 1996 Act also added language to 31 U.S.C. § 3716(d) providing that nothing in section 3716 prohibits the use of any other administrative offset under another statute or the common law. Pub. L. No. 104-134, § 31001(d)(2)(D). See also the current Federal Claims Collection Standards at 31 C.F.R. § 901.3(a)(3) ("Unless otherwise provided for by contract or law, debts or payments that are not subject to administrative offset under 31 U.S.C. 3716 may be collected by administrative offset under the common law or other applicable statutory authority.").

As noted above, offset and withholding are technically different. Many program statutes include withholding provisions. *E.g.*, *Perales v. Heckler*,

762 F.2d 226 (2nd Cir. 1985) (withholding provision in Medicaid legislation may be used to recoup overpayments from state even though state has not yet recovered from provider).

The theory behind withholding is that where a grantee has misapplied grant funds, or in other words, where a grantee's costs are disallowed, the grantee has, in effect, spent its own money and not funds from the grant. Since the issue frequently comes to light in a subsequent budget period, withholding may be viewed as the determination that an amount equal to the disallowed cost remains available for expenditure by the grantee and is therefore carried over into the new budget period. Accordingly, the amount of new money that must be awarded to the grantee to carry on the grant program is reduced by the amount of the disallowance. This may not be strictly applicable where the statutory program authority establishes an entitlement to the funds on the part of the grantee or provides other specific limitations on the use of withholding.

Under the Federal Claims Collection Standards, an agency to which a debt is owed is required in most cases to explore the possibility of collecting by offset from other sources. *See generally* 31 C.F.R. § 901.3.[112] If offset is not available, a withholding provision may provide the basis to accomplish a similar result, at least in part. In 55 Comp. Gen. 1329 (1976), for example, the then Community Services Administration (CSA) was statutorily authorized to suspend (withhold) grant payments to satisfy certain grantee tax delinquencies. Under this authority, the CSA could pay the suspended amounts over to the Internal Revenue Service (IRS) to satisfy a grantee's tax liability to the extent that it was incurred by the grantee in carrying out CSA grants. Since funds previously advanced under the grant should have been used to pay the required taxes in the first place, transfer of the suspended funds to the IRS amounted to payment of an authorized grant purpose. *See also* B-171019, Dec. 14, 1976 (withholding authority of former Law Enforcement Assistance Administration).

In any event, withholding under a limited statutory withholding provision does not satisfy the requirement for the agency to seek offset from other

[112] 31 C.F.R. § 901.3(a) incorporates a number of statutory exceptions to offset, but few of these apply to federal assistance payments. Offset is usually accomplished through the centralized Treasury Department offset program, although individual agencies may also effect offsets. *See* 31 C.F.R. §§ 901.3(b)–(c).

sources to the extent of any remaining liability for which withholding is not available. B-163922, Feb. 10, 1978.

Statutory withholding provisions may include procedural safeguards, most typically notice and opportunity for hearing. Any such procedural requirements must, of course, be satisfied. *See* B-226544, Mar. 24, 1987; 7 C.F.R. § 3016.43(b). The common rules authorize withholding against advances. *See*, *e.g.*, 7 C.F.R. § 3016.52(a)(2).

As with offset, it should be kept in mind that nothing is accomplished by withholding unless the grantee carries out its program at the same level as would otherwise have been the case. The Supreme Court made this point in *Bell v. New Jersey*, 461 U.S. 773 (1983), discussed previously. The Court rejected the state's suggestion that the federal government was free to reduce future grant advances, with the state then undertaking a smaller program. The Court recognized that, under this approach, the government would recover nothing and the states would effectively have no liability for misspent funds. Congress, said the Court, must have contemplated that the government would receive a net recovery by paying less for the same program level. *Id.* at 781 n.5 and 783 n.8.

A 1985 decision of the Court of Appeals for the District of Columbia Circuit took the analysis one step further. The case is *Maryland Department of Human Resources v. United States Department of Health & Human Services*, 763 F.2d 1441 (D.C. Cir. 1985). After discussing the *Bell* analysis, the court went on to conclude:

> "[W]here a statute gives the federal government a right of recovery and also authorizes prospective withholding [withholding funds for services not yet rendered] as a remedy, the state remains obligated to provide all the services that it promised to supply in return for the funds that were then prospectively withheld in satisfaction of the state's debt to the federal government. If a state then proceeds to reduce the size of its federally funded program, the state has committed a new and independent breach of the funding conditions, which gives rise to a new debt to the federal government."

*Maryland*, 763 F.2d at 1455–56. Under this approach, the remedy is clearly a meaningful one. How far the courts will go in applying it remains to be seen. Issues still to be resolved are the extent to which the principle may

apply to an offset as opposed to a withholding, or to a nonstatutory offset or withholding.

In *Housing Authority of the County of King v. Pierce*, 701 F. Supp. 844 (D.D.C. 1988), *modified on other grounds*, 711 F. Supp. 19 (D.D.C. 1989), the court considered the recoupment of overpayments under advance-funded Department of Housing and Urban Development (HUD) housing subsidies. HUD regulations (but not the program statute) authorized recoupment by reducing future subsidy payments. The court upheld HUD's common-law right to recover in the manner specified in the regulations. The court further commented that the teachings of *Bell* and *Maryland Department of Human Resources* "might and perhaps should guide HUD in the course of the recovery here," but found those cases not dispositive because they dealt with statutory rather than common-law remedies. *Pierce*, 701 F. Supp. at 850 n.11.

As the above discussion indicates, there is a direct relationship between the appropriateness of offset or withholding against grant advances and the grantee's obligation to maintain the agreed-upon program level. To date, however, the case law does not provide definitive guidance for sorting through the many legal and practical issues that this relationship presents. Perhaps future litigation or legislation will help to flesh out the details of this relationship.

# Federal Assistance: Guaranteed and Insured Loans

**A. Introduction ... 11-3**
1. General Description ... 11-3
2. Sources of Guarantee Authority ... 11-8

**B. Budgetary and Obligational Treatment ... 11-12**
1. Prior to Federal Credit Reform Act ... 11-12
2. Federal Credit Reform Act of 1990 ... 11-15
   a. Post-1991 Guarantee Commitments ... 11-16
   b. Pre-1992 Commitments ... 11-24
   c. Entitlement Programs ... 11-25
   d. Certain Insurance Programs ... 11-26

**C. Extension of Guarantees ... 11-26**
1. Coverage of Lenders (Initial and Subsequent) ... 11-26
   a. Eligibility of Lender/Debt Instrument ... 11-26
   b. Substitution of Lender ... 11-28
   c. Existence of Valid Guarantee ... 11-29
   d. Small Business Investment Companies ... 11-35
   e. The Federal Financing Bank ... 11-37
2. Coverage of Borrowers ... 11-41
   a. Eligibility of Borrowers ... 11-41
   b. Substitution of Borrowers ... 11-42
   c. Loan Purpose ... 11-43
   d. Change in Loan Purpose ... 11-45
3. Terms and Conditions of Guarantees ... 11-46
   a. Introduction ... 11-46
   b. Property Insurance Programs under the National Housing Act ... 11-47
      (1) Maximum amount of loan ... 11-47
      (2) Maximum loan maturity ... 11-49
      (3) Owner/lessee requirement ... 11-51
      (4) Execution of the note ... 11-53
      (5) Reporting requirement ... 11-54
      (6) Payment of premiums ... 11-55
   c. Small Business Administration Business Loan Program ... 11-56
      (1) Payment of guarantee fee ... 11-56
      (2) Notice of default ... 11-58

**D. Rights and Obligations of Government upon Default ... 11-59**
1. Nature of the Government's Obligation ... 11-59
2. Scope of the Government's Guarantee ... 11-62
3. Amount of Government's Liability ... 11-64
4. Liability of the Borrower ... 11-65
   a. Veterans' Home Loan Guarantee Program ... 11-66
      (1) Loans closed prior to 1990 ... 11-66

(2) Loans closed after December 31, 1989 . . . . . . . . . . . . . . 11-70
b. Debt Collection Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . 11-71
5. Collateral Protection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-73

# Federal Assistance: Guaranteed and Insured Loans

## A. Introduction

### 1. General Description

The preceding chapter dealt with one of the major forms of federal financial assistance, the grant. Another major form is credit assistance, which includes direct loans and, the subject of this chapter, guaranteed and insured loans. In essence, a guaranteed loan is a loan or other advance of credit made to a borrower by a participating lending institution, where the United States government, acting through the particular federal agency involved, "guarantees" payment of all or part of the principal amount of the loan, and often interest, in the event the borrower defaults. A statutory definition along these lines is found in 2 U.S.C. § 661a(3) as follows:

> "The term 'loan guarantee' means any guarantee, insurance, or other pledge with respect to the payment of all or a part of the principal or interest on any debt obligation of a non-Federal borrower to a non-Federal lender, but does not include the insurance of deposits, shares, or other withdrawable accounts in financial institutions."[1]

Depending on the particular program, the borrower may be a private individual, business entity, educational institution, or a state, local, or foreign government. In some cases, the guarantee may be created when a loan originally made by a government agency is subsequently sold by the agency to a third party with the government's assurance of repayment.

Strictly speaking, an insured loan and a guaranteed loan are two different things. An insured loan is one made initially by the federal agency and then sold, while a guaranteed loan is a loan made by a private lender. Occasionally, the agency's program legislation may draw the distinction. For example, the Department of Agriculture has authority both to make

[1] Similar definitions are found in GAO, *A Glossary of Terms Used in the Federal Budget Process*, GAO-05-734SP (Washington, D.C.: September 2005), at 53, and in OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, part V, "Federal Credit," § 185.3(m) (June 21, 2005). Summary information on individual programs may be found in the *Catalog of Federal Domestic Assistance*, prepared annually by the General Services Administration and Office of Management and Budget and available in electronic form at www.cfda.gov (last visited September 15, 2005).

insured loans and to guarantee loans made by other lenders. Under 7 U.S.C. § 935, the Department can make insured loans, defined in subsection 935(b) as loans that are "made, held, and serviced by the Secretary [of Agriculture], and sold and insured by the Secretary hereunder." Under 7 U.S.C. § 936, the Department can guarantee loans which are "initially made, held, and serviced by a legally organized lending agency."[2] Another example is the Department's rural industrialization loan program established by 7 U.S.C. § 1932, again authorizing both insured and guaranteed loans. For purposes of this chapter, we use the term "guarantee" to refer to both guaranteed and insured loans unless otherwise indicated.

The objective of this chapter is to illustrate the kinds of issues and problems that arise in this area and the approaches used in resolving them. We have for the most part emphasized several of the better-known guarantee programs. Naturally, the extent to which any given case will have more general applicability will depend on the agency's organic legislation, program regulations, and the particular circumstances. Since program statutes and regulations are subject to change, the reader should view the discussion as merely illustrative of the particular issue involved.

The primary purpose of loan guarantees is to induce private lenders to extend financial assistance to borrowers who otherwise would not be able to obtain the needed capital on reasonable terms, if at all. Or, as a congressional subcommittee put it, loan guarantee programs are designed to redirect capital resources by intervening in the private market decision process, in order to further objectives deemed by Congress to be in the national interest.[3] These objectives may be social (veterans' home loan guarantees), economic (small business programs), or technological (guarantees designed to foster emerging energy technologies).

[2] For a detailed discussion of some of these and similar credit assistance programs, see the following GAO reports: *Rural Utilities Service: Opportunities to Better Target Assistance to Rural Areas and Avoid Unnecessary Financial Risk*, GAO-04-647 (Washington, D.C.: June 18, 2004); *Rural Development: Rural Business-Cooperative Service Business Loan Losses*, GAO/RCED-99-249 (Washington, D.C.: Aug. 25, 1999); and *Rural Development: Rural Business-Cooperative Service's Lending and the Financial Condition of Its Loan Portfolio*, GAO/RCED-99-10 (Washington, D.C.: Jan. 12, 1999).

[3] Subcommittee on Economic Stabilization, House Committee on Banking, Finance and Urban Affairs, *Catalog of Federal Loan Guarantee Programs*, 95th Cong., 1st sess. (Comm. Print 1977), at page x.

When the federal government guarantees a loan, the guarantee is extended to the original lender supplying the funds, generally either a private lender or the Federal Financing Bank, described in detail in section C.1.e of this chapter, as well as to any subsequent assignees or purchasers of the guaranteed portion of the loan. The subsequent purchase of a guaranteed loan from the original lender is called the "secondary market." *See, e.g.*, 51 Comp. Gen. 474 (1972). Secondary market purchasers are frequently large investment entities such as mutual funds or pension funds.

Secondary market purchasers are not always waiting in the wings, checkbooks in hand. Congress has on several occasions taken action to help create, stimulate, or facilitate secondary markets by establishing privately owned but federally chartered corporations known as "government-sponsored enterprises" (GSEs). Since a GSE is a creature of Congress, the actions it may take are those authorized in its enabling legislation. 71 Comp. Gen. 49 (1991) (Federal Agricultural Mortgage Corporation, or "Farmer Mac"). For discussions from the programmatic perspective, see GAO, *Farmer Mac: Greater Attention to Risk Management, Mission, Public Purpose, and Corporate Governance Is Needed*, GAO-04-827T (Washington, D.C.: June 2, 2004); *Farmer Mac: Some Progress Made, but Greater Attention to Risk Management, Mission, and Corporate Governance Is Needed*, GAO-04-116 (Washington, D.C.: Oct. 16, 2003); and *Farmer Mac: Revised Charter Enhances Secondary Market Activity, but Growth Depends on Various Factors*, GAO/GGD-99-85 (Washington, D.C.: May 21, 1999).[4]

Under a loan guarantee, the risk against which the guarantee is made is, for the most part, default by the borrower. In some cases, however, other risks may be covered as well, and a few examples will be noted later in this chapter.

[4] We do not address GSEs further in this publication. Readers needing more may consult several GAO products such as *Government-Sponsored Enterprises: A Framework for Strengthening GSE Governance and Oversight*, GAO-04-269T (Washington, D.C.: Feb. 10, 2004); *GSEs: Recent Trends and Policy*, T-OCE/GGD-97-76 (Washington, D.C.: July 16, 1997); *Government-Sponsored Enterprises: A Framework for Limiting the Government's Exposure to Risks*, GAO/GGD-91-90 (Washington, D.C.: May 22, 1991); and *Budget Issues: Profiles of Government-Sponsored Enterprises*, GAO/AFMD-91-17 (Washington, D.C.: Feb. 1, 1991).

The *Analytical Perspectives* volume of the President's budget submission for fiscal year 2006 provides extensive background on credit and insurance activities, including loan guarantee programs and the operations of GSEs.[5] At the end of 2004, the face value of federal loan guarantees totaled over $1.2 trillion.[6] This represents a dramatic expansion of loan guarantees in recent decades. In 1970, the total face value of outstanding loan guarantees was less than $2 billion and slightly higher than the outstanding value of direct loans. While the aggregate face value of direct loans has remained fairly consistent since 1970, loan guarantees have increased exponentially.[7] The following are some examples of major loan guarantee and insured loan programs:[8]

- In 2004, the Department of Agriculture provided $3.23 billion of homeownership loan guarantees through its rural housing programs to 34,800 households, of which 30 percent went to very low- and low-income families.

- In 2004, the Department of Housing and Urban Development's Federal Housing Administration insured $107 billion in mortgages for almost 900,000 households.

- In 2004, the Department of Veterans Affairs provided $35 billion in guarantees to assist 270,571 borrowers through its VA housing program for veterans, active duty military personnel, and certain reservists.

- The fiscal year 2006 budget proposes more than $25 billion in Small Business Administration loan guarantees for small businesses and disaster victims.

In the typical loan guarantee program, the lender is charged a fee by the agency, prescribed in the program legislation. However, no fee is charged in some programs. For example, 7 U.S.C. § 936 provides that no fee shall be charged for rural electrification program loan guarantees. Where a fee is

[5] *See generally Analytical Perspectives*, *Budget of the United States Government for Fiscal Year 2006*, chapter 7, "Credit and Insurance" (Feb. 7, 2005), at 85–122, *available at* www.whitehouse.gov/omb/budget/fy2006/ (last visited September 15, 2005).

[6] *Id.* at 85.

[7] *Id.* at 108.

[8] *Id.* at 90, 97.

charged, its disposition is governed by (1) the Federal Credit Reform Act of 1990, discussed later in this chapter, or (2) where the Credit Reform Act does not apply, the applicable program legislation, or (3) in the absence of any guidance in the program legislation, the miscellaneous receipts statute (31 U.S.C. § 3302).

A guarantee may extend to 100 percent of the amount of the underlying loan, or some lesser percentage as specified in the program legislation. *E.g.*, 7 U.S.C. § 936 (rural electrification and telephone service; 100 percent); 42 U.S.C. § 1472(h)(2) (Doug Bereuter single family housing loan guarantee program; 90 percent); 15 U.S.C. § 636(a)(2)(A) (small business plant acquisition, construction, conversion, or expansion; 75 or 85 percent, depending on the loan balance). Unless otherwise provided, a maximum guarantee percentage applies only to restrict the amount the administering agency is authorized to guarantee. *E.g.*, B-137514, Nov. 3, 1958 (no objection to proposal for borrower to "guarantee" portion of loan not covered by government guarantee by making "irrevocable deposit" financed by separate loan, thereby providing lender with 100 percent guarantee).

Banks do not loan money without interest, and the typical loan guarantee therefore covers accrued but unpaid interest as well as unpaid principal. The program statute may set a maximum acceptable rate of interest or may authorize the administering agency to do so by regulation. Assuming there is nothing to the contrary in the enabling legislation, an agency may, within its discretion, extend its guarantees to loans with variable interest rates (rates which rise or fall with changes in prevailing rates) as well as loans with fixed interest rates. B-184857, June 11, 1976.

Credit assistance legislation frequently vests considerable discretion in the administering agency. *E.g.*, B-202568, Sept. 11, 1981 (imposition of "no credit elsewhere" eligibility test to meet funding shortfall within SBA's broad discretion under section 7(b) of the Small Business Act,15 U.S.C. § 636(b)); B-134628, Jan. 15, 1958 (the then Civil Aeronautics Board was authorized within its discretion to make payments to lender immediately upon debtor's default rather than after completion of foreclosure proceedings).

While GAO will not, at the request of a rejected applicant, review the exercise of an agency's discretion in rejecting an application for a loan guarantee, B-178460, June 6, 1973 (nondecision letter), GAO may address an agency's use of appropriations for particular purposes and may review

an agency's conduct of a program under its general audit authority. For example, the Emergency Loan Guarantee Act, Pub. L. 92-70, 85 Stat. 178 (Aug. 9, 1971), 15 U.S.C. §§ 1841–1852, specifically authorized GAO to audit any borrower applying for a loan guarantee, but made no mention of auditing the Emergency Loan Guarantee Board which administered the program. 15 U.S.C. § 1846(b). An issue arose in connection with the Lockheed Aircraft Corporation assistance program, carried out under this statute. GAO took the position that it had the authority to audit the Board's conduct of the program to evaluate whether the Board and borrower were complying with the statutory provisions and whether the government's interests were being adequately protected. This authority derives from GAO's basic audit statutes, such as 31 U.S.C. §§ 712 and 717, and does not have to be repeated in every piece of legislation. B-169300, Sept. 6, 1972; B-169300, Sept. 21, 1971. Occasionally, however, the program legislation will specifically authorize or require GAO audits. *See*, *e.g.*, Launching Our Communities' Access to Local Television ("LOCAL TV") Act of 2000, Pub. L. No. 106-553, title X, § 1006, 114 Stat. 2762, 2762A-138 (Dec. 21, 2000), *at* 47 U.S.C. § 1105 (requiring annual GAO audits of loan guarantee operations under that Act).

