# EXHIBIT 5

United States General Accounting Office

GAO

Report to the Honorable James J. Florio, House of Representatives

October 1989

# TRANSPORTATION NOISE

## Federal Control and Abatement Responsibilities May Need to Be Revised

GAO/RCED-9[illegible]-11

GAO
United States
General Accounting Office
Washington, D.C. 20548

Resources, Community, and
Economic Development Division

B-235875

October 12, 1989

The Honorable James J. Florio
House of Representatives

Dear Mr. Florio:

As you requested, this report discusses transportation noise and the control and abatement activities of the Environmental Protection Agency currently and prior to eliminating its noise program in 1982. It also discusses the transportation noise control and abatement activities of the Department of Transportation and state and local agencies.

As arranged with your office, unless you publicly release its contents earlier, we plan no further distribution of this report until 30 days after the date of this letter. At that time, copies of the report will be sent to appropriate congressional committees; the Administrator, Environmental Protection Agency; the Secretary, Department of Transportation; and the Director, Office of Management and Budget. We will also make the report available to other interested parties.

This work was performed under the general direction of Richard L. Hembra, Director, Environmental Protection Issues (202) 275-6111. Other major contributors to this report are listed in appendix II.

Sincerely yours,

J. Dexter Peach
Assistant Comptroller General

# Executive Summary

## Purpose

Transportation is a major noise source that affects millions of people living near airports, major rail lines and yards, and busy highways and streets. Noise can damage hearing and may contribute to other physiological and psychological harm. Its more likely effects, however, are those often described as eroding the quality of life. These effects include interference with speech communication, sleep, and relaxation. The Environmental Protection Agency's (EPA) noise program, of which transportation was a major focus, was established by the Noise Control Act of 1972 to promote an environment free from noise that jeopardizes public health and welfare. As proposed by the Administration, the Congress eliminated funding for the program in 1982 on the basis that noise control benefits are highly localized and the function could be adequately carried out by state and local governments.

Concerned about transportation noise control in the absence of EPA's program, Congressman James J. Florio of New Jersey requested GAO to examine aircraft, highway, and railroad noise, focusing on the (1) extent of the transportation noise problem, (2) status of EPA's noise control activities and plans when its program was eliminated, and (3) current noise control activities of federal, state, and local agencies.

## Background

According to the Noise Control Act, state and local governments have primary responsibility for noise control, but it also states that national, uniform treatment is essential for control of noise sources in commerce. On this basis, the act requires EPA, among other things, to (1) identify major noise sources and prescribe emission standards for products distributed in commerce in the categories of transportation, electrical/electronic, and construction equipment and motors or engines; (2) submit regulatory proposals to the Federal Aviation Administration (FAA) for consideration in controlling aircraft/airport noise; and (3) promulgate regulations limiting noise from interstate rail and motor carriers for Department of Transportation enforcement. It also provides for EPA to conduct and finance research and provide assistance to state and local governments on noise control methods.

The Department of Transportation also has various noise responsibilities under the Noise Control Act and other legislation. The Department's FAA is responsible for regulating aircraft noise and administering programs of financial and technical assistance to airports for noise abatement. Similarly, the Department's Federal Highway Administration is responsible for legislative requirements related to considering noise impacts in planning and designing highways and financial assistance to

states to construct highway noise barriers. The Department has delegated responsibility for interstate motor and rail carrier noise standards enforcement to the Federal Highway and Federal Railroad Administrations.

## Results in Brief

Transportation noise remains a problem for many communities. For example, FAA estimates that 3.2 million people live in areas generally incompatible for residential use because of high levels of aircraft noise. Although comprehensive data are not available, many more people are subjected to aircraft noise levels that may significantly interfere with sleep, conversation, and relaxation.

The major transportation focus of EPA's noise program was on controlling noise sources and providing technical assistance to state and local governments. EPA issued standards providing national, uniform treatment of interstate rail and motor carriers, trucks, and motorcycles, and recommended various aircraft noise standards to FAA. It also assisted state and local noise program development. EPA had plans to further lower transportation noise levels through additional regulations and greater emphasis on assisting localities in land-use planning around transportation facilities. With program funding eliminated, these plans were not realized.

Following program funding elimination, other federal, state, and local agencies have continued some transportation noise activities. For example, FAA and Federal Highway provide grants to airports and states, respectively, for noise abatement activities. However, these federal agencies, except FAA for aircraft noise, do not have the authority that EPA has to regulate transportation noise sources. More importantly, because the Noise Control Act and EPA's noise standards were not rescinded when program funding was eliminated, federal preemption remains in effect, thereby limiting state and local regulatory authority and noise control options. In other words, states and localities are prohibited from adopting their own noise emission controls for equipment and operations where EPA standards were issued and remain in effect. Further, because of other priorities, some states such as California and New Jersey have not expanded their noise control offices to provide the assistance that EPA had been providing.

## Principal Findings

### Transportation Noise Problems

EPA estimated that in 1979—its latest estimate before its noise program was eliminated—that the number of Americans exposed to aircraft, railroad, and highway traffic noise levels that could significantly interfere with activities, such as sleep, conversation, and relaxation, in normal environments were 50 million, 6.5 million, and 81 million, respectively.

