**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| QUIET COMMUNITIES, INC., *et al.*, | |
| Plaintiffs, | Case No. 23-cv-1649 (JMC) |
| v. | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In the 1970s, Congress passed two laws—together, the Noise Control Act—that tasked the Environmental Protection Agency (EPA) with regulating noise. For nearly a decade, the EPA implemented the Act. But in 1981, President Reagan submitted a budget proposal to Congress through which he sought to wind down the EPA's noise control work. Congress debated that proposal and considered repealing the Noise Control Act. Ultimately, Congress did not repeal the law but did pass a budget consistent with the President's proposed funding cuts. Based on this congressional activity in the early 1980s, the EPA has almost entirely stopped implementing the Act. After more than forty years of inactivity, Quiet Communities, Inc., and Jeanne Kempthorne filed this lawsuit, alleging that the Agency has failed to fulfill its duties under the Act or unreasonably delayed in doing so. The Court lacks jurisdiction over several of their claims, and one fails on the merits. But four of the claims succeed: The EPA's decades-long delay in carrying

1

out the duties at issue in counts one, two, three, and eight is not reasonable. The Court therefore

**GRANTS in part** and **DENIES in part** each of the cross-motions for summary judgment.[1]

## I.       BACKGROUND

"In 1972, Congress enacted the Noise Control Act in response to the growing threat posed nationwide by uncontrolled noise in the environment." *Recreational Vehicle Indus. Ass'n v. EPA*, 653 F.2d 562, 564 (D.C. Cir. 1981). "In so doing, Congress declared that 'it is the policy of the United States to promote an environment for all Americans free from noise that jeopardizes their health or welfare.'" *Id.* (quoting 42 U.S.C. § 4901(b)). The Act serves that purpose by, among other things, requiring the EPA to publish reports related to noise, authorizing the Agency to regulate products that produce noise, and designating the EPA as a hub responsible for coordinating noise control efforts. *See* 42 U.S.C. §§ 4903, 4904, 4905, 4907, 4914. Congress bolstered the Act when it passed the Quiet Communities Act of 1978, which amended the Noise Control Act to further empower the EPA to "promote the development of effective State and local noise control programs." Quiet Communities Act of 1978, Pub. L. No. 95-609, 92 Stat. 3079.

For a time, a dedicated office within the EPA—the Office of Noise Abatement and Control—carried out the Agency's duties under the Act. *See* ECF 19-7 ¶ 9.[2] But in 1982, the EPA

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

[2] The EPA objects that Quiet Communities and Kempthorne "rely on extra-record material contained in affidavits" in support of some of their factual contentions, including the one in this cited paragraph. ECF 19 at 18 n.2; ECF 19-7 at 2. But in agency inaction cases like this one, the Court's review is not limited to "the administrative record." *W. Watersheds Project v. Pool*, 942 F. Supp. 2d 93, 100–01 (D.D.C. 2013). In any event, of the four factual assertions the EPA says are drawn from affidavits, all are established either by statute or the EPA's answer, so the Court need not rely on the affidavits for these points. *See* ECF 19-7 ¶¶ 1–2, 9–10. The Court does rely on the affidavits to determine whether Quiet Communities and Kempthorne have standing to press their claims. That, however, is permissible, and the EPA does not argue otherwise. *See WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 61 (D.D.C. 2019); ECF 19 at 18–19 n.2 (objecting only to reliance on affidavits "for purposes of determining liability").

closed that office and another division in the agency that implemented the Act. *See id.* ¶ 10. That change followed closely on the heels of congressional action related to the Act. In 1981, the newly inaugurated Reagan administration submitted a budget proposal to Congress that "recommended $2.2 million for fiscal year 1982 to be used for an orderly phaseout of" the EPA's noise program, "and no funds for fiscal year 1983 and beyond." U.S. Gov't Accountability Off., GAO-08-751, Transportation Noise: Federal Control Abatement Responsibilities May Need to Be Revised 15 (1989).[3] Congress debated the President's proposal and ultimately approved his budget request. *Id.* at 16. Congress did not, however, repeal the Noise Control Act or its Quiet Communities Act amendments. *See id.*; *see also* ECF 19-7 ¶ 2. As the EPA puts it on its website, "EPA phased out the [Office of Noise Abatement and Control's] funding in 1982," but "the Noise Control Act of 1972 and the Quiet Communities Act of 1978 were never rescinded by Congress and remain in effect today." *EPA History: Noise and the Noise Control Act*, EPA (Nov. 6, 2025), https://www.epa.gov/history/epa-history-noise-and-noise-control-act.

After 1982, the EPA largely stopped carrying out any activities under the Noise Control Act. The agency almost entirely stopped issuing reports and regulations, assisting state and local governments, and coordinating federal efforts related to noise control. *See* ECF 19-7 ¶ 11. In 2009, the Agency did propose a regulation that would have amended a standard it issued in 1979 related to the labeling of hearing protection devices—ear plugs and the like—but it never completed the rulemaking. *See* Product Noise Labeling Hearing Protection Devices, 74 Fed. Reg. 39150 (Aug. 5, 2009); ECF 19-7 ¶¶ 22–24.

---

[3] The EPA filed this report as an exhibit to its motion, *see* ECF 19-6, and the plaintiffs do not contest its accuracy. To the contrary, Quiet Communities and Kempthorne rely on it in their briefing, as well. *See* ECF 21 at 12. Regardless, the Court can "take judicial notice of the GAO Report." *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016).

Aggrieved by the EPA's failure to implement the Noise Control Act, Quiet Communities— a non-profit membership organization "dedicated to helping communities reduce health and environmental harm from noise pollution"—and Jeanne Kempthorne—a Quiet Communities member who lives in Massachusetts—filed this lawsuit. ECF 18-9 ¶¶ 4–5; ECF 18-10 ¶¶ 1–2. Quiet Communities and Kempthorne allege that the EPA has failed to take a slew of "actions mandated" by the Noise Control Act. ECF 1 ¶ 1. In a nine-count complaint, they assert claims both under the Noise Control Act's citizen suit provision, which authorizes suits "where there is alleged a failure . . . to perform any act or duty" under the Act "which is not discretionary," and under the Administrative Procedure Act (APA) provision that allows district courts to "compel agency action unlawfully withheld or unreasonably delayed." 42 U.S.C. § 4911(a)(2)(A); 5 U.S.C. § 706(1). Through its first eight counts, the complaint alleges that the EPA has failed to perform eight different duties imposed by the Noise Control Act. *See* ECF 1 ¶¶ 124–85. The ninth count makes clear that Quiet Communities and Kempthorne are challenging the EPA's failure to take those actions not only under the citizen suit provision, but also under the APA. *See id.* ¶¶ 186–92. The parties filed cross motions for summary judgment. *See* ECF 18; ECF 19.