## 2. Sources of Guarantee Authority

The authority to guarantee the repayment of indebtedness must be derived from some statutory basis. In most cases, this takes the form of express statutory authorization. Typically, the statute will authorize the administering agency to establish the terms and conditions under which the guarantee will be extended, but may also impose various limitations. An example is section 108 of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. § 5308, which authorizes the Secretary of Housing and Urban Development to issue loan guarantees to support various community and economic development activities. Subsection 108(a) provides in part:

> "The Secretary is authorized, upon such terms and conditions as the Secretary may prescribe, to guarantee and make commitments to guarantee, only to such extent or in such amounts as provided in appropriation Acts, the notes or other obligations issued by eligible public entities, or by public agencies designated by such eligible public entities, for the purposes of financing (1) acquisition of real property or the rehabilitation of real property owned by the eligible public entity (including such related expenses as the Secretary may permit by regulation); (2) housing

> rehabilitation; (3) economic development activities . . . ; (4) construction of housing by nonprofit organizations for homeownership . . . ; (5) the acquisition, construction, reconstruction, or installation of public facilities (except for buildings for the general conduct of government); or (6) . . . public works and site or other improvements. A guarantee under this section may be used to assist a grantee in obtaining financing only if the grantee has made efforts to obtain such financing without the use of such guarantee and cannot complete such financing consistent with the timely execution of the program plans without such guarantee. Notes or other obligations guaranteed pursuant to this section shall be in such form and denominations, have such maturities, and be subject to such conditions as may be prescribed by regulations issued by the Secretary."

Subsection 108(a) and the remaining provisions of that section go on to specify additional authorizations, limitations, terms, and conditions applicable to the loan guarantees.

Program authority, as in the example cited, is most commonly in the form of permanent legislation authorizing an ongoing program. In addition, guarantee programs are occasionally enacted to deal with a specific crisis of limited duration. One example of this latter type is the Chrysler Corporation Loan Guarantee Act of 1979.[9] A more recent example is the Air Transportation Safety and System Stabilization Act,[10] which, among other things, authorized loan guarantees for airlines in the wake of the terrorist attacks of September 11, 2001. Guarantee programs may also be enacted as part of appropriation acts. An example is discussed in GAO's report *Israel: U.S. Loan Guaranties for Immigrant Absorption*, GAO/NSIAD-92-119 (Washington, D.C.: Feb. 12, 1992).

It is also possible for loan guarantee authority to be derived by necessary implication from a statutory program of financial assistance, that is, under program legislation which does not explicitly use the term "guarantee" or "insure." For example, the current version of section 7(a) of the Small

[9] Pub. L. No. 96-185, 93 Stat. 1324 (Jan. 7, 1980).

[10] Pub. L. No. 107-42, 115 Stat. 230 (Sept. 22, 2001).

Business Act, 15 U.S.C. § 636(a), authorizes the Small Business Administration (SBA) to make loans to small business concerns as follows:

> "The Administration is empowered to the extent and in such amounts as provided in advance in appropriation Acts to make loans for plant acquisition, construction, conversion, or expansion, including the acquisition of land, material, supplies, equipment, and working capital, and to make loans to any qualified small business concern . . . for purposes of this chapter. Such financings may be made either directly or in cooperation with banks or other financial institutions through agreements to participate on an immediate or deferred (guaranteed) basis."

The statute then goes on to list a number of limitations. A 1981 amendment[11] added the word "guaranteed." Even before the amendment, GAO had concluded that a loan guarantee program was within the SBA's discretion under section 7. 51 Comp. Gen. 474 (1972). An earlier decision, B-140673, Oct. 12, 1959, had upheld a "deferred participation" program under section 7(a), under which SBA would purchase the agreed portion of the deferred participation loan immediately upon demand and reserve the right to recover from the lender if SBA subsequently determined that the lender had not substantially complied with the participation agreement. In view of the broad discretion granted SBA under the statute, SBA was not required to make the "substantial compliance" determination before making payment to the lender.[12]

The evolution of SBA's authority to conduct its disaster loan program, 15 U.S.C. § 636(b), followed a similar pattern. In B-121589, Oct. 19, 1954, the Comptroller General tentatively approved a deferred participation program, strongly urging that the statute be amended to include "immediate or deferred participation" language patterned after the pre-1981 version of section 636(a). This was done and, based on 51 Comp.

[11] The amendment was enacted by section 1902 of the Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357, 767 (Aug. 13, 1981).

[12] The primary difference between a loan guarantee program and a deferred participation loan program is that the lending institution can demand that SBA pay the outstanding balance of a deferred participation loan at any time, but can demand SBA's purchase of the outstanding balance of a guaranteed loan only under the conditions prescribed in the regulations—generally only upon default of the borrower.

Gen. 474, was found sufficient to authorize SBA to guarantee disaster loans to eligible borrowers by participating lending institutions. 58 Comp. Gen. 138, 145 (1978). To remove any doubt, the same amendment which added the word "guaranteed" to section 636(a) added it as well to section 636(b).[13]

In connection with credit assistance under the Small Business Investment Act of 1958,[14] GAO recognized the SBA's implied authority to establish a program in which SBA would guarantee loans made by private lending institutions to small business investment companies, even though the statute authorized only a direct loan program. 42 Comp. Gen. 146 (1962). The decision pointed out that the legislative history of a 1961 amendment to the act clearly demonstrated that Congress intended to continue the nonstatutory "standby" guaranteed loan program that had existed for several years, and concluded therefore that the absence of specific language authorizing the program was due to the apparent belief by both Congress and SBA that such language was unnecessary and did not reflect an intent to deny SBA the authority. *See also* B-149685, Mar. 20, 1968. The guarantee program is now expressly authorized in 15 U.S.C. § 683.

Authority by necessary implication cannot be derived solely from the purpose clause of a statute, which sets out the congressional objectives underlying the legislation, but must be supported by the operative provisions of the statute. 71 Comp. Gen. 49 (1991).

Regardless of whether a loan guarantee program is established under an express statutory provision or by necessary implication, the basic responsibility for administering the program clearly rests with the agency involved. This includes the authority to determine whether or not to extend a guarantee in a particular case, and the manner in which the guarantees are to be handled. The agency has considerable discretion, subject of course to any applicable statutory requirements or restrictions.

[13] Pub. L. No. 97-35, § 1911.

[14] Pub. L. No. 85-699, 72 Stat. 689 (Aug. 21, 1958).

## B. Budgetary and Obligational Treatment

When a federal agency guarantees a loan, there is no immediate cash outlay. The need for an actual cash disbursement, apart from administrative expenses, does not arise unless and until the borrower defaults on the loan and the government is called upon to honor the guarantee. Depending on the terms of the loan, this may not happen until many years after the guarantee is made. It is thus apparent that loan guarantees require budgetary treatment different from ordinary government obligations and expenditures. This treatment is prescribed generally by the Federal Credit Reform Act of 1990 (FCRA). Before describing the FCRA, it is important to first describe the pre-credit reform situation because it illustrates the objectives of credit reform and because FCRA does not cover all programs.

### 1. Prior to Federal Credit Reform Act

Prior to credit reform, the authority to guarantee or insure loans generally was not regarded as budget authority. Indeed, the original enactment of the Congressional Budget Act of 1974 expressly excluded loan guarantees from the statutory definition of budget authority.[15] Under this treatment, the extension of a loan guarantee was an off-budget transaction and was, at the extension stage, largely not addressed by the budget and appropriations process. If and when the government had to pay on the guarantee (*i.e.*, upon default), the administering agency would seek liquidating appropriations, and these liquidating appropriations counted as budget authority. Of course, by the time a liquidating appropriation became necessary, the United States was contractually committed to honor the guarantee, and Congress had little choice but to appropriate the funds. This is an example of so-called "backdoor spending." By the time the budget and appropriations process became involved, there was no meaningful role for it to play.

When a loan guarantee is committed or issued, it cannot be known with absolute certainty when or to what extent the government might be called upon to honor it. Accordingly, and since budget authority was not provided in advance, the making of a loan guarantee, however binding on the government the commitment may have been, was treated only as a contingent liability and did not result in a recordable obligation for purposes of 31 U.S.C. § 1501(a). A recordable obligation did not arise until the contingency occurred (default by the borrower or other event as

[15] Pub. L. No. 93-344, § 3(a)(2), 88 Stat. 297, 299 (July 12, 1974).

authorized in the program legislation), at which time it was recorded against the appropriation or fund available for liquidation. 65 Comp. Gen. 4 (1985); 60 Comp. Gen. 700, 703 (1981).

Under this approach, the obligation was viewed as "authorized by law" for purposes of the Antideficiency Act, and there was no violation if obligations resulting from authorized guarantees exceeded available budgetary resources. 65 Comp. Gen. 4 (1985); B-226718.2, Aug. 19, 1987.

There was a certain logic to this approach. Many loans are repaid in whole or in part, with the result that the government is never called upon to pay under the guarantee, the only disbursements being the administrative expenses of running the program. To require budget authority in the full amount being guaranteed would artificially inflate the budget. The problem was that the pre-credit reform approach went to the opposite extreme, by reflecting the cost to the government in the year the guarantee was made as zero. Since there was no longer any room for discretion by the time liquidating appropriations became necessary, loan guarantee programs were not forced to compete with other programs for increasingly scarce budgetary resources. No one involved in the budget process—Congress, the Office of Management and Budget, GAO—particularly liked this system, and reform became inevitable.

At an absolute minimum, GAO strongly encouraged the imposition of limits, either in the enabling legislation or in appropriation acts, on the total amount of loans to be guaranteed. *E.g.*, GAO, *Legislation Needed to Establish Specific Loan Guarantee Limits for the Economic Development Administration*, FGMSD-78-62 (Washington, D.C.: Jan. 5, 1979). Ceilings of this type may limit the amount of guarantees that can be issued in a given fiscal year, or the total amount of guarantees that can be outstanding at any one time. An example of the former is discussed in 60 Comp. Gen. 700 (1981).

A device that became common in the 1980s was the granting of loan guarantee authority only to the extent provided in advance in appropriation acts. The device was reinforced in 1985 when Congress (1) added to the Congressional Budget Act a definition of "credit authority" ("authority to incur direct loan obligations or to incur primary loan guarantee commitments"), and (2) subjected to a point of order any bill providing new credit authority unless it also limited that authority to the extent or amounts provided in appropriation acts. These provisions are now codified at 2 U.S.C. §§ 622(10) and 651(a)(3), respectively.

While this device provided a measure of congressional control, it still did not require the advance provision of actual budget authority. For example, the Chrysler Corporation Loan Guarantee Act, which predated the 1985 legislation noted above, limited the authority to guarantee loans to the amounts provided in advance in appropriation acts. The Comptroller General and the Attorney General both concluded that this provision did not require advance budget authority, but was satisfied by an appropriation act provision placing a ceiling on the total amount of loans that could be guaranteed, that is, on contingent liability. B-197380, Apr. 10, 1980; *Loan Guarantees—Authority of Chrysler Corporation Loan Guarantee Board to Issue Guarantees*, 43 Op. Att'y Gen. 219, 4A Op. Off. Legal Counsel 12 (1980).

Both opinions also concluded that the appropriation act ceiling related only to outstanding loan principal, with contingent liability for loan interest being in addition to the stated amount.

Where loan guarantee authority is limited to amounts provided in appropriation acts—and we emphasize that we are addressing situations not governed by the Federal Credit Reform Act—those "amounts," as noted, are not actual budget authority but ceilings on contingent liability. Therefore, while exceeding the ceiling may be illegal for other reasons,[16] it does not violate the Antideficiency Act. 64 Comp. Gen. 282, 288–90 (1985). Analogous to budget authority, loan guarantee authority must generally be used (*i.e.*, commitments made) in the fiscal year or years for which it is provided unless the appropriation act provides otherwise. B-212857, Nov. 8, 1983. Also, where advance authority in appropriation acts is statutorily required and Congress does not provide it, the agency's authority to carry out the program may be effectively suspended for the fiscal year in question. B-230951, Mar. 10, 1989.[17]

Congress may set a minimum program level as well as a ceiling. Again, for programs not governed by the Credit Reform Act, failure to achieve the minimum commitment level would not constitute an impoundment since

[16] An "unusual" case where exceeding a ceiling was not illegal, because of rather explicit legislative history, is 53 Comp. Gen. 560 (1974).

[17] Standing alone, 2 U.S.C. § 651(a) is not a statutory requirement for advance appropriation authority. A point of order may not be raised or may be defeated, in which event the validity of any ensuing legislation is not affected. As in the situation discussed in B-230951, many program statutes independently impose the requirement.

the commitment amount is not budget authority. B-195437.2, Sept. 17, 1986. However, under a loan insurance program where the loan itself is made by the agency, failure to achieve a mandated minimum program level would be an impoundment unless the failure results from programmatic factors. *Id.*

## 2. Federal Credit Reform Act of 1990

Consideration of various reform proposals during the 1980s centered on the recognition that there is a "subsidy element" to a government loan guarantee program. If all loans were repaid, there would be no cost to the government apart from administrative expenses. Were this the case, however, there would probably have been no need for the program to begin with. Since the objective of a loan guarantee program is to enhance the availability of credit which the private lending market alone cannot or will not provide, it is reasonable to expect that there will be defaults, most likely at a higher rate than the private lending market experiences. It became apparent that credit reform had to do two things. First, it had to devise a meaningful way of measuring the true cost to the government; and second, it had to bring those costs fully within the budget and appropriations process. *See*, *e.g.*, GAO, *Budget Issues: Budgetary Treatment of Federal Credit Programs*, GAO/AFMD-89-42 (Washington, D.C.: Apr. 10, 1989).

The culmination of these reform efforts was the Federal Credit Reform Act of 1990 (FCRA), enacted by section 13201(a) of the Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, 104 Stat. 1388, 1388-609 (Nov. 5, 1990), and codified as an amendment to title V of the Congressional Budget Act at 2 U.S.C. §§ 661–661f. The approach of the FCRA is to require budget authority to cover the subsidy portion of a loan guarantee program, with the nonsubsidy portion (*i.e.*, the portion expected to be repaid) financed through borrowings from the Treasury. *See* 2 U.S.C. § 661c(b). The Office of Management and Budget has issued detailed instructions for implementing the FCRA. These instructions are now contained in OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, part V, "Federal Credit" (June 21, 2005), and OMB Circular No. A-129, *Policies for Federal Credit Programs and Non-Tax Receivables* (November 2000). The FCRA applies to loan guarantee commitments made

on or after October 1, 1991, with exceptions to be noted later. *See* 2 U.S.C. §§ 661c(a) and (b). For accounting guidance concerning the FCRA, see Federal Accounting Standards Advisory Board, *Accounting for Direct Loans and Loan Guarantees*, SFFAS No. 2 (Aug. 23, 1993), as amended by SFFAS No. 18 (May 2000).[18]

### a. Post-1991 Guarantee Commitments

One of the major purposes of the Federal Credit Reform Act of 1990 (FCRA) is to "measure more accurately the costs [*i.e.*, the subsidy element, in essence] of Federal credit programs." 2 U.S.C. § 661(1). Before the budgetary and appropriations aspects of FCRA can come into play, the administering agency, working with the Office of Management and Budget (OMB), must determine the cost of its programs. The law defines "cost" as the "estimated long-term cost to the Government . . . calculated on a net present value basis, excluding administrative costs and any incidental effects on governmental receipts or outlays." *Id.* § 661a(5)(A). More specifically for purposes of this chapter, the cost of a loan guarantee is the—

> "net present value, at the time when the guaranteed loan is disbursed, of the following estimated cash flows:
>
> > "(i) payments by the Government to cover defaults and delinquencies, interest subsidies, or other payments; and
> >
> > "(ii) payments to the Government including origination and other fees, penalties and recoveries;
>
> "including the effects of changes in loan terms resulting from the exercise by the guaranteed lender of an option included in the loan guarantee contract, or by the borrower of an option included in the guaranteed loan contract."

*Id.* § 661a(5)(C).

[18] These documents are available at www.fasab.gov/codifica.html (last visited September 15, 2005).

Historical experience is obviously a relevant factor in determining cost. Risk assessment is also very important, and OMB requires agencies to develop risk categories for their credit programs. OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, pt. 5, "Federal Credit," § 185.5(a) (June 21, 2005). Agencies should not blindly rely on historical experience when the risk factor has changed. *See* GAO, *SBA Disaster Loan Program: Accounting Anomalies Resolved but Additional Steps Would Improve Long-Term Reliability of Cost Estimates*, GAO-05-409 (Washington, D.C.: Apr. 14, 2005); *Loan Guarantees: Export Credit Guarantee Programs' Long-Run Costs Are High*, GAO/NSIAD-91-180 (Washington, D.C.: Apr. 19, 1991), at 3. For example, it is not unreasonable to expect the default rate under a guaranteed student loan program to increase during a recession, resulting in a higher cost. Established secondary market experience is also relevant in assessing risk. NSIAD-91-180, at 15–16.

Developing reliable subsidy cost estimates for purposes of FCRA has proven to be a challenging undertaking. In the 15 years since enactment of FCRA, GAO has issued numerous reports critiquing agency practices in this regard. The following are just a few of many examples: GAO-05-409, above; *Credit Reform: Improving Rural Development's Credit Program Cost Estimates*, GAO/AIMD-00-286R (Washington, D.C.: Aug. 22, 2000); *Credit Reform: HUD's Fiscal Year 2000 Credit Subsidy Budget Estimates Were Reasonable, But Could Have Been Improved*, GAO/AIMD-00-60R (Washington, D.C.: Jan. 14, 2000); *Credit Reform: Key Credit Agencies Had Difficulty Making Reasonable Loan Program Cost Estimates*, GAO/AIMD-99-31 (Washington, D.C.: Jan. 29, 1999); and *Credit Reform: Greater Effort Needed to Overcome Persistent Cost Estimation Problems*, GAO/AIMD-98-14 (Washington, D.C.: Mar. 30, 1998).

While dealing primarily with one direct loan program, a recent report contains a useful general overview of the analytic requirements and methodologies for developing FCRA cost estimates, as well as a glossary of relevant terms: GAO, *Department of Education: Key Aspects of the Federal Direct Loan Program's Cost Estimates*, GAO-01-197 (Washington, D.C.: Jan. 12, 2001), at 48–53 (Appendix I: Estimating Credit Program Costs) and 60–62 (Glossary).

The second major purpose of FCRA is to "place the cost of credit programs on a budgetary basis equivalent to other Federal spending." 2 U.S.C. § 661(2). To accomplish this, 2 U.S.C. § 661c(b), perhaps the key provision of FCRA, provides:

> "Notwithstanding any other provision of law, . . . new loan guarantee commitments may be made for fiscal year 1992 and thereafter only to the extent that—
>
> > "(1) new budget authority to cover their costs is provided in advance in an appropriations Act;
> >
> > "(2) a limitation on the use of funds otherwise available for the cost of a . . . loan guarantee program has been provided in advance in an appropriations Act; or
> >
> > "(3) authority is otherwise provided in appropriation Acts."

Thus, unless Congress specifically provides otherwise, loan guarantees may be made only if budget authority to cover their cost has been provided in advance. The cost of a loan guarantee is regarded as new budget authority for the fiscal year "in which definite authority becomes available or indefinite authority is used." 2 U.S.C. § 661c(d)(1).

To implement these concepts, the law defines two accounts for credit programs, a "program account" and a "financing account." The program account is the budget account into which appropriations of budget authority are made. The financing account is a revolving, nonbudget account from which the guarantees are actually administered. It receives cost payments from the program account and includes all other cash flows resulting from the guarantee commitment. 2 U.S.C. §§ 661a(6) and (7). Administrative expenses are required to be shown as a separate and distinct line item within the program account. *Id.* § 661c(g).