Although similar data are not available for the current noise situation, FAA estimates that 3.2 million people live in areas generally incompatible for residential use because of aircraft noise. In addition, six of the nine judgmentally selected local governments in the two states included in GAO's review—California and New Jersey—said that highway traffic noise is a problem. Railroad noise was considered to be a major problem by two of the nine.

### Past EPA Noise Program Activities and Plans

Under its noise program, EPA, among other things, issued noise emission standards for newly manufactured medium and heavy trucks and motorcycles and interstate motor and rail carriers; proposed aircraft noise regulations to FAA; and assisted state and local governments in noise program development, noise abatement, and land-use planning. Before the program was eliminated, EPA's plans included making the truck standard more stringent; issuing standards for buses and refrigeration units on truck trailers; and devising noise control strategies for light trucks, automobiles, and tires.

EPA had also planned more effort in assisting localities in land-use planning along highways and obtaining national consensus on a new aircraft noise reduction strategy. For its part of the strategy, EPA intended to concentrate on activities, such as working with (1) FAA to develop a soundproofing and relocation program for areas heavily impacted by noise and a federal policy on appropriate noise abatement actions by airport operators and (2) local governments on compatible land-use development around airports. Because the noise program was eliminated, EPA did not carry out these planned activities.

## Current Control and Abatement Efforts

FAA has a program that includes aircraft noise standards, aircraft operating controls, and noise abatement planning assistance and grants to airports. Airports have used these grants for purposes such as constructing noise barriers and acquiring land to prevent nearby residential development. Federal Highway's program requires states to consider noise in planning and designing federally aided highway projects. Federal Highway also provides funds to the states to construct noise barriers along federal-aid highways—the most recent data shows about $338 million as of December 31, 1986. In addition, some state and local governments construct noise barriers on their own and control land use near transportation facilities.

The Federal Highway and Federal Railroad Administrations, however, do not have the authority to control the amount of noise generated by transportation equipment and operations. And, the Noise Control Act prohibits state and local governments from adopting or enforcing noise emission controls for specific equipment and operations that are not identical to EPA's. In addition, the Department of Transportation has substantially reduced its enforcement of the interstate rail and motor carrier regulations because of higher priorities and the very high compliance rates it had been finding. Because of other priorities, the states that GAO visited had not expanded their noise control offices to assist localities with noise problems.

## Matters for Congressional Consideration

Since EPA's funding to carry out the Noise Control Act has been eliminated but the act's requirements, including the preemption provisions and uniform treatment goals, remain in effect, the Congress may wish to reexamine the federal role with regard to transportation noise control and abatement. If the Congress decides that a change in the federal role is needed, GAO offers a range of alternatives that it may wish to consider. These alternatives include (1) rescinding the Noise Control Act if the goal is less federal involvement and more regulatory authority for state and local governments and (2) establishing a more comprehensive federal transportation noise control program if the goal is uniformity among the states with respect to commerce.

## Agency Comments

GAO discussed the factual information contained in a draft of this report with responsible EPA and Department of Transportation officials. Their comments have been incorporated into the report as appropriate. As requested, GAO did not obtain official agency comments on the report.

# Contents


| | | |
|---|---|---|
| **Executive Summary** | | 2 |
| **Chapter 1 Introduction** | | 10 |
| | Noise Effects and Measurements | 10 |
| | The Noise Control Act | 13 |
| | Phaseout of the EPA Noise Program | 15 |
| | Current EPA Noise Control and Related Activities | 17 |
| | EPA's Expectations for Noise Control in Absence of Its Program | 17 |
| | State Noise Control Offices | 18 |
| | Objectives, Scope, and Methodology | 19 |
| **Chapter 2 Efforts to Control and Abate Aircraft Noise** | | 21 |
| | Aviation Noise Affects Several Million People | 22 |
| | Federal Requirements to Reduce Aviation Noise | 24 |
| | Aircraft Noise Control and Abatement Responsibilities Are Shared | 26 |
| | EPA's Role Changed From Proactive to Reactive | 27 |
| | FAA Aircraft Noise Control and Abatement Efforts Are Multifaceted | 29 |
| | State and Local Authority Limited by Federal Preemption | 34 |
| | Local Airport Noise Control and Abatement Efforts Increasingly Involve Airport Use Restrictions | 36 |
| | Issues Regarding a National Aircraft Noise Policy and Phaseout of Stage 2 Aircraft | 40 |
| | Conclusions | 47 |
| **Chapter 3 Efforts to Control and Abate Railroad Noise** | | 49 |
| | Railroad Noise Is a Concern to Some Communities | 49 |
| | Federal Requirements to Reduce Railroad Noise | 50 |
| | FRA Enforcement of Railroad Noise Standards Is Minimal | 52 |
| | State and Local Role in Railroad Noise Control Has Been Limited | 54 |
| | The Industry Has Made Efforts to Control Railroad Noise | 55 |
| | Federal Preemption of Local Regulations Raises Issue of Federal Role and Responsibility | 56 |
| | Conclusions | 57 |