## II.    LEGAL STANDARD

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "In APA cases such as this one, involving cross-motions for summary judgment, the district judge sits as an appellate tribunal. The entire case on review is a question of law." *Gilbert v. Wilson*, 292 F. Supp. 3d 426, 433 (D.D.C. 2018).

## III.    ANALYSIS

The Court begins, as it must, with its jurisdiction. As the EPA argues, Quiet Communities and Kempthorne lack standing to press two of their claims—counts four and five. The EPA is also

right that this Court lacks jurisdiction over count six. That claim can be brought only in the D.C. Circuit. The Court has jurisdiction over counts one, two, three, seven, and eight.

Count seven fails on the merits because the agency action it seeks to compel is not discrete. The EPA mounts a single defense to the other claims, arguing that although it has not carried out the duties at issue in those claims for more than forty years, its delay is reasonable given Congress's appropriations decisions in the early 1980s. That argument rests on too thin a reed. Congress never repealed the Noise Control Act; although it did enact appropriations laws that decreased the overall funding for the EPA after President Reagan proposed winding down the Agency's noise activities, none of the laws Congress passed said anything about the EPA's noise control work, let alone restricted its ability to do that work; and the EPA readily admits that it could use its lump-sum appropriations to implement the Noise Control Act. Given all of that, the EPA's choice to ignore altogether the statutory mandates imposed by the Noise Control Act is not reasonable. The Court therefore enters judgment for Quiet Communities and Kempthorne as to liability on claims one, two, three, and eight, leaving the question of remedy for further proceedings. *See* ECF 16 at 3 (parties jointly requesting bifurcated summary judgment proceedings).

### A. The plaintiffs lack standing to press counts four and five.

"For there to be a case or controversy under Article III" of the Constitution, "the plaintiff must have a personal stake in the case—in other words, standing." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). To demonstrate the requisite personal stake, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.* This showing must be made "for each claim that [a plaintiff] press[es]." *Id.* at 431. And it must be made "with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 431. Here, that means that at least one of the two plaintiffs must

have created a genuine dispute of material fact as to their standing on each claim. *See Pub. Citizen, Inc. v. Trump*, 435 F. Supp. 3d 144, 152 (D.D.C. 2019) (explaining how summary judgment standard applies to standing); *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (where multiple plaintiffs seek same form of relief, "[a]t least one plaintiff must have standing").

The EPA argues that neither Quiet Communities nor Kempthorne has sufficiently demonstrated their standing to press counts four or five of their complaint. *See* ECF 19 at 21, 31.[4] Of course, that the Agency has not challenged the plaintiffs' standing to bring their other claims does not take that issue off the table: Federal courts have "an independent obligation to assure that standing exists." *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009). Nevertheless, the Court is satisfied that Quiet Communities and Kempthorne have adequately demonstrated their standing to press each of the counts that the EPA does not address. In each of those counts, Quiet Communities and Kempthorne allege that they have "been deprived of information that, on [their] interpretation, a statute requires the government or a third party to disclose" to them and that they "suffer[], by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016). In count one, that 42 U.S.C. § 4904(c) requires the EPA to "revise or supplement" a particular report. ECF 1 ¶¶ 126–28. Same in counts two and three for different reports. *Id.* ¶¶ 133–35, 140–43. In count six, that the Agency has failed to require the disclosure of information via labelling requirements, as it should have done under 42 U.S.C. § 4907. *See* ECF 1 ¶¶ 164–66. For count seven, that the EPA has failed to implement 42 U.S.C. § 4913, which requires, among other things,

---

[4] In its motion for summary judgment, the Agency also argued that the plaintiffs lack standing to press one aspect of count eight—any claim under section 4(c)(1) of the Act that the EPA allegedly failed to coordinate the programs of Federal agencies relating to noise research and control. *See* ECF 19 at 32. But the plaintiffs clarified in their reply that they were not making that claim in count eight, *see* ECF 21 at 26, so the EPA dropped this standing argument in its reply, *see* ECF 27 at 15 n.4.

the "disseminat[ion] of information and educational materials." ECF 1 ¶ 173. And for count eight, that the Agency has failed to publish "a report on the status and progress of Federal activities relating to noise research and control," as required by 42 U.S.C. § 4903(c)(3). ECF 1 ¶ 181. These informational injuries are traceable to the EPA's alleged failure to act in each of these counts of the complaint, and requiring the Agency to disseminate the relevant information would redress the injuries. *See Friends of Animals*, 828 F.3d at 992.

That suffices to establish both Quiet Communities' and Kempthorne's standing for the claims other than those in counts four and five. But as the EPA rightly appreciates, counts four and five are different. Neither of those claims relate to sections of the Noise Control Act that "mandate the disclosure of any information." *Friends of Animals*, 828 F.3d at 990. Instead, they focus on sections of the statute that, as the plaintiffs see it, require the EPA to "publish proposed regulations" of certain products that qualify as "major source[s] of noise"—count four—and to establish a program for certifying "low-noise-emission products" that will then be entitled to a preference in government procurement—count five. 42 U.S.C. §§ 4905(a), 4914; ECF 1 ¶¶ 146–63. The EPA is right that neither Quiet Communities nor Kempthorne have adequately demonstrated their standing to press those two claims.

1.   **Count four: failure to regulate products identified as major sources of noise.**

In 1975, the EPA identified "truck transport refrigeration units as a major source of noise" under 42 U.S.C. § 4904(b). ECF 19-7 ¶ 16; *see* Identification of Products as Major Sources of Noise, 40 Fed. Reg. 23105 (May 28, 1975). Two years later, the Agency identified three more major sources of noise: "power lawn mowers, pavement breakers, and rock drills." ECF 19-7 ¶ 17; *see* Identification of Products as Major Sources of Noise, 42 Fed. Reg. 2525 (Jan. 12, 1977); Identification of Products as Major Sources of Noise: Pavement Breakers and Rock Drills, 42 Fed.

Reg. 6722 (Feb. 3, 1977). In count four, Quiet Communities and Kempthorne allege that once those four major sources of noise were identified, the EPA was required to issue "proposed regulations" for each of them within 18 months of their respective designations. ECF 1 ¶¶ 148–51; *see* 42 U.S.C. § 4905(a)(1), (2)(A). The EPA admits that it never proposed regulations for any of these products. *See* ECF 19-7 ¶ 19. For that reason, in count four plaintiffs seek an order requiring the EPA to "promptly prepare and publish proposed regulations . . . for truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills." ECF 1 ¶ 156.

Quiet Communities invokes both associational and organizational standing in arguing the Court has jurisdiction over this claim. *See* ECF 21 at 20–24. Neither theory succeeds. In reaching that conclusion, the Court also explains why Kempthorne—who is a Quiet Communities member, ECF 18-10 ¶ 2—does not have standing to press this claim, either.