Provisions contained in the Consolidated Appropriations Act, 2005, Pub. L. No. 108-447, 118 Stat. 2809 (Dec. 8, 2004),[19] illustrate how Congress makes the appropriations contemplated by 2 U.S.C. § 661c. Typically, the provisions include a specific amount for the loan subsidy costs and state that such costs "shall be as defined in section 502 of the Congressional Budget Act," that is, 2 U.S.C. § 661a(5)(A), quoted previously. The

[19] As its title suggests, this omnibus act incorporated the fiscal year 2005 appropriations acts for many federal departments and agencies.

provisions also include a separate amount for administrative expense, as required by 2 U.S.C. § 661c(g).[20] Finally, the provisions frequently include a limit on the aggregate principal amount of loan guarantees. See, for example, the following provision:

> "MINORITY BUSINESS RESOURCE CENTER PROGRAM"
>
> "For the cost of guaranteed loans, $500,000, as authorized by 49 U.S.C. 332: *Provided*, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974: *Provided further*, That these funds are available to subsidize total loan principal, any part of which is to be guaranteed, not to exceed $18,367,000. In addition, for administrative expenses to carry out the guaranteed loan program, $400,000."

118 Stat. 3200. Other examples of provisions taking this form appear at 118 Stat. 3305 (Community Development Loan Guarantees Program Account) and 118 Stat. 3309–10 (Federal Housing Administration's General and Special Risk Program Account).

Frequently, the appropriation provisions include both loan guarantee programs and related direct loan programs, which are also subject to the FCRA. Some of these provisions impose separate limits for direct loans and loan guarantees. *See*, *e.g.*, Agricultural Credit Insurance Fund Program Account (118 Stat. 2822); Rural Housing Insurance Fund Program Account (118 Stat. 2828); Small Business Administration's Business Loans Program Account (118 Stat. 2911). Other provisions combine the direct and guaranteed loan programs, and occasionally other programs such as grants, under one overall subsidy cost cap. For example, the Subsidy Appropriation for Export and Investment Assistance by the Export-Import Bank provides in part:

> "For the cost of direct loans, loan guarantees, insurance, and tied-aid grants as authorized by section 10 of the Export-Import Bank Act of 1945, as amended, $59,800,000,

[20] A very general definition of "administrative expenses" may be found in B-24341, Mar. 12, 1942, at 5. For FCRA purposes, see also OMB Cir. No. A-11, § 185.3(a); GAO-01-197, at 60.

> to remain available until September 30, 2008: *Provided*, That such costs, including the cost of modifying such loans, shall be as defined in section 502 of the Congressional Budget Act of 1974 . . ."

118 Stat. 2968. In 72 Comp. Gen. 347, 349 (1993), GAO quoted from the legislative history of a predecessor version of this appropriation language to the effect that this language was intended to give the Bank "the flexibility to determine, in response to demand, the appropriate mix of direct loans, guaranteed loans, tied-in grants, and mixed credits and insurance." Other examples of such flexible provisions can be found with respect to the Renewable Energy Program (118 Stat. 2831) and the Development Credit Authority (118 Stat. 2974). In addition to allowing agencies to determine the mix of direct and guaranteed loans, these provisions grant additional flexibility since they do not separately cap the overall principal amounts of direct or guaranteed loans. Thus, agencies retain discretion to determine the total principal amounts assuming, of course, that the total amounts would not carry estimated subsidy costs exceeding the budget authority provided pursuant to section 502 of the Congressional Budget Act.

For loan guarantee programs, the President's annual budget is to reflect the cost of the program in accordance with 2 U.S.C. § 661a(5) and the planned level of new guarantee commitments. 2 U.S.C. § 661c(a). Congress then makes an appropriation to cover these costs and administrative expenses to the program account.

The appropriation of costs "shall constitute an obligation of the credit program account to pay to the financing account." *Id.* § 661c(d)(1). When a loan for which a guarantee commitment has been made is disbursed by the lender, the cost of the guarantee is obligated against the program account and transferred into the financing account. *Id.* § 661c(d)(2). OMB Circular No. A-11, at §§ 185.9–185.31, contains detailed budget formulation, reporting, and execution instructions for federal credit programs, including loan guarantees. For example, like other forms of budget authority, credit program accounts and financing accounts are subject to apportionment unless exempted by statute or by OMB. *Id.* § 185.14.

The law recognizes that estimating costs is not an exact science and that cost estimates are subject to change over time. Accordingly, costs generally are to be reestimated annually as long as the loans are outstanding. OMB Cir. No. A-11, §§ 185.3(y), 185.6. See GAO, *SBA Disaster Loan Program: Accounting Anomalies Resolved but Additional Steps*

*Would Improve Long-Term Reliability of Cost Estimates*, GAO-05-409 (Washington, D.C.: Apr. 14, 2005), for a description of this process and issues related to the calculation of interest rates. If a reestimation results in an increase to the cost estimate, the law provides permanent indefinite budget authority for the program account. 2 U.S.C. § 661c(f). The agency requests an apportionment of this indefinite authority from OMB, and then records an obligation against the program account and pays the funds into the financing account. OMB Cir. No. A-11, § 185.17.

The law also provides for the treatment of "modifications." For purposes of FCRA, a modification is defined as follows:

> "The term 'modification' means any Government action that alters the estimated cost of an outstanding direct loan (or direct loan obligation) or an outstanding loan guarantee (or loan guarantee commitment) from the current estimate of cash flows. This includes the sale of loan assets, with or without recourse, and the purchase of guaranteed loans. This also includes any action resulting from new legislation, or from the exercise of administrative discretion under existing law, that directly or indirectly alters the estimated cost of outstanding direct loans (or direct loan obligations) or loan guarantees (or loan guarantee commitments) such as a change in collection procedures."

2 U.S.C. § 661a(9). *See also* OMB Cir. No. A-11, § 185.2.

The law prohibits the modification of a loan guarantee commitment "in a manner that increases its costs unless budget authority for the additional cost has been provided in advance in an appropriations Act." 2 U.S.C. § 661c(e). Modifications include such things as forgiveness, forbearance, reductions in interest rate, prepayments without penalty, and extensions of maturity, except where permitted under an existing contract. OMB Cir. No. A-11, § 185.3(r). They also include the sale of loan assets and actions resulting from new legislation, such as a statutory restriction on debt collection. *Id.* As with reestimates, at the time a modification is made, the agency records an obligation of the estimated cost increase against the program account and pays the amount into the financing account. *Id.* § 185.7.

If an agency's original cost estimates, reestimates, and modification estimates have been accurate, the balances of financing accounts for loan

guarantees should always be sufficient to make any required payments. However, if a balance is not sufficient, the "Secretary of the Treasury shall . . . lend to, or pay to the financing accounts such amounts as may be appropriate." 2 U.S.C. § 661d(c). The Secretary is also authorized to borrow or receive amounts from the financing accounts. *Id.* All of these transactions between the Treasury and financing accounts are subject to the apportionment requirements of the Antideficiency Act. *Id.*

Under the FCRA structure as outlined above, there are two separate sets of "obligations"—obligations against the program account when budget authority is transferred to the financing account, and obligations against the financing account when claims are made for payment under a guarantee.

OMB Circular No. A-11, § 145.3, identifies five actions specific to credit programs that will result in Antideficiency Act violations:

- Overobligation or overexpenditure of the amounts appropriated or apportioned for subsidy costs. This includes a modification resulting in such an overobligation or overexpenditure.

- Overobligation or overexpenditure of the credit level supported by the enacted subsidy cost appropriation.

- Overobligation or overexpenditure of the amount appropriated for administrative expenses.

- Obligation or expenditure of the expired unobligated balance of the cost appropriation, except to correct mathematical or data input errors in calculating subsidy amounts. However, error correction will be considered a violation if it exceeds the amount of the expired unobligated balance.

- Overobligation or overexpenditure of the apportioned borrowing authority in a financing account.

Finally, the law emphasizes that the provisions of the FCRA are not to be construed as changing or overriding the administering agency's authority to determine the terms and conditions of eligibility for, or amount of, a loan or loan guarantee. 2 U.S.C. § 661d(g).

As a result of FCRA, guarantee programs are no longer unrestricted. Even if the applicable appropriation act does not explicitly set a maximum program level, the program level that can be supported by the enacted cost appropriation, reinforced by the Antideficiency Act, constitutes an effective ceiling. Programs not governed by FCRA may have their own ceilings. Although a loan or guarantee may not exceed a statutory ceiling, it may nevertheless be possible to extend assistance if the borrower qualifies under another program. For example, in 35 Comp. Gen. 219 (1955), the Small Business Administration could not make a disaster loan to a small business concern which had suffered damage in a flood because SBA had already used up the applicable ceiling on disaster loans. However, it could make a business loan to the same borrower if the transaction otherwise met the criteria under SBA's business loan program.

In addition to providing a new system for setting loan guarantee program levels, the FCRA also affected other statutory provisions whose application is tied to such program levels. The decision in 72 Comp. Gen. 347 (1993) provides an example. That decision concerned a statutory provision, 12 U.S.C. § 635(b)(1)(E)(v), requiring the Export-Import Bank to "make available, from the aggregate loan, guarantee, and insurance authority available to it, an amount to finance exports directly by small business concerns . . . which shall be not less than" a specified percentage of "such authority for each fiscal year." At the time of the decision the percentage was 10 percent; it is now 20 percent. Prior to enactment of the FCRA, Congress had included in appropriation acts a total principal amount for annual loans and guarantees and the Bank used that figure to determine the amount to reserve for small business concerns under the statute. However, in implementing FCRA for this program, Congress decided to include only an annual amount for the program's subsidy cost and not to attach an overall limit to the principal amount of loans. Under these circumstances, GAO agreed with the Bank's General Counsel that the Bank could develop an estimate of the total loan amounts for a given year starting from the subsidy cost figure in order to apply the small business reserve:

> "Although it is only an extrapolation from cost, the Bank's proposal to estimate the total projected authorizations for the year based upon the amount of subsidy appropriated appears to represent a reasonable starting point. As the General Counsel points out, projections based on the estimated cost of loan, guarantee and insurance commitments under credit reform do not directly yield a figure for the Bank's available aggregate loan, guarantee,

> and insurance authority. Furthermore, we have no objection to the Bank, in addition to estimating total authorizations for the ensuing fiscal year starting with the amount of subsidy appropriated, using such other reasonable factors . . . as are consistent with the Bank's statutory objectives and authority."

72 Comp. Gen. at 349–50 (footnote omitted). The decision went on to hold that the Bank could not divert any of the small business reserve to other purposes if it appeared that small businesses were unlikely to use the full reserve for a given fiscal year. *Id.* at 350–51.

### b. Pre-1992 Commitments

The treatment described above applies to loan guarantee commitments made on or after October 1, 1991. Commitments made prior to fiscal year 1992 were made under the rules summarized in section B.1 of this chapter. Since pre-1992 guarantees were not subject to any requirement to determine subsidy costs or to obtain advance appropriations of budget authority, they required different treatment and were addressed in separate provisions of the Federal Credit Reform Act of 1990 (FCRA).

Three provisions, which remain in the FCRA, are particularly relevant to pre-1992 commitments. First, the law establishes "liquidating accounts," defined as budget accounts which include all cash flows to and from the government resulting from pre-1992 commitments. 2 U.S.C. § 661a(8). Second, all collections resulting from pre-1992 guarantee commitments are to be credited to the liquidating account and are available to liquidate obligations to the same extent they were under the applicable program legislation prior to enactment of FCRA. *Id.* § 661f(b). At least once a year, unobligated balances in the liquidating account which are in excess of current needs are to be transferred to the general fund of the Treasury. *Id.*

Third, 2 U.S.C. § 661d(d)(1) specifies the types of payments resulting from pre-1992 commitments that can be made from liquidating accounts. Paragraph (3) of subsection 661d(d) provides:

> "If funds in liquidating accounts are insufficient to satisfy obligations and commitments of such accounts, there is hereby provided permanent, indefinite authority to make any payments required to be made on such obligations and commitments."

Thus, for pre-1992 guarantees which are liquidated in accordance with the terms of the original commitment, payment will still be made from liquidating appropriations. The main change under FCRA is the provision of these liquidating appropriations on a permanent, indefinite basis.

A "modification" to a pre-1992 loan guarantee—the term having the same meaning as described in section B.2.a of this chapter for post-1991 guarantees—is treated differently. *See* OMB Circular No. A-11, *Preparation, Submission, and Execution of the Budget*, pt. 5, "Federal Credit," § 185.7(c) (June 21, 2005).

### c. Entitlement Programs

A partial exemption from the Federal Credit Reform Act of 1990 (FCRA) is found in 2 U.S.C. § 661c(c), which provides that the requirement for the advance appropriation of budget authority to cover estimated costs does not apply to (1) a loan guarantee program which constitutes an entitlement, or (2) programs of the Commodity Credit Corporation existing on FCRA's date of enactment (November 5, 1990). An entitlement program is one in which the provision of assistance is mandatory with respect to borrowers and lenders who meet applicable statutory and regulatory eligibility requirements. The statute gives two examples—the guaranteed student loan program and the veterans' home loan guarantee program. Since the exemption is from the appropriation requirement of 2 U.S.C. § 661c(b) and not the entire act, other provisions of FCRA and OMB Circular No. A-11 presumably apply to the extent not inconsistent with the exemption.

The pre-FCRA rules summarized in section B.1 of this chapter form the starting point with respect to obligational treatment and the application of the Antideficiency Act. A 1985 decision, 65 Comp. Gen. 4, reiterated these rules in the context of the Guaranteed Student Loan Program. GAO advised the Department of Education that (1) a guarantee itself is only a contingent liability and is not recordable as an obligation; (2) an obligation must be recorded upon occurrence of one of the contingencies specified in the program legislation which will require the government to honor the guarantee (in this case, loan default or the death, disability, or bankruptcy of the borrower); and (3) the Antideficiency Act does not require that sufficient budget authority be available at the time the obligation is recorded because, by virtue of the requirements of the program legislation, incurring the obligation is "authorized by law" for Antideficiency Act purposes.

For fiscal year 2005, Congress appropriated to the program account for the veterans' home loan program, for costs as defined in FCRA, "such sums as

may be necessary to carry out the program," together with a definite (specific dollar amount) appropriation for administrative expenses.[21]

#### d. Certain Insurance Programs

Another provision of the Federal Credit Reform Act of 1990 (FCRA), 2 U.S.C. § 661e(a)(1), exempts from the entire act—

> "the credit or insurance activities of the Federal Deposit Insurance Corporation, National Credit Union Administration, Resolution Trust Corporation, Pension Benefit Guaranty Corporation, National Flood Insurance, National Insurance Development Fund, Crop Insurance, or Tennessee Valley Authority."

Thus, to the extent the rules discussed in section B.1 of this chapter would apply to any of the programs conducted by these entities to begin with, they continue to apply unaffected by FCRA.

## C. Extension of Guarantees

### 1. Coverage of Lenders (Initial and Subsequent)

#### a. Eligibility of Lender/Debt Instrument

Program legislation may prescribe eligibility criteria for lending institutions, or may otherwise limit the types of lending institutions to which guarantees may be extended, either as the initial lender or as a subsequent transferee, or may address the manner in which the debt instrument covered by the guarantee may be treated. The safest generalization in this area, and the common strain throughout the cases, is that any proposed action must be consistent with the terms and intent of the agency's statutory authority.

[21] Pub. L. No. 108-447, 118 Stat. 2809, 3286 (Dec. 8, 2004) (Veterans Housing Benefit Program Fund). The fiscal year 2005 appropriation language does include a cap on gross obligations for certain direct loans.

For example, in B-194153, Sept. 6, 1979, GAO considered a proposed pilot program in which the Economic Development Administration (EDA), an agency within the Department of Commerce, would guarantee loans made to private borrowers by participating lending institutions, with the guaranteed portion of the loan to be subsequently assigned to the city of Chicago and financed through the issuance of bonds. The statutory basis for the proposal, since repealed, authorized the Secretary of Commerce to guarantee up to 90 percent of the outstanding balance of loans for certain specified purposes "made to private borrowers by private lending institutions." GAO concluded that allowing the guarantee to be assigned to an entity that was neither private nor a lending institution and could not have qualified for a guarantee initially, would exceed EDA's statutory authority since EDA would be doing something indirectly—guaranteeing a loan by a nonprivate lender—that the statute would not permit it to do directly.

GAO revisited the issue a few years later and reaffirmed the ineligibility of public lenders to participate as secondary market purchasers under the "private lending institution" requirement. Since a secondary market purchaser effectively becomes the lender, it makes no difference whether sale to the public lender is contemplated from the loan's inception or merely occurs in the ordinary course of secondary market operations. 61 Comp. Gen. 517 (1982).

Another issue in B-194153 was whether EDA could legally allow a guaranteed loan to be evidenced by two notes, one to be fully guaranteed and the second with no guarantee. The Comptroller General found the proposed arrangement within EDA's administrative discretion under the statute since the two-note arrangement would still conform to the statutory requirement that no more than 90 percent of a loan be guaranteed and furthermore was apparently intended to effectuate the basic legislative purpose. The decision pointed out, however, that since the two notes represented one loan, their substantive terms such as maturity dates and interest rates must be the same, and the two-note mechanism must not increase the government's potential liability. This portion of the decision was later modified in 60 Comp. Gen. 464 (1981), to the extent that GAO approved use of a "split interest rate" in which the interest on the EDA-guaranteed note was lower than the interest rate on the nonguaranteed note. The split-interest scheme was consistent with programs by other agencies under similar legislation and would be more favorable to the government.

A related type of question arose under the now defunct New Community Development Program authorized by the Urban Growth and New Community Development Act of 1970.[22] The legislation authorized various forms of financial assistance to stimulate the development of new communities, including the guarantee of obligations of private new community developers and state development agencies. A question arose as to whether the Department of Housing and Urban Development was authorized or required to guarantee the indebtedness of a private developer to contractors and subcontractors who had supplied goods and services to the developer. Finding that the intent of the program legislation was that the Department guarantee only obligations issued to private investors, the Comptroller General concluded that the Department was neither required nor authorized to issue guarantees that would run to a developer's contractors and subcontractors. B-170971, Aug. 22, 1975; B-170971, July 22, 1975.

### b. Substitution of Lender

As a general proposition, substitution of lenders is permissible as long as it is not prohibited by the program legislation or regulations and the "replacement lender" meets any applicable eligibility requirements.

In 60 Comp. Gen. 700 (1981), GAO considered the effect of a change in lenders in the rural development loan guarantee program administered at that time by the then Farmers Home Administration (FmHA).[23] The program operated under an annual ceiling, and the specific question was whether a guarantee could continue to be charged against the ceiling for the fiscal year in which it was initially approved, when a change in lenders took place in a subsequent fiscal year. As to the programmatic significance of the change, the decision stated:

> "[T]he basic purpose of the FmHA rural development loan guarantee program is to provide assistance to eligible borrowers to enable them to accomplish one or more of the statutory objectives. In other words, although the guarantee is extended to the lender, it is clear that the purpose of doing so is not to provide a Federal benefit to the lending

[22] Pub. L. No. 91-609, title VII, 84 Stat. 1770, 1791 (Dec. 31, 1970).

[23] The Department of Agriculture's Farm Service Agency now has administrative responsibility for the programs formerly carried out by the Farmers Home Administration. *See* 7 U.S.C. §§ 6932(a) and (b)(3).

> institution but to induce the lender to make the loan to the borrower. In this sense, the lender is just a conduit or funding mechanism through which FmHA provides assistance to an eligible borrower so that the statutory objectives can be realized. Thus, the particular lender involved is of relatively little consequence."

*Id*. at 708–09. Therefore, the decision held that where a guarantee is charged against the ceiling for a particular fiscal year, it can continue to be charged against the same ceiling notwithstanding a substitution of lenders in a subsequent fiscal year, provided that the other relevant terms of the agreement (borrower, loan purpose, and loan terms) remain substantially the same. *Id*. at 709. The statement that the particular lender is of little consequence presumes, as was in fact the case, that the program legislation does not contain any specific eligibility requirements for lenders. Any such requirements (for example, the "private lender" requirement in the Economic Development Administration cases discussed in section C.1.a of this chapter) would of course have to be followed.