| | | |
|---|---|---|
| **Chapter 4 Efforts to Control and Abate Traffic Noise** | | 58 |
| | Traffic Noise Is a Problem for Many Communities | 58 |
| | Federal Requirements to Reduce Highway Traffic Noise | 59 |
| | EPA Traffic Noise Control Activities Have Declined | 60 |
| | FHWA Emphasizes Noise Barriers Over Standards Enforcement | 61 |
| | States We Visited Are Not Enforcing Traffic Noise Standards | 64 |
| | State and Local Efforts to Reduce the Impact of Traffic Noise on Communities | 65 |
| | An Effective Traffic Noise Reduction Strategy: Vehicle Controls vs. Noise Barriers | 67 |
| | Conclusions | 69 |
| **Chapter 5 The Federal Transportation Noise Control and Abatement Role** | | 71 |
| | Federal Preemption Limits State and Local Noise Control Options | 71 |
| | Current Efforts Are Not as Comprehensive | 72 |
| | Matters for Consideration by the Congress | 73 |
| **Appendixes** | Appendix I: Local Governments Included in This Review | 76 |
| | Appendix II: Major Contributors to This Report | 77 |
| **Tables** | Table 1.1: Approximate Sound Levels for Some Typical Noise Sources | 11 |
| | Table 1.2: Examples of Noise Effects in Residential Areas at Various Ldn Levels | 12 |
| | Table 2.1: Airport Improvement Program Grants for Noise Compatibility Projects for Fiscal Years 1982-87 | 34 |
| | Table 2.2: Examples of Airport Use Restrictions as Reported by FAA in 1986 | 37 |
| | Table 2.3: Differences in Decibels Between Stage 2 and Stage 3 Aircraft | 42 |
| | Table 4.1: 1980 National League of Cities Survey Results for Highway Traffic Noise Problems by Source | 59 |

## Abbreviations

| | |
|---|---|
| AAR | Association of American Railroads |
| EPA | Environmental Protection Agency |
| FAA | Federal Aviation Administration |
| FHWA | Federal Highway Administration |
| FRA | Federal Railroad Administration |
| GAO | General Accounting Office |
| NOISE | National Organization to Insure a Sound-Controlled Environment |

Chapter 1

# Introduction

Noise, commonly defined as unwanted sound, is a byproduct or waste created by various human activities. Most notably, it is generated by the operation of machinery and equipment in the workplace, at home, and during the transportation of people and goods. Although it is well documented that certain noise levels can damage human hearing and may cause other physiological and psychological harm, noise to most people is an intrusion that adversely affects the quality of their daily lives.

Because levels and effects can vary substantially by where one lives and works, noise is often viewed as a local issue to be dealt with through local efforts and police powers. The federal government, however, is substantially involved in the control and mitigation of some types of noise, such as transportation noise, through various laws and programs. The Noise Control Act of 1972 and the Quiet Communities Act of 1978 recognized noise as an environmental pollutant and gave the Environmental Protection Agency (EPA) responsibilities for conducting research, identifying major noise sources and establishing national standards or regulations to control them, and providing assistance to state and local governments. In 1982, funding for EPA's noise program was eliminated to reduce the federal budget. However, the Noise Control and Quiet Communities Acts remain in effect.

## Noise Effects and Measurements

Noise has generally not been shown to increase deaths, shorten lifespans, or cause incapacitating illnesses. Nevertheless, it can be a problem. Exposures of sufficient intensity and duration can result in damage to the inner ear and hearing loss. According to EPA, studies have also identified noise as an important cause of physical and psychological stress. Although not conclusively shown by research, it is thought to have other effects. Noise is suspected of interfering with children's learning and with development of the unborn child; it is reported to have triggered extremely hostile behavior among people presumably suffering from emotional illness. In addition, noise is suspected to lower resistance, in some cases, to the onset of infection and disease.

The more common concern of those exposed to noise is its effect on their quality of life. Noise can interfere with speech communication, disturb sleep, adversely influence mood, and disturb relaxation. In addition, it can be a source of annoyance when it interferes with other activities, such as television viewing. Noise can also lower real estate values as the affected areas become less desirable as a place to live because of these effects.

Noise is measured in decibels, which are units of sound pressure. Zero on the decibel scale is based on the lowest sound level that the healthy, unimpaired human ear can detect. Decibels are representative points on a sharply rising curve. Ten decibels is 10 times more intense than 1 decibel, 20 decibels is 100 times more intense (10 X 10), 30 decibels is 1,000 times more intense (10 X 10 X 10), and so on. Decibel ratings decrease as the distance from the noise source increases. The approximate sound levels of some typical noise sources are shown in table 1.1 for illustrative purposes.

**Table 1.1: Approximate Sound Levels for Some Typical Noise Sources**

| Activity | Sound level in decibels |
|---|---|
| Whispering | 30 |
| Light auto traffic at 100 feet | 50 |
| Conversational speech | 60 |
| Vacuum cleaner at 10 feet | 69 |
| Freight train at 50 feet | 75 |
| Alarm clock at 2 feet | 80 |
| Riding inside a city bus | 83 |
| Heavy truck at 50 feet | 90 |
| Jet takeoff at 2,000 feet | 105 |
| Jet takeoff at 200 feet | 120 |
| Threshold of physical pain | 130 |

A common measurement of community noise exposure is the day-night sound level (DNL or commonly Ldn), which was developed by EPA in the early 1970s. Ldn represents an energy averaged sound level for a 24-hour period. The 24-hour sound level is measured from midnight to midnight after adding 10 decibels to nighttime noise events from 10 p.m. to 7 a.m. The 10-decibel correction is applied to nighttime intrusion to account for increased annoyance resulting from noise during that period.