Quiet Communities has not established that it has associational standing because it has not shown that any one of its members—Kempthorne included—has standing to pursue count four "in her or his own right." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 101 (D.C. Cir. 2019). Quiet Communities invokes its members "physical, recreational, financial, and informational harm from unregulated noise." ECF 21 at 20. Setting aside the informational bit for now—the Court returns to it shortly—these are no doubt cognizable injuries in fact. Financial injury is a quintessential injury in fact. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 5 (D.C. Cir. 2017). And what Quiet Communities calls "physical" and "recreational" harm relates to the many ways that its members say noise causes them physical and psychological distress and interferes with their use and enjoyment of their homes. ECF 21 at 21–22. That kind of injury assuredly bears a "close relationship to a harm traditionally recognized as providing a basis for a lawsuit in American courts"—to name just one category of suit, those involving nuisance claims—

and is therefore "concrete for purposes of Article III." *TransUnion*, 594 U.S. at 424; *see Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("Actions to remedy . . . nuisance have long been heard by American courts.").

The problem, however, is that none of Quiet Communities' members injuries are "fairly traceable to the" inaction "challenged" in count four: the EPA's failure to propose regulations for truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills. *Louie v. Dickson*, 964 F.3d 50, 54 (D.C. Cir. 2020). None of Quiet Communities' members say a word in their declarations about truck transport refrigeration units, pavement breakers, or rock drills. Quiet Communities seems to acknowledge as much, responding to the EPA's argument on this front only by insisting that its members have connected their injuries to the Agency's failure to regulate lawn mowers. *See* ECF 21 at 22.

But although several members do link their harms to noise from lawncare, they complain almost entirely about "gas-powered leaf blowers." *See, e.g.*, ECF 18-12 ¶¶ 9–17, 22–25; ECF 18-14 ¶¶ 15, 26, 36, 38, 44; ECF 18-15 ¶¶ 9, 15, 20, 22. Attempting to show that Kempthorne and other Quiet Communities members nevertheless do suffer harms related to noise from lawn mowers, the plaintiffs cited paragraphs from four declarations. *See* ECF 21 at 22. One of those is from Kempthorne's declaration, where she explains that in her former home she heard "landscaping crews . . . mowing and blowing for extended periods of time." ECF 18-10 ¶ 6 (cited at ECF 21 at 22). But Kempthorne no longer lives in that house, and at her new house she complains of noise from "garbage trucks," "leaf blowers, and, most frequently, motorcycles, trucks, and other motor vehicles." *Id.* ¶¶ 13–14. In other words, she does not attribute the current and ongoing noise issues in her home to lawn mowers. *See Jones v. U.S. Secret Serv.*, 143 F.4th 489, 495 (D.C. Cir. 2025) ("Past exposure to illegal conduct, without more, is insufficient to

establish standing for prospective relief."). The plaintiffs' other record citations are even less helpful. None of the cited paragraphs mention lawn mowers, and all three declarations make clear that these members are being harmed by leaf blowers, not lawn mowers. *See* ECF 18-10 ¶¶ 9–17, 22–25; ECF 18-14 ¶¶ 15, 26, 36, 38, 44; ECF 18-15 ¶¶ 9, 15, 20, 22; ECF 21 at 22 (citing these declarations).

The EPA's regulation (or lack thereof) of truck transport refrigeration units, power lawn mowers, pavement breakers, and rock drills, is far "too attenuated" from the activities that Quiet Communities' members say are causing their injuries—the use of *other* noisy products that would not themselves be subject to the regulations that the plaintiffs say must be proposed. *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024). Nor, despite Quiet Communities' claim otherwise, is it a "commonsense economic realit[y]," *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 116 (2025), that the regulation of lawn mowers would have "positive spillover" effects on the loudness of leaf blowers because the two are "part of the same core set of commercial landscaping operations," ECF 21 at 23. The commonsense intuition is that leaf blower manufacturers will maximize their profits, and Quiet Communities has not explained why imposing noise requirements on lawn mowers would either make it cheaper for leaf blower makers to build quieter leaf blowers or would increase the demand for quieter leaf blowers. All told, then, the plaintiffs have failed to establish a causal link between the noise related harms—physical, recreational, and financial—that Quiet Communities' members (Kempthorne included) suffer and the EPA's failure to regulate these four products.

Quiet Communities attempts to gloss over this problem by arguing that regulating those products "would reduce the cumulative noise profile in the communities where" its members live. ECF 21 at 21. But it "fail[ed] to bridge the evidentiary gap" between a more general claimed noise

profile and the specific noise-related injuries that are harming the members whose testimony is in the record. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 85 (D.D.C. 2012). And unlike its members' particularized injuries related to the noise problems they experience in their homes, Quiet Communities cannot point to increased noise generally—the "cumulative noise profile," ECF 21 at 21—as a cognizable injury. That is the sort of "undifferentiated" injury "common to all members of the public" that does not qualify as "particularized." *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 767 (D.C. Cir. 2020).

As for the supposed "informational" harms that Quiet Communities says its members are suffering from the violation alleged in count four, ECF 21 at 20, it is not the sort of informational harm that props up the plaintiffs' other claims. Unlike those claims, in count four the plaintiffs do not allege that the relevant statutory provision requires the EPA to disclose information; instead, they allege that the EPA must "propose[] regulations." ECF 1 ¶ 147. Because the statute at issue in count four does not "mandate the release of information," this claim does not involve that kind of informational injury. *Friends of Animals*, 828 F.3d at 994. Instead, Quiet Communities is invoking a more ephemeral kind of informational injury: that the EPA's failure to regulate these four products "contributes to the misconception that noise is a nuisance and not a harmful pollutant." ECF 21 at 20. That leads Quiet Communities' members to spend additional time and money "convincing others that noise is harmful," and, because of the "collective ignorance of businesses, product manufacturers, [and] local and state governments," there is more noise near Quiet Communities' members' homes. *Id.* at 21. That theory of informational injury is far too speculative and attenuated to prop up count four. It requires stacking inference on inference, with speculation to boot, to conclude that the EPA proposing regulations for these four specific products would alleviate any claimed "collective ignorance" about the seriousness of noise pollution.

11

As for organizational standing, Quiet Communities fares no better. To establish organizational standing, Quiet Communities must show that the EPA's failure to propose regulations of these four products "injure[s] the organization's interest" and that the "organization use[s] its resources to counteract that harm." *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1094 (D.C. Cir. 2015). Quiet Communities cannot make the first of those showings, so the Court need not consider the second prong of the test. Quiet Communities points to two kinds of organizational harm—that the EPA's failure to issue these regulations "contributes to the misconception that noise is a nuisance and not a harmful pollutant," thereby rendering the organization's advocacy efforts more difficult and costly, and that the organization "expends resources working with the lawncare industry and various communities to reduce the noise profile of products used in that industry." ECF 21 at 20–22. Neither is a cognizable injury in fact.