### c. Existence of Valid Guarantee

In order for a loan guarantee commitment to be valid and hence binding on the government, the government official making the commitment must be authorized to do so, and the guarantee must be made to an eligible lender extending credit to an eligible borrower for an authorized purpose. Questions as to whether a valid guarantee was ever created often do not arise until the lender calls upon the government to pay under the guarantee. The answer depends on the program statute and regulations, the terms of the guarantee instrument, and the conduct of the parties.

In 54 Comp. Gen. 219 (1974), GAO considered the authority of the Small Business Administration (SBA) to reimburse three different lenders. In each case, the borrower had applied to SBA for financial assistance, the lender (at the request or with the approval of an SBA official) had provided interim funds to the borrower, but, for various reasons, the financial assistance was ultimately not extended.

In the first case, an SBA official who was authorized to approve loan guarantees advised the bank in writing that the guarantee had been approved. SBA subsequently issued a formal loan authorization, but later canceled it because the bank did not comply with all of the terms and conditions of the guarantee agreement, one of which was that the bank disburse the loan within 3 months. Although the initial written approval created a valid guarantee, the bank's noncompliance caused it to lapse.

Therefore, SBA was not obligated to purchase the interim note, that is, to reimburse the bank for the advance.

In the second case, an authorized SBA official had similarly advised the bank in writing that the guarantee had been approved. Here, however, SBA subsequently determined that the borrower was not eligible for the guarantee, and therefore never issued a formal loan authorization. Since the bank relied on the prior approval and was not legally required to comply with the conditions of the guarantee agreement (such as payment of the guarantee fee) until SBA issued the formal authorization, the bank was entitled to reimbursement for the interim loan.

In the third case, SBA had formally approved a direct loan to a borrower and had issued a written loan authorization. Because of its inability to immediately disburse the funds, SBA requested a private lender to disburse the funds on an interim basis, with SBA's assurance of repayment. SBA later refused to disburse the loan funds because the borrower had disappeared and his business had become defunct. Under the circumstances, SBA's written commitment to reimburse the lender did constitute SBA's "guarantee" of any advances the lender made in reasonable and justified reliance on it. Therefore, even though the direct loan by SBA was never disbursed, SBA was authorized to reimburse the lender.

The decision discussed two earlier cases—B-178250, Aug. 6, 1973, and B-164162, Sept. 20, 1968—involving direct rather than guaranteed loans. GAO had concluded in these cases that, under the specific circumstances involved, SBA could not reimburse a lender for losses suffered on interim disbursements made after SBA had authorized loans to the borrower. In both cases, the claimant bank was unable to adequately establish that any SBA official had made a promise or commitment on which the bank could justifiably rely.

Essentially, the primary theory of recovery in all of these cases, although not specifically identified as such, was estoppel—conduct by the government sufficient to later preclude it from denying the existence of a valid guarantee.[24] Several similar cases specifically raised the estoppel

[24] As discussed later in this section, the continued viability of these cases is questionable in light of subsequent judicial decisions—particularly *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990).

theory. For example, the issue in B-187445, Jan. 27, 1977, was whether SBA was legally obligated for a $10,000 loss suffered by a bank on a loan made to a small business contractor under section 8(a) of the Small Business Act, 15 U.S.C. § 637(a). The bank alleged that the loan was made on the basis of assurances from an SBA official that the loan would be guaranteed. GAO found, however, that the loan was not in fact guaranteed since it was never approved in writing as required by the applicable provision in the guarantee agreement between SBA and the bank. Also, SBA had no liability to the bank under an estoppel theory since the bank was aware that the SBA official involved lacked authority to approve a loan guarantee or otherwise assure the bank of repayment. Further, the bank could not demonstrate that it had made the loan primarily in reliance on the alleged misrepresentations.

In another 1977 case, a bank argued that SBA was liable under an estoppel theory to reimburse the bank for a loss suffered as a result of SBA's approval of a direct disaster loan to the borrower. However, the facts did not support an estoppel since SBA made no misrepresentations to the bank, and the bank did not make the loan in reliance on the representations that SBA did make. B-181432, Feb. 4, 1977. A somewhat similar case involving the former Farmers Home Administration denied the claim of a creditor who alleged that he had advanced supplies and services to a borrower on the basis of assurances from a Farmers Home employee that the borrower's obligation would be guaranteed by the government. Since the regulations then expressly prohibited employees from guaranteeing repayment of non-Farmers Home Administration loans, either personally or on behalf of the government, the creditor was necessarily on notice of the employee's lack of authority to make such assurances. B-168300, Dec. 4, 1969; B-168300, Dec. 3, 1969.

Another estoppel case is B-198310, Apr. 23, 1981. SBA had sent a letter to a borrower confirming approval of a direct handicapped assistance loan. Allegedly in reliance on this letter, the claimant bank advanced funds to the borrower. SBA then issued its formal loan authorization, but canceled it shortly thereafter based on the borrower's failure to disclose all pertinent information on its loan application. The bank sought reimbursement on a theory of "promissory estoppel." The Comptroller General held that SBA was under no obligation to reimburse the bank for two reasons. First, SBA's letter had been to the borrower, not to the bank. Thus, SBA had made no representations to the bank. Second, the bank's reliance on the letter was not reasonable because the letter contained no mention of the possibility that the loan might be used to obtain interim financing nor did

the bank attempt to obtain any assurance from SBA that the borrower would be required to use the proceeds of the SBA loan to repay the interim loan.

The existence of a valid guarantee also was an issue in 60 Comp. Gen. 700 (1981) in a different context. The then Farmers Home Administration regulations required written notification to the lender of the approval or disapproval of a guarantee application. Based on these regulations, and citing B-187445, Jan. 27, 1977, discussed above, GAO concluded that oral notification of a loan guarantee approval was not sufficient to create a valid guarantee for purposes of charging that guarantee against the annual ceiling. 60 Comp. Gen. at 709–10.

As the more recent decisions described above indicate, estoppel claims against the government can rarely succeed. Even those few earlier cases in which GAO has sanctioned them would have to be reassessed before being used as precedent in light of the Supreme Court's decision in *Office of Personnel Management v. Richmond*, 496 U.S. 414 (1990), which held that estoppel against the government requires, in addition to the traditional elements such as reasonable and detrimental reliance, a showing of affirmative misconduct on the part of government officials.[25]

A fairly recent judicial decision involving an SBA loan guarantee, *Frillz, Inc. v. Lader*, 104 F.3d 515 (1st Cir.), *cert. denied*, 522 U.S. 813 (1997), illustrates this point. The SBA approved a loan guarantee authorization for Frillz that contained a clause requiring receipt by the lender of "evidence satisfactory to it [the lender] in its sole discretion" that there had been no unremedied adverse change in condition subsequent to authorization that would warrant not disbursing the loan. Frillz suffered temporary business losses between the time of the authorization and the scheduled loan disbursement. The lender determined that the problem had been sufficiently resolved and was prepared to go ahead with the loan. However, SBA disagreed and declined to approve disbursement of the loan. Frillz then sued SBA for breach of contract on the basis that the guarantee authorization gave the lender—not SBA—sole discretion to determine whether there was an unremedied adverse change. The court ruled in favor of SBA, holding that, under the applicable program regulations, the SBA official who signed the guarantee authorization could not delegate the

[25] Estoppel claims arise in many contexts and are discussed further in Chapter 12 in volume III of the second edition of *Principles of Federal Appropriations Law.*

determination regarding unremedied changes to the lender; thus, the clause was ineffective. *Frillz, Inc.*, 104 F.3d at 517–18.[26] The court also rejected Frillz's estoppel argument:

> "A party seeking to invoke equitable estoppel against the federal government at a minimum must have reasonably relied on some affirmative misconduct attributable to the sovereign. Passing the point that even such reliance may be insufficient, there is absolutely no evidence of affirmative misconduct by the SBA which might arguably be sufficient to support an estoppel claim against the government in this case."

*Id.* at 518 (citations and internal quotation marks omitted). *Wells Fargo Bank N.A. v. United States*, 88 F.3d 1012 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1116 (1997) is also relevant to the issue of whether a valid guarantee exists. While not an estoppel case, *Wells Fargo* involves facts somewhat similar to those in the *Frillz* case, discussed above. In *Wells Fargo*, officials of the then Farmers Home Administration (FmHA) issued a "conditional commitment" to guarantee a loan for construction of an ethanol plant under 7 U.S.C. § 1932 and another statute designed to promote biomass energy projects.[27] Among the conditions was a requirement that before the guarantee was issued—

> "the Lender certif[y] that it has no knowledge of any adverse change, financial or otherwise, in the Borrower, his business, or any parent, subsidiaries, or affiliates since it requested a Loan Note Guarantee."

*Wells Fargo*, 88 F.3d at 1020. While Wells Fargo provided this certification, FmHA determined that adverse changes had occurred and refused to issue the guarantee. The court ruled in favor of Wells Fargo in its breach of

[26] The court noted that, pursuant to a statutory authorization, SBA had delegated certain creditworthiness determinations to lenders in its "Preferred Lenders Program"; however, the lender in this case was not in that program. The Preferred Lenders Program is discussed in GAO, *Small Business Administration: Progress Made but Improvements Needed in Lender Oversight*, GAO-03-90 (Washington, D.C.: Dec. 9, 2002), and in B-300248, Jan. 15, 2004.

[27] The Biomass Energy and Alcohol Fuels Act of 1980, Pub. L. No. 96-294, title II, 94 Stat. 611, 683 (June 30, 1980).

contract suit, holding that the conditional commitment constituted a unilateral contract on the part of the government contingent upon satisfaction of its conditions, and that all of the conditions were, in fact, satisfied. The court rejected several arguments advanced by FmHA to the effect that the conditional commitment was not legally binding:

> "The government . . . argues that no contract was formed because '[u]nder [Administration] regulations, no Government official, not even one having authority to sign the guarantee at the proper time, had the authority to bind the United States to a loan note guarantee prior to compliance with all the regulatory requirements for issuance of a loan note guarantee.' As the Court of Federal Claims correctly stated, however, 'the issue at this point is not whether these officials had the authority to grant a guarantee, but whether these officials had the authority to obligate the [Administration] to a Conditional Commitment.' . . . Administration officials were authorized to execute conditional commitments under the regulations implementing the business and industrial loan guarantee program. . . . That the guarantee could not finally be executed until the conditions were fulfilled is irrelevant in determining the validity of the Conditional Commitment.
>
> "Although Administration regulations characterize the Conditional Commitment as mere 'advice' to the lender . . . the document itself shows that the government is making a binding promise:
>
> > "[T]he United States of America acting through the Farmers Home Administration (FmHA) hereby agrees that . . . it will execute Form(s) FmHA 449-34 'Loan Note Guarantee' subject to the conditions and requirements specified in said regulations and below."

*Wells Fargo*, 88 F.3d at 1018–19. Further, the court concluded that the adverse changes asserted by the government were beyond the scope of those covered by the conditions set forth in the commitment. *Id.* at 1020–21.

### d. Small Business Investment Companies

A "small business investment company" (SBIC) is a private company organized under the Small Business Investment Act of 1958, as amended (15 U.S.C. §§ 661–697g), and licensed by the Small Business Administration (SBA). Its purpose is to provide financial assistance to small business concerns. For background, see GAO, *Small Business: Update of Information on SBA's Small Business Investment Company Programs*, GAO/RCED-97-55 (Washington, D.C.: Feb. 21, 1997).

A series of decisions in the 1960s upheld SBA's authority to provide various forms of financial assistance to SBICs. First, SBA may guarantee loans made to SBICs by private financial institutions. 42 Comp. Gen. 146 (1962). While the guarantee authority was not explicit at the time of the 1962 decision, it was later added and is now found at 15 U.S.C. § 683. SBA also has "secondary guarantee" authority, authority to sell to private investors, with recourse (SBA's guarantee), debt instruments representing loans SBA had made to SBICs. 44 Comp. Gen. 549 (1965). The proposal considered in 44 Comp. Gen. 549 involved loans with a maturity of 5 or 6 years. Later that same year, SBA proposed extending its program to loans with 15-year maturities. GAO again approved, noting that the difference in maturity did not affect the basic authority. 45 Comp. Gen. 253 (1965). The 15-year period also is now specified in 15 U.S.C. § 683(g)(1). *See also* 45 Comp. Gen. 370 (1965) (same holding for similar program under different provision of Small Business Investment Act).

The Comptroller General concluded further in 45 Comp. Gen. 253 that SBA could make the sales through an agent or broker with reasonable compensation if administratively determined to be necessary or more economical. However, the broker's compensation may not be paid from the proceeds of the loan sales but must be charged to SBA's appropriation for administrative expenses.

A small business investment company may be either a corporation or a limited partnership. 15 U.S.C. § 681(a). The scope of authorized SBA assistance includes nonrecourse loans to a limited partnership SBIC (by purchasing or guaranteeing its debentures). B-149685, Jan. 12, 1978. Nonrecourse in this context means that SBA would "waive" its right to recover, provided under the laws of most states, against the separate assets of the general partner.

In B-149685, Mar. 25, 1971, GAO considered SBA's authority to sell guaranteed SBIC debentures to a group of underwriters for resale to private investors. Under this program, SBA would first purchase

$30 million of newly issued debentures from SBICs and then immediately sell them to private investors, with SBA's guarantee of payment of principal and interest according to the terms of the instrument. SBA would act as servicing agent for the holders, receiving payment on the debentures from the SBICs and then paying the holders in accordance with the terms of the debentures. The Comptroller General concluded that the proposed sale and guarantee of debentures in this manner was within the scope of SBA's statutory authority, provided SBA did not exceed any existing statutory program level limitations. *See also* B-149685, June 3, 1969.

Another issue is whether a small business investment company is eligible to participate, as a lending institution, in a government guaranteed loan program. In 49 Comp. Gen. 32 (1969), the Comptroller General held that SBICs were not eligible lenders for purposes of SBA's guaranteed loan program under section 7(a) of the Small Business Act, 15 U.S.C. § 636(a). The decision relied heavily on the legislative history of the Small Business Investment Act.

Some years later, GAO again considered the eligibility of SBICs to be guaranteed lenders in SBA's section 7(a) guaranteed loan program as well as the then Farmers Home Administration's business and industrial loan program (7 U.S.C. § 1932). SBA's new proposal was somewhat different from the arrangement considered in 49 Comp. Gen. 32, because after originating the loan, the SBIC would then immediately sell the guaranteed portion to another lending institution and remain the servicing agent. GAO's conclusion remained the same, again based on the legislative history of the Small Business Investment Act which indicated that Congress intended SBICs to operate independently of other federal loan programs. With respect to the then Farmers Home Administration program, nothing in either the Small Business Investment Act or the applicable program statute or their legislative histories supported a different conclusion. 56 Comp. Gen. 323 (1977).

One type of small business investment company is the "minority enterprise small business investment company," or "MESBIC." As the name implies, an MESBIC is a small business investment company formed to aid minority-owned small businesses. In 59 Comp. Gen. 635 (1980), *aff'd on reconsideration*, B-197439, Nov. 26, 1980, GAO considered SBA's authority to "leverage" against federal funds invested in MESBICs. "Leveraging" means investing on a partial matching basis through the purchase or guarantee of debentures or the purchase of preferred securities. The specific issue was whether SBA could leverage against Federal Railroad

Administration investments in MESBICs. Since the Small Business Investment Act authorizes SBA to leverage only against private money, the decision concluded that, absent specific statutory authority, SBA could not leverage against federal funds invested in MESBICs. The MESBICs took the case to court, arguing that "private" meant simply "non-SBA." Based on the plain meaning of the statutory language, the court agreed with GAO. *Inner City Broadcasting Corp. v. Sanders*, 733 F.2d 154 (D.C. Cir. 1984). "[P]rivate means private and not governmental." *Id.* at 157.

GAO and the court had both recognized that leveraging against other federal funds would be permissible if authorized by the statute under which those other funds were provided. One such example is community development block grant funds provided under Title I of the Housing and Community Development Act of 1974, as amended, 42 U.S.C. §§ 5301–5321. *See* 60 Comp. Gen. 210 (1981).

### e. The Federal Financing Bank

The Federal Financing Bank was created by the Federal Financing Bank Act of 1973.[28] Its purpose is to coordinate federal credit programs with overall government economic and fiscal policies. It is a corporate instrumentality of the United States government, subject to the general direction and supervision of the Secretary of the Treasury. 12 U.S.C. § 2283. The Bank acts essentially as an intermediary. Its powers include purchasing agency debt securities and federally guaranteed borrowings. Specifically, it is authorized by 12 U.S.C. § 2285(a) to—

> "purchase and sell on terms and conditions determined by the Bank, any obligation which is issued, sold, or guaranteed by a Federal agency. Any Federal agency which is authorized to issue, sell, or guarantee any obligation is authorized to issue or sell such obligations directly to the Bank."

The Bank obtains funds by issuing its own securities, almost entirely to the Treasury. *Id.* §§ 2288(b), (c). The decisions summarized below illustrate the varying roles the Bank plays in the credit financing arena.

In 58 Comp. Gen. 138 (1978), GAO considered the Small Business Administration's (SBA) authority to issue certificates to the Federal

[28] Pub. L. No. 93-224, 87 Stat. 937 (Dec. 29, 1973), *codified at* 12 U.S.C. §§ 2281–2296.

Financing Bank evidencing transfer of title of a number of individual loans and setting forth SBA's guaranteed assurance of payment, either in cash or by loan substitution. Even though this arrangement contemplated the sale of certificates evidencing ownership of a group of SBA loans rather than individual loans, it was sufficiently similar to the arrangement upheld in B-149685, Mar. 25, 1971, discussed above in connection with small business investment companies (SBICs), and was therefore permissible. Since the certificate did refer to specific loans and, when transferred to the Bank, would represent a transfer of ownership of the loans to the Bank, the plan would not constitute borrowing by SBA, which would have required specific statutory authority.[29]

The same decision, while noting that SBA's authority to sell loans to the Federal Financing Bank with its guarantee was "neither greater nor less" than its authority to sell loans to other purchasers (58 Comp. Gen. at 139), nevertheless concluded that SBA lacked the authority to sell direct disaster loans (15 U.S.C. § 636(b)) to the Federal Financing Bank on a guaranteed basis. Although SBA does have authority to guarantee disaster loans made to eligible borrowers by participating lending institutions, it is not authorized, in the absence of specific statutory authority or a clear expression of congressional intent, to sell and guarantee disaster loans that it had originally made directly. Since there was at the time no statutory ceiling on the type of loans in question, the proposal would enable SBA to "replenish its disaster loan revolving fund so as to enable it to make new disaster loans and repeat the process indefinitely," potentially resulting in an unlimited contingent liability against the United States with no congressional restraint. 58 Comp. Gen. at 146. In addition, the proposal contemplated a 100 percent guarantee which would have violated the statutory 90 percent maximum guarantee of disaster loans.

Another case involving the Federal Financing Bank as "guaranteed lender" is B-162373-O.M., July 31, 1979, finding that an agreement between the Department of Agriculture, acting through the then Rural Electrification Administration,[30] and the Bank by which the Bank made loans to borrowers that the Department guaranteed under the authority of section 306 of the Rural Electrification Act of 1936 (7 U.S.C. § 936), was within the statutory

[29] SBA now has such borrowing authority in 15 U.S.C. § 633(c)(5).