Ldn can be used to measure various kinds of noise affecting communities. It is used by federal agencies, such as the Federal Aviation Administration (FAA), the Department of Defense, the Department of Housing and Urban Development, and the Department of Veterans Affairs. An Ldn value of 65 decibels is the threshold above which many federal agencies generally consider land incompatible for residential use, including schools and hospitals. Ldn 65 was selected as the standard to balance the environmental effects of noise on various activities (sleeping, communicating, convalescing, and learning) that would take place on a

piece of land and the economic effects (ability to qualify for a mortgage, need to soundproof building interiors, and property resale value) of declaring land incompatible with certain uses. EPA, in its 1978 report, Protective Noise Levels: Condensed Version of EPA Levels Document, stated that outdoor yearly levels on the Ldn scale are sufficient to protect public health and welfare if they do not exceed Ldn 55 in sensitive areas (residences, schools, and hospitals). This protective level, which was not established as a standard, was derived without concern for technical or economic feasibility and contains a margin of safety to ensure their protective value.

Table 1.2 illustrates the effects of noise on people in residential areas at various Ldn levels.

**Table 1.2: Examples of Noise Effects in Residential Areas at Various Ldn Levels**

| Ldn level | Hearing loss | Percent of population highly annoyed | Average community reaction | General community attitude towards area |
|---|---|---|---|---|
| 75 and above | May begin to occur | 37 | Very severe | Noise likely most important of all adverse aspects of the community environment |
| 70 | Will not likely occur | 25 | Severe | Noise is one of the most important adverse aspects of the community environment |
| 65 | Will not occur | 15 | Significant | Noise is one of the important adverse aspects of the community environment |
| 60 | Will not occur | 9 | Moderate to slight | Noise may be considered an adverse aspect of the community environment |
| 55 and below | Will not occur | 4 | — | Noise considered no more important than various other environmental factors |

Source: Guidelines for Considering Noise in Land Use Planning and Control, Federal Interagency Committee on Urban Noise, June 1980.

Table 1.2 shows the percent of people highly annoyed at the various Ldn levels. The percent of people reporting annoyance to a lesser extent would be higher in each case. For example, other studies have shown that at an Ldn of 55 decibels, 33 percent of the people are "moderately or more annoyed," 17 percent are "very or more annoyed," and 5 percent are "extremely annoyed." Thus, 55 percent of the general population is a little or more annoyed at an Ldn of 55 decibels.[1]

[1]Karl Kryter, The Effects of Noise on Man, p. 564.

## The Noise Control Act

Under the 1970 amendments to the Clean Air Act, EPA established an Office of Noise Abatement and Control and made it responsible for conducting a congressionally mandated study of noise and its effects on public health and welfare. The resulting December 31, 1971, report entitled, Report to the President and Congress on Noise, and subsequent congressional hearings led to enactment of the Noise Control Act in October 1972. According to the act, state and local governments are primarily responsible for noise control, but federal action is essential to deal with major noise sources in commerce, whose control requires national uniformity of treatment. The act established the goal of the federal noise control effort as the promotion of an "environment for all Americans free from noise that jeopardizes their health or welfare." The act directs the Administrator of EPA to

- coordinate all federal programs relating to noise research and control and report to the Congress on the status and progress of federal noise control activities;
- publish criteria identifying noise effects and provide information on the levels of noise necessary to protect the public health and welfare;
- identify major sources of noise and prescribe and amend standards limiting noise emissions from any product or class of products identified as a major source of noise in the following categories: construction equipment, transportation equipment (including recreational vehicles), any motor or engine, and electrical or electronic equipment;
- prepare a comprehensive report on the problem of aircraft/airport noise and submit regulatory proposals to FAA for control of aircraft/airport noise;
- require manufacturers to label products that emit noise capable of adversely affecting the public health or welfare or are sold wholly or in part on the basis of their effectiveness in reducing noise;
- conduct and finance research on the psychological and physiological effects of noise and provide technical assistance to state and local governments on the various methods of noise control; and
- promulgate regulations limiting the noise generated from interstate rail carriers and interstate motor carriers, after consulting with the Department of Transportation.

The Noise Control Act was amended by the Quiet Communities Act of 1978 to assist state and local governments and to promote health effects research. Specifically, the amendments require EPA to

- develop and disseminate information and educational materials on the public health and other effects of noise and the most effective means of noise control;
- conduct or finance research on the effects, measurement, and control of noise;
- administer a nationwide Quiet Communities Program to include grants to state and local governments and authorized regional planning agencies, purchase of noise monitoring equipment for loan to state and local noise control programs, and technical support to help state and local governments establish effective noise abatement and control programs;
- establish regional technical assistance centers that use the capabilities of university and private organizations to assist state and local noise control programs; and
- provide technical assistance to state and local governments to facilitate their development and enforcement of noise control, including direct on-site assistance of agency or other personnel and preparation of model state or local legislation.