The first claimed injury is insufficiently "concrete" because the only "service impaired" on that theory is Quiet Communities' "pure issue-advocacy." *PETA*, 797 F.3d at 1093–94. "At most," the first claimed injury is that the EPA "is not properly collecting and disseminating information about" these four would-be regulated products, "which [Quiet Communities] say[s] in turn makes it more difficult for them to inform the public about" the serious problems associated with noise. *All. for Hippocratic Med.*, 602 U.S. at 395; *see, e.g.*, ECF 18-9 ¶¶ 21–23 (organization's President testifying that if "EPA regulated major sources of noise," organization could spend less time "developing and disseminating basic information"). But, as already explained in addressing the claimed informational injury above, Quiet Communities does not suggest that the statute at issue in count four "requires [the EPA] to disseminate . . . information," so this theory does not suffice to establish an organizational injury for that count. *All. for Hippocratic Med.*, 602 U.S. at 395–96.

12

The second theory fails too. Quiet Communities' President has indeed explained that the organization "works with individuals and communities to address" and "raise awareness of noise from a variety of sources including . . . lawn and garden equipment." ECF 18-9 ¶ 16. That effort apparently includes working with a variety of "entities—like school districts, universities, botanic gardens, golf clubs, commercial entities, and libraries—to transition their campuses away from gas-powered lawn equipment, including lawn mowers . . . , to quieter electric alternatives." *Id.* ¶ 64. Even still, Quiet Communities' "use of resources" for this "advocacy" around lawn equipment "is not sufficient to give rise to an Article III injury." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Even if the EPA's failure to regulate lawn mowers forces Quiet Communities to "increase the amount of resources that it spends encouraging" businesses and governments to use quieter lawn mowers, that still amounts to "nothing more than an abstract injury to its interests that is insufficient to support standing." *Id.* at 920–21. Because Quiet Communities has not established organizational or associational standing, and Kempthorne has not established her own standing either, this Court lacks jurisdiction over count four.

### 2.   Count five: failure to implement the "low-noise-emission product" program.

In count five, plaintiffs seek to compel the EPA to comply with a section of the Noise Control Act that addresses the "[d]evelopment of low-noise-emission products." 42 U.S.C. § 4914; *see* ECF 1 ¶¶ 157–63. The section outlines several steps the Agency should take, including "determin[ing] which products qualify as low-noise-emission products in accordance with the provisions of th[e] section" and "certify[ing] . . . product[s] for which a certification application has been filed" as "low-noise-emission product[s]" that are "suitable for use as a substitute for a type of product at that time in use by agencies of the Federal Government." 42 U.S.C. § 4914(b)(1), (2). Products that have been so certified are to "be acquired by purchase or lease by the Federal Government . . . in lieu of other products" if their "procurement cost[]" is "no more than 125

13

percentum of the retail price of the least expensive type of product for which they are certified substitutes." *Id.* § 4914(c)(1). In their reply, the plaintiffs seem to have clarified the scope of this claim, writing that "[t]hrough" count five, they "ask the Court to compel the [EPA] to carry out the specific command of [42 U.S.C. § 4914(h)] to 'promulgate procedures required to implement'" the rest of section 4914. ECF 21 at 43 (quoting 42 U.S.C. § 4914(h)). The plaintiffs rely exclusively on organizational standing to support this claim. *See id.* at 24 (arguing there is "more than enough" evidence "to show organizational standing for [the] harms alleged" in count five).

Quiet Communities has not established organizational standing to press this claim. The organization's theory of injury is a little difficult to follow here. It claims first that the EPA's failure to implement a *different* section of the Act—the one at issue in count four that allegedly requires the promulgation of regulations for those four products—"has had compounding adverse effects on the implementation of the [low-noise-emission products] program." ECF 21 at 24. Best the Court can tell, the "compounding" effect the plaintiffs are referencing stems from the fact that a "low-noise-emission product" is defined as one that "emits noise in amounts significantly below" the regulations that are supposed to be promulgated under that other section. 42 U.S.C. § 4914(a)(3). And it is true that the EPA pointed out in its motion for summary judgment that "no product . . . could qualify as a 'low-noise-emission product'" because there are no such regulations. ECF 19 at 31. But even assuming Quiet Communities is right that the Agency's violation of the regulation section of the statute also leads to a violation of the low-noise-emission products section, that observation does nothing to explain what injury the organization is suffering.

Quiet Communities' second point is slightly more helpful to the Court, but still fails to establish organizational standing. The organization says that it has marshalled evidence showing that the "EPA's obstruction of [low-noise-emission product] certification harms the organization's

interests for which the organization has expended resources to counteract that harm." ECF 21 at 24. In support of that conclusory assertion, the plaintiffs cite a handful of paragraphs from Quiet Communities' President's declaration. *See id.* In those paragraphs, the President explains how a lack of information makes it difficult for "decisionmakers" to decide "how and whether to control noise." ECF 18-9 ¶¶ 39–41. She provides one example where the organization provided consulting services for the District of Columbia "about the relative noise from gas-powered and electric leaf blowers." *Id.* ¶¶ 42–51, 56–62. She also explains her view that, had the EPA "establish[ed] a low-noise-emission products program," manufacturers would have been "incentivized to reduce their products' noise emissions," thereby changing the "portfolio of products developed in the lawn and garden and other industries." *Id.* ¶¶ 70–74.

Once more, the lack of information is insufficient to support Quiet Communities' standing to press a claim seeking to compel the EPA to "promulgate procedures," ECF 21 at 43, not comply with a disclosure statute, *see All. for Hippocratic Med.*, 602 U.S. at 395–96. And although there is some "commonsense economic" intuition behind Quiet Communities' claim that certifying low-noise-emission products would incentivize production of quieter products, *Diamond Alt. Energy*, 606 U.S. at 116, Quiet Communities has still failed to trace a cognizable organizational injury to the EPA's failure to implement the program. Assume that, had the EPA put in place the process for certifying products, producers would have recognized an opportunity to gain a competitive advantage in contracting with the federal government if they could offer certified products, so would have made quieter, qualifying products and sought certification. *See* 42 U.S.C. § 4914(h). Assume too that, having already made those products, the manufacturers would have sought to sell them to more people and made them generally available. Still, Quiet Communities has not explained how having those products on the market would have done anything other than

15

"[de]crease[d] the amount of resources that it spends encouraging" businesses and governments to use quieter products. *Food & Water Watch*, 808 F.3d at 920. Quiet Communities' "use of resources" for this "advocacy" is too "abstract" to "impart standing." *Id.* at 919. Because Quiet Communities has not established that it has organizational standing to bring count five, and because that is the only theory of standing advanced by the plaintiffs, the Court lacks jurisdiction over this claim, as well.