[30] The Department's Rural Utilities Service now performs the functions formerly carried out by the Rural Electrification Administration. *See* 7 U.S.C. § 6942.

authority of both agencies. The legality of the arrangement was considered from the perspectives both of the Department's authority to guarantee loans made by a nonprivate entity such as the Bank and of the Bank's authority to act as the initial lender, making loans directly to a private nongovernmental borrower with the Department's guarantee. Since the Department has authority to guarantee loans made by "any legally organized lending agency," it could guarantee loans made by the Federal Financing Bank. At the same time, the Bank was acting within its statutory authority to purchase obligations guaranteed by a federal agency, since the transaction was in the form of its purchasing the borrower's note from the borrower with payment being guaranteed by the Department. Although the arrangement was legal, GAO was critical because it did not involve the private credit sector in the REA program as contemplated by the Rural Electrification Act. *See* GAO, *Financing Rural Electric Generating Facilities: A Large and Growing Activity*, CED-81-14 (Nov. 28, 1980), at 16–17.

Congress subsequently confirmed the above arrangement by amending 7 U.S.C. § 936 to provide that the loans, upon request of the borrower, "shall be made by the Federal Financing Bank." Under the statute, loan servicing is the responsibility of the lender. Thus, the Department's funds are available to perform the loan servicing function as the Bank's agent only on a reimbursable basis. 62 Comp. Gen. 309 (1983).

Two 1987 opinions discussed the Federal Financing Bank's role in the foreign military sales program. As described in these opinions, the Bank finances credit sales under the Arms Export Control Act, 22 U.S.C. §§ 2751–2799aa-2, with the loans being guaranteed by the Defense Security Assistance Agency (DSAA). If the debtor nation defaults, DSAA pays the Bank. One opinion concluded that the Bank is not authorized to deliberately delay making demand on DSAA for payment upon default. B-226718.2, Aug. 19, 1987. The second advised that two refinancing options under consideration, one involving prepayment without penalty and one involving the partial capitalization of interest, would result in a financial loss to the United States or the substantial risk of one and should not be implemented without clear evidence of congressional approval. 66 Comp. Gen. 577 (1987). Congress subsequently approved a prepayment option. *See* GAO, *Security Assistance: Foreign Military Sales Debt Refinancing*, GAO/NSIAD-89-175 (Washington, D.C.: Aug. 16, 1989); *Federal Financing Bank: The Government Incurred a Cost of $2 Billion on Loan Prepayments*, GAO/AFMD-89-59 (Washington, D.C.: Aug. 22, 1989).

In two later opinions, GAO held that the Federal Financing Bank was an appropriate source of financing for the Federal Triangle International Cultural and Trade Center-Federal Office Building (now known as the Reagan Building) since this was fundamentally a project being constructed by the federal government. B-248647, Dec. 28, 1992, *aff'd*, B-248647.2, Apr. 24, 1995.

A 1985 transaction illustrates a very different role for the Bank. In October 1985, the Treasury Department had reached its statutory public debt ceiling and was in danger of defaulting on its obligations pending congressional action to raise the ceiling. The Bank effectively borrowed $5 billion from the Civil Service Retirement and Disability Fund by issuing securities to the Fund and accepting Treasury obligations in payment. The Bank then used these securities to prepay part of its outstanding debt to Treasury. This in turn reduced Treasury's outstanding debt, enabling it to borrow an additional $5 billion from the public to meet its obligations. Based on the Bank's statutory authority and the conclusion that its obligations do not count against the public debt limit set by 31 U.S.C. § 3101(b), the Comptroller General found the transaction legally unobjectionable. B-138524, Oct. 30, 1985.

The Justice Department's Office of Legal Counsel cited the above 1985 GAO opinion in affirming the legality of similar transactions by the Bank that were designed to free up room under the debt limit. Memorandum for the General Counsel, Department of the Treasury, *Transactions Between the Federal Financing Bank and the Department of the Treasury*, OLC Opinion, Feb. 13, 1996. Among the transactions this opinion approved was the Bank's sale of loan assets evidencing debts by the Postal Service and the Tennessee Valley Authority to the Civil Service Retirement and Disability Fund in exchange for United States debt obligations. For further information on these transactions, see GAO, *Debt Ceiling: Analysis of Actions During the 1995–1996 Crisis*, GAO/AIMD-96-130 (Washington, D.C.: Aug. 30, 1996). For a description of more recent transactions along these lines, see GAO, *Debt Ceiling: Analysis of Actions Taken during the 2003 Debt Issuance Suspension Period*, GAO-04-526 (Washington, D.C.: May 20, 2004), at 25–30.

When the Federal Financing Bank was first created, its transactions were entirely off-budget. 12 U.S.C. § 2290(c) ("receipts and disbursements of the Bank . . . shall not be included in the totals of the budget of the United States Government"). With the budget reforms of the Congressional Budget Act and subsequent legislation, this treatment came under

increasing criticism and GAO, among others, recommended that Bank transactions involving other government entities be reflected in the budget. *E.g.*, 58 Comp. Gen. 138, 142–44 (1978); GAO, *Government Agency Transactions With the Federal Financing Bank Should Be Included on the Budget*, PAD-77-70 (Aug. 3, 1977). *See also* B-178726, Sept. 16, 1976 (pointing out that purchase by the Bank of a loan guaranteed by another agency amounts to a direct loan).

While not amending the Federal Financing Bank Act itself, Congress in 1985 added 2 U.S.C. § 655(b) to the Congressional Budget Act:

> "All receipts and disbursements of the Federal Financing Bank with respect to any obligations which are issued, sold, or guaranteed by a Federal agency shall be treated as a means of financing such agency for purposes of section 1105 of title 31, United States Code [submission of President's budget] and for purposes of [the Congressional Budget] Act."

Under this provision, direct loans of the Bank are accounted for as loans of the guaranteeing agency. *See* B-226718.2, Aug. 19, 1987.

## 2. Coverage of Borrowers

### a. Eligibility of Borrowers

Loan guarantee program legislation may or may not establish criteria for lender eligibility; it will almost invariably address borrower eligibility. This is because the primary purpose of a guarantee program is to enhance credit availability to a particular class of borrowers (farmers, veterans, small businesses, *etc.*). The significance of any such eligibility requirements is that an agency is not authorized to issue a guarantee or reimburse a lender on behalf of an ineligible borrower.

For example, one portion of the National Housing Act, 12 U.S.C. § 1703, authorizes the insurance of loans made to finance repairs or improvements to real property by owners or lessees. Under this statute, it is the lending institution's responsibility to determine borrower eligibility. Thus, a lending institution making a loan to someone who is neither the owner nor the lessee of the property involved is not entitled to be reimbursed for losses resulting from borrower default. B-180015, Nov. 28, 1973; B-174739, Jan. 19, 1972.

While most eligibility requirements are found in the program statute itself, they may appear in other legislation. For example, the Military Selective Service Act provides that any person who is required to register for the draft and knowingly and willfully fails to do so shall be ineligible for guaranteed student loan assistance. 50 U.S.C. App. § 462(f). The Department of Education is authorized to issue implementing regulations, discussed in B-210733, Feb. 25, 1983.

### b. Substitution of Borrowers

Generally, the substitution of borrowers within the same fiscal year will not present problems. However, as with contracts and grants, the substitution may or may not be proper when made in a subsequent fiscal year. Loan guarantee authority—whether it is an advance appropriation of budget authority under the Federal Credit Reform Act or a program level ceiling in a situation not governed by the Credit Reform Act—is granted on an annual, multiple year, or no-year basis. It thus has a period of availability analogous to a regular appropriation. Where the period of availability is a fixed time period, the authority ceases to be available when that period expires.

The issue in B-164031.5, June 25, 1976, was the transferability of a loan guarantee and interest subsidy originally approved under a program of federal assistance for the construction and modernization of hospitals. The question was whether the guarantee could be transferred from one hospital to another in the following fiscal year, when the original hospital became unable to take advantage of the guarantee due to apparent financial difficulties. The Comptroller General found that, since the period of availability of the guarantee authority had expired, the transfer would be authorized only if it could be viewed as a “replacement.” Since the second hospital did not serve the same community as the first, the transfer of the loan guarantee to the new “borrower” was not merely a “replacement” and therefore could not be approved.

A few years later, the then Farmers Home Administration asked whether it could continue to charge a guarantee to the annual ceiling for the fiscal year in which it was originally approved when a new borrower was substituted in a later fiscal year. As a general rule, the answer is no, and the substitution would have to be treated as a new undertaking. This is different from the substitution of lenders discussed previously in this chapter because the approval of a guaranteed loan to a particular borrower requires a specific eligibility determination. Thus, while the identity of the particular lender may be of relatively little consequence, the identity and eligibility of the borrower are essential to the transaction. However, the

substitution may be treated as a continuation of the original guarantee where the substituted borrower bears a "close and genuine relationship" to the originally approved borrower (for example, a corporation and partnership controlled by the same individuals), provided of course that the loan purpose remains substantially unchanged. 60 Comp. Gen. 700, 707 (1981).[31]

### c. Loan Purpose

The authority to make a loan guarantee commitment depends not only on the eligibility of the particular borrower, but also on whether the purpose for which the guaranteed loan is to be made is consistent with the applicable program statute and regulations. The analysis is essentially an application of the "necessary expense" doctrine used in other purpose availability contexts.

A number of illustrative cases have arisen under section 301 of the Defense Production Act of 1950, 50 U.S.C. App. § 2091, which authorizes loan guarantees to finance the performance of contracts where deemed "necessary to expedite or expand production and deliveries or services under Government contracts for the procurement of industrial resources or critical technology items essential to the national defense . . . ." *Id.* § 2091(a)(1). For example, B-115791-O.M., Sept. 3, 1953, concluded that section 301, ordinarily used to provide short-term working capital, could also be used to guarantee loans for the expansion of plant facilities if determined necessary to expedite production and deliveries or services under defense contracts.

Contracts to purchase equipment for civil defense stockpiling purposes may be regarded as contracts for the national defense and therefore eligible for loan guarantees under section 301. 37 Comp. Gen. 417 (1957). The issue in that case was whether a 1953 amendment to the act, which narrowed the definition of "national defense," had the effect of excluding civil defense which clearly would have been covered before the amendment. GAO found no evidence of congressional intent to exclude civil defense, and concluded therefore that the loans could be guaranteed.

While section 301 was intended primarily to assist small and medium-size defense contractors, its language is not so limited and is sufficiently broad

[31] Both 60 Comp. Gen. 700 and B-164031(5) applied the basic principles of decisions on the substitution of grantees discussed in Chapter 10.

to permit guarantees to large-size defense contractors as well. B-170109, July 21, 1970 (large railroad carrier).

GAO considered a different loan guarantee program in 38 Comp. Gen. 640 (1959). The question in that case was whether the then Civil Aeronautics Board, under a statute authorizing the guarantee of aircraft purchase loans, could guarantee the indebtedness of an air carrier for the conversion of an existing aircraft. The case involved the conversion of piston engine aircraft to turbo-powered aircraft. GAO found that the conversion was such an extensive modification as to amount to a new type of aircraft for all practical purposes. Also, it was clear that if the manufacturer had performed the conversion and then sold the converted aircraft to the carrier, the purchase would have been eligible for the guarantee. The conversion was therefore within the statutory purpose and the guarantee was authorized.

An analogous situation occurred in 34 Comp. Gen. 392 (1955), involving the Maritime Administration's ship mortgage insurance authority under the Merchant Marine Act of 1936, as amended, 46 U.S.C. App. §§ 1271–1275. Noting that purchase plus reconstruction was the equivalent of new construction for purposes of the program, the Comptroller General held that the insurance could extend to the purchase money mortgage and reconstruction costs for a vessel acquired by purchase (in this case from the government) instead of under a construction contract. This decision was amplified in 35 Comp. Gen. 18 (1955), which held that the Maritime Administration could insure a second-lien reconstruction mortgage to a private lending institution where the first-lien (purchase money) mortgage was held by the United States. There was nothing in the statute limiting the insurance authority to first-lien mortgages.

The Department of Agriculture's rural electrification financial assistance programs have generated a number of purpose-related cases. Generally, the Department may make direct loans and loan guarantees to finance rural electrification facilities for persons not already receiving central station service. *See* 7 U.S.C. §§ 901–950bb.[32]

[32] The Department of Agriculture used to conduct these programs through the now defunct Rural Electrification Administration; thus, the decisions discussed here refer to that entity. The Department's Rural Utility Service now administers these programs. For recent background on the programs, see GAO, *Rural Utilities Service: Opportunities to Better Target Assistance to Rural Areas and Avoid Unnecessary Financial Risk*, GAO-04-647 (Washington, D.C.: June 18, 2004).

Several cases have established the proposition that the Department can include elements in a project that are arguably beyond a literal reading of the statutory language, where those elements are merely incidental to accomplishing the statutory purpose. Thus, early cases on the Department's direct loan program held that the Department cannot make a loan where the only persons to be benefited are already receiving central service, but it can finance the acquisition of existing facilities which are to be incorporated into a larger system, where the acquisition is necessary for the effective operation of the overall system. B-48590, Apr. 3, 1945; B-32920, Mar. 12, 1943; B-29463, Dec. 1, 1942. This principle applies whether the acquisition is by direct purchase or the purchase of securities to be exchanged for the physical property. B-42486, July 25, 1944.

Rural electrification loans are not intended to parallel existing facilities. Thus, where Plant A and Plant B are located less than 200 feet apart, and Plant A is receiving central service from a power supplier who has offered to provide adequate service to Plant B, Plant B cannot properly be considered a person not receiving central service for purposes of qualifying for financial assistance. B-134138, Oct. 15, 1958.

In B-195437, Feb. 15, 1980, GAO applied the principles of the above direct loan cases to the rural electrification loan guarantee program. The issue was the Department of Agriculture's authority to approve a loan guarantee to finance certain expenditures associated with the construction of a coal-fired electric generating plant, including cancellation charges if two contracts for components of the plant were terminated. The decision held that, since the contractors would not begin to build the components without a commitment that the cancellation costs would be paid, approval of a loan guarantee to assure funding to pay such charges was consistent with the basic statutory purpose of providing electricity to persons in rural areas and therefore authorized.

Finally, loans and loan guarantees to provide housing for the elderly may include the purchase of related necessary equipment such as refrigerators and laundry equipment. 42 Comp. Gen. 528 (1963).

### d. Change in Loan Purpose

A decision previously cited in the section C.1.b discussion of changes in lenders and borrowers, 60 Comp. Gen. 700 (1981), also addressed changes in loan purpose under the Farmers Home Administration rural development loan guarantee program. Again, the issue was when changes could be deemed a continuation of the original transaction, so that the

guarantee would remain chargeable to the annual ceiling for the fiscal year in which it was originally approved.

Similar questions had arisen frequently in the grant context, and the Comptroller General applied the grant principles to loan guarantees, stating:

> "Applying these grant decisions to the area of loan guarantees, when a major change to the 'character' of the project supported by the guarantee is made, the revised loan guarantee must be charged against the ceiling in effect when the revision is made. We believe that just as a significant change in the terms and conditions under which a grant was made would be viewed as creating a new grant, a significant change in the terms and conditions under which a loan guarantee was approved would create a new loan."

*Id.* at 707. Thus, major changes will result in the treatment of the transaction as a new guarantee. However, less substantial changes where the purpose and scope of the revised agreement are consistent with the purpose and scope of the original agreement may be treated as a continuation as long as the need for the project continues to exist. This test must be applied on a case-by-case basis.

## 3. Terms and Conditions of Guarantees

### a. Introduction

Just as with any other contractual obligation, a loan guarantee has terms and conditions which the parties must follow. If a valid guarantee has been created, the borrower defaults, and the lender has complied with all applicable terms and conditions, the government is obligated to pay on the guarantee. Conversely, if the lender does not comply with applicable requirements, it may find that it has lost the benefit of the guarantee. The applicable terms and conditions are found in the program statute, agency regulations, and the guarantee agreement.

This section will discuss the effect of noncompliance, especially by the lender. The cases fall into two broad categories. In one group, the loan may not have been eligible for the guarantee from its inception based on a

failure to satisfy applicable requirements such as a statutory limitation on the maximum amount or maturity of the loan. The result will usually be that the guarantee itself was never valid. In the second group, the loan to be guaranteed complies with all pertinent statutory or regulatory requirements, but the guarantee never takes effect or is nullified as a result of the lender's failure to comply with one or more of the terms and conditions upon which the government's guarantee is contingent.

To illustrate these concepts, we have selected two areas—property insurance programs under the National Housing Act and loan guarantee programs of the Small Business Administration. The specific requirements discussed are the more common ones and apply of course only to the particular program. Nevertheless, our selection is intended to illustrate types of issues, approaches to problem-solving, and the crucial role of agency regulations, and from this perspective is of more general relevance. Also, program details such as maximum loan amount, whether prescribed by statute or regulation, are subject to change from time to time. Accordingly, individual cases do not necessarily reflect current program requirements, but are intended to illustrate or support propositions of continuing validity with respect to requirements of that type.

### b. Property Insurance Programs under the National Housing Act

Title I of the National Housing Act, Pub. L. No. 73-479, 48 Stat. 1246 (June 27, 1934), as amended and codified at 12 U.S.C. §§ 1701–1706d, authorizes a number of housing assistance programs. Several of the programs were formerly administered by the Federal Housing Administration (FHA) and were transferred to the Department of Housing and Urban Development (HUD) upon its creation in 1965. The programs are still popularly known as "FHA programs." GAO has issued numerous reports on these programs, some of the most recent being: *Single-Family Housing: Progress Made, but Opportunities Exist to Improve HUD's Oversight of FHA Lenders*, GAO-05-13 (Washington, D.C.: Nov. 12, 2004); *Multifamily Housing: Improvements Needed in HUD's Oversight of Lenders That Underwrite FHA-Insured Loans*, GAO-02-680 (Washington, D.C.: July 19, 2002); *Mortgage Financing: Changes in the Performance of FHA-Insured Loans*, GAO-02-773 (Washington, D.C.: July 10, 2002).

(1) Maximum amount of loan

Under 12 U.S.C. § 1703, the Secretary of HUD is authorized to insure lenders against losses sustained in extending loans to borrowers for various purposes, including home construction, repair, and improvement, and the purchase of manufactured (mobile) homes. The statute establishes

the maximum amount of loans that may be insured for the various authorized purposes, for example, $25,000 for repairs and improvements to an existing single-family structure. *Id.* § 1703(b)(1)(A)(i). While the specific dollar amounts have changed over the years, the Congress has imposed maximum loan limits in one form or another since the program was established in 1934.

Where a single loan is involved, its face amount cannot exceed the statutory limitation. If a loan which is reported by the lender to HUD for insurance exceeds the statutory limitation in effect when the loan was made, the lender cannot be reimbursed for any of its losses since the loan was ineligible for insurance from its inception. *E.g.*, B-127167, July 15, 1970; B-127243, May 21, 1956.

In applying this limitation where more than one loan is involved, the approach of HUD's program regulations is to consider whether the total amount of all outstanding insured loans made to a borrower under Title I of the Housing Act with respect to the same property or structure exceeds the maximum permissible amount. In this situation, for example, the ceiling for property improvement loans applies to the outstanding aggregate loan balance rather than the sum of the face amounts. 24 C.F.R. § 201.10(a)(2) (2005). Thus, for a second loan, the ceiling is compared with the face amount of the second loan (which represents the outstanding balance of that loan at the time the determination is made) plus the outstanding balance of the first loan. B-148894, June 29, 1962; B-137493, Nov. 20, 1958. The method used to compute the outstanding balance is within HUD's discretion. In considering claims, GAO will apply the method prescribed in the regulations. The fact that other reasonable methods may exist is irrelevant. B-162961, Jan. 19, 1968.

The ceiling applies only to loans for the same property. In B-148804, June 7, 1962, the Comptroller General advised that a lender could be reimbursed for a loss it suffered when the borrower defaulted, even though the original loan of $4,000 exceeded the then-existing $3,500 limitation. Although only one application for a $4,000 loan had been made, the record revealed that two separate properties were involved, with $3,000 of the loan funds intended for the improvement of one property, and $1,000 for the other. Therefore, the limitation which applied only to loans for the same property was not violated.