## EPA's Implementation of the Acts

After the Noise Control Act was passed, EPA developed health and welfare criteria, promulgated regulations, completed a study of airport noise impacts on communities, and made recommendations to FAA on regulating aircraft noise. Among other things, EPA:

- Developed health effects criteria and identified levels necessary to protect health and welfare with a margin of safety. EPA's report, Public Health and Welfare Criteria for Noise, dated July 27, 1973, represented an appraisal of available knowledge relating to the health and welfare effects of noise. Its report, Information on Levels of Environmental Noise Requisite to Protect Public Health and Welfare with an Adequate Margin of Safety, dated March 1974, provided guidance on the noise source regulatory process, especially noise reduction goals for preventing hearing loss, annoyance, and sleep disturbance.
- Identified portable air compressors, medium and heavy trucks, wheel and crawler tractors, truck-mounted solid waste compactors (garbage trucks), motorcycles and motorcycle replacement exhaust systems, buses, truck-transport refrigeration units, power lawn mowers, pavement breakers, and rock drills as major sources of noise for regulation. Also conducted several preidentification studies concerning possible identification of additional major sources of noise, including automobiles and light trucks, tires, chainsaws, and earth moving equipment. (June 1974 - February 1977)

- Issued new product noise emission regulations for newly manufactured medium and heavy trucks, portable air compressors, garbage trucks (later rescinded, according to an EPA official, because of industry concerns about the cost of complying), and motorcycles and motorcycle replacement exhaust systems. Also issued initial in-use noise emission regulations for interstate rail and interstate motor carriers. (January 1976 - December 1980)
- Initiated a labeling program with publication in September 1979 of a general provisions regulation for noise labeling of products and proposed regulation for hearing protectors.
- Issued a report to the Senate Committee on Public Works in August 1973 entitled, Report on Aircraft-Airport Noise and subsequently proposed 11 noise regulations to FAA.

Although continuing its regulatory program, EPA in 1977 began to shift more of its resources toward providing states and localities technical assistance to establish and strengthen local noise control programs. A major activity of this type was implementation of the Quiet Communities Program to study and demonstrate effective means of local noise control and the Each Community Helps Others (ECHO) Program. The ECHO program sent volunteer state and local noise experts to other communities to provide on-site technical assistance and advice.

Other major activities in response to the Quiet Communities Act included financial and technical assistance to help states and localities identify and remedy noise issues and problems, surveys of state and municipal environmental noise programs, regional workshops to train state and local officials; development of a noise training manual; preparation of model state and local legislation; and establishment of a regional technical assistance center in each of EPA's 10 regions to provide assistance and training to state and local officials. EPA also provided airport, highway, and rail transportation planning assistance to localities.

## Phaseout of the EPA Noise Program

Soon after taking office, the Reagan administration decided to terminate EPA's noise program and close down its Office of Noise Abatement and Control to reduce the federal budget. The administration's position was that noise control benefits are highly localized and the function could be adequately carried out at the state and local level without a federal program. The President's budget, which was submitted to the Congress in March 1981, recommended $2.2 million for fiscal year 1982 to be used for an orderly phaseout of the program and no funds for fiscal year 1983 and beyond. The program had grown from $2.7 million for fiscal

year 1973 to President Carter's fiscal year 1982 budget proposal of almost $13 million.

The House and Senate differed substantially in their views on funding for the noise program. The Senate Environment and Public Works Committee proposed further cuts in the program to $1 million for fiscal year 1982 and no funding thereafter. The House Committee on Energy and Commerce wanted to authorize $7.3 million for each of the fiscal years 1982 and 1983. In the latter case, the House Committee proposed to continue technical and financial assistance to state and local governments but to substantially reduce the regulatory program in view of the need to reduce the budget. Under its proposal, EPA's authority to regulate noise emissions for products would have been limited to transportation equipment distributed in interstate commerce and any motor or engine designed for use in the equipment. These regulatory efforts were to remain to provide continued federal preemption over state and local noise control regulations in these areas. The Noise Control Act provides that where there are federal regulations with respect to noise control of products distributed in commerce and to equipment or facilities of interstate rail and interstate motor carriers, no state or local government can adopt or enforce noise control requirements applicable to the same products, equipment, or facilities unless they are identical to the federal regulations. This concept is commonly referred to as federal preemption. The Committee was concerned that, in the absence of federal preemption, state and local governments would establish a myriad of conflicting noise requirements that could increase the production and carrying costs of certain carriers and transportation equipment manufacturers and operators.

After the Congress approved the President's budget request of $2.2 million for fiscal year 1982 and no funding after that, EPA immediately began to phase out the program and reduce the staff of the Office of Noise Abatement and Control. Emphasis was put on transferring knowledge and experience EPA had gained to state and local governments. The phaseout of the program and noise office was completed by September 30, 1982. Although funding for the program was terminated, the Congress did not rescind the Noise Control and Quiet Communities Acts, primarily because it wanted to retain federal preemption for the EPA standards that had been established.