## B.  The D.C. Circuit has exclusive jurisdiction over count six.

The EPA also argues that this Court lacks jurisdiction over count six of the complaint. *See* ECF 19 at 33. Via that claim, Quiet Communities and Kempthorne seek to compel the Agency to comply with 42 U.S.C. § 4907. *See* ECF 1 ¶¶ 164–71. That section says that the EPA "shall by regulation designate any product . . . which emits noise capable of adversely affecting the public health or welfare" or "which is sold wholly or in part on the basis of its effectiveness in reducing noise" and then impose labeling requirements—informing "prospective user[s] of the level of noise the product emits, or its effectiveness in reducing noise"—on those designated products. 42 U.S.C. § 4907(a)–(b). The EPA correctly points out that another section of the Noise Control Act grants the D.C. Circuit exclusive jurisdiction over any "petition for review" of "any labeling regulation under section 4907." *Id.* § 4915(a); *see* ECF 19 at 34. Because that provision assigns the Circuit "exclusive jurisdiction to review" the EPA's actions under section 4907, the Agency argues that the Circuit also has "exclusive jurisdiction over claims"—like count six of the complaint—"seeking to *compel*" action under that section. ECF 19 at 33 (citing *Telecomms. Rsch. & Action Ctr. v. FCC* (*TRAC*), 750 F.2d 70 (D.C. Cir. 1984)).

The EPA has this right. "[W]here a statute commits final agency action to review by the Court of Appeals, . . . that court ha[s] jurisdiction to hear suits seeking relief that would affect its future statutory power of review." *TRAC*, 750 F.2d at 74. So, where a plaintiff claims that an

16

agency has unreasonably delayed in issuing a regulation that, had it been issued, could only have been reviewed by the D.C. Circuit, that court has jurisdiction over the claim. *See id.* at 75. And that court's jurisdiction over the unreasonable delay claim "is exclusive." *Id.* at 77. Applying those rules, the D.C. Circuit has "held that a claim of unreasonable delay [is] reviewable directly and exclusively in [that] [c]ourt" where the "final . . . order" that the agency is alleged to have unreasonably delayed in issuing "could be reviewed in th[at] [c]ourt." *Moms Against Mercury v. FDA*, 483 F.3d 824, 827 (D.C. Cir. 2007).

That describes count six in this case to a T. Quiet Communities and Kempthorne claim that the EPA's "more than forty year[]" delay in "designat[ing] and adopt[ing] or revis[ing] labeling regulations" under section 4907 is unlawful, and they seek an order "requiring EPA to . . . designate and adopt labeling regulations for any product that emits noise capable of adversely affecting the public health or welfare." ECF 1 ¶¶ 167–68, 170. Were the EPA to issue those "labeling regulation[s]," a "petition for review" of them could "be filed only in the" D.C. Circuit. 42 U.S.C. § 4915(a). Because "the discrete agency action sought" in count six "is itself reviewable exclusively" by the Circuit, this "unreasonable delay claim is also reviewable exclusively by" the Circuit. *Silberstein v. SEC*, 153 F. Supp. 3d 233, 237 (D.D.C. 2016).

Quiet Communities and Kempthorne make a handful of attempts to avoid that conclusion, but none succeed. They argue that the Noise Control Act's citizen suit provision "expressly gives the district court jurisdiction over claims alleging agency inaction." ECF 21 at 27 (citing 42 U.S.C. § 4911(a)). That is true, but as Quiet Communities and Kempthorne elsewhere all but concede, count six fails if brought via the citizen suit provision because the labeling regulation provision in section 4907 does not impose any "date-certain deadlines" on the EPA. ECF 18-1 at 32; *see also infra* 21 (explaining why all counts other than count four are being reviewed as APA claims, rather

17

than as claims under the citizen suit provision). The Court therefore treats count six as a claim for unreasonable delay under the APA, and the APA "does not confer an independent grant of jurisdiction." *TRAC*, 750 F.2d at 76.

Nor can Quiet Communities and Kempthorne avoid the exclusive jurisdiction of the Circuit by arguing that "[t]here is no pending matter before EPA." ECF 21 at 27. That argument fails most obviously because it rests on a faulty factual premise: Quiet Communities does have a petition pending at the EPA asking the Agency to "implement, enforce, and update its non-discretionary duties" under the Noise Control Act, including its alleged duties under section 4907. ECF 27-1 at 2. The argument is also legally unsound. It is true that the agency action the plaintiffs in *TRAC* were alleging was unreasonably delayed was the agency's response to petitions pending before the agency. *See* 750 F.2d at 72. But nothing in the court's reasoning hinged on the pending petitions; instead, it was a concern that the district court litigation "might affect the Circuit Court's future jurisdiction" over an "agency action" that was "subject to [its] exclusive review." *Id.* at 78–79. That concern is present in this case, too. Imagine this lawsuit ends in a determination that the EPA is not obligated to issue labeling regulations under section 4907. In that world, the EPA might never issue labeling regulations under this section, thereby preventing the D.C. Circuit from reviewing regulations that would otherwise have been "subject to [its] exclusive review." *Id.*

Quiet Communities and Kempthorne next attempt to liken this case to *Sierra Club v. Jackson*, 813 F. Supp. 2d 149 (D.D.C. 2011), in which another court in this District held that the D.C. Circuit did not have exclusive jurisdiction. *See* ECF 21 at 27–28. But that case bears little resemblance to this one. There, the plaintiffs were challenging a "[d]elay [n]otice" the EPA issued to "stay[] the effective date" of two rules. *Jackson*, 813 F. Supp. 2d at 153. The rules were issued under the Clean Air Act and were themselves "exclusively reviewable in the court of appeals." *Id.*

18

at 152–53, 162. The delay notice, however, was issued pursuant to section 705 of the APA, not the Clean Air Act. *Id.* at 154–55. In that context, the district court held that it could decide whether the EPA lawfully stayed the effective dates of the rules via the APA without "affect[ing] the court of appeals' jurisdiction over the pending petitions for review" of the Clean Air Act rules themselves. *Id.* at 162. Unlike in *Jackson*, count six in this case does not seek review of an agency action taken pursuant to some authority other than the one that would be subject to the D.C. Circuit's exclusive jurisdiction. Instead, this claim looks far more like the one at issue in *TRAC*, where the plaintiffs alleged "unreasonable delay" in taking an agency action that "could be reviewed" only in the D.C. Circuit. *Moms Against Mercury*, 483 F.3d at 827.