This decision points out another important provision of 12 U.S.C. § 1703. The Secretary of HUD is authorized to waive a requirement in the

regulations if in the Secretary's judgment enforcement would impose an injustice on an insured lender, provided that the lender has substantially complied with the regulations in good faith and waiver would not increase the government's obligation beyond what it would have been under full compliance. *Id.* § 1703(e). Thus, in B-148804, the regulations required separate applications for separate properties, but GAO advised that the Federal Housing Administration could waive the requirement. Prior to enactment of the waiver authority, GAO had applied the general rule that agencies have no authority to waive statutory regulations. 15 Comp. Gen. 869 (1936). The waiver provision was enacted 3 weeks after the decision. The authority has been applied in a variety of contexts. *E.g.*, B-127026, Mar. 27, 1956 (bank disbursed loan after a change in regulations under which loan would have been ineligible, but had approved loan in good faith before receiving notice of the change). The Secretary of HUD may delegate the waiver authority to a "substantial compliance committee." B-127167, Dec. 17, 1968.

Several decisions have emphasized that the waiver authority applies only to regulations. It does not apply to a requirement imposed by statute, such as the maximum loan amount. A purported waiver of a statutory requirement is ineffective. *E.g.*, B-127243, May 21, 1956. A waiver inconsistent with the statutory authority, for example, lack of good faith by the lender, is also unauthorized. B-127167, Dec. 5, 1957.

Exercise of the waiver authority is up to HUD, not GAO. While GAO may find a waiver invalid if it violates one of the above principles, GAO cannot positively exercise the authority where HUD has chosen not to do so. As in B-148804, June 7, 1962, GAO can only advise HUD that in its opinion waiver is authorized.

(2) Maximum loan maturity

The Housing Act also prescribes, by category, the maximum maturity term of loans which may be insured under 12 U.S.C. § 1703. For example, the maturity of a loan for repairs and improvements to an existing single-family structure may not exceed 20 years and 32 days. *Id.* § 1703(b)(3)(A)(i). As with the maximum loan amount, maturity limitations have existed since the program's inception.

The maturity date is computed based on the payment due date indicated on the note. If the period exceeds the statutory maximum, the loan is not insurable. It is the responsibility of the lender rather than the government

to make certain that notes do not have maturities in excess of the statutory maximum. 55 Comp. Gen. 126 (1975); B-172121, Apr. 12, 1971. Thus, in 55 Comp. Gen. 126, a bank's claim for reimbursement was denied where a note submitted and accepted for insurance had a projected maturity date 17 days in excess of the maximum in effect when the loan was made.

The decision at 55 Comp. Gen. 126 also held that, since the statutory limitation applies to the maturity of the obligation or note underlying the loan, the date on the note is controlling and not the date on which the note was assigned or the funds disbursed. However, this is not an absolute and there are certain circumstances in which the date on the note has been found not controlling. For example, in B-162542, Oct. 24, 1967, GAO approved a lender's claim even though the note stated a final payment due date after the existing statutory limitation. The holding was based on a letter from the lender to the borrower which agreed to move up the date of the first payment and, by implication, all of the others as well, including the final payment. As a result, the maturity date fell within the statutory period.

Somewhat similarly, B-166521, Apr. 25, 1969, involved a 60-month note which, as written, would have exceeded the statutory maximum. The note was dated June 20, 1963, but provided that the first payment was not due until July 1, 1968. Based on the borrower's actual payment record, it was obvious that the maturity date had been inadvertently entered on the note as the first payment due date. Thus, the maturity date was within the then-existing statutory maximum and the lender could be paid.

Again in B-191660, Mar. 5, 1979, GAO upheld a bank's claim where the note had a projected maturity date 2 days in excess of the then-existing statutory limitation. The borrower's payment record and other evidence supported the bank's allegation that, due to inadvertence, the note as written did not reflect the intention of the parties at the time the loan was made. The decision emphasized that, where extraneous evidence is to be used to correct an alleged error on a note, merely changing the due date after default and after HUD has refused insurance is legally irrelevant. The extraneous evidence must establish that the allegedly correct due date is what the parties intended at the time the note was executed.

Problems may also arise when the term of the initial insured loan is within the statutory maximum but a subsequent extension agreement results in exceeding the maximum maturity period. For example, in B-131963, July 17, 1957, the Federal Housing Administration could not reimburse a

bank for a loss suffered on a defaulted loan where the bank had agreed in writing to extend the maturity date of the note beyond the statutory maximum.

In that decision, GAO held that while 12 U.S.C. § 1703(b)(6) permits a loan to be refinanced, this authority does not include a mere extension of payment. Thus, a lender may extend the time for paying a note beyond the maximum time limitation and still retain insurability only by actually refinancing the loan, that is, by executing a new note. Short of an actual refinancing, a mere extension of payment beyond the maximum will result in the loss of insurability. *See also* B-164118, Nov. 19, 1969; B-149800, Sept. 28, 1962; B-148816, May 21, 1962. Several cases have rejected arguments by the lender either that it had not intended to extend the final maturity date beyond the permissible maximum or that it should have been allowed to subsequently rescind or reform the extension agreement to conform to the statutory limitation. *E.g.*, B-188240, Aug. 10, 1977; B-164118, Dec. 30, 1969; B-164118, Aug. 14, 1968.

Insurability may be retained if the extension is merely a temporary deferral of certain payments, with the deferred payments to be made up prior to the original maturity date. However, if this is the case, it must be spelled out in the extension agreement. B-164118, Dec. 30, 1969.

In 51 Comp. Gen. 222 (1971), the extension agreement was not merely an extension of time but also changed other terms such as the period of payment and the amount of the monthly installment. In these circumstances, the Comptroller General found that the terms of the extension agreement differed so substantially from those of the original note that it was "tantamount to a new note" and could be considered as a refinancing. Although the "refinancing" had not been accomplished in accordance with applicable regulations, GAO advised HUD that it could consider waiving those particular regulatory requirements under 12 U.S.C. § 1703(e).

(3) Owner/lessee requirement

Another requirement of the Housing Act is that property improvement loans can be made only to borrowers who are owners of the property or who are lessees under a lease expiring not less than 6 months after the maturity of the loan or other advance of credit. 12 U.S.C. § 1703(a). A loan made to a borrower who is neither the owner nor the lessee of the property involved is not insurable. For example, where the property was owned by a

corporation and the loan application and note were signed by two individuals who were officers of the corporation, but with no indication that they were signing as representatives of the corporation, the loan was not made to the owner of the property and was ineligible for insurance. B-180015, Nov. 28, 1973. Similarly, where the same person was president of two different corporations and signed the note as president of corporation "A" but had signed the lease on the property involved as president of corporation "B," the loan was not made to the lessee and was not insurable. B-174739, Jan. 19, 1972.

The lease must expire "not less than six months after the maturity of the loan." 12 U.S.C. § 1703(a). A loan to a lessee is not insurable where the lease expires before the maturity date (B-194145, Dec. 12, 1980) or on the maturity date (B-172965, July 16, 1971). Time "after" an event is traditionally computed by excluding the date of the happening. Thus, a loan with a maturity date of July 1, 1956, to a lessee whose lease was due to expire on December 31, 1956, was not insurable. "Not less than six months after" the maturity date would have been on or after January 1, 1957. B-129898, Dec. 28, 1956.

In B-194145, Dec. 12, 1980, a loan was refinanced after the borrower, under a lease with option to purchase, had exercised the option. The bank argued that the loan should be insurable since the refinancing note had been executed to the owner. However, the Comptroller General held that a refinancing loan is insurable only where the prior loan being refinanced was itself validly insured. Since the original loans in that case were ineligible, the refinancing loan was equally ineligible. Also, the refinancing loan could not be considered an entirely new loan for purposes of insurability, since the statute authorizes insurance to finance improvements, not to repay outstanding uninsured loans.

In B-124410, July 25, 1955, GAO allowed a bank's claim on a loan to a borrower who was not the owner of the property. The decision was based on Federal Housing Administration (FHA) regulations which provided that a lender, acting in good faith, may in the absence of any information to the contrary rely on statements of fact in a credit application, and the credit application in that case had been misleading. Compare, however, 17 Comp. Gen. 604 (1938), in which a claim was denied for a loss suffered when a lender advanced funds to an individual other than the borrower upon a forged authorization, where a simple comparison with the signature on the note would have disclosed the forgery.

While a bank is generally entitled to rely on statements of fact in a credit application, it is nevertheless required to exercise good credit judgment. Thus, payment was denied in A-88143, Aug. 21, 1937, where the borrower had previously defaulted on a different loan with the same bank. The result applies equally to a bank with several branches where the contract of insurance is with the home office. 19 Comp. Gen. 92 (1939). An apparent exception occurred in B-124438, July 26, 1955, where a borrower listed on his credit application a prior loan with a branch of the same bank located 110 miles away, but failed to note that it was in default. The bank checked several local credit references and received favorable reports, but did not check with its branch. Since the bank had diligently checked the local references, the borrower cured the default on the prior loan, and the FHA waived the bank's violation of regulations which prohibited accepting a loan when a prior loan was in default, GAO concluded that the bank could be reimbursed for its losses on the second note.[33] For cases on the requirement to approve the credit statement, see 16 Comp. Gen. 958 (1937) and A-71945, June 16, 1937.

(4) Execution of the note

Another requirement, found in the regulations implementing the Housing Act, is that the note evidencing the indebtedness bear the genuine signature of the borrower, be valid and enforceable against the borrower, and be complete and regular on its face. 24 C.F.R. § 201.12 (2005). In a number of cases where either signatures were forged or terms of the note were altered—potentially making the note ineligible for insurance under the regulations—GAO has allowed claims by a lender for reimbursement based on the lender's apparent good faith and the previously discussed authority to waive regulatory requirements. B-127167, Dec. 17, 1968 (forged signature); B-127167, Dec. 5, 1957 (false representation as to age); B-130955, May 2, 1957 (alteration of amount); B-127167, Apr. 10, 1956 (forged signature). Where HUD declines to exercise its waiver authority, it may treat the note as ineligible for insurance. *United States v. deVallet*, 152 F. Supp. 313 (D. Mass. 1957). "The government had the right to make such limitations on its insurance undertaking as it saw fit." *Id.* at 315.

One court has held that the validity/regularity requirement applies "not at the point at which a bank submits its claim, but at the point at which the loan itself is being arranged." *Guardian Federal Savings and Loan*

[33] The same facts in today's computerized environment could well produce a different result.

*Association v. Harris*, 441 F. Supp. 789, 791 (D.D.C. 1977). While this seems clear enough with respect to items such as the validity of the signature and the "regularity" of the note, subsequent events may affect the enforceability of a note, a situation implicitly recognized in the *Harris* case. In B-127483, Apr. 26, 1956, it was held that the enforceability requirement was not affected by a mistrial in a suit brought by the lender resulting in a dismissal without prejudice. In 37 Comp. Gen. 857 (1958), GAO held that a lender could be reimbursed where the note had become unenforceable due to the passage of time notwithstanding the lender's diligent collection efforts. The result would at least arguably be different if a note became unenforceable through the fault or neglect of the lender.

(5) Reporting requirement

The four requirements discussed thus far relate to the eligibility of a loan for insurance from its inception. This one is different because the loan itself is eligible but the lender's failure to comply may result in the loss of insurability. Program regulations require lenders to report loans to the Department of Housing and Urban Development (HUD) on a prescribed form within 31 days from the date of the note or the date the note was purchased. 24 C.F.R. § 201.30(a) (2005). HUD then accepts the loan for insurance or rejects it. The reporting requirement also applies to refinancing loans. *Id.*

Under present regulations, HUD has discretion to accept a late report as long as the loan is not in default. *Id.* § 201.30(b). Once the loan has gone into default, that discretion no longer exists and it is too late to establish coverage. An illustrative case is B-194822, Sept. 24, 1980. A bank inadvertently failed to report a property improvement loan to HUD. More than a year later, after the loan was in default, the bank submitted its report along with its claim for indemnification. Concluding that the loan was never insured, HUD denied the claim, and GAO agreed. The fact that HUD had inadvertently billed the bank for the required premiums, which the bank paid, was not enough to establish coverage. Of course, refund of the premiums was appropriate.

Prior to 1968, the regulations did not limit HUD's discretion, and a late report could be accepted even after default. Cases addressing the exercise of discretion under this version of the regulations are B-165239, Oct. 4, 1968, and B-153971, June 17, 1964.

(6) Payment of premiums

The statute requires that HUD charge the financial institution a premium for the insurance. 12 U.S.C. § 1703(f). The premium is a prerequisite to insurability. *Id.* § 1703(b)(5). This is closely related to the reporting requirement discussed above in that it is the report that triggers HUD's billing of the bank. The sequence is: (1) bank reports loan to HUD on manifest form; (2) HUD includes the loan on its monthly statement to the bank; (3) upon receipt of monthly statement, bank pays premium to HUD; (4) when HUD receives the premium, loan achieves insured status.

Subsection 1703(f) further requires that the premium charge "shall be payable in advance by the financial institution." Thus, advance payment of the premium is necessary for the loan to be eligible for insurance, at least where nonpayment is solely the fault of the bank. B-172965, July 16, 1971 (loan not covered where bank failed to report the loan and was thus never billed by HUD). *See also* B-194822, Sept. 24, 1980 (no authority to accept premiums after default). For loans with a maturity in excess of 25 months, the insurance charge is payable in annual installments. 24 C.F.R. § 201.31(b)(2) (2005).

In 55 Comp. Gen. 891 (1976), the bank claimed that it had reported the loan to HUD. HUD, however, had no record of the report and consequently had neither requested nor received any premium payments from the bank prior to default. Apart from the fact that the advance payment requirement appears in a federal statute, the bank had actual notice that a loan is not insured until it appears on the monthly statement and the premium is paid. Adequate review of the monthly statements would have revealed that the particular loan was not listed and that therefore either HUD never received the report or failed to acknowledge it. Since it is the bank's responsibility to assure payment of premiums in advance, its claim was denied. The decision once again reiterated that HUD's waiver authority does not apply to statutory requirements.

A related case, 55 Comp. Gen. 658 (1976), reaffirmed the proposition that timely payment of the insurance premiums is a prerequisite to continued insurance coverage. The decision also held that claims by a lending institution which is currently delinquent in its premium payments may be allowed if the borrower's default occurred prior to the delinquency. However, if the lending institution was delinquent before the default occurred or became imminent, its claim may not be allowed.

The decision in 55 Comp. Gen. 658 was expanded (and modified with respect to matters not relevant here) in 56 Comp. Gen. 279 (1977), holding that timely payment of insurance premiums under 12 U.S.C. § 1703 is a continuing obligation of the lender and cannot be voluntarily terminated by the lender before the end of the term of the underlying loan. Unpaid insurance premiums constitute a debt presently due and payable by the lender to the United States. Therefore, HUD may offset delinquent premiums against insurance claims otherwise payable to the lender. However, estimated future premiums may not be offset against currently payable claims because they are not certain in amount. (Under the program regulations, the premium may be abated after an insurance claim has been filed or if the loan is paid in full prior to maturity. 24 C.F.R. § 201.31(e).)

### c. Small Business Administration Business Loan Program

(1) Payment of guarantee fee

Like the National Housing Act insurance programs, a loan guarantee under section 7(a) of the Small Business Act is not free to the lender. The Small Business Administration is required to charge a guarantee fee, based on a percentage of the amount guaranteed, on most loans guaranteed under 15 U.S.C. § 636(a). *Id.* § 636(a)(18). The fee is payable by the participating lending institution, but may be passed through to the borrower. *Id.* SBA's implementing regulations are found at 13 C.F.R. part 120 (2005).

For many years prior to the enactment of 15 U.S.C. § 636(a)(18) in 1986,[34] SBA charged a guarantee fee under the authority of its program regulations and guarantee agreement. Thus, pre-1986 GAO decisions dealing with section 7(a) fees must be regarded as modified to the extent they were addressing a nonstatutory requirement. They, however, along with elements of the program regulations which pre-date the 1986 legislation, establish the proposition that an agency may charge a guarantee fee without specific statutory authority as long as it is not prohibited and outline the general parameters of a nonstatutory fee requirement.

As with the Housing Act fees, a fundamental issue is the effect of nonpayment or late payment. Unlike the Housing Act, the SBA provision does not require that the fees be paid in advance. Thus, by itself, 15 U.S.C. § 636(a)(18) neither makes payment of the fee an essential condition of guarantee eligibility, nor does it prohibit such treatment. Under SBA's

[34] Pub. L. No. 99-272, § 18007, 100 Stat. 82, 366 (Apr. 7, 1986).

regulations, the fee is payable when the lender applies for a guarantee for loans with maturities of 12 months or less, and within 90 days after SBA's approval for loans with maturities greater than 12 months. 13 C.F.R. § 120.220(b). Absent statutory direction one way or the other, the effect of missing these deadlines is a matter within SBA's discretion to establish by regulation or terms of the guarantee agreement.

At one time, SBA's guarantee agreement expressly provided that a loan is not guaranteed until the fee has been paid. Under this provision, payment of the fee was a condition precedent to coverage. SBA had the discretion to accept late payment provided the loan was not in default, but the loan was not protected by the guarantee until the fee was paid. B-181432, Nov. 12, 1975; B-181432, Mar. 13, 1975. In cases where the fee remained unpaid at the time the borrower defaulted, claims by lenders were consistently denied in the face of arguments such as estoppel (B-181432, May 21, 1979, and B-181432, Oct. 20, 1978), "constructive payment" (B-181432, July 7, 1978), or inexperience on the part of bank personnel (B-181432, Aug. 15, 1977). Since the requirement was explicitly stated in the guarantee agreement, virtually all of these cases reiterated the proposition that no government official may give away the government's contractual rights without either statutory authority or adequate legal consideration. The courts reached the same result. *See Union National Bank of Chicago v. Weaver*, 604 F.2d 543 (7th Cir. 1979); *Union State Bank v. Weaver*, 526 F. Supp. 29 (S.D.N.Y. 1981).

SBA's current regulations provide that the agency may terminate the guarantee if the fee is not paid. 13 C.F.R. § 120.220 (introductory language and subsection (e)). Implicit in this language is the premise that the guarantee will be regarded as in effect until SBA terminates it.

A 1983 decision considered similar issues under a different SBA program, the Surety Bond Guarantee Program established by 15 U.S.C. §§ 694a–694c. Since nothing in the legislation or implementing regulations made payment of the guarantee fee a condition precedent to the existence of the guarantee, and since the surety bond guarantee agreement contained no provision comparable to the provision then being used in the business loan guarantee agreement, the decision concluded that nonpayment of the fee prior to default would not void SBA's obligation to honor the guarantee, although SBA should deduct the unpaid fee from the surety's claim. B-206893, Mar. 18, 1983.

A 1979 case considered the effect of another provision in the guarantee agreement. A bank, conceding that it had not paid the guarantee fee prior to default on the loan as originally written, argued that it had effectively modified the agreement by granting the borrower additional time to begin repayment. However, the guarantee agreement explicitly required SBA's prior written approval of any change in the terms of the loan, which the bank had neither requested nor received. The modification was therefore not legally effective as against SBA. B-193134, July 27, 1979.

The issue in 58 Comp. Gen. 693 (1979) was the effect of a refinancing loan. In view of SBA's discretion to accept refinancing, GAO concluded that the effect of a bank's failure to timely pay the fee on the original loan was terminated when the original loan was repaid by the refinancing loan. Thus, the fact that the guarantee on the original loan may have been extinguished will not necessarily defeat an otherwise valid guarantee on a subsequent refinancing loan.