## Current EPA Noise Control and Related Activities

With elimination of the program, EPA's noise control activities are limited. Agency personnel in the Office of Federal Activities and the Office of Air and Radiation respond to numerous industry and public inquiries on noise. According to agency officials, these inquiries include requests for noise information (e.g., pamphlets) and technical assistance regarding EPA's regulations. The officials also told us that some requests are from citizens or state and local governments wanting EPA's assistance in dealing with a noise problem. In these latter cases, EPA usually refers the requester to published documents and/or to another federal or state agency. According to an Office of Air and Radiation official, EPA will also take enforcement action against noncompliance with its noise regulations if cases of noncompliance are brought to its attention.

In accordance with Section 309 of the Clean Air Act, EPA continues to review and comment on environmental impact statements and many environmental assessments prepared under the National Environmental Policy Act for federally conducted or assisted activities. The activities' noise impact is one of the environmental considerations that are to be addressed by the assessments or impact statements. For example, noise could be a major consideration in expanding an airport or constructing a highway. If a project receives an "environmentally unsatisfactory" rating from EPA and no agreement on a new approach to the project can be reached with the applicable federal agency, EPA can refer the project to the Council on Environmental Quality for resolution. Also in accordance with section 309, EPA reviews regulatory proposals of other federal agencies that deal with or could have an impact on noise.

On June 15, 1988, a civil suit under Section 12 of the Noise Control Act, as amended, was filed against the Administrator of EPA and the Secretary of Transportation for their alleged failure to carry out the acts and duties required by the act. The United States filed a motion to dismiss in March 1989. No decision has been made in the case, which was filed in the U.S. District Court for the Western District of Tennessee.

## EPA's Expectations for Noise Control in Absence of Its Program

At the time the decision was being made, EPA said that the phaseout of its noise program would have a slight to minimal impact. The agency pointed out that it had been concentrating on strengthening state programs to better assist local governments having complex noise problems. EPA also said that the dramatic increase in the number of state and local programs convincingly demonstrated that state and local governments can and would deal with environmental noise problems within their

jurisdiction. EPA estimated that 16 of the 22 state noise programs receiving grant funds during fiscal year 1980 would continue operating after federal support was dropped. In addition, federal agencies, such as FAA, the Federal Highway Administration (FHWA), and the Federal Railroad Administration (FRA), were to continue their noise activities under the Noise Control Act and other legislation. FAA, for example, continued to be responsible for aircraft noise regulation.

## State Noise Control Offices

Some states have or have had noise abatement and control offices. For example, the California State Office of Noise Control, Department of Health Services, was established in 1973 by the California Noise Control Act to assist local communities in addressing noise problems. According to a state noise official, resources provided the office have decreased from a high of $250,000 and five staff members in 1973 to a low of $60,000 to $70,000 and one staff member in 1988. The office's Noise Control Engineer attributed the decrease in resources to a general trend at the state level away from interest in some environmental issues. The office currently helps local governments develop noise ordinances and noise elements in their general plans. The California Noise Planning in Land Use Act requires every city and county government to have a section in their general plan to address the impact of noise in land-use planning.

The New Jersey Office of Noise Control, Department of Environmental Protection, provides some technical assistance to local governments. However, it primarily investigates complaints of violations of the state noise law and regulations pertaining to industrial and commercial stationary sources, such as a manufacturing plant. According to the noise office chief, the number of staff has varied from one to two people since the office was established in 1972. Funding has fluctuated from $100,000 for the office's first 1-1/2 years of operation to $45,000 for 1980 and $100,000 for 1988. The 1988 budget covered salaries for two full-time staff members plus office expenses. In addition, he said that four inspectors from the air pollution division help with noise investigations when needed. According to Department of Environmental Protection officials, it is difficult to obtain funding from the state legislature for the state's noise program when the federal government has eliminated its program.

According to the Administrator of the National Association of Noise Control Officials, who is also the Chief of the New Jersey State Noise Control Office, very few states have noise control offices now that EPA

has terminated its program. He said an indication of this situation is the large decrease in the association's membership. Several EPA officials also said that few states other than California and New Jersey now have noise control offices.

## Objectives, Scope, and Methodology

Concerned about implementation of the Noise Control and Quiet Communities Acts in absence of EPA's noise control office, Congressman James J. Florio of New Jersey requested that we determine whether the acts' requirements are being carried out by other entities, such as FAA and state agencies. As agreed with the Congressman's office, our objectives were to examine the

- extent of the transportation (aircraft, railroad, and highway traffic) noise problem;
- status of EPA's transportation noise control and abatement efforts and plans for additional action at the time the decision was made to eliminate its program; and
- transportation noise control and abatement activities of federal, state, and local agencies.

As further agreed with Congressman Florio's office, the scope of our work was limited to the transportation noise control and abatement activities of EPA, FAA, FHWA, FRA, and the states of California and New Jersey. The Congressman's office was aware of transportation noise problems in New Jersey and had seen references to major aircraft noise abatement efforts in California.