Finally, Quiet Communities and Kempthorne make a narrower argument, insisting that even if the Court of Appeals has exclusive jurisdiction over one part of count six, this Court has jurisdiction over a different part of the claim. ECF 21 at 28-29. The argument here turns on the text of the judicial review provision. The statute says that a "petition for review of action of the" EPA "in promulgating any . . . labeling regulation under section 4907 . . . may be filed only in the" D.C. Circuit. 42 U.S.C. § 4915(a). Quiet Communities and Kempthorne interpret that language to reach only subsection (b) of section 4907, which says that the EPA "shall by regulation require that notice be given to the prospective user" about certain characteristics of products that have been "designated under subsection (a)" of 4907. *Id.* § 4907(b). Those notice requirements, Quiet Communities and Kempthorne argue, are the "labeling regulation[s]" that must be reviewed in the D.C. Circuit. ECF 21 at 29. The EPA's decisions to "designate" certain products "by regulation" as being subject to the notice requirements, they say, are not "labeling regulation[s]" subject to the judicial review provision. 42 U.S.C. §§ 4907(a), 4915(a).

19

That is an unnatural reading of the judicial review provision. The statute refers to "labeling regulation[s]" issued "under section 4907," not a particular subsection of 4907. 42 U.S.C. § 4915(a). Section 4907's title is "Labeling," suggesting that the entire provision, not merely one of its subsections, addresses labeling regulations. *Id.*; *see Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute."). And the operation of the two subparts suggest that they are best viewed as "a single, continuous effort whose final outcome" is the issuance of rules regarding the notice that must be given about certain products, rules which are in turn "to be reviewed" in the D.C. Circuit under the judicial review provision. *Outdoor Power Equip. Inst., Inc. v. EPA*, 438 F. Supp. 1092, 1096 (D.D.C. 1977) (answering analogous question about other provisions of Noise Control Act). The agency first determines "by regulation" which products must be subject to labeling regulations, and then "by regulation require[s] that notice" about the product's features be given to the product's users. 42 U.S.C. § 4907(a), (b). Together, these are the "labeling regulation[s]" to be reviewed by the D.C. Circuit. *Id.* § 4915(a).

Quiet Communities and Kempthorne's contrary interpretation would lead to the odd result that a party seeking to challenge the imposition of labeling regulations would have to bring separate cases to challenge the EPA's decision to designate a product as subject to labeling requirements—that one in the district court—and the nature of the requirements imposed—that one in the D.C. Circuit. That Congress would have wanted such piecemeal review seems unlikely. Instead, the statute commits review of the entirety of a "labeling regulation [issued] under section 4907" to the Circuit. 42 U.S.C. § 4915(a). And because the Circuit has that jurisdiction, it likewise has jurisdiction over a claim seeking to compel the EPA to issue labeling regulations. This Court therefore lacks jurisdiction over count six.

### C. Quiet Communities and Kempthorne prevail on some, but not all, of their remaining claims.

There are, then, five claims over which the Court has jurisdiction. The Court addresses those claims—counts one, two, three, seven, and eight—as claims for agency action "unreasonably delayed" under the APA. 5 U.S.C. § 706(1). The Court applies that APA provision, rather than the Noise Control Act's citizen suit provision, because none of the duties at issue in these claims are accompanied in the Noise Control Act by a "date-certain deadline." *Sierra Club v. Thomas*, 828 F.2d 783, 792 (D.C. Cir. 1987), *superseded by statute on other grounds by* 42 U.S.C. § 7604(a). As Quiet Communities and Kempthorne acknowledge, the D.C. Circuit has interpreted "similar or near-identical language" in citizen-suit provisions from other "Federal environmental statutes enacted in the same era as" the Noise Control Act as providing relief only where the "alleged nondiscretionary duty . . . requires the agency to act by a 'date-certain deadline.'" ECF 18-1 at 30 (quoting *Thomas*, 828 F.2d at 791–92); *compare Thomas*, 828 F.2d at 787 (quoting language of citizen-suit provision from Clean Air Act), *with* 42 U.S.C. § 4911(a)(2)(A). The Court sees no reason why the same language in the Noise Control Act would have a different meaning. Having adopted that view, the Court applies the APA's unreasonable delay standard to these claims. *See* ECF 18-1 at 29–31.

Defending each of these claims as APA unreasonable delay claims, the EPA offers one argument that is unique to count seven. For counts one, two, three, and eight, the Agency makes the same argument—that its delay is reasonable. The Court starts with the argument unique to count seven and agrees with the EPA that this claim fails because it seeks to compel programmatic, rather than discrete, agency action.[5] But as for the remaining claims, the Court rejects the EPA's

---

[5] In its motion for summary judgment, the EPA also made a discreteness argument about count eight. *See* ECF 19 at 43. The Agency acknowledged, however, that one of the duties at issue in that claim was at least "arguably" discrete.

effort to justify its more than forty year delay in effectuating the duties at issue in those counts and concludes that Quiet Communities and Kempthorne succeed on their unreasonable delay claims.

###### 1. Count seven fails because it does not seek to compel a discrete agency action.

In count seven, Quiet Communities and Kempthorne seek to compel compliance with 42 U.S.C. § 4913. *See* ECF 1 ¶¶ 172–78. That section is where the Quiet Communities Act is codified, and it instructs the EPA to do a whole slew of things meant "[t]o promote the development of effective State and local noise control programs, to provide an adequate Federal noise control research program designed to meet the objectives of" the Noise Control Act, "and to otherwise carry out the policy of" the Noise Control Act. 42 U.S.C. § 4913; *see* Quiet Communities Act of 1978, Pub. L. No. 95-609, 92 Stat. 3079. Section 4913's breadth prompted the EPA to object to count seven on the basis that it alleges "the kind of 'general deficiencies in compliance' with broad statutory mandates" that is not cognizable in an APA case challenging "agency action unlawfully withheld or unreasonably delayed." ECF 19 at 42 (quoting *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004)); 5 U.S.C. § 706(1). Undeterred, Quiet Communities and Kempthorne insist that section 4913 imposes a "punch list of tasks that EPA 'shall' perform," and that can therefore be compelled via the APA. ECF 21 at 45–46.

Even assuming that section 4913 imposes mandatory duties that the EPA is "*required to take*," the Agency is right that this claim fails because the actions that it seeks to compel are insufficiently "*discrete*." *Norton*, 542 U.S. at 64. The discreteness requirement "precludes . . . broad programmatic attack[s]." *Id.* That is precisely the kind of attack mounted in

---

*Id.* at 43 n.13. In their response, Quiet Communities and Kempthorne clarified that their claim in count eight was limited to the duty that the Agency accepted might be discrete. *See* ECF 21 at 26. In its reply, the EPA then dropped any argument related to discreteness on count eight. *See* ECF 27 at 19. The Court therefore understands the EPA to be defending the now-clarified count eight only on the basis that the Agency has not unreasonably delayed in taking the action at issue, and not on the basis that the action is insufficiently discrete.

count seven. Section 4913 requires the EPA to, among other things, "administer a nationwide Quiet Communities Program" via "grants to States, local governments, and authorized regional planning agencies," the "purchase . . . monitoring and other equipment for loan to State and local noise control programs," and the "development of education and training materials and programs, including national and regional workshops, to support State and local noise abatement and control programs." 42 U.S.C. § 4913(c). In alleging that the EPA has failed to carry out these duties, Quiet Communities and Kempthorne are "complain[ing] not that the [Agency] failed to take a *specific* action[,] but rather that [it] failed to carry out the [statute's] general directives." *Am. Forest Res. Council v. United States*, 77 F.4th 787, 805 (D.C. Cir. 2023).