Cases involving late payment or nonpayment of the guarantee fee may be useful in analyzing the treatment and consequences of other terms and conditions of the guarantee agreement, but should not be blindly applied. For example, the court in *Eastern Illinois Trust & Savings Bank v. Sanders*, 826 F.2d 615 (7th Cir. 1987), drew a distinction between provisions expressly declared to be conditions precedent to SBA's obligation, such as the fee provision, and those which are not so declared. If a lender violates a provision in the latter category, the issue becomes "whether the violation was a material breach of the agreement, or rather whether [the lender] substantially complied with the agreement." *Id.* at 616. The lender's violation in the cited case, making "side loans" to a borrower, was found not to constitute a material breach and therefore did not justify repudiation of SBA's guarantee. By way of contrast, a lender who violates a provision in the "condition precedent" category cannot enforce the guarantee, and you never get to the material breach *versus* substantial compliance analysis. *See*, *e.g.*, *First National Bank of Louisa, Kentucky v. United States*, 6 Cl. Ct. 241 (1984).

(2) Notice of default

Another type of provision an agency may include in its program regulations is a requirement that the lender notify the agency in writing within a specified time period after a default occurs. The Small Business Administration's (SBA) regulations included such a requirement for many years. *See*, *e.g.*, 13 C.F.R. § 122.10(a) (1980). The provision was dropped in

a 1985 revision of the regulations. Under current regulations, SBA's obligation under a guarantee is extinguished if the lender fails to demand purchase of the unpaid guaranteed portion within 120 days after maturity of the note. 13 C.F.R. § 120.524(a)(8) (2005).

Pre-1985 decisions on the notice requirement are no longer applicable to SBA under the current regulations. Nevertheless, we briefly note a few of them because they illustrate the scope of an agency's authority to implement a guarantee program by regulation and may have relevance by analogy to similar requirements in other programs. Since the requirement itself is a creature of agency regulations, the agency has discretion to determine the consequences of noncompliance, ranging from an interest penalty (B-181432, Sept. 4, 1979) to termination of the guarantee commitment (B-201388, Sept. 23, 1981). The agency may also make the consequences contingent upon the extent to which noncompliance prejudices the interests of the government. *See* B-187945, Mar. 22, 1977. While the basic requirement may not be waived except to the extent permissible under the regulations (*see* B-181432, Feb. 19, 1976), the particular form of notice, a matter of procedure, is subject to waiver. B-188741, Jan. 25, 1978 (oral notice accepted and acknowledged by agency held to be substantial compliance). *See also* B-181432-O.M., Feb. 19, 1976 (agency may waive requirement in guarantee agreement that lender provide it with a copy of the executed note and settlement sheet).[35]

## D. Rights and Obligations of Government upon Default

### 1. Nature of the Government's Obligation

When a government agency guarantees a loan, it is promising to indemnify someone in case of default. The "someone" includes both the lending institution that originated the loan and subsequent purchasers of the guaranteed portion of the loan. The default results from the borrower's failure to make payment when due or other breach of a material covenant

[35] For a detailed discussion of waiver of agency regulations in the context of Commodity Credit Corporation export assistance guarantees, see B-208610, Sept. 1, 1983.

of the loan. In the simple situation, a borrower borrows money from a lender. The government guarantees the loan, with the commitments of the lender and the government usually reduced to writing in the form of a guarantee agreement. If the borrower defaults on his or her payments, the lender looks to the government to pay on the guarantee.

In some instances, Congress has explicitly provided in the program legislation that the guarantee will be backed by the "full faith and credit" of the United States. Examples are 12 U.S.C. § 635k (guarantees and insurance issued by the Export-Import Bank), 15 U.S.C. § 683(b) (guarantees of debentures or securities issued by small business investment companies), and 20 U.S.C. § 1075(b)(4) (federally insured student loans).[36] Language of this type has been held to be "the highest assurance the Government can give, its plighted faith." *Perry v. United States*, 294 U.S. 330, 351 (1935).

There is a long line of opinions of the Attorney General addressing the effect of statutory language pledging the "faith" or "credit" of the United States, or the absence of such language. While the opinions are not limited to loan guarantee commitments, almost all of the cases arose under loan guarantee programs. This is understandable because (1) lenders are being asked to extend credit to a somewhat riskier universe of borrowers which they most likely would not accommodate without the guarantee; and (2) at least prior to the Federal Credit Reform Act, the government's commitment was not backed by enacted budget authority. To encourage lender participation in a variety of programs, the Attorney General was asked, in effect, "Does the government really mean it?"

Perhaps the leading case is 41 Op. Att'y Gen. 363 (1958), dealing with ship mortgage and loan insurance under provisions of the Merchant Marine Act of 1936, subsequently amended and now codified at 46 U.S.C. App. §§ 1271–1275. The opinion makes several important points. First, what does the language mean? It means that the government's obligation is to be considered on the same footing as the interest-bearing obligations of the United States such as Treasury bills, notes, and bonds. 41 Op. Att'y Gen. at 366 (citing 41 Op. Att'y Gen. 138 (1953)).

[36] This and similar language has, and is intended to have, connotations of constitutional significance, although the words "full faith and credit" appear in the U.S. Constitution only once, in the requirement that each state recognize the laws, records, and judicial proceedings of other states (art. IV, § 1). In addition, the U.S. Constitution empowers the Congress to borrow money "on the credit of the United States" (art. I, § 8, cl. 2).

Second and more important, what is the language's practical significance? None, answered the Attorney General. Although recognizing that Congress can establish such distinctions, the Attorney General stated that, in the absence of such congressional action, there is no "order of solemnity of valid general obligations of the United States," nor does an obligation with the statutory faith and/or credit language have any legal priority over a valid general obligation of the United States without the language. 41 Op. Att'y Gen. at 369.

Finally, the Attorney General addressed the lack of advance budget authority:

> "If . . . the existence of an appropriation is not a condition of or limitation on the authority of an officer to contract on behalf of the United States, the need for appropriations to meet an obligation incurred under the contract does not affect the existence or validity of the obligation."

*Id.* at 370. The opinion noted that Congress expressly authorized the incurrence of obligations under the program in advance of appropriations. *Id.* The following year, the Attorney General made the same points with respect to Interstate Commerce Commission loan guarantees to rail carriers. 41 Op. Att'y Gen. 403 (1959). After emphasizing that the validity of the guarantee "is not affected by the absence from the act of any language expressly pledging the faith or credit of the United States," the opinion states that "It is enough to create an obligation of the United States if an agency or officer is validly authorized to incur such an obligation on its behalf and validly exercises that power." *Id.* at 405.[37]

Thus, reading all of the opinions together, we may state that a loan guarantee is a valid obligation of the United States the same as any other valid obligation, regardless of the presence or absence of full faith and credit language and regardless of the presence or absence of advance budget authority, provided (1) the program statute is constitutional;

[37] Other opinions in this family are 42 Op. Att'y Gen. 327 (1966); 42 Op. Att'y Gen. 323 (1966); 42 Op. Att'y Gen. 21 (1961); 41 Op. Att'y Gen. 424 (1959); and 6 Op. Off. Legal Counsel 262 (1982). Since the opinions all said basically the same thing and seemed to arise under every program in sight, the Attorney General stopped issuing formal opinions on routine full faith and credit questions in this context in 1973. 6 Op. Off. Legal Counsel 262, at n.2.

(2) Congress has not disclaimed liability at the time or before the commitment is made; (3) the guarantee is made by a federal agency or official with the legal authority to do so; and (4) the guarantee complies with applicable statutory and regulatory requirements.

In an opinion concerning guarantees issued by the former Federal Savings and Loan Insurance Corporation incident to its resolution of failed or failing savings and loan institutions, the Comptroller General expressly adopted the criteria and analysis of the Attorney General opinions. 68 Comp. Gen. 14 (1988).

## 2. Scope of the Government's Guarantee

As noted earlier, a loan guarantee statute will typically specify the permissible purpose(s) of the loans to be guaranteed, establish eligibility requirements, and give the administering agency considerable discretion to determine the terms and conditions of the guarantee. Subject to the terms of the program legislation, there is also an element of discretion in determining the permissible scope of a guarantee, that is, the types and degree of risk to which the agency may expose itself. This section presents a few issues GAO has considered regarding the limits of that discretion.

As with any other payment situation, the government is not expected to close its eyes to indications of fraud or misrepresentation. For example, an agency should not make payment to a lender where it has knowledge of the possibility of fraud, negligence, or misrepresentation on the part of the lender. Making payment in the face of such knowledge exposes the certifying officer to potential liability. 51 Comp. Gen. 474 (1972); B-174861, Feb. 23, 1972. In these two cases, however, GAO advised that the Small Business Administration (SBA) could, upon default of the borrower, purchase the guaranteed portion of the loan from an innocent holder who had purchased it in the secondary market and who had no knowledge of the possible misconduct by the originating lender. Payment to the innocent holder in these circumstances would not waive any of SBA's rights against the original lender, and, as a practical matter, would avoid a result adverse to the holder that could seriously jeopardize the secondary market. Thus, paying the innocent holder is an acceptable level of risk whereas paying the suspected wrongdoer is not.

It follows that there is no objection to honoring the claim of an innocent lender who is the victim of fraud by the borrower. B-167329, Oct. 6, 1969.

Similarly, GAO held in 17 Comp. Gen. 604 (1938) that the Federal Housing Administration was not liable to reimburse a lender bank for a loss sustained as a result of a payment made, on the basis of a forged authorization, to an individual other than a *bona fide* borrower. This situation was distinguished from a case where a lender bank, in the exercise of due care, suffered a loss as a result of a forged note. A-94717-O.M., Aug. 12, 1938. The bank in 17 Comp. Gen. 604 already possessed a validly signed note but suffered the loss by accepting a forged authorization for payment. Comparison of the authorization with the note would have disclosed the forgery.

A 1974 decision expanded somewhat on 51 Comp. Gen. 474. GAO determined in B-140673, Dec. 3, 1974, that the SBA has sufficiently broad statutory authority to repurchase the guaranteed portion of a loan from an innocent secondary-market holder where the borrower is not in default but the primary lender negligently or unlawfully withholds payments. (Under the arrangement in question, the primary lender was to continue servicing the loan and remit payments, minus a servicing fee, to the holder.) This decision clearly enlarged the scope of SBA's guarantee since the "triggering event" could be something other than a default by the borrower in repaying the loan. However, the holding in that case was for the relatively limited purpose of allowing SBA to avoid the security registration requirements of the Securities Act of 1933, subsequently amended and now codified at 15 U.S.C. §§ 77a–77aa. The Securities and Exchange Commission had determined that these requirements would apply to SBA-guaranteed loans that were resold in the secondary market, unless SBA's guarantee was absolute and fully protected the purchaser of the guaranteed portion in all circumstances, including instances where the lender did not forward all payments received from the borrower.

A few years later, B-181432, Aug. 11, 1978, explored what are perhaps the outer limits of the "risk discretion" recognized in B-140673. SBA proposed to contract with a private entity to serve as the centralized fiscal agent in the secondary market for SBA guaranteed loans. The fiscal agent would have responsibility for receiving payments from borrowers, remitting these payments to the holders, and certifying the amount of the outstanding balance each time a guaranteed loan was transferred. SBA further proposed to unconditionally guarantee all such actions and representations of the fiscal agent to the holder of the guaranteed portion of a loan. GAO agreed that SBA could contract with a fiscal agent and, consistent with B-140673, guarantee a holder against the agent's failure to properly forward the borrower's loan payments. However, to unconditionally guarantee

holders against certification errors by the fiscal agent would significantly enlarge SBA's existing guarantee responsibility, would subject SBA to substantially new risks, and would therefore require additional legislative authority. The increased risk would include new types of events that could trigger SBA's obligation to purchase a guaranteed loan, as well as the maximum amount of SBA's liability (should the fiscal agent erroneously certify the outstanding balance of a loan to be larger than it actually was).

## 3. Amount of Government's Liability

A program statute may or may not provide guidance on determining the amount the government is obligated to pay under a guarantee or the manner in which a loss is to be computed. If it does not, the agency's discretion again comes into play. As long as they are consistent with whatever statutory guidance does exist, the agency's regulations will generally be controlling.

For example, the computation of claims under Title I of the National Housing Act is prescribed by regulation. *See* 24 C.F.R. § 201.55 (2005). In very simplified form, the claim is a specified percentage of the sum of several elements: the unpaid amount of the loan (subject to certain reductions), plus accrued interest, plus uncollected court costs, plus attorney's fees actually paid, plus certain recording expenses. Claims by lenders using unauthorized computations have been disallowed. *E.g.*, B-133924, Dec. 4, 1957.

In another case involving the National Housing Act loan program, a lender claimed an amount representing partial reimbursement of attorney's fees incurred in collecting on a defaulted note. Although the borrower's obligation on the note was discharged and the note did not contain a stipulation for attorney's fees in the event of default (which would have been ineffective under state law), payment of the claim was proper since it was specifically provided for in the regulations. B-163029, Feb. 16, 1968.

Validly issued program regulations are controlling even though applying them in a particular case may produce an anomalous result to the lender's advantage, at least where the lender has fully complied. For example, regulations governing defaulted mobile home loans provide that reimbursement is computed by deducting from the unpaid amount of the loan either the actual sales price upon repossession or the appraised value of the mobile home, whichever is greater. GAO has found this formula to be within the Department of Housing and Urban Development's (HUD) statutory authority. 71 Comp. Gen. 449 (1992). At one time, the regulations

also prohibited the filing of a claim until after default, repossession, and sale of the mobile home. These regulations occasionally produced a situation in which a particular model could not be found in current rating publications (such as the so-called "blue book") and the mobile home was no longer available for appraisal by HUD because, in compliance with the regulations, it had already been sold. Since the impossibility of appraisal was due to the regulations and was through no fault of the lender, the Comptroller General held that the actual sales price could be used in computing the reimbursement, as long as it was administratively determined to be reasonable. 55 Comp. Gen. 151 (1975); B-184016, Sept. 16, 1975. The solution, of course, was to amend the regulations.

Several early decisions involved the language in 12 U.S.C. § 1703(a) which authorizes HUD to insure lending institutions against "losses which they may sustain" in making home improvement loans or other advances of credit. If the loan does not either provide for the automatic acceleration of maturity upon default or give the lender the option to accelerate which the lender in fact exercises, the government cannot pay the lender the full unpaid balance of an unmatured loan because payments not yet due do not represent a loss actually sustained by the lending institution. A-74701, May 22, 1936. While this result was consistent with the statutory language, it was not practical from an administrative standpoint. It meant that HUD was limited to paying the lender the monthly installments as they became due. Two later decisions effectively modified A-74701 and established that, if there is no acceleration provision (an event which would be unlikely today), or if exercising an acceleration option would be undesirable because of state law, HUD can nevertheless reimburse a lending institution for the entire unpaid balance of the loan if it is clear that the entire unpaid balance will be a claim of the lending institution against the government and if the lender assigns the note or other evidence of indebtedness to the government. 16 Comp. Gen. 723 (1937); 16 Comp. Gen. 336 (1936).

## 4. Liability of the Borrower

When the government guarantees a loan and the borrower defaults, the lender is not required to make special efforts toward collection. Rather, the lender may fall back on the government's guarantee and leave the entire responsibility for collection to the government. *See*, *e.g.*, 16 Comp. Gen. 336 (1936); B-134628, Jan. 15, 1958. Naturally, it is invariably to the lender's advantage to do just that. Payment by the government, however, does not mean that the borrower is off the hook. Unless the program legislation provides otherwise, the government becomes subrogated to the rights of the lender, and the borrower is indebted to the government for the

amount it has paid out. The government is not required to collect more than the amount it has actually paid out to the lender, plus interest and collection costs to the extent authorized. *See* 15 Comp. Gen. 256 (1935). A variety of issues relating to borrower liability can be illustrated by an examination of the Veterans' Home Loan Guarantee Program.

### a. Veterans' Home Loan Guarantee Program

Title III of the Servicemen's Readjustment Act of 1944, as amended and codified at 38 U.S.C. §§ 3701–3751, authorizes the Department of Veterans Affairs (VA) to guarantee loans to enable veterans to purchase or construct homes and for other specified purposes. This is the well-known "G.I. loan." The guarantee is an entitlement in the sense that a loan meeting the statutory requirements and made for one of the statutory purposes is "automatically guaranteed." *Id.* § 3710(a). For certain loans closed after December 31, 1989, the liability of the veteran-borrower to the government was considerably restricted by the Veterans Home Loan Indemnity and Restructuring Act of 1989.[38] A description of the "old" rules is nevertheless useful to understand what has and has not been changed, and because loans under the old and new programs will exist side-by-side for many years into the future.[39]

(1) <u>Loans closed prior to 1990</u>

Upon proper payment of a guarantee, the Department of Veterans Affairs (VA) acquires both the right of subrogation and an independent right of indemnity against the defaulting veteran. *United States v. Shimer*, 367 U.S. 374 (1961); *Vail v. Derwinski*, 946 F.2d 589 (8th Cir. 1991); *McKnight v. United States*, 259 F.2d 540 (9th Cir. 1958). As the Supreme Court noted in *Shimer*, a contrary result would convert the guarantee into a grant. 367 U.S. at 387. The right of indemnity is reinforced by the guarantee agreement and by a regulation in effect since the early days of the program which provides that any amount paid out by the VA under a guarantee by reason of default "shall constitute a debt owing to the United States by such veteran." 38 C.F.R. § 36.4323(e) (2005).

[38] Pub. L. No. 101-237, title III, 103 Stat. 2062, 2069 (Dec. 18, 1989).

[39] For a comprehensive discussion of the program, see Bernard P. Ingold, *The Department of Veterans Affairs Home Loan Guaranty Program: Friend or Foe?*, 132 Mil. L. Rev. 231 (1991).

In the simple situation, the veteran defaults, the bank forecloses, the VA pays the bank under the guarantee and then proceeds to attempt recovery from the defaulting veteran. *E.g.*, *McKnight*, 259 F.2d 540.

Sale of the property by the veteran does not automatically exonerate the veteran from liability. Where a veteran who bought a home under a VA-guaranteed loan sells the property to a purchaser who assumes the mortgage and subsequently defaults, the veteran may still be liable to the government for the amount VA is required to pay under the guarantee. B-155317, Oct. 21, 1964; B-131120, July 26, 1957; B-131210, Apr. 9, 1957. This result applies unless the transaction amounts to a novation, that is, unless the mortgagee releases the original mortgagor and extinguishes the old debt. B-108528, Dec. 3, 1952. Breach by the lender of an agreement to notify the veteran (original borrower) if the subsequent purchaser defaults does not affect the veteran's liability to the United States. B-154496, July 9, 1964.

The potential harshness of the result in many of these cases is largely mitigated through statutory release and waiver provisions. When a veteran disposes of residential property securing a guaranteed loan, the veteran may be released at the time of the sale from all further liability to the VA resulting from the loan, including default by the transferee or subsequent purchaser, if (1) the loan is current, (2) the purchaser is obligated by contract to assume the full liability and responsibility of the veteran under the loan, and (3) the purchaser qualifies from a credit standpoint, that is, if the purchaser would qualify for a guarantee if he or she were an eligible veteran. 38 U.S.C. § 3714(a)(1). Issuance of the release is mandatory if the statutory conditions are met. Upon receipt of written notification by the veteran and a determination that the conditions in 38 U.S.C. § 3714(a) are met, the release is issued by the holder of the loan. In some cases, the VA is considered the loan holder. *Id.* § 3714(a)(2). The veteran has a right to appeal an adverse determination to the VA. *Id.* § 3714(a)(4). Even if the specified conditions are not met, the assumption may be approved in certain circumstances. *Id.* § 3714(a)(4)(B)(ii). Sale of the property without notifying the holder may result in acceleration of the loan. *Id.* § 3714(b).