To determine the extent of transportation noise problems, we reviewed available studies, reports, and surveys at EPA, FAA, FHWA, and FRA headquarters and their offices in California and New Jersey. We also held discussions with officials of these agencies, the appropriate California and New Jersey state agencies, and nine judgmentally selected local governments in these states (see app. I for a listing of these local governments). In addition, we met with the Chairman of the New Jersey Noise Control Council and the Administrator of the National Association of Noise Control Officials. In addition, we reviewed transcripts and attended public meetings held to discuss aircraft noise issues in California and New Jersey. Furthermore, we held discussions and obtained pertinent data from representatives of the operators of four airports: (1) Los Angeles International; (2) San Francisco International, (3) Newark International; and (4) Philadelphia International, whose noise affects nearby parts of New Jersey. Information on railroad noise complaints

was obtained from FRA and California and New Jersey state agencies. Similar information for aircraft noise was obtained from the airports we visited and FAA. We met with representatives of associations in the aircraft, railroad, and trucking industries. Comprehensive data on current transportation noise levels and the major contributors to these levels were not available.

To determine the status of EPA's transportation noise control and abatement efforts, we reviewed annual reports of the EPA noise control program, federal noise control regulations, agency budget justifications, and other reports. We also interviewed EPA officials and officials at FAA, FHWA, FRA, and state and local agencies knowledgeable of EPA's activities.

To determine EPA's noise control plans prior to program elimination, we obtained EPA's 5-year plan (fiscal years 1981 through 1985) for implementation of the noise control program. In addition, we reviewed EPA's budget justification for fiscal year 1981, which was submitted before the program was terminated.

The transportation noise abatement and control activities of EPA, FAA, FHWA, FRA, California and New Jersey state agencies, and the selected local governments were determined through discussions with appropriate officials of these agencies and review of legislation, regulations, studies, reports, and other information on their activities. We also reviewed the fiscal year 1988 Federal Managers' Financial Integrity Act reports of the EPA Administrator and Secretary of Transportation and found no previously reported internal control weaknesses related to current noise control and abatement activities.

Our work was conducted primarily between May 1988 and March 1989 in accordance with generally accepted government auditing standards. We discussed the factual information contained in a draft of this report with responsible EPA and Department of Transportation officials. Their comments have been incorporated into the report where appropriate. As requested by Congressman Florio's office, we did not obtain official agency comments on the report.

Chapter 5

# The Federal Transportation Noise Control and Abatement Role

Transportation noise problems remain, and the overall effort to deal with them is not as comprehensive as it was when EPA's program was in existence. The Noise Control Act and EPA's noise standards were not rescinded. As a result, federal preemption also remains in effect, thereby limiting state and local regulatory authority and noise control options. In addition, activities, such as standards enforcement and technical assistance to localities, have decreased. In light of these issues, the Congress may wish to consider whether changes are needed in the current federal transportation noise role.

## Federal Preemption Limits State and Local Noise Control Options

Federal preemption of state and local governments' authority to regulate transportation noise is pervasive. Only FAA can establish aircraft noise emission standards, and federal (EPA) standards are in place for interstate rail carrier equipment and operations and several major sources of highway traffic noise (motorcycles, medium and heavy trucks, and interstate motor carriers). Under the Noise Control Act, state and local governments cannot issue regulations that are different from or more stringent than the EPA standards for specific equipment and operations.

The basis for federal preemption is that without it state and local governments would establish varying requirements that manufacturers and/or operators of transportation equipment would have to meet. The concern is that meeting these many different requirements would increase manufacturing and operating costs and may adversely affect interstate commerce. Preemption, in effect, recognizes transportation and commerce as largely national rather than local in nature. Thus, the federal preemption issue in transportation is more about how extensive must it be to preclude undue interference with interstate commerce and unreasonable costs for manufacturers and operators than whether it is desirable or not.

Aviation illustrates this issue. Although aviation is substantially covered by federal preemption, airport proprietors have retained some authority related to the use of their facilities. To better respond to local noise problems, they are increasingly exercising this authority to restrict airport access or use. FAA and industry officials are concerned that these restrictions by limiting full use of airport capacity and/or the aircraft fleet will have an adverse impact on aviation and interstate commerce. A national aircraft noise policy being proposed by industry representatives would, in effect, extend federal preemption to at least certain types of airport restrictions in return for more stringent national

regulations. The National Organization to Insure a Sound-Controlled Environment believes that restricting airport use where necessary is an effective way to deal with local aircraft noise problems and does not adversely affect interstate commerce because industry can make adjustments to implement the restrictions. The Airport Operators Council International is in favor of preemption if the phaseout of Stage 2 aircraft is made mandatory and the federal government assumes the potential liability for airport noise damages.

Preemption with regard to railroad transportation has also been a source of contention. EPA initially wanted to regulate only locomotives and railcars. EPA's view was that this equipment was the only part of railroad operations that move through various jurisdictions and thus could be subjected to varying local requirements. Railyards were to be left to be regulated as needed by the jurisdiction in which they are located. The court decision that standards limited to locomotives and railcars did not provide rail carriers with adequate federal preemption as intended by the Noise Control Act resulted in EPA having to issue additional standards. The more recent decision of the U.S. Court of Appeals for the Third Circuit in the Oberly case that the Noise Control Act only forbids states and localities from regulating those sources of railroad noise that federal regulations specifically address could mean that federal preemption is not total. However, preemptive federal regulations are in effect for most railroad equipment and operations.