In arguing that the Court could order compliance with section 4913 by requiring the EPA to do at least "more than nothing" to implement its provisions, Quiet Communities and Kempthorne help to illustrate the problem. ECF 21 at 46. Unlike an order "to promulgate a rule or take some decision by a statutory deadline," requiring the Agency to, for instance, "develop[] . . . education and training materials and programs" would "inject[]" the Court "into day-to-day agency management." *Norton*, 542 U.S. at 63, 67; 42 U.S.C. § 4913(c)(5). Would it be enough if the EPA told one employee to spend five percent of their time on these educational materials and gave them no budget to implement whatever they came up with? Surely Quiet Communities and Kempthorne would say no, forcing the Court to "determine whether compliance" with its order "was achieved." *Norton*, 542 U.S. at 66. Other statutory provisions would create problems of the same kind. *See, e.g.*, 42 U.S.C. § 4913(d) (instructing the EPA to "develop and implement a national noise environmental assessment program to identify trends"); *id.* § 4913(f) (directing the EPA to "provide technical assistance to State and local governments"); *id.* § 4913(c)(3) (tasking Agency with "development and implementation of a quality assurance

23

program for equipment and monitoring procedures of State and local noise control programs").

Because the duties imposed by section 4913—even assuming they are mandatory in nature—are

"broad statutory mandates" of the kind the Court cannot compel compliance with, this claim fails.

*Norton*, 542 U.S. at 66.

   2. **The EPA has unreasonably delayed in carrying out the duties at issue in counts one, two, three, and eight.**

In counts one, two, and three, Quiet Communities and Kempthorne allege that the EPA has

not satisfied its obligation under 42 U.S.C. § 4904(c) to "review and, as appropriate, revise or

supplement" three reports that were issued in the 1970s. ECF 1 ¶¶ 124–43. Count eight turns on

the Agency's alleged failure to "compile and publish" a report about "Federal activities relating to

noise research and noise control." *Id.* ¶¶ 181–82 (citing 42 U.S.C. § 4903(c)(3)); *see also* ECF 21

at 26 (confirming this is the focus of count eight).

The EPA argues that it is entitled to summary judgment on each of these claims because

the Agency "has not 'unreasonably delayed'" in taking any of the actions at issue. ECF 19 at 43

n.13. The Agency's argument hinges on what it describes as "Congress's informed and deliberate

approval of the plan to phase out federal noise control activities" at the EPA. ECF 19 at 46. Recall

that, in 1981, President Reagan proposed the "phaseout" of the EPA's noise control program, with

some funding requested for fiscal year 1982 to be used for that winddown and "no funds for fiscal

year 1983 and beyond." ECF 19-6 at 17 (GAO report); ECF 21-7 ¶ 2. Congress "approved the

President's budget request . . . for fiscal year 1982" and has not made any specific appropriation

for noise control activities at the EPA since then. ECF 19-6 at 18; ECF 21-7 ¶ 4 (not contesting

that no specific appropriations have been made for this purpose while arguing about the import of

that fact). Based on that sequence, the EPA argues that "Congress . . . determined over 40 years

ago that it was *reasonable* for EPA to cease new activities" under the Noise Control Act, and that

the Agency has therefore not unreasonably delayed. ECF 19 at 44. This is the Agency's only defense of its decades-long failure to implement the sections of the Noise Control Act at issue in counts one, two, three, and eight. *See* ECF 19 at 51, 53.[6]

The D.C. Circuit has "set forth a framework for analyzing claims of unreasonable agency delay." *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 814–15 (D.C. Cir. 2024). That "framework" includes "six considerations that, although neither ironclad nor exhaustive, still provide useful guidance." *Id.* at 815. The EPA rests its argument on the first of those considerations, "that the time agencies take to make decisions must be governed by a rule of reason." *Id.* at 816; *see* ECF 19 at 45–49. And that factor is "the most important consideration" and usually the "ultimate issue" in unreasonable delay cases. *Afghan & Iraqi Allies*, 103 F.4th at 816; *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d 1094, 1102 (D.C. Cir. 2003). But, contrary to the EPA's insistence, the Agency cannot justify its "inactivity" under the rule of reason based on Congress's budgeting decision in the early 1980s. ECF 19 at 46.

For starters, all agree that the Noise Control Act is still in effect, and the EPA has expressly disavowed any suggestion that "Congress explicitly or implicitly repealed any of the powers or duties" the Act bestows on the Agency. ECF 27 at 24. Equally important, the EPA is not "arguing that it is prohibited from using lump-sum appropriations" it receives from Congress "to carry out actions under the" Noise Control Act. *Id.* Those two points go a long way to explaining why the EPA's decision to stop implementing the Noise Control Act was unreasonable: "[E]xecutive agencies" "must follow statutory *mandates* so long as there is appropriated money available." *In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013).

---

[6] As already explained, the EPA did raise other objections to count eight, but in explaining that count eight was narrower than the complaint may have suggested Quiet Communities and Kempthorne removed those issues from the case. *Compare* ECF 19 at 53 (EPA's arguments as to count eight), *with supra* 6 n.4 (explaining why the EPA's standing argument is no longer relevant), *and supra* 21 n.5 (same for discreteness).

Nor can the EPA extract the support it seeks from Congress's budgetary decisions in the 1980s. This is not the first time an executive branch agency has sought to justify its decision to ignore a statutory mandate by arguing that Congress's decision to "appropriat[e] . . . relatively low or zero" funding for a given project "demonstrate[s] a congressional desire for the [agency] to shut down the" project. *In re Aiken Cnty.*, 725 F.3d at 260. Here, as there, that argument overreads Congress's budgetary action. "Congress speaks through the laws it enacts," and "[n]o law states that" the EPA "should shut down" its noise control activities or "decline to spend" otherwise available lump-sum appropriations on those activities. *Id.*[7]

In reality, the laws appropriating funds to the EPA for fiscal years 1982 and 1983 make no mention of the Noise Control Act at all. *See* Joshua Ulan Galperin, *Noise Law*, 15 Mich. J. of Env't & Admin. L. 59, 81 (2025) ("In the early years of the Reagan Administration, Congress passed many appropriations bills, none of which single out EPA's noise programs for defunding.").[8] And in the 1970s, Congress funded the EPA's noise control work through lump-sum appropriations, rather than specific funding provisions targeting that work.[9] In other words, Congress did not

---

[7] *In re Aiken County* was a mandamus case, rather than an unreasonable delay case under the APA. *See* 725 F.3d at 257. But the "framework" the D.C. Circuit has applied "to assess claims that agency action has been 'unreasonably delayed' for purposes of the Administrative Procedure Act" is the same one that is applied in the mandamus context, and "the APA carried forward the traditional practice" related to the writ of mandamus when it comes to compelling agency action only that is "legally *required*." *Afghan & Iraqi Allies*, 103 F.4th at 815; *Norton*, 542 U.S. at 63. *In re Aiken County*'s application of the mandamus standard to the question of whether the agency was required to act in that case is therefore instructive to the question of whether the EPA has unreasonably delayed in this case.