In addition, the VA is required to waive a veteran's indebtedness arising from a loan upon determining that collection would be against equity and good conscience, and that there is no indication of fraud, misrepresentation, or bad faith on the part of any interested person. 38 U.S.C. § 5302(b). Waiver must be requested within 1 year from receipt of the notification of indebtedness. *Id.* This is a "mandatory" waiver statute,

imposing upon the VA a duty to actually exercise its discretion once waiver has been requested. *See Beauchesne v. Nimmo*, 562 F. Supp. 250 (D. Conn. 1983) (discussing mandatory nature of 38 U.S.C. § 5302 dealing with waiver of benefit overpayments).

As with many waiver statutes, 38 U.S.C. § 5302 eliminates the potential liability of certifying and disbursing officers with respect to any amounts waived. *Id.* § 5302(d). "Certifying officer" in this context means the authorized certifying officer of the VA who certified the payment in question, and has no reference to any official of any private institution involved in the transaction. *Colorado v. Veterans Administration*, 430 F. Supp. 551, 561 (D. Colo. 1977), *aff'd*, 602 F.2d 926 (10th Cir. 1979), *cert. denied*, 444 U.S. 1014 (1980).

Adverse waiver determinations may be appealed to the Board of Veterans Appeals established by 38 U.S.C. § 7101. *See* 38 C.F.R. §§ 20.101(18)–(19) (2005); *see also* 38 C.F.R. § 1.958. Waiver determinations and the Board's review of them are subject to further judicial review by the United States Court of Veterans Appeals under an "arbitrary and capricious" standard. *E.g.*, *Kaplan v. Brown*, 9 Vet. App. 116, 119 (1996) and cases cited. If waiver is granted, amounts previously paid may be refunded. 38 C.F.R. § 1.967. GAO reviewed these regulations when they were first issued and agreed that they were within the VA's authority. B-158337, Mar. 11, 1966.

Absent either release or waiver, the VA may pursue recovery against the veteran. *See*, *e.g.*, *Davis v. National Homes Acceptance Corp.*, 523 F. Supp. 477 (N.D. Ala. 1981); B-188814, Mar. 8, 1978; B-172672, June 22, 1971. In B-188814, for example, the veteran had failed to obtain a release, would not have been eligible for it anyway, and VA refused to waive the indebtedness. Therefore, the veteran was held liable even though the purchaser who subsequently defaulted had assured him that he would no longer be liable to VA.

Most of the cases cited thus far concern the liability of the original borrower where a subsequent purchaser defaults. The purchaser of property for which VA has guaranteed a loan, whether or not the purchaser is a veteran, may also become liable to VA for amounts VA is required to pay out upon default. For example, in B-141888, July 21, 1960, a veteran purchased a home, obtained a VA guarantee, and later sold the home to a nonveteran who assumed the mortgage. The nonveteran purchaser defaulted. The lender foreclosed and obtained a deficiency judgment against both the veteran and the nonveteran, which VA paid. VA waived the

veteran's indebtedness, but was still entitled to collect from the defaulting purchaser. *See also* B-155932, Feb. 23, 1971; B-155932, Oct. 13, 1970 (same case).

Issues have arisen under the loan program concerning the availability of state law as a defense to a VA claim. For example, it is not uncommon for states to prohibit, or impose various restrictions on, lenders' obtaining deficiency judgments against defaulting purchasers after a foreclosure sale. Since VA's rights under subrogation are limited to the rights of lenders, these statutes would limit VA's right to obtain deficiency judgments under a subrogation theory. However, VA's regulations have been held to "create a uniform system" for administering the guarantee program, a system which displaces state law. *Shimer*, 367 U.S. at 377. These regulations, as noted earlier, include a provision giving the VA an independent right of indemnity. Thus, to avoid the possibility of being hampered by state law, VA has generally proceeded under its independent right of indemnity rather than under a subrogation theory. *E.g.*, B-126500, Feb. 3, 1956; B-124724, Dec. 21, 1955.

Consistent with *Shimer*, the courts generally hold that the VA's right of indemnity prevails over state laws which flatly prohibit VA from obtaining deficiency judgments through subrogation. *Jones v. Turnage*, 699 F. Supp. 795 (N.D. Cal. 1988), *aff'd mem.*, 914 F.2d 1496 (9th Cir. 1990), *cert. denied*, 499 U.S. 920 (1991); *United States v. Rossi*, 342 F.2d 505 (9th Cir. 1965); B-174343, Nov. 17, 1971; B-143844, Nov. 15, 1960; B-124724, Oct. 3, 1955. Other cases applied the same approach to dismiss other aspects of state deficiency laws. *E.g.*, B-173007, June 29, 1971; B-162193, Sept. 1, 1967; B-122929, June 24, 1955.

At one time, some courts viewed VA's right of indemnity as secondary to its subrogation rights, and, therefore, held that VA could not invoke indemnification as a means of avoiding state law restrictions that would limit its recovery rights under a theory of subrogation. *See*, *e.g.*, *Whitehead v. Derwinski*, 904 F.2d 1362 (9th Cir. 1990). However, this view has been abandoned. In its *en banc* decision in *Carter v. Derwinski*, 987 F.2d 611 (9th Cir. 1992), *cert. denied sub nom.*, 510 U.S. 821 (1993), the Ninth Circuit explicitly overruled *Whitehead*. The court held in *Carter* that the two remedies were equally available to VA:

> ". . . The regulation at issue plainly says the VA has a right of both subrogation and indemnity. There is no occasion for us to resolve any conflict between the

> exercise of these two rights, because both can be fully enforced. Indeed, not only are the rights of subrogation and indemnity not in conflict, they are complementary and mutually reinforcing. Demoting the right of indemnity to second-class status amounts to a judicial rewriting of the regulation."

987 F.2d at 615. *See also United States v. Davis*, 961 F.2d 603 (7th Cir. 1992); *Vail v. Derwinski*, 946 F.2d 589 (8th Cir. 1991); *Boley v. Principi*, 144 F.R.D. 305 (E.D.N.C. 1992), *aff'd*, 10 F.3d 218 (4th Cir. 1993); *In re Silveous*, 174 B.R. 479 (Bankr. N.D. Ohio 1994).

The defense of minority has also been raised on occasion. State law generally provides that a contract entered into by a minor is voidable at the minor's option. Several states have statutes which expressly make the defense of infancy inapplicable to contracts under the Servicemen's Readjustment Act, and the few cases GAO has considered have involved statutes of this type. *See* B-126500, Feb. 3, 1956; B-124750, Oct. 3, 1955; B-105429, Dec. 11, 1951. In addition, the United States has sovereign immunity from defenses arising under state statutes of limitations unless expressly waived. *E.g.*, *United States v. Summerlin*, 310 U.S. 414 (1940) (claim under National Housing Act); *Bresson v. Commissioner of Internal Revenue*, 213 F.3d 1173 (9th Cir. 2000) (federal tax assessment); B-134523, Mar. 19, 1958 (*Summerlin* applied to VA claim). *See also*, *United States v. California*, 507 U.S. 746, 757–58 (1993) (reaffirming the rule in *Summerlin* where the government is proceeding in its sovereign capacity, but distinguishing *Summerlin* on the facts of that case).

Another provision of the program legislation makes the "financial transactions" of the VA "incident to, or arising out of" the guarantee program "final and conclusive upon all officers of the Government." 38 U.S.C. § 3720(c). Thus, GAO will not review the amount of indebtedness determined by the VA. B-105551, Sept. 25, 1951. Similarly, apart from advising persons that the options exist, GAO will not review the VA's exercise of its waiver and release authorities. B-108528, Oct. 6, 1952; B-216270, Sept. 25, 1984 (nondecision letter).

(2) Loans closed after December 31, 1989

Under 38 U.S.C. § 3729, the Department of Veterans Affairs will charge the veteran a loan fee based on a percentage of the loan amount. The fee may be included in the loan and paid from its proceeds. Payment of the loan fee

is a prerequisite to the guarantee. Disabled veterans receiving compensation or their surviving spouses are exempt. Subsequent transferees assuming a loan are also charged a loan fee.

A veteran who pays the loan fee or is exempt from paying it—

> "shall have no liability to the Secretary with respect to the loan for any loss resulting from any default of such individual except in the case of fraud, misrepresentation, or bad faith by such individual in obtaining the loan or in connection with the loan default."

*Id.* § 3703(e)(1). This provision was added by section 304(a) of the Veterans Home Loan Indemnity and Restructuring Act of 1989.[40] An explanatory statement on the final House-Senate compromise (there was no conference report) emphasizes that "bad faith" is intended to include abandonment of a mortgage by one with the financial ability to make the payments. 135 Cong. Rec. 30292 (1989). The limited liability of 38 U.S.C. § 3703(e)(1) does not apply to persons assuming a loan or to veterans who receive mobile home loans. *Id.* § 3703(e)(2). Apart from the limited liability of 38 U.S.C. § 3703(e), the VA's right of subrogation is preserved. *Id.* § 3732(a)(1).

### b. Debt Collection Procedures

Debt collection is governed by the Federal Claims Collection Act of 1966,[41] the Debt Collection Act of 1982,[42] and the Debt Collection Improvement Act of 1996,[43] as well as the Federal Claims Collection Standards, 31 C.F.R. parts 900–904 (2005). Authorities available to federal agencies in varying degrees include assessment of interest and penalties, offset, collection in installments, compromise, use of commercial collection agencies, and, if none of this works, referral to the Department of Justice for suit. Federal debt collection practices are explored in detail in Chapter 13 of volume III of the second edition of *Principles of Federal Appropriations Law* and, as a general proposition, are the same for a debt arising from a loan guarantee as for any other debt. The Office of Management and Budget set out

[40] Pub. L. No. 101-237, title III, 103 Stat. 2069, 2073 (Dec. 18, 1989).

[41] Pub. L. No. 89-508, 80 Stat. 308 (July 19, 1966).

[42] Pub. L. No. 97-365, 96 Stat. 1749 (Oct. 25, 1982).

[43] Pub. L. 104-134, 110 Stat. 1321, 1321-358 (Apr. 26, 1996).

general requirements for agencies to follow in managing receivables and collecting debts arising from federal credit activities, including guaranteed and insured loans in OMB Circular No. A-129, *Policies for Federal Credit Programs and Non-Tax Receivables*, Appendix A, §§ IV and V (November 2000). Among other things, these requirements deal with asset sales. In this regard, two recent GAO reports address the asset sales program at the Small Business Administration: *Small Business Administration: Accounting Anomalies and Limited Operational Data Make Results of Loan Sales Uncertain*, GAO-03-87 (Washington, D.C.: Jan. 3, 2003), and a follow-up report, *SBA Disaster Loan Program: Accounting Anomalies Resolved but Additional Steps Would Improve Long-Term Reliability of Cost Estimates*, GAO-05-409 (Washington, D.C.: Apr. 14, 2005).

The governmentwide authorities described above do not apply to the extent an agency has its own debt collection authority, either agency-specific or program-specific. This may be in the form of positive authority or restrictions. We turn again to the Department of Veterans Affairs (VA) for several illustrations.

The VA has the authority to compromise any claim arising from its guarantee or insurance programs, "[n]otwithstanding the provisions of any other law," and, therefore, independent of the governmentwide compromise authority under the Federal Claims Collection Act and related statutes. *See* 38 U.S.C. §§ 3720(a)(3) and(4). Exercise of this authority is entirely up to the VA. *See* B-153726, May 4, 1964. *See generally* 71 Comp. Gen. 449 (1992); 67 Comp. Gen. 271 (1988).

Subject to its own implementing regulations and certain exceptions and procedures specified in the statute, the VA is required to offset debts arising from veterans' benefit programs (for which recovery has not been waived) against future payments under any law administered by the VA. 38 U.S.C. § 5314(a). However, offset against a veteran or his or her surviving spouse by any other agency to collect a debt owed to the VA under a guarantee program is prohibited except with the written consent of the debtor or under a judicial determination. *Id.* § 3726. Under this legislation, for example, the Defense Department may not deduct the amount of indebtedness to VA from the pay of active duty or retired military personnel absent either consent or a court determination. (The statutory definition of veteran includes certain active duty personnel.) B-167880, Jan. 28, 1970. This protection against setoff applies only where the veteran (debtor) has incurred the debt through use of his or her VA loan entitlement. Thus, setoff is not prohibited where a veteran, upon

purchasing a home, assumes a VA loan in the ordinary course of the real estate transaction without involving his or her own loan entitlement. B-167880, Dec. 2, 1969.

The VA also has independent statutory authority (and a general obligation) to assess interest and reasonable administrative costs on debts arising from its benefit programs, including debts arising from guarantee programs to the extent not precluded by the terms of the loan instrument. 38 U.S.C. § 5315. For debts within the scope of the statute, 38 U.S.C. § 5315, rather than 31 U.S.C. § 3717 (Federal Claims Collection Act), is the controlling provision. 66 Comp. Gen. 512 (1987).

If reasonable administrative collection efforts fail, the VA may use its own attorneys to sue the debtor, subject to the direction and supervision of the Attorney General. 38 U.S.C. § 5316.

The VA legislation cited above deals with specific debt collection tools. An example of more general authority is 7 U.S.C. § 1981(b)(4), which authorizes the Farmers Home Administration to "compromise, adjust, reduce, or charge-off debts or claims," and, within certain limits, to release debtors, other than Housing Act debtors, "from personal liability with or without payment of any consideration at the time of the compromise, adjustment, reduction, or charge-off." Under this law, for example, the Farmers Home Administration is authorized to terminate the accrual of interest on the guaranteed portion of defaulted loans. 67 Comp. Gen. 471 (1988) (noting, however, that the agency had restricted its statutory discretion by its own regulations).

## 5. Collateral Protection

In administering a loan guarantee program, it may become desirable for an agency to make expenditures other than merely paying out on the guarantee. From a program or even economical standpoint, it may be desirable, for example, to make expenditures to protect and preserve the government's interest in the collateral, such as custodial care, insurance costs, or the purchase of prior liens. For purposes of this discussion, we use the term "collateral protection" to cover two types of expenditure—preservation of the collateral itself and protection of the government's interest in the collateral.

Whether or not such expenditures are proper is essentially a question of "purpose availability." The first step is to analyze the terms and intent of the agency's program authority to determine whether the agency's funds

are available for the contemplated expenditure either expressly or by necessary implication. If this does not provide the answer, the next step is to apply the "necessary expense" doctrine.[44]

An example of specific authority is 38 U.S.C. § 3727, which authorizes the Department of Veterans Affairs (VA) to make expenditures to correct structural defects in certain homes encumbered by a VA-guaranteed mortgage. The Department of Housing and Urban Development (HUD) has similar authority to use funds available under Title I of the National Housing Act to correct structural defects in housing insured by the Federal Housing Administration (FHA). 12 U.S.C. § 1735b; B-114860-O.M., Jan. 15, 1974. An example of somewhat less specific authority is another provision of the Housing Act, 12 U.S.C. § 1713(k), which authorizes HUD "to take such action and advance such sums as may be necessary to preserve or protect the lien of such mortgage." In 54 Comp. Gen. 1061 (1975), GAO agreed that this provision authorizes HUD to advance money from its insurance fund to make repairs to multifamily projects covered by insured mortgages assigned to HUD upon default, until either the default is cured or HUD acquires title to the property.

Absent specific authority, collateral protection expenditures may still be permissible under a "necessary expense" theory. As a general proposition, the authority to require collateral implies the authority to make reasonable expenditures to care for and preserve the collateral where administratively determined to be necessary. 54 Comp. Gen. 1093 (1975).

The limits of the necessary expense approach are illustrated by B-170971, Jan. 22, 1976, a case involving the now-defunct New Community Development Program. The Department of Housing and Urban Development (HUD) questioned whether it could use the revolving fund established by the Urban Growth and New Community Development Act of 1970 to make two types of collateral protection expenditures: (1) expenditures to repair, maintain, and operate the security and (2) payments to senior lienholders. The expenditures were intended to advance program objectives by preventing deterioration of the security pending possible acquisition by HUD, or perhaps in some cases enable a developer to regain financial health and successfully continue with the project.

[44] See section B of Chapter 4 for a discussion of the necessary expense doctrine.

The Comptroller General reviewed the program legislation and legislative history and concluded that the proposed expenditures would constitute a new and major type of financial assistance entirely beyond the intended scope of the statute, and were not authorized except in cases where HUD had made a *bona fide* determination to acquire the security. A later decision, B-170971, July 9, 1976, discussed HUD's specific authority under the program legislation to make collateral protection expenditures after it had acquired the security.

Where an agency acquires property through a loan or loan guarantee program it administers, it may not transfer the management and disposition of that property to another federal agency without specific statutory authority nor may it effect such a transfer under the Economy Act, 31 U.S.C. § 1535. B-156010, Mar. 16, 1965 (concluding that VA could not transfer the management and disposition of acquired property to HUD without specific authority).

A similar type of payment is one designed to protect the government's interest in the transaction as opposed to maintaining the particular piece of property. Again, the question is one of purpose availability in light of the agency's statutory authority. Thus, where FHA had acquired a second mortgage on real property through payment of a loss to an insured financial institution under Title I of the National Housing Act, it could use Title I funds to redeem the property to protect its junior lien, under a right of redemption conferred by state law, if it determined that redemption was in the best interests of the government and necessary to carry out the provisions of Title I. 36 Comp. Gen. 697 (1957). *See also* 34 Comp. Gen. 47 (1954).

Collateral protection may take forms other than direct expenditures. For example, the Small Business Administration could subordinate a senior lien to enable a borrower to obtain necessary surety bonds upon an administrative determination that the action would be consistent with the statutory purposes and would improve the prospects for repayment of the loan. 42 Comp. Gen. 451 (1963). (Under the governing legislation, SBA had the discretion not to require security at all on loans sufficiently sound as to reasonably assure repayment.) Another 1963 case held that a statute authorizing the Maritime Administration to take necessary steps to protect or preserve collateral securing indebtedness authorized it to agree to reschedule payments under an insured ship mortgage to avert impending default. 43 Comp. Gen. 98 (1963).

In 63 Comp. Gen. 465 (1984), a borrower defaulted on a loan guaranteed by the SBA. SBA purchased the guaranteed portion of the loan from the lending bank and proceeded to place the loan in liquidation. However, a prior lienholder scheduled a foreclosure sale. SBA was unable to get a Treasury check in time to submit a protective bid, and asked the lending bank to advance funds to purchase the property at the foreclosure sale, promising to reimburse the bank with interest. Obviously, a government agency does not normally have the authority to borrow money from a commercial bank to carry out its programs. Under the particular circumstances involved, however, GAO found that the transaction, including the commitment to pay interest, could be justified under SBA's broad authority[45] in 15 U.S.C. § 634(b)(7) to "take any and all actions" deemed necessary in liquidating or otherwise dealing with authorized loans or guarantees. The decision emphasized that it was nothing more than an interpretation of SBA's legal authority under the "unique circumstances of this case," and should not be regarded as establishing a "broad legal precedent." 63 Comp. Gen. at 469.

[45] The Supreme Court has noted in another context that Congress has given the SBA "extraordinarily broad powers" to accomplish the objectives of the Small Business Act. *Small Business Administration v. McClellan*, 364 U.S. 446, 447 (1960).

## GAO's Mission

The Government Accountability Office, the audit, evaluation and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability.

## Obtaining Copies of GAO Reports and Testimony

The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "Subscribe to Updates."

### Order by Mail or Phone

The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to:

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, D.C. 20548

To order by Phone: Voice: (202) 512-6000
TDD: (202) 512-2537
Fax: (202) 512-6061

## To Report Fraud, Waste, and Abuse in Federal Programs

Contact:

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

## Congressional Relations

Gloria Jarmon, Managing Director, JarmonG@gao.gov (202) 512-4400
U.S. Government Accountability Office, 441 G Street NW, Room 7125
Washington, D.C. 20548

## Public Affairs

Paul Anderson, Managing Director, AndersonP1@gao.gov (202) 512-4800
U.S. Government Accountability Office, 441 G Street NW, Room 7149
Washington, D.C. 20548

PRINTED ON RECYCLED PAPER