## Current Efforts Are Not as Comprehensive

The overall transportation noise control and abatement effort is not as comprehensive today as it was when EPA's program was operating. Major differences are in standards setting and enforcement and technical assistance to local governments.

EPA considered the standards that it issued to be initial standards. Before its program was eliminated, it had plans to make the medium and heavy truck standard more stringent and to control additional sources of noise. Since program elimination, the existing EPA standards have not been reassessed or revised, and standards to control additional sources have not been issued. Other federal agencies, except FAA for aircraft noise, do not have regulatory authority to control noise from these sources and state and local governments cannot revise the standards because of federal preemption.

Standards enforcement has declined since termination of EPA's program. Enforcement of the motorcycle and medium and heavy truck standards,

which is EPA's responsibility under the Noise Control Act, essentially no longer takes place, and FHWA and FRA no longer conduct routine noise tests to enforce the interstate motor and rail carriers regulations. State and local governments can adopt and then enforce these standards but the state and local governments we visited had not done so.

Another major focus of EPA's program was technical assistance to local governments in establishing effective noise control programs, performing land-use planning, assessing noise problems, and identifying mitigation measures. EPA's current assistance in these areas is very limited, and our work indicates that the activities of state noise control offices have not expanded to fill the void. While FAA and FHWA provide financial and technical assistance, their major focus is on working through airport operators and state highway agencies, respectively, to ensure adequate aviation and highway systems.

Technical assistance to local governments may be even more important today than when EPA had a program. Three basic ways to address noise problems are (1) controls or limits on the amount of noise from the source; (2) land-use planning to avoid incompatible land uses near transportation facilities; and (3) projects, such as noise barriers, to mitigate noise impacts. In absence of a program to control highway and railroad noise sources, the other two ways become more critical. In addition, population increases and continuing development create added pressure on local governments to make all lands available, including those near transportation facilities. Furthermore, major mitigation efforts can be costly for local governments, making it critical for them to have a good understanding of their noise problems and the mitigation alternatives available to them.

## Matters for Consideration by the Congress

Although comprehensive data are not available, our review indicates that transportation noise continues to be a concern and the overall effort to control and abate it is not as comprehensive as it was with EPA's noise program. With a reduced federal role, the setting of standards to control transportation noise sources, enforcement of these standards, and the availability of technical assistance to local governments generally have declined.

In view of these issues, the Congress may wish to reexamine the federal role with regard to transportation noise control and abatement. Key considerations for the Congress are the extent of the transportation noise

problem, local needs for assistance in dealing with them, and the cost of additional activities to carry out an increased federal role.

## Possible Alternative Courses of Action

If the Congress decides that a change in the federal transportation noise role is needed, some of the alternatives it may wish to consider include:

- Rescind the Noise Control Act and leave noise control entirely to state and local governments, except as provided by other statutes. Rescinding the act would confirm a reduced federal role and may expand state and local efforts because it would return regulatory authority to them. On the other hand, the potential adverse impact of varying state and local requirements on commerce is a concern.
- Provide funding for EPA to implement the Noise Control Act provisions related to special local conditions exemptions. Implementing the special local conditions exemptions provisions would retain preemption but give state and local governments the opportunity to regulate noise sources where problems are unique or severe. These provisions, however, currently apply only to the interstate rail and motor carrier regulations. Whether these exemptions would be effective in solving noise problems and whether the total number of such exemptions would be large enough to pose an undue burden on commerce or industry operations is not known.
- Limit federal preemption to interjurisdictional operations. Limiting federal preemption to interjurisdictional or interstate operations would recognize the national aspects of transportation and allow local governments to control noise at facilities located within their jurisdictions. Railyard operations and equipment, for example, normally would not be interjurisdictional, whereas locomotives and railcars would be. Current FAA and industry concerns about airport use restrictions, however, illustrate how local control over facilities may potentially have an effect on transportation systems.
- Establish an EPA transportation noise program that provides for periodic reassessment and revision of existing EPA standards, issuance of new standards as needed, standards enforcement and/or technical assistance to local governments. Establishing such a program with responsibilities for the standards and/or technically assisting localities would recognize the national scope of transportation, maintain federal preemption, and help ensure the continuing appropriateness and effectiveness of the standards. Technical assistance may reduce the need for national regulations and the cost of federal noise mitigation assistance, such as FHWA's noise barrier program. Although such a program would be more limited than EPA's prior program, the activities would require some funding,

expand the already broad range of EPA responsibilities, and increase the number of agencies currently involved in transportation noise. Additional or more stringent standards could increase industry costs.

- Assign responsibility for issuing, reassessing, and revising transportation noise standards to the Department of Transportation and/or expand the Department's technical assistance programs. The Department already has the responsibility for aircraft standards. Completely assigning these responsibilities would draw on the Department's transportation expertise and other existing programs. The Department's efforts, however, may not have the same level of credibility as EPA's with those affected by the noise and some state and local officials because of the Department's major responsibilities for promoting the development of transportation systems adequate to meet the nation's needs. Noise, as a byproduct of transportation, has proven at times to be a constraint to system expansion.