[8] *See* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, 95 Stat. 357; Act of Dec. 15, 1981, Pub. L. No. 97-92, 95 Stat. 1183; An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Agencies, Boards, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1982, and for Other Purposes, Pub. L. No. 97-101, 95 Stat. 1417 (1981); An Act Making Urgent Supplemental Appropriations for the Fiscal Year Ending September 30, 1982, and for Other Purposes, Pub. L. No. 97-216, 96 Stat. 180 (1982); An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Agencies, Boards, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1983, and for Other Purposes, Pub. L. No. 97-272, 96 Stat. 1160 (1982).

[9] *See* An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Executive Agencies, Boards, Bureaus, Commissions, Corporations, and Offices for the Fiscal Year Ending June 30, 1976, and the Period Ending September 30, 1976, and for Other Purposes, Pub. L. No. 94-116, 89 Stat.

actually "eliminat[e], and never restor[e], appropriations for" Noise Control Act implementation, as the EPA says it did. ECF 19 at 46. Instead, Congress debated the President's budget proposal—through which the President sought to "phaseout" the EPA's noise control activities, ECF 19-6 at 17—and ultimately passed an appropriations bill that was "silent on noise law," albeit with a "reduced lump-sum EPA appropriation[]." Galperin, *supra*, at 83. To interpret that as a congressional mandate to ignore a still-in-effect statute is a stretch. Congress—not only the early 1980s Congress, but all the bodies that passed funding bills thereafter—could just as much have intended the EPA to continue using its lump-sum appropriations to fund its noise control work. *See Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("[T]he very point of a lump-sum appropriation is to give an agency capacity to adapt to changing circumstances and *meet its statutory responsibilities* in what it sees as the most effective or desirable way." (emphasis added)). And although the EPA correctly points out that Congress debated the President's proposal to defund the Agency's noise control work and that at least some members understood that the President's budget proposal would "discontinue" the EPA's noise control "program altogether," "indicia in committee reports and other legislative history . . . do not establish any legal requirements on [an] agency" where "Congress merely appropriates lump-sum amounts." H.R. Rep. No. 97-85, at 3 (1981); *Lincoln*, 508 U.S. at 192.

---

581 (1975); *See* An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Executive Agencies, Boards, Bureaus, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1977 and for Other Purposes, Pub. L. No. 94-378, 90 Stat. 1095 (1976); An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Executive Agencies, Boards, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1978, and for Other Purposes, Pub. L. No. 95-119, 91 Stat. 1073 (1977); An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Agencies, Boards, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1979, and for Other Purposes, Pub. L. No. 95-392, 92 Stat. 791 (1978); An Act Making Appropriations for the Department of Housing and Urban Development, and for Sundry Independent Agencies, Boards, Commissions, Corporations, and Offices for the Fiscal Year Ending September 30, 1980, and for Other Purposes, Pub. L. No. 96-103, 93 Stat. 771 (1979).

This is not a scenario where Congress prohibited the EPA from using any appropriated funds towards implementing the Noise Control Act via an appropriations rider, either. *See Neguse v. U.S. Immigr. & Customs Enf't*, 813 F. Supp. 3d 45, 61 (D.D.C. 2025) (explaining how Congress uses "appropriations riders" to "limit (or occasionally require) the use of funds for purposes or activities an agency is authorized to undertake"). The EPA has cited no appropriations law that in any way restricts its ability to implement the Nosie Control Act. Notably, even were Congress to have passed such a rider, the EPA would still be "required to effectuate the original statutory scheme as much as possible, within the limits of the added constraint." *City of L.A. v. Adams*, 556 F.2d 40, 50 (D.C. Cir. 1977). That the EPA would still be required to do what it could to faithfully fulfill its obligations under the Noise Control Act even if Congress had expressly limited its authority to do so confirms that here, where no statute prohibits the EPA from executing those duties, the Agency cannot justify its delay as reasonable based on a decrease in its appropriation. *See Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001) (noting that "a lack of sufficient funds . . . in and of [itself]" cannot "justify extensive delay").

The EPA's only justification for its delay is Congress's budgeting decision in the early 1980s. *See* ECF 19 at 44–49. Having concluded that does not justify the Agency's decision to stop implementing the Noise Control Act, the Court has little trouble concluding that the EPA has unreasonably delayed in carrying out the duties at issue in counts one, two, three, and eight. The EPA admits that it has not updated or published the reports at issue in those claims since, at the latest, 1982. *See* ECF 19-7 ¶¶ 12–14, 26. The Court "need not dwell on" the other factors relevant to unreasonable delay claims, "because the D.C. Circuit has *never* held that a delay of the magnitude present here—more than [40] years—can be reasonable." *Air All. Houston v. U.S. Chem. & Safety Hazard Investigation Bd.*, 365 F. Supp. 3d 118, 131 (D.D.C. 2019).

28

Because the EPA only defended counts one, two, three, and eight by arguing that its delay was reasonable, and because the Court rejects that argument, the Court enters judgment for Quiet Communities and Kempthorne on the merits of these counts. Quiet Communities and Kempthorne have not sought summary judgment as to remedies, *see* ECF 18-1 at 11, so the Court does not yet address that issue. The Court notes that it has "broad equitable powers" to craft an appropriate remedy. *Cobell*, 240 F.3d at 1108. Because the litigation will next turn to that task, the Court flags here one issue that was not briefed by the parties but that it thinks may be important in further proceedings. Because the statutory provision at issue in counts one, two, and three only requires the EPA to "revise or supplement" the reports "as appropriate," it seems plausible that the remedy on those claims will be limited to ordering the Agency to "review" the relevant reports and determine if any revision or supplementation is "appropriate." 42 U.S.C. § 4904(c). The parties can address this and any other issue related to remedies in future proceedings.

*    *    *

Both motions for summary judgment, ECF 18, ECF 19, are **GRANTED in part** and **DENIED in part.** Counts four, five, and six are **DISMISSED** for lack of jurisdiction. The Court grants summary judgment to the EPA on count seven. The Court grants summary judgment to Quiet Communities and Kempthorne on counts one, two, three, and eight (only insofar as count eight relates to the EPA's duties under 42 U.S.C. § 4903(c)(3)).

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: July 16, 2026

29